UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re QIWI plc Securities Litigation | : | Case No. 1:20-cv-06054-RPK-CLP |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

|  |  |  |
|---|---|---|
| | : | **ECF Case** |
| This Document Relates To: | : | **Electronically Filed** |
| | : | |
| ALL ACTIONS. | : | **Oral Argument Requested** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW OF
QIWI PLC AND ANDREY PROTOPOPOV
IN SUPPORT OF THEIR MOTION TO DISMISS THE
<u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Alexander C. Drylewski
William J. O'Brien
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
alexander.drylewski@skadden.com
william.obrien@skadden.com

*Attorneys for QIWI plc and
  Andrey Protopopov*

September 17, 2021

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS .....................................................................................................6

    A.    Defendants ..................................................................................................6

    B.    QIWI Establishes an Interactive Bets Accounting Center (or "TSUPIS") .............7

    C.    QIWI Warns Investors About the Myriad Risks to Which It Is Exposed...............7

        1.    QIWI Warns That It Is Subject to Extensive and Uncertain Government Regulation ...............................................................................8

        2.    QIWI Warns About the Heightened Regulatory Risks Involving the Online Betting Industry.....................................................................9

        3.    QIWI Warns That It Can Give No Assurance of Sanctions Not Being Imposed by the CBR in the Future ....................................................9

        4.    QIWI Warns That It Is Still in the Process of Implementing Enhanced Internal Controls Protocols .......................................................10

        5.    QIWI Warns That Its Services Might be Used for Illegal Activity ..........11

    D.    QIWI Announces the Results From a Regularly Scheduled CBR Audit...............11

    E.    Russia Codifies a New Framework for Regulating Online Betting......................12

ARGUMENT .....................................................................................................................13

I.    THE CAC SHOULD BE DISMISSED WITH PREJUDICE............................................13

    A.    Plaintiff Fails To State a Claim Under Section 10(b) of the Exchange Act .........13

        1.    The CAC Fails To Plead an Actionable Misrepresentation or Omission .................................................................................................13

            (a)    Plaintiff Fails To Plead That QIWI Committed Undisclosed Violations Relating to Online Betting............................................14

            (b)    Statements About Regulatory Compliance Were Not Materially False or Misleading .....................................................16

          (c)     Statements About Internal Controls Were Not Materially False or Misleading ...................................................................19

          (d)     Statements About QIWI's Financial Performance Were Not Materially False or Misleading ......................................................20

     2.     Many of the Challenged Statements Are Non-Actionable Opinions .........22

     3.     Multiple Statements Are Protected Under the PSLRA Safe Harbor and Bespeaks Caution Doctrine ..................................................24

     4.     Multiple Statements Represent Non-Actionable Puffery .........................26

   B.     Plaintiff Fails To Plead a Strong Inference of Scienter .........................................27

     1.     Plaintiff Fails To Plead a Cognizable Motive .............................................27

     2.     Plaintiff Fails To Plead Conscious Misbehavior or Recklessness ............28

     3.     The More Cogent and Compelling Inference Is Nonculpable ..................29

II.     Plaintiff Fails to State a Claim For Control Person Liability .............................................30

CONCLUSION ...........................................................................................................................30

## **TABLE OF AUTHORITIES**

Page(s)

## **CASES**

*Abramson v. Newlink Genetics Corp.*,
    965 F.3d 165 (2d Cir. 2020)............................................................................26

*In re Adient plc Securities Litigation*,
    No. 18 Civ. 9116 (RA), 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)..............................24

*In re Alkermes Public Ltd. Co. Securities Litigation*,
    No. 18 Civ. 7410 (LDH) (RML), 2021 WL 768134 (E.D.N.Y. Feb. 26, 2021)...............28

*In re AmTrust Financial Services, Inc. Securities Litigation*,
    No. 17 Civ. 1545 (LAK), 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) .........................24

*Asay v. Pinduoduo*,
    No. 20-1423, 2021 WL 3871269 (2d Cir. Aug. 31, 2021) ................................................17

*ATSI Communications, Inc. v. Shaar Fund Ltd.*,
    493 F.3d 87 (2d Cir. 2007)..................................................................................................6

*In re Axis Capital Holdings Ltd. Securities Litigation*,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006).................................................................................21

*In re Bemis Co. Securities Litigation*,
    512 F. Supp. 3d 518 (S.D.N.Y. 2021).................................................................................26

*Canez v. Intelligent Systems Corp.*,
    No. 19 Civ. 3949 (RPK) (CLP), 2021 WL 3667012 (E.D.N.Y. Aug. 18, 2021).........28, 29

*In re Citigroup, Inc. Securities Litigation*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004).................................................................................22

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)........................................................................................13, 26

*In re CRM Holdings, Ltd. Securities Litigation*,
    No. 10 Civ. 975 (RPP), 2012 WL 1646888 (S.D.N.Y. May 10, 2012) ...........................28

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..........................................................................................5, 27

*Employees Retirement System of City of Providence v. Embraer S.A.*,
    No. 16 Civ. 6277 (RMB), 2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018) ........................15

*In re FedEx Corp. Securities Litigation*,
    517 F. Supp. 3d 216 (S.D.N.Y. 2021) .......................................................................25, 27

*Gamm v. Sanderson Farms, Inc.*,
    944 F.3d 455 (2d Cir. 2019) ...................................................................................13

*In re GeoPharma, Inc. Securities Litigation*,
    411 F. Supp. 2d 434 (S.D.N.Y. 2006)...................................................................30

*In re HEXO Corp. Securities Litigation*,
    No. 19 Civ. 10965 (NRB), — F. Supp. 3d —, 2021 WL 878589
    (S.D.N.Y. Mar. 8, 2021) ......................................................................................16, 26

*Holbrook v. Trivago N.V.*,
    No. 17 Civ. 8348 (NRB), 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019) .............................30

*In re Iconix Brand Grp., Inc.*,
    No. 15 Civ. 4860 (PGG), 2017 WL 4898228, (S.D.N.Y. Oct. 25, 2017)...................29, 30

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020)....................................................................................29

*Janbay v. Canadian Solar, Inc.*,
    No. 10 Civ. 4430 (RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ........................15

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011).............................................................................................26

*Lachman v. Revlon, Inc.*,
    487 F. Supp. 3d 111 (E.D.N.Y. 2020) ................................................................ *passim*

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
    No. 19 Civ. 8647 (JPO), 2021 WL 517934 (S.D.N.Y. Feb. 10, 2021)........................27, 28

*Marcu v. Cheetah Mobile Inc.*,
    No. 18 Civ. 11184 (JMF), 2020 WL 4016645 (S.D.N.Y.
    July 16, 2020)................................................................................................. *passim*

*Martin v. Quartermain*,
    732 F. App'x 37 (2d Cir. 2018) .............................................................................18, 23

*Menora Mivtachim Insurance Ltd. v. International Flavors & Fragrances Inc.*,
    No. 19 Civ. 7536 (NRB), 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021)...............4, 21, 23

*Mucha v. Volkswagen Aktiengesellschaft*,
    No. 17 Civ. 5092 (DLI) (PK), 2021 WL 2006079 (E.D.N.Y. May 20, 2021) .................15

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
 575 U.S. 175 (2015)................................................................................18, 22, 23, 24

*Ong v. Chipotle Mexican Grill, Inc.*,
 294 F. Supp. 3d 199 (S.D.N.Y. 2018)..............................................................22

*In re Petrochina Co. Ltd. Securities Litigation*,
 120 F. Supp. 3d 340 (S.D.N.Y. 2015)..............................................................15

*In re Philip Morris International Securities Litigation*,
 437 F. Supp. 3d 329 (S.D.N.Y. 2020)..............................................................25

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
 No. 20-3231, -- F.4th --, 2021 WL 3744894 (2d Cir. Aug. 25, 2021).....................*passim*

*In re Pretium Resources Inc. Securities Litigation*,
 No. 18 Civ. 8199 (LAP), 2020 WL 953609 (S.D.N.Y. Feb. 27, 2020)...........................24

*Ross v. Lloyds Banking Group, PLC*,
 No. 11 Civ. 8530 (PKC), 2012 WL 4891759 (S.D.N.Y. Oct. 16, 2012),
 *aff'd*, 546 F. App'x 5 (2d Cir. 2013)................................................................28

*Salim v. Mobile Telesystems PJSC*,
 No. 19 Civ. 1589 (AMD) (RLM), 2021 WL 796088 (E.D.N.Y. Mar. 1, 2021).................7

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*,
 75 F.3d 801 (2d Cir. 1996).............................................................................27

*In re Sanofi Securities Litigation*,
 155 F. Supp. 3d 386 (S.D.N.Y. 2016)..............................................................24

*Santa Fe Indus., Inc. v. Green*,
 430 U.S. 462 (1977)....................................................................................16

*Schiro v. Cemex, S.A.B. de C.V.*,
 396 F. Supp. 3d 283 (S.D.N.Y. 2019).....................................................5, 21, 24

*Schiro v. Cemex, S.A.B. de C.V.*,
 438 F. Supp. 3d 194 (S.D.N.Y. 2020)..............................................................15

*In re Seadrill Ltd. Securities Litigation*,
 No. 14 Civ. 9642 (LGS), 2016 WL 3461311 (S.D.N.Y. June 20, 2016)........................30

*Singh v. CIGNA*,
 918 F.3d 57 (2d Cir. 2019)..................................................................1, 4, 17, 20

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
 552 U.S. 148 (2008)......................................................................................3

*In re SunEdison, Inc. Securities Litigation,*
    300 F. Supp. 3d 444 (S.D.N.Y. 2018) ............................................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ............................................................................2, 5, 6, 29

*Tongue v. Sanofi,*
    816 F.3d 199 (2d Cir. 2016) ............................................................................23

*Ulbricht v. Ternium SA,*
    No. 18 Civ. 6801 (PKC) (RLM), 2020 WL 5517313 (E.D.N.Y. Sept. 14, 2020) .............19

*In re Virtus Investment Partners, Inc. Securities Litigation,*
    195 F. Supp. 3d 528 (S.D.N.Y. 2016) ............................................................................21

## STATUTES

15 U.S.C. § 78j(b) ............................................................................13

15 U.S.C. § 78u-4(b) ............................................................................3, 25

## RULES

Fed. R Civ. P. 9(b) ............................................................................13, 15

## REGULATIONS

17 C.F.R. § 240.10b-5 ............................................................................13

## OTHER

John C. Coffee Jr., *Event-Driven Securities Litigation: Its Rise and Partial Fall,*
    N.Y.L.J. (Mar. 20, 2019) ............................................................................1

Defendants QIWI plc ("QIWI" or the "Company") and Andrey Protopopov (together, the "Moving Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiff's Consolidated Amended Class Action Complaint (ECF No. 30 ("CAC")).[1]

## PRELIMINARY STATEMENT

This case is emblematic of an all-too-familiar and unfortunate trend in securities litigation: the plaintiff highlights a negative event in the life of a corporation, points to a stock price decline, and asserts—in conclusory and hindsight fashion—that "fraud" must have been the cause. Courts in this Circuit have routinely rejected this type of "event-driven litigation," which, like the CAC here, opportunistically attempts to use the federal securities laws in ways that were never intended. *See, e.g.*, *Singh v. Cigna Corp.*, 918 F.3d 57, 60 (2d Cir. 2019) (affirming dismissal of claims based on announcement of regulatory violations); *see also* John C. Coffee Jr., *Event-Driven Securities Litigation: Its Rise and Partial Fall*, N.Y.L.J. (Mar. 20, 2019) ("We are . . . beginning to see the courts confront (with skepticism) this new pattern of event-driven securities litigation.").

QIWI is a leading provider of payment and financial services in Russia and the Commonwealth of Independent States. The Company operates across online, mobile and physical channels—including QIWI Wallet, which enables consumers to make and receive online payments through computers and mobile devices. QIWI derives a portion of its revenue by processing payments for an array of goods and services. These activities are regulated by the Central Bank of the Russian Federation ("CBR"), which conducts routine audits of QIWI's subsidiary, QIWI Bank (JSC) ("QIWI Bank"). Recently, Russian authorities have intensified their scrutiny of the online payments sector, and in particular the online betting industry, through new laws and increasingly

---

[1] The CAC is appended as Exhibit A to the Declaration of Alexander C. Drylewski, dated September 17, 2021, exhibits to which are referred to herein as "Ex. __."

stringent control. As QIWI warned investors throughout the Class Period, this complex and evolving regulatory landscape is "subject to varying interpretation and inconsistent application," and has spawned a myriad of risks, including that the CBR would issue violations and impose restrictions that could have a material adverse effect on QIWI's business.

These readily disclosed risks materialized on December 9, 2020, when QIWI reported that the CBR had identified through a routine audit "certain violations and deficiencies relating primarily to reporting and record-keeping requirements," and separately introduced restrictions on QIWI Bank's operations, including "the suspension or limitation of most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts." (CAC ¶ 13.) QIWI explained that these restrictions were driven by the CBR's "increased scrutiny" in the cross-border payments area "rather than [the] specific deficiencies identified" in the audit—and indeed, similar limitations were imposed on one of QIWI's key competitors.

Seeking to capitalize on these events, the CAC seizes on the drop in QIWI's stock price following the announcement, recites snippets of QIWI's past disclosures out of context, and asserts in conclusory fashion that these events revealed a scheme to defraud the Company's investors. More specifically, Plaintiff asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), alleging that the December 2020 announcement somehow shows that QIWI and seven "Individual Defendants" conspired to engage in securities fraud during the Class Period. Plaintiff cannot deny, however, that QIWI repeatedly and expressly warned investors about the precise risks that came to pass. Thus, the CAC cannot survive scrutiny under the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which Congress enacted to curb speculative lawsuits like this one that "can be employed abusively to impose substantial costs on companies and individuals." *Tellabs, Inc. v.*

*Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). Far from meeting the PSLRA's standards, the CAC offers allegations that, when viewed collectively, paint a compelling picture of *non*-fraudulent conduct. The CAC should be dismissed for the following reasons:

**Failure To Plead QIWI's Allegedly Undisclosed Misconduct (*Infra* I.A.1.a).** First, the linchpin of Plaintiff's theory of fraud—*i.e.*, that Defendants knew, but concealed, that QIWI was involved in unlawful online betting activity—fails as a matter of law and mandates dismissal. As the Second Circuit recently emphasized, "[w]hen a securities fraud claim is premised on the defendant's predicate violations of law . . . the facts of that underlying violation must be pled with particularity." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 2021 WL 3744894, at *4 (2d Cir. Aug. 25, 2021). This means that a "plaintiff must specify *what* law or standard the defendant violated and *how* the alleged violation occurred." *Id.* The CAC never pleads that QIWI violated any specific law or regulation, nor does it offer any factual support for how and when these unidentified violations occurred. These failures expose the CAC for what it really is: a hindsight-based critique of QIWI's online business operations in a highly-uncertain regulatory environment. The securities laws are not designed to regulate such criticisms. *Id.* at *1.

**Failure To Plead an Actionable Misstatement or Omission (*Infra* I.A.1.b).** Second, the CAC fails to identify with particularity any material misrepresentation or omission. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); 15 U.S.C. § 78u-4(b). Plaintiff accuses Defendants of failing to disclose that its "internal controls related to reporting and record-keeping were ineffective" and that one driver of the Company's financial results (the accuracy of which are not in dispute) was based on "illicit online betting." (*E.g.*, CAC ¶¶ 17, 124, 137.) As noted, however, Plaintiff fails to plead facts demonstrating that QIWI's Class Period activities violated existing laws or regulations in Russia. But even if it could, there is no support for

Plaintiff's suggestion that investors were misled. To the contrary, QIWI not only warned of the complex and uncertain regulatory environment in which it operated, but emphasized time and again that it could offer "no assurance" that future regulatory audits would "not result in [the] discovery of any significant or minor additional violations." (*E.g., id.* ¶ 142.) These disclosures "suggest[] caution (rather than confidence) regarding the extent of [Defendant's] compliance," *Singh*, 918 F.3d at 64, and "render[] implausible plaintiffs' suggestion that defendants were engaged in a scheme to deliberately or recklessly mislead investors," *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 138 (E.D.N.Y. 2020) (Kovner, J.). (*Infra* I.A.1.b.)

Plaintiff's claim that QIWI misleadingly touted its internal controls is equally without merit. Throughout the Class Period, QIWI warned investors that (i) its services could be used by others for "illegal or improper purposes"; (ii) it still "need[ed] to implement enhanced processes, procedures and controls in order to provide reasonable assurance that [it was] operating in compliance with applicable regulatory requirements"; (iii) it was "continuing to realign [its] compliance function with the size and scope of [its] business"; and (iv) as a consequence, there could be "no assurance" that such internal controls "[would] work effectively at all times or protect us against liability." (*Infra* I.A.1.c.) This language "suggests a company actively working to improve its compliance efforts, rather than one expressing confidence in their complete (or even substantial) effectiveness." *Singh*, 918 F.3d at 64.

Plaintiff's omissions theory runs headlong into another bedrock principle: "'[a]ccurately reported financial statements . . . cannot become actionable simply because companies do not simultaneously disclose some wrongdoing that may have contributed to the company's financial performance.'" *Menora Mivtachim Ins. v. Int'l Flavors & Fragrances Inc*., 2021 WL 1199035, at *16 (S.D.N.Y. Mar. 30, 2021). Applying this axiom, courts routinely dismiss claims based on

4

statements that "merely describe . . . accurate financial data using more vivid language," *id.*, or attribute a company's performance to "broad trends and corporate strengths, without pointing to any specific factors or sources of revenue," *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 297 (S.D.N.Y. 2019). Here, the vast majority of challenged statements fall into one or both of these categories. As for the few disclosures that identify online betting as a contributor to QIWI's business, Plaintiff fails to offer any support for the notion that this revenue was derived from illicit activity. And in all events, because "'disclosure is not a rite of confession,'" QIWI had no duty "'to disclose uncharged, unadjudicated wrongdoing'"—even if Plaintiff had sufficiently pled the details thereof. *Plumber & Steamfitters Loc. 773*, 2021 WL 3744894, at *4. (*Infra* I.A.1.d.)

**Failure To Plead a Strong Inference of Scienter (*Infra* I.B).** Third, Plaintiff fails to allege particularized facts giving rise to a "strong inference" of scienter—*i.e.*, an inference that is "cogent and at least as compelling as any opposing inference [of fraud]." *Tellabs*, 551 U.S. at 324. The CAC is devoid of allegations that Defendants received any "'concrete and personal benefit' from making their alleged misrepresentations." *Lachman*, 487 F. Supp. 3d at 136. Plaintiff claims merely that two of the seven Individual Defendants tried to sell certain of their shares in a secondary offering that never came to pass. (CAC ¶ 9.) But Plaintiff does not offer a single fact to support its conjecture that these two individuals sought to profit from a fraudulent scheme to mislead the public, or that they (or any other Defendant) sold shares at any later point through the end of the Class Period—a shortcoming that refutes any inference of fraudulent intent.

Nor does Plaintiff plead any facts evincing Defendants' "conscious misbehavior or recklessness." *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198-99 (2d Cir. 2009). The CAC fails to allege that any Defendant was privy to any internal report, email, oral communication, or any other specific information that contradicted QIWI's

statements during the Class Period. Nor does Plaintiff offer a single allegation from a confidential witness (a common practice in securities cases), despite vaguely citing unspecified discussions with "individuals formerly employed by QIWI." (CAC at 1.)

Juxtaposed against these non-specific allegations are Defendants' repeated warnings, which detailed the numerous risks and challenges facing QIWI, including those risks that Plaintiff now complains were concealed. As this Court has recognized, defendants who wish to deceive investors typically conceal negative information rather than disclose it. *See Lachman*, 487 F. Supp. 3d at 138. Defendants' public statements raise a far more powerful, nonculpable inference: that QIWI was attempting to provide accurate, timely, and meaningful information to investors as it wrestled with Russia's uncertain and still-developing regulatory environment. "This steady stream of warnings renders implausible plaintiffs' suggestion that defendants were engaged in a scheme to deliberately or recklessly mislead investors." *Id.*

## STATEMENT OF FACTS[2]

### A.    Defendants

QIWI is a Cyprus company whose American Depositary Shares trade on NASDAQ. (CAC ¶ 24.) It is "a leading provider of next generation payment and financial services in Russia and the [Commonwealth of Independent States], with an integrated proprietary network" that enables payments "across online, mobile and physical environments." (*Id.* ¶ 40.) These services include QIWI Wallet (an e-wallet platform), which allows consumers to pay for goods and services or transfer money from their mobile devices or computers. (*Id.* ¶ 42.)

---

[2] The facts are drawn from the CAC and "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc.*, 551 U.S. at 322. The Court may consider any "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Plaintiff has also sued seven of QIWI's present or former officers, including Andrey Protopopov, QIWI's current Chief Executive Officer. (*See id.* ¶¶ 25-31.) During the Class Period, Mr. Protopopov was the Head of IT and Product until August 2019, when he was named CEO of the Company's Payment Services segment, a position he held until June 2021. (*Id.* ¶ 27.)[3]

**B.      QIWI Establishes an Interactive Bets Accounting Center (or "TSUPIS")**

In 2014, amendments to Russian laws required all "interactive bets" to be accepted through a TSUPIS "set up by a credit organization together with a self-regulated association of bookmakers." (Ex. B, at 9; CAC ¶ 54.) To capitalize on this government-sanctioned framework, QIWI Bank, together with the self-regulating organization "Association of Bookmakers," created a TSUPIS in 2016 that allowed QIWI Bank to act as one of the two existing Interactive Bets Accounting Centers. (CAC ¶ 61.) Under Russian law, adults can register an account on a betting merchant's website. Thereafter, such adults can link this account to a QIWI Wallet for interactive betting, provided they meet QIWI Bank's identification requirements. (*Id.*) Through its management of a TSUPIS, QIWI generates revenue by processing payments to betting merchants and bettors, reporting both within the Company's Payment Services segment. (*Id.* ¶ 71.)

**C.      QIWI Warns Investors About the Myriad Risks to Which It Is Exposed**

Throughout the Class Period, QIWI warned extensively of the risks associated with operating a financial institution in Russia, including those relating to online betting. These disclosures provided detailed descriptions regarding (i) the highly-regulated environment in which QIWI and QIWI Bank operate; (ii) the risk of further sanctions being imposed on QIWI Bank; (iii)

---

[3] The other Individual Defendants are Boris Kim, Sergey Solonin, Alexander Karavaev, Varvara Kiseleva, Vladislav Poshmorga, and Pavel Korzh. (CAC ¶¶ 25-26, 28-31.) As of the time of this filing, these individuals have not been served in this action. Given the threadbare nature of Plaintiff's allegations as discussed herein, the Court can dismiss the CAC as to *all* Defendants. *See Salim v. Mobile Telesystems PJSC*, 2021 WL 796088, at *15 (E.D.N.Y. Mar. 1, 2021) (dismissing in full even though individual defendants in Russia had not been served or appeared).

the increased regulatory scrutiny to which QIWI was exposed through its involvement with online payments and betting; (iv) QIWI's ongoing efforts to implement internal controls; and (v) the possibility that its platform would be used for improper purposes. These disclosures are characterized by their breadth and depth, and refute Plaintiff's hindsight-based theory of fraud.

### 1. QIWI Warns That It Is Subject to Extensive and Uncertain Government Regulation

For instance, QIWI disclosed that it is "***subject to extensive government regulation***," explaining that its business "is impacted by laws and regulations . . . affect[ing] our industry, the number of which has increased significantly in recent years." (Ex. C, at 14; Ex. D, at 13; Ex. E, at S-22 (emphasis in original).) QIWI warned that:

- "[m]any of these laws and regulations are constantly evolving, and are often unclear and inconsistent with other applicable laws and regulations, . . . *making compliance challenging*" (*id.* (emphasis added));

- "[e]xisting laws and regulations could be amended, the manner in which laws and regulations are enforced or interpreted could change and new laws or regulations could be adopted" (Ex. C, at 13; Ex. D, at 12; Ex. E, at S-20); and

- if Russian authorities "enforce specific interpretations of the applicable legislation that differ from ours, we may be found to be in violation and subject to penalties or other liabilities." (Ex. C, at 14; Ex. D, at 13; Ex. E, at S-22.)

As QIWI explained, because the "banking system in Russia remains underdeveloped," "Russian legislation relating to banks and bank accounts is subject to varying interpretation and inconsistent application." (Ex. B, at 27; Ex. D, at 29; Ex. E, at S-47.)

To demonstrate the fast pace at which the regulatory scheme was evolving, QIWI offered concrete examples of recent legislative developments. (*Id.*) It disclosed that "Russian lawmakers and enforcement agencies have recently demonstrated increased scrutiny in matters relating to cyberspace and e-payments" and, to this end, had passed a law in July 2019 "toughen[ing] control over the activities of foreign payment systems, foreign electronic payment services and payment

8

aggregators in Russia." (Ex. C, at 15; Ex. E, at S-23.) QIWI noted that if the law were interpreted as prohibiting the use of foreign payment aggregators, this "could have a significant negative impact on our business, in particular in the e-commerce space." (*Id.*)

### 2.    QIWI Warns About the Heightened Regulatory Risks Involving the Online Betting Industry

QIWI further alerted investors that the Russian government, including the CBR, was focused intensely on the online betting industry. As QIWI explained, "[t]he betting industry is subject to extensive and actively developing regulation in Russia, as well as increasing government scrutiny." (CAC ¶¶ 143, 182, 201.) To illustrate, in its 2019 Form 20-F, QIWI cited several laws and regulations that could negatively impact revenue from online betting, among them the creation of a government "blacklist" that had banned certain betting merchants for being "in violation or . . . not in compliance with applicable Russian laws." (Ex. C, at 17; Ex. D, at 15; Ex. E, at S-26.) Highlighting the impact of this measure, QIWI also revealed that (i) it had "experienced a number of instances where certain providers [were] blacklisted"; (ii) "this trend [was] gaining momentum . . . [with] further blacklistings likely"; and (iii) this "may result in the contraction of the betting sector or our share in this market and therefore adversely affect" its financial results. (*Id.*) QIWI disclosed that, as a result of this legislation, it "could not only become subject to fines and other sanctions, but could also have to discontinue to process transactions that are deemed to be in breach of the applicable rules and as a result lose associated revenue streams." (*Id.*)

### 3.    QIWI Warns That It Can Give No Assurance of Sanctions Not Being Imposed by the CBR in the Future

QIWI informed investors that its banking subsidiary was another source of regulatory focus: "***Qiwi Bank and other Russian banks and credit organizations operate in a highly regulated environment and increased regulatory scrutiny could have an adverse effect on our business, financial condition and results of operations.***" (CAC ¶ 51; Ex. C, at 13; Ex. D, at 12;

Ex. E, at S-20 (emphasis in original).) QIWI observed that "[t]he CBR may at any time conduct

full or selective audits of any bank's filings and may inspect all of its books and records." (*Id.*;

CAC ¶¶ 51, 200.) QIWI further reported that the CBR had conducted an audit of QIWI Bank in

2018, during which it identified "a number of violations." (*Id.* ¶ 142; Ex. C, at 13.) While QIWI

expressed its "belie[f]" that it had "remedied the violations and taken appropriate measures to

ensure that [it would] not be in breach of such requirements going forward," (CAC ¶¶ 142, 181,

200), the Company emphasized that it was offering no guaranty:

> [T]here can be no assurance that additional sanctions will not be imposed on us as
> a result of such or any other findings and that we will not come under greater CBR
> scrutiny in connection with any perceived deficiencies in our past conduct, *or that
> any currently planned or future inspections will not result in discovery of any
> significant or minor additional violations* of various banking regulations, and what
> sanctions the CBR would choose to employ against us if this were to happen. *Any
> such sanctions could have a material adverse effect on our business, financial
> condition and results of operations.*

(*Id.*; Ex. C, at 13; Ex. D, at 12; Ex. E, at S-21 (emphasis added).)

### 4.    QIWI Warns That It Is Still in the Process of
### Implementing Enhanced Internal Controls Protocols

QIWI also addressed its internal controls under the heading: "***We have grown rapidly in***

***recent years and need to implement enhanced compliance processes, procedures and controls***

***with respect to the rules and regulations that apply to our business***." (Ex. C, at 18; Ex. D, at 17;

Ex. E, at S-28 to S-29 (emphasis in original); CAC ¶ 109.) It clarified that, because of this growth

and its role as "a highly regulated business that processes large volumes of payments," it "need[s]

to have enhanced processes, procedures and controls in order to provide reasonable assurance that

[it is] operating in compliance with applicable regulatory requirements." (*Id.*) QIWI disclosed that

it had "implemented policies and procedures and internal controls designed to provide reasonable

assurance that we, our employees, distributors and other intermediaries comply with the anti-

corruption laws to which we are subject." (Ex. C, at 18; Ex. D, at 17; Ex. E, at S-29; CAC ¶¶ 100,

109.) At the same time, QIWI warned that "*there are inherent limitations to the effectiveness of any policies, procedures and internal controls*." (*Id.* (emphasis added).) It then cautioned:

> There can be *no assurance that such policies or procedures or internal controls will work effectively at all times* or protect us against liability under these or other laws for actions taken by our employees, distributors and other intermediaries with respect to our business or any businesses that we may acquire.

(Ex. C, at 18; Ex. D, at 17; Ex. E, at S-29 (emphasis added).) The CAC omits this admonition.

### 5.   QIWI Warns That Its Services Might be Used for Illegal Activity

QIWI allows customers to create anonymous e-wallets by linking the newly-opened account to that individual's phone number. (CAC ¶ 43.) In an age of data breaches and identity theft, such innovations serve a legitimate purpose and appeal to privacy-conscious users. But as QIWI disclosed, its "services have been and may continue to be used for fraudulent, illegal or improper purposes, which could expose us to additional liability and harm our business," including in relation to "illegal online gambling." (Ex. C, at 20; Ex. D, at 19; Ex. E, at S-31.)

QIWI explained that while it had developed "risk management policies and procedures" to combat suspicious activity, such measures "may not be fully effective to identify, monitor and manage these risks." (*Id.*) As a result, QIWI stated it "may from time to time not be able to identify merchants who are engaged in illegal activities, particularly if we work with them indirectly through payment aggregators since we generally do not perform full know-your-customer procedures with respect to each merchant engaged by such aggregators and rely on the aggregators to vet their merchants appropriately." (Ex. C, at 20; Ex. E, at S-31 to 32; *see also* Ex. D, at 19.)

### D.   QIWI Announces the Results From a Regularly Scheduled CBR Audit

On December 9, 2020, QIWI disclosed that from July 2020 to December 2020, the CBR had conducted a regular audit of QIWI Bank, during which it identified certain "violations and deficiencies relating primarily to reporting and record-keeping requirements" and levied a one-

time fine of approximately $150,000. (CAC ¶ 228 (citation omitted).) As QIWI explained, it "believe[d] . . . the deficiencies that have been identified by the audit can arise as part of an ordinary course for most banking institutions of Qiwi Bank's scale." (Ex. F, at 2.)

Separately, QIWI announced that the CBR had placed certain restrictions on QIWI Bank's operations, "including, effective from December 7, 2020, the suspension or limitation of most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts." (*Id.*) QIWI expressed its belief that the catalyst for the restrictions was the CBR's "increased scrutiny in the areas of cyberspace and cross border payments" more generally, not the "specific deficiencies identified" in the audit. (*Id.*) And indeed, in January 2021, similar restrictions were imposed on at least one of QIWI's key competitors. (Ex. G, at 12.) QIWI further advised that it could give no assurance the new restrictions "will not ultimately become permanent, including through the adoption of new laws or regulations." (*Id.*) QIWI later reported that "[i]n June 2021, the term of [the December 2020] restrictions imposed by the CBR expired." (Ex. H at 11.)

### E.    Russia Codifies a New Framework for Regulating Online Betting

Since the December 7 announcement, Russia has solidified its oversight of the betting industry by enacting new laws. In late December 2020, Russian authorities established a "Unified Gambling Regulator" and created the role of a single Unified Interactive Bets Accounting Center ("ETSUP") to replace the TSUPIS system by the end of September 2021. (Ex. G, at 14, 66, 89.) In March 2021, a draft bill was submitted to the Russian legislature barring Russian credit institutions from dealing directly or through intermediaries with betting merchants, domestic or foreign, that are not on an approved list. (*Id.* at 14.) This bill became law in July 2021. QIWI has submitted a proposal to operate the ETSUP but has cautioned that there can "be no assurance . . . [the] bid will be successful." (CAC ¶ 232 (citation omitted); Ex. G, at 14, 66, 89.)

## ARGUMENT

## I.      THE CAC SHOULD BE DISMISSED WITH PREJUDICE

### A.      Plaintiff Fails To State a Claim Under Section 10(b) of the Exchange Act

The pleading standards for a claim brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, are well settled. *See Lachman*, 487 F. Supp. 3d at 126-29, 135-37. And here, these standards—including the heightened pleading requirements of Rule 9(b) and the PSLRA—make plain that Plaintiff's claims should be dismissed.

### 1.      The CAC Fails To Plead an Actionable Misrepresentation or Omission

The CAC is rooted in Defendants' alleged failure to disclose QIWI's purported violations of Russian law relating to the processing of payments for online betting. (*See, e.g.*, CAC ¶¶ 12-13.) Such a theory may only be viable where "'the corporation is subject to a duty to disclose the omitted facts.'" *Marcu v. Cheetah Mobile Inc.*, 2020 WL 4016645, at *3 (S.D.N.Y. July 16, 2020) (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)). "Generally speaking, 'disclosure is not a rite of confession,' so 'companies do not have a duty to disclose uncharged, unadjudicated wrongdoing.'" *Plumber & Steamfitters Loc. 773*, 2021 WL 3744894, at *4 (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014)). Moreover, "[w]hen a securities fraud claim is premised on the defendant's predicate violations of law," *Plumber & Steamfitters Loc. 773*, 2021 WL 3744894, at *4, a plaintiff must meet two essential pleading requirements. First, "the facts of that underlying violation must be pled with particularity." *Id.* That is, "plaintiff must specify *what* law or standard the defendant violated and *how* the alleged violation occurred," *id.*, and it must do so "in accordance with the heightened pleading requirement[s] of Rule 9(b) and the PSLRA," *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019). Then, Plaintiff "must ple[ad] with sufficient specificity how 'the alleged

13

omissions [were] sufficiently connected to Defendants' existing disclosures to make those public statements misleading.'" *Marcu*, 2020 WL 4016645, at *3. As demonstrated below, Plaintiff does not meet either prong of this test.

> **(a)** **Plaintiff Fails To Plead That QIWI Committed Undisclosed Violations Relating to Online Betting**

First, Plaintiff fails to plead facts demonstrating that QIWI violated any existing betting-related laws or regulations during the Class Period. For all its rhetoric, the CAC's allegations of misconduct are wholly conclusory and devoid of any particularized substance. For example, Plaintiff asserts throughout the CAC its core allegation (which it repeats no less than eighteen times) that QIWI's "lax identification requirements and payment processing controls were obfuscating illicit online betting transactions . . . being made through its payment system." (*E.g.*, CAC ¶ 17.) But the CAC does not plead any particulars as to *how* these requirements and controls concealed "illicit online betting"; *what* laws or regulations (if any) QIWI violated; *whether* these standards were in effect during the Class Period; *what* made the underlying transactions at issue "illicit"; *what* portion of QIWI's revenues was comprised of these unlawful transactions; and, as discussed below, *how* any Individual Defendant became aware of these deficiencies.

What Plaintiff offers instead is mere "'fraud by innuendo,'" which courts regularly reject. *Gamm*, 944 F.3d at 466 (citation omitted). For example, the CAC relies on unsourced observations from an obscure, Russian-language website of unknown reliability called *Betting Business Russia*, or *BBR*. (CAC ¶¶ 95 n. 48, 98 n. 55.) Notably, the *BBR* article on which Plaintiff leans most heavily does not accuse QIWI of violating any law or regulation. Instead, it speculates that offshore betting merchants were, of their own volition, using QIWI Wallets to exploit loopholes (*i.e.*, ambiguities or gaps) in the law that Russia had *yet* to make illegal—a fact that fatally undermines Plaintiff's entire theory. Courts have dismissed securities complaints with far greater detail than this. *See*

*Gamm*, 944 F.3d at 465 (dismissing complaint where "there [was] virtually no explanation as to how [the allegedly] . . . collusive conduct occurred, and whether and how it affected trade"); *In re Petrochina Co. Sec. Litig.*, 120 F. Supp. 3d 340, 360-61 (S.D.N.Y. 2015) (dismissing complaint that "[did] not identif[y] a specific requirement of the China Securities Regulatory Commission, HKSE, NYSE, or SEC that PetroChina was violating at the time of its statements").[4]

The PSLRA and Rule 9(b) also foreclose Plaintiff's claim that QIWI's "internal controls related to reporting and record-keeping were ineffective." (*E.g.*, CAC ¶ 17.) In this regard, the CAC does not "allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why." *Emps. Ret. Sys. of Providence v. Embraer S.A.*, 2018 WL 1725574, at *9 (S.D.N.Y. Mar. 30, 2018). Indeed, the CAC does not even posit that the violations issued by the CBR in December 2020 implicated QIWI's identification requirements and payment processing controls—or even procedures relating to online betting activities more generally. (*See* CAC ¶¶ 13, 121, 228.) This level of generality is not nearly enough to survive dismissal. *See Embraer S.A.*, 2018 WL 1725574, at *9-10 (dismissing 10(b) claim where "there [were] no particularized allegations regarding Defendants' failure to maintain adequate controls," including facts as to their "structure" or "how they failed"); *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *9 (S.D.N.Y. Mar. 30, 2012) ("[R]ely[ing] solely on general assertions regarding the existence of deficient controls . . . fall[s] far short of satisfying the [PSLRA].").

While Plaintiff points to the CBR's newly-implemented restrictions on QIWI's online payments business (CAC ¶¶ 13, 228, 231), which were disclosed promptly in December 2020, the CAC does not plead any facts that these restrictions were imposed due to historical violations of

---

[4] *See also Mucha v. Volkswagen Aktiengesellschaft*, 2021 WL 2006079, at *15 (E.D.N.Y. May 20, 2021) (dismissing securities claims where plaintiffs "fail[ed] to identify any specific laws or . . . plead with particularity how Volkswagen's conduct violated those laws"); *Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 198-99 (S.D.N.Y. 2020) (dismissing securities claims where plaintiffs failed to plead "essential elements" of alleged bribery scheme).

law. To the contrary, QIWI expressed its belief that the new restrictions were the product of the CBR's "increased scrutiny" of the industry, and not the "specific deficiencies identified" in the audit (which resulted in a relatively minor fine). (*See* Facts, *supra*, at D.) Indeed, Russia later passed restrictive new legislation and imposed similar restrictions on a key competitor. (*Id.*)

The CAC's lack of particularity illuminates Plaintiff's true strategy: to second-guess the business judgments of QIWI's management as it navigated Russia's complex, uncertain, and still-developing regulatory environment based solely on its hindsight-based view of the CBR's new restrictions. (*See* CAC ¶ 98 (criticizing QIWI for not "tak[ing] the initiative to tighten its controls"); *id.* ¶ 78 (critiquing QIWI for being "reactive" rather than "proactive" in regulatory sphere).) Such complaints about business strategy and judgment—which arose only *after* the CBR instituted new restrictions—simply do not and cannot give rise to a viable claim for securities fraud. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977); *see also Plumber & Steamfitters Loc. 773*, 2021 WL 3744894, at *1; *In re HEXO Corp. Sec. Litig.*, 2021 WL 878589, at *16 (S.D.N.Y. Mar. 8, 2021) ("[P]laintiffs' 'fundamental disagreements with Defendants' business judgments . . . are not actionable under Section 10(b) and Rule 10b-5.'").

> **(b)   Statements About Regulatory
> Compliance Were Not Materially False or Misleading**

The CAC also fails to allege how the December 2020 announcement rendered any of Defendants' Class Period statements materially false or misleading. For example, Plaintiff suggests that Defendants misleadingly guaranteed that QIWI was in compliance with all laws and regulations relating to the online payment industry in Russia. To the contrary, QIWI repeatedly warned investors about the unique regulatory risks it faced in navigating Russia's rapidly developing and difficult-to-interpret regulatory scheme. (*See* Facts, *supra*, at C.1-3.)

QIWI also flagged an array of risks that were even more specific to its online betting-related services. It cautioned, for instance, that (i) "[t]he betting industry is subject to extensive and actively developing regulation in Russia" that has led to "increasing government scrutiny"; (ii) Russia has started "blacklisting . . . betting merchants" with further blacklistings "likely"; (iii) Russia has "toughen[ed] control over the activities of foreign payment systems, foreign electronic payment services and payment aggregators"; and (iv) "if these amendments [were] interpreted as prohibiting the use of foreign payment aggregators," QIWI "would have to make changes to [its] established practices" that "could have a significant negative impact on our business." (Ex. C at 14-15, 17.) Taken together, these disclosures communicated an unmistakable message: that QIWI was operating within a regulatory environment that was fraught with uncertain risk. Far from offering guarantees of compliance, these public statements detailed "the complex, evolving regulatory [framework] . . . [it] faced," *Singh*, 918 F.3d at 64, and candidly acknowledged that meeting its demands had been and would be "challenging." (*E.g.*, Ex. C, at 14.) "Such framing" not only "suggests caution (rather than confidence) regarding the extent of [QIWI's] compliance . . . in light of complex and shifting government regulations," *Singh*, 918 F.3d at 64, but "renders implausible plaintiffs' suggestion that defendants were engaged in a scheme to deliberately or recklessly mislead investors," *Lachman*, 487 F. Supp. 3d at 138; *see also Asay v. Pinduoduo Inc.*, 2021 WL 3871269, at *3 (2d Cir. Aug. 31, 2021) (rejecting claim that company deceptively touted its "strict" anti-counterfeiting measures where it warned that they "may not always be successful or timely").

Plaintiff is no more successful in accusing Defendants of "tout[ing] that Qiwi had 'remedied'" certain violations found by the CBR during a previous audit in 2018, and thus "'[would] not be in breach of such requirements going forward.'" (CAC ¶ 11; *see also id.* ¶¶ 7,

13). This allegation distorts what the Company actually stated. In reality, although QIWI expressed a "belie[f]" that it had "remedied the violations and taken appropriate measures to ensure that [it would] not be in breach of such [regulatory] requirements going forward," it offered "*no assurance*" that "any currently planned or future inspections [would] not result in discovery of any *significant* or minor additional violations." (*Id.* ¶ 142 (emphases added).) QIWI also cautioned that any future violations could "expose [the Company] to potential liability," adding that "such sanctions could have a material adverse effect on our business, financial condition and results of operations." (*Id.*) The full context of these disclosures lays bare Plaintiff's strategy of inappropriately omitting (*see id.* ¶¶ 7, 11) critical "surrounding text, including hedges [and] disclaimers.'" *Martin v. Quartermain*, 732 F. App'x 37, 41-42 (2d Cir. 2018) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015)).

This Court's decision in *Lachman* is instructive. There, plaintiffs alleged that the defendant company's attempt to rollout a new software product had caused production delays, led to lost sales, and created material weaknesses in internal controls over financial reporting. 487 F. Supp. 3d at 119. In dismissing, the Court placed emphasis on the company's public statements, which warned "that the transition carried substantial risks" that "could have a material adverse effect" on its business. *Id.* at 138. The Court concluded: "[t]his steady stream of warnings renders implausible plaintiffs' suggestion that defendants were engaged in a scheme to deliberately or recklessly mislead investors." *Id.* (citing *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996)). The same reasoning applies here, where QIWI gave investors a "steady stream of warnings" regarding the regulatory uncertainty it faced, including the very same risks about which Plaintiff now complains. Moreover, following the CBR's restrictions on QIWI's online payments business, the Company

timely informed the public of these restrictions and the anticipated effect on QIWI's business going

forward. *Id.* As in *Lachman*, Plaintiff's claims thus should be dismissed.[5]

### (c)    Statements About Internal Controls
### Were Not Materially False or Misleading

Plaintiff next claims that QIWI failed to disclose that (i) its "internal controls related to

reporting and record-keeping were ineffective"; (ii) these controls had allowed "lax identification

requirements and payment processing" protocols to "obfuscate[] illicit online betting

transactions"; and (iii) as a result, it "would not be able to pass an audit by the CBR," leading to

negative consequences. (*E.g.*, CAC ¶ 17, 140; *see also id.* ¶¶ 9, 16.) Contrary to Plaintiff's

unsupported narrative, however, QIWI warned investors repeatedly that it still "need[ed] to

implement enhanced processes, procedures and controls in order to provide reasonable assurance

that [it was] operating in compliance with applicable regulatory requirements." (*E.g.*, *id.* ¶ 109.)

QIWI also cautioned—in language Plaintiff notably omits—that QIWI's "business ha[d] grown

and developed rapidly in recent years"; that it was "continuing to realign [its] compliance function

with the size and scope of [its] business"; that "there [were] inherent limitations to the effectiveness

of any policies, procedures and internal controls"; and that, as a consequence, "[t]here [could] be

no assurance that such policies or procedures or internal controls [would] work effectively at all

times or protect us against liability." (*E.g.*, Ex. C, at 18.)

QIWI further stated that its "services have been and may continue to be used for fraudulent,

---

[5] Equally meritless is Plaintiff's claim that QIWI's risk factors were themselves misleading because they failed to acknowledge that the described contingencies supposedly "had already materialized." (CAC ¶¶ 141, 180, 199; *see also id.* ¶ 117.) Because the predicate violations underpinning its suit—*i.e.*, the "materialized" risks—are not pled with specificity, Plaintiff's derivative attack on QIWI's risk disclosures must also fail. *See Gamm*, 944 F.3d at 464 (where undisclosed misconduct is not adequately pled, a complaint necessarily "provides no basis as to what rendered [the company's] statements false or misleading"); *Marcu*, 2020 WL 4016645, at *6 (similar). To rule otherwise would eviscerate the principle that companies have no duty to disclose uncharged, unadjudicated wrongdoing. Indeed, this proposition "'would be entirely meaningless if every reporting company were required to disclose [such] conduct in the risk-factors sections of its filings.'" *Ulbricht v. Ternium SA*, 2020 WL 5517313, at *10 (E.D.N.Y. Sept. 14, 2020).

19

illegal or improper purposes," including *inter alia* "illegal online gambling"; and that its "risk management policies and procedures may not be fully effective to identify, monitor and manage these risks." (*Id.* at 20.) As the Second Circuit held in *Singh*, these disclosures "suggest[] a company actively working to improve its compliance efforts, rather than one expressing confidence in their complete (or even substantial) effectiveness." *Singh*, 918 F.3d at 64.

As for Plaintiff's claim that QIWI needed to speculate in its SEC filings about the outcome of an ongoing and *yet-to-be-completed* CBR audit, there is no duty to "disclose uncharged, unadjudicated wrongdoing." *Plumber & Steamfitters Loc. 773*, 2021 WL 3744894, at *4 (citation omitted). And this argument applies with even greater strength here, since Plaintiff fails to plead even basic facts about the audit's progress (such as when or how QIWI officials supposedly learned that the inspection was, in Plaintiff's words, "not going well") (CAC ¶ 9). Absent such detail, there is no basis to allege that Defendants were attempting to "conceal" the audit. To the contrary, QIWI disclosed on multiple occasions that it was subject to regular audits by authorities, and that "[t]he CBR may *at any time* conduct full or selective audits of any bank's filings and may inspect all of its books and records." (*E.g.*, Ex. C, at 13 (emphasis added).) This negates any suggestion that QIWI was trying to keep investors in the dark about the CBR's inspection rights.

### (d) Statements About QIWI's Financial Performance Were Not Materially False or Misleading

Equally without merit is Plaintiff's allegation that QIWI's financial statements misled investors by accurately reporting profits, revenues, and payment volumes without, at the same time, disclosing that these numbers were derived in part from "illicit online betting transactions." (*E.g.*, CAC ¶ 137.) In pressing this claim, Plaintiff does not contend that any of the reported figures were inaccurate. This silence is fatal, since it is "clearly established in this Circuit" that accurately reported financial statements "cannot become actionable simply because companies do not

20

simultaneously disclose some wrongdoing that may have contributed to the company's financial performance." *Menora Mivtachim*, 2021 WL 1199035, at *16 (quoting *Fogel v. Vega*, 759 F. App'x 18, 24 (2d Cir. 2018)). And the same is true for statements that "merely describe undisputed data," *Marcu*, 2020 WL 4016645, at *5; *see also Menora Mivtachim*, 2021 WL 1199035, at *16 (disclosures are not actionable if they "merely describe the accurate financial data using more vivid language"), or attribute revenue, profit, and the like to "broad trends and corporate strengths, without pointing to any specific factors or sources of revenue," *Schiro*, 396 F. Supp. 3d at 297.

Here, the vast majority of challenged statements either reported historical results of undisputed accuracy (*e.g.*, CAC ¶ 125) or "put into words information reflected in the company's financial statements" (*In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016)), by, among other things, presenting the figures alongside broad affirmations of QIWI's competitive strength, without any reference to online betting at all. (*See, e.g.*, CAC ¶ 206.)[6] Courts routinely find such statements non-actionable. *See, e.g., Menora Mivtachim*, 2021 WL 1199035, at *17-18; *Marcu*, 2020 WL 4016645, at *5 (a "press release stating 'that revenues from mobile utility products in the domestic market increased' and 'generate[d] strong profit and cash flow' merely describe[d] undisputed data" and thus could not support falsity); *Schiro*, 396 F. Supp. 3d at 297; *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 588-89 (S.D.N.Y. 2006).[7]

---

[6] (*See also* CAC ¶¶ 48, 127, 156, 159, 167, 175, 190.)

[7] The CAC also disputes several forward-looking statements about QIWI's *projected* financial performance, including whether the Company would meet its 2019 "mid-term guidance" (CAC ¶¶ 160, 162), and whether QIWI's strength in e-commerce volumes would continue in Q4 2018 (*id.* ¶ 130 (reflecting Mr. Solonin's confidence that "the trend is going to continue . . .").) But "[i]f statements about accurate historical data are not actionable, it also stands to reason that projections of expected future financial performance modeled on accurate historical trends are similarly not actionable notwithstanding the existence of underlying misconduct." *Menora Mivtachim*, 2021 WL 1199035, at *16. Moreover, the very documents upon which Plaintiff relies confirm that QIWI both met its 2019 guidance (*compare* Ex. I, at 8, *with* Ex. J, at 4) and grew its e-commerce volumes in Q4 2018 as predicted (*see* CAC ¶¶ 125, 132).

The few challenged statements that even mention online betting services are just as non-actionable. First, as noted above, Plaintiff has not pled the predicate for this theory—that betting-related revenue was derived from illicit activity. *See Marcu*, 2020 WL 4016645, at *5. Regardless, those few disclosures that generally identified online betting as one driver of QIWI's business made equally manifest—through the use of words like "primarily," "mainly," and "largely"—that other factors were at play. (*E.g.*, CAC ¶ 133.)[8] Such qualifiers are of heightened importance here, since QIWI also warned that its "services [had] been and may continue to be used for fraudulent, illegal or improper purposes," including "illegal online gambling." (Ex. C, at 20); *see Marcu*, 2020 WL 4016645, at *5 (statements describing means by which app developer generated revenue were not actionable for omitting "fraud" as one such source, where disclosures "did not, explicitly or implicitly, rule out other factors playing a role"). At bottom, given these explicit disclosures, QIWI had no obligation to "accuse itself of wrongdoing" or engage in self-sabotage by "disclos[ing] that its revenues were derived from 'unsustainable and illegitimate sources[.]'" *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (citation omitted).[9]

## 2.   Many of the Challenged Statements Are Non-Actionable Opinions

Numerous challenged statements independently fail the rigorous pleading requirements for opinions set forth in *Omnicare*. *See Omnicare*, 575 U.S. at 194. Under the Supreme Court's

---

[8] (*See also* CAC ¶¶ 126, 127, 134, 166, 173, 174.)

[9] Other challenged statements are tenuously connected (at best) to the alleged omissions. As an example, Plaintiff accuses Mr. Protopopov of stating during the Q2 2019 earnings call that a moderation of revenue growth in e-commerce was traceable to "high betting volumes" from the prior year's World Cup. (CAC ¶ 163.) Plaintiff then avers that Mr. Solonin perpetuated this deception during the Q3 2019 earnings call when he represented that betting revenues were "more or less in line with the budget, but not growing as fast anymore as it was previous year." (*Id.* ¶ 171.) Notably, there is no claim that either comparison was false—*i.e.*, that in fact revenue growth did *not* slow on a year-over-year basis. More importantly, though, Plaintiff fails to explain how "lax reporting and record-keeping" (*i.e.*, the allegedly omitted misconduct) (CAC ¶ 183) would bear on the accuracy of these prior year comparisons. *See Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 233 (S.D.N.Y. 2018) (finding no duty to disclose when the challenged "misstatement . . . is far too attenuated from the alleged omission"). A similar disconnect prevents Plaintiff from attaching liability to Mr. Protopopov's innocuous—and undisputed—statement from the Q1 2020 earnings call that betting volumes had "stabilized in . . . mid-April." (CAC ¶ 194.)

22

framework, Plaintiff must allege facts sufficient to show either that "(1) 'the speaker d[oes] not hold the belief . . . professed'; (2) the 'fact[s] [] supplied' in support of the belief professed are 'untrue'; or (3) the speaker 'omits information' that 'makes the statement misleading to a reasonable investor.'" *Martin*, 732 F. App'x at 40 (quoting *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016)). Under the omissions prong, plaintiffs "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Sanofi*, 816 F.3d at 209. Meeting the *Omnicare* standard "is no small task for an investor." *Id.* at 210.

Here, Plaintiff fails to clear this hurdle in three main areas. First, regarding the 2018 CBR inspection, QIWI never guaranteed or offered categorical assurances that it had rectified all CBR violations. (*See* I.A.1.b, *supra*.) QIWI merely expressed its "belie[f]" that it had taken appropriate measures, but then qualified this already-tentative statement by warning that there "[could] be no assurance . . . additional sanctions [would] not be imposed." (*E.g.*, Ex. C, at 13.) The CAC does not plead a single fact that cuts against this opinion or suggests it was not genuinely held.

Second, Plaintiff challenges QIWI's subjective "conclu[sion] that . . . our internal control over financial reporting was effective." (CAC ¶¶ 139-40, 178-79.) But the CAC's core allegation—that QIWI declined to implement procedures for preventing illegal betting transactions with offshore merchants—has nothing to do with internal controls over *financial reporting*. And indeed the CAC, by failing to accuse QIWI of issuing inaccurate financial statements, tacitly concedes the point. There is, therefore, no plausible basis for challenging these conclusions. *See Menora Mivtachim*, 2021 WL 1199035, at *18 (allegations of unlawful "payment scheme in Russia and Ukraine" "ha[d] nothing to do with controls over financial reporting," where "there

[were] no allegations that defendants issued inaccurate financial statements").[10] In any event, QIWI "did not state that the Company's internal controls were effective—[it] stated only that management had *concluded* as much." *Schiro*, 396 F. Supp. 3d at 299. Plaintiff nowhere contends that management did not actually reach or believe this conclusion. *See In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at *25 (S.D.N.Y. Sept. 9, 2019) (plaintiffs "must allege adequately that defendants . . . reached a conclusion different from the one stated, or that defendants reached no conclusion at all.").

Finally, Plaintiff contests numerous vague opinions expressing confidence in the "resilience," "adaptability," "value," and competitive positioning of the Company's business model. (*See, e.g.*, CAC ¶¶ 134, 148, 206, 207.) But it is "not sufficient" to merely "allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *15 (S.D.N.Y. Apr. 2, 2020). The CAC alleges no facts that were materially at odds with Defendants' optimistic remarks when made. At most, Plaintiff cites the CBR's imposition of sanctions in December 2020 and then criticizes Defendants in hindsight for being (in its view) excessively exuberant during prior periods. *Omnicare* cannot be outflanked so easily. *See In re Pretium Res. Inc. Sec. Litig.*, 2020 WL 953609, at *5 (S.D.N.Y. Feb. 27, 2020) ("[B]road expressions of confidence" in "viability" of a mine excavation plan were not actionable where plaintiffs failed to plead facts that "pushed the scale's needle so far as to render continued faith in the plan unreasonable").

### 3.     Multiple Statements Are Protected Under the PSLRA Safe Harbor and Bespeaks Caution Doctrine

"Under the PSLRA's safe harbor, a defendant 'shall not be liable with respect to any

---

[10] *See also In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 470 (S.D.N.Y. 2018) ("With no corresponding error in the Company's financial reporting, the Complaint fails to plausibly allege that the certification of effective internal controls was false or misleading."); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016) (same).

forward-looking statement' if (1) [it] is 'identified' as such and 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,' or (2) the forward-looking statement is 'immaterial,' or (3) the plaintiff 'fails to prove that [a] forward-looking statement . . . if made by a natural person, was made with actual knowledge'" of its falsity. *In re FedEx Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 232 (S.D.N.Y. 2021) (quoting 15 U.S.C. § 78u-5(c)(1)).[11] Because liability attaches "only upon proof of knowing falsity," the "scienter requirement for forward-looking statements is stricter than for statements of current fact." *In re Philip Morris Int'l Sec. Litig.*, 437 F. Supp. 3d 329, 355 (S.D.N.Y. 2020).

This test bars Plaintiff from disputing opinions expressed by QIWI officials about the impact of proposed regulatory initiatives that would, if enacted, place restrictions on betting merchants and foreign e-wallets. (CAC ¶¶ 219-24.) These remarks were replete with qualifications and hedges, including warnings about how the proposed laws might negatively impact QIWI's business if enacted. (*E.g.*, CAC ¶ 220 ("[W]e believe that certain regulatory initiatives . . . have a potential to negatively affect our operating performance in the future."); *id.* ¶ 221 (proposed restrictions could "limit such operation [of trans-border payments]" and "could have an impact on our business"); *id.* ¶ 219 (such laws could "impose additional pressure on our operations[.]").) QIWI's then-interim CFO advised during the same call that "forward-looking statements [] are subject to known and unknown risks and uncertainties" and "[were] not guarantees of future performance." (Ex. K, at 4.) She then referenced QIWI's recent Form 20-F "for factors that could cause our actual results to differ materially from any forward-looking statements," (*id.*), which

---

[11] The "bespeaks caution doctrine" similarly offers protection for "forward-looking statements that adequately disclose the risk factors that might cause a different outcome" than the one forecast. *Philip Morris*, 437 F. Supp. 3d at 355 n.7.

warned that new reporting requirements for e-wallets "could result in a slowdown in the growth of our user base" and "negatively affect our results of operations." (Ex. C, at 15.)

Mr. Kim's opinion that QIWI "[had] a chance to be the single TSUPIS" is equally protected. (CAC ¶ 222.) Mr. Kim stressed that the climate was "uncertain" and it was "difficult to predict whether this draft law will be adopted eventually" or "what will be the final text and who will be the single TSUPIS." (*Id.*) Tailored warnings like this compel dismissal. *See HEXO Corp.*, 2021 WL 878589, at *17 (dismissing complaint where filings "specifically identified that HEXO's statements could be affected by risks relating to 'changes to government laws, regulations or policies'"); *In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 532-33 (S.D.N.Y. 2021) (projections nonactionable where company warned of "known and unknown risks and uncertainties").[12]

### 4.   Multiple Statements Represent Non-Actionable Puffery

Finally, Plaintiff fails to plead falsity with respect to certain statements because they are "'too general to cause a reasonable investor to rely upon them.'" *Lachman*, 487 F. Supp. 3d at 130-31; *see also Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 173-74 (2d Cir. 2020) ("Generic, indefinite statements of corporate optimism typically are not actionable"). Examples of this "puffery" abound throughout the CAC. (*See* CAC ¶¶ 126-27, 134-35, 148-49, 151, 156-58, 167, 190, 206, 214.) Time and again, courts have deemed such statements "too general" to be actionable. *City of Pontiac*, 752 F.3d at 183. The same holding is warranted here.[13]

---

[12] Plaintiff challenges two other regulation-focused predictions. (CAC ¶¶ 153, 210.) For all of the reasons described above, Plaintiff does not plead with specificity how either opinion was false or misleading when made. And even if it could, Plaintiff cannot overcome the PSLRA safe harbor's actual knowledge prong.

[13] Plaintiff cannot hold Mr. Protopopov primarily liable for any statement he did not make. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 137 (2011). Mr. Protopopov is only accused of speaking falsely at earnings calls held on or after August 20, 2019. (*See* CAC ¶ 158.) There is no allegation linking Mr. Protopopov to any of QIWI's SEC filings and press releases, and the CAC offers only boilerplate group pleading allegations to suggest that the Individual Defendants engaged in "scheme" liability under Rules 10b-5(a) and (c), (CAC ¶¶ 37, 250), which are wholly insufficient. *See Plumber & Steamfitters Loc. 773*, 2021 WL 3744894, at *9.

**B.    Plaintiff Fails To Plead a Strong Inference of Scienter**

Under the PSLRA's demanding standards for pleading a "strong inference" of scienter, plaintiffs must allege particularized facts "(1) [showing both] motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Loc. 134 IBEW*, 553 F.3d at 198; *Lachman*, 487 F. Supp. 3d at 136. Here, the CAC does neither.

**1.    Plaintiff Fails To Plead a Cognizable Motive**

Pleading motive requires plaintiffs to "'do more than allege that defendants wished to maintain "the appearance of corporate profitability' or to 'prolong the benefits of holding corporate office.'"" *Lachman*, 487 F. Supp. 3d at 136 (quoting *Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55, 57 (2d Cir. 2018)). Rather, "plaintiffs must allege that the individual defendants received a *concrete and personal benefit* from making their alleged misrepresentations." *Id.* (emphasis added) (citation omitted); *see also FedEx Corp.*, 517 F. Supp. 3d at 237 (same).

Here, the CAC alleges merely that two of the seven Individual Defendants tried to profit from QIWI's supposed "undisclosed operational problems" by offering Class B shares in a July 2020 secondary offering. (CAC ¶ 9.) But Plaintiff does not plead a shred of factual support for the notion that either individual possessed material adverse information, much less that they sought to exploit such knowledge. And regardless, there is a fundamental flaw with Plaintiff's narrative: the offering *never happened*. (*See id.* ¶ 10.) The CAC also does not allege that either individual (or any Defendant) sold shares from July 2020 through the end of the Class Period—an omission that suggests they "were *harmed* by the fraud they purportedly orchestrated, undermining any fraud theory." *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 779 (S.D.N.Y. 2021); *see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996). This deficiency underscores that Plaintiff has alleged only "motives

27

possessed by virtually all corporate insiders," which courts routinely deem inadequate. *Maloney*, 518 F. Supp. 3d at 779 (quoting *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)).

### 2.   Plaintiff Fails To Plead Conscious Misbehavior or Recklessness

Because Plaintiff cannot plead a cognizable motive for Defendants to commit fraud, the CAC's allegations of conscious misbehavior or recklessness must be "'correspondingly greater.'" *Lachman*, 487 F. Supp. 3d at 136 (citation omitted). They are not. "Recklessness in this context means 'a state of mind approximating actual intent, and not merely a heightened form of negligence.'" *In re Alkermes Pub. Ltd. Co. Sec. Litig.*, 2021 WL 768134, at *6 (E.D.N.Y. Feb. 26, 2021) (quoting *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009)). To meet this threshold, plaintiffs "typically must 'specifically allege[ ] defendants' knowledge of facts or access to information contradicting their public statements.'" *Canez v. Intelligent Sys. Corp.*, 2021 WL 3667012, at *10 (E.D.N.Y. Aug. 18, 2021) (Kovner, J.) (citation omitted). "[I]t is well-established" that merely citing "a defendant's position does not, without more, support a conclusion that the defendant had access to information contradicting an alleged misrepresentation." *Marcu*, 2020 WL 4016645, at *7. Instead, "'[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.'" *Canez*, 2021 WL 3667012, at *10 (citation omitted).

Here, Plaintiff vaguely contends that, by virtue "of their positions with Qiwi," the Individual Defendants "had access to material adverse non-public information concerning the Central Bank's audit of Qiwi Bank and its record-keeping and reporting." (CAC ¶¶ 32-34, 256.) But the CAC pleads no facts indicating that any Individual Defendant[14] had access to specific

---

[14] "Scienter may not be alleged through group pleading." *Ross v. Lloyds Banking Grp., PLC*, 2012 WL 4891759, at *10 (S.D.N.Y. Oct. 16, 2012), *aff'd*, 546 F. App'x 5 (2d Cir. 2013). Rather, a complaint must "allege facts that adequately address the scienter element with respect to each of the Individual Defendants." *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *30 (S.D.N.Y. May 10, 2012). Plaintiff's generic allegations do not come close.

information—whether an internal report, email, oral communication or otherwise—that contradicted the Company's public statements when made. Plaintiff also fails to muster a single allegation from any "confidential witness," despite vaguely alluding to discussions with "individuals formerly employed by QIWI." (CAC ¶ 1); *see In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, at *19 (S.D.N.Y. Oct. 25, 2017) (rejecting allegations that were "entirely circumstantial and do not rely on any internal documents or confidential witnesses"). This scant showing does not approach the "cogent and compelling" inference of scienter required. *Tellabs*, 551 U.S. at 324. And indeed, this Court has dismissed similarly "boilerplate" allegations of insider access. *Canez*, 2021 WL 3667012, at *10; *see Lachman*, 487 F. Supp. 3d at 137-38.[15]

### 3.      The More Cogent and Compelling Inference Is Nonculpable

Finally, it bears emphasis that Plaintiff's proposed inference of fraudulent intent is belied by a more compelling non-culpable inference. "[A] court must take into account 'not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged.'" *Lachman*, 487 F. Supp. 3d at 136 (citation omitted). Here, the breadth of QIWI's risk warnings, coupled with its timely disclosure of the CBR restrictions and their expected effect, paint the picture of a management team that was trying, in real time, to provide the most accurate and meaningful information to investors as it grappled with Russia's uncertain and still-developing regulatory framework. "This steady stream of warnings renders implausible plaintiffs' suggestion that defendants were engaged in a scheme to deliberately or recklessly mislead investors because they did not offer the specific additional warnings that plaintiffs allege were warranted." *Id.* at 138;

---

[15] These defects also doom Plaintiff's effort to plead corporate scienter. While "it is possible to draw a strong inference of corporate scienter without being able to name the individuals" who engaged in the fraud, such findings are reserved for statements "'so "dramatic"' that they 'would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading.'" *Lachman*, 487 F. Supp. 3d at 139. Such an "exceedingly rare instance[]" of fraud is not pled here. *Jackson v. Abernathy*, 960 F.3d 94, 98-99 (2d Cir. 2020).

*see also Holbrook v. Trivago N.V.*, 2019 WL 948809, at \*22 (S.D.N.Y. Feb. 26, 2019) ("[A]ny . . . inference of fraudulent intent raised by plaintiffs [was] rendered implausible by Trivago's numerous and fulsome disclosures . . . ."); *Iconix,* 2017 WL 4898228, at \*19 (disclosures raised non-culpable inference); *In re Seadrill Ltd. Sec. Litig.*, 2016 WL 3461311, at \*13 (S.D.N.Y. June 20, 2016) ("[T]he more compelling inference is that Defendants were reacting to an uncertain and rapidly changing environment and attempting to understand the implications . . . .").

In the final analysis, Plaintiff's theory of fraud rests on its conclusion—made with hindsight—that because the CBR found certain violations and imposed new restrictions, securities fraud must have been committed. But the CAC cites no facts that Defendants knew these events would occur and yet purposefully hid them from investors—or even why they would do so. *See, e.g.*, *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 446-47 (S.D.N.Y. 2006) (recognizing "the tenuous plausibility of the [defendant's] alleged scheme" where the public would "quickly uncover the scheme"). This implausible theory is far outweighed by non-fraudulent inferences.

## II.    PLAINTIFF FAILS TO STATE A CLAIM FOR CONTROL PERSON LIABILITY

"To establish a prima facie case of control person liability, a plaintiff must show '(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Lachman*, 487 F. Supp. 3d at 139. Because Plaintiff fails to plead a primary violation or culpable participation by any Individual Defendant, its claim fails.

<u>CONCLUSION</u>

For the foregoing reasons, the Moving Defendants respectfully request that the Court dismiss the CAC in its entirety with prejudice.

Dated:  New York, New York
       September 17, 2021

/s/ Alexander C. Drylewski
Alexander C. Drylewski
William J. O'Brien
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
alexander.drylewski@skadden.com
william.obrien@skadden.com

*Attorneys for Defendant QIWI plc
 and Andrey Protopopov*