# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re QIWI PLC SECURITIES LITIGATION | Master File No.: 1:20-cv-06054-RPK-CLP <br><br> <u>CLASS ACTION</u> <br><br> JURY TRIAL DEMANDED |
| This Document Relates To: <br><br> ALL ACTIONS. | |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION ............................................................................ 1

II.  JURISDICTION AND VENUE ..................................................................... 7

III. PARTIES ....................................................................................................... 8

IV. SUBSTANTIVE ALLEGATIONS ............................................................... 14

    A.  Relevant Background Regarding Qiwi ................................................. 14

        1.  Qiwi Operates One of Three TSUPIS Centers in Russia .............. 18

        2.  Online Betting was a Significant Source of Revenue for Qiwi ...... 22

    B.  Russian Authorities Tightened Regulations on E-Wallets and Online Gambling as the Acting Institutions, Including Qiwi, Continued to Fail to Prevent Illicit Activity. ....................................................... 27

        1.  The Anonymity Default for Qiwi E-Wallets Has Invited Illicit Actors and Put Defendants on Notice of the Risk of Qiwi Violating Applicable Regulations. ...................................................... 27

        2.  Qiwi's Lax Identification Requirements and Payment Processing Controls Conflicted with Its Responsibilities as a TSUPIS and Its Support of Regulators' Fight Against Illegal Gambling. .................. 31

        3.  As Self-Regulation Failed, Russian Regulators Further Cracked Down on E-Wallets ......................................................................... 38

    C.  Defendants Concealed the Significant Impact of Amended Regulations, the Ongoing CBR Audit, and Qiwi's Insufficient Internal Controls, While the Individual Defendants Attempted to Off-load Qiwi Stock. .......................... 43

V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........... 45

    Third Quarter 2018 Financial Results .................................................... 46

    Fourth Quarter and Fiscal Year 2018 Financial Results ........................ 49

    First Quarter 2019 Financial Results ..................................................... 57

    Second Quarter 2019 Financial Results ................................................. 62

    Third Quarter 2019 Financial Results .................................................... 66

    Fourth Quarter and Fiscal Year 2019 Financial Results ........................ 70

    First Quarter 2020 Financial Results ..................................................... 79

    Republished Financial Results for First Quarter 2020 ........................... 82

    Secondary Public Offering Prospectus .................................................. 84

    Second Quarter 2020 Financial Results ................................................. 88

    Third Quarter 2020 Financial Results .................................................... 92

VI. THE TRUTH EMERGES ............................................................................. 97

    July 20 Partial Disclosure ...................................................................... 97

December 9 Class Period Ending Disclosure ..................................................................... 98

VII.   LOSS CAUSATION ............................................................................................. 101

VIII.  CLASS ALLEGATIONS ...................................................................................... 102

IX.    PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET ................................. 103

X.     INAPPLICABILITY OF SAFE HARBOR ................................................................ 105

XI.    CLAIMS FOR RELIEF ........................................................................................ 105

       COUNT I ........................................................................................................... 105

       COUNT II .......................................................................................................... 109

XII.   PRAYER FOR RELIEF ........................................................................................ 110

XIII.  JURY TRIAL DEMANDED .................................................................................. 111

Lead Plaintiff Moset International Company Limited ("Lead Plaintiff" or "Moset"), by and through its attorneys, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to its own acts and on information and belief as to all other matters. Lead Plaintiff bases this information and belief on, among other things, the investigation conducted by its counsel, which includes a review and analysis of: United States Securities and Exchange Commission ("SEC") filings by Qiwi plc ("Qiwi" or the "Company"); press releases, analyst reports, public statements, news articles and other publications disseminated by or concerning Qiwi; independent factual sources, including individuals formerly employed by Qiwi; and other publicly available information. Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to Defendants or are exclusively within their custody or control. Lead Plaintiff's investigation indicates substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class ("Class") consisting of all persons and entities that purchased or otherwise acquired Qiwi securities between November 14, 2018 and December 9, 2020, both dates inclusive (the "Class Period"), against Qiwi, and corporate insiders Boris Kim ("Kim"), Sergey Solonin ("Solonin"), Andrey Protopopov ("Protopopov"), Alexander Karavaev ("Karavaev"), Varvara Kiseleva ("Kiseleva"), Vladislav Poshmorga ("Poshmorga"), and Pavel Korzh ("Korzh") (collectively, "Individual Defendants") (together with Qiwi, "Defendants"), pursuing remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2. Qiwi, incorporated in Cyprus, purports to be a leading provider of next generation payment and financial services in Russia and the Commonwealth of Independent States ("CIS").

1

It has an integrated proprietary network of electronic wallets ("e-wallets") and cash-collecting terminals and kiosks enabling merchants and consumers to instantly and interchangeably make, accept, and transfer cash and electronic payments ("e-payments") across online, mobile, and physical environments.

3. Throughout the Class Period, online gambling – specifically sports betting – was a significant revenue stream for Qiwi. The Company served as the operator of one of only three interactive bets accounting centers ("TSUPIS") authorized to accept electronic bets on behalf of self-regulated bookmakers, or betting merchants, operating in Russia. Specifically, online betting accounted for more than one-third of Qiwi's revenues in 2019.

4. In that capacity, Qiwi has been subject to an assortment of Russian regulations aimed at restricting gambling on illegitimate websites and applications. In addition, Qiwi owns and controls Qiwi Bank JSC ("Qiwi Bank"), which has a Banking License issued by the Central Bank of the Russian Federation ("CBR").[1] Accordingly, Qiwi must also maintain compliance with the CBR's reporting and record-keeping requirements and is subject to routine and spontaneous audits by the CBR.

5. From 2015 through 2019, Russia enhanced its scrutiny on and regulations of online gambling sites and businesses (including Qiwi) that facilitated payments to and from those sites. Specifically, the Russian government:

- shut down thousands of gambling, lottery, and bookmaker websites and applications;
- required full identification for those withdrawing cash from prepaid cards;
- banned money transfers to illegal gambling and bookmaking operations;
- banned the withdrawal of cash from anonymous e-wallets;

---

[1] Prior to September 2013, the CBR was the main regulator of the Russian banking industry. On September 1, 2013, the CBR became a mega-regulator of **all** financial markets of Russia, not just of the banking industry.

2

- facilitated the identification of bettors using illegal bookmakers; and

- required owners of anonymous e-wallets to use bank accounts to make deposits (rather than paying cash into payment terminals or at branch offices), such that payors replenishing wallets could be identified and accounts could be blocked if an illegal operation was suspected.

6. Given its substantial revenues from online gambling, Qiwi's compliance with the regulations for online betting was critical to investors. Any profits that the Company earned from illegitimate transactions were unsustainable. Furthermore, regulatory violations invited scrutiny and sanctions that would threaten Qiwi's profits from legitimate transactions. Indeed, experts in the Russian bookmaking industry "called the blocking of Qiwi and similar payment services almost the only effective way to [combat] offshore bookmakers." To continue profiting from legitimate transactions to authorized gambling sites, therefore, Qiwi had to comply with regulations, maintain adequate records, and satisfy the CBR's audits. Going into the Class Period, Defendant Solonin noted that "[w]e constantly interact with law enforcement agencies and provide them with tools to track transactions and calculate unscrupulous counterparties in the system."

7. During the Class Period, Defendants assured investors that Qiwi complied with those ongoing obligations and profited from legitimate, rather than illicit, transactions. While regulators had found Qiwi non-compliant with certain requirements before the Class Period, by March 2019, Defendants assured investors that "we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward any violations or deficiencies found by the CBR." Defendant Solonin further noted in May 2019 that, because Qiwi focused on legitimate transactions, the Company worked with regulators and "any new regulation rules will be basically positive for us."

8. Qiwi's purported compliance permitted the Company to go all-in on the Russian betting industry. The Company struck "favorable deals with the gambling brands inside the

country" and made "money by charging deposit and withdrawal fees from customers." As represented by Defendants, Qiwi's bet paid off, as it "was able to significantly improve its top-line performance and by the end of 2019, revenues from the betting industry accounted for more than [a] third of its total revenues." In other words, Qiwi appeared to have successfully tapped into the legitimate betting industry, while complying with the enhanced regulatory scrutiny of that industry. Those material representations appealed to investors, prompting Qiwi's share price to rise to its Class Period high of $24.50.

9.      Unbeknownst to investors, however, the CBR had begun auditing Qiwi again in July 2020, and the audit was not going well for Qiwi. Defendants concealed that material information regarding the CBR audit and the impact of new regulations. But they made a partial disclosure in the form of announcing a secondary public offering ("SPO"). Specifically, on July 20, 2020 – after the markets closed – Defendants announced that major shareholders, including Defendants Kim and Solonin, were registering 6.8 million Class B Shares (represented by ADSs) for sale through the SPO. In other words, insiders who knew material information about Qiwi wanted to sell significant amounts of their holdings. That news indicated to the market that Qiwi faced undisclosed operational problems. Consequently, Qiwi's ADS price fell $1.90 per share, or 9.9%, to close at $17.29 per share on July 21, 2020, on unusually heavy trading.

10.      But, on July 22, 2020, Defendants reversed course and cancelled the SPO, claiming that the selling shareholders, including Defendants Kim and Solonin, had backed out "due to market conditions." Defendants, therefore, signaled that the Company was performing well in the regulatory environment and that investors should not be concerned about undisclosed operational struggles. The message worked. Qiwi's share price increased $1.54, or 8.8%, to close at $18.75 per share on July 22, 2020.

4

11.     By the fall of 2020, Defendants had not disclosed the CBR audit and, instead, maintained the message that Qiwi was successfully traversing the shifting regulatory landscape. However, by this time, as a result of a failing self-regulated system, Russia was considering new regulations that would create a single Unified Interactive Bets Accounting Center (ETSUP), replacing the current self-regulated TSUPISs, including TSUPIS-2 operated by Qiwi, by the end of 2021. Consequently, it was vital for Qiwi to earn that role. Needless to say, Qiwi could earn the role only if the Company was fully complying with the CBR's regulations. Assuaging any investor concerns and maintaining their portrayal of the Company's ongoing regulatory compliance, Defendants continued to repeatedly tout that Qiwi had "remedied" previous violations and "will not be in breach of such requirements going forward."

12.     Thus, Defendants' consistent message to investors was that its regulatory violations were in the past, that Qiwi was legitimately and profitably operating in the online betting space, and that regulatory scrutiny provided growth opportunities, including the possibility of becoming the single ETSUP. Defendants did not mention the CBR audit or suggest that operational or regulatory concerns had influenced the attempted SPO or its cancellation.

13.     **That narrative was false**. In reality, Qiwi was violating even the most basic regulatory requirements by the CBR. Defendant Korzh – who had joined the Company in August 2020 as Chief Financial Officer ("CFO") of Qiwi Bank (Qiwi's wholly-owned subsidiary) – became CFO on December 1, 2020. One week into his tenure, on December 9, 2020, Defendants stunned investors with the unexpected disclosures that:

- "From July to December 2020, the [CBR], acting in its supervisory capacity, performed a routine scheduled audit of [Qiwi Bank] for the period of July 2018 to September 2020;"

- "[I]n the course of this audit, [CBR] has identified certain violations and deficiencies relating primarily to reporting and record-keeping requirements;"

5

- The CBR fined Qiwi RUB 11 million or approximately USD 150,000;

- "[T]he CBR introduced certain restrictions with respect to Qiwi Bank's operations, including, effective from December 7, 2020, the suspension or limitation of most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts;" and

- "[A]ssuming such CBR restrictions were to be in effect and the corresponding operations were to be discounted for the entire nine-month period ending on September 30, 2020, approximately 33% to 40% of our Payment Services Segment Net Revenue for such period would have been negatively affected (based on our actual results of operations for such period as previously reported on November 19, 2020), primarily in E-Commerce and Money Remittance market verticals."

14.     On December 10, 2020, the revelation of the truth caused a 20.6% loss on Qiwi's ADS price, leaving investors with tens of millions of dollars in losses. Just three months later, Defendant Korzh—who, in his new role as CFO, had purportedly forced the Company to reveal the truth to investors—resigned.

15.     Worse yet, Qiwi's regulatory violations from July 2018 to September 2020 had jeopardized the Company's ability to become Russia's new gambling ETSUP.  As Defendant Kim confirmed on March 30, 2021, Qiwi had "made a proposal to serve as the ETSUP, however, we cannot be sure that our bid will be successful" and if Qiwi "cannot become a part of the new industry landscape, we may experience a decrease in, or complete loss of, payments volume and income related to the TSUPIS."

16.     Thus, contrary to Defendants' public statements throughout the Class Period, Qiwi's reporting, record-keeping, and regulatory compliance were so deficient that it was unable to pass even a routine scheduled audit by the CBR. Defendants' statements that, *inter alia*, Qiwi had "remedied" past violations, "will not be in breach of such requirements going forward," and "new regulation rules will be basically positive for us" were false. Despite statements related to the possible risk of a CBR audit, Defendants failed to inform investors that the Company was the subject of a CBR audit that was not proceeding favorably. Specifically, from July 2020 (the start

6

of the CBR audit) to the Company's disclosure of the audit on December 9, 2020, Defendants conducted 2 quarterly calls with analysts and investors, and issued approximately 13 public filings and/or press releases without ever mentioning the ongoing 2020 CBR audit.

17. In sum, throughout the Class Period, Defendants made materially false and misleading statements regarding Qiwi's business, operations, and internal controls. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's internal controls related to reporting and record-keeping were ineffective; (2) Qiwi was thus not meeting the CBR's reporting and record-keeping requirements; (3) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment system; (4) then-current applicable Russian regulations increasing identification requirements for e-wallets and restricting transactions through illegal online betting merchants were having a negative impact on Qiwi's revenue; (5) Qiwi was undergoing a CBR audit that it was unable to pass; (6) as a result, Qiwi would be fined by the CBR, would have its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR, would no longer be in a prime position to process electronic bets in Russia; (7) as a result, Qiwi would no longer be able to receive significant revenue from its legitimate transactions, including online gambling; and (8) consequently, Defendants' public statements were materially false and/or misleading at all relevant times.

18. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.   JURISDICTION AND VENUE

19. The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act (15

U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20.     This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act (15 U.S.C. § 78aa).

21.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

22.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

23.     Lead Plaintiff Moset was appointed to serve as Lead Plaintiff in this Action by Order of this Court dated May 20, 2021 (ECF No. 27). As set forth in his shareholder certification (ECF No. 20-1), which is incorporated by reference herein, Moset purchased Qiwi securities at artificially inflated prices during the Class Period and suffered economic losses when true facts about the Company's business operations and future prospects were disclosed and the artificial inflation was removed from the price of Qiwi securities.

24.     Defendant Qiwi, together with its subsidiaries, provides online, mobile and physical payment services to consumers and merchants primarily in Russia, Kazakhstan, Moldova, Belarus, Romania, the United Arab Emirates, and other overseas markets. Qiwi is incorporated in

Cyprus with its principal executive offices located at 12-14 Kennedy Ave., Kennedy Business Centre, 2nd Floor, Office 203, 1087 Nicosia, Cyprus. The Company's American Depository Shares ("ADSs") are traded on the NASDAQ under the ticker symbol "QIWI."

25.     Defendant Kim served as Qiwi's Chief Executive Officer ("CEO") from January 15, 2020 through June 2, 2021[2], a director since May 2013 and had previously served as Chairman of its Board from June 2014 to January 2020. Before joining Qiwi, he co-founded the e-port payment system and served as its CEO from November 2004 until September 2007 and as an advisor to the CEO from September 2007 until February 2010. In addition, he was the head of the payment networks and banking instruments committee at the Russian E-Market Participants National Association from 2007 until 2012 and an executive director at the Association for Development of Financial Technologies from 2017 until 2018. He graduated from Lomonosov Moscow State University in 1985 with a degree in chemistry, Russian Institute of Finance and Economics in 1996 with a degree in finance, Moscow State Law Academy in 2000 with a degree in law, and Lomonosov Moscow State University in 2004 and in 2007 with degrees in psychology and philosophy, respectively.

26.     Defendant Solonin co-founded Qiwi and served as its CEO from October 2012 through January 15, 2020, a director since December 2010, and Chairman of the Board since January 2020. He has held key executive roles within Qiwi and is currently a member of the Boards of Qiwi Bank and FLOCKTORY LTD. He is also a co-director of the FinNet working group within the framework of the National Technology Initiative since September 2016, a General Director

---

[2] On March 31, 2021, Qiwi announced that "as a result of a lengthy succession planning process," the Board of Directors ("Board") recommended that Defendant Protopopov replace Defendant Kim as the CEO. On June 8, 2021, Qiwi announced the appointment of Defendant Protopopov as CEO effective June 2, 2021.

9

and a member of the Supervisory Board of Association for Development of Financial Technologies since January 2017, a member of the Board of AlfaStrakhovanie JSC since June 2017, a member of the Investment Committee of Venture Fund of Skolkovo — IT I since June 2017 and a member of the Expert Committee of Vnesheconombank since October 2017. Mr. Solonin graduated from Distance-Learning Institute of Finance and Economics (now part of Financial University under the Government of the Russian Federation) in 1996 with a degree in economics.

27.     Defendant Protopopov has served as Qiwi's CEO since June 2, 2021. Prior to his current position, Protopopov served as the Company's CEO of Payment Services Segment beginning August 2019, served as its Head of IT and Product from June 2015 to August 2019, and Head of Product Management from September 2013 to June 2015. Before joining Qiwi, Protopopov worked at Procter & Gamble for 12 years, holding numerous positions in market strategy and planning, as well as business development. Protopopov graduated from Novosibirsk State University in 2004 with a master's degree in mathematics.

28.     Defendant Karavaev served as Qiwi's CFO from July 4, 2013 to May 17, 2019, a director from June 2019 to December 31, 2020, and Chief Operating Officer from August 2012 to July 2013. Before joining Qiwi, he had served as the CFO of Mail.ru (a leading Internet Company in Russia) from November 2008 to September 2011, the CFO of Akado Group (a subsidiary of Renova Holding) between March 2008 and October 2008, and deputy CFO at Renova from May 2007 to October 2008. He began his career in the audit department of Arthur Andersen in 1997 and after moving to Ernst & Young LLC in May 2001 worked at the audit and business consulting departments until December 2003. Karavaev graduated from the Siberian Aerospace Academy with a degree in economics, majoring in management and strategic planning. Concurrently, he attended the University Passau in Germany, studying strategic planning.

29. Defendant Poshmorga served as Qiwi's CFO from July 1, 2019 to October 8, 2019. Prior to joining Qiwi, Poshmorga served as a Chief Investment Officer at Social Discovery Ventures (an international group of technology and software engineering companies); Chief Financial Officer at S.P.I. Group (a leading international producer of premium spirits); worked in various investment banking and investment management roles at Salomon Smith Barney and Morgan Stanley UK and Switzerland; and held different finance positions at London Fortaiting Company in Cyprus and Guta-Bank in Moscow. Poshmorga received a master's degree in economics from Russian Peoples' Friendship University in Moscow and an MBA in finance from Johnson School of Management at Cornell University.

30. Defendant Kiseleva joined Qiwi in 2013. During her time with the Company, she served as Qiwi's Deputy CFO of Capital Markets from April 2015 to May 19, 2019; from July 1, 2019 to October 8, 2019; and again, from December 1, 2020 until departure sometime in December 2020. She also served as interim CFO from May 17, 2019 to July 1, 2019, and from October 8, 2019 to December 1, 2020. In addition, Kiseleva was Head of Investor Relations from April 2015 until December 2020. Prior to joining Qiwi, Kiseleva worked at Macquarie Russian Infrastructure Fund and KPMG. She holds a bachelor and a master's degree in banking from National Research University Higher School of Economics.

31. Defendant Korzh served as Qiwi's CFO from December 1, 2020 to April 2, 2021.[3] Korzh joined the Company in August 2020 as CFO of its wholly owned subsidiary, Qiwi Bank. Korzh has over 20 years of experience in finance. Prior to joining Qiwi, Korzh worked as CFO at

---

[3] On March 3, 2021, Qiwi announced Korzh's resignation as purportedly due to "personal reasons" and revealed that Elena Nikonova, Qiwi's then Deputy CFO for Financial Reporting (appointed in 2019), would serve as interim CFO. Prior to her position as Deputy CFO, Nikonova worked as Qiwi's Deputy Head of International Financial Reporting Standards (IFRS) Department from 2010 to 2019.

Ozon (a leading e-commerce company in Russia that went public on Nasdaq in 2020) and Wikimart (an online marketplace). He also worked at the Director of Treasury and Corporate Finance and Director of Financial Reporting at CTC Media and held various positions at PricewaterhouseCoopers. Korzh graduated from the Moscow State Institute of International Relations (MGIMO University) with a degree in International Economic Relations.

32.     The Individual Defendants, because of their positions with Qiwi, had access to non-public information about its business operations and prospects, financial condition, markets, and meetings and communications with the Central Bank and/or other third-parties *via* access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and *via* reports and other information provided to them in connection therewith. Because of the Individual Defendants professional achievements, education, and relevant industry expertise, the Individual Defendants were aware of regulatory requirements and had access to industry standards and protocols for record-keeping and reporting.

33.     As such, the Individual Defendants had access to material adverse non-public information concerning the Central Bank's audit of Qiwi Bank and its record-keeping and reporting. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

34.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained

12

therein and omissions therefrom, and were aware of their materially false and misleading nature. Each of the Individual Defendants had access to the adverse undisclosed information about Qiwi's record-keeping and reporting as specified herein, and knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about Qiwi and its business, which were issued or adopted by the Company, materially false and misleading.

35. In addition, the Individual Defendants, by reason of their positions with Qiwi, were "controlling persons" within the meaning of § 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Qiwi's business.

36. As control persons of a publicly traded company whose securities was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Qiwi's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Qiwi's securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions of material facts during the Class Period violated these specific requirements and obligations.

37. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Qiwi's publicly traded securities by disseminating materially false and misleading statements and/or concealing material

13

adverse facts. The scheme deceived the investing public concerning the CBR's audit of Qiwi Bank and its record-keeping and reporting, causing Lead Plaintiff and other members of the Class to purchase Qiwi securities at artificially inflated prices.

38. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

39. The scienter of the Individual Defendants and other employees and agents of Qiwi is similarly imputed to the Company under *respondeat superior* and agency principles.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Relevant Background Regarding Qiwi

40. Qiwi purports to be a leading provider of next generation payment and financial services in Russia and the CIS, with an integrated proprietary network of e-wallets and cash-collecting terminals and kiosks enabling merchants and consumers to instantly make, accept, and transfer cash and e-payments across online, mobile, and physical environments interchangeably.

41. The Company's payment services business, encompassing its virtual distribution services (Qiwi Wallet), physical distribution (kiosks and terminals), Contact money remittance system, and merchant focused services, or E-commerce (including, betting companies), has been and continues to be a major focus of its operations. Historically, Qiwi's payment services business has generated most of its revenues.

42. Qiwi operates its payment services primarily through its virtual products, most notably Qiwi Wallet. Qiwi Wallet enables Qiwi's customers to access, make, and receive payments through their computers or mobile devices. To set up a Qiwi Wallet, customers create an online account, or virtual wallet, with Qiwi through a variety of interfaces where the customer can store money deposited from cash or funded from other sources, such as pre-paid cards, bank accounts,

mobile phone balances, or money transfers. With a Qiwi Wallet, customers can make online payments and purchases at any time. Further, as discussed in detail below, prior to July 2019, customers were also allowed to make cash payments and withdraws from "anonymous" e-wallets directly through one of Qiwi's physical distribution networks.[4] In addition, Qiwi Wallet accounts can be linked to virtual or physical Visa pre-paid cards that can be used to make purchases at any merchant accepting Visa worldwide.

43.     The default for the Company is an "anonymous" Qiwi Wallet, meaning customers only need to provide a phone number to open an account— as touted by Qiwi, "[m]aking a wallet is easier than tying your shoelaces."[5] Customers who choose to be identified receive advanced features and options, but most wallets remain without personification as that functionality is enough for most everyday transactions.

44.     By the end of 2019, 534.6 million e-wallets had been opened in Russia, of which only 17.1 million were personalized.[6] During that year, Russians used those e-wallets to make 2.8 billion transactions totaling 1.9 trillion rubles. Of those transactions, **800 billion rubles** fell on anonymous wallets. The largest share of e-wallets belongs to Yandex.Money (48.5%), followed by WebMoney (38.9%), PayPal (38.6%), and Qiwi (36.2%).

45.     Through a Qiwi Wallet, customers can virtually access Qiwi's merchants. The Company also provides hyperlink icons placed directly on its kiosk screens for Qiwi's larger merchants. Qiwi's merchants are vendors, including online retailers and service providers, betting

---

[4] *Anonymous replenishment of Yandex.Money and QIWI wallets will be banned in Russia*, RBC (July 29, 2019) https://www.rbc.ru/finances/29/07/2019/5d3b00db9a7947f7ddbd3787 (last visited June 14, 2021) (Google trans.).

[5] QIWI, PLC, https://qiwi.com (last visited July 6, 2021) (Google trans.).

[6] *Tax Service got access to data on electronic wallets of Russians*, RBC (Apr. 1, 2020) https://www.rbc.ru/finances/01/04/2020/5e834c079a79475db11e1698 (last visited June 14, 2021) (Google trans.).

companies, banks, microfinance organizations, money remittance companies, mobile network operators, and utilities.

46.     As of December 31, 2020, Qiwi had approximately 10,900 merchants active on its system, on a monthly basis. According to the Company, it regularly adds new merchants to its list "with the aim of creating a 'one-stop' experience for [its] customers."

47.     In September 2010, Qiwi acquired Qiwi Bank (which is licensed credit organization in the Russian Federation) to serve as a platform for Qiwi Wallet. As Qiwi explains it:

> When a consumer deposits cash into his or her Qiwi Wallet account, Qiwi Bank issues a virtual prepaid card to a consumer. Qiwi Bank also issues plastic cards to Qiwi Wallet customers. Funds received by Qiwi Bank from customers loading and reloading their Qiwi Wallet accounts are held on Qiwi Bank's account. Qiwi Bank does not pay interest on Qiwi Wallet accounts.[7]

48.     Thus, Qiwi Bank "is not a credit institution in its classical form" but "is the settlement center of the Qiwi payment system, which has only electronic wallets."[8]

49.     In addition, as of April 2017, Qiwi Bank became the operator of Qiwi's Contact money remittance system, and its operational, payment clearing and settlement center. Qiwi's Contact money transfer system provides, *without opening a bank account*, fund transfer services to individuals and legal entities in Russia, CIS, and abroad, and it allows customers to reload cards of international payment systems such as MasterCard, Visa, and UnionPay.

50.     Notably, payouts of winnings to customers from Qiwi's sports gambling merchants are included in its Money Remittances services.[9]

---

[7] QIWI plc, Annual Report (Form 20-F) p. 97 (Apr. 15, 2021).
[8] *Staying Alive: A Loophole for Illegal Online Bookmakers*, BETTING BUSINESS RUSSIA (AUG. 5, 2019), https://bettingbusiness.ru/articles/0014100-ostatsya-v-zhivyh-lazejka-dlya-nelegalnyh-onlajn-bukmekerov (last visited June 14, 2021) (Google trans.).
[9] QIWI plc, Annual Report (Form 20-F) p. 15 (Mar. 28, 2019).

51.     As a licensed credit organization, Qiwi Bank is subject to regulation by the CBR. As Qiwi explains it:

> All banks and non-banking credit organizations operating in Russia are subject to extensive regulation and supervision. Requirements imposed by regulators, including capital adequacy, liquidity reserves, prudential ratios, loss provisions and other regulatory requirements are designed to ensure the integrity of the financial markets and to protect consumers and other third parties with whom a bank deals. These regulations may limit our activities, and may increase our costs of doing business, or require us to seek additional capital in order to comply with applicable capital adequacy or liquidity requirements. Existing laws and regulations could be amended, the manner in which laws and regulations are enforced or interpreted could change and new laws or regulations could be adopted. Russian banks also have extensive reporting obligations, including, without limitation, disclosure of financial statements, various operational indicators, and affiliates and persons who exercise (direct or indirect) influence over the decisions taken by the management bodies of the bank. **The CBR may at any time conduct full or selective audits of any bank's filings and may inspect all of its books and records.**[10]

52.     The CBR was the main regulator of the Russian banking industry until September 1, 2013, after which it became a mega-regulator of all financial markets of Russia. The CBR's goals are "to protect the ruble and ensure its stability; to develop and strengthen the banking system of the Russian Federation, to ensure stability of and develop the national payment system, and to develop the financial market of the Russian Federation to ensure its stability."[11] The CBR's powers are, in effect, the functions of a body of state power, because their implementation implies the use of state enforcement. The CBR is accountable to the State Duma of the Federal Assembly of the Russian Federation (the "State Duma").

---

[10] QIWI plc, Annual Report (Form 20-F) p. 12 (Mar. 28, 2018).
[11] Legal Status and Functions, BANK OF RUSSIA, https://www.cbr.ru/eng/about_BR/bankstatus/ (last visited June 14, 2021).

### 1. *Qiwi Operates One of Three TSUPIS Centers in Russia*

53.     Capitalizing on its position as a licensed credit organization, Qiwi established a unique position in the fast-growing market of online betting as the co-operator of one of only three interactive bets accounting centers (TSUPIS).

54.     On July 21, 2014, Russian regulators introduced the interactive bet (интерактивные ставки),[12] an amendment to Federal Law No. 244-FZ, "[o]n state regulation on the organization and management of gambling operations, and on amending individual legislative acts of the Russian Federation" (the "Betting Law"), dated December 2006, changing the industry and establishing a legal basis for online bookmaking.[13] Pursuant to the amended Betting Law, any bookmaker, licensed by Russia's Federal Tax Service ("FTS"), could undertake interactive bets, and no specific online license was needed. However, the licensed bookmaker must disclose the domain name through which it would operate online (they are limited to one) and must be a member of a self-regulatory organization ("SRO"). In addition, the servers handling the transactions must be physically located within Russia. Moreover, interactive bets are limited to only sports betting and totalizator verticals. Online casinos in any form are explicitly banned.

55.     With the legalization of online bookmaking, Russia saw a spike in licensed gambling operations. Specifically, between 2013 and 2015, the number of gambling operators

---

[12] *Gambling in Russia: Policies, Markets, and Research*, INTERNATIONAL JOURNAL OF RUSSIAN STUDIEs, Issue No. 9 (2020/2), http://www.ijors.net/issue9_2_2020/pdf/__www.ijors.net_issue9_2_2020_article_2_marionneau.pdf.

[13] Stephen Carter, *Online betting in Russia: an overview*, iGB (Feb. 18, 2020), https://igamingbusiness.com/online-betting-in-russia-an-overview/ (last visited June 14, 2021).

18

paying taxes had grown from 39 to 728, an increase of 1,867%.[14] The most significant growth came from a rise in the number of bookmaker betting shops, which increased by a factor of 116.

56.   In 2016, the tax on gambling businesses amounted to 809.4 million RUB, up from 623 million RUB in 2015, mainly due to increases in the numbers of taxable objects. The largest share of this revenue (404.9 million RUB) came from the casino sector, followed by bookmakers (379.9 million RUB) and totalizator betting (24.5 million RUB).

57.   Then in November 2017, Russian President Vladimir Putin ("Putin") signed into law an amendment to Part Two of the Tax Code of the Russian Federation doubling gambling tax rates and clarifying the peculiarities of calculating the amounts of income tax in the form of winnings and the procedure for taxation of gambling objects.[15] As such, under Russian law, bettors must pay a 13% tax from their winnings to the Federal Tax Service. The bookmaker is supposed to automatically withhold 13% of net winnings (winnings minus bet amount) when funds are withdrawn.

58.   While the SROs control the bookmaking industry and act as the primary level of regulatory oversight under Russian law, the transactions themselves must be accepted through a centralized financial processing system called TSUPIS (Центр Учёта Переводов Интерактивных Ставок, or Centre for Accounting of Interactive Bet Transactions). A TSUPIS must be set up by a credit organization, like Qiwi, and an SRO.

---

[14] *Gambling in Russia: Policies, Markets, and Research*, INTERNATIONAL JOURNAL OF RUSSIAN STUDIEs, Issue No. 9 (2020/2), p. 128, http://www.ijors.net/issue9_2_2020/pdf/__www.ijors.net_issue9_2_2020_article_2_marionneau.pdf.

[15] *The President of the Russian Federation signed the law on doubling the tax rates on gambling business*, BETTING BUSINESS RUSSIA (Nov. 28, 2017), https://bettingbusiness.ru/news/0011012-prezident-rf-podpisal-zakon-ob-udvoenii-stavok-naloga-na-igornyj-biznes (last visited July 6, 2021) (Google trans.).

59.     Initially opened to ensure safety and prevent fraud, the TSUPIS acted as an intermediary between a bookmaker and a bettor, guaranteeing security of payments.[16] On the other hand, TSUPIS acts as a creditor for the SROs of Russian bookmakers. The TSUPIS does not take bets on its own, but transfers money from a bettor to the bookmaker's account and vice-versa, when winnings were withdrawn. Russian government officials stated that they would only favor online bookmakers and gambling operators compliant with its TSUPIS center, designed to protect Russian consumers against criminal and fraudulent activities.[17]

60.     Currently, three TSUPIS exist: TSUPIS-1, TSUPIS-2, and TSUPIS-3.[18] The first TSUPIS began its operations in February 2016.[19] To legally participate in interactive betting, players must verify his/her identity twice: for the bookmaker and for the TSUPIS organization. The key requirements include: Russian citizenship; adulthood; and identity verification. To register with TSUPIS-1, the player must visit the first TSUPIS's official website; fill in the fields with a valid phone number and email address and create a password; enter a code received in an SMS message; choose a bookmaker and pass their identification requirements. To verify their identity with most bookmakers associated with TSUPIS-1, a player must physically attend a bookmaker location or local Euroset store with a passport, mobile telephone, and tax number. The first TSUPIS accepts payment through e-wallets, as well as debit and credit cards.

---

[16] *What is TSUPIS, and who benefits from it?*, 3SNET LIMITED, https://3snet.co/en/news/chto-takoe-cupis-i-komu-eto-vygodno/ (last visited May 27, 2021).

[17] Leonard Postrado, *Russia censorship targets sports betting portals, affiliates*, CALVINAYRE.COM (July 11, 2016), https://calvinayre.com/2016/07/11/business/russia-censorship-targets-sports-betting-portals-affiliates/ (last visited July 9, 2021).

[18] *What is TSUPIS, and who benefits from it?*, 3SNET LIMITED, https://3snet.co/en/news/chto-takoe-cupis-i-komu-eto-vygodno/ (last visited May 27, 2021).

[19] I Davletsin, P Raciborki, *Russian Technology, Digital battleground*, Wood & Company, pp. 41-42 (Dec. 2, 2019), www.wood.com

61.     The second TSUPIS, launched in December 2016, is a joint project by the Association of Bookmakers SRO ("Bookmakers SRO") and Qiwi Bank. TSUPIS-2 does not require registration or physical attendance at the bookmaker or Euroset store. To register in the TSUPIS-2, players visit www.qiwi.com and create a wallet. As a reminder, to create a Qiwi Wallet, customers only need to provide a valid phone number. TSUPIS-2 routes all payments through the Qiwi platform, and support service is provided by the Qiwi support team through email and a hotline. Furthermore, bettors can only use Qiwi Wallet as the method of payment.

62.     The third TSUPIS offers bettors the option to verify their identity online or to pass full identification through one of the following ways: visit the TSUPIS-3's office, provide notarized documents; verify identity in one the Euroset stores or at one the Contact Payment System service points.[20]

63.     Again, the main functions of a TSUPIS are: to accept interactive bets in favor of the members of the SROs; to pay winnings to players; to verify the age of the bettors; and to record and provide to the members of the SROs, information on the bettors and accepted interactive bets.

64.     On July 3, 2019, Putin signed a law to simplify the identification of players through the TSUPIS.[21] The law was aimed at eliminating duplicative provisions requiring double identification of a gambling participant. The law allowed bookmakers to accept interactive bets from bettors who have been identified through the TSUPIS.

---

[20] *What is TSUPIS, and who benefits from it?*, 3SNET LIMITED, https://3snet.co/en/news/chto-takoe-cupis-i-komu-eto-vygodno/ (last visited May 27, 2021).

[21] *Putin signed a law to simplify the identification of players in the bookmaker*, BETTING BUSINESS RUSSIA (July 4, 2019), https://bettingbusiness.ru/news/0014029-putin-podpisal-zakon-ob-uproshenii-identifikacii-igrokov-v-bk (last visited July 6, 2021) (Google trans.).

### 2. *Online Betting was a Significant Source of Revenue for Qiwi*

65. As the operator of TSUPIS-2, going into 2017, Qiwi was in prime position to capitalize on the fastest growing sector of the Russian economy – bookmaking.[22] The estimated turnover of the bookmaking industry, both legal and illegal, amounted to 677 billion RUB (10.1 billion USD) in 2017 and online betting represented approximately 62% of that market. The Olympics and the FIFA World Cup aided the significant growth of payments from bookmakers' customers in 2017-2018.

66. Indeed, by 2019, Qiwi reported payment volumes of 1,488.6 billion RUB for its Payment Services segment[23] – specifically, 410.6 billion RUB for its E-commerce and 549.1 billion RUB for its Money remittance verticals.[24] Approximately 21.6% of Qiwi's Payment Services segment payment volume came from processing payments to betting merchants.[25]

67. Because Qiwi was processing bookmaker transfers, it was capturing nearly half of the legal market.[26] As a result, the share of betting for its turnover more than doubled from 6.9% in 2016 to 15.5% in 2018. The Company's development director, Nikolay Volchek ("Volchek"), noted that "[t]his market growth reflects both the low base effect and the fact that the segment itself was growing - bookmakers were allowed to advertise on television. Plus, during this period,

---

[22] *Gambling in Russia: Policies, Markets, and Research*, INTERNATIONAL JOURNAL OF RUSSIAN STUDIES, Issue No. 9 (2020/2), http://www.ijors.net/issue9_2_2020/pdf/__www.ijors.net_issue9_2_2020_article_2_marionneau.pdf.

[23] Payment Services payment volume – consists of the amount paid by Qiwi's customers to merchants, including betting companies, or other customers included in each market vertical (E-commerce, financial services, money remittances and telecom) less intra-group eliminations.

[24] Qiwi plc, Annual Report (Form 20-F) p. 48 (Mar. 24, 2020).

[25] Qiwi plc, Annual Report (Form 20-F) p. 17 (Mar. 24, 2020).

[26] *Staying Alive: A Loophole for Illegal Online Bookmakers*, BETTING BUSINESS RUSSIA (AUG. 5, 2019), https://bettingbusiness.ru/articles/0014100-ostatsya-v-zhivyh-lazejka-dlya-nelegalnyh-onlajn-bukmekerov (last visited July 6, 2021) (Google trans.).

there were such sports events as the Europa League, Champions League, and the FIFA World Cup. They became the catalyst for this growth." [27]

68.     Qiwi was able to make money on several bookmaker products. First, the Company received a commission because its infrastructure was used for settlements between bookmakers and gamblers. According to a Forbes source, Qiwi charged about 3.5% for depositing money and 5% for receiving a prize. Volchek had explained that Qiwi "automatically create[s] a wallet for each user, as required by law. The client does not see this, and it does not matter for him how he transfers money - through other e-wallets or through a bank card." Qiwi wallets are then used for settlements at rates and in MCCIS, for which the Company also receives a commission. Lastly, Qiwi earned 1.8% to 2.2% directly from the acquiring commission, making payments between bookmakers and banks.

69.     Qiwi's share of income from receiving payments to bookmakers, *i.e.* payment processing fees, has been estimated to be as high as 35-40% of its revenue for 2018, or 6.9-7.9 billion RUB. Defendant Solonin confirmed in 2018 "that Qiwi's bookmaker transactions account for about 70% of e-commerce traffic."[28]

70.     Throughout the Class Period, "[p]rocessing payments for betting merchants represent[ed] a significant portion of [Qiwi's] revenues and also generally carrie[d] higher margins than processing payments to merchants in most of the other market verticals [the Company]

---

[27] Yulia Titova and Lyudmila Petukhova, *Qiwi's new source of income: the company earned up to 40% of revenue from bookmakers*, FORBES (June 25, 2019, 00:58), https://www.forbes.ru/finansy-i-investicii/378361-novyy-istochnik-dohoda-qiwi-kompaniya-zarabotala-do-40-vyruchki-na (last visited June 14, 2021) (Google trans.).

[28] *Staying Alive: A Loophole for Illegal Online Bookmakers*, BETTING BUSINESS RUSSIA (Aug. 5, 2019), https://bettingbusiness.ru/articles/0014100-ostatsya-v-zhivyh-lazejka-dlya-nelegalnyh-onlajn-bukmekerov (last visited June 14, 2021) (Google trans.).

23

serve[d]. Furthermore, gains received by [the Company's] consumers from betting into their Qiwi Wallet accounts represents one of the significant reload sources for Qiwi Wallet accounts."[29]

71.    Qiwi's revenue from processing payments to betting merchants are included in its E-commerce market vertical and processing customer winnings (settlements) are included in its Money Remittance market vertical, which are both segments of the Company's Payment Services. The chart below illustrates Qiwi's revenue reported for these segments during the Class Period through its most recent quarterly filing:

| Three months Ended | Adjusted Net Revenue (in millions) (USD) | | | |
|---|---|---|---|---|
| | Total Revenue | Payment Services | E-Commerce | Money Remittances |
| Sept. 30, 2018 | 79.7 | 55.9 | 31.1 | 16.5 |
| Dec. 31, 2018 | 83.7 | 59.3 | 34.9 | 16.7 |
| Mar. 31, 2019 | 82.9 | 64.5 | 38.2 | 18.8 |
| June 30, 2019 | 88.2 | 69.9 | 40.0 | 22.1 |
| Sept. 30, 2019 | 93.0 | 72.6 | 41.3 | 22.2 |
| Dec. 31, 2019 | 101.0 | 78.2 | 44.6 | 24.1 |
| Mar. 31, 2020 | 80.5 | 59.1 | 34.9 | 17.4 |
| June 30, 2020 | 97.8 | 65.9 | 38.4 | 18.8 |
| Sept. 30, 2020 | 83.3 | 66.6 | 39.2 | 20.1 |
| Dec. 31, 2020 | 84.5 | 68.3 | 34.6 | 24.5 |
| Mar. 31, 2021 | 68.2 | 53.7 | 23.5 | 25.1 |

72.    The Individual Defendants had actual knowledge of Qiwi's revenue streams, and the significant amount online gambling contributed to the Company's business. During the Company's quarterly call with investors to discuss its financial results for the third quarter of 2018 ("3Q18 Earnings Call"), Defendant Solonin touted, "***Our results this quarter were mainly driven by the growth in our key vertical, currently our betting related payment services that presented as part of our e-commerce market vertical***[.]"

---

[29] QIWI plc, Annual Report (Form 20-F) p. 9 (Mar. 28, 2019); Qiwi plc, Annual Report (Form 20-F) p. 10 (Mar. 24, 2020).

73. During a call with investors regarding Qiwi's financial results for the fourth quarter of 2018 ("4Q18 Earnings Call"), Defendant Karavaev had the following exchange with analyst Svetlana Sukhanova with Sberbank:

*Sukhanova*: [C]an you help us betting services, how much was it either of total payments of payment services or can you give us approximately the size, the significant part of the payment business as of now? Betting business, I mean, betting business?

*Karavaev*: **It's a substantial part**. It's, I mean, it's involved the payment gateways, **it's just around half of our business**.

*Sukhanova*: Half of the payment business, in terms of payment volumes range of what? Is it half of ecommerce business or half of payment services business? Apologies.

*Karavaev*: **Half of payment services business**.

74. During a call with investors regarding Qiwi's financial results for the first quarter of 2019 ("1Q19 Earnings Call"), in response to a question from analyst Svetlana Sukhanova with Sberbank about "what kind of betting contribution was the e-commerce growth or e-commerce revenues in the first quarter," Defendant Solonin stated that "**for sports betting, it's still one of the key categories. So it has continued to the major part of the segment**." Ms. Sukhanova followed up with the question, "[b]ut what's a major part? Because for the full year you, I think you said that it's about 60% of your e-commerce revenue. So is the major part is it's like 80%, 90% or what kind of ratios that are going to come?" Defendant Solonin responded by stating, "[w]ell, I'm really disclosing the kind of both the numbers but the composition of net revenue **within these segments remained on a stable compared to the last quarter**."

75. Then, Defendant Kiseleva and analyst Sukhanova had the following exchange during an investor call regarding the Company's financial results for the second quarter of 2019 ("2Q19 Earnings Call"):

25

*Sukhanova*: [S]o my first question in betting could be if you can kindly disclose or give us some kind of hint what percent of betting revenues as of your total payment revenues. Is it more than 30%? How significant – any hint would be much appreciated? And second question in betting would be if I look at 100% of your betting revenues, how would this be separated between e-commerce and Money Remittances segment because when asked about Money Remittances segment, the effect of betting, the answer was it's pretty insignificant for the acceleration, but how significant betting revenues for Money Remittances segment and the split between e-commerce and Money Remittance? Thank you.

*Kiseleva*: Yes, hi. So in terms of the split between categories, digital entertainment category, overall, the majority consist of the major part of the e-commerce category. We do not disclose separately the betting revenues. And ***if we are discussing the contribution of betting in e-commerce and Money Remittance, the major part by far would be booked into e-commerce category***.

*Sukhanova*: That's very clear. Thank you very much. Quick question, a quick follow-up on digital entertainment, what else do you include in digital entertainment? Is it games or it's pretty much all e-commerce or what is it, in fact?

*Kiseleva*: That's online. ***That's online games, social network, some parts of the donations and e-sports, cyber sports, etcetera, everything which you can basically call digital entertainment***.

76.     Likewise, during a call with investors regarding the Company's financial results for the fourth quarter of 2019 ("4Q19 Earnings Call"), in response to questions from Andrey Pavlov-Rusinov with Goldman Sachs about "what actually was your betting share in payments and revenues in the fourth quarter and also in the Money Remittances, as far as I remember there is also or kind of a share of volumes that are related to betting payout, so also what is there, what is the share there," Defendant Kiseleva stated:

So as we've discussed, we don't disclose the exact share of betting revenues in our e-commerce market vertical. But I can say that ***for 2019, we have disclosed the share of betting in volumes. It's roughly around 22%, information is disclosed in our 20-F report – 22% of the entire group volume.***

So you can basically extrapolate to the share in revenues. So ***that's for the betting as part of the quarters. And in terms share of Money Remittance, which is***

*connected with the payout for betting merchants that would be around like mid-teens percentages.*

**B.    Russian Authorities Tightened Regulations on E-Wallets and Online Gambling as the Acting Institutions, Including Qiwi, Continued to Fail to Prevent Illicit Activity.**

77.    Russian authorities have long had a strong interest in regulating online financial transactions, in an effort to combat illicit activity. Likewise, Defendants have been on notice of Qiwi's payment system being used to commit fraud, illegal trading, and other unlawful activities. As the provider of anonymous e-wallets and the operator of TSUPIS-2, Qiwi's business has been heavily impacted by new regulations.

*1.    The Anonymity Default for Qiwi E-Wallets Has Invited Illicit Actors and Put Defendants on Notice of the Risk of Qiwi Violating Applicable Regulations.*

78.    In a world with internet banks, banking apps and plastic cards, Qiwi is one of many players, and for Russia, is not the most popular or the most innovative. However, Qiwi has positioned itself as a leading payment system among payers who prefer cash and anonymity. Because Qiwi Bank is not a bank in the classical form, Qiwi does not have legal obligation to identify its customers. Thus, for the same reason as millions of security-conscious Russians, illicit actors are drawn to the Company's services—allowing people to transfer money electronically without having to transmit sensitive bank account information and without having to have a bank account in the first place. However, despite ample notice and opportunity to be proactive, for years, the Company chose to be reactive instead.

79.    Indeed, as early as July 2013, Qiwi Bank was inspected by the CBR, resulting in the discovery of deficiencies in the Company's compliance with certain banking regulations.[30]

---

[30] *Qiwi plc: An Attempt At Answering The Most Important Questions*, SEEKING ALPHA (Jul. 27, 2015, 08:58 AM ET)).

27

Thereafter, the Company assured investors these deficiencies had been rectified and Qiwi paid a fine of 150,000 RUB (or 2,593 USD).

80.     Following a series of suicide bombings that killed 34 people in Volgograd at the end of 2013, on January 15, 2014, Russian lawmakers introduced amendments to the Country's counter-terrorism laws that would limit electronic financial transactions and increase government surveillance.[31]  Specifically, the proposed legislation would restrict anonymous online payments to no more than 1,000 RUB (30 USD) per day or 15,000 RUB per month for one user, down from the then current limit of 15,000 RUB per transaction or 40,000 RUB per month. Industry analysts estimated that the new measures could cause the volume of Russian's online payment transactions to shrink by 50 to 80 percent. Qiwi investors reacted negatively to this news. After closing at $53.96 on January 14, Qiwi opened at $50.01 on January 15 and plummeted to $40 within the first half-hour of trading.

81.     The final version of the amended law passed on May 5, 2014, and while anonymous payments under 15,000 RUB were retained, the legislation did ban anonymous payments of any size if they were between individuals rather than companies or other organizations.[32] And on January 10, 2021, amendments to the counter-terrorism law came into force, providing even stricter control over cash flow and non-cash transactions exceeding 600,000 rubles.

82.     In September 2014, the CBR again discovered a number of violations of the Russian National Payment System Law at Qiwi Bank. The CBR issued an order requiring Qiwi to

---

[31] *Qiwi Shares Plummet as Anti-Terror Bill Targets Electronic Payments*, THE MOSCOW TIMES (Jan. 16, 2014), https://www.themoscowtimes.com/2014/01/16/qiwi-shares-plummet-as-anti-terror-bill-targets-electronic-payments-a31145 (last visited June 14, 2021).
[32] Joanna Paraszczuk, *IS Militants Use Popular Russian Web Payment System To Raise Cash,* TRACKING ISLAMIC STATE, RADIOFREEEUROPE RADIOLIBERTY (May 17, 2015, 16:05 GMT) https://www.rferl.org/a/islamic-state-funding-russian-web-payments-qiwi/27021379.html (last visited July 6, 2021).

rectify the violations and implement the CBR's recommendations, including the adoption of an internal action plan, which contained step-by-step measures to ensure no such violations would occur in the future.

83.     Thus, at least since 2014, Qiwi has been aware that the lack of identification required from its customers could be "easily exploited to transfer proceeds from illicit activities, from drug dealing to tax evasion."[33] Indeed, The New York Times ("NY Times") reported as part of an article on June 12, 2015 that "QIWI's chief executive, Sergei Solonin, said in a telephone interview that QIWI blocked some of the accounts identified by The Times last summer because they were engaged in fund-raising activity prohibited by company policy."

84.     Likewise, in cooperation with law enforcement officials in connection with an investigation relating to clients of Qiwi Bank, Qiwi was required "to provide certain additional information concerning its users, clients, partners and employees."[34] As noted in the Company's Form 6-K filed on February 20, 2015, "[c]ooperation with law enforcement agencies is one of the tasks of our company. We closely cooperate with them in matters that relate to uncovering fraud, illegal trading and other unlawful activities."[35]

85.     Thus, since at least 2015, Qiwi has been aware of the importance of record keeping and the need for proper internal controls as "Qiwi Group continues to receive and handle enquiries from law enforcement agencies on a regular basis."

86.     Despite lawmakers' efforts to quash the use of e-payments systems, like Qiwi, for terrorist financing, in May 2015, Radio Free Europe/Radio Liberty ("RFE/RL"), reported that an

---

[33] Jo Becker and Steven Lee Myers, *Russian Groups Crowdfund the War in Ukraine*, THE NEW YORK TIMES (June 11, 2015) https://www.nytimes.com/2015/06/12/world/europe/russian-groups-crowdfund-the-war-in-ukraine.html?searchResultPosition=1 (last visited July 6, 2021).
[34] QIWI, plc, Current Report (Form 6-K) (Feb. 20, 2015).
[35] QIWI, plc, Current Report (Form 6-K) (Feb. 20, 2015).

Islamic State (IS) militant group was openly using Qiwi services to raise money, even though Russian banned IS and donating money to it was illegal. Specifically, the IS militant group provided a Qiwi account number on its official page, allowing IS sympathizers who wanted to donate to do so either through a Qiwi kiosk or *via* their smartphone, by transferring money from their own Qiwi account to the IS militant group's Qiwi account. Qiwi responded to an inquiry by RFE/RL regarding this illegal use of its services providing that the Company operates in "strict compliance with applicable legislation including legislation to combat money laundering or criminal funds and terror financing." Qiwi went on to add:

> The Company is taking all necessary and applicable legal measures to protect its services from penetration by criminal proceeds and also to minimize the risk of the company being involved in the laundering of proceeds from criminal activities and terrorist financing.[36]

87.     However, without additional identification requirements, Qiwi's efforts to combat illicit activity were futile. Underscoring just how difficult it can be to curtail illicit activities, as noted by the NY Times, many actors with accounts blocked by Qiwi simply update their page to include a new Qiwi account number.[37]

88.     Despite being on notice and warning investors about Qiwi's payment system being used for illicit transactions for years, Russian media reported a criminal trial in February 2019

---

[36] Joanna Paraszczuk, *IS Militants Use Popular Russian Web Payment System To Raise Cash,* TRACKING ISLAMIC STATE, RADIOFREEEUROPE RADIOLIBERTY (May 17, 2015, 16:05 GMT) https://www.rferl.org/a/islamic-state-funding-russian-web-payments-qiwi/27021379.html (last visited July 6, 2021).

[37] Jo Becker and Steven Lee Myers, *Russian Groups Crowdfund the War in Ukraine*, THE NEW YORK TIMES (June 11, 2015) https://www.nytimes.com/2015/06/12/world/europe/russian-groups-crowdfund-the-war-in-ukraine.html?searchResultPosition=1 (last visited June 14, 2021).

involving the organized criminal group "Vovse" that had been using the Qiwi payment service as well as cryptocurrency in mutual settlements involving the sale of illegal drugs.[38]

### 2. Qiwi's Lax Identification Requirements and Payment Processing Controls Conflicted with Its Responsibilities as a TSUPIS and Its Support of Regulators' Fight Against Illegal Gambling.

89.     While Regulators were attempting to stifle illicit actors by approving new limitations on the authorized payment amounts between anonymous individuals, the 2014 amendments to the Betting Laws opened the possibility of transfers to gambling and lottery companies deemed in violation of Russian regulations. When the interactive bet was first introduced, the law was unclear and some believed it allowed for full online betting, while others construed the law to apply only to financial transactions associated with betting.[39] In practice, the interactive bet developed under the broader understanding and was confirmed with amendments to the Betting Law in July 2019, to clarify that the law constitutes an exclusive exception to the prohibition on remote gambling.

90.     However, as previously discussed, Russia regulators intended online betting to a local game – meaning interactive bets placed with local bookmakers through a TSUPIS center is the only legal vehicle for online betting. International transactions involving gambling are not allowed unless the offshore merchant partners with a commercial arrangement with a local licensed bookmaker.[40]

---

[38] *In Ryazan, members of the organized criminal group "Vovse"*, YA62, (Feb. 25, 2019, 07:28 PM), https://ya62.ru/news/laworder/v_ryazani_sudyat_chlenov_ong_vovse/ (last visited June 16, 2021) (Google trans.).

[39] Stephen Carter, *Online betting in Russia: an overview*, iGB (Feb. 18, 2021), https://igamingbusiness.com/online-betting-in-russia-an-overview/ (last visited July 9, 2021).

[40] Stephen Carter, *Online betting in Russia: an overview*, iGB (Feb. 18, 2021), https://igamingbusiness.com/online-betting-in-russia-an-overview/ (last visited July 9, 2021).

91.     Indeed, from October 2015 to July 2016, the Russian Federal Service for Supervision of Communications, Information Technology and Mass Media ("Roskomnadzor") regulator shut out more than 6,000 gambling and lottery websites – including sports betting portals – and their affiliates that the Russian government deemed violating their regulations.[41] From June 8 to 21, 2016 alone, at least 118 online casinos and online bookmakers' websites and 50 applications in Apple's App Store and Google Play were blocked by the Russian media regulator. Such sites included everything from unregulated Russian sportsbooks to well-known Western brands like PokerStars and William Hill.[42]

92.     As part of its clampdown on unlicensed online gambling, Roskomnadzor sent a cease-and-desist letter to Qiwi in July 2016 to remove from its website links to Internet casinos and opportunities to transfer money to bookmakers.[43] As a result of the letter and being blacklisted, *i.e.* entered into Russia's unified register of Internet resources containing information banned in the Russian Federation, Qiwi deleted the offending online gambling advertisements from its pages.[44] At the time, the president of the Bookmakers SRO, Konstantin Makarov, stated that "[i]f

---

[41] Leonard Postrado, *Russia censorship targets sports betting portals, affiliates*, CALVINAYRE.COM (July 11, 2016), https://calvinayre.com/2016/07/11/business/russia-censorship-targets-sports-betting-portals-affiliates/ (last visited June 15, 2021).

[42] Katie Barlowe, *Russia Blacklists Skrill and QIWI in Clampdown on Payment Processors*, CASINO.ORG (July 18, 2016, 06:35 AM, updated Oct. 12, 2016, 08:34 AM), https://www.casino.org/news/russia-blacklists-skrill-qiwi-clampdown-payment-processors/ (last visited June 15, 2021).

[43] Dmitry Churin, *Roskomnadzor sends notices to take down information from payment service sites*, CAPITAL LEGAL SERVICES (July 19, 2016), https://www.cls.ru/press-centr/legal-overviews/roskomnadzor-sends-notices-to-take-down-information-from-payment-service-sites/ (last visited June 15, 2021).

[44] Steven Stradbrooke, *Russia blacklists payment processors Skrill and Qiwi over online gambling links*, CALVINAYRE.COM (July 15, 2016), https://calvinayre.com/2016/07/15/business/russia-blacklists-payment-processors-skrill-qiwi-online-gambling-links/ (last visited June 15, 2021).

32

Roskomnadzor made such a decision, then the company had violations. As far as I know from the media, Qiwi is now actively working to prepare its resources in accordance with applicable law."[45]

93.     Regarding why Russian authorities honed in on blocking Qiwi, the Chairman of the Board of Directors of the First TSUPIS, Anton Rozhkovsky, noted in an interview that the Company was "among the most noticeable in terms of the share of processed payments and the coverage of the Russian audience in this segment" and that "the state will soon have other mechanisms to directly block payments … including non-residents."[46] He also believed that Russian authorities would "create a register of illegal gambling companies, with which banks will be prohibited from conducting transactions," and that Russian banks would "carefully comply with the instructions of this register, since the control over them is now very serious."

94.     When TSUPIS-2 was being created, experts in the Russian bookmaking industry "called the blocking of Qiwi and similar payment services almost the only effective way to [combat] offshore bookmakers" and argued "that the threat of blocking should force [Qiwi] to tighten control over illegal transactions."[47] However, "unscrupulous bookmakers" continued to look for "loopholes – opportunities for transfers to illegal companies through Qiwi wallets."

95.     Despite knowing that "offshore bookmakers with marketing proposals to new customers" sometimes would even "guarantee, in the event of a replenishment of the account

---

[45] *Konstantin Makarov: "The situation with Qiwi will not affect the launch of MCCIS*, BETTING BUSINESS RUSSIA (July 15, 2016), https://bettingbusiness.ru/news/0006744-konstantin-makarov-ya-ne-vizhu-nikakih-osnovanij-somnevatsya-v-tom-chto-blokirovka-qiwi-povliyaet-na-sozdanie-cupis (last visited June 15, 2021) (Google trans.).

[46] Alexey Ageev, *Skrill and Qiwi blocking is just the first step*, CHAMPIONAT (July 15, 2016, 02:15 PM), https://www.championat.com/bets/article-3288531-anton-rozhkovskij---o-borbe-s-nelegalnymi-bukmekerami-v-rossii.html (last visited June 17, 2021) (Google trans.).

[47] *Staying Alive: A Loophole for Illegal Online Bookmakers*, BETTING BUSINESS RUSSIA (Aug. 5, 2019), https://bettingbusiness.ru/articles/0014100-ostatsya-v-zhivyh-lazejka-dlya-nelegalnyh-onlajn-bukmekerov (last visited June 14, 2021) (Google trans.).

through Qiwi wallet, '100% refund of the first bet on any match if it does not win,'" Qiwi did not take the initiative to close those loopholes, because that would mean cutting its own revenue.[48]

96.     Then on November 15, 2017, the State Duma adopted a law banning money transfers to illegal gambling operations.[49] Shortly thereafter, on November 27, 2017, Putin, signed into law a new amendment to the Betting Law banning money transfers to illegal bookmakers.[50] In particular, this new regulation obliged credit institutions to refuse to carry out transactions for the transfer and receipt of funds, including electronic money, for cross-border money transfers to organize and conduct gambling with violation of the legislation of the Russian Federation.

97.     When the Betting Law, as amended in 2017, took force in January 2018, the Roskomnadzor created a backlist, requiring banks to block payments to blacklisted cites.[51] While few entities were named on the blacklist, Russian banks appeared to be unwilling to handle any international gambling transactions.[52] Indeed, on October 19, 2018, in response to the amendments to the Betting Law, Sberbank, the largest bank in Russia, became the first central bank to block all

---

[48] *Staying Alive: A Loophole for Illegal Online Bookmakers*, BETTING BUSINESS RUSSIA (Aug. 5, 2019), https://bettingbusiness.ru/articles/0014100-ostatsya-v-zhivyh-lazejka-dlya-nelegalnyh-onlajn-bukmekerov (last visited June 16, 2021) (Google trans.).

[49] *State Duma adopts law banning money transfers to illegal gambling operators*, BETTING BUSINESS RUSSIA (Nov. 15, 2017) https://bettingbusiness.ru/news/0010947-gosduma-prinyala-zakon-o-zaprete-denezhnyh-perevodov-nelegalnym-operatoram-azartnyh-igr (last visited June 16, 2021) (Google trans.).

[50] *The President of the Russian Federation signed a law banning money transfers to illegal bookmakers*, BETTING BUSINESS RUSSIA (Nov. 28, 2017), https://bettingbusiness.ru/news/0011015-prezident-rf-podpisal-zakon-o-zaprete-perevodov-nelegalnym-bukmekeram (last visited June 16, 2021) (Google trans.).

[51] Stephen Carter, *Online betting in Russia: an overview*, iGB (Feb. 18, 2021), https://igamingbusiness.com/online-betting-in-russia-an-overview/ (last visited July 9, 2021).

[52] Stephen Carter, *Online betting in Russia: an overview*, iGB (Feb. 18, 2021), https://igamingbusiness.com/online-betting-in-russia-an-overview/ (last visited July 9, 2021).

payments to offshore gambling operations.[53] Likewise, the payment system Yandex.Money also began blocking suspect transfers in mass.[54]

98.     Yet the Company continued to not take the initiative to tighten its controls to prevent bookmakers from using its system as a tool to withdraw funds offshore. In fact, when banks began blocking money transfers in accordance with the new law, "some betting organizers who conduct their business with violations, offer[ed] to use the services of e-payment systems, in particular Qiwi, the main owner of which is Sergey Solonin, a member of the 2015 Forbes list."[55] In addition, illegal offshore bookmakers with confusingly similar names and indistinguishable logos to legal bookmakers offered "the same means of crediting money as in the official bookmaker office, including Qiwi wallet."

99.     Instead, Qiwi simply reminded investors in its Form 20-F Annual Report for fiscal year ended December 31, 2017, filed with the SEC on March 28, 2018, ("2017 20-F") that its payment system has "been and may continue to be used for fraudulent, illegal or improper purposes" and that Qiwi Bank has "been the subject of CBR investigations in the past that have uncovered various violations and deficiencies in relation to, among other things, reporting requirements, anti-money laundering, cybersecurity, compliance with applicable e-payments

---

[53] Anuj Arora, *Russia's Largest Bank Implements Ban on Offshore Gambling Transactions*, POKERINDUSTRYPRO.COM (Nov. 2, 2018), https://pokerindustrypro.com/news/article/210158-russias-largest-bank-implements-ban-offshore-gambling (last visited July 9, 2021).

[54] *Staying Alive: A Loophole for Illegal Online Bookmakers*, BETTING BUSINESS RUSSIA (Aug. 5, 2019), https://bettingbusiness.ru/articles/0014100-ostatsya-v-zhivyh-lazejka-dlya-nelegalnyh-onlajn-bukmekerov (last visited June 16, 2021) (Google trans.).

[55] *Staying Alive: A Loophole for Illegal Online Bookmakers*, BETTING BUSINESS RUSSIA (Aug. 5, 2019), https://bettingbusiness.ru/articles/0014100-ostatsya-v-zhivyh-lazejka-dlya-nelegalnyh-onlajn-bukmekerov (last visited June 16, 2021) (Google trans.).

35

thresholds requirements in connection with electronic money transfers and the topping up of electronic accounts and other issues[.]" [56]

100.    In addition, the Company warned investors that "the perceived risk of the use of e-payments to finance fraudulent, illegal or improper activities is causing the regulators to impose restrictions on the payment systems' operations" and that it was "recently notified that in 2018 Qiwi Bank will be subject to a CBR inspection as part of the ongoing supervisory process." The Company further conceded that "[i]n light of the fact that we are a highly regulated business that processes large volumes of payments, we need to implement enhanced processes, procedures and controls in order to provide reasonable assurance that we are operating in compliance with applicable regulatory requirements."

101.    On August 16, 2018, Qiwi similarly stated with regard to the CBR's supervision and regulation of Qiwi Bank in its Form 6-K filed with the SEC announcing the Company's second quarter 2018 financial results ("2Q18"):

> In recent years, the CBR has considerably increased the intensity of its supervision and regulation of the Russian banking sector. Qiwi Bank is central to the operation of all of the Group's segments, as it provides issuing, acquiring and deposit settlement functions within the Group, serves as the issuing bank for our payment-by-installment SOVEST cards and is the banking institution behind Tochka's financial services offering. Qiwi Bank, like all banks and non-banking credit organizations operating in Russia, is subject to extensive regulation and reporting obligations, which may limit the Groups activities and increase the Groups costs of doing business. Qiwi Bank has been the subject of CBR investigations in the past that have uncovered various regulatory violations and deficiencies, **which the Group has generally rectified**.

102.    Despite Russian authorities enacting more and more regulations to curtail illegal gambling activity, the Company did little to nothing to strengthen its controls over documentation

---

[56] QIWI plc, Annual Report (Form 20-F) at 18 (Mar. 28, 2018).

and reporting in preparation for the upcoming CBR inspection. Qiwi simply continued to respond to new regulations as they were enacted and to law enforcement investigations as they arose.

103. As Defendant Solonin noted in an interview on April 4, 2018, "[w]e constantly interact with law enforcement agencies and provide them with tools to track transactions and calculate unscrupulous counterparties in the system."[57]

104. Artem Kiryanov, Chairman of the Executive Committee of the Russian Union of Taxpayers, head of the working group on improving the level of financial literacy of the Public Chamber of the Russian Federation, suggested:

> Perhaps this is because the mechanism for detecting illegal transfers has not been properly detached. There are problems with compliance with the ban on offshore transfers. In this sense, there are no problems for banks that make payments virtually manually, tracking illegal transactions and checking the register of the Federal Tax Service. The payment system is more automated. However, in my opinion, the difficulties in organizing translation control should not justify the company, as Qiwi ensures payment security in its [TSUPIS].[58]

105. Russian Regulators continued their fight against illegal gambling through another series of amendments, tightening the regulation on the betting market. On July 22, 2020, the State Duma adopted new amendments to the Betting Law, prohibiting bookmakers from accepting bets on non-sports events, obligating them to issue a bank guarantee of performance of obligations to players in the amount of more than 500 million rubles and pay targeted deductions from betting not only on Russian, but also on foreign sports, as well as prohibiting "dormant" licenses – companies that have received a license will have to start operating within six months.[59]

---

[57] Anna Eremina, *The Crypto-Clipper should be anonymous*, VEDOMOSTI, (Apr. 4, 2018, 19:43) https://www.vedomosti.ru/finance/characters/2018/04/04/755869-kriptorubl (last visited July 6, 2021) (Google trans.).

[58] *Staying Alive: A Loophole for Illegal Online Bookmakers*, BETTING BUSINESS RUSSIA (Aug. 5, 2019), https://bettingbusiness.ru/articles/0014100-ostatsya-v-zhivyh-lazejka-dlya-nelegalnyh-onlajn-bukmekerov (last visited June 16, 2021) (Google trans.).

[59] Anna Afanasyeva, *Bookmakers banned unsportsmanlike behavior*, KOMMERSANT (July 23, 2020), https://www.kommersant.ru/doc/4426077 (last visited July 9, 2021) (Google trans.).

106.    Further, in the summer of 2020, the Deoffshorization Law was expanded to bookmakers.[60] Initially adopted in January 2015, Federal Law No. 376-FZ 'Concerning the Introduction of Amendments to Parts One and Two of the Tax Code of the Russian Federation (Regarding the Taxation of the Profit of Controlled Foreign Companies and the Income of Foreign Organizations)' (the "Deoffshorization Law"), signed by Putin, declared "offshorization" illegal.[61] In practice, the Deoffshorization Law introduced significant changes to the rules governing the reporting and taxation of interests of Russian tax residents in controlled foreign companies ("CFC"). A CFC is a foreign company or structure which is not a Russian tax resident and is controlled by a Russian tax resident. Following the introduction of this new law the profit of CFCs is imputed as taxable profit of a Russian tax resident at the usual Russian tax rate.

107.    Then in March 2021, a draft bill was submitted to the Russian legislature that would prohibit Russian credit institutions from contracting with any gambling merchants, including offshore merchants, that are not on a list of specifically approved betting merchants maintained by the regulator (the "Whitelist").[62] In addition, the proposed law would prohibit Russian credit institutions from contracting with any foreign banks, foreign payment institutions or other payment facilities processing, or facilitating in any way, payments of the "blacklisted" gambling merchants.

### 3.   *As Self-Regulation Failed, Russian Regulators Further Cracked Down on E-Wallets.*

---

[60] Andriey Nabukhotnyi, *Russian Company William Hill LLC Unfreezes It's License*, E-PLAY ONLINE (Oct. 6, 2020), https://e-playonline.com/russian-company-william-hill-llc-unfreezes-its-license/ (last visited July 9, 2021).

[61] Emily Yiolitis, Philip Graham and Simon Hudd, *Russian Federation: Guide To The Russian Deoffshorization Law*, MONDAQ (Dec. 15, 2014), https://www.mondaq.com/russianfederation/corporate-tax/358972/guide-to-the-russian-deoffshorization-law (last visited July 9, 2021).

[62] Qiwi plc, Annual Report (Form 20-F) at p.14 (Apr. 15, 2021).

108.    When the lack of self-regulation continued, Russian authorities took matters into their own hands, increasing restrictions on e-wallets. On March 18, 2019, Russian authorities banned the withdrawal of cash from anonymous wallets.[63] The measure was "intended to counteract the cashing of proceeds from crime."[64]

109.    On March 28, 2019, Qiwi specifically noted in its Form 20-F Annual Report for fiscal year December 31, 2018 ("2018 20-F") that:

- "Russian lawmakers and enforcement agencies have recently demonstrated increased scrutiny in matters relating to cyberspace and e-payments, as borne out in the enhanced enforcement activities in the kiosk market, the de-anonymization of e-payments and various other initiatives aimed at increasing state control over online activities;"

- Qiwi's "business has grown and developed rapidly in recent years and we are continuing to realign our compliance function with the size of our business. In light of the fact that we are a highly regulated business that processes large volumes of payments, we need to implement enhanced processes, procedures and controls in order to provide reasonable assurance that we are operating in compliance with applicable regulatory requirements;" and

- "[T]he Russian anti-money laundering laws to which we are subject contain numerous requirements with respect to identification of clients, and documentation and reporting of transactions subject to mandatory control and other suspicious transactions to the relevant authorities."[65]

These observations were reiterated in Qiwi's SEC filings throughout the rest of the Class Period.[66]

110.    On July 16, 2019, the State Duma adopted a law "which prohibited bank payment agents from using a remote [cash register] in payment terminals."[67] Even though "[t]he new

---

[63] Bill No. 287876-7 (Archived), STATE DUMA OF THE FEDERAL ASSEMBLY OF THE RUSSIAN FEDERATION, https://sozd.duma.gov.ru/bill/287876-7 (last visited June 24, 2021) (Google trans.).
[64] *Anonymous replenishment of Yandex.Money and QIWI wallets will be banned in Russia*, RBC (July 29, 2019) https://www.rbc.ru/finances/29/07/2019/5d3b00db9a7947f7ddbd3787 (last visited June 14, 2021) (Google trans.).
[65] QIWI, plc, Annual Report (Form 20-F) at 14-15 (Mar. 28, 2019).
[66] QIWI, plc, Annual Report (Form 20-F) at 14, 17 (Mar. 28, 2019).
[67] *Banks warned of reduction of payment terminals due to new law,* RBC (July 23, 2019, 08:00), https://www.rbc.ru/economics/23/07/2019/5d30962a9a79478eb3b69fd6?from=from_main (last visited June 16, 2021) (Google trans.).

requirements w[ould] primarily affect QIWI payment terminals," Defendant Solonin told the RBC Group, or RosBiznesConsulting ("RBC"),[68] that the requirements would "have an insignificant effect on QIWI's business" because at most, they "may affect small paying agents in remote parts of Russia, where business margins are low."

111.    On July 26, 2019, the Federation Council (the upper chamber of the Federal Assembly, the Russian Parliament, composed of two representatives from every constituent entity of the Russian Federation[69]) approved changes to the law of the national payment system preventing owners of anonymous e-wallets, including Qiwi Wallet, from replenishing "them in cash through payment terminals and offices of cellular operators - for this they will need a bank account."[70]

112.    First Deputy Chairman of the Federation Council Committee on Budget and Financial Markets, Nikolay Zhuravlev confirmed that "the purpose of the law is to strengthen control over the payment services market when making cross-border money transfers."[71] As a result of the change in the law, Anatoly Aksakov, head of the State Duma Committee on the Financial Market, noted, that "the source of funds will be known."[72] Sergey Grishunin, senior manager of the risk management department at Deloitte, similarly explained that "[r]eplenishing a

---

[68] RBC, established in 1993, is a large Russian media group headquartered in Moscow.

[69] FEDERATION COUNCIL OF THE FEDERAL ASSEMBLY OF THE RUSSIAN FEDERATION, http://council.gov.ru/en/structure/council/ (last visited June 24, 2021).

[70] *Anonymous replenishment of Yandex.Money and QIWI wallets will be banned in Russia*, RBC (July 29, 2019) https://www.rbc.ru/finances/29/07/2019/5d3b00db9a7947f7ddbd3787 (last visited June 24, 2021) (Google trans.).

[71] *The requirements for the activities of foreign payment systems are being clarified*, COUNCIL OF THE FEDERATION (July 26, 2019, 13:58), http://council.gov.ru/events/news/107002/ (last visited July 7, 2021) (Google trans.).

[72] *Anonymous replenishment of Yandex.Money and QIWI wallets will be banned in Russia*, RBC (July 29, 2019), https://www.rbc.ru/finances/29/07/2019/5d3b00db9a7947f7ddbd3787 (last visited July 7, 2021) (Google trans.).

40

wallet from a bank account will allow to accurately identify the identity of the payer and block his account if it is suspected of performing an illegal operation."[73]

113. At that time, the Association of Electronic Money and Money Transfer Market Participants calculated that "in Russia[,] 2 billion transactions totaling more than 1.7 trillion rubles" are performed annually through e-wallets and "[m]ore than 10 million people own anonymous wallets."[74] Qiwi representatives stressed that "the vast majority of users in the QIWI ecosystem" are identified and that in any case, "anonymous wallets [have been] strictly limited in amount: their balance cannot exceed 15 thousand rubles, and the total amount of transactions per month – no more than 40 thousand rubles."[75] But Yandex.Money representatives, the largest e-payment system in Russia, stated that "[t]he changes will negatively affect the income of electronic money operators, which, along with banks, invest a lot in stimulating non-cash payments."[76]

114. E-wallet owners began to see the impact of the new laws on September 15, 2019, when the ban on the withdrawal of cash from anonymous wallets became law. After that point, owners were forbidden to withdraw cash from non-personalized e-wallets.[77]

---

[73] *Anonymous replenishment of Yandex.Money and QIWI wallets will be banned in Russia*, RBC (July 29, 2019), https://www.rbc.ru/finances/29/07/2019/5d3b00db9a7947f7ddbd3787 (last visited July 7, 2021) (Google trans.).

[74] *Owners of anonymous e-wallets will be prohibited from replenishing via terminals*, VEDOMOSTI (July 29, 2019, 05:26), https://www.vedomosti.ru/technology/news/2019/07/29/807509-obladatelyam-koshelkov-terminali (last visited June 24, 2021) (Google trans.).

[75] *Anonymous replenishment of Yandex.Money and QIWI wallets will be banned in Russia*, RBC (July 29, 2019), https://www.rbc.ru/finances/29/07/2019/5d3b00db9a7947f7ddbd3787 (last visited July 7, 2021) (Google trans.).

[76] *Anonymous replenishment of Yandex.Money and QIWI wallets will be banned in Russia*, RBC (July 29, 2019) https://www.rbc.ru/finances/29/07/2019/5d3b00db9a7947f7ddbd3787 (last visited July 7, 2021) (Google trans.).

[77] Bill No. 287876-7 (Archived), STATE DUMA OF THE FEDERAL ASSEMBLY OF THE RUSSIAN FEDERATION, https://sozd.duma.gov.ru/bill/287876-7 (last visited June 24, 2021) (Google trans.).

41

115.    On April 1, 2020, amendments to the tax code entered into force which required banks to provide the Federal Tax Service with information on opening or closing personalized e-wallets which have undergone simplified or full identification.[78] Russian fiscal authorities needed information about funds in e-wallets to identify income that should be taxed and to combat money laundering and terrorist financing.[79] By January 6, 2021, the Federal Taxation Service had begun tracking data on e-wallets operated in Russia following the CBR's determination on how data on opened and closed e-wallets would be transferred to the FTS.

116.    Beginning on August 3, 2020, owners of Qiwi Wallet and other e-wallets in Russia could no longer deposit cash to their accounts anonymously through payment terminals and offices of mobile operators, they would have to identify themselves and link a bank account to their wallet in order to do so, as a result of the amendments to the law of the national payment system that had been adopted in July 2019.[80] Market participants had been given 12 months to adapt their business processes to the amendments, but had sought a postponement due to the coronavirus pandemic, which the CBR did not grant. A representative of the CBR told the RBC that "[t]hese changes are aimed at improving control over anonymous electronic money transfers. The law was adopted in August 2019, **was widely discussed with participants in the payment market**, the time for the implementation of these changes, taking into account the entry into force, is one year, which seems

---

[78] *E-wallet services reported the postponement of data transfer to the Federal Tax Service*, RBC (Apr. 01, 2020, 18:53) https://www.rbc.ru/finances/01/04/2020/5e8493bb9a7947684dc1ce0b (last visited June 24, 2021).

[79] Evgeniya Chernyshova, *Tax Service got access to data on electronic wallets of Russians*, RBC (Apr. 01, 2020), https://www.rbc.ru/finances/01/04/2020/5e834c079a79475db11e1698 (last visited June 24, 2021) (Google trans.).

[80] *Russia has limited cash deposits to anonymous wallets and travel cards*, RBC (Aug. 03, 2020), https://www.rbc.ru/finances/03/08/2020/5f2434599a7947fd59aa1d21 (last visited June 24, 2021) (Google trans.).

to be sufficient, including in the context of the spread of coronavirus infection."[81] As for Qiwi, it continued to state that it was "unlikely to see a direct and significant impact on the business in connection with the amendments."

  **C.**  **Defendants Concealed the Significant Impact of Amended Regulations, the Ongoing CBR Audit, and Qiwi's Insufficient Internal Controls, While the Individual Defendants Attempted to Off-load Qiwi Securities.**

117. Based on Defendants' tracking of the Company's financial metrics – including the number of active account users on Qiwi Wallet – Defendants were aware of the current and future materially negative impact of increased regulations on Qiwi's business. Furthermore, Qiwi's SEC filings identified the risks of regulatory non-compliance and of a potential audit by the CBR. But Defendants failed to disclose to investors that those impacts and risks had materialized.

118. Instead of disclosing the truth,[82] Qiwi launched an SPO after the markets closed on July 20, 2020, registering for sale 6.8 million Class B Shares represented by ADSs. The SPO would dilute Qiwi's approximately 62 million outstanding shares, without providing Qiwi with any funds.[83] Instead, Defendants Kim and Solonin, and other large shareholders, would be enriching themselves:

---

[81] Evgeniya Chernyshova, *The Central Bank did not support the transfer of the ban on replenishing anonymous wallets with cash*, RBC (June 5, 2020, 06:00), https://www.rbc.ru/finances/05/06/2020/5ed8bca99a79477a7bed3662 (last visited June 24, 2021) (Google trans.).

[82] QIWI plc, Quarterly Report (Form 6-K) (Dec. 9, 2020).

[83] QIWI plc, Prospectus Supplement (Form 424B7) (July 20, 2020).

| | Kim | | Solonin | |
|---|---|---|---|---|
| | Total Class A Shares | Total Class B Shares | Total Class A Shares | Total Class B Shares |
| Shares Owned Prior to Offering | 468,894 | 703,881 | 10,756,822 | 896,501 |
| Shares Owned After Offering (assuming no exercise of options to purchase additional shares) | 468,894 | 91,811 | 9,977,256 | 0 |
| Shares Owned After Offering (assuming option to purchase additional shares exercised in full) | 468,894 | 0 | 9,860,321 | 0 |
| Total Shares Being Offered | 0 | 703,811 | 0 | 896,501 |

119.   The market reacted negatively to the news, causing Qiwi's ADS price to fall $1.90 per share to close at $17.29 on July 21, 2020. The next day, on July 22, 2020, Qiwi cancelled the SPO – purportedly "due to market conditions."[84] The Russian news agency *Tass* reported that Qiwi shareholders had backed out of the share sale.[85] As a result, Qiwi's ADS price came back up $1.54 per share to close at $18.75 on July 22, 2020.

120.   Then on August 20, 2020, Qiwi disclosed that the number of active accounts of Qiwi Wallet had decreased from 21.8 million to 20.9 million, or over 4%.[86] The Company explained that "[t]his decrease was mainly the result of the introduction of new restrictions on the use of anonymous wallets and the subsequent optimization of certain transaction processes, the extension of the inactivity period from six to 12 months (the period after which the service turns off the wallet and debits a commission from it, an increase in the inactive period occurred in October 2019) and expanding the client verification procedure, [such that the] identification and verification [complies] with regulatory requirements." Defendant Protopopov continued to assure

---

[84] *QIWI Announces Cancellation of Proposed Secondary Offering*, GLOBENEWSWIRE (July 22, 2020), https://investor.qiwi.com/node/9591/pdf.

[85] *Qiwi canceled SPO*, TASS (July 22, 2020, 03:35 AM, updated July 22, 2020, 04:21 AM), https://tass.ru/ekonomika/9022993 (last visited July 9, 2021) (Google trans.).

[86] Evgeniya Chernyshova, *QIWI lost 4% of wallets due to restrictions for anonymous*, RBC (Aug. 20, 2020), https://www.rbc.ru/finances/20/08/2020/5f3d11f59a79476179615b74 (last visited June 24, 2021) (Google trans.).

44

the RBC that "Contrary to popular belief, unidentified wallets have very little effect on turnover and occupy an insignificant part in the structure of our product."

121. But after the markets closed on December 9, 2020, Qiwi was forced to reveal that it had been the subject of a CBR audit, covering July 2018 to September 2020, since July 2020. Qiwi further disclosed that, as a result of the audit, the CBR had fined Qiwi Bank approximately $150,000 for "violations and deficiencies relating primarily to reporting and record-keeping requirements" *and* suspended or limited its ability to conduct "most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts." Qiwi explained that if those restrictions had been in effect for the prior nine months, "*33% to 40%* of [the Company's] Payment Services Segment Net Revenue for such period would have been negatively affected."

122. As a Motley Fool analyst noted the next day, "$150,000 doesn't sound so bad, but the Central Bank has also suspended Qiwi's ability to conduct most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts, effective Dec. 7. It's not entire clear how serious this [suspension] will be for Qiwi -- but it sounds like it could be pretty serious."[87]

123. As a result of Defendants' revelations, Qiwi's ADS price fell $2.80 per share, or 20.6%, to close at $10.79 on December 10, 2020. Defendants' representations to investors had been materially false, and the market was stunned when Defendants finally revealed the truth.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS[88]

124. Throughout the Class Period, Defendants made materially false and misleading statements regarding Qiwi's business, operations, and internal controls. Specifically, Defendants

---

[87] Rich Smith, *Why Qiwi Stock Just Crashed 20%*, THE MOTLEY FOOL (Dec. 10, 2020, 11:19 AM), https://www.fool.com/investing/2020/12/10/why-qiwi-stock-just-crashed-20/.
[88] The particular portions of the statements alleged to be false or misleading are in bold and italicized herein.

made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's internal controls related to reporting and record-keeping were ineffective; (2) Qiwi was thus not meeting the CBR's reporting and record-keeping requirements; (3) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment system; (4) then-current applicable Russian regulations increasing identification requirements for e-wallets and restricting transactions through illegal online betting merchants were having a negative impact on Qiwi's revenue; (5) Qiwi was undergoing a CBR audit that it was unable to pass; (6) as a result, Qiwi would be fined by the CBR, would have its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR, would no longer be in a prime position to process electronic bets in Russia; (7) as a result, Qiwi would no longer be able to receive significant revenue from its legitimate transactions, including online gambling; and (8) consequently, Defendants' public statements were materially false and/or misleading at all relevant times.

Third Quarter 2018 Financial Results

125.    The Class Period begins on November 14, 2018, when Qiwi announced its financial results for the third quarter of 2018 ("3Q18 Financial Report"). On that day, Qiwi filed its 3Q18 Financial Report as Exhibit 99.1 to a Form 6-K, signed by Defendant Karavaev, touting its total revenue growth as well as of its Payment Services Segment:

- *Total Adjusted Net Revenue* for the quarter ended September 30, 2018 *was RUB 5,230 million ($79.7 million), an increase of 62%* compared with RUB 3,238 million in the prior year. *The increase was mainly driven by Payment Services* and SME Segments Net Revenue growth.

- *PS Payment [Processing Fees] Adjusted Net Revenue*[89] *was RUB 3,668 million ($55.9 million), an increase of 38%* compared with RUB 2,661 million in the prior year. PS Payment Adjusted Net Revenue *growth was*

---

[89] PS Payment Revenue represents payment processing fees, which primarily consists of the merchant and consumer fees charged for the payment transactions.

*predominantly driven by a volume growth in the E-commerce and Money Remittance* market verticals as well as by an improvement in Payment Average Adjusted Net Revenue Yield resulting from the shift in product mix.

- *Payment Services Segment Net Revenue* for the quarter ended September 30, 2018 *was RUB 4,257 million ($64.9 million), an increase of 34%* compared with RUB 3,179 million in the prior year.

- For the quarter ended September 30, 2018, *Payment Services Segment Net Profit was RUB 2,487 million ($37.9 million), an increase of 27%* compared with RUB 1,952 million in the prior year driven by Payment Services Segment Net Revenue growth and slightly offset an increase in income tax expense.

- For the quarter ended September 30, 2018, *Payment Services Segment payment volume was RUB 297.1 billion ($4.5 billion), an increase of 26%* compared with RUB 235.9 billion in the prior year. The *increase in payment volume was driven by growth in E-commerce and Money Remittances market verticals resulting largely from the development of certain payment solutions for merchants including betting merchants*, new contracts and projects targeting the self-employed market as well as secular growth in some of our key categories.

126. Defendant Solonin is quoted in Qiwi's 3Q18 Financial Report as stating:

I would like to *emphasize the robust performance of our core Payment Services segment, which demonstrated 34% segment net revenue growth and 27% segment net profit growth driven by the development of our payment ecosystem and growth in our key verticals including primarily betting related payment services* that are presented as part of the e-commerce market vertical.

*As we continued to benefit from the strong performance of the Payment Services segment, which remains a core part of our business, generating significant cash flows, we are well positioned to* pursue our strategy and carry on with investing in new business lines and projects in order to build up our ecosystem, diversify our operations, prolong the life cycle of our clients and *ultimately secure the long term growth prospects of our Company.*

127. Later that day, the Company held its 3Q18 Earnings Call to discuss its quarterly results with analysts and investors. During the call, Defendant Solonin touted:

*Our core Payment Service segment demonstrated robust performance with 34 segment net revenue and 27 segment net profit growth*.

   *Our results this quarter were mainly driven by the growth in our key vertical, currently our betting related payment services* that presented as part of our e-commerce market vertical[.]

* * *

47

As *we continue to benefit from the strong performance of Payment Services segment, which remains a core part of our business, generating significant cash flows*, we are well-positioned to pursue our strategy and carry on with investing in new business lines and projects in order to build out our ecosystem, diversify operation, prolong the life cycle of our clients and ultimately secure the long-term growth prospects of our company.

* * *

*Payment Services segment volume increased by 26% to reach RUB297 billion, driven by significant growth in e-commerce and Money Remittance verticals, which grew 56% and 46%, respectively*, over the third quarter of 2017. The *growth was largely driven by the circle of trends in our core categories including the boom of sports betting markets* triggered by the football World Cup of 2018.

128.    Defendant Karaveav also stated during the 3Q18 Earnings Call that:

This quarter *[Total Adjusted Net Revenue increased] 62% to reach RUB5.2 billion, up from RUB3.2 billion* for the third quarter of 2017. The *increase was mainly driven by Payment Services* and the Financial Services net revenue growth. *Payment Services segment net revenue is 34% to reach RUB4.3 billion compared to RUB3.2 billion in the prior year*. *Payment Services, payment adjusted net revenue increased 38% to RUB3.7 billion*, up from RUB2.7 billion in the prior year. *As a result of the net revenue growth in our e-commerce and money interest verticals, we grew 63% and 43% respectfully*, offset by a decline in net revenue in Financial Services vertical by 10%.

Our financial results in this segment was driven both by increase of volumes, as [Solonin] just described, and the improvement of the payment average net return income by 10 basis points year-over-year, as a result of change in category and product mix, offset by slight degree of decline in most key categories.

129.    The statements referenced in ¶¶ 125-28 *supra* regarding Qiwi's revenue, profits, payment volumes, cash flows, and "growth" in "Payment Services" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment system; (2) as a result, Qiwi would not be able to sustain its revenue levels without the use of its

48

payment services by unlicensed betting merchants that violated applicable Russian regulations; and (3) Qiwi was putting the significant revenue from its legitimate transactions, including online gambling, at risk by not complying with the current applicable Russian regulations.

130. In addition, in response to a question from analyst Ulyana Lenvalskaya with UBS regarding whether the "surprisingly strong" e-commerce volumes were the result of "any one-offs," Defendant Solonin stated that:

> [I]t's relatively a new market for us, especially around ***skilled betting*** and self-employed but ***very strong user dynamic***. In September and October, we feel that in Q3 ***there were no sort of say one off items***. So generally speaking, ***the trend is going to continue***. And not only in Q4, but again, a yearly kind of RUB50 million at the top of penetration of rubles in this market is still very low. ***So we would really expect to benefit from cycle of trend, from increasing of the penetration of those markets***.

131. The statements referenced in ¶ 130 *supra* relating to the "e-commerce volumes" and "skilled betting" revenues were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that Qiwi's lax reporting and record-keeping was obfuscating illicit online betting transactions that were being made through its payment system.

Fourth Quarter and Fiscal Year 2018 Financial Results

132. On March 28, 2019, Qiwi filed its financial results for the fourth quarter of 2018 and full year ended December 31, 2018 ("4Q18 and FY18 Financial Report") as Exhibit 99.1 to a Form 6-K, signed by Defendant Karavaev. Regarding Qiwi's 4Q18 financial results, the Report provided in relevant part:

- ***Total Adjusted Net Revenue (Total Segment Net Revenue)*** for the quarter ended December 31, 2018 ***was RUB 5,818 million ($83.7 million), an increase of 41%*** compared with RUB 4,116 million in the prior year. The ***increase was***

*mainly driven by Payment Services* and SME Segments Net Revenue growth, which was slightly offset by the negative Net Revenue contribution of Rocketbank Segment.

- *Payment Services Segment Net Revenue* for the quarter ended December 31, 2018 *was RUB 4,741 million ($68.2 million), an increase of 35%* compared with RUB 3,500 million in the prior year.

- *PS Payment [Processing Fees] Adjusted Net Revenue was RUB 4,118 million ($59.3 million), an increase of 37%* compared with RUB 3,005 million in the prior year. PS Payment Adjusted Net Revenue *growth was predominantly driven by a volume growth in the E-commerce and Money Remittance* market verticals underpinned by an improvement in Payment Average Adjusted Net Revenue Yield resulting from the shift in product mix.

- For the quarter ended December 31, 2018, *Adjusted Net Profit (Total Segment Net Profit) was RUB 1,014 million ($14.6 million), an increase of 58%* compared with RUB 642 million in the prior year. The growth of Adjusted Net Profit was primarily driven by the same factors impacting Adjusted EBITDA.

- For the quarter ended December 31, 2018, *Payment Services Segment Net Profit was RUB 2,584 million ($37.2 million), an increase of 28%* compared with RUB 2,013 million in the prior year driven by Payment Services Segment Net Revenue growth and slightly offset an increase in compensation to employees and related taxes (excluding effect of share-based payments) as well as income tax expense.

- For the quarter ended December 31, 2018, *Payment Services Segment payment volume was RUB 330.7 billion ($4.8 billion), an increase of 32%* compared with RUB 250.9 billion in the prior year. The *increase in payment volume was driven by growth in E-commerce and Money Remittances market verticals resulting largely from the development of certain payment solutions for merchants including betting merchants*, new contracts and projects targeting the self-employed market as well as secular growth in some of our key categories.

133. In addition, the 4Q18 and FY18 Financial Report provided the following FY18 financial results:

- *Total Adjusted Net Revenue (Total Segment Net Revenue)* for the year ended December 31, 2018 *was RUB 19,657 million ($283.0 million), an increase of 49%* compared with RUB 13,193 million in the prior year. The *increase was mainly driven by Payment Services* and SME Segments Net Revenue growth.

- *Payment Services Segment Net Revenue* for the year ended December 31, 2018 *was RUB 16,497 million ($237.5 million), an increase of 31%* compared with RUB 12,580 million in the prior year.

50

- *PS Payment [Processing Fees] Adjusted Net Revenue was RUB 14,370 million ($206.9 million), an increase of 37%* compared with RUB 10,509 million in the prior year. PS Payment Adjusted Net Revenue *growth was predominantly driven by a volume growth in the E-commerce and Money Remittance* market verticals underpinned by an improvement in Payment Average Adjusted Net Revenue Yield resulting from the shift in product mix.

- For the year ended December 31, 2018, *Adjusted Net Profit (Total Segment Net Profit) was RUB 4,137 million ($59.6 million), an increase of 2%* compared with RUB 4,054 million in the prior year. The growth of Adjusted Net Profit was primarily driven by the same factors impacting Adjusted EBITDA offset by a net foreign exchange loss (excluding foreign exchange effect on the funds received at SPO) as compared to the net foreign exchange gain (excluding foreign exchange effect on the funds received at SPO) in the same period in the prior year as well as an increase in income tax expenses.

- For the year ended December 31, 2018, *Payment Services Segment Net Profit was RUB 9,529 million ($137.2 million), an increase of 26%* compared with RUB 7,543 million in the prior year driven by Payment Services Segment Net Revenue growth and slightly offset by an increase in compensation to employees and related taxes (excluding effect of share-based payments) as well as income tax expense and a net foreign exchange loss as compared to the net foreign exchange gain in the same period in the prior year.

- For the year ended December 31, 2018, *Payment Services Segment payment volume was RUB 1,138.1 billion ($16.4 billion), an increase of 25%* compared with RUB 911.1 billion in the prior year. The *increase in payment volume was driven by growth in Ecommerce and Money Remittances market verticals resulting largely from the development of certain payment solutions for merchants and partners including betting merchants*, new contracts and projects targeting the self-employed market and sharing economy partners as well as secular growth in some of our key categories.

134. Defendant Solonin is quoted in the 4Q18 and FY18 Financial Report as stating:

This year we demonstrated outstanding performance, especially in *our Payment Services business,* which *delivered 31% segment net revenue growth and 26% segment net profit growth*, with growth rates accelerating throughout the year and significantly improving as compared to the trends we saw in 2016 and 2017. Moreover, *we have reached an important milestone surpassing RUB 1 trillion in payment volume of our payment services business this year*. I would like to highlight that the *reacceleration of our payment services business was driven largely by the development of numerous new use cases that are well fitted to serve our users, merchants and partners including betting merchants*, self-employed and sharing economy partners. Our growth was simultaneously underpinned by secular trends in our key markets *demonstrating the adaptability and resilience of the payment ecosystem we have developed and will continue to develop further*.

51

As *we continued to benefit from the strong performance of the Payment Services segment, which remains a core part of our business, generating substantial cash flows*, I believe we are well positioned to pursue our strategy and carry on our investments in the new business lines and projects… *This year we have built a strong foundation for future growth,* we are well positioned to continue building up our ecosystem, diversifying our operations, increasing the life cycle of our clients with an ultimate goal of securing the long-term growth prospects of our Company.

135. Also on March 28, 2019, Qiwi held its fourth quarter 2018 financial earnings call ("4Q18 Earnings Call") to discuss its quarterly results with analysts. During the call, Defendant Solonin stated that:

And in the fourth quarter, *payment services segment demonstrated 35% segment net revenue and 28% segment net profit growth*.

* * *

Our *impressive growth was driven by strong performance in our key areas, payment services for betting related merchants*, digital money remittances and projects we developed, self employed and B2B, B2C customers as well as by a more general expansion of our payments ecosystem.

* * *

Our *payment services segment* volume increased by 31% to reach RUB329 billion, *driven by significant growth in e-commerce and money remittance vertical, which grew 80% and 46% respectively. The growth was largely driven by* the secular trends and *development of our core categories, including sports based market, headed by our Football World Cup 2018 reinforced by the expansion of product offering for the betting merchant*, to roll out our project we developed for our partners as part of our B2B, B2C strategy, development of self employed use cases and expansion of our B2B ecosystem.

136. Defendant Karavaev further stated during the 4Q18 Earnings Call:

Fourth quarter 2018 *total adjusted net revenue increased by 41%* to reach RUB5.8 billion, up from RUB4.1 billion in the fourth quarter of 2017. The *increase was mainly driven by payment services* and small and medium enterprises segment net revenue growth, slightly offset by negative net revenue contribution of Rocketbank segment.

*Payment services segment net revenue increased 35%* to reach RUB4.7 billion to compare with 3.5 billion in the prior year. *Payment Services payment adjusted net revenue increased 37%* to RUB4.1 billion, up from RUB3 billion in the prior year. *As a result of the net revenue growth in our ecommerce and money*

52

*remittance verticals, which grew 54% and 37% respectively,* offset by decline in net revenue in financial services vertical by 8%.

*Our financial result in this segment was driven both by increase in volumes that [Defendant Solonin] just described and the improvement of the payment average net revenue yield by 7 basis points year-over-year*, as a result of shift in product mix, offset by slight yield decline in most categories. Payments services other adjusted net revenue increased 26% to RUB623 million as compared to 495 million in the prior year.

137.    The statements referenced in ¶¶ 132-36 *supra* regarding Qiwi's revenue, profits, payment volumes, cash flows, "strong foundation," and "growth" in "payment services" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment system; (2) then-current applicable Russian regulations increasing identification requirements for e-wallets and restricting transactions through illegal online betting merchants were having a negative impact on Qiwi's revenue; (3) as a result, Qiwi would not be able to sustain its revenue levels without the use of its payment services by unlicensed betting merchants that violated applicable Russian regulations; and (4) Qiwi was putting the significant revenue from its legitimate transactions, including online gambling, at risk by not complying with the current applicable Russian regulations.

138.    That same day, Qiwi filed its 2018 20-F with the SEC, which provided the Company's 2018 financial statements and position. The 2018 20-F was signed by Defendant Solonin and contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Solonin and Karavaev attesting to the accuracy of financial reporting, the disclosure

53

of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

139.    As to internal controls, the 2018 20-F stated that "***management concluded that as of December 31, 2018, our internal control over financial reporting was effective***."

140.    The statements referenced in ¶¶ 138-39 *supra* relating to Qiwi's internal controls were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's internal controls related to reporting and record-keeping were ineffective; (2) Qiwi was thus not meeting the CBR's reporting and record-keeping requirements; (3) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment system; (4) as a result, Qiwi would not be able to pass an audit by the CBR, would be fined by the CBR, and would have its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR; and (5) as a result, Qiwi would no longer be in a prime position to process electronic bets in Russia and receive significant revenue from online gambling.

141.    Furthermore, while the 2018 20-F discussed several "Risk Factors," the Defendants failed to adequately warn investors that the following "Risk Factors" had already materialized at the time of the Annual Report.

142.    First, with regard to "extensive government regulation," the 2018 20-F warned that:

> Both Qiwi Bank and Rapida LTD have been the subject of CBR investigations in the past that have uncovered various violations and deficiencies in relation to, among other things, reporting requirements, anti-money laundering, cybersecurity, compliance with applicable electronic payments thresholds

54

requirements and other issues which we believe we have generally rectified. In the course of 2018, Qiwi Bank underwent a major scheduled audit by the CBR as part of its ongoing supervisory process, which resulted in CBR identifying a number of violations and imposing certain sanctions on us. The measures that the CBR has so far imposed on us in response have not had a significant impact on our operations and have been mostly lifted. We believe that ***we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward***. However, there can be no assurance that additional sanctions will not be imposed on us as a result of such or any other findings and that we will not come under greater CBR scrutiny in connection with any perceived deficiencies in our past conduct, or that any currently planned or future inspections will not result in discovery of any significant or minor additional violations of various banking regulations, and what sanctions the CBR would choose to employ against us if this were to happen. ***Any such sanctions could have a material adverse effect on our business, financial condition and results of operations***.

* * *

***Any breach of applicable regulations could expose us to potential liability, including fines, prohibition to carry out certain transactions for a period of up to six months (or more in the event of repeated violations)***, the introduction of temporary administration by the CBR and in certain instances the revocation of our banking license.... For these reasons, ***any material breach of laws and regulations by Qiwi Bank*** or the revocation of its banking licenses ***could have a material adverse effect on our business, financial condition and results of operations***.

143.   Second, with regard to the "substantial portion of [Qiwi's] revenues [derived] from merchants in the betting industry," the 2018 20-F warned that:

> We provide payment processing services to a number of merchants in the betting industry. Processing payments to such merchants constitutes approximately 7.5% of our payment services segment payment volumes for the year ended December 31, 2017 and also represents a relatively significant portion of our revenues. Moreover, processing such payments generally carries higher margins than processing payments to merchants in most other market verticals that we serve, while the repayment of winnings also functions as one of the wallet reload channels contributing to the sustainability and attractiveness of our ecosystem. The betting industry is subject to extensive and actively developing regulation in Russia, as well as increasing government scrutiny. In particular, under amendments to the Russian betting laws introduced in 2014 (see "Regulation"), in order to engage in the betting industry, a bookmaker has to become a member of a self-regulated organization of bookmakers and abide by its rules, and any and all interactive bets may be only accepted through an Interactive Bets Accounting Center (TSUPIS) set up by a credit organization together with a self-regulated association of bookmakers. In 2016 QIWI Bank established a TSUPIS together with one of the self-regulated associations of bookmakers in order to be able to accept such payments. ***If any of our merchants engaged in the betting industry is not able or willing to comply***

55

**with the Russian betting legislation** or if they decide to cease their operations in Russia for regulatory reasons or otherwise**, we would have to discontinue servicing them and would lose the associated income. Moreover, if we are found to be in non-compliance with any of the requirements of the applicable legislation, we could not only become subject to fines and other sanctions.**

144. The statements referenced in ¶¶ 142-43 *supra* relating to Qiwi's compliance with application regulations were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) despite remedying violations discovered during the 2018 CBR audit, Qiwi was still not meeting the CBR's reporting and record-keeping requirements; (2) Qiwi's lax reporting and record-keeping was obfuscating illicit online betting transactions that were being made through its payment system; (3) as a result, Qiwi would not be able to pass an audit by the CBR, would be fined by the CBR, and would have its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR; (4) as a result, Qiwi would no longer be in a prime position to process electronic bets in Russia and receive significant revenue from online gambling; and (5) Qiwi was putting the significant revenue from its legitimate transactions, including online gambling, at risk by not complying with the current applicable Russian regulations.

145. Third, with regard to Qiwi's "need to implement enhanced compliance processes, procedures and controls with respect to the rules and regulations that apply to [its] business," the 2018 20-F warned that:

> Following our acquisition of Rapida LTD in 2015, we have had to devote additional resources to enhance the compliance function within Rapida LTD, which, at the time of our acquisition, was deficient in several areas. As of the date of this annual report we continue to develop and integrate certain control procedures with respect to our new projects SOVEST and Tochka in order to maintain a comprehensive system of controls and procedures across our business. There can be no assurance, however, that that the measures we undertake will be

56

sufficient to prevent significant deficiencies in the compliance procedures and internal controls of our new projects. ***Our failure to implement and maintain effective internal control over financial reporting could result in errors in our financial statements that could lead to a restatement of our financial statements, cause us to fail to meet our reporting obligations and cause investors to lose confidence in our reported financial information, which may result in a decline in the market price of our ADSs***.

146. The statements referenced in ¶ 145 *supra* relating to Qiwi's internal controls were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's internal controls related to reporting and record-keeping were ineffective; (2) Qiwi was thus not meeting the CBR's reporting and record-keeping requirements; (3) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment system; (4) as a result, Qiwi would not be able to pass an audit by the CBR, would be fined by the CBR, and would have its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR; and (5) as a result, Qiwi would no longer be in a prime position to process electronic bets in Russia and receive significant revenue from online gambling.

First Quarter 2019 Financial Results

147. On May 16, 2019, Qiwi filed its financial results for the first quarter of 2019 ("1Q19 Financial Report") as Exhibit 99.1 to a Form 6-K, signed by Defendant Karavaev, touting:

- ***Total Adjusted Net Revenue (Total Segment Net Revenue)*** for the quarter ended March 31, 2019 ***was RUB 5,367 million ($82.9 million), an increase of 31%*** compared with RUB 4,099 million in the prior year. The ***increase was mainly driven by Payment Services*** and CFS Segments Net Revenue growth, which was slightly offset by the negative Net Revenue contribution of Rocketbank Segment.

57

- *Payment Services Segment Net Revenue* for the quarter ended March 31, 2019 *was RUB 4,836 million ($74.7 million), an increase of 32%* compared with RUB 3,668 million in the prior year.

- *PS Payment [Processing Fees] Adjusted Net Revenue was RUB 4,175 million ($64.5 million), an increase of 30%* compared with RUB 3,223 million in the prior year. PS Payment Adjusted Net Revenue *growth was predominantly driven by a volume growth in the E-commerce and Money Remittance market verticals*.

- For the quarter ended March 31, 2019, *Payment Services Segment Net Profit was RUB 2,988 million ($46.2 million), an increase of 35%* compared with RUB 2,209 million in the prior year driven by Payment Services Segment Net Revenue growth and certain expenses savings that will be caught up during the year.

- For the quarter ended March 31, 2019, *Payment Services Segment payment volume was RUB 326.0 billion ($5.0 billion), an increase of 31%* compared with RUB 249.2 billion in the prior year. The *increase in payment volume was driven by growth in E-commerce and Money Remittances market verticals resulting largely from the development of certain payment solutions for merchants including betting merchants*, new contracts and projects targeting the self-employed market as well as secular growth in some of our key categories.

148. Defendant Solonin is quoted in the 1Q19 Financial Report as stating:

This quarter *we continue to demonstrate strong performance, especially in our Payment Services business, which delivered 32% segment net revenue growth and 35% segment net profit growth*. I would like to highlight that *the performance of our payment services business continues to be driven predominantly by the development of our product proposition aimed at our user, merchant and partners including solutions for digital entertainment merchants*, self-employed and sharing economy partners. Our growth is simultaneously underpinned by the secular trends in our key markets demonstrating the adaptability and resilience of the payment ecosystem we have developed so far and aim to develop further.

   *As we continued to benefit from the strong performance and substantial cash flows generated by the Payment Services segment, which remains a core part of our business, I believe we are well positioned to pursue our strategy and carry on our investments in the new projects*. We are well positioned to continue building up our ecosystem, diversifying our operations and increasing the life cycle of our clients with an ultimate goal of securing the long-term growth prospects of our Company.

58

149. That same day, Qiwi held its first quarter 2019 financial earnings call ("1Q19 Earnings Call") to discuss its quarterly results with analysts. During the call, Defendant Solonin stated that:

This quarter we demonstrated ***continued solid performance of our operating service business, delivered 32% segment net revenue and 35% segment net profit growth***, setting up a strong start of the year.

Our ***growth was driven by robust performance of our key areas; payment services for betting-related merchants***, digital money remittances, and projects we developed for self-employed and B2B B2C customers, as well as by a general expansion of our payment ecosystem. Glad to acknowledge that ***the continued strong performance of payment service business provides stable foundation for future growth***.

\* \* \*

For the first quarter of 2019, ***our payment services segment volume increased by 31% to reach RUB326 billion, driven by the significant growth in e-commerce and money remittance verticals which grew 79% and 36% respectively***.

\* \* \*

***Strong growth in our key market verticals converted into robust payment services segment net revenue growth***, and together with our SME and the CSS segments ***contributed to the overall robust performance of our business***.

150. Defendant Karavaev added to the 1Q19 Earnings Call that:

First quarter 2019 ***total adjusted net revenue increased by 31%*** to reach RUB5.4 billion, up from RUB4.1 billion in the first quarter of 2018. This ***increase was mainly driven by payment services and consumer financial services segment net revenue growth***, slightly offset by negative net revenue contribution of Rocketbank segment.

***Payment services segment net revenue increased 32%*** to reach RUB4.8 billion compared to RUB3.7 billion in the prior year. ***Payments services [] adjusted net revenue increased 30%*** to RUB4.2 billion, up from RUB3.2 billion in the prior year***, a result of the net share revenue growth in our e-commerce and money remittance verticals which grew 40% and 33% respectively***, partially offset by a slight decline in net revenue and other verticals. Our ***financial results in this segment were predominantly driven by an increase in the volume*** as [Defendant Solonin] just described.

151. Defendant Solonin also stated during the 1Q19 Earnings Call that:

59

This quarter we demonstrated ***continued solid performance of our operating service business, delivered 32% segment net revenue and 35% segment net profit growth***, setting up a strong start of the year.

Our ***growth was driven by robust performance of our key areas; payment services for betting-related merchants***, digital money remittances, and projects we developed for self-employed and B2B B2C customers, as well as by a general expansion of our payment ecosystem. Glad to acknowledge that ***the continued strong performance of payment service business provides stable foundation for future growth***.

\* \* \*

For the first quarter of 2019, ***our payment services segment volume increased by 31% to reach RUB326 billion, driven by the significant growth in e-commerce and money remittance verticals which grew 79% and 36% respectively***.

\* \* \*

***Strong growth in our key market verticals converted into robust payment services segment net revenue growth***, and together with our SME and the CSS segments ***contributed to the overall robust performance of our business***.

152. The statements referenced in ¶¶ 147-51 *supra* relating to Qiwi's revenue, profits, payment volumes, and "growth" in "payment services for betting" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment system; (2) then-current applicable Russian regulations increasing identification requirements for e-wallets and restricting transactions through illegal online betting merchants were having a negative impact on Qiwi's revenue; (3) as a result, Qiwi would not be able to sustain its revenue levels without the use of its payment services by unlicensed betting merchants that violated applicable Russian regulations; and (4) Qiwi was putting the significant revenue from its legitimate

transactions, including online gambling, at risk by not complying with the current applicable Russian regulations.

153. In addition, in response to a question from analyst Maria Sukhanova with BCS Global Markets about "a draft bill approved in the first, about varying market and about putting stricter rules into play," Defendant Solonin stated that:

> And on the regulatory part, I mean we - I mean first of all, it's not something that all the kind of rumors and the regulation that we're discussing now. We're aware of that, so we are actually working together with the regulators and are doing additional perspective that given our scale and market partition, ***any new regulation rules will be basically positive for us***, we feel the markets in the way and ***we will be in a position to kind of extend our figures***.

154. The statements referenced in ¶ 153 *supra* relating to the impact of the "draft bill…putting stricter rules into play" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi was not meeting the CBR's reporting and record-keeping requirements; (2) Qiwi's lax reporting and record-keeping was obfuscating illicit online betting transactions that were being made through its payment system; (3) as a result, Qiwi would not be able to pass an audit by the CBR, would be fined by the CBR, and would have its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR; and (4) as a result, Qiwi would no longer be in a prime position to process electronic bets in Russia and receive significant revenue from online gambling.

Second Quarter 2019 Financial Results

155.    On August 19, 2019, Qiwi filed its financial results for the second quarter of 2019

("2Q19 Financial Report") as Exhibit 99.1 to a Form 6-K, signed by Defendant Poshmorga,

providing in relevant part:

- ***Total Adjusted Net Revenue (Total Segment Net Revenue)*** for the quarter ended June 30, 2019 ***was RUB 5,563 million ($88.2 million), an increase of 23%*** compared with RUB 4,510 million in the prior year. The ***increase was mainly driven by Payment Services*** and CFS Segments Net Revenue growth, which was partially offset by the decline in the SME Segment Net Revenue as well as negative Net Revenue contribution of Rocketbank Segment.

- ***Payment Services Segment Net Revenue*** for the quarter ended June 30, 2019 ***was RUB 5,158 million ($81.8 million), an increase of 35%*** compared with RUB 3,832 million in the prior year.

- ***PS Payment [Processing Fees] Adjusted Net Revenue was RUB 4,412 million ($70.0 million), an increase of 31%*** compared with RUB 3,362 million in the prior year. PS Payment Adjusted Net Revenue ***growth was predominantly driven by a volume growth in the E commerce, Financial Services and Money Remittance market verticals*** partially offset by the decline of the Payment Average Adjusted Net Revenue Yield.

- For the quarter ended June 30, 2019, ***Adjusted Net Profit (Total Segment Net Profit) was RUB 1,965 million ($31.2 million), an increase of 125%*** compared with RUB 872 million in the prior year. The growth of Adjusted Net Profit was primarily driven by the same factors impacting Adjusted EBITDA as well as by a significantly smaller net foreign exchange loss as compared to the same period in the prior year.

- For the quarter ended June 30, 2019, ***Payment Services Segment Net Profit was RUB 3,206 million ($50.8 million), an increase of 42%*** compared with RUB 2,250 million in the prior year driven by Payment Services Segment Net Revenue growth. Certain expenses that were postponed this quarter will be incurred in the second half of the year.

- For the quarter ended June 30, 2019, ***Payment Services Segment payment volume was RUB 370.8 billion ($5.9 billion), an increase of 41%*** compared with RUB 262.8 billion in the prior year. The ***increase in payment volume was driven by growth in E-commerce, Financial Services and Money Remittances market verticals resulting largely from the development of certain payment solutions for merchants including betting merchants***, new contracts and new projects targeting the self-employed market as well as secular growth in some of our key categories.

156.    Defendant Solonin is quoted in the 2Q19 Financial Report as stating:

62

This quarter *we continue to demonstrate exceptional performance, especially in our Payment Services business, which delivered 35% segment net revenue growth and 42% segment net profit growth*. I am glad to say that *the performance of our payment services business continues to be driven predominantly by the expansion and enhancement of the product proposition we offer to our users, merchants and partners including solutions for digital entertainment merchants*, self-employed and sharing economy partners. Our growth is simultaneously underpinned by the secular trends in our key markets. Our results clearly emphasize the value and relevance of the payment ecosystem we have developed so far and aim to develop further.

As *we continue to benefit from the strong performance and substantial cash flows generated by the Payment Services segment, which remains a core part of our business,* we proceed with pursuing our strategy, building up our payment and financial services ecosystem and investing in the development of the new products and projects. We see many opportunities both in the payment space and in the adjacent markets and I believe we are well positioned to continue strengthening our ecosystem and increasing the life cycle of our clients with an ultimate goal of securing the long-term growth prospects of our Company.

157. That same day, Qiwi held its second quarter 2019 financial earnings call ("2Q19 Earnings Call") to discuss its quarterly results with analysts. Defendant Solonin discussed the Company's revenue growth, stating in relevant part:

This quarter, *we have demonstrated exceptional performance. Our Payment Services business delivered 35% segment net revenue and 42% segment net profit growth securing strong results for the first half of 2019. Our growth was driven by the robust performance in our key strategic streams, Payment Services for digital entertainment merchants*, digital money remittances and projects to develop for self-employed and sharing economy partners as well as by the general expansion of our payment ecosystem.

\* \* \*

Second quarter 2019 *total adjusted net revenue increased by 23%* to reach RUB5.6 billion, up from RUB4.5 billion in the second quarter of 2018. The *increase was mainly driven by Payment Services* and Consumer Financial Services segment net revenue growth.

158. Defendant Protopopov went on to add during the 2Q19 Earnings Call:

For the second quarter 2019, our *Payment Service segment volume increased by 41%* to reach RUB371 billion *driven by significant growth in E-commerce, Financial Services and Money Remittance vertical, which grew 74%, 52% and 43%, respectively. The growth in E-commerce and Money Remittance verticals was largely driven by the development of our key streams, mainly digital*

63

*entertainment,* self-employed and sharing economy partners, where we're able to expand our partner and merchant network, build up our relations with our existing partners and expand our product offering.

*   *   *

*Payment Service segment net revenue increased 35%* to reach RUB5.2 billion compared to RUB3.8 billion in the prior year. *Payment Service adjustment net revenue increased 31%* to RUB4.4 billion, up from RUB3.4 billion in the prior year *as a result of the net revenue growth in our Money Remittance and E-commerce verticals, which grew 73% and 25%, respectively*, partially offset by a slight decline in net revenue in other verticals. *Our financial results in this segment were predominantly driven by increasing volumes.*

159.    Defendant Poshmorga also addressed Qiwi's quarterly profit during the 2Q19

Earnings Call:

*[P]rofit operating performance of our Payment Services business has continued to generate substantial cash flows*, supported our investments in the development of our new projects.

*   *   *

*Payment Services segment net profit increased 42%* to RUB3.2 billion compared with RUB2.3 billion in the prior year *driven primarily by Payment Services segment net revenue growth* and certain expenses that we performed and will be caught up during the year.

160.    Analyst Chris Kennedy with William Blair inquired about Qiwi's ability to achieve

its mid-term guidance during the 2Q19 Earnings Call. Defendant Kiseleva responded by saying:

*[W]e are on a new track to achieve the guidance* that we have provided during our Investor Day. *We are well on with the Payment Services business over-performing our current expectations.* We reiterate the mid-term guidance no change to that yet, but we believe that we are on a good track with our 3 main streams. And definitely, as we have already said, *the core of the results and the core of the increase in the scale of business and net profit, both net revenue, and net profit guidance lies within the growth of the Payment Services business*.

161.    The statements referenced in ¶¶ 155-60 *supra* relating to Qiwi's revenue, profits,

payment volumes, "growth" in "Payment Services," and guidance were materially false and/or

misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's

business, operational and financial results, which were known to Defendants or recklessly

disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment system; (2) then-current applicable Russian regulations increasing identification requirements for e-wallets and restricting transactions through illegal online betting merchants were having a negative impact on Qiwi's revenue; (3) as a result, Qiwi would not be able to sustain its revenue levels without the use of its payment services by unlicensed betting merchants that violated applicable Russian regulations; and (4) Qiwi was putting the significant revenue from its legitimate transactions, including online gambling, at risk by not complying with the current applicable Russian regulations.

162.    Analyst Chris Kennedy with William Blair inquired about Qiwi's ability to achieve its mid-term guidance during the 2Q19 Earnings Call. Defendant Kiseleva responded by saying:

> ***[W]e are on a new track to achieve the guidance*** that we have provided during our Investor Day. ***We are well on with the Payment Services business over-performing our current expectations.*** We reiterate the mid-term guidance no change to that yet, but we believe that we are on a good track with our 3 main streams. And definitely, as we have already said, ***the core of the results and the core of the increase in the scale of business and net profit, both net revenue, and net profit guidance lies within the growth of the Payment Services business***.

163.    Also during the 2Q19 Earnings Call, Defendant Protopopov had the following exchange with analyst Sveta Sukhanova with Sberbank:

> *Sukhanova*: [H]ow Money Rem are affected by the betting revenues and that kind of acceleration of Money Rem, I would think about payout, about self-employed, etcetera. But yes, is that kind of Money Rem acceleration somehow connected with the betting business and with the payouts to them from the betting business to the wallet that people forward to – using the same peer-to-peer money transfer, etcetera, etcetera? So the question is it somehow connected with betting businesses now?

> *Protopopov*: It is partially connected with the betting businesses as well, because part of the payout is going directly to the bank card is going to the Money Rem, while the volume that is going to the payout to the wallet

is not reflected in our volumes of the category since its top-up – part of our wallet top-up. So it's partially connected, but ***the main growth of this category is driven by other factors***, as I already mentioned and the [indiscernible] is not big.

*Sukhanova*: Very clear. Thank you very much. And ***what about e-commerce revenue slowdown***?

*Protopopov*: Actually, ***the main reason is the high base in the last year because of the World Cup and the high betting volumes on this period last year***.

164.    Later during the 2Q19 Earnings Call, in response to a question from analyst Andrey Pavlov-Rusinov wondering with regard to the "25% year-on-year growth in net revenues there, what is growing faster, the betting, revenues or the rest of the e-commerce," Defendant Protopopov stated that "regarding the e-commerce category, ***betting has more or less the same growth rate as other parts of this business***."

165.    The statements referenced in ¶¶ 162-64 *supra* relating to the "betting volumes" and "betting" revenues were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that Qiwi's lax reporting and record-keeping was obfuscating illicit online betting transactions that were being made through its payment system.

Third Quarter 2019 Financial Results

166.    On November 20, 2019, Qiwi filed its financial results for the third quarter of 2019 ("3Q19 Financial Report") as Exhibit 99.1 to a Form 6-K, signed by Defendant Kiseleva, touting:

- ***Total Adjusted Net Revenue (Total Segment Net Revenue)*** for the quarter ended September 30, 2019 w***as RUB 5,993 million ($93.0 million), an increase of 15%*** compared with RUB 5,230 million in the prior year. The ***increase was mainly driven by Payment Services*** and CFS Segments Net Revenue growth,

which was partially offset by the decline in the SME Segment Net Revenue as well as negative Net Revenue contribution of Rocketbank Segment.

- *Payment Services Segment Net Revenue* for the quarter ended September 30, 2019 *was RUB 5,484 million ($85.1 million), an increase of 29%* compared with RUB 4,257 million in the prior year.

- *PS Payment [Processing Fees] Adjusted Net Revenue was RUB 4,676 million ($72.6 million), an increase of 27%* compared with RUB 3,668 million in the prior year. PS Payment Adjusted Net Revenue *growth was predominantly driven by volume growth in E-commerce, Financial Services and Money Remittance market verticals* partially offset by a slight decline in the Payment Average Adjusted Net Revenue Yield.

- For the quarter ended September 30, 2019, *Adjusted Net Profit (Total Segment Net Profit) was RUB 1,893 million ($29.4 million), an increase of 62%* compared with RUB 1,170 million in the prior year. The growth of Adjusted Net Profit was primarily driven by the same factors impacting Adjusted EBITDA as well as by a net foreign exchange gain as compared to the net foreign exchange loss for the same period in the prior year.

- For the quarter ended September 30, 2019, *Payment Services Segment Net Profit was RUB 3,259 million ($50.6 million), an increase of 31%* compared with RUB 2,487 million in the prior year driven by Payment Services Segment Net Revenue slightly offset by growth of payroll, compensation to employees and related taxes (excluding effect of share based payments).

- For the quarter ended September 30, 2019, *Payment Services Segment payment volume was RUB 391.3 billion ($6.1 billion), an increase of 32%* compared with RUB 297.1 billion in the prior year. The *increase in payment volume was driven by growth in Ecommerce, Financial Services and Money Remittances market verticals resulting largely from the development of certain payment solutions for merchants including betting merchants*, new contracts and new projects targeting the self-employed market as well as secular growth in some of our key categories.

167. Defendant Solonin is quoted in the 3Q19 Financial Report as saying:

This quarter *we continue to demonstrate robust performance, especially in our Payment Services business, which delivered 29% segment net revenue growth and 31% segment net profit growth.* The performance of our payment services business continues to be *driven predominantly by the expansion and enhancement of the product proposition we offer to our users, merchants and partners underpinned by the secular trends in our key markets.* Our results clearly emphasize the value and relevance of the payment ecosystem we have developed so far and aim to develop further.

*As we continue to benefit from the strong performance and substantial cash flows generated by the Payment Services segment, which remains a core part of our business, we proceed with pursuing our strategy of building up our payment and*

67

*financial services ecosystem* and investing in the development of new products and projects, the majority of which also demonstrate improving operating and financial performance. We see many opportunities both in the payment space and in the adjacent markets and I believe we are well positioned to continue strengthening our ecosystem with the ultimate goal of securing a long-term growth prospects.

168. That same day, Qiwi held its third quarter 2019 financial earnings call ("3Q19 Earnings Call") to discuss its quarterly results with analysts. Defendant Solonin began the discussion stating:

This quarter, *we have demonstrated robust performance. Our Payment Services business delivered 29% segment net revenue and 31% segment net profit growth* securing strong results for nine months of 2019. Our *growth was driven by solid performance of our key streams, Payment Services for digital entertainment merchants, digital money remittances* and projects we developed for self-employed and sharing economy partners.

\* \* \*

Moreover, *significant cash flows that are generated by our Payment Services business allow us to invest in the new products and projects in financial and payments spaces, in order to secure the long-term growth prospects of our Company.*

\* \* \*

Third quarter of 2019 *total adjusted net revenue increased by 15%* to reach RUB6 billion, up from RUB5.2 billion in the third quarter of 2018. The *increase was mainly driven by Payment Services* and Consumer Financial Services segments' net revenue growth.

169. Defendant Protopopov added:

For the third quarter of 2019, our *Payment Services segment volume increased by 32%* to reach RUB391 billion *driven by significant growth in the E-commerce, Financial Services, and Money Remittance vertical which grew 56%, 37% and 33% respectively.*

The *growth in the E-commerce and Money Remittance vertical were largely driven by the development of our key streams, mainly the digital entertainment*, self-employed and sharing economy partners, where we were able to expand our partner and merchant network, build up our relations with our existing partners and expand our product offering. This growth was reinforced by secular market trends towards the digitalization of payment in our key regions.

\* \* \*

*Payment Services segment net revenue increased 29%* to reach RUB5.5 billion compared to RUB4.3 billion in the prior year. *Payment Services payment adjusted*

*net revenue increased 28%* to RUB4.7 billion, up from RUB3.7 billion in the prior year, *primarily as a result of the net revenue growth in our Money Remittance, E-commerce and Financial Service vertical, which grew 33%, 30% and 19% respectively.*

Our financial results in this segment were *predominantly driven by the increase in volumes.*

170. The statements referenced in ¶¶ 166-69 *supra* relating to Qiwi's revenue, profits, payment volumes, cash flows, and "growth" in "Payment Services" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment system; (2) then-current applicable Russian regulations increasing identification requirements for e-wallets and restricting transactions through illegal online betting merchants were having a negative impact on Qiwi's revenue; (3) as a result, Qiwi would not be able to sustain its revenue levels without the use of its payment services by unlicensed betting merchants that violated applicable Russian regulations; and (4) Qiwi was putting the significant revenue from its legitimate transactions, including online gambling, at risk by not complying with the current applicable Russian regulations.

171. During the call, in response to a question from analyst Svetlana Sukhanova with Sberbank about "the performance of betting-related revenues in Q3" which "are recorded on this kind of E-commerce line," Defendant Solonin stated that:

*On the betting revenues, we are not growing at the same pace of course as the previous year. So now betting revenues are more or less in line with the budget, but not growing as fast anymore as it was previous year.* That's what I can say.

172. The statements referenced in ¶ 171 *supra* relating to "betting revenues" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that Qiwi's lax reporting and record-keeping was obfuscating illicit online betting transactions that were being made through its payment system.

<u>Fourth Quarter and Fiscal Year 2019 Financial Results</u>

173. On March 24, 2020, Qiwi filed its financial results for the fourth quarter of 2019 and full year ended December 31, 2019 ("4Q19 and FY19 Financial Report") as Exhibit 99.1 to a Form 6-K, signed by Defendant Kiseleva. Regarding Qiwi's 4Q19 financial results, the Report provided in relevant part:

- ***Total Adjusted Net Revenue (Total Segment Net Revenue)*** for the quarter ended December 31, 2019 ***was RUB 6,253 million ($101.0 million), an increase of 7%*** compared with RUB 5,818 million in the prior year. The ***increase was mainly driven by Payment Services (PS)*** and Consumer Financial Services (CFS) Segments Net Revenue growth, which was partially offset by the decline in the Small and Medium Enterprises (SME) Segment Net Revenue.

- ***Payment Services Segment Net Revenue*** for the quarter ended December 31, 2019 ***was RUB 5,487 million ($88.6 million), an increase of 16%*** compared with RUB 4,741 million in the prior year.

- ***PS Payment [Processing Fees] Adjusted Net Revenue was RUB 4,840 million ($78.2 million), an increase of 18%*** compared with RUB 4,118 million in the prior year. PS Payment Adjusted Net Revenue ***growth was predominantly driven by volume growth in E-commerce, Money Remittance and Financial Services market verticals*** partially offset by a slight decline in the Payment Average Adjusted Net Revenue Yield driven predominantly by a decline in E-commerce category adjusted net revenue yield resulting from changing product mix.

- For the quarter ended December 31, 2019, ***Adjusted Net Profit (Total Segment Net Profit) was RUB 1,168 million ($18.9 million), an increase of 15%*** compared with RUB 1,014 million in the fourth quarter of the prior year. The growth of Adjusted Net Profit was primarily driven by the same factors impacting Adjusted EBITDA as well as by a decrease in net foreign exchange loss1 as compared to the same period in the prior year.

70

- For the quarter ended December 31, 2019, *Payment Services Segment Net Profit was RUB 2,652 million ($42.8 million), an increase of 3%* compared with RUB 2,584 million in the prior year driven by Payment Services Segment Net Revenue growth offset by growth of payroll, compensation to employees and related taxes (excluding effect of share-based payments) as well as by growth in marketing and advertising expenses.

- For the quarter ended December 31, 2019, *Payment Services Segment payment volume was RUB 400.5 billion ($6.5 billion), an increase of 22%* compared with RUB 328.9 billion in the prior year. The *increase in payment volume was driven by growth in Ecommerce, Money Remittances and Financial Services market verticals resulting largely from the development of certain payment solutions for merchants including betting merchants*, new contracts and new projects targeting the self-employed market.

174. Regarding Qiwi's FY19 financial results, the 4Q19 and FY19 Financial Report provided in relevant part:

- *Total Adjusted Net Revenue (Total Segment Net Revenue)* for the year ended December 31, 2019 *was RUB 23,176 million ($374.4 million), an increase of 18%* compared with RUB 19,657 million in the prior year. The increase was mainly driven by Payment Services and CFS Segments Net Revenue growth partially offset by the decline in the SME Segment Net Revenue as well as negative Net Revenue contribution of Rocketbank Segment.

- *Payment Services Segment Net Revenue* for the year ended December 31, 2019 *was RUB 20,965 million ($338.7 million), an increase of 27%* compared with RUB 16,497 million in the prior year.

- *PS Payment [Processing Fees] Adjusted Net Revenue was RUB 18,103 million ($292.4 million), an increase of 26%* compared with RUB 14,370 million in the prior year. PS Payment Adjusted Net Revenue *growth was predominantly driven by volume growth in the E-commerce, Financial services and Money Remittance market verticals* slightly offset by a decrease in Payment Average Adjusted Net Revenue Yield driven predominantly by a decline in E-commerce category adjusted net revenue yield resulting from changing product mix.

- For the year ended December 31, 2019, *Adjusted Net Profit (Total Segment Net Profit) was RUB 6,679 million ($107.9 million), an increase of 61%* compared with RUB 4,137 million in the prior year. The growth of Adjusted Net Profit was primarily driven by the same factors impacting Adjusted EBITDA as well as a decrease in net foreign exchange loss2 as compared to the same period in the prior year offset by an increase in income tax expense.

- For the year ended December 31, 2019, *Payment Services Segment Net Profit was RUB 12,105 million ($195.5 million), an increase of 27%* compared with RUB 9,529 million in the prior year *driven by Payment Services Segment Net*

71

*Revenue growth* and slightly offset by an increase in compensation to employees and related taxes (excluding effect of share-based payments) as well as depreciation and amortization resulting from the adoption of IFRS 16.

- For the year ended December 31, 2019, *Payment Services Segment payment volume was RUB 1,489 billion ($24.0 billion), an increase of 31%* compared with RUB 1,138 billion in the prior year. The *increase in payment volume was driven by growth in Ecommerce, Money Remittances and Financial Services market verticals resulting largely from the development of certain payment solutions for merchants and partners including betting merchants*, new contracts and projects targeting the self-employed market and sharing economy partners as well as secular growth in some of our key categories.

175. Defendant Kim is quoted in the 4Q19 and FY19 Financial Report as touting:

In 2019, *we demonstrated outstanding performance, especially in our Payment Services business, which delivered 27% segment net revenue and segment net profit growth year over year. The performance of our payment services business was driven predominantly by the expansion and enhancement of the product proposition we offer to our users, merchants and partners* underpinned by the secular trends in our key markets, the latter, however, have started to decelerate towards the end of the fourth quarter of 2019. *This year we have processed close to 1.5 trillion rubles in cash and electronic payments, increasing our turnover by almost one third*…. Our *results clearly emphasize the value and relevance of the payment ecosystem we have developed so far* and aim to develop further.

\* \* \*

*[W]e continue to optimize our operations and implement stricter cost controls and we see the majority of the projects that we have been investing in demonstrate improving operating and financial performance*[.]

176. The statements referenced in ¶¶ 173-75 *supra* relating to Qiwi's revenue, profits, payment volumes, cash flows, and growth in "Payment Services" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment system; (2) then-current applicable Russian regulations increasing identification requirements for

72

e-wallets and restricting transactions through illegal online betting merchants were having a negative impact on Qiwi's revenue; (3) as a result, Qiwi would not be able to sustain its revenue levels without the use of its payment services by unlicensed betting merchants that violated applicable Russian regulations; and (4) Qiwi was putting the significant revenue from its legitimate transactions, including online gambling, at risk by not complying with the current applicable Russian regulations.

177. That same day, Qiwi filed its 20-F Annual Report for the year ended December 31, 2019 (the "2019 20-F") with the SEC, which provided the Company's 2019 financial statements and position. The 2019 20-F was signed by Defendant Kim and contained signed SOX certifications by Defendants Kim and Kiseleva attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

178. As to internal controls, the 2019 20-F stated that "***management concluded that as of December 31, 2019, our internal control over financial reporting was effective***."

179. The statements referenced in ¶¶ 177-78 *supra* relating to Qiwi's internal controls were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's internal controls related to reporting and record-keeping were ineffective; (2) Qiwi was thus not meeting the CBR's reporting and record-keeping requirements; (3) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment system; (4) as a result, Qiwi would not be able to pass an audit by the CBR, would be

73

fined by the CBR, and would have its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR; and (5) as a result, Qiwi would no longer be in a prime position to process electronic bets in Russia and receive significant revenue from online gambling.

180. Furthermore, while the 2019 20-F discussed several "Risk Factors," the Defendants failed to adequately warn investors that the following "Risk Factors" had already materialized at the time of the annual report.

181. First, with regard to "Qiwi Bank and other Russian banks and credit organizations operat[ing] in a highly regulated environment and increased regulatory scrutiny," the 2019 20-F warned that:

> Both Qiwi Bank and Rapida LTD have been the subject of CBR investigations in the past that have uncovered various violations and deficiencies in relation to, among other things, reporting requirements, anti-money laundering, cybersecurity, compliance with applicable electronic payments thresholds requirements and other issues which we believe we have generally rectified. In the course of 2018, Qiwi Bank underwent a major scheduled audit by the CBR as part of its ongoing supervisory process, which resulted in CBR identifying a number of violations and imposing certain sanctions on us. The measures that the CBR has so far imposed on us in response have not had a significant impact on our operations and have been mostly lifted. We believe that *we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward*. However, there can be no assurance that additional sanctions will not be imposed on us as a result of such or any other findings and that we will not come under greater CBR scrutiny in connection with any perceived deficiencies in our past conduct, or that any currently planned or future inspections will not result in discovery of any significant or minor additional violations of various banking regulations, and what sanctions the CBR would choose to employ against us if this were to happen. *Any such sanctions could have a material adverse effect on our business, financial condition and results of operations.*
>
> * * *
>
> *Any breach of applicable regulations could expose us to potential liability, including fines, prohibition to carry out certain transactions for a period of up to six months (or more in the event of repeated violations)*, the introduction of temporary administration by the CBR and in certain instances the revocation of our banking license. ... For these reasons, *any material breach of laws and regulations*

74

*by Qiwi Bank* or the revocation of its banking licenses *could have a material adverse effect on our business, financial condition and results of operations*.

182.     Second, with regard to the substantial portion of [Qiwi's] revenues [derived] from

merchants in the betting industry," the 2019 20-F warned that:

> We provide payment processing and acquiring services to a number of merchants in the betting industry. Processing payments to such merchants constituted approximately 9.5%, 15.5% and 21.6% of our payment services segment payment volume for the periods ended December 31, 2017, December 31, 2018 and December 31, 2019 respectively. These volumes are included in our E-commerce market vertical. Processing payments for this category of merchants generally carries higher average margins then processing payments to merchants in most other market verticals that we serve and corresponded to a significant part of our revenues in our payment services segment in 2019. We also provide winning repayment services to such merchants including processing of winnings to banking cards that is included in our Money Remittances market vertical and repayment of winnings to QIWI Wallets that is not included in our payment volume. Moreover, the repayment of winnings by such merchants to the customers' QIWI Wallets serves as an important and economically beneficial reload channel and new customer acquisition tool, contributing to the sustainability and attractiveness of our ecosystem. Our operating results will continue to depend on merchants in the betting industry and their use of our services for the foreseeable future. The betting industry is subject to extensive and actively developing regulation in Russia, as well as increasing government scrutiny. Under amendments to the Russian betting laws introduced in 2014 (see "Regulation"), in order to engage in the betting industry, a bookmaker has to become a member of a self-regulated organization of bookmakers and abide by its rules, and any and all interactive bets may be only accepted through an Interactive Bets Accounting Center (TSUPIS) set up by a credit organization together with a self-regulated association of bookmakers. In 2016 QIWI Bank established a TSUPIS together with one of the self - regulated associations of bookmakers in order to be able to accept such payments. If any of our merchants engaged in the betting industry is not able or willing to comply with the Russian betting legislation or if they decide to cease their operations in Russia for regulatory reasons or otherwise or shift to another payment processor (TSUPIS), we would have to discontinue servicing them and would lose associated volumes and income. *Moreover, if we are found to be in non-compliance with any of the requirements of the applicable legislation, we could not only become subject to fines and other sanctions, but could also have to discontinue to process transactions that are deemed to be in breach of the applicable rules and as a result lose associated revenue streams.*

183.     The statements referenced in ¶¶ 181-82 *supra* relating to Qiwi's compliance with

application regulations were materially false and/or misleading because they misrepresented and

failed to disclose adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) despite remedying violations discovered during the 2018 CBR audit, Qiwi was still not meeting the CBR's reporting and record-keeping requirements; (2) Qiwi's lax reporting and record-keeping was obfuscating illicit online betting transactions that were being made through its payment system; (3) as a result, Qiwi would not be able to pass an audit by the CBR, would be fined by the CBR, and would have its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR; and (4) as a result, Qiwi would no longer be in a prime position to process electronic bets in Russia and receive significant revenue from online gambling.

184. Third, with regard to Qiwi's "need to implement enhanced compliance processes, procedures and controls with respect to the rules and regulations that apply to [its] business," the 2019 20-F warned that:

> Following our acquisition of Rapida LTD in 2015, we have had to devote additional resources to enhance the compliance function within Rapida LTD, which, at the time of our acquisition, was deficient in several areas. As of the date of this annual report, we continue to develop and integrate certain control procedures with respect to our new projects SOVEST, Tochka, Rocketbank, Flocktory and Billing Online in order to maintain a comprehensive system of controls and procedures across our business. There can be no assurance, however, that the measures we undertake will be sufficient to prevent significant deficiencies in the compliance procedures and internal controls of our new projects. Moreover, we develop Tochka as an associate together with Otkritie Bank (see—*"We may not be able to complete or integrate successfully any potential future acquisitions, partnerships or joint ventures."*) and do not have the full control over operations and processes of JSC Tochka, which has an operational independence under respective agreements. Thus, there can be no assurance that we will be able to implement and successfully execute all necessary control procedures in JCS Tochka. ***Our failure to implement and maintain effective internal control over financial reporting could result in errors in our financial statements that could lead to a restatement of our financial statements, cause us to fail to meet our reporting obligations and cause investors to lose confidence in our reported***

*financial information, which may result in a decline in the market price of our ADSs.*

185. The statements referenced in ¶ 184 *supra* relating to Qiwi's internal controls were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's internal controls related to reporting and record-keeping were ineffective; (2) Qiwi was thus not meeting the CBR's reporting and record-keeping requirements; (3) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment system; (4) as a result, Qiwi would not be able to pass an audit by the CBR, would be fined by the CBR, and would have its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR; and (5) as a result, Qiwi would no longer be in a prime position to process electronic bets in Russia and receive significant revenue from online gambling.

186. Later that day, Qiwi held its fourth quarter 2020 financial earnings call ("4Q19 Earnings Call") to discuss its quarterly results with analysts. Defendant Kim touted:

> I am pleased to share our fourth quarter and full-year 2019 results year-to-date. This year, *we demonstrated outstanding performance, especially in our Payment Services business, which delivered 27% segment net revenue and segment net profit growth year-over-year.*
>
> Our *growth was driven by the solid performance in our key streams; Payment Services for digital entertainment merchants, digital money remittances*, and projects we developed for self-employed and sharing economy partners.
>
> Our *growth was enforced by our overall expansion of our payment ecosystem, driven by the scaling of our operations and enhancement of the product proposition we offer to our users, merchants, and partners*.
>
> * * *

77

Fourth quarter 2019 *total adjusted net revenue increased by 7%* to reach RUB 6.3 billion, up from RUB 5.8 billion in the fourth quarter of 2018. The *increase was mainly driven by Payment Services* and Consumer Financial Services segments' net revenue growth.

187. Defendant Protopopov added to the 4Q19 Earnings Call by stating:

Now on to the results of our Payment Services segment. ***This year we have processed close to RUB 1.5 trillion in cash and electronic payments, increasing our turnover by almost one third…***Our ***results clearly emphasize the value and relevance of the payment ecosystem we have developed*** so far and aim to develop further.

For the fourth quarter 2019, our ***Payment Services segment volume increased by 22%*** to reach RUB 400.5 billion, ***driven by significant growth in Money Remittance, E-commerce and Financial Services vertical, which grew 31%, 29% and 13%, respectively***.

The ***growth in the E-commerce and Money Remittance vertical is largely driven by the development of our key streams, mainly the digital entertainment***, self-employed and sharing economy partners, where we were focused on extending our partner and merchant network, building up our relations with our existing partners and expanding our product offering. This growth was reinforced by secular market trend towards the digitalization of payment in our key regions.

\* \* \*

***Payment Service segment net revenue increased 16%*** in the fourth quarter 2019 to reach RUB 5.5 billion compared to RUB 4.7 billion in the prior year. ***Payment Services payment adjusted net revenue increased 18%*** to RUB 4.8 billion, up from RUB 4.1 billion in the prior year***, primarily as a result of the net revenue growth in our Money Remittance, Financial Services, and E-commerce verticals, which grew 29%, 18% and 13%, respectively.***

Our ***financial results in these segments were predominantly driven by the increase in volumes.***

188. The statements referenced in ¶¶ 186-87 *supra* relating to Qiwi's revenue, profits, payment volumes, cash flows, and "growth" in "Payment Services" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment

78

system; (2) then-current applicable Russian regulations increasing identification requirements for e-wallets and restricting transactions through illegal online betting merchants were having a negative impact on Qiwi's revenue; (3) as a result, Qiwi would not be able to sustain its revenue levels without the use of its payment services by unlicensed betting merchants that violated applicable Russian regulations; and (4) Qiwi was putting the significant revenue from its legitimate transactions, including online gambling, at risk by not complying with the current applicable Russian regulations.

<u>First Quarter 2020 Financial Results</u>

189.     On May 20, 2020, Qiwi filed its financial results for the first quarter of 2020 ("1Q20 Financial Results") as Exhibit 99.1 to a Form 6-K, signed by Defendant Kiseleva, stating:

- ***Total Net Revenue*** for the quarter ended March 31, 2020 ***was RUB 6,260 million ($80.5 million), an increase of 17%*** compared with RUB 5,367 million in the prior year. The ***increase was mainly driven by Payment Services Segment Net Revenue growth*** as well as CFS Segments Net Revenue growth.

- ***Payment Services (PS) Segment Net Revenue*** for the quarter ended March 31, 2020 ***was RUB 5,321 million ($68.5 million), an increase of 10%*** compared with RUB 4,836 million in the prior year.

- ***PS Payment [Processing Fees] Adjusted Net Revenue was RUB 4,595 million ($59.1 million), an increase of 10%*** compared with RUB 4,175 million in the prior year. PS Payment Adjusted Net Revenue ***growth was predominantly driven by volume growth in Money Remittance, E-commerce***, and Telecom market verticals partially offset by a slight decline in the Payment Average Adjusted Net Revenue Yield.

- For the quarter ended March 31, 2020, ***Adjusted Net Profit (Total Segment Net Profit) was RUB 1,754 million ($22.6 million), an increase of 6%*** compared with RUB 1,653 million in the prior year. The growth of Adjusted Net Profit was primarily driven by the same factors impacting Adjusted EBITDA as well as by share of gain of an associate and a joint venture as opposed to share of loss of an associate and a joint venture for the same period in the prior year and a net foreign exchange gain as compared to the net foreign exchange loss for the same period in the prior year offset by higher income tax expense and other income and expenses, net loss as compared to gain demonstrated for the same period in the prior year.

- For the quarter ended March 31, 2020, *Payment Services Segment Net Profit was RUB 3,051 million ($39.3 million), an increase of 2%* compared with RUB 2,988 million in the prior year *driven by Payment Services Segment Net Revenue growth* offset by an increase in payroll and related taxes (excluding effect of share-based payments) and Payment Services Segment foreign exchange loss.

- For the quarter ended March 31, 2020, *Payment Services Segment payment volume was RUB 370.3 billion ($4.8 billion), an increase of 14%* compared with RUB 326 billion in the prior year. The increase in payment volume was *driven by growth in Money Remittances, E-commerce*, and Telecom market verticals *resulting largely from the strong performance of our core products, development of certain payment solutions for merchants including betting merchants,* and new projects targeting the self-employed market as well as growth in some of our key categories.

190.    In addition, Defendant Kim is quoted in the 1Q20 Financial Results stating, in

relevant part:

> This quarter *we demonstrated robust performance,* even though we have started seeing the negative impact of the spread of COVID-19 and quarantine regime imposed globally late in the quarter. *Despite the global challenges we are encountering we believe that our performance confirms the value and relevance of the payment ecosystem and digital solutions we have developed* so far and aim to develop further.
>
> * * *
>
> *[W]e continue to optimize our operations and implement stricter cost controls*. Even in these challenging times, we see many opportunities both in the payment space and in the adjacent markets and I believe *we are well positioned to continue strengthening our ecosystem with the ultimate goal of securing our long-term growth prospects*.

191.    That same day, Qiwi held its first quarter 2020 financial earnings call ("1Q20

Earnings Call") to discuss its quarterly results with analysts. Defendant Protopopov discussed the

Company's "growth" stating:

> [O]ur payment services segment, for the first quarter 2020, our *payment service segment volume increased by 14%* to reach RUB370 million, *driven by significant growth in money remittances and e-commerce verticals, which grew 24% and 18% respectively. The growth in the e-commerce and money remittances verticals were largely driven by the development of our key streams including digital entertainment*, self-employed, and sharing economy partners.
>
> * * *

80

*[P]ayment services segment net revenues increased 10%* to reach RUB5.3 billion compared to RUB4.8 billion in the prior year. *Payment service, payment adjusted net revenues increased 10%* to RUB4.6 billion, up from RUB4.2 billion in the prior year, *primarily as a result of net revenue growth, in our money remittance and ecommerce verticals, which grew 11% and 10% respectively*.

Our financial results were *predominantly driven by the volume growth in money remittance and e-commerce categories*.

192.    Defendant Kiseleva added to the call:

*Payment services segments net profit increased 2%* to RUB3.1 billion compared to RUB3 billion in the prior year, d*riven primarily by the payment services segment as revenue growth* offset by the increase of payroll and related factors.

193.    The statements referenced in ¶¶ 189-92 *supra* relating to Qiwi's revenue, profits, payment volumes, and "growth" in "Payment Services" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment system; (2) then-current applicable Russian regulations increasing identification requirements for e-wallets and restricting transactions through illegal online betting merchants were having a negative impact on Qiwi's revenue; (3) as a result, Qiwi would not be able to sustain its revenue levels without the use of its payment services by unlicensed betting merchants that violated applicable Russian regulations; and (4) Qiwi was putting the significant revenue from its legitimate transactions, including online gambling, at risk by not complying with the current applicable Russian regulations.

194.    During the call, in response to a question from Vladimir Bespalov about "how big was the decline of betting volumes" in April and May, Defendant Protopopov stated:

81

Yes, we of course observe for the sudden decrease around 25% to 30%. But at the same time, I would say, *it's stabilized in the mid-April, and we are more or less stable trend since then on this volume*. We have, I would say, moderate optimism looking forward as soon as some of the sports events already started, you know, probably the Bundesliga restarted this weekend. We saw some I would say pick up, so we will continue to monitor other sport events and the volumes recovery going forward.

195.    The statements referenced in ¶ 194 *supra* relating to the stability of "betting volumes" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's lax reporting and record-keeping was obfuscating illicit online betting transactions that were being made through its payment system; (2) as a result, Qiwi would not be able to pass an audit by the CBR, would be fined by the CBR, and would have its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR; and (3) as a result, Qiwi would no longer be in a prime position to process electronic bets in Russia and receive significant revenue from online gambling.

Republished Financial Results for First Quarter 2020

196.    On July 20, 2020, Qiwi filed a Form 6-K, signed by Defendant Kiseleva, with the purpose of republishing Qiwi's financial statements for the first quarter ended March 31, 2020 ("Republished 1Q20"). The Republished 1Q20 provided, in relevant part:

- *Revenue for the three months ended March 31, 2020 was RUB 10,610 million, an increase of 19%,* or RUB 1,672 million, compared to the same period in 2019. This increase was *primarily driven by an increase in payment processing fees of RUB 988 million, resulting predominantly from volume growth in Money Remittance, E-commerce*, and Telecom market verticals, partially offset by a slight decline in the Payment Average Adjusted Net Revenue Yield.

82

- ***Segment net revenue attributable to the Payment Services segment for the three months ended March 31, 2020 was RUB 5,321 million, an increase of 10%,*** or RUB 485 million, compared to the same period in 2019. The ***growth in Payment Services segment*** net revenue was ***mainly due to an increase in payment processing fees and interest revenue*** calculated using the effective interest rate partially offset by a decrease in other revenue and an increase in transaction costs. ***Payment processing fees increased by 14%,*** or by RUB 988 million, compared to the same period in 2019 in line with volume growth. The ***growth of payment processing fees was driven primarily by growth in E-commerce, Money Remittances and Financial Services market verticals*** and was partially offset by the slight decline of the Payment Average Adjusted Net Revenue Yield. Transaction costs increased by 20% or by RUB 567 million, largely in line with the increase in payment processing fees. ***Interest revenue increased by 14%*** or by RUB 59 million compared to the three months ended March 31, 2019. The increase in interest revenue resulted ***primarily from larger amounts of deposits that QIWI Bank placed within CBR and other banks*** during the three months ended March 31, 2020. ***Fees from inactive accounts and unclaimed payments increased by 10%***, or RUB 45 million, in the three months ended March 31, 2020. Other revenue increased by 92%, or RUB 34 million, compared to the same period in 2019. ***Payment Services segment net revenue accounted for 85% of total net revenue in the three months ended March 31, 2020.***

- For the quarter ended March 31, 2020, ***Payment Services Segment net profit was RUB 3,051 million, an increase of 2%,*** compared with RUB 2,988 million in the same period in 2019, ***driven predominantly by Payment Services Segment net revenue growth*** offset by an increase in payroll and related taxes (excluding effect of share-based payments) and Payment Services Segment foreign exchange loss.

197. The statements referenced in ¶ 196 *supra* relating to Qiwi's revenue, profits, payment volumes, and "growth" in "Payment Services" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment system; (2) then-current applicable Russian regulations increasing identification requirements for e-wallets and restricting transactions through illegal online betting merchants were having a negative impact on

83

Qiwi's revenue; (3) as a result, Qiwi would not be able to sustain its revenue levels without the use of its payment services by unlicensed betting merchants that violated applicable Russian regulations; and (4) Qiwi was putting the significant revenue from its legitimate transactions, including online gambling, at risk by not complying with the current applicable Russian regulations.

Secondary Public Offering Prospectus

198. Also, on July 20, 2020, Qiwi filed a Prospectus Supplement ("Prospectus"), on Form 424B7, as part of a registration statement the Company filed with the SEC, on January 16, 2020, under the "shelf" registration process. The Prospectus provided a summary of historical consolidated financial data of Qiwi for the year ended December 31, 2015, 2016, 2017, 2018, 2019 and as of March 31, 2020, and for the three-month periods ended March 31, 2019 and 2020.

199. In addition, the Prospectus detailed the various "Risk Factors" and incorporated by reference, the "Risk Factors" contained in Qiwi's FY19 Form 20-F, and "*updates, if any*," to those "Risk Factors" disclosed in a Form 6-K. While the Prospectus discussed several "Risk Factors," the Defendants failed to adequately warn investors that the following "Risk Factors" had already materialized at the time of the filing of the Prospectus.

200. First, with regard to "Qiwi Bank and other Russian banks and credit organizations operat[ing] in a highly regulated environment and increased regulatory scrutiny," the Prospectus warned that:

> The ***CBR may at any time conduct full or selective audits*** of any bank's filings and may inspect all of its books and records.
>
> Both ***Qiwi Bank*** and Rapida LTD have been ***the subject of CBR investigations in the past*** that have uncovered various violations and deficiencies in relation to, among other things, reporting requirements, anti-money laundering, cybersecurity, compliance with applicable electronic payments thresholds requirements and other issues which we believe we have generally rectified. In the

84

course of 2018, Qiwi Bank underwent a major scheduled audit by the CBR as part of its ongoing supervisory process, which resulted in CBR identifying a number of violations and imposing certain sanctions on us. The measures that the CBR has so far imposed on us in response have not had a significant impact on our operations and have been mostly lifted. We believe that *we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward*. However, there can be no assurance that additional sanctions will not be imposed on us as a result of such or any other findings and that we will not come under greater CBR scrutiny in connection with any perceived deficiencies in our past conduct, or that any currently planned or future inspections will not result in discovery of any significant or minor additional violations of various banking regulations, and what sanctions the CBR would choose to employ against us if this were to happen. *Any such sanctions could have a material adverse effect on our business, financial condition and results of operations.*

* * *

*Any breach of applicable regulations could expose us to potential liability, including fines, prohibition to carry out certain transactions for a period of up to six months (or more in the event of repeated violations)*, the introduction of temporary administration by the CBR and in certain instances the revocation of our banking license. ... For these reasons, *any material breach of laws and regulations by Qiwi Bank* or the revocation of its banking licenses *could have a material adverse effect on our business, financial condition and results of operations*.

201. Second, with regard to the substantial portion of [Qiwi's] revenues [derived] from

merchants in the betting industry," the Prospectus warned that:

We provide payment processing and acquiring services to a number of merchants in the betting industry. Processing payments to such merchants constituted approximately 9.5%, 15.5% and 21.6% of our payment services segment payment volume for the periods ended December 31, 2017, December 31, 2018 and December 31, 2019 respectively. These volumes are included in our E-commerce market vertical. Processing payments for this category of merchants generally carries higher average margins then processing payments to merchants in most other market verticals that we serve and corresponded to a significant part of our revenues in our payment services segment in 2019. We also provide winning repayment services to such merchants including processing of winnings to banking cards that is included in our Money Remittances market vertical and repayment of winnings to QIWI Wallets that is not included in our payment volume. Moreover, the repayment of winnings by such merchants to the customers' QIWI Wallets serves as an important and economically beneficial reload channel and new customer acquisition tool, contributing to the sustainability and attractiveness of our ecosystem. Our operating results will continue to depend on merchants in the betting industry and their use of our services for the foreseeable future. The betting industry is subject to extensive and actively developing regulation in Russia, as well as increasing government scrutiny. Under amendments to the Russian betting laws

85

introduced in 2014 (see "Regulation"), in order to engage in the betting industry, a bookmaker has to become a member of a self-regulated organization of bookmakers and abide by its rules, and any and all interactive bets may be only accepted through an Interactive Bets Accounting Center (TSUPIS) set up by a credit organization together with a self-regulated association of bookmakers. In 2016 QIWI Bank established a TSUPIS together with one of the self - regulated associations of bookmakers in order to be able to accept such payments. If any of our merchants engaged in the betting industry is not able or willing to comply with the Russian betting legislation or if they decide to cease their operations in Russia for regulatory reasons or otherwise or shift to another payment processor (TSUPIS), we would have to discontinue servicing them and would lose associated volumes and income. ***Moreover, if we are found to be in non-compliance with any of the requirements of the applicable legislation, we could not only become subject to fines and other sanctions, but could also have to discontinue to process transactions that are deemed to be in breach of the applicable rules and as a result lose associated revenue streams.***

202. The statements referenced in ¶¶ 200-01 *supra* relating to Qiwi's compliance with application regulations were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi was *currently* the subject of a CBR audit; (2) despite remedying violations discovered during the 2018 CBR audit, Qiwi was still not meeting the CBR's reporting and record-keeping requirements; (3) Qiwi's lax reporting and record-keeping was obfuscating illicit online betting transactions that were being made through its payment system; (4) as a result, Qiwi would not be able to pass the currently ongoing audit by the CBR, and would have its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR; and (5) as a result, Qiwi would no longer be in a prime position to process electronic bets in Russia and receive significant revenue from online gambling.

86

203. Third, with regard to Qiwi's "need to implement enhanced compliance processes, procedures and controls with respect to the rules and regulations that apply to [its] business," the Prospectus warned that:

> Following our acquisition of Rapida LTD in 2015, we have had to devote additional resources to enhance the compliance function within Rapida LTD, which, at the time of our acquisition, was deficient in several areas. As of the date of this annual report, we continue to develop and integrate certain control procedures with respect to our new projects SOVEST, Tochka, Rocketbank, Flocktory and Billing Online in order to maintain a comprehensive system of controls and procedures across our business. There can be no assurance, however, that the measures we undertake will be sufficient to prevent significant deficiencies in the compliance procedures and internal controls of our new projects. Moreover, we develop Tochka as an associate together with Otkritie Bank (see—*"We may not be able to complete or integrate successfully any potential future acquisitions, partnerships or joint ventures."*) and do not have the full control over operations and processes of JSC Tochka, which has an operational independence under respective agreements. Thus, there can be no assurance that we will be able to implement and successfully execute all necessary control procedures in JCS Tochka. ***Our failure to implement and maintain effective internal control over financial reporting could result in errors in our financial statements that could lead to a restatement of our financial statements, cause us to fail to meet our reporting obligations and cause investors to lose confidence in our reported financial information, which may result in a decline in the market price of our ADSs***.

204. The statements referenced in ¶ 203 *supra* relating to Qiwi's internal controls were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's internal controls related to reporting and record-keeping were ineffective; (2) Qiwi was thus not meeting the CBR's reporting and record-keeping requirements; (3) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment system; (4) as a result, Qiwi would not be able to pass the currently ongoing audit by the CBR, would be fined by the CBR, and would have its ability to make payments to foreign

merchants and transfer money to pre-paid cards restricted by the CBR; and (5) as a result, Qiwi would no longer be in a prime position to process electronic bets in Russia and receive significant revenue from online gambling.

Second Quarter 2020 Financial Results

205.    On August 19, 2020, Qiwi filed its financial results for the second quarter of 2020 ("2Q20 Financial Results") as Exhibit 99.1 to a Form 6-K, signed by Defendant Kiseleva, stating:

- *Total Net Revenue* for the quarter ended June 30, 2020 *was RUB 6,839 million ($97.8 million), an increase of 23%* compared with RUB 5,563 million in the prior year. The increase *was mainly resulted from* Rocketbank Segment Net Revenue growth driven primarily by the revenue generated from the loyalty program termination, as well as by *Payment Services segment* and Consumer Financial Services Segment Net Revenue growth.

- *Payment Services (PS) Segment Net Revenue* for the quarter ended June 30, 2020 *was RUB 5,397 million ($77.2 million), an increase of 5%* compared with RUB 5,158 million in the prior year.

- *PS Payment [Processing Fees] Adjusted Net Revenue was RUB 4,609 million ($65.9 million), an increase of 4%* compared with RUB 4,412 million in the prior year. PS Payment Adjusted Net Revenue *growth was predominantly driven by the improvement of the Payment Average Adjusted Net Revenue Yield resulting primarily from higher net revenue yield in E-commerce market vertical* offset by the overall decline in volume.

- For the quarter ended June 30, 2020, *Adjusted Net Profit (Total Segment Net Profit) was RUB 2,756 million ($39.4 million), an increase of 40%* compared with RUB 1,965 million in the prior year. The growth of Adjusted Net Profit was primarily driven by the same factors impacting Adjusted EBITDA increase offset by higher income tax expenses as well as an increase in foreign exchange loss.

- For the quarter ended June 30, 2020, *Payment Services Segment Net Profit was RUB 3,243 million ($46.4 million), an increase of 1%* compared with RUB 3,206 million in the prior year driven by Payment Services Segment Net Revenue growth offset by an increase in personnel expenses (excluding effect of share-based payments) and an increase in Payment Services Segment foreign exchange loss.

206.    Defendant Kim is quoted in the 2Q20 Financial Results stating:

This quarter *we demonstrated robust performance notwithstanding the negative impact of the COVID-19 pandemic and associated lockdown measures imposed globally on our business and operations throughout most of the quarter*. Our

88

*Payment Services segment showed solid dynamics despite challenging market environment and delivered 5% segment net revenue growth*. April and May were the most challenging months for us so far while in June we have started to see a strong recovery in our key markets and niches. *We believe that the performance of our payment services business demonstrates the resilience of our ecosystem as well as the value and relevance of the digital solutions we have developed to date* and aim to develop further.

\* \* \*

We strive to further improve the efficiency of our operations across all key segments and projects. At the same time, *we continue to focus on our payment services business as well as on developing and leveraging our highly adaptive and consumer-oriented payment services ecosystem.*

207.     That same day, Qiwi held its second quarter 2020 financial earnings call ("2Q20 Earnings Call") to discuss its quarterly results with analysts. Defendant Kim touts the Company's Payment Services business:

However, *in June, we started to see strong recovery in the key markets and niches of our Payment Services segment and managed to achieve positive year-over-year growth.*

\* \* \*

*We believe that the performance of Payment Services business, as well as our other projects, demonstrated resilience of the digital solutions we have developed* so far, their value and relevance for our customers.

\* \* \*

Second quarter of 2020, *net revenue increased by 23%* to reach RUB6.8 billion, up from RUB5.6 billion in the second quarter of 2019. The *increase was mainly driven* by Rocketbank segment net revenue, as well as by *Payment Services segment* and Consumer Financial Services segment's net revenue growth.

208.     Defendant Protopopov added to the call stating:

For the second quarter 2020, our *Payment Services segment volume decreased by 6% to RUB347 billion, driven primarily by decline in financial services market vertical volumes,* offset predominantly by increase in Money Remittances market vertical volumes.

The *volume dynamics in Financial Services vertical was primarily driven by the decline of our physical distribution network*. As [Defendant Kim] mentioned, it was negatively affected by the lockdown measures and temporary retail shutdowns that limited users' access to certain retail location as well as their overall activity.

\* \* \*

*Payment Services segment net revenue increased 5%* to reach RUB5.4 billion compared to RUB5.2 billion the prior year. *Payment Services payment adjusted*

89

*net revenue increased 4%* to RUB4.6 billion, up from RUB4.4 billion in the prior year, primarily due to the improvement of payment average adjusted net revenue yield, resulting predominantly from higher net revenue yield in e-commerce market verticals, offset by an overall decline in volume.

209. The statements referenced in ¶¶ 205-08 *supra* relating to Qiwi's revenue, profits, payment volumes, cash flows, and "growth" in "Payment Services" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment system; (2) then-current applicable Russian regulations increasing identification requirements for e-wallets and restricting transactions through illegal online betting merchants were having a negative impact on Qiwi's revenue; (3) as a result, Qiwi would not be able to sustain its revenue levels without the use of its payment services by unlicensed betting merchants that violated applicable Russian regulations; and (4) Qiwi was putting the significant revenue from its legitimate transactions, including online gambling, at risk by not complying with the current applicable Russian regulations.

210. During the call, Chris Kennedy with William Blair requested "an update on the sports betting market and . . . some regulatory changes in the fall; how could that impact your business?" In response, Defendants Kim and Protopopov stated:

*Kim*: [We] already mentioned that the government was considering the proposal from Boxing Federation regarding the change in regulation of betting market. And according to the media report, the government has decided to postpone the discussion of this proposal and [indiscernible]. And the first reaction of regulators and market participants to the proposal was generally negative. At the grant of its proposal, the federation mentioned below contributions to the development of sports and the lack of transparency in their calculations. These problems were

90

addressed with the adoption in July of two laws which define the regulation of the industry.

They also reported in the press about the affiliation of the Boxing Federation on one of the market players and at least they have joint projects [indiscernible]. However, I don't think that it's possible to delegate the regulation of the market under the control of its participants, a private company. Nevertheless, we believe that uncertainty in market regulation has increased, and we will closely monitor the situation. We are also confident that our expertise as service acquirer and issuer of Qiwi Wallet will be in demand in any scenario. And ***this will allow us to maintain a significant presence in this market in any case.***

*Protopopov*: Let me add a bit on the dynamics of the market itself. So, as we, I think, told earlier, there was a decline in April and, let's say, it was mid of May. Later on we started to see the increase of the volumes in June and the trend continuous. And I would say that overall, the summer is very strong for betting, because as most of the championship and competitions will stop for half of the spring. Now, we have a lot of events going on almost every day. So, like, these two weeks we have Championship League and the volumes are quite high because we have, kind of, events really, really every day. So, we will see how it will go after this, I would say, transition period will end. But ***current trends are quite -- quite strong, I would say, overall, in the betting market***.

211.    Later during the call, Andrey Pavlov-Pusinov with Goldman Sachs requested "a little bit more color on how the volumes in this [e-commerce] market still showed very solid and dynamic despite the cancelation in major sports events and what basically helped you to sustain the solid performance?" In response, Defendant Protopopov stated that:

So, for the volumes, there are two reasons. First one is the decline. While we absorbed the decline in betting volumes, though ***it was not like dramatic and drastic decline*** as we told in our previous calls. So, ***because people were still playing for other types of sports and other type of events.*** Second reason is that ***at the same time, other digital entertainment from other digital entertainment categories, such as, for example, online games, demonstrated solid growth at the same period of time***. So overall, we managed to, let's say, keep them -- the overall volume.

212.    The statements referenced in ¶¶ 210-11 *supra* relating to the "current trends" in the "betting market" and the "performance" of the betting "volumes" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's business, operational and financial results, which were known to Defendants or recklessly

91

disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's lax reporting and record-keeping was obfuscating illicit online betting transactions that were being made through its payment system; (2) as a result, Qiwi would not be able to pass the currently ongoing audit by the CBR, would be fined by the CBR, and would have its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR; and (3) as a result, Qiwi would no longer be in a prime position to process electronic bets in Russia and receive significant revenue from online gambling.

Third Quarter 2020 Financial Results

213. On November 19, 2020, Qiwi filed its financial results for the third quarter of 2020 ("3Q20 Financial Report") as Exhibit 99.1 to a Form 6-K, signed by Defendant Kiseleva, stating:

- ***Total Net Revenue*** for the quarter ended September 30, 2020 ***was RUB 6,637 million ($83.3 million), an increase of 11%*** compared with RUB 5,993 million in the prior year. The ***increase mainly resulted from Payment Services (PS) Segment Net Revenue growth*** and positive contribution of Rocketbank (RB) Segment as opposed to negative effect on Total Net Revenue for the same period of the previous year offset by Consumer Financial Services (CFS) Segment Net Revenue decline due to the sale of the SOVEST project.

- ***Payment Services Segment Net Revenue*** for the quarter ended September 30, 2020 ***was RUB 6,108 million ($76.7 million), an increase of 11%*** compared with RUB 5,484 million in the prior year.

- ***PS Payment [Processing Fees] Adjusted Net Revenue was RUB 5,303 million ($66.6 million), an increase of 13%*** compared with RUB 4,676 million in the prior year. PS Payment Adjusted Net Revenue ***growth was predominantly driven by volume growth***.

- For the quarter ended September 30, 2020, ***Adjusted Net Profit (Total Segment Net Profit) was RUB 3,275 million ($41.1 million), an increase of 73%*** compared with RUB 1,893 million in the prior year. The growth of Adjusted Net Profit was primarily driven by the same factors impacting Adjusted EBITDA increase as well as by higher foreign exchange gain2 offset by higher income tax expenses.

- For the quarter ended September 30, 2020, ***Payment Services Segment Net Profit was RUB 3,633 million ($45.6 million), an increase of 11%*** compared with RUB 3,259 million in the prior year driven by Payment Services Segment Net Revenue growth as well as by a decline of travelling expenses and

marketing and advertising expenses offset by an increase in personnel expenses (excluding effect of share-based payments).

- For the quarter ended September 30, 2020, *Payment Services Segment payment volume was RUB 435.4 billion ($5.5 billion), an increase of 11%* compared with RUB 391.3 billion in the prior year. The increase in payment volume *was primarily driven by growth in E-commerce and Money Remittances market verticals* offset by decline in Financial Services and Telecom market verticals.

214. Defendant Kim is quoted in the 3Q20 Financial Report stating, in relevant part:

This quarter *we continued to demonstrate strong performance in our Payment Services segment* and Other projects. Our *Payment Services segment showed solid dynamics and delivered 11% segment net revenue growth supported by several factors including high density of sport events* as well as growth of our strategic self-employed stream.

215. That same day, Qiwi held its third quarter 2020 financial earnings call ("3Q20 Earnings Call") to discuss its quarterly results with analysts. Defendant Kim began the discussion stating, in relevant part:

Third quarter 2020 *total net revenue increased 11%* to reach RUB6.6 billion, up from RUB6 billion in the third quarter of 2019. The *increase was mainly driven by Payment Services segment* and corporate and other category net revenue growth as well as by positive contribution of Rocketbank as opposed to negative effect on total net revenue for the same period of the prior year.

216. Defendant Protopopov added to the call:

For the third quarter 2020, our *Payment Services segment volume increased by 11%* to RUB435 billion, *driven primarily by growth in E-commerce and money limited market vertical*, offset by a decline in financial services and telecom market vertical. As we've discussed on a number of occasions, we started to see volume recovery in June as the current restrictions are eased and the majority of sports events are back on track.

\* \* \*

*Payment Services segment net revenue increased 11%,* reached RUB6.1 billion compared to RUB5.5 billion prior year. *Payment Services payment adjusted net revenue increased 13%* to RUB5.3 billion, up from RUB4.7 billion in the prior year primarily due to the volume growth supported by the slight improvement of the payment average adjusted net revenue.

217. In addition, Defendant Kiseleva touted:

93

***Payment Services segment net profit increased 11%*** to RUB3.6 billion driven primarily by Payment Services segment net revenue growth, offset by an increase of payroll and related taxes, excluding effect of share-based payments, predominantly driven by higher bonus accruals and expenses related to the cash-based LTI compensation program.

218.     The statements referenced in ¶¶ 213-17 *supra* relating to Qiwi's revenue, profits, payment volumes, and "growth" in "Payment Services" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions that were being made through its payment system; (2) then-current applicable Russian regulations increasing identification requirements for e-wallets and restricting transactions through illegal online betting merchants were having a negative impact on Qiwi's revenue; (3) as a result, Qiwi would not be able to sustain its revenue levels without the use of its payment services by unlicensed betting merchants that violated applicable Russian regulations; and (4) Qiwi was putting the significant revenue from its legitimate transactions, including online gambling, at risk by not complying with the current applicable Russian regulations.

219.     During the call, Defendant Kim stated that:

 [W]e have noted in the past and are likely to continue to see in the future, cost of default of our governmental bodies to adopt more robust and stringent regulations in respect of our key products and markets. These may include, without limitations, more elaborate wallet, KYC requirement, establishment of certain limits for the digital wallet transactions, both in respect of the types and maximum amounts, specific rules and regulations in respect of the cross-border transactions and regulation of the sport betting market.

As of today, ***a number of legislative initiatives has been discussed by different legislative bodies, formally or informally, that can eventually become legislative proposals or laws, and impose additional pressure on our operations***.

94

220.    Defendant Protopopov also stated that:

This quarter, we continued to see declines in the number of active QIWI Wallet from RUB22.3 million as of September 30, 2019, to RUB19.7 million at September 30, 2020.

We believe that ***the key factors that resulted in such decline related primarily to the regulatory and operational reason*** rather than any substantial changes in the consumer preferences for economic slowdown. Such decline did not substantially impact our financial operating performance due to increasing diversification of our product proposition and operating models. At the same time, we believe that ***certain regulatory initiatives that are being discussed from time to time as well as continued economic slowdown have a potential to negatively affect our operating performance in the future***.

221.    In addition, in response to a request from Chris Kennedy with William Blair for "more color on the potential regulatory changes in Russia and how that would impact QIWI's business and how you would navigate potential changes," Defendant Kim stated that:

[W]e have a few initiatives from the government and legislative bodies regarding two key markets. The first one is betting. And I mean the at which the change the legislation is astonishing even for Russia because they just adopted two new laws in July, changing the legislation for bookmakers in terms of in terms of taxation and offshore beneficiary ownership.

And now we prepare two new laws, which now are being discussed and at the level of the government, a bit slower is about further increase in quite different taxation of book makers. And the second low is about changing the whole regulation of bookmaker companies including creating unified TSUPIS.

Now I remind you, we have two TSUPIS, to one of this TSUPIS is here. So, it's very early to predict any material effect on QIWI business, but for sure that's a very important change in the regulation. And the second law is about foreign e-money wallets. At the moment, it's about -- I mean, they try to introduce a special form of reporting of owners of this wallet for federal taxation office and for central bank about the operations.

***It wouldn't directly impact our operation*** but of course, that shows – that's a sign of the level of attention or the regulator to their e-money and to the electronic wallets, especially in trans-border payments. So, it's a sign of this attention and ***potentially they could limit such operation***. ***And that could -- that could have an impact on our business*** in this case.

95

222.     Maria Sukhanova of BCS then followed up on Defendant Kim's statements "about grading single TSUPIS, could you please tell us, have there been more developments on this front so far? . . . So I wonder the fact that you have stressed now is it because you are really concerned about what's going on the regulatory front or it just like reflects there have been so many initiatives so far, which together might be, if approved, negative?" In response, Defendant Kim stated that:

> So talking about single TSUPIS, the situation has changed since September or since August when we had the last earnings call, because in August, it was just a proposal from books in federation, which was discussed at the level of government. And now it's a draft law, which is now in Parliament. And so, they started to consider this draft lots. That's a huge progress in this.
>
> That's why we put this sentence in our press release even because the situation is changing. At the moment, I mean, it's difficult to predict whether this draft law will be adopted eventually. And what will be the final text and who will be the single TSUPIS. *We also have a chance to be the single TSUPIS*. *And that's going to be much better for us even because we will serve the whole market instead of half of that, half of it*, *but the true is here, the situation is changing and is becoming more uncertain.*

223.     Later during the call, Vladimir Bespalov of VTB Capital "follow[ed]-up on the regulatory issue" and asked Defendants to "assume that the situation develops in to worst-case scenario, you are not the funder of this new single 2% in it. Could you give for a very rough maybe estimate what kind of heat your adjusted net revenues or whatever metric could take in this event?" Defendant Kim responded:

> I will answer to your question regarding betting. At this stage, it's very early to make such stress scenario just because the legislation itself, it's not even on the first reading and statistics of Russian laws show that only 80% of the law, which are just -- which could be into Parliament and to the parliament. Only 20% goes further from the first region. And there are two competitive laws. At the moment, one from the government, but it's still not in the parliament because it's being still discussed at the level of the government.
>
> And the second one about single supers is already in the parent, but not on the first region, even. So I would say that at the moment, it's a very theoretical discussion. What will be the real hit on our net revenue if and when this legislation will be adopted. So at the moment, we couldn't just give you any numbers. But we have to warn you, and we have to discuss that, *that could be probably an impact on our net revenue in the future*.

96

224. The statements referenced in ¶¶ 219-23 *supra* relating to the impact of pending "legislative" or "regulatory initiatives" in Russia were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Qiwi's lax reporting and record-keeping was obfuscating illicit online betting transactions that were being made through its payment system; (2) as a result, Qiwi would not be able to pass the currently ongoing audit by the CBR, would be fined by the CBR, and would have its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR; and (3) as a result, Qiwi would no longer be in a prime position to process electronic bets in Russia and receive significant revenue from online gambling after the single ETSUP replaces the two TSUPIS.

## VI.   THE TRUTH EMERGES

### July 20 Partial Disclosure

225. After the markets closed on July 20, 2020, Qiwi launched an SPO, registering 6.8 million Class B Shares represented by ADSs for sale by shareholders who included Defendants Kim and Solonin.[90] On this news, Qiwi's ADS price fell $1.90 per share, or 9.9%, to close at $17.29 per share on July 21, 2020, on unusually heavy trading.

226. Then, On July 22, 2020, the Russian news agency *Tass* reported that Qiwi shareholders had back out of the share sale.[91] An analyst for Seeking Alpha explained in an article

---

[90] Jason Aycock, *Qiwi -4% after holder to offer ADRs*, SEEKING ALPHA (July 20, 2020, 08:44 PM ET), https://seekingalpha.com/news/3592903-qiwiminus-4-after-holder-to-offer-adrs.
[91] Brandy Betz, *Qiwi +9% after reports of scrapped share sale*, SEEKING ALPHA (July 22, 2020, 08:33 AM ET), https://seekingalpha.com/news/3593564-qiwiplus-9-after-reports-of-scrapped-share-sale.

97

titled "Qiwi +9% after reports of scrapped share sale," that "On Monday, Qiwi said shareholders were planning to sell 6.8M shares in a secondary offering. The ADRs were supposed to trade today." When announcing the cancellation of the SPO, Qiwi informed investors that the selling shareholders had decided not to proceed with the offering purportedly "due to market conditions."[92] On this news, Qiwi's share price increased $1.54, or 8.8%, to close at $18.75 per share on July 22, 2020.

227. An analyst for Russian Rocket further noted in an August 3, 2020 article titled "Qiwi Plc: Fundamental Risks In The Core Business" that "[a] failed attempt to provide SPO signifies some core problems in the company's business and suggests that institutional investors do not want to buy Qiwi shares."[93] The analyst added that "[w]hile Qiwi stock price returned to the previous level as the SPO was cancelled, there are still factors that could have a negative impact on the company. The fact that the company's management attempted to get rid of the stake in the company, but have so far failed to do it, is concerning."

December 9 Class Period Ending Disclosure

228. After the markets closed on December 9, 2020, Qiwi filed a Form 6-K with the SEC, revealing that as the result of an audit performed by the CBR, from July to December 2020, covering the period of July 2018 to September 2020, the CBR had identified "violations and deficiencies relating primarily to reporting and record-keeping requirements" resulting in a fine on Qiwi Bank for approximately $150,000, in addition to, the suspension or limitation of its ability to conduct "most types of payments to foreign merchants and money transfers to pre-paid cards from

---

[92] *Qiwi Announces Cancellation of Proposed Secondary Offering*, GLOBE NEWSWIRE (July 22, 2020), https://investor.qiwi.com/node/9591/pdf.
[93] Russian Rocket, *Qiwi plc: Fundamental Risks In The Core Business*, Seeking Alpha (Aug. 3, 2020).

corporate accounts." As Qiwi further explained "[f]or illustrative purposes only and in order to assist our investors in understanding the potential impact of these restrictions on our results of operations, assuming such CBR restrictions were to be in effect and the corresponding operations were to be discounted for the entire nine-month period ending on September 30, 2020, approximately *33% to 40%* of our Payment Services Segment Net Revenue for such period would have been negatively affected[.]"

229.    On this news, Qiwi's ADS price fell $2.80 per share, or 20.6%, to close at $10.79 per share on December 10, 2020, on unusually heavy trading.

230.    As an analyst for the Motley Fool noted in a December 10, 2020 article titled "Why Qiwi Stock Just Crashed 20%," "$150,000 doesn't sound so bad, but the Central Bank has also suspended Qiwi's ability to conduct most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts, effective Dec. 7. It's not entire clear how serious this [suspension] will be for Qiwi -- but it sounds like it could be pretty serious."[94]

231.    An analyst for Seeking Alpha further explained on December 23, 2020 that the CBR "prohibited Qiwi from executing transfers to foreign online shops and to the prepaid cards, since prepaid cards are anonymous most of the time, while foreign online shops could act as online casinos that can't be regulated."[95] The analyst also noted that while Qiwi stated that the $150,000 fine was for accounting violations, "numerous Russian sources tell that the fine has to do with Qiwi's involvement in the betting industry and that this might not be the last fine that it receives."

---

[94] Rich Smith, *Why Qiwi Stock Just Crashed 20%*, THE MOTLEY FOOL (Dec. 10, 2020, 11:19 AM), https://www.fool.com/investing/2020/12/10/why-qiwi-stock-just-crashed-20/.
[95] *Qiwi: The Future Is In The Hands Of Russian Regulators*, SEEKING ALPHA (Dec. 23, 2020, 08:04 AM ET), https://seekingalpha.com/article/4395948-qiwi-future-is-in-hands-of-russian-regulators.

99

232. Investors' suspicions about the material impact of the CBR's restrictions were proven correct on March 30, 2021. That day, during Qiwi's fourth quarter 2020 ("4Q20") earnings conference call, Defendant Kim confirmed that "the CBR restrictions continue to have a negative impact on our volumes and revenues, primarily in E-Commerce and Money Remittance curve" and that Qiwi had "made a proposal to serve as the ETSUP,[96] however, we cannot be sure that our bid will be successful."[97] He added that if Qiwi "cannot become a part of the new industry landscape, we may experience a decrease in or complete loss of payments volume and income related to the TSUPIS." Under the new law, the single Unified Interactive Bets Accounting Center (ETSUP) will replace the existing TSUPIS by the end of September 2021.[98]

233. Further confirming Qiwi's lack of proper recordkeeping and internal controls, Qiwi reported on one Critical Audit Matter in the Company's 2020 20-F.[99] As reported in a Watchdog Report dated May 26, 2021, when submitting financial reports with the SEC, some companies have begun reporting Critical or Key Audit Matters, including "those matters that, in the auditor's judgment, were of most significance in the audit of the company's financial statements," in accordance with the standards issued by the International Audit and Assurance Standards Board

---

[96] On December 23, 2020, the State Duma adopted a bill on reforming the betting market to create a public-law company "The United Gambling Regulator" and a unified center for recording bookmaker rates in the form of a credit institution, which was then signed into law on December 30, 2020. *See* Bill No. 1055657-7 (Archived), STATE DUMA OF THE FEDERAL ASSEMBLY OF THE RUSSIAN FEDERATION, https://sozd.duma.gov.ru/bill/1055657-7 (last visited June 24, 2021) (Google trans.).

[97] *Qiwi plc (QIWI) CEO Boris Kim on Q4 2020 Results - Earnings Call Transcript*, SEEKING ALPHA (Mar. 30, 2021, 08:30 AM ET), https://seekingalpha.com/article/4416829-qiwi-plc-qiwi-ceo-boris-kim-on-q4-2020-results-earnings-call-transcript.

[98] *QIWI Announces Unaudited Fourth Quarter and Full Year 2020 Financial Results*, QIWI PLC (Mar. 30, 2021), https://investor.qiwi.com/news-releases/news-release-details/qiwi-announces-unaudited-fourth-quarter-and-full-year-2020 (last visited June 25, 2021).

[99] Qiwi plc, Annual Report (Form 20-F) at p. F-2 (Apr. 15, 2021).

in January 2015.[100] This is the only Critical Audit Matter Qiwi has reported on since 2016. The Watchdog Report provides the description of the Critical Audit Matter as "recognition of revenue for payment processing fees" regarding the topic of "cash and income."

## VII.    LOSS CAUSATION

234.    The false and misleading misrepresentations and material omissions, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class members it represents.

235.    During the Class Period, Lead Plaintiff and Class members purchased Qiwi securities at artificially inflated prices and were damaged thereby. The price of the Company's securities declined significantly when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were disseminated and publicly revealed.

236.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Qiwi securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Qiwi's business, operations, and prospects, as alleged herein.

237.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and other members of the Class. Defendants made or caused to be made materially false and/or misleading statements about Qiwi's business, operations and

---

[100] Qiwi, WATCHDOG RESEARCH, INC. (May 26, 2021) (the "Watchdog Report").

101

future prospects. These material misstatements and/or omissions had the cause and effect of creating in the market a false positive assessment of the Company and its business and operational performance and related well-being, thus causing its securities to be overvalued and the price of its securities to be artificially inflated at all relevant times. Defendants' materially false and/or misleading statements, as alleged herein, resulted in Lead Plaintiff and other members of the Class in purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was partially revealed July 20, 2020, and then fully on December 9, 2020, causing the trading price of Qiwi securities to materially decline and removing the previously embedded artificial inflation.

## VIII. CLASS ALLEGATIONS

238. Lead Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all person and entities that purchased, or otherwise acquired, Qiwi securities during the Class Period, and were damaged by the conduct asserted herein. Excluded from the Class are Defendants and their immediate families and legal representatives, heirs, successors or assigns and any entity in which the Defendants named herein have, or had, a controlling interest.

239. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes there are hundreds, if not thousands, of members in the proposed Class. Throughout the Class Period, millions of Qiwi securities were outstanding, owned and/or publicly traded on the NASDAQ by hundreds, if not thousands, of persons.

102

240.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the Class that predominate over those that may affect individual class members include whether:

- Defendants violated the federal securities laws;

- Defendants omitted and/or misrepresented material facts;

- Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- Defendants knowingly or with deliberate recklessness, disregarded or turned a blind eye toward the fact that their Class Period statements were false and misleading;

- Individual Defendants caused Qiwi to issue false and misleading filings during the Class Period;

- The price of Qiwi securities was artificially inflated because of the Defendants' conduct complained of herein; and

- The Class members have sustained damages and, if so, the appropriate measure of damages.

241.     Lead Plaintiff's claims are typical of those of the Class members because they each were similarly damaged by Defendants' wrongful conduct in violation of the federal securities laws.

242.     Lead Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced in securities class action litigation. Lead Plaintiff has no interests that conflict with those of the Class.

243.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Lead Plaintiff knows of no difficulties in the management of this action that would preclude its maintenance as a class action.

## IX.     PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET

244.     Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations or failed to disclose material facts; (b) the omissions and misrepresentations

103

were material; (c) the Company's securities traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and (e) Lead Plaintiff and the other members of the Class purchased Qiwi securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

245. At all relevant times, the market for Qiwi securities was efficient for the following reasons, among others: (a) Qiwi securities met the listing requirements for, and were listed and actively traded on the NASDAQ, a highly efficient market; (b) during the Class Period, Qiwi shares were actively traded, supporting a strong presumption of efficiency; (c) as an SEC regulated issuer, Qiwi issued *via* NASDAQ periodic public reports; (d) Qiwi regularly communicated with public investors, including via regular disseminations of press releases on major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (e) unexpected material news about Qiwi was rapidly reflected in and incorporated into the price of its securities during the Class Period.

246. As a result, the market for Qiwi securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of Qiwi's shares. Under these circumstances, all purchasers or acquirers of Qiwi securities during the Class Period suffered similar injury through their purchase or acquisition of Qiwi securities at artificially inflated prices, and a presumption of reliance applies.

247. In addition, Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

## X.   INAPPLICABILITY OF SAFE HARBOR

248.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. All of the specific statements pleaded herein were not identified as, and/or were not "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Company and the Individual Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Qiwi named under the Exchange Act who knew that those statements were materially false and misleading when made.

## XI.   CLAIMS FOR RELIEF

### COUNT I
#### Violations of § 10(b) of the Exchange Act and
#### Rule 10b-5 Promulgated Thereunder
#### (Against All Defendants)

249.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants.

250.    Defendants, carried out a plan, scheme, and course of conduct which was intended to, and did, deceive the investing public, including Lead Plaintiff and the other Class members, as alleged herein, and caused Lead Plaintiff and the other Class members to purchase Qiwi securities

105

at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

251. During the Class Period, Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew, or deliberately disregarded as, or turned a blind eye to being, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

252. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statement made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers or acquirers of Qiwi securities in an effort to maintain artificially high market prices for Qiwi securities in violation of § 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

253. Defendants, individually and together, directly and/or indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Qiwi's business, operations, and future prospects as specified herein.

254. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Qiwi's value and performance and continued substantial growth, which included the preparation of and/or dissemination or approval of untrue statements of material facts and/or omitting to state material facts necessary in order to

106

make statements made about Qiwi and its business operations and further prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and course of business which operated as a fraud and deceit upon the purchasers and acquirers of Qiwi securities during the Class Period.

255. Defendants had motive and opportunity to perpetrate the fraudulent scheme and course of conduct described herein. Defendants acted with scienter in that they knew that the public documents and statements prepared, issued and/or disseminated in the name of Qiwi were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants by virtue of their receipt of information reflecting the true facts of Qiwi, their control over, and/or receipt and/or modification of Qiwi's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Qiwi, participated in the fraudulent scheme alleged herein.

256. The Individual Defendants are the most high-level executives and/or directors at Qiwi and members of its management team or had control thereof. By virtue of their responsibilities and activities as senior officers, the Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material fact set forth herein and intended to deceive Lead Plaintiff and other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed to obtain such knowledge by deliberately refraining from taking steps necessary to discover whether the statements alleged herein, were false and/or misleading, or turned a blind eye toward the true facts available to them. Defendants' material

misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's true prospects from the investing public and supporting the artificially inflated price of Qiwi securities.

257.    As a result of the dissemination of the materially false and/or misleading information and failure to disclose material facts, as set forth herein, the market price of Qiwi securities was artificially inflated. In ignorance of the fact that market price of Qiwi securities was artificially inflated during the Class Period, and relying directly or indirectly on Defendants' false and misleading statements, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or recklessly disregarded, by Defendants, but not disclosed in public statements by Defendants, Lead Plaintiff and the other Class members acquired Qiwi securities at artificially high prices and were, or will be, damaged thereby.

258.    At the time of said misrepresentation and omissions, Lead Plaintiff and the other Class members were ignorant of their falsity and believed them to be true. Had Lead Plaintiff and the other members of the Class, and the marketplace known the truth regarding the Company's business, which was not disclosed by Defendants, Lead Plaintiff and the other member of the Class would not have purchased or acquired Qiwi securities, of if they had purchased or acquired such securities, they would not have done so at the artificially inflated prices that they paid.

259.    By virtue of the foregoing, the Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

260.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Qiwi securities during the Class Period.

261. This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiff's purchase of securities giving rise to the cause of action.

## COUNT II
### Violations of § 20(a) of the Exchange Act
### (Against the Individual Defendants)

262. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. As members of Qiwi's executive team and/or the Company's board of directors, the Individual Defendants acted as controlling persons of Qiwi within the meaning of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

263. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Qiwi's operations and/or intimate knowledge of the false information disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Qiwi, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. The Individual Defendants were provided with, or had unlimited access to Qiwi's reports, press releases, public filings and other statements, alleged by Lead Plaintiff to have been misleading, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

264. In particular, each of the Individual Defendants had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control and/or influence the particular transactions giving rise to the securities violations, as alleged herein, and exercised the same.

265. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Qiwi's

109

business operations and prospects, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

266. As set forth above, Qiwi and the Individual Defendants each violated § 10(b) and Rule 10b-5, promulgated thereunder, by their acts and omissions as alleged in this Complaint and the Class was damaged thereby. By virtue of their positions as "controlling persons", the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.

267. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their purchase or acquisition of Qiwi securities during the Class Period.

268. This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiff's purchase of securities giving rise to the cause of action.

## XII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff on behalf of itself and the Class, prays for relief and judgment, as follows:

a. Declaring this Action is a proper class action and certifying Lead Plaintiff as class representative pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein and Lead Plaintiff's counsel as Class Counsel;

b. Awarding Lead Plaintiff and the other members of the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' conduct, in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

d. Awarding such other equitable/injunctive or further relief as this Court may deem just and proper.

## XIII. JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury on all triable claims.

DATED: July 9, 2021                    Respectfully Submitted,

**ROCHE FREEDMAN LLP**

<u>*/s/ Constantine P. Economides*</u>
Constantine P. Economides
Ivy T. Ngo (*pro hac vice forthcoming*)
Velvel (Devin) Freedman
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 971-5943
Emails: ceconomides@rcfllp.com
        ingo@rcfllp.com
        vel@rcfllp.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall (*pro hac vice* forthcoming)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*

111

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on July 9, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

*/s/ Constantine P. Economides*
Constantine P. Economides

112