# Exhibit D

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# Form 20-F

---

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

Or

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2018**

Or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Or

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number: 001-35893**

---

# QIWI PLC
**(Exact name of Registrant as specified in its charter)**

---

**N/A**
**(translation of Registrant's name into English)**

**Cyprus**
**(Jurisdiction of incorporation or organization)**

**Kennedy 12, Kennedy Business Centre, 2nd floor**
**P.C. 1087, Nicosia, Cyprus**
**(Address of principal executive offices)**

**Varvara Kiseleva**
**+ 357 2265-3390**
**ir@qiwi.com**
**Kennedy 12, Kennedy Business Centre, 2nd floor**
**P.C. 1087, Nicosia, Cyprus**
**(Name, telephone, e-mail and/or facsimile number and address of company contact person)**

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| American Depositary Shares, each representing one Class B ordinary share, having a nominal value EUR 0.0005 per share<br>Class B ordinary shares, having a nominal value of EUR 0.0005 per share* | The NASDAQ Stock Market LLC |

---

\*   *Not registered for trading, but exist only in connection with the registration of the American Depositary Shares.*

**Securities registered or to be registered pursuant to Section 12(g) of the Act:**

**None**
**(Title of Class)**

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:**

**None**
**(Title of Class)**

———————————————

Indicate the number of outstanding shares of each of the Issuer's classes of capital or common stock as of the close of the period covered by the annual report.

**As of December 31, 2018, 13,833,419 Class A ordinary shares, par value EUR 0.0005 per share and 48,879,556 Class B ordinary shares, par value EUR 0.0005 per share were outstanding.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such a shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See definition of "large accelerated filer, "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐        Accelerated filer ☒        Non-accelerated filer ☐        Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act   ☐

†   The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐        International Financial Reporting Standards as issued                                    Other ☐
                       by the International Accounting Standards Board ☒

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the Registrant has elected to follow:   Item 17 ☐   Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.   Yes ☐   No ☐

**Table of Contents**

**TABLE OF CONTENTS**

PART I

| | | |
|---|---|---:|
| ITEM 1. | Identity of Directors, Senior Management and Advisers | 3 |
| ITEM 2. | Offer Statistics and Expected Timetable | 3 |
| ITEM 3. | Key Information | 3 |
| | A. Selected Financial Data | 3 |
| | B. Capitalization and Indebtedness | 7 |
| | C. Reasons for the Offer and Use of Proceeds | 7 |
| | D. Risk Factors | 7 |
| ITEM 4. | Information on the Company | 40 |
| | A. History and Development of the Company | 40 |
| | B. Business Overview | 40 |
| | C. Organizational Structure | 58 |
| | D. Property, Plants and Equipment | 58 |
| ITEM 4A. | Unresolved Staff Comments | 58 |
| ITEM 5. | Operating and Financial Review and Prospects | 58 |
| | A. Operating Results | 58 |
| | B. Liquidity and Capital Resources | 76 |
| | C. Research and Development, Patents and Licenses, etc. | 78 |
| | D. Trend Information | 78 |
| | E. Off-balance Sheet Arrangements | 78 |
| | F. Tabular Disclosure of Contractual Obligations | 78 |
| | G. Safe Harbor | 78 |
| ITEM 6. | Directors, Senior Management and Employees | 79 |
| | A. Directors and Senior Management | 79 |
| | B. Compensation | 80 |
| | C. Board Practices | 82 |
| | D. Employees | 83 |
| | E. Share Ownership | 84 |
| ITEM 7. | Major Shareholders and Related Party Transactions | 84 |
| | A. Major Shareholders | 84 |
| | B. Related Party Transactions | 85 |

1

**Table of Contents**

| | | | |
|---|---|---|---|
| | C. | Interests of Experts and Counsel | 86 |
| ITEM 8. | | Financial Information | 86 |
| | A. | Consolidated Financial Statements and Other Financial Information | 86 |
| | B. | Significant Changes | 87 |
| ITEM 9. | | The Offer and Listing | 87 |
| | A. | Offer and Listing Details | 87 |
| | B. | Plan of Distribution | 87 |
| | C. | Markets | 87 |
| | D. | Selling Shareholders | 87 |
| | E. | Dilution | 87 |
| | F. | Expenses of the Issue | 87 |
| ITEM 10. | | Additional Information | 87 |
| | A. | Share Capital | 87 |
| | B. | Memorandum and Articles of Association | 88 |
| | C. | Material Contracts | 92 |
| | D. | Exchange Controls | 92 |
| | E. | Taxation | 92 |
| | F. | Dividends and Paying Agents | 104 |
| | G. | Statements by Experts | 104 |
| | H. | Documents on Display | 104 |
| | I. | Subsidiary Information | 104 |
| ITEM 11. | | Quantitative and Qualitative Disclosures About Market Risk | 104 |
| ITEM 12. | | Description of Securities Other Than Equity Securities | 106 |
| | A. | Debt Securities | 106 |
| | B. | Warrants and Rights | 106 |
| | C. | Other Securities | 106 |
| | D. | American Depositary Shares | 107 |

PART II

| | | |
|---|---|---|
| ITEM 13. | Defaults, Dividend Arrearages and Delinquencies | 107 |
| ITEM 14. | Material Modifications to the Rights of Security Holders and Use of Proceeds | 107 |
| ITEM 15. | Controls and Procedures | 108 |
| ITEM 16. | [RESERVED] | 109 |
| ITEM 16A. | Audit Committee Financial Expert | 109 |
| ITEM 16B. | Code of Ethics | 109 |
| ITEM 16C. | Principal Accountant Fees and Services | 110 |
| ITEM 16D. | Exemptions from the Listing Standards for Audit Committees | 110 |
| ITEM 16E. | Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 110 |
| ITEM 16F. | Change in Registrant's Certifying Accountant | 110 |
| ITEM 16G. | Corporate Governance | 110 |
| ITEM 16H. | Mine Safety Disclosure | 111 |

PART III

| | | |
|---|---|---|
| ITEM 17. | Financial Statements | 111 |
| ITEM 18. | Financial Statements | 111 |
| ITEM 19. | Exhibits | 111 |

2

Table of Contents

The following table reconciles adjusted net profit to net profit.

| | Year ended December 31, | | | | | |
| | 2014 | 2015 | 2016 | 2017 | 2018 | |
| | RUB | RUB | RUB | RUB | RUB | U.S.$ |
| | | | (in millions) | | | |
| **Net profit** | **4,968** | **5,274** | **2,489** | **3,142** | **3,626** | **52** |
| Impairment of intangible assets recorded on acquisitions | — | — | 878 | — | — | — |
| Amortization of fair value adjustments | 74 | 270 | 396 | 344 | 369 | 6 |
| (Gain)/loss on disposals of subsidiaries | — | 38 | 10 | — | — | — |
| Offering expenses | 32 | — | — | — | — | — |
| Income from depositary (2) | (38) | — | — | — | — | — |
| Share-based payment expenses | 422 | 88 | 224 | 398 | 635 | 9 |
| Effect of taxation of the above items | (15) | (52) | (258) | (66) | (60) | (1) |
| Foreign Exchange loss/(gain) on June 2014 offering proceeds (1) | (1,947) | (1,476) | 975 | 236 | (433) | (6) |
| **Adjusted net profit** | **3,496** | **4,142** | **4,714** | **4,054** | **4,137** | **60** |

(1)    Foreign exchange gain on June 2014 offering proceeds, as presented in the reconciliation of net profit to adjusted net profit differs from the foreign exchange loss/(gain) in the reconciliation of net profit to adjusted EBITDA as the latter includes all the foreign exchange losses/(gains) for the period, while the former relates solely to foreign currency changes resulting from the funds received in connection with our offering of ADSs in June 2014.

(2)    Income from depositary is presented in the separate line in reconciliation tables for convenience purposes, while it is included in other income in our financial statements for the years ended December 31, 2014 and December 31, 2015.

**B.    Capitalization and Indebtedness.**

Not applicable.

**C.    Reasons for the Offer and Use of Proceeds.**

Not applicable.

**D.    Risk Factors**

*In conducting our business, we face many risks that may interfere with our business objectives. Some of these risks relate to our operational processes, while others relate to our business environment. It is important to understand the nature of these risks. If any of the following risks actually occurs, it may materially harm our business, results of operations or financial condition.*

**Risks Relating to Our Business and Industry**

***The financial services industry is highly competitive, and we have a vast number of competitors that are larger and have greater financial and other resources.***

The financial services industry in which we operate with our payment services and other financial services that we provide is highly competitive, and our ability to compete effectively is therefore of paramount importance. In all countries where we operate, we face competition from a variety of financial and non-financial business groups. These competitors include retail banks, non-traditional payment service providers (such as retailers and mobile network operators, or MNOs), electronic payment system operators, as well as other companies which provide various forms of banking and payment solutions or services, including electronic payments, payment processing services, consumer lending and other services. Competitors in our industry seek to differentiate themselves by features and functionalities such as speed, convenience, network size, accessibility, safety, reliability and price, among others. A significant number of our competitors have greater financial, technological and marketing resources than we have, operate robust networks and are highly regarded by consumers.

Our key competitors in Russia are retail banks, particularly those with a focus on well-developed electronic payment solutions, including Sberbank, Russia's largest retail bank that is majority-owned by the Russian state, Alfa-Bank, one of the leading privately owned Russian retail banks, both of which have electronic banking solutions and large retail networks, and Tinkoff Bank, which positions itself as a specialized bank specifically focused on innovative online retail financial services. Sberbank, for example, has long adhered to the strategy of innovation in the financial and payments space and has been focusing on the promotion of alternative banking channels, such as kiosks, internet banking and mobile banking. Sberbank is the market leader of the Russian payments market, and has access to significant financial resources and has an extensive nationwide network of branches. It is also the largest processor of utility bill payments, which constitute a significant portion of overall consumer spending in our industry. It actively develops its online payment services capabilities, including through its online and mobile banking platform Sberbank Online and through Yandex.Money, one of the major electronic payment service providers in Russia that it operates in a joint venture with Yandex, a leading Russian diversified technology company. These factors give Sberbank a substantial competitive advantage over us in the payments business as well as any other financial services businesses that we pursue or may pursue. Additionally, Sberbank is pursuing a strategy to transform itself into an e-commerce ecosystem based on open source software. In furtherance

7

Table of Contents

of this strategy, in April 2018 Sberbank announced together with Yandex that they have completed the formation of a joint venture based on the Yandex.Market platform where they intend to combine the technological capabilities of Yandex and the infrastructure and technologies of Sberbank to develop a leading B2C (business-to-consumer) e-commerce ecosystem. While the e-commerce platform created by this joint venture is still being rolled out, this deal could result in a substantial shift in the competitive landscape of the Russian physical e-commerce market to the detriment of our position, market share and growth potential in this category of payments. The recently announced joint venture between Mail.ru Group, Alibaba Group, Megafon and RDIF to create a largest social commerce platform in Russia and the Commonwealth of Independent States ("CIS") based on AliExpress Russia and Pandao platforms, could have a similar effect. Our other major competitors in the banking industry include Alfa-Bank, a major retail bank that combines a strong competitive position in the traditional retail banking sector with a focus on developing innovative financial and payments solutions, and Tinkoff Bank, which is a provider of online retail financial services operating in Russia through a high-tech branchless platform. Numerous other Russian banks are also actively pursuing the electronic payments business and developing various consumer payment solutions.

The competition in the digital money transfer services space is also further intensifying as key market players including retail banks develop and digitalize their products. Recently the Central Bank of Russia in cooperation with other banks established an instant payment system which is designed to enable instantaneous money transfers between accounts at different banks with the only piece of identification needed for a transfer being the person's cell phone number. All banks doing business in Russia can and will likely be obliged to connect to this system (which Qiwi Bank has already done) for doing peer-to-peer money transfers. It may prove difficult for our digital money remittance solutions to compete with such system on the basis of convenience, price, or otherwise. There can also be no assurance that the CBR will not impose an upper fee limit for transfers within such system that will be lower than the currently prevailing fee rates and thereby drive down the entire market for money remittance fees.

Our competitors in the payments business also include non-traditional payment service providers that engage in payment services as a non-core business. In particular, we compete with the Russian Federal State Unitary Enterprise Postal Service, or Russian Post, which offers certain payment services. Russian Post's geographical penetration is at least as dispersed as our physical distribution network (i.e. our kiosks and terminals). It also co-owns, in a joint-venture with the Russian state-controlled VTB Bank, the full-service commercial bank Pochta Bank. As a state-sponsored institution, we believe that it is able to provide payment services at significantly lower prices than we are able to match profitably. We also face competition from other non-traditional payment service providers that have substantial financial resources, such as brick-and-mortar and online retailers (such as Alibaba and its financial services subsidiary Ant Financial which operates the AliPay payment system), and MNOs, in particular the Russian "Big Three" MNOs, MegaFon, VimpelCom and MTS, as well as their closest competitor Rostelekom, all of which have various payment solutions of their own. In addition, non-traditional payment service providers also include social networks such as Mail.ru Group's VK, which is developing its own payment solution VKPay and smartphone manufacturers such as Samsung and Apple. New competitors may penetrate the Russian electronic payment market as well, including established international players such as MoneyGram or Google.

Globally and in Russia, there is a steady influx of new fintech businesses looking to challenge and disrupt the payments and financial services industry. These include so-called "challenger banks" such as Starling, Monzo, N26, Revolut, Atom and Tandem, who develop various digital banking and financial services and compete with various aspects of our services offering (none of the aforementioned companies has penetrated the Russian market as of the date hereof, although we have entered into agreements with Revolut contemplating the development of its business in Russia through the QIWI open API ecosystem). Since the financial services industry is susceptible to disruption, new categories of non-traditional financial service providers may emerge in the future that may be difficult to currently anticipate. See "– *If we cannot keep pace with rapid developments and change in our industry and provide new services to our clients, or if any of the new products we roll out are unsuccessful, the use of our services could decline, and we could experience a decline in revenue and an inability to recoup costs*".

We also compete against some directly comparable businesses, such as electronic payment system operators (primarily Yandex.Money, WebMoney and PayPal) and kiosk and terminal operators, including Cyberplat, Compay and Elecsnet.

In recent years, we have started expanding our product portfolio beyond our traditional payment services business to include other types of financial services. These new projects include our payment-by-installments SOVEST card project that we launched in 2016, Tochka, a digital banking service focused on offering a broad range of services to small and medium businesses (SMEs), and Rocketbank, a digital banking service offering debit cards and deposits to retail customers. In connection with each of these projects, we face intense competition from commercial and retail banks. In particular, SOVEST competes with commercial banks that operate unsecured retail consumer lending programs, such as Sovkombank, HomeCredit, Tinkoff and Alfa Bank, all of which have equivalent or similar products including pay-by-installment projects, which are a direct competition, credit card programs or POS loan solutions. Tochka and Rocketbank are online and mobile banking services that digitalize traditional banking services (general banking (and add-on) services for SMEs in case of Tochka and debit cards and deposits in case of Rocketbank) and compete primarily on the basis of enhanced user experience, price and add-on features, and are therefore exposed to competition from any banking institutions, particularly those that are focused on developing convenient online and mobile solutions such as Sberbank, Alfa Bank and Tinkoff. Such banking institutions often have more established businesses in consumer lending and other banking services similar to those offered by Tochka and Rocketbank, respectively. While we seek to differentiate SOVEST, Tochka and Rocketbank from the competition, there cannot be any assurance that we will be successful in doing so due to the number of the competitors and their level of sophistication. We have also recently placed some focus on the so-called sharing economy/ B2B2C segment, whereby we provide different complex payment and payout solutions to diverse businesses, such as payments to taxi drivers by taxi companies or payments to property holders by companies like Airbnb as well as on the self-employed market, where we provide different payment and acquiring-like solutions to self-employed individuals. These products are similar in nature to a salary program and certain other products at a traditional retail bank, thereby exposing us to competition from all banks that offer such services, particularly if they are similarly focused on convenience of on-boarding and use as well as customizable and user-friendly interfaces.

8

Table of Contents

In 2016, we became one of the two payment services providers that are able to accept electronic bets on behalf of sports betting companies in Russia. Under amendments to the Russian betting laws introduced in 2014, in order to engage in sports betting, a bookmaker has to become a member of a self-regulated organization of bookmakers and abide by its rules, and any and all interactive bets may be only accepted through an Interactive Bets Accounting Center (TSUPIS) set up by a credit organization together with a self-regulated association of bookmakers. Accordingly, in 2016 QIWI Bank established a TSUPIS together with one of the self-regulated associations of bookmakers in order to be able to accept such payments and started acting as a platform for acceptance of interactive bets in favor of the members of the self-regulated organization of bookmakers. Processing payments for betting merchants represents a significant portion of our revenues and also generally carries higher margins than processing payments to merchants in most of the other market verticals we serve. Furthermore, gains received by our consumers from betting into their Qiwi Wallet accounts represents one of the significant reload sources for Qiwi Wallet accounts. If other banks or payment service providers were to enter this market, the payment volume, revenue and margins of our Payment Services business, as well as overall usage of Qiwi Wallet, could be materially adversely affected.

Any increase in competition by other market participants, or any shift of customer preferences in their favor due to any real or perceived advantages of their products, could result in a loss of consumers and harm to our payment volume, revenue and margins. As major commercial and retail banks increase their online and virtual presence and come up with increasingly sophisticated products directly competing with our core competencies, our competitive position could be severely undermined, resulting in reduced demand for our products, both with respect to our payment services business and the other financial services projects that we are pursuing. If we are unable to compete successfully for consumers, agents, merchants or other partners (including new corporate clients such the clients of Tochka or the businesses that use our B2B2C services as described above), our business, financial condition and results of operations could be materially adversely affected.

***Our continued growth depends on our ability to maintain or increase our payment services average net revenue yield.***

One of the key measures we use to assess the performance of our payment services business is payment average adjusted net revenue yield, which we calculate by dividing payment adjusted net revenue by the total payment volume of the transactions we process. Our payment average adjusted net revenue yield may be affected by a number of factors, including increased competition, pressure from merchants and/or agents, changes in regulation and acquisitions. We have experienced declines in our payment average adjusted net revenue yield for certain merchant categories in the past, in particular for our Telecom merchants where the merchant fees were sharply reduced by the Big Three MNOs, who have been seeking to reduce costs, and may continue to do so in the future. We have also experienced, to a lesser extent, the declines of our net revenue yield in the money remittance and certain categories of e-commerce market verticals. For example, in 2015, our average adjusted net revenue yield declined following the acquisition of the Contact money transfer system ("Contact") and the Rapida payment processing system ("Rapida") businesses, both of which had been operating with a significantly lower average net revenue yield than QIWI (excluding Contact and Rapida) during 2015. Our payment average adjusted net revenue yield may be further compressed in connection with the introduction of the recently established instant money transfer system (see "– *The financial services industry is highly competitive, and we have a vast number of competitors that are larger and have greater financial and other resources*"). The introduction and extensive utilization of this service, especially if the maximum commission limits are imposed by the CBR, can lead to a shift of part of our digital money remittance volumes within our ecosystem: from our card-to-card money transfer service to the instant money transfer system. This may lead to a decline in average commission in the money remittance market vertical and thus be dilutive to our payment average adjusted net revenue yield. In order to maintain our competitiveness, we must continue to ensure that our payment processing system provides a more convenient and attractive option for merchants, customers and partners than alternative systems that may not require payment of a processing fee. Retail banks and various payment service providers are constantly developing low to zero-commission payment channels for their consumers. To attract consumers, we also offer certain services on a commission-free basis, such as most peer-to-peer transfers within Qiwi Wallet and certain payments in e-commerce. Despite our efforts, consumers may still choose to use other payment service providers, even if those providers do not offer the convenience that we do, because they charge lower fees. In addition, because merchants, partners and agents are able to switch between different payment service providers, we may face additional pressure to reduce the fees we charge due to increased competition from other payment service providers.

Our payment average adjusted net revenue yield is also impacted by the cost to us of consumers reloading their Qiwi Wallet accounts. We make available to our consumers a large variety of methods to reload the Qiwi Wallet accounts, including, among others, bank cards and accounts, mobile phone balances, kiosks and terminals and ATMs. Customers can also receive different payouts or money transfers to their wallets. The top up methods have different cost implications for us and such cost implications can change for different channels overtime. For example, on payments made through the kiosks and terminals owned by our agents, we historically have paid lower fees for reloading the Qiwi Wallet than on most payments made from bank cards, as well as certain other channels. However, recently kiosks became a relatively more expensive top up channel for us. Additionally, since we provide payment processing services to merchants in the sports betting industry, betting gains received by our consumers into their Qiwi Wallet accounts also represent an important and cost-efficient source of Qiwi Wallets reloads, which could decline if our presence as a payment provider in the sports betting market diminishes for any reason. Should the relative weight of these reload channels in our total mix decline, this could put a negative pressure on our yields. We currently do not attempt to direct consumer preferences towards any particular reload methods. If reload methods that come at a higher cost to us were to constitute a larger proportion of our overall reload channels mix, our margins could be adversely affected, which could have a material adverse effect on our business, financial condition and results of operations.

Our payment services segment net revenue yield, which we calculate by dividing payment services segment net revenue by the total payment volume of the transactions we process, is affected by changes in our payment average adjusted net revenue yield and by our ability to generate revenue from payment-related value added services, as well as passive revenue such as interest income on the wallet balances we hold and revenue from fees for inactive accounts and unclaimed payments. If we are not able to generate such additional revenues for any reasons including regulatory restrictions (see "– *We are subject to extensive government regulation*"), intensified competition or other reasons outside of our control, our financial condition and results of operation could be materially negatively affected.

Table of Contents

If payment average adjusted net revenue yield or payment services segment net revenue declines as a result of any of these or other factors, we will have to offset the financial impact of such decline by increasing our payment volume, through the development and enhancement of value-added services or the development of new services and products. We cannot assure you that we will be able to increase our payment volumes or that any new services we introduce or new products we develop will be profitable. If we are unable to offset the decline in our payment average adjusted net revenue yield resulting from this and other factors, our business, financial condition and results of operations could be materially adversely affected.

***If we cannot keep pace with rapid developments and change in our industry and provide new services to our clients, or if any of the new products we roll out are unsuccessful, the use of our services could decline, and we could experience a decline in revenue and an inability to recoup costs.***

The financial services industry in which we operate is characterized by rapid technological change, new product and service introductions, evolving industry standards, changing customer needs and the entrance of more established market players seeking to expand into these businesses. In order to remain competitive, we continually seek to expand the services we offer and to develop new projects. These projects carry risks, such as delays in delivery, performance problems, lack of customer acceptance, failure to adequately assess the potential revenues and budget the expenses of a project and the amount of investment required by it, failure to anticipate potential pitfalls and issues, and misjudgment of a need for a particular product by the intended customer base, among other things. In our industry, these risks are acute. Any delay in the delivery of new services or the failure to differentiate our services or to accurately predict and address market demand could render our services less desirable, or even obsolete, to consumers, merchants or partners, and hurt our future prospects. For example, if alternative payment and credit mechanisms become widely available, thereby substituting our current products and services, and we do not develop and offer similar alternative payment and credit mechanisms successfully and on a timely basis, our business and its prospects could be adversely affected. At the same time, if a new product we roll out or acquire fails to perform as anticipated, this could similarly adversely affect our business, financial position and results of operations. Since we position ourselves as a provider of next generation payment and financial services, many of these new products are based on business models that are unproven and are essentially start-ups launched to test a hypothesis based on various assumptions regarding consumer behavior patterns and demands. These assumptions may ultimately prove wrong and we may not be able to convert these hypotheses into sustainable businesses and recoup our investments made in such businesses. This is particularly applicable to the SOVEST project, for which few equivalents exist in Russia or internationally. Its business model currently continues to evolve, while the project is operating at a loss. Rocketbank is similarly currently at the stage of proving its business model and monetization potential, and we may ultimately not be successful in converting the idea underlying its model into a profitable business or platform to engage new consumers towards our other more profitable products or extend the life cycle and product penetration of our existing clients. There can be no assurance that either SOVEST or Rocketbank will be able to outgrow these respective stages of their development, prove their respective business cases and ever become profitable. Both SOVEST and Rocketbank may turn out to be based on business models that are unsustainable either at a unit level or at scale, to the extent that we would have to recognize our investments in them (which have been and are likely in the foreseeable to continue to be) substantial, as a sunk cost. Although Tochka is more of an established operation with a business model that has proved itself, we may face challenges with further developing its product offering or expanding the scope of its operations due to constraints imposed by the terms of our equity associate, co-owned by Otkritie, that now holds the Tochka business, or by any regulatory hurdles. For example, AML and KYC requirements and regulations all across the banking industry, and in the small and medium enterprises ("SME") end-market especially, are constantly evolving and may generally lack widely accepted principals, may often be relatively nonadoptive or difficult to observe and may be subject to varying interpretations by different market participants and regulatory bodies. Hence, we may not be able from time to time to onboard new clients at a targeted pace even if such small and medium-sized businesses are entirely legitimate, or we may be subject to fines, penalties or operational restrictions if any of the appropriate regulatory bodies interprets industry practices or regulations differently from us or if such interpretations changes over time. If any such restrictions or fines were imposed or if we are not able to onboard clients with a projected pace for any of the above reasons or otherwise, our business, financial condition and results of operations could be materially adversely affected.

We may be unable to recover the costs we have incurred in developing, rolling out, implementing and marketing new products and services. Our development efforts could result in increased costs and we could also experience a loss in business that could reduce our earnings or could cause a loss of revenue if promised new services are not timely delivered to our clients, are not able to compete effectively with those of our competitors or do not perform as anticipated. As we enter markets that are new for us with our new products and services offerings, we face additional operational, regulatory and other risks that we may not be able to adequately address due to our lack of experience in such markets and the associated risks.

We have already incurred and expect to continue to incur significant costs in connection with the roll-out and operations of our new projects that we may not be able to offset by associated income, at least for a certain period of time. SOVEST in particular is a cash-intensive project for us, since we have to invest in the development and marketing of a project with a model that is novel to the market as well as use our own funds to provide funding to our customers to make purchases from the merchants with the use of SOVEST cards; if it does not yield the expected results, it may result in a substantial sunk cost for us. See also "*–Our business is exposed to counterparty and credit risks*" and "*–Our operations may be constrained if we cannot attract or service future debt financin*g." As we are seeking to convert SOVEST into a multi-bank platform to transfer the credit portfolio to partner banks and thereby enable a more rapid and efficient scaling of the project, we may not be able to structure the economics of such partnership in a manner that ensures adequate returns for us or the partner banks. If this was to happen, we could either suffer diminished returns or lose our banking partners, or we may not be able to reach agreement on sharing the economics with our prospective partners altogether, in which case we would have to forego the development of the SOVEST multi-bank platform and bear the entirety of the SOVEST credit portfolio, credit risks and funding costs on our own. Moreover, if this or any other risks were to materialize such that we would have to substantially modify or scale down the SOVEST project, we may face a substantial increase in the cost of risk that we may not be able to manage and thus may suffer additional losses. Further developing the multi-bank model that Tochka currently operates under also may present challenges, since we do not control the management of Tochka pursuant to our arrangements with Otkritie and the

10

Table of Contents

Tochka founders. The anticipated returns of Tochka may fail to be achieved due to the failure of Otkritie Bank to perform under its obligations to us, which it assumed in connection with our agreements in respect of Tochka, or any conflict between us and Otkritie with respect to the development of Tochka; see "–*We may not be able to complete or integrate successfully any potential future acquisitions, partnerships or joint ventures*."

We also actively develop other new products, services and technologies, including in the areas of blockchain and cryptoprocessing. If our efforts in connection with any of such research and development initiatives do not pay off as expected, this will result in the loss of our investment both in terms of money and management time, which could adversely affect our profitability.

Additionally, in order to remain competitive in an innovative industry such as ours, we have to make investments in start-up companies or undertake different research and development initiatives. If our investments in start-up companies or research and development initiatives do not yield the expected results, we may lose money, time and effort invested.

If we are unable to develop, adapt to or access technological changes or evolving industry standards on a timely and cost effective basis, or if our new initiatives do not yield the expected results, our business, financial condition and results of operations could be materially adversely affected.

***We are subject to the economic risk and business cycles of our merchants, partners and agents and the overall level of consumer spending.***

The financial services industry depends heavily on the overall level of consumer spending, which affects each of our operating segments. We are exposed to general economic conditions that affect consumer confidence, consumer spending, consumer discretionary income or changes in consumer purchasing habits. Economic factors such as employment levels, business conditions, energy and fuel costs, interest rates, inflation rate and the strength of the ruble against foreign currencies (in particular the U.S. dollar) could reduce consumer spending or change consumer purchasing habits. A reduction in the amount of consumer spending could result in a decrease in our revenue and profits. If our merchants or partners make fewer sales of their products and services using our services or consumers spend less money per transaction, the volume of payments our Payment services segment processes will decline, resulting in lower revenue. A further weakening in the economy could have a negative impact on our merchants, as well as consumers who purchase products and services using our payment processing systems, which could, in turn, negatively impact our business, financial condition and results of operations, particularly if the recessionary environment disproportionately affects some of the market segments that represent a larger portion of our payment processing volume. In addition, these factors could force some of our merchants and/or agents to liquidate their operations or go bankrupt, or could cause our agents to reduce the number of their locations or hours of operation, resulting in reduced convenience of our service. Similarly, deteriorating economy and reduced consumer spending may translate into a decline in number of transactions with, or average ticket of, our SOVEST cards and may also affect the creditworthiness of customers, which could result in increased credit risk (see "–*Our business is exposed to counterparty and credit risks*"). Tochka is also exposed to the negative repercussions of the economic slowdown since its business depends on the general level of entrepreneurial activity, which tends to be lower during such periods, while Rocketbank's debit cards and retail deposits business has a direct correlation with consumer spending levels and earning power. We also have a certain amount of fixed costs, including salaries and rent, which could limit our ability to adjust costs and respond quickly to changes affecting the economy and our business.

Russia's economy has been facing significant challenges for the past few years due to the combined effect of the ongoing crisis in Eastern Ukraine, the deterioration of Russia's relationships with many Western countries, the economic and financial sanctions imposed in connection with these events on certain Russian companies and individuals, as well as against entire sectors of Russian economy, by the U.S., EU, Canada and other countries, a steep decline in oil prices, a record weakening of the Russian ruble against the U.S. dollar, a lack of access to financing for Russian issuers, capital flight and a general climate of political and economic uncertainty, among other factors. (See "– *Economic instability in Russia could have an adverse effect on our business*" and "– *The situation in Ukraine and the U.S., EU and other sanctions that have been imposed could adversely impact our operations and financial condition*"). The Russian economy contracted in both 2015 and in 2016, although it returned to modest growth in 2017 and 2018. During 2014-2016, the population's purchasing power decreased due to the weakening of the ruble, basic necessities such as food products and utilities became more expensive, and consumer confidence declined significantly, according to the Russian Consumer Confidence Overall Index reported by Rosstat. According to Rosstat, inflation was 11.4% in 2014 and 12.9% in 2015 (although it relatively stabilized in 2016 at 5.4% and then further declined to 2.5% in 2017, before increasing again to 4.2% in 2018, which exceeded the targets set by the government), while real disposable income has been declining for five years in a row as of the end of 2018 with 0.2% decline in 2018 according to Ministry of Economic Development data. Against this backdrop, household consumption decreased in 2015 versus 2014, although it subsequently rebound somewhat in absolute terms, according to Rosstat. Nevertheless, consumer spending generally remains cautious and consumer confidence is far from its peaks. A further decline in real disposable income and consumer purchasing power is expected in connection with the recent increase of VAT in Russia effective as of the beginning of 2019. A prolonged economic slowdown in Russia could have a significant negative effect on consumer spending in Russia and, accordingly, on our business. As a result of the challenging operating environment in Russia, we have experienced slower payment volume growth in certain of our payment categories and payment volume decline in certain others, in particular certain types of money remittances and financial services categories. Further adverse changes in economic conditions in Russia could adversely impact our future revenues and profits and cause a material adverse effect on our business, financial condition and results of operations.

11

Table of Contents

***If customer and merchant confidence in our business deteriorates, our business, financial condition and results of operations could be adversely affected.***

Our business is built on customers' and merchants' confidence in our brands, as well as our ability to provide fast, reliable payment services, including electronic payment and payment processing services, and other financial services. The strength of our brands and reputation are of paramount importance to us. A number of factors could adversely affect customer confidence in our brands, many of which are beyond our control, and could have an adverse impact on our results of operations. These factors include:

•   illegal or improper use of our systems and compliance related concerns;

•   regulatory action or investigations against us;

•   any significant interruption to our systems and operations; and

•   any breach of our security system or any compromises of consumer data.

In addition, we are to some extent dependent on our agents, merchants and partners to which we license our products to maintain the reputation of our brands. Despite the measures that we put in place to ensure their compliance with our performance standards, our lack of control over their operations may result in the low quality of service of a particular counterparty being attributed to our brands, negatively affecting our overall reputation. For example, our agents are able to charge consumers fees for the use of the kiosks and terminals operated by them, in addition to the fees charged by us, and we mostly do not cap or otherwise control the level of such fees levied by our agents on consumers. We can provide no assurance that our agents will not raise these fees to a level that will adversely affect the popularity of our products among consumers. We also might determine to cap this type of fee to protect the strength of our brand and thereby lose some of our agents and points of physical presence. Furthermore, negative publicity surrounding any assertion that our agents, merchants and/or partners are implicated in fraudulent transactions, irrespective of the accuracy of such publicity or its connection with our current operations or business, could harm our reputation.

Any event that hurts any of our brands and reputation as a reliable financial services provider could have a material adverse effect on our business, financial condition and results of operations.

***Qiwi Bank and other Russian banks and credit organizations operate in a highly regulated environment and increased regulatory scrutiny could have an adverse effect on our business, financial condition and results of operations.***

Qiwi Bank is central to the operation of all of our key business segments as it provides issuing, acquiring and deposit settlement functions within our group, serves as the issuing bank for our payment-by-installment SOVEST cards and Rocketbank cards, and is the banking institution behind Tochka's banking services offering (along with our partner Otkritie Bank). In June 2015, we acquired Rapida LTD, a non-banking credit organization, from Otkritie Investment Cyprus Limited, or Otkritie. Rapida LTD was merged into Qiwi Bank in 2017.

All banks and non-banking credit organizations operating in Russia are subject to extensive regulation and supervision. Requirements imposed by regulators, including capital adequacy, liquidity reserves, prudential ratios, loss provisions and other regulatory requirements are designed to ensure the integrity of the financial markets and to protect consumers and other third parties with whom a bank deals. These regulations may limit our activities, and may increase our costs of doing business, or require us to seek additional capital in order to comply with applicable capital adequacy or liquidity requirements. Existing laws and regulations could be amended, the manner in which laws and regulations are enforced or interpreted could change and new laws or regulations could be adopted. Russian banks also have extensive reporting obligations, including, without limitation, disclosure of financial statements, various operational indicators, and affiliates and persons who exercise (direct or indirect) influence over the decisions taken by the management bodies of the bank. The CBR may at any time conduct full or selective audits of any bank's filings and may inspect all of its books and records.

Both Qiwi Bank and Rapida LTD have been the subject of CBR investigations in the past that have uncovered various violations and deficiencies in relation to, among other things, reporting requirements, anti-money laundering, cybersecurity, compliance with applicable electronic payments thresholds requirements and other issues which we believe we have generally rectified. In the course of 2018, Qiwi Bank underwent a major scheduled audit by the CBR as part of its ongoing supervisory process, which resulted in CBR identifying a number of violations and imposing certain sanctions on us. The measures that the CBR has so far imposed on us in response have not had a significant impact on our operations and have been mostly lifted. We believe that we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward. However, there can be no assurance that additional sanctions will not be imposed on us as a result of such or any other findings and that we will not come under greater CBR scrutiny in connection with any perceived deficiencies in our past conduct, or that any currently planned or future inspections will not result in discovery of any significant or minor additional violations of various banking regulations, and what sanctions the CBR would choose to employ against us if this were to happen. Any such sanctions could have a material adverse effect on our business, financial condition and results of operations.

Moreover, the scrutiny can be expected to increase in connection with our involvement in the SOVEST, Tochka and Rocketbank projects as they have extended the scope of traditional commercial and retail bank services that Qiwi Bank is providing. Additionally, some of our new projects require significant funding and therefore put certain pressure on the ability of Qiwi Bank to comply with applicable capital requirements and other prudential ratios, while through other projects we are engaged in managing substantial amounts of consumer's funds. Any breach of applicable regulations could expose us to potential liability, including fines, prohibition to carry out certain transactions for a period of up to six months (or more in the event of repeated violations), the introduction of temporary administration by the CBR and in certain instances the revocation of our banking license. Revocation of Qiwi Bank's banking license would significantly hinder our ability to process payments, and would result in a decrease of our profitability, damage our reputation and could cause other regulators to increase their scrutiny of our activities. If Qiwi Bank's banking license is revoked, we would effectively be unable to provide most of our services. For these reasons, any material breach of laws and regulations by Qiwi Bank or the revocation of its banking licenses could have a material adverse effect on our business, financial condition and results of operations.

12

Table of Contents

Recent developments in the Russian banking sector (see "–*The banking system in Russia remains underdeveloped*") have put increasing pressure on Qiwi Bank, and have also impacted, and we expect may continue to impact, our business in a number of other ways, including a decrease in consumer lending from most large and medium sized banks, resulting in less loan repayments through our network and therefore reduced fees as well as a decrease of Contact's network of partner banks through which it operates and corresponding decline in the reach of its network and thus money remittance volumes. All of these factors could materially adversely affect our business, financial condition and results of operations.

### A decline in the use of cash as a means of payment or a decline in the use of kiosks and terminals may result in a reduced demand for our services.

A substantial part of the Russian population continues to rely on cash payments, rather than credit and debit card payments or electronic banking. Our business developed as a network of kiosks and terminals allowing consumers to use physical currency for online payments, and our core competitive edge at the time was our ability to offer consumers that primarily used cash as means of payment access to online payments through our kiosks and terminals simultaneously offering merchants access to a large pool of customers that use cash. While we have since largely outgrown that model, our kiosks and terminals network remains a significant part of our infrastructure as a reload and client acquisition channel for Qiwi Wallet. We believe therefore that the usage of Qiwi Wallet and hence our volumes, revenues and the profitability of our payment services segment continues to depend to some extent on the use of cash as a means of payment and the reach of our kiosks and terminals network. Over time, the prevalence of cash payments is declining as a greater percentage of the population in emerging markets is adopting credit and debit card payments and electronic banking, and our kiosks and terminals network is decreasing. Unless we can successfully differentiate ourselves from competition in the payments and financial services market through other features and functionalities beyond providing a pathway to online payments for consumers who continue to rely on cash through our kiosks and terminals network, and the access to this consumer segment for merchants and partners, the shift from cash payments to credit and debit card payments and electronic banking could reduce our market share and payment volumes and may have a material adverse effect on our business, financial condition and results of operations.

Other factors could also contribute to a decline in the use of kiosks and terminals, including regulatory changes, increases in consumer fees imposed by the agents (see "–*If customer and merchant confidence in our business deteriorates, our business, financial condition and results of operations could be adversely affected*"), and development of alternative payment channels. Based on available data, we believe that the overall number of and the use of kiosks declined substantially in 2015 versus prior years and continues to decline slightly. The decline in 2015 was a result, among other things, of enhanced scrutiny by the CBR over the compliance by the agents with legislation that requires them to remit their proceeds to special accounts (see *"- Regulation – Regulation of Payment Services"*). Through reducing the size of our network, this has adversely affected the availability and convenience of our services to consumers, including the convenience of use of Qiwi Wallet, for which historically kiosks and terminals have been the most popular reload channel. We have since observed that these developments had the effect of making the use of our kiosks and terminals generally more expensive or less convenient for the consumers. These developments also temporarily increased the cost to us of consumers reloading their Qiwi Wallet accounts, since historically our kiosks and terminals have been the most popular reload channel (see *"– Our continued growth depends on our ability to maintain or increase our average payment net revenue yield"*). There can be no assurance that this negative impact will not continue going forward as increased regulatory pressures put more agents out of business and deter new ones from entering it. Other statutory requirements that could have a similar effect on our business if fully enforced are the amendments to the Federal Law of the Russian Federation No. 54-FZ "On the use of cash registers in cash payments and (or) settlements with the use of payment cards", dated May 22, 2003 (as amended). In particular, the law mandates that all kiosks (subject to certain exceptions) should be equipped with new or modernized cash registers. There can be no assurance that our agents are and will continue to be fully in compliance with these requirements, which could cause a further reduction of our kiosk network. Moreover, failure to comply with such enhanced control measures by us or our agents could result in the CBR imposing fines or restrictions on our activities (see "–*Qiwi Bank and other Russian banks and credit organizations operate in a highly regulated environment, and increased regulator scrutiny could have an adverse effect on our business, financial condition and results of operations*"). All of these factors could have a material adverse effect on our business, financial condition and results of operations.

### We are subject to extensive government regulation.

Our business is impacted by laws and regulations that affect our industry, the number of which has increased significantly in recent years. We are subject to a variety of regulations aimed at preventing money laundering and financing criminal activity and terrorism, financial services regulations, payment services regulations, consumer protection laws, currency control regulations, advertising laws, betting laws and privacy and data protection laws and therefore experience periodic investigations by various regulatory authorities in connection with the same, which may sometimes result in monetary or other sanctions being imposed on us. Further, these laws and regulations vary significantly from country to country. Many of these laws and regulations are constantly evolving, and are often unclear and inconsistent with other applicable laws and regulations, including across various jurisdictions, making compliance challenging and increasing our related operating costs and legal risks. If local authorities in Russia or other countries choose to enforce specific interpretations of the applicable legislation that differ from ours, we may be found to be in violation and subject to penalties or other liabilities. This could also limit our ability to provide some of our services going forward and may increase our cost of doing business.

Changes in our industry are rapid, and new products that we develop may become subject to government regulation undoing the benefits we expect to derive from such products. In some jurisdictions where we operate, there is currently little or virtually no legislation addressing electronic payments, and no assurance can be made that if such legislation is adopted it will be beneficial to our business. With respect to countries that do have an established regulatory framework for the types of services that we provide, no assurance can be given that the relevant legislation will not be amended to the detriment of our business, including due to the lobbying efforts undertaken by or on behalf of our competitors. For instance, if any restrictions including complete prohibition, ban of specific reload methods or various quantitative caps

13

Table of Contents

are imposed on the use or reloads of anonymous e-wallets, it could have a significant negative impact on our business. From time to time, such proposals are being raised by various officials. For example, pursuant to the draft amendments to the Russian anti-money laundering legislation currently considered by the State Duma, anonymous users will not be able to withdraw cash from their prepaid cards. In addition, in early 2018 it was reported that the CBR, Rosfinmonitoring and the Ministry of Finance are actively discussing new proposed legislation that would ban the use of anonymous e-wallets completely or at least prohibit the reloading of such e-wallets other than from a bank account. We could also be significantly adversely affected if legislators prohibit, or otherwise regulate to our disadvantage, the treatment of fees that we charge on inactive accounts for their continued maintenance and unclaimed payments, which represents a significant revenue stream for us. Such initiatives are currently being discussed, but have not yet been formally proposed by legislators.

In December 2018, another proposed development in the area of e-payments in Russia has been submitted for consideration to the Russian State Duma and subsequently approved in the first reading in March 2019. The proposed amendments to the Russian National Payment System Law would toughen control over the activities of foreign payment systems and foreign electronic payment services in Russia. Foreign payment services providers would essentially be prohibited from offering their services to consumers that are Russian residents and would have to localize their operations in order to continue servicing such consumers. If these amendments become law, we would have to make changes to our established practices of working with international merchants and payment aggregators, which could have a significant negative impact on our business, in particular in the e-commerce space. Additionally, these developments could cause us to lose the business of other international payment services providers for which we serve as the conduit to the Russian market to the extent they do not choose to localize their Russian operations.

Generally, Russian lawmakers and enforcement agencies have recently demonstrated increased scrutiny in matters relating to cyberspace and e-payments, as borne out in the enhanced enforcement activities in the kiosk market, the de-anonymization of e-payments and various other initiatives aimed at increasing state control over online activities.

Furthermore, recently there has been increased public attention and heightened legislation and regulations regarding money laundering and terrorist financing. We sometimes have to make significant judgment calls in applying anti-money laundering legislation and risk being found in non-compliance with it, particularly in relation to its mandatory client identification requirements, if, for example, we process payments made by our consumers from their Qiwi Wallet accounts for amounts in excess of the thresholds imposed by anti-money laundering legislation or for certain types of merchants without the required client identification. Although we use all methods available for client identification in all our projects and believe our practices in this regard are in compliance with legal requirements and in line with market practice (see "—*Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes*"), the Russian regulators may view us as being non-compliant and impose fines and other sanctions on us. There can also be no assurance that the mandatory client identification requirements under the anti-money laundering legislation will not change further in a manner adverse to our business, for example, through making the identification process more burdensome or through lowering the thresholds for transactions which non-identified customers or customers that only underwent the simplified identification process can perform (see "Regulation"), which could result in lower payment volumes for us. For instance, there have already been proposals from certain government officials to ban payments by unidentified consumers altogether. On December 31, 2017, a new law came into force prescribing that the CBR may limit the number of bank accounts opened in aggregate in any number of banks to a client that has only been identified remotely, the amount of credit that may be provided to such customer, or the number of transactions such customer may perform within a month. Any further adverse change to these requirements could have a substantial negative effect on our business.

Risks associated with applying anti-money laundering legislation may be further exacerbated for us in connection with our new projects, particularly Tochka, that is focused on servicing small and medium sized business entities. Tochka is providing services to legal entities, which execute a significant number of transactions that are under scrutinized control of the regulatory authorities. Thus, the complexity of transactions and clients that we serve and consequently the number of suspicious transactions has materially increased exposing us to extensive ongoing control of the regulator. See also "–*Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes*."

Certain sanctions relating to the ongoing hostility between Russian and Ukraine, and Russian countersanctions instituted in response, directly target payment services providers such as ourselves. In November 2016, the National Bank of Ukraine banned several Russian payment services providers from the Ukrainian market. In response, in April 2017, a law was enacted in Russia prohibiting certain types of money remittance from Russia to countries that have introduced sanctions against Russian payment systems (which, to our knowledge, so far only include Ukraine). Moreover, in May 2018, Qiwi Bank, one of our key subsidiaries, was added to the list of sanctioned entities by the Ukrainian government. While we have not experienced any substantial operational difficulties in connection with this so far, there can be no assurance as to what effect the imposition of sanctions on us by Ukraine might have in the future, or what further adverse actions the government of Ukraine might take against us. Any determination by a relevant regulator that we have not complied with the spirit or text of any such sanctions or regulations, or even any statements to that effect, may have a material adverse effect on our business, financial condition and results of operations, as well as the price of our ADSs. While Ukraine remains the only country so far to introduce sanctions of this type, there can be no assurance that additional sanctions affecting the payments business will not be imposed by regulators in other countries in which we operate.

Tax legislation regarding electronic payments and other online services keeps evolving. In July 2016, a bill was signed into law in Russia making online services subject to VAT at the location of the customer, which would require any foreign companies selling certain online services in Russia to register as taxpayers in Russia and pay VAT on Russian sales (see—"*VAT on digital services in Russia*"). The new law also requires companies providing settlement services on behalf of the foreign merchants to act as tax agents and withdraw and remit to the tax authorities the applicable VAT. If we are found to have any obligations under this law or not be in compliance with such obligations or if the authorities choose to enforce specific interpretations of the applicable legislation that differ from ours, we could face significant adverse tax consequences. We could also experience a reduction in volumes from our foreign merchants as they cease or downsize their sales to Russia in the light of the new regulation.

14

Table of Contents

The regulatory framework around electronic payments and other financial services that we offer is in a state of development in most of the countries in which we operate. For example, on January 1, 2017, the Regulatory Framework for Stored Values and Electronic Payment Systems came into force in the United Arab Emirates. It introduced a mandatory licensing and related compliance regime for certain electronic payment service providers and established a one-year transitional period for existing digital payment services providers to take appropriate measures to comply with the new rules. In case of failure to do so payment services provider may be mandated to cease provision of such services. Moreover, any individual or entity providing (or representing themselves as capable of providing) digital payment services without the appropriate license or authorization will be subject to administrative penalties. Implementing legislation and clarifications still remain to be adopted, and we are still assessing the applicability and potential impact of the new legislation on our business. If our position on our status under the Regulatory Framework is different from that of the UAE regulator or if we are unable to comply with the mandatory licensing if it is deemed applicable to us, it could have a material adverse effect on our business, financial condition and results of operations. Effective January 1, 2018, the United Arab Emirates introduced a value added tax at a rate of 5% for certain types of services (while other types of services are subject to a zero tax rate or benefit from exemptions). Although currently we do not expect to be affected materially by this new law, there can be no assurance that we will not be materially affected by it in the future. Any material changes in the applicable legislation, its interpretation by the relevant authorities or their enforcement practice could increase our tax burden substantially and thus reduce our margins.

Further, since the end of 2014 our subsidiary in Kazakhstan is subject to local financial monitoring legislation that imposes certain client identification requirements on us. In connection with this legislation, we had to restructure our operations in Kazakhstan to make our Kazakh subsidiary the operator of our payment system in the country in 2015. As the anti-money laundering legislation in Kazakhstan is still relatively nascent and undeveloped, we may face various difficulties when implementing such legislation. If we are not able to comply with the applicable legislation for any reason, we could become subject to regulatory action in Kazakhstan and could face fines or significant restrictions on our operations in the country. Moreover, the Law of the Republic of Kazakhstan No. 11-VI "On Payments and Payment Systems", dated July 26, 2016, that came into force in September 2016 introduced a more comprehensive regulatory regime for the payments market in general and brought the Kazakh legislation more in line with the international standards. Since the position of the local regulator in relation to the enforcement of this legislation is not yet clear and established, we may be found in violation of applicable laws and regulations and be subject to penalties or other liabilities.

Due to the international nature of our business we are exposed to changes in legislation throughout the world. As an example, we may be impacted by the March 2019 resolution by the Council of the European Union to include the United Arab Emirates into its list of non-cooperative tax jurisdictions, since one of subsidiaries is set up in the UAE. We are still assessing the potential effect that this development may have on our operations.

Subsequent legislation and regulation and interpretations thereof, litigation, court rulings, or other events could expose us to increased costs, liability and reputational damage that could have a material adverse effect on our business, financial condition and results of operations.

### *We derive a substantial portion of our revenues from merchants in the betting industry.*

We provide payment processing services to a number of merchants in the betting industry. Processing payments to such merchants constituted approximately 6.9%, 9.5% and 15.5% of our payment services segment payment volume for the years ended December 31, 2016, 2017 and 2018 respectively. These volumes are included in our E-commerce market vertical. Processing payments for this category of merchants generally carries higher margins then processing payments to merchants in most other market verticals that we serve and corresponds to a significant part of our revenues. We also provide winning repayment services to such merchants including processing of winnings to banking cards that is included in our Money Remittances market vertical and repayment of winnings to QIWI Wallets that is not included in our payment volume. Moreover, the repayment of winnings by such merchants to the customers' QIWI Wallets serves as an important and economically beneficial reload channel and new customer acquisition tool, contributing to the sustainability and attractiveness of our ecosystem. Our operating results will continue to depend on merchants in the betting industry and their use of our services for the foreseeable future. The betting industry is subject to extensive and actively developing regulation in Russia, as well as increasing government scrutiny. Under amendments to the Russian betting laws introduced in 2014 (see "Regulation"), in order to engage in the betting industry, a bookmaker has to become a member of a self-regulated organization of bookmakers and abide by its rules, and any and all interactive bets may be only accepted through an Interactive Bets Accounting Center (TSUPIS) set up by a credit organization together with a self-regulated association of bookmakers. In 2016 QIWI Bank established a TSUPIS together with one of the self-regulated associations of bookmakers in order to be able to accept such payments. If any of our merchants engaged in the betting industry is not able or willing to comply with the Russian betting legislation or if they decide to cease their operations in Russia for regulatory reasons or otherwise or shift to another payment processor (TSUPIS), we would have to discontinue servicing them and would lose associated volumes and income. Moreover, if we are found to be in non-compliance with any of the requirements of the applicable legislation, we could not only become subject to fines and other sanctions, but could also have to discontinue to process transactions that are deemed to be in breach of the applicable rules and as a result lose associated revenue streams. Effective January 1, 2018, relevant legislation has been supplemented with the concept of government blacklisting of betting merchants that have been found to be in violation or allegedly are not in compliance with applicable Russian laws, and the requirement for credit institutions to block any payments to such blacklisted merchants. We have already experienced a number of instances where certain providers have been blacklisted and we observe that this trend is gaining momentum and further blacklistings are likely. Any of these developments may result in the contraction of the betting sector or our share in this market and therefore adversely affect the revenues, margins and payment net revenue yield of our E-commerce market vertical and overall Payment Services segment as well as decrease the attractiveness of our ecosystem to some of our consumers and consequently overall negatively affect consumer engagement with our services. Furthermore, if any of our merchants engaged in the betting industry are blacklisted, our subsidiaries, which process the payments for betting merchants may be found to be in violation of the relevant laws, whether due to misinterpretation of applicable requirements, failure to take timely action, or for any other reason, and could become so blacklisted as well, which could substantially hinder our operations.

15

Table of Contents

We may also be subject to reputational risks associated with being involved in the betting business through offering our payments services to betting merchants. For example, in July 2016, we were served with notices from Roskomnadzor, the Russian state agency responsible, among other things, for overseeing the media and Internet, stating that we had breached Russian laws on public distribution of information about gambling, since our website contained links to services offered by certain betting operators which were allegedly not in compliance with the Russian betting legislation. We have complied with the prescriptions contained in the notices. However, there can be no assurance that further violations will not occur in the future as we service a wide variety of merchants and depend on their compliance with relevant laws in this regard. If we are found to be in breach, Roskomnadzor or other agencies could take further action against us, including by blocking our website or imposing fines or other sanctions. Furthermore, we could face similar difficulties in other jurisdictions since online betting is an area of intense focus by regulators in many of the countries in which we operate. If we have to terminate our relationships with any of our major merchants in the betting industry, whether for regulatory or reputational reasons or otherwise, and are unable to replace this business, if our current terms of doing business with any of these merchants becomes significantly less favorable, or if we face adverse regulatory consequences associated with servicing such merchants, our business, financial condition and results of operations may be materially adversely affected.

***We may not be able to complete or integrate successfully any potential future acquisitions, partnerships or joint ventures.***

From time to time, we have evaluated and expect to continue to evaluate possible acquisition transactions, partnerships or joint ventures on an on-going basis, some of which may be material. At any time, including currently, we may be engaged in discussions or negotiations or diligence evaluations with respect to possible acquisitions, partnerships or joint ventures or may have entered into non-binding documents in relation to such transactions. As part of our strategy, we intend to continue our disciplined approach to identifying, executing and integrating strategic acquisitions, partnerships and joint ventures.

Potential future acquisitions, partnerships and joint ventures may pose significant risks to our existing operations if we acquire businesses that prove not to be a good fit for our organization, fail to perform the necessary due diligence on the relevant targets, overestimate their anticipated contribution to our business, overvalue them or fail to successfully integrate them. These projects would place additional demands on our managerial, operational, financial and other resources, create operational complexity requiring additional personnel and other resources as well as enhanced control procedures. In addition, we may not be able to successfully finance or integrate any businesses, services or technologies that we acquire or with which we form a partnership or joint venture. Furthermore, the integration of any acquisition may divert management's time and resources from our main business and disrupt our operations. Moreover, even if we were successful in integrating newly acquired assets, expected synergies or cost savings may not materialize, resulting in lower than expected benefits to us from such transactions. We may spend time and money on projects that fail to perform in line with our expectations or require financing in excess of what we were budgeting at the time of the acquisition. Additionally, when making acquisitions it may not be possible for us to conduct a detailed investigation of the nature of the assets being acquired due to, for instance, time constraints in making the decision and other factors. We may become responsible for additional liabilities or obligations not foreseen at the time of an acquisition. In addition, in connection with any acquisitions, we must comply with various antitrust requirements. It is possible that perceived or actual violations of these requirements could give rise to regulatory enforcement action or result in us not receiving all necessary approvals in order to complete a desired acquisition. To the extent we pay the purchase price of any acquisition in cash, it would reduce our cash reserves, and to the extent the purchase price is paid with our stock, it could be dilutive to our stockholders. To the extent we pay the purchase price with proceeds from the incurrence of debt, it would increase our level of indebtedness and could negatively affect our liquidity and restrict our operations. Our competitors may be willing or able to pay more than us for acquisitions, which may cause us to lose certain acquisitions that we would otherwise desire to complete. We may also face counterparty and credit risks in connection with acquisitions, partnerships and joint ventures in the event our counterparties fail to perform their obligations.

Some of these risks have materialized or may materialize in connection with our August 2017 acquisition of Tochka and Rocketbank assets from Otkritie Bank, one of the largest shareholders of our company. The acquisition of Tochka and Rocketbank assets was a complex deal involving a series of transactions to acquire the brands, software and hardware of both businesses, as well as a number of operational agreements with Otkritie Bank. We subsequently reached an agreement with Otkritie Bank and the founders of Tochka to operate Tochka together through a jointly-owned company that we account for as an equity associate on the basis of a multi-bank model where customers can choose the servicing bank from among our own Qiwi Bank and Otkritie Bank. Although JSC Tochka started to operate Tochka multi-banking platform from February 1, 2019, certain aspects of this arrangement still remain to be finalized as of the date of this annual report. Furthermore, under the terms of the relevant documentation, all key shareholder decisions with respect to Tochka are to be made by a unanimous vote of the JV partners, and Otkritie has the right to buy out our share in Tochka together with the share of the founders of Tochka or separately in the event of a deadlock, while neither we nor the founders of Tochka enjoy a similar right. This potentially exposes us to various risks relating to conflicts with Otkritie or the founders of Tochka as our JV counterparties in JSC Tochka. In the event Otkritie changes its strategy with respect to Tochka, pursues a different development strategy, or experiences financial or other difficulties or if our or Otkrities' relations with the founders or management of JSC Tochka deteriorates or in case of the inability of founders and management to run the business for any reasons outside of our control, this could have a material adverse effect on the operations of Tochka and consequently the ultimate success or failure of this transaction from our perspective. Certain aspects of the Rocketbank acquisition also remain to be finalized as of the date of this annual report, since some of Rocketbank's business processes still by necessity run through Otkritie Bank, and as such we have to rely on Otkritie Bank to some extent to operate Rocketbank's business. All of the above has resulted and may result in the future in us not being able to realize the full anticipated benefit of these acquisitions so far.

16

Table of Contents

All of the above risks could have a material adverse effect on our business, results of operations, financial condition, and prospects.

***We have grown rapidly in recent years and need to implement enhanced compliance processes, procedures and controls with respect to the rules and regulations that apply to our business.***

Our business has grown and developed rapidly in recent years and we are continuing to realign our compliance function with the size and scope of our business. In light of the fact that we are a highly regulated business that processes large volumes of payments, we need to have enhanced processes, procedures and controls in order to provide reasonable assurance that we are operating in compliance with applicable regulatory requirements. Given that we store and/or transmit sensitive data of our customers, we have ultimate liability to our customers for our failure to protect this data. As discussed in more detail below, we have experienced breaches of our cybersecurity in the past, and future breaches resulting in unauthorized disclosure of data are possible (see - *"Our services have been and may continue to be used for fraudulent, illegal or improper purposes, which could expose us to additional liability and harm our business.").* In addition, the Russian anti-money laundering laws to which we are subject contain numerous requirements with respect to identification of clients, and documentation and reporting of transactions subject to mandatory control and other suspicious transactions to the relevant authorities.

Following our acquisition of Rapida LTD in 2015, we have had to devote additional resources to enhance the compliance function within Rapida LTD, which, at the time of our acquisition, was deficient in several areas. As of the date of this annual report, we continue to develop and integrate certain control procedures with respect to our new projects SOVEST, Tochka and Rocketbank in order to maintain a comprehensive system of controls and procedures across our business. There can be no assurance, however, that the measures we undertake will be sufficient to prevent significant deficiencies in the compliance procedures and internal controls of our new projects. Moreover, we develop Tochka as an associate together with Otkritie Bank (see - *"We may not be able to complete or integrate successfully any potential future acquisitions, partnerships or joint ventures.")* and do not have the full control over operations and processes of JSC Tochka, which has an operational independence under respective agreements. Thus there can be no assurance that we will be able to implement and successfully execute all necessary control procedures in JCS Tochka. Our failure to implement and maintain effective internal control over financial reporting could result in errors in our financial statements that could lead to a restatement of our financial statements, cause us to fail to meet our reporting obligations and cause investors to lose confidence in our reported financial information, which may result in a decline in the market price of our ADSs.

Among others, we are subject to the U.S. Foreign Corrupt Practices Act, or the FCPA, which prohibits U.S. companies and their intermediaries from bribing foreign officials for the purpose of obtaining or keeping business or otherwise obtaining favorable treatment, and other laws concerning our international operations. Similar legislation in other jurisdictions contains similar prohibitions, although varying in both scope and jurisdiction. We have implemented policies and procedures and internal controls designed to provide reasonable assurance that we, our employees, distributors and other intermediaries comply with the anti-corruption laws to which we are subject. However, there are inherent limitations to the effectiveness of any policies, procedures and internal controls, including the possibility of human error and the circumvention or overriding of the policies, procedures and internal controls. There can be no assurance that such policies or procedures or internal controls will work effectively at all times or protect us against liability under these or other laws for actions taken by our employees, distributors and other intermediaries with respect to our business or any businesses that we may acquire.

Our success requires significant public confidence in our ability to handle large and growing payment volumes and amounts of customer funds, as well as comply with applicable regulatory requirements. Any failure to manage consumer funds or to comply with applicable regulatory requirements could result in the imposition of fines, harm our reputation and significantly diminish use of our products. In addition, if we are not in compliance with anti-corruption laws and other laws governing the conduct of business with government entities and/or officials (including local laws), we may be subject to criminal and civil penalties and other remedial measures, which could have an adverse impact on our business, financial condition, results of operations and prospects.

***Our success depends to a large degree on our ability to successfully address the rapidly evolving market for transactions on mobile devices.***

Mobile devices are increasingly used for e-commerce and money remittance transactions. A significant and growing portion of our customers access our payment services through mobile devices. We may lose customers if we are not able to continue to meet our customers' mobile and multi-screen experience expectations. The variety of technical and other configurations across different mobile devices and platforms increases the challenges associated with this environment. In addition, a number of other companies with significant resources and a number of innovative startups have introduced products and services focusing on mobile markets. Our ability to successfully address the challenges posed by the rapidly evolving market for mobile transactions is crucial to our continued success, and any failure to continuously increase the volume of mobile transactions effected through our platform could have a material adverse effect on our business, financial condition and results of operations.

***Our systems and our third party providers' systems may fail due to factors beyond our control, which could interrupt our service, cause us to lose business and increase our costs.***

We depend on the efficient and uninterrupted operation of numerous systems, including our computer systems, software and telecommunications networks, as well as the data centers that we lease from third parties. Our systems and operations, or those of our third party providers, could be exposed to damage or interruption from, among other things, fire, flood, natural disaster, power loss, telecommunications failure, vendor failure, unauthorized entry, improper operation and computer viruses. In addition, because all three of our data centers used for processing payments are located in the city of Moscow, a catastrophic event affecting the city of Moscow may result in

17

Table of Contents

the loss of both data centers. Substantial property and equipment loss, and disruption in operations as well as any defects in our systems or those of third parties or other difficulties could expose us to liability and materially adversely impact our business, financial condition and results of operations in all of our operating segments. In addition, any outage or disruptive efforts could adversely impact our reputation, brand and future prospects.

***Unauthorized disclosure of data, whether through cybersecurity breaches, computer viruses or otherwise, could expose us to direct loss, liability, protracted and costly litigation and damage our reputation.***

We store and/or transmit sensitive data, such as credit or debit card numbers, mobile phone numbers and other identification data, and we have ultimate liability to our customers for our failure to protect this data. We have experienced breaches of our security by hackers in the past, and breaches could occur in the future. In such circumstances, our encryption of data and other protective measures have not prevented unauthorized access and may not be sufficient to prevent future unauthorized access. For example, in January 2014 we discovered certain unauthorized activity in a number of wallet accounts. Although we do not believe that any confidential customer account data was compromised as a result of the activity, we incurred a loss of RUB 88 million. Rapida LTD (prior to its merger with and into QIWI Bank) also experienced several security breaches prior to our acquisition of the company. Any future breach of our system, including through employee fraud, may subject us to material losses or liability, including fines and claims for unauthorized purchases with misappropriated credit or debit card information, identity theft, impersonation or other similar fraud claims. A misuse of such data or a cybersecurity breach could harm our reputation and deter clients from using electronic payments as well as kiosks and terminals generally and any of our services specifically, increase our operating expenses in order to correct the breaches or failures, expose us to uninsured liability, increase our risk of regulatory scrutiny, subject us to lawsuits, result in the imposition of material penalties and fines by state authorities and otherwise materially adversely affect our business, financial condition and results of operations.

***If we fail to comply with the applicable requirements of our agreements with major payment systems, they could seek to fine us, suspend us or terminate our registrations.***

Under our agreements with major payment systems, including Visa, MasterCard and MIR, both existing and any such agreements we might enter into in the future, we are and will be required to comply with the terms of the relevant agreement and the generally applicable terms and conditions of the respective payment system based on the applicable laws of Russian Federation. If we do not comply with the terms of the agreements or the rules of the relevant payment system, the relevant payment system could seek to fine us, suspend us or terminate the registrations that allow us to process transactions on its network. If we are in breach of the agreements or the relevant payment system otherwise terminates its agreements with us or terminates or suspends our participation, we may be unable to issue cards under its brand or process transactions made with the use of such cards, which could have a material adverse effect on our business. Any of these factors could have a material adverse effect on our reputation, as well as on our business, financial condition and results of operations.

***Customer complaints, actual or perceived failures of our customer service function or negative publicity about our customer service could materially adversely affect the attractiveness of our services.***

Customer complaints, actual or perceived failures of our customer service function or negative publicity about our customer service could diminish consumer confidence in, and the attractiveness of, our services. Breaches of our consumers' privacy and our security systems could have the same effect. We sometimes take measures to combat risks of fraud and breaches of privacy and security, such as freezing consumer funds or rejecting in opening an account, which could damage relations with our consumers. These measures heighten the need for prompt and attentive customer service to resolve irregularities and disputes. In addition, we have previously received negative media coverage regarding customer disputes. Moreover, some of our products compete to a large extent on the basis of enhanced customer service and attention to customers, and are vulnerable to any customer complaints or actual or perceived decline in service levels. Any failure on our part to continue to provide customers with the level of service they have come to expect could harm our reputation significantly. Effective customer service requires significant personnel expense, and this expense, if not managed properly, could impact our profitability significantly. Any inability by us to manage or train our customer service representatives properly could compromise our ability to handle customer complaints effectively. If we fail to provide customer service at the level our clients expect from us or do not handle customer complaints effectively, our reputation may suffer and we may lose our customers' confidence, which could have a material adverse effect on our business, financial condition and results of operations.

***Our agreements with most of our counterparties, including our agents, merchants and other partners, do not include exclusivity clauses and may be terminated unilaterally at any time or at short notice.***

We normally do not include exclusivity clauses in our agreements with our counterparties, including our agents, merchants (apart from a small number of SOVEST partner merchants), other partners and partner banks that participate in our multi-bank platforms. Accordingly, our counterparties usually do not have any restrictions on dealings with other providers and can switch from our payment processing system to another or disconnect from our system or platform without significant investment. Additionally, due to mandatory provisions of Russian civil law, our agreements with agents may be unilaterally terminated by the agents at any time, and our agreements with merchants and other counterparties may be unilaterally terminated at a short prior notice. The termination of our contracts with existing agents, merchants or other partners, or a significant decline in the amount of business we do with them as a result of our contracts not having exclusivity clauses could have a material adverse effect on our business, financial condition and results of operations.

18

Table of Contents

*Our services have been and may continue to be used for fraudulent, illegal or improper purposes, which could expose us to additional liability and harm our business.*

Despite measures we have taken and continue to take, our services have been and may continue to be used for fraudulent, illegal or improper purposes. These include use of our payment and other financial services in connection with fraudulent sales of goods or services, illicit sales of prescription medications or controlled substances, illegal online gambling, software and other intellectual property piracy, money laundering, bank fraud, terrorist financing, trafficking, and prohibited sales of restricted products.

Criminals are using increasingly sophisticated methods to engage in illegal activities. It is possible that fraudulent, illegal or improper use of our services could increase in the future. Our risk management policies and procedures may not be fully effective to identify, monitor and manage these risks. We are not able to monitor in each case the sources for our counterparties' funds or the ways in which they use them. Increases in chargebacks or other liability could have a material adverse effect on our business, financial condition and results of operations. An increase in fraudulent transactions or publicity regarding chargeback disputes could harm our reputation and reduce consumer confidence in the use of our products and services. In addition, changes in law have increased the penalties for intermediaries providing payment services for certain illegal activities and additional payments-related proposals are under active consideration by government authorities. Moreover, the perceived risk of the use of e-payments or other financial services to finance fraudulent, illegal or improper activities is causing the regulators to impose restrictions on the operations of the providers of such services including payment systems that negatively affect regular compliant transactions and operations as well. See "– *Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes*" and "– *If we cannot keep pace with rapid developments and change in our industry and provide new services to our clients, or if any of the new products we roll out are unsuccessful, the use of our services could decline, and we could experience a decline in revenue and an inability to recoup costs*".

Any resulting claims could damage our reputation and any resulting liabilities (including the revocation of applicable banking licenses or significant fines), the loss of transaction volume, decline in the number of customers or increased costs could have a material adverse effect on our business, financial condition and results of operations.

*Our business is exposed to counterparty and credit risks.*

In our Payment Services segment, we seek to sell services on a prepayment basis or to ensure that our counterparties have low credit risk profiles, such as large merchants and agents. Nevertheless, we are exposed to the risk of non-payment or other default under our contracts with our agents and merchants. If we provide trade credit or loans to an agent and we are unable to collect loans or proceeds paid to the agent by its consumers due to the agent's insolvency, fraud or otherwise, we must nonetheless complete the payment to the merchant on behalf of the consumer. As a result, our losses would not be limited to a loss of revenue in the form of fees due to us from the agent, but could amount to the entire amount of consumer payments accepted by such agent for a certain period of time.

We also have significant receivables due from some of our merchants and agents, and may not recover these receivables in the event of such merchants' bankruptcy or otherwise. As of December 31, 2018, we had credit exposure to our agents of RUB 3,937 million and to our merchants of RUB 3,657 million. Our receivables from merchants are generally unsecured and non-interest bearing, our receivables and loans from agents are generally interest-bearing and unsecured. Although we monitor the creditworthiness of our counterparties on an ongoing basis, there can be no assurance that the models and approaches we use to assess and monitor their creditworthiness will be sufficiently predictive, and we may be unable to detect and take steps to timely mitigate an increased credit risk.

In our Consumer Financial Services segment, which is represented by our SOVEST installment card project, we are subject to risks related to the credit quality of loans to the customers who have outstanding credit on their SOVEST cards, in addition to the risks of credit exposure to the merchants who may owe us commission payments for short periods. As of December 31, 2018, we had credit exposure to the clients of the SOVEST project of RUB 5,274 million. Changes in the creditworthiness of our customers, or in their behavior, or arising from macroeconomic risks in the Russian or global financial systems, could result in losses for us and in us having to make provisions for impairment of related loans and receivables. In recent years, Russia has experienced an increase in non-performing retail loans, and many of the banks that have been particularly active in this sector have faced difficulties (see "–*We are subject to the economic risk and business cycles of our merchants and agents and the overall level of consumer spending*" and "–*The banking system in Russia remains underdeveloped)*." While we have credit policies in place to manage this risk, the models, techniques and checks used by us to evaluate the creditworthiness of applicants for the SOVEST cards may not always present a complete and accurate picture of each consumer's financial condition or be able to accurately evaluate the impact of various changes, including changes in the Russian macroeconomic situation, which could significantly and quickly alter a consumer's financial condition. We have little experience addressing such risks, as we have not been active in the consumer lending market before the launch of the SOVEST project. We manage such risk by utilizing different predictive models based on consumer transaction behavior and restricting the card limits available to such individuals; however, due to our lack of relevant experience, our projections may prove incorrect. Additionally, we cannot always accurately ascertain what the current indebtedness of any particular current or potential customer may be as the credit bureau databases in Russia are still in a developmental stage. Additionally, we have no way of preventing our customers from taking additional loans from other financial institutions or otherwise taking steps that heighten the risk that a customer may default on their SOVEST installment payments. As a result, we may not always be able to correctly evaluate the current financial condition of each prospective customer and accurately determine the ability of our customers to pay us back the funds they have used. In addition, we do not take any security for payments outstanding under the SOVEST cards. In the event of defaults by a significant number of our consumers, we may be unable to recover all or a significant proportion of the balance of such outstanding amounts. As we are seeking to develop SOVEST as a multi-bank platform to share the credit risk, we may not be able to structure the economics in a manner that ensures adequate returns for us and the partner banks, and could either suffer diminished returns or lose our banking partners.

19

Table of Contents

In addition to the above sources of credit risk, as of December 31, 2018, we had credit exposure to our counterparties in connection with our Qiwi Factoring business of RUB 1,559 million and in connection with financial and performance guarantees we provide to non-related parties, mostly our merchants (predominantly in betting space), in the amount of RUB 1,260 million.

If we experience material defaults by our consumers, agents and/or merchants, our business, financial condition and results of operations could be materially adversely affected.

### *We are subject to fluctuations in currency exchange rates.*

We are exposed to currency risks. Our financial statements are expressed in Russian rubles, while our revenues and expenses outside Russia are in local currencies and some of our assets and liabilities are in foreign currencies (see "— *Quantitative and Qualitative Disclosures About Market Risk – Foreign Exchange Risk*"). Accordingly, our results of operations and assets and liabilities are exposed to fluctuations in exchange rates between the ruble and such other currencies. Changes in currency exchange rates also affect the carrying value of assets on our consolidated statement of financial position, which, depending on the statement of financial position classification of the relevant asset, can result in losses on our consolidated statement of financial position. In addition, because our earnings are primarily denominated in Russian rubles whereas our ADSs are quoted in U.S. dollar, currency exchange rate fluctuations between the Russian ruble and the U.S. dollar significantly affect the price of our ADSs.

Over the past ten years, the Russian ruble has fluctuated dramatically against the U.S. dollar and the euro. Due to the economic sanctions imposed on certain Russian companies and individuals by the US, EU, Canada and other countries, as well as the volatility in oil prices, high inflation and a sharp capital outflow from Russia, the Russian ruble has significantly depreciated against the U.S. dollar and euro since the beginning of 2014 (see "–*Economic instability in Russia could have an adverse effect on our business*"). According to the CBR, from December 31, 2014 to December 31, 2015 and from December 31, 2013 to December 31, 2014, the ruble has depreciated by 30% and 72% against the U.S. dollar, respectively, and by 17% and 52% against the euro, respectively. From December 31, 2015 to December 31, 2016, the ruble appreciated somewhat against these currencies and remained relatively stable throughout 2017; however, depreciation of the Ruble resumed in 2018 when its value fell 21% against the U.S. dollar and 15% against the euro, in each case from December 31, 2017 to December 31, 2018. It is likely that significant fluctuations will continue in the future. Further fluctuations of the ruble could have a material adverse effect on our business, financial condition, results of operations and the price of our ADSs.

### *Regulatory authorities in Russia and Kazakhstan could determine that we hold a dominant position in our markets, and could impose limitations on our operational flexibility, which may adversely affect our business, financial condition and results of operations.*

The Russian anti-monopoly authorities impose various requirements on companies that occupy a dominant position in their markets. One of the important questions is to identify and define the relevant market, in which the entity in question operates. There are numerous aspects to be taken into account, including interchangeability or substitutability of the products and/or services for the consumer, their pricing and intended use. Different approaches may be applied in this respect by anti-monopoly authorities and the participants of the market. Thus, the state authorities may conclude that we hold a dominant position in one or more of the markets in which we operate. If they were to do so, this could result in limitations on our future acquisitions and a requirement that we pre-clear with the authorities any changes to our standard agreements with merchants and agents, as well as any specially negotiated agreements with business partners. In addition, if we were to decline to conclude a contract with a third party this could, in certain circumstances, be regarded as abuse of a dominant market position. Any abuse of a dominant market position could lead to administrative penalties and the imposition of a fine of up to 15% of our annual revenue for the previous year. These limitations if imposed may reduce our operational and commercial flexibility and responsiveness, which may adversely affect our business, financial condition and results of operations.

### *We may not be able to successfully protect our intellectual property and may be subject to infringement claims.*

We rely on a combination of contractual rights, copyright, trademark and trade secret laws to establish and protect our proprietary technology. We also maintain patents for certain of our technologies. We customarily require our employees and independent contractors to execute confidentiality agreements or otherwise to agree to keep our proprietary information confidential when their relationship with us begins. Typically, our employment contracts also include clauses requiring our employees to assign to us all of the inventions and intellectual property rights they develop in the course of their employment and to agree not to disclose our confidential information. Nevertheless, others, including our competitors, may independently develop similar technology, duplicate our services or design around our intellectual property. Further, contractual arrangements may not prevent unauthorized disclosure of our confidential information or ensure an adequate remedy in the event of any unauthorized disclosure of our confidential information. Because of the limited protection and enforcement of intellectual property rights in certain jurisdictions in which we operate, such as Russia and CIS countries, our intellectual property rights may not be as protected as they may be in more developed markets such as the United States. We may have to litigate to enforce or determine the scope or enforceability of our intellectual property rights (including trade secrets and know-how), which could be expensive, could cause a diversion of resources and may not prove successful. The loss of intellectual property protection could harm our business and ability to compete and could result in costly redesign efforts, discontinuance of certain service offerings or other competitive harm. Additionally, we do not hold any patents for our business model or our business processes, in part because our ability to obtain them in Russia is subject to legislative constraints, and we do not currently intend to obtain any such patents in Russia or elsewhere.

We may also be subject to costly litigation in the event our services or technology are claimed to infringe, misappropriate or otherwise violate a third party's intellectual property or proprietary rights. Such claims could include patent infringement, copyright infringement, trademark infringement, trade secret misappropriation or breach of licenses. In addition, while we seek to obtain copyright

20

Table of Contents

registration certificates for the critical software we develop, our rights to software obtained as works for hire might be potentially challenged by the employees and former employees or developers of such software. We may not be able to successfully defend against such claims, which may result in a limitation on our ability to use the intellectual property subject to these claims and also might require us to redesign affected services, enter into costly settlement or license agreements, pay costly damage awards, or face a temporary or permanent injunction prohibiting us from marketing or selling certain of our services. In such circumstances, if we cannot or do not license the infringed technology on reasonable terms or substitute similar technology from another source, our revenue and earnings could be adversely impacted. Additionally, non-practicing entities had and may continue in the future to acquire patents, make claims of patent infringement and attempt to extract settlements from companies in our industry. Even if we believe that such claims are without merit and successfully defend these claims, defending against such claims is time consuming and expensive and could result in the diversion of the time and attention of our management and employees.

### We may use open source software in a manner that could be harmful to our business.

We use open source software in connection with our technology and services. The original developers of the open source code provide no warranties on such code. Moreover, some open source software licenses require users who distribute open source software as part of their software to publicly disclose all or part of the source code to such software and/or make available any derivative works of the open source code on unfavorable terms or at no cost. The use of such open source code may ultimately require us to replace certain code used in our products, pay a royalty to use some open source code or discontinue certain products. Any of the above requirements could be harmful to our business, financial condition and operations.

### We do not have and may be unable to obtain sufficient insurance to protect ourselves from business risks.

The insurance industry in Russia is not yet fully developed, and many forms of insurance protection common in more developed countries are not yet fully available or are not available on comparable or commercially acceptable terms. Accordingly, while we hold certain mandatory types of insurance policies in Russia, we do not currently maintain insurance coverage for business interruption, property damage or loss of key management personnel as we have been unable to obtain these on commercially acceptable terms. We do not hold insurance policies to cover for any losses resulting from counterparty and credit risks or fraudulent transactions. We also do not generally maintain separate funds or otherwise set aside reserves for most types of business-related risks. Accordingly, our lack of insurance coverage or reserves with respect to business-related risks may expose us to substantial losses, which could materially adversely affect our business, financial condition and results of operations.

### In a dynamic industry like ours, the ability to attract, recruit, retain and develop qualified personnel is critical to our success and growth.

Our business functions at the intersection of rapidly changing technological, social, economic and regulatory developments that require a wide ranging set of expertise and intellectual capital. In order for us to compete and grow successfully, we must attract, recruit, retain and develop the necessary personnel who can provide the needed expertise across the entire spectrum of our intellectual capital needs. This is particularly true with respect to qualified and experienced software engineers and IT staff, who are highly sought after and are not in sufficient supply in Russia and in most other markets in which we operate. The market for such personnel is highly competitive, and we may not succeed in recruiting additional personnel or may fail to replace effectively current personnel who depart with qualified or effective successors. Our efforts to retain and develop personnel may result in significant additional expenses, which could adversely affect our profitability. We currently do not have a market standard long-term incentive plan due to the failure by our shareholders to approve the disapplication of pre-emptive rights (see "– *Our ADS holders may not be able to exercise their pre-emptive rights in relation to future issuances of class B shares*"), which restricts our ability to attract top talent who have come to expect share-based compensation in an industry like ours. Since in Cyprus, where our Company is registered, there is no statutory carve-out from pre-emptive rights for issuances of shares to employees like in some other jurisdictions, any such disapplication has to be specifically approved by shareholders and renewed periodically. Such failure to approve disapplication of pre-emptive rights has rendered us unable to issue shares to our employees under our employee incentive plans, and has caused us to incur additional expenses due to the fact that we have to make cash payouts to employees in lieu of issuing shares under an employee incentive plan. These developments could undermine our ability to retain and attract competitive talent because we are not able to adequately align employee interests with the long-term interests of our shareholders. For these and other reasons, we cannot assure you that we will be able to attract and retain qualified personnel in the future. Failure to retain or attract key personnel could have a material adverse effect on our business, financial condition and results of operations.

### Our operations may be constrained if we cannot attract or service future debt financing.

We may incur debt financing to finance the development of the SOVEST installment card project and other new projects including Rocketbank project, and our operations and growth may be constrained if we cannot do so on favorable terms or at all. Our debt capacity depends upon our ability to maintain our operating performance at a certain level, which is subject to general economic and market conditions and to financial, business and other factors, many of which are outside of our control. If our cash flow from operating activities is insufficient to service our debt, we could be forced to take certain actions, including delaying or reducing capital or other expenditures or other actions, to restructure or refinance our debt; selling or mortgaging our assets or operations; or raising additional equity capital, which we might not be able to do on favorable terms, in a timely manner or at all. Furthermore, such actions might not be sufficient to allow us to service our debt obligations in full and, in any event, could have a material adverse effect on our business, financial condition, and results of operations. Moreover, our inability to service our debt through internally generated cash flow or other sources of liquidity could put us in default of our obligations to creditors, which could trigger various default provisions under our financings and thus have a material adverse effect on the business, financial condition, and results of operations.

21

Table of Contents

***We have recently been experiencing, and may continue to experience, increasing challenges with conducting transactions denominated in U.S. dollars.***

We contract with some of our international merchants in U.S. dollars and other currencies such as Euros. Recently we started to encounter difficulties in conducting such transactions, even with respect to our largest and most well-known international merchants, due to the refusal of an increasing number of our U.S. relationship banks and the correspondent U.S. banks of our non-U.S. relationship banks to service U.S. dollar payments. A direct or correspondent relationship with a U.S. bank is necessary in order for any non-U.S. company to transact in U.S. dollars. Reasons we have been given to explain these changes in approach by our banks mainly referred to changes in internal know-your-customer procedures, limits on certain types of merchants and certain jurisdictions, and other internal policies, which we believe might be a result of the increasing negative sentiment towards Russia on part of U.S. banks, among other factors (see—*The situation in Ukraine and the U.S., EU and other sanctions that have been imposed in connection therewith could adversely impact our operations and financial condition*), even with respect to transactions and relationships that do not present any potential violation of any applicable sanctions. Even though we still maintain a number of U.S. dollar accounts with various financial institutions, at the same time we are already conducting a portion of U.S. dollar transactions with our international merchants in other currencies, bearing additional currency conversion costs. No assurance can be given that such institutions or their respective correspondent banks in the U.S. will not similarly refuse to process our transactions for similar reasons or otherwise, thereby further increasing the currency conversion costs that we have to bear or that our international merchants will agree to accept payments in any currency, but the U.S. dollar in the future. If we are not able to conduct transactions in U.S. dollars, we may bear significant currency conversion costs or lose some of our merchants who will not be willing to conduct transactions in currencies other than the U.S. dollars, and our business, financial condition and results of operations may be materially adversely affected. We can give no assurance that similar issues would not arise with respect to our transactions in other currencies, such as the Euro, which could have similarly adverse consequences for us.

***We may not be able to expand into new geographical markets, or develop our existing international operations successfully, which could limit our ability to grow and increase our profitability.***

Certain of our services are offered in countries beyond Russia, and we may look to further expand our geographical footprint if the right opportunities appear. Our expansion into new geographical markets and further development of our international operations depend on our ability to apply our existing technology or to develop new applications to meet the particular needs of each local market or country. We may not have adequate financial, technological or personnel and management resources to develop effective and secure services or distribution channels that will satisfy the demands of these markets. We may not be able to establish partnerships with any counterparties that we may need in order to strengthen our international operations. If we fail to enter new markets or countries or to develop our international operations, we may not be able to continue to grow our revenues and earnings. Furthermore, we may expand into new geographical markets in which we may not have any previous operating experience. We operate in an industry that is often subject to significant regulation, and our lack of familiarity with the regulatory landscape in new markets may result in us running into unanticipated problems or delays in obtaining the requisite regulatory approvals and licenses. We may not be able to successfully expand in such markets due to our lack of experience. Moreover, we may not be able to execute our strategy in our existing international operations successfully, which may result in additional losses or limit our growth prospects. In addition, expanding internationally subjects us to a number of risks, including:

- greater difficulty in managing foreign operations;

- expenses associated with localizing our products, including offering consumers the ability to transact in major currencies;

- higher labor costs and problems integrating employees that we hire in different countries into our existing corporate culture;

- laws and business practices that favor local competitors;

- multiple and changing laws, tax regimes and government regulations;

- foreign currency restrictions and exchange rate fluctuations;

- changes in a specific country's or region's political or economic conditions; and

- differing intellectual property laws.

In addition, our international operations may expose us to numerous and sometimes conflicting legal and regulatory requirements, and violations or unfavorable interpretation by authorities of these regulations could harm our business. In particular, we are exposed to the risk of being deemed to have permanent establishment in a specific country and transfer pricing risks which could result in additional tax liability.

If we are not able to manage these and multiple other risks associated with international operations successfully, our business, financial condition and results of operations could be materially adversely affected.

22

Table of Contents

**Risks Relating to Corporate Governance Matters and Organizational Structure**

*The substantial share ownership position of our chief executive officer Sergey Solonin may limit your ability to influence corporate matters.*

Our chief executive officer Sergey Solonin owns 85.0% of our class A shares and 0.7% of our class B shares, representing combined approximately 63.0% of the voting power of our issued share capital. As a result of this concentration of share ownership, Mr. Solonin has sole discretion over any matters submitted to our shareholders for approval that require a simple majority vote and has significant voting power on all matters submitted to our shareholders for approval that require a qualified majority vote, including the power to veto them. Our articles of association require the approval of no less than 75% of present and voting shareholders for matters such as amendments to the constitutional documents of our company, dissolution or liquidation of our company, reducing the share capital, buying back shares and approving the total number of shares and classes of shares to be reserved for issuance under any employee stock option plan or any other equity-based incentive compensation program of our group. Matters requiring a simple majority shareholder vote include, among other matters, increasing our authorized capital, removing a director, approving the annual audited accounts and appointing auditors.

This concentration of ownership could delay, deter or prevent a change of control or other business combination that might otherwise give you the opportunity to realize a premium over then-prevailing market price of our shares. The interests of Mr. Solonin may not always coincide with the interests of our other shareholders. This concentration of ownership may also adversely affect the price of our ADSs.

*The substantial share ownership position of Otkritie could be adverse to the interests of our minority shareholders.*

Otkritie Bank owns 43.8% of our class B shares, representing approximately 11.4% of the voting power of our issued share capital. Were Mr. Solonin to sell down his stake in such a manner that his shares would convert into class B shares pursuant to our Articles of Association, voting power of Otkritie Bank would increase accordingly. Moreover, since late 2017, Otkritie Bank has been owned by the CBR as a result of its financial rehabilitation. The liquidity of our ADSs has already significantly declined and could potentially further decline due to one large holder accumulating a significant portion of the shares that formerly constituted free float. The interests of Otkritie Bank, particularly as a state-owned institution, may not always coincide with the interests of our other shareholders. In particular, if Otkritie Bank or its controlling shareholder were to decide they are not interested in continuing to hold this stake, whether due to the fact that it represents a non-core business for Otkritie Bank or otherwise, a sale of a stake of the size could put significant downward pressure on the price of our ADSs. We also believe that due to the recent deterioration of relationships between Russia and the U.S. the fact that the CBR owns, albeit indirectly, a significant stake in our company may be perceived as a negative by certain investors. This concentration of ownership may also adversely affect the price of our ADSs.

*Our ADS holders have limited rights in relation to the appointment of our directors, including our independent directors.*

Other than in certain limited cases provided for in our articles of association, our directors are elected by shareholder weighted voting, sometimes referred to as cumulative voting, under which each shareholder has the right to cast as many votes as the voting rights attached to its shares multiplied by a number equal to the number of board seats to be filled by shareholders. As a result, our class A shareholders will have the ability to appoint, through the weighted voting set forth in our articles of association, at least a majority of the board of directors for the foreseeable future. The interests of our directors may therefore not be aligned with or be in the best interests of the holders of our ADSs.

*The rights of our shareholders are governed by Cyprus law and our articles of association, and differ in some important respects from the typical rights of shareholders under U.S. state laws.*

Our corporate affairs are governed by our articles of association and by the laws governing companies incorporated in Cyprus. The rights of our shareholders and the responsibilities of members of our board of directors under Cyprus law and our articles of association are different than under some of the U.S. state laws. For example, by law existing holders of shares in a Cypriot public company are entitled to pre-emptive rights on the issue of new shares in that company (provided such shares are paid in cash and the pre-emption rights have not been disapplied). In addition, our articles of association include other provisions, which differ from provisions typically included in the governing documents of most companies organized in the U.S.:

- our board of directors can only take certain actions by means of a supermajority vote of 75% of its members, including approving our annual budget and business plan, disposing of our interest in a subsidiary if such disposal results in a change of control over such subsidiary, issuing shares for consideration other than cash and other actions;

- our shareholders are able to convene an extraordinary general meeting; and

- if our board of directors exercises its right to appoint a director to fill a vacancy on the board created during the term of a director's appointment, shareholders holding 10.01% of the voting rights of the company may terminate the appointment of all of the directors and initiate reelection of the entire board of directors.

As a result of the differences described above, our shareholders may have rights different to those generally available to shareholders of companies organized under U.S. state laws and our board of directors may find it more difficult to approve certain actions.

23

Table of Contents

***Acquisitions of Russian entities are subject to pre-closing approval by multiple government authorities which exercise significant discretion as to whether a consent should be granted or not, and are regulated by a significant body of law which is often ambiguous and open to varying interpretations.***

Due to our ownership of Qiwi Bank, any transactions resulting in the acquisition of more than 50% of our voting power or the right to otherwise direct our business activities would become subject to preliminary approval by the CBR. In addition, any acquisition of more than 50% of our voting power may also be subject to a preliminary approval by the Russian Federal Antimonopoly Service, or the FAS. Furthermore, Qiwi Bank holds encryption licenses which are necessary to conduct its operations, and by virtue of this may be deemed to be a "strategic enterprise" for the purposes of the Federal Law of the Russian Federation No. 57-FZ "On the Procedure for Foreign Investments in Enterprises which are Strategically Important for the State Defense and National Security", dated April 29, 2008, as amended. In this case, any acquisition of control over our company would require an approval of a specialized government commission, which is a relatively lengthy process that typically takes between three and six months in practice (see " *- Regulation—Regulation of Strategic Investments*"). These regulatory approval requirements may have the effect of making a takeover of our company more difficult or less attractive, and may prevent or delay a change of control, which could have a negative impact on the liquidity of, and investor interest in, our ADSs.

Additionally, under Russian law, the depositary may be treated as the owner of the class B shares underlying the ADSs, and therefore, could be deemed a beneficial shareholder of Qiwi Bank. This is different from the way other jurisdictions treat ADSs. As a result, the depositary may be subject to the approval requirements of the CBR, FAS and the government commission described above in the event an amount of our shares representing over 50% of our voting power is deposited in the ADS program. Accordingly, our ADS program may be subject to an effective limit of 50% of our voting power, unless the depositary obtains FAS, CBR and potentially additional government commission approvals to increase its ownership in excess of 50% of our voting power. This could limit our ability to raise capital in the future and the ability of our existing shareholders to sell their ADSs in the public markets, which in turn may impact the liquidity of share capital.

***The quota imposed on foreign ownership of Russian banks may make a takeover of our company by a foreign purchaser impossible.***

Under current Russian law, the Russian government is entitled, upon consultation with the CBR, to propose legislation imposing a quota on foreign ownership in the Russian banking industry, covering both Russian branches of international banks and foreign participation in the charter capital of Russian banks, such as Qiwi Bank. In December 2015, a 50% quota on foreign ownership was introduced, subject to certain exemptions. If such quota is exceeded, a takeover of our company by a foreign purchaser may become impossible, which could limit, prevent or delay a change of control of our company and in turn could negatively impact the liquidity of our ADSs.

***As a foreign private issuer whose ADSs are listed on Nasdaq, we have elected to follow certain home country corporate governance practices instead of certain Nasdaq requirements.***

As a foreign private issuer whose ADSs are listed on Nasdaq, we are permitted in certain cases to, and do, follow Cyprus corporate governance practices instead of the corresponding requirements of Nasdaq. A foreign private issuer that elects to follow a home country practice instead of Nasdaq requirements must submit to Nasdaq in advance a written statement from an independent counsel in such issuer's home country certifying that the issuer's practices are not prohibited by the home country's laws. In addition, a foreign private issuer must disclose in its annual reports filed with the Securities and Exchange Commission any significant requirement that it does not follow and describe the home country practice followed instead of any such requirement. We follow Cyprus corporate governance practices with regard to the composition of our board of directors which, unlike the applicable Nasdaq rule for U.S. corporations, do not require that a majority of our directors be independent. Currently only three out of our seven directors are independent. We also do not have a compensation committee or a nominating committee comprised entirely of independent directors, and our independent directors do not meet in regular executive sessions. In addition, our board of directors has not made any determination whether it will comply with certain Nasdaq rules concerning shareholder approval prior to our taking certain company actions, including the issuance of 20% or more of our then-outstanding share capital or voting power in connection with an acquisition, and our board of directors, in such circumstances, may instead determine to follow Cypriot law. Accordingly, our shareholders may not be afforded the same protection as provided under Nasdaq corporate governance rules.

***Our ADS holders may not have the same voting rights as the holders of our class A shares and class B shares and may not receive voting materials in time to be able to exercise their right to vote. Our ADS holders' right to receive certain distributions may be limited in certain respects by the deposit agreement.***

Except as set forth in the deposit agreement, holders of our ADSs are not able to exercise voting rights attaching to the class B shares represented by our ADSs on an individual basis. Holders of our ADSs have to appoint the depositary or its nominee as their representative to exercise the voting rights attaching to the class B shares represented by the ADSs. Upon receipt of voting instructions from an ADS holder, the depositary will vote the underlying class B shares in accordance with these instructions. Pursuant to our articles of association, we may convene an annual shareholders' meeting or a shareholders' meeting called for approval of matters requiring a 75% shareholder vote upon at least 45 days' notice and upon at least 30 days' notice for all other shareholders' meetings. If we give timely notice to the depositary under the terms of the deposit agreement, the depositary will notify you of the upcoming vote and arrange to deliver our voting materials to you. We cannot assure our ADS holders that they will receive the voting materials in time to instruct the depositary to vote the class B shares underlying their ADSs, and it is possible that our ADS holders, or persons who hold their ADSs through brokers, dealers or other third parties, will not have the opportunity to exercise a right to vote. In addition, the depositary and its agents are not responsible for failing to carry out voting instructions or for the manner of carrying out voting instructions. This means that our ADS holders may not be able to exercise their right to vote and there may be nothing such holders can do if the class B shares underlying your ADSs are not voted as requested. In addition, although our ADS holders may directly exercise their right to vote by withdrawing the class B shares underlying their ADSs, they may not receive sufficient advance notice of an upcoming shareholders' meeting to withdraw the class B shares underlying their ADSs to allow them to vote with respect to any specific matter. Furthermore, under the deposit agreement, the depositary has the right to restrict distributions to holders of the ADSs in the event that it is unlawful or impractical to make such distributions. We have no obligation to take any action to permit distributions to holders of our ADSs. As a result, holders of ADSs may not receive distributions made by us.

24

Table of Contents

**Risks Relating to the Russian Federation and Other Markets in Which We Operate**

***Emerging markets such as Russia are subject to greater risks than more developed markets, including significant legal, economic and political risks.***

Investors in emerging markets such as Russia should be aware that these markets are subject to greater risk than more developed markets, including in some cases significant legal, economic and political risks. Investors should also note that emerging economies are subject to rapid change and that the information set out herein may become outdated relatively quickly. Accordingly, investors should exercise particular care in evaluating the risks involved and must decide for themselves whether, in light of those risks, their investment is appropriate. Generally, investment in emerging markets is only suitable for sophisticated investors who fully appreciate the significance of the risks involved, and investors are urged to consult with their own legal and financial advisors before making an investment in our ADSs.

***The situation in Ukraine and the U.S., EU and other sanctions that have been imposed in connection therewith could adversely impact our operations and financial condition.***

The Ukraine crisis, which started in late 2013 and remains unresolved, has brought Russian relations with the West to a post-Cold War low point. Western countries protested when Crimea (which had been part of Ukraine since 1954) entered into the Russian Federation in March 2014 and have complained that Russia is fomenting civil insurrection in east Ukraine.

In response to the Ukraine crisis, Ukraine, the European Union and the United States (as well as other countries such as Norway, Canada and Australia) have passed a variety of economic sanctions against Russia. One form these sanctions have taken is to identify certain persons as 'designated nationals' with the basic practical consequences that U.S. persons cannot do business with them while EU persons cannot provide funds or other economic resources to them, their assets in the EU and United States are subject to seizure and in the case of individuals they can be subject to travel bans. A number of Russian government officials, businessmen, banks and companies have been so designated. Another form these sanctions have taken, with greater consequence for the Russian economy, is 'sectoral' sanctions with the basic consequence that several of Russia's leading banks – including Gazprombank, Vnesheconombank, Bank of Moscow, Russian Agricultural Bank, VTB Bank, and Sberbank – cannot access Western capital (as EU and U.S. persons are prohibited from extending them debt financing in excess of 30 days or dealing in their new equity issuances and providing related services); similar sectoral sanctions have been applied against several prominent Russian oil and gas and defense companies. Other Western sanctions have been imposed in respect of, among other things, Russian military defense entities, dual use technologies, sophisticated off-shore oil drilling technologies and doing business in Crimea.

Certain sanctions, thus far only imposed by Ukraine, and Russian countersanctions instituted in response to such sanctions, directly target payment services providers such as ourselves (see *"–We are subject to extensive government regulation"*). There can be no assurance that additional sanctions affecting the payments business will not be imposed by Russia or other countries in which we operate. While other current sanctions do not target us or the payments industry more generally, these sanctions have had and may continue to have the effect of damaging the Russian economy by, among other things, accelerating capital flight from Russia, weakening of the Russian ruble, exacerbating the negative investor sentiment towards Russia and making it harder for Russian companies to access international financial markets for debt and equity financing. In addition, a number of Western businesses have curtailed or suspended activities in Russia or dealings with Russian counterparts for reputational reasons even though currently neither such activities nor dealings with their relevant Russian counterparts were proscribed by the sanctions. An expansion of the existing or introduction of new sanctions, including those mentioned above, or sanctions specifically targeting us or our management or shareholders, or our sector generally, could result in our international customers, suppliers, shareholders and other business partners revising their relationship with us for compliance, political, reputational or other reasons, which could affect our business.

Some of our agents, merchants or Tochka's SME clients, although mostly not incorporated in Crimea, may have operations there. Further, before the introduction of the corresponding sanctions we have had direct contacts with several Crimea banks that are registered as financial legal entities in Crimea, and currently such banks may continue to operate as our agents or merchants. On December 19, 2014, U.S. President Obama signed an executive order imposing comprehensive sanctions on the Crimea region. The EU has similarly introduced a broad set of sanctions through the Council Regulation (EU) 692/2014 as amended by Regulation (EU) 1351/2014. To date, we do not believe that any of the current sanctions as in force limit our ability to work with entities that may have operations in Crimea or operate in Crimea. Nevertheless, if we are deemed to be in violation of any sanctions currently in place or if any new or expanded sanctions are imposed on Russian businesses operating in Crimea by the U.S., EU, or other countries, our business and results of operations may be materially adversely affected.

In the ordinary course of our business, we may accept payments from consumers to or otherwise indirectly interact with certain entities that are the targets of U.S. sanctions. We operate primarily within the Russian financial system and, accordingly, many of our customers have accounts at banks in Russia. The U.S., EU and other countries have adopted a package of economic restrictive measures imposing certain sanctions on the operations of various Russian banks, including VTB Bank and Gazprombank. Some of our subsidiaries hold bank accounts at the aforementioned banks as well as have overdrafts and bank guarantees with VTB Bank. A number of Russian banks, including Bank Rossiya, SMP Bank, Investcapitalbank and Sobinbank have been designated by OFAC and are subject to U.S. economic sanctions. In addition, Tempbank was designated due to its dealings with the Syrian government. U.S. sanctions may be extended to any person that U.S. authorities determine has materially assisted, or provided financial, material, or technological support for, or goods or services to or in support of, any sanctioned individuals or entities. For example, we may be associated with U.S.-designated banks due to us accepting payments for them from consumers in the ordinary course of our business, even though we may not have any direct contract relationships with them. There can be no assurance that the U.S. Government would not view such activities as meeting the criteria for U.S. economic sanctions.

25

Table of Contents

In addition, because of the nature of our business, we do not generally identify our customers where there is no express requirement to do so under Russian anti-money laundering legislation. Therefore, we are not always able to screen them against the Specially Designated Nationals and Blocked Persons List published by OFAC and other sanctions lists.

While we believe that our indirect interaction with sanctioned Russian banks and potential interaction with designated individuals, as well as other interactions we may potentially have with entities and persons that may be subject to U.S. or EU economic and financial sanctions does not contravene any law, our business and reputation could be adversely affected if the U.S. government were to designate us as a blocked party and extend such sanctions to us. The executive orders authorizing the U.S. sanctions provide that persons may be designated if, inter alia, they materially assist, or provide financial, material, or technological support for goods or services to or in support of, blocked or designated parties. EU financial sanctions prohibit the direct and indirect making available of funds or economic resources to or for the benefit of sanctioned parties. Investors may also be adversely affected if we are so designated, resulting in their investment in our securities being prohibited or restricted. Furthermore, under those circumstances, some U.S. or EU investors may decide for legal or reputational reasons to divest their holdings in us or not to purchase our securities in the first place. We are aware of initiatives by U.S. governmental entities and U.S. institutional investors, such as pension funds, to adopt or consider adopting laws, regulations, or policies prohibiting transactions with or investment in, or requiring divestment from, entities doing business with certain countries. There can be no assurance that the foregoing will not occur or that such occurrence will not have a material adverse effect on our share price. Even if we are not subjected to U.S. or other economic sanctions, our participation in the Russian financial system and indirect interaction with sanctioned banks and potential interaction with designated individuals may adversely impact our reputation among investors. There is also a risk that other entities with which we engage in business, or individuals or entities associated with them, are, or at any time in the future may become, subject to sanctions.

In August 2017, the United States passed a Countering America's Adversaries Through Sanctions Act ("CAATSA"), which significantly tightened 'sectoral sanctions' discussed above and introduced a host of new sanctions, including 'secondary sanctions' targeting non-U.S. persons if the U.S. President determines that any such person knowingly and materially violates, attempts to violate, conspires to violate or causes a violation of a restriction introduced under any relevant U.S. Russian sanctions legislation or facilitates a significant transaction or transactions for or on behalf of any person subject to U.S. Russian sanctions or his or her relatives. This legislation further restricts access of the sanctioned Russian banks and energy companies to debt financing on international capital markets, and expands the application of sanctions in relation to the Russian energy sector. Furthermore, this legislation puts significant limitations on the U.S. President's authority to ease sanctions and issue licensing actions with respect to Russia.

In October 2017, the U.S. Department of State issued public guidance on implementation of CAATSA and the list of Russian defense and intelligence companies and institutions, 'significant transactions' with which may result in the imposition of sanctions on persons that engage in such transactions with these companies and institutions. The new legislation also widens the differences between the U.S. and EU sanctions against Russia. The EU recently extended its own sectoral sanctions until 31 July 2018 but has not adopted new, broader sanctions like those in the said U.S. legislation. Instead, some EU leaders have discussed possible 'blocking' or retaliatory measures in response to those U.S. secondary sanctions that may adversely affect European companies.

CAATSA also requires the U.S. Department of Treasury to issue reports on Russian senior political figures and oligarchs, Russian parastatal entities and illicit financing in Russia, presumably to determine whether other parties should be sanctioned. The first report was issued on 29 January 2018 and lists 114 senior Russian political figures and 96 wealthy Russian businessmen ("Report"). The Report states, and the OFAC further clarified, that it is not a sanctions list, and the inclusion of individuals or entities in it, its appendices, or its annex does not and in no way should be interpreted to impose sanctions on those individuals or entities, and moreover, the inclusion of individuals or entities in the Report, its appendices, or its classified annexes does not, in and of itself, imply, give rise to, or create any other restrictions, prohibitions, or limitations on dealings with such persons by U.S. or non-U.S. persons. The inclusion on the unclassified list does not indicate that the U.S. Government has information about the individuals' involvement in malign activities. In April 2018, several major Russian businessmen (each of them a controlling shareholder of a vast number of diverse businesses in Russia) who were mentioned in the Report became "designated nationals", which had a significant adverse impact on the Russian economy in general and in particular the value of the Rouble. Any new sanctions imposed on the basis of the Report, may have a material adverse effect on the Russian economy and lead to retaliatory sanctions from Russia.

To date, no individual or entity within our group has been designated by either the United States or the EU as a specific target of their respective Ukraine related sanctions. No assurance can be given, however, that any such individual or entity will not be so designated in the future, or that broader sanctions against Russia that affect our company, will not be imposed. In addition, no assurance can be given that any of our transactions with third parties that are subject to the sanctions will not constitute 'significant transactions' for purposes of CAATSA. Non-compliance with the U.S., EU and other sanctions programs applicable to us could expose us to significant fines and penalties and to enforcement measures, or result in the loss of clients, any which in turn could adversely impact our business, financial conditions, results of operations and prospects.

The crisis in Ukraine is ongoing and could escalate. Were full-fledged hostilities to break out between Ukraine and Russia, they would likely cause significant economic disruption and further calls from the Western countries for a comprehensive sanction regime that would seek to further isolate Russia from the world economy. Even the current level of ongoing civil insurrection in eastern Ukraine, if no resolution is forthcoming, may well lead to further strengthening and broadening of Ukraine-related sanctions. For example, there have been proposals to cut off Russia from the international SWIFT payment system, which would disrupt ordinary financial services in Russia and any cross-border trade. Other proposed sanctions that have not been enacted so far but could have a devastating effect on the Russian economy in general and our business, financial condition, results of operations and prospects in particular, include more comprehensive sanctions with respect to major Russian state-owned banks (including a prohibitions on U.S. dollar transactions) and other entities, prohibition on transactions

26

Table of Contents

involving sovereign debt of Russia, and various other measures. The potential further repercussions surrounding the situation in Crimea and Eastern Ukraine are unknown and no assurance can be given regarding the future of relations between Russia and other countries. Overall, the situation in Ukraine and Crimea remains uncertain and we cannot predict how the Ukrainian crisis will unfold or the impact it will have on our business or results of operations. Additionally, relations between the US and Russia have recently become strained over a variety of other issues, which could result in further sanctions against Russia or specific individuals, entities or economy sectors. *See "– Deterioration of Russia's relations with other countries could negatively affect the Russian economy and those of the nearby regions".* Any or all of the above factors could have a material adverse effect on our business, financial condition, results of operations and prospects.

***Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes.***

Our business is currently subject to know-your-client requirements established by Federal Law of the Russian Federation No. 115-FZ "On Combating the Legalization (Laundering) of Criminally Obtained Income and Funding of Terrorism", dated August 7, 2001, as amended, or the Anti-Money Laundering Law. Based on the Anti-Money Laundering Law we distinguish three types of consumers based on their level of identification, being anonymous, identified through a simplified procedure and fully identified. All these types of consumers face varying monetary and non-monetary restrictions in terms of the transactions they may perform and electronic money account balances they may hold, with fully identified consumers enjoying the most privileges. The key difference between the simplified and the full identification procedures is that the simplified identification can be performed remotely. The remote identification requires the verification of certain data provided by consumers against public databases. There can be no assurance that we will always be able to collect all necessary data to perform the identification procedure in full or that the data the users provide us for the purposes of identification will not contain any mistakes or misstatements and will be correctly matched with the information available in the governmental databases. At the end of 2017, a new law was enacted enabling "full" identification performed remotely as well, to the extent the relevant individual has previously undergone identification by an eligible credit institution and has consented for his data to be included in a database; however, as of the date of this annual report such identification method has not been fully developed either. Thus, current situation could cause us to be in violation of the identification requirements. In case we are forced not to use the simplified identification procedure until the databases are fully running or in case the identification requirements are further tightened, it could negatively affect the number of our consumers and, consequently, our volumes and revenues. Additionally, Russian anti-money laundering legislation is in a constant state of development and is subject to varying interpretations. If we are found to be in non-compliance with any of its requirements, we could not only become subject to fines and other sanctions, but could also have to discontinue to process operations that are deemed to be in breach of the applicable rules and lose associated revenue streams.

***Political and governmental instability could adversely affect the value of investments in Russia.***

Political conditions in the Russian Federation were highly volatile in the 1990s, as evidenced by the frequent conflicts amongst executive, legislative and judicial authorities, which negatively impacted the business and investment climate in the Russian Federation. Over the past three decades the course of political and other reforms has in some respects been uneven and the composition of the Russian Government has at times been unstable. The Russian political system continues to be vulnerable to popular dissatisfaction, including dissatisfaction with the results of the privatizations of the 1990s, as well as to demands for autonomy from certain religious, ethnic and regional groups.

Future changes in the Russian Government, the State Duma or the presidency, major policy shifts or eventual lack of consensus between the president, the Russian Government, Russia's parliament and powerful economic groups could lead to political instability. Additionally, the potential for political instability resulting from the worsening of the economic situation in Russia and deteriorating standards of living should not be underestimated. Any such instability could negatively affect the economic and political environment in Russia, particularly in the short term. Shifts in governmental policy and regulation in the Russian Federation are less predictable than in many Western democracies and could disrupt or reverse political, economic and regulatory reforms. Any significant change in the Russian Government's program of reform in Russia could lead to the deterioration of Russia's investment climate that might limit our ability to obtain financing in the international capital markets or otherwise have a material adverse effect on our business, financial condition and results of operations.

***The implementation of government policies in Russia targeted at specific individuals or companies could harm our business as well as investments in Russia more generally.***

The use of governmental power against particular companies or persons, for example, through the tax, environmental or prosecutorial authorities, could adversely affect the Russian economic climate and, if directed against us, our senior management or our major shareholders, could materially adversely affect our business, financial condition and results of operations. Russian authorities have recently challenged some Russian companies and prosecuted their executive officers and shareholders on the grounds of tax evasion and related charges. In some cases, the results of such prosecutions and challenges have been significant claims against companies for unpaid taxes and the imposition of prison sentences on individuals. There has been speculation that in certain cases these challenges and prosecutions were intended to punish, and deter, opposition to the government or the pursuit of disfavored political or economic agendas. There has also been speculation that certain environmental challenges brought recently by Russian authorities in the oil and gas as well as mining sectors have been targeted at specific Russian businesses under non-Russian control, with a view to bringing them under state control. More generally, some observers have noted that takeovers in recent years of major private sector companies in the oil and gas, metals and manufacturing sectors by state-controlled companies following tax, environmental and other challenges may reflect a shift in official policy in favor of state control at the expense of individual or private ownership, at least where large and important enterprises are concerned.

27

Table of Contents

***Deterioration of Russia's relations with other countries could negatively affect the Russian economy and those of the nearby regions.***

Over the past several years, Russia has been involved in conflicts, both economic and military, involving other members of the CIS or other countries. On several occasions, this has resulted in the deterioration of Russia's relations with other members of the international community, including the United States and various countries in Europe. Many of these jurisdictions are home to financial institutions and corporations that are significant investors in Russia and whose investment strategies and decisions may be affected by such conflicts and by worsening relations between Russia and its immediate neighbors.

For example, relations between Ukraine and Russia, as well as Georgia and Russia, have been strained over a variety of issues. On March 21, 2014, President Putin signed legislation to recognize Crimea's accession to, and status as part of, Russia. Since then, there has been continuing tensions between Russia and Ukraine, which were aggravated by the military conflict in Eastern Ukraine. Another recent point of tension between Russia and Western governments has been the Russian role in the Syrian crisis and its military support for the government of Syria. The events in Ukraine, Crimea and Syria have prompted condemnation by members of the international community and have been strongly opposed by the EU and the United States, with a resulting material negative impact on the relationships between the EU, the United States and Russia. See "– *The situation in Ukraine and the U.S., EU and other sanctions that have been imposed could adversely impact our operations and financial condition*". The Ukraine crisis, which started in late 2013 and remains unresolved, has brought additional tensions between Russia and Western countries (such as the U.S., UK and a number of EU countries), and new issues that adversely affect such relations may arise in the future. Other recent points of tension between Russia and Western governments have included: the Russian role in the Syrian crisis and its military support for the government of Syria; the alleged involvement of the Russian government in the cyber-attacks aimed at disrupting the election process in the U.S.; the alleged involvement of the Russian intelligence service in an attempted poisoning of a Russian citizen in the UK; and the incident involving Ukrainian vessels near the Kerch Strait in November 2018. All of the above have led to escalation of geopolitical tensions, and introduction or expansion of international sanctions or other countermeasures by Western countries against Russia, and may continue to do so in the future. In particular, in response to the alleged use by Russian intelligence services of chemical warfare on UK soil, in August 2018 the U.S. State Department imposed new sanctions on Russia under the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991 (the "CBW Act"). The initial round of sanctions under the CBW Act includes, among other things, termination of sales of any defense articles and services and the prohibition on the export to Russia of certain national security-sensitive goods and technology. If within three months after the initial determination made under the CBW Act, the U.S. President determines that certain conditions set out in the CBW Act are not met, further sanctions, including, among other things, a prohibition on U.S. financial institutions to provide financing to the Russian state, additional bans on exports of goods and technologies and a possible suspension or revocation of the authority of Russian state-owned or controlled air carriers to provide transportation to or from the U.S., may be introduced. The emergence of new or escalated tensions between Russia and neighboring states or other states could negatively affect the Russian economy. This, in turn, may result in a general lack of confidence among international investors in the region's economic and political stability and in Russian investments generally. Such lack of confidence may result in reduced liquidity, trading volatility and significant declines in the price of listed securities of companies with significant operations in Russia, including our ADSs, and in our inability to raise debt or equity capital in the international capital markets, which may affect our ability to achieve the level of growth to which we aspire.

***Crime and corruption could create a difficult business climate in Russia.***

The political and economic changes in Russia since the early 1990s have led, amongst other things, to reduced policing of society and increased lawlessness. Organized crime, particularly property crimes in large metropolitan centers, has reportedly increased significantly since the dissolution of the Soviet Union. In addition, the Russian and international media have reported high levels of corruption in Russia. Press reports have also described instances in which government officials have engaged in selective investigations and prosecutions to further the interest of the government and individual officials or business groups. Although we adhere to a business ethics policy and internal compliance procedures to counteract the effects of crime and corruption, instances of illegal activities, demands of corrupt officials, allegations that we or our management have been involved in corruption or illegal activities or biased articles and negative publicity could materially and adversely affect our business, financial condition and results of operations.

***Economic instability in Russia could have an adverse effect on our business.***

The Russian economy has been adversely affected by the recent global financial and economic crisis. A continuation of the economic crisis could have a negative effect on the scale and profitability of our business. Any of the following risks, which the Russian economy has experienced at various points in the past, may have or have already had a significant adverse effect on the economic climate in Russia and may burden or have already burdened our operations:

- significant declines in gross domestic product, or GDP;

- high levels of inflation;

- sudden price declines in the natural resource sector;

- high and fast-growing interest rates;

- unstable credit conditions;

- international sanctions;

- high state debt/GDP ratio;

- instability in the local currency market;

- a weakly diversified economy which depends significantly on global prices of commodities;

Table of Contents

- lack of reform in the banking sector and a weak banking system providing limited liquidity to Russian enterprises;

- pervasive capital flight;

- corruption and the penetration of organized crime into the economy;

- significant increases in unemployment and underemployment;

- the impoverishment of a large portion of the Russian population;

- large number of unprofitable enterprises which continue to operate due to deficiency in the existing bankruptcy procedure;

- prevalent practice of tax evasion; and

- growth of the black-market economy.

As Russia produces and exports large quantities of crude oil, natural gas, petroleum products and other commodities, the Russian economy is particularly vulnerable to fluctuations in oil and gas prices as well as other commodities prices, which historically have been subject to significant volatility over time, as illustrated by the recent decline in crude oil prices. Russian banks, and the Russian economy generally, were adversely affected by the global financial crisis. In 2014 and 2015, Russia experienced an economic downturn characterized by substantial depreciation of its currency, sharp fluctuations of interest rates, a decline in disposable income, a steep decline in the value of shares traded on its stock exchanges, a material increase in the inflation rate, and a decline in the gross domestic product. In 2016-2017 some of those economic trends reversed or moderated, with oil prices increasing somewhat, inflation rates declining significantly and gross domestic product returning to modest growth. However, economic instability resumed in 2018, with the Rouble depreciating significantly and inflation exceeding the government's forecasts. There can be no assurance that any measures adopted by the Russian government to mitigate the effect of any financial and economic crisis will result in a sustainable recovery of the Russian economy. Current macroeconomic challenges, low or negative economic growth in the United States, China, Japan and/or Europe and market volatility may provoke or prolong any economic crisis.

As an emerging economy, Russia remains particularly vulnerable to further external shocks. Events occurring in one geographic or financial market sometimes result in an entire region or class of investments being disfavored by international investors—so-called "contagion effects". Russia has been adversely affected by contagion effects in the past, and it is possible that it will be similarly affected in the future by negative economic or financial developments in other countries. Economic volatility, or a future economic crisis, may undermine the confidence of investors in the Russian markets and the ability of Russian businesses to raise capital in international markets, which in turn could have a material adverse effect on the Russian economy and the Group's results of operations, financial condition and prospects. In addition, any further declines in oil and gas prices or other commodities pricing could disrupt the Russian economy and materially adversely affect our business, financial condition, results of operations and prospects.

### *The banking system in Russia remains underdeveloped.*

The banking and other financial systems in Russia are not well-developed or regulated, and Russian legislation relating to banks and bank accounts is subject to varying interpretation and inconsistent application. The 1998 financial crisis resulted in the bankruptcy and liquidation of many Russian banks and almost entirely eliminated the developing market for commercial bank loans at that time. From April to July 2004, the Russian banking sector experienced further serious turmoil. As a result of various market rumors and certain regulatory and liquidity problems, several privately owned Russian banks experienced liquidity problems and were unable to attract funds on the inter-bank market or from their client base. Simultaneously, they faced large withdrawals of deposits by both retail and corporate customers. Several of these privately owned Russian banks collapsed or ceased or severely limited their operations. Russian banks owned or controlled by the government and foreign owned banks generally were not adversely affected by the turmoil.

There are currently a limited number of creditworthy Russian banks (most of which are headquartered in Moscow). Although the CBR has the mandate and authority to suspend banking licenses of insolvent banks, some insolvent banks still operate. Many Russian banks also do not meet international banking standards, and the transparency of the Russian banking sector in some respects still lags behind internationally accepted norms. Banking supervision is also often inadequate, as a result of which many banks do not follow existing CBR regulations with respect to lending criteria, credit quality, loan loss reserves, diversification of exposure or other requirements. The imposition of more stringent regulations or interpretations could lead to weakened capital adequacy and the insolvency of some banks. Prior to the onset of the 2008 global economic crisis, there had been a rapid increase in lending by Russian banks, which many believe had been accompanied by a deterioration in the credit quality of the loan portfolio of those banks. In addition, a robust domestic corporate debt market was leading Russian banks to hold increasingly large amounts of Russian corporate ruble bonds in their portfolios, which further deteriorated the risk profile of the assets of Russian banks. The global financial crisis of 2007-2008 has led to the collapse or bailout of some Russian banks and to significant liquidity constraints for others. Profitability levels of most Russian banks have been adversely affected. Indeed, the global crisis has prompted the government to inject substantial funds into the banking system amid reports of difficulties among Russian banks and other financial institutions.

In recent years, the CBR has considerably increased the intensity of its supervision and regulation of the Russian banking sector. Historically, the revocation of banking licenses by the CBR has been a relatively rare event mostly occurring to local banks with little assets and little or no significance for the banking sector as a whole. Starting October 2013, however, the CBR has launched a campaign aimed at cleansing the Russian banking industry, revoking the licenses from an unusually high number of banks (including significant banks such as Ugra, Master-Bank, Investbank, ProBusinessBank, Svyaznoy Bank, Vneshprombank, Tatfondbank and others) on allegations of money

29

**Table of Contents**

laundering, financial statements manipulation and other illegal activities, as well as inability of certain banks to discharge their financial obligations, which resulted in turmoil in the industry, instigated bank runs on a number of Russian credit institutions, and severely undermined the trust that the Russian population had with private banks. In addition, in the course of 2017 three of Russia's largest private banks, Otkritie Bank, Binbank and Promsvyazbank, were all bailed out and taken over by the CBR through the newly established Banking Industry Consolidation Fund, since all of them were allegedly unable to perform their obligations as they fell due for various reasons. License revocations have continued throughout 2018 and early 2019, again with some major banks impacted. The private banking sector in Russia, always relatively minor compared to state players like Sberbank and VTB to begin with, has contracted severely as a result. This can be expected to result in reduced competition in the banking sector (while at the same time putting alternative payment solution providers such as ourselves in the position of having to predominantly compete with the government itself), increased inflation and a general deterioration of the quality of the Russian banking industry. It could be expected that the difficulties currently faced by the Russian economy could result in further collapses of Russian banks. With few exceptions (notably the state-owned banks), the Russian banking system suffers from weak depositor confidence, high concentration of exposure to certain borrowers and their affiliates, poor credit quality of borrowers and related party transactions. Current economic circumstances in Russia are putting stress on the Russian banking system. Combined with heightened interest rates – with the key interest rate of the CBR currently at 7.75% per annum (but rising as high as 17% over the course of 2014-2015) – these circumstances decrease the affordability of consumer credit, putting further pressure on overall consumer purchasing power. In addition, these factors could further tighten liquidity on the Russian market and add pressure onto the ruble.

Our business is significantly affected by development in the Russian banking sector. First, we periodically hold funds in a number of Russian banks and rely on guarantees given by those banks to enhance our liquidity. Increased uncertainty in the Russian banking sector exposes us to additional counterparty risk and affects our liquidity. In addition, a significant portion of our revenue is derived from consumer payments in the banking industry in our Financial Services market vertical. As a result, the bankruptcy or insolvency of one or more of these banks could adversely affect our business, financial condition and results of operations. The continuation or worsening of the banking crisis could decrease our transaction volumes, while the bankruptcy or insolvency of any of the banks which hold our funds could prevent us from accessing our funds for several days. All of these factors could have a material adverse effect on our business, financial condition and results of operations.

***Social instability could lead to labor and social unrest, increased support for renewed centralized authority, nationalism or violence.***

Failures to adequately address social problems have led in the past, and could lead in the future, to labor and social unrest. Labor and social unrest could have political, social and economic consequences, such as increased support for a renewal of centralized authority; increased nationalism, with support for re-nationalization of property, or expropriation of or restrictions on foreign involvement in the economy of Russia; and increased violence. Any of these could have an adverse effect on confidence in Russia's social environment and the value of investments in Russia, could restrict our operations and lead to a loss of revenue, and could otherwise have a material adverse effect on its business, results of operations and financial condition.

***Russia has experienced high levels of inflation in the past.***

As a substantial portion of our expenses (including operating costs and capital expenditures) are denominated in rubles, the relative movement of inflation and exchange rates significantly affects our results of operations. The effects of inflation could cause some of our costs to rise. Russia has experienced high levels of inflation since the early 1990s. For example, inflation increased dramatically after the 1998 financial crisis, reaching a rate of 84.4% in that year. According to Rosstat, inflation in the Russian Federation was 11.4% in 2014, 12.9% in 2015, 5.4% in 2016, 2.5% in 2017 and 4.2% in 2018. Certain of our costs, such as salaries and rent, are affected by inflation in Russia. To the extent the inflation causes these costs to increase, such inflation may materially adversely affect our business, financial condition and results of operations.

***The immaturity of legal systems, processes and practices in the Russian Federation may adversely affect our business, financial condition and results of operations.***

Risks associated with the legal systems of the Russian Federation include, to varying degrees, inconsistencies between and among laws, presidential decrees, edicts and governmental and ministerial orders and resolutions; conflicting local, regional, and federal rules and regulations; the lack of judicial or administrative guidance regarding the interpretation of the applicable rules; the untested nature of the independence of the judiciary and its immunity from political, social and commercial influences; the relative inexperience of jurists, judges and courts in interpreting recently enacted legislation and complex commercial arrangements; a high degree of unchecked discretion on the part of governmental authorities; alleged corruption within the judiciary and governmental authorities; substantial gaps in the regulatory structure due to delays in or absence of implementing regulations; bankruptcy procedures that are not well-developed and are subject to abuse; and a lack of binding judicial precedent. All of these weaknesses affect our ability to protect and enforce our legal rights, including rights under contracts, and to defend against claims by others. In addition, the merger of the Supreme Arbitration Court of the Russian Federation, which used to oversee business disputes, into the Supreme Court, which used to only handle criminal cases and civil lawsuits, is viewed by some as having further aggravated these issues.

The Russian judicial system is not immune from economic and political influences. The Russian court system is understaffed and underfunded, and the quality of justice, duration of legal proceedings, and performance of courts and enforcement of judgments remain problematic. Under Russian legislation, judicial precedents generally have no binding effect on subsequent decisions and are not recognized as a source of law. However, in practice, courts usually consider judicial precedents in their decisions. Enforcement of court judgments can in practice be very difficult and time-consuming in Russia. Additionally, court claims are sometimes used in furtherance of political and commercial aims. All of these factors can make judicial decisions in Russia difficult to predict and make effective redress problematic in certain instances.

Table of Contents

The relatively recent enactment of many laws, the lack of consensus about the scope, content and pace of political and economic reform and the rapid evolution of legal systems in ways that may not always coincide with market developments have resulted in legal ambiguities, inconsistencies and anomalies and, in certain cases, the enactment of laws without a clear constitutional or legislative basis. Legal and bureaucratic obstacles and corruption exist to varying degrees in each of the regions in which we operate, and these factors are likely to hinder our further development. These characteristics give rise to investment risks that do not exist in countries with more developed legal systems. The developing nature of the legal systems in Russia could materially adversely affect our business, financial condition and results of operations.

### *Unlawful, selective or arbitrary government action may have an adverse effect on our business.*

Governmental authorities have a high degree of discretion in Russia and at times appear to act selectively or arbitrarily, without hearing or prior notice, and in a manner that is contrary to law or influenced by political or commercial considerations. Moreover, the Russian Government also has the power in certain circumstances, by regulation or government act, to interfere with the performance of, nullify or terminate contracts. Unlawful, selective or arbitrary governmental actions have reportedly included denial or withdrawal of licenses, sudden and unexpected tax audits, criminal prosecutions and civil actions. Federal and local government entities also appear to have used common defects in matters surrounding share issuances and registration as pretexts for court claims and other demands to invalidate the issuances or registrations or to void transactions, seemingly for political purposes. Moreover, selective, public criticism by Russian Government officials of Russian companies has in the past caused the price of publicly traded securities in such Russian companies to sharply decline, and there is no assurance that any such public criticism by Russian Government officials in the future will not have the same negative affect. Standard & Poor's has expressed concerns that "Russian companies and their investors can be subjected to government pressure through selective implementation of regulations and legislation that is either politically motivated or triggered by competing business groups". In this environment, our competitors could receive preferential treatment from the government, potentially giving them a competitive advantage. Unlawful, selective or arbitrary governmental action, if directed at our operations in Russia, could materially and adversely affect our business, financial condition and results of operations.

### *Shareholder liability under Russian corporate law could cause us to become liable for the obligations of our subsidiaries.*

Russian law generally provides that shareholders in a Russian joint-stock company or participants in a limited liability company are not liable for that company's obligations and risk only the loss of their investment. This may not be the case, however, when one company (the "effective parent") is capable of making decisions for another (the "effective subsidiary"). Under certain circumstances, the effective parent bears joint and several responsibility for transactions concluded by the effective subsidiary in carrying out such decisions.

In addition, under Russian law, an effective parent is secondarily liable for an effective subsidiary's debts if an effective subsidiary becomes insolvent or bankrupt as a result of the action of an effective parent. In these instances, the other shareholders of the effective subsidiary may claim compensation for the effective subsidiary's losses from the effective parent that causes the effective subsidiary to take action or fail to take action knowing that such action or failure to take action would result in losses. We could be found to be the effective parent of our subsidiaries, in which case we would become liable for their debts, which could have a material adverse effect on our business, financial condition and results of operations.

### *Our operations in Kazakhstan have become significant, and many of the risks we face in Kazakhstan are similar to those we face in Russia.*

In addition to Russia, our operations in Kazakhstan are significant. In many respects, the risks we face in operating business in Kazakhstan are similar to those in Russia as set out above in "—Risks Relating to the Russian Federation and Other Markets in Which We Operate". As is typical of an emerging market, Kazakhstan does not possess a well-developed business, legal and regulatory infrastructure and has been subject to substantial political, economic and social change. Our business in Kazakhstan is subject to Kazakhstan specific laws and regulations including with respect to tax, anti-corruption, and foreign exchange controls. Such laws are often rapidly changing and are unpredictable. In addition, we are exposed to foreign currency fluctuations between the Russian ruble and the Kazakh tenge, which could affect our financial position and our profitability. Our failure to manage the risks associated with doing business in Kazakhstan could have a material adverse effect upon our results of operations.

### Risks Relating to Taxation

### *Global anti-offshore measures may have adverse impact on our business, financial condition and results of operations.*

In 2013 OECD and G20 countries accepted that existing international tax rules create opportunities for base erosion and profit shifting, because these rules have been designed more than a century ago. Pursuing solutions for this problem, OECD and G20 countries adopted a 15-point Action Plan to address base erosion and profit shifting. The BEPS package of measures represents the substantial renovation of the international tax rules. Once the new measures become applicable, it is expected that profits will be reported where the economic activities that generate them are carried out and where value is created.

31

Table of Contents

The Convention on Mutual Administrative Assistance in Tax Matters developed by the Council of Europe and the OECD in 1988 and amended by Protocol in 2010 is now signed by 127 jurisdictions (the Russian Federation, Cyprus, UAE are among the signatories). This Convention, by virtue of its Article 6, requires competent authorities of jurisdictions-signatories hereto to participate in the automatic exchange of Country-by-Country Reports and the automatic exchange of financial account information pursuant to the Common Reporting Standard (CRS). In addition, by virtue of Article 5 the Convention requires competent authorities of jurisdictions-signatories hereto to participate in the exchange of information on request and, by virtue of Article 7, stipulates that such competent authorities should participate in spontaneous exchange of information. The tax authorities (including, Russian, Cypriot and UAE tax authorities) already cooperate in terms of mutual administrative assistance in tax matters.

On June 7, 2017 67 countries signed the the Multilateral Convention to Implement Tax Treaty Related Measures to Prevent Base Erosion and Profit Shifting ("MLI") in order to implement treaty related measures. The Russian Federation, Cyprus, UAE are among the signatories, currently this instrument is being ratified on the domestic level. MLI already covers 87 jurisdictions and entered into force on July 1, 2018 for the first five jurisdictions, which deposited their respective ratification instruments. It is expected that further countries will also join the Convention by signing of MLI.

Generally, new means for global exchange of financial information provide for much more transparency of international transactions. Due to information exchange instruments the tax authorities are becoming much more efficient in combating tax avoidance.

The implementation of global instruments means the application of such instruments by competent authorities on mutually agreed grounds, however, there might be a risk that competent authorities of jurisdictions where our subsidiaries operate would apply newly introduced global transparency instruments inconsistently, which would lead to the imposition of additional taxes on us. For more details on the possible impact of these measures, see sections below.

***Significant change of substance requirements in certain offshore jurisdictions may adversely impact our business.***

Following the global trend on increase of substance requirements in various jurisdictions, starting from 2019 traditional offshore jurisdictions implement legislation that requires companies registered in the relevant offshore jurisdiction to maintain actual substance on the territory of such jurisdictions, which may include, amongst others, the qualified personnel, premises located in the particular jurisdiction, reasonable expenses to support daily operation of the company.

We cannot exclude that we might be subject to additional costs and/or tax liabilities resulted from the said requirements, which could have a material adverse effect on our business, financial condition and results of operations.

***Weaknesses and changes in the Russian tax system could materially and adversely affect our business and the value of investments in Russia.***

We are subject to a broad range of taxes and other compulsory payments imposed at federal, regional and local levels, including, but not limited to, profits tax, VAT, corporate property tax and social contributions. Tax laws, namely the Russian Tax Code, have been in force for a short period relative to tax laws in more developed market economies, and the implementation of these tax laws is often unclear or inconsistent. Historically, the system of tax collection has been relatively ineffective, resulting in continual changes to the interpretation of existing laws. Although the quality of Russian tax legislation has generally improved with the introduction of the first and second parts of the Russian Tax Code, the possibility exists that Russia may impose arbitrary or onerous taxes and penalties in the future, which could adversely affect our business, financial condition and results of operations. A large number of changes have been made to various chapters of the Russian Tax Code since their introduction. Since Russian federal, regional and local tax laws and regulations are subject to changes and some of the sections of the Russian Tax Code relating to the aforementioned taxes are comparatively new, interpretation of these regulations is often unclear or non-existent. Also, different interpretations of tax regulations exist both among and within government bodies at the federal, regional and local levels, which creates uncertainties and inconsistent enforcement. The current practice is that private clarifications to specific taxpayers' queries with respect to particular situations issued by the Russian Ministry of Finance are not binding on the Russian tax authorities and there can be no assurance that the Russian tax authorities will not take positions contrary to those set out in such clarifications. During the past several years the Russian tax authorities have shown a tendency to take more assertive positions in their interpretation of the tax legislation, which has led to an increased number of material tax assessments issued by them as a result of tax audits. Starting from January 1, 2019 tax authorities are entitled to claim documents (information) used for calculation and payment of taxes (other obligatory payments) from the taxpayers' auditors. In practice, the Russian tax authorities generally interpret the tax laws in ways that do not favor taxpayers, who often have to resort to court proceedings against the Russian tax authorities to defend their position. In some instances, Russian tax authorities have applied new interpretations of tax laws retroactively. There is no established precedent or consistent court practice in respect of these issues. Furthermore, in the absence of binding precedent, court rulings on tax or other related matters by different courts relating to the same or similar circumstances may also be inconsistent or contradictory.

The Russian tax authorities are increasingly taking a "substance over form" approach. For example, starting from January 1, 2015 a number of amendments have been made to the Russian tax legislation introducing, among others, the concepts of controlled foreign companies, corporate tax residency and beneficial ownership (see also "Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations"). Due to the relative lack of court and administrative practice, no assurance can be currently given as to how these amendments will be applied in practice, their potential interpretation by the tax authorities and the possible impact on us.

In addition, on November 27, 2017 the Federal Law No. 340-FZ introducing country-by-country reporting ("CbCR") requirements was published. The mandatory filing of CbCR is, in general, in line with the Organization for Economic Co-operation and Development ("OECD") recommendations within the Base Erosion and Profit Shifting ("BEPS") initiative. The law has taken effect on the date of its official publication, and its provisions apply to financial years starting in 2017 (except for the provisions regarding the national documentation). These amendments would require multinational corporate enterprise groups with consolidated revenues of over certain threshold to submit annual

Table of Contents

CbCR, as well as certain other reporting forms detailing multinational corporate enterprises groups operations (locally and globally, respectively), as well as transfer pricing methodologies applied to intra-group transactions. Thus, if we reach the reporting threshold in Russia (over RUB 50 billion), or alternatively in any other jurisdiction of our presence (e.g. in Cyprus, where the Decree issued by the Cyprus Minister of Finance on December 30, 2016 introduced a mandatory CbCR for multinational enterprise groups generating consolidated annual turnover exceeding EUR 750 million) we may be liable to submit relevant CbCR. It is unclear at the moment how the above measures will be applied in practice by the Russian tax authorities and courts. We do not consider the Company to be subject to CbCR requirements. However, taking into consideration the possibility of further developments in Russia as well as international legislation, we may become subject to the above requirements. It is important to note that the above changes and amendments to the Russian Tax Code introduced by the law do not replace already existing transfer pricing documentation requirements.

Certain other changes were introduced to the Russian Tax Code over the recent years, namely temporary limit on the amount of loss carried forward to be utilized to reduce taxable income (applicable for 2017-2020 inclusively); increase of late payment interest for overdue tax payments; changes to types of controlled transactions subject to transfer pricing rules, namely starting from 2017 any guarantees between Russian non-banking organizations, as well as interest-free loans between Russian related parties will not be treated as controlled transactions; further significant reduction of types of transactions subject to transfer pricing control starting from 2019 (for more details see "Russian transfer pricing legislation may require pricing adjustments and impose additional tax liabilities with respect to all controlled transactions"), increase of the VAT rate to 20%, changes in the regulation concerning VAT on digital services, etc.

The possibility exists that the Government may introduce additional tax-raising measures. Although it is unclear how such measures would operate, the introduction of any such measures may affect the Group's overall tax efficiency and may result in significant additional taxes becoming payable.

On November 24, 2016, the OECD published the MLI which introduces new provisions to existing double tax treaties limiting the use of tax benefits provided thereof. For example, the reduced rate on dividends provided under a double tax treaty shall be denied if the conditions for holding equity interest or shares by the time of the dividend payout are met over less than a 365-day period. MLI also proposes taxing income from gains upon alienation of shares (interests) of property-rich companies in the country where such property is situated if the immovable property value threshold is met at any time during the 365 days preceding the transaction and not at the time of the transaction itself. Thus, when determining tax consequences several sources of legislation will now need to be considered, namely the domestic tax law, double tax treaties and MLI provisions, which have been adopted by states-parties to the relevant double tax treaty. To date the MLI has not been ratified by Russia. The draft law on ratification of the MLI has been submitted to the Russian State Duma (the low chamber of the parliament). However, it is likely that the application of the double tax treaties, which Russia is a party to, i.a. the double tax treaty between Russia and Cyprus, will be significantly limited by the MLI. Further sections below include information about the application of double tax treaties with due regard to the current non-active status of the MLI in Russia.

There can be no assurance that the Russian Tax Code will not be changed in the future in a manner adverse to the stability and predictability of the tax system. These factors, together with the potential for state budget deficits, raise the risk of the imposition of additional taxes on us. The introduction of new taxes or amendments to current taxation rules may have a substantial impact on the overall amount of our tax liabilities. There is no assurance that we would not be required to make substantially larger tax payments in the future, which may adversely affect our business, financial condition and results of operations.

***Our business in Russia may be deemed to receive unjustified tax benefits.***

In its decision No 138-0 dated July 25, 2001, the Constitutional Court of the Russian Federation, or the Constitutional Court, introduced the concept of "a taxpayer acting in a bad faith" without clearly stipulating the criteria for it. Although this concept is not defined in Russian tax law, it has been used by the tax authorities to deny, for instance, the taxpayer's right to obtain tax deductions and benefits provided by the tax law. The tax authorities and courts often exercise significant discretion in interpreting this concept in a manner that is unfavorable to taxpayers.

On October 12, 2006, the Plenum of the Higher Arbitrazh Court of the Russian Federation, or the Higher Arbitrazh Court, issued Ruling No. 53, formulating another concept known as the concept of an "unjustified tax benefit". This concept is defined in the ruling mainly by reference to specific examples of such tax benefits (e.g., tax benefits obtained as a result of a transaction that has no reasonable business purpose) which may lead to disallowance of their application. The tax authorities applied the "unjustified tax benefit" concept in a broad sense, not only combatting the abuse of the Russian tax law, but also disallowing benefits granted by double tax treaties. To date, in the cases where this concept has been applied, the courts have ruled in favor of taxpayers that managed to demonstrate business rationale of the operations challenged by the Russian tax authorities.

On July 19, 2017 a law introducing the concept of "unjustified tax benefit" into the Russian Tax Code was adopted. As opposed to the court-based version of the concept, currently there are two specific criteria that should be met simultaneously to entitle a taxpayer to reduce the tax base or the amount of tax: (i) the main purpose of the transaction (operation) is not a non-payment (incomplete payment) and (or) offset (refund) of the amount of tax; and (ii) the obligation under the transaction (operation) is executed by a person who is a party to a contract entered into with the taxpayer and / or a person to whom the obligation to execute a transaction (operation) was transferred under a contract or law.

The Russian Tax Code specifically indicates that signing of primary documents by an unidentified or unauthorized person, violation by the counterparty of tax legislation, the possibility to obtain the same result by a taxpayer by entering into other transactions not prohibited by law cannot be considered in itself as a basis for recognizing the reduction of the tax base or the amount of tax unlawful. However, application of these criteria is still under consideration of the tax authorities, therefore, no assurance can be given that positions of taxpayers will not be challenged by the Russian tax authorities.

33

Table of Contents

The new version of the concept of "unjustified tax benefit" is applied starting from August 19, 2017, yet it may be applied to prior periods if it benefits taxpayers. However, as of the date of this annual report, no assurance can be given that later the Russian tax authorities would not rely on the court-based version of the concept or even both ones, which may result in a higher tax burden of taxpayers.

In addition to the usual tax burden imposed on Russian taxpayers, these conditions complicate tax planning and related business decisions. This uncertainty could possibly expose our Group to significant fines and penalties and to enforcement measures, despite our best efforts at compliance, and could result in a greater than expected tax burden.

### *Our Russian subsidiaries are subject to tax audits by Russian tax authorities which may result in additional tax liabilities.*

Tax returns together with related documentation are subject to review and investigation by a number of authorities, which are enabled by Russian law to impose substantial fines and interest charges. Generally, taxpayers are subject to tax audits for a period of three calendar years immediately preceding the year in which the decision to conduct the audit is taken. Nevertheless, in some cases the fact that a tax period has been reviewed by the tax authorities does not prevent further review of that tax period, or any tax return applicable to that tax period. In addition, based on the court practice and the first part of the Russian Tax Code, the three-year statute of limitations for tax liabilities is extended if the actions of the taxpayer create insurmountable obstacles for the tax audit. Because none of the relevant terms is defined in Russian law, the tax authorities may have broad discretion to argue that a taxpayer has "obstructed" or "hindered" or "created insurmountable obstacles" in respect of an audit, effectively linking any difficulty experienced in the course of their tax audit with obstruction by the taxpayer and use that as a basis to seek tax adjustments and penalties beyond the three-year term. Therefore, the statute of limitations is not entirely effective. Tax audits may result in additional costs to our Group if the relevant tax authorities conclude that our Russian entities did not satisfy their tax obligations in any given year. Such audits may also impose additional burdens on our Group by diverting the attention of management resources. The outcome of these audits could have a material adverse effect on our business, financial condition and results of operations.

### *Russian transfer pricing legislation may require pricing adjustments and impose additional tax liabilities with respect to all controlled transactions.*

The existing transfer pricing rules became effective from January 1, 2012. Under these rules the Russian tax authorities are allowed to make transfer-pricing adjustments and impose additional tax liabilities in respect of certain types of transactions ("controlled" transactions). The list of the "controlled" transactions includes transactions with related parties (with several exceptions such as guarantees between Russian non-banking organizations and interest-free loans between Russian related parties) and certain types of cross border transactions. Starting from 2019 transactions between Russian tax residents will be controlled only if the amount of income from the transactions between these parties within one year exceeds RUB 1 billion and one of the conditions stipulated in Article 105.14 of Russian Tax Code (e.g., the parties to the transaction apply different corporate income tax rates) is met. Certain other transactions, such as foreign trade transactions in commodities traded on global exchanges, transactions with parties from blacklisted countries, transactions between related parties under participation of the independent intermediary, as well as transactions between the Russian tax resident and foreign tax resident (related parties) remain under control in case the amount of income from transactions between these parties within one year exceeds RUB 60 million threshold. The new rules apply to transactions, under which income (expenses) from such controlled transactions are recognised after January 1, 2019. As a side effect, the Russian tax authorities who are entitled to perform tax audits of Russian taxpayers with focus on compliance with existing transfer pricing legislation will no longer be involved in tax audit of transactions between Russian parties due to increased limits on transactions between Russian tax residents but they will be able to pay more attention to cross-border transactions.

The burden of proving market prices, as well as keeping specific documentation, lies with the taxpayers. Major taxpayers are allowed to enter into advance pricing agreements to agree an appropriate transfer pricing methodology for certain period with the tax authorities; however, it is unclear how such agreements operate in practice as their content is not publically available. Special transfer pricing rules apply to transactions with securities and derivatives. It is currently difficult to evaluate what effect these provisions may have on us. Alternatively, the prices under our transactions that are not subject to transfer pricing control may be challenged under unjustified tax benefit concept. For more information see "*Our business in Russia may be deemed to receive unjustified tax benefits*".

It is therefore possible that the Group entities may become subject to transfer pricing tax audits by tax authorities in the foreseeable future. Due to the uncertainty and lack of established practice of application of the Russian transfer pricing legislation the Russian tax authorities may challenge the level of prices applied by the Group under the "controlled" transactions (including certain intercompany transactions) or challenge the methods used to prove prices applied by the Group, and as a result accrue additional tax liabilities. If additional taxes are assessed with respect to these matters, they could have a material adverse effect on our business, financial condition and results of operations.

### *ADS holders outside of Russia may be subject to Russian tax for income earned upon a sale, exchange or disposal of our ADSs.*

In the event that the proceeds from a sale, exchange or disposal of ADSs are deemed to be received from a source within Russia, a non-resident holder that is an individual may be subject to Russian tax in respect of such proceeds at a rate of 30% of the gain (such gain being computed as the sales price less any available documented cost deduction, including the acquisition price of the ADSs and other documented expenses, such as depositary expenses and brokers' fees). In case of non-resident holders that are legal entities or organizations proceed from sale, exchange or disposal of ADSs would be regarded as Russian source proceeds subject to tax in Russia at the rate of 20% if more than 50% of our assets consist of immovable property in Russia. Relevant tax may be eliminated under any available double tax treaty relief, provided that the necessary requirements to qualify for the treaty relief and the appropriate administrative requirements under the Russian tax legislation have been met. For example, holders of ADSs that are eligible for the benefits of the United States-Russia double tax treaty should generally not be subject to tax in Russia on any gain arising from the disposal of ADSs, provided that the gain is not attributable to a permanent

34

**Table of Contents**

establishment or a fixed base that is or was located in Russia and/or provided that no more than 50% of our assets consist of immovable property situated in Russia (as defined in the treaty). Because the determination of whether more than 50% of our assets consist of immovable property situated in Russia is inherently factual and is made on an on-going basis, and because the relevant Russian legislation and regulations are not entirely clear, there can be no assurance that immovable property situated in Russia will not, from time to time, constitute more than 50% of our assets. If more than 50% of our assets were to consist of immovable property situated in Russia, the benefits of the United States-Russia double tax treaty may not be available to an ADS holder (whether a legal entity or an individual). For more details, see "Russian Tax Considerations Relevant to the Purchase, Ownership and Disposal of the ADSs".

***Changes in the double tax treaty between Russia and Cyprus may significantly increase our tax burden.***

A company that is tax resident of Cyprus is subject to Cypriot taxation and qualifies for benefits available under the Cypriot tax treaty network, including the Russia-Cyprus double tax treaty. We can provide no assurance that the double tax treaty will not be renegotiated or revoked.

The Protocol of October 7, 2010 introduced a number of amendments to the Russia-Cyprus double tax treaty dated December 5, 1998. Most of these amendments have been in effect since January 1, 2013. Additionally, the Protocol contained a clause on Article 13 of the Russia-Cyprus double tax treaty, under which gains from the alienation of shares or similar rights deriving more than 50% of their value from immovable property, must be taxed in the country where the property is located starting from January 1, 2017. Moreover, the MLI that is currently being ratified in Russia and Cyprus may have a significant impact on application of the Russia-Cyprus double tax treaty, if relevant positions would be mutually agreed upon by Russia and Cyprus. For more information see "*Weaknesses and changes in the Russian tax system could materially and adversely affect our business and the value of investments in Russia*".

Adverse changes in, or the cancellation of, the Russia-Cyprus double tax treaty may significantly increase our tax burden and adversely affect our business, financial condition and results of operations.

***We may be deemed to be a tax resident outside of Cyprus.***

According to the provisions of the Cyprus Income Tax Law, a company is considered to be a resident in Cyprus for tax purposes if its management and control are exercised in Cyprus. The concept of "management and control" is not defined in the Cypriot tax legislation. For more details in relation to tax residency in Cyprus see "Item 10.E Taxation—Material Cypriot Tax Considerations—Tax residency of a company". If we are deemed not to be a tax resident in Cyprus, we may not be subject to the Cypriot tax regime other than in respect of Cyprus sourced income and we may be subject to the tax regime of the country in which we are deemed to be a tax resident. Further, we would not be eligible for benefits under the double tax treaties entered into between Cyprus and other countries.

Under the Russian Tax Code, a foreign legal entity may be recognized as a Russian tax resident if such entity is in fact managed from Russia. For more details in relation to tax residency in Russia see "Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations".

The double tax treaty in force between Cyprus and Russia provides that a company shall be deemed to be a tax resident of the state in which the place of effective management of the company is situated. In case both states claim the tax residency of the company, the process of determining the effective management will be achieved through the two states endeavoring to determine the place of effective management by mutual agreement having regard to all relevant factors.

On June 7, 2017 Cyprus signed MLI, according to which, and upon ratification by Cyprus and its co-signatories, Cyprus will implement a series of tax treaty measures to update the existing network of double tax treaties. Cyprus has adopted the minimum standards of the MLI and made full reservations on all other provisions of the MLI, including replacement of the "effective management" concept with the mutual agreement procedure between the jurisdictions of which the entity shall be deemed to be a resident.

In addition, taking into account that the majority of our board of directors comprises tax residents or citizens of Russia, this may pose a risk that we, even if we are managed and controlled from Cyprus and, therefore, being a tax resident in Cyprus, may be deemed to have a permanent establishment in Russia or elsewhere. Such a permanent establishment could be subject to taxation of the jurisdiction of the permanent establishment on the profits allocable to the permanent establishment. If we are tax resident in a jurisdiction outside of Cyprus or are deemed to have a permanent establishment in Russia or elsewhere, our tax burden may increase significantly, which, in turn, may materially adversely affect our business, financial condition and results of operations.

***Our subsidiaries may be deemed a tax resident outside of countries of their incorporation.***

Each jurisdiction has its own tax residency requirements. We believe that our subsidiaries do comply with tax residency requirements of the jurisdiction, where they are incorporated; however, there might be a risk that they may be deemed a tax resident outside of countries of their incorporations.

Moreover, the MLI provides that if there is a conflict of tax residency for the person (other than an individual) and competent authorities do not come to an agreement on the relevant person, it shall not be entitled to any tax relief or exemption provided by the relevant double tax treaty except to the extent as may be agreed upon by the competent authorities. In the absence of relevant practice we could not exclude the risk that there might be a conflict of tax residency for our subsidiaries resulting in significant increase of our tax burden, which may materially adversely affect our business, financial condition and results of operations.

35

Table of Contents

***Depending upon the value and the nature of our assets and the amount and nature of our income over time, we could be classified as a passive foreign investment company ("PFIC") for U.S. federal income tax purposes.***

We will be classified as a PFIC in any taxable year if either: (a) 50% or more of the fair market value of our gross assets (determined on the basis of a quarterly average) for the taxable year produce passive income or are held for the production of passive income, or (b) 75% or more of our gross income for the taxable year is passive income. As a publicly traded foreign corporation we intend for this purpose to treat the aggregate fair market value of our gross assets as being equal to the aggregate value of our outstanding stock ("market capitalization") plus the total amount of our liabilities and to treat the excess of the fair market value of our assets over their book value as a nonpassive asset to the extent attributable to our nonpassive income. Because we currently hold, and expect to continue to hold, a substantial amount of cash and cash equivalents and other passive assets used in our business, and because the value of our gross assets is likely to be determined in large part by reference to our market capitalization securities, we would likely become a PFIC for a given taxable year if the market price of our ADSs were to decrease significantly. The application of the PFIC rules is subject to uncertainty in several respects, and we must make a separate determination after the close of each taxable year as to whether we were a PFIC for such year. If we are a PFIC for any taxable year during which a U.S. investor held our ADSs or ordinary shares, the U.S. investor might be subject to increased U.S. federal income tax liability and to additional reporting obligations. We do not intend to provide the information necessary for the U.S. investor to make a qualified electing fund election with respect to our ADSs or ordinary shares. See "Taxation – United States Federal Income Tax Considerations – Passive Foreign Investment Companies."

***Our companies established outside of Russia may be exposed to taxation in Russia.***

Due to our international structure (see "Item 18. Financial Statements, Note 5. Consolidated subsidiaries), we are subject to permanent establishment and transfer pricing risks in various jurisdictions in which we operate. We manage the related risks by looking at management functions and risks in various countries and level of profits allocated to each subsidiary. If additional taxes are assessed with respect to these matters, they may be material.

The Russian Tax Code contains the concept of a permanent establishment in Russia as means for taxing foreign legal entities, which carry on regular operational activities in Russia beyond preparatory and auxiliary activities. The Russian double tax treaties with other countries also contain a similar concept. If a foreign company is treated as having a permanent establishment in Russia, it would be subject to Russian taxation in a manner broadly similar to the taxation of a Russian legal entity, but only to the extent of the amount of the foreign company's income that is attributable to the permanent establishment in Russia. However, the practical application of the concept of a permanent establishment under Russian domestic law is not well developed and so foreign companies having even limited operations in Russia, which would not normally satisfy the conditions for creating a permanent establishment under international rules, may be at risk of being treated as having a permanent establishment in Russia and hence being exposed to Russian taxation. Furthermore, the Russian Tax Code contains attribution rules, which are not sufficiently developed, and there is a risk that the tax authorities might seek to assess Russian tax on the global income of a foreign company. Having a permanent establishment in Russia may also lead to other adverse tax implications, including challenging a reduced withholding tax rate on dividends under an applicable double tax treaty, potential effect on VAT and property tax obligations. There is also a risk that penalties could be imposed by the tax authorities for failure to register a permanent establishment with the Russian tax authorities. Recent events in Russia suggest that the tax authorities may be seeking more actively to investigate and assert whether foreign entities of our Group operate through a permanent establishment in Russia. Any such taxes or penalties could have a material adverse effect on our business, financial condition and results of operations.

A number of amendments had been made to the Russian tax legislation introducing, amongst others, the concepts of controlled foreign companies, corporate tax residency and beneficial ownership (Federal Law No. 376-FZ was signed by the Russian President on November 24, 2014 (as amended) with its provisions applicable starting from January 1, 2015). Due to the lack of court and administrative practice, no assurance can be currently given as to how these amendments will be applied in practice and their exact nature, their potential interpretation by the tax authorities and the possible impact on us. We cannot rule out the possibility that, as a result of the introduction of changes to Russian tax legislation, certain of our companies established outside Russia might be deemed to be Russian tax residents (especially when they fail to meet substance requirements in the countries of their incorporation), subject to all applicable Russian taxes. For more details see risks described in "Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations".

***We may encounter difficulties in obtaining lower rates of Russian withholding income tax envisaged by the Russia-Cyprus double tax treaty for dividends distributed from Russia.***

Dividends paid by a Russian legal entity to a foreign legal entity are generally subject to Russian withholding income tax at a rate of 15%, although this tax rate may be reduced under an applicable double tax treaty. We intend to rely on the Russia-Cyprus double tax treaty. The tax treaty allows reduction of withholding income tax on dividends paid by a Russian company to a Cypriot company to 10% provided that the following conditions are met: (i) the Cypriot company is a tax resident of Cyprus within the meaning of the tax treaty; (ii) the Cypriot company is the beneficial owner of the dividends; (iii) the dividends are not attributable to a permanent establishment of the Cypriot company in Russia; and (iv) the treaty clearance procedures are duly performed. This rate may be further reduced to 5% if the direct investment of the Cypriot company in a Russian subsidiary paying the dividends is at least EUR100,000. Although we will seek to claim treaty protection, there is a risk that the applicability of the reduced rate of 5% or 10% may be challenged by Russian tax authorities. As a result, there can be no assurance that we would be able to avail ourselves of the reduced withholding income tax rate in practice.

Specifically, our Cypriot holding company may incur a 15% withholding income tax at source on dividend payments from Russian subsidiaries if the treaty clearance procedures are not duly performed at the date when the dividend payment is made. In this case, we may seek to claim as a refund the difference between the 15% tax withheld and the reduced rate of 10% or 5% as appropriate. However, there can be no assurance that such taxes would be refunded in practice. Similar approach is applied to dividends received from Russian subsidiaries by the Company's non-Russian subsidiaries.

36

Table of Contents

Furthermore, a number of amendments had been made to the Russian tax legislation introducing, amongst others, the concept of beneficial ownership. Under this concept, double tax treaty benefits are only available to the recipient of income from Russian sources, if such recipient is the beneficial owner of the relevant income. Foreign entities that do not qualify as beneficial owners may not claim double tax treaty relief even if they are residents in a double tax treaty country. For these purposes, the beneficial owner is defined as a person holding directly, through its direct and/or indirect participation in other organizations or otherwise, the right to own, use or dispose of income, or the person on whose behalf another person is authorized to use and/or dispose of such income. In order to determine whether a foreign entity is a beneficial owner of income, it is necessary to take into account the functions performed by such foreign entity, as well as the risks borne by it. Entities are not recognized as beneficial owners of income if they have limited authorities to use or dispose income received from Russian sources, perform agency or other similar functions in favour of third parties, not taking any risks or transfer such income (either partially or in full) to third parties that are not eligible to double tax treaty benefits.

Introduction of the concept of beneficial ownership may result in the inability of the foreign companies within our Group to claim benefits under a double taxation treaty through structures which historically have benefited from double taxation treaty protection in Russia. This may be the case if the recipient of the income is not recognized as its beneficial owner, look-through approach cannot be applied or is challenged by the tax authorities. Recent court cases demonstrate that the Russian tax authorities actively challenge application of double tax treaty benefits retroactively (i.e. prior to concept of beneficial ownership was introduced in the Russian Tax Code) on the grounds that double tax treaties already include beneficial ownership requirement to allow application of reduced tax rates or exemptions. In these cases the Russian tax authorities obtained relevant information by means of information exchange with the foreign tax authorities. The imposition of additional tax liabilities as a result of the application of this rule to transactions carried out by us may have a material adverse effect on our business, financial condition and results of operations (see "-Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations").

***Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations.***

The Russian Federation, like a number of other countries in the world, is actively involved in introduction of measures against tax evasion through the use of low tax jurisdictions as well as aggressive tax planning structures. Starting from January 1, 2015, the Federal Law No. 376-FZ, introducing the concept of "controlled foreign companies" (the "CFC Rules"), the concept of "corporate tax residency" and the concept of "beneficial ownership" into Russian tax legislation, came into force (with further amendments within 2016-2018). Moreover, Russia has entered into several multilateral agreements for the exchange of information between the tax authorities of different countries.

Under the Russian CFC Rules, in certain circumstances, undistributed profits of foreign companies and non-corporate structures (e.g., trusts, funds or partnerships) domiciled in foreign jurisdictions, which are ultimately owned and/ or controlled by Russian tax residents (legal entities and individuals) will be subject to taxation in Russia. The Russian CFC Rules are being constantly developed. A number of amendments to the Russian CFC Rules were made within 2015-2017 years. In the meantime, certain provisions of the Russian CFC Rules are still ambiguous and may be subject to arbitrary interpretation by the Russian tax authorities.

Under the concept of "corporate tax residency" a foreign legal entity may be recognized as a Russian tax resident if: (i) its executive body(ies) operates in respect of such company in Russia on regular basis (however, the activity of executive body will not be viewed as regular if it is insignificant compared to the one in the other jurisdiction), or (ii) senior executive personnel of the company who are authorized to plan and control activities of the company and take responsibility over it basically carry out management of the company from Russia (i.e. make decisions or take any other measures in respect of operational activities of the company that are within the competence of the company's executive body). Provided that one of the above conditions is met both in Russia and in other jurisdiction to the same extent, the place of management and control is defined as Russia, provided that one or more of the following is carried out in Russia: (i) bookkeeping and maintaining of management accounts (other than preparation and reporting of consolidated financial or management accounts, as well as analysis of operations of the foreign company), or (ii) company's record keeping, or (iii) daily management of the company's staff. When an entity is recognized as Russian tax resident it is obligated to register with the Russian tax authorities, calculate and pay Russian tax on its worldwide income and comply with other tax-related rules established for Russian entities. There is still an uncertainty as to how these criteria will be applied by the Russian tax authorities in practice.

Under the Russian Tax Code, a beneficial owner is defined as a person holding directly, through its direct and/or indirect participation in other organizations or otherwise, the right to own, use or dispose of income, or the person on whose behalf another person is authorized to use and/or dispose of such income. When determining the beneficial owner, the functions of a foreign person that is claiming the application of reduced tax rates under an applicable double tax treaty and the risks that such person takes should be analyzed. In accordance with the provisions of the Russian Tax Code, the benefits of a double tax treaty will not apply if a foreign person claiming such benefits has limited powers to dispose of the relevant income, fulfills intermediary functions without performing any other duties or taking any risks and paying such income (partially or in full) directly or indirectly to another person who would not be entitled to the same benefits should it received the income in question directly from Russia. Starting from January 1, 2017, the Russian Tax Code requires a tax agent (i.e. the payer of income) (in addition to a certificate of tax residency) to obtain a confirmation from the recipient of the income that it is the beneficial owner of the income. To date, there is still no approved or recommended format of such confirmation letter. However, the court practice proves that in each case the tax authorities follow "the substance over form" approach when considering the beneficial owner confirmations.

The Russian Tax Code allows for a "look through" approach to withholding tax, i.e. double tax treaty benefits shall be still available to the actual beneficial owner of income coming from Russian sources in case the first recipient of such income does not satisfy beneficial ownership criteria and, therefore, is not subject to double tax treaty relief. In this case the actual beneficial owner of such income may be entitled to double tax treaty relief, subject to certain conditions stipulated in articles 7 and 312 of the Russian Tax Code, provided it is a tax resident of the jurisdiction, which has a double tax treaty with Russia. If the actual beneficial owner is a Russian tax resident or is a resident of the jurisdiction with no double tax treaty with Russia in place, provisions of the Russian Tax Code shall apply. Before 2019 there was uncertainty, whether the "look through" approach could be applied in relation to any type of income other than dividends. Since 2019 it is specifically allowed by the Russian Tax Code.

37

Table of Contents

On November 4, 2014 the Russian President signed Federal Law No. 325-FZ ratifying the multilateral Convention on Mutual Administrative Assistance in Tax Matters developed by the Council of Europe and the OECD, which the Russian Federation signed in 2011. Ratification of this Convention enables the Russian Federation starting from July 1, 2015 to receive tax information from all participating countries which include, among others, a number of offshore jurisdictions (mutual disclosures to the participating countries are required). In particular, this Convention provides for three types of tax information exchange between countries: exchange upon request, automated exchange and voluntary (ad-hoc) exchange. Moreover, the Convention offers such instruments as simultaneous tax audits (tax authorities can carry out an audit in their respective territories and then exchange data on the audited group of companies or persons connected with joint interests), as well as foreign tax audits (when a tax audit includes the work of foreign tax authorities). The Convention also foresees mutual assistance of states to collect taxes within their respective territories.

It is currently unclear how the Russian tax authorities will interpret and apply the abovementioned tax concepts and what will be the possible impact on us and our subsidiaries. In practice, over the last few years the tax authorities have actively applied and used all information exchange instruments available to them. As to the beneficial ownership concept, in a number of recent court cases, the tax authorities successfully applied this concept retroactively in respect to payments made before 2015 (i.e. prior to the date when the Russian beneficial ownership concept have come into force). Herewith, the tax authorities were unable to refer to the new rules enacted by the Federal Law No. 376-FZ for the period prior to 2015, so they referred to an applicable double tax treaty and the Commentaries to the OECD Model Tax Convention. Starting from 2015 the tax authorities may refer to specific provision of the Russian Tax Code when they challenge the beneficial ownership of the recipient and charge additional tax. Moreover, as mentioned above, starting from 2017, obtaining a confirmation that the income recipient is its beneficial owner became an obligatory procedure (rather than a right of a tax agent) for applying a reduced withholding tax rate.

Therefore, it cannot be excluded that we might be subject to additional tax liabilities because of these changes being introduced and applied to transactions carried out by us, which could have a material adverse effect on our business, financial condition and results of operations.

*VAT on digital services in Russia.*

Starting from January 1, 2017, the new provisions of the Russian Tax Code introducing an obligation to pay Russian VAT on digital (electronically supplied) services in case such digital services are supplied (deemed to be supplied) to the individuals in Russia ("VAT law") entered into force. Starting from January 1, 2019, the law also extends the obligation to register and pay VAT to foreign companies that provide electronic services to legal entities and individual entrepreneurs in Russia. At the same time, buyers of such services are provided with the right to deduct VAT from foreign sellers.

Based on the new VAT law digital services shall be regarded as supplied at the place of the buyer's location. The new rules establish special criteria to determine whether the buyers are located in Russia.

Obligations to pay VAT on digital services supplied in Russia would depend on the way such services are provided. In particular, the VAT law contains the following provisions:

- If services are provided by foreign suppliers to Russian customers via Russian sales agents under agency (or other similar) agreements and such agents participate in settlements directly with customers, then such Russian agents would be obliged to act as tax agents, withhold and pay the respective amounts of VAT to the Russian budget. No VAT registration will be required for the foreign suppliers. If services are provided via chain of sales agents the last sales agent in the chain collecting money from customers should withhold and pay the respective amounts of VAT;

- If services are provided by foreign suppliers to Russian customers via foreign sales agents and such agents participate in settlements directly with customers, then such foreign agents are obliged to register in Russia for VAT purposes and fulfil VAT obligations related to digital services. If services are provided via several foreign agents, then a foreign agent which performs settlements directly with customers is regarded as a tax agent which should be registered in Russia for VAT purposes and fulfil VAT obligations.

These rules do not contain exact list of companies which should be regarded as tax agents for payment of VAT on digital services, but rather mention a broad list of intermediaries. However, based on the amendments introduced by the Federal Law No. 335-FZ dated November 27, 2017, starting from January 1, 2018 the national payment system operators specified in Federal Law No. 161-FZ "On the National Payment System" dated June 27, 2017 and mobile operators are excluded from the list of tax agents in respect of activities involving cash settlements for digital services.

Many provisions of VAT law are still ambiguous. It is currently unclear whether the foreign service provider registered in Russia for VAT purposes should pay VAT from other (non-digital) services VATable in Russia.

In case we are considered to be a foreign sales agent participating in settlements directly with customers, we may be forced to comply with VAT law as a tax agent for payment of VAT on digital services. Such event together with further developments of VAT law could have a material adverse effect on our business, financial condition and results of operations.

38

Table of Contents

**Risks Relating to our ADSs**

*The class B shares underlying the ADSs are not listed and may be illiquid.*

The class B shares underlying the ADSs are neither listed nor traded on any stock exchange, and we do not intend to apply for the listing or admission to trading of the class B shares on any stock exchange. As a result, a withdrawal of class B shares by a holder of ADSs, whether by election or due to certain other events will result in that holder obtaining securities that are significantly less liquid than the ADSs and the price of those class B shares may be discounted as a result of such withdrawal.

*Our ADSs trade on more than one market and this may result in increased volatility and price variations between such markets.*

Our ADSs trade on both Nasdaq and MOEX. Trading in our ADSs on these markets occurs in different currencies (U.S. dollars on Nasdaq and Russian rubles on MOEX) and at different times (due to different time zones, trading days and public holidays in the United States and Russia). The trading prices of our ADSs on these two markets may differ due to these and other factors. The liquidity of trading in our ADSs on MOEX is limited. This may impair your ability to sell your ADSs on MOEX at the time you wish to sell them or at a price that you consider reasonable. In addition, trading of a small number of ADSs on that market could adversely impact the price of our ADSs significantly and could, in turn, impact the price in the United States. ADSs are completely fungible between both markets. Any decrease in the trading price of our ADSs on one of these markets could cause a decrease in the trading price of our ADSs on the other market. Additionally, as there is no direct trading or settlement between the two stock markets, the time required to move the ADSs from one market to another may vary and there is no certainty of when ADSs that are moved will be available for trading or settlement.

*Future sales of ADSs or ordinary shares by significant shareholders could cause the price of our ADSs to decline.*

If any of our significant shareholders sell, or indicate an intent to sell, substantial amounts of our ADSs or ordinary shares, including both class A shares and class B shares, in the market, the trading price of our ADSs could decline significantly. We cannot predict the effect, if any, that future sales of these ADSs or ordinary shares or the availability of these ADSs or ordinary shares for sale will have on the market price of our ADSs. As of the date of this annual report, we have outstanding 62,712,975 ordinary shares, including those represented by ADSs. Our shares that are not currently represented by ADSs could generally be added into our ADS program in relatively short order, subject to applicable securities laws restrictions. Our significant shareholders currently include Mr. Sergey Solonin (see *"–The substantial share ownership position of our chief executive officer Sergey Solonin may limit your ability to influence corporate matters"*) and Otkritie Bank (see "*–The substantial share ownership position of Otkritie could be adverse to the interests of our minority shareholders*"). A significant sale of our securities by any of these holders or any other future owner of a substantial stake in our company could have a detrimental effect on the trading price of our ADSs. We cannot predict what effect, if any, market sales of securities held by our significant shareholders or any other shareholder or the availability of these securities for future sale will have on the market price of the ADSs.

*Investors in our ADSs may have limited recourse against us, our directors and executive officers because we conduct our operations outside the United States and most of our current directors and executive officers reside outside the United States.*

Our presence outside the United States may limit investors' legal recourse against us. We are incorporated under the laws of the Republic of Cyprus. Almost all of our current directors and senior officers reside outside the United States, principally in the Russian Federation. Substantially all of our assets and the assets of our current directors and executive officers are located outside the United States, principally in the Russian Federation. As a result, investors may not be able to effect service of process within the United States upon our company or its directors and executive officers or to enforce U.S. court judgments obtained against our company or its directors and executive officers in Russia, Cyprus or other jurisdictions outside the United States, including actions under the civil liability provisions of U.S. securities laws. In addition, it may be difficult for investors to enforce, in original actions brought in courts in jurisdictions outside the United States, liabilities predicated upon US securities laws. There is no treaty between the United States and the Russian Federation providing for reciprocal recognition and enforcement of foreign court judgments in civil and commercial matters. These limitations may deprive investors of effective legal recourse for claims related to their investment in our ADSs.

*Our ADS holders may not be able to exercise their pre-emptive rights in relation to future issuances of class B shares.*

In order to raise funding in the future, we may issue additional class B shares, including in the form of ADSs. Generally, existing holders of shares in Cypriot public companies are entitled by law to pre-emptive rights on the issue of new shares in that company (provided that such shares are paid in cash and the pre-emption rights have not been disapplied). Our ADS holders may not be able to exercise pre-emptive rights for class B shares represented by ADSs unless applicable securities law requirements are adhered to or an exemption from such requirements is available. In the United States, we may be required to file a registration statement under the Securities Act to implement pre-emptive rights. We can give no assurance that an exemption from the registration requirements of the Securities Act would be available to enable U.S. holders of ADSs to exercise such pre-emptive rights and, if such exemption is available, we may not take the steps necessary to enable U.S. holders of ADSs to rely on it. Accordingly, our ADS holders may not be able to exercise their pre-emptive rights on future issuances of shares, and, as a result, their percentage ownership interest in us would be reduced.

In April 2013, our shareholders authorized the disapplication of pre-emptive rights for a period of five years from May 8, 2013, the date of the closing of our initial public offering, in connection with the issue of up to an additional 52,000,000 class B shares, including in the form of ADSs. Such disapplication has expired on May 8, 2018, and while we have solicited further disapplication by our shareholders, such disapplication has not been supported by our public shareholders so far. If no further disapplication of pre-emptive rights is approved by our shareholders, any of our share issuances would be subject to the pre-emptive rights of our shareholders which some of our ADS holders may not be able to exercise due to the factors described above. At the same time, to the extent we attempt an offering of ADSs in the United States pursuant to the pre-emptive rights of our shareholders, we may not be able to do so due to the fact that rights offerings are difficult to implement effectively under the current U.S. securities laws, and our ability to raise capital in the future may be compromised if we need to do so via a rights offering in the United States.

Table of Contents

*ADS holders have no legal interest in the underlying class B shares.*

ADS holders acquire the beneficial, and not the legal, interest in the underlying class B shares, which the depositary holds on trust for them, under the terms of the deposit agreement. The intended effect of the trust is to ring-fence the class B shares in the hands of the depositary by conferring a property interest on ADS holders as beneficiaries. The interest of the ADS holders as beneficiaries in trust assets, which are the class B shares, is indirect, in the sense that in the normal course they do not have any direct recourse to the class B shares nor do they have any direct right of action against us.

*ADS holders may be subject to limitations on transfer of their ADSs.*

ADSs are transferable on the books of the depositary. However, the depositary may close its transfer books at any time or from time to time when it deems expedient in connection with the performance of its duties. In addition, the depositary may refuse to deliver, transfer or register transfers of ADSs generally when our books or the books of the depositary are closed, or at any time if we or the depositary deems it advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason in accordance with the terms of the deposit agreement.

**ITEM 4.    Information on the Company**

**A.    History and Development of the Company**

We were incorporated in Cyprus under the name of OE Investments Limited on February 26, 2007 as a new holding company for JSC QIWI (previously known as OSMP CJSC and QIWI CJSC). The company operates under the Companies Law, related legislation, and common law of Cyprus. In 2007, we acquired, among other entities, CJSC E-port and LLC Qiwi Wallet, which were reorganized in the form of accession to JSC QIWI. In April 2008, we launched the Qiwi brand, which gradually became the marketing name for our businesses. We changed our legal name to Qiwi Limited on September 13, 2010, and subsequently to Qiwi plc upon going public on February 25, 2013.

Our primary subsidiaries are QIWI Bank (JSC), or Qiwi Bank, JSC QIWI and QIWI Payments Services Provider Limited. JSC QIWI was incorporated in Russia in January 2004, and QIWI Payments Services Provider Limited was incorporated in the United Arab Emirates in February 2011.

In September 2010, we acquired Qiwi Bank from a group of our then-current shareholders. In June 2015, we acquired the Rapida payment processing system and the Contact money transfer system from Otkritie Investment Cyprus Limited. In April 2017 Rapida LTD was merged into Qiwi Bank.

In June 2018, QIWI, Otkritie Bank and Tochka management signed a partnership agreement to establish a new entity JCS Tochka to collectively develop this businessTochka, a digital banking service focused on offering a broad range of services to small and medium businesses, as a multi-bank platform. JCS Tochka commenced its business operations in February 2019.

In July 2018, we acquired 100% of Rocketbank, a digital banking service offering debit cards and deposits to retail customers, from Otkritie Bank. Rocketbank currently operates as a branch of Qiwi Bank JSC.

Our principal executive office is located at Kennedy 12, Kennedy Business Centre, 2nd floor, P.C. 1087, Nicosia, Cyprus. Our telephone number at this address is: +357-22-653390. Our registered office is at the same address.

The SEC maintains an internet website that contains reports and other information about issuers, like us, that file electronically with the SEC. The address of that website is www.sec.gov. Our website address is www.qiwi.com. The information contained on, or that can be accessed through, our website is not part of, and is not incorporated into, this Annual Report. References herein to the company's websites shall not be deemed to cause such incorporation.

For a description of our principal capital expenditures and divestitures for the three years ended December 31, 2018 and for those currently in progress, see Item 5 "Operating and Financial Review and Prospects."

For a description of the rules and regulations under which we are governed, see Item 4 "Regulation."

**B.    Business Overview**

We are a leading provider of next generation payment and financial services in Russia and the CIS. We have an integrated proprietary network that enables payment services across online, mobile and physical channels as well as provides access to certain financial services that we offer to our retail customer and B2B partners. We have deployed over 20.8 million virtual wallets, over 143,000 kiosks and terminals, and enabled merchants, customers and partners to accept and transfer over RUB 94 billion cash and electronic payments monthly connecting over 45 million consumers using our network at least once a month (aggregating consumers across QIWI and Contact networks, without eliminating potential duplication). Our consumers and partners can use cash, stored value and other electronic payment methods in order to pay for goods and services or transfer money across virtual or physical environments interchangeably, as well as employ our open API infrastructure and use our highly customizable, sophisticated payment solutions to serve their business or personal needs. We believe the complementary combination of our physical and virtual payment and financial services as well as our open infrastructure provides differentiated convenience to our

40