# Exhibit G

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# Form 20-F

---

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Or**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2020**

**Or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Or**

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number: 001-35893**

---

# QIWI PLC
**(Exact name of Registrant as specified in its charter)**

---

**N/A**
**(translation of Registrant's name into English)**

**Cyprus**
**(Jurisdiction of incorporation or organization)**

**Kennedy 12, Kennedy Business Centre, 2nd floor**
**P.C. 1087, Nicosia, Cyprus**
**(Address of principal executive offices)**

**+ 357 2265-3390**
**ir@qiwi.com**
**Kennedy 12, Kennedy Business Centre, 2nd floor**
**P.C. 1087, Nicosia, Cyprus**
**(Name, telephone, e-mail and/or facsimile number and address of company contact person)**

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol | Name of Each Exchange on Which Registered |
|---|---|---|
| American Depositary Shares, each representing one Class B ordinary share, having a nominal value EUR 0.0005 per share | QIWI | The NASDAQ Stock Market LLC |
| Class B ordinary shares, having a nominal value of EUR 0.0005 per share* | N/A | |

*\* Not registered for trading, but exist only in connection with the registration of the American Depositary Shares.*

**Securities registered or to be registered pursuant to Section 12(g) of the Act:**

**None**
**(Title of Class)**

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:**

Indicate the number of outstanding shares of each of the Issuer's classes of capital or common stock as of the close of the period covered by the annual report.

**As of December 31, 2020, 10,413,522 Class A ordinary shares, par value EUR 0.0005 per share and 52,299,453 Class B ordinary shares, par value EUR 0.0005 per share were outstanding.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☐    No ☒

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.    Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such a shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See definition of "large accelerated filer, "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐        Accelerated filer ☒        Non-accelerated filer ☐        Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act    ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐        International Financial Reporting Standards as issued                    Other ☐
                    by the International Accounting Standards Board ☒

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the Registrant has elected to follow:    Item 17 ☐    Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.    Yes ☒    No ☐

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.    Yes ☐    No ☐

**TABLE OF CONTENTS**

PART I

| | | | |
|---|---|---|---|
| ITEM 1. | Identity of Directors, Senior Management and Advisers | | 3 |
| ITEM 2. | Offer Statistics and Expected Timetable | | 3 |
| ITEM 3. | Key Information | | 4 |
| | A. | Selected Financial Data | 4 |
| | B. | Capitalization and Indebtedness | 8 |
| | C. | Reasons for the Offer and Use of Proceeds | 8 |
| | D. | Risk Factors | 8 |
| ITEM 4. | Information on the Company | | 45 |
| | A. | History and Development of the Company | 45 |
| | B. | Business Overview | 46 |
| | C. | Organizational Structure | 64 |
| | D. | Property, Plants and Equipment | 64 |
| ITEM 4A. | Unresolved Staff Comments | | 64 |
| ITEM 5. | Operating and Financial Review and Prospects | | 65 |
| | A. | Operating Results | 65 |
| | B. | Liquidity and Capital Resources | 86 |
| | C. | Research and Development, Patents and Licenses, etc. | 88 |
| | D. | Trend Information | 88 |
| | E. | Off-balance Sheet Arrangements | 89 |
| | F. | Tabular Disclosure of Contractual Obligations | 89 |
| | G. | Safe Harbor | 89 |
| ITEM 6. | Directors, Senior Management and Employees | | 89 |
| | A. | Directors and Senior Management | 89 |
| | B. | Compensation | 91 |
| | C. | Board Practices | 93 |
| | D. | Employees | 95 |
| | E. | Share Ownership | 95 |
| ITEM 7. | Major Shareholders and Related Party Transactions | | 96 |
| | A. | Major Shareholders | 96 |
| | B. | Related Party Transactions | 96 |

|  |  |  |  |
|---|---|---|---|
|  | C. | Interests of Experts and Counsel | 98 |
| ITEM 8. |  | Financial Information | 98 |
|  | A. | Consolidated Financial Statements and Other Financial Information | 98 |
|  | B. | Significant Changes | 98 |
| ITEM 9. |  | The Offer and Listing | 98 |
|  | A. | Offer and Listing Details | 98 |
|  | B. | Plan of Distribution | 98 |
|  | C. | Markets | 98 |
|  | D. | Selling Shareholders | 99 |
|  | E. | Dilution | 99 |
|  | F. | Expenses of the Issue | 99 |
| ITEM 10. |  | Additional Information | 99 |
|  | A. | Share Capital | 99 |
|  | B. | Memorandum and Articles of Association | 99 |
|  | C. | Material Contracts | 103 |
|  | D. | Exchange Controls | 103 |
|  | E. | Taxation | 103 |
|  | F. | Dividends and Paying Agents | 117 |
|  | G. | Statements by Experts | 117 |
|  | H. | Documents on Display | 117 |
|  | I. | Subsidiary Information | 117 |
| ITEM 11. |  | Quantitative and Qualitative Disclosures About Market Risk | 117 |
| ITEM 12. |  | Description of Securities Other Than Equity Securities | 119 |
|  | A. | Debt Securities | 119 |
|  | B. | Warrants and Rights | 120 |
|  | C. | Other Securities | 120 |
|  | D. | American Depositary Shares | 120 |

PART II

| ITEM 13. | Defaults, Dividend Arrearages and Delinquencies | 120 |
|---|---|---|
| ITEM 14. | Material Modifications to the Rights of Security Holders and Use of Proceeds | 121 |
| ITEM 15. | Controls and Procedures | 121 |
| ITEM 16. | [RESERVED] | 122 |
| ITEM 16A. | Audit Committee Financial Expert | 122 |
| ITEM 16B. | Code of Ethics | 122 |
| ITEM 16C. | Principal Accountant Fees and Services | 123 |
| ITEM 16D. | Exemptions from the Listing Standards for Audit Committees | 123 |
| ITEM 16E. | Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 123 |
| ITEM 16F. | Change in Registrant's Certifying Accountant | 123 |
| ITEM 16G. | Corporate Governance | 123 |
| ITEM 16H. | Mine Safety Disclosure | 124 |

PART III

| ITEM 17. | Financial Statements | 124 |
|---|---|---|
| ITEM 18. | Financial Statements | 124 |
| ITEM 19. | Exhibits | 124 |

*Adjusted Net Profit*

Adjusted Net Profit is defined as net profit excluding fair value adjustments recorded on business combinations and their amortization, share-based payments, foreign exchange loss/(gain) from revaluation of cash proceeds, impairment of non-current assets, loss on disposals of subsidiaries, offering and related expenses, loss from sale of Sovest loan portfolio, and the effects of taxation on those excluded items. Adjusted Net Profit is a key measure used by management to observe the operational profitability of the company. We believe Adjusted Net Profit is useful to an investor in evaluating our operating performance because it measures a company's operating performance without the effect of non-recurring items or items that are not core to our operations. For example, loss on disposals of subsidiaries and the effects of deferred taxation on excluded items do not represent the core operations of the business, and fair value adjustments recorded on business combinations and their amortization, impairment of non-current assets and share-based payments expenses do not have a substantial cash effect. Nevertheless, such gains and losses can affect our financial performance. For the periods presented in this Annual Report Adjusted Net Profit is equal to Total Segment Net Profit.

The following table reconciles Adjusted Net Profit to net profit.

| | Year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | |
| | RUB | RUB | RUB | RUB | RUB | U.S.$ |
| | | | (in millions) | | | |
| **Net profit from continuing operations** | **2,683** | **5,643** | **7,181** | **9,441** | **11,246** | **152.2** |
| **Net loss from discontinued operations** | **(194)** | **(2,501)** | **(3,555)** | **(4,554)** | **(2,308)** | **(31.2)** |
| adjusted for: | | | | | | |
| Fair value adjustments recorded on business combinations and their amortization | 396 | 344 | 369 | 479 | 337 | 4.6 |
| Share-based payments | 224 | 398 | 635 | 464 | 43 | 0.6 |
| Foreign exchange loss/(gain) from revaluation of cash proceeds (1) | 975 | 236 | (433) | 130 | — | — |
| Impairment of non-current assets | 878 | — | — | 792 | 134 | 1.8 |
| Loss on disposals of subsidiaries | 10 | — | — | — | 42 | 0.6 |
| Offering expenses | — | — | — | 79 | 71 | 1.0 |
| Loss from sale of Sovest loan portfolio | — | — | — | — | 712 | 9.6 |
| Effect of taxation of the above items | (258) | (66) | (60) | (152) | 27 | 0.4 |
| **Adjusted Net Profit** | **4,714** | **4,054** | **4,137** | **6,679** | **10,304** | **139.5** |

(1)    Foreign exchange gain on June 2014 offering proceeds, as presented in the reconciliation of net profit to adjusted net profit differs from the foreign exchange loss/(gain) in the reconciliation of net profit to Adjusted EBITDA as the latter includes all the foreign exchange losses/(gains) for the period, while the former relates solely to foreign currency changes resulting from the funds received in connection with our offering of ADSs in June 2014.

**B.    Capitalization and Indebtedness.**

Not applicable.

**C.    Reasons for the Offer and Use of Proceeds.**

Not applicable.

**D.    Risk Factors**

*In conducting our business, we face many risks that may interfere with our business objectives. Some of these risks relate to our operational processes, while others relate to our business environment. It is important to understand the nature of these risks. If any of the following risks actually occurs, it may materially harm our business, results of operations or financial condition.*

**Risk Factors Summary**

Our business operations are subject to numerous risks and uncertainties, including those outside of our control, that could cause our actual results to be negatively affected. Set forth below is a summary of the principal risks associated with an investment in our ADSs:

8

**Risks Related to Our Business and Our Assets**

- The financial services industry is highly competitive, and we have a vast number of competitors that are larger and have greater financial and other resources;

- Qiwi Bank operates in a highly regulated environment and increased regulatory scrutiny could have an adverse effect on our business, financial condition and results of operations;

- We have become subject to lawsuits in connection with the abrupt decrease in our share price caused by our disclosure of the restrictions introduced by the CBR with respect to Qiwi Bank's operations in December 2020;

- We derive a substantial portion of our revenues from merchants in the betting industry and may lose all or a significant portion of such revenue stream due to recent changes in regulation;

- Our continued growth depends on our ability to maintain or increase our payment services average net revenue yield;

- If we cannot keep pace with rapid developments and change in our industry and provide new services to our clients, or if any of the new products we roll out are unsuccessful, the use of our services could decline, and we could experience a decline in revenue and an inability to recoup costs;

- We are subject to the economic risk and business cycles of our merchants, partners and agents and the overall level of consumer spending;

- If customer or merchant confidence in our business deteriorates, our business, financial condition and results of operations could be adversely affected;

- A decline in the use of cash as a means of payment or a decline in the use of kiosks and terminals may result in a reduced demand for our services;

- We are subject to extensive government regulation;

- Events outside of our control, including public health crises, may negatively affect consumer spending and our business;

- We may not be able to complete or integrate successfully any potential future acquisitions, partnerships or joint ventures;

- Our compliance processes, procedures and controls with respect to the rules and regulations that apply to our business may prove insufficient;

- Our success depends to a large degree on our ability to successfully address the rapidly evolving market for transactions on mobile devices;

- Our systems and our third party providers' systems may fail due to factors beyond our control, which could interrupt our service, cause us to lose business and increase our costs;

- Unauthorized or improper disclosure of data, whether through cybersecurity breaches, computer viruses or otherwise, could expose us to direct loss, liability, protracted and costly litigation and damage our reputation;

- If we fail to comply with the applicable requirements of our agreements with major payment systems, they could seek to fine us, suspend us or terminate our registrations;

- Customer complaints, actual or perceived failures of our customer service function or negative publicity about our customer service could materially adversely affect the attractiveness of our services;

- Our services have been and may continue to be used for fraudulent, illegal or improper purposes, which could expose us to additional liability and harm our business;

- Our business is exposed to counterparty and credit risks;

- We may not be able to successfully protect our intellectual property and may be subject to infringement claims;

- Starting from 2024, companies such as ours will be required to use primarily domestic Russia-produced software and hardware;

- In a dynamic industry like ours, the ability to attract, recruit, retain and develop qualified personnel is critical to our success and growth;

- Our operations may be constrained if we cannot attract or service future debt financing;

*Risks Relating to Corporate Governance Matters and Organizational Structure*

- The substantial share ownership position of the Chairman of our board of directors, Sergey Solonin, may limit your ability to influence corporate matters;

- The substantial share ownership position of Otkritie could be adverse to the interests of our minority shareholders;

- Our ADS holders have limited rights in relation to the appointment of our directors, including our independent directors;

- The rights of our shareholders are governed by Cyprus law and our articles of association, and differ in some important respects from the typical rights of shareholders under US state laws;

- Acquisitions of Russian entities are subject to pre-closing approval by multiple government authorities which exercise significant discretion as to whether a consent should be granted or not, and are regulated by a significant body of law which is often ambiguous and open to varying interpretations;

- As a foreign private issuer whose ADSs are listed on Nasdaq, we have elected to follow certain home country corporate governance practices instead of certain Nasdaq requirements;

Case 1:20-cv-06054-BMC-CLP   Document 45-7   Filed 11/01/21   Page 8 of 51 PageID #: 880

- Our ADS holders may not have the same voting rights as the holders of our class A shares and class B shares and may not receive voting materials in time to be able to exercise their right to vote. Our ADS holders' right to receive certain distributions may be limited in certain respects by the deposit agreement;

9

*Risks Relating to the Russian Federation and Other Markets in Which We Operate*

- Emerging markets such as Russia are subject to greater risks than more developed markets, including significant legal, economic and political risks;

- The situation in Ukraine and the US, EU and other sanctions that have been imposed in connection therewith could adversely impact our operations and financial condition;

- Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes;

- Political and governmental instability could adversely affect the value of investments in Russia;

- Deterioration of Russia's relations with other countries could negatively affect the Russian economy and those of the nearby regions;

- Economic instability in Russia could have an adverse effect on our business;

- The implementation of government policies in Russia targeted at specific individuals or companies could harm our business as well as investments in Russia more generally;

- The immaturity of legal systems, processes and practices in the Russian Federation may adversely affect our business, financial condition and results of operations;

- Shareholder liability under Russian corporate law could cause us to become liable for the obligations of our subsidiaries;

*Risks Relating to Taxation*

- Global anti-offshore measures may have adverse impact on our business, financial condition and results of operations;

- Significant change of substance requirements in certain jurisdictions may adversely impact our business;

- Weaknesses and changes in the Russian tax system could materially and adversely affect our business and the value of investments in Russia;

- Our business in Russia may be deemed to receive unjustified tax benefits;

- Our Russian subsidiaries are subject to tax audits by Russian tax authorities which may result in additional tax liabilities;

- Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations;

- We may encounter difficulties in obtaining lower rates of Russian withholding income tax envisaged by the Russia-Cyprus double tax treaty for dividends distributed from Russia;

- We may be deemed to be a tax resident outside of Cyprus;

- Our companies established outside of Russia may be exposed to taxation in Russia;

- ADS holders outside of Russia may be subject to Russian tax for income earned upon a sale, exchange or disposal of our ADSs;

- Depending upon the value and the nature of our assets and the amount and nature of our income over time, we could be classified as a passive foreign investment company ("PFIC") for U.S. federal income tax purposes;

*Risks Relating to our ADSs*

- The class B shares underlying the ADSs are not listed and may be illiquid;

- Our ADSs trade on more than one market and this may result in increased volatility and price variations between such markets;

- Future sales of ADSs or ordinary shares by significant shareholders could cause the price of our ADSs to decline;

- Investors in our ADSs may have limited recourse against us, our directors and executive officers because we conduct our operations outside the United States and most of our current directors and executive officers reside outside the United States.

**Risks Relating to Our Business and Industry**

***The financial services industry is highly competitive, and we have a vast number of competitors that are larger and have greater financial and other resources.***

The financial services industry in which we operate with our payment services and other financial services that we provide is highly competitive, and our ability to compete effectively is therefore of paramount importance. In all countries where we operate, we face competition from a variety of financial and non-financial business groups. These competitors include retail banks, non-traditional payment service providers (such as retailers and mobile network operators, or MNOs), electronic payment system operators, as well as other companies which provide various forms of banking and payment solutions or services, including electronic payments, payment processing services, consumer lending and other services. Competitors in our industry seek to differentiate themselves by features and functionalities such as speed, convenience, network size, accessibility, safety, reliability and price, among others. A significant number of our competitors have greater financial, technological and marketing resources than we have, operate robust networks and are highly regarded by consumers.

Our key competitors in Russia are retail banks, particularly those with a focus on well-developed electronic payment solutions, including Sberbank, Russia's largest bank that is majority-owned by the Russian state, which benefits from a large retail network, Alfa-Bank, one of the leading privately owned Russian retail banks, and Tinkoff Bank, which positions itself as a specialized bank focused on innovative online retail financial services. Sberbank has long adhered to the strategy of innovation in the financial and payments space and has been focusing on the promotion of alternative banking channels, such as kiosks, internet banking and mobile banking. Sberbank is the market leader of the Russian payments market, has access to significant financial resources, and possesses an extensive nationwide network of branches. It

actively develops its online payment services capabilities, including through its online and mobile banking platform Sberbank Online and through YooMoney, one of the major electronic payment service providers in Russia formerly operated through a joint venture with Yandex, a leading Russian diversified technology company, which Sberbank bought out entirely in 2020. These factors give Sberbank a substantial competitive advantage over us in the payments business as well as any other financial services businesses that we pursue or may pursue. Additionally, Sberbank is pursuing a strategy to transform itself into a multi-purpose digital ecosystem offering, in addition to its core banking and payments products, a variety of diverse online services including e-commerce, entertainment, telemedicine, and others. It has also been reported that Sberbank is currently working on a "super-app" as a single entry point for all of its various consumer services, which would have the potential to make its products even more attractive and more difficult to compete against. The increasing domination of a major bank such as Sberbank in various online services, particularly e-commerce, may make customer acquisition and retention more complex and costly for smaller independent payment services providers such as ourselves.

Our other major competitors in the banking industry include Alfa-Bank, a major retail bank that combines a strong competitive position in the traditional retail banking sector with a focus on developing innovative financial and payments solutions, and Tinkoff Bank, which is a provider of online retail financial services operating in Russia through a high-tech branchless platform. Similarly to Sberbank, Tinkoff Bank announced in December 2019 the launch of a super-app designed to be its own marketplace and an entry point to all of the numerous lifestyle services of Tinkoff and its partners. Numerous other Russian banks are also actively pursuing the electronic payments business and developing various consumer payment solutions.

Tinkoff is also our major competitor in the self-employed servicing market, which is important to us as a key strategic growth stream. We provide different complex payment and payout solutions to diverse businesses, such as taxi companies (payments to taxi drivers) or delivery businesses (payments to couriers). These products are somewhat similar in nature to salary programs and certain other products offered by traditional retail banks, thereby exposing us to competition from all banks that offer such services for self-employed, particularly those similarly focused on convenience of on-boarding and use as well as customizable and user-friendly interfaces, such as Tinkoff and other major Russian banks with actively developing self-employed individuals and sole entrepreneurs servicing programs.

The competition in the digital money transfer services space is also further intensifying as key market players including retail banks develop and digitalize their products. Recently the Central Bank of Russia in cooperation with other banks established an instant payment system ("IPS"), in which all major Russian retail banks participate, and which enables instantaneous money transfers between accounts at different banks with the only piece of identification needed for a transfer being the person's cell phone number. It may prove difficult for our digital money remittance solutions to compete with such system on the basis of convenience, price, or otherwise, particularly since it often features zero or relatively low commissions. There can be no assurance that the commissions within the IPS will not further decrease, whether as a result of a regulatory action or a market trend. Another CBR initiative that may adversely affect our business is the proposed introduction of the "digital Rouble", an officially sanctioned cryptocurrency that will exist alongside the traditional monetary system in Russia. Sberbank has publicly stated that according to its research, the introduction of the digital Ruble has the potential to cause an outflow from the Russian banks of 4 trillion Rubles (approximately USD 54 billion) in liquidity in the first three years after the project has been launched. The electronic payments businesses may be similarly adversely affected.

Our competitors in the payments business also include non-traditional payment service providers that engage in payment services as a non-core business. In particular, we compete with the Russian Federal State Unitary Enterprise Postal Service, or Russian Post, which offers certain payment services. Russian Post's geographical penetration is at least as dispersed as our physical distribution network (i.e. our kiosks and terminals). It also co-owns, in a joint-venture with the Russian state-controlled VTB Bank, the full-service commercial bank Pochta Bank. As a state-sponsored institution, we believe that it is able to provide payment services at significantly lower prices than we are able to match profitably. We also face competition from other non-traditional payment service providers that have substantial financial resources, such as major tech businesses branching out into fintech, including Yandex, which could be expected to develop its own fintech products after having parted ways with Sberbank, Alibaba and its financial services subsidiary Ant Financial, and Mail.ru Group, and MNOs, in particular the Russian "Big Three" MNOs, MegaFon, VimpelCom and MTS, as well as their closest competitor Rostelekom, all of which have developed various payment solutions. In February 2021, Mail.ru Group, Alibaba Group, MegaFon and Russian Direct Investment Fund (RDIF) signed binding agreements to create two joint ventures, one in the payments business and the other in financial services. The payments joint venture is to acquire Mail.ru Group's payment service Money.Mail.ru and the payment system VK Pay operated by Mail.ru Group's subsidiary VKontakte, Russia's major social network company. As is the case with Sberbank's increased presence in online services including e-commerce, creation of proprietary payment solutions by major IT companies may make customer acquisition and retention more complex and costly for smaller independent payment services providers such as ourselves, since tech companies' captive payment services providers are likely to be promoted heavily by their parent companies with respect to the online services they offer. In addition, non-traditional payment service providers also include smartphone manufacturers such as Samsung and Apple. New competitors may penetrate the Russian electronic payment market as well, including established international players such as MoneyGram or Google.

Globally and in Russia, there is a steady influx of new fintech businesses looking to challenge and disrupt the payments and financial services industry. These include so-called "challenger banks" such as Starling, Monzo, N26, Revolut, Atom and Tandem, who develop various digital banking and financial services and compete with various aspects of our services offering (to the best of our knowledge, none of the aforementioned companies has entered the Russian market as of the date hereof). Since the development in the fintech space is rapid, new categories of non-traditional financial service providers may emerge in the future that may be difficult to currently anticipate. *See "– If we cannot keep pace with rapid developments and change in our industry and provide new services to our clients, or if any of the new products we roll out are unsuccessful, the use of our services could decline, and we could experience a decline in revenue and an inability to recoup costs".*

We also compete against some directly comparable businesses, such as electronic payment system operators (primarily YooMoney, WebMoney and PayPal) and kiosk, terminal and e-wallet operators, including Cyberplat, Comepay and Elecsnet.

In recent years, we have started expanding our product portfolio beyond our traditional payment services business to include other types of financial services, such as digital banking services for small and medium enterprises ("SME") with Tochka (our equity associate co-owned by Otkritie) and factoring and digital bank guarantees services, which we offer through our Factoring PLUS project. In connection with each of these projects, we face intense competition from a multitude of commercial and retail banks. Such banking institutions often have more established businesses in the various services similar to those offered by us. While we seek to differentiate our products from the competition on the basis of enhanced user experience, price and add-on features, there cannot be any assurance that we will be successful in doing so due to the number of competitors and their level of sophistication.

Any increase in competition by other market participants, or any shift of customer preferences in their favor due to any real or perceived advantages of their products, could result in a loss of consumers and harm tour payment volumes, revenues and margins. As major commercial and retail banks increase their online and virtual presence and come up with increasingly sophisticated products directly competing with our core competencies, our competitive position could be severely undermined, resulting in reduced demand for our products, both with respect to our payment services business and the other financial services projects that we are pursuing. If we are unable to compete successfully for consumers, agents, merchants or other partners, our business, financial condition and results of operations could be materially adversely affected.

***Qiwi Bank operates in a highly regulated environment and increased regulatory scrutiny could have an adverse effect on our business, financial condition and results of operations.***

Qiwi Bank is central to the operation of all of our key business segments as it provides issuing, acquiring and deposit settlement functions within our group, and is the banking institution behind Tochka's banking services offering (along with our partner Otkritie Bank) and our recently launched electronic bank guarantees business (part of the Factoring PLUS project).

All banks and non-banking credit organizations operating in Russia are subject to extensive regulation and supervision. Requirements imposed by regulators, including capital adequacy, liquidity reserves, prudential ratios, loss provisions and other regulatory requirements are designed to ensure the integrity of the financial markets and to protect consumers and other third parties with whom a bank deals. These regulations may limit our activities, and may increase our costs of doing business, or require us to seek additional capital in order to comply with applicable capital adequacy or liquidity requirements. Existing laws and regulations could be amended, the manner in which laws and regulations are enforced or interpreted could change and new laws or regulations could be adopted. Russian banks also have extensive reporting obligations, including, without limitation, disclosure of financial statements, various operational indicators, and affiliates and persons who exercise (direct or indirect) influence over the decisions taken by the management bodies of the bank. The CBR may at any time conduct full or selective audits of any bank's filings and may inspect all of its books and records.

Qiwi Bank has been the subject of CBR investigations in the past that have uncovered certain violations and deficiencies in relation to, among other things, reporting requirements, anti-money laundering, cybersecurity, compliance with applicable electronic payments thresholds requirements and other issues which we believe we have generally rectified. In the course of 2018, Qiwi Bank underwent a major scheduled audit by the CBR as part of its ongoing supervisory process, which resulted in CBR identifying a number of violations and imposing certain sanctions on us. The measures that the CBR has imposed on us in response have not had a significant impact on our operations and have been mostly lifted. We believe that we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward.

In the second half of 2020, the CBR, acting in its supervisory capacity, performed another routine scheduled audit of Qiwi Bank for the period of July 2018 to September 2020 and, in the course of this audit, has identified certain violations and deficiencies relating primarily to reporting and record-keeping requirements. The monetary fine imposed on Qiwi Bank as a result of these findings was RUB 11 million, or approximately USD 150,000. In addition, the CBR introduced certain restrictions with respect to Qiwi Bank's operations, including, effective from December 7, 2020, the suspension or limitation of most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts. We believe that the restrictions imposed on us were primarily driven by an evaluation of the overall approach of the CBR to the interpretation of the applicable e-payments regulation and general trends towards increased scrutiny in the areas of cyberspace and cross-border payments that we have been observing recently rather than specific deficiencies identified. Later in January 2021, as reported in the media, similar restrictions were imposed on our key competitor YooMoney, one of the major electronic payment service providers in Russia currently wholly-owned by Sberbank. We are currently working closely with the CBR to remediate the identified deficiencies and violations and eliminate or narrow down the restrictions that have been imposed. As of the date of this report, the CBR permitted us to resume processing payments to certain key foreign merchants. However, there can be no assurance that there will be any further easing of the restrictions that were originally imposed, or that they will not ultimately become permanent, including through the adoption of new laws or regulations. The restrictions introduced by the CBR are expected to have a substantial negative effect on our business, financial condition and results of operations, primarily through decreasing the volumes in our E-Commerce and Money Remittance market verticals, and as a result, our revenues and profits. There can be no assurance that additional restrictions will not be imposed on us as a result of these findings. Our past and future operations may also be subject to greater scrutiny from the CBR as a result of these events. While we are taking measures to minimize the effect of the restrictions on our business, no assurance can be given that we will be successful in doing so. Additionally, our abrupt termination of services of a large number of merchants may have reputational risks for us going forward. Both from merchant and consumer perspective, these events could cause the confidence in the reliability of our services to deteriorate, and deter both consumers and merchants from using our services, even in areas that are unaffected by the CBR order. We anticipate that even when and if the CBR's restrictions are lifted partially or entirely, it may prove difficult for us to rebuild the relevant relationships.

12

Table of Contents

There can be no assurance that new sanctions will not be imposed on us as a result of any past or future findings and that we will not come under greater CBR scrutiny in connection with any perceived deficiencies in our conduct, or that any currently planned or future inspections will not result in discovery of any significant or minor additional violations of various banking regulations, and of what sanctions the CBR may impose on us in connection with such deficiencies or violations. Any such sanctions could have a material adverse effect on our business, financial condition and results of operations.

Additionally, some of our new projects require significant funding and therefore put certain pressure on the ability of Qiwi Bank to comply with applicable capital requirements and other prudential ratios, while through other operations we are engaged in managing substantial amounts of consumer's funds. All these factors increase our potential exposure to regulatory risks. Moreover, additional scrutiny may be expected in connection with our involvement in the Tochka project as well as our past projects, SOVEST and Rocketbank, as they have extended the scope of traditional commercial and retail bank services that Qiwi Bank was previously providing. With respect to SOVEST and Rocketbank, given that the businesses were divested or discontinued, we may not have all necessary archive materials that the regulator may require and may not be able to retrieve such documents upon request. Any failure to meet any demands of the regulator in this respect could result in additional sanctions on us by the CBR.

Any breach of applicable regulations could expose us to potential liability, including fines, prohibition to carry out certain transactions, introduction of temporary administration by the CBR and in certain instances the revocation of our banking license. Revocation of Qiwi Bank's banking license would render us unable to process payments and provide most of our services, and may result in a material decrease of our profitability, and any actual or perceived breach by us of any applicable banking laws and regulations could have a material adverse effect on our business, financial condition and results of operations.

***We have become subject to lawsuits in connection with the abrupt decrease in our share price caused by our disclosure of the restrictions introduced by the CBR with respect to Qiwi Bank's operations in December 2020.***

Following our disclosure of the restrictions imposed by the CBR on us in December 2020 (see "*– Qiwi Bank operates in a highly regulated environment and increased regulatory scrutiny could have an adverse effect on our business, financial condition and results of operations*"), we and certain of our current and former executive officers have been named as defendants in two lawsuits in the United States District Court for the Eastern District of New York that were filed in December 2020 and January 2021 and have been coordinated before the same judge. These lawsuits allege that the defendants made certain false or misleading statements that were supposedly revealed when the CBR audit results and restrictions were disclosed in December 2020, which the plaintiffs perceive as a violation of Sections 10(b) and 20(a) of the 1934 Securities Exchange Act, and seek damages and other relief based upon such allegations. We believe that these lawsuits are without merit and intend to defend against them vigorously, and we expect to incur certain costs associated with defending against these actions. At this early stage of the litigations, the ultimate outcomes are uncertain and we cannot reasonably predict the timing or outcomes, or estimate the amount of loss, if any, or their effect, if any, on our financial statements. Any litigation to which we are a party may result in an onerous or unfavorable judgment that may not be reversed on appeal, or we may decide to settle lawsuits on unfavorable terms. Any such negative outcome could result in payments of substantial monetary damages and accordingly our business could be seriously harmed. Regardless of the final outcome, defending these claims is costly and can impose a significant burden on management and employees, and we may receive unfavorable preliminary, interim, or final rulings in the course of litigation, which could seriously harm our business.

***We derive a substantial portion of our revenues from merchants in the betting industry and may lose all or a significant portion of such revenue stream due to recent changes in regulation.***

We provide payment processing and acquiring services to a number of merchants in the betting industry. Processing payments to such merchants constituted approximately 15.5%, 21.6% and 23.6% of our Payment Services segment payment volume for the periods ended December 31, 2018, December 31, 2019 and December 31, 2020, respectively. These volumes are included in our E-commerce market vertical. We are particularly dependent on the use of our services by one of our clients in the betting industry, LLC F.O.N. (operating under the brand name Fonbet), which accounted for 5.6% of our payment volume for 2020, *please refer to Note 7 — Operating segments for discussion around our dependent on LLC F.O.N.* Processing payments for this category of merchants generally carries higher average margins than processing payments to merchants in most other market verticals that we serve, and a significant part of Payment Services segment net revenue in 2019 and 2020 is attributable to this line of business. We also provide winning repayment services to such merchants, including processing of winnings to banking cards, and repayment of winnings to QIWI Wallets that are included in our Money Remittances market vertical net revenue. The repayment of winnings by such merchants to the customers' QIWI Wallets serves as an important and economically beneficial reload channel, contributing to the attractiveness and sustainability of our ecosystem.

The betting industry is subject to extensive and actively developing regulation in Russia, as well as increasing government scrutiny. Under the legislation currently in force, in order to engage in the betting industry, a bookmaker has to become a member of a self-regulated organization of bookmakers and abide by its rules, and any and all interactive bets may be only accepted through an Interactive Bets Accounting Center (TSUPIS) set up by a credit organization together with a self-regulated association of bookmakers. In 2016 QIWI Bank established a TSUPIS together with one of the self-regulated associations of bookmakers in order to be able to accept such payments, and we thereby became one of the two payment services providers that are able to accept electronic bets on behalf of sports betting companies in Russia.

13

In December 2020, a new law was adopted, abolishing the mandatory participation of bookmakers in self-regulated organizations, establishing a Unified Gambling Regulator as a new governmental agency with broad authority to oversee the betting market, and creating the role of a single Unified Interactive Bets Accounting Center. This role is required to be assigned to a credit institution specifically authorized by the President of Russia based on a proposal made by the Government. By the end of September 2021, such newly-appointed Unified Interactive Bets Accounting Center will replace the existing TSUPIS. Currently, both we and the operator of the competing TSUPIS have publicly made proposals to serve as the Unified Interactive Bets Accounting Center pursuant to the new regulatory regime, however, there can be no assurance that our bid will be successful. If we are not able to secure an active role in this new industry landscape, we may experience a decrease in or complete loss of payment volumes and income associated directly or indirectly with the TSUPIS established by Qiwi Bank. This or any further significant change in betting legislation may negatively affect the payment volume, revenue and margins of our Payment Services business, as well as overall usage of Qiwi Wallet.

Further, under the Russian betting legislation, the betting merchants that we serve may become "blacklisted" by the government if they have been found to be in violation of applicable Russian laws, in which case we have to discontinue servicing them. We have already experienced a number of instances where certain providers have been blacklisted and we observe that this trend is gaining momentum and further blacklistings are likely. Furthermore, to our knowledge, in March 2021, a draft bill was submitted to the Russian legislature that would prohibit Russian credit institutions from contracting with any betting merchants, including foreign ones, that are not on a list of specifically approved betting merchants maintained by the regulator, or with foreign banks, foreign payment institutions and other payment facilitators processing or facilitating in any way payments of the "blacklisted" betting merchants. If this proposal becomes law, it will usher in a significant change of the regulatory regime, effectively replacing the prohibition on working with blacklisted merchants with a permission to work with "whitelisted" merchants exclusively. Both further blacklistings and any regulatory developments that impose additional restrictions on the betting industry, such as the "whitelisting" proposal described above, may result in the contraction of the betting sector or our share in this market and therefore adversely affect the revenues, margins and payment net revenue yield of our E-commerce and Money Remittance market verticals, as well as decrease the attractiveness of our ecosystem to some of our consumers, and consequently negatively affect consumer engagement with our services. Furthermore, if any of the merchants engaged in the betting industry are blacklisted or restricted in any other way, our subsidiaries which process the payments for such betting merchants may be found to be in violation of the relevant laws, whether due to misinterpretation of applicable requirements, failure to take timely action, or for any other reason, and could become blacklisted in their own right or restricted in another manner, which could substantially hinder our operations.

We also face other regulatory risks associated with our involvement in the betting industry. In July 2016, we were served with notices from Roskomnadzor, the Russian state agency responsible, among other things, for overseeing the media and Internet, stating that we had breached Russian laws on public distribution of information about gambling, since our website contained links to services offered by certain betting operators which were allegedly not in compliance with the Russian betting legislation. We have complied with the prescriptions contained in the notices. However, there can be no assurance that further violations will not occur in the future as we service a wide variety of merchants and depend on their compliance with relevant laws in this regard. If we are found to be in breach, Roskomnadzor or other agencies could take further action against us, including by blocking our website or imposing fines or other sanctions. Furthermore, we could face similar difficulties in other jurisdictions since online betting is an area of intense focus by regulators in many of the countries in which we operate.

If our involvement with the betting industry payment processing business diminishes, if we have to terminate our relationships with any of our major merchants in the betting industry (whether for reputational reasons, due to such merchant having being found to be in violation of applicable law, or otherwise) and are unable to replace this business, if our current terms of doing business with any of our significant merchants in the betting industry (particularly Fonbet) become significantly less favorable, or if we face adverse regulatory or reputational consequences associated with servicing such merchants, our business, financial condition and results of operations may be materially adversely affected.

**_Our continued growth depends on our ability to maintain or increase our payment services average net revenue yield._**

One of the key measures we use to assess the performance of our payment services business is payment average adjusted net revenue yield, which we calculate by dividing payment adjusted net revenue by the total payment volume of the transactions we process. Our payment average adjusted net revenue yield may be affected by a number of factors, including changes in regulation, increased competition, pressure from merchants and/or agents and acquisitions. We have experienced declines in our payment average adjusted net revenue yield for certain merchant categories in the past, in particular for our Telecom merchants where the merchant fees were sharply reduced by the Big Three MNOs, who have been seeking to reduce costs, and may continue to do so in the future. We have also experienced, to a lesser extent, the declines of our net revenue yield in the Money Remittance and certain categories of E-Commerce market verticals. For example, in 2015, our average adjusted net revenue yield declined following the acquisition of the Contact money transfer system ("Contact") and the Rapida payment processing system ("Rapida") businesses, both of which operate with a significantly lower average net revenue yield than QIWI (excluding Contact and Rapida). Furthermore, our payment average adjusted net revenue yield may decline if we introduce new products that are important for expanding our ecosystem and growing our business, but are generally lower-yielding and thus dilute our net revenue yield, which has, as an example, happened with respect to certain part of our betting category with the introduction of card acquiring services, which we now offer to our betting merchants together with Qiwi Wallet acquiring and other services. Our payment average adjusted net revenue yield may be further compressed in connection with the introduction of the instant money transfer system established by the CBR (see "– _The financial services industry is highly competitive, and we have a vast number of competitors that are larger and have greater financial and_

Table of Contents

*other resources*") resulting in a shift of part of our digital money remittance volumes within our ecosystem from our card-to-card money transfer service to the instant money transfer system. This may lead to a decline in average commission in the Money Remittance market vertical and thus be dilutive to our payment average adjusted net revenue yield. In order to maintain our competitiveness, we must continue to ensure that our payment processing system provides a more convenient and attractive option for merchants, customers and partners than alternative systems that may not require payment of a processing fee. Retail banks and various payment service providers are constantly developing low to zero-commission payment channels for their consumers. To attract consumers, we also offer certain services on a commission-free basis, such as most peer-to-peer transfers within Qiwi Wallet and certain payments in e-commerce. Despite our efforts, consumers may still choose to use other payment service providers, even if those providers do not offer the convenience that we do, because they charge lower fees. In addition, because merchants, partners and agents are able to switch between different payment service providers, we may face additional pressure to reduce the fees we charge due to increased competition from other payment service providers. In addition to market competition, our commissions may also come under pressure if any future laws and regulations are adopted that impose limits on various types of fees that we charge. Proposals to such effect are constantly being floated by various government agencies.

Our payment average adjusted net revenue yield is also impacted by the cost to us of consumers reloading their Qiwi Wallet accounts. We make available to our consumers a large variety of methods to reload the Qiwi Wallet accounts, including, among others, bank cards and accounts, mobile phone balances, kiosks and terminals and ATMs. Customers can also receive different payouts or money transfers to their wallets. The top up methods have different cost implications for us and such cost implications can change for different channels overtime. For example, on payments made through the kiosks and terminals owned by our agents, we historically have paid lower fees for reloading the Qiwi Wallet than on most payments made from bank cards, as well as certain other channels. However, recently kiosks became a relatively more expensive top up channel for us. Additionally, since we provide payment processing services to merchants in the sports betting industry, betting gains received by our consumers into their Qiwi Wallet accounts also represent an important and cost-efficient source of Qiwi Wallets reloads, which could decline if our presence as a payment provider in the sports betting market diminishes for any reason (see "*– We derive a substantial portion of our revenues from merchants in the betting industry and may lose all or a significant portion of such revenue stream due to recent changes in regulation*"). Similarly, our products for the self-employed individuals such as payout programs for taxi drivers, couriers, and similarly situated self-employed individuals, also account for a substantial amount of Qiwi Wallets reloads that are cost-efficient to us, and any decline in this category could increase the average Qiwi Wallet top-up cost. Should the relative weight of these reload channels in our total mix decline, this could put a negative pressure on our yields. We currently do not attempt to direct consumer preferences towards any particular reload methods. If reload methods that come at a higher cost to us were to constitute a larger proportion of our overall reload channels mix, our margins could be adversely affected, which could have a material adverse effect on our business, financial condition and results of operations.

The December 2020 CBR order requiring us to suspend or limit most types of payments to foreign merchants (see "– Qiwi Bank operates in a highly regulated environment and increased regulatory scrutiny could have an adverse effect on our business, financial condition and results of operations") puts further negative pressure on our yields, since such payments on average carried a higher commission.

Our payment services segment net revenue yield is also affected by changes in our payment average adjusted net revenue yield and by our ability to generate revenue from payment-related value added services, as well as passive revenue such as interest income on the wallet balances we hold and revenue from fees for inactive accounts and unclaimed payments. If we are not able to generate such additional revenues for any reasons including regulatory restrictions (see "*– We are subject to extensive government regulation*"), intensified competition or other reasons outside of our control, our financial condition and results of operation could be materially negatively affected.

If payment average adjusted net revenue yield or payment services segment net revenue declines as a result of any of these or other factors, we will have to offset the financial impact of such decline by increasing our payment volume, through the development and enhancement of existing and new services and products. We cannot assure you that we will be able to increase our payment volumes or that any new services we introduce or new products we develop will be profitable. If we are unable to offset the decline in our payment average adjusted net revenue yield resulting from this and other factors, our business, financial condition and results of operations could be materially adversely affected.

***If we cannot keep pace with rapid developments and change in our industry and provide new services to our clients, or if any of the new products we roll out are unsuccessful, the use of our services could decline, and we could experience a decline in revenue and an inability to recoup costs.***

The financial services industry in which we operate is characterized by rapid technological change, new product and service introductions, evolving industry standards, changing customer needs and the entrance of more established market players seeking to expand into these businesses. In order to remain competitive, we continually seek to expand the services we offer and to develop new projects. These projects carry risks, such as delays in delivery, performance problems, lack of customer acceptance, failure to adequately assess the potential revenues and budget the expenses of a project and the amount of investment required by it, failure to anticipate potential pitfalls and issues, and misjudgment of a need for a particular product by the intended customer base, among other things. In our industry, these risks are acute. Any delay in the delivery of new services or the failure to differentiate our services or to accurately predict and address market demand could render our services less desirable, or even obsolete, to consumers, merchants or partners, and hurt our future prospects. For example, if alternative payment and financial products and services become widely available, thereby substituting our current products and services, and we do not develop and offer similar alternative products and services successfully and on a timely basis, our business and its prospects could be adversely affected. At the same time, if a new product we roll out or acquire fails to perform as anticipated, this could similarly adversely affect our business, financial position and results of operations. Since we position ourselves as a provider of next generation payment and financial services, many of these new products are based on business models that are unproven and are essentially start-ups launched to test a hypothesis

based on various assumptions regarding consumer behavior patterns and demands. These assumptions may ultimately prove wrong and we may not be able to convert these hypotheses into sustainable businesses and recoup our investments made in such businesses. These risks have materialized in particular with respect to Rocketbank, which we acquired from Otkritie in 2017 and which we had to wind down in 2020, and with respect to our payment-by-installments card project SOVEST, which we divested in July 2020. Although Tochka is more of an established operation with a business model that has proved itself, it may face challenges with further developing its product offering or expanding the scope of its operations due to constraints imposed by the terms of our arrangements with Otkritie, or by any regulatory hurdles. For example, AML and KYC requirements and regulations all across the banking industry, and in the small and medium enterprises ("SME") end-market especially, are constantly evolving and may generally lack widely accepted principals, may often be relatively nonadoptive or difficult to observe and may be subject to varying interpretations by different market participants and regulatory bodies. Hence, Tochka may not be able from time to time to onboard new clients at a targeted pace even if such small and medium-sized businesses are entirely legitimate, or we may be subject to fines, penalties or operational restrictions if any of the appropriate regulatory bodies interprets industry practices or regulations differently from us or if such interpretations change over time. If any such restrictions or fines were imposed or if we are not able to onboard clients with a projected pace for any of the above reasons or otherwise, our business, financial condition and results of operations could be materially adversely affected.

We may be unable to recover the costs we have incurred in developing, rolling out, implementing and marketing new products and services. Our development efforts could result in increased costs and we could also experience a loss in business that could reduce our earnings or could cause a loss of revenue if promised new services are not timely delivered to our clients, are not able to compete effectively with those of our competitors or do not perform as anticipated. As we enter markets that are new for us with our new products and services offerings, we face additional operational, regulatory and other risks that we may not be able to adequately address due to our lack of experience in such markets and the associated risks.

We also actively develop other new products, services and technologies, such as factoring and digital bank guarantees, products aimed at the self-employed market, and certain other projects. If our efforts in connection with any of such initiatives do not pay off as expected, this will result in the loss of our investment both in terms of money and management time, which could adversely affect our profitability.

Additionally, in order to remain competitive in an innovative industry such as ours, we have to make investments in start-up companies or undertake different research and development initiatives. If our investments in start-up companies or research and development initiatives do not yield the expected results, we may lose money, time and effort invested.

If we are unable to develop, adapt to or access technological changes or evolving industry standards on a timely and cost-effective basis, or if our new initiatives do not yield the expected results, our business, financial condition and results of operations could be materially adversely affected.

***We are subject to the economic risk and business cycles of our merchants, partners and agents and the overall level of consumer spending.***

The financial services industry depends heavily on the overall level of consumer spending, which affects each of our operating segments. We are exposed to general economic conditions that affect consumer confidence, consumer spending, consumer discretionary income or changes in consumer purchasing habits. Economic factors such as employment levels, business conditions, energy and fuel costs, interest rates, inflation rate and the strength of the ruble against foreign currencies (in particular the U.S. dollar) could reduce consumer spending or change consumer purchasing habits. A reduction in the amount of consumer spending could result in a decrease in our revenue and profits. If our merchants or partners make fewer sales of their products and services using our services or consumers spend less money per transaction, the volume of payments our Payment services segment processes will decline, resulting in lower revenue. A further weakening in the economy could have a negative impact on our merchants, as well as consumers who purchase products and services using our payment processing systems, which could, in turn, negatively impact our business, financial condition and results of operations, particularly if the recessionary environment disproportionately affects some of the market segments that represent a larger portion of our payment processing volume. In addition, these factors could force some of our merchants and/or agents to liquidate their operations or go bankrupt, or could cause our agents to reduce the number of their locations or hours of operation, resulting in reduced convenience of our service. Tochka is also exposed to the negative repercussions of the economic slowdown since its business depends on the general level of entrepreneurial activity, which tends to be lower during such periods. We also have a certain amount of fixed costs, including salaries and rent, which could limit our ability to adjust costs and respond quickly to changes affecting the economy and our business.

Russia's economy has been facing significant challenges for the past few years due to the combined effect of the ongoing crisis in Eastern Ukraine, the deterioration of Russia's relationships with many Western countries, the economic and financial sanctions imposed in connection with these events on certain Russian companies and individuals, as well as against entire sectors of Russian economy, by the U.S., EU, Canada and other countries, a steep decline in oil prices, a record weakening of the Russian ruble against the U.S. dollar, a lack of access to financing for Russian issuers, capital flight and a general climate of political and economic uncertainty, among other factors. (See "– *Economic instability in Russia could have an adverse effect on our business*" and "– *The situation in Ukraine and the U.S., EU and other sanctions that have been imposed could adversely impact our operations and financial condition*"). More recently, the ongoing COVID-19 pandemic and related lockdown measures have also contributed to the deterioration of the Russian economy. The Russian economy contracted in both 2015 and in 2016, although it returned to modest growth in 2017 – 2019. During 2014-2016, the population's purchasing power decreased due to the weakening of the ruble, basic necessities such as food products and utilities became more expensive, and consumer confidence declined significantly, according to the Russian Consumer Confidence Overall Index reported by Rosstat. According to Rosstat, inflation was 11.4% in 2014 and 12.9% in 2015 (although it relatively stabilized in subsequent years before increasing again to 4.9% in 2020

16

due to the global COVID-19 pandemic), while real disposable income has been declining for seven years in a row as of the end of 2020 (save for a minor 0.8% increase in 2019) according to the Ministry of Economic Development data. Consumer spending generally remained cautious even prior to the COVID-19 pandemic, which upended the modest recovery of the Russian economy in the few preceding years. The outbreak of the COVID-19 strain of coronavirus and associated responses from various countries around the world, which began in early 2020 and continue to unfold to date, have negatively affected consumer demand across the globe and across industries. The International Monetary Fund estimates the global economy to have shrunk by 4.4% in 2020 compared with a contraction of just 0.1% in 2009 in connection with the mortgage crisis. One of the effects of the coronavirus outbreak that was sensed particularly severely in Russia was a substantial plunge in the price of crude oil due to extended factory shutdowns and a fall in air travel and road transportation. In response, the Organization of the Petroleum Exporting Countries (OPEC) has attempted, and failed, to reach agreement with Russia on a deal to cut oil production, which resulted in crude prices plummeting further. Following the news, oil prices fell 10.1% to end at $41.28 per barrel on the day the proposed OPEC-Russia deal failed to be reached, and have subsequently declined even further to around $30 per barrel of Brent crude oil (from over $65 at the start of the year). As a result, the Russian ruble has significantly and abruptly depreciated against the U.S. dollar and euro, and such volatile exchange rate environment continues to prevail even though the oil prices have rebound somewhat. The full scope of the negative impact of the ongoing COVID-19 pandemic and the lockdown measures adopted in response may have on the Russian economy remains unclear but is likely to be very significant. According to the World Bank's latest Russia Economic Report, fiscal, monetary and social policies put in place have helped contain the impact of the pandemic-induced crisis to date. Nevertheless, the effects of the pandemic have been sever and multi-faceted: the unemployment rate increased to 6.3 percent in October 2020, the highest in eight years; the national poverty rate increased to 12.6 percent and 13.2 percent in the first and second quarter of 2020, respectively. According to Rosstat, Russia's consumer confidence remains well below pre-pandemic levels.

A prolonged economic slowdown in Russia could have a significant negative effect on consumer spending in Russia and, accordingly, on our business. As a result of the challenging operating environment in Russia, we have experienced slower payment volume growth in certain of our payment categories and payment volume decline in certain others, in particular certain types of money remittances and financial services categories. Further adverse changes in economic conditions in Russia could adversely impact our future revenues and profits and cause a material adverse effect on our business, financial condition and results of operations.

***If customer or merchant confidence in our business deteriorates, our business, financial condition and results of operations could be adversely affected.***

Our business is built on customers' and merchants' confidence in our brands, as well as our ability to provide fast, reliable payment services, including electronic payment and payment processing services, and other financial services. The strength of our brands and reputation are of paramount importance to us. A number of factors could adversely affect customer confidence in our brands, many of which are beyond our control, and could have an adverse impact on our results of operations. These factors include:

- illegal or improper use of our systems and compliance related concerns;

- regulatory action or investigations against us (see "– *Qiwi Bank operates in a highly regulated environment and increased regulatory scrutiny could have an adverse effect on our business, financial condition and results of operations*");

- any significant interruption to our systems and operations; and

- any breach of our security system or any compromises of consumer data.

In addition, we are to some extent dependent on our agents, merchants and partners to which we license our products to maintain the reputation of our brands. Despite the measures that we put in place to ensure their compliance with our performance standards, our lack of control over their operations may result in the low quality of service of a particular counterparty being attributed to our brands, negatively affecting our overall reputation. For example, our agents are able to charge consumers fees for the use of the kiosks and terminals operated by them, in addition to the fees charged by us, and we mostly do not cap or otherwise control the level of such fees levied by our agents on consumers. We can provide no assurance that our agents will not raise these fees to a level that will adversely affect the popularity of our products among consumers. We also might determine to cap this type of fee to protect the strength of our brand and thereby lose some of our agents and points of physical presence. Furthermore, negative publicity surrounding any assertion that our clients, agents, merchants and/or partners are implicated in fraudulent transactions, irrespective of the accuracy of such publicity or its connection with our current operations or business, could harm our reputation. Any event that hurts any of our brands and reputation as a reliable financial services provider could have a material adverse effect on our business, financial condition and results of operations.

***A decline in the use of cash as a means of payment or a decline in the use of kiosks and terminals may result in a reduced demand for our services.***

A substantial part of the Russian population continues to rely on cash payments, rather than credit and debit card payments or electronic banking. Our business developed as a network of kiosks and terminals allowing consumers to use physical currency for online payments, and our core competitive edge at the time was our ability to offer consumers that primarily used cash as means of payment access to online payments through our kiosks and terminals simultaneously offering merchants access to a large pool of customers that use cash. While we have since largely outgrown that model, our kiosks and terminals network remains a significant part of our infrastructure as a reload and client acquisition channel for Qiwi Wallet. We believe therefore that the usage of Qiwi Wallet and hence our volumes, revenues and the profitability

17

of our payment services segment continues to depend to some extent on the use of cash as a means of payment and the reach of our kiosks and terminals network. Over time, the prevalence of cash payments is declining as a greater percentage of the population in emerging markets is adopting credit and debit card payments and electronic banking, and our kiosks and terminals network, and the number of our agents, are decreasing as the market evolves towards a higher share of digital payments. In 2020, our physical distribution network and the number of our agents also were and to a certain extent continue to be, negatively affected by the spread of COVID-19 pandemic, corresponding lockdown measures, and other restrictions that limited users' access to certain retail locations as well as the overall activity of the population. Unless we can successfully differentiate ourselves from competition in the payments and financial services market through other features and functionalities beyond providing a pathway to online payments for consumers who continue to rely on cash through our kiosks and terminals network, and the access to this consumer segment for merchants and partners, the shift from cash payments to credit and debit card payments and electronic banking could reduce our market share and payment volumes and may have a material adverse effect on our business, financial condition and results of operations.

Other factors could also contribute to a decline in the use of kiosks and terminals, including regulatory changes, increases in consumer fees imposed by the agents (see "– *If customer and merchant confidence in our business deteriorates, our business, financial condition and results of operations could be adversely affected*"), and development of alternative payment channels. The overall number of and the use of kiosks underwent a substantial decline in 2015 as a result, among other things, of enhanced scrutiny by the CBR over the compliance by the agents with legislation that requires them to remit their proceeds to special accounts (see *"– Regulation – Regulation of Payment Services"*), and has been continuously declining since. Such decline has adversely affected the availability and convenience of our services to consumers, including the convenience of use of Qiwi Wallet, for which historically kiosks and terminals have been the most popular reload channel. There can be no assurance that this negative impact will not continue going forward as increased regulatory pressures put more agents out of business and deter new ones from entering it. Other statutory requirements that could have a similar effect on our business if fully enforced against our agents are the provisions of the Federal Law of the Russian Federation No. 54-FZ "On the use of cash registers in cash payments and (or) settlements with the use of payment cards" which mandate that all kiosks (subject to certain exceptions) should be equipped with new or modernized cash registers. There can be no assurance that our agents are and will continue to be fully in compliance with these requirements, which could cause a further reduction of our kiosk network. Moreover, failure to comply with such enhanced control measures by us or our agents could result in the CBR imposing fines or restrictions on our activities (see "– *Qiwi Bank and other Russian banks and credit organizations operate in a highly regulated environment, and increased regulator scrutiny could have an adverse effect on our business, financial condition and results of operations*"). All of these factors could have a material adverse effect on our business, financial condition and results of operations.

### *We are subject to extensive government regulation.*

Our business is impacted by laws and regulations that affect our industry, the number of which has increased significantly in recent years. We are subject to a variety of regulations aimed at preventing money laundering and financing criminal activity and terrorism, financial services regulations, payment services regulations, consumer protection laws, currency control regulations, advertising laws, betting laws and privacy and data protection laws and therefore experience periodic investigations by various regulatory authorities in connection with the same, which may sometimes result in monetary or other sanctions being imposed on us. Further, these laws and regulations vary significantly from country to country. Many of these laws and regulations are constantly evolving, and are often unclear and inconsistent with other applicable laws and regulations, including across various jurisdictions, making compliance challenging and increasing our related operating costs and legal risks. If local authorities in Russia or other countries choose to enforce specific interpretations of the applicable legislation that differ from ours, we may be found to be in violation and subject to penalties or other liabilities. This could also limit our ability to provide some of our services going forward and may increase our cost of doing business.

Changes in our industry are rapid, and new products and services that we develop or the use cases in connection with which our products and services may be used may become subject to government regulation undoing the benefits we expect to derive from such new products, services or use cases. In some jurisdictions where we operate, there is currently little or virtually no legislation addressing electronic payments, and no assurance can be made that if such legislation is adopted it will be beneficial to our business. Court interpretations and applicability of legislation and regulations in certain jurisdictions in relation to our business can be ambiguous or contradictory, and it is possible that authorities in such jurisdictions may determine that we are required to possess additional licenses, permits or registrations to provide our services. Such licensing or compliance processes may be time consuming and expensive and we may not be successful in acquiring any newly required licenses. If we fail to obtain and maintain required licenses, permits or registrations or comply with certain mandatory procedures in any jurisdiction where we operate, we may face fines, penalties, sanctions, experience a loss of revenues or have to discontinue providing certain services or doing business altogether. With respect to countries that do have an established regulatory framework for the types of services that we provide, no assurance can be given that the relevant legislation will not be amended to the detriment of our business, including due to the lobbying efforts undertaken by or on behalf of our competitors. For instance, any restrictions including complete prohibition, ban of specific reload methods or various quantitative caps on the use or reloads of anonymous e-wallets could have a significant negative impact on our business.

Generally, Russian lawmakers and enforcement agencies have recently demonstrated increased scrutiny in matters relating to cyberspace and e-payments, in particular cross-border payments, as borne out in the enhanced enforcement activities in the kiosk market, the de-anonymization of e-payments and various other initiatives aimed at increasing state control over online activities. In the latest of such trends, the Central Bank appears to be instituting closer controls over cross-border payments. We believe that the recent restrictions imposed by the CBR on such payments through the key industry players, including our company and YooMoney, a subsidiary of Sberbank, fits within such trend. See "– *Qiwi Bank operates in a highly regulated environment and increased regulatory scrutiny could have an adverse effect on our business, financial condition and results of operations*".

18

*Regulation of E-Wallets*

For example, in early 2018 it was reported that the CBR, Rosfinmonitoring and the Ministry of Finance are actively discussing new proposed legislation that would ban the use of anonymous e-wallets completely. In 2019, amendments to the National Payment System Law were introduced that prohibit the reloading of anonymous e-wallets other than from a bank account. This development could have the effect of making our onboarding process more complicated and therefore our service less attractive, which would in turn slow down the influx of new users or increase the cost of their engagement. Our revenues may also be adversely affected by further regulation of fees charged on inactive accounts for their continued maintenance and unclaimed payments, which represent a significant revenue stream for us. We have voluntarily signed up to the Memorandum adopted by the E-Money Market Participants Association (a non-state association of fintech players in Russia that we are a founding member of) which imposes certain guidelines with respect to the treatment of such inactive account fees and have had to adjust our policies with respect to such fees upon our accession to the Memorandum. The negative financial impact from such adjustment has been limited so far; however, any further regulation in this regard, whether legislation introduced by state authorities or rules voluntarily self-imposed by the industry, imposing more stringent restrictions than those currently in existence, could have a further adverse effect on such revenue stream.

Another recent regulatory measure that could potentially result in a decline in the use of e-wallets and adversely affect our business include the requirement to report newly opened e-wallets to the tax authorities in the same manner the banks report new bank accounts, which came into effect starting from January 1, 2021, and the requirement to report movements of funds and wallet balances at tax authorities' request, which will become effective in April 2021. These measures may obliviate some of the perceived advantages of e-wallets over bank accounts and could result in a slowdown in the growth of our user base or negatively affect the propensity of our users to identify their e-wallets and consecutively lead to a decline in the use of e-wallets of different levels of identification (see "– *Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes*") and hence negatively affect our results of operations. Our growth plans could be further adversely affected by any additional increase of the regulatory burdens associated with reporting, onboarding or other functions, all of which can have the effect of making our products less differentiated and attractive to consumers. In another example of such regulation, in November 2020 a draft bill was submitted to the Russia legislature requiring the reporting by Russian residents of transactions above a certain threshold made with the use of e-wallets provided by foreign operators. If this bill becomes law, it may affect the operations of our Kazakh subsidiary TOO Qiwi Kazakhstan, which provides e-wallets to Russian citizens among others, and our subsidiary ContactPay Solution Ltd., which is planning to launch an e-wallet product in 2021, by making their products less attractive to Russian citizens due to the additional reporting burden. It may also decrease the volume of money remittances from Qiwi Wallet to e-wallets provided by foreign operators.

*Anti-Money Laundering Legislation*

We sometimes have to make significant judgment calls in applying anti-money laundering legislation and to take risk of being found in non-compliance with it, particularly in relation to mandatory client identification requirements and applicability of the thresholds for transactions imposed based on the client identification level, if, for example, we process payments made by our consumers from their Qiwi Wallet accounts for amounts in excess of the applicable thresholds or for certain types of merchants without the required client identification. Although we use all methods available for client identification in all our projects and believe our practices in this regard are in compliance with applicable legal requirements and in line with market practice in Russia (see "– *Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes*"), the Russian regulators may view us as being non-compliant and impose fines and other sanctions on us. There can also be no assurance that the mandatory client identification requirements under the anti-money laundering legislation will not change further in a manner adverse to our business, for example, through making the identification process more burdensome or through lowering the thresholds for transactions which non-identified customers or customers that only underwent the simplified identification process can perform (see "Regulation"), which could result in lower payment volumes for us. For instance, there have already been proposals from certain government officials to ban payments by unidentified consumers altogether. Any further adverse change to these requirements could have a substantial negative effect on our business.

Risks associated with applying anti-money laundering legislation may be further exacerbated for us in connection with certain of our projects, particularly Tochka, that is focused on servicing small and medium sized business entities. Tochka is providing services to legal entities, which execute a significant number of transactions that are under scrutinized control of the regulatory authorities. Thus, the complexity of transactions and clients that we serve and consequently the number of suspicious transactions has materially increased exposing us to extensive ongoing control of the regulator. See also "– *Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes.*"

*Foreign Sanctions*

Certain sanctions relating to the ongoing hostility between Russian and Ukraine, and Russian countersanctions instituted in response, directly target payment services providers such as ourselves. In November 2016, the National Bank of Ukraine banned several Russian payment services providers from the Ukrainian market. In response, in April 2017, a law was enacted in Russia prohibiting certain types of money remittance from Russia to countries that have introduced sanctions against Russian payment systems (which, to our knowledge, so far only include Ukraine). Moreover, in May 2018, Qiwi Bank, one of our key subsidiaries, was added to the list of sanctioned entities by the

19

Ukrainian government. While we have not experienced any substantial operational difficulties in connection with this so far, there can be no assurance as to what effect the imposition of sanctions on us by Ukraine might have in the future, or what further adverse actions the government of Ukraine might take against us. Any determination by a relevant regulator that we have not complied with the spirit or text of any such sanctions or regulations, or even any statements to that effect, may have a material adverse effect on our business, financial condition and results of operations, as well as the price of our ADSs. While Ukraine remains the only country so far to introduce sanctions of this type, there can be no assurance that additional sanctions affecting the payments business will not be imposed by regulators in other countries in which we operate.

*New Regulations Outside of Russia*

The regulatory framework around electronic payments and other financial services that we offer is constantly in a state of development in most of the countries in which we operate, including the United Arab Emirates and Kazakhstan. New laws that are being adopted in these countries may increase our compliance costs and create new regulatory risks. For example, on January 1, 2017, the Regulatory Framework for Stored Values and Electronic Payment Systems came into force in the United Arab Emirates. It introduced a mandatory licensing and related compliance regime for certain electronic payment service providers and established a one-year transitional period for existing digital payment services providers to take appropriate measures to comply with the new rules. In case of failure to do so payment services provider may be mandated to cease provision of such services. Moreover, any individual or entity providing (or representing themselves as capable of providing) digital payment services without the appropriate license or authorization will be subject to administrative penalties. Even though such legislation has been in effect for a few years now, there still remains a lack of clarity as to the interpretation of many of its provisions, and we are still assessing the applicability and potential impact of the new legislation on our business. If our position on our status under the Regulatory Framework is different from that of the UAE regulator or if we are unable to comply with the mandatory licensing if it is deemed applicable to us, it could have a material adverse effect on our business, financial condition and results of operations.

*Privacy and Protection of User Data*

We are subject to a number of laws, rules, directives, and regulations (which we refer to as "privacy and data protection laws") relating to the collection, use, retention, security, processing, and transfer (which we collectively refer to as "processing") of personally identifiable information about our customers and employees (which we refer to as "personal data") in the countries where we operate. Our business relies on the processing of personal data in many jurisdictions and the movement of data across national borders. As a result, much of the personal data that we process, which may include certain financial information associated with individuals, is regulated by multiple privacy and data protection laws and, in some cases, the privacy and data protection laws of multiple jurisdictions. In many cases, these laws apply not only to third-party transactions, but also to transfers of information between or among us, our subsidiaries, and other parties with which we have commercial relationships.

Regulatory scrutiny of privacy, data protection, cybersecurity practices, and the processing of personal data is increasing around the world. There is uncertainty associated with the legal and regulatory environment relating to privacy and data protection laws, which continue to develop in ways we cannot predict, including with respect to evolving technologies such as cloud computing, artificial intelligence, and blockchain technology. Any failure or perceived failure to comply with existing or new laws of any government authority (including changes to or expansion of the interpretation of those laws), including those discussed in this risk factor, may subject us to significant fines, penalties, civil lawsuits, and enforcement actions in one or more jurisdictions, result in additional compliance requirements, increase regulatory scrutiny of our business, restrict our operations, and force us to change our business practices, make product or operational changes, or delay planned product launches or improvements.

Any failure, or perceived failure, by us to comply with our privacy policies as communicated to users could result in proceedings or actions against us by data protection authorities, government entities or others, including class action privacy litigation in certain jurisdictions. Such proceedings or actions could subject us to significant fines, penalties, judgments, and negative publicity which may materially harm our business. The foregoing may require us to change our business practices and would likely increase the costs and complexity of compliance. In addition, compliance with inconsistent privacy and data protection laws may restrict our ability to provide products and services to our customers.

Subsequent legislation and regulation and interpretations thereof, litigation, court rulings, or other events could expose us to increased costs, liability and reputational damage that could have a material adverse effect on our business, financial condition and results of operations.

**Events outside of our control, including public health crises, may negatively affect consumer spending and our business.**

Our operations are susceptible to public health crises, such as pandemics and epidemics, political instability or other events outside of our control. These types of events could have a negative effect on consumer spending and result in unpredictable declines in business activity in various industries that we serve.

For example, in December 2019, a novel strain of coronavirus surfaced in Wuhan, China, which has resulted in the temporary closure of many corporate offices, retail stores, and manufacturing facilities and factories across China. The virus then quickly spread out across Europe and the Americas, resulting in various "shelter-in-place" regulations, lockdowns, curfews, bans on international travel, cancellations of public events, and supply chain disruptions. These measures continue to be in place in various forms in most countries in the world, including (to a rather minor extent as of the date of this report) Russia. These developments have negatively impacted consumer and business spending and

20

payments activity generally, and have significantly contributed to deteriorating macroeconomic conditions, business closures, higher unemployment and decrease in consumer confidence throughout the world, including Russia and other countries in which we operate. While governments around the world have taken steps to attempt to mitigate some of the more severe anticipated economic effects of COVID-19, such steps have not always been effective. The negative effects of the coronavirus on our business have included a decline in revenues from our betting merchants due to the cancellation of numerous major sporting events, a drop in money remittance primarily due to a decline in payments to self-employed individuals due to an overall contraction of business activity, and a decline in the use of our kiosk network. The coronavirus pandemic is still ongoing and significant quarantine restrictions largely continue to prevail globally. The full impact of the COVID-19 pandemic on the global economy is difficult to predict due to the lack of clarity on how long it could be expected to last as the world has now entered its second year. These factors may remain prevalent for a significant period of time and may continue to adversely affect our business, results of operations and financial condition, even after the COVID-19 outbreak has subsided.

The COVID-19 outbreak has required and is likely to continue to require significant management attention, substantial investments of time and resources across our enterprise, and increased costs to effectively manage our operations. The spread of COVID-19 has caused us to make significant modifications to our business practices, including enabling most of our workforce to work from home, establishing strict health and safety protocols for our offices, restricting physical participation in meetings, events, and conferences and imposing restrictions on employee travel. The significant increase in the number of our employees who are working remotely as a result of the outbreak, and an extended period of remote work arrangements and subsequent reintroduction into the workplace could introduce operational risk, increase cybersecurity risk, strain our business continuity plans, negatively impact productivity, give rise to claims by employees, and impair our ability to manage our business or otherwise adversely affect our business. Additionally, COVID-19 could negatively affect our internal controls over financial reporting as a significant portion of our workforce is required to work from home and therefore new or modified processes, procedures, and controls could be required to respond to changes in our business environment. We may take further actions as may be required by government authorities or that we determine are in the best interests of our employees, customers, and business partners. There is no certainty that such measures will be sufficient to mitigate the risks posed by COVID-19 or will otherwise be satisfactory to government authorities.

We cannot predict the ultimate impact that COVID-19 will have on our customers, suppliers, merchants, and other business partners, and their respective financial condition, and any significant negative impact on these parties could materially and adversely impact us. All these factors could harm our business and adversely affect our operating results.

***We may not be able to complete or integrate successfully any potential future acquisitions, partnerships or joint ventures.***

From time to time, we have evaluated and expect to continue to evaluate possible acquisition transactions, partnerships or joint ventures, some of which may be material. At any time, including currently, we may be engaged in discussions or negotiations or diligence evaluations with respect to possible acquisitions, partnerships or joint ventures or may have entered into non-binding documents in relation to such transactions. As part of our strategy, we intend to continue our disciplined approach to identifying, executing and integrating strategic acquisitions, partnerships and joint ventures.

Potential future acquisitions, partnerships and joint ventures may pose significant risks to our existing operations if we acquire businesses that prove not to be a good fit for our organization, fail to perform the necessary due diligence on the relevant targets, overestimate their anticipated contribution to our business, overvalue them or fail to successfully integrate them. These projects would place additional demands on our managerial, operational, financial and other resources, create operational complexity requiring additional personnel and other resources as well as enhanced control procedures. In addition, we may not be able to successfully finance or integrate any businesses, services or technologies that we acquire or with which we form a partnership or joint venture. Furthermore, the integration of any acquisition may divert management's time and resources from our main business and disrupt our operations. Moreover, even if we were successful in integrating newly acquired assets, expected synergies or cost savings may not materialize, resulting in lower than expected benefits to us from such transactions. We may spend time and money on projects that fail to perform in line with our expectations or require financing in excess of what we were budgeting at the time of the acquisition. Additionally, when making acquisitions it may not be possible for us to conduct a detailed investigation of the nature of the assets being acquired due to, for instance, time constraints in making the decision and other factors. We may become responsible for additional liabilities or obligations not foreseen at the time of an acquisition. In addition, in connection with any acquisitions, we must comply with various antitrust requirements. It is possible that perceived or actual violations of these requirements could give rise to regulatory enforcement action or result in us not receiving all necessary approvals in order to complete a desired acquisition. To the extent we pay the purchase price of any acquisition in cash, it would reduce our cash reserves, and to the extent the purchase price is paid with our stock, it could be dilutive to our stockholders. In the event we pay the purchase price with proceeds from the incurrence of debt, it would increase our level of indebtedness and could negatively affect our liquidity and restrict our operations. Our competitors may be willing or able to pay more than us for acquisitions, which may cause us to may lose certain acquisitions that we would otherwise desire to complete. We may also face counterparty and credit risks in connection with acquisitions, partnerships and joint ventures in the event our counterparties fail to perform their obligations. In Russia, acquisitions, partnerships and joint ventures are also complicated by the lack of strong judicial protection for non-competition and non-solicitation covenants, which are often unenforceable as a result. Joint ventures also carry specific risks such as potential disagreements with partners about the management and strategy of the JV, adverse actions by JV partners prompted by such disagreements or otherwise, and reliance on JV partners for the development of the JV's business and resulting inability to continue development of the venture in the event the relationship with the partner is terminated.

Some of these risks have materialized or may materialize in connection with our August 2017 acquisition of Tochka and Rocketbank assets from Otkritie Bank, one of the largest shareholders of our company. The acquisition of Tochka and Rocketbank assets was a complex deal involving a series of transactions to acquire the brands, software and hardware of both businesses, as well as a number of operational agreements

21

with Otkritie Bank. We subsequently reached an agreement with Otkritie Bank and the founders of Tochka to operate Tochka together through a jointly-owned company that we account for as an equity associate. Furthermore, under the terms of the relevant documentation, all key shareholder decisions with respect to Tochka are to be made by a unanimous vote of the JV partners, and Otkritie has the right to buy out our share in Tochka together with the share of the founders of Tochka or separately in the event of a deadlock, while neither we nor the founders of Tochka enjoy a similar right. This potentially exposes us to various risks relating to conflicts with Otkritie or the founders of Tochka as our JV counterparties in JSC Tochka. In the event Otkritie changes its strategy with respect to Tochka, pursues a different development strategy, or experiences financial or other difficulties or if our or Otkritie's relations with the founders or management of JSC Tochka deteriorates or in case of the inability of founders and management to run the business for any reasons outside of our control, this could have a material adverse effect on the operations of Tochka and consequently the ultimate success or failure of this transaction from our perspective. In addition, if a regulator were to challenge the validity of our arrangements in relation to Tochka, we may be subject to fines or be forced to restructure these arrangements, any or all of which may expose us to negative publicity as well as loss of income or impairment of our investments. Any or all of the above has resulted and may result in the future in us not being able to realize the full anticipated benefit of these acquisitions and other commercial arrangements so far.

Any or all of the above risks could have a material adverse effect on our business, results of operations, financial condition, and prospects.

***Our compliance processes, procedures and controls with respect to the rules and regulations that apply to our business may prove insufficient.***

Our business has grown and developed rapidly in recent years and we are continuing to realign our compliance function with the size and scope of our business. In light of the fact that we are a highly regulated business that processes large volumes of payments, we need to have enhanced processes, procedures and controls in order to provide reasonable assurance that we are operating in compliance with applicable regulatory requirements. Given that we store and/or transmit sensitive data of our customers, we have ultimate liability to our customers for our failure to protect this data. As discussed in more detail below, we have experienced breaches of our cybersecurity in the past, and future breaches resulting in unauthorized disclosure of data are possible (see – "*Our services have been and may continue to be used for fraudulent, illegal or improper purposes, which could expose us to additional liability and harm our business."*). In addition, the Russian anti-money laundering laws to which we are subject contain numerous requirements with respect to identification of clients, and documentation and reporting of transactions subject to mandatory control and other suspicious transactions to the relevant authorities.

Following our acquisition of Rapida LTD in 2015, we have had to devote additional resources to enhance the compliance function within Rapida LTD, which, at the time of our acquisition, was deficient in several areas. As of the date of this annual report, we continue to develop and integrate certain control procedures with respect to our projects Tochka, Flocktory and Billing Online in order to maintain a comprehensive system of controls and procedures across our business. There can be no assurance, however, that the measures we undertake will be sufficient to prevent significant deficiencies in the compliance procedures and internal controls of our projects. Moreover, we operate Tochka as an equity associate together with Otkritie Bank (see – "*We may not be able to complete or integrate successfully any potential future acquisitions, partnerships or joint ventures.*") and do not have the full control over operations and processes of JSC Tochka, which has an operational independence under respective agreements. Thus, there can be no assurance that we will be able to implement and successfully execute all necessary control procedures in Tochka. Our failure to implement and maintain effective internal control over financial reporting could result in errors in our financial statements that could lead to a restatement of our financial statements, cause us to fail to meet our reporting obligations and cause investors to lose confidence in our reported financial information, which may result in a decline in the market price of our ADSs.

Among others, we are subject to the U.S. Foreign Corrupt Practices Act, or the FCPA, which prohibits U.S. companies and their intermediaries from bribing foreign officials for the purpose of obtaining or keeping business or otherwise obtaining favorable treatment, and other laws concerning our international operations. Similar legislation in other jurisdictions contains similar prohibitions, although varying in both scope and jurisdiction. We have implemented policies and procedures and internal controls designed to provide reasonable assurance that we, our employees, distributors and other intermediaries comply with the anti-corruption laws to which we are subject. However, there are inherent limitations to the effectiveness of any policies, procedures and internal controls, including the possibility of human error and the circumvention or overriding of the policies, procedures and internal controls. There can be no assurance that such policies or procedures or internal controls will work effectively at all times or protect us against liability under these or other laws for actions taken by our employees, distributors and other intermediaries with respect to our business or any businesses that we may acquire.

Our success requires significant public confidence in our ability to handle large and growing payment volumes and amounts of customer funds, as well as comply with applicable regulatory requirements. Any failure to manage consumer funds or to comply with applicable regulatory requirements could result in the imposition of fines, harm our reputation and significantly diminish use of our products. In addition, if we are not in compliance with anti-corruption laws and other laws governing the conduct of business with government entities and/or officials (including local laws), we may be subject to criminal and civil penalties and other remedial measures, which could have an adverse impact on our business, financial condition, results of operations and prospects.

***Our success depends to a large degree on our ability to successfully address the rapidly evolving market for transactions on mobile devices.***

Mobile devices are increasingly used for e-commerce and money remittance transactions. A significant and growing portion of our customers access our payment services through mobile devices. We may lose customers if we are not able to continue to meet our customers' mobile and multi-screen experience expectations. The variety of technical and other configurations across different mobile devices and platforms increases the challenges associated with this environment. In addition, a number of other companies with significant resources and a number of innovative startups have introduced products and services focusing on mobile markets. Our ability to successfully address the challenges posed by the rapidly evolving market for mobile transactions is crucial to our continued success, and any failure to continuously increase the volume of mobile transactions effected through our platform could have a material adverse effect on our business, financial condition and results of operations.

***Our systems and our third party providers' systems may fail due to factors beyond our control, which could interrupt our service, cause us to lose business and increase our costs.***

We depend on the efficient and uninterrupted operation of numerous systems, including our computer systems, software and telecommunications networks, as well as the data centers that we lease from third parties. Our systems and operations, or those of our third party providers, could be exposed to damage or interruption from, among other things, fire, flood, natural disaster, power loss, telecommunications failure, vendor failure, unauthorized entry, improper operation and computer viruses. In addition, because all three of our data centers used for processing payments are located in the city of Moscow, a catastrophic event affecting the city of Moscow may result in the loss of all of three of our data centers. Substantial property and equipment loss, and disruption in operations as well as any defects in our systems or those of third parties or other difficulties could expose us to liability and materially adversely impact our business, financial condition and results of operations in all of our operating segments. In addition, any outage or disruptive efforts could adversely impact our reputation, brand and future prospects.

***Unauthorized or improper disclosure of data, whether through cybersecurity breaches, computer viruses or otherwise, could expose us to direct loss, liability, protracted and costly litigation and damage our reputation.***

We store and/or transmit sensitive data, such as credit or debit card numbers, mobile phone numbers and other personal data, and we have ultimate liability to our customers for our failure to protect this data. Numerous and evolving cybersecurity threats, including advanced and persisting cyberattacks, cyberextortion, spear phishing and social engineering schemes, the introduction of computer viruses or other malware, and the physical destruction of all or portions of our information technology and infrastructure could compromise the confidentiality, availability, and integrity of the data in our systems. We have experienced breaches of our security by hackers in the past, and breaches could occur in the future. In such circumstances, our encryption of data and other protective measures have not prevented unauthorized access and may not be sufficient to prevent future unauthorized access. For example, in January 2014 we discovered certain unauthorized activity in a number of wallet accounts. Although we do not believe that any confidential customer account data was compromised as a result of the activity, we incurred a loss of RUB 88 million. Rapida LTD (prior to its acquisition by us and its merger with and into QIWI Bank) also experienced several security breaches. Any future breach of our system, including through employee fraud, may subject us to material losses or liability, including fines and claims for unauthorized purchases with misappropriated credit or debit card information, identity theft, impersonation or other similar fraud claims. These risks are exacerbated by the COVID-19 pandemic and related lockdowns, since unauthorized access to data may potentially be easier when a large percentage of employees works from home. Moreover, even in the absence of an emergency event such as a cyberbreach, we may at times be found to be not in compliance with applicable personal data processing and transfer legislation, which is actively developing and becoming increasingly complex throughout the world, including in Russia. A misuse of sensitive data, including personal data, or a cybersecurity breach could harm our reputation and deter clients from using electronic payments as well as kiosks and terminals generally and any of our services specifically, increase our operating expenses in order to correct the breaches or failures, expose us to uninsured liability, increase our risk of regulatory scrutiny, subject us to lawsuits, result in the imposition of material penalties and fines by state authorities and otherwise materially adversely affect our business, financial condition and results of operations.

***If we fail to comply with the applicable requirements of our agreements with major payment systems, they could seek to fine us, suspend us or terminate our registrations.***

Under our agreements with major payment systems, including Visa, MasterCard and MIR, both existing and any such agreements we might enter into in the future, we are and will be required to comply with the terms of the relevant agreement and the generally applicable terms and conditions of the respective payment system based on the applicable laws of Russian Federation. If we do not comply with the terms of the agreements or the rules of the relevant payment system, the relevant payment system could seek to fine us, suspend us or terminate the registrations that allow us to process transactions on its network. If we are in breach of the agreements or the relevant payment system otherwise terminates its agreements with us or terminates or suspends our participation, we may be unable to issue cards under its brand or process transactions made with the use of such cards, which could have a material adverse effect on our business. Any of these factors could have a material adverse effect on our reputation, as well as on our business, financial condition and results of operations.

***Customer complaints, actual or perceived failures of our customer service function or negative publicity about our customer service could materially adversely affect the attractiveness of our services.***

Customer complaints, actual or perceived failures of our customer service function or negative publicity about our customer service could diminish consumer confidence in, and the attractiveness of, our services. Breaches of our consumers' privacy and our security systems could have the same effect. We sometimes take measures to combat risks of fraud and breaches of privacy and security, such as freezing consumer funds or rejecting in opening an account, which could damage relations with our consumers. These measures heighten the need for prompt and attentive customer service to resolve irregularities and disputes. In addition, we have previously received negative media coverage regarding customer disputes. Moreover, some of our products compete to a large extent on the basis of enhanced customer service and attention

to customers, and are vulnerable to any customer complaints or actual or perceived decline in service levels. Any failure on our part to continue to provide customers with the level of service they have come to expect could harm our reputation significantly. Effective customer service requires significant personnel expense, and this expense, if not managed properly, could impact our profitability significantly. Any inability by us to manage or train our customer service representatives properly could compromise our ability to handle customer complaints effectively. If we fail to provide customer service at the level our clients expect from us or do not handle customer complaints effectively, our reputation may suffer and we may lose our customers' confidence, which could have a material adverse effect on our business, financial condition and results of operations.

***Our agreements with most of our counterparties, including our agents, merchants and other partners, do not include exclusivity clauses and may be terminated unilaterally at any time or at short notice.***

We normally do not include exclusivity clauses in our agreements with our counterparties, including our agents, merchants and other partners. Accordingly, our counterparties usually do not have any restrictions on dealings with other providers and can switch from our payment processing system to another or disconnect from our system or platform without significant investment. Additionally, due to mandatory provisions of Russian civil law, our agreements with agents may be unilaterally terminated by the agents at any time, and our agreements with merchants and other counterparties may be unilaterally terminated at a short prior notice. The termination of our contracts with existing agents, merchants or other partners, or a significant decline in the amount of business we do with them as a result of our contracts not having exclusivity clauses could have a material adverse effect on our business, financial condition and results of operations.

***Our services have been and may continue to be used for fraudulent, illegal or improper purposes, which could expose us to additional liability and harm our business.***

Despite measures we have taken and continue to take, our services have been and may continue to be used for fraudulent, illegal or improper purposes. These include use of our payment and other financial services in connection with fraudulent sales of goods or services, illicit sales of prescription medications or controlled substances, illegal online gambling, software and other intellectual property piracy, money laundering, bank fraud, terrorist financing, trafficking, and prohibited sales of restricted products.

Criminals are using increasingly sophisticated methods to engage in illegal activities. It is possible that fraudulent, illegal or improper use of our services could increase in the future. Our risk management policies and procedures may not be fully effective to identify, monitor and manage these risks, and we may from time to time not be able to identify merchants who are engaged in illegal activities, particularly if we work with them indirectly through payment aggregators since we generally do not perform full know-your-customer procedures with respect to each merchant engaged by such aggregators and rely on the aggregators to vet their merchants appropriately. Furthermore, the regulators' interpretation of what constitutes illegal activities is subject to change, and their interpretation of applicable laws may differ from ours. We are also not able to monitor in each case the sources for our counterparties' funds or the ways in which they use them. Increases in chargebacks or other liability could have a material adverse effect on our business, financial condition and results of operations. An increase in fraudulent transactions or publicity regarding chargeback disputes could harm our reputation and reduce consumer confidence in the use of our products and services. In addition, changes in law have increased the penalties for intermediaries providing payment services for certain illegal activities, and additional proposals are currently under consideration by government authorities increasing the potential responsibility of such intermediaries. Moreover, the perceived risk of the use of e-payments or other financial services to finance fraudulent, illegal or improper activities is causing the regulators to impose restrictions on the operations of the providers of such services that negatively affect regular compliant transactions and operations as well. See "*– Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes*" and "*– If we cannot keep pace with rapid developments and change in our industry and provide new services to our clients, or if any of the new products we roll out are unsuccessful, the use of our services could decline, and we could experience a decline in revenue and an inability to recoup costs*". Furthermore, while we already undertake efforts to cut off or refuse to engage merchants who appear to be engaged in illegal activities from our network, the relevant state authorities could further increase their enforcement measures against such merchants, including through the introduction of new legislation, to curtail the operation of various types of merchants by targeting the processing of payments for such merchants. In the event that we are required to cease working with a significant number of merchants or payment aggregators as a result of such actions, our revenue and our profitability could materially decline.

Any resulting claims could damage our reputation and any resulting liabilities (including the revocation of applicable banking licenses or significant fines), the loss of transaction volume, decline in the number of customers or increased costs could have a material adverse effect on our business, financial condition and results of operations.

***Our business is exposed to counterparty and credit risks.***

In our Payment Services segment, we seek to sell services on a prepayment basis or to ensure that our counterparties have low credit risk profiles, such as large merchants and agents. Nevertheless, we are exposed to the risk of non-payment or other default under our contracts with our agents and merchants. If we provide trade credit or loans to an agent and we are unable to collect loans or proceeds paid to the agent by its consumers due to the agent's insolvency, fraud or otherwise, we must nonetheless complete the payment to the merchant on behalf of the consumer. As a result, our losses would not be limited to a loss of revenue in the form of fees due to us from the agent, but could amount to the entire amount of consumer payments accepted by such agent for a certain period of time.

24

Table of Contents

We also have significant receivables due from some of our merchants and agents, and may not recover these receivables in the event of such merchants' bankruptcy or otherwise. As of December 31, 2020, we had credit exposure to our agents of RUB 2,208 million and to our merchants of RUB 4,662 million. Our receivables from merchants are generally non-interest bearing and unsecured, while our receivables and loans from agents are generally interest-bearing and unsecured. Although we monitor the creditworthiness of our counterparties on an ongoing basis, there can be no assurance that the models and approaches we use to assess and monitor their creditworthiness will be sufficiently predictive, and we may be unable to detect and take steps to timely mitigate an increased credit risk.

In addition to the above sources of credit risk, as of December 31, 2020, we had credit exposure to our counterparties in connection with our Factoring PLUS project factoring portfolio of RUB 5,745 million and guarantees for third party obligations (primarily in connection with our digital bank guarantee services) in the amount of RUB 1,100 million. Factoring PLUS also issues performance digital bank guarantees for public procurement participation and execution. As of December 31, 2020, Factoring PLUS, digital bank guaranteed portfolio amounted to RUB 20,936 million. We also may pursue certain credit or similar products that would involve counterparty and credit risk exposure.

If we experience material defaults by our consumers, agents, merchants, or other partners, our business, financial condition and results of operations could be materially adversely affected.

### *We are subject to fluctuations in currency exchange rates.*

We are exposed to currency risks. Our financial statements are expressed in Russian rubles, while our revenues and expenses outside Russia are in local currencies and some of our assets and liabilities are in foreign currencies (see "– *Quantitative and Qualitative Disclosures About Market Risk – Foreign Exchange Risk*"). Accordingly, our results of operations and assets and liabilities are exposed to fluctuations in exchange rates between the ruble and such other currencies. Changes in currency exchange rates also affect the carrying value of assets on our consolidated statement of financial position, which, depending on the statement of financial position classification of the relevant asset, can result in losses on our consolidated statement of financial position. In addition, because our earnings are primarily denominated in Russian rubles whereas our ADSs are quoted in U.S. dollar, currency exchange rate fluctuations between the Russian ruble and the U.S. dollar significantly affect the price of our ADSs.

Over the past ten years, the Russian ruble has fluctuated dramatically against the U.S. dollar and the euro. Due to the economic sanctions imposed on certain Russian companies and individuals by the US, EU, Canada and other countries, as well as the volatility in oil prices, high inflation and a sharp capital outflow from Russia, the Russian ruble has significantly depreciated against the U.S. dollar and euro since the beginning of 2014 (see " – *Economic instability in Russia could have an adverse effect on our business*"). According to the CBR, from December 31, 2014 to December 31, 2015 and from December 31, 2013 to December 31, 2014, the ruble has depreciated by 30% and 72% against the U.S. dollar, respectively, and by 17% and 52% against the euro, respectively. From December 31, 2015 to December 31, 2016, the ruble appreciated somewhat against these currencies and remained relatively stable throughout 2017; however, depreciation of the ruble resumed in 2018 when its value fell 21% against the U.S. dollar and 15% against the euro, in each case from December 31, 2017 to December 31, 2018. In 2019, the ruble/U.S. Dollar exchange was relatively stable with intermittent volatility, and was RUB 61.9 per U.S.$1.00 on December 31, 2019. However, in the first quarter of 2020 the ruble again depreciated substantially and abruptly against the U.S. dollar and the euro due to a steep decline in oil prices and has continued to be volatile throughout the year, ending it at RUB73.88 per U.S.$1.00 on December 31, 2020 (see "– *We are subject to the economic risk and business cycles of our merchants, partners and agents and the overall level of consumer spending*"). It is likely that significant fluctuations will continue in the future. Further fluctuations of the ruble could have a material adverse effect on our business, financial condition, results of operations and the price of our ADSs.

### *Regulatory authorities in Russia and Kazakhstan could determine that we hold a dominant position in our markets, and could impose limitations on our operational flexibility, which may adversely affect our business, financial condition and results of operations.*

The Russian anti-monopoly authorities impose various requirements on companies that occupy a dominant position in their markets. One of the important questions is to identify and define the relevant market, in which the entity in question operates. There are numerous aspects to be taken into account, including interchangeability or substitutability of the products and/or services for the consumer, their pricing and intended use. Different approaches may be applied in this respect by anti-monopoly authorities and the participants of the market. Thus, the state authorities may conclude that we hold a dominant position in one or more of the markets in which we operate. If they were to do so, this could result in limitations on our future acquisitions and a requirement that we pre-clear with the authorities any changes to our standard agreements with merchants and agents, as well as any specially negotiated agreements with business partners. In addition, if we were to decline to conclude a contract with a third party this could, in certain circumstances, be regarded as abuse of a dominant market position. Any abuse of a dominant market position could lead to administrative penalties and the imposition of a fine of up to 15% of our annual revenue for the previous year. These limitations if imposed may reduce our operational and commercial flexibility and responsiveness, which may adversely affect our business, financial condition and results of operations.

### *We may not be able to successfully protect our intellectual property and may be subject to infringement claims.*

We rely on a combination of contractual rights, copyright, trademark and trade secret laws to establish and protect our proprietary technology. We also maintain patents for certain of our technologies. We customarily require our employees and independent contractors to execute confidentiality agreements or otherwise to agree to keep our proprietary information confidential when their relationship with us begins. Typically, our employment contracts also include clauses requiring our employees to assign to us all of the inventions and intellectual property rights they develop in the course of their employment and to agree not to disclose our confidential information. Nevertheless, we may

25

not be able to successfully protect our intellectual property at all times. Our agreements with software developers may not have always properly and unambiguously assigned the rights to software to us, and as such this software may be exposed to their claims. This is also often the case at various companies we have acquired throughout our history. Certain technologies that we have developed may not be fully and comprehensively protected by copyrights or patents and could therefore be exposed to theft or misuse. Third parties, including our competitors, may independently develop similar technology, duplicate our services or design around our intellectual property. Further, contractual arrangements may not prevent unauthorized disclosure of our confidential information or ensure an adequate remedy in the event of any unauthorized disclosure of our confidential information. Because of the limited protection and enforcement of intellectual property rights in certain jurisdictions in which we operate, such as Russia and CIS countries, our intellectual property rights may not be as protected as they may be in more developed markets such as the United States. We may have to litigate to enforce or determine the scope or enforceability of our intellectual property rights (including trade secrets and know-how), which could be expensive, could cause a diversion of resources and may not prove successful. The loss of intellectual property protection could harm our business and ability to compete and could result in costly redesign efforts, discontinuance of certain service offerings or other competitive harm. Additionally, we do not hold any patents for our business model or our business processes, in part because our ability to obtain them in Russia is subject to legislative constraints, and we do not currently intend to obtain any such patents in Russia or elsewhere.

We may also be subject to costly litigation in the event our services or technology are claimed to infringe, misappropriate or otherwise violate a third party's intellectual property or proprietary rights. Such claims could include patent infringement, copyright infringement, trademark infringement, trade secret misappropriation or breach of licenses. In addition, while we seek to obtain copyright registration certificates for the critical software we develop, our rights to software obtained as works for hire might be potentially challenged by the employees and former employees or developers of such software. We may not be able to successfully defend against such claims, which may result in a limitation on our ability to use the intellectual property subject to these claims and also might require us to redesign affected services, enter into costly settlement or license agreements, pay costly damage awards, or face a temporary or permanent injunction prohibiting us from marketing or selling certain of our services. In such circumstances, if we cannot or do not license the infringed technology on reasonable terms or substitute similar technology from another source, our revenue and earnings could be adversely impacted. Additionally, non-practicing entities had and may continue in the future to acquire patents, make claims of patent infringement and attempt to extract settlements from companies in our industry. Even if we believe that such claims are without merit and successfully defend these claims, defending against such claims is time consuming and expensive and could result in the diversion of the time and attention of our management and employees.

***We may use open source software in a manner that could be harmful to our business.***

We use open source software in connection with our technology and services. The original developers of the open source code provide no warranties on such code. Moreover, some open source software licenses require users who distribute open source software as part of their software to publicly disclose all or part of the source code to such software and/or make available any derivative works of the open source code on unfavorable terms or at no cost. The use of such open source code may ultimately require us to replace certain code used in our products, pay a royalty to use some open source code or discontinue certain products. Any of the above requirements could be harmful to our business, financial condition and operations.

***Starting from 2024, companies such as ours will be required to use primarily domestic Russia-produced software and hardware.***

In October 2020, a legislative initiative was publicized aiming to mandate the use of domestically-developed software and hardware with respect to all critical digital infrastructure (including the banking industry and thus our company) from January 1, 2024 and 2025, respectively. Since we use a lot of foreign-produced technologies and equipment, complying with these requirements may prove a challenge for us and is likely to result in significant operational costs. The switch to locally produced software and hardware may adversely affect the performance and safety features of the system and thus the quality of our services. The full impact of this initiative is difficult to assess at this time, but it is possible that it could materially adversely affect our business, financial condition and results of operations.

***We do not have and may be unable to obtain sufficient insurance to protect ourselves from business risks.***

The insurance industry in Russia is not yet fully developed, and many forms of insurance protection common in more developed countries are not yet fully available or are not available on comparable or commercially acceptable terms. Accordingly, while we hold certain mandatory types of insurance policies in Russia, we do not currently maintain insurance coverage for business interruption, property damage or loss of key management personnel as we have been unable to obtain these on commercially acceptable terms. We do not hold insurance policies to cover for any losses resulting from counterparty and credit risks or fraudulent transactions. We also do not generally maintain separate funds or otherwise set aside reserves for most types of business-related risks. Accordingly, our lack of insurance coverage or reserves with respect to business-related risks may expose us to substantial losses, which could materially adversely affect our business, financial condition and results of operations.

***In a dynamic industry like ours, the ability to attract, recruit, retain and develop qualified personnel is critical to our success and growth.***

Our business functions at the intersection of rapidly changing technological, social, economic and regulatory developments that require a wide-ranging set of expertise and intellectual capital. In order for us to compete and grow successfully, we must attract, recruit, retain and develop the necessary personnel who can provide the needed expertise across the entire spectrum of our intellectual capital needs. This is particularly true with respect to top management personnel as well as qualified and experienced software engineers and IT staff, who are highly

sought after and are not in sufficient supply in Russia and in most other markets in which we operate. The market for such personnel is highly competitive, and we may not succeed in recruiting additional personnel or may fail to replace effectively current personnel who depart with qualified or effective successors. A failure to replace departing personnel in an efficient and timely manner might result in improper functioning or failures of our systems and technologies, since our know-how may not always be properly institutionalized and instead is reliant on the expertise of specific employees, which we may not be able to replace immediately in the event of their departure. Our efforts to retain and develop personnel may result in significant additional expenses, which could adversely affect our profitability. We currently do not have a market standard long-term incentive plan due to the refusal by our shareholders to approve the disapplication of pre-emptive rights (see "– *Our ADS holders may not be able to exercise their pre-emptive rights in relation to future issuances of class B shares*"). In Cyprus, where our Company is registered, there is no statutory carve-out from pre-emptive rights for issuances of shares to employees like in some other jurisdictions, and such carve-out has to be specifically approved by shareholders and renewed periodically. The refusal by our shareholders to approve disapplication of pre-emptive rights for issuances of shares to employees has rendered us unable to issue shares to our employees under our employee incentive plans, and has caused us to incur additional expenses due to the fact that we have to make cash payouts to employees in lieu of issuing shares under an employee incentive plan. These developments could undermine our ability to retain and attract competitive talent who have come to expect share-based compensation in an industry like ours. For these and other reasons, we cannot assure you that we will be able to attract and retain qualified personnel in the future. Failure to retain or attract key personnel could have a material adverse effect on our business, financial condition and results of operations.

***Our operations may be constrained if we cannot attract or service future debt financing.***

As of the date of this annual report, we have incurred RUB 6.6 billion in debt, which primarily consists of RUB 5 billion in bonds issued by our subsidiary Qiwi Finance, with respect to which Qiwi plc and our key subsidiaries JSC Qiwi and Sette FZ-LLC have provided irrevocable offers to bondholders to purchase such bonds from them upon the occurrence of certain events. We may also incur additional debt financing to finance the development of our new or existing projects, and our operations and growth may be constrained if we cannot do so on favorable terms or at all. In particular, the continued success of our Factoring PLUS project is heavily dependent on procuring external funding to finance its operations. Our debt capacity depends upon our ability to maintain our operating performance at a certain level, which is subject to general economic and market conditions and to financial, business and other factors, many of which are outside of our control. If our cash flow from operating activities is insufficient to service our debt, we could be forced to take certain actions, including delaying or reducing capital or other expenditures or other actions, to restructure or refinance our debt; selling or mortgaging our assets or operations; or raising additional equity capital, which we might not be able to do on favorable terms, in a timely manner or at all. Furthermore, such actions might not be sufficient to allow us to service our debt obligations in full and, in any event, could have a material adverse effect on our business, financial condition, and results of operations. Moreover, our inability to service our debt through internally generated cash flow or other sources of liquidity could put us in default of our obligations to creditors, which could trigger various default provisions under our financings and thus have a material adverse effect on the business, financial condition, and results of operations.

***We have recently been experiencing, and may continue to experience, increasing challenges with conducting transactions denominated in U.S. dollars.***

We contract with some of our international merchants in U.S. dollars and other currencies such as Euros. Recently we started to encounter difficulties in conducting such transactions, even with respect to our largest and most well-known international merchants, due to the refusal of an increasing number of our U.S. relationship banks and the correspondent U.S. banks of our non-U.S. relationship banks to service U.S. dollar payments. A direct or correspondent relationship with a U.S. bank is necessary in order for any non-U.S. company to transact in U.S. dollars. Reasons we have been given to explain these changes in approach by our banks mainly referred to changes in internal know-your-customer procedures, limits on certain types of merchants and certain jurisdictions, and other internal policies, which we believe might be a result of the increasing negative sentiment towards Russia on part of U.S. banks, among other factors (see – *The situation in Ukraine and the U.S., EU and other sanctions that have been imposed in connection therewith could adversely impact our operations and financial condition*), even with respect to transactions and relationships that do not present any potential violation of any applicable sanctions. Even though we still maintain a number of U.S. dollar accounts with various financial institutions, at the same time we are already conducting a portion of U.S. dollar transactions with our international merchants in other currencies, bearing additional currency conversion costs. No assurance can be given that such institutions or their respective correspondent banks in the U.S. will not similarly refuse to process our transactions for similar reasons or otherwise, thereby further increasing the currency conversion costs that we have to bear or that our international merchants will agree to accept payments in any currency, but the U.S. dollar in the future. If we are not able to conduct transactions in U.S. dollars, we may bear significant currency conversion costs or lose some of our merchants who will not be willing to conduct transactions in currencies other than the U.S. dollars, and our business, financial condition and results of operations may be materially adversely affected. We can give no assurance that similar issues would not arise with respect to our transactions in other currencies, such as the Euro, which could have similarly adverse consequences for us.

***We may not be able to expand into new geographical markets, or develop our existing international operations successfully, which could limit our ability to grow and increase our profitability.***

Certain of our services are offered in countries beyond Russia, and we may look to further expand our geographical footprint if the right opportunities appear. Our expansion into new geographical markets and further development of our international operations depend on our ability to apply our existing technology or to develop new applications to meet the particular needs of each local market or country. We may not have adequate financial, technological or personnel and management resources to develop effective and secure services or distribution channels that will satisfy the demands of these markets. We may not be able to establish partnerships with any counterparties that we may need

in order to strengthen our international operations. If we fail to enter new markets or countries or to develop our international operations, we may not be able to continue to grow our revenues and earnings. Furthermore, we may expand into new geographical markets in which we may not have any previous operating experience. We operate in an industry that is often subject to significant regulation, and our lack of familiarity with the regulatory landscape in new markets may result in us running into unanticipated problems or delays in obtaining the requisite regulatory approvals and licenses. We may not be able to successfully expand in such markets due to our lack of experience. Moreover, we may not be able to execute our strategy in our existing international operations successfully, which may result in additional losses or limit our growth prospects. In addition, expanding internationally subjects us to a number of risks, including:

- greater difficulty in managing foreign operations;

- expenses associated with localizing our products, including offering consumers the ability to transact in major currencies;

- higher labor costs and problems integrating employees that we hire in different countries into our existing corporate culture;

- laws and business practices that favor local competitors;

- multiple and changing laws, tax regimes and government regulations;

- foreign currency restrictions and exchange rate fluctuations;

- changes in a specific country's or region's political or economic conditions; and

- differing intellectual property laws.

In addition, our international operations may expose us to numerous and sometimes conflicting legal and regulatory requirements, and violations or unfavorable interpretation by authorities of these regulations could harm our business. In particular, we are exposed to the risk of being deemed to have permanent establishment in a specific country and transfer pricing risks which could result in additional tax liability.

If we are not able to manage these and multiple other risks associated with international operations successfully, our business, financial condition and results of operations could be materially adversely affected.

**Risks Relating to Corporate Governance Matters and Organizational Structure**

***The substantial share ownership position of the Chairman of our board of directors, Sergey Solonin, may limit your ability to influence corporate matters.***

The Chairman of our board of directors, Sergey Solonin, owns substantially all of our class A shares, representing approximately 66.6% of the voting power of our issued share capital. As a result of this concentration of share ownership, Mr. Solonin has sole discretion over any matters submitted to our shareholders for approval that require a simple majority vote and has significant voting power on all matters submitted to our shareholders for approval that require a qualified majority vote, including the power to veto them. Our articles of association require the approval of no less than 75% of present and voting shareholders for matters such as amendments to the constitutional documents of our company, dissolution or liquidation of our company, reducing the share capital, buying back shares and approving the total number of shares and classes of shares to be reserved for issuance under any employee stock option plan or any other equity-based incentive compensation program of our group. Matters requiring a simple majority shareholder vote include, among other matters, increasing our authorized capital, removing a director, approving the annual audited accounts and appointing auditors.

This concentration of ownership could delay, deter or prevent a change of control or other business combination that might otherwise give you the opportunity to realize a premium over then-prevailing market price of our shares. The interests of Mr. Solonin may not always coincide with the interests of our other shareholders. This concentration of ownership may also adversely affect the price of our ADSs.

***The substantial share ownership position of Otkritie could be adverse to the interests of our minority shareholders.***

Otkritie Bank owns 41.0% of our class B shares, representing approximately 13.7% of the voting power of our issued share capital, and has nominated one member to our board of directors, Ms. Nadiya Cherkasova. Were Mr. Solonin to sell down his stake in such a manner that his shares would convert into class B shares pursuant to our Articles of Association, voting power of Otkritie Bank would increase accordingly. Moreover, since late 2017, Otkritie Bank has been owned by the Central Bank of Russian Federation (CBR) as a result of its financial rehabilitation. CBR is the designated regulator for the financial and securities markets in Russia and is the primary regulator of Qiwi's Russian banking and payments businesses. The liquidity of our ADSs has already significantly declined and could potentially further decline due to one large holder accumulating a significant portion of the shares that formerly constituted free float. The interests of Otkritie Bank, particularly as a state-owned institution, may not always coincide with the interests of our other shareholders. In particular, if Otkritie Bank or its controlling shareholder were to decide they are not interested in continuing to hold this stake, whether due to the fact that it represents a non-core business for Otkritie Bank or otherwise, a sale of a stake of the size could put significant downward pressure on the price of our ADSs. Otkritie Bank's decision to dispose its ownership in the Company may be perceived as directly or indirectly influenced by CBR's internal policies which may

28

Table of Contents

negatively impact our business or the market value of our ADSs given CBR's role as the Company's primary regulator. We also believe that due to the recent deterioration of relationships between Russia and the U.S. the fact that the CBR owns, albeit indirectly, a significant stake in our company may be perceived as a negative by certain investors. This concentration of ownership may also adversely affect the price of our ADSs.

***Our ADS holders have limited rights in relation to the appointment of our directors, including our independent directors.***

Other than in certain limited cases provided for in our articles of association, our directors are elected by shareholder weighted voting, sometimes referred to as cumulative voting, under which each shareholder has the right to cast as many votes as the voting rights attached to its shares multiplied by a number equal to the number of board seats to be filled by shareholders. As a result, our class A shareholders will have the ability to appoint, through the weighted voting set forth in our articles of association, at least a majority of the board of directors for the foreseeable future. The interests of our directors may therefore not be aligned with or be in the best interests of the holders of our ADSs.

***The rights of our shareholders are governed by Cyprus law and our articles of association, and differ in some important respects from the typical rights of shareholders under U.S. state laws.***

Our corporate affairs are governed by our articles of association and by the laws governing companies incorporated in Cyprus. The rights of our shareholders and the responsibilities of members of our board of directors under Cyprus law and our articles of association are different than under some of the U.S. state laws. For example, by law existing holders of shares in a Cypriot public company are entitled to pre-emptive rights on the issue of new shares in that company (provided such shares are paid in cash and the pre-emption rights have not been disapplied). In addition, our articles of association include other provisions, which differ from provisions typically included in the governing documents of most companies organized in the U.S.:

- our board of directors can only take certain actions by means of a supermajority vote of 75% of its members, including approving our annual budget and business plan, disposing of our interest in a subsidiary if such disposal results in a change of control over such subsidiary, issuing shares for consideration other than cash and other actions

- our shareholders are able to convene an extraordinary general meeting; and

- if our board of directors exercises its right to appoint a director to fill a vacancy on the board created during the term of a director's appointment, shareholders holding 10.01% of the voting rights of the company may terminate the appointment of all of the directors and initiate reelection of the entire board of directors.

As a result of the differences described above, our shareholders may have rights different to those generally available to shareholders of companies organized under U.S. state laws and our board of directors may find it more difficult to approve certain actions.

***Acquisitions of Russian entities are subject to pre-closing approval by multiple government authorities which exercise significant discretion as to whether a consent should be granted or not, and are regulated by a significant body of law which is often ambiguous and open to varying interpretations.***

Due to our ownership of Qiwi Bank, any transactions resulting in the acquisition of more than 50% of our voting power or the right to otherwise direct our business activities would become subject to preliminary approval by the CBR. In addition, any acquisition of more than 50% of our voting power may also be subject to a preliminary approval by the Russian Federal Antimonopoly Service, or the FAS. Furthermore, Qiwi Bank holds encryption licenses which are necessary to conduct its operations, and by virtue of this may be deemed to be a "strategic enterprise" for the purposes of the Federal Law of the Russian Federation No. 57-FZ "On the Procedure for Foreign Investments in Enterprises which are Strategically Important for the State Defense and National Security", dated April 29, 2008, as amended, or "the Strategic Enterprise Law". In this case, any acquisition of control over our company would require an approval of a specialized government commission, which is a relatively lengthy process that typically takes between three and six months in practice (see "– *Regulation – Regulation of Strategic Investments*"). These regulatory approval requirements may have the effect of making a takeover of our company more difficult or less attractive, and may prevent or delay a change of control, which could have a negative impact on the liquidity of, and investor interest in, our ADSs.

Additionally, under Russian law, the depositary may be treated as the owner of the class B shares underlying the ADSs, and therefore, could be deemed a beneficial shareholder of Qiwi Bank. This is different from the way other jurisdictions treat ADSs. As a result, the depositary may be subject to the approval requirements of the CBR, FAS and the government commission described above in the event an amount of our shares representing over 50% of our voting power is deposited in the ADS program. Accordingly, our ADS program may be subject to an effective limit of 50% of our voting power, unless the depositary obtains FAS, CBR and potentially additional government commission approvals to increase its ownership in excess of 50% of our voting power. This could limit our ability to raise capital in the future and the ability of our existing shareholders to sell their ADSs in the public markets, which in turn may impact the liquidity of share capital.

Table of Contents

***The quota imposed on foreign ownership of Russian banks or IT companies may make a takeover of our company by a foreign purchaser impossible.***

Under current Russian law, the Russian government is entitled, upon consultation with the CBR, to propose legislation imposing a quota on foreign ownership in the Russian banking industry, covering both Russian branches of international banks and foreign participation in the charter capital of Russian banks, such as Qiwi Bank. Currently, a 50% quota on foreign ownership is in place, subject to certain exemptions.

Furthermore, in late 2019 a draft legislative bill was submitted to the Russian legislature proposing to restrict ownership by foreign persons of certain key Russian IT companies pursuant to a list to be determined at a later stage to not more than 20% in the aggregate. Such draft law was repealed after significant criticism. However, there can be no assurance that similar measures will not be adopted in the future, as has already happened, for example, to media companies and video content distributors under other laws adopted in Russia in recent years.

If the quota on foreign ownership of Russian banks is exceeded, or if a law restricting foreign ownership of Russian IT companies is adopted, a takeover of our company by a foreign purchaser may become impossible, which could limit, prevent or delay a change of control of our company and in turn could negatively impact the liquidity of our ADSs.

***As a foreign private issuer whose ADSs are listed on Nasdaq, we have elected to follow certain home country corporate governance practices instead of certain Nasdaq requirements.***

As a foreign private issuer whose ADSs are listed on Nasdaq, we are permitted in certain cases to, and do, follow Cyprus corporate governance practices instead of the corresponding requirements of Nasdaq. We follow Cyprus corporate governance practices with regard to the composition of our board of directors which, unlike the applicable Nasdaq rule for U.S. corporations, do not require that a majority of our directors be independent. Currently only three out of our seven directors are independent. We also do not have a compensation committee or a nominating committee comprised entirely of independent directors, and our independent directors do not meet in regular executive sessions. In addition, our board of directors has not made any determination whether it will comply with certain Nasdaq rules concerning shareholder approval prior to our taking certain company actions, including the issuance of 20% or more of our then-outstanding share capital or voting power in connection with an acquisition, and our board of directors, in such circumstances, may instead determine to follow Cypriot law. Accordingly, our shareholders may not be afforded the same protection as provided under Nasdaq corporate governance rules.

***Our ADS holders may not have the same voting rights as the holders of our class A shares and class B shares and may not receive voting materials in time to be able to exercise their right to vote. Our ADS holders' right to receive certain distributions may be limited in certain respects by the deposit agreement.***

Except as set forth in the deposit agreement, holders of our ADSs are not able to directly exercise voting rights attaching to the class B shares represented by our ADSs. Holders of our ADSs may instruct the depositary how to vote such holder's class B shares represented by the ADSs. Upon receipt of voting instructions from an ADS holder, the depositary will vote the underlying class B shares in accordance with these instructions. Pursuant to our articles of association, we may convene an annual shareholders' meeting or a shareholders' meeting called for approval of matters requiring a 75% shareholder vote upon at least 45 days' notice and upon at least 30 days' notice for all other shareholders' meetings. If we give timely notice to the depositary under the terms of the deposit agreement and so request, the depositary will notify you of the upcoming vote and arrange to deliver our voting materials to you. We cannot assure our ADS holders that they will receive the voting materials in time to instruct the depositary to vote the class B shares underlying their ADSs, and it is possible that our ADS holders, or persons who hold their ADSs through brokers, dealers or other third parties, will not have the opportunity to exercise a right to vote. In addition, the depositary and its agents are not responsible for failing to carry out voting instructions or for the manner of carrying out voting instructions. This means that our ADS holders may not be able to exercise their right to vote and there may be nothing such holders can do if the class B shares underlying your ADSs are not voted as requested. In addition, although our ADS holders may directly exercise their right to vote by withdrawing the class B shares underlying their ADSs, they may not receive sufficient advance notice of an upcoming shareholders' meeting to withdraw the class B shares underlying their ADSs to allow them to vote with respect to any specific matter. Furthermore, under the deposit agreement, the depositary has the right to restrict distributions to holders of the ADSs in the event that it is unlawful or impractical to make such distributions. We have no obligation to take any action to permit distributions to holders of our ADSs. As a result, holders of ADSs may not receive distributions made by us.

**Risks Relating to the Russian Federation and Other Markets in Which We Operate**

***Emerging markets such as Russia are subject to greater risks than more developed markets, including significant legal, economic and political risks.***

Investors in emerging markets such as Russia should be aware that these markets are subject to greater risk than more developed markets, including in some cases significant legal, economic and political risks. Investors should also note that emerging economies are subject to rapid change and that the information set out herein may become outdated relatively quickly. Accordingly, investors should exercise particular care in evaluating the risks involved and must decide for themselves whether, in light of those risks, their investment is appropriate.

Generally, investment in emerging markets is only suitable for sophisticated investors who fully appreciate the significance of the risks involved, and investors are urged to consult with their own legal and financial advisors before making an investment in our ADSs.

***The situation in Ukraine and the U.S., EU and other sanctions that have been imposed in connection therewith could adversely impact our operations and financial condition.***

The Ukraine crisis, which started in late 2013 and remains unresolved, has brought Russian relations with the West to a post-Cold War low point. In response to the Ukraine crisis, Ukraine, the European Union and the United States (as well as other countries such as Norway, Canada and Australia) have passed a variety of economic sanctions against certain Russian government officials, private individuals and Russian companies, as well as "sectoral" sanctions affecting specified types of transactions with named participants in certain industries, including named Russian financial institutions, and sanctions that prohibit most commercial activities of U.S. and EU persons in Crimea and Sevastopol. There is significant uncertainty regarding the extent or timing of any potential further economic or trade sanctions or the potential easing of such measures. In August 2017, the United States passed a Countering America's Adversaries Through Sanctions Act ("CAATSA"), which introduced 'secondary sanctions' targeting non-U.S. persons if the U.S. President determines that any such person knowingly and materially violates, attempts to violate, conspires to violate or causes a violation of a restriction introduced under any relevant U.S. Russian sanctions legislation or facilitates a significant transaction or transactions for or on behalf of any person subject to U.S. Russian sanctions or his or her relatives.

Certain sanctions, thus far only imposed by Ukraine, and Russian countersanctions instituted in response to such sanctions, directly target payment services providers such as ourselves (see *"– We are subject to extensive government regulation"*). There can be no assurance that additional sanctions affecting the payments business will not be imposed by Russia or other countries in which we operate. While other current sanctions do not target us or the payments industry more generally, these sanctions have had and may continue to have the effect of damaging the Russian economy by, among other things, accelerating capital flight from Russia, weakening of the Russian ruble, exacerbating the negative investor sentiment towards Russia and making it harder for Russian companies to access international financial markets for debt and equity financing. In addition, a number of Western businesses have curtailed or suspended activities in Russia or dealings with Russian counterparts for reputational reasons even though currently neither such activities nor dealings with their relevant Russian counterparts were proscribed by the sanctions. An expansion of the existing or introduction of new sanctions, including those mentioned above, or sanctions specifically targeting us or our management or shareholders, or our sector generally, could result in our international customers, suppliers, shareholders and other business partners revising their relationship with us for compliance, political, reputational or other reasons, which could affect our business.

Some of our agents, merchants or Tochka and Factoring PLUS SME clients, although mostly not incorporated in Crimea, may have operations there. Further, before the introduction of the corresponding sanctions we have had direct contacts with several Crimea banks that are registered as financial legal entities in Crimea, and currently such banks may continue to operate as our agents or merchants. To date, we do not believe that any of the current sanctions as in force limit our ability to work with entities that may have operations in Crimea or operate in Crimea. Nevertheless, if we are deemed to be in violation of any sanctions currently in place or if any new or expanded sanctions are imposed on Russian businesses operating in Crimea by the U.S., EU, or other countries, our business and results of operations may be materially adversely affected.

In the ordinary course of our business, we may accept payments from consumers to or otherwise indirectly interact with certain entities that are the targets of U.S. sanctions. We operate primarily within the Russian financial system and, accordingly, many of our customers have accounts at banks in Russia. The U.S., EU and other countries have adopted a package of economic restrictive measures imposing certain sanctions on the operations of various Russian banks, including VTB Bank and Gazprombank. Some of our subsidiaries hold bank accounts at the aforementioned banks as well as have overdrafts and bank guarantees with VTB Bank. A number of Russian banks, including Bank Rossiya, SMP Bank, Investcapitalbank and Sobinbank have been designated by OFAC and are subject to U.S. economic sanctions. In addition, Tempbank was designated due to its dealings with the Syrian government. U.S. sanctions may be extended to any person that U.S. authorities determine has materially assisted, or provided financial, material, or technological support for, or goods or services to or in support of, any sanctioned individuals or entities. For example, we may be associated with U.S.-designated banks due to us accepting payments for them from consumers in the ordinary course of our business, even though we may not have any direct contract relationships with them. There can be no assurance that the U.S. Government would not view such activities as meeting the criteria for U.S. economic sanctions.

In addition, because of the nature of our business, we do not generally identify our customers where there is no express requirement to do so under Russian anti-money laundering legislation. Therefore, we are not always able to screen them against the Specially Designated Nationals and Blocked Persons List published by OFAC and other sanctions lists.

While we believe that our indirect interaction with sanctioned Russian banks and potential interaction with designated individuals, as well as other interactions we may potentially have with entities and persons that may be subject to U.S. or EU economic and financial sanctions does not contravene any law, our business and reputation could be adversely affected if the U.S. government were to designate us as a blocked party and extend such sanctions to us. The executive orders authorizing the U.S. sanctions provide that persons may be designated if, inter alia, they materially assist, or provide financial, material, or technological support for goods or services to or in support of, blocked or designated parties. EU financial sanctions prohibit the direct and indirect making available of funds or economic resources to or for the benefit of sanctioned parties. Investors may also be adversely affected if we are so designated, resulting in their investment in our securities being prohibited or restricted. Furthermore, under those circumstances, some U.S. or EU investors may decide for legal or reputational reasons to divest their holdings in us or not to purchase our securities in the first place. We are aware of initiatives by U.S. governmental entities and U.S. institutional investors, such as pension funds, to adopt or consider adopting laws, regulations, or policies prohibiting transactions with or investment in, or requiring divestment from, entities doing business with certain countries. There can be no assurance that the foregoing will not occur or that such occurrence will not have a material adverse effect on our share price. Even if we are not subjected to U.S. or other economic sanctions, our participation in the Russian financial system and indirect interaction with sanctioned banks and potential interaction with designated individuals may adversely impact our reputation among investors. There is also a risk that other entities with which we engage in business, or individuals or entities associated with them, are, or at any time in the future may become, subject to sanctions.

31

To date, no individual or entity within our group has been designated by either the United States or the EU as a specific target of their respective Ukraine related sanctions. No assurance can be given, however, that any such individual or entity will not be so designated in the future, or that broader sanctions against Russia that affect our company, will not be imposed. In addition, no assurance can be given that any of our transactions with third parties that are subject to the sanctions will not constitute 'significant transactions' for purposes of CAATSA. Non-compliance with the U.S., EU and other sanctions programs applicable to us could expose us to significant fines and penalties and to enforcement measures, or result in the loss of clients, any which in turn could adversely impact our business, financial conditions, results of operations and prospects.

The crisis in Ukraine is ongoing and could escalate. Were full-fledged hostilities to break out between Ukraine and Russia, they would likely cause significant economic disruption and further calls from the Western countries for a comprehensive sanction regime that would seek to further isolate Russia from the world economy. Even the current level of ongoing civil insurrection in eastern Ukraine, if no resolution is forthcoming, may well lead to further strengthening and broadening of Ukraine-related sanctions. For example, there have been proposals to cut off Russia from the international SWIFT payment system, which would disrupt ordinary financial services in Russia and any cross-border trade. Other proposed sanctions that have not been enacted so far but could have a devastating effect on the Russian economy in general and our business, financial condition, results of operations and prospects in particular, include more comprehensive sanctions with respect to major Russian state-owned banks (including a prohibitions on U.S. dollar transactions) and other entities, prohibition on transactions involving sovereign debt of Russia, and various other measures. The potential further repercussions surrounding the situation in Crimea and Eastern Ukraine are unknown and no assurance can be given regarding the future of relations between Russia and other countries. Overall, the situation in Ukraine and Crimea remains uncertain and we cannot predict how the Ukrainian crisis will unfold or the impact it will have on our business or results of operations. Additionally, relations between the US and Russia have recently become strained over a variety of other issues, which could result in further sanctions against Russia or specific individuals, entities or economy sectors. *See "– Deterioration of Russia's relations with other countries could negatively affect the Russian economy and those of the nearby regions"*. Any or all of the above factors could have a material adverse effect on our business, financial condition, results of operations and prospects.

### *Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes.*

Our business is currently subject to know-your-client requirements established by Federal Law of the Russian Federation No. 115-FZ "On Combating the Legalization (Laundering) of Criminally Obtained Income and Funding of Terrorism", dated August 7, 2001, as amended, or the Anti-Money Laundering Law. Based on the Anti-Money Laundering Law we distinguish three types of consumers based on their level of identification, being anonymous, identified through a simplified procedure and fully identified. There can be no assurance that we will always be able to collect all necessary data to perform the identification procedure in full or that the data the users provide us for the purposes of identification will not contain any mistakes or misstatements and will be correctly matched with the information available in the governmental databases. Due to the lack of clarity and gaps existing under the current customer identification legislation, we have to employ a risk-based approach to customer KYC and sometimes make judgment calls in applying anti-money laundering legislation, with the resulting risk of being found in non-compliance with it. Thus, current situation could cause us to be in violation of the identification requirements. In case we are forced to change our approaches to identification procedure or in case the identification requirements are further tightened, it could negatively affect the number of our consumers and, consequently, our volumes and revenues. Additionally, Russian anti-money laundering legislation is in a constant state of development and is subject to varying interpretations. If we are found to be in non-compliance with any of its requirements, we could not only become subject to fines and other sanctions, but could also have to discontinue to process operations that are deemed to be in breach of the applicable rules and lose associated revenue streams.

### *Political and governmental instability could adversely affect the value of investments in Russia.*

Political conditions in the Russian Federation were highly volatile in the 1990s, as evidenced by the frequent conflicts amongst executive, legislative and judicial authorities, which negatively impacted the business and investment climate in the Russian Federation. Over the past three decades the course of political and other reforms has in some respects been uneven and the composition of the Russian Government has at times been unstable. The Russian political system continues to be vulnerable to popular dissatisfaction, including dissatisfaction with the results of the privatizations of the 1990s, as well as to demands for autonomy from certain religious, ethnic and regional groups.

On January 15, 2020, Russian Prime Minister Dmitry Medvedev announced that he and the entire Government were resigning after President Vladimir Putin proposed constitutional amendments that would, among other things, strengthen the powers of the Russian parliament regarding appointment of the Prime Minister and members of the Government. Vladimir Putin has subsequently nominated the former head of the Federal Taxation Service, Mikhail Mishustin, to replace Dmitry Medvedev as Prime Minister and appointed the new Government. Future changes in the Russian Government, the State Duma or the presidency, major policy shifts or eventual lack of consensus between the president, the Russian Government, Russia's parliament and powerful economic groups could lead to political instability. Additionally, the potential for political instability resulting from the worsening of the economic situation in Russia and deteriorating standards of living should not be underestimated. Any such instability could negatively affect the economic and political environment in Russia, particularly in the short term. Shifts in governmental policy and regulation in the Russian Federation are less predictable than in many Western democracies and could disrupt or reverse political, economic and regulatory reforms. Any significant change in the Russian Government's program of reform in Russia could lead to the deterioration of Russia's investment climate that might limit our ability to obtain financing in the international capital markets or otherwise have a material adverse effect on our business, financial condition and results of operations.

32

***The implementation of government policies in Russia targeted at specific individuals or companies could harm our business as well as investments in Russia more generally.***

The use of governmental power against particular companies or persons, for example, through the tax, environmental or prosecutorial authorities, could adversely affect the Russian economic climate and, if directed against us, our senior management or our major shareholders, could materially adversely affect our business, financial condition and results of operations. Russian authorities have recently challenged some Russian companies and prosecuted their executive officers and shareholders on the grounds of tax evasion and related charges. In some cases, the results of such prosecutions and challenges have been significant claims against companies for unpaid taxes and the imposition of prison sentences on individuals. There has been speculation that in certain cases these challenges and prosecutions were intended to punish, and deter, opposition to the government or the pursuit of disfavored political or economic agendas. There has also been speculation that certain environmental challenges brought recently by Russian authorities in the oil and gas as well as mining sectors have been targeted at specific Russian businesses under non-Russian control, with a view to bringing them under state control. More generally, some observers have noted that takeovers in recent years of major private sector companies in the oil and gas, metals and manufacturing sectors by state-controlled companies following tax, environmental and other challenges may reflect a shift in official policy in favor of state control at the expense of individual or private ownership, at least where large and important enterprises are concerned.

***Deterioration of Russia's relations with other countries could negatively affect the Russian economy and those of the nearby regions.***

Over the past several years, Russia has been involved in conflicts, both economic and military, involving other members of the CIS or other countries. On several occasions, this has resulted in the deterioration of Russia's relations with other members of the international community, including the United States and various countries in Europe. Many of these jurisdictions are home to financial institutions and corporations that are significant investors in Russia and whose investment strategies and decisions may be affected by such conflicts and by worsening relations between Russia and its immediate neighbors.

For example, relations between Ukraine and Russia, as well as Georgia and Russia, have been strained over a variety of issues. The events in Ukraine, Crimea and Syria have prompted condemnation by members of the international community and have been strongly opposed by the EU and the United States, with a resulting material negative impact on the relationships between the EU, the United States and Russia. See "– *The situation in Ukraine and the U.S., EU and other sanctions that have been imposed could adversely impact our operations and financial condition*". The Ukraine crisis, which started in late 2013 and remains unresolved, has brought additional tensions between Russia and Western countries (such as the U.S., UK and a number of EU countries), and new issues that adversely affect such relations may arise in the future. Other recent points of tension between Russia and Western governments have included: the Russian role in the Syrian crisis and its military support for the government of Syria; the alleged involvement of the Russian government in the cyber-attacks aimed at disrupting the election process in the U.S.; the alleged involvement of the Russian intelligence service in an attempted poisoning of a Russian citizen in the UK; the incident involving Ukrainian vessels near the Kerch Strait in November 2018; and, most recently, the incarceration of a prominent Russian public figure Alexey Navalny. All of the above have led to escalation of geopolitical tensions, and sometimes introduction or expansion of international sanctions or other countermeasures by Western countries against Russia, or calls for introduction of additional sanctions, and may continue to do so in the future. The emergence of new or escalated tensions between Russia and neighboring states or other states could negatively affect the Russian economy. This, in turn, may result in a general lack of confidence among international investors in the region's economic and political stability and in Russian investments generally. Such lack of confidence may result in reduced liquidity, trading volatility and significant declines in the price of listed securities of companies with significant operations in Russia, including our ADSs, and in our inability to raise debt or equity capital in the international capital markets, which may affect our ability to achieve the level of growth to which we aspire.

***Crime and corruption could create a difficult business climate in Russia.***

The political and economic changes in Russia since the early 1990s have led, amongst other things, to reduced policing of society and increased lawlessness. Organized crime, particularly property crimes in large metropolitan centers, has reportedly increased significantly since the dissolution of the Soviet Union. In addition, the Russian and international media have reported high levels of corruption in Russia. Press reports have also described instances in which government officials have engaged in selective investigations and prosecutions to further the interest of the government and individual officials or business groups. Although we adhere to a business ethics policy and internal compliance procedures to counteract the effects of crime and corruption, instances of illegal activities, demands of corrupt officials, allegations that we or our management have been involved in corruption or illegal activities or biased articles and negative publicity could materially and adversely affect our business, financial condition and results of operations.

***Economic instability in Russia could have an adverse effect on our business.***

The Russian economy has been adversely affected by the recent global financial and economic crisis. A continuation of the economic crisis could have a negative effect on the scale and profitability of our business. Any of the following risks, which the Russian economy has experienced at various points in the past, may have or have already had a significant adverse effect on the economic climate in Russia and may burden or have already burdened our operations:

- significant declines in gross domestic product, or GDP;

- high levels of inflation;

- sudden price declines in the natural resource sector;

- high and fast-growing interest rates;

- unstable credit conditions;

- international sanctions;

- high state debt/GDP ratio;

- instability in the local currency market;

- a weakly diversified economy which depends significantly on global prices of commodities;

- lack of reform in the banking sector and a weak banking system providing limited liquidity to Russian enterprises;

- pervasive capital flight;

- corruption and the penetration of organized crime into the economy;

- significant increases in unemployment and underemployment;

- the impoverishment of a large portion of the Russian population;

- large number of unprofitable enterprises which continue to operate due to deficiency in the existing bankruptcy procedure;

- prevalent practice of tax evasion; and

- growth of the black-market economy.

As Russia produces and exports large quantities of crude oil, natural gas, petroleum products and other commodities, the Russian economy is particularly vulnerable to fluctuations in oil and gas prices as well as other commodities prices, which historically have been subject to significant volatility over time, as illustrated by the recent decline in crude oil prices. Russian banks, and the Russian economy generally, were adversely affected by the global financial crisis. In 2014 and 2015, Russia experienced an economic downturn characterized by substantial depreciation of its currency, sharp fluctuations of interest rates, a decline in disposable income, a steep decline in the value of shares traded on its stock exchanges, a material increase in the inflation rate, and a decline in the gross domestic product. In 2016-2017 some of those economic trends reversed or moderated, with oil prices increasing somewhat, inflation rates declining significantly and gross domestic product returning to modest growth. Economic instability resumed in 2018, with the ruble depreciating significantly and inflation exceeding the government's forecasts. In 2019, the ruble was relatively stable with intermittent volatility and inflation was below government forecast; however, the first quarter of 2020 saw another abrupt drop in oil prices, and, as a result, the value of the ruble, which then continued to be volatile throughout the year (see "– *We are subject to the economic risk and business cycles of our merchants, partners and agents and the overall level of consumer spending*"). There can be no assurance that any measures adopted by the Russian government to mitigate the effect of any financial and economic crisis will result in a sustainable recovery of the Russian economy. Current macroeconomic challenges, low or negative economic growth in the United States, China, Japan and/or Europe and market volatility due to the outbreak of COVID-19 or other factors may provoke or prolong any economic crisis.

As an emerging economy, Russia remains particularly vulnerable to further external shocks. Events occurring in one geographic or financial market sometimes result in an entire region or class of investments being disfavored by international investors – so-called "contagion effects". Russia has been adversely affected by contagion effects in the past, and it is possible that it will be similarly affected in the future by negative economic or financial developments in other countries. Economic volatility, or a future economic crisis, may undermine the confidence of investors in the Russian markets and the ability of Russian businesses to raise capital in international markets, which in turn could have a material adverse effect on the Russian economy and the Group's results of operations, financial condition and prospects. In addition, any further declines in oil and gas prices or other commodities pricing could disrupt the Russian economy and materially adversely affect our business, financial condition, results of operations and prospects.

***The banking system in Russia remains underdeveloped.***

The banking and other financial systems in Russia are not well-developed or regulated, and Russian legislation relating to banks and bank accounts is subject to varying interpretation and inconsistent application. The 1998 financial crisis resulted in the bankruptcy and liquidation of many Russian banks and almost entirely eliminated the developing market for commercial bank loans at that time. From April to July 2004, the Russian banking sector experienced further serious turmoil. As a result of various market rumors and certain regulatory and liquidity problems, several privately owned Russian banks experienced liquidity problems and were unable to attract funds on the inter-bank market or from their client base. Simultaneously, they faced large withdrawals of deposits by both retail and corporate customers. Several of these privately owned Russian banks collapsed or ceased or severely limited their operations. Russian banks owned or controlled by the government and foreign owned banks generally were not adversely affected by the turmoil.

34

Table of Contents

There are currently a limited number of creditworthy Russian banks (most of which are headquartered in Moscow). Although the CBR has the mandate and authority to suspend banking licenses of insolvent banks, some insolvent banks still operate. Many Russian banks also do not meet international banking standards, and the transparency of the Russian banking sector in some respects still lags behind internationally accepted norms. Banking supervision is also often inadequate, as a result of which many banks do not follow existing CBR regulations with respect to lending criteria, credit quality, loan loss reserves, diversification of exposure or other requirements. The imposition of more stringent regulations or interpretations could lead to weakened capital adequacy and the insolvency of some banks. Prior to the onset of the 2008 global economic crisis, there had been a rapid increase in lending by Russian banks, which many believe had been accompanied by a deterioration in the credit quality of the loan portfolio of those banks. In addition, a robust domestic corporate debt market was leading Russian banks to hold increasingly large amounts of Russian corporate ruble bonds in their portfolios, which further deteriorated the risk profile of the assets of Russian banks. The global financial crisis of 2007-2008 has led to the collapse or bailout of some Russian banks and to significant liquidity constraints for others. Profitability levels of most Russian banks have been adversely affected. Indeed, the global crisis has prompted the government to inject substantial funds into the banking system amid reports of difficulties among Russian banks and other financial institutions. In recent years, the CBR has considerably increased the intensity of its supervision and regulation of the Russian banking sector. Historically, the revocation of banking licenses by the CBR has been a relatively rare event mostly occurring to local banks with little assets and little or no significance for the banking sector as a whole. Starting October 2013, however, the CBR has launched a campaign aimed at cleansing the Russian banking industry, revoking the licenses from an unusually high number of banks (including significant banks such as Ugra, Master-Bank, Investbank, ProBusinessBank, Svyaznoy Bank, Vneshprombank, Tatfondbank and others) on allegations of money laundering, financial statements manipulation and other illegal activities, as well as inability of certain banks to discharge their financial obligations, which resulted in turmoil in the industry, instigated bank runs on a number of Russian credit institutions, and severely undermined the trust that the Russian population had with private banks. In addition, in the course of 2017 three of Russia's largest private banks, Otkritie Bank, Binbank and Promsvyazbank, were all bailed out and taken over by the CBR through the newly established Banking Industry Consolidation Fund, since all of them were allegedly unable to perform their obligations as they fell due for various reasons. License revocations have continued throughout 2018 and 2019, again with some major banks impacted. The private banking sector in Russia, always relatively minor compared to state players like Sberbank and VTB to begin with, has contracted severely as a result. This can be expected to result in reduced competition in the banking sector (while at the same time putting alternative payment solution providers such as ourselves in the position of having to predominantly compete with the government itself), increased inflation and a general deterioration of the quality of the Russian banking industry. It could be expected that the difficulties currently faced by the Russian economy could result in further collapses of Russian banks. With few exceptions (notably the state-owned banks), the Russian banking system suffers from weak depositor confidence, high concentration of exposure to certain borrowers and their affiliates, poor credit quality of borrowers and related party transactions. Current economic circumstances in Russia are putting stress on the Russian banking system. These circumstances decrease the affordability of consumer credit, putting further pressure on overall consumer purchasing power. In addition, these factors could further tighten liquidity on the Russian market and add pressure onto the ruble.

Our business is significantly affected by development in the Russian banking sector. First, we periodically hold funds in a number of Russian banks and rely on guarantees given by those banks to enhance our liquidity. Increased uncertainty in the Russian banking sector exposes us to additional counterparty risk and affects our liquidity. In addition, a significant portion of our revenue is derived from consumer payments in the banking industry in our Financial Services market vertical. As a result, the bankruptcy or insolvency of one or more of these banks could adversely affect our business, financial condition and results of operations. The continuation or worsening of the banking crisis could decrease our transaction volumes, while the bankruptcy or insolvency of any of the banks which hold our funds could prevent us from accessing our funds for several days. All of these factors could have a material adverse effect on our business, financial condition and results of operations.

### *Social instability could lead to labor and social unrest, increased support for renewed centralized authority, nationalism or violence.*

Failures to adequately address social problems have led in the past, and could lead in the future, to labor and social unrest. Labor and social unrest could have political, social and economic consequences, such as increased support for a renewal of centralized authority; increased nationalism, with support for re-nationalization of property, or expropriation of or restrictions on foreign involvement in the economy of Russia; and increased violence. Any of these could have an adverse effect on confidence in Russia's social environment and the value of investments in Russia, could restrict our operations and lead to a loss of revenue, and could otherwise have a material adverse effect on its business, results of operations and financial condition.

### *Russia has experienced high levels of inflation in the past.*

As a substantial portion of our expenses (including operating costs and capital expenditures) are denominated in rubles, the relative movement of inflation and exchange rates significantly affects our results of operations. The effects of inflation could cause some of our costs to rise. Russia has experienced high levels of inflation since the early 1990s. For example, inflation increased dramatically after the 1998 financial crisis, reaching a rate of 84.4% in that year. According to Rosstat, inflation in the Russian Federation was 12.9% in 2015, 5.4% in 2016, 2.5% in 2017, 4.2% in 2018, 3% in 2019 and 4.9% in 2020. Certain of our costs, such as salaries and rent, are affected by inflation in Russia. To the extent the inflation causes these costs to increase, such inflation may materially adversely affect our business, financial condition and results of operations.

35

Table of Contents

***The immaturity of legal systems, processes and practices in the Russian Federation may adversely affect our business, financial condition and results of operations.***

Risks associated with the legal systems of the Russian Federation include, to varying degrees, inconsistencies between and among laws, presidential decrees, edicts and governmental and ministerial orders and resolutions; conflicting local, regional, and federal rules and regulations; the lack of judicial or administrative guidance regarding the interpretation of the applicable rules; the untested nature of the independence of the judiciary and its immunity from political, social and commercial influences; the relative inexperience of jurists, judges and courts in interpreting recently enacted legislation and complex commercial arrangements; a high degree of unchecked discretion on the part of governmental authorities; alleged corruption within the judiciary and governmental authorities; substantial gaps in the regulatory structure due to delays in or absence of implementing regulations; bankruptcy procedures that are not well-developed and are subject to abuse; and a lack of binding judicial precedent. All of these weaknesses affect our ability to protect and enforce our legal rights, including rights under contracts, and to defend against claims by others. In addition, the merger of the Supreme Arbitration Court of the Russian Federation, which used to oversee business disputes, into the Supreme Court, which used to only handle criminal cases and civil lawsuits, is viewed by some as having further aggravated these issues. The Russian judicial system is not immune from economic and political influences.

The Russian court system is understaffed and underfunded, and the quality of justice, duration of legal proceedings, and performance of courts and enforcement of judgments remain problematic. Under Russian legislation, judicial precedents generally have no binding effect on subsequent decisions and are not recognized as a source of law. However, in practice, courts usually consider judicial precedents in their decisions. Enforcement of court judgments can in practice be very difficult and time-consuming in Russia. Additionally, court claims are sometimes used in furtherance of political and commercial aims. All of these factors can make judicial decisions in Russia difficult to predict and make effective redress problematic in certain instances.

The relatively recent enactment of many laws, the lack of consensus about the scope, content and pace of political and economic reform and the rapid evolution of legal systems in ways that may not always coincide with market developments have resulted in legal ambiguities, inconsistencies and anomalies and, in certain cases, the enactment of laws without a clear constitutional or legislative basis. Legal and bureaucratic obstacles and corruption exist to varying degrees in each of the regions in which we operate, and these factors are likely to hinder our further development. These characteristics give rise to investment risks that do not exist in countries with more developed legal systems. The developing nature of the legal systems in Russia could materially adversely affect our business, financial condition and results of operations.

***Unlawful, selective or arbitrary government action may have an adverse effect on our business.***

Governmental authorities have a high degree of discretion in Russia and at times appear to act selectively or arbitrarily, without hearing or prior notice, and in a manner that is contrary to law or influenced by political or commercial considerations. Moreover, the Russian Government also has the power in certain circumstances, by regulation or government act, to interfere with the performance of, nullify or terminate contracts. Unlawful, selective or arbitrary governmental actions have reportedly included denial or withdrawal of licenses, sudden and unexpected tax audits, criminal prosecutions and civil actions. Federal and local government entities also appear to have used common defects in matters surrounding share issuances and registration as pretexts for court claims and other demands to invalidate the issuances or registrations or to void transactions, seemingly for political purposes. Moreover, selective, public criticism by Russian Government officials of Russian companies has in the past caused the price of publicly traded securities in such Russian companies to sharply decline, and there is no assurance that any such public criticism by Russian Government officials in the future will not have the same negative affect. Standard & Poor's has expressed concerns that "Russian companies and their investors can be subjected to government pressure through selective implementation of regulations and legislation that is either politically motivated or triggered by competing business groups". In this environment, our competitors could receive preferential treatment from the government, potentially giving them a competitive advantage. Unlawful, selective or arbitrary governmental action, if directed at our operations in Russia, could materially and adversely affect our business, financial condition and results of operations.

***Shareholder liability under Russian corporate law could cause us to become liable for the obligations of our subsidiaries.***

Russian law generally provides that shareholders in a Russian joint-stock company or participants in a limited liability company are not liable for that company's obligations and risk only the loss of their investment. This may not be the case, however, when one company (the "effective parent") is capable of making decisions for another (the "effective subsidiary"). Under certain circumstances, the effective parent bears joint and several responsibilities for transactions concluded by the effective subsidiary in carrying out such decisions.

In addition, under Russian law, an effective parent is secondarily liable for an effective subsidiary's debts if an effective subsidiary becomes insolvent or bankrupt as a result of the action of an effective parent. In these instances, the other shareholders of the effective subsidiary may claim compensation for the effective subsidiary's losses from the effective parent that causes the effective subsidiary to take action or fail to take action knowing that such action or failure to take action would result in losses. We could be found to be the effective parent of our subsidiaries, in which case we would become liable for their debts, which could have a material adverse effect on our business, financial condition and results of operations.

36

***Our operations in Kazakhstan have become significant, and many of the risks we face in Kazakhstan are similar to those we face in Russia.***

In addition to Russia, our operations in Kazakhstan are significant. In many respects, the risks we face in operating business in Kazakhstan are similar to those in Russia as set out above in "– Risks Relating to the Russian Federation and Other Markets in Which We Operate". As is typical of an emerging market, Kazakhstan does not possess a well-developed business, legal and regulatory infrastructure and has been subject to substantial political, economic and social change. Our business in Kazakhstan is subject to Kazakhstan specific laws and regulations including with respect to tax, anti-corruption, and foreign exchange controls. Such laws are often rapidly changing and are unpredictable. In addition, we are exposed to foreign currency fluctuations between the Russian ruble and the Kazakh tenge, which could affect our financial position and our profitability. Our failure to manage the risks associated with doing business in Kazakhstan could have a material adverse effect upon our results of operations.

**Risks Relating to Taxation**

***Global anti-offshore measures may have adverse impact on our business, financial condition and results of operations.***

In 2013 the Organization for Economic Co-operation and Development ("OECD") and G20 countries accepted that existing international tax rules create opportunities for base erosion and profit shifting, because these rules have been designed more than a century ago. Pursuing solutions for this problem, OECD and G20 countries adopted a 15-point Action Plan to Base Erosion and Profit Shifting ("BEPS"). The BEPS package of measures represents the substantial renovation of the international tax rules. In light of the new measures, it is expected that profits will be reported where the economic activities that generate them are carried out and where value is created.

The Convention on Mutual Administrative Assistance in Tax Matters developed by the Council of Europe and the OECD in 1988 and amended by Protocol in 2010 is now signed by 141 jurisdictions (the Russian Federation, Cyprus, UAE are among the signatories). This Convention, by virtue of its Article 6, requires competent authorities of jurisdictions-signatories to participate in the automatic exchange of information that is foreseeably relevant for the administration or enforcement of their domestic laws concerning the taxes. In addition, by virtue of Article 5 the Convention requires competent authorities of jurisdictions-signatories to participate in the exchange of information on request and, by virtue of Article 7, stipulates that such competent authorities should participate in spontaneous exchange of information. The tax authorities (including, Russian, Cypriot and UAE tax authorities) already cooperate in terms of mutual administrative assistance in tax matters. In compliance with the requirements of Article 6 of this Convention in 2016 the Russian Federation joined the Standard for Automatic Exchange of Financial Account Information (Common Reporting Standard, the "CRS"). CRS calls on jurisdictions to obtain information from their financial institutions and automatically exchange that information with other jurisdictions on an annual basis. The Russian Federation also adopted country-by-country reporting ("CbCR") requirements which assume automatic exchange of county-by-country reports. The mandatory CbCR reporting for multinational enterprise groups was introduced in Cyprus as well. The new means of global exchange of financial information provide for much more transparency of international transactions. Due to information exchange instruments the tax authorities are becoming much more efficient in combating tax avoidance. Currently, the Russian Federation applies automatic exchange of financial information, among others, with Cyprus and UAE and does not apply such automatic exchange of financial information with the UK.

The above developments in terms of global information exchange could complicate tax planning as well as related business decisions and could possibly expose us to significant fines and penalties and to enforcement measures, despite our best efforts at compliance, and could result in a greater than expected tax burden.

On November 24, 2016, the OECD published the Multilateral Convention to Implement Tax Treaty Related Measures to Prevent BEPS ("MLI") which introduces new provisions to existing double tax treaties limiting the use of tax benefits provided thereof. As a minimum standard MLI implements principle purposes test, under which treaty benefits are disallowed if one of the principle purposes of the transaction or the structure was to obtain tax benefit. Depending on the position chosen by the party of MLI, certain optional provisions limiting tax treaty benefits could also apply. For example, the reduced rate on dividends provided under a double tax treaty shall be denied if the conditions for holding equity interest or shares by the time of the dividend payout are met over less than a 365-day period. The optional provisions of MLI also provide for Dual Resident Entities rules under which if there is a conflict of tax residency for the person (other than an individual) and competent authorities do not come to an agreement on the relevant person, it shall not be entitled to any tax relief or exemption provided by the relevant double tax treaty except to the extent as may be agreed upon by the competent authorities. Given that certain provisions of MLI are optional and are subject to notifications and reservations by the states-parties, tax consequences should now be determined by way of considering several sources of legislation, namely the domestic tax law, double tax treaties and MLI provisions, which have been adopted by states-parties to the relevant double tax treaty.

Cyprus Government ratified the MLI on January 22, 2020. Cyprus has adopted the minimum standards of the MLI and made full reservations on all other provisions of the MLI, including replacement of the "effective management" concept with the mutual agreement procedure between the jurisdictions of which the entity shall be deemed to be a resident. In effect, the double tax treaties of Cyprus will be amended to include these provisions without further bilateral negotiations after the other jurisdiction of the respective tax treaty has deposited its instrument of ratification, acceptance, or approval of the MLI, and a specified time period has passed. The UAE has ratified MLI on May 29, 2019 covering 114 of its double tax treaties, adopting the minimum standards and making certain reservations with respect to optional provisions.

On May 1, 2019 the MLI was ratified by the Russian Federation. Starting from 2021, MLI has come into effect in respect of withholding taxes covered by tax treaties concluded by the Russian Federation with 34 countries (including tax treaty with Cyprus). Application of MLI could potentially limit tax benefits granted by double tax treaties of Russian Federation and Cyprus.

37

The implementation of global instruments means the application of such instruments by competent authorities on mutually agreed grounds, however, there might be a risk that competent authorities of jurisdictions where our subsidiaries operate would apply newly introduced global transparency instruments inconsistently, which would lead to the imposition of additional taxes on us.

For more details on the possible impact of these measures, see sections below.

### *Significant change of substance requirements in certain jurisdictions may adversely impact our business.*

Following the global trend on increase of substance requirements in various jurisdictions, starting from 2019, certain jurisdictions (including traditional offshore jurisdictions) implement legislation that requires companies registered in the relevant offshore jurisdiction to maintain actual substance on the territory of such jurisdictions, which may include, amongst others, the qualified personnel, premises located in the particular jurisdiction, reasonable expenses to support daily operation of the company.

We cannot exclude that we might be subject to additional costs and/or tax liabilities resulting from the said requirements, which could have a material adverse effect on our business, financial condition and results of operations.

### *Weaknesses and changes in the Russian tax system could materially and adversely affect our business and the value of investments in Russia.*

We are subject to a broad range of taxes and other compulsory payments imposed at federal, regional and local levels, including, but not limited to, profits tax, VAT and social contributions. Tax laws, namely the Russian Tax Code, have been in force for a short period relative to tax laws in more developed market economies, and the implementation of these tax laws is still unclear or inconsistent. Historically, the system of tax collection has been relatively ineffective. The Russian tax laws and regulations are subject to frequent changes, varying and contradicting interpretations and inconsistent and selective enforcement. Although the quality of Russian tax legislation has generally improved since the introduction of the first and second parts of the Russian Tax Code, there is a possibility that in the future Russia may impose arbitrary or burdensome taxes and penalties, which could adversely affect our business, financial condition and results of operations.

A large number of changes have been made to various chapters of the Russian Tax Code since their introduction. Since Russian federal, regional and local tax laws and regulations are subject to changes and some of the sections of the Russian Tax Code relating to the aforementioned taxes are comparatively new, interpretation of these regulations is still unclear or non-existent. Also, different interpretations of tax regulations exist both among and within government bodies at the federal, regional and local levels, which creates uncertainties and inconsistent enforcement. The current practice is that private clarifications to specific taxpayers' queries with respect to particular situations issued by the Russian Ministry of Finance are not binding on the Russian tax authorities and there can be no assurance that the Russian tax authorities will not take positions contrary to those set out in such clarifications. During the past several years the Russian tax authorities have shown a tendency to take more assertive positions in their interpretation of the tax legislation, which has led to an increased number of material tax assessments issued by them as a result of tax audits. Starting from January 1, 2019 tax authorities are entitled to claim documents (information) used for calculation and payment of taxes (other obligatory payments) from the taxpayers' auditors. In practice, the Russian tax authorities generally interpret the tax laws in ways that do not favor taxpayers, who often have to resort to court proceedings against the Russian tax authorities to defend their position. In some instances, Russian tax authorities have applied new interpretations of tax laws retroactively. There is no established precedent or consistent court practice in respect of these issues. Furthermore, in the absence of binding precedent, court rulings on tax or other related matters by different courts relating to the same or similar circumstances may also be inconsistent or contradictory.

Starting from January 1, 2015, a number of amendments have been made to the Russian tax legislation introducing, among others, the concepts of controlled foreign companies, corporate tax residency and beneficial ownership (see also "*Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations*").

On November 27, 2017, the Federal Law No. 340-FZ introducing CbCR requirements was published. The mandatory filing of CbCR is, in general, in line with the OECD recommendations within the BEPS initiative. The law has taken effect on the date of its official publication, and its provisions apply to financial years starting in 2017 (except for the provisions regarding the national documentation). These amendments would require multinational corporate enterprise groups with consolidated revenues of over certain threshold to submit annual CbCR, as well as certain other reporting forms detailing multinational corporate enterprises groups operations (locally and globally, respectively), as well as transfer pricing methodologies applied to intra-group transactions. Thus, if we reach the reporting threshold established for the consolidated revenue of the group (over RUB 50 billion if parent company for CbCR purposes is regarded as Russian tax resident or over relevant threshold established in any other jurisdiction as applicable (e.g. EUR 750 million for Cyprus))) we may be liable to submit relevant CbCR. It is unclear at the moment how the above measures will be applied in practice by the tax authorities and courts. It is important that, for example, the above changes and amendments to the Russian Tax Code introduced by the law do not replace the already existing transfer pricing documentation requirements.

In addition, in 2019, the OECD proposed introduction of action plans under two pillars as measures to limit the erosion of the tax base in the digital era. The Pillar 1 plan provides for a new tax regime under which multinational enterprises with consolidated revenues exceeding a certain threshold would pay corporate income tax in those countries where they have a large customer base. The tax would be paid based on a prescribed formula under which a certain portion of consolidated profits of multinational enterprises exceeding a set threshold would be allocated to jurisdictions where such enterprises have substantial customer base even without traditional presence in the form of subsidiary or a

branch. This new approach to determine taxable base and associated tax payment procedure would apply to automated digital service providers and consumer-facing businesses. The Pillar 2 plan proposes tax rules under which multinational enterprises would be liable tax at not less than certain minimum tax rate set on a global basis. This Pillar 2 should address remaining BEPS challenges by ensuring large companies pay a minimum level of tax on income regardless of where it arises. Although the agreement on the two plans has not yet been reached to date, the OECD has published documents that contain the principal arrangements and main options to be discussed. It is currently unclear what will be the effect from these initiatives, in what form these suggested new tax rules will be applied and how these initiatives will impact on business and operations.

Certain other changes were introduced to the Russian Tax Code over the recent years, namely changes to types of controlled transactions subject to transfer pricing rules, increase of the VAT rate to 20%, etc.

On September 8, 2020 the protocol on amendment of double tax treaty between Russia and Cyprus was signed. The amendments increased withholding tax rate envisaged by this double tax treaty in respect of dividends and interest to 15% (with certain exceptions). The amendments were ratified in the end of 2020 and came into effect starting from January 1, 2021.

The possibility exists that the Government may introduce additional tax-raising measures. Although it is unclear how such measures would operate, the introduction of any such measures may affect the Group's overall tax efficiency and may result in significant additional taxes becoming payable.

There can be no assurance that the Russian Tax Code will not be changed in the future in a manner adverse to the stability and predictability of the tax system. These factors, together with the potential for state budget deficits, raise the risk of the imposition of additional taxes on us. The introduction of new taxes or amendments to current taxation rules may have a substantial impact on the overall amount of our tax liabilities. There is no assurance that we would not be required to make substantially larger tax payments in the future, which may adversely affect our business, financial condition and results of operations.

***Our business in Russia may be deemed to receive unjustified tax benefits.***

In its decision No 138-0 dated July 25, 2001, the Constitutional Court of the Russian Federation, or the Constitutional Court, introduced the concept of "a taxpayer acting in a bad faith" without clearly stipulating the criteria for it. Although this concept is not defined in Russian tax law, it has been used by the tax authorities to deny, for instance, the taxpayer's right to obtain tax deductions and benefits provided by the tax law. The tax authorities and courts often exercise significant discretion in interpreting this concept in a manner that is unfavorable to taxpayers.

The concept of "unjustified tax benefit" was formulated in Resolution No. 53 issued by the Plenum of the Supreme Arbitrazh Court of the Russian Federation in 2006. The concept is defined in the resolution mainly by reference to specific examples of tax benefits obtained as a result of a transaction that has no reasonable business purpose and which may lead to disallowance of their application.

On July 19, 2017, new anti-avoidance provisions were introduced by the Article 54.1 of the Russian Tax Code, which replaced the previously existing concept of "unjustified tax benefit". These anti-avoidance provisions establish two specific criteria that should be met simultaneously to entitle a taxpayer to reduce the tax base or the amount of tax: (i) the main purpose of the transaction (operation) is not a non-payment (incomplete payment) and (or) offset (refund) of the amount of tax; and (ii) the obligation under the transaction (operation) is executed by a person who is a party to a contract entered into with the taxpayer and / or a person to whom the obligation to execute a transaction (operation) was transferred under a contract or law. The Russian Tax Code specifically indicates that signing of primary documents by an unidentified or unauthorized person, violation by the counterparty of tax legislation, the possibility to obtain the same result by a taxpayer by entering into other transactions not prohibited by law cannot be considered in itself as a basis for recognizing the reduction of the tax base or the amount of tax unlawful. However, application of these criteria is still under consideration of the tax authorities, therefore, no assurance can be given that positions of taxpayers will not be challenged by the Russian tax authorities.

The Russian Ministry of Finance issued clarifications that the concepts expressed in Resolution No. 53 and evolved in the relevant court practice should not be applied by the Russian tax authorities in the course of tax audits following the enactment of new anti-avoidance rules. However, it cannot be excluded that this new concept could be applied by the tax authorities in a broader sense. There were some recent publications in mass media with reference to the Head of Federal Tax Service of the Russian Federation stating that more than 85% of tax disputes based on Article 54.1 of the Russian Tax Code are ruled out in favor of the tax authorities. Furthermore, recently the Russian tax authorities issued the new clarifications regarding application of Article 54.1 of the Russian Tax Code. In view of this trend and taking into the account the uncertainties with application of anti-avoidance concept, this could possibly expose our Group to significant fines and penalties and to enforcement measures, despite our best efforts at compliance, and could result in a greater than expected tax burden.

***Our Russian subsidiaries are subject to tax audits by Russian tax authorities which may result in additional tax liabilities.***

Generally, taxpayers are subject to tax audits for a period of three calendar years immediately preceding the year in which the decision to conduct the audit is taken. Nevertheless, in some cases the fact that a tax period has been reviewed by the tax authorities does not prevent further review of that tax period, or any tax return applicable to that tax period within three-year statute of limitation period. In addition, based on the court practice and the first part of the Russian Tax Code, the three-year statute of limitations for tax liabilities is extended if the actions of the taxpayer create insurmountable obstacles for the tax audit. Because none of the relevant terms is defined in Russian law, the tax authorities may have broad discretion to argue that a taxpayer has "obstructed" or "hindered" or "created insurmountable obstacles" in respect

39

Table of Contents

of an audit, effectively linking any difficulty experienced in the course of their tax audit with obstruction by the taxpayer and use that as a basis to seek tax adjustments and penalties beyond the three-year term. Therefore, the statute of limitations is not entirely effective. Tax audits may result in additional costs to our Group if the relevant tax authorities conclude that our Russian subsidiaries did not satisfy their tax obligations in any given year. Such audits may also impose additional tax burdens on our Group by diverting the attention of management resources. The outcome of these audits could have a material adverse effect on our business, financial condition and results of operations.

***Russian transfer pricing legislation may require pricing adjustments and impose additional tax liabilities with respect to all controlled transactions.***

The existing Russian transfer pricing rules became effective from January 1, 2012. Under these rules the Russian tax authorities are allowed to make transfer-pricing adjustments and impose additional tax liabilities in respect of certain types of transactions ("controlled" transactions). The list of the "controlled" transactions includes transactions with related parties (with several exceptions such as guarantees between Russian non-banking organizations and interest-free loans between Russian related parties) and certain types of cross border transactions. Starting from 2019, transactions between Russian tax residents will be controlled only if the amount of income from the transactions between these parties within one year exceeds RUB 1 billion and at the same time one of the conditions stipulated in Article 105.14 of Russian Tax Code (e.g., the parties to the transaction apply different corporate income tax rates) is met. Certain other transactions, such as foreign trade transactions in commodities traded on global exchanges, transactions with counterparties from blacklisted countries, transactions between related parties with participation of the independent intermediary, as well as transactions between the Russian tax resident and foreign tax resident (related parties) remain under control in case the amount of income from transactions between these parties within one year exceeds RUB 60 million threshold. As a side effect of this change, the Russian tax authorities who are entitled to perform tax audits of Russian taxpayers with focus on compliance with existing transfer pricing legislation will no longer be involved in tax audit of transactions between Russian parties due to increased limits on transactions between Russian tax residents but they will be able to pay more attention to cross-border transactions.

The burden of proving market prices, as well as keeping specific documentation, lies with the taxpayers. In certain circumstances, the Russian tax authorities may apply the transfer pricing rules and methods in cases where the rules are formally not applicable, claiming additional tax charges calculated using the transfer rules but based on other tax concepts (e.g. anti-avoidance rules, lack of economic justification of expenses, etc.). For more information see "O*ur business in Russia may be deemed to receive unjustified tax benefits*". It is therefore possible that the Group entities established in Russia may become subject to transfer pricing tax audits by tax authorities in the foreseeable future. Due to the uncertainty and developing practice of application of the Russian transfer pricing legislation the Russian tax authorities may challenge the level of prices applied by the Group under the "controlled" transactions (including certain intercompany transactions) or challenge the methods used to prove prices applied by the Group, and as a result accrue additional tax liabilities. If additional taxes are assessed with respect to these matters, they could have a material adverse effect on our business, financial condition and results of operations.

***Cyprus transfer pricing legislation may require pricing adjustments and impose additional tax liabilities with respect to intra group financing transactions and/or all related party transactions.***

The arm's length principle in the Cyprus income tax law requires that all transactions between related parties should be carried out on an arm's length basis, being at fair values and on normal commercial terms.

More specifically, under the arm's length principle, where conditions are made or imposed upon the commercial or financial relations of two related parties which differ from those which would have been made between independent parties, any profits which would have accrued to one of the party had the two parties been independent, but have not so accrued, may be included in the profits of that party and taxed accordingly. The amendment to the income tax law, effective as of January 1, 2015, extends the arm's length principle by introducing the possibility of, in cases where two related Cyprus tax residents transact and the Cyprus tax authorities make an upward arm's length adjustment to one of them, effecting a corresponding downwards adjustment to the other one.

On June 30, 2017, the Cyprus tax authorities issued a tax technical circular (Circular) providing guidance for the tax treatment of intra-group financing transactions (IGFTs). The Circular effective as from July 1, 2017 closely follows the application of the arm's length principle of the OECD Transfer Pricing Guidelines and it applies for all relevant existing and future IGFTs. In this respect, the remuneration on all IGFTs should be supported by a transfer pricing study in order to be accepted by the Cyprus tax authorities.

IGFTs for the purposes of the Circular are defined as (i) any activity relating to granting of loans or cash advances to related companies that is or should be remunerated by interest; and (ii) such activity is financed by financial means and instruments, such as debentures, private loans, cash advances and bank loans.

The Circular requires that the transfer pricing study should be prepared by independent experts and will have to be based on the relevant OECD standards for the purposes of (i) describing (delineating) the IGFT by performing a comparability analysis based on the functional and risk profile of the company; and (ii) determining the applicable arm's length remuneration by performing an economic analysis.

There are no specific transfer pricing rules or any transfer pricing documentation requirements in the Cyprus tax laws with respect to any other related party transactions. However, Cyprus is in the late stages of adopting transfer pricing rules, covering all types of transactions, that are applicable to Cyprus tax resident companies or Cyprus permanent establishments that meet the standards set in the OECD BEPS Action 13: Transfer Pricing Documentation and Country-by-Country Reporting. The Cyprus draft transfer pricing legislation is expected to be enacted within the coming months.

***We may encounter difficulties in obtaining lower rates of Russian withholding income tax envisaged by the Russia-Cyprus double tax treaty for dividends distributed from Russia.***

Dividends paid by a Russian legal entity to a foreign legal entity are generally subject to Russian withholding income tax at a rate of 15%, although this tax rate may be reduced under an applicable double tax treaty. We intend to rely on the Russia-Cyprus double tax treaty. The Russian-Cyprus double tax treaty allows reduction of withholding income tax on dividends paid by a Russian company to a Cypriot company provided that the following conditions are met: (i) the Cypriot company is a tax resident of Cyprus within the meaning of the tax treaty; (ii) the Cypriot company is the beneficial owner of the dividends; (iii) the dividends are not attributable to a permanent establishment of the Cypriot company in Russia; (iv) the conditions established by the Russia-Cyprus double tax treaty for application of the reduced tax rate are satisfied; (v) the treaty benefits are not disallowed by the applicable provisions of MLI; and (vi) the treaty clearance procedures are duly performed.

The new Protocol of September 8, 2020 coming into effect from January 2021 increased withholding tax rates in respect of interest and dividend income to 15% (though it provides for a number of exceptions where the lower rates of 5% or 0% are envisaged). The reduced 5% tax rate in respect of dividend and interest income is envisaged for certain categories of income recipients, including public companies whose shares are listed on a registered stock exchange provided that at least 15% of the voting shares of that company are in free float and which holds directly at least 15% of the capital of the company paying the dividends throughout a 365 days period that includes the day of payment of the dividends. The Cypriot holding company believes that it fulfills the conditions for application of the reduced 5% tax rate under the amended Russia-Cyprus double tax treaty in respect of dividend income. However, there is no assurance that the Russian Ministry of Finance will not revise its position in the future or that the Russian tax authorities will not challenge the Company's position in this respect. There is also no assurance that the reduced withholding income tax rate under the Russia-Cyprus double tax treaty will be applied to interest income.

The application of Russia-Cyprus double tax treaty benefits could be also disallowed if our Cypriot holding company fails to duly perform the treaty clearance procedures at the date when the dividend payment is made. In this case, we may seek to claim as a refund the difference between the 15% tax withheld and the reduced rate of 5% (as applicable). However, there can be no assurance that such taxes would be refunded in practice. Furthermore, starting from January 1, 2015, a number of amendments had been made to the Russian tax legislation introducing, amongst others, the concept of beneficial ownership. Under this concept, double tax treaty benefits are only available to the recipient of income from Russian sources, if such recipient is the beneficial owner of the relevant income. Foreign entities that do not qualify as beneficial owners may not claim double tax treaty relief even if they are residents in a double tax treaty country. Starting from 1 January 2017, the Russian Tax Code requires the tax agent to obtain confirmation from the non-resident holder-legal entity that it is the beneficial owner of the relevant income. Russian tax law provides neither the form of such confirmation nor the precise list of documents which can demonstrate the beneficial owner status of the recipient with respect to the received income. Due to the introduction of these changes, there can be no assurance that treaty relief at source will be available in practice. According to the recent clarifications of the Russian tax authorities, a foreign company may not benefit from a double tax treaty if its activity does not have a real business purpose, if such company does not bear any risks that are normal for business activity, such company does not benefit from the use of such income and its employees actually do not control/ manage such company. If activities of the company are limited to investments and/or financing of a group of companies, it cannot be considered as an independent business activity and it is not enough to confirm the beneficial owner status of the recipient of income. In addition, it is unclear how the beneficial ownership concept will evolve in the future. As a result, there is a risk that application of the concept of beneficial ownership may result in the inability of the foreign companies within our Group to claim benefits under a double taxation treaty through structures which historically have benefited from double taxation treaty protection in Russia.

Cypriot holding company intends to use simplified approach for confirmation of the beneficial ownership status that has recently been adopted for public companies with shares and (or) depository receipts comprising more that 25% of their share capital admitted to trade on a qualifying stock exchange if the respective confirmation letter on its beneficial ownership status and documents confirming publicly traded company status are in place. Since this simplified approach is relatively new and untested there is no assurance that the Russian tax authorities will not challenge our beneficial ownership status.

***We may be deemed to be a tax resident outside of Cyprus.***

According to the provisions of the Cyprus Income Tax Law, a company is considered to be a resident in Cyprus for tax purposes if its management and control is exercised in Cyprus. The concept of "management and control" is not defined in the Cypriot tax legislation. For more details in relation to tax residency in Cyprus see "Item 10.E Taxation – Material Cypriot Tax Considerations – Tax residency of a company". On October 22, 2020 the Cyprus Council of Ministers approved the Cyprus draft budgetary plan for 2021 (the "draft budget") which announced two unilateral tax measures to address aggressive tax planning, one of which being the introduction of corporate tax residency test based on incorporation in addition to the existing "management and control" test.

If we are deemed not to be a tax resident in Cyprus, we may not be subject to the Cypriot tax regime other than in respect of Cyprus sourced income and we may be subject to the tax regime of the country in which we are deemed to be a tax resident. Further, we would not be eligible for benefits under the double tax treaties entered into between Cyprus and other countries. Under the Russian Tax Code, a foreign legal entity may be recognized as a Russian tax resident if such entity is in fact managed from Russia. For more details in relation to tax residency in Russia see "Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations".

41

The double tax treaty in force between Cyprus and Russia provides that a company shall be deemed to be a tax resident of the state in which the place of effective management of the company is situated. In case both states claim the tax residency of the company, the process of determining the effective management will be achieved through the two states endeavoring to determine the place of effective management by mutual agreement having regard to all relevant factors. In cannot be excluded that the Covid-19 restrictions limiting the ability of the directors who are not Cypriot citizens to travel and physically attend the meetings of the board of directors could have certain impact on the application of the Cypriot tax residency concept and associated risks. However, the Company has already obtained a tax ruling from the Cyprus tax authorities where the Cyprus tax authorities confirm that tax residency position of the Company for 2020 and 2021 is not affected due to borders shutdown and inability of the directors to attend meetings in person.

***Our subsidiaries may be deemed a tax resident outside of countries of their incorporation.***

Each jurisdiction has its own tax residency requirements. We believe that our subsidiaries do comply with tax residency requirements of the jurisdiction, where they are incorporated; however, there might be a risk that they may be deemed a tax resident outside of countries of their incorporations.

***Our companies established outside of Russia may be exposed to taxation in Russia.***

Due to our international structure (see "Item 18. Financial Statements, Note 5. Consolidated subsidiaries"), we are subject to permanent establishment rules and transfer pricing risks in various jurisdictions in which we operate. We manage the related risks by looking at management functions and risks in various countries and level of profits allocated to each subsidiary. If additional taxes are assessed in connection with these matters, they may be material. The Russian Tax Code contains the concept of a permanent establishment in Russia as means for taxing foreign legal entities, which carry on regular operational activities in Russia beyond the activities of preparatory and auxiliary nature.

The Russian double tax treaties with other countries also contain a similar concept. If a foreign company is treated as having a permanent establishment in Russia, it would be subject to Russian taxation in a manner broadly similar to the taxation of a Russian legal entity, but only to the extent of the amount of the foreign company's income that is attributable to the permanent establishment in Russia. However, the practical application of the concept of a permanent establishment under Russian domestic law is not well developed and so foreign companies having even limited operations in Russia, which would not normally satisfy the conditions for creating a permanent establishment under international rules, may be at risk of being treated as having a permanent establishment in Russia and hence being exposed to Russian taxation. Furthermore, the Russian Tax Code contains attribution rules, which are not sufficiently developed, and there is a risk that the tax authorities might seek to assess Russian tax on the global income of a foreign company. Having a permanent establishment in Russia may also lead to other adverse tax implications, including challenging a reduced withholding tax rate on dividends under an applicable double tax treaty, potential effect on VAT and property tax obligations. There is also a risk that penalties could be imposed by the tax authorities for failure to register a permanent establishment with the Russian tax authorities. Recent events in Russia suggest that the tax authorities may be seeking more actively to investigate and assert whether foreign entities of our Group operate through a permanent establishment in Russia. Any such taxes or penalties could have a material adverse effect on our business, financial condition and results of operations.

***Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations.***

The Russian Federation, like a number of other countries in the world, is actively involved in implemenation of measures against tax evasion through the use of low tax jurisdictions as well as aggressive tax planning structures. Starting from January 1, 2015, the Federal Law No. 376-FZ, introducing the concept of "controlled foreign companies" (the "CFC Rules"), the concept of "corporate tax residency" and the concept of "beneficial ownership" into Russian tax legislation, came into force. Moreover, Russia has entered into several multilateral agreements for the exchange of information between the tax authorities of different countries.

Under the Russian CFC Rules, in certain circumstances, undistributed profits of foreign companies and non-corporate structures (e.g., trusts, funds or partnerships) domiciled in foreign jurisdictions, which are ultimately owned and/ or controlled by Russian tax residents (legal entities and individuals) will be subject to taxation in Russia. The Russian CFC Rules are being constantly developed. A number of amendments to the Russian CFC Rules were made within 2015-2020 years. In the meantime, certain provisions of the Russian CFC Rules are still ambiguous and may be subject to arbitrary interpretation by the Russian tax authorities.

Under the concept of "corporate tax residency" a foreign legal entity may be recognized as a Russian tax resident if: (i) its executive body(ies) operates in respect of such company in Russia on regular basis (however, the activity of executive body will not be viewed as regular if it is insignificant compared to the one in the other jurisdiction), or (ii) senior executive personnel of the company who are authorized to plan and control activities of the company and take responsibility over it basically carry out management of the company from Russia (i.e. make decisions or take any other measures in respect of operational activities of the company that are within the competence of the company's executive body). Provided that one of the above conditions is met both in Russia and in other jurisdiction to the same extent, the place of management and control is defined as Russia, provided that one or more of the following is carried out in Russia: (i) bookkeeping and maintaining of management accounts (other than preparation and reporting of consolidated financial or management accounts, as well as analysis of operations of the foreign company), or (ii) company's record keeping, or (iii) daily management of the company's staff. When an entity is recognized as Russian tax resident it is obligated to register with the Russian tax authorities, calculate and pay Russian tax on its worldwide income and comply with other tax-related rules established for Russian entities. There is still an uncertainty as to how these criteria will be applied by the Russian tax authorities in practice.

Under the Russian Tax Code, a beneficial owner is defined as a person with by means of direct and/or indirect participation or control over other organizations or otherwise, has the right to own, use or dispose of income, or the person on whose behalf another person is authorized to use and/or dispose of such income. When determining the beneficial owner, the functions of a foreign person that is claiming the application of reduced tax rates under an applicable double tax treaty and the risks that such person takes should be analyzed. In accordance with the provisions of the Russian Tax Code, the benefits of a double tax treaty will not apply if a foreign person claiming such benefits has limited powers to dispose of the relevant income, fulfills intermediary functions without performing any other duties or taking any risks and paying such income (partially or in full) directly or indirectly to another person who would not be entitled to the same benefits should it received the income in question directly from Russia. Starting from January 1, 2017, the Russian Tax Code requires a tax agent, i.e. the payer of income, in addition to a certificate of tax residency to obtain a confirmation from the recipient of the income that it is the beneficial owner of the income. To date, there is still no approved or recommended format of such confirmation letter and (or) the precise list of documents to be obtained from the recipient of income claiming the beneficial owner status.

It cannot be excluded that we might be subject to additional tax liabilities because of these changes being introduced and applied to transactions carried out by us, which could have a material adverse effect on our business, financial condition and results of operations (see also "We may encounter difficulties in obtaining lower rates of Russian withholding income tax envisaged by the Russia-Cyprus double tax treaty for dividends distributed from Russia", "Global anti-offshore measures may have adverse impact on our business, financial condition and results of operations").

### The Russian thin capitalization rules allow for different interpretations, which may affect our business, results of operations and financial condition

Russian tax legislation contains thin capitalization rules envisaged under the point 2 of the Article 269 of the Russian Tax Code. These rules under certain conditions limit the amount of interest that could be deducted by the Russian companies with direct or indirect participation of foreign company. These rules were subject to frequent amendments and different interpretations over the past years

Our Russian subsidiaries may be affected by the Russian Federation's thin capitalisation rules in respect of loans from or have loans guaranteed by foreign or Russian related parties.

It is currently unclear how the Russian tax authorities could interpret and apply thin capitalisation rules. Specifically, it is unclear whether thin capitalization rules should be applied to coupon payments on bonds issued by one of our Russian subsidiaries when the investors in such bonds have irrevocable public offer from Group companies in place. If thin capitalization rules are applied, the Russian tax authorities may disallow part or full coupon payments for income tax deduction purposes. As a result, non deductible coupon payments would be considered as payment of dividends and subsequently would be subject to withholding tax rate at 13% or 15%. As at the date of this Report there is no available court practice on this matter. It cannot be ruled out that we might be subject to additional tax liabilities, which could have a material adverse effect on our business.

### ADS holders outside of Russia may be subject to Russian tax for income earned upon a sale, exchange or disposal of our ADSs.

In the event that the proceeds from a sale, exchange or disposal of ADSs are deemed to be received from a source within Russia, a non-resident holder that is an individual may be subject to Russian tax in respect of such proceeds at a rate of 30% of the gain (such gain being computed as the sales price less any available documented cost deduction, including the acquisition price of the ADSs and other documented expenses, such as depositary expenses and brokers' fees). In case of non-resident holders that are legal entities or organizations proceeds from sale, exchange or disposal of ADSs would be regarded as Russian source proceeds subject to tax in Russia at the rate of 20% if more than 50% of our assets directly or indirectly consist of immovable property in located in Russia. Relevant tax may be eliminated under any available double tax treaty relief, provided that the necessary requirements to qualify for the treaty relief, including beneficial ownership requirements, and the appropriate administrative requirements under the Russian tax legislation have been met. For example, holders of ADSs that are eligible for the benefits of the United States-Russia double tax treaty should generally not be subject to tax in Russia on any gain arising from the disposal of ADSs, provided that the gain is not attributable to a permanent establishment or a fixed base that is or was located in Russia and/or provided that no more than 50% of our assets consist of immovable property situated in Russia (as defined in the treaty). If not less than 50% of our assets were to consist of immovable property situated in Russia, the benefits of the United States-Russia double tax treaty may not be available to an ADS holder (whether a legal entity or an individual). For more details, see "Russian Tax Considerations Relevant to the Purchase, Ownership and Disposal of the ADSs". We believe that this should not be applicable to ADSs as our assets do not directly or indirectly by more than 50% consist of the immovable property located in Russia as of the date of this Report.

### Depending upon the value and the nature of our assets and the amount and nature of our income over time, we could be classified as a passive foreign investment company ("PFIC") for U.S. federal income tax purposes.

We will be classified as a PFIC in any taxable year if either: (a) 50% or more of the fair market value of our gross assets (determined on the basis of a quarterly average) for the taxable year produce passive income or are held for the production of passive income, or (b) 75% or more of our gross income for the taxable year is passive income. As a publicly traded foreign corporation we intend for this purpose to treat the aggregate fair market value of our gross assets as being equal to the aggregate value of our outstanding stock ("market capitalization") plus the total amount of our liabilities and to treat the excess of the fair market value of our assets over their book value as a nonpassive asset to the extent attributable to our nonpassive income. Because we currently hold, and expect to continue to hold, a substantial amount of cash and cash

Table of Contents

equivalents and other passive assets used in our business, and because the value of our gross assets is likely to be determined in large part by reference to our market capitalization securities, we would likely become a PFIC for a given taxable year if the market price of our ADSs were to decrease significantly. The application of the PFIC rules is subject to uncertainty in several respects, and we must make a separate determination after the close of each taxable year as to whether we were a PFIC for such year. If we are a PFIC for any taxable year during which a U.S. investor held our ADSs or ordinary shares, the U.S. investor might be subject to increased U.S. federal income tax liability and to additional reporting obligations. We do not intend to provide the information necessary for the U.S. investor to make a qualified electing fund election with respect to our ADSs or ordinary shares. See "Taxation – United States Federal Income Tax Considerations – Passive Foreign Investment Companies."

**Risks Relating to our ADSs**

***The class B shares underlying the ADSs are not listed and may be illiquid.***

The class B shares underlying the ADSs are neither listed nor traded on any stock exchange, and we do not intend to apply for the listing or admission to trading of the class B shares on any stock exchange. As a result, a withdrawal of class B shares by a holder of ADSs, whether by election or due to certain other events will result in that holder obtaining securities that are significantly less liquid than the ADSs and the price of those class B shares may be discounted as a result of such withdrawal.

***Our ADSs trade on more than one market and this may result in increased volatility and price variations between such markets.***

Our ADSs trade on both Nasdaq and MOEX. Trading in our ADSs on these markets occurs in different currencies (U.S. dollars on Nasdaq and Russian rubles on MOEX) and at different times (due to different time zones, trading days and public holidays in the United States and Russia). The trading prices of our ADSs on these two markets may differ due to these and other factors. The liquidity of trading in our ADSs on MOEX is limited. This may impair your ability to sell your ADSs on MOEX at the time you wish to sell them or at a price that you consider reasonable. In addition, trading of a small number of ADSs on that market could adversely impact the price of our ADSs significantly and could, in turn, impact the price in the United States. ADSs are completely fungible between both markets. Any decrease in the trading price of our ADSs on one of these markets could cause a decrease in the trading price of our ADSs on the other market. Additionally, as there is no direct trading or settlement between the two stock markets, the time required to move the ADSs from one market to another may vary and there is no certainty of when ADSs that are moved will be available for trading or settlement.

***Future sales of ADSs or ordinary shares by significant shareholders could cause the price of our ADSs to decline.***

If any of our significant shareholders sell, or indicate an intent to sell, substantial amounts of our ADSs or ordinary shares, including both class A shares and class B shares, in the market, the trading price of our ADSs could decline significantly. We cannot predict the effect, if any, that future sales of these ADSs or ordinary shares or the availability of these ADSs or ordinary shares for sale will have on the market price of our ADSs. As of the date of this annual report, we have outstanding 62,712,975 ordinary shares, including those represented by ADSs. Our shares that are not currently represented by ADSs could generally be added into our ADS program in relatively short order, subject to applicable securities laws restrictions. Our significant shareholders currently include Mr. Sergey Solonin (see *"– The substantial share ownership position of our chief executive officer Sergey Solonin may limit your ability to influence corporate matters"*) and Otkritie Bank (see *"– The substantial share ownership position of Otkritie could be adverse to the interests of our minority shareholders"*), both of whom have certain registration rights and are able to cause us to conduct registered offerings. A significant sale of our securities by any of these holders or any other future owner of a substantial stake in our company could have a detrimental effect on the trading price of our ADSs. We cannot predict what effect, if any, market sales of securities held by our significant shareholders or any other shareholder or the availability of these securities for future sale will have on the market price of the ADSs.

***Investors in our ADSs may have limited recourse against us, our directors and executive officers because we conduct our operations outside the United States and most of our current directors and executive officers reside outside the United States.***

Our presence outside the United States may limit investors' legal recourse against us. We are incorporated under the laws of the Republic of Cyprus. All of our current directors and senior officers reside outside the United States, principally in the Russian Federation. Substantially all of our assets and the assets of our current directors and executive officers are located outside the United States, principally in the Russian Federation. As a result, investors may not be able to effect service of process within the United States upon our company or its directors and executive officers or to enforce U.S. court judgments obtained against our company or its directors and executive officers in Russia, Cyprus or other jurisdictions outside the United States, including actions under the civil liability provisions of U.S. securities laws. In addition, it may be difficult for investors to enforce, in original actions brought in courts in jurisdictions outside the United States, liabilities predicated upon US securities laws. There is no treaty between the United States and the Russian Federation providing for reciprocal recognition and enforcement of foreign court judgments in civil and commercial matters. These limitations may deprive investors of effective legal recourse for claims related to their investment in our ADSs.

***Our ADS holders may not be able to exercise their pre-emptive rights in relation to future issuances of class B shares.***

In order to raise funding in the future, we may issue additional class B shares, including class B shares represented by ADSs. Generally, existing holders of shares in Cypriot public companies are entitled by law to pre-emptive rights on the issue of new shares in that company (provided that such shares are paid in cash and the pre-emption rights have not been disapplied). Our ADS holders may not be able to exercise

44

pre-emptive rights for class B shares represented by ADSs unless applicable securities law requirements are adhered to or an exemption from such requirements is available. In the United States, we may be required to file a registration statement under the Securities Act to implement pre-emptive rights. We can give no assurance that an exemption from the registration requirements of the Securities Act would be available to enable U.S. holders of ADSs to exercise such pre-emptive rights and, if such exemption is available, we may not take the steps necessary to enable U.S. holders of ADSs to rely on it. Accordingly, our ADS holders may not be able to exercise their pre-emptive rights on future issuances of shares, and, as a result, their percentage ownership interest in us would be reduced.

In April 2013, our shareholders authorized the disapplication of pre-emptive rights for a period of five years from May 8, 2013, the date of the closing of our initial public offering, in connection with the issue of up to an additional 52,000,000 class B shares, including in the form of ADSs. Such disapplication has expired on May 8, 2018, and while we have solicited further disapplication by our shareholders, such disapplication has not been supported by our public shareholders so far. If no further disapplication of pre-emptive rights is approved by our shareholders, any of our share issuances would be subject to the pre-emptive rights of our shareholders which some of our ADS holders may not be able to exercise due to the factors described above. At the same time, to the extent we attempt an offering of ADSs in the United States pursuant to the pre-emptive rights of our shareholders, we may not be able to do so due to the fact that rights offerings are difficult to implement effectively under the current U.S. securities laws, and our ability to raise capital in the future may be compromised if we need to do so via a rights offering in the United States.

### ADS holders have no legal interest in the underlying class B shares.

ADS holders acquire the beneficial, and not the legal, interest in the underlying class B shares, which the depositary holds for them, under the terms of the deposit agreement. The intended effect is to ring-fence the class B shares in the hands of the depositary by conferring a property interest on ADS holders as beneficiaries. However, the interest of the ADS holders as beneficiaries in the class B shares, is indirect, in the sense that in the normal course they do not have any direct recourse to the class B shares nor do they have any direct right of action against us.

### ADS holders may be subject to limitations on transfer of their ADSs.

ADSs are transferable on the books of the depositary. However, the depositary may close its transfer books at any time or from time to time when it deems expedient in connection with the performance of its duties. In addition, the depositary may refuse to deliver, transfer or register transfers of ADSs generally when our books or the books of the depositary are closed, or at any time if we or the depositary deems it advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason in accordance with the terms of the deposit agreement.

### ITEM 4.    Information on the Company

### A.    History and Development of the Company

We were incorporated in Cyprus under the name of OE Investments Limited on February 26, 2007 as a new holding company for JSC QIWI (previously known as OSMP CJSC and QIWI CJSC). The company operates under the Companies Law, related legislation, and common law of Cyprus. In 2007, we acquired, among other entities, CJSC E-port and LLC Qiwi Wallet, which were reorganized in the form of accession to JSC QIWI. In April 2008, we launched the Qiwi brand, which gradually became the marketing name for our businesses. We changed our legal name to Qiwi Limited on September 13, 2010, and subsequently to QIWI plc upon going public on February 25, 2013.

Our primary subsidiaries are QIWI Bank (JSC), or Qiwi Bank, JSC QIWI and Sette FZ-LLC. JSC QIWI was incorporated in Russia in January 2004, and its key business functions include the provision of payment processing services as well as development and maintenance of our physical distribution network. QIWI Payments Services Provider Limited was incorporated in the United Arab Emirates in February 2011, and until December 31, 2019 was one of our primary subsidiaries. In 2019 in order to optimize our business operations we incorporated Sette FZ-LLC in the United Arab Emirates. All rights and obligations of QIWI Payments Services Provider Limited under the contracts with most merchants and partners have been transferred to Sette FZ-LLC.

In September 2010, we acquired Qiwi Bank from a group of our then-current shareholders. In June 2015, we acquired the Rapida payment processing system and the Contact money transfer system from Otkritie Investment Cyprus Limited and subsequently in April 2017, they merged into Qiwi Bank.

In June 2018, QIWI, Otkritie Bank and the Tochka management signed a partnership agreement to establish a new entity JSC Tochka to collectively develop the Tochka business, as a digital banking service focused on offering a broad range of services to small and medium-sized businesses. JSC Tochka commenced its business operations in February 2019.

In July 2018, we acquired 100% of Rocketbank, a digital banking service offering debit cards and deposits to retail customers, from Otkritie Bank. In 2019, the Board of Directors requested that management investigates the potential for a partial or complete sale of Rocketbank. As we were unable to find a suitable buyer for Rocketbank, the Board of Directors resolved to wind down Rocketbank's operations. The wind-down of Rocketbank's operations was substantially completed in 2020.

In 2016, we launched a payment-by-installment card project SOVEST. In July 2020, following a strategic decision to divest the project, we sold the SOVEST consumer-lending business to Sovcombank. In connection with this transaction we assigned receivables from SOVEST customers (the portfolio of installment card loans) and trasnfered certain other assets related to the SOVEST project to Sovcombank.

**ITEM 5.**        **Operating and Financial Review and Prospects**

You should read the following operating and financial review together with our consolidated financial statements and related notes included elsewhere in this annual report. Certain statements in this section are "forward-looking statements" and are subject to risks and uncertainties, which may cause actual results to differ materially from those expressed or implied by such forward-looking statements. Please see "Special Note Regarding Forward-Looking Statements" and "Risk Factors" for more information.

**A.    Operating Results**

**Overview**

We are a leading provider of next generation payment and financial services in Russia and the CIS. We have an integrated proprietary network that enables payment services across online, mobile and physical channels and provides access to certain financial services that we offer to our customers, merchants and partners. We operate in and target markets and segments that lack convenient digital solutions for customers and partners to pay or accept payments for goods and services, transfer money or use other financial tools in online, mobile and physical environments or that are largely cash-based.

We distribute our payment services online through our virtual Qiwi Wallet and other Qiwi Wallet infrastructure-based solutions, which enable consumers to make payments, transfer and receive funds through their computers or mobile devices, while funding their accounts through a variety of sources. We have also built a physical network of over 113,000 kiosks and terminals using a proprietary agent model. We provide our merchants with access to convenient and secure payments and offer a wide range of payment solutions, including acquiring services, instant payouts, payment gateways, and certain other infrastructural solutions. We also develop a number of digital financial services targeting primarily sole proprietors, and small and medium-sized businesses, such as Tochka or Factoring PLUS.

Our primary source of revenue are fees we receive from processing payments made by consumers to merchants or other customers or by merchants or partners to users, which we refer to as payment processing fees, typically based on a percentage of the size of the transactions processed, which we refer to as payment volume. We refer to payment processing fees that are paid to us by merchants for collecting payments on their behalf or for processing payouts as "merchant fees" and to payment processing fees that are paid by our consumers directly to us or transmitted to us by our agents as "consumer fees". If transactions are made in cash through our kiosks and terminals, we typically pass on a portion of the merchant fees to our agents.

Further, throughout 2018 we generated revenue from servicing Tochka clients with accounts at Otkritie Bank under the information and technology services agreement between Qiwi Bank and Otkritie Bank. We also generate revenue from commissions we charge for servicing the clients of Tochka, who have accounts with QIWI Bank.

In line with our constant search for new business opportunities, in 2019 we launched a new project focused on providing factoring services and digital bank guarantees where we generate revenues based on the difference between the purchase price for receivables and their actual amount, and fees for guarantee issued, respectively. We also provide digital marketing services through our subsidiary Flocktory where we charge subscription fees to our clients.

**Key Measures of Financial and Operational Performance**

Our management monitors our financial and operational performance on the basis of the following measures.

**Financial Measures**

The following table presents our key financial measures for the year ended December 31, 2018, 2019 and 2020.

| | Year ended December 31, | | |
|---|---|---|---|
| | **2018** | **2019** | **2020** |
| | (in RUB millions) | | |
| Total Net Revenue (1) | 19,657 | 23,176 | 25,978 |
| Payment Services Segment Net Revenue (1) | 16,497 | 20,965 | 22,637 |
| Adjusted EBITDA (1) | 5,948 | 9,099 | 13,837 |
| Adjusted Net Profit (1) | 4,137 | 6,679 | 10,304 |

(1)    See "Selected Consolidated Financial and Other Data — Non-IFRS Financial Measures" for how we define and calculate Total Net Revenue, Adjusted EBITDA, and Adjusted Net Profit as non-IFRS financial measures and reconciliations of these measures to revenue, in the case of Total Net Revenue, and net profit, in the case of Adjusted EBITDA and Adjusted Net Profit.

**Operating Measures**

The following table presents our key operating measures for the year ended December 31, 2018, 2019 and 2020.

| | Year ended December 31, | | |
|---|---|---|---|
| | **2018** | **2019** | **2020** |
| | (in RUB millions, unless otherwise indicated) | | |
| Payment Services Segment Payment Volume | 1,138,149 | 1,488,587 | 1,616,799 |
| Active Qiwi Wallet accounts (at period end, in millions) (1) | 20.8 | 22.5 | 18.1 |
| Active kiosks and terminals (units) (2) | 143,690 | 134,280 | 113,713 |
| Payment Services Segment Net Revenue Yield (3) | 1.45% | 1.41% | 1.40% |

(1)   Number of active Qiwi Wallet accounts is defined as the number of wallets through which at least one payment has been made or that have been loaded or reloaded in the 12 months preceding the end of the relevant reporting period.

(2)   We measure the numbers of our kiosks and terminals on a daily basis, with only those kiosks and terminals being taken into calculation through which at least one payment has been processed during the day, which we refer to as active kiosks and terminals. The period end numbers of our kiosks and terminals are calculated as an average of the amount of active kiosks and terminals for the last 30 days of the respective reporting period.

(3)   Payment Services segment net revenue yield is defined as Payment Services segment net revenue divided by Payment Services segment payment volume.

*Payment volume.* Payment Services segment payment volume provides a measure of the overall size and growth of the business, and increasing our payment volumes is essential to growing our profitability. Payment Services segment payment volumes have increased by 8.6% in 2020 as compared to 2019, reaching RUB 1,617 billion for the year ended December 31, 2020 mainly due to the growth in Money Remittance and E-commerce market verticals resulting largely from the development of payment solutions for merchants including betting merchants, new contracts and new projects targeting the self-employed market. Payment Services segment payment volumes have increased by 30.8% in 2019 as compared to 2018, reaching RUB 1,489 billion for the year ended December 31, 2019 mainly as a result of the growth in E-commerce and Money Remittance market verticals where we are best suited to leverage our payment infrastructure by providing our customers with convenient solutions. The following factors may have a significant impact on the payment volumes and therefore our revenue and profits:

- *Russian economy*. We carry out our operations primarily in Russia. Macroeconomic conditions in Russia significantly impact the volume of payments made by our consumers. During periods of economic growth, overall consumer spending tends to increase along with rises in wealth, and during economic downturns, consumer spending tends to correspondingly decline, although some of the market we service tend to show counter cyclical trends.

- *Regulatory changes.* Our business is impacted by laws and regulations that affect our industry, the number of which has increased significantly in the recent years. We are subject to a variety of regulations aimed at preventing money laundering and financing criminal activity and terrorism, financial services regulations, payment services regulations, consumer protection laws, currency control regulations, advertising laws, betting laws and privacy and data protection laws, and experience periodic investigations by various regulatory authorities in connection with the same, which may sometimes result in monetary or other sanctions being imposed on us. In December 2020, following a routine scheduled audit of QIWI Bank, the CBR imposed certain restrictions with respect to Qiwi Bank's operations, including the suspension or limitation of most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts. We are currently working closely with the CBR to remediate the identified deficiencies and violations and eliminate or narrow down the restrictions that have been imposed. As a result of such cooperation, the CBR permitted us to resume processing payments to certain key foreign merchants and lifted some of the other restrictions imposed in December 2020. However, there can be no assurance that there will be any further easing of the restrictions that were originally imposed, or that they will not ultimately become permanent, including through the adoption of new laws or regulations. The restrictions introduced by the CBR are expected to substantially decrease the volumes in our E-Commerce and Money Remittance market verticals. See *Item 3.D Risk Factors, - "Qiwi Bank operates in a highly regulated environment and increased regulatory scrutiny could have an adverse effect on our business, financial condition and results of operations").* We also observe regulatory changes in the betting market landscape. In December 2020, a new law was adopted, creating the Unified Interactive Bets Accounting Center's role. By the end of September 2021, this newly-appointed Unified Interactive Bets Accounting Center will replace the existing TSUPIS. Currently, both we and the operator of the competing TSUPIS have publicly made proposals to serve as the single Interactive Bets Accounting Center pursuant to the new regulatory regime, however, there can be no assurance that our bid will be successful. If we are not able to secure an active role in this new industry landscape, we may experience a decrease in or complete loss of payment volumes and income associated directly or indirectly with the TSUPIS established by Qiwi Bank. This or any further significant change in betting legislation may negatively affect the payment volume, revenue, and margins of our Payment Services business, as well as overall usage of Qiwi Wallet. See *Item 3.D Risk Factors, - "We derive a substantial portion of our revenues from merchants in the betting industry and may lose all or a significant portion of such revenue stream due to recent changes in regulation").*

- *Increase in the volume of online transactions and the use of alternative payment methods*. The volume of online transactions has grown considerably in the recent years and continues to grow. Similarly, we expect the use of both banking cards and alternative payment methods in Russia, such as smartphones to grow considerably. We believe that growth in online transactions and alternative payment methods will be an important driver in increasing the demand

66

for technological payment solutions, the number of potential merchants and partners for which we can offer payment services and the potential number of our users. However, the rapid development of bank card transactions in online as well as development of online banking services could hinder the growth in alternative payment methods.

- *Consumer adoption.* We have actively sought new merchants to offer consumers more payment choices when using our products and developed certain solutions and technological capabilities to widen the scope of services that we offer for merchants, partners and customers. We believe that growth of our infrastructure and suite of services we offer as well as merchant and partner network will lead to more consumers using our payment and financial services more frequently. In addition, we actively encourage consumers to use multiple products, distribution channels and interfaces, for example, for users of our physical distribution network to create a Qiwi Wallet or other online account and use it for wider range of purposes such as, for example, recurring and non-recurring payments, money transfers or as a payment collection tool. We also encourage our merchants and partners to use variety of our complimentary solutions and promote users of our payment services to adopt the financial services products that we offer, such as Factoring PLUS, Flocktory, and Tochka. We believe that the synergies offered within our ecosystem and between our payment and financial services will help enhance consumer adoption of our services in the future and create a more attractive and complete range of use cases and consumer journeys.

- *Use of cash as a means of payment.* Changes in the aggregate use of cash as a means of payment is an important variable affecting our revenues. Cash payments are one of the principal forms of payment in Russia, and, as a result, a significant share of our payment volumes continues to be cash-based. Over time, the prevalence of cash payments is declining as a greater percentage of the population in emerging markets is adopting credit and debit card payments and electronic banking, and our kiosks and terminals network is decreasing. We expect cash payments to continue to be an important means of payment in Russia and to sustain demand for use of our kiosks and terminals in the near future. If the use of cash as a mean of payment declines in Russia, it may negatively impact our financial results, hence we increasingly focus on offering our clients primarily digital solutions.

*Number of active Qiwi Wallet accounts.* Number of active wallets represents the number of wallets through which at least one payment has been made or which has been loaded in the 12 months preceding the end of the relevant reporting period. Number of active wallets is one of the measures of our success in penetrating the market and expanding our customer base. The number of active Qiwi Wallet accounts decreased to 18.1 million as of December 31, 2020 from 22.5 million as of December 31, 2019. Such decline is attributable primarily to the introduction of new limitations on anonymous wallets and consequent optimization of certain transaction processes, change of inactivity term from 6 to 12 months and enhancement of certain KYC, identification and compliance procedures. Such decline did not substantially impact our financial performance due to increasing diversification of our product proposition and operating models. We expect that the number of active QIWI Wallet could also be affected by the CBR restrictions imposed in December 2020 and resulting outflow of clients that customarily used our services specifically for payments to merchants that have become subject to the restrictions (*see – Item 3.D Risk Factors,—"Qiwi Bank operates in a highly regulated environment and increased regulatory scrutiny could have an adverse effect on our business, financial condition and results of operations" and Item 3.D Risk Factors,—"Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes"*).

*Number of active kiosks and terminals.* We measure the numbers of our kiosks and terminals on a daily basis, with only those kiosks and terminals being taken into calculation through which at least one payment has been processed during the day, which we refer to as active kiosks and terminals. The period end numbers of our kiosks and terminals are calculated as an average of the amount of active kiosks and terminals for the last 30 days of the respective reporting period. From December 31, 2019 to December 31, 2020, our number of kiosks decreased from 111,000 to 94,000 and the number of terminals decreased from 23,000 to 19,000. Our kiosks and terminals can be found next to convenience stores, in train stations, post offices, retail stores and airport terminals in all major urban cities as well as many small and rural towns that lack large bank branches and other financial infrastructure. The number of kiosks and terminals is generally decreasing as market evolves towards higher share of digital payments, moreover our physical distribution network was, and to a certain extend continues to be, negatively affected by the spread of COVID-19 pandemic, corresponding lockdown measures and other restrictions that limited users' access to certain retail locations as well as the overall activity of the population. Nevertheless, we believe that our physical distribution network remains an important part of our infrastructure, and we maintain or even slightly increase our market share.

*Payment Services segment net revenue yield.* We calculate Payment Services segment net revenue yield by dividing Payment Services segment net revenue by Payment Services segment payment volume. Payment Services segment net revenue yield provides a measure of our ability to generate net revenue per unit of volume we process. Payment Services segment net revenue yield was 1.45%, 1.41% and 1.40% in 2018, 2019, and 2020, respectively. In 2020, Payment Services segment net revenue yield decreased by 1 bps in comparison to 2019. The following factors have influenced Payment Services segment net revenue yield and may influence it going forward:

- We have experienced a changing business mix towards higher yielding transactions, which are primarily e-commerce and money remittances, whereas lower yielding transaction, such as telecoms and financial services, have declined as a percentage of total Payment Services segment payment volume. At the same time, throughout 2020 the yields in our key market verticals were decreasing primarily as a result of changing product mix within verticals (for example the development of card acquiring for betting and other merchants, which has lower commissions compared to most other products that we offer). The December 2020 CBR order (*see Item 3.D Risk Factors, —"Qiwi Bank operates in a highly regulated environment and increased regulatory scrutiny could have an adverse effect on our business, financial condition and results of operations"*) puts further negative pressure on our yields, since it primarily affects e-commerce and money remittances.

Table of Contents

- In the past, we have experienced a decline in average net revenue yields derived from large merchants such as, for example, MNOs since they have a substantial bargaining power over the payment channels they use including our infrastructure. We expect that the average net revenue yields will be declining in certain verticals such as E-Commerce and Money Remittances if merchants in these verticals continue to gain scale and accordingly bargaining power or if lower yielding products offered as part our infrastructure gain larger share.

- Our Payment Services segment net revenue yield depends on the level and mix of merchant commissions as well as the level of the reload costs we have. Such costs depend on the commissions charged to us by our partners and agents for the wallet reload as well as on the mix of such channels. If the consumer preferences shift between different reload methods or if any channel becomes more expensive to us (as we have experienced in 2015 in relation to our kiosk network) or less expensive to us, our Payment Services segment net revenue yield may decrease or increase respectively. Our yields may be adversely affected by the changes in the betting legislation that will enter into force in September 2021. Betting gains received by our consumers into their Qiwi Wallet accounts represent an important and cost-efficient source of Qiwi Wallets reloads, which could decline if our presence as a payment provider in the sports betting market diminishes for any reason (see *Item 3.D Risk Factors,—*"*We derive a substantial portion of our revenues from merchants in the betting industry and may lose all or a significant portion of such revenue stream due to recent changes in regulation*").

**Impact of COVID-19**

In December 2019, a novel strain of coronavirus surfaced in Wuhan, China, which has resulted in the temporary closure of many corporate offices, retail stores, and manufacturing facilities and factories across China. The virus then quickly spread out across Europe and the Americas, resulting in various "shelter-in-place" regulations, lockdowns, curfews, bans on international travel, cancellations of public events, and supply chain disruptions. These measures continue to be in place in various forms in most countries in the world, including (to a rather minor extent as of the date of this report) Russia. These developments have negatively impacted consumer and business spending and payments activity generally, and have significantly contributed to deteriorating macroeconomic conditions, business closures, higher unemployment and decrease in consumer confidence throughout the world, including Russia and other countries in which we operate. While governments around the world have taken steps to attempt to mitigate some of the more severe anticipated economic effects of COVID-19, such steps have not always been effective. The negative effects of the coronavirus on our business have included a decline in revenues from our betting merchants due to the cancellation of numerous major sporting events, a drop in money remittance primarily due to a decline in payments to self-employed individuals due to an overall contraction of business activity, and a decline in the use of our kiosk network. The coronavirus pandemic is still ongoing and significant quarantine restrictions largely continue to prevail globally. The full impact of the COVID-19 pandemic on the global economy is difficult to predict due to the lack of clarity on how long it could be expected to last as the world has now entered its second year. These factors may remain prevalent for a significant period of time and may continue to adversely affect our business, results of operations and financial condition, even after the COVID-19 outbreak has subsided.

The COVID-19 outbreak has required and is likely to continue to require significant management attention, substantial investments of time and resources across our enterprise, and increased costs to effectively manage our operations. The spread of COVID-19 has caused us to make significant modifications to our business practices, including enabling most of our workforce to work from home, establishing strict health and safety protocols for our offices, restricting physical participation in meetings, events, and conferences and imposing restrictions on employee travel. The significant increase in the number of our employees who are working remotely as a result of the outbreak, and an extended period of remote work arrangements and subsequent reintroduction into the workplace could introduce operational risk, increase cybersecurity risk, strain our business continuity plans, negatively impact productivity, give rise to claims by employees, and impair our ability to manage our business or otherwise adversely affect our business. Additionally, COVID-19 could negatively affect our internal controls over financial reporting as a significant portion of our workforce is required to work from home and therefore new or modified processes, procedures, and controls could be required to respond to changes in our business environment. We may take further actions as may be required by government authorities or that we determine are in the best interests of our employees, customers, and business partners. There is no certainty that such measures will be sufficient to mitigate the risks posed by COVID-19 or will otherwise be satisfactory to government authorities.

The rapidly changing global market and economic conditions as a result of COVID-19 have impacted, and are expected to continue to impact, our operations and business. The broader implications of the COVID-19 pandemic on our business, financial condition, and results of operations remain uncertain. For additional information on how COVID-19 has impacted and could continue to negatively impact our business, see below for specific discussion in the respective areas, and also refer to "Part I, Item 3D, Risk Factors" in this report.

**Sources of Revenue**

Our primary source of revenue is payment processing fees. In addition, we receive interest revenue, fees for inactive accounts and unclaimed payments and other revenue, which includes cash and settlement service fees as well as platform and marketing services related fees and fees for guarantees issued.

68

**Borrowings**

As of December 31, 2020 and December 31, 2019, our debt consisted of the following:

| | Credit limit | Interest rate | Maturity | As of December 31, 2019 | As of December 31, 2020 |
|---|---|---|---|---|---|
| **Current interest—bearing debt** | | | | | |
| Bank revolving credit facility | 460 | Up to 10% (1) | December 31, 2021 | — | — |
| **Non-current interest—bearing debt** | | | | | |
| Bank revolving credit facility | 1,000 | 8.5% (2) | October 7, 2021 | 765 | 604 |
| Bank revolving credit facility | 1,000 | 8.5% (2) | December 22, 2021 | 780 | 945 |
| Bonds issued | 5,000 | 8,4% | October 10, 2023 | — | 5,014 |
| **Total debt** | | | | **1,545** | **6,563** |
| *Including short-term portion* | | | | *—* | *1,640* |

(1)   The agreement stipulates the right of the lender to increase the interest rate in case covenants are violated.
(2)   The agreement stipulates the right of the lender to increase the interest rate and demand early repayment in case the covenants are violated. We were in breach of one of the covenants, but no action has been taken by the lender in response to such breach.

In October 2020 we issued unsecured bonds in the principal amount of RUB 5 billion with a fixed nominal interest rate of 8.4% (issuing costs amounted to RUB 83 million, so that effective interest rate comprised 9.3%). The bonds mature in 2023. Certain of our Group companies are subject to various covenants pursuant to the terms of these bonds. As of December 31, 2020, we were in compliance with all such covenants. Under the terms of the bonds, in the event of a breach of certain covenants the bondholders have the right to request that the Company, JSC QIWI and Sette FZ-LLC purchase their Bonds at their nominal value plus any interest accrued but not yet paid and, in certain instances, a default interest. The proceeds from the bond placement are used to finance our Factoring PLUS project as well as for other projects.

Bank revolving credit facilities in the amount of 2,000 are secured.

Interest expense with respect to the entirety of our debt amounted to RUB 218 million in 2020 compared to RUB 17 million in 2019.

**C.    Research and development, patents and licenses, etc.**

See Item 4.B, "Business Overview — Intellectual Property."

**D.    Trend information**

In 2020, we experienced a slowdown in the growth rates of our Payment Services segment due to a number of factors, including the implementation of additional know-your-client and anti-money laundering measures and the outbreak of COVID-19 resulting in various "shelter-in-place" regulations, lockdowns, curfews, bans on international travel, cancellations of public events, and supply chain disruptions. The coronavirus pandemic is still ongoing, and significant quarantine restrictions mostly continue to prevail globally, including, to a limited extent as of the date of this report, in Russia. The adverse effects of the coronavirus on our business have included a decline in revenues from our betting merchants due to the cancellation of numerous major sporting events, a drop in money remittance primarily due to a decrease in payments to self-employed individuals due to an overall contraction of business activity, and a decline in the use of our kiosk network. The full impact of the COVID-19 pandemic on the global economy is difficult to predict due to the lack of clarity on how long it could be expected to last as the world has now entered its second year.

In December 2020, following the routine scheduled audit of Qiwi Bank, the CBR introduced certain restrictions on Qiwi Bank's operations, including, effective from December 2020, the suspension or limitation of most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts. The restrictions introduced by the CBR are expected to have a substantial adverse effect on our business, financial condition, and results of operations, primarily through decreasing the volumes in our E-commerce and Money Remittance market verticals, and as a result, our revenues and profits. We are currently working closely with the CBR to remediate the identified deficiencies and violations and eliminate or narrow down the restrictions that have been imposed. As a result of such cooperation, the CBR permitted us to resume processing payments to certain key foreign merchants and lifted some of the other restrictions imposed in December 2020. However, there can be no assurance that there will be any further easing of the restrictions that were originally imposed, or that they will not ultimately become permanent, including through the adoption of new laws or regulations.

We also observe regulatory changes in the betting market landscape. In December 2020, a new law was adopted, creating the Unified Interactive Bets Accounting Center's role. By the end of September 2021, this newly-appointed Unified Interactive Bets Accounting Center will replace the existing TSUPIS. Currently, both we and the operator of the competing TSUPIS have publicly made proposals to serve as the single Interactive Bets Accounting Center pursuant to the new regulatory regime. There can be no assurance that our bid will be successful. If we are not able to secure an active role in this new industry landscape, we may experience a decrease in or complete loss of payment volumes and income associated directly or indirectly with the TSUPIS established by Qiwi Bank. This or any further significant change in betting legislation may negatively affect the payment volume, revenue, and margins of our Payment Services business, as well as overall usage of Qiwi Wallet.

As a result of these factors, our growth potential will be significantly affected during 2021. Please see also "3.D Risk Factors."

### E.    Off-balance sheet arrangements

#### Guarantees issued

As part of our operations we issue performance and financial guarantees to non-related parties for a term of up to five years at market rate. The total amount of guarantees issued as of December 31, 2020 was RUB 22,036 million, up from RUB 8,545 million as of December 31, 2019. The growth of the amount of bank guarantees outstanding resulted from the development of the digital bank guarantees services of Factoring PLUS project focused on providing digital bank guarantees to different legal entities participating in public procurement procedures (primarily small and medium enterprises).

### F.    Tabular disclosure of contractual obligations

The following table sets forth our contractual obligations as of December 31, 2020:

|  | Total | less than one year | one to three years | three to five years | more than five years |
|---|---|---|---|---|---|
|  |  | | (in RUB millions) | | |
| Operating lease obligations | 21 | 21 | — | — | — |
| Total contractual obligations | 21 | 21 | — | — | — |

### G.    Safe harbor

See "Special Note Regarding—Forward Looking Statements" on page 1 of this annual report.

### ITEM 6.    Directors, Senior Management and Employees

### A.    Directors and Senior Management

#### Directors and Executive Officers

The following table sets forth information regarding our directors and executive officers as of the date of this annual report.

| Name | Age | Position |
|---|---|---|
| Sergey Solonin | 47 | Director, Chairman of the Board |
| Boris Kim | 57 | Director, Chief Executive Officer |
| Marcus Rhodes | 59 | Independent Director |
| Elena Titova | 53 | Independent Director |
| Alexey Marey | 43 | Independent Director |
| Nadiya Cherkasova | 49 | Director |
| Tatiana Zharkova | 45 | Director |
| Pavel Korzh | 45 | Chief Financial Officer |
| Elena Nikonova | 37 | Deputy CFO for Financial Reporting |
| Maria Shevchenko | 44 | Chief Operating Officer |
| Andrey Protopopov | 39 | Chief Executive Officer of Payment Services |

#### Biographies

*Sergey Solonin.* Mr. Sergey Solonin has served as our director since December 2010 and as chairman of our Board of Directors since January 2020. He has also been our chief executive officer from October 2012 to January 2020. Mr. Solonin is an entrepreneur and has over 15 years of experience in the payment services and banking industries. Mr. Solonin is also a co-director of the FinNet working group within the framework of the National Technology Initiative since September 2016, a member of the Supervisory Board of Association for Development of Financial Technologies since January 2017, a member of the board of directors of "AlfaStrakhovanie" PLC since June 2017, a member of the