UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re QIWI plc Securities Litigation | Master File No.: 1:20-cv-06054-RPK-CLP |
| | ECF Case |
| | Electronically Filed |
| This Document Relates To: | |
| ALL ACTIONS. | Oral Argument Requested |

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO QIWI PLC AND ANDREY PROTOPOPOV'S MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

ROCHE FREEDMAN LLP
Constantine P. Economides
Ivy T. Ngo (*pro hac vice*)
Velvel (Devin) Freedman
1 SE 3rd Avenue, Suite 1250
Miami, Florida 33131
(T): (786) 924-2900
ceconomides@rochefreedman.com
ingo@rochefreedman.com
vel@rochefreedman.com

*Counsel for Moset Int'l Co. Ltd. and
Lead Counsel for the Class*

Dated:  October 18, 2021

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION .......................................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................................... 3

LEGAL STANDARDS .................................................................................................................. 9

ARGUMENTS ............................................................................................................................... 9

I.      THE COMPLAINT SUFFICIENTLY ALLEGES FALSITY .............................................. 10

        A.      Moving Defendants' Claimed Compliance with Russian Regulations Fails. .................... 12

        B.      Qiwi's Risk Disclosures Were Misleading. ...................................................................... 13

        C.      Defendants Triggered a Duty to Disclose Truthful Information About Qiwi's
                Operations, Regulatory Compliance, and CBR Audit. ...................................................... 14

        D.      Defendants Are Liable Even if Some Statements Are Construed as Opinions. ................. 15

        E.      The Safe Harbor Does Not Immunize Defendants From Liability. .................................... 17

II.     THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER ............................. 19

        A.      The Complaint Adequately Alleges Qiwi's Corporate Scienter. ....................................... 19

        B.      The Complaint Adequately Alleges Scienter as to the Individual Defendants ................... 21

                1.      Kim and Solonin Had Motive and Opportunity to Commit Fraud .............................. 22

                2.      The Individual Defendants Confirmed That They Knew, at a Minimum, of the
                        CBR Audit Prior to its Public Disclosure on December 9, 2020. ............................... 23

                3.      The Individual Defendants Had Access to and a Duty to Monitor, but Did Not
                        Check, Information Indicating Their Public Statements Were Inaccurate ................... 24

                4.      The Core Operations Doctrine Bolsters the Inference of Scienter. ............................. 28

                5.      Moving Defendants' Proposed Non-Culpable Inference of Negligence Is Not More
                        Cogent and Compelling Than the Inference of Recklessness ...................................... 29

CONCLUSION ............................................................................................................................. 30

## TABLE OF AUTHORITIES

Cases

*Behrendsen v. Yangtze River Port & Logistics Ltd.*,
    2021 WL 2646353 (E.D.N.Y. June 28, 2021) ........................................................... 18

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
    2021 WL 3675180 (D. Conn. Aug. 19, 2021) ........................................................... 27

*Canez v. Intelligent Sys. Corp.*,
    2021 WL 3667012 (E.D.N.Y. Aug. 18, 2021) ........................................................... 30

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
    477 F. Supp. 3d 123 (S.D.N.Y. 2020) ..................................................................... 22

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018) ...................................................... 10, 11, 15

*ECA & Loc. 134 IBEW*,
    553 F.3d 187 (2d Cir. 2009) .................................................................................... 28

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) .................................................................................... 22

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..................................................................... 11

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) ...................................................................................... 9

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
    422 F. Supp. 3d 821 (S.D.N.Y. 2019) ..................................................................... 26

*In Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
    518 F. Supp. 3d 772 (S.D.N.Y. 2021) ..................................................................... 22

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
    2021 WL 1178216 (S.D.N.Y. Mar. 29, 2021) ......................................................... 28

*In re Aphria, Inc. Sec. Litig.*,
    2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020) ......................................................... 25

*In re Commodity Exch., Inc.*,
    213 F. Supp. 3d 631 (S.D.N.Y. 2016) ..................................................................... 12

*In re CRM Holdings, Ltd. Sec. Litig.*,
    2012 WL 1646888 (S.D.N.Y. May 10, 2012) ......................................................... 24

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013) ..................................................................... 13

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
    2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) ........................................................... 28

*In re Fed Ex Corp. Sec. Litig.*,
    517 F. Supp. 3d 216 (S.D.N.Y. 2021) ..................................................................... 23

*In re Henry Schein, Inc. Sec. Litig.*,
   2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019)............................................................. 10, 15, 20

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ............................................................................. 28

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
   32 F. Supp. 3d 464 (S.D.N.Y. 2014)....................................................................................... 27

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013)..................................................................................... 24

*In re Openwave Sys. Sec. Litig.*,
   528 F. Supp. 2d 236 (S.D.N.Y. 2007)..................................................................................... 27

*In re Pall Corp.*,
   2009 WL 3111777 (E.D.N.Y. Sept. 21, 2009)......................................................................... 25

*In re Pareteum Sec. Litig.*,
   2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ......................................................................... 23

*In re Perrigo Co. PLC Sec. Litig.*,
   435 F. Supp. 3d 571 (S.D.N.Y. 2020)................................................................................. 23, 28

*In re Reserve Fund Sec. and Deriv. Litig.*,
   732 F. Supp. 2d 310 (S.D.N.Y. 2010)..................................................................................... 28

*In re Salix Pharm., Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016).......................................................................... 18

*In re Seadrill Ltd. Sec. Litig.*,
   2016 WL 3461311 (S.D.N.Y. June 20, 2016) ......................................................................... 30

*In re Signet Jewelers Ltd. Sec. Litig.*,
   389 F. Supp. 3d 221 (S.D.N.Y. 2019),
   *recons. den.*, 2019 WL 2656338 (S.D.N.Y. June 20, 2019) ...................................................... 14

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005) ................................................................................. 11, 15

*In re VEON Ltd. Sec. Litig.*,
   2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017)...................................................... 10, 15, 20, 21

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   195 F. Supp. 3d 528 (S.D.N.Y. 2016)................................................................................ 10, 15

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) .................................................................................................... 10

*In re Wells Fargo & Co. Sec. Litig.*,
   2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021)............................................................. 16, 17, 19

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016) .................................................................................................. 9, 28

*Jackson v. Abernathy*,
   960 F.3d 94 (2d Cir. 2020) ...................................................................................................... 24

iii

*Lachman v. Revlon, Inc.*,
  487 F. Supp. 3d 111 (E.D.N.Y. 2020) .................................................................. 30

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015) ............................................................................... 20

*Marcu v. Cheetah Mobile Inc.*,
  2020 WL 4016645 (S.D.N.Y. July 16, 2020) ..................................................... 15

*Martinek v. AmTrust Fin. Servs., Inc.*,
  2020 WL 4735189 (S.D.N.Y. Aug. 14, 2020) .................................................... 23

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
  2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) .................................................... 15

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019) .................................................................. 21

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ..................................................................................... 10, 16

*Ont. Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
  432 F. Supp. 3d 131 (D. Conn. 2019) ................................................................ 27

*Plumber & Steamfitters Loc. 773 v. Danske*,
  2021 WL 3744894 (2d Cir. 2021) ................................................................. 14, 15

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l*,
  89 F. Supp. 3d 602 (S.D.N.Y. 2015) .................................................................. 26

*Puddu v. 6D Glob. Techs., Inc.*,
  2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) ...................................................... 9

*Ross v. Lloyds Banking Grp., PLC*,
  2012 WL 4891759 (S.D.N.Y. Oct. 16, 2012),
  *aff'd*, 546 F. App'x 5 (2d Cir. 2013) .................................................................. 24

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*,
  75 F.3d 801 (2d Cir. 1996) ................................................................................. 23

*Schiro v. Cemex, S.A.B. de C.V.*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019) ................................................................ 15

*Sfiraiala v. Deutsche Bank Aktiengesellschaft*,
  729 F. App'x 55 (2d Cir. 2018) .......................................................................... 23

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) ................................................................................. 14

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 3268495 (S.D.N.Y. June 16, 2020),
  *recons. den.*, 2020 WL 4208442 (S.D.N.Y. July 21, 2020) .............................. 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................................... 19

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
   672 F. Supp. 2d 596 (S.D.N.Y. 2009) ........................................................................................ 23

*Wilson v. LSB Indus., Inc.*,
   2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ............................................................................. 18

*Yannes v. SCWORX Corp.*,
   2021 WL 2555437 (S.D.N.Y. June 21, 2021) ...................................................................... 21, 25

*Zanghi v. Ritella*,
   2021 WL 4392756 (S.D.N.Y. Sept. 24, 2021) ........................................................................... 23

Plaintiff Moset International Company Limited ("Plaintiff"), individually and on behalf of the Class, respectfully submits this Memorandum of Law in opposition to Defendants Qiwi plc ("Qiwi") and Andrey Protopopov's ("Moving Defendants") Motion to Dismiss the Consolidated Amended Complaint ("Motion") and supporting Memorandum ("Mem.").[1]

## INTRODUCTION

As a financial services provider in the online gambling industry, Qiwi must maintain regulatory compliance. Illicit transactions are unsustainable and threaten to invite regulatory sanctions that can also curtail profits from legitimate transactions. Accordingly, regulatory compliance is a critical focal point for Qiwi's investors.

Acknowledging that reality, Qiwi and its executives repeatedly spoke about its compliance efforts. They disclosed that the Central Bank of the Russian Federation ("CBR") had conducted an audit in 2018, identifying certain violations that Qiwi stated it had remedied. They conveyed that Qiwi could even benefit from enhanced regulations, because it would comply where competitors would falter. And while they described risks if hypothetical issues arose – such as illicit transactions, a future CBR audit, the CBR's identification of violations, or the CBR's imposition of sanctions – Defendants portrayed that they were monitoring those issues while generating sustainable net revenue growth *via* betting transactions.

But Defendants concealed material facts and portrayed Qiwi in a false light. Qiwi's regulatory violations were significant, meaning profits were not sustainable. Worse yet, when the CBR began a new audit in 2020, Defendants said nothing to investors about the status, scope, or risks of the audit. They did not even disclose that an audit had begun. Instead, during the 2020 audit, **Defendants repeated the**

---

[1] Citations to "¶" refer to the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 30) ("Complaint" or "CAC"). Capitalized terms not defined herein have the meaning ascribed in the Complaint. Citations to "Ex." are to the Exhibits attached to the Declaration of Alexander C. Drylewski in Support of the Motion of QIWI plc and Andrey Protopopov to Dismiss the Consolidated Amended Class Action Complaint.

1

**previous audit-related disclosure to investors.** ¶¶142, 181, 200. In other words, Defendants conveyed that there were no material updates as to those issues since the 2018 audit.

On December 9, 2020, Defendants finally revealed the truth to investors. Improprieties in Qiwi's operations were rampant. The CBR had begun a new audit in July 2020. And that audit had led to severe sanctions risking 33% to 40% of Qiwi's Payment Services Segment Net Revenue. As a result, Qiwi's share price plummeted 20.6%. Qiwi's investors lost millions of dollars. They are now seeking redress for Defendants' material omissions and misleading statements.

In response, Moving Defendants rely on an unpersuasive theme: that they were "trying, in real time, to provide the most accurate and meaningful information to investors as [they] grappled with Russia's uncertain and still-developing regulatory framework" and that they did not know there would be sanctions by the CBR. This narrative contradicts the alleged facts and mischaracterizes the appropriate analysis at the pleading stage.

The issue is not whether Defendants knew sanctions were coming. Rather, the issue is whether a reasonable investor would have been misled by Defendants' statements and omissions regarding Qiwi's compliance, audits, and related risks. Defendants did **not** disclose that a CBR audit had started or a single fact about the scope or status of that audit. They did **not** disclose a single improper transaction involving Qiwi. Even after stunning investors with news of the audit and the resulting sanctions, they did not identify or explain the violations found by the CBR or the basis for the detrimental sanctions. Throughout the Class Period, Defendants gave investors the impression that all was well with Qiwi's operations and compliance efforts, with no updates since Qiwi had remedied some violations found in the 2018 audit. These facts do **not** reflect a good faith attempt for Defendants to provide real time, accurate, or meaningful information to investors.

In sum, Plaintiff has adequately alleged falsity and scienter and is entitled to proceed to discovery. Moving Defendants have invited the Court to hold, as a matter of law, that they are exonerated from liability to Qiwi's investors. In light of Plaintiff's robust allegations, the Court should decline that invitation, leave factual disputes for the jury, and deny the Motion in full.

## FACTUAL BACKGROUND

Qiwi purports to be a leading provider of next generation payment and financial services in Russia and the Commonwealth of Independent States, with an integrated proprietary network of electronic wallets ("e-wallets") and cash-collecting terminals and kiosks enabling merchants and consumers to instantly and interchangeably make, accept, and transfer cash payments and electronic payments across online, mobile, and physical environments. ¶2. Qiwi also owns and controls Qiwi Bank JSC ("Qiwi Bank"), which has a Banking License issued by the CBR.[2] ¶4.

Throughout the Class Period, Qiwi served as the operator of one of only three interactive bets accounting centers ("TSUPIS") authorized to accept electronic bets on behalf of self-regulated bookmakers, or betting merchants, operating in Russia. ¶3. Accordingly, online gambling – specifically sports betting – was a significant revenue stream for Qiwi. *Id*. Indeed, online betting accounted for more than a third of Qiwi's revenues in 2019. *Id.*

In those capacities, Qiwi must comply with the CBR's reporting and record-keeping requirements, adhere to various Russian regulations aimed at restricting gambling on illegitimate websites and applications, and face routine and spontaneous audits by the CBR. ¶4. From 2015 through 2019, moreover, Qiwi's compliance efforts were increasingly vital as Russia enhanced its scrutiny on and regulations of online gambling sites and businesses (including Qiwi) that facilitated payments to and from those sites. *See* ¶5. Specifically, the Russian government:

---

[2] Prior to September 2013, the CBR was the main regulator of the Russian banking industry. On September 1, 2013, the CBR became a mega-regulator of **all** financial markets of Russia, not just of the banking industry.

- Shut down thousands of gambling, lottery, and bookmaker websites and applications;

- Began requiring full identification for those withdrawing cash from prepaid cards;

- Banned money transfers to illegal gambling and bookmaking operations;

- Banned the withdrawal of cash from anonymous e-wallets;

- Enacted legislation facilitating bettor identification using illegal bookmakers; and

- Began requiring owners of anonymous e-wallets to use bank accounts to make deposits (rather than paying cash into payment terminals or at branch offices), such that payors replenishing wallets could be identified and accounts could be blocked if an illegal operation was suspected. *Id.*

Due to its substantial revenue from online gambling, Qiwi's compliance with online betting regulations was critical to investors. ¶6. Any profit Qiwi earned from illegitimate transactions was unsustainable. *Id.* And regulatory violations invited scrutiny and sanctions that threatened Qiwi's profits from legitimate transactions. Indeed, Russian bookmaking industry experts "called the blocking of Qiwi and similar payment services almost the only effective way to [combat] offshore bookmakers." *Id.* Thus, to continue profiting from legitimate transactions to authorized betting sites, Qiwi had to comply with regulations, maintain adequate records, and pass CBR audits. *Id.*

Throughout the Class Period, Defendants assured investors that legitimate betting transactions drove profits and created ongoing sustainable growth:

- 11/14/2018: "[G]rowth was largely driven by the circle of trends in our core categories including **the boom of sports betting markets** triggered by the football World Cup of 2018." ¶127.

- 3/28/2019: "[G]rowth was simultaneously underpinned by secular trends in our key markets **demonstrating the adaptability and resilience of the payment ecosystem** we have developed and will continue to develop further." ¶134.

- 5/16/2019: "[G]rowth was driven by robust performance of our key areas; payment services **for betting-related merchants**." ¶149.

- 8/19/2019: "[T]he core of the results and the core of the increase in the scale of business and net profit, both net revenue, and net profit guidance lies within the growth of the **Payment Services** business." ¶160.

- 11/20/2019: "[I]ncrease in payment volume was driven by growth in Ecommerce, Financial Services and Money Remittances market verticals resulting largely from the development of certain payment solutions for merchants including **betting merchants**." ¶166.

4

- 3/24/2020: "**[I]ncrease in payment volume was driven by growth in Ecommerce, Money Remittances and Financial Services market verticals resulting largely from the development of certain payment solutions for merchants and partners including betting merchants**." ¶174.

In conjunction with touting that sustainable growth, Defendants repeatedly conveyed that Qiwi had rectified past regulatory violations and did not know of any repeated or current regulatory violations. ¶¶7, 101, 142, 181, 200. In their annual reports (Forms 20-F) and prospectus (Form 424B7) filed during the Class Period, for example, Defendants stated:

> Qiwi Bank … ha[s] been the subject of CBR investigations in the past that have uncovered various violations and deficiencies in relation to, among other things, reporting requirements, anti-money laundering, cybersecurity, compliance with applicable electronic payments thresholds requirements and other issues which we believe we have generally rectified. In the course of 2018, Qiwi Bank underwent a major scheduled audit by the CBR as part of its ongoing supervisory process, which resulted in CBR identifying a number of violations and imposing certain sanctions on us. The measures that the CBR has so far imposed on us in response have not had a significant impact on our operations and have been mostly lifted. **We believe that we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward.**

¶¶7, 101 (2Q18 Form 6-K "Qiwi Bank has been the subject of CBR investigations in the past that have uncovered various regulatory violations and deficiencies, which the Group has generally rectified."), 142, 181, 200. Defendants also certified that "management concluded that as of December 31, 2018, our internal control over financial reporting was effective." ¶¶139, 178 (as of 12/31/2019). And when analysts asked about future stricter regulations for the betting industry, Defendant Solonin assured them that Qiwi worked with regulators and complied with regulations, meaning enhanced regulation would thwart non-compliant competitors while helping Qiwi:

> And on the … regulation that we're discussing now. We're aware of that, so we are actually working together with the regulators and are doing additional perspective that given our scale and market partition, **any new regulation rules will be basically positive for us, we feel the markets in the way and we will be in a position to kind of extend our figures.** ¶153.

Thus, Qiwi appeared to have successfully tapped into the legitimate betting industry, while

complying with enhanced regulatory scrutiny. ¶8. Those material representations appealed to investors, prompting Qiwi's share price to rise to its Class Period high of $24.50. *Id*.

**Unbeknownst to investors, however, Qiwi was still violating applicable regulations, meaning it could not sustain its profits or growth**. ¶¶9, 117-23, 228-33. Indeed, Qiwi was violating even the most basic requirements by the CBR, including deficient and violative reporting and record-keeping requirements. ¶¶9, 13, 121, 228. Then, in July 2020, the CBR began a new audit of Qiwi's operations from July 2018 through September 2020. *Id*. Defendants concealed that material information from investors and instead repeatedly referenced the previous 2018 audit, stating that "[w]e believe that we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward." ¶¶7, 142, 181, 200. Worse yet—while the new audit was ongoing—Defendants misleadingly discussed the risks of a future audit as a **hypothetical**, not as an already-existing circumstance:

> However, there can be no assurance that additional sanctions **will** not be imposed on us as a result of such or any other findings and that we will not come under greater CBR scrutiny in connection with any perceived deficiencies in our past conduct, or that any currently planned or future inspections will not result in discovery of any significant or minor additional violations of various banking regulations, and what sanctions the CBR **would** choose to employ against us **if** this were to happen. **Any** such sanctions **could** have a material adverse effect on our business, financial condition and results of operations.
>
> * * *
>
> **Any** breach of applicable regulations **could** expose us to potential liability, including fines, prohibition to carry out certain transactions for a period of up to six months (or more in the event of repeated violations), the introduction of temporary administration by the CBR and in certain instances the revocation of our banking license.....

¶¶142-43. Consequently, investors knew only that Defendants had implemented and maintained "appropriate measures" since the 2018 audit and that nothing had changed vis-à-vis the risks of additional non-compliance, a new audit, or additional sanctions. ¶¶7, 142, 181, 200.

Instead of revealing the truth, Defendants sought to capitalize on investors' unawareness of

Qiwi's true state of affairs. On July 20, 2020 – after the markets closed – Defendants announced that major shareholders, including Defendants Kim and Solonin, were registering 6.8 million Class B Shares (represented by ADSs) for sale through a Secondary Public Offering ("SPO"). ¶¶9, 225. In other words, insiders with material information about Qiwi wanted to sell significant amounts of their holdings. *Id*. Although Defendants did not provide the full disclosure to which investors were entitled, the news of the SPO indicated to the market that Qiwi faced undisclosed problems. As a result, Qiwi's ADS price fell nearly 10% on July 21, 2020, on unusually heavy trading. *Id*.

In response, Defendants continued to mislead investors. Instead of revealing the audit, the practices that were violating regulations, or the materialized risks, Defendants cancelled the SPO on July 22, 2020, claiming that selling shareholders had backed out "due to market conditions." ¶¶10, 119. Defendants thus signaled that Qiwi was performing well in the regulatory environment and that investors should not be concerned about undisclosed struggles. *Id*. The message worked. Qiwi's share price increased $1.54 per share, or 8.8%, to close at $18.75 on July 22, 2020. ¶119.

By fall 2020, Defendants **still** had not disclosed the CBR audit and, instead, maintained the message that Qiwi was successfully traversing the shifting regulatory landscape. ¶¶11, 205-24. By this time, however, Russia was considering new regulations to create a single Unified Interactive Bets Accounting Center ("ETSUP"), replacing the existing self-regulated TSUPISs (including the one Qiwi operated) by the end of 2021. ¶¶11, 222. It was vital for Qiwi to earn that role, but Qiwi could do so only by fully complying with the CBR's regulations. ¶15. Assuaging investor concerns and maintaining their portrayal of the Company's ongoing regulatory compliance, Defendants did not update the message that Qiwi had "remedied" previous violations and "will not be in breach of such requirements going forward." ¶¶16, 142, 181, 200. Defendants' consistent message to investors was that Qiwi's regulatory violations were in the past, that Qiwi was legitimately and profitably operating in the online betting space, and that

regulatory scrutiny provided growth opportunities, including the possibility of becoming the single ETSUP. ¶¶7, 12, 127, 134, 149, 153, 160, 166, 174, 210, 222. Defendants did not mention the CBR audit or suggest that regulatory concerns had influenced the attempted SPO or its cancellation. ¶¶9, 11-12, 201.

Defendants finally revealed the truth in December 2020. On December 1, 2020, Defendant Korzh – who had joined in August 2020 as CFO of Qiwi Bank (Qiwi's wholly-owned subsidiary) – became CFO of Qiwi. On December 9, 2020, one week into his tenure, Defendants stunned investors with the following unexpected disclosures:

- "From July to December 2020, the [CBR], acting in its supervisory capacity, performed a routine scheduled audit of [Qiwi Bank] for the period of July 2018 to September 2020;"
- "[I]n the course of this audit, [CBR] has identified certain violations and deficiencies relating primarily to reporting and record-keeping requirements;"
- The CBR fined Qiwi RUB 11 million or approximately USD 150,000;
- "[T]he CBR introduced certain restrictions with respect to Qiwi Bank's operations, including, effective from December 7, 2020, the suspension or limitation of most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts;" and
- "[A]ssuming such CBR restrictions were to be in effect and the corresponding operations were to be discounted for the entire nine-month period ending on September 30, 2020, approximately 33% to 40% of our Payment Services Segment Net Revenue for such period would have been negatively affected (based on our actual results of operations for such period as previously reported on November 19, 2020), primarily in E-Commerce and Money Remittance market verticals."

¶¶13, 228. These revelations of the truth caused a 20.6% loss in Qiwi's ADS price, and millions of dollars in losses to the Class. Just three months later, Defendant Korzh resigned – after having just appeared to force the Company to reveal the truth to investors in his new role. ¶¶14, 31 n.3.

Further, Qiwi's regulatory violations from July 2018 to September 2020 had jeopardized its ability to become Russia's new ETSUP. As Defendant Kim confirmed on March 30, 2021, Qiwi had "made a proposal to serve as the ETSUP, however, we cannot be sure that our bid will be successful" and if Qiwi "cannot become a part of the new industry landscape, we may experience a decrease in, or complete loss of, payments volume and income related to the TSUPIS." ¶15, 232.

In sum, contrary to Defendants' public Class Period statements, Qiwi's reporting, record-keeping, and regulatory compliance were so deficient that it could not pass a CBR audit. From the start of the CBR audit in July 2020 to Qiwi's disclosure of the audit on December 9, 2020, moreover, Defendants conducted two quarterly calls with analysts and investors and issued at least 13 public filings and/or press releases without mentioning the ongoing audit. Instead, Defendants described compliance violations and future audits as hypothetical unmaterialized risks, while repeating the misleading statements that, *inter alia*, Qiwi had "remedied" past violations, "will not be in breach of such requirements going forward" and "new regulation rules will be basically positive for us." When the truth was revealed, investors, including Plaintiff, suffered enormous losses.

## <u>LEGAL STANDARDS</u>

To state a claim under § 10(b) of the Exchange Act and Rule 10b–5(b), "a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *5 (S.D.N.Y. Mar. 30, 2021) (quoting *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016)). For a claim under § 20(a) of the Exchange Act, a plaintiff "must show a primary violation [here, Rule 10b–5 violations] by the controlled person ... and control of the primary violator by the targeted defendant [ ], and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *Id.* at *12 (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000)).

## <u>ARGUMENTS</u>[3]

---

[3] Defendants argue that Plaintiff's § 20(a) claim fails as there is no § 10(b) liability. Mem. at 30. For the reasons stated below, there is § 10(b) liability; therefore, the § 20(a) claim should not be dismissed.

## I.  THE COMPLAINT SUFFICIENTLY ALLEGES FALSITY

"[W]hether a statement or omission is materially misleading ... is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Rosi v. Aclaris Therapeutics*, Inc., 2021 WL 1177505, at *9 (S.D.N.Y. Mar. 29, 2021) (quoting *In re Vivendi, S.A. Sec. Litig*., 838 F.3d 223, 250 (2d Cir. 2016)). "Moreover, under the federal securities laws, 'literal accuracy is not enough. An issuer must as well desist from misleading investors by saying one thing and holding back another.'" *Id.* (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015)). Even with "no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd*., 761 F.3d 245, 250 (2d Cir. 2014). "Thus, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate." *Id.* at 250-51.

Under those standards, "a duty to disclose [ ] can arise when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices." *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 441 (S.D.N.Y. Aug. 8, 2018). Accordingly, statements are actionably false where "a company reports positive sales results without disclosing that those results were due, even if in part, to bribery, antitrust violations, or some other illegal conduct." *Rosi*, 2021 WL 1177505, at *16. And courts have repeatedly found actionable misrepresentations or omissions where defendants tout success but fail to disclose that improper practices contributed to that success.[4]

---

[4] *See, e.g.*, *id.* (finding falsity where defendant attributed its success to an advertising campaign but failed to disclose that the advertisements in that campaign were misleading); *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *15-*16 (E.D.N.Y. Sept. 27, 2019) (finding falsity where defendant claimed, *inter alia*, that its "strong commitment to customer service" contributed to its success, but omitted that illegal price-fixing scheme also contributed to success); *see also In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, at *6-*7 (S.D.N.Y. Sept. 19, 2017) (finding falsity where defendant disclosed that its "sales and marketing efforts" drove revenue in Uzbekistan, but omitted that revenue was also due to bribes); *In re Virtus Inv. Partners,*

As alleged, Defendants misled investors into believing that Qiwi's profits and growth arose from legal activities when, in truth, Qiwi was violating Russian regulations. They created the false impression that Qiwi had remedied prior violations and positioned itself to benefit, and not suffer, from stricter regulations. *See* ¶16 ("[A]ny new regulation rules will be basically positive for us."); *see also* ¶¶7, 11, 153, 210, 222. In other words, they portrayed Qiwi's operations as legitimate, so regulatory scrutiny would eliminate illicit competitors while strengthening Qiwi's market share.

Bolstering those misrepresentations, Defendants talked about CBR audits in only two contexts: (a) the concluded 2018 audit that had identified past violations subsequently remedied by Qiwi; and (b) the risk that there **could** be a new audit that **could** reveal additional violations. ¶¶7, 101, 142-43, 181, 200. In truth, Defendants were hiding a new audit that had begun in July 2020 and that posed major risks to the sustainability of Qiwi's financial results. ¶¶9, 11, 13, 117-23. Left in the dark, Qiwi's investors could not account for that risk. Worse yet, Qiwi was violating existing regulations, and as a consequence, the CBR ultimately suspended Qiwi's "payments to foreign merchants and money transfers to pre-paid cards from corporate accounts." ¶228.

In sum, Defendants provided investors with a false impression of the sources and status of Qiwi's operations and growth. Qiwi relied on illicit transactions and concealed the CBR audit that was uncovering those improprieties. Taken as true, these allegations demonstrate that Defendants made materially false and misleading statements and omissions to investors.[5]

---

*Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 536-37 (S.D.N.Y. 2016) (finding falsity where defendant claimed success was due to managers' investment performance, but did not disclose that performance was based on hypothetical back-testing, not actual results); *DoubleLine*, 323 F. Supp. 3d at 442-43 (finding falsity where defendant attributed success to, among other factors, "its engineering capabilities and experience," but omitted that that success was due to bribes); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005) (finding falsity where defendant attributed trading success to "trading volumes and price volatility," but omitted that it engaged in trading practices that violated NYSE rules).

[5] *See, e.g.*, *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) ("If a company … puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success[.]"); *see also Jinkosolar Holdings*, 761 F.3d at 251 (finding falsity where statements "gave comfort to investors that reasonably effective steps were being taken to comply with applicable environmental regulations" but did not disclose that the measures were "failing to prevent substantial violations of the ... regulations").

Attempting to bypass those well-pled allegations, Moving Defendants assert five arguments regarding falsity. None warrant dismissal.

### A.  Moving Defendants' Claimed Compliance with Russian Regulations Fails.

Moving Defendants argue that the Complaint lacks allegations that Qiwi violated any laws or regulations. *See* Mem. at 14-16. They also speculate that the CBR imposed restrictions although Qiwi was not violating any laws or regulations. *See id*. at 15-16. Those arguments fail.

First, as a threshold matter, Moving Defendants' factual denials and speculation have no place here. *See, e.g.*, *Horowitz v. Sunlands Tech. Grp.*, 2021 WL 1224517, at *3 (E.D.N.Y. Mar. 31, 2021) ("[Plaintiff] must eventually prove those allegations, of course, but that is not his burden on a motion to dismiss."); *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 669-72 (S.D.N.Y. 2016) (a court "may not pick and choose among plausible explanations" at the pleading stage).

Second, the CBR found—and Qiwi admitted—that the Company had engaged in violative conduct. On December 9, 2020, Qiwi disclosed that the CBR "**identified certain violations and deficiencies** relating primarily to reporting and record-keeping requirements;" Qiwi was undertaking "mitigation efforts;" and Qiwi was "working closely with the CBR to **remediate the identified deficiencies and violations**." Ex. F; *see also* ¶228. If—as Moving Defendants now contend—there were no violations, then there was nothing to disclose or remediate.[6]

Third, Moving Defendants' "belief" about the CBR's motivation is irrelevant. The CBR found violations and imposed material sanctions on Qiwi. ¶228. Prior to disclosing the sanctions, moreover, Defendants misleadingly concealed the CBR audit's existence, emphasized Qiwi's remediation of past violations, and described future audits and violations as hypothetical risks. Those statements and omissions misled investors, regardless of the CBR's motivation. Thus, Moving Defendants cannot

---

[6] Moving Defendants also contend that Qiwi's internal controls were sufficient. Mem. at 15-16. But as Defendants disclosed, the CBR found violations as to Qiwi's "reporting and record-keeping requirements." ¶¶13, 228.

bypass Plaintiff's well-pled allegations.[7]

### B.  Qiwi's Risk Disclosures Were Misleading.

Moving Defendants argue that Qiwi's risk warnings were adequate and, thus, extinguish liability. Mem. at 16-20. This argument ignores the law, and the content of those "disclosures."

A "company's purported risk disclosures are misleading where the company warns only that a risk **may** impact its business when that risk has already materialized." *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013). Indeed, "a warning framed in hypothetical terms does not apprise a reasonable investor of actual misconduct." *Horowitz*, 2021 WL 1224517, at *3; *see also Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019 WL 2360942, at *4 (S.D.N.Y. Mar. 4, 2019) ("These were current problems, not potential ones, and representing otherwise was untruthful."); *Jinkosolar Holdings*, 761 F.3d at 251 (finding "misleading omission[s]" where company warned of risk from "environmental violations" but did not "disclose then-ongoing and serious pollution violations" which caused investors to be "overly optimistic" about the risk).

Defendants' risk disclosures characterized then-materialized risks as merely potential or hypothetical. While the audit was ongoing, for example, Defendants repeated the same risk warnings from prior years: "there can be no assurance ... that any currently planned or future inspections **will** not result in discovery of any significant or minor additional violations of various banking regulations, and

---

[7] Defendants rely on various distinguishable cases. In *Gamm*, for example, plaintiffs alleged anticompetitive conduct and antitrust violations but "there [was] virtually no explanation as to how [the allegedly] ... collusive conduct occurred, and whether and how it affected trade." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019). In *PetroChina*, the court noted that "Plaintiffs are required ... to establish—at a bare minimum—that the underlying fraud took place during the time period covered by the purportedly false public statements and that someone at PetroChina knew or had reason to know about it." *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 358 (S.D.N.Y. 2015), *aff'd* (Mar. 21, 2016); *see also Mucha v. Volkswagen Aktiengesellschaft*, 2021 WL 2006079, at *3 (E.D.N.Y. May 20, 2021) (finding allegations of illegal conduct insufficient where specific laws not identified and company was still "under investigation"); *Asay v. Pinduoduo Inc.*, 2021 WL 3871269, at *3 (2d Cir. Aug. 31, 2021) (finding falsity insufficiently alleged where "the materialized risks were disclosed in the Offering Documents"). Here, Plaintiff alleged that Defendants touted compliance success and remedial efforts related to a past audit, while hiding the existence of a current audit that was uncovering severe violations. Indeed, the risk had materialized, yet Defendants continued discussing a future audit as a hypothetical possibility. Moreover, the violations were not speculative; the CBR confirmed that the violations occurred and then curtailed a substantial portion of Qiwi's operations.

what sanctions the CBR **would** choose to employ against us **if** this were to happen" and "**[a]ny** such sanctions **could** have a material adverse effect on our business, financial condition and results of operations." *Compare* 2019 Form 20-F (Ex. C) at 13 *with* Form 424B7 (Ex. E) at S-21. Those warnings conveyed to investors that nothing had changed since the 2018 audit—*i.e.*, that Qiwi faced only hypothetical risks from a hypothetical future audit that might uncover hypothetical violations. And Defendants always preceded that warning with the assurance that the CBR had recently audited the same operations and that Qiwi had remedied all violations. *See* 2019 Form 20-F (Ex. C) at 13 ("We believe that we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward"); *see also* Form 424B7 (Ex. E) at S-21. Thus, by characterizing manifested risks as hypothetical, Defendants misrepresented the true state of affairs: Qiwi had ongoing violations and was in the middle of a new CBR audit. *See Tableau*, 2019 WL 2360942, at *4 (finding falsity where "[b]y using the qualifiers 'if' and 'may,' the Form 10-K presents these issues as potential problems ... [b]ut the plaintiffs allege that the company was already experiencing significant setbacks with licensing sales at the time the 10-K was issued").[8]

### C. Defendants Triggered a Duty to Disclose Truthful Information About Qiwi's Operations, Regulatory Compliance, and CBR Audit.

Relying on *Plumber & Steamfitters Loc. 773 v. Danske*, Moving Defendants assert that "there is no duty to 'disclose uncharged, unadjudicated wrongdoing.'" Mem. at 20 (quoting 2021 WL 3744894, at *4 (2d Cir. 2021)). That argument fails.

In *Danske*, the court held that, *inter alia*, "accurately reported financial statements do not automatically become misleading by virtue of the company's nondisclosure of suspected misconduct

---

[8] Defendants' reliance on *Cigna* is misplaced, as it did not involve defendant's compliance statements about the risk of hypothetical future audits by a key regulator when one was already in progress. *See Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019). *Cigna* thus does not require dismissal here. *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 230 (S.D.N.Y. 2019), *recons. den.*, 2019 WL 2656338 (S.D.N.Y. June 20, 2019) (noting that "context matters" in holding that "the alleged facts of this case ... differ starkly from those alleged in *Cigna*").

that may have contributed to the financial results." *Danske,* 2021 WL 3744894, at *4. Here, the issue is not suspected misconduct or disclosing information absent a duty to disclose. Defendants could have remained silent but chose to speak about CBR audits, CBR violations, ongoing success in remedying violations, and future audit risks. Defendants, therefore, purported to provide the most updated information about CBR audits and related violations yet purposefully concealed all aspects of the ongoing CBR audit and the practices that ultimately led to damaging sanctions. Those allegations establish that Defendants had a duty to disclose the whole truth to investors. *See, e.g.*, *Rosi,* 2021 WL 1177505, at *9 ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." (quoting *Meyer*, 761 F.3d at 252)).[9]

### D.  Defendants Are Liable Even if Some Statements Are Construed as Opinions.

Moving Defendants assert that "[n]umerous challenged statements independently fail the rigorous pleading requirements for opinions set forth in *Omnicare.*" Mem. at 22-24. But Moving Defendants ignore the correct application of the *Omnicare* framework.

"[A]s the Supreme Court made clear in *Omnicare* [opinion] phrases [such as 'I expect' and 'my sense is'] do not operate as a magic shield against liability." *In re Wells Fargo & Co. Sec. Litig.*, 2021

---

[9] For the same reasons, Defendants' statements about financial performance were misleading as they omitted Qiwi's reliance on improper operations for which the Company was ultimately sanctioned by the CBR at the end of the undisclosed audit. *See DoubleLine*, 323 F. Supp. 3d at 441-43; *In re Henry*, 2019 WL 8638851, at *15-*16; *also In re VEON*, 2017 WL 4162342, at *6-*7; *In re Virtus*, 195 F. Supp. 3d at 536-37; *In re Van der Moolen*, 405 F. Supp. 2d at 400-01. Even if the financial metrics were accurate, statements regarding the sources, sustainability, and risks of the revenue were misleading, as stated above. Therefore, these facts differ from those in the cases cited by Defendants. *See Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *16 (S.D.N.Y. Mar. 30, 2021) (acknowledging that "certain statements attributing a company's financial success to legitimate sources may be actionable where they omit that improper or illegal business practices materially contributed to that success ... when the factors discussed in the statements are specific and share at least a reasonably close connection to the omitted conduct"); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 296 (S.D.N.Y. 2019) (noting that omissions of wrongdoing can be actionable where there is a "direct nexus between the alleged wrongdoing and the company's statements"). In *Marcu*, for example, the "Complaint d[id] not include a single allegation about the significance of the click injection scheme ... to Cheetah Mobile's overall revenues." *Marcu v. Cheetah Mobile Inc.*, 2020 WL 4016645, at *5 (S.D.N.Y. July 16, 2020). Here, however, Plaintiff alleges (and Defendants admitted) that the sanctions would have affected "approximately 33% to 40% of [Qiwi's] Payment Services Segment Net Revenue." ¶228.

WL 4482102, at *9-*10 (S.D.N.Y. Sept. 30, 2021) (quoting *Omnicare*, 575 U.S. at 188-89). Opinions "can give rise to liability in two distinct ways, even if they are sincerely believed: if they contain false embedded statements of fact or if they omit[ ] material facts about the [speaker's] inquiry into or knowledge concerning a[n] opinion." *Id.* "[A] reasonable investor may understand an opinion … to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." *Omnicare*, 575 U.S. at 188.

Accordingly, "[a]t the pleading stage, a plaintiff must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *In re Wells Fargo*, 2021 WL 4482102, at *10. The "core inquiry is whether the omitted facts would conflict with what a reasonable investor would take from the statement itself." *Id.*

Under those standards, the challenged statements—even if construed as opinions—are actionable. When Defendants repeatedly stated that "[w]e believe that we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward," (*see* ¶¶142, 181, 200), reasonable investors understood that Qiwi had proactively identified and curtailed illicit transactions such that any new CBR audit would not pose material problems for the Company. In reality, the illicit transactions were so pervasive that the CBR's responsive restrictions on Qiwi's operations would have eliminated about "33% to 40% of [Qiwi's] Payment Services Segment Net Revenue" for the first nine months of 2020. *See* ¶228.

Furthermore, when Defendants continued providing the same disclosures regarding the 2018 audit and risks of future audits, reasonable investors understood that there were no material updates on

those subjects. In other words, Defendants falsely conveyed that there was no change since the 2018 audit. As of July 2020, however, Defendants knew of, but concealed, a critical update: Qiwi was embroiled in a new CBR audit. *See In re Wells Fargo*, 2021 WL 4482102, at *14 ("Wells Fargo argues that it could not have informed investors of the extension request without disclosing confidential information. Mr. Sloan could have explained that to investors; but instead, he chose to speak. Therefore, he assumed a duty to be both accurate and complete. In telling investors that there was 'no change[,]' he made a statement of fact that was plainly false.").

Simply put, Defendants cannot claim that the existence and progress of the new CBR audit was somehow irrelevant to their "opinions" regarding compliance success and potential sanctions. Indeed, Defendants confirmed that CBR audits posed risks: "there can be no assurance that additional sanctions will not be imposed on us as a result of such or any other findings and that we will not come under greater CBR scrutiny in connection with any perceived deficiencies in our past conduct, or that any currently planned or future inspections will not result in discovery of any significant or minor additional violations of various banking regulations." ¶¶142, 181, 200. As soon as Defendants spoke about that subject, they needed to provide the whole truth pertaining to their statements or opinions: a substantial portion of operations violated CBR requirements and the CBR was currently scrutinizing those operations. *See In re Wells Fargo*, 2021 WL 4482102, at *11 ("Based on that context, Lead Plaintiffs have adequately pleaded that [Defendant]'s opinions are actionable because they omitted facts that conflicted with his statements.").[10]

### E.   The Safe Harbor Does Not Immunize Defendants From Liability.

Moving Defendants argue that various alleged misstatements were forward-looking and

---

[10] For the same reasons, Defendants are wrong in suggesting that certain statements are non-actionable puffery (Mem. at 26). *See In Re Wells Fargo*, 2021 WL 4482102, at *11 ("[L]ike opinion statements, statements of optimism and puffery can be actionable where they 'contradict facts that are known to a defendant,' or where they amount to 'misrepresentations of existing facts' that were made even though the speaker 'knew that the contrary was true.'").

protected by the PSLRA safe harbor. Mem. at 24-26. This argument fails for three reasons.

First, the "safe harbor ... does not protect material omissions." *In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016); *see also Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017) ("Court[s] in this circuit have consistently held that neither the PSLRA safe harbor, nor the bespeaks-caution doctrine protects material omissions.").

As described above, Defendants omitted the existence of the ongoing CBR audit, as well as the continuation of illicit activities violating CBR regulations and warranting extreme sanctions. The safe harbor cannot shield Defendants from liability for those material omissions.

Second, "statements about present or historical facts, whose accuracy can be determined at the time they were made, are not forward-looking[.]" *Behrendsen v. Yangtze River Port & Logistics Ltd.*, 2021 WL 2646353, at *7 (E.D.N.Y. June 28, 2021). Rather, forward-looking statements' "accuracy can only be verified after they are made." *Id.* "Where a statement contains elements that are forward-looking and elements that are not ... the forward-looking elements and the non-forward-looking are severable." *Id.* Thus, "[d]efendants cannot escape liability merely by including forward-looking statements alongside statements of historical and present facts." *Id.*

Moving Defendants cite various statements that are not forward-looking.[11] Each statement includes present or historical facts whose accuracy could be determined when it was made. The statements indicated that specific events had taken place and that those events posed specific risks as of that moment. Initiatives either were or were not discussed. Those initiatives either had the potential to affect operating performance or not. Therefore, the statements were inaccurate if, for example, those risks

---

[11] *See, e.g.*, ¶219 ("As of today, a number of legislative initiatives has been discussed by different legislative bodies, formally or informally, that can eventually become legislative proposals or laws, and impose additional pressure on our operations"); ¶220 ("[W]e believe that certain regulatory initiatives that are being discussed from time to time as well as continued economic slowdown have a potential to negatively affect our operating performance in the future."); ¶221 ("So, it's a sign of this attention and potentially they could limit such operation. And that could – that could have an impact on our business in this case.").

had already manifested or if the harms were imminent rather than "potential."

Third, "[t]o avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *In re Wells Fargo*, 2021 WL 4482102, at \*11. "Because [c]autionary language in securities offerings is just about universal[,] the key question … is whether plaintiffs have overcome the existence of such language. Plaintiffs may do this by showing … that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." *Id.*

As stated above, Qiwi's risk disclosures were inadequate and misleading. *See* § I.B., *supra*. Defendants described their success in remediating past violations from a prior audit and then warned of what "may" happen "if" there were ongoing violations or "if" another audit took place. But at that time, there **were** ongoing violations and another audit **was** in progress. Because the risk warnings failed to expressly warn of actual risks, Defendants cannot rely on the safe harbor.

## II. THE COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER

"As the Supreme Court has instructed, [a court] evaluate[s] the sufficiency of a complaint's allegations of scienter 'holistically,' considering 'all of the facts alleged, taken collectively,' rather than 'any individual allegation, scrutinized in isolation.'" *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007)). A court must compare "plausible inferences" while "**constantly assuming the plaintiff's allegations to be true**" and inquire: "[w]hen the allegations **are accepted as true** and taken **collectively**, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs*, 551 U.S. at 324-27. Accordingly, "at the motion to dismiss stage, a tie on scienter goes to the plaintiff." *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at \*10 (S.D.N.Y. June 16, 2020), *recons. den.*, 2020 WL 4208442 (S.D.N.Y. July 21, 2020).

### A. The Complaint Adequately Alleges Qiwi's Corporate Scienter.

The well-pled allegations—as set forth in the Complaint and described below (*see* § II.B, *infra*)—demonstrate that the Individual Defendants acted (at least) recklessly. Irrespective of that finding as to those individuals, however, Qiwi still possesses the requisite scienter.

"Where, as here, the scienter of a corporation is at issue, the plaintiff must allege 'facts sufficient to create a strong inference **either** (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter **or** (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading.'" *In re VEON*, 2017 WL 4162342, at *10 (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015)). "[I]t is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant." *Id.* Even when scienter is imputed to the corporation, moreover, "[t]he person whose state of mind is imputed to the corporate defendant need not also be the person who made the material misstatements at issue." *In re Henry*, 2019 WL 8638851, at *22-*23 n.5 (noting that "scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants").

Under those standards, Plaintiff's allegations establish Qiwi's scienter. While Qiwi was profiting from improper transactions which violated CBR regulations—and, subsequently, was being audited by the CBR—Qiwi's management touted the end of the last CBR audit and the remediation of regulatory violations, emphasizing current compliance and framing regulatory violations and sanctions as past. ¶¶7, 79, 101, 139, 142-43, 181, 200. Those statements were approved by corporate officials sufficiently knowledgeable about Qiwi to know that the statements were misleading. At a minimum, the officials approving those statements knew that the CBR had begun a new audit which was an existential threat to Qiwi. Those allegations give rise to a cogent and compelling inference of Qiwi's recklessness when misrepresenting material facts to investors.

20

**B.   The Complaint Adequately Alleges Scienter as to the Individual Defendants.**

"To establish scienter, a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Set Cap.*, 996 F.3d 64 at 78. Recklessness is "'at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Rosi*, 2021 WL 1177505, at *22 (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).

In evaluating scienter, a court may consider, *inter alia*, whether plaintiff alleged that "defendant '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; **or** (4) failed to check information they had a duty to monitor.'" *In re VEON*, 2017 WL 4162342, at *9-*10 (quoting *Novak*, 216 F.3d at 311). "[T]he 'motive and opportunity' and 'circumstantial evidence' theories are separate strategies for pleading scienter[;] failure to plead one does not preclude … pleading the other." *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38-39 (S.D.N.Y. 2019). Accordingly, "securities fraud claims typically have sufficed to state a claim based on recklessness ... where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud[.]" *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *4 (S.D.N.Y. June 21, 2021).

As explained below, Plaintiff has met those standards. First, Defendants Kim and Solonin had motive and opportunity to commit fraud. Second, the Individual Defendants knew of the CBR audit prior to publicly disclosing it on December 9, 2020. Third, Defendants had access to and a duty to monitor—but failed to check—information indicating that their public statements omitted material facts or were otherwise misleading. Fourth, the core operations doctrine bolsters the inference of scienter. Finally,

Defendants' non-culpable inference is not more compelling than the inference of recklessness.[12]

      1.   <u>Kim and Solonin Had Motive and Opportunity to Commit Fraud.</u>

"The motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 137 (S.D.N.Y. 2020). "Unusual insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter." *Id.*

On July 20, 2020—the same month the concealed CBR audit began—Qiwi announced an SPO through which Kim and Solonin sought to sell approximately 1.6 million personal shares. ¶118. The prospectus, moreover, omitted any reference to a new audit. ¶¶198-204. Instead, Defendants repeated the same disclosure about having remediated violations from the 2018 audit and future audit risks being hypothetical. *Id.* Thus, the Complaint adequately alleges that Kim and Solonin stood to benefit concretely and personally when they made misstatements. *See Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) (finding scienter "[w]hen executives enter into a trading plan during the Class Period and the Complaint sufficiently alleges that the purpose of the plan was to take advantage of an inflated stock price"); *cf. In Maloney v. Ollie's Bargain Outlet Holdings, Inc.,* 518 F. Supp. 3d 772, 779 (S.D.N.Y. 2021) (finding a lack of motive when the only individual defendant who sold shares during the class period, pursuant to a divestment plan that he had entered prior to the class period,

---

[12] Defendants incorrectly suggest that, to establish scienter, a plaintiff must rely on internal documents or confidential witnesses to support their allegations. *See* Mem. at 28-29. That requirement does not exist. *See Lexmark*, 367 F. Supp. 3d at 38 ("None of Defendants' arguments are availing. Plaintiffs do not rely on any confidential witnesses, but this Court is aware of no authority requiring confidential witness allegations."). Further, the Complaint alleges that Qiwi's Independent Registered Public Accounting Firm reported a Critical Audit Matter for fiscal year ending December 31, 2020, relating to "recognition of revenue for payment processing fees" (¶233), thus indicating scienter. *Cf. In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, at *18-*19 (S.D.N.Y. Oct. 25, 2017) (finding that while "the absence of internal documents and statements from confidential witnesses does not preclude a finding that Plaintiffs have presented evidence raising a strong circumstantial inference of scienter," the lack of allegations that "defendants' auditors disapproved of the disputed [basic] accounting practices or found any lack of internal controls" undermined scienter).

"undermines any allegation that the timing or amounts of the trades was unusual or suspicious.").

While Defendants cancelled the SPO—presumably because investors saw the sudden SPO as portending negative news for Qiwi—Kim and Solonin still had motive and opportunity to commit fraud by attempting to sell their shares to unsuspecting investors prior to the fallout from the CBR audit. *Martinek v. AmTrust Fin. Servs., Inc.*, 2020 WL 4735189, at *17 (S.D.N.Y. Aug. 14, 2020) ("[M]otive showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit."); *Zanghi v. Ritella*, 2021 WL 4392756, at *11 (S.D.N.Y. Sept. 24, 2021) ("Motive and opportunity can be established by showing that the defendant could realize concrete personal benefits by committing the fraud, had the means to defraud plaintiff to realize those benefits, and used those means.").[13]

### 2. The Individual Defendants Confirmed That They Knew, at a Minimum, of the CBR Audit Prior to its Public Disclosure on December 9, 2020.

"One who utters a statement knowing it is false, or indifferent to whether it is true or false, speaks with scienter." *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *16 (S.D.N.Y. Aug. 11, 2021); *see also Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) (That "CSP had weak internal controls and … that the CSP Defendants were aware of the problems … support" scienter.); *In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571, 588 (S.D.N.Y. 2020) (Defendants "acted with at least a reckless disregard of a known or obvious duty to disclose" where they received, but did not publicly disclose, audit findings letter with "detailed calculations, resulting in a [t]ax payable"

---

[13] Moving Defendants, once again, rely on inapposite cases. In *Sfiraiala v. Deutsche Bank Aktiengesellschaft*, plaintiffs did not allege defendants personally benefitted from the misstatements, only that "Deutsche Bank's Russia office had a culture of 'greed and corruption.'" 729 F. App'x 55, 57 (2d Cir. 2018). Similarly, the plaintiff in *In re Fed Ex Corp. Sec. Litig.* did not allege the individual defendants acted with motive. 517 F. Supp. 3d 216, 237 (S.D.N.Y. 2021). In *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, the Court concluded that the stock sale by one "executive does not give rise to a strong inference of the company's fraudulent intent," pointing to the fact that he "acquired more shares by the conclusion of the transactions than he had sold." 75 F.3d 801, 814 (2d Cir. 1996). None of those cases involved an attempted SPO where defendants would have sold their personal shares while concealing from investors that the company's primary regulator was conducting an audit that risked its core operations.

that "was material to" the company).

On December 9, 2020, Defendants publicly disclosed that the CBR had been auditing Qiwi since July 2020. ¶228. Because an audit requires a company to provide documents and other information for the auditor's review, Qiwi and its executives necessarily coordinated with the CBR and knew of the audit. It is implausible (if even possible) that the CBR audited Qiwi for months without the knowledge of Qiwi's: CEO (Defendant Kim), Board Chair (Defendant Solonin), CEO of Payment Services (Defendant Protopopov), Director (Defendant Karavaev), **or** Interim CFO (Defendant Kiseleva). Furthermore, Qiwi and its executives provided the CBR with the documents evidencing Qiwi's violative practices. Hence, Defendants had knowledge of (or were reckless in ignoring) the very information leading to the drastic sanctions. Instead of disclosing the truth, Qiwi filed 2Q20 and 3Q20 results, knowingly omitting any mention of the existence of the audit, the damning information provided to the CBR, or the imminence of the CBR's response to Qiwi's ongoing regulatory violations. ¶¶7, 11, 16, 213-24. Nothing more is required to show scienter.

3. The Individual Defendants Had Access to and a Duty to Monitor, but Did Not Check, Information Indicating Their Public Statements Were Inaccurate.

In addition to the above allegations showing actual knowledge, four categories of allegations demonstrate that the Individual Defendants[14] had access to information contradicting their public

---

[14] Moving Defendants assert that the CAC improperly relies upon group pleading to plead scienter. Mem. at n. 14. Not so. As stated above, the CAC details Qiwi's scienter through numerous facts. *See* § II.A., *supra*. Furthermore, the CAC details each Individual Defendant's high-level position within Qiwi, as well as relevant employment background and education. ¶¶25-31. In addition, the CAC identifies statements made by each of the Individual Defendants during the Class Period, which conveyed that they had knowledge of or access to the facts described therein. ¶¶125-223. In sum, each Individual Defendant purported to understand Qiwi's revenues, internal controls, and regulatory compliance, and repeatedly spoke about those material issues to investors. *See id.* But the information they gave was false and misleading, leaving investors stunned when the truth about the CBR audit was revealed. ¶¶ 225-33. At this stage, those facts give rise to a cogent and compelling inference of scienter. *See In re MF Glob. Holdings Ltd. Sec. Litig.,* 982 F. Supp. 2d 277, 319-20, n.27 (S.D.N.Y. 2013) (rejecting defendants' reliance on *In re CRM Holdings, Ltd. Sec. Litig.,* 2012 WL 1646888, at *30 (S.D.N.Y. May 10, 2012) when the plaintiffs pled "knowledge of or failure by each of the Officer Defendants to conduct a sufficient investigation into facts that would contradict the Officers' public statements"); *cf. Ross v. Lloyds Banking Grp., PLC,* 2012 WL 4891759, at *10 (S.D.N.Y. Oct. 16, 2012), *aff'd,* 546 F. App'x 5 (2d Cir. 2013). For the same reasons, the CAC pleads facts sufficient to create a strong inference of scienter, and Moving Defendants' reliance on *Jackson v. Abernathy,* 960 F.3d 94, 98-99 (2d Cir. 2020) is inapposite.

statements and/or failed to check information they had a duty to monitor—*i.e.*, acted recklessly. Collectively, those allegations create an overwhelming inference of scienter.

First, "[h]igh level corporate officers who signed SEC filings containing the company's financial statement have a duty to familiarize themselves with the facts relevant to the core operations of the company and the financial reporting of those operations." *In re Pall Corp.*, 2009 WL 3111777, at *7–*8 (E.D.N.Y. Sept. 21, 2009) ("Defendants should have familiarized themselves with the facts relevant to tax and accounting practices to ensure that the SEC filings they signed were truthful and accurate."). Similarly, particular company positions trigger an inference that "[defendants] ... had access to [the] information given their positions." *In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020).

As executives and/or board members, each Individual Defendant signed or had ultimate authority over the SEC filings containing inaccurate information about the Company. Accordingly, they had a duty to familiarize themselves with the operations that violated regulations, the portion of revenues and profits that depended on violative conduct, the true risks that old and new regulations posed to Qiwi, the status of the CBR audit, and the true risks posed by the CBR audit. When signing filings and communicating with investors–including repeated communications about Qiwi's success in abiding by regulations and remediating past violations—each Individual Defendant had access to the true state of the Company's operations and compliance.

Second, scienter is adequately alleged where a complaint references information "that the defendants could have and should have learned in the course of reasonable due diligence[.]" *Yannes*, 2021 WL 2555437, at *4. When "this information ... [is] accessible to [the defendants] prior to the defendants' [misstatement] ... it weighs in favor of an inference that [they] either knew about" the issue "or showed a reckless disregard for it." *Id.*; *see also Plumbers & Pipefitters Nat'l Pension Fund v.*

*Orthofix Int'l*, 89 F. Supp. 3d 602, 618 (S.D.N.Y. 2015) (scienter supported by the allegation that information about the company's finances were "reasonably available" to the CFO, although the plaintiff did not allege that the CFO read reports containing this information).

Any proper diligence would have uncovered the truth behind Qiwi's misstatements. The Individual Defendants consistently spoke about Qiwi's growing net revenue arising from "growth in our key vertical, currently our betting related payment services" and the continuation of that growth. ¶¶127-28, 130, 132, 134-36, 147-51, 156-57, 159-60, 163, 167, 169, 175, 191, 206, 214-17. In conjunction with those statements, the Individual Defendants spoke about monitoring regulatory changes, the need for regulatory compliance, and the risks of non-compliance. ¶¶143, 182, 184, 200-01, 210, 219-20, 222-23. And to reassure investors about compliance, the Individual Defendant spoke about regulatory violations from a 2018 CBR audit and unwaveringly reiterated that "[w]e believe that we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward." ¶¶142, 181, 200. The Individual Defendants even framed Qiwi's successful compliance efforts as a competitive advantage. ¶153 ("any new regulation rules will be basically positive for us").

In conjunction with those statements, the Individual Defendants could and should have known that a substantial portion of Qiwi's business violated existing regulations. Furthermore, they could and should have known that the CBR was auditing those operations and that the risks of sanctions had drastically increased. To the extent they somehow were unaware of the violative operations or the risks of the CBR audit, they recklessly failed to conduct proper diligence, despite access to information. And they recklessly (if not knowingly) made misstatements to investors.

<u>Third</u>, speaking knowledgeably on a topic creates an inference that the speaker knows facts about that topic. *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 850 (S.D.N.Y. 2019) (noting that, "to speak so knowledgeably regarding" a topic, a defendant "must

have educated himself regarding" that topic); *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 2021 WL 3675180, at *20 (D. Conn. Aug. 19, 2021) ("Actively communicating with the public about this issue demonstrates defendants' sensitivity to it, and is strong circumstantial evidence that [they] were receiving some form of specific information about the subject[.]").

As described above, the Individual Defendants consistently spoke knowledgeably to investors about Qiwi's betting-related operations, revenue growth, compliance risks, and compliance successes. They, therefore, should have educated themselves about the Company's violative operations, as well as the status of the ongoing CBR audit in 2020.

Fourth, "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may give rise to an inference of recklessness." *Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194, 214 (S.D.N.Y. 2018); *see Ont. Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.,* 432 F. Supp. 3d 131, 170–71 (D. Conn. 2019) (finding scienter where "at the very least [defendants] failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud").[15]

Even if no Individual Defendants had knowledge, the allegations show that they refused to see the obvious. The regulatory violations and corrective sanctions were not minor; they would have affected "33% to 40% of our Payment Services Segment Net Revenue" for the first nine months of 2020. ¶228. Once the audit began in 2020, moreover, the entire risk calculus materially changed for Qiwi and its investors. Future audits were no longer theoretical, and past disclosures about remedying violations found in the 2018 audit were no longer up to date. Nonetheless, the Individual Defendants did not disclose the 2020 audit and did not describe any internal operational investigations or changes made to ensure

---

[15] *See also In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 464, 474–75 (S.D.N.Y. 2014) ("[A] jury could well find that [defendant] recklessly 'failed to check information [he] had a duty to monitor'" where "[he] immediately denied [an] analyst's allegations before attempting to investigate them"); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 250 (S.D.N.Y. 2007) ("[C]ompensation committee [members] were charged with a specific duty to monitor the exercise dates of the options granted. Their failure to do so ... gives rise to an inference of scienter.")

compliance. Instead, they kept the same risk disclosures and statements focused on the 2018 audit, and continued violative operations leading to the severe sanctions by the CBR. Therefore, the Individual Defendants refused to see the obvious or investigate the doubtful.[16]

Viewed collectively, those allegations confirm that the Individual Defendants acted at least recklessly. They spoke regularly about ongoing growth from betting transactions, the importance of compliance, and the success vis-à-vis the 2018 CBR audit. Meanwhile, they ignored obvious flaws and failed to ensure Qiwi had basic controls and protocols around those material issues. Based on those facts, there is a cogent and compelling inference that Defendants acted recklessly.

4. The Core Operations Doctrine Bolsters the Inference of Scienter.

In addition to the aforementioned facts, the core operations doctrine bolsters scienter. "Core operations include matters critical to the long term viability of the company." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013). "Under the core operations theory, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue." *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 2021 WL 1178216, at *46 (S.D.N.Y. Mar. 29, 2021); *see also In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 249508, at *15 (S.D.N.Y. Jan. 20, 2015) (finding scienter where "high level corporate executives with responsibility for the financial statements" made "misstatements" about core operations); *In re Reserve Fund Sec. and Deriv. Litig.*, 732 F. Supp. 2d 310, 322-23 (S.D.N.Y. 2010) ("Once a plaintiff has adequately alleged that a defendant made false or misleading statements about [] core operations … an inference arises that [he] knew or should have

---

[16] *Compare In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571 (S.D.N.Y. 2020) (finding that "the size of the potential tax liability—nearly 40% of [Defendants] annual revenues" supported scienter, noting that "[t]he magnitude of a loss remains a 'relevant factor' in assessing scienter") *to ECA & Loc. 134 IBEW*, 553 F.3d 187, 202-03 (2d Cir. 2009) (finding plaintiffs failed to allege materiality and thus could not plead knowledge of materiality nor recklessness with circumstantial evidence); *see also Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (finding scienter in part because defendant knew the "extent of" a potential liability and the risk that it would lose a "significant number" of contracts).

known the statements were false when made.").

Qiwi's core operations involved the betting transactions that the CBR audit targeted, that involved ongoing violations, and that resulted in severe sanctions. *See* ¶¶7, 9, 13, 101, 117-23, 127, 134, 139, 142, 149, 160, 166, 174, 178, 181, 200, 228-33. Thus, the core operations doctrine adds to the other allegations and arguments supporting Defendants' scienter.

> 5. Moving Defendants' Proposed Non-Culpable Inference of Negligence Is Not More Cogent and Compelling Than the Inference of Recklessness.

Moving Defendants note that "the breadth of QIWI's risk warnings, coupled with its timely disclosure of the CBR restrictions and their expected effect, paint the picture of a management team that was trying, in real time, to provide the most accurate and meaningful information to investors as it grappled with Russia's uncertain and still-developing regulatory framework." Mem. at 29. They add that "the CAC cites no facts that Defendants knew" that the CBR would find "certain violations" and "impose[] new restrictions," "yet purposefully hid them from investors." *Id*. at 30. Such arguments misstate the scienter pleading standard and ignore Plaintiff's allegations.

First, contrary to Defendants' assertion, knowledge is not required. Rather, an inference of recklessness—based on the allegations considered collectively and construed as true—suffices.

Second, although the CBR audit began in July 2020, Defendants concealed:

- the audit's existence until the December 9, 2020 disclosure;
- all communications with and disclosures to the CBR in conjunction with the audit; and
- the dates, scope, and substance of the violations found by the CBR.

*See* ¶¶228-33. If Defendants sought to "provide the most accurate and meaningful information to investors," they would have disclosed, at minimum, the existence of the ongoing CBR audit. They also would have updated Qiwi's risk disclosures to specify that a hypothetical audit had become reality and to provide updates about the audit and Qiwi's compliance. Instead, Defendants issued a prospectus and two quarters of financial results, without materially updating the statements on CBR audits and related

compliance measures. ¶¶198-224. Simply put, the December 9th announcement—that a CBR audit had led to the suspension of Qiwi's ability to conduct "most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts"—was the **first** indication to investors of new audit activity or risks since the 2018 audit.

Defendants purposefully concealed those material facts from investors or recklessly omitted it. Either way, the allegations sufficiently establish scienter. In sum, the allegations (and Qiwi's own SEC filings) belie the inference that Defendants provided "the most accurate and meaningful information to investors." They can raise that fact to a jury, but at this stage, Plaintiff has pled facts giving rise to a cogent and compelling inference that Defendants acted recklessly.[17]

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the Motion in full. To the extent the Court grants the Motion, Plaintiff respectfully requests leave to amend.

DATED: October 18, 2021                    Respectfully Submitted,

                                           **ROCHE FREEDMAN LLP**

                                           */s/ Constantine P. Economides*

---

[17] Once again, Moving Defendants rely on factually distinguishable cases. In *Lachman*, for example, the alleged fraud arose from a new software platform that ultimately went poorly and drove the stock price down. *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 120 (E.D.N.Y. 2020). Notably, "Revlon and its executives disclosed risks associated with adopting the new platform before the transition occurred. And they acknowledged harms from the flawed transition afterward." *Id.* There were no allegations that defendants concealed that the launch itself was taking place or framed the choice to implement new software as a hypothetical, until after the launch had taken place and damaged the company. *See id.* Similarly, in *In re Seadrill Ltd. Sec. Litig.*, the alleged fraud arose from international sanctions that proved to pose a threat to defendants' contracts and dividend. 2016 WL 3461311, at *13 (S.D.N.Y. June 20, 2016). The Court found that because "[t]he uncertainties about the sanctions were disclosed…undercut the inference that Defendants were attempting to conceal the truth." *Id.* Here, however, Defendants focused on compliance risks in a dynamic regulatory environment and even touted regulatory compliance as an advantage for Qiwi while concealing the true status of violative or illicit transactions, going so far as to hide the existence of a new audit that ultimately led to severe sanctions. In *Canez*, moreover, there were no facts placing defendants on notice that a transaction should be disclosed as a "related-party transaction." *See Canez v. Intelligent Sys. Corp.*, 2021 WL 3667012, at *11 (E.D.N.Y. Aug. 18, 2021). Here, Defendants had repeatedly indicated that illicit transactions, CBR audits, regulatory violations, and sanctions were material issues for investors. Defendants had disclosed such issues for the 2018 audit—even touting Qiwi's success in remediating past violations—yet remained silent when the issues manifested in a new 2020 audit—one that ultimately triggered drastic sanctions.

Constantine P. Economides
Velvel (Devin) Freedman
Ivy T. Ngo (*pro hac vice*)
1 SE 3rd Avenue, Suite 1250
Miami, Florida 33131
(T): (786) 924-2900
ceconomides@rochefreedman.com
vel@rochefreedman.com
ingo@rochefreedman.com

*Counsel for Moset Int'l Co. Ltd. and
Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall (*pro hac vice* forthcoming)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Moset Int'l Co. Ltd.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify under penalty of perjury that on October 18, 2021, I served the foregoing via

email on counsel of record, pursuant to the Court's order on August 17, 2021.

<u>*/s/ Constantine P. Economides*</u>
Constantine P. Economides