# Exhibit C

Case 1:20-cv-06054-BMC-CLP    Document 48-3    Filed 11/01/21    Page 2 of 34 PageID #: 1250

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## Form 20-F

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Or**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2016**

**Or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Or**

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number: 001-35893**

# QIWI PLC
**(Exact name of Registrant as specified in its charter)**

**N/A**
**(translation of Registrant's name into English)**

**Cyprus**
**(Jurisdiction of incorporation or organization)**

**Kennedy 12, Kennedy Business Centre, 2 nd floor**
**P.C. 1087, Nicosia, Cyprus**
**(Address of principal executive offices)**

**Varvara Kiseleva**
**+7 (357) 250-28091**
**ir@qiwi.com**
**Kennedy 12, Kennedy Business Centre, 2 nd floor**
**P.C. 1087, Nicosia, Cyprus**
**(Name, telephone, e-mail and/or facsimile number and address of company contact person)**

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| American Depositary Shares, each representing one Class B ordinary share, having a nominal value EUR 0.0005 per share | The NASDAQ Stock Market LLC |
| Class B ordinary shares, having a nominal value of EUR 0.0005 per share* | |

\* *Not for trading, but only in connection with the registration of the American Depositary Shares.*

**Securities registered or to be registered pursuant to Section 12(g) of the Act:**

**None**
**(Title of Class)**

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:**

**None**
**(Title of Class)**

_____

Indicate the number of outstanding shares of each of the Issuer's classes of capital or common stock as of the close of the period covered by the annual report.

**As of December 31, 2016, 15,516,573 Class A ordinary shares, par value EUR 0.0005 per share and 45,080,461 Class B ordinary shares, par value EUR 0.0005 per share were outstanding.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such a shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐        Accelerated filer ☒        Non-accelerated filer ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐        International Financial Reporting Standards as issued        Other ☐
                     by the International Accounting Standards Board ☒

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the Registrant has elected to follow: Item 17 ☐   Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☒

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.   Yes ☐   No ☐

**Table of Contents**

**TABLE OF CONTENTS**

PART I

| | | | |
|---|---|---|---|
| ITEM 1. | Identity of Directors, Senior Management and Advisers | | 3 |
| ITEM 2. | Offer Statistics and Expected Timetable | | 3 |
| ITEM 3. | Key Information | | 3 |
| | A. | Selected financial data | 3 |
| | B. | Capitalization and Indebtedness | 8 |
| | C. | Reasons for the Offer and Use of Proceeds | 8 |
| | D. | Risk Factors | 9 |
| ITEM 4. | Information on the Company | | 37 |
| | A. | History and Development of the Company | 37 |
| | B. | Business Overview | 37 |
| | C. | Organizational Structure | 49 |
| | D. | Property, Plants and Equipment | 49 |
| ITEM 4A. | Unresolved Staff Comments | | 49 |
| ITEM 5. | Operating and Financial Review and Prospects | | 49 |
| | A. | Operating Results | 50 |
| | B. | Liquidity and capital resources | 62 |
| | C. | Research and development, patents and licenses, etc. | 64 |
| | D. | Trend information | 64 |
| | E. | Off-balance sheet arrangements | 64 |
| | F. | Tabular disclosure of contractual obligations | 64 |
| | G. | Safe harbor | 64 |
| ITEM 6. | Directors, Senior Management and Employees | | 64 |
| | A. | Directors and Senior Management | 64 |
| | B. | Compensation | 65 |
| | C. | Board Practices | 67 |
| | D. | Employees | 69 |
| | E. | Share Ownership | 69 |
| ITEM 7. | Major Shareholders and Related Party Transactions | | 69 |
| | A. | Major Shareholders | 69 |
| | B. | Related Party Transactions | 70 |

1

**Table of Contents**

|  | C. | Interests of Experts and Counsel | 70 |
| ITEM 8. | | Financial Information | 71 |
| | A. | Consolidated Financial Statements and Other Financial Information | 71 |
| | B. | Significant Changes | 71 |
| ITEM 9. | | The Offer and Listing | 71 |
| | A. | Offer and Listing Details | 71 |
| | B. | Plan of Distribution | 71 |
| | C. | Markets | 71 |
| | D. | Selling Shareholders | 72 |
| | E. | Dilution | 72 |
| | F. | Expenses of the Issue | 72 |
| ITEM 10. | | Additional Information | 72 |
| | A. | Share Capital | 72 |
| | B. | Memorandum and Articles of Association | 73 |
| | C. | Material Contracts | 76 |
| | D. | Exchange Controls | 77 |
| | E. | Taxation | 77 |
| | F. | Dividends and Paying Agents | 86 |
| | G. | Statements by Experts | 86 |
| | H. | Documents on Display | 86 |
| | I. | Subsidiary Information | 86 |
| ITEM 11. | | Quantitative and Qualitative Disclosures About Market Risk | 86 |
| ITEM 12. | | Description of Securities Other Than Equity Securities | 88 |
| | A. | Debt Securities | 88 |
| | B. | Warrants and Rights | 88 |
| | C. | Other Securities | 88 |
| | D. | American Depositary Shares | 88 |

PART II

| ITEM 13. | Defaults, Dividend Arrearages and Delinquencies | 89 |
| ITEM 14. | Material Modifications to the Rights of Security Holders and Use of Proceeds | 89 |
| ITEM 15. | Controls and Procedures | 89 |
| ITEM 16. | [RESERVED] | 90 |
| ITEM 16A. | Audit Committee Financial Expert | 90 |
| ITEM 16B. | Code of Ethics | 91 |
| ITEM 16C. | Principal Accountant Fees and Services | 91 |
| ITEM 16D. | Exemptions from the Listing Standards for Audit Committees | 91 |
| ITEM 16E. | Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 91 |
| ITEM 16F. | Change in Registrant's Certifying Accountant | 91 |
| ITEM 16G. | Corporate Governance | 91 |
| ITEM 16H. | Mine Safety Disclosure | 94 |

PART III

| ITEM 17. | Financial Statements | 95 |
| ITEM 18. | Financial Statements | 95 |
| ITEM 19. | Exhibits | 95 |

Table of Contents

**D.    Risk Factors**

*In conducting our business, we face many risks that may interfere with our business objectives. Some of these risks relate to our operational processes, while others relate to our business environment. It is important to understand the nature of these risks. If any of the following risks actually occurs, it may materially harm our business, results of operations or financial condition.*

**Risks Relating to Our Business and Industry**

***The payment services industry is highly competitive, and we have a number of competitors that are larger and have greater financial and other resources.***

The payment services industry is highly competitive, and our continued growth depends on our ability to compete effectively. In the countries in which we operate, we face competition from a variety of financial and non-financial business groups. These competitors include retail banks, non-traditional payment service providers (such as retailers and mobile network operators, or MNOs), traditional kiosk and terminal operators and electronic payment system operators, as well as other companies which provide various forms of payment services, including electronic payment and payment processing services. Competitors in our industry seek to differentiate themselves by features and functionalities such as speed, convenience, network size, accessibility, hours of operation, reliability and price. A significant number of our competitors have greater financial, technological and marketing resources than we have, operate robust networks and are highly regarded by consumers.

In Russia, we face significant competition from retail banks for our services. Our primary competitors include Sberbank, Russia's largest retail bank that is majority-owned by the Russian state, and Alfa-Bank, one of the leading privately owned Russian retail banks, both of which have electronic banking systems and large retail networks. Some retail banks have either developed or are currently developing their own networks of kiosks and terminals and various electronic payment products. Sberbank, for example, has long stated that its strategic goals include the promotion of alternative banking channels, such as kiosks, internet banking and mobile banking, and actively develops its online payment services capabilities, including through Yandex.Money, a major electronic payment system operator in Russia. In November 2016 the Supervisory Board of Sberbank approved a strategic initiative to transform the bank into an e-commerce ecosystem based on open source software by 2018. If implemented, this move may make Sberbank's model closer to that of our company, enable Sberbank and other players to develop new financial products on the basis of Sberbank's platform and potentially further intensify competition between us. Sberbank has access to significant financial resources and an extensive nationwide network of branches. Sberbank is the largest processor of utility bill payments, which constitute a very significant portion of overall consumer spending in our industry. These factors may give Sberbank a substantial competitive advantage over us in the kiosk, internet banking and mobile banking businesses. In January 2017, it was reported that Sberbank and the Chinese e-retail company Alibaba are in discussions to create a joint venture that would include the Chinese group's existing cross-border e-commerce businesses in Russia and neighboring countries, which could further strengthen both companies' respective positions in the e-payments market. Other Russian banks are also actively pursuing the electronic payments business with well-developed e-wallet products and other solutions, including Alfa Bank and Tinkoff Bank.

Our competitors also include the Russian Federal State Unitary Enterprise Postal Service, or Russian Post, which offers certain payment services. Russian Post's geographical penetration is more dispersed than our physical distribution network (i.e. our kiosks and terminals). It also owns a full-service commercial bank. As a state-sponsored institution, we believe that it is able to provide payment services at significantly lower prices than we are able to match profitably. An increase in competition by other market participants, including Sberbank, Alfa-Bank or Russian Post, could result in a loss of consumers and our margins could be harmed. The geographical footprint of some of our competitors could also be leveraged by them to gain or increase a market share in the money transfers business. We also face competition from non-traditional payment service providers that have substantial financial resources, such as major telecommunication and small electronics retailers, including Euroset and Svyaznoy, online retailers such as Alibaba (and its financial services subsidiary Ant Financial which operates the AliPay payment system), as well as MNOs, in particular the Russian "Big Three" MNOs, MegaFon, VimpelCom and MTS, as well as their closest competitor Rostelekom. In February 2017 MTS announced the launch of MTS Money Wallet, an e-wallet which combines all payment tools on one platform, including electronic wallet, bank cards, and customers' mobile account balances. We also compete against some directly comparable businesses, such as traditional kiosk and terminal operators, including Cyberplat, Compay and Elecsnet, and electronic payment system operators (primarily Yandex.Money, WebMoney and PayPal). New competitors may penetrate the Russian electronic payment market as well, including established international players such as MoneyGram, Google, Samsung (which acquired an electronic payments company LoopPay in February 2015) or Apple (which introduced its own payments service Apple Pay in September 2014). In connection with our recently launched payment-by-installments card program under the SOVEST brand, we face intense competition from all commercial banks with unsecured retail consumer lending programs and we may expect to face increasing competition in case commercial banks launch similar products. Additionally, some of our competitors are currently our major merchants (the Big Three MNOs) or our large agents (for example, Svyaznoy). If we are unable to compete successfully for consumers, agents and merchants, our business, financial condition and results of operations could be materially adversely affected.

***Our continued growth depends on our ability to maintain or increase our average net revenue yield.***

One of the key measures we use to assess our financial performance is our average net revenue yield, which we calculate by dividing adjusted net revenue by the total payment volume of the transactions we process. Our average net revenue yield may be affected by a number of factors, including increased competition, pressure from merchants and/or agents, and acquisitions. We have experienced declines in our average net revenue yield for certain merchant categories in the past, in particular for our Telecom merchants where the merchant fees were sharply reduced by the Big Three MNOs, who have been seeking to reduce costs, and may continue to do so in the future. In addition, in 2015, our average net revenue yield declined following the acquisition of the Contact money transfer system ("Contact") and the Rapida payment processing system ("Rapida") businesses, both of which had been operating with a significantly lower average net revenue yield than QIWI (excluding Contact and Rapida) during 2015. In order to maintain our competitiveness, we must continue to ensure that our payment processing system provides a more convenient and attractive option for both merchants and customers than alternative systems that may not require payment of a processing fee.

9

Table of Contents

Retail banks and various payment service providers are constantly developing low to zero-commission payment channels for their consumers. To attract consumers, we also offer certain services on a commission-free basis, such as most peer-to-peer transfers within Visa Qiwi Wallet and certain payments in e-commerce. Despite our efforts, consumers may still choose to use other payment systems, even if those systems do not offer the convenience that we do, because they charge lower fees. In addition, because agents and merchants are able to switch between different payment processing systems, we may face additional pressure to reduce the fees we charge due to increased competition from other payment service providers.

As a result, if average net revenue yields continue to decline, we must offset the financial impact of such decline by increasing our payment volume or through the development and enhancement of value added services. We cannot assure you that we will be able to increase our payment volumes or that any value added services we introduce will be profitable. If we are unable to offset the decline in our average net revenue yield resulting from this and other factors, our business, financial condition and results of operations could be materially adversely affected.

*We are subject to the economic risk and business cycles of our merchants and agents and the overall level of consumer spending.*

The payment services industry depends heavily on the overall level of consumer spending. We are exposed to general economic conditions that affect consumer confidence, consumer spending, consumer discretionary income or changes in consumer purchasing habits. Economic factors such as employment levels, business conditions, energy and fuel costs, interest rates, inflation rate and the strength of the ruble against foreign currencies (in particular the U.S. dollar) could reduce consumer spending or change consumer purchasing habits. A reduction in the amount of consumer spending could result in a decrease in our revenue and profits. If our merchants make fewer sales of their products and services using our services or consumers spend less money per transaction, the volume of payments we process will decline, resulting in lower revenue. A further weakening in the economy could have a negative impact on our merchants, as well as consumers who purchase products and services using our payment processing systems, which could, in turn, negatively impact our business, financial condition and results of operations, particularly if the recessionary environment disproportionately affects some of the market segments that represent a larger portion of our payment processing volume. In addition, these factors could force some of our merchants and/or agents to liquidate their operations or go bankrupt, or could cause our agents to reduce the number of their locations or hours of operation, resulting in reduced transaction volumes. We also have a certain amount of fixed costs, including salaries and rent, which could limit our ability to adjust costs and respond quickly to changes affecting the economy and our business.

Russia's economy has been facing significant challenges for the past few years due to the combined effect of the ongoing crisis in Eastern Ukraine and Syria, the economic and financial sanctions imposed in connection with it on certain Russian companies and individuals, as well as against entire sectors of Russian economy, by the U.S., EU, Canada and other countries, a steep decline in oil prices, a record weakening of the Russian ruble against the U.S. dollar, a lack of access to financing for Russian issuers, capital flight and a general climate of political and economic uncertainty. See "– Economic instability in Russia could have an adverse effect on our business" and "– The situation in Ukraine and the U.S., EU and other sanctions that have been imposed could adversely impact our operations and financial condition". The Russian economy contracted both in 2015 and in 2016. At the same time, the population's purchasing power decreased due to the weakening of the ruble, basic necessities such as food products and utilities became more expensive, and consumer confidence declined significantly, according to the Russian Consumer Confidence Overall Index reported by Rosstat. According to Rosstat, inflation was 11.4% in 2014 and 12.9% in 2015 (although it relatively stabilized in 2016 at 5.4%), while real average wages have been declining (with Rosstat's data for 2016 indicating that the population's real disposable income contracted by 5.9% in 2016 as compared to 2015). Against this backdrop, household consumption decreased significantly in 2015 versus 2014, although it grew slightly by 1.5% in 2016, according to Rosstat. A prolonged economic slowdown in Russia could have a significant negative effect on consumer spending in Russia and, accordingly, on our business. As a result of the challenging operating environment in Russia, we have experienced slower payment volume growth in certain of our payment categories and payment volume decline in certain others. In particular Money Remittance and Financial Services categories were affected by weak consumer spending and lack of growth in the underlying markets resulting from decrease in real disposable income, cautious consumer spending, reduced migration, ongoing purge of the Russian banking industry by the CBR and shrinkage of the banking sector as well as several other sector specific challenges. The current financial crisis in Russia is still ongoing. Further adverse changes in economic conditions in Russia could adversely impact our future revenues and profits and cause a material adverse effect on our business, financial condition and results of operations.

*We do not control the rates of the fees levied by our agents on consumers.*

Our agents pay us an agreed fee using a portion of the fees levied by them on consumers. The fee paid to us by the agent is based on a percentage of the value of each transaction that we process. In certain cases, mostly in telecom market vertical, the amount of fees levied by an agent on a consumer for each particular transaction is determined by such agent at its own discretion. We do not cap the amount of such fees or otherwise control it. We believe that the fees set by our agents are market-driven, and that our interests and our agents' interests are aligned with a view to maintaining fees at a level that would simultaneously result in our agents' profitability and customer satisfaction. However, we can provide no assurance that our agents will not raise fees to a level that will adversely affect the popularity of our products among consumers. At the same time, if we are forced to cap customer fees to protect the strength of our brand or otherwise, we may lose a significant number of agents, which would reduce the penetration of our physical distribution network. In some instances, we have introduced such caps at the request of our merchants. No assurance can be made that this trend will not increase. Material increases in customer fees by our agents or the imposition of caps on the rates of such fees by us could have an adverse effect on our business, financial condition and results of operations.

10

Table of Contents

***Our independent public registered accounting firm identified a material weakness in our internal control over financial reporting during our 2011 audit, and we can provide no assurance that additional material weaknesses will not be identified in the future.***

Our internal controls relating to preparation of our financial statements have not kept pace with the changes in and increasing scope and volume of our business. Our financial reporting function and system of internal controls is less developed in certain respects than those of payment service providers that operate in more developed markets and may not provide our management with as much or as accurate or timely information. The Public Company Accounting Oversight Board, or PCAOB, has defined a material weakness as "a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim statements will not be prevented or detected." In connection with their audit of our consolidated financial statements for the year ended December 31, 2011, our independent registered public accounting firm identified a material weakness in our internal controls with respect to our financial statement closing process. As a result of efforts we undertook, we remediated the related material weakness as of December 31, 2012. However, we can give no assurance that additional material weaknesses in our internal control over financial reporting will not be identified in the future. Our failure to implement and maintain effective internal control over financial reporting could result in errors in our financial statements that could lead to a restatement of our financial statements, cause us to fail to meet our reporting obligations and cause investors to lose confidence in our reported financial information, which may result in a decline in the market price of our ADSs.

***If consumer confidence in our business deteriorates, our business, financial condition and results of operations could be adversely affected.***

Our business is built on consumers' confidence in our brands, as well as our ability to provide fast, reliable payment services, including electronic payment and payment processing services. As a consumer business, the strength of our brand and reputation are of paramount importance to us. A number of factors could adversely affect consumer confidence in our brand, many of which are beyond our control, and could have an adverse impact on our results of operations. These factors include:

- illegal or improper use of our systems and compliance related concerns;

- regulatory action or investigations against us;

- any significant interruption to our systems and operations; and

- any breach of our security system or any compromises of consumer data.

In addition, we are largely dependent on our agents and to some extent on our franchisees to which we license our products to maintain the reputation of our brand. Despite the measures that we put in place to ensure their compliance with our performance standards, our lack of control over their operations may result in the low quality of service of a particular agent or franchisee being attributed to our brand, negatively affecting our overall reputation. Furthermore, negative publicity surrounding any assertion that our agents and/or merchants are implicated in fraudulent transactions, irrespective of the accuracy of such publicity or its connection with our current operations or business, could harm our reputation.

Any event that hurts our brand and reputation among consumers as a reliable payment services provider could have a material adverse effect on our business, financial condition and results of operations.

***A decline in the use of cash as a means of payment or a decline in the use of kiosks and terminals may result in a reduced demand for our services.***

Substantially all of our business is in emerging markets, including Russia and Kazakhstan, where a substantial part of the population relies on cash payments, rather than credit and debit card payments or electronic banking. We believe that consumers making cash payments are more likely to use our kiosks and terminals as well as Visa Qiwi Wallet, which is most commonly reloaded via kiosks and terminals, than using alternative payment methods. As a result, we believe that our profitability depends to an extent on the use of cash as a means of payment and the reach of our kiosks and terminals network. Over time, the prevalence of cash payments is expected to decline as a greater percentage of the population in emerging markets adopts credit and debit card payments and electronic banking and as our kiosks and terminals network decreases. The shift from cash payments to credit and debit card payments and electronic banking could reduce our market share and payment volumes and may have a material adverse effect on our business, financial condition and results of operations.

Other factors could also contribute to a decline in the use of kiosks and terminals, including regulatory changes, increases in consumer fees imposed by the agents (see "–We do not control the rates of the fees levied by our agents on consumers"), and development of alternative payment channels. Based on available data, we believe that the overall number of and the use of kiosks declined in 2015 versus prior years and was slightly lower in 2016 as compared to 2015.

Since mid-2015 the CBR enhanced its scrutiny over the compliance by the agents with legislation that requires them to remit their proceeds to special accounts (see "- Regulation – Regulation of Payment Services"), which has had a negative impact on the size of our kiosk network. Through reducing the size of our network, this adversely affects the availability and convenience of our services to consumers, including the convenience of use of Visa Qiwi Wallet, for which historically our kiosks and terminals have been the most popular reload channel. We have since observed that these developments had the effect of making the use of our kiosks and terminals generally more expensive or less convenient for the consumers as reflected in the decreasing payment volumes in telecom and other (mainly Multi Level Marketing or MLM) market verticals. These developments also increased the cost to us of consumers reloading their Visa Qiwi Wallet accounts, since historically our own kiosks and terminals have been the most popular reload channel (see "–The cost to us of consumers reloading their Visa Qiwi Wallet accounts may increase"). There can be no assurance that this negative impact will not continue going forward as increased regulatory pressures put more agents out of business and deter new ones from entering it. Another recent development that could have a similar effect on our business is the introduction in 2016 of amendments to the Federal Law of the Russian Federation No. 54-FZ "On the use of cash registers in cash payments and (or) settlements with the use of payment cards", dated May 22, 2003 (as amended). In particular, the law mandated that all kiosks (subject to certain exceptions) be equipped with new or modernized cash registers. If our agents are not able or willing to comply with the new legislation, it could cause a further reduction of our kiosk network.

11

Table of Contents

All of these factors could undermine the appeal of our services for the consumers. Moreover, failure to comply with such enhanced control measures by us or our agents could result in the CBR imposing fines or restrictions on our activities (see "–Qiwi Bank, Rapida LTD and other Russian banks and credit organizations operate in a highly regulated environment, and increased regulator scrutiny could have an adverse effect on our business, financial condition and results of operations"). All of these factors could have a material adverse effect on our business, financial condition and results of operations.

*We may not be able to expand into new geographical markets, or develop our existing international operations successfully, which could limit our ability to grow and increase our profitability.*

Our expansion into new geographical markets and further development of our international operations depend on our ability to apply our existing technology or to develop new applications to meet the particular needs of each local market or country. We may not have adequate financial, technological or personnel and management resources to develop effective and secure services or distribution channels that will satisfy the demands of these markets. We may not be able to establish partnerships with merchants or to attract agents to invest in new geographical markets to strengthen our international operations. If we fail to enter new markets or countries and to further develop our international operations, we may not be able to continue to grow our revenues and earnings. Furthermore, we may expand into new geographical markets in which we may not have any previous operating experience. We operate in an industry that is often subject to significant regulation, and our lack of familiarity with the regulatory landscape in new markets may result in us running into unanticipated problems or delays in obtaining the requisite regulatory approvals and licenses. We may not be able to successfully expand in such markets due to our lack of experience. Moreover, we may not be able to execute our strategy in our existing international operations successfully, which may result in additional losses or limit our growth prospects. In addition, expanding internationally subjects us to a number of risks, including:

- greater difficulty in managing foreign operations;

- expenses associated with localizing our products, including offering consumers the ability to transact in major currencies;

- higher labor costs and problems integrating employees that we hire in different countries into our existing corporate culture;

- laws and business practices that favor local competitors;

- multiple and changing laws, tax regimes and government regulations;

- foreign currency restrictions and exchange rate fluctuations;

- changes in a specific country's or region's political or economic conditions; and

- differing intellectual property laws.

In addition, our global operations expose us to numerous and sometimes conflicting legal and regulatory requirements, and violations or unfavorable interpretation by authorities of these regulations could harm our business. In particular, we are exposed to the risk of being deemed to have permanent establishment in a specific country and transfer pricing risks which could result in additional tax liability.

If we are not able to manage these and multiple other risks associated with global operations successfully, our business, financial condition and results of operations could be materially adversely affected.

*We are subject to extensive government regulation.*

Our business is impacted by laws and regulations that affect our industry, the number of which has increased significantly in recent years. We are subject to a variety of regulations aimed at preventing money laundering and financing criminal activity and terrorism, financial services regulations, payment services regulations, consumer protection laws, currency control regulations, advertising laws, betting laws and privacy and data protection laws and therefore experience periodic investigations by various regulatory authorities in connection with the same, which may sometimes result in monetary or other sanctions being imposed on us. Further, these laws and regulations vary significantly from country to country. Many of these laws and regulations are constantly evolving, and are often unclear and inconsistent with other applicable laws and regulations, including across various jurisdictions, making compliance challenging and increasing our related operating costs and legal risks. If local authorities in Russia, Kazakhstan or other countries choose to enforce specific interpretations of the applicable legislation that differ from ours, we may be found to be in violation and subject to penalties or other liabilities. This could also limit our ability in processing some of the payments we currently process going forward and may increase our cost of doing business.

For example, on January 01, 2017, the Regulatory Framework for Stored Values and Electronic Payment Systems came into force in the United Arab Emirates. It introduced a mandatory licensing and related compliance regime for certain electronic payment service providers and established a one-year transitional period for existing digital payment services providers to take appropriate measures to comply with the new rules. In case of failure to do so payment services provider may be mandated to cease provision of such services. Moreover, any individual or entity providing (or representing themselves as capable of providing) digital payment services without the appropriate license or authorization will be subject to administrative penalties. We are currently assessing the applicability and potential impact of the new legislation on our business.

12

Table of Contents

If our position on our status under the Regulatory Framework is different from that of the UAE regulator or if we are unable to comply with the mandatory licensing if it is deemed applicable to us, it could have a material adverse effect on our business, financial condition and results of operations.

Further, at the end of 2014, our subsidiary in Kazakhstan became subject to local financial monitoring legislation, imposing certain client identification requirements on us. In connection with this legislation, we had to restructure our operations in Kazakhstan to make our Kazakh subsidiary the operator of our payment system in the country. The restructuring was completed in September 2015. As the anti-money laundering legislation in Kazakhstan is relatively nascent and undeveloped, we may face various difficulties when applying the legislation. If we are not able to comply with the applicable legislation for any reason, we could become subject to regulatory action in Kazakhstan and could face fines or significant restrictions on our operations in the country.

Moreover, the Law of the Republic of Kazakhstan No. 11-VI "On Payments and Payment Systems", dated July 26, 2016, came into force in September 2016 substituting the Law of the Republic of Kazakhstan No. 237-I "On Payments and Money Transfers" dated June 29, 1998. The new law introduced a more comprehensive regulatory regime for the payments market in general, thus bringing the Kazakh legislation more in line with the international standards. Since the position of the local regulator in relation to the enforcement of the new legislation is not yet clear and established, we may be found in violation of applicable laws and regulations and be subject to penalties or other liabilities.

Furthermore, recently there has been increased public attention and heightened legislation and regulations regarding money laundering and terrorist financing. We sometimes have to make significant judgment calls in applying anti-money laundering legislation and risk being found in non-compliance with it, particularly in relation to its mandatory client identification requirements, if, for example, we process payments made by our consumers from their Visa Qiwi Wallet accounts for amounts in excess of the thresholds imposed by anti-money laundering legislation or for certain types of merchants without the required client identification. Although we use all methods available for client identification and believe we are in compliance with market practice (see "—Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes"), the Russian regulators may view us as being non-compliant and impose fines and other sanctions on us. There can also be no assurance that the mandatory client identification requirements under the anti-money laundering legislation will not change further in a manner adverse to our business, for example, through making the identification process more burdensome or through lowering the thresholds for transactions which non-identified customers or customers that only underwent the simplified identification process can perform (see "Regulation"), which could result in lower payment volumes for us. For instance, there have already been proposals from certain government officials to ban payments by unidentified consumers altogether. Any adverse change to these requirements could have a substantial negative effect on our business.

Generally, Russian lawmakers and enforcement agencies have recently demonstrated increased scrutiny in matters relating to cyberspace and e-payments, as borne out in the enhanced enforcement activities in the kiosk market, the de-anonymization of e-payments and various other initiatives aimed at increasing state control over online activities.

In July 2016, we were served with notices from Roskomnadzor, the Russian state agency responsible, among other things, for overseeing the media and Internet, stating that we had breached Russian laws on public distribution of information about gambling, since our website contained links to services offered by certain betting operators which were allegedly not in compliance with the Russian betting legislation. We have complied with the prescriptions contained in the notices. However, there can be no assurance that further violations will not occur in the future as we service a wide variety of merchants and depend on their compliance with relevant laws in this regard. If we are found to be in breach, Roskomnadzor or other agencies could take further action against us, including by blocking our website or imposing fines or other sanctions.

Moreover, recent amendments to the Russian betting legislation introduced a more comprehensive regulatory framework in this area. In particular, under amendments to the Russian betting laws introduced in 2014 (see "Regulation"), in order to engage in the betting business, a bookmaker has to become a member of a self-regulated organization of bookmakers and abide by its rules, and any and all interactive bets may be only accepted through an Interactive Bets Accounting Center (TSUPIS) set up by a credit organization together with a self-regulated association of bookmakers. In 2016 QIWI Bank established a TSUPIS together with one of the self-regulated associations of bookmakers in order to be able to accept such payments. If any of our merchants engaged in the betting business is not able or willing to comply with the Russian betting legislation or if they decide to cease their operations in Russia for regulatory reasons or otherwise, we would have to discontinue servicing them and would lose the associated income. Moreover, if we are found to be in non-compliance with any of the requirements of the applicable legislation, we could not only become subject to fines and other sanctions, but could also have to discontinue to process operations that are deemed to be in breach of the applicable rules and lose associated revenue streams. We may also be subject to reputational risks associated with being involved in the betting business through offering our payments services to betting merchants. Furthermore, we could face similar difficulties in other jurisdiction since online betting is an area of intense focus by regulators in many of the countries in which we operate.

Besides, in July 2016, a bill was signed into law making online services subject to VAT at the location of the customer, which would require any foreign companies selling certain online services in Russia to register as taxpayers in Russia and pay VAT on Russian sales. See "VAT on digital services in Russia" for more details. The new law also requires companies providing settlement services on behalf of the foreign merchants to act as tax agents and withdraw and remit to the tax authorities the applicable VAT. If we are found to have any obligations under this law or not be in compliance with such obligations or if the authorities choose to enforce specific interpretations of the applicable legislation that differ from ours, we could face significant adverse tax consequences. We could also experience a reduction in volumes from our foreign merchants as they cease or downsize their sales to Russia in the light of the new regulation.

In 2016 the Ministry of Finance of the United Arab Emirates announced that it was planning to introduce a value added tax at a rate of 5% with some limited exceptions including basic food items, healthcare and education starting from January 01, 2018. If implemented, it could increase our tax burden and thus reduce our margins.

Changes in our industry are rapid, and new products that we develop may become subject to government regulation undoing the benefits we expect to derive from such products.

13

Table of Contents

In some jurisdictions where we operate, there is currently little or virtually no legislation addressing electronic payments, and no assurance can be made that if such legislation is adopted it will be beneficial to our business. For instance, if a statutory cap is imposed on the fees that can be charged to the consumers using our kiosks and terminals, it could significantly reduce our margins. From time to time, proposals are submitted to the Russian State Duma to cap the amount of such fees.

Subsequent legislation and regulation and interpretations thereof, litigation, court rulings, or other events could expose us to increased costs, liability and reputational damage that could have a material adverse effect on our business, financial condition and results of operations.

***We may not be able to complete or integrate successfully any potential future acquisitions, partnerships or joint ventures.***

From time to time, we have evaluated and expect to continue to evaluate possible acquisition transactions, partnerships or joint ventures on an on-going basis, some of which may be material. At any time, including currently, we may be engaged in discussions or negotiations or diligence evaluations with respect to possible acquisitions, partnerships or joint ventures or may have entered into non-binding documents in relation to such transactions. As part of our strategy, we intend to continue our disciplined approach to identifying, executing and integrating strategic acquisitions.

Potential future acquisitions, partnerships and joint ventures may pose significant risks to our existing operations if they cannot be successfully integrated. These projects would place additional demands on our managerial, operational, financial and other resources, create operational complexity requiring additional personnel and other resources as well as enhanced control procedures. In addition, we may not be able to successfully finance or integrate any businesses, services or technologies that we acquire or with which we form a partnership or joint venture. Furthermore, the integration of any acquisition may divert management's time and resources from our core business and disrupt our operations. Moreover, even if we were successful in integrating newly acquired assets, expected synergies or cost savings may not materialize, resulting in lower than expected benefits to us from such transactions. We may spend time and money on projects that do not increase our revenue. Additionally, when making acquisitions it may not be possible for us to conduct a detailed investigation of the nature of the assets being acquired due to, for instance, time constraints in making the decision and other factors. We may become responsible for additional liabilities or obligations not foreseen at the time of an acquisition. In addition, in connection with any acquisitions, we must comply with various antitrust requirements. It is possible that perceived or actual violations of these requirements could give rise to regulatory enforcement action or result in us not receiving all necessary approvals in order to complete a desired acquisition. To the extent we pay the purchase price of any acquisition in cash, it would reduce our cash reserves, and to the extent the purchase price is paid with our stock, it could be dilutive to our stockholders. To the extent we pay the purchase price with proceeds from the incurrence of debt, it would increase our level of indebtedness and could negatively affect our liquidity and restrict our operations. Our competitors may be willing or able to pay more than us for acquisitions, which may cause us to lose certain acquisitions that we would otherwise desire to complete. All of the above risks could have a material adverse effect on our business, results of operations, financial condition, and prospects.

***We have grown rapidly in recent years and need to implement enhanced compliance processes, procedures and controls with respect to the rules and regulations that apply to our business.***

Our business has grown and developed rapidly in recent years and we are continuing to realign our compliance function with the size of our business. In light of the fact that we are a highly regulated business that processes large volumes of payments, we need to implement enhanced processes, procedures and controls in order to provide reasonable assurance that we are operating in compliance with applicable regulatory requirements. In particular, the Russian anti-money laundering laws to which we are subject contain numerous requirements with respect to identification of clients, and documentation and reporting of transactions subject to mandatory control and other suspicious transactions to the relevant authorities. Following our acquisition of Rapida LTD in 2015, we have had to devote additional resources to enhance the compliance function within Rapida LTD, which, at the time of our acquisition, was deficient in several areas.

Among others, we are subject to the U.S. Foreign Corrupt Practices Act, or the FCPA, which prohibits U.S. companies and their intermediaries from bribing foreign officials for the purpose of obtaining or keeping business or otherwise obtaining favorable treatment, and other laws concerning our international operations. Similar legislation in other jurisdictions contains similar prohibitions, although varying in both scope and jurisdiction. We have implemented policies and procedures and internal controls designed to provide reasonable assurance that we, our employees, distributors and other intermediaries comply with the anti-corruption laws to which we are subject. However, there are inherent limitations to the effectiveness of any policies, procedures and internal controls, including the possibility of human error and the circumvention or overriding of the policies, procedures and internal controls. There can be no assurance that such policies or procedures or internal controls will work effectively at all times or protect us against liability under these or other laws for actions taken by our employees, distributors and other intermediaries with respect to our business or any businesses that we may acquire.

Our success requires significant public confidence in our ability to handle large and growing payment volumes and amounts of consumer funds, as well as comply with applicable regulatory requirements. Any failure to manage consumer funds or to comply with applicable regulatory requirements could result in the imposition of fines, harm our reputation and significantly diminish use of our products. In addition, if we are not in compliance with anti-corruption laws and other laws governing the conduct of business with government entities and/or officials (including local laws), we may be subject to criminal and civil penalties and other remedial measures, which could have an adverse impact on our business, financial condition, results of operations and prospects.

14

Table of Contents

***If we cannot keep pace with rapid developments and change in our industry and provide new services to our clients, or if any of the new products we roll out are unsuccessful, the use of our services could decline, and we could experience a decline in revenue and an inability to recoup costs.***

The payment services industry in which we operate is characterized by rapid technological change, new product and service introductions, evolving industry standards, changing customer needs and the entrance of more established market players seeking to expand into these businesses. In order to remain competitive, we continually seek to expand the services we offer and to develop new projects. These projects carry risks, such as delays in delivery, performance problems and lack of customer acceptance. In our industry, these risks are acute. Any delay in the delivery of new services or the failure to differentiate our services or to accurately predict and address market demand could render our services less desirable, or even obsolete, to consumers. In addition, if alternative payment mechanisms become widely available, substituting our current products and services, and we do not develop and offer similar alternative payment mechanisms successfully and on a timely basis, our business and prospects could be adversely affected. Furthermore, we may be unable to recover the costs we have incurred in developing new services. Our development efforts could result in increased costs and we could also experience a loss in business that could reduce our earnings or could cause a loss of revenue if promised new services are not timely delivered to our clients, are not able to compete effectively with our competitors' or do not perform as anticipated. As we enter markets that are new for us with our new product and services offerings, we face additional operational, regulatory and other risks that we may not be able to adequately address due to our lack of experience with such markets and associated risks.

In late 2016, we launched a payment-by-installments card program under the SOVEST brand. At the moment these cards are issued exclusively by Qiwi Bank. SOVEST cards are not co-branded with any other payment network. SOVEST cards operate as a payment-by-installment cards: consumers can use these cards to make payments to merchants within the card's limit and then top up the balance of the card to repay the funds they used in equal installments or at once. If balance is topped up in a timely manner during the installment period, no interest or fee is charged on the consumer except for an annual subscription fee. We would only charge the consumers if they are late to repay the funds they have used. We believe that such charges would generally be lower than the interest charged on credit cards, and the free use installment period would generally be longer than the grace period offered by credit card issuers. We would receive income from the use of SOVEST cards in the form of fees payable to us by merchants that accept them in return for enabling consumers to receive better access to their products. Therefore, we view these late payment charges as a tool to disincentivize late repayments rather than a source of income for us. SOVEST cards can only be used with merchants that have enrolled in the program and not with any other companies. They also cannot be used to withdraw funds from an ATM. Although we expect the SOVEST program to deliver substantial future growth, there can be no assurance that it will ultimately gain sufficient acceptance with either merchants or consumers to justify our investment and to deliver the growth that we are projecting. We will incur significant costs in connection with its roll-out and operation that are likely to not be offset by associated income at least for a certain period of time. This program will be a cash-intensive project for us in particular since we will have to use our own funds to pay the merchants that our consumers make purchases from with the use of SOVEST cards, and if it does not yield the expected results, it will result in a substantial sunk cost for us. See also "–Our business is exposed to counterparty and credit risks" and "–Our operations may be constrained if we cannot attract or service future debt financing."

We also actively develop other new products, services and technologies. Recently, we launched a company specifically dedicated to R&D work in connection with our blockchain and cryptoprocessing initiatives. If our efforts in connection with any of our R&D initiatives do not pay off as expected, this will result in the loss of our investment both in terms of money and management time, which could adversely affect our profitability.

Additionally, in order to remain competitive in an innovative industry such as ours, we have to make investments in start-up companies or undertake different research and development initiatives. If our investments in start-up companies or research and development initiatives do not yield the expected results, we may lose money, time and effort invested.

If we are unable to develop, adapt to or access technological changes or evolving industry standards on a timely and cost effective basis, or if our new initiatives do not yield the expected results, our business, financial condition and results of operations could be materially adversely affected.

***Our success depends to a large degree on our ability to successfully address the rapidly evolving market for transactions on mobile devices.***

Mobile devices are increasingly used for e-commerce transactions. A significant and growing portion of our customers access our platform through mobile devices. We may lose customers if we are not able to continue to meet our customers' mobile and multi-screen experience expectations. The variety of technical and other configurations across different mobile devices and platforms increases the challenges associated with this environment. In addition, a number of other companies with significant resources and a number of innovative startups have introduced products and services focusing on mobile markets. Our ability to successfully address the challenges posed by the rapidly evolving market for mobile transactions is crucial to our continued success, and any failure to continuously increase the volume of mobile transactions effected through our platform could have a material adverse effect on our business, financial condition and results of operations.

***Our systems and our third party providers' systems may fail due to factors beyond our control, which could interrupt our service, cause us to lose business and increase our costs.***

We depend on the efficient and uninterrupted operation of numerous systems, including our computer systems, software and telecommunications networks, as well as the data centers that we lease from third parties. Our systems and operations, or those of our third party providers, could be exposed to damage or interruption from, among other things, fire, flood, natural disaster, power loss, telecommunications failure, vendor failure, unauthorized entry, improper operation and computer viruses. In addition, because both of our data centers used for processing payments are located in the city of Moscow, a catastrophic event affecting the city of Moscow may result in the loss of both data

15

Table of Contents

centers. Substantial property and equipment loss, and disruption in operations as well as any defects in our systems or those of third parties or other difficulties could expose us to liability and materially adversely impact our business, financial condition and results of operations. In addition, any outage or disruptive efforts could adversely impact our reputation, brand and future prospects.

### *Unauthorized disclosure of data, whether through cybersecurity breaches, computer viruses or otherwise, could expose us to direct loss, liability, protracted and costly litigation and damage our reputation.*

We store and/or transmit sensitive data, such as credit or debit card numbers, mobile phone numbers and other identification data, and we have ultimate liability to our consumers for our failure to protect this data. We have experienced breaches of our security by hackers in the past, and breaches could occur in the future. In such circumstances, our encryption of data and other protective measures have not prevented unauthorized access and may not be sufficient to prevent future unauthorized access. For example, in January 2014 we discovered unauthorized activity in 687 of our accounts which were inappropriately credited, and the improperly credited funds were subsequently withdrawn. Although we do not believe that any confidential customer account data was compromised as a result of the activity, we incurred a loss of RUB 88 million. Rapida LTD also experienced several security breaches prior to our acquisition of the company. Any future breach of our system, including through employee fraud, may subject us to material losses or liability, including fines and claims for unauthorized purchases with misappropriated credit or debit card information, identity theft, impersonation or other similar fraud claims. A misuse of such data or a cybersecurity breach could harm our reputation and deter clients from using electronic payments as well as kiosks and terminals generally and our services specifically, increase our operating expenses in order to correct the breaches or failures, expose us to uninsured liability, increase our risk of regulatory scrutiny, subject us to lawsuits, result in the imposition of material penalties and fines by state authorities and otherwise materially adversely affect our business, financial condition and results of operations.

### *If we fail to comply with the applicable requirements of our agreements with Visa Inc., Visa could seek to fine us, suspend us or terminate our registrations.*

Under our agreements with Visa, we are required to comply with both the terms of those agreements and the terms of Visa Core Rules and Visa Product and Service Rules. If we do not comply with the terms of the agreements or the rules, Visa could seek to fine us, suspend us or terminate the registrations that allow us to process transactions on its network. In addition, under our agreements with Visa, Visa is entitled to terminate the agreements in case of a material breach by us or if it determines the agreements are contrary to its interests. If we are in breach of the agreements or Visa otherwise terminates its agreements with us, we may be unable to issue Visa-branded cards, which could have a material adverse effect on our business. The termination of our registration, or any changes in the payment network rules that would impair our registration, could prevent us from issuing Visa-branded cards, thereby reducing the number of transactions made through Visa Qiwi Wallet. Any of these factors could have a material adverse effect on our reputation, as well as on our business, financial condition and results of operations.

### *The cost to us of consumers reloading their Visa Qiwi Wallet accounts and other products may increase.*

We make available to our consumers a large variety of methods to reload the Visa Qiwi Wallet accounts and SOVEST cards, including, among others, mobile phone balances, bank cards, kiosks and terminals and ATMs. The top up methods have different cost implications for us. For example, on payments made through the kiosks and terminals owned by our agents, we historically paid lower fees for reloading the Visa Qiwi Wallet than on payments made from bank cards as well as certain other channels. We currently do not attempt to direct consumer preferences towards particular reload methods. If their preferences are for other reload methods that come at a higher cost to us, our margins could be adversely affected, which could have a material adverse effect on our business, financial condition and results of operations.

### *Qiwi Bank, Rapida LTD and other Russian banks and credit organizations operate in a highly regulated environment and increased regulatory scrutiny could have an adverse effect on our business, financial condition and results of operations.*

In September 2010, we acquired Qiwi Bank from certain of our shareholders. Qiwi Bank provides issuing, acquiring and deposit settlement functions within our group as well as serves as the issuing bank for our payment-by-installment card product under the brand SOVEST.

In June 2015 we acquired Rapida LTD from Otkritie Investment Cyprus Limited, or Otkritie. Rapida LTD is a non-banking credit organization and operates payment processing and money transfer settlements within the group. In January 2017 Rapida LTD began the process of merger into Qiwi Bank.

All banks and non-banking credit organizations operating in Russia are subject to extensive regulation and supervision. Requirements imposed by regulators, including capital adequacy, liquidity reserves, prudential ratios, loss provisions and other regulatory requirements are designed to ensure the integrity of the financial markets and to protect consumers and other third parties with whom a bank deals. These regulations may limit our activities, and may increase our costs of doing business, or require us to seek additional capital in order to comply with applicable capital adequacy or liquidity requirements. Existing laws and regulations could be amended, the manner in which laws and regulations are enforced or interpreted could change and new laws or regulations could be adopted.

In April 2015 we have received order from the CBR prescribing QIWI Bank to comply with applicable electronic payments thresholds requirements in connection with electronic money transfers and the topping up of electronic accounts. We requested certain clarifications from the CBR, for which we are still awaiting a reply. In 2015 the CBR revealed certain violations by Rapida LTD of the applicable Russian legislation, including breaches of anti-money laundering legislation. As a result, a range of restrictions were imposed on its operations that have been removed due to full rectification of the violations as of the date of this annual report. After the acquisition, we implemented additional compliance and internal control procedures in Rapida LTD aimed to rectify the detected violations and to prevent them in future. However, there can be no assurance that such measures will be sufficient.

16

**Table of Contents**

In July 2016 the CBR completed an audit of Qiwi Bank and discovered a number of deficiencies in its compliance with certain banking regulations in relation to, among other things, reporting requirements, cybersecurity and using of special accounts of payment agents and bank payment agents. The CBR issued an order to Qiwi Bank to rectify discovered violations, and Qiwi Bank is undertaking measures to implement the CBR's recommendations, which is still ongoing as of the date of this annual report.

There can be no assurance that similar inspections in the future or increased scrutiny by the CBR will not result in discovery of more significant violations of various banking regulations, or what sanctions the CBR would choose to employ against us if this were to happen. Moreover, such scrutiny can be expected to increase following our launch of SOVEST as it brings us into the consumer lending territory that is an area of intense focus by the regulators. Any breach of applicable regulations could expose us to potential liability, including in extreme instances the revocation of our banking license. Revocation of any of our banking licenses would significantly hinder our ability to process payments, and would result in a decrease of our profitability, damage our reputation and could cause other regulators to increase their scrutiny of our activities. Furthermore, under our arrangements with Visa, Qiwi Bank represents, among other things, that it is in good standing and has been granted all necessary authorizations from applicable governmental and regulatory authorities to operate a Visa card program. If any of Qiwi Bank's licenses are revoked or it loses its authorization to operate a Visa card program, Qiwi Bank will not be able to sustain the same level of operation under Visa card program. As a result of such breach Visa could terminate its agreements with us. For these reasons, any breach of laws and regulations by Qiwi Bank or the revocation of its banking licenses would have a material adverse effect on our business, financial condition and results of operations.

In recent years, the CBR has considerably increased the intensity of its supervision and regulation of the Russian banking sector. Historically, the revocation of banking licenses by the CBR has been a relatively rare event mostly occurring to local banks with little assets and little or no significance for the banking sector as a whole. Starting October 2013, however, the CBR has launched a campaign aimed at cleansing the Russian banking industry, revoking the licenses from an unusually high number of banks (including significant banks such as Master-Bank, Investbank, ProBusinessBank, Svyaznoy Bank, Vneshprombank, Tatfondbank and others) on allegations of money laundering, financial statements manipulation and other illegal activities, as well as inability of certain banks to discharge their financial obligations. These measures resulted in turmoil in the banking industry, instigated bank runs on a number of Russian credit institutions, and severely undermined the trust that the Russian population had with private banks. In addition to putting increasing regulatory pressure on Qiwi Bank and Rapida LTD, this change in policy by the CBR has also impacted, and we expect may continue to impact, our business in a number of other ways, including reduced spending by the banks on advertising, a decrease in consumer lending, resulting in less loan repayments through our network and therefore reduced fees as well as a decrease of the Contact's network of partner banks through which it operates and corresponding decline in the reach of its network and thus money remittance volumes. As a result of a general decrease in banking activity, among other factors, Russia may continue to experience less robust consumer spending, which could also result in the reduction of our payment processing fees. In addition, these factors could further tighten liquidity on the Russian market and add pressure onto the ruble. All of these factors could materially and adversely affect our business, financial condition and results of operations.

***Customer complaints or negative publicity about our customer service could affect attractiveness of our services adversely and, as a result, could have an adverse effect on our business, financial condition and results of operations.***

Customer complaints or negative publicity about our customer service could diminish consumer confidence in, and the attractiveness of, our services. Breaches of our consumers' privacy and our security systems could have the same effect. We sometimes take measures to combat risks of fraud and breaches of privacy and security, such as freezing consumer funds, which could damage relations with our consumers. These measures heighten the need for prompt and attentive customer service to resolve irregularities and disputes. In addition, we have previously received negative media coverage regarding customer disputes. Effective customer service requires significant personnel expense, and this expense, if not managed properly, could impact our profitability significantly. Any inability by us to manage or train our customer service representatives properly could compromise our ability to handle customer complaints effectively. If we do not handle customer complaints effectively, our reputation may suffer and we may lose our customers' confidence, which could have a material adverse effect on our business, financial condition and results of operations.

***Our agreements with our agents and our merchants do not include exclusivity clauses and may be terminated unilaterally at any time or at short notice.***

We normally do not include exclusivity clauses in our agreements with agents or merchants. Accordingly, our merchants and agents do not have any restrictions on dealings with other providers and can switch from our payment processing system to another without significant investment. Additionally, due to mandatory provisions of Russian civil law, our agreements with agents may be unilaterally terminated by the agents at any time, and our agreements with merchants may be unilaterally terminated by the merchants upon one month's prior notice. The termination of our contracts with existing agents or merchants or a significant decline in the amount of business we do with them as a result of our contracts not having exclusivity clauses could have a material adverse effect on our business, financial condition and results of operations.

***Our payment system has been and may continue to be used for fraudulent, illegal or improper purposes, which could expose us to additional liability and harm our business.***

Despite measures we have taken and continue to take, our payment system has been and may continue to be used for fraudulent, illegal or improper purposes. These include use of our payment services in connection with fraudulent sales of goods or services, illicit sales of prescription medications or controlled substances, illegal online gambling, software and other intellectual property piracy, money laundering, bank fraud, terrorist financing, trafficking, and prohibited sales of restricted products.

17

Table of Contents

Criminals are using increasingly sophisticated methods to engage in illegal activities. It is possible that fraudulent, illegal or improper use of our payment system could increase in the future. Our risk management policies and procedures may not be fully effective to identify, monitor and manage these risks. We are not able to monitor in each case the sources for our counterparties' funds or the ways in which they use them. Increases in chargebacks or other liability could have a material adverse effect on our business, financial condition and results of operations. An increase in fraudulent transactions or publicity regarding chargeback disputes could harm our reputation and reduce consumer confidence in the use of our kiosks, terminals, virtual wallets and other products. In addition, changes in law have increased the penalties for intermediaries providing payment services for certain illegal activities and additional payments-related proposals are under active consideration by government authorities. Moreover, the perceived risk of the use of e-payments to finance fraudulent, illegal or improper activities is causing the regulators to impose restrictions on the payment systems' operations that negatively affect regular compliant transactions as well.

Any resulting claims could damage our reputation and any resulting liabilities (including the revocation of applicable banking licenses or significant fines), the loss of transaction volume or increased costs could have a material adverse effect on our business, financial condition and results of operations.

### Our business is exposed to counterparty and credit risks.

We seek to sell services on a prepayment basis or to ensure that our counterparties have low credit risk profiles, such as large merchants and agents. Nevertheless, we are exposed to the risk of non-payment or other default under our contracts with our agents and merchants. If we provide trade credit or loans to an agent and we are unable to collect loans or proceeds paid to the agent by its consumers due to the agent's insolvency, fraud or otherwise, we must nonetheless complete the payment to the merchant on behalf of the consumer. As a result, our losses would not be limited to a loss of revenue in the form of fees due to us from the agent, but could amount to the entire amount of consumer payments accepted by such agent for a certain period of time.

We also have significant receivables due from some of our merchants and agents, and may not recover these receivables in the event of such merchants' bankruptcy or otherwise. As of December 31, 2016, we had credit exposure to our agents of RUB 2,998 million and to our merchants of RUB 2,470 million. Our receivables from merchants are generally unsecured and non-interest bearing, our receivables and loans from agents are generally interest-bearing and unsecured. Although we monitor the creditworthiness of our counterparties on an ongoing basis, there can be no assurance that the models and approaches we use to assess and monitor their creditworthiness will be sufficiently predictive, and we may be unable to detect and take steps to timely mitigate an increased credit risk.

In connection with our SOVEST installment card program, we are also subject to risks related to the credit quality of loans to our cardholders who have outstanding payments on SOVEST cards. Changes in the creditworthiness of our customers, or in their behavior, or arising from macroeconomic risks in the Russian or global financial systems, could result in losses for us and in us having to make provisions for impairment of related receivables. In recent years, Russia has experienced an increase in non-performing retail loans, and many of the banks that have been particularly active in this sector have faced difficulties. See also "–We are subject to the economic risk and business cycles of our merchants and agents and the overall level of consumer spending" and "–The banking system in Russia remains underdeveloped." While we have credit policies in place to manage this risk, the techniques and checks used by us to evaluate the creditworthiness of applicants for the SOVEST cards (many of whom are expected to have little or no credit history) may not always present a complete and accurate picture of each consumer's financial condition or be able to accurately evaluate the impact of various changes, including changes in the Russian macroeconomic situation, which could significantly and quickly alter a consumer's financial condition. We have little experience addressing such risks as we have not been active in the consumer lending market before. Part of the anticipated appeal of the SOVEST program is its availability to people who would not fall within the normal target groups of regular banks, including consumers with limited or no credit histories. We plan to manage such risk by restricting the card limits available to such individuals; however, due to our lack of relevant experience, our projections may prove incorrect. Additionally, we cannot always accurately ascertain what the current indebtedness of any particular current or potential customer may be as the credit bureau databases in Russia are still in a developmental stage. Additionally, we have no way of preventing our customers from taking additional loans from other financial institutions or otherwise taking steps that heighten the risk that a customer may default on their SOVEST payments. As a result, we may not always be able to correctly evaluate the current financial condition of each prospective customer and accurately determine the ability of our customers to pay us back the funds they have used. In addition, we do not plan to take any security for payments outstanding under the SOVEST cards. As a result, in the event of defaults by a significant number of our consumers, we may be unable to recover all or a significant proportion of the balance of such outstanding amounts.

If we experience material defaults by our consumers, agents and/or merchants, our business, financial condition and results of operations could be materially adversely affected.

### We are subject to fluctuations in currency exchange rates.

We are exposed to currency risks. Our financial statements are expressed in Russian rubles, while our revenues and expenses outside Russia are in local currencies and some of our assets and liabilities are in foreign currencies (predominantly cash from offering proceeds denominated in U.S. dollars, for details see "—Quantitative and Qualitative Disclosures About Market Risk – Foreign Exchange Risk"). Accordingly, our results of operations and assets and liabilities are exposed to fluctuations in exchange rates between the ruble and such other currencies. Changes in currency exchange rates also affect the carrying value of assets on our consolidated statement of financial position, which, depending on the statement of financial position classification of the relevant asset, can result in losses on our consolidated statement of financial position. In addition, because our earnings are primarily denominated in Russian rubles whereas our ADSs are quoted in U.S. dollar, currency exchange rate fluctuations between the Russian ruble and the U.S. dollar significantly affect the price of our ADSs.

18

Table of Contents

Over the past ten years, the Russian ruble has fluctuated dramatically against the U.S. dollar and the euro. Due to the economic sanctions imposed on certain Russian companies and individuals by the US, EU, Canada and other countries, as well as the volatility in oil prices, high inflation and a sharp capital outflow from Russia, the Russian ruble has significantly depreciated against the U.S. dollar and euro since the beginning of 2014. According to the CBR, from December 31, 2014 to December 31, 2015 and from December 31, 2013 to December 31, 2014, the ruble has depreciated by 30% and 72% against the U.S. dollar, respectively, and by 17% and 52% against the euro, respectively. From December 31, 2015 to December 31, 2016, the ruble appreciated somewhat against these currencies, but no assurance can be given that significant fluctuations will not occur in the future. Further fluctuations of the ruble could have a material adverse effect on our business, financial condition, results of operations and the price of our ADSs.

***Regulatory authorities in Russia and Kazakhstan could determine that we hold a dominant position in our markets, and could impose limitations on our operational flexibility, which may adversely affect our business, financial condition and results of operations.***

The Russian anti-monopoly authorities impose various requirements on companies that occupy a dominant position in their markets. One of the important questions is to identify and define the relevant market, in which the entity in question operates. There are numerous aspects to be taken into account, including interchangeability or substitutability of the products and/or services for the consumer, their pricing and intended use. Different approaches may be applied in this respect by anti-monopoly authorities and the participants of the market. Thus, the state authorities may conclude that we hold a dominant position in one or more of the markets in which we operate. If they were to do so, this could result in limitations on our future acquisitions and a requirement that we pre-clear with the authorities any changes to our standard agreements with merchants and agents, as well as any specially negotiated agreements with business partners. In addition, if we were to decline to conclude a contract with a third party this could, in certain circumstances, be regarded as abuse of a dominant market position. Any abuse of a dominant market position could lead to administrative penalties and the imposition of a fine of up to 15% of our annual revenue for the previous year. In addition, in April 2012 the Competition Protection Agency of the Republic of Kazakhstan, or the Competition Protection Agency, included our subsidiary in Kazakhstan in the state register of market participants with dominant or monopoly position in Kazakhstan. We have subsequently been taken off this register due to changes in Kazakh law; however, there can be no assurance that we will not be deemed to hold a substantial market share in Kazakhstan going forward and therefore could become target of antimonopoly action or related operating restrictions in certain jurisdiction in which we operate. These limitations if imposed may reduce our operational and commercial flexibility and responsiveness, which may adversely affect our business, financial condition and results of operations.

***We may not be able to successfully protect our intellectual property and may be subject to infringement claims.***

We rely on a combination of contractual rights, copyright, trademark and trade secret laws to establish and protect our proprietary technology. We also maintain patents for certain of our technologies. We customarily require our employees and independent contractors to execute confidentiality agreements or otherwise to agree to keep our proprietary information confidential when their relationship with us begins. Typically, our employment contracts also include clauses requiring our employees to assign to us all of the inventions and intellectual property rights they develop in the course of their employment and to agree not to disclose our confidential information. Nevertheless, others, including our competitors, may independently develop similar technology, duplicate our services or design around our intellectual property. Further, contractual arrangements may not prevent unauthorized disclosure of our confidential information or ensure an adequate remedy in the event of any unauthorized disclosure of our confidential information. Because of the limited protection and enforcement of intellectual property rights in certain jurisdictions in which we operate, such as Russia and Kazakhstan, Moldova, Romania and Belarus, our intellectual property rights may not be as protected as they may be in more developed markets such as the United States. We may have to litigate to enforce or determine the scope or enforceability of our intellectual property rights (including trade secrets and know-how), which could be expensive, could cause a diversion of resources and may not prove successful. The loss of intellectual property protection could harm our business and ability to compete and could result in costly redesign efforts, discontinuance of certain service offerings or other competitive harm. Additionally, we do not hold any patents for our business model or our business processes, in part because our ability to obtain them in Russia is subject to legislative constraints, and we do not currently intend to obtain any such patents in Russia or elsewhere.

We may also be subject to costly litigation in the event our services or technology are claimed to infringe, misappropriate or otherwise violate a third party's intellectual property or proprietary rights. Such claims could include patent infringement, copyright infringement, trademark infringement, trade secret misappropriation or breach of licenses. In addition, while we seek to obtain copyright registration certificates for the critical software we develop, our rights to software obtained as works for hire might be potentially challenged by the employees and former employees or developers of such software. We may not be able to successfully defend against such claims, which may result in a limitation on our ability to use the intellectual property subject to these claims and also might require us to redesign affected services, enter into costly settlement or license agreements, pay costly damage awards, or face a temporary or permanent injunction prohibiting us from marketing or selling certain of our services. In such circumstances, if we cannot or do not license the infringed technology on reasonable terms or substitute similar technology from another source, our revenue and earnings could be adversely impacted. Additionally, in recent years, non-practicing entities have been acquiring patents, making claims of patent infringement and attempting to extract settlements from companies in our industry. Even if we believe that such claims are without merit and successfully defend these claims, defending against such claims is time consuming and expensive and could result in the diversion of the time and attention of our management and employees.

19

Table of Contents

*We may use open source software in a manner that could be harmful to our business.*

We use open source software in connection with our technology and services. The original developers of the open source code provide no warranties on such code. Moreover, some open source software licenses require users who distribute open source software as part of their software to publicly disclose all or part of the source code to such software and/or make available any derivative works of the open source code on unfavorable terms or at no cost. The use of such open source code may ultimately require us to replace certain code used in our products, pay a royalty to use some open source code or discontinue certain products. Any of the above requirements could be harmful to our business, financial condition and operations.

*We do not have and may be unable to obtain sufficient insurance to protect ourselves from business risks.*

The insurance industry in Russia is not yet fully developed, and many forms of insurance protection common in more developed countries are not yet fully available or are not available on comparable or commercially acceptable terms. Accordingly, while we hold certain mandatory types of insurance policies in Russia, we do not currently maintain insurance coverage for business interruption, property damage or loss of key management personnel as we have been unable to obtain these on commercially acceptable terms. We do not hold insurance policies to cover for any losses resulting from counterparty and credit risks or fraudulent transactions. We also do not generally maintain separate funds or otherwise set aside reserves for most types of business-related risks. Accordingly, our lack of insurance coverage or reserves with respect to business-related risks may expose us to substantial losses, which could materially adversely affect our business, financial condition and results of operations.

*In a dynamic industry like ours, the ability to attract, recruit, retain and develop qualified personnel is critical to our success and growth.*

Our business functions at the intersection of rapidly changing technological, social, economic and regulatory developments that require a wide ranging set of expertise and intellectual capital. In order for us to compete and grow successfully, we must attract, recruit, retain and develop the necessary personnel who can provide the needed expertise across the entire spectrum of our intellectual capital needs. This is particularly true with respect to qualified and experienced software engineers and IT staff, who are highly sought after and are not in sufficient supply in Russia and in most other markets in which we operate. The market for such personnel is highly competitive, and we may not succeed in recruiting additional personnel or may fail to replace effectively current personnel who depart with qualified or effective successors. Our efforts to retain and develop personnel may result in significant additional expenses, which could adversely affect our profitability. We cannot assure you that we will be able to attract and retain qualified personnel in the future. Failure to retain or attract key personnel could have a material adverse effect on our business, financial condition and results of operations.

*Our operations may be constrained if we cannot attract or service future debt financing.*

We may incur debt financing to finance the development of the SOVEST installment card program, and our operations and growth may be constrained if we cannot do so on favorable terms or at all. Our debt capacity depends upon our ability to maintain our operating performance at a certain level, which is subject to general economic and market conditions and to financial, business and other factors, many of which are outside of our control. If our cash flow from operating activities is insufficient to service our debt, we could be forced to take certain actions, including delaying or reducing capital or other expenditures or other actions, to restructure or refinance our debt; selling or mortgaging our assets or operations; or raising additional equity capital, which we might not be able to do on favorable terms, in a timely manner or at all. Furthermore, such actions might not be sufficient to allow us to service our debt obligations in full and, in any event, could have a material adverse effect on our business, financial condition, and results of operations. Moreover, our inability to service our debt through internally generated cash flow or other sources of liquidity could put us in default of our obligations to creditors, which could trigger various default provisions under our financings, which could have a material adverse effect on our business, financial condition, and results of operations.

**Risks Relating to Corporate Governance Matters and Organizational Structure**

*The substantial share ownership position of our chief executive officer Sergey Solonin may limit your ability to influence corporate matters.*

Our chief executive officer Sergey Solonin, through Saldivar Investments Limited, beneficially owns 76.5 % of our class A shares, representing approximately 59.3 % of the voting power of our issued share capital. As a result of this concentration of share ownership, Mr. Solonin has sole discretion over any matters submitted to our shareholders for approval that require a simple majority vote and has significant voting power on all matters submitted to our shareholders for approval that require a qualified majority vote, including the power to veto them. Our articles of association require the approval of no less than 75% of present and voting shareholders for matters such as amendments to the constitutional documents of our company, dissolution or liquidation of our company, reducing the share capital, buying back shares and approving the total number of shares and classes of shares to be reserved for issuance under any employee stock option plan or any other equity-based incentive compensation program of our group. Matters requiring a simple majority shareholder vote include, among other matters, increasing our authorized capital, removing a director, approving the annual audited accounts and appointing auditors.

This concentration of ownership could delay, deter or prevent a change of control or other business combination that might otherwise give you the opportunity to realize a premium over then-prevailing market price of our shares. The interests of Mr. Solonin may not always coincide with the interests of our other shareholders. This concentration of ownership may also adversely affect the price of our ADSs.

*Our ADS holders have limited rights in relation to the appointment of our directors, including our independent directors.*

Other than in certain limited cases provided for in our articles of association, our directors are elected by shareholder weighted voting, sometimes referred to as cumulative voting, under which each shareholder has the right to cast as many votes as the voting rights attached to its shares multiplied by a number equal to the number of board seats to be filled by shareholders. As a result, our class A shareholders will have the ability to appoint, through the weighted voting set forth in our articles of association, at least a majority of the board of directors for the foreseeable future. The interests of our directors may therefore not be aligned with or be in the best interests of the holders of our ADSs.

20

Table of Contents

***The rights of our shareholders are governed by Cyprus law and our articles of association, and differ in some important respects from the typical rights of shareholders under U.S. state laws.***

Our corporate affairs are governed by our articles of association and by the laws governing companies incorporated in Cyprus. The rights of our shareholders and the responsibilities of members of our board of directors under Cyprus law and our articles of association are different than under the laws of some U.S. state laws. For example, by law existing holders of shares in a Cypriot public company are entitled to pre-emptive rights on the issue of new shares in that company (provided such shares are paid in cash and the pre-emption rights have not been disapplied). In addition, our articles of association include other provisions, which differ from provisions typically included in the governing documents of most companies organized in the U.S.:

- our board of directors can only take certain actions by means of a supermajority vote of 75% of its members, including approving our annual budget and business plan, disposing of our interest in a subsidiary if such disposal results in a change of control over such subsidiary, issuing shares for consideration other than cash and other actions;

- our shareholders are able to convene an extraordinary general meeting; and

- if our board of directors exercises its right to appoint a director to fill a vacancy on the board created during the term of a director's appointment, shareholders holding 10.01% of the voting rights of the company may terminate the appointment of all of the directors and initiate reelection of the entire board of directors.

As a result of the differences described above, our shareholders may have rights different to those generally available to shareholders of companies organized under U.S. state laws and our board of directors may find it more difficult to approve certain actions.

***Acquisitions of Russian entities are subject to pre-closing approval by multiple government authorities which exercise significant discretion as to whether a consent should be granted or not, and are regulated by a significant body of law which is often ambiguous and open to varying interpretations.***

Due to our ownership of Qiwi Bank and Rapida LTD, any transactions resulting in the acquisition of more than 50% of our voting power or the right to otherwise direct our business activities would become subject to preliminary approval by the CBR. In addition, any acquisition of more than 50% of our voting power may also be subject to a preliminary approval by the Russian Federal Antimonopoly Service, or the FAS. Furthermore, Qiwi Bank and Rapida LTD hold encryption licenses which are necessary to conduct their operations, and by virtue of this may be deemed to be "strategic enterprises" for the purposes of the Federal Law of the Russian Federation No. 57-FZ "On the Procedure for Foreign Investments in Enterprises which are Strategically Important for the State Defense and National Security", dated April 29, 2008, as amended. In this case, any acquisition of control over our company would require an approval of a specialized government commission, which is a relatively lengthy process that typically takes between three and six months in practice. See "Regulation—Regulation of Strategic Investments." These regulatory approval requirements may have the effect of making a takeover of our company more difficult or less attractive, and may prevent or delay a change of control, which could have a negative impact on the liquidity of, and investor interest in, our ADSs.

Additionally, under Russian law, the depositary may be treated as the owner of the class B shares underlying the ADSs, and therefore, could be deemed a beneficial shareholder of Qiwi Bank and Rapida LTD. This is different from the way other jurisdictions treat ADSs. As a result, the depositary may be subject to the approval requirements of the CBR, the FAS and the government commission described above in the event an amount of our shares representing over 50% of our voting power is deposited in the ADS program. Accordingly, our ADS program may be subject to an effective limit of 50% of our voting power, unless the depositary obtains FAS, CBR and potentially additional government commission approvals to increase its ownership in excess of 50% of our voting power. This could limit our ability to raise capital in the future and the ability of our existing shareholders to sell their ADSs in the public markets, which in turn may impact the liquidity of share capital.

***The quota imposed on foreign ownership of Russian banks may make a takeover of our company by a foreign purchaser impossible.***

Under current Russian law, the Russian government is entitled, upon consultation with the CBR, to propose legislation imposing a quota on foreign ownership in the Russian banking industry, covering both Russian branches of international banks and foreign participation in the charter capital of Russian banks, such as Qiwi Bank. In December 2015, a 50% quota on foreign ownership was introduced, subject to certain exemptions. If such quota is exceeded, a takeover of our company by a foreign purchaser may become impossible, which could limit, prevent or delay a change of control of our company and in turn could negatively impact the liquidity of our ADSs.

***As a foreign private issuer whose ADSs are listed on Nasdaq, we have elected to follow certain home country corporate governance practices instead of certain Nasdaq requirements.***

As a foreign private issuer whose ADSs are listed on Nasdaq, we are permitted in certain cases to, and do, follow Cyprus corporate governance practices instead of the corresponding requirements of Nasdaq. A foreign private issuer that elects to follow a home country practice instead of Nasdaq requirements must submit to Nasdaq in advance a written statement from an independent counsel in such issuer's home country certifying that the issuer's practices are not prohibited by the home country's laws. In addition, a foreign private issuer must disclose in its annual reports filed with the Securities and Exchange Commission any significant requirement that it does not follow and describe the home country practice followed instead of any such requirement. We follow Cyprus corporate governance practices with regard to the composition of our board

21

Table of Contents

of directors which, unlike the applicable Nasdaq rule for U.S. corporations, do not require that a majority of our directors be independent. As a result, although currently four out of seven directors on our board are independent, we cannot assure you that our board of directors will always have a majority of independent directors in the future. We also do not have a compensation committee or a nominating committee comprised entirely of independent directors, and our independent directors do not meet in regular executive sessions. In addition, our board of directors has not made any determination whether it will comply with certain Nasdaq rules concerning shareholder approval prior to our taking certain company actions, including the issuance of 20% or more of our then-outstanding share capital or voting power in connection with an acquisition, and our board of directors, in such circumstances, may instead determine to follow Cypriot law. Accordingly, our shareholders may not be afforded the same protection as provided under Nasdaq corporate governance rules.

***Our ADS holders may not have the same voting rights as the holders of our class A shares and class B shares and may not receive voting materials in time to be able to exercise their right to vote. Our ADS holders' right to receive certain distributions may be limited in certain respects by the deposit agreement.***

Except as set forth in the deposit agreement, holders of our ADSs are not able to exercise voting rights attaching to the class B shares represented by our ADSs on an individual basis. Holders of our ADSs have to appoint the depositary or its nominee as their representative to exercise the voting rights attaching to the class B shares represented by the ADSs. Upon receipt of voting instructions from an ADS holder, the depositary will vote the underlying class B shares in accordance with these instructions. Pursuant to our articles of association, we may convene an annual shareholders' meeting or a shareholders' meeting called for approval of matters requiring a 75% shareholder vote upon at least 45 days' notice and upon at least 30 days' notice for all other shareholders' meetings. If we give timely notice to the depositary under the terms of the deposit agreement, the depositary will notify you of the upcoming vote and arrange to deliver our voting materials to you. We cannot assure our ADS holders that they will receive the voting materials in time to instruct the depositary to vote the class B shares underlying their ADSs, and it is possible that our ADS holders, or persons who hold their ADSs through brokers, dealers or other third parties, will not have the opportunity to exercise a right to vote. In addition, the depositary and its agents are not responsible for failing to carry out voting instructions or for the manner of carrying out voting instructions. This means that our ADS holders may not be able to exercise their right to vote and there may be nothing such holders can do if the class B shares underlying your ADSs are not voted as requested. In addition, although our ADS holders may directly exercise their right to vote by withdrawing the class B shares underlying their ADSs, they may not receive sufficient advance notice of an upcoming shareholders' meeting to withdraw the class B shares underlying their ADSs to allow them to vote with respect to any specific matter. Furthermore, under the deposit agreement, the depositary has the right to restrict distributions to holders of the ADSs in the event that it is unlawful or impractical to make such distributions. We have no obligation to take any action to permit distributions to holders of our ADSs. As a result, holders of ADSs may not receive distributions made by us.

**Risks Relating to the Russian Federation and Other Markets in Which We Operate**

***Emerging markets, such as Russia and Kazakhstan, are subject to greater risks than more developed markets, including significant legal, economic and political risks.***

Investors in emerging markets, such as Russia and Kazakhstan, should be aware that these markets are subject to greater risk than more developed markets, including in some cases significant legal, economic and political risks. Investors should also note that emerging economies are subject to rapid change and that the information set out herein may become outdated relatively quickly. Accordingly, investors should exercise particular care in evaluating the risks involved and must decide for themselves whether, in light of those risks, their investment is appropriate. Generally, investment in emerging markets is only suitable for sophisticated investors who fully appreciate the significance of the risks involved, and investors are urged to consult with their own legal and financial advisors before making an investment in our ADSs.

***The situation in Ukraine and the U.S., EU and other sanctions that have been imposed could adversely impact our operations and financial condition.***

The Ukraine crisis, which started in late 2013 and remains unresolved, has brought Russian relations with the West to a post-Cold War low point. Western countries protested when Crimea (which had been part of Ukraine since 1954) entered into the Russian Federation in March 2014 and have complained that Russia is fomenting civil insurrection in east Ukraine.

In response to the Ukraine crisis, Ukraine, the European Union and the United States (as well as other countries such as Norway, Canada and Australia) have passed a variety of economic sanctions against Russia. One form these sanctions have taken is to identify certain persons as 'designated nationals' with the basic practical consequences that U.S. persons cannot do business with them while EU persons cannot provide funds or other economic resources to them, their assets in the EU and United States are subject to seizure and in the case of individuals they can be subject to travel bans. A number of Russian government officials, businessmen, banks and companies have been so designated. Another form these sanctions have taken, with greater consequence for the Russian economy, is 'sectoral' sanctions with the basic consequence that several of Russia's leading banks – including Gazprombank, Vnesheconombank, Bank of Moscow, Russian Agricultural Bank, VTB Bank, and Sberbank – cannot access Western capital (as EU and U.S. persons are prohibited from extending them debt financing in excess of 30 days or dealing in their new equity issuances and providing related services); similar sectoral sanctions have been applied against several prominent Russian oil and gas and defense companies. Other Western sanctions have been imposed in respect of, among other things, Russian military defense entities, dual use technologies, sophisticated off-shore oil drilling technologies and doing business in Crimea.

In November 2016, the National Bank of Ukraine has banned several Russian payment systems from the Ukrainian market, including ours. So far this measure has not had a significant impact on our business; however, there can't be any assurance that it will not do so in the future, or other countries will not introduce similar measures. While other current sanctions do not target us or the payments industry more generally, these sanctions have had and may continue to have the effect of damaging the Russian economy by, among other things, accelerating capital flight

22

Table of Contents

from Russia, weakening of the Russian ruble, exacerbating the negative investor sentiment towards Russia and making it harder for Russian companies to access international financial markets for debt and equity financing. In addition, a number of Western businesses have curtailed or suspended activities in Russia or dealings with Russian counterparts for reputational reasons even though currently neither such activities nor dealings with their relevant Russian counterparts were proscribed by the sanctions. An expansion of the existing or introduction of new sanctions, including those mentioned above, or sanctions specifically targeting us or our management or shareholders, or our sector generally, could result in our international customers, suppliers, shareholders and other business partners revising their relationship with us for compliance, political, reputational or other reasons, which could affect our business.

As a response to the Western sanctions, since 2015, all Russian domestic transactions with the use of cards issued under international brands, such as Visa and MasterCard, have been processed through the facilities of the Russian national payment card system rather than the international payment systems' own facilities pursuant to legislation that came into effect in 2014 in response to international payment systems shutting off Russian banks that became targets of Western sanctions. While both Visa and MasterCard are continuing to operate in Russia within the framework of the new legislation, there can be no assurance how situation will further develop. If further adverse legislative changes are implemented and Visa ceases to operate in Russia, we may be unable to issue Visa-branded cards. This could lower consumer confidence with our products and could reduce the number of transactions made though Visa Qiwi Wallet, which could have a material adverse effect on our Visa Qiwi Wallet business and our business as a whole. Additionally, these developments have caused international payment systems to start increasing their fees for Russian banks to protect their margins. Additional sanctions or other countermeasures imposed by Russia against the U.S. or the E.U. may have a material adverse effect on our business, financial condition, results of operations, prospects or the price of our ADSs. In particular, there is a draft law under consideration by the Russian State Duma that would restrict money remittance from Russia to countries that have introduced sanctions against Russian payment systems, proposed as a response to the Ukrainian sanctions discussed above. The draft law has been approved by the Duma in the first reading in February 2017. If it becomes law, or if the Russian government introduces similar restrictions on payment systems' operations, this could negatively impact our volumes or put us in breach of applicable law and make us subject to penalties.

In addition, following the accession of Crimea to Russia, which is seen by the EU and the US as illegal annexation of Crimea, some of our agents, which are incorporated elsewhere in Russia, started to place and operate QIWI branded kiosks in that region. Further, we have direct contacts with several Crimea banks that are registered as financial legal entities in Crimea and operate as our agents or merchants. On December 19, 2014, U.S. President Obama signed a new executive order imposing comprehensive sanctions on the Crimea region. Almost all transactions involving a U.S. person or that are subject to U.S. jurisdiction and that directly or indirectly involve an individual or entity in Crimea are prohibited, with the exception of certain transactions involving certain agricultural commodities, medicine and medical devices. The executive order also permits the designation of persons that operate in Crimea, leaders of entities operating in Crimea, entities that are owned or controlled by a person that is designated by OFAC, or persons that provide material assistance or financial, material, or technological support to a person that is designated by OFAC. The EU has similarly introduced a broad set of sanctions through the Council Regulation (EU) 692/2014 as amended by Regulation (EU) 1351/2014, including: an investment ban prohibiting to acquire new or extend any existing participation or ownership of real estate located in Crimea or Sevastopol, acquire new or extend any existing participation or ownership or control of an entity in Crimea or Sevastopol, provide financing to an entity in Crimea or Sevastopol, create any joint venture in Crimea or Sevastopol or with an entity in Crimea or Sevastopol or provide investment services directly related to the above activities; an embargo on certain listed goods and technology that are suited for the key sectors of transport, telecommunications, energy and mining; and an import ban on goods originating from Crimea and Sevastopol and on financial assistance as well as insurance and reinsurance related to such import.

To date, we do not believe that any of the current sanctions as in force limit our ability to operate in Crimea. Nevertheless, any new or expanded sanctions that may be imposed on Russian businesses operating in Crimea by the U.S., EU, or other countries may materially adversely affect us.

In the ordinary course of our business, we may accept payments from consumers to or otherwise indirectly interact with certain entities that are the targets of U.S. sanctions. We operate primarily within the Russian financial system and, accordingly, many of our customers have accounts at banks in Russia. A number of Russian banks, including Bank Rossiya, SMP Bank, Investcapitalbank and Sobinbank have been designated by OFAC and are subject to U.S. economic sanctions. In addition, Tempbank was designated due to its dealings with the Syrian government. U.S. sanctions may be extended to any person that U.S. authorities determine has materially assisted, or provided financial, material, or technological support for, or goods or services to or in support of, any sanctioned individuals or entities. For example, we may be associated with U.S.-designated banks due to us accepting payments for them from consumers in the ordinary course of our business, even though we may not have any direct contract relationships with them. There can be no assurance that the U.S. Government would not view such activities as meeting the criteria for U.S. economic sanctions.

In addition, because of the nature of our business, we do not generally identify our customers where there is no express requirement to do so under Russian anti-money laundering legislation. Therefore, we are not always able to screen them against the Specially Designated Nationals and Blocked Persons List published by OFAC and other sanctions lists.

While we believe that our indirect interaction with Russian banks and potential interaction with designated individuals that may be subject to U.S. or EU economic and financial sanctions does not contravene any law, our business and reputation could be adversely affected if the U.S. government were to designate us as a blocked party and extend such sanctions to us. The executive orders authorizing the U.S. sanctions provide that persons may be designated if, inter alia, they materially assist, or provide financial, material, or technological support for goods or services to or in support of, blocked or designated parties. EU financial sanctions prohibit the direct and indirect making available of funds or economic resources to or for the benefit of sanctioned parties. Investors may also be adversely affected if we are so designated, resulting in their investment in our securities being prohibited or restricted. Furthermore, under those circumstances, some U.S. or EU investors may decide for

23

Table of Contents

legal or reputational reasons to divest their holdings in us or not to purchase our securities in the first place. We are aware of initiatives by U.S. governmental entities and U.S. institutional investors, such as pension funds, to adopt or consider adopting laws, regulations, or policies prohibiting transactions with or investment in, or requiring divestment from, entities doing business with certain countries. There can be no assurance that the foregoing will not occur or that such occurrence will not have a material adverse effect on our share price. Even if we are not subjected to U.S. or other economic sanctions, our participation in the Russian financial system and indirect interaction with sanctioned banks and potential interaction with designated individuals may adversely impact our reputation among investors. There is also a risk that other entities with which we engage in business, or individuals or entities associated with them, are, or at any time in the future may become, subject to sanctions.

The crisis in Ukraine is ongoing and could escalate. Were full-fledged hostilities to break out between Ukraine and Russia, they would likely cause significant economic disruption and further calls from the Western countries for a comprehensive sanction regime that would seek to further isolate Russia from the world economy. Even the current level of ongoing civil insurrection in eastern Ukraine, if no resolution is forthcoming, may well lead to further strengthening and broadening of Ukraine-related sanctions. For example, there have been proposals to cut off Russia from the international SWIFT payment system, which would disrupt ordinary financial services in Russia and any cross-border trade. The potential further repercussions surrounding the situation in Crimea and Eastern Ukraine are unknown and no assurance can be given regarding the future of relations between Russia and other countries. Overall, the situation in Ukraine and Crimea remains uncertain and we cannot predict how the Ukrainian crisis will unfold or the impact it will have on our business or results of operations. Any or all of the above factors could have a material adverse effect on our business, financial condition, results of operations and prospects.

***Russian military support for the Syrian government could also contribute to a further deterioration in relations with Western governments, and result in the imposition of sanctions, which could materially adversely affect the value of investments in Russia, including our ADSs, as well as our business, financial condition, results of operations and prospects.***

Another recent point of tension between Russia and U.S. and E.U. governments has been the Russian role in the Syrian crisis and its steadfast support for the government of Syria headed by President Bashar al-Assad. Throughout 2015, and 2016, direct Russian military support for the Syrian government has been increasing, with Russian military being directly involved in air bombing missions on various anti-government rebel forces and on-the-ground combat against them. According to press reports, Russian planes have carried out such missions not only against Islamic State rebel forces (which are also under attack by U.S.-led forces) but also against the rebel forces generally supported by Western countries. Western governments have generally called for the immediate departure of President Assad, a position that Russia rejects. Concern has been expressed that these uncoordinated military missions of Russia, the United States and other forces in Syria could lead to confrontation. U.S. and EU officials have stated that they do not view increased Russian military support of the Syrian government as helpful in resolving the ongoing Syrian civil conflict. Russian military involvement in Syria has also been increasingly blamed for the humanitarian crisis currently going on in Syria, particularly in connection with the bombings of Aleppo.

The U.S., the E.U. and a number of other states have imposed economic sanctions against various Syrian government officials and other Syrian nationals in light of the current civil conflict in Syria. Russia's role in the Syrian conflict might lead to further sanctions against Russia, including economic sanctions, and may be an additional factor in an overall deterioration in relations between Russia and the West. Accordingly, the Syrian crisis, for which no resolution appears imminent, and Russia's apparent expanding role in supporting the Syrian government, could lead to international sanctions or other countermeasures by Western countries again Russia, and ultimately have a material adverse effect on our business, financial condition, results of operations and prospects.

***Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes.***

Our business is currently subject to know-your-client requirements established by Federal Law of the Russian Federation No. 115-FZ "On Combating the Legalization (Laundering) of Criminally Obtained Income and Funding of Terrorism", dated August 7, 2001, as amended, or the Anti-Money Laundering Law. Based on the Anti-Money Laundering Law we distinguish three types of consumers based on their level of identification, being anonymous, identified through a simplified procedure and fully identified. The consumers who have not undergone any identification procedure are qualified as anonymous and are not allowed to perform transactions in excess of RUB15,000 as well as hold an electronic money account balance in excess of RUB15,000. They may also face some restrictions in terms of categories of merchants they can pay to (for example they cannot pay for foreign merchants). The consumers who have undergone simplified identification procedure with the payment services provider are entitled to perform electronic money transactions in excess of RUB15,000 provided that at any point of time the account balance of electronic money does not exceed RUB60,000 and the total amount of transactions does not exceed RUB200,000 per month. Fully identified consumers are entitled to perform same type of electronic transfers as consumers identified through a simplified procedure but with increased threshold of the electronic money account balance of RUB600,000 and no limitations for the total transaction amount per month. The key difference between the simplified and the full identification procedures is that the simplified identification can be performed remotely. The remote identification requires the verification of certain data provided by consumers against public databases. Albeit a government order No. 630 dated 8 July 2014 was enacted providing that public databases shall be set up by specific government authorities and access to them shall be granted to the third parties authorized to carry out identification of consumers, to our knowledge, such databases are not yet up and running at scale. Thus, current situation could cause us to be in violation of the identification requirements. In case we are forced not to use the simplified identification procedure until the databases are fully running or in case the identification requirements are further tightened, it could negatively affect the number of our consumers and, consequently, our volumes and revenues. Additionally, Russian anti-money laundering legislation is in a constant state of development and is subject to varying interpretations. If we are found to be in non-compliance with any of its requirements, we could not only become subject to fines and other sanctions, but could also have to discontinue to process operations that are deemed to be in breach of the applicable rules and lose associated revenue streams.

24

Table of Contents

*Political and governmental instability could adversely affect the value of investments in Russia.*

Political conditions in the Russian Federation were highly volatile in the 1990s, as evidenced by the frequent conflicts amongst executive, legislative and judicial authorities, which negatively impacted the business and investment climate in the Russian Federation. Over the past two decades the course of political and other reforms has in some respects been uneven and the composition of the Russian Government has at times been unstable. The Russian political system continues to be vulnerable to popular dissatisfaction, including dissatisfaction with the results of the privatizations of the 1990s, as well as to demands for autonomy from certain religious, ethnic and regional groups.

Over the last 15 years, the Russian political system and the relationship between the President, the Russian Government and the Russian Parliament were generally stable. There have been, however, public protests in Moscow and other urban areas following elections for the State Duma in December 2011 alleging that the elections were subject to substantial electoral fraud. The Prime Minister at that time, Mr. Vladimir Putin has rejected calls by opposition leaders that the elections for the State Duma be annulled and re-run, but has instituted limited political reforms. Similar protests took place following the presidential elections in March 2012 which resulted in re-election of Mr. Vladimir Putin.

Future changes in the Russian Government, the State Duma or the presidency, major policy shifts or eventual lack of consensus between the president, the Russian Government, Russia's parliament and powerful economic groups could lead to political instability. Additionally, the potential for political instability resulting from the worsening of the economic situation in Russia and deteriorating standards of living should not be underestimated. Any such instability could negatively affect the economic and political environment in Russia, particularly in the short term. Shifts in governmental policy and regulation in the Russian Federation are less predictable than in many Western democracies and could disrupt or reverse political, economic and regulatory reforms. Any significant change in the Russian Government's program of reform in Russia could lead to the deterioration of Russia's investment climate that might limit our ability to obtain financing in the international capital markets or otherwise have a material adverse effect on our business, financial condition and results of operations.

*The implementation of government policies in Russia targeted at specific individuals or companies could harm our business as well as investments in Russia more generally.*

The use of governmental power against particular companies or persons, for example, through the tax, environmental or prosecutorial authorities, could adversely affect the Russian economic climate and, if directed against us, our senior management or our major shareholders, could materially adversely affect our business, financial condition and results of operations. Russian authorities have recently challenged some Russian companies and prosecuted their executive officers and shareholders on the grounds of tax evasion and related charges. In some cases, the results of such prosecutions and challenges have been significant claims against companies for unpaid taxes and the imposition of prison sentences on individuals. There has been speculation that in certain cases these challenges and prosecutions were intended to punish, and deter, opposition to the government or the pursuit of disfavored political or economic agendas. There has also been speculation that certain environmental challenges brought recently by Russian authorities in the oil and gas as well as mining sectors have been targeted at specific Russian businesses under non-Russian control, with a view to bringing them under state control. More generally, some observers have noted that takeovers in recent years of major private sector companies in the oil and gas, metals and manufacturing sectors by state-controlled companies following tax, environmental and other challenges may reflect a shift in official policy in favor of state control at the expense of individual or private ownership, at least where large and important enterprises are concerned.

*Political and other conflicts create an uncertain operating environment that hinders our long-term planning ability and could adversely affect the value of our investments in Russia.*

Russia is a federation of 85 sub-federal political units, consisting of republics, territories, regions, cities of federal importance and autonomous regions and districts. The delineation of authority and jurisdiction among the members of the federation and the federal government is, in many instances, unclear and remains contested. Lack of consensus between the federal government and local or regional authorities often results in the enactment of conflicting legislation at various levels and may lead to further political instability. In particular, in the past, conflicting laws have been enacted in the areas of privatization, securities, corporate legislation, regulation of land use and licensing. Some of these laws and governmental and administrative decisions implementing them, as well as certain transactions consummated pursuant to them, have in the past been challenged in the courts in Russia and such challenges may occur in the future.

Ethnic, religious, historical and other divisions have on occasion given rise to tensions and, in certain cases, military conflict and terrorist attacks in certain regions of Russia. For example, a military conflict in August 2008 between Russia and Georgia involving South Ossetia and Abkhazia, as well as the ongoing conflict between Russia and Ukraine, resulted in significant overall price declines in the Russian stock exchanges and capital outflow from Russia. Such tensions, military conflict or terrorist activities could have significant political consequences, including the imposition of a state of emergency in some or all of Russia or heightened security measures, which could cause disruption to domestic commerce and exports from Russia, disrupt normal economic activity in Russia and materially adversely affect our business, financial condition and results of operations.

*Deterioration of Russia's relations with other countries could negatively affect the Russian economy and those of the nearby regions.*

Over the past several years, Russia has been involved in conflicts, both economic and military, involving other members of the CIS. On several occasions, this has resulted in the deterioration of Russia's relations with other members of the international community, including the United States and various countries in Europe. Many of these jurisdictions are home to financial institutions and corporations that are significant investors in Russia and whose investment strategies and decisions may be affected by such conflicts and by worsening relations between Russia and its immediate neighbors.

25

Table of Contents

For example, relations between Ukraine and Russia, as well as Georgia and Russia, have recently been strained over a variety of issues. On March 21, 2014, President Putin signed legislation to recognize Crimea's accession to, and status as part of, Russia. Since then, there has been continuing tensions between Russia and Ukraine, which were aggravated by the military conflict in Eastern Ukraine. The events in Ukraine, Crimea and Syria have prompted condemnation by members of the international community and have been strongly opposed by the EU and the United States, with a resulting material negative impact on the relationships between the EU, the United States and Russia. See "– The situation in Ukraine and the U.S., EU and other sanctions that have been imposed could adversely impact our operations and financial condition". Additionally, in December 2016 the U.S.-Russia relationships became further strained over the alleged involvement of the Russian government in the cyber-attacks aimed at disrupting the election process in the U.S. and the new sanctions imposed by the U.S. president in response. The emergence of new or escalated tensions between Russia and other countries could negatively affect the Russian economy. This, in turn, may result in a general lack of confidence among international investors in the region's economic and political stability and in Russian investments generally. Such lack of confidence may result in reduced liquidity, trading volatility and significant declines in the price of listed securities of companies with significant operations in Russia, including our ADS, and in our inability to raise debt or equity capital in the international capital markets, which may affect our ability to achieve the level of growth to which we aspire.

***Crime and corruption could create a difficult business climate in Russia.***

The political and economic changes in Russia since the early 1990s have led, amongst other things, to reduced policing of society and increased lawlessness. Organized crime, particularly property crimes in large metropolitan centers, has reportedly increased significantly since the dissolution of the Soviet Union. In addition, the Russian and international media have reported high levels of corruption in Russia. Press reports have also described instances in which government officials have engaged in selective investigations and prosecutions to further the interest of the government and individual officials or business groups. Although we adhere to a business ethics policy and internal compliance procedures to counteract the effects of crime and corruption, instances of illegal activities, demands of corrupt officials, allegations that we or our management have been involved in corruption or illegal activities or biased articles and negative publicity could materially and adversely affect our business, financial condition and results of operations.

***The Russian economy has fallen into recession in 2015 and continues to suffer from ruble depreciation, inflation and capital flight, and depends highly on the global pricing of crude oil, which has fallen significantly compared to 2014.***

Russian real GDP contracted by 3.7% in 2015, putting Russia in recession. 2015 was the worst year for the Russian economy since 2009, when Russian GDP fell 7.8%, according to Rosstat. In 2016 Russian real GDP sustained a decline at a slower pace and fell by 0.2% according to Rosstat. Given the importance of the energy sector to the Russian economy, a principal reason for this downturn has been the continued low level of global oil prices. After a steep fall in 2015, the price of the global benchmark Brent crude in 2016 rose from U.S.$37.28/bbl on December 31, 2015 to U.S. $54.96/bbl on December 31, 2016, which remains significantly lower than the pre-2015 prices and was not sufficient to stabilize the economy. The international sanctions arising from the Ukraine crisis have also undercut confidence in the Russian economy and added to the cost of capital. The lack of confidence in the Russian economy led to a run on the ruble in late 2014 and further weakening in 2015 (which were slightly offset by appreciation by the end of 2016: the average ruble/U.S. dollar exchange rate was RUB36.18/$1 for the third quarter of 2014, RUB46.96/$1 for the fourth quarter of 2014, RUB62.16/$1 for the first quarter of 2015, RUB52.63/$1 for the second quarter of 2015, RUB62.85/$1 for the third quarter of 2015, RUB65.86/$1 for the fourth quarter of 2015, RUB74.63/$1 for the first quarter of 2016, RUB65.89/$1 for the second quarter of 2016, RUB64.62/$1 for the third quarter of 2016, and RUB63.07/$1 for the fourth quarter of 2016, according to the CBR. This has been accompanied by rising inflation and a declining trend in real average wages. According to Rosstat, inflation was 11.4% in 2014, 12.9% in 2015 and 5.4% in 2016, while real average wages have been declining (with Rosstat's preliminary data for 2015 indicating that the population's real disposable income contracted by 5.9% in 2016 as compared to 2015). Against this backdrop, household consumption decreased significantly in 2015 versus 2014, although it grew slightly by 1.5% in 2016, according to Rosstat. Another indicator of lack of confidence in the Russian economy is capital flight, which was U.S.$15.4 billion in 2016, U.S.$56.9 billion in 2015, U.S.$153.0 billion in 2014 and U.S.$63.0 billion in 2013. There are concerns that the Russian government may seek to increase the tax burden of Russian companies or become stricter in its enforcement of existing tax legislation in the light of the shrinking state income due to decline in oil prices. The weakening of the Russian economy and the deterioration of Government finances (which rely significantly on taxes on oil revenues) has also led to international rating agencies to lower the Russian Federation credit ratings. Credit ratings for a number of Russian companies and banks have been lowered in the past months, another factor contributing to an increased cost of capital in the Russian economy.

The ongoing deterioration of the Russian economy could have a material adverse effect on our business, financial condition, results of operations and prospects.

***Economic instability in Russia could have an adverse effect on our business.***

The Russian economy has been adversely affected by the recent global financial and economic crisis. A continuation of the economic crisis could have a negative effect on the scale and profitability of our business. Any of the following risks, which the Russian economy has experienced at various points in the past, may have or have already had a significant adverse effect on the economic climate in Russia and may burden or have already burdened our operations:

- significant declines in gross domestic product, or GDP;

- high levels of inflation;

- sudden price declines in the natural resource sector;

- high and fast-growing interest rates;

26

**Table of Contents**

- unstable credit conditions;

- international sanctions;

- high state debt/GDP ratio;

- instability in the local currency market;

- a weakly diversified economy which depends significantly on global prices of commodities;

- lack of reform in the banking sector and a weak banking system providing limited liquidity to Russian enterprises;

- pervasive capital flight;

- corruption and the penetration of organized crime into the economy;

- significant increases in unemployment and underemployment;

- the impoverishment of a large portion of the Russian population;

- large number of unprofitable enterprises which continue to operate due to deficiency in the existing bankruptcy procedure;

- prevalent practice of tax evasion; and

- growth of the black-market economy.

In the past few years, the Russian economy has been characterized by significant volatility in the debt and equity markets (which experienced significant declines in the second half of 2008), causing market regulators to temporarily suspend trading multiple times on the principal Russian securities exchanges, MICEX and the Russian Trading System (which subsequently merged in 2011, creating the Moscow Exchange). The Russian economy has also been characterized by significant reductions in foreign investment and sharp decreases in GDP.

As Russia produces and exports large quantities of crude oil, natural gas, petroleum products and other commodities, the Russian economy is particularly vulnerable to fluctuations in oil and gas prices as well as other commodities prices, which historically have been subject to significant volatility over time, as illustrated by the recent decline in crude oil prices. Russian banks, and the Russian economy generally, were adversely affected by the global financial crisis. The Russian economy has fallen into a recession in 2015. There can be no assurance that any measures adopted by the Russian government to mitigate the effect of any financial and economic crisis will result in a sustainable recovery of the Russian economy. Current macroeconomic challenges, low or negative economic growth in the United States, China, Japan and/or Europe and market volatility may provoke or prolong any economic crisis.

As an emerging economy, Russia remains particularly vulnerable to further external shocks. Events occurring in one geographic or financial market sometimes result in an entire region or class of investments being disfavored by international investors - so-called "contagion effects". Russia has been adversely affected by contagion effects in the past, and it is possible that it will be similarly affected in the future by negative economic or financial developments in other countries. Economic volatility, or a future economic crisis, may undermine the confidence of investors in the Russian markets and the ability of Russian businesses to raise capital in international markets, which in turn could have a material adverse effect on the Russian economy and the Group's results of operations, financial condition and prospects. In addition, any further declines in oil and gas prices or other commodities pricing could disrupt the Russian economy and materially adversely affect our business, financial condition, results of operations and prospects.

***The banking system in Russia remains underdeveloped.***

The banking and other financial systems in Russia are not well-developed or regulated, and Russian legislation relating to banks and bank accounts is subject to varying interpretation and inconsistent application. The 1998 financial crisis resulted in the bankruptcy and liquidation of many Russian banks and almost entirely eliminated the developing market for commercial bank loans at that time. From April to July 2004, the Russian banking sector experienced further serious turmoil. As a result of various market rumors and certain regulatory and liquidity problems, several privately owned Russian banks experienced liquidity problems and were unable to attract funds on the inter-bank market or from their client base. Simultaneously, they faced large withdrawals of deposits by both retail and corporate customers. Several of these privately owned Russian banks collapsed or ceased or severely limited their operations. Russian banks owned or controlled by the government and foreign owned banks generally were not adversely affected by the turmoil.

There are currently a limited number of creditworthy Russian banks (most of which are headquartered in Moscow). Although the CBR has the mandate and authority to suspend banking licenses of insolvent banks, many insolvent banks still operate. Many Russian banks also do not meet international banking standards, and the transparency of the Russian banking sector in some respects still lags behind internationally accepted norms. Banking supervision is also often inadequate, as a result of which many banks do not follow existing CBR regulations with respect to lending criteria, credit quality, loan loss reserves, diversification of exposure or other requirements. The imposition of more stringent regulations or interpretations could lead to weakened capital adequacy and the insolvency of some banks. Prior to the onset of the 2008 global economic crisis, there had been a rapid increase in lending by Russian banks, which many believe had been accompanied by a deterioration in the credit quality of the loan portfolio of those banks. In addition, a robust domestic corporate debt market was leading Russian banks to hold increasingly large amounts of Russian corporate ruble bonds in their portfolios, which further deteriorated the risk profile of the assets of Russian banks. The global financial crisis of 2007-2008 has led to the collapse or bailout of some Russian banks and to significant liquidity constraints for others. Profitability levels of most Russian banks have been adversely affected. Indeed, the global crisis has prompted the government to inject substantial funds into the banking system amid reports of difficulties among Russian banks and other financial institutions.

27

Table of Contents

In recent years, the CBR has considerably increased the intensity of its supervision and regulation of the Russian banking sector. Historically, the revocation of banking licenses by the CBR has been a relatively rare event mostly occurring to local banks with little assets and little or no significance for the banking sector as a whole. Starting October 2013, however, the CBR has launched a campaign aimed at cleansing the Russian banking industry, revoking the licenses from an unusually high number of banks (including significant banks such as Master-Bank, Investbank, ProBusinessBank, Svyaznoy Bank, Vneshprombank, Tatfondbank and others) on allegations of money laundering, financial statements manipulation and other illegal activities, as well as inability of certain banks to discharge their financial obligations, which resulted in turmoil in the industry, instigated bank runs on a number of Russian credit institutions, and severely undermined the trust that the Russian population had with private banks. It could be expected that the difficulties currently faced by the Russian economy could result in further collapses of Russian banks. With few exceptions (notably the state-owned banks), the Russian banking system suffers from weak depositor confidence, high concentration of exposure to certain borrowers and their affiliates, poor credit quality of borrowers and related party transactions. Current economic circumstances in Russia are putting stress on the Russian banking system. Combined with heightened interest rates – with the key interest rate of the CBR currently at 10% per annum (and rising as high as 17% over the course of 2014-2015) – these circumstances decrease the affordability of consumer credit, putting further pressure on overall consumer purchasing power.

Our business is significantly affected by development in the Russian banking sector. First, we periodically hold funds in a number of Russian banks and rely on guarantees given by those banks to enhance our liquidity. Increased uncertainty in the Russian banking sector exposes us to additional counterparty risk and affects our liquidity. In addition, a significant portion of our revenue is derived from consumer payments in the banking industry in our Financial Services market vertical. As a result, the bankruptcy or insolvency of one or more of these banks could adversely affect our business, financial condition and results of operations. The continuation or worsening of the banking crisis could decrease our transaction volumes, while the bankruptcy or insolvency of any of the banks which hold our funds could prevent us from accessing our funds for several days. All of these factors could have a material adverse effect on our business, financial condition and results of operations.

*Social instability could lead to labor and social unrest, increased support for renewed centralized authority, nationalism or violence.*

Failures to adequately address social problems have led in the past, and could lead in the future, to labor and social unrest. Labor and social unrest could have political, social and economic consequences, such as increased support for a renewal of centralized authority; increased nationalism, with support for re-nationalization of property, or expropriation of or restrictions on foreign involvement in the economy of Russia; and increased violence. Any of these could have an adverse effect on confidence in Russia's social environment and the value of investments in Russia, could restrict our operations and lead to a loss of revenue, and could otherwise have a material adverse effect on its business, results of operations and financial condition.

*Russia has experienced high levels of inflation in the past.*

As a substantial portion of our expenses (including operating costs and capital expenditures) are denominated in rubles, the relative movement of inflation and exchange rates significantly affects our results of operations. The effects of inflation could cause some of our costs to rise. Russia has experienced high levels of inflation since the early 1990s. For example, inflation increased dramatically after the 1998 financial crisis, reaching a rate of 84.4% in that year. According to Rosstat, inflation in the Russian Federation was 6.5% in 2013, 11.4% in 2014, 12.9% in 2015 and 5.4% in 2016. Certain of our costs, such as salaries and rent, are affected by inflation in Russia. To the extent the inflation causes these costs to increase, such inflation may materially adversely affect our business, financial condition and results of operations.

*The immaturity of legal systems, processes and practices in the Russian Federation may adversely affect our business, financial condition and results of operations.*

Risks associated with the legal systems of the Russian Federation include, to varying degrees, inconsistencies between and among laws, presidential decrees, edicts and governmental and ministerial orders and resolutions; conflicting local, regional, and federal rules and regulations; the lack of judicial or administrative guidance regarding the interpretation of the applicable rules; the untested nature of the independence of the judiciary and its immunity from political, social and commercial influences; the relative inexperience of jurists, judges and courts in interpreting recently enacted legislation and complex commercial arrangements; a high degree of unchecked discretion on the part of governmental authorities; alleged corruption within the judiciary and governmental authorities; substantial gaps in the regulatory structure due to delays in or absence of implementing regulations; bankruptcy procedures that are not well-developed and are subject to abuse; and a lack of binding judicial precedent. All of these weaknesses affect our ability to protect and enforce our legal rights, including rights under contracts, and to defend against claims by others. In addition, the merger of the Supreme Arbitration Court of the Russian Federation, which used to oversee business disputes, into the Supreme Court, which used to only handle criminal cases and civil lawsuits, is viewed by some as having further aggravated these issues.

The Russian judicial system is not immune from economic and political influences. The Russian court system is understaffed and underfunded, and the quality of justice, duration of legal proceedings, and performance of courts and enforcement of judgments remain problematic. Under Russian legislation, judicial precedents generally have no binding effect on subsequent decisions and are not recognized as a source of law. However, in practice, courts usually consider judicial precedents in their decisions. Enforcement of court judgments can in practice be very difficult and time-consuming in Russia. Additionally, court claims are sometimes used in furtherance of political and commercial aims. All of these factors can make judicial decisions in Russia difficult to predict and make effective redress problematic in certain instances.

28

Table of Contents

The relatively recent enactment of many laws, the lack of consensus about the scope, content and pace of political and economic reform and the rapid evolution of legal systems in ways that may not always coincide with market developments have resulted in legal ambiguities, inconsistencies and anomalies and, in certain cases, the enactment of laws without a clear constitutional or legislative basis. Legal and bureaucratic obstacles and corruption exist to varying degrees in each of the regions in which we operate, and these factors are likely to hinder our further development. These characteristics give rise to investment risks that do not exist in countries with more developed legal systems. The developing nature of the legal systems in Russia could materially adversely affect our business, financial condition and results of operations.

*Unlawful, selective or arbitrary government action may have an adverse effect on our business.*

Governmental authorities have a high degree of discretion in Russia and at times appear to act selectively or arbitrarily, without hearing or prior notice, and in a manner that is contrary to law or influenced by political or commercial considerations. Moreover, the Russian Government also has the power in certain circumstances, by regulation or government act, to interfere with the performance of, nullify or terminate contracts. Unlawful, selective or arbitrary governmental actions have reportedly included denial or withdrawal of licenses, sudden and unexpected tax audits, criminal prosecutions and civil actions. Federal and local government entities also appear to have used common defects in matters surrounding share issuances and registration as pretexts for court claims and other demands to invalidate the issuances or registrations or to void transactions, seemingly for political purposes. Moreover, selective, public criticism by Russian Government officials of Russian companies has in the past caused the price of publicly traded securities in such Russian companies to sharply decline, and there is no assurance that any such public criticism by Russian Government officials in the future will not have the same negative affect. Standard & Poor's has expressed concerns that "Russian companies and their investors can be subjected to government pressure through selective implementation of regulations and legislation that is either politically motivated or triggered by competing business groups". In this environment, our competitors could receive preferential treatment from the government, potentially giving them a competitive advantage. Unlawful, selective or arbitrary governmental action, if directed at our operations in Russia, could materially and adversely affect our business, financial condition and results of operations.

*Russian companies can be forced into liquidation on the basis of formal non-compliance with certain requirements of Russian law.*

Certain provisions of Russian law may allow a court to order the liquidation of a Russian legal entity on the basis of its formal non-compliance with certain requirements during formation, reorganization or during its operation. There have been cases in the past in which formal deficiencies in the establishment process of a Russian legal entity or non-compliance with provisions of Russian law have been used by Russian courts as a basis for the liquidation of a legal entity. Weaknesses in the Russian legal system create an uncertain legal environment, which makes the decisions of a Russian court or a governmental authority difficult, if not impossible, to predict. If any of our operating subsidiaries incorporated in Russia were subject to involuntary liquidation, such liquidation could lead to significant negative consequences for our business, financial condition and results of operations.

For example, under Russian corporate law, negative net assets calculated on the basis of the Russian accounting standards as of the end of the year following the second or any subsequent year of a company's existence can serve as a basis for creditors to accelerate their claims and to demand payment of damages, as well as for a court to order the liquidation of the company upon a claim by governmental authorities. Many Russian companies have negative net assets due to very low historical value of property, plant and equipment reflected on their Russian accounting standards balance sheets. However, their solvency (defined as their ability to pay debts as they come due) is not otherwise adversely affected by such negative net assets. There are cases when courts have ordered mandatory liquidation of a company based on its negative net assets, though such company had continued to fulfill its obligations and had net assets in excess of the required minimum at the time of liquidation.

*Shareholder liability under Russian corporate law could cause us to become liable for the obligations of our subsidiaries.*

Russian law generally provides that shareholders in a Russian joint-stock company or participants in a limited liability company are not liable for that company's obligations and risk only the loss of their investment. This may not be the case, however, when one company (the "effective parent") is capable of making decisions for another (the "effective subsidiary"). Under certain circumstances, the effective parent bears joint and several responsibility for transactions concluded by the effective subsidiary in carrying out such decisions.

In addition, under Russian law, an effective parent is secondarily liable for an effective subsidiary's debts if an effective subsidiary becomes insolvent or bankrupt as a result of the action of an effective parent. In these instances, the other shareholders of the effective subsidiary may claim compensation for the effective subsidiary's losses from the effective parent that causes the effective subsidiary to take action or fail to take action knowing that such action or failure to take action would result in losses. We could be found to be the effective parent of our subsidiaries, in which case we would become liable for their debts, which could have a material adverse effect on our business, financial condition and results of operations.

*Our operations in Kazakhstan have become significant, and many of the risks we face in Kazakhstan are similar to those we face in Russia.*

In addition to Russia, our operations in Kazakhstan have become significant. In many respects, the risks we face in operating business in Kazakhstan are similar to those in Russia as set out above in "—Risks Relating to the Russian Federation and Other Markets in Which We Operate". As is typical of an emerging market, Kazakhstan does not possess a well-developed business, legal and regulatory infrastructure and has been subject to substantial political, economic and social change. Our business in Kazakhstan is subject to Kazakhstan specific laws and regulations including with respect to tax, anti-corruption, and foreign exchange controls. Such laws are often rapidly changing and are unpredictable. In addition, we are exposed to foreign currency fluctuations, between the Russian ruble and the Kazakh tenge, which could affect our financial position and our profitability. Our failure to manage the risks associated with doing business in Kazakhstan could have a material adverse effect upon our results of operations.

29

Table of Contents

**Risks Relating to Taxation**

*Weaknesses and changes in the Russian tax system could materially and adversely affect our business and the value of investments in Russia.*

We are subject to a broad range of taxes and other compulsory payments imposed at federal, regional and local levels, including, but not limited to, profits tax, VAT, corporate property tax and social contributions. Tax laws, namely the Russian Tax Code, have been in force for a short period relative to tax laws in more developed market economies, and the implementation of these tax laws is often unclear or inconsistent. Historically, the system of tax collection has been relatively ineffective, resulting in continual changes to the interpretation of existing laws. Although the quality of Russian tax legislation has generally improved with the introduction of the first and second parts of the Russian Tax Code, the possibility exists that Russia may impose arbitrary or onerous taxes and penalties in the future, which could adversely affect our business, financial condition and results of operations. A large number of changes have been made to various chapters of the Russian Tax Code since their introduction. Since Russian federal, regional and local tax laws and regulations are subject to changes and some of the sections of the Russian Tax Code relating to the aforementioned taxes are comparatively new, interpretation of these regulations is often unclear or non-existent. Also, different interpretations of tax regulations exist both among and within government bodies at the federal, regional and local levels, which creates uncertainties and inconsistent enforcement. The current practice is that private clarifications to specific taxpayers' queries with respect to particular situations issued by the Russian Ministry of Finance are not binding on the Russian tax authorities and there can be no assurance that the Russian tax authorities will not take positions contrary to those set out in such clarifications. During the past several years the Russian tax authorities have shown a tendency to take more assertive positions in their interpretation of the tax legislation, which has led to an increased number of material tax assessments issued by them as a result of tax audits. In practice, the Russian tax authorities generally interpret the tax laws in ways that do not favor taxpayers, who often have to resort to court proceedings against the Russian tax authorities to defend their position. In some instances, Russian tax authorities have applied new interpretations of tax laws retroactively. There is no established precedent or consistent court practice in respect of these issues. Furthermore, in the absence of binding precedent, court rulings on tax or other related matters by different courts relating to the same or similar circumstances may also be inconsistent or contradictory. Taxpayers often have to resort to court proceedings to defend their position against the tax authorities.

The Russian tax authorities are increasingly taking a "substance over form" approach. For example, starting from January 1, 2015 a number of amendments have been made to the Russian tax legislation introducing, among others, the concepts of controlled foreign companies, corporate tax residency and beneficial ownership (see also "Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations"). Due to the relative lack of court and administrative practice, no assurance can be currently given as to how these amendments will be applied in practice, their potential interpretation by the tax authorities and the possible impact on us.

In addition, in April 2016 a draft law introducing country-by-country reporting ("CbCR") requirements has been released for public discussion. In September 2016 significantly expanded version of draft law was published by the Russian Ministry of Finance. Introducing mandatory filing of CbCR is in general in line with the Organization for Economic Co-operation and Development ("OECD") recommendations within the Base Erosion and Profit Shifting ("BEPS") initiative. The proposed amendments would require multinational corporate enterprise groups with consolidated revenues of over certain threshold to submit annual CbCR, as well as certain other reporting forms detailing multinational corporate enterprises groups operations (locally and globally, respectively), as well as transfer pricing methodologies applied to intra-group transactions. It is at the moment unclear how the above measures will be applied in practice by the Russian tax authorities and courts. It is proposed that only multinational corporate enterprises with consolidated revenues of over RUB 50 billion to be subject to CbCR requirements. Thus, if the proposed amendments come into force and we reach the reporting threshold in Russia, or alternatively in any other jurisdiction of our presence (e.g. in Cyprus, where the Decree issued by the Cyprus Minister of Finance on December 30, 2016 introduced a mandatory CbCR for multinational enterprise groups generating consolidated annual turnover exceeding EUR 750 million) we may be liable to submit relevant CbCR.

The possibility exists that the Government may introduce additional revenue-raising measures. Although it is unclear how such measures would operate, the introduction of any such measures may affect the Group's overall tax efficiency and may result in significant additional taxes becoming payable.

Further, the Russian Ministry of Finance in its "Main Directions of Russian Tax policy for 2017 and the Planning Period of 2018 and 2019" outlined a number of initiatives. Among others, the following changes were put in force as a legislative implementation of those initiatives: temporary limit on the amount of loss carried forward to be utilized to reduce taxable income (applicable for 2017-2020 inclusively); increase of late payment interest for overdue tax payments; changes to classification of controlled transactions under the transfer pricing rules (starting from 2017 any guarantees between Russian non-banking organizations, as well as interest-free loans between Russian related parties will not be treated as controlled transactions).

It is expected that other initiatives of the Russian Ministry of Finance, such as acceding to the OECD Multilateral Convention on amending double tax treaties, and automatic information exchange with foreign tax authorities, will also be adopted in the near time.

There can be no assurance that the Russian Tax Code will not be changed in the future in a manner adverse to the stability and predictability of the tax system. These factors, together with the potential for state budget deficits, raise the risk of the imposition of additional taxes on us. The introduction of new taxes or amendments to current taxation rules may have a substantial impact on the overall amount of our tax liabilities. There is no assurance that we would not be required to make substantially larger tax payments in the future, which may adversely affect our business, financial condition and results of operations.

30

Table of Contents

***Our business in Russia may be deemed to receive unjustified tax benefits.***

In its decision No 138-0 dated July 25, 2001, the Constitutional Court of the Russian Federation, or the Constitutional Court, introduced the concept of "a taxpayer acting in a bad faith" without clearly stipulating the criteria for it. Similarly, this concept is not defined in Russian tax law. Nonetheless, this concept has been used by the tax authorities to deny, for instance, the taxpayer's right to obtain tax deductions and benefits provided by the tax law. The tax authorities and courts often exercise significant discretion in interpreting this concept in a manner that is unfavorable to taxpayers. On October 12, 2006, the Plenum of the Higher Arbitrazh Court of the Russian Federation, or the Higher Arbitrazh Court, issued Ruling No. 53, formulating the concept of an "unjustified tax benefit" which is defined in the ruling mainly by reference to specific examples of such tax benefits (e.g., tax benefits obtained as a result of a transaction that has no reasonable business purpose) which may lead to disallowance of their application. There is growing practice of the interpretation of this concept by the tax authorities or the courts and it is apparent that the tax authorities actively seek to apply this concept when challenging tax positions taken by taxpayers. Although the intention of Ruling No. 53 was to combat the abuse of tax law, based on cases brought to courts to date relating to Ruling No. 53, the tax authorities have started applying the "unjustified tax benefit" concept in a broader sense than may have been intended by the Higher Arbitrazh Court. In particular, we are aware of cases when this concept has been applied by the tax authorities in order to disallow benefits granted by double tax treaties. To date, in the cases where this concept has been applied, the courts have ruled in favor of taxpayers that managed to demonstrate business rationale of the operations challenged by the Russian tax authorities, but it is not possible to determine whether the courts will follow these precedents in the future.

In May 2015, a draft legislation introducing the concept of "unjustified tax benefit" into the Russian Tax Code passed the first reading in the State Duma of the Russian Federation. Subject to certain exceptions, the proposed legislation would prohibit taxpayers from deducting expenses for profits tax purposes and corresponding input VAT in cases where a business transaction was primarily aimed at tax avoidance, the primary documents were signed by unauthorized or unspecified persons, or the seller did not actually sell goods (work, services) or transfer any property rights. Although at the moment the draft law is still under review and pending amendments to be made by the State Duma of the Russian Federation and it is not clear how the final legislation will be worded it is anticipated that the introduction of these changes would allow the Russian tax authorities to have more arguments in disputes with taxpayers related to unjustified tax benefits. It is unclear if and when the concept of "unjustified tax benefit" is to be introduced into the Russian tax legislation.

In addition to the usual tax burden imposed on Russian taxpayers, these conditions complicate tax planning and related business decisions. This uncertainty could possibly expose our Group to significant fines and penalties and to enforcement measures, despite our best efforts at compliance, and could result in a greater than expected tax burden.

***Our Russian subsidiaries are subject to tax audits by Russian tax authorities which may result in additional tax liabilities.***

Tax returns together with related documentation are subject to review and investigation by a number of authorities, which are enabled by Russian law to impose substantial fines and interest charges. Generally, taxpayers are subject to tax audits for a period of three calendar years immediately preceding the year in which the decision to conduct the audit is taken. Nevertheless, in some cases the fact that a tax period has been reviewed by the tax authorities does not prevent further review of that tax period, or any tax return applicable to that tax period. In addition, based on the court practice and the first part of the Russian Tax Code, the three-year statute of limitations for tax liabilities is extended if the actions of the taxpayer create insurmountable obstacles for the tax audit. Because none of the relevant terms is defined in Russian law, the tax authorities may have broad discretion to argue that a taxpayer has "obstructed" or "hindered" or "created insurmountable obstacles" in respect of an audit, effectively linking any difficulty experienced in the course of their tax audit with obstruction by the taxpayer and use that as a basis to seek tax adjustments and penalties beyond the three-year term. Therefore, the statute of limitations is not entirely effective. Tax audits may result in additional costs to our Group if the relevant tax authorities conclude that our Russian entities did not satisfy their tax obligations in any given year. Such audits may also impose additional burdens on our Group by diverting the attention of management resources. The outcome of these audits could have a material adverse effect on our business, financial condition and results of operations.

***Russian transfer pricing legislation may require pricing adjustments and impose additional tax liabilities with respect to all controlled transactions.***

Russian transfer pricing legislation became effective in the Russian Federation on January 1, 1999. This legislation allowed the tax authorities to make transfer-pricing adjustments and impose additional tax liabilities in respect of certain types of transactions ("controlled" transactions). Following the adoption of Federal Law No. 227-FZ "On amendments to certain legislative acts of the Russian Federation in connection with the improvement of pricing principles" dated July 18, 2011, current transfer pricing rules became effective from January 1, 2012. The list of the "controlled" transactions under the current transfer pricing legislation includes transactions with related parties (with several exceptions including any guarantees between Russian non-banking organizations and interest-free loans between Russian related parties) and certain types of cross border transactions. The amendments have toughened considerably the previous transfer pricing rules, by, among other things, effectively shifting the burden of proving market prices from the tax authorities to the taxpayer and obliging the taxpayer to keep specific documentation. The current rules also permit taxpayers to enter into advance pricing agreements with the tax authorities; however, it is unclear how such agreements will operate in practice. Special transfer pricing rules apply to transactions with securities and derivatives. It is currently difficult to evaluate what effect these provisions may have on us.

31

Table of Contents

Currently the tax authorities perform tax audits of some Russian taxpayers with major focus on compliance with existing transfer pricing legislation. It is therefore possible that the Group entities may become subject to transfer pricing tax audits by tax authorities in the foreseeable future. Due to the uncertainty and lack of established practice of application of the Russian transfer pricing legislation the Russian tax authorities may challenge the level of prices applied by the Group under the "controlled" transactions (including certain intercompany transactions) and accrue additional tax liabilities. If additional taxes are assessed with respect to these matters, they may be material.

***ADS holders outside of Russia may be subject to Russian tax for income earned upon a sale, exchange or disposal of our ADSs.***

In the event that the proceeds from a sale, exchange or disposal of ADSs are deemed to be received from a source within Russia, a non-resident holder that is an individual may be subject to Russian tax in respect of such proceeds at a rate of 30% of the gain (such gain being computed as the sales price less any available documented cost deduction, including the acquisition price of the ADSs and other documented expenses, such as depositary expenses and brokers' fees). In case of non-resident holders that are legal entities or organizations proceed from sale, exchange or disposal of ADSs would be regarded as Russian source proceeds subject to tax in Russia at the rate of 20% if more than 50% of our assets consist of immovable property in Russia. Relevant tax may be eliminated under any available double tax treaty relief, provided that the necessary requirements to qualify for the treaty relief and the appropriate administrative requirements under the Russian tax legislation have been met. For example, holders of ADSs that are eligible for the benefits of the United States-Russia double tax treaty should generally not be subject to tax in Russia on any gain arising from the disposal of ADSs, provided that the gain is not attributable to a permanent establishment or a fixed base that is or was located in Russia and/or provided that no more than 50% of our assets consist of immovable property situated in Russia (as defined in the treaty). Because the determination of whether more than 50% of our assets consist of immovable property situated in Russia is inherently factual and is made on an on-going basis, and because the relevant Russian legislation and regulations are not entirely clear, there can be no assurance that immovable property situated in Russia does not currently, or will not, constitute more than 50% of our assets. If more than 50% of our assets were to consist of immovable property situated in Russia, the benefits of the United States-Russia double tax treaty may not be available to an ADS holder (whether a legal entity or an individual).

***Changes in the double tax treaty between Russia and Cyprus may significantly increase our tax burden.***

A company that is tax resident of Cyprus is subject to Cypriot taxation and qualifies for benefits available under the Cypriot tax treaty network, including the Russia-Cyprus double tax treaty. We can provide no assurance that the double tax treaty will not be renegotiated or revoked.

The Protocol of October 7, 2010 introduced a number of amendments to the Russia-Cyprus double tax treaty dated December 5, 1998. Most of these amendments have been in effect since January 1, 2013. Additionally, the Protocol contained a clause on Article 13 of the Russia-Cyprus double tax treaty, under which gains from the alienation of shares or similar rights deriving more than 50% of their value from immovable property, must be taxed in the country where the property is located starting from January 1, 2017. According to information from the Cypriot Ministry of Finance, an additional protocol to the Russia-Cyprus double tax treaty is expected to be signed as the parties are currently finalizing this document. It will stipulate that the changes described above will eventually take effect, but will be postponed to a later date. The final deadline will depend on when similar amendments are made to Russia's double tax treaties with other European countries. It is still unclear, however, whether these changes are introduced and how these changes of the Russia-Cyprus double tax treaty (if adopted) could be postponed as they are already in effect since January 1, 2017.

Adverse changes in, or the cancellation of, the Russia-Cyprus double tax treaty may significantly increase our tax burden and adversely affect our business, financial condition and results of operations.

***We may be deemed to be a tax resident outside of Cyprus.***

According to the provisions of the Cyprus Income Tax Law, a company is considered to be a resident of Cyprus for tax purposes if its management and control are exercised in Cyprus. The concept of "management and control" is not defined in the Cypriot tax legislation. The Cyprus Tax Authorities have published a questionnaire form indicating information that need to be provided by a company when obtaining Cyprus tax residency certificate. According to the information provided by a company via submission of the said questionnaire, it may or may not be considered a Cyprus tax resident. For more details in relation to tax residency see "Item 10.E Taxation—Material Cypriot Tax Considerations—Tax residency". If we are deemed not to be a tax resident in Cyprus, we may not be subject to the Cypriot tax regime other than in respect of Cyprus sourced income and we may be subject to the tax regime of the country in which we are deemed to be a tax resident.

Further, we would not be eligible for benefits under the tax treaties entered into between Cyprus and other countries. If applicable Russian law is amended so that a company that is a tax resident of Cyprus can also be considered a tax resident of Russia, the tax treaty in force between Cyprus and Russia provides that such a company shall be deemed to be a tax resident of the state in which the place of effective management of the company is situated. A protocol to this treaty was signed in October 2010 and ratified by Cyprus in September 2011 and the Russian Duma in February 2012. This protocol provides that the process of determining the effective management in this case will be achieved through the two states endeavoring to determine the place of effective management by mutual agreement having regard to all relevant factors. Where the majority of our board of directors comprises tax residents or citizens of Russia, this may pose a risk that we, even if we are managed and controlled in Cyprus and therefore a tax resident in Cyprus, may be deemed to have a permanent establishment in Russia or elsewhere. Such a permanent establishment could be subject to taxation of the jurisdiction of the permanent establishment on the profits allocable to the permanent establishment. If we are tax resident in a jurisdiction outside of Cyprus or are deemed to have a permanent establishment in Russia or elsewhere, our tax burden may increase significantly, which, in turn, may materially adversely affect our business, financial condition and results of operations.

32

**Table of Contents**

***We may be subject to Special Contribution for the Defence Fund in Cyprus.***

According to the provisions of the Special Contribution for the Defence of the Republic Law N.117(I)/2002, as amended, Special Contribution for the Defence might be imposed on dividend income, "passive" interest income and rental income earned by companies tax resident in Cyprus (See "Item 10.E Taxation – Material Cypriot Tax Considerations – Taxation of Dividend income" and - "Deemed Dividends Distribution").

Cyprus tax resident companies which do not distribute 70% of their profits after tax, as defined by the Special Contribution for the Defence of the Republic Law, by the end of the two years after the end of the year of assessment to which the profits refer, will be deemed to have distributed this amount as dividend. Special Contribution for the Defence will be payable on such deemed dividend to the extent that the shareholders for deemed dividend distribution purposes at the end of the period of two years from the end of the year of assessment to which the profits refer, are Cyprus tax residents. The Special Contribution for the Defence rate is equal to 17% in respect of profits of years of assessment 2012 onwards. The amount of this deemed dividend distribution is reduced by any actual dividend paid out of the profits of the relevant year by the end of the period of two years from the end of the year of assessment to which the profits refer. This Special Contribution for the Defence is paid by the Company for the account of the shareholders.

In September 2011, the Commissioner of the Inland Revenue Department of Cyprus issued Circular 2011/10, which exempted from the Special Contribution for the Defence any profits of a company that is tax resident in Cyprus imputed indirectly to shareholders that are themselves tax resident in Cyprus to the extent that these profits are indirectly apportioned to shareholders who are ultimately not Cyprus tax residents.

To the extent that we are unable to recover this amount due to a change in shareholders or no actual dividend is ever paid out of the relevant profits, we will suffer the cost of this defense tax. Imposition of this tax could have a material adverse effect on our results of operations and financial condition if we are unable to recover the tax from shareholders as described above.

***Depending upon the value and the nature of our assets and the amount and nature of our income over time, we could be classified as a passive foreign investment company ("PFIC") for U.S. federal income tax purposes.***

We will be classified as a PFIC in any taxable year if either: (a) 50% or more of the fair market value of our gross assets (determined on the basis of a quarterly average) for the taxable year produce passive income or are held for the production of passive income, or (b) 75% or more of our gross income for the taxable year is passive income. As a publicly traded foreign corporation we intend for this purpose to treat the aggregate fair market value of our gross assets as being equal to the aggregate value of our outstanding stock ("market capitalization") plus the total amount of our liabilities and to treat the excess of the fair market value of our assets over their book value as a nonpassive asset to the extent attributable to our nonpassive income. Because we currently hold, and expect to continue to hold, a substantial amount of cash and cash equivalents and other passive assets used in our business, and because the value of our gross assets is likely to be determined in large part by reference to our market capitalization securities, we would likely become a PFIC for a given taxable year if the market price of our ADSs were to decrease significantly. The application of the PFIC rules is subject to uncertainty in several respects, and we must make a separate determination after the close of each taxable year as to whether we were a PFIC for such year. If we are a PFIC for any taxable year during which a U.S. investor held our ADSs or ordinary shares, the U.S. investor might be subject to increased U.S. federal income tax liability and to additional reporting obligations. We do not intend to provide the information necessary for the U.S. investor to make a qualified electing fund election with respect to our ADSs or ordinary shares. See "Taxation – United States Federal Income Tax Considerations – Passive Foreign Investment Companies."

***Our companies established outside of Russia may be exposed to taxation in Russia.***

Due to our international structure, we are subject to permanent establishment and transfer pricing risks in various jurisdictions in which we operate. We manage the related risks by looking at management functions and risks in various countries and level of profits allocated to each subsidiary. If additional taxes are assessed with respect to these matters, they may be material.

The Russian Tax Code contains the concept of a permanent establishment in Russia as means for taxing foreign legal entities, which carry on regular entrepreneurial activities in Russia beyond preparatory and auxiliary activities. The Russian double tax treaties with other countries also contain a similar concept. If a foreign company is treated as having a permanent establishment in Russia, it would be subject to Russian taxation in a manner broadly similar to the taxation of a Russian legal entity, but only to the extent of the amount of the foreign company's income that is attributable to the permanent establishment in Russia. However, the practical application of the concept of a permanent establishment under Russian domestic law is not well developed and so foreign companies having even limited operations in Russia, which would not normally satisfy the conditions for creating a permanent establishment under international norms, may be at risk of being treated as having a permanent establishment in Russia and hence being exposed to Russian taxation. Furthermore, the Russian Tax Code contains attribution rules, which are not sufficiently developed and there is a risk that the tax authorities might seek to assess Russian tax on the global income of a foreign company. Having a permanent establishment in Russia may also lead to other adverse tax implications, including challenging a reduced withholding tax rate on dividends under an applicable double tax treaty, potential effect on VAT and property tax obligations. There is also a risk that penalties could be imposed by the tax authorities for failure to register a permanent establishment with the Russian tax authorities. Recent events in Russia suggest that the tax authorities may be seeking more actively to investigate and assert whether foreign entities of our Group operate through a permanent establishment in Russia. Any such taxes or penalties could have a material adverse effect on our business, financial condition and results of operations.

A number of amendments had been made to the Russian tax legislation introducing, amongst others, the concepts of controlled foreign companies, corporate tax residency and beneficial ownership (Federal Law No. 376-FZ was signed by the Russian President on November 24, 2014 with its provisions applicable starting from January 1, 2015). Due to the lack of court and administrative practice, no assurance can be

33

Table of Contents

currently given as to how these amendments will be applied in practice and their exact nature, their potential interpretation by the tax authorities and the possible impact on us. We cannot rule out the possibility that, as a result of the introduction of changes to Russian tax legislation, certain of our companies established outside Russia might be deemed to be Russian tax residents, subject to all applicable Russian taxes. For more details see risks described in "Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations".

***We may encounter difficulties in obtaining lower rates of Russian withholding income tax envisaged by the Russia-Cyprus double tax treaty for dividends distributed from Russia.***

Dividends paid by a Russian legal entity to a foreign legal entity are generally subject to Russian withholding income tax at a rate of 15%, although this tax rate may be reduced under an applicable double tax treaty. We intend to rely on the Russia-Cyprus double tax treaty. The tax treaty allows reduction of withholding income tax on dividends paid by a Russian company to a Cypriot company to 10% provided that the following conditions are met: (i) the Cypriot company is a tax resident of Cyprus within the meaning of the tax treaty; (ii) the Cypriot company is the beneficial owner of the dividends; (iii) the dividends are not attributable to a permanent establishment of the Cypriot company in Russia; and (iv) the treaty clearance procedures are duly performed. This rate may be further reduced to 5% if the direct investment of the Cypriot company in a Russian subsidiary paying the dividends is at least EUR100,000. Although we will seek to claim treaty protection, there is a risk that the applicability of the reduced rate of 5% or 10% may be challenged by Russian tax authorities. As a result, there can be no assurance that we would be able to avail ourselves of the reduced withholding income tax rate in practice. Specifically, our Cypriot holding company may incur a 15% withholding income tax at source on dividend payments from Russian subsidiaries if the treaty clearance procedures are not duly performed at the date when the dividend payment is made. In this case we may seek to claim as a refund the difference between the 15% tax withheld and the reduced rate of 10% or 5% as appropriate. However, there can be no assurance that such taxes would be refunded in practice.

Russian withholding tax may also be applied when dividends are received from Russian subsidiaries by the company's non-Russian subsidiaries. Although we intend to rely on an applicable double tax treaty between Russia and the country where the relevant non-Russian subsidiary is resident, no assurance can be given that the reduced withholding tax rate would apply. A number of amendments had been made to the Russian tax legislation introducing, amongst others, the concept of beneficial ownership. Under this concept, double tax treaty benefits are only available to the recipient of income from Russian sources, if such recipient is the beneficial owner of the relevant income. Foreign entities that do not qualify as beneficial owners may not claim double tax treaty relief even if they are residents in a double tax treaty country. For these purposes, the beneficial owner is defined as a person holding directly, through its direct and/or indirect participation in other organizations or otherwise, the right to own, use or dispose of income, or the person on whose behalf another person is authorized to use and/or dispose of such income. In order to determine whether a foreign entity is a beneficial owner of income, it is necessary to take into account the functions performed by such foreign entity, as well as the risks borne by it. Entities are not recognized as beneficial owners of income if they have limited authorities to use or dispose income received from Russian sources, perform agency or other similar functions in favor of third parties, not taking any risks, or transfer such income (either partially or in full) to third parties that are not eligible to double tax treaty benefits.

Introduction of the concept of beneficial ownership may result in the inability of the foreign companies within our Group to claim benefits under a double taxation treaty through structures which historically have benefited from double taxation treaty protection in Russia. This may be the case if the recipient of the income is not recognized as its beneficial owner, look-through approach cannot be applied or is challenged by the tax authorities. Recent court cases demonstrate that the Russian tax authorities actively challenge application of double tax treaty benefits retroactively (i.e. prior to concept of beneficial ownership was introduced in the Russian Tax Code) on the grounds that double tax treaties already include beneficial ownership requirement to allow application of reduced tax rates or exemptions. In these cases the Russian tax authorities obtained relevant information by means of information exchange with the foreign tax authorities. The imposition of additional tax liabilities as a result of the application of this rule to transactions carried out by us may have a material adverse effect on our business, financial condition and results of operations (see "- Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations").

***Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations***

The Russian Federation, like a number of other countries in the world, is actively involved in discussion of measures against tax evasion through the use of low tax jurisdictions as well as aggressive tax planning structures. Initiatives such as the incorporation into Russian tax law of the concept of beneficial ownership, corporate tax residency of legal entities, the controlled foreign companies rules, conclusion of multilateral agreements for the exchange of information between the tax authorities of different countries have already been raised by the Government in the Main Directions of Russian Tax Policy for 2013 and the planned period of 2014-2015 and were found in the Main Directions of Russian Tax Policy for 2015 and the planned period of 2016-2017.

Starting from January 1, 2015, the Federal Law No. 376-FZ came into force. This law introduced several concepts into Russian tax legislation, including the following:

(i)    the concept of "controlled foreign companies" (the "CFC Rules"). Under the Russian CFC Rules, in certain circumstances, undistributed profits of foreign companies and non-corporate structures (e.g., trusts, funds or partnerships) domiciled in foreign jurisdictions, which are ultimately owned and/ or controlled by Russian tax residents (legal entities and individuals) will be subject to taxation in Russia. The Russian CFC Rules are being further developed. In particular, in June 2015, the President of the Russian Federation signed a federal law introducing technical amendments to the Russian CFC Rules, and another federal law amending the CFC rules was signed in February 2016. In the meantime, certain provisions of the Russian CFC Rules are still ambiguous and may be subject to arbitrary interpretation by the Russian tax authorities;

34

Table of Contents

(ii)     the concept of "corporate tax residency". Under this concept, a foreign legal entity may be recognized as a Russian tax resident if such entity is in fact managed from Russia. When an entity is recognized as Russian tax resident it is obligated to register with the Russian tax authorities, calculate and pay Russian tax on its worldwide income and comply with other tax-related rules established for Russian entities. The new rules set principal and secondary criteria for determining the place of management (among other things, the place where the company's executive body operates). However, there is some uncertainty as to how these criteria will be applied by the Russian tax authorities in practice;

(iii)     the concept of "beneficial ownership". Under the Russian Tax Code, a beneficial owner is defined as a person holding directly, through its direct and/or indirect participation in other organizations or otherwise, the right to own, use or dispose of income, or the person on whose behalf another person is authorized to use and/or dispose of such income. When determining the beneficial owner, the functions of a foreign person that is claiming the application of reduced tax rates under an applicable double tax treaty and the risks that such person takes should be analyzed. In accordance with the provisions of the Russian Tax Code, the benefits of a double tax treaty will not apply if a foreign person claiming such benefits has limited powers to dispose of the relevant income, fulfills intermediary functions without performing any other duties or taking any risks and paying such income (partially or in full) directly or indirectly to another person who would not be entitled to the same benefits should it received the income in question directly from Russia. The Russian Tax Code gives the right to the tax agent (i.e., the payer of income) to require, in addition to a certificate of tax residency, a confirmation from the recipient of the income that it is the beneficial owner of the income, however, at the moment it is still not clear in what form such confirmation should be obtained. Starting from January 1, 2017 this right of the tax agent becomes an obligation.

It is currently unclear how the Russian tax authorities will interpret and apply the new tax provisions and what will be the possible impact on us. As to the beneficial ownership concept, in a number of recent court cases, the tax authorities successfully applied this concept retroactively in respect to payments made before 2015 (i.e. prior to the date when the Russian beneficial ownership concept have come into force). Herewith, the tax authorities were unable to refer to the new rules enacted by the Federal Law No. 376-FZ for the period prior to 2015, so they referred to an applicable double tax treaty and the Commentaries to the OECD Model Tax Convention. Starting from 2015 the tax authorities may refer to specific provision of the Russian Tax Code when they challenge the beneficial ownership of the recipient and charge additional tax. Moreover, as mentioned above, starting from 2017, obtaining a confirmation that the income recipient is its beneficial owner will become an obligatory procedure (rather than a right of a tax agent) for applying a reduced withholding tax rate.

Therefore, it cannot be excluded that we might be subject to additional tax liabilities because of these changes being introduced and applied to transactions carried out by us, which could have a material adverse effect on our business, financial condition and results of operations.

On November 4, 2014 the Russian President also signed Federal Law No. 325-FZ ratifying the multilateral Convention on Mutual Administrative Assistance in Tax Matters developed by the Council of Europe and the OECD, which the Russian Federation signed in 2011. Ratification of this Convention will enable the Russian Federation to receive tax information from all participating countries which include, among others, a number of offshore jurisdictions. The provisions of the Convention came into force for Russia starting from July 1, 2015.

No assurance can currently be given as to the potential interpretation of the abovementioned changes into Russian tax legislation by the Russian tax authorities and the possible impact on us and our subsidiaries. These developments could have a material adverse effect on our business, financial condition and results of operations.

### *VAT on digital services in Russia*

Starting from January 1, 2017, the new rules of the Russian Tax Code introducing obligation to pay Russian VAT on the digital (electronically supplied) services in case such digital services are supplied (deemed to be supplied) in Russia ("VAT law") entered into force. Based on the new VAT law digital services shall be regarded as supplied at the place of the buyer's location. The new rules establish special criteria to determine whether the buyers are located in Russia.

Based on the new rules obligations to pay VAT on digital services supplied in Russia would depend on the way of the provision of such services. In particular, VAT law contains the following provisions in respect of agents:

- If services are provided by foreign suppliers to Russian individuals via Russian sales agents under agency (or other similar) agreements and such agents participate in settlements directly with individuals, then such Russian agents would be obliged to act as tax agents, withhold and pay the respective amounts of VAT to the Russian budget. No VAT registration will be required for the foreign suppliers. If services are provided via chain of sales agents the last sales agent in the chain collecting money from customers should withhold and pay the respective amounts of VAT;

- If services are provided by foreign suppliers to Russian individuals via foreign sales agents and such agents participate in settlements directly with individuals, then such foreign agents are obliged to register in Russia for VAT purposes and fulfill VAT obligations related to digital services. If sale of digital services is made via several foreign agents, then a foreign agent which performs settlements with individuals is regarded as a tax agent which should be register in Russia for VAT purposes and fulfill VAT obligations.

35

Table of Contents

The new rules do not contain exact list of companies which should be regarded as tax agents for payment of VAT on digital services. Therefore, it is not clear at the moment whether Russian payment operators and other third party companies involved in cash collection should be treated as tax agents for the purposes of the VAT law. In case we are deemed to be a tax agent and face the respective liabilities in terms of tax collection, we may have to renegotiate our contractual arrangements with foreign suppliers in order to comply with VAT law. Moreover, no assurance can be given that all foreign suppliers will continue to offer their services in Russia in light of the new legislative constraints. Any further developments on enforcement of VAT law could have a material adverse effect on our business, financial condition and results of operations.

**Risks Relating to our ADSs**

***The class B shares underlying the ADSs are not listed and may be illiquid.***

The class B shares underlying the ADSs are neither listed nor traded on any stock exchange, and we do not intend to apply for the listing or admission to trading of the class B shares on any stock exchange. As a result, a withdrawal of class B shares by a holder of ADSs, whether by election or due to certain other events will result in that holder obtaining securities that are significantly less liquid than the ADSs and the price of those class B shares may be discounted as a result of such withdrawal.

***Our ADSs trade on more than one market and this may result in increased volatility and price variations between such markets.***

Our ADSs trade on both Nasdaq and MOEX. Trading in our ADSs on these markets occurs in different currencies (U.S. dollars on Nasdaq and Russian rubles on MOEX) and at different times (due to different time zones, trading days and public holidays in the United States and Russia). The trading prices of our ADSs on these two markets may differ due to these and other factors. The liquidity of trading in our ADSs on MOEX is limited. This may impair your ability to sell your ADSs on MOEX at the time you wish to sell them or at a price that you consider reasonable. In addition, trading of a small number of ADSs on that market could adversely impact the price of our ADSs significantly and could, in turn, impact the price in the United States. ADSs are completely fungible between both markets. Any decrease in the trading price of our ADSs on one of these markets could cause a decrease in the trading price of our ADSs on the other market. Additionally, as there is no direct trading or settlement between the two stock markets, the time required to move the ADSs from one market to another may vary and there is no certainty of when ADSs that are moved will be available for trading or settlement.

***Future sales of ADSs or ordinary shares by significant shareholders could cause the price of our ADSs to decline.***

If any of our significant shareholders sell, or indicate an intent to sell, substantial amounts of our ADSs or ordinary shares, including both class A shares and class B shares, in the market, the trading price of our ADSs could decline significantly. We cannot predict the effect, if any, that future sales of these ADSs or ordinary shares or the availability of these ADSs or ordinary shares for sale will have on the market price of our ADSs. As of the date of this annual report, we have outstanding 60,632,585 ordinary shares, including those represented by ADSs. Of these, 45,116,012 ordinary shares are immediately freely tradable, without restriction, in the public market.

In addition, we have granted registration rights to Saldivar Investments Limited, Sergey A. Solonin, Andrey N. Romanenko, Igor N. Mikhaylov, E1 Limited and Mitsui & Co., Ltd., who collectively own 100% of our class A shares and approximately 77.5% of the voting power of our issued share capital as of the date of this annual report. To the extent these shares are sold into the market, the market price of our ADSs could decline. We cannot predict what effect, if any, market sales of securities held by our significant shareholders or any other shareholder or the availability of these securities for future sale will have on the market price of the ADSs.

***Investors in our ADSs may have limited recourse against us, our directors and executive officers because we conduct our operations outside the United States and most of our current directors and executive officers reside outside the United States.***

Our presence outside the United States may limit investors' legal recourse against us. We are incorporated under the laws of the Republic of Cyprus. Almost all of our current directors and senior officers reside outside the United States, principally in the Russian Federation. Substantially all of our assets and the assets of our current directors and executive officers are located outside the United States, principally in the Russian Federation. As a result, investors may not be able to effect service of process within the United States upon our company or its directors and executive officers or to enforce U.S. court judgments obtained against our company or its directors and executive officers in Russia, Cyprus or other jurisdictions outside the United States, including actions under the civil liability provisions of U.S. securities laws. In addition, it may be difficult for investors to enforce, in original actions brought in courts in jurisdictions outside the United States, liabilities predicated upon US securities laws. There is no treaty between the United States and the Russian Federation providing for reciprocal recognition and enforcement of foreign court judgments in civil and commercial matters. These limitations may deprive investors of effective legal recourse for claims related to their investment in our ADSs.

***Our ADS holders may not be able to exercise their pre-emptive rights in relation to future issuances of class B shares.***

In order to raise funding in the future, we may issue additional class B shares, including in the form of ADSs. Generally, existing holders of shares in Cypriot public companies are entitled by law to pre-emptive rights on the issue of new shares in that company (provided that such shares are paid in cash and the pre-emption rights have not been disapplied). Our ADS holders may not be able to exercise pre-emptive rights for class B shares represented by ADSs unless applicable securities law requirements are adhered to or an exemption from such requirements is

36

Table of Contents

available. In the United States, we may be required to file a registration statement under the Securities Act to implement pre-emptive rights. We can give no assurance that an exemption from the registration requirements of the Securities Act would be available to enable U.S. holders of ADSs to exercise such pre-emptive rights and, if such exemption is available, we may not take the steps necessary to enable U.S. holders of ADSs to rely on it. Accordingly, our ADS holders may not be able to exercise their pre-emptive rights on future issuances of shares, and, as a result, their percentage ownership interest in us would be reduced. In April 2013, our shareholders authorized the disapplication of pre-emptive rights for a period of five years from May 8, 2013, the date of the closing of our initial public offering, in connection with the issue of up to an additional 52,000,000 class B shares, including in the form of ADSs. Any issuances of class B shares for cash exceeding this amount during this five-year period would require disapplication of pre-emptive rights by the class B shareholders at such time. However, a Cyprus court or regulatory authority could determine that such waiver should not apply to an issuance of class B shares even if it is within such amount. If for any reason the disapplication of these rights proves to be ineffective or class B shareholders do not approve any further disapplication of pre-emptive rights that may be required, our ADS holders' ability to participate in future issuances of class B shares, including in the form of ADSs, may be limited. Furthermore, rights offerings are difficult to implement effectively under the current U.S. securities laws and our ability to raise capital in the future may be compromised if we need to do so via a rights offering in the United States.

***ADS holders have no legal interest in the underlying class B shares.***

ADS holders acquire the beneficial, and not the legal, interest in the underlying class B shares, which the depositary holds on trust for them, under the terms of the deposit agreement. The intended effect of the trust is to ring-fence the class B shares in the hands of the depositary by conferring a property interest on ADS holders as beneficiaries. The interest of the ADS holders as beneficiaries in trust assets, which are the class B shares, is indirect, in the sense that in the normal course they do not have any direct recourse to the class B shares nor do they have any direct right of action against us.

***ADS holders may be subject to limitations on transfer of their ADSs.***

ADSs are transferable on the books of the depositary. However, the depositary may close its transfer books at any time or from time to time when it deems expedient in connection with the performance of its duties. In addition, the depositary may refuse to deliver, transfer or register transfers of ADSs generally when our books or the books of the depositary are closed, or at any time if we or the depositary deems it advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason in accordance with the terms of the deposit agreement.

**ITEM 4.    Information on the Company**

**A.    History and Development of the Company**

We were incorporated in Cyprus under the name of OE Investments Limited on February 26, 2007 as a new holding company for JSC QIWI (previously known as OSMP CJSC and QIWI CJSC), which was incorporated in Russia in January in 2004. In 2007, we acquired, among other entities, CJSC E-port and LLC Qiwi Wallet, which were reorganized in the form of accession to JSC QIWI. In April 2008, we launched the Qiwi brand, which gradually became the marketing name for our businesses. We changed our name to Qiwi Limited on September 13, 2010, and subsequently to Qiwi plc upon converting to a public limited company on February 25, 2013.

Our principal executive office is located at Kennedy 12, Kennedy Business Centre, 2nd floor, P.C. 1087, Nicosia, Cyprus. Our telephone number at this address is: +357-22-653390. Our registered office is the same.

Our primary subsidiaries are QIWI Bank (JSC), or Qiwi Bank, JSC QIWI, QIWI Payments Services Provider Limited and Rapida LTD. We acquired Qiwi Bank in September 2010 from a group of our shareholders, and JSC QIWI was incorporated in Russia in January 2004. QIWI Payments Services Provider Limited was incorporated in the United Arab Emirates in February 2011. In June 2015, we acquired the Rapida payment processing system and the Contact money transfer system from Otkritie Investment Cyprus Limited ("Otkritie"). In January 2017 Rapida LTD began the process of merging into Qiwi Bank.

For a description of our principal capital expenditures and divestitures for the three years ended December 31, 2016 and for those currently in progress, see Item 5 "Operating and Financial Review and Prospects."

For a description of the rules and regulations under which we are governed, see Item 5 "Regulation."

**B.    Business Overview**

We are a leading provider of next generation payment services in Russia and the CIS. We have an integrated proprietary network that enables payment services across physical, online and mobile channels. We have deployed over 17.2 million virtual wallets, over 162,000 kiosks and terminals, and enabled merchants to accept over RUB 70 billion cash and electronic payments monthly from over 56 million consumers using our network at least once a month (aggregating consumers across QIWI, Contact and Rapida networks, without elimination of potential duplication). Our consumers can use cash, stored value and other electronic payment methods in order to pay for goods and services across physical or virtual environments interchangeably. We believe the complementary combination of our physical and virtual payment services provides differentiated convenience to our consumers and creates a strong network effect that drives payment volume across our business. With