# EXHIBIT C
# Part 3

income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions.

## E. Critical Accounting Estimates

We prepare our financial statements in conformity with IFRS.

Certain accounting policies require that we apply significant judgment in defining the appropriate assumptions for calculating financial estimates. By their nature, these judgments will be subject to an inherent degree of uncertainty. Our judgments are based upon our management's historical experience, terms of existing contracts, observance of trends in the industry, information provided by our customers and information available from other outside sources, as appropriate.

We consider accounting estimates to be critical accounting policies when:

- the estimates involve matters that are highly uncertain at the time the accounting estimate is made; and

- different estimates or changes to estimates could have a material impact on the reported financial positions, changes in financial position or results of operations.

When more than one accounting principle, or method of its application, is generally accepted, we select the principle or method that we consider to be the most appropriate when given the specific circumstances. Application of these accounting principles requires us to make estimates about the future resolution of existing uncertainties. Due to the inherent uncertainty involving estimates, actual results reported in the future may differ from such estimates. For additional information on our significant accounting policies, please refer to Note 4 (*Accounting judgments, estimates and assumptions*) to our audited consolidated financial statements for the fiscal year ended December 31, 2021, included elsewhere in this Annual Report.

## ITEM 6.  DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES

## A. Directors and Senior Management

The following table sets forth the name, age and position of each of our executive officers and directors as of the date of this Annual Report:

| Name | Age | Title |
|---|---|---|
| Andrey Fadeev | 37 | Chief Executive Officer, Co-Founder and Director |
| Alexander Karavaev | 47 | Chief Financial Officer |
| Anton Reinhold | 35 | Chief Operating Officer |
| Roman Safiyulin | 32 | Chief Corporate Development Officer |
| Andrey Akimov | 39 | Chief Communication Officer |
| Andrey Kuznetsov | 31 | Chief Investment Officer |
| Boris Gertsovskiy | 44 | Co-Founder and Director |
| Dmitrii Bukhman | 36 | Director |
| Igor Bukhman | 40 | Director |
| Ivan Tavrin | 45 | Director (Chairman) |
| Natasha Braginsky Mounier | 52 | Director |
| Andrew Sheppard | 45 | Director |

## Executive Officers

*Andrey Fadeev.* Mr. Fadeev has served as Nexters' chief executive officer and as a member of Nexters' board of directors since August 2021. Mr. Fadeev is a co-founder of Nexters Global. Mr. Fadeev was the chief executive officer of Progrestar, a company specializing in the development of online games for social networks. Mr. Fadeev graduated

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Moscow State Technical University of N.E. Bauman with specialty "Automated Information Processing and Management". We believe that Mr. Fadeev is qualified to serve

82

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

as a member of our board of directors due to the perspective and experience he brings as our chief executive officer and as a co-founder of Nexters Global and his online and mobile gaming industry knowledge and experience.

***Alexander Karavaev.*** Mr. Karavaev has served as chief financial officer of Nexters since August 2021. From 2019 to 2020, Mr. Karavaev served as a member of the board of directors of QIWI Group, a leading payment company in Russia and the CIS. From 2012 to May 2019, Mr. Karavaev was the Chief Financial Officer of QIWI Group. In December 2020 and January 2021, class action lawsuits were filed against QIWI plc and certain of its current and former officers in the United States District Court for the Eastern District of New York. The complaints allege that QIWI plc made material false or misleading statements and omissions regarding its business, operational and compliance policies in its annual report filed on Form 20-F for the years ended December 31, 2019 and 2018. Plaintiffs have sought to consolidate the cases into one proceeding, and seek an award of unspecified damages, prejudgment and post-judgment interest, as well as reasonable attorneys' fees, and other costs. QIWI plc and certain of its current and former officers are defending rigorously against these allegations. Prior to the Company, Mr. Karavaev was also the managing director of GK Samolet, a leading residential real estate development holding in Russia in 2019. From 2008 to 2011, Mr. Karavaev served as chief financial officer for Mail.ru Group Limited, a leading internet company in Russia and the CIS and Akado, a leading broadband and pay-TV operator. From 2003 to 2007, Mr. Karavaev served as deputy chief financial officer for Renova Holding and SUAL Holding. Mr. Karavaev worked at Andersen and Ernst & Young from 1997 to 2003. Mr. Karavaev holds a degree in economics from the Siberian Aerospace Academy.

***Anton Reinhold.*** Dr. Reinhold has served as Nexters' chief operating officer since August 2021. Dr. Reinhold served as chief business development officer and chief marketing officer of Nexters Global since November 2013. From March 2013 to November 2013, Dr. Reinhold served as chief marketing officer at Lingualeo, at the time a leading language learning startup startup in Russia. From 2012 to 2013, Dr. Reinhold served as demand generation lead at Comindware, a B2B startup for workflow management software. From 2007 to 2012, Dr. Reinhold served as head of online consumer sales in Acronis International GmbH, a global backup & recovery software development company. Dr Reinhold holds a Ph.D. degree from Russian State University for the Humanities (Moscow).

***Roman Safiyulin.*** Mr. Safiyulin has served as Nexters' chief corporate development officer since August 2021. From 2019 to 2021, Mr. Safiyulin served as an investor relations officer of HeadHunter Group PLC, a leading online job classified in Russia and the CIS. From 2017 to June 2019, Mr. Safiyulin was the head of corporate development and communication of Azbuka Vkusa. From 2014 to June 2017, Mr. Safiyulin was the Investor Relations Manager of Lenta PLC. Mr. Safiyulin holds a degree in economics from the Higher School of Economics, Moscow.

***Andrey Akimov.*** Mr. Akimov has served as Nexters' chief communication officer since August 2021. From 2018 to 2020, Mr. Akimov served as a chief communications officer at Metahash AG, a Swiss registered tech startup and developer of a distributed network. From 2016 to 2018, Mr. Akimov was a head of marketing and from 2014 to 2016, a public relations director at My.com B.V., which is operated under the MY.GAMES gaming brand and is a part of Mail.ru Group Limited, a leading internet company in Russia and the CIS. From 2012 to 2014, Mr. Akimov was the head of communications as a public relations director at Game Insight, one of the leading developers and publishers of mobile games. From 2004 to 2012, Mr. Akimov worked as a public relations director at an IT group, NCT, and as a public relations manager at a gaming company, G5 Entertainment. Mr. Akimov holds degrees in philology from The State University of Humanities and Technology and in public relations from Moscow State University of Culture and Arts.

***Andrey Kuznetsov.*** Mr. Kuznetsov has served as Nexters' chief investment officer since August 2021. From May 2017 to July 2021, Mr. Kuznetsov served as senior investment manager of Mail.ru Group, a leading Russian internet holding in Russia and CIS with assets in social networks, games, online-to-offline commerce, online education and other segments. From November 2016 to April 2017, Mr. Kuznetsov was the investment analyst at Medme, an early-stage venture capital firm. From November 2015 to October 2016, Mr. Kuznetsov was the investment analyst at Maxfield Capital, an early-stage venture capital firm. From January 2015 to November 2015, Mr. Kuznetsov was the investment analyst at B2B-Center – the leading Russian SaaS platform for corporate procurement. Mr. Kuznetsov worked at KPMG from 2013 to 2015. Mr. Kuznetsov worked at PricewaterhouseCoopers from 2012 to 2013. Mr. Kuznetsov holds a bachelor's degree in economics from the Higher School of Economics (Moscow) and master's degree from the University of Finance under Government of Russian Federation (Moscow).

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

83

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**Directors**

***Boris Gertsovskiy.*** Mr. Gertsovskiy has served as a member of Nexters' board of directors since August 2021. Mr. Gertsovskiy co-founded Nexters Global and Mr. Gertsovskiy has been a director of Flow Research S. L. U. since 2017. From 2012 to 2015, Mr. Gertsovskiy was the president of Crazy Bit LLC, a program product research company. In 2010, Mr. Gertsovskiy was the head of VAS group of Mail.ru. From 2007 to 2010, Mr. Gertsovskiy was the co-owner and vice-president of Astrum Online. From 2003 to 2007, Mr. Gertsovskiy was the co-owner of Time Zero, and served as a game designer, project manager, vice-president, and chief executive officer of Time Zero. Mr. Gertsovskiy holds a degree in computer complexes, systems and networks from the Petersburg Polytechnic University Faculty of Automation and Computer Engineering. We believe that Mr. Gertsovskiy is qualified to serve as a member of our board of directors due to the perspective and experience he brings as a co-founder of Nexters Global and his online gaming industry knowledge and experience.

***Dmitrii Bukhman.*** Mr. D. Bukhman has served as a member of Nexters' board of directors since August 2021. Mr. D. Bukhman is the co-founder and on the board of directors of PLR Worldwide Sales Limited ("Playrix"), a developer and distributor of mobile video games. Mr. D. Bukhman also sits on the board of directors of Dom Advisors Limited and, from 2019 to 2020, sat on the board of directors of Nogard Capital Limited. Between 2018 and 2019, Mr. D. Bukhman was an advisor for Everest Greenlight Advisors Ltd., a consulting company headquartered in Israel. Mr. D. Bukhman is the ultimate beneficial owner of Rimute Holdings Limited and Everix Investments Limited, both of which are affiliates of the Company. Mr. D. Bukhman holds a specialist degree in Applied Mathematics and Computer Science from Vologda State Pedagogical University. We believe that Mr. D. Bukhman is qualified to serve as a member of our board of directors due to the perspective and experience he brings as a co-founder of Playrix and his mobile gaming industry knowledge and experience.

***Igor Bukhman.*** Mr. I. Bukhman has served as a member of Nexters' board of directors since August 2021. Mr. I. Bukhman is the co-founder and on the board of directors of Playrix, a developer and distributor of mobile video games. Between 2018 and 2019, Mr. I. Bukhman was an advisor for Everest Greenlight Advisors Ltd., a consulting company headquartered in Israel. Mr. I. Bukhman is the ultimate beneficial owner of Rimute Holdings Limited and Everix Investments Limited, both of which are affiliates of the Company. Mr. I. Bukhman holds a specialist degree in Applied Mathematics and Computer Science from Vologda State Pedagogical University. We believe that Mr. I. Bukhman is qualified to serve as a member of our board of directors due to the perspective and experience he brings as a co-founder of Playrix and his mobile gaming industry knowledge and experience.

***Ivan Tavrin.*** Mr. Tavrin has served as a member of Nexters' board of directors since August 2021 and as Chairman of the board of directors since September 2021. Mr. Tavrin is the founder and principal of Kismet Capital Group, a private investment group, which he founded in 2017 and has managed since its inception. In that capacity, and as part of Kismet Capital Group's investment strategy, Mr. Tavrin, through special purpose entities controlled by him, acquired LLC Gallery Service in 2018 and acquired an indirect controlling interest in Vertical LLC in 2019. Mr. Tavrin also serves as founder, chief executive officer and director of Kismet Acquisition Two Corp and Kismet Acquisition Three Corp, special purpose acquisition companies that completed their initial public offerings in February 2021. From 2012 to 2016, Mr. Tavrin served as chief executive officer of PJSC MegaFon, or MegaFon, the second largest telecommunications operator in Russia as of December 31, 2016, having led its $1.8 billion initial public offering and dual listing on the London Stock Exchange and Moscow Exchange in 2012, which was the largest initial public offering of a telecommunications company in Russia at that time. Mr. Tavrin oversaw MegaFon's growth from 27% to 30% of market share between 2012 and 2015 and a more than two-fold increase in the OIBDA-Capex in the same period. Prior to this, Mr. Tavrin founded UTH Russia Limited, or UTH, one of the largest independent media broadcasting groups in Russia and served as its chief executive officer from its inception in 2009 to 2011. Mr. Tavrin has served as chairman of the board of directors of UTH from 2012 to 2016. In 2015, he led UTH in a transaction to acquire a 75% interest in CTC Media which was at the time listed on Nasdaq. Under new leadership, CTC Media's profitability improved significantly within the first 12 months of operations after the time of the acquisition.

In 2019, Mr. Tavrin led an acquisition of an indirect controlling interest in Vertical LLC, one of the leading independent telecommunications infrastructure operators in Moscow. In 2018, Mr. Tavrin, through LLC Media-1, completed an acquisition of LLC Gallery Service, the second largest out-of-home (OOH) advertising operator in Russia and the largest digital OOH operator across the country. In 2013, Mr. Tavrin purchased a significant minority stake in VK, a

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

leading social network in Russia, from its founder facilitating a resolution of a complicated corporate situation. The following year, he sold this stake to Mail.ru Group, VK's major shareholder, which later became a critical step for Mail.ru Group to consolidate control in VK and alignment of interests of all stakeholders. From 2009 to 2011, Mr. Tavrin held a controlling stake in Netbynet, one of the leading fibers to the home ("FTTH") operators in Moscow and central Russia, or NBN. He aided NBN's expansion through the acquisition of 30 local internet service

84

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

providers and subsequently sold NBN in an auction process, in which MegaFon was the successful bidder. Starting in 2006, Mr. Tavrin built "Vyberi Radio," a leading regional radio network via a roll‑up of 55 stations. In 2001, Mr. Tavrin founded Regional Media Group, which he subsequently merged into a television network TV3, becoming its largest individual shareholder and president, and grew the combined business through the acquisition of numerous regional television assets. He then sold the company to Prof‑Media for approximately $550 million. Mr. Tavrin currently serves as a board member of Holding Vyberi Radio LLC and Disney Channel Russia. Mr. Tavrin is a graduate of the Moscow State Institute of International Relations (MGIMO).

*Natasha Braginsky Mounier*. Ms. Braginsky Mounier has served as a member of Nexters' board of directors since August 2021. Natasha Braginsky Mounier is a retired partner from Capital Group, where she was investing in international equities for nearly 20 years and was the first ESG director. Earlier in her career, Natasha was an investment banker at JP Morgan and an associate at The Blackstone Group. Natasha is a native Russian speaker and is also fluent in English and French. She graduated from Georgetown University School of Foreign Service and Harvard Business School. Currently, she is non‑executive director at Aradei Capital, in addition to being Senior Fellow at FCLT Global and a trustee at Girls Are INvestors. Natasha is based in London.

*Andrew Sheppard*. Mr. Sheppard has served as a member of Nexters' board of directors since August 2021. Mr. Sheppard has over 20 years of experience building, managing and advising multi‑billion dollar consumer businesses. Past employers include EA, CNET/Gamespot, Kabam and GREE. He has direct experience working in online media, social media, mobile games, console games, online/PC games, game services, and consumer applications. Mr. Sheppard is currently a Managing Director at Transcend Fund, an early stage venture capital firm focused on gaming and gaming adjacent investments. He also serves as an independent member of the board of directors for Rakuten Games. We believe that Mr. Sheppard is qualified to serve as a member of our board of directors due to the perspective and experience he brings as a leader in the gaming industry and his knowledge and experience growing consumer businesses.

**Family Relationships**

Except for Dmitrii Bukhman and Igor Bukhman who are brothers, there are no family relationships among our directors and executive officers.

**Director Appointments**

Certain members of our board of directors were designated pursuant to the director appointment rights set forth in our Amended and Restated Memorandum and Articles of Association. Specifically, (i) each of Dmitrii Bukhman and Igor Bukhman is a designee of Everix Investments Limited and (i) each of Andrey Fadeev and Boris Gertsovskiy is a designee of Andrey Fadeev and Boris Gertsovskiy, acting jointly. See "*Item 7. Major Shareholders and Related Party Transactions—B. Related Party Transactions—Director Appointment Rights.*"

**B.  Compensation**

**Executive Officer and Director Compensation**

Our policies with respect to the compensation of our executive officers are administered by our board of directors in consultation with our nomination and compensation committee (as described under "—*C. Board Practices—Nomination and Compensation Committee*"). The compensation decisions regarding the Company's executives are based on the Company's need to retain those individuals who continue to perform at or above our expectations and to attract individuals with the skills necessary for us to achieve our business plan. We intend to be competitive with other similarly situated companies in its industry.

Performance‑based and equity‑based compensation is and is expected to be an important foundation in executive compensation packages. We believe that performance‑based and equity‑based compensation can be an important component of the total executive compensation package for maximizing shareholder value while, at the same time, attracting, motivating and retaining high‑quality executives.

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Ivan Tavrin does not receive any compensation for his services as a member of our board of directors. By contrast, the Company's executive officers will receive a combination of cash and equity compensation. Our nomination and compensation committee is charged with performing an annual review of our executive officers' cash and equity compensation to determine whether

85

Copyright © 2022 www.secdatabase.com. All Rights Reserved.

Please Consider the Environment Before Printing This Document

Table of Contents

they provide adequate incentives and motivation to executive officers and whether they adequately compensate the executive officers relative to comparable officers in other companies. In addition to the guidance provided by our nomination and compensation committee, we may utilize the services of third parties from time to time in connection with the hiring and compensation awarded to executive employees. This could include subscriptions to executive compensation surveys and other databases.

Our nominating and compensation committee will consider adopting formal or informal policies or guidelines for allocating compensation between long-term and currently paid out compensation, between cash and equity compensation, or among different forms of compensation.

For the fiscal year ended December 31, 2021, the aggregate cash compensation paid to the Company's executive officers was $1,395 thousand and the aggregate cash compensation paid to the Company's directors was $870 thousand. For grants of options to our executive officers and directors under our 2021 Employee Stock Option Plan, see "*—Options Granted Under the 2021 ESOP*." We have not set aside or accrued any amount to provide pension, retirement or other similar benefits to our executive officers and directors.

**2021 Employee Stock Option Plan**

On November 16, 2021, the Company's board of directors adopted the 2021 Employee Stock Option Plan (the "2021 ESOP"). In accordance with the Company's Amended and Restated Memorandum and Articles of Association, no Company shareholder approval was required in respect of the adoption of the 2021 ESOP. The 2021 ESOP provides for the grant of rights ("Options") entitling participants under the 2021 ESOP to acquire ordinary shares of the Company. The Company is the issuer of the shares under the 2021 ESOP.

The stated purpose of the 2021 ESOP is to achieve the following goals:

- Align interests of the shareholders and the management of the Company by providing to the key employees and service providers of the Company and its affiliates an opportunity to participate in a long-term growth of the Company's value;

- Increase investment attractiveness of the Company;

- Provide competitive remuneration and retain key employees of the Company and its affiliates; and

- Alignment with practice of public companies.

The principal features of the 2021 ESOP are summarized below.

*Administration*

Either the board of directors of the Company, or a committee thereof, or the Chief Executive Officer of the Company (the "CEO") if expressly so permitted by the board of directors, acting as administrator, will have the authority to adopt, amend and repeal such administrative rules, guidelines and practices relating to the 2021 ESOP as it deems advisable.

*Available Shares*

A maximum of 9,826,155 ordinary shares, being 5% of the issued ordinary shares of the Company as of the date of adoption of the 2021 ESOP, are reserved for issuance under Options granted under the 2021 ESOP. If any Option granted under the 2021 ESOP expires, terminates or is cancelled for any reason without having been exercised in full, the number of ordinary shares underlying such expired, terminated or cancelled Option will again be available for the purpose of awards under the 2021 ESOP. The difference between the number of Options granted to a specific person and number of ordinary shares received by that person as a result of cashless exercise will be added back to the Option pool available for grant.

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

86

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Eligibility*

The CEO will select recipients of Options under the 2021 ESOP ("Participants") from among those key employees and service providers of the Company or its affiliates who, in the opinion of the CEO, are in a position to make a significant contribution to the success of the Company and its affiliates.

*Awards*

Participants will receive a right entitling the Participant to acquire ordinary shares upon satisfaction of the vesting conditions set forth in the applicable award agreement and payment of the applicable price per ordinary share ("Exercise Price") determined by the board of directors or a committee thereof.

The board of directors or committee thereof will determine the terms of all Options and will furnish to each Participant an agreement (the "Award Agreement") setting forth the terms applicable to the Participant's Option. Terms and conditions of Options may differ amongst different Participants and different grants of Options.

Vesting of Options will be governed by the Award Agreement with each Participant unless otherwise determined by the board of directors or a committee thereof. Options which have not become vested as of the date of termination of the Participant's employment or service will be forfeited upon such termination. Option holders will have ninety days following termination of employment or service to exercise vested Options.

The Company may permit Participants to exercise Options under the 2021 ESOP pursuant to a cashless exercise program.

*Adjustment*

In the event of any share split or combination of shares (including a reverse share split), reorganization, recapitalization, large, special and non-recurring dividend, split-up, spin-off, merger, exchange of shares, redemption, repurchase, consolidation, other change in the capital structure of the Company, sale of assets or other similar event which requires adjustment in order to avoid the enlargement or dilution of rights under the 2021 ESOP, the board of directors or a committee thereof will make adjustments to the maximum number Shares that may be delivered under the 2021 ESOP, and the Exercise Price of any Options and also make such changes in the number and kind of shares, securities or other property (including cash) covered by outstanding Options, and the terms thereof, as the board of directors or a committee thereof determines to be appropriate.

*Change of Control*

The board of directors may, in its sole and absolute discretion, at any time as long as any of the Options under the 2021 ESOP remain outstanding, amend the 2021 ESOP and any respective Award Agreements to implement provisions regarding a change of control over the Company as may be reasonably necessary to grant Participants reasonable protection from any materially adverse changes which may result from a change of control over the Company.

*Transferability and Lock-Up*

No Option granted under the 2021 ESOP may be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner, nor may a Participant enter into any derivative agreement or other similar hedging arrangement relating to any Option without prior written consent of the Company.

It will be a condition to the grant of each Option under the 2021 ESOP that each Participant unconditionally agree to comply with such lock-up arrangements if required to do so by the board of directors, a committee thereof, or the CEO.

*Forfeiture and Claw-Back Provisions*

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Options which have not become vested as of the date of termination of the Participant's employment or service will be forfeited upon such termination. Option holders will have ninety days following termination of employment or service to exercise vested Options.

87

Copyright © 2022 www.secdatabase.com. All Rights Reserved.

Please Consider the Environment Before Printing This Document

Table of Contents

The Company may require the Participant to deliver, surrender, or otherwise repay to the Company the Option and any ordinary shares or other amount or property that may be issued, delivered or paid in respect of the Option, as well as any consideration that may be received in respect of a sale or other disposition of any such ordinary shares or property, (a) if the Participant commits or engages in a breach of confidentiality, (b) if the Participant commits or engages in an act of theft, embezzlement or fraud, or (c) pursuant to any applicable securities, tax or stock exchange laws, rules or regulations relating to the recoupment or clawback of incentive compensation, as in effect from time to time.

### Amendment and Termination

The board of directors, in its sole and absolute discretion, may at any time or times amend or alter the 2021 ESOP or any outstanding Option and may at any time terminate or discontinue the 2021 ESOP as to any future grants of Options; *provided*, that the board of directors may not, without the Participant's consent, amend, alter or terminate the terms of an Option or the 2021 ESOP so as to affect adversely a Participant's existing rights under an Option or the 2021 ESOP.

The 2021 ESOP became effective upon its approval by the board of directors on November 16, 2021 and will expire on the tenth anniversary thereof (unless terminated earlier by the board of directors).

### Governing law and jurisdiction

The 2021 ESOP will be governed by, and be construed in accordance with, the laws of the British Virgin Islands**.** Any disputes relating to the 2021 ESOP or any Award Agreement entered into in connection with the 2021 ESOP will be subject to the exclusive jurisdiction of the courts of the British Virgin Islands.

88

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**Options Granted Under the 2021 ESOP**

The following executive officers and directors of the Company held Options (both vested and unvested) as of December 31, 2021:

| Participant | Total Number of Options | Grant Date | Vesting Date | Exercise Price | | Number of Options Outstanding |
|---|---|---|---|---|---|---|
| Alexander Karavaev | 1,000,000 | November 16, 2021 | · 200,000 at 1st anniversary of grant date<br>· 200,000 at 2nd anniversary of grant date<br>· 200,000 at 3rd anniversary of grant date<br>· 200,000 at 4th anniversary of grant date<br>· 200,000 at 5th anniversary of grant date | $ | 10 | 1,000,000 |
| | 20,000 | November 30, 2021 | · 20,000 at grant date | | nil | 20,000 |
| Anton Reinhold | 735,769 | November 16, 2021 | · 73,577 at January 1, 2022<br>· 147,154 at January 1, 2023<br>· 147,154 at January 1, 2024<br>· 147,154 at January 1, 2025<br>· 147,154 at January 1, 2026<br>· 73,576 at July 1, 2026 | | nil | 735,769 |
| Roman Safiyulin | 100,000 | November 16, 2021 | · 25,000 at grant date<br>· 25,000 at 1st anniversary of grant date<br>· 25,000 at 2nd anniversary of grant date<br>· 25,000 at 3rd anniversary of grant date | $ | 10 | 100,000 |
| Andrey Akimov | 100,000 | November 16, 2021 | · 25,000 at grant date<br>· 25,000 at 1st anniversary of grant date<br>· 25,000 at 2nd anniversary of grant date<br>· 25,000 at 3rd anniversary of grant date | $ | 10 | 100,000 |
| Andrey Kuznetsov | 100,000 | November 16, 2021 | · 25,000 at grant date<br>· 25,000 at 1st anniversary of grant date<br>· 25,000 at 2nd anniversary of grant date<br>· 25,000 at 3rd anniversary of grant date | $ | 10 | 100,000 |
| Natasha Braginsky Mounier | 15,000 | November 21, 2021 | · 1,250 at 3 months after grant date<br>· 1,250 at 6 months after grant date<br>· 1,250 at 9 months after grant date<br>· 11,250 at 1st anniversary of grant date | | nil | 15,000 |
| Andrew Sheppard | 15,000 | November 29, 2021 | · 1,250 at 3 months after grant date<br>· 1,250 at 6 months after grant date<br>· 1,250 at 9 months after grant date<br>· 11,250 at 1st anniversary of grant date | | nil | 15,000 |

As of December 31, 2021, no Options granted to our executive officers and directors were exercised.

**C.  Board Practices**

**Composition of the Board of Directors**

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

When considering whether directors and director nominees have the experience, qualifications, attributes and skills, taken as a whole, to enable the Company's board of directors to satisfy its oversight responsibilities effectively in light of its business and structure, the board of directors expects to focus primarily on each person's background and experience as reflected in the information discussed in each of the directors' individual biographies set forth above in order to provide an appropriate mix of experience and skills relevant to the size and nature of its business.

**Committees of the Board of Directors**

The Company's board of directors directs the management of its business and affairs, as provided by British Virgin Islands law, and conducts its business through meetings of the board of directors and standing committees. The Company has a standing audit committee and a nomination and compensation committee, each of which operates under a written charter.

89

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

In addition, from time to time, special committees may be established under the direction of the board of directors when the board deems it necessary or advisable to address specific issues. Current copies of our committee charters are posted on its website, *https://nexters.com*, as required by applicable SEC and Nasdaq rules. The information on or available through such website is not deemed incorporated in this Annual Report and does not form part of this Annual Report.

**Audit Committee**

The Company's audit committee consists of Ivan Tavrin, Natasha Braginsky Mounier and Andrew Sheppard, with Natasha Braginsky Mounier serving as the chair of the committee. Nexters' board of directors has determined that each of these individuals meets the independence requirements of the Sarbanes-Oxley Act of 2002, as amended, or the Sarbanes-Oxley Act, Rule 10A-3 under the Exchange Act and the applicable listing standards of Nasdaq. Each member of our audit committee can read and understand fundamental financial statements in accordance with Nasdaq audit committee requirements. In arriving at this determination, the board has examined each audit committee member's scope of experience and the nature of their prior and/or current employment.

The Company's board of directors has determined that Natasha Braginsky Mounier qualifies as an audit committee financial expert within the meaning of SEC regulations and meets the financial sophistication requirements of the Nasdaq rules. In making this determination, our board has considered Natasha Braginsky Mounier's formal education and previous and current experience in financial and accounting roles. Both the Company's independent registered public accounting firm and management periodically will meet privately with our audit committee.

The audit committee's responsibilities include, among other things:

- appointing, compensating, retaining, evaluating, terminating and overseeing the Company's independent registered public accounting firm;

- discussing with the Company's independent registered public accounting firm their independence from management;

- reviewing with the Company's independent registered public accounting firm the scope and results of their audit;

- pre-approving all audit and permissible non-audit services to be performed by the Company's independent registered public accounting firm;

- overseeing the financial reporting process and discussing with management and the Company's independent registered public accounting firm the interim and annual financial statements that we file with the SEC;

- reviewing and monitoring our accounting principles, accounting policies, financial and accounting controls and compliance with legal and regulatory requirements; and

- establishing procedures for the confidential anonymous submission of concerns regarding questionable accounting, internal controls or auditing matters.

**Nomination and Compensation Committee**

The Company's nomination and compensation committee consists of Ivan Tavrin, Natasha Braginsky Mounier and Andrew Sheppard. The Company's board of directors has determined that each of these individuals meets the independence requirements of the applicable listing standards of Nasdaq. Nevertheless, as a foreign private issuer, we are permitted to follow the corporate governance practices of our home country, the British Virgin Islands, in lieu of the applicable Nasdaq rules in respect of compensation committees and nomination of directors. The nomination and compensation committee's responsibilities include, among other things:

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

- reviewing and setting or making recommendations to our board of directors regarding the compensation of the Company's executive officers;

- making recommendations to our board of directors regarding the compensation of the Company's directors;

90

Copyright © 2022 www.secdatabase.com. All Rights Reserved.

Please Consider the Environment Before Printing This Document

Table of Contents

- reviewing and approving or making recommendations to our board of directors regarding the Company's incentive compensation and equity-based plans and arrangements;

- appointing and overseeing any compensation consultants; and

- overseeing the selection of persons to be nominated to serve on our board of directors.

**Nomination and Compensation Committee Interlocks and Insider Participation**

None of the Company's executive officers currently serves, or has served during the last year, as a member of the board of directors or nomination and compensation committee of any entity, other than Nexters, that has one or more executive officers serving as a member of the Company's board of directors.

**D.  Employees**

As of December 31, 2021, we had 809 employees, of whom 309 were women, with approximately 117 employees in Cyprus and approximately 692 employees in Russia and other countries. None of our employees are represented by a labor union or party to a collective bargaining agreement. We have never experienced any work stoppages or strikes as a result of labor disputes. We consider our relationship with our employees to be good. Our human capital resources objectives include, as applicable, identifying, recruiting, retaining, incentivizing and integrating our existing and prospective employees. The principal purposes of our incentive plans are to attract, retain and motivate selected employees, executive officers and directors through the granting of stock-based compensation awards and cash-based performance bonus awards.

**E.  Share Ownership**

Information regarding the ownership of our ordinary shares by our directors and executive officers is set forth in "*Item 7. Major Shareholders and Related Party Transactions—A. Major Shareholders.*"


**ITEM 7.  MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS**

**A.  Major Shareholders**

**Beneficial Ownership**

The following table sets forth information relating to the beneficial ownership of our ordinary shares as of February 28, 2022 based on a total number of 196,523,101 ordinary shares outstanding as of such date, with respect to the beneficial ownership of our shares by:

- each person, or group of affiliated persons, known by us to beneficially own more than 5% of outstanding ordinary shares;

- each of our directors;

- each of our named executive officers; and

- all of our directors and executive officers as a group.

Beneficial ownership is determined according to the rules of the SEC, which generally provide that a person has beneficial ownership of a security if he, she or it possesses sole or shared voting or investment power over that security, including options and warrants that are currently exercisable or exercisable within 60 days. Except as described in the footnotes below and subject to applicable community property laws and similar laws, we believe that each person listed above has sole voting and investment power with respect to all ordinary shares held by that person based on information

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

provided to us by such person. This table is based on information supplied by our directors and officers and by Schedules 13D and Schedules 13G, if any, filed with the SEC.

91

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Unless otherwise indicated, we believe that all persons named in the table below have sole voting and investment power with respect to the voting securities beneficially owned by them.

| Beneficial Owners | Number of Ordinary Shares[1] | Percentage of Ordinary Shares[2] |
|---|---|---|
| *Directors and Executive Officers* | | |
| Andrey Fadeev (Director and Chief Executive Officer) | 39,790,076 | 20.2 % |
| Boris Gertsovskiy (Director) | 39,790,076 | 20.2 % |
| Dmitrii Bukhman[3] (Director) | 37,200,700 | 18.9 % |
| Igor Bukhman[3] (Director) | 37,200,700 | 18.9 % |
| Ivan Tavrin[4] (Director) | 17,875,000 | 8.8 % |
| Natasha Braginsky Mounier (Director)[5] | 1,250 | * |
| Andrew Sheppard[5] (Director) | 1,250 | * |
| Alexander Karavaev[5] (Chief Financial Officer) | 20,000 | * |
| Anton Reinhold[6] (Chief Operating Officer) | 3,605,263 | 1.8 % |
| Roman Safiyulin[5] (Chief Corporate Development Officer) | 25,000 | * |
| Andrey Akimov[5] (Chief Communication Officer) | 25,000 | * |
| Andrey Kuznetsov[5] (Chief Investment Officer) | 25,000 | * |
| All Nexters directors and executive officers as a group  (12 individuals) | 175,559,315 | 86.6 % |
| *Other 5% Shareholders* | — | — |

---

\* Less than one percent (1%) of our outstanding ordinary shares.

(1) The number of ordinary shares listed for each beneficial owner assumes the exercise of all of the warrants beneficially owned by such beneficial owner.

(2) In calculating the percentages, (a) the numerator is calculated by adding the number of ordinary shares held by such beneficial owners and the number of ordinary shares issuable upon the exercise of options and warrants held by such beneficial owner (if any); and (b) the denominator is calculated by adding the aggregate number of ordinary shares outstanding, the number of ordinary shares issuable upon the exercise of options and warrants held by such beneficial owner, if any (but not the number of ordinary shares issuable upon the exercise of warrants held by any other beneficial owner).

(3) Represents 50% of the 74,401,400 ordinary shares directly held by Everix Investments Limited. Based on information reported on a Schedule 13G filed on February 14, 2022, each of Dmitrii Bukhman and Igor Bukhman has a 50% indirect ownership interest in Everix Investments Limited. Consequently, each of Dmitrii Bukman and Igor Bukhman may be deemed to be the indirect beneficial owner of 50% of the ordinary shares held by Everix Investments Limited.

(4) Represents 11,750,000 ordinary shares and 6,125,000 ordinary shares issuable upon the exercise of 6,125,000 warrants directly held by Kismet Sponsor Limited, as Sponsor. Based on information reported on a Schedule 13G filed on February 14, 2022, in December 2021, in connection with a number of restructuring actions, Mr. Tavrin transferred his 100% interest in Kismet Sponsor Limited to Kismet Holdings Limited. Pursuant to such report on Schedule 13G, Kismet Holdings Limited directly holds a 100% interest in Kismet Sponsor Limited. Because Mr. Tavrin holds a 22% interest in Kismet Holdings Limited, he maintains an indirect 22% interest in Kismet Sponsor Limited. In addition, Mr. Tavrin has (i) sole voting power over all of our ordinary shares held by Kismet Sponsor Limited pursuant to a Special Power of Attorney and Irrevocable Proxy, dated December 23, 2021, executed as a deed by Kismet Sponsor Limited, and (ii) sole dispositive power over all of our ordinary shares held by Kismet Sponsor Limited until February 11, 2023, pursuant to a Special Power of Attorney, dated December 23, 2021, executed as a deed by Kismet Holdings Limited. Accordingly, Mr. Tavrin may be deemed to share beneficial ownership over our ordinary shares owned by Kismet Sponsor Limited.

(5) Represents ordinary shares issuable upon exercise of options that have been granted and are currently exercisable or exercisable within 60 days. For information regarding the options, see "*Item 6. Directors, Senior Management and Employees—B. Compensation—Options Granted Under the 2021 ESOP.*"

(6) Includes (i) 3,531,686 ordinary shares and (ii) 73,577 ordinary shares issuable upon the exercise of options that have been granted and are currently exercisable or exercisable within 60 days. For information regarding the options, see "*Item 6. Directors, Senior Management and Employees—B. Compensation—Options Granted Under the 2021 ESOP.*"

**Difference in Voting Rights**

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

All of the Company's ordinary shares have the same voting rights and no major shareholder of the Company has different voting rights.

**Securities Held in the Host Country**

As of February 28, 2021, 196,523,101 ordinary shares of the Company were issued and outstanding, of which 3,188,758, or 1.6%, were held by one record holder in the United States, Cede & Co.

92

Copyright © 2022 www.secdatabase.com. All Rights Reserved.

Please Consider the Environment Before Printing This Document

Table of Contents

**Arrangements for Change in Control**

We are not aware of any arrangement that may, at a subsequent date, result in a change of control of the Company.

**B.  Related Party Transactions**

**Policies and Procedures for Related Person Transactions**

The board of directors of the Company have adopted a written related person transaction policy that sets forth the following policies and procedures for the review and approval or ratification of related person transactions.

A "related person transaction" is a transaction, arrangement or relationship in which the Company or any of its subsidiaries was, is or will be a participant, the amount of which involved exceeds $120,000, and in which any related person had, has or will have a direct or indirect material interest. A "related person" means:

- any person who is, or at any time during the applicable period was, one of the Company's executive officers or one of the Company's directors;

- any person who is known by the Company to be the beneficial owner of more than 5% of its voting shares;

- any immediate family member of any of the foregoing persons, which means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother in-law or sister-in-law of a director, executive officer or a beneficial owner of more than 5% of the Company's voting shares, and any person (other than a tenant or employee) sharing the household of such director, executive officer or beneficial owner of more than 5% of the Company's voting shares; and

- any firm, corporation or other entity in which any of the foregoing persons is a partner or principal, or in a similar position, or in which such person has a 10% or greater beneficial ownership interest.

The Company has implemented policies and procedures designed to minimize potential conflicts of interest arising from any dealings it may have with its affiliates and to provide appropriate procedures for the disclosure of any real or potential conflicts of interest that may exist from time to time. Specifically, pursuant to its audit committee charter, the audit committee will have the responsibility to review related party transactions.

**Certain Relationships and Related Person Transactions**

***Transactions Related to the Business Combination of Nexters, Kismet and Nexters Global***

*Business Combination Agreement*

On August 26, 2021, we consummated the Transactions contemplated by the business combination agreement (the "Business Combination Agreement"), dated as of January 31, 2021, as amended on July 17, 2021 and August 11, 2021, by and among Nexters, Kismet, the Sponsor (which is solely owned by Ivan Tavrin, one of the Company's directors), solely in its capacity as Kismet's representative, Nexters Global, Fantina Holdings Limited, a private limited liability company domiciled in Cyprus, solely in its capacity as the Company Shareholders representative, and the shareholders of Nexters Global party thereto. Pursuant to the Business Combination Agreement, among other things, Kismet was merged into Nexters, with Nexters surviving the merger and the securityholders of Kismet (other than those who elected to redeem their Kismet ordinary shares) becoming securityholders of Nexters, and Nexters acquired all of the issued and outstanding share capital of Nexters Global from the holders of Nexters Global's share capital for a combination of cash and Nexters ordinary shares, such that Nexters Global became a direct wholly owned subsidiary of Nexters. The Business Combination Agreement contained customary representations and warranties and pre- and post-closing covenants of each party and customary closing conditions.

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

93

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Kismet Founder Shares*

On June 8, 2020, Kismet issued 6,250,000 Kismet founder shares. The Sponsor (which is solely owned by Ivan Tavrin, one of the Company's directors), paid for certain offering costs of $25,000 on behalf of Kismet in exchange for issuance of the Kismet founder shares. In July 2020, Kismet performed a 1.23 share split resulting in the Sponsor holding an aggregate of 7,687,500 Kismet founder shares. All Kismet shares and associated amounts were retroactively restated to reflect the share capitalization. The Sponsor had agreed to forfeit up to an aggregate of 937,500 Kismet founder shares, on a pro rata basis, to the extent that the option to purchase additional Kismet units in the IPO was not exercised in full by the underwriters. On September 17, 2020, the underwriters notified Kismet that the over-allotment option was not exercised; as a result, these Kismet founder shares were forfeited effective as of September 19, 2020, leaving the Sponsor with 6,750,000 Kismet founder shares.

In connection with the Transactions, the Sponsor's 6,750,000 Kismet founder shares were exchanged for 6,750,000 Nexters ordinary shares.

*Private Placement Warrants*

Simultaneously with the closing of the IPO, Kismet consummated a private placement of 6,750,000 Kismet private placement warrants, at a price of $1.00 per Kismet private placement warrant, to the Sponsor (which is solely owned by Ivan Tavrin, one of the Company's directors), generating gross proceeds of approximately $6.8 million.

In connection with the Transactions, the Sponsor's 6,750,000 Kismet private placement warrants were exchanged for 6,750,000 Nexters private placement warrants, 1,625,000 of which were transferred by the Sponsor to certain institutional investors in private placements pursuant to the PIPE Subscription Agreements consummated in connection with the Transactions.

*Forward Purchase Agreement*

On August 5, 2020, Kismet entered into a forward purchase agreement (the "Forward Purchase Agreement") with the Sponsor (which is solely owned by Ivan Tavrin, one of the Company's directors), which provided for the purchase of $20,000,000 of Kismet units, with each Kismet unit consisting of one Kismet ordinary share (the "Forward Purchase Shares") and one half of one Kismet warrant (the "Forward Purchase Warrants"), for a purchase price of $10.00 per Kismet unit, in a Kismet private placement to occur concurrently with the closing of Kismet's initial business combination.

On January 31, 2021, Kismet, Nexters and the Sponsor entered into an amended and restated Forward Purchase Agreement (the "A&R Forward Purchase Agreement"). The A&R Forward Purchase Agreement amended the Forward Purchase Agreement, dated August 5, 2020, between Kismet and the Sponsor by, among other things, increasing the Sponsor's purchase commitment thereunder from $20.0 million to $50.0 million and replacing the Sponsor's commitment to acquire Kismet's units with a commitment to acquire 5,000,000 Nexters ordinary shares and 1,000,000 Nexters public warrants in a private placement to occur after, and subject to, the Merger Closing and prior to the Share Acquisition Closing. Upon Closing, the Sponsor subscribed for and purchased 5,000,000 Nexters ordinary shares and 1,000,000 Nexters public warrants from Nexters for an aggregate purchase price of $50,000,000, pursuant to the terms of the A&R Forward Purchase Agreement.

*PIPE Subscription Agreements*

On July 16, 2021, Kismet, Nexters and the Sponsor entered into separate subscription agreements (each as amended, restated or supplemented from time to time, a "PIPE Subscription Agreement") with certain institutional investors that are not "U.S. persons" as defined in Regulation S under the Securities Act and with whom the Sponsor had prior business relationships (each, a "PIPE Investor"), pursuant to which the PIPE Investors agreed to subscribe for and purchase an aggregate of 5,000,000 Nexters ordinary shares for a purchase price of $10.00 per share for an aggregate commitment of $50 million in a private placements outside the United States in reliance on Regulation S under the Securities Act (the "PIPE"). The PIPE was consummated concurrently with the closing of the Transactions.

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

94

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Registration Rights Agreement*

Upon consummation of the Transactions, on August 26, 2021, Nexters, the Key Company Shareholders and the Sponsor entered into a Registration Rights Agreement (the "Registration Rights Agreement"). Pursuant to the Registration Rights Agreement, subject to certain requirements and customary conditions, including with regard to the number of demand rights that may be exercised, the Holders (as defined therein) may demand at any time or from time to time, that Nexters file a registration statement with the SEC to register the securities of Nexters held by such Holders. The Registration Rights Agreement also (i) provides the Holders with "piggy-back" registration rights, subject to certain requirements and customary conditions, and (ii) terminates the registration rights agreement, dated as of August 5, 2020, among Kismet, the Sponsor and the other "Holders" named therein.

*Lock-Up Agreements*

Upon consummation of the Transactions, on August 26, 2021, (i) the Key Company Shareholders each entered into a lock-up agreement with Nexters (the "Company Shareholders Lock-Up Agreement"), and (ii) the Sponsor entered into a lock-up agreement with Nexters (the "Sponsor Lock-Up Agreement" and, together with the Company Shareholders Lock-Up Agreement, the "Lock-Up Agreements"). Pursuant to the Company Shareholders Lock-Up Agreement, subject to certain limited exceptions, the Key Company Shareholders agreed not to transfer any Nexters ordinary shares received and to be received by the Key Company Shareholders pursuant to the Business Combination Agreement during the period commencing from the Share Acquisition Closing until the earlier to occur of (i) one year after the Share Acquisition Closing, (ii) 150 days after the Share Acquisition Closing, if the closing price of the Nexters ordinary shares during such period equals or exceeds $12.00 per share (as adjusted for share splits, share dividends, reorganizations and recapitalizations) for any 20 trading days within any 30 trading day period and (iii) a date after the Share Acquisition Closing on which Nexters consummates a subsequent liquidation, merger, share exchange or other similar transaction which results in all of the Nexters' shareholders having the right to exchange their Nexters ordinary shares for cash, securities or other property.

Pursuant to the Sponsor Lock-Up Agreement, subject to certain limited exceptions, the Sponsor agreed not to transfer any Nexters ordinary shares and the Nexters warrants received and to be received by the Sponsor pursuant to the A&R Forward Purchase Agreement and the Business Combination Agreement (including the Nexters ordinary shares issued or issuable upon the exercise or conversion of the Nexters warrants) during the period commencing from the Merger Closing until the earlier to occur of (i) one year after the Share Acquisition Closing, (ii) 150 days after the Share Acquisition Closing, if the closing price of the Nexters ordinary shares during such period equals or exceeds $12.00 per share (as adjusted for share splits, share dividends, reorganizations and recapitalizations) for any 20 trading days within any 30 trading day period and (iii) a date after the Share Acquisition Closing on which Nexters consummates a subsequent liquidation, merger, share exchange or other similar transaction which results in all of the Nexters' shareholders having the right to exchange their Nexters ordinary shares for cash, securities or other property. Pursuant to the Sponsor Lock-Up Agreement, the Sponsor also agreed not to transfer any Nexters warrants until 30 days after the Merger Closing.

*Deferred Exchange Shares*

Pursuant to the Business Combination Agreement, the issuance of an aggregate of 20,000,000 Nexters ordinary shares (valued at approximately $200.0 million) to the former shareholders of Nexters Global has been deferred as follows: (i) the issuance of 10,000,000 ordinary shares, in the aggregate, is deferred until the volume weighted average trading price of Nexters ordinary shares is $13.50 or greater for any 20 trading days within a period of 30 trading days prior to the third anniversary of the Share Acquisition Closing; and (ii) the issuance of an additional 10,000,000 ordinary shares, in the aggregate, is deferred until the volume weighted average trading price of Nexters ordinary shares is $17.00 or greater for any 20 trading days within a period of 30 trading days prior to the third anniversary of the Share Acquisition Closing.

**Director Appointment Rights**

Pursuant to our Amended and Restated Memorandum and Articles of Association, each of (1) Everix Investments Limited (which is wholly owned by Dmitrii Bukhman, a Company director, and Igor Bukhman, a Company

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

director), and (2) Andrey Fadeev (the Chief Executive Officer and a director of the Company) and Boris Gertsovskiy (a Company director), acting jointly, have the right to appoint two directors to the board of directors, which number may decrease as those shareholders dispose of their shares in the Company. For further information, see the Company's Amended and Restated Memorandum and Articles of Association, which is included as an exhibit to this Annual Report.

95

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

### Indemnification Agreements

Our Amended and Restated Memorandum and Articles of Association provide for certain indemnification rights for our directors and executive officers, and we entered into an indemnification agreement with each of our executive officers and directors providing for procedures for indemnification and advancements by us of certain expenses and costs relating to claims, suits or proceedings arising from his or her service to us or, at our request, service to other entities, as officers or directors to the maximum extent permitted by British Virgin Islands law.

### Loans from Shareholders

On May 8, 2021, May 25, 2021 and August 6, 2021, Nexters Global entered into a loan agreement with Nexters Inc. for an aggregate amount of $386,308, comprising a tranche of €153,000 and two tranches of $100,000. The loan was provided interest free. With the consummation of the Transactions, pursuant to which Nexters Global became a consolidated subsidiary of Nexters Inc., the loan has been eliminated for reporting purposes from the consolidated balance sheet of the Company.

On May 17, 2019, Nexters Global entered into a loan agreement with IDSB Holding Limited, a company in which the Company's directors Dmitrii and Igor Bukhman indirectly own a share of 50%, for the total amount of $5,000,000. The loan was provided interest free and was fully repaid on March 3, 2020.

On April 17, 2019, Nexters Global entered into a loan agreement with PLR Worldwide Sales Limited, a company in which the Company's directors Dmitrii and Igor Bukhman indirectly own a share of 48.5% and are members of the board of directors, for the total amount of $1,000,000 and with an annual interest rate of 3%. The loan was fully repaid on May 24, 2019, including the principal of $1,000,000 and the accrued interest of $2,630.

On April 1, 2019, Nexters Global entered into a loan agreement with its shareholder (a director and the Chief Executive Officer of the Company), Andrey Fadeev, for the total amount of $500,000. The loan was provided interest free, and was fully repaid on April 23, 2019.

### Loans to Shareholders

On October 30, 2019, Nexters Global entered into a loan agreement with its shareholder (a director of the Company), Boris Gertsovskiy, for the total amount of €10,000. The loan was provided interest free and was fully repaid on February 12, 2021.

On July 30, 2019, Nexters Global entered into a loan agreement with its shareholder (a director of the Company), Boris Gertsovskiy, for the total amount of €300,000. The loan was provided interest free, and was fully repaid on July 24, 2020.

On October 1, 2018, Nexters Global entered into a loan agreement with its shareholder (a director of the Company), Boris Gertsovskiy, for the total amount of €240,000 with an annual interest rate of 2%. The loan was fully repaid on April 23, 2020, including the principal of €240,000 and the accrued interest of €6,918.

### Relationship with Flow Research S. L.

Flow Research S.L. is a Spanish company that is the Company's wholly-owned subsidiary. Mr. Gertsovskiy, a Company director, has been a director and administrator of Flow Research since 2017 and his spouse, Tatiana Gertsovskaya, is employed by Flow Research S.L. in a non-executive position.

On August 1, 2018, Flow Research S. L. entered into a loan agreement with Empathy International S. A., for the total amount of €40,000. The loan was further assigned on October 30, 2018 to Boris Gertsovskiy (as transferee) and was fully repaid on April 1, 2021. The loan was provided interest free.

### Relationship with Everix Investments Limited

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Everix Investments Limited directly held 38% of our outstanding ordinary shares as of February 28, 2022 and is beneficially owned by Igor Bukhman and Dmitrii Bukhman, two of our directors.

96

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

On January 27, 2022, Nexters entered into an Agreement for the Sale and Purchase of Shares in the Capital of MX Capital Limited with Everix Investments Limited, pursuant to which we acquired shares representing a 48.8% stake in MX Capital Limited held by Everix Investments Limited for initial consideration of $16.6 million plus further earn-out payments of up to $35 million depending on the achievement of certain metrics. The share acquisition was financed by cash on balance

Nexters has agreed with the remaining shareholder of MX Capital Limited, MSRJ LTD, to put and call options allowing Nexters to consolidate 100% in MX Capital Limited in the first half of 2024. The price payable under the put and call options depends on achievement of certain agreed KPI's by MX Capital Limited. Option arrangements also envisage earn-out payments to the founders based on performance metrics. The share acquisition(s) upon execution of the options will be payable by cash and newly issued equity of Nexters and will be based on a discount to a projected future enterprise valuation of Nexters.

MX Capital is the owner of RJ Games, a veteran game development studio which has vast experience in developing social games in various genres, from casual adventure to strategy games.

***Other Related Party Transactions***

For additional information on related party transactions, see Note 26 (*Related party transactions*) to the Company's audited consolidated financial statements for the fiscal year ended December 31, 2021, included elsewhere in this Annual Report.

**C.  Interests of Experts and Counsel**

Not applicable.

**ITEM 8.  FINANCIAL INFORMATION**

**A.  Consolidated Statements and Other Financial Information**

**Financial Statements**

See "*Item 18. Financial Statements*," which contains our financial statements prepared in accordance with IFRS.

**Legal Proceedings**

From time to time, we are subject to various claims, complaints and legal actions in the normal course of business. On the basis of current information, we do not expect that the actual claims, lawsuits and other proceedings to which we are subject, or potential claims, lawsuits and other proceedings relating to matters of which we are aware, will ultimately have a material adverse effect on our results of operations, financial condition or liquidity. However, given the large or indeterminate amounts sought in certain of these actions, and the inherent unpredictability of litigation, it is possible that an adverse outcome in certain matters could, from time to time, have a material adverse effect on our results of operations or cash flows in particular periods.

**Dividends and Dividend Policy**

The Company has never declared or paid any cash dividends. Our board of directors will consider whether or not to institute a dividend policy. It is presently intended that the Company will retain its earnings for use in business operations and, accordingly, it is not anticipated that our board of directors will declare dividends in the foreseeable future. The Company has not identified a paying agent.

**B.  Significant Changes**

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Recently, in response to geopolitical developments between Russia and Ukraine, a number of governments, including those of the United States, United Kingdom and European Union, have adopted new sanctions on specified persons and entities in Russia, including the Central Bank of Russia, and new export controls affecting specific, sensitive technologies. The ambit and the level of the sanctions have become increasingly severe as the conflict between those countries continues to escalate. To date, none of Nexters, any

97

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

of our subsidiaries, any members of our board of directors or management or any of our principal shareholders is a target of these sanctions.

Prompted by the newly imposed sanctions, on February 28, 2022, Nasdaq and the New York Stock Exchange imposed a suspension of trading in securities of a number of companies with operations in Russia, including Nexters, which suspension currently remains in place. Nexters has been in regular communication with representatives of Nasdaq since the imposition of the suspension of trading in an effort to lift the suspension on the basis of the Company's limited nexus to Russia and Russian country risk:

- Nexters' principal executive offices are situated in Cyprus and the greater majority of its directors, officers and strategic personnel are domiciled in Cyprus, other European Union countries or the United Kingdom;

- all of Nexters' vital infrastructure, including its servers and licenses, are either located in the European Union or held by Nexters Inc., incorporated in the British Virgin Islands, or Nexters Global, formed in Cyprus;

- Nexters' revenues derived from the Former Soviet Union countries, including Russia, historically represent an increasingly diminishing fraction of its total worldwide revenues, at 13.3%, 14.9% and 20.3% for the years ended December 31, 2021, 2020 and 2019, respectively; and

- Nexters' expenses incurred in Russia are substantially limited and relate only to costs of personnel and office rental space.

While the Company remains hopeful that Nasdaq will agree with its conclusions and lift the suspension of trading in its securities, there can be no assurance that Nasdaq will not ultimately decide to formally delist the Company's securities. See also "*Item 3. Key Information—D. Risk Factors—Risks Related to the Company's Securities—A delisting of our ordinary shares from Nasdaq could have materially adverse effects on our business, financial condition and results of operations.*"

## ITEM 9. THE OFFER AND LISTING

### A. Offer and Listing Details

Our ordinary shares commenced trading on Nasdaq on August 27, 2021. Prior to that date, there was no public trading market for our ordinary shares.

### B. Plan of Distribution

Not applicable.

### C. Markets

Our ordinary shares and warrants are listed on Nasdaq under the symbols "GDEV" and "GDEVW," respectively.

### D. Selling Shareholders

Not Applicable.

### E. Dilution

Not applicable.

### F. Expenses of the Issue

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Not applicable.

98

---

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**ITEM 10.  ADDITIONAL INFORMATION**

**A.  Share Capital**

Not applicable.

**B.  Memorandum and Articles of Association**

We are a company incorporated in the British Virgin Islands as a business company (Company Number 2053442) and our affairs are governed by the provisions of our Amended and Restated Memorandum and Articles of Association, as amended and restated from time to time ("M&A"), and the BVI Business Companies Act, 2004, as amended (the "Companies Act"), and the applicable laws of the BVI (including applicable common law).

Our M&A authorizes us to issue an unlimited number of shares consisting of one class of ordinary shares of the Company, no par value per share. A copy of our M&A, effective on August 19, 2021 is filed as Exhibit 1.1 to this Annual Report and incorporated by reference herein.

The following description of our authorized shares and our constitutional rules under our M&A is qualified in its entirety by reference to our M&A.

**Amended and Restated Memorandum and Articles of Association**

The following discussion describes our M&A:

*Objects and Purposes, Register, and Shareholders*

Subject to the Companies Act and our M&A, our objects and purposes are unlimited. Our register of members is maintained by Continental Stock Transfer & Trust Company, our transfer agent. The entry of the name of a person in the register of members as a holder of a share in a BVI company is prima facie evidence that legal title in the share vests in that person. Under the Companies Act, a BVI company may treat the registered holder of a share as the only person entitled to (i) exercise any voting rights attaching to the share, (ii) receive notices, (iii) receive a distribution in respect of the share and (iv) exercise other rights and powers attaching to the share. Consequently, as a matter of BVI law, where a shareholder's shares are registered in the name of a nominee, the nominee is entitled to receive notices, receive distributions and exercise rights in respect of any such shares registered in its name. The beneficial owners of the shares registered in a nominee's name will therefore be reliant on their contractual arrangements with the nominee in order to receive notices and dividends and ensure the nominee exercises voting and other rights in respect of the shares in accordance with their directions.

*Directors' Powers*

Under the Companies Act, and as confirmed in the Company's M&A, the Company's business and affairs are managed by, or under the direction or supervision of, its directors, and the directors generally have all powers necessary to manage the Company. In accordance with, and subject to, our M&A, the directors may by resolution of directors exercise all the powers of the Company to incur indebtedness, liabilities or obligations and to secure indebtedness, liabilities or obligations whether of the Company or of any third party.

A director must disclose any interest he has on any proposal, arrangement or contract to be entered into by the Company. Under the Companies Act, an interested director may (subject to the M&A) vote on a transaction in which he has an interest. Under our M&A, however, where a director is interested in a matter, any majority approving such matter must include a majority of the disinterested directors. It is also possible for a majority of disinterested directors to make a determination that a director may be considered to be interested in a matter, following which that director will be treated as being interested in the matter and will not be able to vote thereon.

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

99

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

*Rights, Preferences and Restrictions of Ordinary Shares*

Our directors may, by Supermajority Resolution of Directors (as defined below), adopt or amend a dividend policy for the Company and may authorize dividends at such time and in such amount as they determine (*provided* that, after payment of such dividend, the Company will pass the 'solvency test', as described below). The term "Supermajority Resolution of Directors" means a resolution of the directors of the Company passed by the entire board of directors, or by the entire board of directors minus one director. For these purposes, 'entire board of directors' is construed as not including any directors who are interested in a transaction.

Each ordinary share is entitled to one vote. In the event of a liquidation or dissolution of the Company, the holders of ordinary shares are entitled to share ratably in all surplus assets remaining available for distribution to them after payment and discharge of all claims, debts, liabilities and obligations of the Company. There are no sinking fund provisions applicable to our ordinary shares, nor are holders of fully-paid shares liable for any capital calls by the Company. Subject to the provisions of the Companies Act, we may, (subject to the M&A) with the consent of the relevant shareholder and subject to the approval of the directors in a Supermajority Resolution of Directors, repurchase our ordinary shares in certain circumstances provided always that the Company will, immediately after the repurchase, satisfy the solvency test. The Company will satisfy the solvency test, if (i) the value of the Company's assets exceeds its liabilities, and (ii) the Company is able to pay its debts as they fall due.

*Variation of the Rights of Shareholders*

As permitted by the Companies Act and in accordance with our M&A, the rights attached to shares of the Company may only, whether or not the Company is being wound up, be varied by a resolution passed at a meeting of the shareholders by the holders of more than fifty percent (50%) of the ordinary shares present at a duly convened and constituted meeting of the shareholders which were present at the meeting and voted.

*Shareholder Meetings*

In accordance with, and subject to, our M&A, (i) any director of the Company may convene meetings of the shareholders at such times and in such manner and places within or outside the British Virgin Islands as the director considers necessary or desirable (and the director convening a meeting of shareholders must fix in the notice of the meeting the record date for determining those shareholders that are entitled to vote at the meeting); and (ii) upon the written request of shareholders entitled to exercise thirty percent (30%) or more of the voting rights in respect of the matter for which the meeting is requested, the directors must convene a meeting of shareholders. In accordance with, and subject to, our M&A, (a) the director convening a meeting must give not less than 30 nor more than 60 days' notice of a meeting of shareholders to those shareholders whose names on the date the notice is given appear as shareholders in the register of shareholders of the Company and are entitled to vote at the meeting; and the other directors; (b) a meeting of shareholders held in contravention of the requirement to give notice is valid if shareholders holding at least 80% of the total voting rights on all the matters to be considered at the meeting have waived notice of the meeting and, for this purpose, the presence of a shareholder at the meeting will constitute waiver in relation to all of the ordinary shares that that shareholder holds; (c) a meeting of shareholders is duly constituted if, at the commencement of the meeting, there are present in person or by proxy not less than 50 percent of the votes of the ordinary shares or class or series of ordinary shares entitled to vote on resolutions of shareholders to be considered at the meeting; and (d) if within two hours from the time appointed for the meeting a quorum is not present, the meeting, at the discretion of the chairman of the board of directors, will be dissolved or stand adjourned to a business day in the jurisdiction in which the meeting was to have been held at the same time and place. The quorum for such adjourned meeting (which must be reached within one hour of the appointed time for the meeting) is one third of the votes of the ordinary shares or class or series of ordinary shares entitled to vote on resolutions of shareholders to be considered at the meeting; if such quorum is not reached, the meeting will either be dissolved or stand further adjourned, at the discretion of the chairman of the board of directors.

*Dividends*

As considered above under "—*Rights, Preferences and Restrictions of Ordinary Shares*," our directors may, by Supermajority Resolution of Directors, declare dividends at a time and amount as they think fit if they are satisfied,

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

based on reasonable grounds, that, immediately after distribution of the dividend, the value of our assets will exceed our liabilities and we will be able to pay our debts as they fall due. There is no further BVI law restriction on the amount of funds which may be distributed by us by dividend, including all amounts paid by way of the subscription price for ordinary shares regardless of whether such amounts may be wholly or partially treated as share capital or share premium under certain accounting principles. Shareholder approval is not

100

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

required to pay dividends under BVI law. In accordance with, and subject to, our M&A, no dividend will bear interest as against the Company.

### *Disclosure of the Securities and Exchange Commission's Position on Indemnification for Securities Act Liabilities*

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers or persons controlling the registrant pursuant to the foregoing provisions, the registrant has been informed that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

### *Transfer of Shares*

Any of our shareholders may transfer all or any of his or her shares by an instrument of transfer in the usual or common form or in any other form which our directors may approve (such instrument of transfer being signed by the transferor and containing the name and address of the transferee). Our M&A also (save as otherwise provided therein) provide that (a) where ordinary shares of the Company are listed on the Nasdaq or any other stock exchange or automated quotation system on which the ordinary shares are then traded, shares may be transferred without the need for a written instrument of transfer if the transfer is carried out in accordance with the law, rules, procedures and other requirements applicable to shares listed on such exchange or system, or (b) uncertificated shares may be transferred by means of a system utilized for the purposes of holding and transferring shares in uncertificated form (the "Relevant System"), and that the operator of the Relevant System will act as agent of the shareholders for the purposes of the transfer of any uncertificated shares.

### *Rights of Non-Resident or Foreign Shareholders*

There are no limitations imposed by our M&A on the rights of non-resident or foreign shareholders to hold or exercise voting rights on our shares. In addition, there are no provisions in our M&A governing the ownership threshold above which shareholder ownership must be disclosed.

### *Changes in Authorized Shares*

We are authorized to issue an unlimited number of shares which will have the same rights, privileges, restrictions and conditions attaching to them as the shares in issue. We may by resolution of directors or shareholders:

- consolidate and divide all or any of our unissued authorized shares into shares of larger or smaller amount than our existing shares; or

- cancel any ordinary shares which, at the date of the passing of the resolution, have not been taken or agreed to be taken by any person.

### *Pre-emption Rights*

There are no pre-emption rights applicable to the issuance of new shares under our M&A.

### Summary of Certain Significant Provisions of the Companies Act

The Companies Act differs from laws applicable to U.S. corporations and their shareholders. Set forth below is a summary of certain significant provisions of the Companies Act applicable to us (save to the extent that such provisions have been, to the extent permitted under the Companies Act, negated or modified in our M&A in accordance with the Companies Act).

### *Mergers, Consolidations and Similar Arrangements*

The Companies Act provides for mergers as that expression is understood under U.S. corporate law. Under the Companies Act, two or more companies may either merge into one of such existing companies, referred to as the

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

surviving company, or consolidate with both existing companies ceasing to exist and forming a new company, referred to as the consolidated company. The

101

Copyright © 2022 www.secdatabase.com. All Rights Reserved.

Please Consider the Environment Before Printing This Document

Table of Contents

procedure for a merger or consolidation between our Company and another company (which need not be a BVI company) is set out in the Companies Act. The directors of the BVI company or BVI companies which are to merge or consolidate must approve a written plan of merger or consolidation which must also be authorized by a resolution of shareholders (and the outstanding shares of every class of shares that are entitled to vote on the merger or consolidation as a class if the memorandum or articles of association so provide or if the plan of merger or consolidation contains any provisions that, if contained in a proposed amendment to the memorandum or articles, would entitle the class to vote on the proposed amendment as a class) of the shareholders of the BVI company or BVI companies which are to merge. A foreign company which is able under the laws of its foreign jurisdiction to participate in the merger or consolidation is required by the Companies Act to comply with the laws of that foreign jurisdiction in relation to the merger or consolidation. The BVI company must then execute articles of merger or consolidation, containing certain prescribed details. The plan and articles of merger or consolidation are then filed with the Registrar of Corporate Affairs in the BVI, or the Registrar. If the surviving company or the consolidated company is to be incorporated under the laws of a jurisdiction outside BVI, it must file the additional instruments required under Section 174(2)(b) of the Companies Act. The Registrar then (if he or she is satisfied that the requirements of the Companies Act have been complied with) registers, in the case of a merger, the articles of merger and any amendment to the memorandum and articles of association of the surviving company and, in the case of a consolidation, the M&A of the new consolidated company and issues a certificate of merger or consolidation (which is conclusive evidence of compliance with all requirements of the Companies Act in respect of the merger or consolidation). The merger or consolidation is effective on the date that the articles of merger or consolidation are registered by the Registrar or on such subsequent date, not exceeding thirty days, as is stated in the articles of merger or consolidation but if the surviving company or the consolidated company is a company incorporated under the laws of a jurisdiction outside the BVI, the merger or consolidation is effective as provided by the laws of that other jurisdiction.

As soon as a merger or consolidation becomes effective (*inter alia*), (i) the surviving company or consolidated company (so far as is consistent with its memorandum and articles of association, as amended or established by the articles of merger or consolidation) has all rights, privileges, immunities, powers, objects and purposes of each of the constituent companies; (ii) the memorandum and articles of association of any surviving company are automatically amended to the extent, if any, that changes to its memorandum and articles of association are contained in the articles of merger; (iii) assets of every description, including choses-in-action and the business of each of the constituent companies, immediately vest in the surviving company or consolidated company; (iv) the surviving company or consolidated company is liable for all claims, debts, liabilities and obligations of each of the constituent companies; (v) no conviction, judgment, ruling, order, claim, debt, liability or obligation due or to become due, and no cause existing, against a constituent company or against any shareholder, director, officer or agent thereof, is released or impaired by the merger or consolidation; and (vi) no proceedings, whether civil or criminal, pending at the time of a merger or consolidation by or against a constituent company, or against any shareholder, director, officer or agent thereof, are abated or discontinued by the merger or consolidation, but: (a) the proceedings may be enforced, prosecuted, settled or compromised by or against the surviving company or consolidated company or against the shareholder, director, officer or agent thereof, as the case may be, or (b) the surviving company or consolidated company may be substituted in the proceedings for a constituent company but if the surviving company or the consolidated company is incorporated under the laws of a jurisdiction outside the BVI, the effect of the merger or consolidation is the same as noted foregoing except in so far as the laws of the other jurisdiction otherwise provide.

The Registrar must strike off the register of companies each constituent company that is not the surviving company in the case of a merger and all constituent companies in the case of a consolidation (save that this will not apply to a foreign company).

If the directors determine it to be in the best interests of the Company, it is also possible for a merger to be approved as a court approved plan of arrangement or as a scheme of arrangement in accordance with (in each such case) the Companies Act. The convening of any necessary shareholders meetings and subsequently the arrangement must be authorized by the BVI court. A scheme of arrangement requires the approval of a majority in number of the shareholders, representing not less than 75% of the votes of the shares or class of shares. If the effect of the scheme is different in relation to different shareholders, it may be necessary for them to vote separately in relation to the scheme, with it being required to secure the requisite approval level of each separate voting group. Under a plan of arrangement, a BVI court may determine what shareholder approvals are required and the manner of obtaining the approval.

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

*Continuation into a Jurisdiction Outside the BVI*

In accordance with, and subject to, our M&A, the Company may by resolution of shareholders or by a resolution of directors continue as a company incorporated under the laws of a jurisdiction outside the BVI in the manner provided under those laws. The

102

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

Company does not cease to be a BVI company unless the foreign law permits continuation and the BVI company has complied with the requirements of that foreign law. In the event that the Company is continued under the laws of a jurisdiction outside the BVI, (i) the Company continues to be liable for all of its claims, debts, liabilities and obligations that existed prior to its continuation, (ii) no conviction, judgment, ruling, order, claim, debt, liability or obligation due or to become due, and no cause existing, against the Company or against any shareholder, director, officer or agent thereof, is released or impaired by its continuation as a company under the laws of the jurisdiction outside the BVI, (iii) no proceedings, whether civil or criminal, pending by or against the Company, or against any shareholder, director, officer or agent thereof, are abated or discontinued by its continuation as a company under the laws of the jurisdiction outside the BVI, but the proceedings may be enforced, prosecuted, settled or compromised by or against the Company or against the shareholder, director, officer or agent thereof, as the case may be; and (iv) service of process may continue to be effected on the registered agent of the Company in the BVI in respect of any claim, debt, liability or obligation of the Company during its existence as a company under the Companies Act.

### *Directors*

In accordance with, and subject to, our M&A (including, for the avoidance of any doubt, any rights or restrictions attaching to any ordinary shares), for so long as Everix has at least 50% of its 'Initial Holding' (which is the number of shares held by Everix immediately after the consummation of the Transactions) it is entitled to appoint two directors to the board. If Everix were to sell its shares such that it had 25-50% of its Initial Holding this would decrease to the number of directors it is entitled to appoint to one director; below 25% there are no appointment rights. Mr. Andrey Fadeev and Mr. Boris Gertsovskiy (collectively, "FG") have the same rights, acting together and with the number of shares they each hold aggregated for the purposes of calculating their Initial Holding and subsequent percentages thereof.

Other directors of the Company are elected by resolution of shareholders or by resolution of directors for such term as the shareholders or directors determine. Each director holds office until the Company's next annual general meeting immediately following their appointment, or until their earlier disqualification, death, resignation or removal. Our directors do not have a retirement age requirement under our M&A. A director, other than one appointed by Everix or FG, may be removed from office by resolution of shareholders. A director may resign his office by giving written notice of his resignation to the Company and the resignation has effect from the date the notice is received by the Company at the office of its registered agent or from such later date as may be specified in the notice and a director must resign forthwith as a director if he is, or becomes, disqualified from acting as a director under the Companies Act. A director is not required to hold shares as a qualification to office.

In accordance with, and subject to, our M&A, (a) any one director of the Company may call a meeting of the directors by sending a written notice to each other director (including by email having obtained electronic delivery confirmation thereof); (b) the directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside the British Virgin Islands as the notice calling the meeting provides; (c) a director must be given not less than five days' notice of meetings of directors, but a meeting of directors held without five days' notice having been given to all directors will be valid if all the directors entitled to vote at the meeting who do not attend waive notice of the meeting (and the presence of a director at a meeting will constitute waiver by that director), and the inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting; (d) a meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person not less than one-half of the total number of directors unless there are only two directors in which case the quorum is two; (e) a resolution of directors is passed if either (i) the resolution is approved at a duly convened and constituted meeting of directors of the Company by the affirmative vote of a majority of the directors present at the meeting who voted; or (ii) in the form of written resolution by a majority of the directors, save where a resolution must be passed as a Supermajority Resolution of Directors (which may be passed at a meeting or in writing but in which case the requisite majority is all of the board of directors, or all of the board of directors minus one, with interested directors being discounted for all purposes).

### *Indemnification of Directors*

In accordance with, and subject to, our M&A (including the limitations detailed therein), the Company may at any time enter into one or more indemnification agreements with any person who (a) may be a party or may be

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

threatened to be made a party to any proceeding (howsoever defined in the relevant agreement) by reason of the fact that such person is or was a director, officer, employee, contractor or adviser of the Company, or (b) is or was, at the request of the Company, serving as a director of, or in any other capacity is or was acting for, another 'Enterprise' (as defined in the M&A). The ability of the Company to indemnify any person with whom the Company has entered into such an agreement with is limited by the Companies Act, in that such indemnification is

103

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

only lawful where the indemnified person acted honestly and in good faith and in what he believed to be in the best interests of the company and, in the case of criminal proceedings, the indemnified person had no reasonable cause to believe that his conduct was unlawful.

In accordance with, and subject to, our M&A, the Company may purchase and maintain insurance, purchase or furnish similar protection or make other arrangements including, but not limited to, providing a trust fund, letter of credit or surety bond in relation to any person who at the request of the Company is or was serving as a director, officer or liquidator of, or in any other capacity is or was acting for, another Enterprise, against any liability asserted against the person and incurred by him in that capacity, whether or not the Company has or would have had the power to indemnify him against the liability as provided in the M&A.

### Directors and Conflicts of Interest

In accordance with, and subject to, our M&A, no director will, by reason of such director holding the office of director, be accountable to the Company for any benefit which he derives from any transaction in which he may have an interest and no such transaction will be liable to be avoided on the grounds of any such interest or benefit, *provided* such director must, immediately after becoming aware of the fact that he is interested in a transaction entered into or to be entered into by the Company, disclose such interest to the board.

### Shareholders' Suits

The enforcement of the Company's rights will ordinarily be a matter for its directors.

In certain circumstances, a shareholder has the right to seek various remedies against a BVI company in the event the directors are in breach of their duties under the Companies Act. Pursuant to Section 184B of the Companies Act, if a company or director of a BVI company engages, proposes to engage in, or has engaged in conduct that contravenes the provisions of the Companies Act or the M&A of the company, the BVI court may, on application of a shareholder or director of the company, make an order directing the company or director to comply with, or restraining the company or director from engaging in conduct that contravenes, the Companies Act or the memorandum or articles of association.

Furthermore, pursuant to Section 184I(1) of the Companies Act a shareholder of a company who considers that the affairs of the company have been, are being or are likely to be, conducted in a manner that is, or any acts of the company have been, or are likely to be oppressive, unfairly discriminatory, or unfairly prejudicial to him in that capacity, may apply to the BVI Court for an order which, *inter alia*, can require the company or any other person to pay compensation to the shareholder.

The Companies Act provides for a series of remedies available to shareholders. Where a company incorporated under the Companies Act conducts some activity which contravenes the Companies Act or the company's M&A, the court can issue a restraining or compliance order. Under Section 184G of the Companies Act, a shareholder of a company may bring an action against the company for breach of a duty owed by the company to him as a shareholder. A shareholder also pursuant to Section 184C of the Companies Act may, with the leave of the BVI court, bring proceedings or intervene in proceedings in the name of the company, in certain circumstances. Such actions are known as derivative actions. The BVI court may only grant leave to bring a derivative action where the following circumstances apply:

- the company does not intend to bring, diligently continue or defend or discontinue proceedings; or

- it is in the interests of the company that the conduct of the proceedings should not be left to the directors or to the determination of the shareholders as a whole.

When considering whether to grant leave, the BVI court is also required to have regard to the following matters:

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

- whether the shareholder is acting in good faith;

- whether a derivative action is in the company's interests, taking into account the directors' views on commercial matters;

- whether the proceedings are likely to succeed;

104

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

- the costs of the proceedings in relation to the relief likely to be obtained; and

- whether an alternative remedy is available.

Any shareholder of a company may apply to the BVI court under the Insolvency Act, 2003 of the BVI (the "Insolvency Act") for the appointment of a liquidator to liquidate the company and the court may appoint a liquidator for the company if it is of the opinion that it is just and equitable to do so.

***Appraisal Rights***

The Companies Act provides that any shareholder of a company is entitled to payment of the fair value of his shares upon dissenting from any of the following: (i) a merger if the company is a constituent company, unless the company is the surviving company and the shareholder continues to hold the same or similar shares; (ii) a consolidation, if the company is a constituent company; (iii) any sale, transfer, lease, exchange or other disposition of more than 50% in value of the assets or business of the company if not made in the usual or regular course of the business carried on by the company but not including: (a) a disposition pursuant to an order of the court having jurisdiction in the matter, (b) a disposition for money on terms requiring all or substantially all net proceeds to be distributed to the shareholders in accordance with their respective interests within one year after the date of disposition, or (c) a transfer pursuant to the power of the directors to transfer assets for the protection thereof; (iv) a compulsory redemption of 10% or fewer of the issued shares of the company required by the holders of 90% or more of the votes of the outstanding shares of the company pursuant to the terms of Section 176 of the Companies Act; and (v) an arrangement, if permitted by the BVI court.

Generally, any other claims against a company by its shareholders must be based on the general laws of contract or tort applicable in the BVI or their individual rights as shareholders as established by the company's memorandum and articles of association. There are common law rights for the protection of shareholders that may be invoked, largely derived from English common law. For example, under the rule established in the English case known as *Foss v. Harbottle*, a court will generally refuse to interfere with the management of a company at the insistence of a minority of its shareholders who express dissatisfaction with the conduct of the company's affairs by the majority or the board of directors. However, every shareholder is entitled to seek to have the affairs of the company conducted properly according to law and the constituent documents of the company. As such, if those who control the company have persistently disregarded the requirements of company law or the provisions of the company's memorandum and articles of association, then the courts may grant relief. Generally, the areas in which the courts will intervene are the following:

- a company is acting or proposing to act illegally or beyond the scope of its authority;

- the act complained of, although not beyond the scope of the authority, could only be effected if duly authorized by more than the number of votes which have actually been obtained;

- the individual rights of the plaintiff shareholder have been infringed or are about to be infringed; or

- those who control the company are perpetrating a "fraud on the minority."

***Share Repurchases and Redemptions***

As permitted by the Companies Act and subject to our M&A, shares may be repurchased, redeemed or otherwise acquired by us with shareholder consent and with the prior approval of the directors in a Supermajority Resolution of Directors. Unless the redemption or repurchase is being effected pursuant to a right of the relevant shareholder to have their shares repurchased or redeemed, our directors will need to determine that, immediately following the redemption or repurchase, we will be able to satisfy our debts as they fall due and the value of our assets exceeds our liabilities. Our directors may only exercise this power on our behalf, subject to the Companies Act, our M&A and to any applicable requirements imposed from time to time by the SEC, the Nasdaq or any other stock exchange on which our securities are listed.

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

105

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

### Inspection of Books and Records

Under the Companies Act, members of the general public, on payment of a nominal fee, can obtain copies of the public records of a company available at the office of the Registrar, including the company's certificate of incorporation, its memorandum and articles of association (with any amendments thereto), records of license fees paid to date, any articles of dissolution, any articles of merger, and a register of charges created by the company (if the company has elected to file such a register or an applicable charge has caused the same to be filed).

A shareholder of a company is entitled, on giving written notice to the company, to inspect:

(i)  the memorandum and articles of association;

(ii)  the register of members;

(iii)  the register of directors; and

(iv)  the minutes of meetings and resolutions of shareholders and of those classes of shares of which he is a shareholder.

In addition, a shareholder may make copies of or take extracts from the documents and records referred to in (i) through (iv) above. However, the directors may, if they are satisfied that it would be contrary to the company's interests to allow a shareholder to inspect any document, or part of any document, specified in (ii), (iii) or (iv) above, refuse to permit the shareholder to inspect the document or limit the inspection of the document, including limiting the making of copies or the taking of extracts from the records. Where a company fails or refuses to permit a shareholder to inspect a document or permits a shareholder to inspect a document subject to limitations, that shareholder may apply to the High Court of the BVI for an order that he should be permitted to inspect the document or to inspect the document without limitation.

Our registered agent is Ogier Global (BVI) Limited of Ritter House, Wickhams Cay II, PO Box 3170, Road Town, Tortola VG1110, British Virgin Islands. The Company is required to keep a copy of its register of members and register of directors at the offices of its registered agent in the BVI, and the Company is required to notify any changes to the originals of such registers (assuming the originals are held elsewhere) to the registered agent, in writing, within 15 days of any change and to provide the registered agent with a written record of the physical address of the place or places at which the original register of members or the original register of directors is kept.

Where the place at which the original register of members or the original register of directors of the Company is changed, the Company must provide the registered agent with the physical address of the new location of the records within 14 days of the change of location.

The Company is also required to keep at the office of its registered agent or at such other place or places, within or outside the BVI, as the directors may determine the minutes of meetings and resolutions of shareholders and of classes of shareholders; and the minutes of meetings and resolutions of directors and committees of directors. If such records are kept at a place other than at the office of the Company's registered agent, the Company is required to provide the registered agent with a written record of the physical address of the place or places at which the records are kept and to notify the registered agent, within 14 days, of the physical address of any new location where such records may be kept.

### Dissolution; Winding Up

As permitted by the Companies Act and subject to our M&A, we may be voluntarily liquidated and dissolved under Part XII of the Companies Act by a Supermajority Resolution of Directors or by a resolution of shareholders passed at a meeting of the shareholders by at least 85% of the votes of the shares entitled to vote thereon which were present at the meeting and were voted, if we have no liabilities or we are able to pay our debts as they fall due and the value of our assets equals or exceeds our liabilities.

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

We also may be wound up and dissolved in circumstances where we are insolvent in accordance with the terms of the Insolvency Act.

106

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

### *Anti-Money Laundering Laws*

In order to comply with legislation and regulations aimed at the prevention of money laundering we are required to adopt and maintain anti‑money laundering procedures, and may require subscribers to provide evidence to verify their identity. Where permitted, and subject to certain conditions, we also may delegate the maintenance of our anti‑money laundering procedures (including the acquisition of due diligence information) to a suitable person. We reserve the right to request such information as is necessary to verify the identity of a subscriber. In the event of delay or failure on the part of the subscriber in producing any information required for verification purposes, we may refuse to accept the application, in which case any funds received will be returned without interest to the account from which they were originally debited.

If any person resident in the BVI knows or suspects that another person is engaged in money laundering or terrorist financing and the information for that knowledge or suspicion came to his or her attention in the course of his or her business the person will be required to report his belief or suspicion to the Financial Investigation Agency of the BVI, pursuant to the Proceeds of Criminal Conduct Act 1997 (as amended). Such a report will not be treated as a breach of confidence or of any restriction upon the disclosure of information imposed by any enactment or otherwise.

### *Exchange controls*

We know of no BVI laws, decrees, regulations or other legislation that limit the import or export of capital or the payment of dividends to shareholders holders who do not reside in the BVI.

### **Material Differences in BVI Law and our Amended and Restated M&A and Delaware Law**

Our corporate affairs are governed by our amended and restated M&A and the provisions of applicable BVI law, including the Companies Act and BVI common law. The Companies Act differs from laws applicable to U.S. corporations and their shareholders. The following table provides a comparison between certain statutory provisions of the Companies Act (together with the relevant provisions of our M&A) and the Delaware General Corporation Law relating to shareholders' rights.

### *Shareholder Meetings*

| BVI | Delaware |
|---|---|
| • In accordance with, and subject to, our M&A, (a) any director of the company may convene meetings of the shareholders at such times and in such manner and places within or outside the British Virgin Islands as the director considers necessary or desirable; and (b) upon the written request of shareholders entitled to exercise thirty percent (30%) or more of the voting rights in respect of the matter for which the meeting is requested the directors shall convene a meeting of shareholders. | • May be held at such time or place as designated in the charter or the by‑laws, or if not so designated, as determined by the board of directors. |
| • May be held inside or outside the BVI. | • May be held inside or outside Delaware. |
| • In accordance with, and subject to, our M&A, (a) the director convening a meeting shall give not less than 30 days' nor more than 60 days' written notice of a meeting of shareholders to those shareholders whose names on the date the notice is given appear as shareholders in the register of members of the company and are entitled to vote at the meeting, and the other directors; and (b) the director convening a meeting of shareholders shall fix in the notice of the meeting the record date for determining those shareholders that are entitled to vote at the meeting. | • Whenever shareholders are required to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, if any, date and hour of the meeting, and the means of remote communication, if any. |

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

107

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

***Shareholder's Voting Rights***

| BVI | Delaware |
|---|---|
| • In accordance with, and subject to, our M&A (including, for the avoidance of any doubt, any rights or restrictions attaching to any shares), (a) a shareholder may be represented at a meeting of shareholders by a proxy who may speak and vote on behalf of the shareholder; and (b) the instrument appointing a proxy shall be produced at the place designated for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote. | • Any person authorized to vote may authorize another person or persons to act for him by proxy. |
| • In accordance with, and subject to, our M&A (including, for the avoidance of any doubt, any rights or restrictions attaching to any shares), (a) a meeting of shareholders is duly constituted if, at the commencement of the meeting, there are present in person or by proxy not less than 50 percent of the votes of the ordinary shares or class or series of ordinary shares entitled to vote on resolutions of shareholders to be considered at the meeting; and (b) if within two hours from the time appointed for the meeting a quorum is not present, the meeting, at the discretion of the chairman of the board of directors, shall be dissolved or stand adjourned to a business day in the jurisdiction in which the meeting was to have been held at the same time and place. | • The charter or bylaws may specify the number to constitute a quorum but in no event shall a quorum consist of less than one-third of shares entitled to vote at a meeting. In the absence of such specifications, a majority of shares shall constitute a quorum. |
| • In accordance with, and subject to, our M&A (including, for the avoidance of any doubt, any rights or restrictions attaching to any shares), (a) at any meeting of the shareholders, a resolution put to the vote of the meeting shall be decided on a show of hands by a simple majority, unless a poll is demanded by any shareholder present in person or by proxy, or by the Chairman. In the case of an equality of votes, whether on a show of hands or on a poll, the Chairman of the meeting at which the show of hands takes place, or at which the poll is demanded, shall not be entitled to a second or casting vote. | |
| • In accordance with, and subject to, our M&A, (a) the rights attached to ordinary shares as specified in the M&A may only, whether or not the company is being wound up, be varied with the consent in writing of the holders of not less than one half of the issued shares of that class. | • Except as provided in the charter documents, changes in the rights of shareholders as set forth in the charter documents require approval of a majority of its shareholders. |
| • In accordance with, and subject to, our M&A (including, for the avoidance of any doubt, any rights or restrictions attaching to any shares), the Company may amend its memorandum or articles by a resolution of shareholders or by a resolution of directors, save that no amendment may be made by a resolution of directors (*inter alia*): (i) to restrict the rights or powers of the shareholders to amend the memorandum or articles; (ii) to change the percentage of shareholders required to pass a resolution of shareholders to amend the memorandum or articles; (iii) in circumstances where the memorandum or articles cannot be amended by the shareholders. | • The certificate of incorporation or bylaws may provide for cumulative voting. |

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

108

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

***Directors***

| BVI | Delaware |
|---|---|
| • In accordance with, and subject to, our M&A, the minimum number of directors shall be one. | • Board must consist of at least one member. |
| •     In accordance with, and subject to, our M&A (including, for the avoidance of any doubt, any rights or restrictions attaching to any ordinary shares), for so long as Everix has at least 50% of its 'Initial Holding' (which is the number of shares held by Everix immediately after the consummation of the Transactions) it is entitled to appoint two directors to the board. If Everix were to sell its shares such that it had 25-50% of its Initial Holding this would decrease to the number of directors it is entitled to appoint to one director; below 25% there are no appointment rights. Mr. Andrey Fadeev and Mr. Boris Gertsovskiy (collectively, "FG") have the same rights, acting together and with the number of shares they each hold aggregated for the purposes of calculating their Initial Holding and subsequent percentages thereof.<br><br>    Other directors of the Company are elected by resolution of shareholders or by resolution of directors for such term as the shareholders or directors determine. Each director holds office until the Company's next annual general meeting immediately following their appointment, or until their earlier disqualification, death, resignation or removal. A director, other than one appointed by Everix or FG, may be removed from office by resolution of shareholders. A director may resign his office by giving written notice of his resignation to the Company and the resignation has effect from the date the notice is received by the Company at the office of its registered agent or from such later date as may be specified in the notice and a director shall resign forthwith as a director if he is, or becomes, disqualified from acting as a director under the Companies Act. A director is not required to hold shares as a qualification to office. | • Number of board members shall be fixed by the by laws, unless the charter fixes the number of directors, in which case a change in the number shall be made only by amendment of the charter. |
| • Directors do not have to be independent. | • Directors do not have to be independent. |

109

Copyright © 2022 www.secdatabase.com. All Rights Reserved.

Please Consider the Environment Before Printing This Document

Table of Contents

*Fiduciary Duties*

| BVI | Delaware |
|---|---|
| ● Directors owe duties at both common law and under statute including as follows: | ● Directors and officers must act in good faith, with the care of a prudent person, and in the best interest of the corporation. |
| ● Duty to act honestly and in good faith and in what the director believes to be in the best interests of the company; | ● Directors and officers must refrain from self-dealing, usurping corporate opportunities and receiving improper personal benefits. |
| ● Duty to exercise powers for a proper purpose and directors shall not act, or agree to the Company acting, in a manner that contravenes the Companies Act or the M&A; | |
| ● The Companies Act provides that a director of a company shall, forthwith after becoming aware of the fact that he is interested in a transaction entered into, or to be entered into, by the company, disclose the interest to the board of the company. However, the failure of a director to disclose that interest does not affect the validity of a transaction entered into by the director or the company, so long as the transaction was not required to be disclosed because the transaction is between the company and the director himself and is in the ordinary course of business and on usual terms and conditions. Additionally, the failure of a director to disclose an interest does not affect the validity of the transaction entered into by the company if (a) the material facts of the interest of the director in the transaction are known by the shareholders entitled to vote at a meeting of shareholders and the transaction is approved or ratified by a resolution of shareholders or (b) the company received fair value for the transaction. | ● Directors may vote on a matter in which they have an interest so long as the director has disclosed any interests in the transaction. |

110

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

*Shareholder's Derivative Actions*

| BVI | Delaware |
|---|---|
| • Generally speaking, the company is the proper plaintiff in any action. A shareholder may, with the leave of the BVI court, bring proceedings or intervene in proceedings in the name of the company, in certain circumstances. Such actions are known as derivative actions. The BVI court may only grant leave to bring a derivative action where the following circumstances apply: | • In any derivative suit instituted by a shareholder of a corporation, it shall be averred in the complaint that the plaintiff was a shareholder of the corporation at the time of the transaction of which he complains or that such shareholder's stock thereafter devolved upon such shareholder by operation of law. |
| • the company does not intend to bring, diligently continue or defend or discontinue the proceedings; and | • Complaint shall set forth with particularity the efforts of the plaintiff to obtain the action by the board or the reasons for not making such effort. |
| • it is in the interests of the company that the conduct of the proceedings not be left to the directors or to the determination of the shareholders as a whole.<br><br>When considering whether to grant leave, the BVI court is also required to have regard to the following matters: | • Such action shall not be dismissed or compromised without the approval of the Delaware Court of Chancery. |

   (i)   whether the shareholder is acting in good faith;

   (ii)  whether a derivative action is in the interests of the company, taking into account the directors' views on commercial matters;

   (iii) whether the action is likely to succeed;

   (iv) whether the costs of the proceedings in relation to the relief likely to be obtained; and

   (v)  whether an alternative remedy to the derivative claim is available.

## C.  Material Contracts

We have not entered into any material contracts other than in the ordinary course of business and other than those described in "*Item 4. Information on the Company*" or "*Item 7. Major Shareholders and Related Party Transactions—B. Related Party Transactions—Certain Relationships and Related Person Transactions*" or elsewhere in this Annual Report.

## D.  Exchange Controls

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

There are currently no exchange control regulations in the British Virgin Islands applicable to us or our shareholders.

**E.  Taxation**

**Certain Material U.S. Federal Income Tax Considerations**

The following discussion is a summary of certain material U.S. federal income tax considerations to U.S. Holders and Non‑U.S. Holders (each as defined below) of the ownership and disposition of Nexters ordinary shares and warrants. This discussion

111

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

applies only to ordinary shares and warrants, as the case may be, that are held as "capital assets" within the meaning of Section 1221 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") (generally, property held for investment).

The following does not purport to be a complete analysis of all potential tax considerations arising in connection with the ownership and disposal of ordinary shares and warrants. The effects and considerations of other U.S. federal tax laws, such as estate and gift tax laws, alternative minimum or Medicare contribution tax consequences and any applicable state, local or non-U.S. tax laws are not discussed. This discussion is based on the Code, Treasury regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the U.S. Internal Revenue Service (the "IRS"), in each case in effect as of the date hereof. These authorities may change or be subject to differing interpretations. Any such change or differing interpretation may be applied retroactively in a manner that could adversely affect the tax consequences discussed below. Nexters has not sought and will not seek any rulings from the IRS regarding the matters discussed below. There can be no assurance the IRS will not take or a court will not sustain a contrary position to that discussed below regarding the tax consequences discussed below.

This discussion does not address all U.S. federal income tax consequences relevant to a holder's particular circumstances. In addition, it does not address consequences relevant to holders subject to special rules, including, without limitation:

- regulated investment companies and real estate investment trusts;

- brokers, dealers or traders in securities;

- traders in securities that elect to mark to market interested party transactions that require shareholder approval;

- tax-exempt organizations or governmental organizations;

- U.S. expatriates and former citizens or long-term residents of the United States;

- persons holding ordinary shares and/or warrants, as the case may be, as part of a hedge, straddle, constructive sale, or other risk reduction strategy or as part of a conversion transaction or other integrated investment;

- persons subject to special tax accounting rules as a result of any item of gross income with respect to ordinary shares and/or warrants, as the case may be, being taken into account in an applicable financial statement;

- persons that actually or constructively own 5% or more (by vote or value) of the ordinary shares;

- "controlled foreign corporations," "passive foreign investment companies," and corporations that accumulate earnings to avoid U.S. federal income tax;

- S corporations, partnerships or other entities or arrangements treated as partnerships or other flow-through entities for U.S. federal income tax purposes (and investors therein);

- U.S. Holders having a functional currency other than the U.S. dollar;

- persons who hold or received ordinary shares and/or warrants, as the case may be, pursuant to the exercise of any employee stock option or otherwise as compensation; and

- tax-qualified retirement plans.

For purposes of this discussion, a "U.S. Holder" is any beneficial owner of ordinary shares and/or warrants, as the case may be, that is for U.S. federal income tax purposes:

- in individual who is a citizen or resident of the United States;

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

- a corporation (or other entity taxable as a corporation) created or organized under the laws of the United States, any state thereof, or the District of Columbia;

112

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

- an estate, the income of which is subject to U.S. federal income tax regardless of its source; or

- a trust that (1) is subject to the primary supervision of a U.S. court and the control of one or more "United States persons" (within the meaning of Section 7701(a)(30) of the Code), or (2) has a valid election in effect to be treated as a "United States person" (within the meaning of Section 7701(a)(30) of the Code) for U.S. federal income tax purposes.

If an entity or arrangement treated as a partnership for U.S. federal income tax purposes holds ordinary shares and/or warrants, the tax treatment of an owner of such entity will depend on the status of the owners, the activities of the entity or arrangement and certain determinations made at the partner level. Accordingly, entities or arrangements treated as partnerships for U.S. federal income tax purposes and the partners in such partnerships should consult their tax advisors regarding the U.S. federal income tax consequences to them.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES APPLICABLE TO HOLDERS OF ORDINARY SHARES AND WARRANTS WILL DEPEND ON EACH HOLDER'S PARTICULAR TAX CIRCUMSTANCES. YOU ARE URGED TO CONSULT YOUR TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, AND LOCAL, AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES TO YOU, IN LIGHT OF YOUR PARTICULAR INVESTMENT OR TAX CIRCUMSTANCES, OF ACQUIRING, HOLDING, AND DISPOSING OF ORDINARY SHARES AND WARRANTS.

### U.S. Holders

*Distributions on ordinary shares*

If Nexters makes distributions of cash or property on the ordinary shares, the gross amount of such distributions (including any amount of foreign taxes withheld) will be treated for U.S. federal income tax purposes first as a dividend to the extent of its current and accumulated earnings and profits (as determined for U.S. federal income tax purposes), and then as a tax-free return of capital to the extent of the U.S. Holder's tax basis, with any excess treated as capital gain from the sale or exchange of the shares. Because Nexters does not expect to provide calculations of its earnings and profits under U.S. federal income tax principles, a U.S. Holder should expect all cash distributions to be reported as dividends for U.S. federal income tax purposes. Any dividend will not be eligible for the dividends received deduction allowed to corporations in respect of dividends received from U.S. corporations.

Subject to the discussions below under "—*Passive Foreign Investment Company Rules*," dividends received by certain non-corporate U.S. Holders (including individuals) may be "qualified dividend income," which is taxed at the lower applicable long-term capital gains rate, *provided* that:

- either (a) the shares are readily tradable on an established securities market in the United States, or (b) Nexters is eligible for the benefits of the income tax treaty between the United States and Cyprus;

- Nexters is neither a PFIC (as discussed below under below under "—*Passive Foreign Investment Company Rules*") nor treated as such with respect to the U.S. Holder for Nexters in any taxable year in which the dividend is paid or the preceding taxable year;

- the U.S. Holder satisfies certain holding period requirements; and

- and certain other requirements are met.

U.S. Holders should consult their own tax advisors regarding the availability of the lower rate for dividends paid with respect to ordinary shares. Subject to certain exceptions, dividends on ordinary shares will constitute foreign source income and generally passive income for foreign tax credit limitation purposes.

*Sale, Exchange, Redemption or Other Taxable Disposition of Ordinary Shares and Warrants*

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Subject to the discussion below under "—*Passive Foreign Investment Company Rules*," a U.S. Holder generally will recognize gain or loss on any sale, exchange, redemption or other taxable disposition of ordinary shares or warrants in an amount equal to the difference between (i) the amount realized on the disposition and (ii) such U.S. Holder's adjusted tax basis in such

113

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

ordinary shares and/or warrants, as the case may be. Any gain or loss recognized by a U.S. Holder on a taxable disposition of ordinary shares or warrants generally will be capital gain or loss. A non-corporate U.S. Holder, including an individual, who has held the ordinary shares and/or warrants for more than one year generally will be eligible for reduced tax rates for such long-term capital gains. The deductibility of capital losses is subject to limitations.

Any such gain or loss recognized generally will be treated as U.S. source gain or loss. U.S. Holders are urged to consult their own tax advisor regarding the ability to claim a foreign tax credit and the application of the Treaty to such U.S. Holder's particular circumstances.

*Exercise or Lapse of a Warrant*

Except as discussed below with respect to the cashless exercise of a warrant, a U.S. Holder generally will not recognize gain or loss upon the acquisition of an ordinary share on the exercise of a warrant for cash. A U.S. Holder's tax basis in ordinary shares received upon exercise of the warrant generally should be an amount equal to the sum of the U.S. Holder's tax basis in the warrant received therefore and the exercise price. The U.S. Holder's holding period for an ordinary share received upon exercise of the warrant will begin on the date following the date of exercise (or possibly the date of exercise) of the warrant and will not include the period during which the U.S. Holder held the warrant. If a warrant is allowed to lapse unexercised, a U.S. Holder that has otherwise received no proceeds with respect to such warrant generally will recognize a capital loss equal to such U.S. Holder's tax basis in the warrant.

The tax consequences of a cashless exercise of a warrant are not clear under current U.S. federal income tax law. A cashless exercise may be tax-deferred, either because the exercise is not a realization event or because the exercise is treated as a recapitalization for U.S. federal income tax purposes. In either situation, a U.S. Holder's basis in the ordinary shares received would equal the U.S. Holder's basis in the warrants exercised therefor. If the cashless exercise is not treated as a realization event, a U.S. Holder's holding period in the ordinary shares would be treated as commencing on the date following the date of exercise (or possibly the date of exercise) of the warrants. If the cashless exercise were treated as a recapitalization, the holding period of the ordinary shares would include the holding period of the warrants exercised therefor.

It is also possible that a cashless exercise of a warrant could be treated in part as a taxable exchange in which gain or loss would be recognized in the manner set forth above under "—*Sale, Exchange, Redemption or Other Taxable Disposition of ordinary shares and warrants*." In such event, a U.S. Holder could be deemed to have surrendered warrants equal to the number of ordinary shares having an aggregate fair market value equal to the exercise price for the total number of warrants to be exercised. The U.S. Holder would recognize capital gain or loss in an amount generally equal to the difference between (i) the fair market value of the warrants deemed surrendered and (ii) the U.S. Holder's tax basis in such warrants deemed surrendered. In this case, a U.S. Holder's tax basis in the ordinary shares received would equal the sum of (i) U.S. Holder's tax basis in the warrants deemed exercised and (ii) the exercise price of such warrants. A U.S. Holder's holding period for the ordinary shares received in such case generally would commence on the date following the date of exercise (or possibly the date of exercise) of the warrants.

Due to the absence of authority on the U.S. federal income tax treatment of a cashless exercise of warrants, there can be no assurance which, if any, of the alternative tax consequences and holding periods described above would be adopted by the IRS or a court of law. Accordingly, U.S. Holders should consult their own tax advisors regarding the tax consequences of a cashless exercise of warrants.

*Possible Constructive Distributions*

The terms of each warrant provide for an adjustment to the number of ordinary shares for which the warrant may be exercised or to the exercise price of the warrant in certain events, as discussed under "*Description of Securities—Warrants—Nexters Public Warrants and Forward Purchase Warrants—Anti-dilution Adjustments*." An adjustment which has the effect of preventing dilution generally is not taxable. A U.S. Holder of a warrant would, however, be treated as receiving a constructive distribution from Nexters if, for example, the adjustment increases the holder's proportionate interest in Nexters' assets or earnings and profits (for instance, through an increase in the number of ordinary shares that would be obtained upon exercise of such warrant) as a result of a distribution of cash or other property such as other securities to the holders of the ordinary shares which is taxable to the holders of such shares as

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

described under "—*Distributions on ordinary shares*" above. Such constructive distribution would generally be subject to tax as described under that section in the same manner as if the U.S. Holder of such warrant received a cash distribution from Nexters equal

114

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

to the fair market value of such increased interest. However, it is unclear whether a distribution treated as a dividend deemed paid to a non-corporate U.S. Holder would be eligible for the lower applicable long-term capital gains rates as described above under "—*Distributions on Ordinary Shares.*"

*Passive Foreign Investment Company Rules*

The treatment of U.S. Holders of the ordinary shares could be materially different from that described above, if Nexters is treated as a PFIC for U.S. federal income tax purposes. A non-U.S. entity treated as a corporation for U.S. federal income tax purposes generally will be a PFIC for U.S. federal income tax purposes for any taxable year if either (1) at least 75% of its gross income for such year is passive income or (2) at least 50% of the value of its assets (generally based on an average of the quarterly values of the assets) during such year is attributable to assets that produce passive income or are held for the production of passive income. For this purpose, we will be treated as owning its proportionate share of the assets and earning its proportionate share of the income of any other entity treated as a corporation for U.S. federal income tax purposes in which Nexters owns, directly or indirectly, 25% or more (by value) of the stock.

Based on the current and anticipated composition of the income, assets and operations of Nexters and its subsidiaries, Nexters does not believe it will be treated as a PFIC for the taxable year ending on December 31, 2021. However, there can be no assurances in this regard, nor can there be any assurances that Nexters will not be treated as a PFIC in any future taxable year. Moreover, the application of the PFIC rules is subject to uncertainty in several respects, and Nexters can make no assurances that the IRS will not take a contrary position or that a court will not sustain such a challenge by the IRS.

Whether Nexters or any of its subsidiaries is treated as a PFIC is determined on an annual basis after the close of each taxable year. The determination of whether Nexters or any of its subsidiaries is a PFIC is a factual determination that depends on, among other things, the composition of the income and assets of Nexters, and the market value of its and its subsidiaries' shares and assets. In this regard, changes in the market value of its shares could cause Nexters to become treated as a PFIC because such changes would generally result in changes in the value of goodwill of Nexters for this purpose. Similarly, changes in the composition of Nexters or any of its subsidiaries' income or assets may cause Nexters to be or become a PFIC for the current or subsequent taxable years as well. Under the PFIC rules, if Nexters were considered a PFIC at any time that a U.S. Holder owns ordinary shares or warrants, Nexters would continue to be treated as a PFIC with respect to such U.S. Holder's investment unless (i) it ceased to be a PFIC and (ii) the U.S. Holder made a "deemed sale" election under the PFIC rules. If such election is made, a U.S. Holder will be deemed to have sold its ordinary shares or warrants at their fair market value on the last day of the last taxable year in which Nexters is classified as a PFIC, and any gain from such deemed sale would be subject to the consequences described below. After the deemed sale election, the ordinary shares or warrants with respect to which the deemed sale election was made will not be treated as shares in a PFIC unless Nexters subsequently becomes a PFIC.

For each taxable year that Nexters is treated as a PFIC with respect to a U.S. Holder's ordinary shares or warrants, the U.S. Holder will be subject to special tax rules with respect to any "excess distribution" (as defined below) received and any gain realized from a sale or disposition (including a pledge) of its ordinary shares or warrants (collectively the "Excess Distribution Rules"), unless the U.S. Holder makes a valid QEF election or mark-to-market election as discussed below. Distributions received by a U.S. Holder in a taxable year that are greater than 125% of the average annual distributions received during the shorter of the three preceding taxable years or the U.S. Holder's holding period for the ordinary shares will be treated as excess distributions. Under these special tax rules:

- the excess distribution or gain (including gain on a sale of disposition of warrants) will be allocated ratably over the U.S. Holder's holding period for the ordinary shares or warrants;

- the amount allocated to the current taxable year, and any taxable years in the U.S. Holder's holding period prior to the first taxable year in which Nexters is a PFIC, will be treated as ordinary income; and

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

- the amount allocated to each other taxable year will be subject to the highest tax rate in effect for individuals or corporations, as applicable, for each such year and the interest charge generally applicable to underpayments of tax will be imposed on the resulting tax attributable to each such year.

115

Copyright © 2022 www.secdatabase.com. All Rights Reserved.

Please Consider the Environment Before Printing This Document

Table of Contents

Under the Excess Distribution Rules, the tax liability for amounts allocated to taxable years prior to the year of disposition or excess distribution cannot be offset by any net operating losses, and gains (but not losses) realized on the sale of the ordinary shares or warrants cannot be treated as capital gains, even though the U.S. Holder holds the ordinary shares or warrants as capital assets.

Certain of the PFIC rules may impact U.S. Holders with respect to equity interests in subsidiaries and other entities which Nexters may hold, directly or indirectly, that are PFICs (collectively, "Lower-Tier PFICs"). There can be no assurance, however, that Nexters does not own, or will not in the future acquire, an interest in a subsidiary or other entity that is or would be treated as a Lower-Tier PFIC. U.S. Holders should consult their own tax advisors regarding the application of the PFIC rules to any of Nexters' subsidiaries.

If Nexters is a PFIC, a U.S. Holder of ordinary shares (but not warrants) may avoid taxation under the Excess Distribution Rules described above by making a "qualified electing fund" ("QEF") election. However, a U.S. Holder may make a QEF election with respect to its ordinary shares only if Nexters provides U.S. Holders on an annual basis with certain financial information specified under applicable U.S. Treasury regulations. Because Nexters does not intend to provide such information, however, the QEF Election will not be available to U.S. Holders with respect to Nexters ordinary shares and a QEF election is not available with respect to warrants.

Alternatively, a U.S. Holder of "marketable stock" (as defined below) may make a mark-to-market election for its ordinary shares to elect out of the Excess Distribution Rules discussed above if Nexters is treated as a PFIC. If a U.S. Holder makes a mark-to-market election with respect to its ordinary shares, such U.S. Holder will include in income for each year that Nexters is treated as a PFIC with respect to such ordinary shares an amount equal to the excess, if any, of the fair market value of the ordinary shares as of the close of the U.S. Holder's taxable year over the adjusted basis in the ordinary shares. A U.S. Holder will be allowed a deduction for the excess, if any, of the adjusted basis of the ordinary shares over their fair market value as of the close of the taxable year. However, deductions will be allowed only to the extent of any net mark-to-market gains on the ordinary shares included in the U.S. Holder's income for prior taxable years. Amounts included in income under a mark-to-market election, as well as gain on the actual sale or other disposition of the ordinary shares, will be treated as ordinary income. Ordinary loss treatment will also apply to the deductible portion of any mark-to-market loss on the ordinary shares, as well as to any loss realized on the actual sale or disposition of the ordinary shares, to the extent the amount of such loss does not exceed the net mark-to-market gains for such ordinary shares previously included in income. A U.S. Holder's basis in the ordinary shares will be adjusted to reflect any mark-to-market income or loss. If a U.S. Holder makes a mark-to-market election, any distributions Nexters makes would generally be subject to the rules discussed above under "—*Distributions on ordinary shares*," except the lower rates applicable to qualified dividend income would not apply. U.S. Holders of warrants may not be able to make a mark-to-market election with respect to their warrants.

The mark-to-market election is available only for "marketable stock," which is stock that is regularly traded on a qualified exchange or other market, as defined in applicable U.S. Treasury regulations. U.S. Holders should consult their advisors as to whether ordinary shares will be treated as "regularly traded" for purposes of these rules. Because a mark-to-market election cannot be made for equity interests in any Lower-Tier PFICs, a U.S. Holder will continue to be subject to the Excess Distribution Rules with respect to its indirect interest in any Lower-Tier PFICs as described above, even if a mark-to-market election is made for Nexters.

If a U.S. Holder does not make a mark-to-market election (or a QEF election) effective from the first taxable year of a U.S. Holder's holding period for the ordinary shares in which Nexters is a PFIC, then the U.S. Holder generally will remain subject to the Excess Distribution Rules. A U.S. Holder that first makes a mark-to-market election with respect to the ordinary shares in a later year will continue to be subject to the Excess Distribution Rules during the taxable year for which the mark-to-market election becomes effective, including with respect to any mark-to-market gain recognized at the end of that year. In subsequent years for which a valid mark-to-mark election remains in effect, the Excess Distribution Rules generally will not apply. A U.S. Holder that is eligible to make a mark-to-market with respect to its ordinary shares may do so by providing the appropriate information on IRS Form 8621 and timely filing that form with the U.S. Holder's tax return for the year in which the election becomes effective. U.S. Holders should consult their own tax advisors as to the availability and desirability of a mark-to-market election, as well as the impact of such election on interests in any Lower-Tier PFICs.

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

A U.S. Holder of a PFIC may be required to file an IRS Form 8621 on an annual basis. U.S. Holders should consult their own tax advisors regarding any reporting requirements that may apply to them if Nexters is a PFIC.

116

Copyright © 2022 www.secdatabase.com. All Rights Reserved.

Please Consider the Environment Before Printing This Document

Table of Contents

U.S. Holders are strongly encouraged to consult their tax advisors regarding the application of the PFIC rules to their particular circumstances.

### Non-U.S. Holders

The section applies to Non-U.S. Holders of ordinary shares and warrants. For purposes of this discussion, a Non-U.S. Holder means a beneficial owner (other than a partnership or an entity or arrangement so characterized for U.S. federal income tax purposes) of ordinary shares or warrants that is not a U.S. Holder, including:

- a nonresident alien individual, other than certain former citizens and residents of the United States;

- a foreign corporation; or

- a foreign estate or trust.

*U.S. Federal Income Tax Consequences of the Ownership and Disposition of ordinary shares and warrants to Non-U.S. Holders*

Any (i) distributions of cash or property paid to a Non-U.S. Holders in respect of ordinary shares or (ii) gain realized upon the sale or other taxable disposition of ordinary shares and/or warrants generally will not be subject to U.S. federal income taxation unless:

- the gain or distribution is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment in the United States to which such gain is attributable); or

- in the case of any gain, the Non-U.S. Holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the disposition and certain other requirements are met.

Gain or distributions described in the first bullet point above generally will be subject to U.S. federal income tax on a net income basis at the regular rates. A Non-U.S. Holder that is a corporation also may be subject to a branch profits tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty) on such effectively connected gain, as adjusted for certain items.

Gain described in the second bullet point above will be subject to U.S. federal income tax at a rate of 30% (or such lower rate specified by an applicable income tax treaty), which may be offset by U.S. source capital losses of the Non-U.S. Holder (even though the individual is not considered a resident of the United States), provided the Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

The U.S. federal income tax treatment of a Non-U.S. Holder's exercise of a warrant, or the lapse of a warrant held by a Non-U.S. Holder, generally will correspond to the U.S. federal income tax treatment of the exercise or lapse of a warrant by a U.S. Holder, as described under "—*U.S. Holders—Exercise or Lapse of a warrant*," above, although to the extent a cashless exercise or lapse results in a taxable exchange, the consequences would be similar to those described in the preceding paragraphs above for a Non-U.S. Holder's gain on the sale or other disposition of the ordinary shares and warrants.

Non-U.S. Holders should consult their own tax advisors regarding potentially applicable income tax treaties that may provide for different rules.

### Information Reporting and Backup Withholding

Information reporting requirements may apply to distributions received by U.S. Holders of ordinary shares, and the proceeds received on sale or other taxable the disposition of ordinary shares or warrants effected within the United States (and, in certain cases, outside the United States), in each case other than U.S. Holders that are exempt recipients (such as corporations). Backup withholding may apply to such amounts if the U.S. Holder fails to provide an accurate

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

taxpayer identification number (generally on an IRS Form W‑9 provided to the paying agent of the U.S. Holder's broker) or is otherwise subject to backup withholding. Any distributions with respect to ordinary shares and proceeds from the sale, exchange, redemption or other disposition of ordinary shares or warrants may be

117

Copyright © 2022 www.secdatabase.com. All Rights Reserved.

Please Consider the Environment Before Printing This Document

Table of Contents

subject to information reporting to the IRS and possible U.S. backup withholding. U.S. Holders should consult their own tax advisors regarding the application of the U.S. information reporting and backup withholding rules.

Information returns may be filed with the IRS in connection with, and Non-U.S. Holders may be subject to backup withholding on amounts received in respect of, a Non-U.S. Holder's ordinary shares or warrants, unless the Non-U.S. Holder furnishes to the applicable withholding agent the required certification as to its non-U.S. status, such as by providing a valid IRS Form W-8BEN, IRS Form W-8BEN-E or IRS Form W-8ECI, as applicable, or the Non-U.S. Holder otherwise establishes an exemption. Distributions paid with respect to ordinary shares and proceeds from the sale of other disposition of ordinary shares or warrants received in the United States by a Non-U.S. Holder through certain U.S.-related financial intermediaries may be subject to information reporting and backup withholding unless such Non-U.S. Holder provides proof an applicable exemption or complies with certain certification procedures described above, and otherwise complies with the applicable requirements of the backup withholding rules.

Backup withholding is not an additional tax. Amounts withheld as backup withholding generally may be credited against the taxpayer's U.S. federal income tax liability, and a taxpayer may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing the appropriate claim for a refund with the IRS and furnishing any required information.

**British Virgin Islands Tax Considerations**

Under the Companies Act, Nexters is exempt from all forms of BVI tax; all dividends, interest, royalties and other amounts payable by Nexters, and any gain realized on any shares, debt obligations or other securities of Nexters is exempt from BVI tax; and no BVI estate, inheritance, succession or gift taxes are payable with respect to any shares, debt obligations or other securities of Nexters.

**Cyprus Tax Considerations**

The following section is a short summary of certain important taxation principles that may be or become relevant with respect to Nexters in Cyprus, though it does not purport to be a complete summary of tax law and practice currently applicable in Cyprus and does not contain any statement with respect to the tax treatment of an investment in any other jurisdiction. Furthermore, this section does not address the taxation of Nexters in any other jurisdiction. Therefore, prospective investors are advised to consult their own professional tax advisers in respect of the possible tax consequences of subscribing for, buying, holding, redeeming, converting or selling shares or warrants under the laws of their country of citizenship, residence, domicile or incorporation.

The following summary is based on laws, regulations and practice currently applicable in Cyprus at the date of this Annual Report and is subject to changes therein.

*Tax Residency*

In accordance with the Income Tax Law, a company is tax resident in Cyprus if the management and control is exercised in Cyprus. There is no definition in the Cyprus Income Tax law as to what constitutes management and control. However, as a minimum, management and control may be taken to mean the place where the majority of directors reside, where the majority of the board meetings of the Company are held and where the majority of significant decisions are taken.

On December 9, 2021, the Cyprus Parliament passed into law a bill that aims to strengthen the Cyprus tax framework for the prevention of tax abuse. In an effort to strengthen the residency rule framework beyond the management and control criterion/concept, effective as from December 31, 2022, the term "Cyprus tax resident company" will be expanded to also include a company that was incorporated/registered in Cyprus, but whose management and control is exercised outside Cyprus, as long as the company is not a tax resident in any other state.

*Taxation of Nexters*

*Corporate Income Tax, Capital Gains Tax and Special Contribution for Defence*

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Corporate income tax for Cyprus resident companies is imposed at the rate of twelve and a half percent (12.5%) for each year of assessment upon the taxable income derived from sources both within and outside Cyprus. The year of assessment starts on the 1st

118

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

of January and ends on the 31st of December. In arriving at the taxable income, deductions on such income and exemptions are taken into account. All relevant expenses for the production of the taxable income are generally deductible expenses whereas dividends and profits from the sale of securities (including shares and share warrants) constitute income which is exempt from income tax. Expenses that directly or indirectly relate to tax exempt income are generally not tax deductible.

*Profits from the sale of "Securities"*

According to Article 2 of the Cyprus Income Tax Law "securities" means shares, bonds, debentures, founders' shares and other securities of companies or other legal persons, incorporated under the law in the Republic or abroad and options thereon.

Based on Circular 2008/13 issued by the Cyprus Tax Authorities, which gives a wider definition of the term "securities", units in open-end or closed-end collective investment schemes which have been established, registered and operate under the provisions of the law of the country in which they have been established fall under the definition of "securities".

Profits from the disposal of securities are fully exempt from corporate income tax.

Capital gains tax at the rate of 20% is only payable on gains earned on the disposal of immovable property (land and buildings) situated in Cyprus, including shares of companies not listed on a recognized stock exchange which, directly or indirectly (subject to the below condition for indirect ownership), own such immovable property situated in Cyprus.

On December 17, 2015, the Capital Gains Tax Law was amended extending the definition of "immovable property" so that capital gains tax is also imposed on any gain on disposal of shares of a company which participates in other companies which hold immovable property in Cyprus, when at least 50% of the market value of the shares sold is derived from such immovable property situated in Cyprus. In calculating whether the value of the immovable property represents at least 50% of the market value of the shares, any liabilities are ignored.

*Dividend income*

Dividends received by a Cyprus tax resident company from companies located in Cyprus or abroad are exempt from corporate income tax.

As from January 1, 2016, the corporate income tax exemption shall not apply to the extent that such dividends are deductible from the taxable income of the dividend paying company. It is explicitly stated that any such dividends that do not qualify for the corporate income tax exemption are not considered as dividends for Special Contribution for Defence ("SCD") purposes and as such they are subject to 12.5% corporate income tax.

Dividends received by a Cyprus tax resident company from another Cyprus tax resident company are exempt from 17% SCD except for dividends paid out of profits earned more than 4 years from the year of the distribution.

Dividends received by a Cyprus tax resident company from a non-Cyprus tax resident company are exempt from SCD if the non-Cyprus tax resident company paying the dividend:

- does not carry on, directly or indirectly, more than 50% investment activities which give rise to investment income; or

- the foreign tax burden on the income of the company paying the dividend is not substantially lower than the tax burden of the company in Cyprus (substantially lower is interpreted as lower than 6.25%).

If there is a group with many layers of subsidiaries, the exemption from SCD will be extended and applied if the group does not carry on more than 50% activities leading to investment income. For the purpose of calculating the 50% threshold, intra-group dividends are ignored.

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Investment income is not precisely defined in the Cyprus tax laws. According to Article 2 of the Income Tax Law, investment income "means any income which is not derived or arising from any business, employment, pensions or annuity."

119

Copyright © 2022 www.secdatabase.com. All Rights Reserved.

Please Consider the Environment Before Printing This Document

Table of Contents

Business is further defined as "commercial or manufacturing business, profession or vocation and includes any other business of a trading nature."

If the dividends are taxable, any withholding tax paid overseas on the dividends can be relieved against the SCD irrespective of whether a double tax treaty exists or not. Underlying tax may also be given as a credit against the SCD if provided for under a double taxation treaty and/or if the dividend paying company is a tax resident in an EU member state.

*Deemed dividend distribution rules*

As from the tax year 2003 onwards, companies are deemed to have distributed to their Cyprus tax resident shareholders, 70% of their accounting profits after the deduction of corporation tax at the end of two years from the end of the year in which the profits were earned.

On such a deemed distribution 17% SCD should be withheld and paid over to the Cyprus Tax Authorities. The deemed distribution provisions do apply to Cyprus tax resident corporate shareholders but do not apply to non-Cyprus tax resident shareholders and to Cyprus tax resident but not domiciled individuals.

As from January 1, 2011, the term "corporation tax" has been extended to include the SCD, the capital gains tax and any taxes paid abroad that have not been credited against the corporation tax. These taxes are taken into consideration for the calculation of the company's accounting profits subject to deemed distribution.

As from September 13, 2011, the Commissioner of Taxation has issued a Circular numbered 2011/10 according to which the exemption with respect to profits attributable to non-resident shareholders has been extended to profits attributable to resident corporate shareholders of a Cypriot resident company to the extent that such profits are indirectly attributable to ultimate shareholders which are non-residents of Cyprus.

**Taxation of Investors**

Cyprus does not currently levy any withholding tax on dividend payments made to persons not being resident for tax purposes of Cyprus or to individuals who are tax residents of Cyprus but do not have a Cypriot domicile (as defined in the SCD Law).

Dividends paid to Cyprus tax resident and domicile individuals are subject to 17% SCD which will be withheld at source by Nexters.

Cyprus tax resident individuals are also subject to General Healthcare System ("GHS") contributions on their dividend income, irrespective of whether they are domiciled or non-domiciled in Cyprus. The applicable GHS rate is currently 2.65% and it applies on total annual income of an individual of €180.000. The GHS contributions on dividends paid or deemed (under the deemed dividend distribution rules) to be paid to Cyprus tax resident individuals (irrespective of their domicile status) will be withheld at source by Nexters.

On December 9, 2021, the Cyprus Parliament passed into law a bill that aims to strengthen the Cyprus tax framework for the prevention of tax abuse. Effective as from December 31, 2022, withholding taxes ("WHT") will be introduced on payments to companies in jurisdictions included in the EU Blacklist of non-cooperative jurisdictions ("EU Blacklist") as follows:

- *Dividends.* WHT at the rate of 17% will apply on dividends paid by a Cyprus tax resident company to companies which are:

  o resident in jurisdictions included in the EU Backlist, or

  o incorporated/registered in a jurisdiction included in the EU Blacklist and are not tax resident in any other jurisdiction that is not included in the EU Blacklist.

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

120

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

The following conditions apply:

o    The company receiving the dividend holds directly, either alone or jointly with associated companies, over 50% of the capital, voting rights, or is entitled to receive more than 50% of the profits in the company paying the dividends.

o    The associated companies should also be resident in an EU blacklisted jurisdiction or incorporated/ registered in an EU blacklisted jurisdiction and are not tax resident in any other jurisdiction that is not included in the EU Blacklist.

The WHT will not apply in the case of dividend payments on shares listed on a recognised stock exchange.

• *Interest*.   WHT at the rate of 30% will apply on interest paid by a Cyprus tax resident company to companies which are:

o    resident in jurisdictions included in the EU Blacklist, or

o    incorporated/registered in a jurisdiction included in the EU Blacklist and are not tax resident in any other jurisdiction that is not included in the EU Blacklist.

The WHT will not apply in the case of:

o    Interest payments on securities listed on a recognised stock exchange.

o    Interest payments made by individuals.

• *Royalties*.   WHT at the rate of 10% will apply on royalties paid by a Cyprus tax resident company to companies which are:

o    resident in jurisdictions included in the EU blacklist, or

o    incorporated/registered in a jurisdiction included in the EU Blacklist and are not tax resident in any other jurisdiction that is not included in the EU Blacklist.

The WHT will not apply in the case of royalty payments made by individuals.

*Tax Residency and Domicile for Individuals*

An individual is considered to be a tax resident of Cyprus if he or she is physically present in the Republic of Cyprus for an aggregate total of more than 183 days in a tax year.

As of January 1, 2017, an individual is also recognized as a Cypriot tax resident for a tax year if he or she meets all of the following requirements:

(1)   does not spend more than 183 days in total in any state within the tax year;

(2)   is not recognized as a tax resident of another state in the same tax year;

(3)   stays in Cyprus for at least 60 days in the tax year;

(4)   pursues a business or is employed in Cyprus or holds an office with a company that is a Cypriot tax resident at any time during the tax year; and

(5)   maintains a permanent home in Cyprus that is either owned or rented.

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

If an individual terminates his or her employment/winds up his business or ceases to hold office as per (4) above, he or she cannot be considered a Cypriot tax resident for the respective tax year.

121

---

Copyright © 2022 www.secdatabase.com. All Rights Reserved.

Please Consider the Environment Before Printing This Document

Table of Contents

The SCD Law contains the following term and definition:

"Resident in the Republic", when applied to an individual, means a person who is resident in the Republic of Cyprus as defined in accordance with the provisions of the Income Tax Law, and who also has domicile in the Republic of Cyprus.

For the purposes of this Law, a person has "domicile in the Republic" if he or she has domicile of origin in the Republic of Cyprus based on the provisions of the Wills and Succession Law, except for:

(i)   a person who has acquired and maintains domicile of choice outside the Republic based on the provisions of the Wills and Succession Law, *provided* that he or she was not resident in the Republic as defined in accordance with the provisions of the Income Tax Law for any period of at least twenty (20) consecutive years before the tax year, or

(ii)  a person who was not resident in the Republic as defined in accordance with the provisions of the Income Tax Law for a period of at least twenty (20) consecutive years before the entry into force of the provisions of this Law

It is provided that regardless of the domicile of origin, any person who is resident in the Republic, as defined in accordance with the provisions of the Income Tax Law, for at least seventeen (17) out of the last twenty (20) years before the tax year will be deemed domiciled in the Republic for the purposes of this Law.

*Tax Residency for Companies*

A company is considered to be tax resident in the Republic of Cyprus if its management and control is exercised in Cyprus. There is no definition in the Cyprus income tax laws as to what constitutes management and control, however in practice it is considered to be exercised where:

(1)      the Majority of the directors are resident;

(2)      the Majority of the Board of Directors meetings are held; and

(3)      the majority of significant decisions are taken.

*Profits from the sale of "Securities"*

Profits from the disposal of securities are fully exempt from personal income tax.

For information regarding the definition of "securities" under the Cyprus Income Tax Law and the treatment of capital gains tax in Cyprus, see "—*Cyprus Tax Considerations—Taxation of Nexters—Profits from the sale of 'Securities'*" above.

**F.  Dividends and Paying Agents**

Not applicable.

**G.  Statement by Experts**

Not applicable.

**H.  Documents on Display**

We are subject to certain of the informational filing requirements of the Exchange Act. Accordingly, we are required to file with the SEC an annual report on Form 20-F containing financial statements audited by an independent accounting firm, as well as reports on Form 6-K. The SEC maintains a website at *http://www.sec.gov* that contains

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Case 1:20-cv-06054-BMC-CLP    Document 64-5    Filed 01/18/23    Page 80 of 104 PageID #: 2068

reports and other information that we file with or furnish electronically to the SEC. Since we are a "foreign private issuer", we are exempt from the rules and regulations under the Exchange Act prescribing the furnishing and content of proxy statements, and our officers, directors and principal shareholders are

122

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

exempt from the reporting and "short-swing" profit recovery provisions contained in Section 16 of the Exchange Act with respect to their purchase and sale of the Company's ordinary shares. In addition, we are not required to file reports and financial statements with the SEC as frequently or as promptly as U.S. public companies whose securities are registered under the Exchange Act.

We also maintain an Internet website at: *https://nexters.com*. Through our website, we will make available, free of charge, the following documents as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC: our annual reports on Form 20-F; our reports on Form 6-K; amendments to these documents; and other information as may be required by the SEC. The information contained on, or that may be accessed through, our website is not part of, and is not incorporated into, this Annual Report.

**I.   Subsidiary Information**

Not applicable.

**ITEM 11.  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

We are exposed to market risks in the ordinary course of our business. These risks primarily include credit risk, liquidity risk, and currency risk as follows:

**Credit Risk**

Credit risk is the risk that a counterparty will not meet its obligations under a financial instrument or customer contract, leading to a financial loss. We are exposed to credit risk from our operating activities (primarily trade receivables), which is concentrated around the key platforms through which we distribute our games.

Credit risk related to trade receivables is considered immaterial, as almost all sales are generated through major companies, with consistently high credit ratings. These distributors pay the Company on a monthly basis, based on sales to the end-users, and payments are made one to two months after the sale to the end-user. The distributors are responsible for tracking and accounting of end-user sales, and send us monthly royalty reports reflecting amounts to be paid. We do not have any material overdue or impaired accounts receivable, and the credit risk associated with the trade receivable that is neither due nor impaired is deemed to be small. For additional information on our credit risk, please see Note 28 (*Financial instruments – fair values and risk management—B. Financial risk management—(i) Credit risk*) to our audited consolidated financial statements for the fiscal year ended December 31, 2021, included elsewhere in this Annual Report.

**Liquidity Risk**

Liquidity risk refers to the risk of being unable to fulfil payment obligations when they fall due. We have purposefully and consciously invested in growing and expanding our business and we intend to continue to make significant investments in growth and expansion. This requires us to carefully plan and monitor our capital needs. Our objective when managing liquidity is to ensure, as far as possible, that we will have sufficient liquidity to meet our liabilities when they are due, under both normal and stressed conditions without incurring unacceptable losses or risking damage to our reputation. For additional information on our liquidity risk, please see Note 28 (*Financial instruments – fair values and risk management—B. Financial risk management—(ii) Liquidity risk*) to our audited consolidated financial statements for the fiscal year ended December 31, 2021, included elsewhere in this Annual Report.

**Currency Risk**

Currency risk is the risk that the value of financial instruments will fluctuate due to changes in foreign exchange rates. Currency risk arises when future commercial transactions and recognized assets and liabilities are denominated in a currency that is not the functional currency. We are is exposed to foreign exchange risk arising from various currency exposures primarily with respect to the Euro and the Russian Ruble. We monitor the exchange rate fluctuations on a continuous basis.

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

123

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

For the periods presented, our exposure to foreign currency risk, expressed in U.S. dollars, was as follows:

|  | For the year ended December 31, 2021 | |
|  | Euro | Russian Ruble |
|---|---|---|
| **Assets** | *$* | |
| Loans receivable | 123 | — |
| Trade and other receivables | 9,493 | 3,571 |
| Cash and cash equivalents | 33,297 | 621 |
|  | **42,913** | **4,192** |
| **Liabilities** | | |
| Lease liabilities | (1,795) | (139) |
| Trade and other payables | (4,701) | (1,092) |
|  | **(6,496)** | **(1,231)** |
| **Net exposure** | **36,417** | **2,961** |

A 10% strengthening of the U.S. dollar against the following currencies at December 31, 2021 would have increased (decreased) equity and profit or loss by the amounts shown below. This analysis assumes that all other variables, in particular interest rates, remain constant. For a 10% weakening of the U.S. dollar against the relevant currency, there would be an equal and opposite impact on the profit and other equity.

|  | As of December 31, 2021 | |
|  | Strengthening of USD by 10% | Weakening of USD by 10% |
|---|---|---|
|  | *$* | |
| Euro | (3,642) | 3,642 |
| Russian Ruble | (296) | 296 |
|  | **(3,938)** | **3,938** |

In February 2022, following the imposition of sanctions by the United States, the European Union and the United Kingdom, as well as other countries, in response to the commencement of Russia's military operations in Ukraine, there was a significant depreciation of the Russian Ruble against other currencies. While currency control and other stabilization measures implemented by the Central Bank of the Russian Federation appear, as of the date of this Annual Report, to have been effective in restoring the value of the Russian Ruble to its pre-conflict levels, the longer-term effects of the current or potential future sanctions on the Russian economy, among other things, may further impact its value.

**ITEM 12. DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES**

**A.  Debt Securities**

Not applicable.

**B.  Warrants and Rights**

Not applicable.

**C.  Other Securities**

Not applicable.

**D.  American Depositary Shares**

Not applicable.

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

124

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

# PART II

## ITEM 13.  DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES

Not applicable.

## ITEM 14.  MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS

Not applicable.

## ITEM 15.  CONTROLS AND PROCEDURES

### A.  Disclosure Controls and Procedures

We maintain disclosure controls and procedures (as that term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) that are designed to ensure that information required to be disclosed in the Company's reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. Any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2021.

Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2021, our disclosure controls and procedures were not effective due to certain deficiencies that our management and our independent registered public accounting identified in connection with the audit of Nexters Inc.'s financial statements as of and for the years ended December 31, 2021 and 2020, and the audit of Nexters Global's financial statements as of and for the years ended December 31, 2020 and 2019, and were determined to represent material weaknesses in our internal control over financial reporting.

We have a relatively short history of operations and, as a private company prior to the consummation of the Transactions, had limited resources to dedicate towards addressing our internal controls and procedures. The deficiencies identified were primarily attributable to (i) our lack of an effective control structure and oversight over the financial reporting process; (ii) lack of sufficient risk assessment over the share-based payments, indirect tax, treasury and procurement processes to identify, assess and manage risks, including the development of formalized policies and procedures with adequate segregation of duties and the development of control activities to mitigate risks; and (iii) lack of sufficient general controls over information technology systems relating to change management and controls over access within certain information systems. We developed a plan to remediate these material weaknesses, including (i) designing and implementing improved processes and internal controls regarding the revenue (including in respect of our new gaming company acquisitions), tax, treasury and procurement processes, (ii) hiring additional personnel dedicated to carrying out regular independent monitoring of general controls regarding information technology and to exercise controls regarding the revenue recognition process, (iii) establishing an access policy for its information systems, (iv) improving controls over access rights management, including reviews of current access rights, user roles and access management procedures, and (v) implementing change management control procedures for its information systems. For progress we have made regarding our remediation plan, see "—*D. Changes in Internal Control Over Financial Reporting*" below.

### B.  Management's Annual Report on Internal Control Over Financial Reporting

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Case 1:20-cv-06054-BMC-CLP    Document 64-5    Filed 01/18/23    Page 86 of 104 PageID #: 2074

This Annual Report does not include a report of management's assessment regarding internal control over financial reporting due to a transition period established by rules of the SEC for newly public companies.

**C. Attestation Report of Registered Public Accounting Firm**

This Annual Report does not include an attestation report of the Company's registered public accounting firm due to a transition period established by rules of the SEC for newly public companies and because we are an emerging growth company under the JOBS Act.

125

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**D. Changes in Internal Control Over Financial Reporting**

During the period covered by this Annual Report, we made the following changes in our internal controls over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting:

- We have established an audit committee comprising our three independent directors;

- We have hired additional employees dedicated to accounting, reporting and control procedures; and

- implemented controls over revenue, financial closing, transformation and consolidation to cover significant risks.

While significant progress has been made to enhance our internal control over financial reporting, we are still in the process of implementing, documenting and testing these processes, procedures and controls. The process of implementing an effective financial reporting system is a continuous effort that requires us to anticipate and react to changes in our business and the economic and regulatory environments and to expend significant resources to maintain a financial reporting system that is adequate to satisfy our reporting obligations. Additional time is required to complete implementation as well as to assess and ensure the sustainability of these procedures. We believe these actions will be effective in remediating the material weaknesses described above and we will continue to devote significant time and attention to these remediation efforts. However, the material weaknesses cannot be considered remediated until the applicable controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. As we continue to evaluate and take actions to improve our internal control over financial reporting, we may take additional actions to address control deficiencies or modify certain of the remediation measures described above.

**ITEM 16.  [RESERVED]**

**ITEM 16A.  AUDIT COMMITTEE FINANCIAL EXPERT**

Our board of directors has determined that Natasha Braginsky Mounier, a member of our audit committee, is a "financial expert," as defined in Item 16A of Form 20-F. Ms. Braginsky Mounier is "independent," as defined in Rule 10A-3 under the Exchange Act. For a description of Ms. Braginsky Mounier's experience, see "*Item 6. Directors, Senior Management and Employees—A. Directors and Senior Management—Directors—Natasha Braginsky Mounier.*"

**ITEM 16B.  CODE OF ETHICS**

We have adopted a Code of Conduct and Ethics that applies to all our directors, officers and employees, including our principal executive, principal financial and principal accounting officers. Our Code of Conduct and Ethics addresses, among other things, conflicts of interest, corporate opportunity requirements, confidentiality, competition and fair dealing, financial matters and external reporting, our funds and assets, as well as the process for reporting violations of the Code of Conduct and Ethics and employee misconduct. Our Code of Conduct and Ethics is intended to meet the definition of "code of ethics" under Item 16B of Form 20-F under the Exchange Act.

We intend to disclose on our website any amendment to, or waiver from, a provision of our Code of Conduct and Ethics that applies to our directors or executive officers to the extent required under the rules of the SEC or Nasdaq. Our Code of Conduct and Ethics is available on our website at: *https://nexters.com*. The information contained on our website is not incorporated by reference in this Annual Report.

**ITEM 16C.  PRINCIPAL ACCOUNTANT FEES AND SERVICES**

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

The consolidated financial statements of Nexters Inc. as of December 31, 2021 and 2020, and for each of the years in the two-year period ended December 31, 2021, have been included herein in reliance upon the report of our independent registered public accounting firm, JSC "KPMG", Moscow, Russia, Auditor Firm ID: 3055, appearing elsewhere herein, and upon the authority of said firm as experts in accounting and auditing.

126

Copyright © 2022 www.secdatabase.com. All Rights Reserved.

Please Consider the Environment Before Printing This Document

Table of Contents

The table below sets out the total amount of fees for the services rendered by JSC "KPMG" for the years ended December 31, 2021 and 2020, and breaks down these amounts by category of service:

| | Year ended December 31, | |
| --- | --- | --- |
| | **2021** | **2020** |
| | *(in thousands of U.S. dollars)* | |
| Audit Fees | 1,242 | 1,081 |
| Audit-Related Fees | 68 | — |
| Tax Fees | 478 | 8 |
| All Other Fees | — | — |
| **Total** | **1,787** | **1,089** |

***Audit Fees***

Audit fees for the years ended December 31, 2021 and 2020 were related to the audit of our consolidated financial statements and other audit or interim review services provided in connection with statutory and regulatory filings or engagements.

***Audit-Related Fees***

Audit related fees for the year ended December 31, 2021 were primarily related to services in connection with the consummation of the Transactions and our Nasdaq listing.

***Tax Fees***

Tax fees for the years ended December 31, 2021 and 2020 were related to ongoing tax advisory, tax compliance and tax planning services as well as non-recurring tax advice relating to the Transactions.

***Audit Committee Pre-Approval Policies and Procedures***

Pursuant to our audit committee charter, the audit committee, or the chair of the audit committee, is required to pre-approve all audit services to be provided to the Company, whether provided by the principal auditor or other firms, and all other services (review, attest and non-audit) to be provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules.

All services rendered by our independent auditor since the establishment of our audit committee were pre-approved by either the audit committee or the chair of the audit committee, in accordance with the audit committee's pre-approval policy.

## ITEM 16D.  EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES

Not applicable.

## ITEM 16E.  PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS

During the year ended December 31, 2021, no purchases of our equity securities were made by or on behalf of us or any affiliated purchaser.

## ITEM 16F.  CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Not applicable.

127

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**ITEM 16G.  CORPORATE GOVERNANCE**

As a British Virgin Islands company listed on the Nasdaq Global Select Market, we are subject to Nasdaq corporate governance listing standards. However, Rule 5615(a)(3) of The Listing Rules of the Nasdaq Stock Market (the "Nasdaq Rules") permits foreign private issuers like us to follow certain home country corporate governance practices in lieu of certain provisions of the Rule 5600 Series of the Nasdaq Rules. A foreign private issuer that elects to follow a home country practice instead of such provisions, must disclose in its annual reports each requirement that it does not follow and describe the home country practice followed by it.

Our current corporate governance practices differ from Nasdaq corporate governance requirements for U.S. companies in certain respects, as summarized below:

- *Composition of Board*. Rule 5605(b)(1) of the Nasdaq Rules generally requires a Nasdaq listed company to have a majority of the board be independent. In this regard we have elected to adopt the practices of our home country, the British Virgin Islands, which practices do not require a majority independent board. Ivan Tavrin, Natasha Braginsky Mounier and Andrew Sheppard are Nexters' independent directors.

- *Executive Sessions*. Rule 5605(b)(2) of Nasdaq Rules generally requires independent directors of a Nasdaq listed company must meet regularly in executive sessions (without members of management present), and such executive sessions should occur at least twice a year. In this regard we have elected to adopt the practices of our home country, the British Virgin Islands, which practices which do not require independent directors to meet regularly in executive sessions separate from the full board of directors.

- *Compensation Committee Charter*. Rule 5605(d)(1) of the Nasdaq Rules generally requires a Nasdaq listed company to adopt a formal written compensation committee charter specifying the items enumerated in Rule 5605(d)(1) and that such charter must be reviewed and reassessed annually. In this regard, we have elected to adopt alternative practices in relation to director and officer compensation consistent with or otherwise permitted by British Virgin Islands law.

- *Compensation Committees*. Rule 5605(d)(2) of the Nasdaq Rules generally requires a Nasdaq listed company to have a compensation committee composed solely of independent directors to determine or recommend the compensation of the executive officers of the company. The practices of our home country, the British Virgin Islands, do not require that any of the members of a company's compensation committee be independent directors. While we have elected to have our nomination and compensation committee composed solely of independent directors, we do not have a stand-alone compensation committee, and the members of our nomination and compensation committee are not limited to independent directors.

- *Independent Director Oversight of Director Nominations*. Rules 5605(e)(1) of the Nasdaq Rules generally requires director nominations of a Nasdaq listed company to be made or recommended solely by independent directors. We follow British Virgin Islands practice which does not require director nominations or recommendations solely by independent directors.

- *Formal Written Charter for Director Nominations*. Rule 5605(e)(2) of the Nasdaq Rules generally requires that a Nasdaq listed company must adopt a formal written charter or board resolution, as applicable, addressing the nominations process and such related matters as may be required under U.S. federal securities laws. We follow British Virgin Islands practice which does not require us to have a formal written charter or board resolution addressing the director nominations process.

- *Quorum for Meeting of Shareholders*. Rule 5620(c) of the Nasdaq Rules generally requires that the by-laws of a Nasdaq listed company must provide a quorum for shareholder meetings of at least 33⅓% of the outstanding shares of the company's common voting stock. In this regard, we will prescribe those quorum requirements for meetings as set forth in our Amended and Restated Memorandum and Articles of Association, as permitted under applicable British Virgin Islands law, which provides that a quorum may be that as specifically fixed by the memorandum and articles of association of the company in question.

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

128

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

- *Shareholder Approval of Equity Compensation*. Rule 5635(c) of the Nasdaq Rules generally requires shareholder approval prior to the issuance of securities of a Nasdaq listed company when a stock option or purchase plan is to be established or other equity compensation arrangement made, pursuant to which stock may be acquired by officers, directors, employees, or consultants. In this regard we have elected to adopt the practices of our home country, the British Virgin Islands, which does not require such prior shareholder approval of the establishment of stock option or purchase plans, or other equity compensation arrangements.

**ITEM 16H.  MINE SAFETY DISCLOSURE**

Not applicable.

**ITEM 16I.  DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS**

Not applicable.

129

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**PART III**

**ITEM 17. FINANCIAL STATEMENTS**

See "*Item 18. Financial Statements*."

**ITEM 18. FINANCIAL STATEMENTS**

The audited consolidated financial statements as required under Item 18 are attached hereto starting on page F-1 of this Annual Report. The audit report of our independent registered public accounting firm, JSC "KPMG", Moscow, Russia, Auditor Firm ID: 3055, is included herein preceding the audited consolidated financial statements.

130

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**ITEM 19.  EXHIBITS**

The following documents are filed as part of this Annual Report or incorporated by reference herein:

| Exhibit No. | Description | Incorporation by Reference | | | |
|---|---|---|---|---|---|
| | | Form | File Number | Exhibit No. | Filing Date |
| 1.1 | Amended and Restated Memorandum and Articles of Association of the Company. | 20-F | 001-40758 | 1.1 | August 27, 2021 |
| 2.1 | Specimen Nexters ordinary share certificate. | F-4 | 333-257103 | 4.1 | June 15, 2021 |
| 2.2 | Specimen Nexters warrant. | F-4 | 333-257103 | 4.2 | June 15, 2021 |
| 2.3 | Warrant Agreement, dated as of August 5, 2020, between Kismet and the Continental Stock Transfer & Trust Company. | F-4 | 333-257103 | 4.3 | June 15, 2021 |
| 2.4 | Assignment, Assumption and Amendment Agreement for Kismet's outstanding warrants. | 20-F | 001-40758 | 2.4 | August 27, 2021 |
| 2.5 | Form of the existing Option Agreement. | F-4 | 333-257103 | 4.5 | June 15, 2021 |
| 2.6 | Form of the Assignment, Assumption and Amendment Agreement for Kismet's outstanding option agreements. | F-4 | 333-257103 | 4.4 | June 15, 2021 |
| 2.7* | Description of Securities. | | | | |
| 4.1 | Business Combination Agreement, dated as of January 31, 2021, as it may be amended, by and among Kismet, Nexters, the Sponsor, solely in its capacity as Kismet's representative, the Company, Fantina Holdings Limited, a private limited liability company domiciled in Cyprus, solely in its capacity as the Company Shareholders representative, and the shareholders of the Company party thereto. | F-4 | 333-257103 | 2.1 | June 15, 2021 |
| 4.2 | Amendment No. 1 to Business Combination Agreement, dated as of July 17, 2021, by and among Kismet, the Sponsor, solely in its capacity as Kismet's representative, Nexters, the Company, Fantina Holdings Limited, solely in its capacity as the Company Shareholders representative and the shareholders of the Company party thereto. | F-4/A | 333-257103 | 2.2 | July 28, 2021 |
| 4.3 | Amendment No. 2 to Business Combination Agreement, dated as of August 11, 2021, by and among Kismet, the Sponsor, solely in its capacity as Kismet's representative, Nexters, the Company, Fantina Holdings Limited, solely in its capacity as the Company Shareholders representative and the shareholders of the Company party thereto. | 20-F | 001-40758 | 4.3 | August 27, 2021 |
| 4.4 | A&R Forward Purchase Agreement, dated as of January 31, 2021, by and among Kismet Acquisition One Corp, Kismet Sponsor Limited, and Nexters. | F-4 | 333-257103 | 10.1 | June 15, 2021 |
| 4.5† | Registration Rights Agreement, by and among Nexters and the other parties thereto. | 20-F | 001-40758 | 4.5 | August 27, 2021 |
| 4.6† | Lockup Agreement, between Nexters and the other parties thereto. | 20-F | 001-40758 | 4.6 | August 27, 2021 |
| 4.7 | Lock-up Agreement, between Nexters and Kismet Sponsor Limited. | 20-F | 001-40758 | 4.7 | August 27, 2021 |
| 4.8 | Form of Subscription Agreement. | F-4/A | 333-257103 | 10.7 | July 28, 2021 |

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

| 4.9 | Form of Director and Officer Indemnification Agreement. | 20-F | 001-40758 | 4.9 | August 27, 2021 |
| 4.10 | 2021 Employee Stock Option Plan. | 6-K | 001-40758 | 99.1 | November 19, 2021 |

131

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

| | | | | | |
|---|---|---|---|---|---|
| 4.11 | MX Capital Share Purchase Agreement, dated as of January 27, 2022, between the Company and Everix Investments Limited, a related party of the Company. | 6-K | 001-40758 | 99.2 | January 27, 2022 |
| 8.1* | Subsidiaries of Nexters. | | | | |
| 12.1* | Certification of Principal Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | |
| 12.2* | Certification of Principal Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. | | | | |
| 13.1* | Certification of Principal Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | |
| 13.2* | Certification of Principal Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. | | | | |
| 15.1* | Consent of JSC "KPMG". | | | | |
| 101.INS | Inline XBRL Instance Document – the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document | | | | |
| 101.SCH | Inline XBRL Taxonomy Extension Schema | | | | |
| 101.CAL | Inline XBRL Taxonomy Extension Schema Calculation Linkbase | | | | |
| 101.DEF | Inline XBRL Taxonomy Extension Schema Definition Linkbase | | | | |
| 101.LAB | Inline XBRL Taxonomy Extension Schema Label Linkbase | | | | |
| 101.PRE | Inline XBRL Taxonomy Extension Schema Presentation Linkbase | | | | |
| 104 | Cover Page Interactive Date File (formatted as Inline XBRL and contained in Exhibit 101) | | | | |

(*)     Filed herewith

(†)     Certain identified confidential information has been redacted from this exhibit because disclosure of that information would constitute a clearly unwarranted invasion of personal privacy.

132

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**SIGNATURES**

      The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this Annual Report on its behalf.

<table>
<tr><td></td><td><strong>NEXTERS INC.</strong></td></tr>
<tr><td>Date: April 29, 2022</td><td>By:    /s/Andrey Fadeev</td></tr>
<tr><td></td><td>Name: Andrey Fadeev</td></tr>
<tr><td></td><td>Title:   Chief Executive Officer</td></tr>
</table>

Table of Contents

**Nexters Inc.**

Contents

Report of Independent Registered Public Accounting Firm (JSC "KPMG", Moscow, Russia, Auditor Firm ID: 3055)                                                                                                        F-2
CONSOLIDATED STATEMENT OF FINANCIAL POSITION                                                            F-4
CONSOLIDATED STATEMENT OF PROFIT OR LOSS AND OTHER COMPREHENSIVE INCOME             F-5
CONSOLIDATED STATEMENT OF CHANGES IN EQUITY                                                             F-6
CONSOLIDATED STATEMENT OF CASH FLOWS                                                                     F-8
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS                                                           F-9

F-1

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**Nexters Inc.**

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Audit committee
Nexters Inc.:

*Opinion on the Consolidated Financial Statements*

We have audited the accompanying consolidated statements of financial position of Nexters Inc. and subsidiaries (the "Group") as of December 31, 2021 and December 31, 2020, the related consolidated statements of profit or loss and other comprehensive income, changes in equity, and cash flows for each of the years in the three-year period ended December 31, 2021, and the related notes to the consolidated financial statements (collectively, the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Group as of December 31, 2021 and December 31, 2020 and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2021 in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board.

*Correction of a Misstatement*

As discussed in Note 4 to the consolidated financial statements, the 2020 and 2019 consolidated financial statements have been restated to correct a misstatement.

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Group's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Group in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

F-2

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

JSC "KPMG"

We have served as the Group's auditor since 2021.

Moscow, Russia
April 29, 2022

F-3

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

## Nexters Inc.

CONSOLIDATED STATEMENT OF FINANCIAL POSITION
As at December 31, 2021 and 2020*
(in thousands of US$)

| | Note | December 31, 2021 | December 31, 2020 restated |
|---|---|---|---|
| **ASSETS** | | | |
| **Non-current assets** | | | |
| Property and equipment | 15 | 1,352 | 171 |
| Intangible assets | 16 | 266 | 76 |
| Goodwill | 3 | 1,501 | — |
| Long-term deferred platform commission fees | 25 | 116,533 | 89,587 |
| Right-of-use assets | 18 | 2,050 | 1,044 |
| Deferred tax asset | | 25 | — |
| Other non-current assets | | 107 | — |
| **Total non-current assets** | | **121,834** | **90,878** |
| **Current assets** | | | |
| Trade and other receivables | 19 | 45,087 | 32,974 |
| Loans receivable | 17 | 123 | 8 |
| Cash and cash equivalents | 20 | 142,802 | 84,557 |
| Prepaid tax | | 3,137 | 3,137 |
| **Total current assets** | | **191,149** | **120,676** |
| **Total assets** | | **312,983** | **211,554** |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | |
| **Equity** | | | |
| Share capital | 21 | — | 27 |
| Other reserves | 12,29 | 166,405 | 12,084 |
| Accumulated deficit | | (327,497) | (114,019) |
| **Equity attributable to equity holders of the Company** | | **(161,092)** | **(101,908)** |
| Non-controlling interest | | 44 | — |
| **Total equity** | | **(161,048)** | **(101,908)** |
| **Non-current liabilities** | | | |
| Lease liabilities – non-current | 18 | 1,103 | 818 |
| Long-term deferred revenue | 25 | 128,074 | 79,220 |
| Share warrant obligations | 24 | 22,029 | — |
| **Total non-current liabilities** | | **151,206** | **80,038** |
| **Current liabilities** | | | |
| Short-term loans | 23 | — | 49 |
| Lease liabilities – current | 18 | 831 | 293 |
| Trade and other payables | 22 | 26,573 | 17,214 |
| Tax liability | | 814 | 306 |
| Deferred revenue | 25 | 294,607 | 215,562 |
| **Total current liabilities** | | **322,825** | **233,424** |
| **Total liabilities** | | **474,031** | **313,462** |
| **Total liabilities and shareholders' equity** | | **312,983** | **211,554** |

* For further information, see Note 4 (Accounting judgments, estimates and assumptions — Correction of errors).

The accompanying notes are an integral part of these consolidated financial statements.

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

F-4

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

Table of Contents

**Nexters Inc.**

CONSOLIDATED STATEMENT OF PROFIT OR LOSS AND OTHER COMPREHENSIVE INCOME
For the years ended December 31, 2021, 2020 and 2019[*]
(in thousands of US$)

| | Note | 2021 | 2020, restated | 2019, restated |
|---|---|---|---|---|
| **Revenue** | 7 | **434,094** | **260,892** | **93,811** |
| **Costs and expenses, excluding depreciation and amortization** | | | | |
| Cost of revenue: | | | | |
| Platform commissions | | (117,229) | (75,163) | (28,766) |
| Game operation cost | 8 | (18,945) | (17,390) | (15,727) |
| Selling and marketing expenses | 9 | (270,167) | (165,756) | (82,180) |
| General and administrative expenses | 10 | (23,031) | (3,689) | (2,611) |
| Share listing expense | 12 | (125,438) | — | — |
| **Total costs and expenses, excluding depreciation and amortization** | | **(554,810)** | **(261,998)** | **(129,284)** |
| Depreciation and amortization | | (2,540) | (561) | (286) |
| **Loss from operations** | | **(123,256)** | **(1,667)** | **(35,759)** |
| Net finance income | 11 | 6,939 | 1,778 | 240 |
| **(Loss)/profit before income tax** | | **(116,317)** | **111** | **(35,519)** |
| Income tax expense | 13 | (1,127) | (862) | (7) |
| **Loss for the year, net of tax** | | **(117,444)** | **(751)** | **(35,526)** |
| Attributable to equity holders of the Company | | (117,455) | (751) | (35,526) |
| Attributable to non-controlling interest | | 11 | — | — |
| Other comprehensive income/(loss) | | 11 | 15 | (3) |
| **Total comprehensive loss for the year, net of tax** | | **(117,433)** | **(736)** | **(35,529)** |
| Attributable to equity holders of the Company | | (117,444) | (736) | (35,529) |
| Attributable to non-controlling interest | | 11 | — | — |
| **Loss per share:** | | | | |
| Basic and diluted loss per share, US$ | 6 | (0.64) | (0.00) | (0.20) |

* For further information, see Note 4 (Accounting judgments, estimates and assumptions ― Correction of errors).

These consolidated financial statements were approved by management on April 29, 2022 and signed on its behalf:

Andrey Fadeev                                                                          Alexander Karavaev
Chief Executive Officer                                                        Chief Financial Officer

The accompanying notes are an integral part of these consolidated financial statements.

F-5

Copyright © 2022 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document