UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

                             **MEMORANDUM AND ORDER**

IN RE QIWI PLC SECURITIES LITIGATION    20-CV-6054 (RPK)(CLP)

------------------------------------------------------------x

RACHEL P. KOVNER, United States District Judge:

Plaintiff Moset International Company ("Moset") brings this putative securities class action against Qiwi plc ("Qiwi"), and a number of Qiwi's officers. *See* Am. Compl. (Dkt. #30). Moset alleges that defendants are civilly liable under Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for making false and misleading statements related to compliance with Russian regulations. Qiwi and individual defendant Protopopov have moved to dismiss the complaint. *See* Mem. in Supp. of Mot. to Dismiss (Dkt. #44) ("Defs.' Mem."). For the reasons stated below, defendants' motion is granted.

## BACKGROUND

The following facts are drawn from the complaint and are assumed true for the purposes of this order.

## I.    Qiwi's Platform

Qiwi operates a "network of electronic wallets" and physical "terminals and kiosks" that let merchants and consumers make instant payments in Russia, Kazakhstan, Moldova, Belarus, and other countries. Am. Compl ¶¶ 2, 24, 40. Qiwi's American Depository Shares are traded on the NASDAQ. *Id.* ¶ 24.

Qiwi's customers use a product called Qiwi Wallet to make and receive online payments. *Id.* ¶ 42. Almost 11,000 merchants are accessible to customers through the Qiwi Wallet system. *Id.* ¶¶ 45–46. To open an "anonymous" Qiwi Wallet, customers only need a phone number. *See id.* ¶ 43. Prior to July 2019, Qiwi's customers could make cash payments and withdrawals from "anonymous" e-wallets through Qiwi's physical distribution networks. *Id.* ¶ 42. By the end of 2019, 534.6 million e-wallets had been opened in Russian, and 36.2% of those wallets belong to Qiwi. *Id.* ¶ 44.

Qiwi also owns and controls Qiwi Bank JSC ("Qiwi Bank"), *id.* ¶ 4, which is the platform for Qiwi Wallet, *see id.* ¶ 47. When a customer puts cash into a Qiwi Wallet account, Qiwi Bank issues virtual and physical cards to the customer. *Ibid.* Qiwi Bank also operates a money remittance system that provides transfer services to individuals and entities. *Id.* ¶ 49. A bank account is not required to participate in that system. *See ibid.* Qiwi's money remittances services include payouts of winnings to customers from sports gambling merchants. *Id.* ¶ 50.

The Central Bank of the Russian Federation ("CBR"), which regulates all financial markets in Russia, has issued a banking license for Qiwi Bank. *Ibid.*; *id.* ¶¶ 4 n.1, 52. Qiwi is required to comply with the CBR's reporting and recordkeeping rules and is subject to routine CBR audits. *Id.* ¶ 4. As Qiwi explained in a March 2018 annual report, the CBR "may at any time conduct full or selective audits of any bank's filings." *Id.* ¶ 51 (citation omitted).

In Russia, any bookmaker licensed by the Russian tax service can engage in interactive betting. *Id.* ¶ 54. Among other requirements, online bookmakers must be a member of a self-regulatory organization ("SRO"). *Ibid.*

The SROs control the Russian bookmaking industry and engage in regulatory oversight. *Id.* ¶ 58. But gambling transactions must be accepted through a centralized financial processing

2

system called a TSUPIS.  *Ibid.*  The basic function of a TSUPIS is to transfer money between bettor and bookmaker accounts.  *Id.* ¶ 59.

The TSUPIS system also allegedly protects consumers against criminal and fraudulent gambling activities.  *See id.* ¶ 59.  For example, to place legal bets, bettors must verify their identity, including their Russian citizenship and age, for the bookmaker and the TSUPIS.  *Id.* ¶ 60. As of July 3, 2019, Russian law permitted bookmakers to accept interactive bets from bettors identified through a TSUPIS.  *Id.* ¶ 64.  A TSUPIS records and transmits information about bettors and their bets to SROs.  *Id.* ¶ 63.

There are three TSUPIS in Russia, and Qiwi Bank operates one of them, TSUPIS-2, as a joint project with the Association of Bookmakers SRO ("Bookmakers SRO").  *Id.* ¶¶ 53, 61, 65. To register with the TSUPIS-2 system, bettors go to the Qiwi website and create a wallet.  *Id.* ¶ 61.  Qiwi Wallet is the only available payment method for TSUPIS-2.  *See ibid.*

During the class period, online betting generated significant revenue for Qiwi.  *See id.* ¶¶ 3, 70–71.  Plaintiff alleges that Qiwi captured nearly half of the legal bookmaking market.  *See id.* ¶ 67.  Qiwi generated revenue from that market by charging percentage fees for deposits and prize winnings and by making commissions on payments between bookmakers and banks.  *See id.* ¶ 68. Qiwi's income on payment processing fees was allegedly thirty-five to forty percent of its revenue in 2018.  *See id.* ¶ 69.  At the end of 2019, revenue derived from the betting industry amounted to more than a third of Qiwi's total revenue.  *Id.* ¶ 8.

Plaintiff alleges that the individual defendants knew about Qiwi's revenue streams and the significant amount that online gambling contributed to Qiwi's business.  *Id.* ¶ 72.  For example, during an earnings call for the fourth quarter of 2018, defendant Karavaev, who at the time was Qiwi's Chief Financial Officer ("CFO"), said that the betting business was "[h]alf of [the] payment

services business." *Id.* ¶¶ 28, 73.  Plaintiff alleges that other defendants made comments on later earnings calls suggesting that online gambling was a significant part of Qiwi's business.  *See id.* ¶¶ 74–76 (defendants Solonin and Kiseleva).

## II.   Russia's Regulation and Enforcement Actions Between 2015 and 2020

Plaintiff alleges that between 2015 and 2019, Russia started cracking down on online gambling and businesses like Qiwi that facilitate payments to betting sites. *See id.* ¶ 5.

In July 2016, a Russian government agency sent Qiwi a cease-and-desist letter ordering Qiwi to stop linking to Internet casinos and permitting money transfers to bookmakers. *Id.* ¶ 92. Qiwi complied. *See ibid.*  The president of the Bookmakers SRO allegedly said in response that if the government agency "made such a decision, then [Qiwi] had violations." *Ibid.*  Even though Russian bookmaking experts thought that the threat of further sanctions would force Qiwi to exert greater control over illegitimate transactions, plaintiff alleges that some bookmakers looked for loopholes in the Qiwi system that would allow for transfers to illegal companies. *See id.* ¶ 94. Plaintiff alleges that Qiwi did not close those loopholes because doing so would result in losses to Qiwi's revenue. *Id.* ¶ 95.

In November 2017, Russian passed a law banning money transfers to illegal bookmakers. *Id.* ¶ 96.  That regulation required credit institutions to decline cross-border money transfers for gambling.  *See ibid.*  Faced with that new regulatory scheme, Russian banks were allegedly unwilling to handle international gambling transactions. *See id.* ¶ 97.  But plaintiff alleges that Qiwi still did not take action to stop bookmakers from withdrawing offshore funds. *See id.* ¶ 98. And illegal offshore bookmakers allegedly found ways to continue using Qiwi Wallet. *See ibid.*

Plaintiff alleges that instead of stopping illegitimate gambling operators from accessing Qiwi Wallet, Qiwi advised investors in its Form 20-F Annual Report filed on March 28, 2018 ("2017 20-F") that its system has "been and may continue to be used for fraudulent, illegal or

4

improper purposes" and that Qiwi Bank has "been the subject of CBR investigations in the past that have uncovered various violations and deficiencies in relation to, among other things, reporting requirements, anti-money laundering, cybersecurity, compliance with applicable e-payments thresholds requirements in connection with electronic money transfers and the topping up of electronic accounts and other issues." *Id.* ¶ 99.  Qiwi also warned that the perceived risk of illegal activity on the Qiwi platform was "causing . . . regulators to impose restrictions on . . . operations" and that Qiwi was "recently notified that in 2018 Qiwi Bank will be subject to a CBR inspection as part of the ongoing supervisory process." *Id.* ¶ 100.  Qiwi admitted that it needed "to implement enhanced processes, procedures and controls in order to provide reasonable assurance that we are operating in compliance with applicable regulatory requirements." *See ibid.*

In Qiwi's August 2018 Form 6-K, Qiwi made a similar disclosure that Qiwi Bank "is subject to extensive regulation and reporting obligations, which may . . . increase the . . . costs of doing business." *Id.* ¶ 101.  Qiwi also noted that "Qiwi Bank has been the subject of CBR investigations in the past that have uncovered various regulatory violations and deficiencies, which the Group has generally rectified." *See ibid.*  For example, in an interview on April 4, 2018, defendant Solonin, who co-founded Qiwi and served as its CEO from October 2012 through January 15, 2020, *id.* ¶ 26, said that Qiwi "constantly interact[s] with law enforcement agencies and provide[s] them with tools to track transactions and calculate unscrupulous counterparties in the system." *Id.* ¶ 103.

On March 18, 2019, Russian banned cash withdrawals from anonymous wallets.  *Id.* ¶ 108.  Ten days later, Qiwi noted in its Form 20-F Annual Report for 2018 that "Russian lawmakers and enforcement agencies . . . recently demonstrated increased scrutiny [of] . . . e-payments."  *Id.* ¶

109.  Qiwi admitted that it "need[ed] to implement enhanced processes . . . to provide reasonable assurance that [Qiwi] [was] operating in compliance with . . . regulatory requirements." *Ibid.*

In July 2019, the Russian Duma adopted a law prohibiting "bank payment agents from using a remote [cash register] in payment terminals." *Id.* ¶ 110.  Solonin said that the requirements would "have an insignificant effect on Qiwi's business" because they "may affect small paying agents in remote parts of Russia, where business margins are low." *Ibid.*  That month, one chamber of the Russian Parliament also approved changes to Russian law that would prevent anonymous e-wallets, including anonymous Qiwi Wallets, from being replenished in cash through payment terminals and without bank accounts. *See id.* ¶ 111.  Qiwi's representatives said that "the vast majority of [Qiwi] users" were identified and Qiwi had limited the maximum balance and transactional volume for anonymous wallets. *Id.* ¶ 113.  Representatives from the largest e-payment system in Russia, Yandex.Money, asserted that the relevant changes in the law would "negatively affect the income of electronic money operators." *Ibid.*

The ban on cash withdrawals from anonymous e-wallets became law on September 15, 2019. *Id.* ¶ 114.  And starting on August 3, 2020, holders of Russian e-wallets could not anonymously deposit cash to their accounts through certain physical terminals and offices without identifying themselves and linking a bank account to the wallet. *See id.* ¶ 116.  Qiwi responded that the change in the law was "unlikely to [have] a direct and significant impact on the business." *Ibid.*

Plaintiff alleges that defendants tracked Qiwi's financial metrics and were therefore aware of the negative impacts that increased regulations would have on Qiwi's business. *Id.* ¶ 117.  While Qiwi's SEC filings noted the risks of regulatory non-compliance and of a potential CBR audit,

defendants allegedly failed to disclose that those risks and negative impacts on business from regulations had materialized. *Id.* ¶ 117.

Indeed, the CBR began auditing Qiwi in July 2020. *Id.* ¶ 9. Qiwi did not disclose that the CBR was conducting an audit. *See ibid.*

However, on July 20, 2020, after the markets closed, defendants announced a secondary public offering through which major shareholders of Qiwi would sell millions of shares. *See id.* ¶¶ 9, 118, 225. Plaintiff alleges that because the secondary public offering indicated "undisclosed operation problems," Qiwi's share price fell 9.9%. *Id.* ¶ 9. Two days later, defendants canceled the secondary public offering "due to market conditions." *Id.* ¶¶ 10, 226. Qiwi's share price then increased 8.8%. *Ibid.*

On August 20, 2020, Qiwi disclosed that active Qiwi Wallet accounts had declined from 21.8 million to 20.9 million. *Id.* ¶ 120. Qiwi explained that the decrease in accounts "was mainly the result of the introduction of new restrictions on the use of anonymous wallets," "expanding the client verification procedure" in order to comply "with regulatory requirements," and an extension of the period after which Qiwi turns off an inactive wallet. *Id.* ¶ 120. Defendant Protopopov also said that "unidentified wallets have very little effect on turnover and occupy an insignificant part in the structure of [Qiwi's] product." *Ibid.*

Plaintiff alleges that by fall 2020, Russia was considering new regulations that would create a single "Unified Interactive Bets Accounting Center" ("ETSUP") that would replace TSUPISs. *Id.* ¶ 11; *see id.* ¶ 3. Plaintiff further alleges that for Qiwi to become the ETSUP, Qiwi had to "fully comply[] with the CBR's regulations." *Id.* ¶ 11.

Plaintiff asserts that defendants represented to investors that Qiwi's "regulatory violations were in the past, that Qiwi was legitimately and profitably operating in the online betting space,

and that regulatory scrutiny provided growth opportunities, including the possibility of becoming the single ETSUP." *Id.* ¶ 12.

Defendant Korzh joined Qiwi as CFO of Qiwi Bank in August 2020.  *Id.* ¶ 13.  On December 1, 2020, Korzh became CFO of Qiwi.  *Ibid.*  Eight days later, Qiwi disclosed that the CBR had "performed a routine scheduled audit" of Qiwi Bank "for the period of July 2018 to September 2020."  *Ibid.*; *see id.* ¶ 121.  Defendants disclosed that the CBR "identified certain violations and deficiencies relating primarily to reporting and record-keeping requirements," and the CBR fined Qiwi approximately $150,000.  *Id.* ¶¶ 13, 228.  In addition, defendants disclosed that the CBR "introduced certain restrictions with respect to Qiwi Bank's operations, including, effective from December 7, 2020, the suspension or limitation of most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts." *Id.* ¶ 13; *see id.* ¶ 228. Qiwi explained that had those restrictions been in effect for the nine-month period ending on September 30, 2020, about thirty-three to forty percent of net revenue from the payment services segment would have been negatively affected. *See id.* ¶¶ 13, 228.

Those disclosures allegedly caused a 20.6% decline in Qiwi's stock price.  *See id.* ¶¶ 14, 229.  Korzh resigned three months later.  *Id.* ¶ 14.  Plaintiff also alleges that Qiwi's regulatory violations jeopardized Qiwi's bid to become the ETSUP.  *Id.* ¶ 15.

Because Qiwi failed to pass the CBR's routine audit, plaintiff alleges that Qiwi's regulatory compliance was deficient and defendants' statements that Qiwi had "remedied" earlier violations and would not "be in breach of [regulatory] requirements going forward" and that new regulations would "be basically positive for [Qiwi]" were false. *Id.* ¶ 16. Plaintiff also alleges that defendants made statements about the risk of a CBR audit while failing to tell investors that Qiwi was the subject of an audit that was going poorly for the company.  *Ibid.*  From the start of the audit in July

2020 to the disclosure of the audit on December 9, 2020, defendants had two quarterly calls and issued thirteen public filings or press releases without mentioning the audit. *Ibid.*

## III.     Defendants' Allegedly False and Misleading Statements

Plaintiff alleges that defendants made numerous false or misleading statements during the class period.

First, plaintiff alleges that Qiwi's quarterly earnings reports issued from the third quarter of 2018 to the third quarter of 2020 and reports for the fiscal years 2018 and 2019 contained false or misleading statements.  *See id.* ¶¶ 125, 132, 133, 147, 155, 166, 173, 174, 189, 196, 205, 213. Except for a republished earnings report for the first quarter of 2020, *id.* ¶ 196, those reports noted Qiwi's net revenue growth driven by the payment services segment, *see id.* ¶¶ 125, 132, 133, 147, 155, 166, 173, 174, 189, 205, 213.  Many of those reports included quotations from Qiwi officers emphasizing the strong performance of that segment and its contribution to Qiwi's business.  *See id.* ¶ 126 (Solonin, third quarter 2018); *id.* ¶ 134 (Solonin, fourth quarter 2018); *id.* ¶ 148 (Solonin, first quarter 2019); *id.* ¶ 156 (Solonin, second quarter 2019); *id.* ¶ 167 (Solonin, third quarter 2019); *id.* ¶ 175 (Kim, fourth quarter 2019); *id.* ¶ 190 (Kim, first quarter 2020); *id.* ¶ 206 (second quarter 2020 quoting Kim as stating that the segment had "solid dynamics despite [a] challenging market environment"); *id.* ¶ 214 (Kim, third quarter 2020).

Plaintiff alleges that statements in those reports regarding "Qiwi's revenue, profits, payment volumes, cash flows, and 'growth' in 'Payment Services,'" *id.* ¶¶ 129, 170, 176, 209; *see id.* ¶¶ 193, 197, 218, a "strong foundation" in that segment, *id.* ¶ 137, growth in "payment services for betting," *id.* ¶ 152, and "guidance," *id.* ¶ 161, were false or misleading because they failed to disclose that Qiwi's identification requirements and payment processing controls were covering up illegitimate online betting transactions, that Russian regulations that increased identification requirements for e-wallets and restricted transactions involving illegal online betting merchants

9

were negatively impacting Qiwi's revenue, that Qiwi could not sustain its revenue levels without unlicensed betting merchants that violated Russian regulations, or that Qiwi's revenue from legitimate transactions was endangered by Qiwi's failure to comply with Russian regulations, *see id.* ¶¶ 129, 137, 152, 161, 170, 176, 193, 197, 218.

Plaintiff makes essentially the same allegations about statements concerning the payment services segment made by Karaveav, Solonin, Protopopov, Poshmorga, Kiseleva, and Kim on various earnings calls, *see id.* ¶¶ 127–28, 130, 135–36, 149–51, 157–60, 168–69, 186–87, 191–92, 207–08, 215–17, and statements from Protopopov and Solonin on earnings calls about betting volumes and betting revenues, *see id.* ¶¶ 163–65, 171–72.

Plaintiff also alleges that Qiwi's 2018 and 2019 20-F forms contained false or misleading statements. Those forms said that Qiwi's "internal control over financial reporting was effective," *id.* ¶¶ 139, 178, but also advised that Qiwi's failure "to implement and maintain effective internal control over financial reporting could result in errors in our financial statements that could lead to a restatement of our financial statements, cause us to fail to meet our reporting obligations and cause investors to lose confidence in our reported financial information, which may result in a decline in the market price of our ADSs," *id.* ¶¶ 145, 184. The 2019 20-F form also said that Qiwi's measures might not be sufficient "to prevent significant deficiencies in the compliance procedures and internal controls of . . . new projects." *Id.* ¶ 184.

Plaintiff alleges that these forms contained false or misleading statements because they failed to disclose that Qiwi's internal controls for reporting and record-keeping were ineffective; Qiwi was not in compliance with the CBR's reporting and record-keeping requirements; Qiwi's identification requirements and payment processing controls obscured illegitimate online betting transactions; and that Qiwi could not pass a CBR audit, would be fined by the CBR, would have

10

its ability to make transactions to foreign merchants and pre-paid cards restricted by the CBR, and would lose revenue from online gambling. *See id.* ¶¶ 140, 146, 179, 185.

Those forms also allegedly failed to adequately warn investors that certain risk factors had materialized. *See id.* ¶¶ 141, 180. The forms warn that Qiwi Bank had been subject to "CBR investigations in the past that have uncovered various violations and deficiencies . . . which we believe we have generally rectified." *Id.* ¶¶ 142, 181. They note that a 2018 CBR audit identified violations and imposed sanctions. *Id.* ¶¶ 142, 181. Qiwi explained on both forms that the CBR's sanctions had not had "a significant impact on . . . operations and have been mostly lifted," and Qiwi had "remedied the violations and taken appropriate measure to ensure that [Qiwi] will not be in breach of [the] requirements going forward." *Id.* ¶¶ 142, 181. But Qiwi added that the CBR might impose additional sanctions, might scrutinize Qiwi further in the future, or might discover "significant or minor additional violations of . . . regulations" and might impose sanctions that "could have a material adverse effect" on Qiwi. *Ibid*. Moreover, Qiwi warned that regulatory violations could result in fines or prohibitions on Qiwi's ability to carry out certain transactions. *Ibid*.

Both forms also warn that the Russian betting industry was "subject to extensive and actively developing regulation in Russia," and that if merchants on the Qiwi platform did not comply with Russian law or ceased operation, Qiwi would lose income from those merchants. *See id.* ¶¶ 143, 182. The 2019 form adds that if betting merchants switched to a different TSUPIS, Qiwi would lose income. *See id.* ¶ 182. The forms assert that if Qiwi failed to comply with the relevant regulations, Qiwi would be exposed to sanctions. *See id.* ¶¶ 143, 182.

Plaintiff alleges that those statements were deficient because they failed to disclose that Qiwi was still not in compliance with CBR requirements, Qiwi's reporting and record-keeping

obfuscated illegitimate online betting, Qiwi would not pass a CBR audit and would therefore be fined, have its ability to make transactions to foreign merchants and pre-paid cards restricted by the CBR, lose revenue from online gambling, and put revenue from legitimate transactions at risk. *See id.* ¶¶ 144, 183.

Plaintiff makes similar allegations about certain comments made by Qiwi officers on earnings calls before and after the July 2020 audit had started.

Prior to the audit, on the first quarter 2019 earnings call, Solonin also said that "any new regulation rules will be basically positive for us, . . . we will be in a position to . . . extend our figures." *Id.* ¶ 153.  And on the first quarter 2020 earnings call, defendants were asked about how much betting volumes declined in April and May.  Protopov said that volumes "stabilized in . . . mid-April, and we are [on a] stable trend since then." *Id.* ¶ 194.  Those statements allegedly failed to disclose that Qiwi's reporting and record-keeping obfuscated illegitimate online betting, that Qiwi was not meeting the CBR's reporting and record-keeping requirements, and that Qiwi would not pass a CBR audit and would be fined, have its ability to make transactions to foreign merchants and pre-paid cards restricted by the CBR, and lose revenue from online gambling.  *Id.* ¶¶ 154, 195.

During the second quarter 2020 earnings call, after the audit had begun, defendants were asked for an update on the sports betting market and regulatory changes.  *See id.* ¶ 210.  Kim responded that notwithstanding increased "uncertainty in market regulation," Qiwi would be able to "maintain a significant presence in [the] market." *Id.* ¶ 210.  Protopopov added that "current trends" in the betting market were "quite strong."  *Ibid.*  When asked about how e-commerce market volumes remained solid despite the cancelation of sports events, Protopopov said that the decline in betting volumes was not "dramatic and drastic" because of the availability of "other

types of sports and other types of events." *Id.* ¶ 211.  Protopopov also pointed to growth from digital entertainment.  *Ibid.*

During the third quarter 2020 earnings call, Qiwi's officers also discussed the changing regulatory environment.  Protopopov noted a continued decline in the number of active Qiwi Wallets and said that the decline "related primarily to . . . regulatory and operational reason[s]." *Id.* ¶ 220.  Moreover, Protopopov warned that regulatory initiatives and an economic slowdown could "negatively affect . . . operating performance." *Ibid.*

Likewise, Kim suggested that Russia was likely to adopt "more robust and stringent regulations" that might "impose additional pressure on [Qiwi's] operations." *Id.* ¶ 219.  Kim mentioned that Russia was considering "changing the whole regulation of bookmaker companies including creating [a] unified TSUPIS" and imposing a scheme for reporting owners of e-money wallets to the Russian tax office and the CBR.  *Id.* ¶ 221.  Kim said that "[i]t wouldn't directly impact our operation." *Ibid.*  But Kim explained that Russia "could limit such operation[] [a]nd that could . . . have an impact on [Qiwi's] business." *Ibid.*  As to the unified TSUPIS, Kim said that Qiwi had a chance to win that role.  *See id.* ¶ 222.  If Qiwi did become the single TSUPIS, it would "serve the whole market," but Kim stated that "the situation is changing and . . . becoming more uncertain." *Ibid.*  When asked what would happen if Qiwi did not become the single TSUPIS, Kim refused to put a number on the impact on Qiwi's revenues but admitted that there "could be probably an impact on . . . net revenue in the future." *Id.* ¶ 223.

Plaintiff alleges that those statements failed to disclose that Qiwi was obfuscating illegal online betting transactions, would not be able to pass the ongoing CBR audit, would be fined by the CBR, have its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR, and would lose revenue. *Id.* ¶¶ 212, 224.

Finally, the complaint includes similar allegations about statements associated with Qiwi's secondary public offering.  *See id.* ¶ 198.  Qiwi filed a prospectus supplement on July 20, 2020, that allegedly failed to warn investors that certain risks had materialized.  *See id.* ¶ 199.

The prospectus warned that the CBR "may at any time conduct full or selective audits" and Qiwi Bank had been the subject of past audits that had uncovered violations and deficiencies.  *Id.* ¶ 200.  The prospectus notes that the CBR imposed sanctions on Qiwi Bank following a 2018 audit that identified violations and explained that Qiwi "remedied the violations and [took] appropriate measures to ensure that [it] will not be in breach of such requirements going forward."  *Ibid.*  Qiwi asserted that the CBR might impose future sanctions, put Qiwi under greater scrutiny, and discover additional violations.  *Ibid.*  Regulatory violations could result in fines or prohibitions on Qiwi's ability to carry out certain transactions, and those sanctions could have an adverse effect on Qiwi's business.  *Ibid.*

The prospectus also warned that the Russian betting industry was "subject to extensive and actively developing regulation . . . [and] increasing government scrutiny."  *Id.* ¶ 201.  If betting merchants on the Qiwi platform failed to comply with regulations, stopped operating in Russia, or switched to a different TSUPIS, Qiwi would lose income from them.  *Ibid.*  And if Qiwi failed to comply with regulations, Qiwi would be subject to fines and be prohibited from processing transactions that violate the relevant regulations.  *Ibid.*

Plaintiff alleges that those statements failed to disclose that Qiwi was subject to a CBR audit at the time of those statements; Qiwi was not meeting the CBR's requirements; Qiwi was obfuscating illegal betting transactions; and that Qiwi would not be able to pass the ongoing audit, and as a result, Qiwi's ability to process payments to foreign merchants and transfer money to pre-paid cards would be restricted and Qiwi would lose revenue.  *See id.* ¶ 202.

Like Qiwi's 2018 and 2019 20-F forms, the prospectus included representations that Qiwi was developing and integrating control procedures, *see id.* ¶ 203, but also warned that a failure to implement and maintain control over financial reporting could result in errors, *ibid.* Plaintiff alleges that those statements were deficient because they failed to disclose that Qiwi's internal controls were ineffective; Qiwi was not meeting the CBR's requirements; Qiwi was obfuscating illegal online betting transactions; Qiwi would not pass the ongoing CBR audit, and that as a result, Qiwi would be fined, lose its ability to make payments to foreign merchants and transfer money to pre-paid cards, and lose revenue. *Id.* ¶ 204.

In sum, plaintiff alleges that defendants made numerous false or misleading statements during the class period because defendants allegedly failed to disclose that: (i) Qiwi's internal controls for reporting and recordkeeping were ineffective; (ii) Qiwi was failing to meeting the CBR's reporting and recordkeeping requirements; (iii) Qiwi's "lax identification requirements and payment processing controls" hid illegitimate online betting transactions; (iv) regulations increasing identification requirements and restricting illegitimate online gambling transactions were negatively impacting Qiwi's revenue; (v) Qiwi was being audited by the CBR and would be unable to pass the audit; (vi) Qiwi would be fined by the CBR, be subject to certain restrictions on making payments to foreign merchants and transferring money to pre-paid cards, and would not be in "a prime position to process electronic bets in Russia"; and (vii) Qiwi would lose significant revenue from its legitimate transactions as a result of those restrictions. *See id.* ¶¶ 17, 124.

## IV.    Procedural Background

Dale Ochakoff filed the original complaint in this case on December 11, 2020. Compl. (Dkt. #1). In 2021, Judge Pollak granted a motion to consolidate this case with a related action and appointed Moset as the lead plaintiff. *See* May 20, 2021 Order (Dkt. #27).

On July 9, 2021, Moset filed an amended complaint bringing two causes of action against defendants. *See* Am. Compl.  First, plaintiff alleges that all defendants violated Section 10(b) of the Exchange Act and Rule 10(b)-5 by preparing, disseminating, or approving misleading statements that caused Moset and other class members to buy Qiwi securities at artificially high prices. *Id.* ¶¶ 250–51.  Second, plaintiff alleges that the individual defendants violated Section 20(a) of the Exchange Act because they were "controlling persons" at Qiwi that had the power to and did influence and control Qiwi's decision to disseminate misleading statements. *Id.* ¶¶ 262– 63.  Plaintiff seeks compensatory damages on behalf of itself and the other class members. *See id.* at 110 ("Prayer For Relief").

Defendants Qiwi and Protopopov have now moved to dismiss the complaint. *See* Defs.' Mem.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Rule 12(b)(6), a court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010), *abrogated on other grounds*, *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)).  To avoid dismissal, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  The complaint, in other words, must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. While the plausibility standard "is not akin to a 'probability requirement,'" it requires "more than

a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

A complaint alleging securities fraud must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") by "stating with particularity the circumstances constituting fraud." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)). To satisfy these requirements, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 94 (2d Cir. 2018) (quoting *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015)). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u-4(b)(2)).

At the motion-to-dismiss stage, a court may consider only (i) the complaint itself, (ii) documents either attached to the complaint or incorporated in it by reference, (iii) documents the plaintiff relied on and knew of when bringing suit, and (iv) matters in the public record that are subject to judicial notice. *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004); *Leonard F. v. Israel Disc. Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999).

**DISCUSSION**

Plaintiff's Section 10(b) claim is dismissed as to all defendants.[1]  Because plaintiff cannot plead a claim of control-person liability under Section 20(a) of the Exchange Act without a primary offense, that claim is dismissed as well.

**I.        Section 10(b) Claims**

Plaintiff has not adequately pleaded a claim under Section 10(b) of the Exchange Act or under Rule 10b-5.  Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  In turn, Rule 10b-5 implements this section by making it unlawful "for any person, directly or indirectly . . . [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.

To state a claim under these provisions, "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."  *Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 105).  Scienter is "a mental state embracing

---

[1] While not all individual defendants have moved to dismiss, "a district court has the power to *sua sponte* dismiss claims against nonmoving defendants for failure to state a claim, as long as the plaintiff has been given an opportunity to be heard."  *Malek v. New York Unified Ct. Sys.*, No. 22-CV-5416 (HG) (RER), 2023 WL 2429528, at *19 (E.D.N.Y. Mar. 9, 2023) (quoting *N. Am. Olive Oil Ass'n v. D'Avolio Inc.*, 457 F. Supp. 3d 207, 232 (E.D.N.Y. 2020)).  Here, plaintiff's claims against the nonmoving individual defendants are substantially the same as their claims against Protopopov.  Because plaintiff has therefore been provided a full and fair opportunity to be heard as to the basis for dismissal of claims against nonmoving defendants, plaintiff's claims are dismissed against both moving and nonmoving defendants.  *See id.* at *20 (dismissing claims against nonmoving defendants because they were "virtually identical" to those against the moving defendants); *Pereira v. Town of N. Hempstead*, No. 22-CV-06231 (HG), 2023 WL 4532595, at *10 (E.D.N.Y. July 13, 2023) (dismissing claims against nonmoving defendant because the court's findings "are true for all defendants" and the "[p]laintiffs have had a fair opportunity to be heard on these issues").

intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (citation omitted); *see Setzer*, 968 F.3d at 212.

As explained below, plaintiff's claims are deficient because plaintiff has not adequately pleaded that defendants made misstatements or omissions of material fact or that defendants acted with scienter.

### A.   Plaintiff has not adequately pleaded materially false statements or omissions.

The complaint does not adequately plead any actionable misstatements or omissions.

Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  A statement is misleading when "a reasonable investor would have received a false impression from the statement."  *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017) (quoting *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010)). Statements are actionable under Rule 10b-5 only if they were "false when made" and do not qualify as mere "optimistic statements or puffery."  *Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d 373, 383 (S.D.N.Y. 2011) (citing *Rombach*, 355 F.3d at 174).  In addition, to be actionable, a misstatement must be "material," meaning that there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act."  *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).

Omissions are actionable under Section 10(b) and Rule 10b-5 only when a defendant is subject to an underlying duty to disclose the omitted information.  *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013) (citing *Basic*, 485 U.S. at 239 n.17).  In other words, Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material

19

information." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) (citation and quotation marks omitted). Rather, a duty to disclose arises when new information "renders prior public statements materially misleading," *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993), or when an actor "chooses, even without obligation, to speak" on a given issue or topic, *In re Vivendi*, 838 F.3d at 258 (emphasis omitted). In the event that a company chooses to speak on a particular matter, the company has "'a duty to tell the whole truth,' 'even when there is no existing independent duty to disclose information' on the issue or topic." *Id.* at 258 (quoting *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014)) (alterations omitted).

As I noted, the complaint alleges that defendants failed to properly disclose information about (i) the 2020 CBR audit and the likely consequences of that audit for Qiwi's business; (ii) how Qiwi's internal reporting and recordkeeping controls were ineffective and violated CBR requirements; (iii) how Qiwi's systems hid illegitimate online betting transactions, and (iv) the effects of certain regulations on Qiwi's revenue. *See* Am. Compl. ¶¶ 17, 124. Plaintiff's opposition brief frames defendants' alleged misstatements in similar terms, arguing that defendants "misled investors into believing that Qiwi's profits and growth arose from legal activities when, in truth, Qiwi was violating Russian regulations," "created the false impression that Qiwi had remedied prior [regulatory] violations and [would] . . . benefit . . . from stricter regulations," and "hid[]" the 2020 audit. Pl.'s Opp'n to Defs.' Mot. to Dismiss 11 (Dkt. #46) ("Pl.'s Mem."). I consider each of those allegations in turn and conclude that none provides a basis for liability in this case.

### 1. Plaintiff fails to plead with particularity that defendants made actionable statements based on alleged unlawful acts or recordkeeping deficiencies.

Plaintiff's papers can be construed to argue that defendants made actionable statements or omissions relating to compliance with Russian laws and regulations on three theories. First,

20

plaintiff argues that defendants "misled investors into believing that Qiwi's profits and growth arose from legal activities when, in truth, Qiwi was violating Russian regulations." Pl.'s Mem. 11. Next, plaintiff contends that defendants failed to properly disclose that Qiwi's internal reporting and recordkeeping controls were ineffective and violated regulations. *Id.* at 11–12. Finally, plaintiff suggest that defendants misled investors about the activities of Qiwi's customers, asserting that Qiwi's statements about revenue and growth were misleading because "Qiwi relied on illicit transactions." *Id.* at 11. Plaintiff does not plausibly allege a violation of Section 10(b) under any of these theories.

### a. Regulatory violations by Qiwi

Plaintiff's claim that defendants misled investors into believing that Qiwi's profits and growth were derived from legal transactions when the company was, in fact, violating Russian regulations "is premised on [a] . . . predicate violation[] of law," and so "the facts of that underlying violation must be pled with particularity." *Danske Bank*, 11 F.4th at 99; *see* Am. Compl. ¶¶ 17, 124; Pl.'s Mem. 10, 11. To do so, plaintiff must "specify *what* law or standard the defendant violated and *how* the alleged violation occurred." *Ibid.* (emphasis in original).

But plaintiff has not identified any specific legal violations, the substance of those violations, or the underlying conduct that led to the violations. The complaint references various Russian laws, including three amendments to the "Betting Law," tax laws, and restrictions on anonymous e-wallets, *see* Am. Compl. ¶¶ 89, 96, 105, 106, 108, 111, 115, but it does not specify how defendants violated any of those provisions. Similarly, the complaint mentions Qiwi's compliance with a cease-and-desist letter issued by a Russian agency, "loopholes" in Qiwi's systems exploited by users, Qiwi's alleged failure to "take the initiative" to stop bookmakers from withdrawing offshore funds, and an organized crime group's use of Qiwi, *see id.* ¶¶ 92, 95, 98; Defs.' Mem. 14, but does not assert that Qiwi violated laws through that conduct or explain how

Qiwi's conduct was illegal.   Likewise, plaintiff does not offer any specific details about "deficiencies" in Qiwi's "compliance with certain banking regulations" and unspecified "violations of the Russian National Payment System Law" that were discovered in 2013 and 2014. *Id.* ¶¶ 79, 82.   And in any event, those alleged violations occurred several years prior to the class period and plaintiff has not argued that defendants failed to disclose those violations at any relevant time.   In sum, despite plaintiff's insistence that Qiwi engaged in "illicit transactions," *see, e.g.*, Am. Compl. ¶ 88, the complaint lacks the factual detail necessary to adequately plead that Qiwi violated specific laws, *see Danske Bank*, 11 F.4th at 99; *see, e.g.*, *Mucha v. Volkswagen Aktiengesellschaft*, 540 F. Supp. 3d 269, 96 (E.D.N.Y. 2021) ("[A] failure to identify any specific laws or to plead with particularity how [company's] conduct violated those laws is fatal."), *aff'd sub nom.*, *Mucha v. Winterkorn*, 2022 WL 774877 (2d Cir. Mar. 15, 2022) (applying *Danske Bank*); *In re PetroChina*, 120 F. Supp. 3d at 361 (finding allegations insufficient where plaintiffs did not identify "a specific requirement" of the relevant regulatory agencies that the company "was violating at the time of its statements").

Plaintiff principally argues that it pleaded with particularity defendants' illegal activities because it alleged that the CBR audit "identified certain violations and deficiencies relating primarily to reporting and record-keeping requirements."   Pl.'s Mem. 12 (citation omitted).   But plaintiff does not specify what "reporting and record-keeping requirements" were violated or how Qiwi violated them, as plaintiff must to allege illegality with particularity under Rule 9(b) and the PSLRA.   *See Danske Bank*, 11 F.4th at 99; Am. Compl. ¶ 228.   Moreover, because plaintiff has alleged no details about the nature of the alleged illegality, plaintiff has not plausibly alleged that Qiwi's alleged violations rendered defendants' statements about the company's profits and growth misleading.   That is, plaintiff has not alleged with any particularity that the violations "relating

22

primarily to reporting and record-keeping requirements" had a meaningful relationship to Qiwi's profits or growth.

### b. Reporting and recordkeeping deficiencies

Plaintiff also suggests that defendants violated Section 10(b) by stating that while past CBR investigations had uncovered violations of "reporting requirements," Qiwi "believe[d] that [it] ha[d] remedied the violations and taken appropriate measures to ensure that [it] will not be in breach of such requirements going forward," *e.g.*, Am. Compl. ¶¶ 178, 200, and by stating that as of particular dates (December 31, 2018, and December 31, 2019), Qiwi's management had concluded that its "internal control over financial reporting was effective," *see id.* ¶¶ 139, 178.

For essentially the reasons stated above, plaintiff has failed to plead with particularity that defendants' statements regarding remedying past reporting violations were misleading. Plaintiff does not plead any reporting or recordkeeping violations with specificity because plaintiff does not allege what reporting or recordkeeping requirements were violated, when, and in what ways. *See Danske Bank*, 11 F.4th at 99. Plaintiff relies again on Qiwi's December 2020 disclosure that the CBR discovered "violations and deficiencies relating primarily to reporting and record-keeping requirements." Am. Compl. ¶ 228. But because plaintiff does not provide any detail about the alleged violations that the CBR allegedly discovered in 2020, plaintiff's allegations do not make plausible an inference that Qiwi did not in fact "remed[y]" the reporting failures that had been uncovered in past CBR investigations and "take[] appropriate measures to ensure that [Qiwi would] not be in breach of *such requirements* going forward." *Id*. ¶¶ 178, 200 (emphasis added). That is, plaintiff does not allege with any specificity that the violations allegedly uncovered in December 2020 had any connection to the earlier violations that Qiwi represented it believed were remedied. *Cf. id.* ¶¶ 142, 181 (Qiwi's warning that future inspections might discover "additional violations of various banking regulations").

Plaintiff similarly fails for several reasons to plausibly challenge as false or misleading the representations that Qiwi's "management concluded that as of December 31, 2018," *id.* ¶ 139, and "as of December 31, 2019," *id.* ¶ 178, the company's "internal control over financial reporting was effective," *id.* ¶¶ 139, 178. Plaintiff suggests that Qiwi's internal controls over financial reporting were in fact "ineffective" at those times. *See, e.g.*, *id.* ¶ 140. But, first, plaintiff's assertions of ineffectiveness do not satisfy the requirements of Rule 9(b) and the PSLRA because plaintiff does not plead with particularity what reporting or recordkeeping controls were allegedly ineffective, when, or in what way. *See Emps. Retirement Sys. Of City of Providence v. Embraer S.A.*, No. 16-CV-6277 (RMB), 2018 WL 1725574, at *9–10 (S.D.N.Y. Mar. 30, 2018) ("Where plaintiffs alleges that internal controls are deficient, courts have consistently required plaintiffs to allege specific facts concerning the purportedly deficient internal controls, including how they were deficient, when and why." (internal quotation marks and citation omitted)); *Janbay v. Can. Solar, Inc.*, No. 10-CV-4430 (RWS), 2012 WL 1018306, at *9 (S.D.N.Y. Mar. 30, 2012) (collecting cases); *Salim v. Mobile Telesystems PJSC*, No. 19-CV-1589 (AMD) (RLM), 2021 WL 796088, at *11 (E.D.N.Y. Mar. 1, 2021) (similar), *aff'd on other grounds*, 2022 WL 966903 (2d Cir. Mar. 31, 2022). Plaintiff defends this claim in a conclusory footnote, asserting that Qiwi's internal controls were not sufficient because the CBR found violations as to reporting and recordkeeping requirements. *See* Pl.'s Mem. 12 n.6. But the December 2020 disclosure that the CBR had "identified certain violations and deficiencies relating primarily to reporting and record-keeping requirements" does not fill the gap in plaintiff's pleadings because it did not identify any particular deficiencies in Qiwi's internal controls or provide a basis for inferring whether the alleged

deficiencies existed as of December 31, 2018, or December 31, 2019.  *See* Pl's Mem. 12; Am. Compl. ¶ 228.[2]

In any event, statements describing *Qiwi's management's views* on the company's internal controls are statements of opinion.  *See Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 183 (2015) (noting that statements about what a speaker "believe[s]" or "think[s]" are statements of opinion).  Such statements of belief are not actionable simply because the "belief turned out to be wrong."  *Id.* at 186.  Rather, an opinion statement is only actionable if the speaker does not "actually hold[] the stated belief," *id.* at 184; if the statement "contain[s] embedded statements of fact" that are not true, *id.* at 185; or if the opinion statement "omitted to state facts necessary to make its opinion . . . not misleading," *id.* at 186 (internal quotation marks omitted).  Plaintiff has not pleaded facts adequate to support an inference that these opinion statements were actionable on any of these grounds.  *See, e.g.*, *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 299 (S.D.N.Y. 2019) (fact that company ultimately "disclosed that its financial controls had not been effective" during a particular period was not sufficient to state a claim that earlier representations "that management 'had concluded that internal control over financial reporting [had been] effective'" were false) (brackets in original).

Accordingly, plaintiff fails to plead actionable statements related to internal reporting and recordkeeping controls.

### c.  Customers' illicit gambling transactions

Plaintiff also fails to state a claim under Section 10(b) based on defendants' alleged failure to disclose illegal gambling transactions by Qiwi's customers.

---

[2] For similar reasons, plaintiff's allegations about defendants' risk disclosures concerning internal controls are insufficient.  *See, e.g.*, Am. Compl. ¶¶ 145–46.

First, plaintiff does not state a claim that defendants' statements regarding profits and growth were false or misleading on the theory that defendants did not disclose that customers' illegal gambling transactions contributed to the company's revenue or growth. *See* Pl.'s Mem. 10 n.4, 11, 11 n.5; Am. Compl. ¶¶ 125, 129, 137. "[A]ccurately reported financial statements do not automatically become misleading by virtue of the company's nondisclosure of suspected misconduct that may have contributed to the financial results," *Danske Bank*, 11 F.4th at 98–99, because companies "do not have a duty to disclose uncharged, unadjudicated wrongdoing," *City of Pontica Policemen's & Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (internal quotation marks and citation omitted); *see Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19-CV-7536 (NRB), 2021 WL 1199035, at *16 (S.D.N.Y. Mar. 30, 2021) (collecting cases). Here, plaintiff's allegations about illicit gambling are, at best, assertions of uncharged, unadjudicated wrongdoing. While plaintiff alleges that a CBR audit identified "violations and deficiencies relating primarily to reporting and record-keeping requirements," Am. Compl. ¶ 228, plaintiff does not plausibly allege that the CBR charged or adjudicated unlawful gambling on the part of Qiwi's customers. *Cf.* Pl.'s Mem. 15 n.9 (arguing without citation to or support from the complaint that Qiwi "was ultimately sanctioned . . . at the end of the . . . audit" for "Qiwi's reliance on improper operations"). Plaintiff does not even allege with particularity when or how any of those transactions were illegal or improper or identify the specific regulations that rendered particular transactions illegal. *Cf. Danske Bank*, 11 F.4th at 99.[3]

Second, plaintiff has not plausibly alleged a violation of Section 10(b) based on the principle that a company may have a duty to disclose uncharged wrongdoing when the company

---

[3] For similar reasons, defendants' statements in the complaint "that merely describe the accurate financial data using more vivid language" or that projected "expected future financial performance modeled on accurate historical trends" are not actionable, either. *Menora Mivtachim*, 20201 WL 1199035, at *16; *see Marcu v. Cheetah Mobile Inc.*, No. 18-CV-11184 (JMF), 2020 WL 4016645, at *5 (S.D.N.Y. July 16, 2020); *see, e.g.*, Am. Compl. ¶¶ 125–28.

"puts the reasons for its success at issue[] but fails to disclose that a material source of its success is the use of improper or illegal business practices," *In re Virtus Inv. Partners, Inc. Secs. Lit.*, 195 F. Supp. 3d 528, 536 (S.D.N.Y. 2016) (internal quotation marks and citation omitted); *In re VEON Ltd. Secs. Lit.*, No. 15-CV-8672 (ALC), 2017 WL 4162342, at *6 (S.D.N.Y. Sept. 19, 2017) (Statements "putting the source of . . . revenue at issue" may be actionable.); *Freudenberg*, 712 F. Supp. 2d at 180 (similar).  Invoking that principle, plaintiff argues that defendants' statements about the "sources, sustainability, and risks of . . . revenue" were misleading because defendants failed to disclose "Qiwi's reliance on improper operations."  Pl.'s Mem. 15 n.9.  For example, plaintiff points to statements that "growth was largely driven by . . . trends in . . . core categories including the boom of sports betting markets," Am. Compl. ¶ 127 (Nov. 14, 2018), "growth was . . . underpinned by secular trends in . . . key markets demonstrating the adaptability and resilience of [Qiwi's] payment ecosystem," *id.* ¶ 134 (Mar. 28, 2019), "growth was driven by . . . payment services for betting-related merchants," *id.* ¶ 160 (Aug. 19, 2019), "increase in payment volume was driven by growth . . . resulting largely from the development of certain payment solutions for merchants including betting merchants," *id.* ¶¶ 166, 174 (Nov. 20, 2019 and Mar. 24, 2020); *see* Pl.'s Mem. 4–5 (discussing those statements).  Plaintiff suggests that those and other statements improperly "tout[ed] success but fail[ed] to disclose that improper practices contributed to that success."  Pl.'s Mem. 10.

But plaintiff has not plausibly alleged with particularity that "a material source of [Qiwi's] success is the use of improper or illegal business practices," *In re Virtus Inv. Partners, Inc. Secs. Lit.*, 195 F. Supp. 3d at 536.  The complaint's assertions that "Qiwi's lax identification requirements and payment processing controls were obfuscating illicit online betting transactions," *see, e.g.*, Am. Compl. ¶ 204, are conclusory.  Plaintiff does not allege which customer transactions

were illegal, when they were illegal, what laws or regulations they violated, how those legal requirements were transgressed, or to what extent illegal transactions contributed to revenue or growth.  And as noted above, insofar as plaintiff suggests in its briefing that the CBR audit determined that Qiwi's customers had engaged in illegal transactions, *see, e.g.*, Pl.'s Mem. 11, that claim lacks grounding in plaintiff's complaint.

Unlike cases where parties did allege with particularity the specific ways in which undisclosed activity was illegal or improper, plaintiff's threadbare allegations in this case fall far short of Rule 9(b) and the PSLRA.  *See Rosi v. Aclaris Therapeutics, Inc.*, No. 19-CV-7118 (LJL), 2021 WL 1177505, at *17 (S.D.N.Y. Mar. 29, 2021) (plaintiff alleged basic elements of specific underlying offense); *In re Henry Schein, Inc. Secs. Lit*, No. 18-CV-1428 (MKB), 2019 WL 8638851, at *2–3, *6 (E.D.N.Y. Sept. 27, 2019) (plaintiff alleged in detail anticompetitive scheme that culminated in antitrust lawsuit); *In re VEON*, 2017 WL 4162342, at *6 (plaintiff alleged bribes paid to a specific person); *In re Virtus Inv. Partners, Inc. Secs. Lit.*, 195 F. Supp. 3d at 533, 537 (plaintiff alleged defendant misrepresented success of investment strategy because performance was not based on live strategy, as defendant said, but rather on back-tested, hypothetical assets as a company product manager admitted); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 408–09, 444 (S.D.N.Y. 2018) (plaintiff alleged in detail bribery scheme); *In re Van der Moolen Holding N.V. Secs. Lit.*, 405 F. Supp. 2d 388, 393, 400–01 (S.D.N.Y. 2005) (plaintiff alleged specific violations of New York Stock Exchange rules).  And plaintiff cites no authority to suggest that its allegations are sufficient.  *See* Pl.'s Mem. 10 n.4, 15 n.9.[4]

Accordingly, plaintiff fails to plead with particularity actionable statements related to illegal gambling transactions.

---

[4] For similar reasons, plaintiff's allegations about defendants' risk disclosures concerning betting merchants are insufficient. *See, e.g.*, Am. Compl. ¶¶ 143–44.

**2. Plaintiff fails to adequately allege actionable statements related to the CBR audit.**

Plaintiff alleges that defendants made actionable statements during the class period because defendants failed to disclose the July 2020 CBR audit and the regulatory violations that the audit had uncovered.  *See, e.g.*, Am. Compl. ¶ 124; Pl.'s Mem. 1–2, 11.  Those allegations are also insufficient to state a claim.

Plaintiff has not adequately alleged that defendants "misleadingly concealed the CBR audit's existence."  Pl.'s Mem. 12.  Because Qiwi was not obligated to disclose "uncharged, unadjudicated wrongdoing," *UBS AG*, 752 F.3d at 184 (citation omitted), defendants were not required to inform investors that the CBR was performing a routine audit that had not yet charged Qiwi with misconduct, *cf. In re Lions Gate Ent. Corp. Secs. Lit.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) (no duty to disclose existence of SEC investigation).  Even if the existence of the audit would have been "relevant or of interest to a reasonable investor," *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 153 (2d Cir. 2013) (internal quotation marks and citation omitted), disclosure of the audit would have been required "only . . . to make statements made, in the light of the circumstances under which they were made, not misleading," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011) (internal quotation marks and citation omitted).  Plaintiff points to no such statements.

The fact that defendants had previously disclosed that "Qiwi Bank underwent a major scheduled audit by the CBR" "[i]n . . . 2018, which resulted in [the] CBR identifying a number of violations and imposing certain sanctions," Am. Compl. ¶¶ 142, 200, and warned that the CBR "may at any time conduct full or selective audits of any bank's filings," *id.* ¶ 51, does not change the equation, *see* Pl.'s Mem. 15.  Plaintiff argues that those statements triggered an obligation to disclose the 2020 CBR audit because once defendants spoke on the topic of CBR audits, they had

"a duty to tell the whole truth." *Ibid.* (quoting *Rosi*, 2021 WL 1177505, at *9).  But even assuming that defendants' statement triggered a duty to disclose any ongoing audit, plaintiff has not alleged that an audit was ongoing at the time of the statements in question.  The allegedly actionable statements regarding the 2018 audit and possible future audits were made on March 28, 2019, March 24, 2020, and July 20, 2020.  *See* Am. Compl. ¶¶ 135, 138, 142, 173, 177, 181, 198, 200. And plaintiff merely alleges that the new audit began in "July 2020," Am. Compl. ¶¶ 9, 16, 121. Therefore, plaintiff does not adequately allege that when defendants made those statements, they knew of any additional audit.

For those reasons, plaintiff is also wrong that defendants' "risk disclosures" as to audits "characterized then-materialized risks as merely potential or hypothetical."  Pl.'s Mem. 13.  As I explained, plaintiff fails to allege that defendants were being audited at the time of the risk disclosures, as plaintiff must to plead that the risks of an audit had materialized. *Cf. In re Facebook, Inc. IPO Secs. & Derivative Lit.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("[R]isk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized.").[5]

### 3.  Plaintiff fails to allege that defendants made actionable statements about negative impacts of regulations on Qiwi's business.

Finally, plaintiff has not pleaded with particularity that defendants "created the false impression that Qiwi had . . . positioned itself to benefit, and not suffer, from stricter regulations." Pl.'s Mem. 11.  Plaintiff identifies three allegedly actionable statements.  *See* Pl.'s Mem. 9, 11, 26. In response to a question about a draft bill, Solonin said that "any new regulation rules will

---

[5] Plaintiff also alleges that defendants had two quarterly calls with investors and issued about thirteen public filings after July 2020 without mentioning the CBR audit.  Am. Compl. ¶ 16.  But with the exception of an August 20, 2020, statement about the decrease in active Qiwi Wallet users, *id.* ¶ 120, plaintiff fails to identify the date of those statements or their contents, and plaintiff does not clearly identify who made any of those statements or why they were misleading given the ongoing audit, *see Charles Schwab Corp.*, 883 F.3d at 94.

basically be positive for us." Am. Compl. ¶ 153.  When asked about a regulatory change proposed by the "Boxing Federation" about which the Russian government had postponed discussion, Kim said that despite "uncertainty in market regulation," Qiwi's "expertise" would "allow [it] to maintain a significant presence in the market." *Id.* ¶ 210.  And in a comment about the proposal to create an ETSUP, Kim said that Qiwi had "a chance to be the single TSUPIS[,] [a]nd that's going to be much better . . . because Qiwi will serve the whole market . . . but the true is here, the situation is changing and is becoming more uncertain." *Id.* ¶ 222.

Plaintiff's allegations that these statements regarding the impact of future regulations were misleading are deficient because plaintiff does not plead with particularity that new regulations were harmful to the company.  The complaint includes conclusory allegations that "new regulations" have "heavily impacted" "Qiwi's business," Am. Compl. ¶ 77, *see id.* ¶ 117 (similar), and discusses the impacts of regulations implemented years before the events at issue in this lawsuit, *see, e.g.*, *id.* ¶¶ 80–81.  But nowhere does plaintiff allege that the draft bill referenced by Solonin, the proposed Boxing Federation regulation, or the ETSUP program hurt Qiwi.  Instead, plaintiff appears to rely on defendants' disclosure that had the CBR restrictions imposed in December 2020 been in effect at an earlier time, Qiwi's payment segment revenue would have been negatively impacted.  *See* Pl.'s Mem. 9, 11.  Yet plaintiff does not plausibly allege that the CBR restrictions on payments to foreign merchants and pre-paid cards were based on new regulations, or that the restrictions the CBR imposed themselves qualified as regulations.  Accordingly, plaintiff does not plausibly allege that a "reasonable investor would have received a false impression from [defendants'] statement[s]." *In re Inv. Tech. Grp*, 251 F. Supp. 3d at 609.[6]

---

[6] The complaint also alleges that Russian law was amended during the class period to restrict certain anonymous cash deposits to e-wallets, and that Qiwi stated in response that "it was unlikely to see a direct and significant impact on the business." Am. Compl. ¶ 116.  Seventeen days after the amendment went into effect, Qiwi disclosed that active

**B.      Plaintiff has not adequately pleaded scienter for any defendant.**

To state a claim under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), which in the context of Section 10(b) and Rule 10b-5 is "an intent to deceive, manipulate or defraud," *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  That *mens rea* can be established through proof of either intent or recklessness.  *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008).

Since plaintiff must allege facts supporting a "strong inference" of scienter, it is not enough to "allege facts from which an inference of scienter rationally could be drawn." *Tellabs*, 551 U.S. at 323 (emphasis omitted).  Rather, the inference of intent to defraud "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.* at 314.  Because "[t]he strength of an inference cannot be decided in a vacuum," *id.* at 323, a court must consider "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged," *id.* at 314.   The critical question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets th[e] standard." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 291–92 (S.D.N.Y. 2014) (citing *Tellabs*, 551 U.S. at 322–23).

---

Qiwi Wallet accounts had declined from 21.8 million to 20.9 million. *Id.* ¶ 120.  Protopopov said that "[c]ontrary to popular belief, unidentified wallets have very little effect on turnover and occupy an insignificant part in the structure of [Qiwi's] product." *Ibid.*  Plaintiff does not invoke these allegations in its opposition brief, and it is unclear whether plaintiff claims that those statements were actionable.  *See id.* at 44–45 (allegations in question appearing before section of complaint titled "defendant's materially false and misleading statements" (capitalization altered)).  In any event, neither statement is adequately pleaded under Rule 9(b) and the PSLRA because plaintiff fails to "state where and when the statements were made." *Charles Schwab Corp.*, 883 F.3d at 94.  Further, with respect to Protopopov's statement, plaintiff does not clearly allege that unidentified wallets had more than a "very little effect on turnover" or were a not insignificant aspect of the product's "structure."

Scienter can be established by "alleging facts to show that defendants had both motive and opportunity to commit fraud, or . . . by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."   *Ganino*, 228 F.3d at 168-69 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).   Plaintiff has not done either.

### 1.   Plaintiff has not alleged motive to commit fraud.

While "[t]he opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer," *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 468 (S.D.N.Y. 2013) (citing cases), plaintiff has not alleged facts supporting an inference that any of the defendants had a motive to commit fraud.   To allege such a motive, plaintiff "must do more than allege that defendants wished to maintain 'the appearance of corporate profitability' or to 'prolong the benefits of holding corporate office.'"   *Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55, 57 (2d Cir. 2018) (quoting *Novak*, 216 F.3d at 307).   Rather, plaintiff must allege "that the individual defendants received a 'concrete and personal benefit' from making their alleged misrepresentations."   *Ibid.* (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)).   For example, motive and opportunity is "generally" established "when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit."   *In re Scholatic Corp. Secs. Lit.*, 252 F.3d 63, 74 (2d Cir. 2001).

Plaintiff alleges that defendants Kim and Solonin had motive and opportunity to commit fraud because they registered shares for sale in an SPO announced on July 20, 2020.   *See* Am. Compl. ¶¶ 9–10, 118–19, 225–27; Pl.'s Mem. 22–23.   Kim and Solonin were allegedly "[i]nsiders" who "knew material information about Qiwi [and] wanted to sell . . . their holdings."   Am. Compl. ¶ 9; *see id.* ¶ 118.   Plaintiff's theory is that Kim and Solonin "stood to benefit concretely and personally" through the sale of their shares "when they made misstatements."   Pl.'s Mem. 23.   But while Kim, Solonin and others *registered* to sell shares during the period preceding the December

2020 disclosure, they withdrew their offer of sale once the value of their shares dropped, citing "market conditions," Am. Compl. ¶ 226; *see id.* ¶¶ 10, 119. That choice prevented Kim and Solonin from profiting on the alleged fraud before the CBR audit and related violations were disclosed to investors. Indeed, no individual defendants are alleged to have sold any Qiwi shares during the class period. Therefore, when Qiwi's stock fell about twenty percent after the December 9, 2020 disclosure, Am. Compl. ¶ 228, the individual defendants took a loss, too.

Taking into account the entire chain of events, plaintiff has not adequately pleaded scienter based on motive and opportunity. Kim and Solonin's listing of shares, considered in isolation, could suggest a motive to profit from fraud by selling before the CBR audit and alleged misconduct were revealed. But that inference is not "at least as compelling as any opposing inference of nonfraudulent intent," *Tellabs*, 551 U.S. at 314, when subsequent events are considered, too. Specifically, the fact that Kim, Solonin, and other selling shareholders withdrew their offer of sale when prices declined, and did not sell any stock during the period of allegedly inflated prices, undermines an inference that Kim and Solonin made actionable misstatements or omissions with the motive of selling their stock at artificially inflated prices before adverse events became public.

## 2. Plaintiff has not adequately pleaded conscious misbehavior or recklessness.

In addition to motive and opportunity, a plaintiff can plead fraud "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit*, 264 F.3d at 138 (citation and internal quotation marks omitted). Conscious misbehavior or recklessness can be established through allegations of "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 142 (quoting *Honeyman v. Hoyt (In re Carter-Wallace, Inc. Sec. Litig.)*, 220 F.3d 36,

39 (2d Cir. 2000)).   A plaintiff must, as a general matter, "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements."  *Novak*, 216 F.3d at 308.  Scienter may then be inferred because "defendants knew or . . .  should have known that they were misrepresenting material facts related to the corporation."  *Ibid.*

Under that standard, plaintiff fails to plead scienter as to the individual defendants because plaintiff has not specifically alleged those defendants' knowledge of facts or access to information contradicting their public statements.  The complaint alleges that the individual defendants held certain corporate positions at Qiwi and describes their backgrounds and education.  *See* Am. Compl. ¶¶ 25–31.  It also generally asserts that the individual defendants "because of their positions . . . had access to non-public information about [Qiwi's] business operations and prospects, financial conditions, markets, and meeting and communications with . . . [the CBR]." *Id.* ¶ 32; *see id.* ¶ 33 (alleging that individual defendants "had access to material adverse non-public information"); *id.* ¶ 72 (alleging that the individual defendants "had actual knowledge of Qiwi's revenue streams[] and the significant amount online gambling contributed to [Qiwi's] business").  But "[c]ourts in this [c]ircuit have rejected . . .  attempts to hold senior officers liable based on their position . . . in the absence of specific allegations that the named defendant[s] actually received information about the fraud."  *In re Veon Ltd. Sec. Litig.*, No. 15-CV-8672 (ALC), 2018 WL 4168958, at *18 (S.D.N.Y. Aug. 30, 2018) (citing cases).

Plaintiff's general references to defendants' possession of non-public information are insufficient because "where plaintiffs contend defendants had access to . . . facts" contrary to defendants' public statements, "they must specifically identify the reports or statements containing this information." *Shetty v. Trivago N.V.*, 796 F. App'x 31, 35 (2d Cir. 2019) (summary order) (quoting *Novak*, 216 F.3d at 309).  Notwithstanding plaintiff's citations to dozens of defendants'

statements about growth and the changing regulatory environment, *see* Pl.'s Mem. 26 (citing Am. Compl. ¶¶ 127–28, 130, 132, 134–36, 143, 147–51, 156–57, 159–60, 163, 167, 169, 175, 182, 184, 191, 200–01, 206, 210, 214–17, 219–20, 222–23), plaintiff does not identify any reports or statements that contained contrary information to which defendants allegedly had access.

For similar reasons, plaintiff falls short in contending that "[i]n conjunction" with defendants' statements about growth and regulatory compliance, the individual defendants "could and should have known" that Qiwi was violating regulations, that the CBR was conducting an audit, and that Qiwi might be sanctioned.  Pl.'s Mem. 26.  At most, allegations that individual defendants spoke about "betting-related operations, revenue growth, compliance risks, and compliance successes," Pl.'s Mem. 27, are "circumstantial evidence that [defendants] were receiving *some form* of specific information about [those] subject[s]," *Bos. Ret. Sys. v. Alexion Pharms., Inc*., 556 F. Supp. 3d 100, 133–34 (D. Conn. 2021) (emphasis added and citations omitted).  But plaintiff fails to allege that any individual defendants had knowledge of, or access to, specific "reports or statements" that contained "information suggesting that [the company's] public statements were not accurate," such that a strong inference of scienter could be drawn as to those defendants.  *Shetty*, 796 F. App'x at 35; *see Novak*, 216 F.3d at 308 ("[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.").  Without more, defendants' having made statements on the topics that plaintiff points to does not permit the inference that defendants acted in a "highly unreasonable" way that "represents an extreme departure from the standards of ordinary care." *Kalnit*, 264 F.3d at 138 (internal quotation marks and citation omitted).

For similar reasons, the bare allegation that defendants signed certain SEC filings that contained "inaccurate information about . . . [Qiwi]" does not permit a cogent inference of fraudulent intent. Pl.'s Mem. 25. While some "[courts] have found allegations of recklessness to be sufficient where [p]laintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor," *In re Pall Corp.*, No. 07-CV-3359 (JS) (ARL), 2009 WL 3111777, at *8 n.4 (E.D.N.Y. Sept. 21, 2009) (quoting *Novak*, 216 F.3d at 308); *see* Pl.'s Mem. 25 (relying on *In re Pall*), plaintiff does not point to allegations suggesting that defendants *did* fail to review or check such information, *cf. Novak*, 216 F.3d at 309 (giving as example of sufficient allegations that defendant included false statements in SEC filings despite suspicious source of information and advice not to include those statements), or that the challenged portions of the SEC filings "relat[ed] to the core operations of their company" such that knowledge of facts contrary to the filings could be imputed to defendants, *In re Pall*, 2009 WL 3111777, at *7 (citation omitted); *cf. Woodley v. Wood*, 2022 WL 103563, at *8 (S.D.N.Y. Jan. 11, 2022) ("A plaintiff cannot raise an inference of fraudulent intent based on the signing of a certification [that SEC filings are accurate in compliance with the Sarbanes-Oxley Act] without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements." (quoting *In re Diebold Nixdorf, Inc, Secs. Litig.*, No. 19-CV-6180 (LAP) 2021 WL 1226627, at *14 (S.D.N.Y. Mar. 30, 2021))).

Moreover, the numerous warnings about regulatory compliance, audits, and online gambling that defendants included in Qiwi's filings undercut any inference of fraudulent intent pertaining to the statements that plaintiff highlights. *See Tellabs*, 551 U.S. at 314 (noting that inference of fraudulent intent must be "at least as compelling as any opposing inference of nonfraudulent intent"). For example, Qiwi warned that Russian "regulations may limit [Qiwi's]

activities," Am. Compl. ¶ 51, that "[e]xisting laws and regulations could be amended, the manner in which laws and regulations are enforced or interpreted could change and new laws or regulations could be adopted," *ibid.*, and that "[i]f local authorities in Russia or other countries choose to enforce specific interpretations of the applicable legislation . . . [Qiwi] may be found to be in violation and subject to penalties," Decl. of Alexander C. Drylewski Ex. C at 14 (2019 20-F) (Dkt. #45); *id.* Ex. D at 13 (2018 20-F); *id.* Ex E at S-22 (SPO prospectus supplement).  As to online gambling, Qiwi warned that the Russian "betting industry is subject to extensive and actively developing regulation[,] as well as increasing government scrutiny."  Am. Compl. ¶¶ 143, 182, 201.  Qiwi explained that Russia had "blacklisted" certain betting merchants, that the blacklisting "trend is gaining momentum[,] further blacklistings are likely," and such a development could "result in the contraction of the betting sector or [Qiwi's] share in the market."  Decl. of Alexander C. Drylewski Ex. C at 17 (2019 20-F); *see id.* Ex. D at 15 (similar) (2018 20-F), *id.* Ex. E at S-26 (SPO prospectus supplement).  If regulators found Qiwi to "be in non-compliance with any of the requirement of . . . applicable legislation," the company further disclosed, Qiwi "could also have to discontinue to process transactions that are deemed to be in breach of the applicable rules." *Ibid*. And Qiwi also flagged that the CBR might audit Qiwi in the future, Am. Compl. ¶¶ 51, 200, that CBR inspections could result in the discovery of violations and the imposition of sanctions, *id.* ¶¶ 142, 181, 200, and that Qiwi's services "have been and may continue to be used for fraudulent, illegal[,] or improper purposes" including "illegal online gambling," Decl. of Alexander C. Drylewski Ex. C at 20 (2019 20-F); *id.* Ex. D at 19 (2018 20-F); *id.* Ex. E at S-31 (SPO prospectus supplement).  Defendants' "steady stream of warnings" makes it implausible that they intentionally or recklessly misled investors because they did not offer precisely the warnings that plaintiff thinks would have been prudent.  *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 138 (E.D.N.Y. 2020).

In sum, considering all the facts alleged in the complaint and the permissible inference that might be drawn for either side, an inference of fraudulent intent is less compelling than the inference that defendants negligently failed to anticipate the behavior of Russian regulators while attempting to warn investors that those regulators were unpredictable.

Plaintiff's other arguments in support of scienter are unpersuasive. Plaintiff argues that defendants must have acted at least recklessly because their failure to recognize Qiwi's "violative operations" constituted an "[a]n egregious refusal to see the obvious, or to investigate the doubtful." Pl.'s Mem. 27 (quoting *Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194, 214 (S.D.N.Y. 2018)). But plaintiff falls far short of alleging that Qiwi committed regulatory violations that were so obvious as to make a failure to investigate egregious. As noted above, plaintiff has pleaded no details about the nature of the alleged regulatory or recordkeeping violations. *See supra* I.A.1.a–b. To support the claim that the violations nevertheless must have been egregiously obvious, plaintiff points to the company's disclosure that if the post-audit restrictions the CBR imposed in December 2020 had been in effect during a previous nine-month period, the restrictions would have affected a large portion of Qiwi's payment services revenue. *Ibid.* But the CBR's sanctions are not sufficient to establish that the regulatory or recordkeeping violations were themselves so egregiously obvious that defendants' failure to identify them at an earlier date was reckless. *Blank*, 338 F. Supp. 3d at 214.

Finally, plaintiff argues that the "core operations doctrine bolsters scienter." Pl.'s Mem. 28. That doctrine "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018) (citation omitted). Core operations "include matters critical to the long term viability of the company and events affecting a significant source of income." *In re Hi-*

*Crush Partners L.P. Sec. Litig.*, No. 12-CV-8557 (CM), 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) (internal quotation marks and citations omitted).  The core operations doctrine generally applies only to an operation that "constitutes nearly all of a company's business," and even where knowledge of those operations can be inferred, that inference "at most . . . constitutes supplemental support for alleging scienter."  *In re Adient PLC Secs. Litig.*, No. 18-CV-9116 (RA), 2020 WL 1644018, at *29 (S.D.N.Y. Apr. 2, 2020) (alterations, internal quotation marks, and citation omitted).  Plaintiff does not adequately allege that "the betting transactions that the CBR audit targeted," Pl.'s Mem. 29, amounted to "nearly all" of Qiwi's business, *In re Adient*, 2020 WL 1644018, at *29, such that the core operations doctrine applies.  *See* Am. Compl. ¶¶ 8, 69 (alleging Qiwi's income on payment processing fees was thirty-five to forty percent of its revenue in 2018 and betting industry revenue was more than a third of Qiwi's total revenue in 2019).  But even if plaintiff had made sufficient allegations to that effect, the totality of circumstantial evidence still does not give rise to an inference of fraudulent intent that is at least as compelling as an opposing inference of negligence.

### 3.  Plaintiff has not alleged corporate scienter.

Plaintiff also fails to adequately plead corporate scienter.  Generally speaking, "[w]hen the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Dynex*, 531 F.3d at 195.  But in "exceedingly rare instances," *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020), "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud," *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).  In such circumstances, scienter will only be found where the "fraudulent statement[s] [are] . . . so 'dramatic,' " *Jackson*, 960 F.3d at 99 (quoting *Tellabs*, 513 F.3d at 710), that they "would have been approved by corporate officials

sufficiently knowledgeable about the company to know that those statements were misleading," *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Dynex*, 531 F.3d at 195–96).  Plaintiff identifies no such statement.  *See* Pl.'s Mem. 20 (suggesting that "Qiwi's management touted the end of the last CBR audit and the remediation of regulatory violations" after "the CBR had begun a new audit" without identifying specific statements made after the audit had begun).

For those reasons, plaintiff's Section 10(b) and Rule 10b-5 claims also fail because plaintiff has not pleaded facts that support a strong inference of scienter for any defendant.

### C.    Plaintiff fails to state a claim for scheme liability.

Insofar as plaintiff intends to bring a claim under subsections (a) and (c) of Rule 10b-5, which prohibit "employ[ing] any device, scheme, or artifice to defraud," and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit," 17 C.F.R. § 240.10b–5, *see* Am. Compl. ¶ 252, that claim also fails.

To state a scheme liability claim, a plaintiff must show "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."  *Danske Bank*, 11 F.4th at 105 (citation omitted).  Although plaintiff need not allege that defendants made a misstatement or omission to plead a subsection (a) and (c) claim, *see ibid.* (citing *Lorenzo v. SEC*, 139 S. Ct. 1094, 1098 (2019)), plaintiff "must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue," *ibid.* (internal quotation marks and citation omitted).

Because plaintiff appears to rely on the first 248 paragraphs of the complaint instead of "articulat[ing] with precision the contours of an alleged scheme to defraud investors, or which

specific acts were conducted in furtherance of it," *ibid.*, and because plaintiff does not adequately plead scienter, plaintiff's subsection (a) and (c) claim is dismissed.

## II.      Section 20(a) Claims

Plaintiff's claims of control-person liability under Section 20(a) of the Exchange Act against the individual defendants must also be dismissed.  Section 20(a) establishes liability for those who control persons or entities who violate provisions of the Exchange Act.  *See* 15 U.S.C. § 78t(a).  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI Commc'ns, Inc.*, 493 F.3d at 108.  Because plaintiff fails to adequately plead a primary violation of the Exchange Act, its claims of control-person liability under Section 20(a) are dismissed.  *See ibid.*

## CONCLUSION

Plaintiff's claims against defendants are dismissed without prejudice.  Plaintiff may file a motion seeking leave to file a second amended complaint within thirty days.  Any such motion should include the proposed second amended complaint as an exhibit and explain why leave to amend should be granted.  If plaintiff does not seek leave to amend within thirty days, judgment shall be entered and the case shall be closed.

SO ORDERED.

/s/ Rachel Kovner
RACHEL P. KOVNER
United States District Judge

Dated: November 3, 2023
        Brooklyn, New York

42