**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re QIWI PLC SECURITIES LITIGATION | Master File No.: 1:20-cv-06054-RPK-CLP |
| | CLASS ACTION |
| This Document Relates To: | |
| ALL ACTIONS. | JURY TRIAL DEMANDED |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO FILE**
**SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.  INTRODUCTION .................................................................................................... 1

II.  RELEVANT PROCEDURAL HISTORY ............................................................... 4

III.  ARGUMENT .......................................................................................................... 4

    A.  Plaintiff's Motion is timely and not the result of bad faith. ........................... 6

    B.  Defendants will not be unduly prejudiced by the amendment. ....................... 6

    C.  Plaintiff's proposed amendment is not futile. ................................................ 8

        1.  Alleged misstatements regarding unlawful acts or recordkeeping deficiencies ............. 9

        2.  Alleged omission regarding the 2020 CBR Audit ......................................... 11

        3.  Alleged misstatements regarding the impacts of new and pending regulations ........... 13

IV.  CONCLUSION ...................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbey v. Skokos*,
   303 F. App'x 911 (2d Cir. 2008) ........................................................................ 4

*Abramson v. Newlink Genetics Corp.*,
   965 F.3d 165 (2d Cir. 2020)........................................................................ 11, 12

*Agerbrink v. Model Serv. LLC*,
   155 F. Supp. 3d 448 (S.D.N.Y. 2016)................................................................. 7

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007).................................................................................. 5

*Block v. First Blood Assocs.*,
   988 F.2d 344 (2d Cir. 1993)................................................................................ 7

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
   556 F. Supp. 3d 100 (D. Conn. 2021)............................................................... 16

*Boyer Works USA, LLC v. Rubik's Brand Ltd.*,
   No. 21 CIV. 7468 (AKH), 2022 WL 355398 (S.D.N.Y. Feb. 7, 2022).................... 6

*Chill v. Gen. Elec. Co.*,
   101 F. 3d 263 (2d Cir. 1996)............................................................................... 5

*Contrera v. Langer*,
   314 F. Supp. 3d 562 (S.D.N.Y. 2018)................................................................. 6

*Cornwell v. Credit Suisse Grp.*,
   689 F. Supp. 2d 629 (S.D.N.Y. 2010)............................................................... 17

*Cosmas v. Hassett*,
   886 F.2d 8 (2d Cir. 1989) ................................................................................. 16

*Env't Sols. Assocs. Grp., LLC v. Conopoco, Inc.*,
   No. 1:20-CV-10699-MKV, 2021 WL 2075586 (S.D.N.Y. May 24, 2021).............. 7

*Francisco v. Abengoa, S.A.*,
   559 F. Supp. 3d 286 (S.D.N.Y. 2021)............................................................. 7, 8

*Ho Myung Moolsan Co. v. Manitou Min. Water, Inc.*,
   665 F. Supp. 2d 239 (S.D.N.Y. 2009)................................................................. 8

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004)......................................................................... 17

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015)........................................................................... 13

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009)........................................................................... 5

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996)................................................................................ 13

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)........................................................................ 5, 6

*In re Tufin Software Techs. Ltd. Sec. Litig.*,
    No. 1:20-CV-5646-GHW, 2022 WL 596861 (S.D.N.Y. Feb. 25, 2022)....................... 5

*Joint Stock Co. v. Infomir LLC*,
    No. 16CIV1318GBDBCM, 2017 WL 2988249 (S.D.N.Y. Mar. 27, 2017)................... 8

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)........................................................................................ 5

*Luce v. Edelstein*,
    802 F.2d 49 (2d Cir. 1986)........................................................................................... 6

*Lucente v. Int'l Bus. Machines Corp.*,
    310 F.3d 243 (2d Cir. 2002)........................................................................................ 8

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)..................................................................................................... 12

*McCarthy v. Dun & Bradstreet Corp.*,
    482 F.3d 184 (2d Cir. 2007)........................................................................................ 4

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)................................................................................. 13, 16

*Monahan v. New York City Dep't of Corr.*,
    214 F.3d 275 (2d Cir. 2000)........................................................................................ 7

*Oliver Sch., Inc. v. Foley*,
    930 F.2d 248 (2d Cir. 1991)........................................................................................ 4

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    347 F. App'x 617 (2d Cir. 2009) ................................................................................ 8

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012)...................................................................................... 8

*Pasternack v. Shrader*,
  863 F.3d 162 (2d Cir. 2017)..................................................................................... 4, 5

*Peifa Xu v. Gridsum Holding Inc.*,
  No. 18 CIV. 3655 (ER), 2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020)..................................... 5

*Ronzani v. Sanofi S.A.*,
  899 F.2d 195 (2d Cir. 1990)...................................................................................... 4

*Saraf v. Ebix, Inc.*,
  632 F. Supp. 3d 389 (S.D.N.Y. 2022)....................................................................... 5

*Schvimmer v. Off. of Ct. Admin.*,
  857 F. App'x 668 (2d Cir. 2021) ............................................................................ 5

*State Tchrs. Ret. Bd. v. Fluor Corp.*,
  654 F.2d 843 (2d Cir. 1981)...................................................................................... 6

*Stonewell Corp. v. Conestoga Title Ins. Co.*,
  No. 04 CV 9867 KMW/GWG, 2010 WL 647531 (S.D.N.Y. Feb. 18, 2010) ............................ 5

*Union Carbide Corp. v. Siemens Westinghouse Power Corp.*,
  No. 99 CIV. 12003 (LMM), 2002 WL 31387269 (S.D.N.Y. Oct. 23, 2002)............................ 8

*Williams v. Citigroup Inc.*,
  659 F.3d 208 (2d Cir. 2011) (per curiam................................................................. 4

**Rules**

Federal Rule of Civil Procedure 15(a)(2) ................................................................. 1, 4

Lead Plaintiff Moset International Company Limited ("Plaintiff" or "Moset"), by and through its attorneys, individually and on behalf of all others similarly situated, hereby moves for leave to amend its Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (Dkt. #30) (the "Complaint"). Attached hereto is a redlined version of the proposed Second Amended Class Action Complaint for Violations of the Federal Securities Laws (the "SAC") against the Complaint as Exhibit A, and a clean version as Exhibit B.[1]

## I.    INTRODUCTION

The liberal standard of Federal Rule of Civil Procedure 15(a)(2) ("Rule 15 (a)(2)") states that leave to amend should be freely granted. In the Second Circuit, a motion for leave to amend may only be denied where there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or where the amendment would be futile. No such bar to amendment applies here, and furthermore, the amendment adds compelling factual allegations supporting Defendants' liability and narrows the case. Accordingly, Plaintiff's motion should be granted.

In its memorandum and order dated November 3, 2023, the Court dismissed the Complaint without prejudice and stated, "Plaintiff may file a motion seeking leave to file a second amended complaint within thirty days … and explain why leave to amend should be granted." Dkt. #78 ("Order") at 42. Pursuant to the Court's Order and Rule 15(a)(2), Plaintiff now respectfully submits this memorandum of law in Support of its Motion for Leave to Amend the Complaint (the "Motion") in this action (the "Action").

The SAC addresses the Court's concerns for more particularity and satisfies the pleading requirements. Based on Lead Counsel's renewed investigation, the SAC pleads new, detailed, and contemporaneous facts that plausibly establish falsity and scienter – including what laws,

---

[1] Capitalized terms not defined herein have the meaning ascribed in the Complaint. Citations to "¶" refer to the clean SAC (Ex. B).

1

regulations, and CBR policies Qiwi was violating and how (*see* ¶¶9, 90, 107, 110, 119-20, 124) and what processes, procedures, and controls were deficient and how (*see* ¶¶9, 16, 104, 112, 120). Additionally, Plaintiff has narrowed the SAC by removing alleged (1) misstatements related to the proposed Boxing Federation regulation and Qiwi's revenue or growth unless the statement specifically referred to betting and (2) omissions related to illicit gambling transactions.

*First*, the SAC alleges that Defendants misled investors into believing that Qiwi had established effective processes, procedures, and controls to ensure betting transactions in its payment system involved licensed and local bookmakers in accordance with Russia's Betting Law and non-anonymous customers in accordance with the National Payment System Law and thus its touted betting revenue growth was sound. *See* ¶¶6-8, 10-12, 131-33, 135, 137-39, 141-42, 145, 149-51, 153, 155-57, 159-60, 162-63, 165, 167, 169-70, 173, 177-78, 180, 183, 186, 188-89. In truth, since July 2018, Qiwi had agreements with Western banks pursuant to which they channeled money to Qiwi via money cards and Qiwi then transferred that money to anonymous e-wallets. *See* ¶110. But Qiwi did not have, or require, records about who the money card holders were and thus did not know, or check, who the customer was in violation of the CBR's "Know Your Client" instruction, and the related July 26, 2019 amendment to the National Payment System Law preventing anonymous cash deposits into e-wallets. *See* ¶¶110, 120, 124. Nor did Qiwi verify whether a gambling network was registered and licensed as required under the Betting Law, enabling the "grey" gambling industry to hide and function anonymously in Qiwi's payment system. *See* ¶¶107, 109-10. But Defendants had been under a duty to review and improve Qiwi's processes, procedures, and controls over anonymous e-wallets since the July 2019 National Payment System Law amendment, and over payments to offshore bookmakers since the Betting Law had taken force in January 2018 – which competitor banks were complying with by the fall

2

of 2018. *See* ¶¶99, 120.

*Second*, the SAC alleges that Defendants concealed from investors that Qiwi had not improved those processes, procedures, and internal controls before the scheduled, routine CBR audit which had begun by July 20, 2020 and continued until December 2020 – despite knowing that the July 26, 2019 amendment to the National Payment System Law would be in force beginning on August 3, 2020 and that to ensure compliance, the CBR had been inspecting banks involved with online casinos since 2019. *See* ¶¶9, 13, 112, 114, 120. Furthermore, in 2018, Qiwi had undergone a major scheduled CBR audit which resulted in sanctions. *See* ¶¶145, 173, 183. Since Qiwi had still not ensured adequate reporting and record-keeping of money card holders who transferred funds to anonymous e-wallets when the 2020 CBR audit began, Defendants knew or should have known that more, and worse, sanctions would result. *See* ¶¶6, 110, 116120.

*Third*, the SAC alleges that Defendants misleadingly assured investors the new regulations rolling out during the Class Period would have a minimal and perhaps positive impact on Qiwi's business, implying that the Company was already above board with identifying illegal bookmakers and knowing its customers. *See* ¶¶7, 11, 145, 153, 173, 183, 193-95. Because Qiwi was not, it saw its revenue growth decline as new regulations increasingly restricted its ability to process transactions in the grey betting space and then plummet when the CBR took Qiwi to task by preventing it from processing any payments to foreign merchants and any money transfers to pre-paid cards from corporate accounts – even if the transactions had nothing to do with betting – and not including it in the new single ETSUP. *See* ¶¶13, 15, 107, 108-09, 124-25, 205-06. Defendants' own statements indicate their knowledge about the regulations and their investigation into what the impact of the regulations would be on Qiwi's core business. *See* ¶¶7, 112, 145, 153, 173, 183.

Accordingly, the SAC readily cures the defects identified by the Court and fully satisfies

3

the pleading standards set forth in Rule 9(b) and the PSLRA, as detailed further *infra* in III.3.

## II.   RELEVANT PROCEDURAL HISTORY

On May 20, 2021, Moset was appointed Lead Plaintiff in this action. Dkt. #26. On July 9, 2021, Plaintiff filed its Complaint against Defendants asserting claims under §§ 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5. Dkt. #30. On September 17, 2021, Qiwi and Protopopov moved to dismiss the Complaint. *See* Dkt. ##43-45. On October 18, 2021, Plaintiff opposed the motion, and on November 1, 2021, Qiwi and Protopopov filed their reply. *See* Dkt. ##46-48.

On November 3, 2023, the Court issued its Order dismissing Plaintiff's claims without prejudice and stated, "Plaintiff may file a motion seeking leave to file a second amended complaint within thirty days" and that "[a]ny such motion should include the proposed second amended complaint as an exhibit and explain why leave to amend should be granted." Dkt. #78.

## III.   ARGUMENT

Rule 15(a)(2) provides that courts should freely give leave to amend "when justice so requires." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Justice requires leave to amend when there are "at least colorable grounds for relief …." *Abbey v. Skokos*, 303 F. App'x 911, 913 (2d Cir. 2008). "This permissive standard is consistent with [the Second Circuit's] 'strong preference for resolving disputes on the merits.'" *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam).

"Although the decision whether to grant leave to amend is within the discretion of the district court, refusal to grant leave must be based on a valid ground." *Oliver Sch., Inc. v. Foley*, 930 F.2d 248, 253 (2d Cir. 1991) (quoting *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)). "The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Pasternack v. Shrader*, 863 F.3d 162, 174

4

(2d Cir. 2017). Therefore, leave to amend should only be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Schvimmer v. Off. of Ct. Admin.*, 857 F. App'x 668, 671 (2d Cir. 2021). It is the burden of the party opposing amendment to establish that the proposed amendment would be prejudicial or cause undue delay. *Stonewell Corp. v. Conestoga Title Ins. Co.*, No. 04 CV 9867 KMW/GWG, 2010 WL 647531, at \*2 (S.D.N.Y. Feb. 18, 2010)

Additionally, given the stringent standards applicable to securities fraud claims, courts have determined that "leave to amend should be granted liberally" in such actions. *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 518 (S.D.N.Y. 2009); *see In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 312 (S.D.N.Y. 2008) (citing the importance of adherence to liberal amendment standards in the context of complicated PSLRA pleading rules and allowing filing of third amended complaint); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015)) (The Second Circuit urges leave to amend particularly in securities fraud cases as they "combine[] a complex commercial reality with a long, multi-prong complaint."); *Chill v. Gen. Elec. Co.*, 101 F. 3d 263, 271 (2d Cir. 1996) ("In the securities litigation context, leave to amend is particularly appropriate[.]"). "District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007); *Saraf v. Ebix, Inc.*, 632 F. Supp. 3d 389, 402 (S.D.N.Y. 2022) (quoting *Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017)) ("'complaints dismissed under Rule 9(b)' or the PSLRA 'are almost always dismissed with leave to amend[.]'"); *In re Tufin Software Techs. Ltd. Sec. Litig.*, No. 1:20-CV-5646-GHW, 2022 WL 596861, at \*11 (S.D.N.Y. Feb. 25, 2022) (S.D.N.Y. Feb. 25, 2022) (Woods, J.) (granting leave to amend for a second time); *Peifa Xu v. Gridsum Holding Inc.*, No. 18 CIV. 3655 (ER),

5

2020 WL 1508748, at *9 (S.D.N.Y. Mar. 30, 2020) (same).

As detailed below, Plaintiff's request for leave to amend: (1) is not unduly delayed or sought in bad faith; (2) would not unduly prejudice Defendants; and (3) would not be futile. Thus, Plaintiff respectfully requests that the Court grant leave to amend.

A.    *Plaintiff's Motion is timely and not the result of bad faith.*

Courts consistently find that a party's desire to amend a complaint at the motion to dismiss stage is a valid reason to amend, and not one that constitutes bad faith, particularly where the matter arises under the heightened pleading standards of Rule 9(b) or the PSLRA. *In re Take-Two Interactive Securities Litigation*, 551 F. Supp. 2d at 312. Indeed, "[c]omplaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend." *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986). "Mere delay …, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *Contrera v. Langer*, 314 F. Supp. 3d 562, 566 (S.D.N.Y. 2018) (quoting *State Tchrs. Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981).

Here, Plaintiff's request for leave to amend is made absent any undue delay, bad faith, or dilatory motive. Rather, the request is made after the Court stated in its Order that "Plaintiff may file a motion seeking leave to file a second amended complaint within thirty days." Order at 42. Plaintiff timely moved for leave to amend after the dismissal and within the Court's allotted thirty-day window. Accordingly, there has been no undue delay, bad faith, or dilatory motive.

B.    *Defendants will not be unduly prejudiced by the amendment.*

"[P]rejudice alone is insufficient to justify a denial of leave to amend; rather, the necessary showing is **undue** prejudice to the opposing party." *Boyer Works USA, LLC v. Rubik's Brand Ltd.*, No. 21 CIV. 7468 (AKH), 2022 WL 355398, at *3 (S.D.N.Y. Feb. 7, 2022) (emphasis in original).

To determine what constitutes prejudice, courts must consider whether the proposed amendment, "would '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction.'" *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 454 (S.D.N.Y. 2016) (quoting *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000). "[T]he prospect of spending more time, effort, or money on litigation—including through additional discovery and motion practice—does not render an amended complaint unduly prejudicial." *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 312, 314 (S.D.N.Y. 2021); *see also Block v. First Blood Assocs.*, 988 F.2d 344, 351 (2d Cir. 1993) (granting leave to amend where defendants argued prejudice resulted "solely because of the time, effort and money they expended in litigating this matter"); *Agerbrink*, 155 F. Supp. 3d at 454 (finding defendant not unduly prejudiced where plaintiff sought leave to amend before the close of discovery).

Under controlling Second Circuit precedent, granting Plaintiff leave to file its SAC would not unduly prejudice Defendants. Defendants have yet to answer the Complaint and can move to dismiss the SAC if leave to amend is granted. Further, no discovery has taken place pursuant to the PSLRA discovery stay. No schedule of pre-trial deadlines has been proposed or entered. No trial date has been set. Furthermore, the SAC does not name any additional defendants or seek to alter the Class Period.

Accordingly, Defendants will not be unduly prejudiced by the proposed amendment. *See Env't Sols. Assocs. Grp., LLC v. Conopoco, Inc.*, No. 1:20-CV-10699-MKV, 2021 WL 2075586, at *2 (S.D.N.Y. May 24, 2021) (allowing amendment upon finding "'no undue prejudice because the parties are far from trial, no Defendant has answered, no Rule 16 conference has been held,

7

and no discovery deadlines have been established.'") (quoting *Joint Stock Co. v. Infomir LLC*, No. 16CIV1318GBDBCM, 2017 WL 2988249, at *1 (S.D.N.Y. Mar. 27, 2017)); *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 312, 314 (S.D.N.Y. 2021) (allowing amendment upon finding no undue prejudice when "defendant[s] ha[ve] been on notice of the substance of and theories underlying the plaintiff's claims."). Given the early posture of the case, any delay does not prejudice Defendants.

C.      *Plaintiff's proposed amendment is not futile.*

Permitting Plaintiff to amend the Complaint to add more detailed allegations supporting its claims to resolve the deficiencies identified by the Court in its Order will not be futile. "Granting leave to amend is futile if it appears that a plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F. App'x 617, 622 (2d Cir. 2009); *see also Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss"). In assessing futility, courts consider "the proposed amendment[s] . . . along with the remainder of the complaint,' accept as true all non-conclusory factual allegations therein, and draw all reasonable inferences in plaintiff's favor to determine whether the allegations plausibly give rise to an entitlement to relief." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012). "The party opposing the amendment has the burden of demonstrating that leave to amend would be futile." *Ho Myung Moolsan Co. v. Manitou Min. Water, Inc.*, 665 F. Supp. 2d 239, 250 (S.D.N.Y. 2009).

Here, the proposed amendments directly address the deficiencies identified in the Order regarding falsity and scienter for all three categories of alleged misstatements. *See Union Carbide Corp. v. Siemens Westinghouse Power Corp.*, No. 99 CIV. 12003 (LMM), 2002 WL 31387269, at

8

*3 (S.D.N.Y. Oct. 23, 2002) (amendment is appropriate where it "is closely related to the original claim and is based on a similar set of operative facts.").

> 1. <u>Alleged misstatements regarding unlawful acts or recordkeeping deficiencies</u>

*First*, in considering the alleged misstatements regarding unlawful acts or recordkeeping deficiencies, the Court found that the Complaint had "not identified any specific legal violations, the substance of those violations, [] the underlying conduct that led to the violations," or "what reporting or recordkeeping requirements were violated, when and in what ways." *See* Order at 21, 23. The SAC now alleges underlying conduct which includes agreements with Western banks dating as far back as July 2018 pursuant to which Qiwi received money via money cards and then transferred the money to anonymous e-wallets. *See* ¶110. The SAC also adds that in violation of the CBR's "Know Your Client" instruction and related July 2019 amendment to the National Payment System Law preventing anonymous cash deposits into e-wallets, Qiwi did not have processes, procedures, or controls in place to obtain or require records identifying the money card holders were and thus did not know or check who the customer was before transferring the money to e-wallets. *See* ¶¶110, 120. The SAC further details that as a result, Qiwi did not have the requisite customer information to start providing it to the FTS on April 1, 2020 in violation of the tax code. *See* ¶119. In addition, the SAC alleges that Qiwi did not verify records showing a gambling network was registered and licensed as required under the Betting Law, enabling the "grey" gambling industry to function anonymously within the Company's payment system through dormant licenses or new corporate names that were not on the "blacklist." *See* ¶¶54, 107, 109-10.

Next, the Court found that the Complaint did "not plausibly allege[] that Qiwi's alleged violations rendered defendants' statements about the company's profits and growth misleading." Order at 22. The SAC now alleges that because Qiwi did not have processes, procedures and

9

controls to detect illegal bookmakers or identify and verify money card holders, it was processing payments and profiting from both legal and illegal transactions. *See* ¶¶109-10. In support of scienter, the SAC describes how Defendants knew or should have known those transactions were taking place within Qiwi's payment system based on, at a minimum, the public reporting on November 2, 2018 of competitor banks like Sberbank blocking all payments to offshore gambling operations and on August 5, 2019 of e-payment providers like Yandex.Money blocking suspect transfers in mass in response to the Betting Law which had taken force in January 2018 because then, illegal bookmakers were pushed to Qiwi. *See* ¶¶99-100. The SAC also alleges illicit activity like that uncovered in the February 2019 criminal trial of the organized criminal group Vovse which used Qiwi's payment service to sell illegal drugs – which Defendants knew or should have known about as they "constantly interact[ed] with law enforcement agencies and provide[d] them with tools to track transactions and calculate unscrupulous counterparties in the system." *See* ¶¶90, 105. In addition, the SAC explains how these transactions all violated the CBR's long-standing policy against illicit funds (*see* ¶¶52, 90, 99-100) and were part of the impetus for the July 2019 amendment to the National Payment System Law preventing anonymous e-wallet holders from replenishing them in cash and requiring a bank account so that "the source of funds would be known" (*see* ¶¶114-15). The SAC further details how Yandex.Money warned that "[t]he changes will negatively affect the income of electronic money operators, which, along with banks, invest a lot in stimulating non-cash payments" while Qiwi told investors that the changes were immaterial to it because "the vast majority of users in the QIWI ecosystem" were identified. *See* ¶116.

Turning to what Defendants knew or should have known about the CBR, CBR audits, and CBR enforcement going into and during the Class Period, the Court noted the Complaint did "not offer any specific details about 'deficiencies' in Qiwi's 'compliance with certain banking

regulations' and unspecified 'violations of the Russian National Payment System Law' that were discovered in 2013 and 2014" or "allege with any specificity that the violations allegedly uncovered in December 2020 had any connection to the earlier violations that Qiwi represented it believed were remedied." *See* Order at 21, 23. The SAC now details the 2013 deficiencies as related to "reporting requirements" and internal controls which "did not reflect the nature and scope of the bank's activities" as well as the 2014 violations of the National Payment System Law as including reporting requirements, specifically customer identification for person-to-person transfers. *See* ¶¶81, 84. The SAC also alleges new facts about the CBR fining Qiwi in March 2015, and shutting down many of its kiosks because it was allowing uncontrolled use of the kiosks – despite there being no specific regulation about how much cash could be taken out or deposited into a kiosk. *See* ¶85. Against this backdrop, the SAC explains how Qiwi's statements about having "generally rectified" the "various regulatory violations and deficiencies" uncovered in prior CBR audits misleadingly lulled investors into believing that Defendants had reviewed and ensured that Qiwi now met the reporting requirements for money transfers and had internal controls that took into account the full scope of its activities, including online betting, when that was not true. *See* ¶¶100-02. While Defendants' statements about Qiwi's "internal controls are statements of opinion" (Order at 25), "[w]hen omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable." *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020).

### 2. Alleged omission regarding the 2020 CBR Audit

*Second*, in considering the alleged omission regarding the 2020 CBR audit, the Court found that the Complaint did not allege actionable statements related to the failure to disclose the July 2020 CBR audit and the regulatory violations that the audit had uncovered. Order at 29. The Court

11

stated that "disclosure of the audit would have been required 'only … to make statements made, in light of the circumstances under which they were made, not misleading,'" *Id.* (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011)), and "Plaintiff points to no such statements." *Id.* The SAC points to such statements in the Prospectus Supplement ("Prospectus") Qiwi filed on July 20, 2020, in the 3Q20 Financial Report, and during the 3Q20 Earnings Call. *See* ¶¶183-84, 191-96.

The SAC addresses the Court's concerns by pleading with specificity that Defendants made statements warning of audit and regulatory risks in the Prospectus, and that those risks had already materialized—and Defendants knew they had materialized—due to (1) not having the processes, procedures and controls to identify customers who were transferring money into anonymous e-wallets pursuant to the July 26, 2019 amendment to the National Payment System Law in force on August 3, 2020 and (2) the CBR audit of Qiwi beginning by July 20, 2020 in which the CBR discovered the Company's continued lack of reporting and recordkeeping as to money card holders and foreign bookmakers. *See* ¶¶120, 182-84. Additionally, the SAC points to specific statements, and adds a statement made by Defendants Protopopov and Kim discussing the potential impact of new and pending regulations on Qiwi, including the change of bookmaker companies to create a single, unified TSUPIS. *See* ¶¶191-96. Those statements were made without disclosing the ongoing CBR audit—which was having an immediate regulatory impact and undercutting the strength of Qiwi's application to be the sole TSUPIS. ¶¶185, 197.

As to the Court's comment that "plaintiff has not alleged that an audit was ongoing at the time of the statements in question," Order at 30, the SAC now pleads that Defendants were aware of the CBR audit of Qiwi transactions with international firms that began by July 20, 2020 and of the CBR audits of other banks involved with online casinos since 2019 to ensure their compliance

12

with the July 2019 National Payment System Law amendment in force on August 3, 2020. *See* ¶¶9, 18, 112, 120 (Although the CBR got to Qiwi on July 20, 2020, the CBR began inspecting banks involved with online casinos in 2019 and scheduled the audit with Qiwi in advance). No more is required at the motion to dismiss stage. *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (vacating dismissal of complaint and finding falsity where defendant's statements "gave comfort to investors that reasonably effective steps were being taken to comply with applicable [Chinese] environmental regulations" but did not disclose that such measures "were then failing to prevent substantial violations of the Chinese regulations"); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 729 (S.D.N.Y. 2015) (denying motion to dismiss as to statements and omissions where there was an ongoing government investigation, were active investigations into other companies in the same business as defendants, and the conduct was "remarkably similar to the conduct [defendant] had been engaged in for a number of years"); *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (no protection afforded "to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away").

### 3.   Alleged misstatements regarding the impacts of new and pending regulations

*Third*, in considering the alleged misstatements regarding the negative impacts of regulations on Qiwi's business, the Court stated that the Complaint did not allege how regulations hurt the Company or how CBR restrictions qualified as regulations. Specifically, the Court stated "nowhere does plaintiff allege that the draft bill referenced by Solonin, the proposed Boxing Federation regulation, or the ETSUP program hurt Qiwi," and "plaintiff does not plausibly allege that the CBR restrictions on payments to foreign merchants and pre-paid cards were based on new regulations, or that the restrictions the CBR imposed themselves qualified as regulations." *See*

Order at 31. The SAC contains new factual allegations, pled with particularity, addressing the Court's concerns, and removes allegations relating to the proposed Boxing Federation regulation.

The new facts alleged in the SAC explain in detail how the draft bill referenced by Solonin reduced the number of merchants with whom Qiwi could transact and receive the associated revenue, and how excluding Qiwi from the ETSUP program would cut all of its betting revenues, so the Company's Class Period non-compliance with the Betting Laws, National Payment Law System, and the CBR's instructions pursuant to the AML Law was hurting the Company. *See* ¶¶109-10, 205-06. Likewise, the SAC's new facts now adequately allege that the CBR restrictions on payments to foreign merchants and pre-paid cards were a result of the amendments to the National Payment System Law adopted in July 2019, and Qiwi was hurt by those amendments because Defendants still had not adequately expanded its client identification and verification procedure to money card holders to comply with the CBR's "Know Your Client" instruction or adequately restricted the use of anonymous e-wallets before the CBR audit began. *See* ¶¶6, 110, 120. The SAC also explains how the CBR's long-standing policy against illegal proceeds and associated "Know Your Client" instruction qualified as regulations in that Qiwi needed to comply with them to avoid more and worse sanctions from the CBR. *See* ¶¶52-53, 110. And the SAC details how expanding the Deoffshorization Law to bookmakers hurt Qiwi's business because local bookmakers establishing international offshoots could no longer provide online casino and poker products to Russian customers without running into regulatory scrutiny. *See* ¶108. Last but not least, the SAC contains particularized facts surrounding how Qiwi was hurt by repeatedly not staying on top of the increasingly restrictive Betting Laws and National Payment Law System in that it was then severely sanctioned by the CBR and precluded from participating in the ETSUP program after being TSUPIS-2 since December 2016, causing Qiwi to subsequently experience a

14

14.7% decline in e-commerce. *See* ¶¶205-06.

Defendants paid close attention to new betting regulations and laws as they rolled out throughout the Class Period, as demonstrated by Defendants' own statements. The SAC addresses the Court's scienter concerns by identifying with particularity Defendants' statements discussing the new laws and regulations, how those statements were false and misleading, and what impact those statements and new laws and regulations had on Qiwi and investors. *See* ¶153 (Defendant Solonin: "[O]n the regulatory part, I mean we – I mean first of all, it's not something that all the kind of rumors and the regulation that we're discussing now. ***We're aware of that***, so ***we are actually working together with the regulators*** and are doing additional perspective that given our scale and market partition, any new regulation rules will be basically positive for us"); ¶195 (Defendant Kim: "So talking about single TSUPIS, the situation has changed since September or since August when we had the last earnings call, because in August, it was just a proposal from books in federation, which was discussed at the level of government. And now it's a draft law, which is now in Parliament. And so, they started to consider this draft lots. That's a huge progress in this. ***That's why we put this sentence in our press release*** even because the situation is changing."); ¶192 (Defendant Protopopov: "***[T]he key factors that resulted in such decline related primarily to the regulatory and operational reason*** rather than any substantial changes in the consumer preferences for economic slowdown . . .. At the same time, we believe that ***certain regulatory initiatives that are being discussed from time to time*** as well as continued economic slowdown ***have a potential to negatively affect our operating performance in the future***."); *see also* ¶¶105, 113, 124, 126, 193-94, 196, 205.

Defendants' own words regarding the importance of and the impact that amendments and new regulations would have on Qiwi, and their ability to speak knowledgeably on these topics,

15

supports an inference that they had educated themselves about the Company's violative operations and kept abreast of the status of the ongoing CBR audit. *See Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100 (D. Conn. 2021) ("Actively communicating with the public about this issue demonstrates defendants' sensitivity to it, and is strong circumstantial evidence that [they] were receiving some form of specific information about the subject[.]")

Moreover, the betting laws and regulations related to Qiwi's core operations during the Class Period because going into the Class Period, its "bookmaker transactions account[ed] for about 70% of e-commerce traffic" and throughout the Class Period, betting transactions "represent[ed] a significant portion of [its] revenues and also generally carrie[d] higher margins than" other merchant transactions and "gains received by [Qiwi's] consumers from betting into their Qiwi Wallet accounts represent[ed] one of the significant reload sources for Qiwi Wallet accounts." *See* ¶¶71-72. As such, Defendants had a duty to stay on top of the amendments and new regulations as they rolled out and to speak truthfully and fully about them if Defendants chose to speak about them. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (inferring knowledge of new regulations in an area that represented a significant part of business). For instance, after Defendant Kim discussed the proposed legislation around consolidating the TSUPIS into one ETSUP during the 3Q20 Earnings Call, he added: "***We also have a chance to be the single TSUPIS***. And that's going to be much better for us even because we will serve the whole market instead of half of that, half of it, but the true is here, the situation is changing and is becoming more uncertain." *See* ¶195. This statement was misleading, as it failed to disclose that Qiwi would not be able to pass the then-ongoing CBR audit and thus, would no longer be in the running to be the single ETSUP, and was made with the requisite scienter. *See* ¶197; *Meyer*, 761 F.3d at 251 (finding "misleading omissions" where company warned of risk from "environmental violations"

but did not "disclose then-ongoing and serious pollution violations" which caused investors to be "overly optimistic" about the risk); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010) (finding that the proposed complaint "alleges sufficient facts showing that the [d]efendants had direct knowledge of information contradicting their public statements or access to similar information **they should have monitored**[,]" and pre-class period knowledge "remained pertinent" to class period statements); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made.").

## IV.   CONCLUSION

For the reasons stated herein, Plaintiff's motion for leave to file the proposed SAC should be granted.

DATED: December 4, 2023

Respectfully Submitted,

**FREEDMAN NORMAND FRIEDLAND LLP**

*/s/ Ivy T. Ngo*
Ivy T. Ngo (*pro hac vice*)
Velvel (Devin) Freedman
1 SE 3rd Avenue, Suite 1240
Miami, Florida 33131
Telephone: (786) 924-2900
Emails: ingo@fnf.law
         vel@fnf.law

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall (*pro hac vice* forthcoming)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964

17

Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on December 4, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

*/s/ Ivy T. Ngo*
Ivy T. Ngo