UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re QIWI plc Securities Litigation     :   Case No. 1:20-cv-06054-RPK-CLP

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

                                        :

This Document Relates To:              :

                                        :

ALL ACTIONS.                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE
## <u>CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT</u>

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Alexander C. Drylewski
William J. O'Brien
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
alexander.drylewski@skadden.com
william.obrien@skadden.com

*Counsel for Defendants QIWI plc, Andrey Protopopov, Sergey Solonin, Boris Kim, Alexander Karavaev, Varvara Kiseleva, and Vladislav Poshmorga*

Dated: February 2, 2024

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................................1

STATEMENT OF RELEVANT FACTS.........................................................................................4

ARGUMENT...................................................................................................................................9

I.      Plaintiff Still Fails to Plead a Strong Inference of Scienter ...............................................9

        A.      Plaintiff Does Not Attempt To Cure Its Deficient Allegations of Motive ..............9

        B.      Allegations of Conscious Misbehavior and Recklessness Remain Deficient .......10

                1.      Allegations Concerning the Individual Defendants' Statements ..............10

                2.      Allegations Concerning Public Media Reports About Third Parties ........12

                3.      Allegations Based on "Core Operations" and Imputed Knowledge .........13

        C.      The More Cogent and Compelling Inference Remains Nonculpable ...................14

II.     Plaintiff Cannot Plead an Actionable Statement or Omission .........................................15

        A.      Allegations Regarding "Unlawful Acts or Recordkeeping Deficiencies" ...........15

                1.      Purported Violations and Deficiencies by QIWI ....................................16

                2.      Purported Violations of the Betting Law by QIWI's Customers.............20

        B.      Allegations Regarding the 2020 CBR Audit.......................................................22

        C.      Allegations Regarding the Impacts of New and Pending Regulations ................23

CONCLUSION.............................................................................................................................25

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Arkansas Public Employees Retirement System v. Bristol-Myers Squibb Co.*,
  28 F.4th 343 (2d Cir. 2022)........................................................................................24

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)............................................................................................4

*Boston Retirement System v. Alexion Pharmaceuticals, Inc.*,
  556 F. Supp. 3d 100 (D. Conn. 2021)..........................................................................12

*In re Citigroup, Inc. Securities Litigation*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Trust v. Citigroup Inc.*, 165 F. App'x 928 (2d Cir. 2006)..........................................................................22

*In re Columbia Tuition Refund Action*,
  523 F. Supp. 3d 414 (S.D.N.Y. 2021) .........................................................................16

*In re Cronos Group Inc. Securities Litigation*,
  No. 2:20-cv-1310-ENV-JMW, 2023 WL 8003324 (E.D.N.Y. Nov. 11, 2023)...............13

*In re DraftKings Inc. Securities Litigation*,
  650 F. Supp. 3d 120 (S.D.N.Y. 2023) ........................................................ 3, 11, 15, 24

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)...........................................................................................1

*In re EHang Holdings Ltd. Securities Litigation*,
  646 F. Supp. 3d 443 (S.D.N.Y. 2022) ...................................................................11, 12

*In re Garrett Motion Inc. Securities Litigation*,
  No. 1:20-cv-07992 (JLR), 2023 WL 2744029 (S.D.N.Y. Mar. 31, 2023),
  *appeal filed*, No. 23-668 (2d Cir. Apr. 20, 2023)..........................................................14

*Gray v. Alpha & Omega Semiconductor Ltd.*,
  No. 20-CV-2414 (RA), 2021 WL 4429499 (S.D.N.Y. Sept. 27, 2021) ..........................17

*In re HEXO Corp. Securities Litigation*,
  524 F. Supp. 3d 283 (S.D.N.Y. 2021) .........................................................................24

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020)...........................................................................................14

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)..........................................................................................10

ii

*Lachman v. Revlon, Inc.*,
    487 F. Supp. 3d 111 (E.D.N.Y. 2020) ........................................................................2, 10

*Marcu v. Cheetah Mobile Inc.*,
    No. 18-CV-11184 (JMF), 2020 WL 4016645 (S.D.N.Y. July 16, 2020)........................22

*Mi v. Waterdrop Inc.*,
    No. 23-301, 2024 WL 159191 (2d Cir. Jan. 16, 2024)...................................................25

*In re Mylan N.V. Securities Litigation*,
    No.16-CV-7926 (JPO),  2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023),
    *appeal filed*, No. 23-720 (2d Cir. Apr. 28, 2023)...........................................................14

*Nandkumar v. AstraZeneca PLC*,
    No. 22-2704-cv, 2023 WL 3477164 (2d Cir. May 16, 2023).................................. 10, 12

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015) ......................................................................................................24

*In re Pfizer, Inc. Securities Litigation*,
    538 F. Supp. 2d 621 (S.D.N.Y. 2008) ...........................................................................13

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) .............................................................................................15

*Rotunno v. Wood*,
    No. 22-502, 2022 WL 14997930 (2d Cir. Oct. 27, 2022) ...............................................11

*Sandoz v. Waterdrop Inc.*,
    No. 21cv7683 (DLC), 2023 WL 1767526 (S.D.N.Y. Feb. 3, 2023), *aff'd sub nom. Mi v. Waterdrop Inc.*, No. 23-301, 2024 WL 159191 (2d Cir. Jan. 16, 2024) ..........................23

*Schiro v. Cemex, S.A.B. de C.V.*,
    438 F. Supp. 3d 194 (S.D.N.Y. 2020) ...........................................................................15

*Steamfitters Local 449 Pension Plan v. AT&T Inc.*,
    No. 21-2698-cv, 2022 WL 17587853 (2d Cir. Dec. 13, 2022).................................. 16, 20

*Sun v. TAL Education Group*,
    No. 22-cv-01015 (ALC), 2023 WL 6394413 (S.D.N.Y. Sept. 29, 2023) .................. 11, 14

*In re Telefonaktiebolaget LM Ericsson Securities Litigation*,
    No. 22-CV-1167 (WFK) (LB), 2023 WL 3628244
    (E.D.N.Y. May 24, 2023) ........................................................................3, 14, 18, 19, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ....................................................................................................1, 4

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)........................................................................................25

*Wilbush v. Ambac Financial Group, Inc.*,
    271 F. Supp. 3d 473 (S.D.N.Y. 2017) .........................................................................13

QIWI plc ("QIWI" or the "Company") and the Individual Defendants[1] (together, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiff's Consolidated Second Amended Class Action Complaint (ECF No. 82 ("SAC")).[2]

## **PRELIMINARY STATEMENT**

On November 3, 2023, this Court dismissed Plaintiff's Consolidated Amended Class Action Complaint ("FAC"), which had asserted claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The Court held that Plaintiff had not pled falsity or scienter, two essential elements of a Section 10(b) claim, with the particularity required by Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). In its Memorandum and Order ("MTD Order"), the Court concluded that the FAC failed to substantiate its "threadbare allegations" of securities fraud but granted Plaintiff an opportunity to seek leave to amend. (ECF No. 78, at 28.) As detailed below, Plaintiff has responded by filing a new complaint that merely repeats, rather than rectifies, the fatal flaws and pleading defects of its predecessor. As such, it should suffer the same fate and be dismissed in its entirety—this time with prejudice.

**Plaintiff Still Fails To Adequately Plead Scienter (*Infra* Point I).** First, the SAC has not added any new allegations to address Plaintiff's previous failure to allege particularized facts giving rise to a "strong inference" of scienter. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). Plaintiff does not even try to repair its deficient theory of motive, failing to add a single allegation on this point. And Plaintiff is no more successful in pleading that any Defendant acted with "conscious misbehavior or recklessness." *ECA & Loc. 134 IBEW Joint*

---

[1] The Individual Defendants are Andrey Protopopov, Boris Kim, Sergey Solonin, Alexander Karavaev, Varvara Kiseleva, and Vladislav Poshmorga. (SAC ¶¶ 1, 25-31.) As of the time of this filing, Pavel Korzh has not been served. The Court can dismiss the SAC as to all Defendants, including Korzh. (*See* ECF No. 78, at 18 n.1.)

[2] The SAC is appended as Exhibit A to the Declaration of Alexander C. Drylewski, dated February 2, 2024, exhibits to which are referred to herein as "Ex. __."

*Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198-99 (2d Cir. 2009). Yet again, the SAC fails to allege that any Defendant was privy to any internal report, email, oral communication, or any other specific information contradicting their class period statements. And yet again, Plaintiff fails to offer a single confidential witness allegation despite vaguely citing unspecified discussions with "individuals formerly employed by Qiwi." (SAC at 1.)

Plaintiff also has no answer for Defendants' repeated public warnings, which detailed the numerous risks facing QIWI, including those very risks Plaintiff now complains were concealed. As this Court recognized, Defendants' public statements raise a far more powerful, nonculpable inference: that QIWI was attempting to provide accurate, timely, and meaningful information to investors as it wrestled with Russia's uncertain and still-developing regulatory environment. (*See* MTD Order at 37-39.) "This steady stream of warnings renders implausible [Plaintiff's] suggestion that defendants were engaged in a scheme to deliberately or recklessly mislead investors . . . ." *Lachman v. Revlon, Inc*., 487 F. Supp. 3d 111, 138 (E.D.N.Y. 2020).

### Plaintiff Still Fails To Plead an Actionable Misstatement or Omission (*Infra* Point II).

Because many of Plaintiff's alleged misstatements and omissions are premised on purported violations of Russian law, Plaintiff was obligated to plead "'the facts of [these] . . . underlying violation[s] . . . with particularity.'" (MTD Order at 21.)[3] It has fallen short once again, however. Plaintiff's core allegation, for instance, is that certain unnamed "Western banks entered into . . . agreement[s] with, and channeled money to, Qiwi via money cards," and that QIWI "then transferred the money to e-wallets for Western customers." (SAC ¶ 110.) Plaintiff alleges that these so-called agreements violated Russian laws because "QIWI did not have information on who the money card holders were and thus did not know, and did not check, who the customer was."

---

[3] Throughout this memorandum, unless otherwise indicated, internal citations have been omitted and emphasis added.

(*Id.*) Yet Plaintiff fails to allege how or why this alleged activity, even if true, violated any specific Russian law—and in fact elsewhere in the SAC, Plaintiff alleges in categorical terms that "[b]ecause Qiwi Bank is not a bank in the classical form, Qiwi *does not have a legal obligation to identify its customers*." (SAC ¶ 80.) This internal inconsistency creates more (rather than less) ambiguity and fails to plead "'*what* law or standard the defendant violated and *how* the alleged violation occurred.'" (MTD Order at 21.)

Moreover, under Section 10(b) there is not a standalone "'duty to disclose uncharged, unadjudicated wrongdoing.'" (*Id.* at 26.) Thus, even if Plaintiff could plead a predicate violation of law with particularity (it does not), it still must allege that the resulting omission was "sufficiently connected to Defendants' existing disclosures to make those public statements misleading." *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 169 n.20 (S.D.N.Y. 2023). Plaintiff does not meet this requirement either, mischaracterizing and/or ignoring QIWI's actual disclosures. As one example, Plaintiff complains that QIWI "touted" betting as one element of the Company's success while misleadingly omitting that illegal transactions were a material contributor. (*See, e.g.*, SAC ¶¶ 133-34.) But QIWI readily warned about the risks that unlawful customer activity posed to the Company's growth and revenue by, among other things, cautioning that its "services 'ha[d] been and may continue to be used for fraudulent, illegal or improper purposes,'" which could include "'illegal online gambling.'" (MTD Order at 38.) "Court[s] must assess whether a statement is misleading based on its context"; and this context necessarily "includes a [company's] steady stream of warnings to investors." *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 2023 WL 3628244, at *13 (E.D.N.Y. May 24, 2023). Viewed in the context of QIWI's disclosures in totality, Plaintiff's claims fail.

<u>**STATEMENT OF RELEVANT FACTS**</u>[4]

The Court previously held that Plaintiff failed to state a claim under the Exchange Act in part because it "fail[ed] to plead with particularity that defendants made actionable statements based on alleged unlawful acts or recordkeeping deficiencies." (MTD Order at 20.) To avoid unnecessary repetition, this section focuses on factual allegations relevant to whether the SAC has cured the legal infirmities cataloged by the Court in its MTD Order.

**I.    ALLEGED VIOLATIONS OF RUSSIAN LAWS AND REGULATIONS**

Plaintiff's allegations focus almost entirely on its effort to plead violations of Russian laws by QIWI and its customers. In this regard, the SAC purports to identify four statutes or regulations that allegedly rendered its statements misleading, and alleges the following with respect to each:

**A.    <u>Alleged Violations of the CBR's "Know Your Client" Instructions</u>**

The CBR's "Know Your Client" ("KYC") instructions are "rooted in" the KYC requirements established by Russia's Anti-Money Laundering Law ("AML Law"). (SAC ¶ 53.) These instructions allegedly required QIWI to obtain and maintain records of its customers for whom it transfers money, including by "obtaining a copy of an ID, an address, and a place of employment as well as regular verifications through governmental agencies." (*Id.* ¶ 110.) Plaintiff alleges that certain unnamed "Western banks entered into an agreement with, and channeled money to, Qiwi via money cards who then transferred the money to e-wallets for Western customers," but "QIWI did not have information on who the money card holders were and thus did not know, and did not check, who the customer was." (*Id.*) Plaintiff claims that QIWI "had not adequately expanded the client identification and verification procedure to money card holders to

---

[4] These facts are drawn from the SAC and "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322. The Court may consider any "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

comply with the CBR's [KYC] instruction or adequately restricted the use of anonymous wallets before the CBR audit began by July 20, 2020" (*id.* ¶ 120), and that as of August 20, 2020, QIWI was "still not obtaining or requiring verification of money card holders' identification before transferring winnings to pre-paid cards" (*id.* ¶ 124).

**B.       Alleged Violations of the National Payment System Law**

On May 5, 2014, Russia passed the "final version" of amendments to the National Payment System Law ("NPS Law"). (*Id.* ¶¶ 82-83 & n.39.) The NPS Law restricted "anonymous payments" above 15,000 rubles, and "ban[ned] anonymous payments of any size if they were between individuals rather than companies or organizations." (*Id.* ¶ 83.) In July 2019, the NPS Law was again amended to prevent e-wallet owners from "deposit[ing] cash to their accounts anonymously through payment terminals and offices of mobile operators"; instead, they had to "link a bank account." (*Id.* ¶ 120.) This amendment took effect on August 3, 2020. (*Id.*) The SAC alleges that, despite this amendment, "Qiwi still had not adequately expanded the client identification and verification procedure to money card holders . . . or adequately restricted the use of anonymous wallets before the CBR audit began by July 20, 2020" (*id.*)—before the amendment took effect. Plaintiff concludes that QIWI "put all its legitimate online revenue at risk by not ensuring compliance with . . . Russia's [NPS Law]." (*E.g.*, *id.* ¶¶ 130, 134, 136, 140, 148.)

**C.       Alleged Violations of Russia's Tax Code**

The SAC alleges that amendment N 325-FZ to Russia's tax code took effect on April 1, 2020, and "requir[ed] banks to provide the FTS with information on opening or closing personalized e-wallets that undergone [sic] simplified or full identification." (*Id.* ¶ 119.) Plaintiff claims QIWI "did not obtain or require the requisite identification information from money card holders before transferring their winnings to e-wallets to start providing it to the FTS" by the time the law took effect in April 2020 (*id.*), nor was it able to report information on opened and closed

e-wallets to the FTS by the time the CBR audit began on July 20, 2020, (*id.* ¶¶ 120, 179, 181, 185, 187, 190).

### D.    Alleged Customer Transactions That Violated the Betting Law

On July 21, 2014, Russian regulators introduced the Betting Law. (*Id.* ¶ 55.) Plaintiff acknowledges that, when first introduced, the Betting Law was "unclear" and subject to varying interpretations. (*Id.* ¶ 91.) On November 27, 2017, the law was amended to "ban[] money transfers to illegal bookmakers." (*Id.* ¶ 98.) Plaintiff alleges the amendment "obliged credit institutions like Qiwi to refuse to carry out transactions for the transfer and receipt of funds . . . for cross-border money transfers to organize and conduct gambling" in violation of the law, and that authorities "created a blacklist, requiring banks to block payments to blacklisted cites." (*Id.* ¶¶ 93, 98-99.) This amendment "took force in January 2018." (*Id.* ¶ 99.) Plaintiff avers that QIWI "recklessly did not tighten its controls to prevent illegal bookmakers from using its system to withdraw gambling funds offshore," and "failed to investigate and improve [its] processes, procedures, and controls to identify and verify bookmakers in its system." (*Id.* ¶ 100.)

The Betting Law was further amended on July 22, 2020, allegedly to close "loopholes permitting payments to illegal bookmakers." (*Id.* ¶ 107.) The amendment "prohibit[ed] bookmakers from accepting bets on non-sports events" and "prohibit[ed] 'dormant' licenses" by requiring companies receiving a license to "start operating within six months." (*Id.*) Plaintiff claims that "[p]reviously [*i.e.*, prior to July 22, 2020], Qiwi was not verifying that bookmakers using its platform were only accepting bets on sports events or that companies using its platform did not have dormant licenses." (*Id.*) As a result, the SAC posits, QIWI's financial performance "included online betting transactions which violated the Betting Law." (*E.g.*, *id.* ¶¶ 134, 136, 140.)

## II.    QIWI WARNS ABOUT THE MYRIAD RISKS TO WHICH IT IS EXPOSED

As the Court recognized, QIWI's disclosures warned investors about "numerous" risks

6

concerning (i) the Company's compliance with laws and regulations and the impact of those laws on its business; (ii) its processes, procedures, and controls, including its ability to detect illegal conduct by customers; and (iii) regulatory enforcement by Russian authorities. (MTD Order at 37-39.) These disclosures are equally relevant in adjudicating Plaintiff's claims under the SAC.

A. **QIWI Warns That It May Not be in Compliance With Government Regulation and Discloses Potential Impacts of Regulations on its Business**

QIWI disclosed that it is "***subject to extensive government regulation***," explaining that its business "is impacted by laws and regulations . . . affect[ing] our industry, the number of which has increased significantly in recent years." (*E.g.*, Ex. B at 13; Ex. C at 14-15; Ex. D at S-22 (emphasis in original).) For example, QIWI warned that:

- "[m]any of these laws . . . are constantly evolving, and are often unclear and inconsistent with other applicable laws and regulations, . . . making compliance challenging" (*id.*); and

- "[e]xisting laws and regulations could be amended, the manner in which laws and regulations are enforced or interpreted could change and new laws or regulations could be adopted" (*e.g.*, Ex. B at 12; Ex. C at 13; Ex. D at S-20; MTD Order at 38).

QIWI also warned investors about risks associated with the specific regulations invoked in the SAC, including CBR's KYC instructions and related client identification requirements, the NPS Law, and the Betting Law. The SAC omits many of these disclosures:

- QIWI "sometimes ha[s] to make significant judgment calls in applying [AML] legislation and risks being found in non-compliance with it, particularly in relation to . . . mandatory client identification requirements" (*e.g.*, Ex. B at 14; Ex. C at 15; Ex. D at S-24);

- AML "legislation is in a constant state of development and is subject to varying interpretations" (*e.g.*, Ex. B at 27; Ex. C at 29; Ex. D at S-44);

- "Russian regulators may view us as being non-compliant [with client identification requirements] and impose fines and other sanctions on us" (*e.g.*, Ex. B at 14; Ex. C at 15; Ex. D at S-24);

- NPS Law amendments could make QIWI's "service less attractive," "slow down the influx of new users or [increase] the cost of their engagement," and ultimately hurt QIWI's revenue stream (*e.g.*, Ex. C at 14-15; Ex. D at S-23);

7

- the "betting industry is subject to extensive and actively developing regulation in Russia, as well as increasing government scrutiny" (SAC ¶¶ 147, 175, 184; MTD Order at 11, 14, 38);

- as a result of betting legislation, QIWI "could not only become subject to fines and other sanctions, but could also have to discontinue to process transactions that are deemed to be in breach of the applicable rules and as a result lose associated revenue streams" (*e.g.*, Ex. B at 15-16; Ex. C at 17; Ex. D at S-26; *see also* MTD Order at 14).

### B.      QIWI Warns That It Is Still in the Process of <u>Implementing Enhanced Internal Controls Protocols</u>

QIWI also addressed its internal controls, acknowledging it has "grown rapidly in recent years and need[s] to implement enhanced compliance processes, procedures and controls . . . to provide reasonable assurance that [it is] operating in compliance with applicable regulatory requirements." (*E.g.*, Ex. B at 17; Ex. C at 18; *see also* MTD Order at 5.) QIWI further warned that "there are inherent limitations to the effectiveness" of such processes, cautioning that "[t]here can be *no assurance* that such policies or procedures or internal controls will work effectively at all times or protect us against liability under these or other laws." (Ex. B at 17; Ex. C at 18.)

QIWI specifically disclosed that its "services have been and may continue to be used for fraudulent, illegal or improper purposes, which could expose us to additional liability and harm our business." (*E.g.*, Ex. B at 19; Ex. C at 20; *see also* MTD Order at 38.) It further explained that its "risk management policies and procedures" to combat suspicious activity "may not be fully effective to identify, monitor and manage these risks." (*E.g.*, Ex. B at 19; Ex. C at 20.)

### C.      <u>QIWI Warns That It Can Give No Assurance Regarding CBR Sanctions</u>

QIWI informed investors that its banking subsidiary was another source of regulatory focus: ***"Qiwi Bank and other Russian banks and credit organizations operate in a highly regulated environment and increased regulatory scrutiny could have an adverse effect on our business, financial condition and results of operations."*** (*E.g.*, Ex. B at 12; Ex. C at 13; Ex. D at S-20 (emphasis in original); *see also* SAC ¶¶ 51, 173, 183.) QIWI warned that "[t]he CBR may at

8

any time conduct full or selective audits of any bank's filings and may inspect all of its books and records." (*E.g.*, Ex. B at 12; Ex. C at 13; SAC ¶¶ 51, 183; *see also* MTD Order at 2, 14.) QIWI further reported that the CBR audited QIWI Bank in 2018, during which it identified "a number of violations." (*E.g.*, Ex. B at 12; Ex. C at 13; SAC ¶¶ 145, 173; *see also* MTD Order at 11.) While QIWI expressed its "belie[f]" that it had "remedied the violations and taken appropriate measures to ensure that [it would] not be in breach of such requirements going forward," (*e.g.*, Ex. B at 12; Ex. C at 13), QIWI cautioned that it was offering no guarantee:

> [T]here can be **no assurance** that additional sanctions will not be imposed on us as a result of such or any other findings and that we will not come under greater CBR scrutiny in connection with any perceived deficiencies in our past conduct, or that any currently planned or future inspections will not result in discovery of any significant or minor additional violations of various banking regulations, and what sanctions the CBR would choose to employ against us if this were to happen. Any such sanctions could have a **material adverse effect** on our business, financial condition and results of operations.

(*Id.*; *see also* MTD Order at 11, 14.)

## ARGUMENT

## THE SAC SHOULD BE DISMISSED WITH PREJUDICE

### I.    PLAINTIFF STILL FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER

Plaintiff has made no serious effort to rehabilitate its legally deficient allegations of scienter, which, as the Court previously held, are insufficient to raise the requisite "strong inference" that each Defendant acted with an intent to defraud. (MTD Order at 32.) Its wholesale failure to address these deficiencies serves as a threshold basis to dismiss the SAC with prejudice.

#### A.    Plaintiff Does Not Attempt To Cure Its Deficient Allegations of Motive

First, the SAC does not add any new allegations of motive for Defendants to commit securities fraud. Just as before, Plaintiff contends that defendants Kim and Solonin registered shares for sale in an SPO announced on July 20, 2020. (SAC ¶¶ 9–10, 122-23, 229.) As the Court

concluded, however, this is insufficient to give rise to a strong inference of scienter. (MTD Order at 33-34.) Indeed, as the Court previously emphasized, the decision by "Kim, Solonin, and other selling shareholders [to withdraw] their offer of sale when prices declined, and . . . not sell any stock during the period of allegedly inflated prices, undermines an inference" of motive. (*Id.* at 34.) Plaintiff still does not allege that any Individual Defendant (or other QIWI officer or director) sold any QIWI shares during the class period. This defeats any inference of scienter because "when Qiwi's stock fell about twenty percent . . . [these individuals] took a loss, too." (*Id.*)

**B.    Allegations of Conscious Misbehavior and Recklessness Remain Deficient**

Plaintiff likewise has not added any allegations that would sustain its heavy burden to plead conscious misbehavior or recklessness, which requires particularized allegations that Defendants' conduct was "'highly unreasonable'" and "'an extreme departure from the standards of ordinary care.'" (MTD Order at 36 (citing *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).) And because Plaintiff has (again) failed to plead any cognizable motive, its circumstantial allegations on this point must be "correspondingly greater" in strength. *Nandkumar v. AstraZeneca PLC*, 2023 WL 3477164, at \*3 (2d Cir. May 16, 2023); *see also Lachman*, 487 F. Supp. 3d at 136.

Like the FAC, the SAC fails to meet this high standard—it does not offer a single "confidential witness," document or internal communication to support a strong inference that any Defendant knowingly made false or misleading statements to investors. Instead, the SAC merely offers up recycled versions of arguments and allegations the Court previously rejected.

**1.    Allegations Concerning the Individual Defendants' Statements**

Plaintiff argues that "Defendants' own words regarding the importance of and the impact that amendments and new regulations would have on Qiwi . . . supports an inference that they had educated themselves about the Company's violative operations and kept abreast of the status of the ongoing CBR audit." (Pl.'s Mot. for Leave, ECF No. 80 ("Motion") at 15-16 (citing SAC

10

¶¶ 153, 192, 195); *id.* at 15 ("Defendants paid close attention to new betting regulations and laws as they rolled out throughout the Class Period, as demonstrated by Defendants' own statements.").) But the unremarkable fact that certain Defendants "made statements on the topics" to which Plaintiff points does not permit the inference that any Defendant acted with scienter. (MTD Order at 36.) Instead, the SAC must "specifically allege" each Defendant's "knowledge of facts or access to information contradicting their public statements," as "'[c]ourts in this [c]ircuit have rejected . . . attempts to hold senior officers liable based on their position . . . in the absence of specific allegations that the named defendant[s] actually received information about the fraud.'" (*Id.* at 35.)

Plaintiff itself frames these statements as representing, at most, "'strong circumstantial evidence that [Defendants] were receiving ***some form*** of specific information about [those] subject[s].'" (Motion at 15-16.) Hazy assertions like this do not pass muster under Second Circuit law. (MTD Order at 36 (deeming insufficient "'circumstantial evidence that [Defendants] were receiving some form of specific information'" about "'betting-related operations, revenue growth, compliance risks, and compliance successes'")); *In re DraftKings*, 650 F. Supp. 3d at 173, 177-78 (refusing to infer scienter where complaint made "only conclusory allegations that defendants knew of" certain "black-market operations," and did not "'specifically identify the reports or statements containing this information' that were accessible to individual defendants").[5] Likewise, Plaintiff's speculation that Defendants would have "educated themselves about the Company's violative operations" (Motion at 16) is legally insufficient. *Rotunno v. Wood*, 2022 WL 14997930,

---

[5] *See also Sun v. TAL Educ. Grp.*, 2023 WL 6394413, at *32 (S.D.N.Y. Sept. 29, 2023) (recklessness could not be inferred based on defendants' purported awareness of company's "vast number of violations" of Chinese regulations where plaintiffs "point[ed] to no specific documents or reports that were accessed by the Individual Defendants"); *In re EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d 443, 464-65 (S.D.N.Y. 2022) (no scienter where complaint lacked "concrete allegations" as to each defendant's "particular knowledge of [the company's] regulatory approvals," and did not identify "any specific reports or statements, or that any Individual Defendant had access to such reports").

11

at *3 (2d Cir. Oct. 27, 2022) (allegations that defendant "would have learned the truth about a company's fraud" through due diligence are "generally insufficient").

In the end, Plaintiff's failure to plead any Individual Defendant's knowledge of, or access to, specific contradictory information—whether from a confidential witness, internal report, email, or otherwise—is a fatal (and unremedied) flaw that forecloses its theory of scienter. *Nandkumar*, 2023 WL 3477164, at *4 (affirming dismissal where allegations "lack[ed] specificity as to what information the Individual Defendants allegedly knew").[6]

### 2.    Allegations Concerning Public Media Reports About Third Parties

Plaintiff fares no better with its next argument: that "Defendants knew or should have known" that violative transactions "were taking place within Qiwi's payment system based on" (i) the publicly reported actions allegedly taken by competitors Sberbank and Yandex.Money in 2018 and 2019, respectively, to block certain "suspect" betting-related transactions; and (ii) QIWI's alleged interactions with law enforcement officials in connection with the February 2019 criminal trial of an organization, Vovse, that had been accused of "us[ing] Qiwi's payment service to sell illegal drugs." (Motion at 10 (citing SAC ¶¶ 90, 99-100).)

Plaintiff's reliance on these media reports is not new—each allegation was featured in the now-dismissed FAC. Worse, Plaintiff's argument neglects to explain how any of these publicly reported events, involving the conduct of parties ***other than QIWI***, demonstrate either QIWI's supposed violations or the knowing falsity of any allegedly misleading statements with respect thereto. *EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d at 465 (plaintiffs failed to allege "any specific reports or statements. . . that would demonstrate . . . falsity").

---

[6] *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100 (D. Conn. 2021) (Motion at 16), upon which Plaintiff relies, highlights the SAC's flaws by comparison. There, the allegations directly tied two individual defendants to the concealment of unethical business practices by drawing on the kinds of particularized and contradictory sources—such as allegations from five confidential witnesses and the findings of an internal report—that are absent here.

Indeed, Plaintiff's theory collapses when viewed in tandem with QIWI's own disclosures, which never represented that the Company had eliminated illegal transactions using its products—in fact, it acknowledged just the opposite. (*See, e.g.*, SAC ¶ 101 (citing Form 20-F in which QIWI warned that its systems have "been and may continue to be used for fraudulent, illegal or improper purposes").) At bottom, Plaintiff's continued reliance on obscure media reports is a far cry from the sort of particularized facts necessary to plead scienter.[7]

### 3.    Allegations Based on "Core Operations" and Imputed Knowledge

Plaintiff also recycles its "core operations" theory, claiming it "'supports the inference'" that Defendants "'knew or should have known . . . [their] statements were false when made.'" (Motion at 16-17.) But just like the dismissed FAC, the SAC "does not adequately allege" that the transactions at issue "amounted to 'nearly all' of Qiwi's business, . . . such that the core operations doctrine applies." (MTD Order at 40.) At most, Plaintiff vaguely posits that betting transactions represented a "significant" portion of the Company's revenues and, in the case of winnings, "'represent[ed] one of the significant reload sources for Qiwi Wallet accounts.'" (Motion at 16 (citing SAC ¶¶ 71-72).) This loose formulation does not help Plaintiff because in the Second Circuit, "core operations are more than merely 'a significant area of business.'" *In re Cronos Grp. Inc. Sec. Litig.*, 2023 WL 8003324, at *7 (E.D.N.Y. Nov. 11, 2023).

And even if Plaintiff could meet the "nearly all" threshold, the SAC does not specify *what* the proposed imputation of knowledge would have revealed about QIWI's "core operations" or *how* possessing such information would have alerted Defendants to the falsity of any class period statement. While Plaintiff hypothesizes that Defendants would have uncovered certain regulatory

---

[7] *See Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 496-97 (S.D.N.Y. 2017) (explaining that plaintiffs must allege defendants "had access to ***non-public*** information contradicting their public statements" (collecting cases)); *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 637 (S.D.N.Y. 2008) ("Numerous courts have suggested or assumed that the contradictory information must have been ***non-public*** in order to raise a strong inference of intent.").

13

"deficiencies" and legal violations (Motion at 10-11), merely alleging the existence of "violations" is insufficient to plead scienter. This is true even where the violations are "clearly shown"—which is not the case here (*see infra* Point II).[8] *See, e.g.*, *In re Mylan N.V. Sec. Litig.*, 2023 WL 2711552, at \*10 (S.D.N.Y. Mar. 30, 2023) ("[A] defendant['s] violat[ion] [of] a law or industry practice, even if clearly shown, is not sufficient to support an inference of scienter . . . . [A] plaintiff must also show a mental state of extreme recklessness if not actual knowledge."). Regardless, the core operations theory "'at most constitutes supplemental support'" for "independently sufficient" allegations of scienter. *Sun*, 2023 WL 6394413, at \*33; *Telefonaktiebolaget LM Ericsson Sec. Litig.*, 2023 WL 3628244, at \*15. Such "independently sufficient" facts are missing here.

## C.    The More Cogent and Compelling Inference Remains Nonculpable

Finally, Plaintiff's generic, non-particularized allegations cannot measure up to the "'steady stream of warnings'" that QIWI included in its filings "about regulatory compliance, audits, and online gambling." (MTD Order at 37-38.) QIWI disclosed that the constantly evolving nature of Russian regulations makes regulatory compliance difficult; that the CBR may audit the Company in the future, which could result in sanctions; and that QIWI's services may be used for illegal online gambling or other improper purposes. (*See supra* Facts II; MTD Order at 10-11, 38.)

These disclosures—which address the very subjects about which Plaintiff complains— "undercut any inference of fraudulent intent pertaining to the statements that plaintiff highlights." (MTD Order at 37); *In re Garrett Motion Inc. Sec. Litig.*, 2023 WL 2744029, at \*15 (S.D.N.Y. Mar. 31, 2023) ("Any inference of recklessness . . . is negated by the disclosures themselves, which relay the decline of [the company] and warned investors that a restructuring was possible

---

[8] As detailed below, Plaintiff does not come close to pleading the sort of "dramatic" misstatements that would support corporate scienter. (MTD Order at 40-41 (citing *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020)).)

during the Class Period."). At the same time, they raise a more compelling non-culpable inference: Defendants were trying to provide investors timely, accurate, and complete information about a complex, rapidly shifting regulatory landscape fraught with uncertainty. These warnings attest to Defendants' good faith and defeat any suggestion they sought to mislead investors.

## II.    PLAINTIFF CANNOT PLEAD AN ACTIONABLE STATEMENT OR OMISSION

Plaintiff is no more successful in rehabilitating its falsity allegations—which, if anything, have grown more ambiguous and non-particular. When allegations of falsity are "'premised on [a] . . . predicate violation[ ] of law,' . . . 'the facts of that underlying violation must be pled with particularity.'" (MTD Order at 21 (citing *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021)).) This means that a "plaintiff must 'specify ***what*** law or standard the defendant violated and ***how*** the alleged violation occurred.'" (*Id.*); *see also Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 198 (S.D.N.Y. 2020) ("Plaintiffs must plead the 'who, what, when, where, and how' of the alleged improper transaction."). Moreover, "companies 'do not have a duty to disclose uncharged, unadjudicated wrongdoing.'" (MTD Order at 26). So when a complaint "assert[s] claims rooted in a failure to disclose misconduct," a plaintiff "must plead with sufficient specificity how the alleged omissions are sufficiently connected to Defendants' existing disclosures to make those public statements misleading." *In re DraftKings*, 650 F. Supp. 3d at 169 n.20. The SAC does not meet these established standards.

### A.    Allegations Regarding "Unlawful Acts or Recordkeeping Deficiencies"

First, the SAC accuses Defendants of misleading investors that QIWI had "established effective processes, procedures, and controls to ensure betting transactions in its payment system" complied with Russian laws and regulations, when "[i]n truth" this was not the case. (Motion at 2.) This core assertion is underpinned by two categories of allegedly unlawful acts—those committed by QIWI and those committed by its customers. Neither withstands scrutiny.

15

### 1.     Purported Violations and Deficiencies by QIWI

Plaintiff alleges that "since July 2018, Qiwi had agreements with Western banks pursuant to which they channeled money to Qiwi via money cards and Qiwi then transferred that money to anonymous e-wallets." (*Id.* (citing SAC ¶ 110).) These transactions, Plaintiff contends, (i) violated the CBR's KYC instructions by failing to "require . . . records about who the money card holders were"; and (ii) violated the NPS Law by permitting "anonymous cash deposits into e-wallets." (*Id.* (citing SAC ¶¶ 110, 120, 124).) But this allegation, which is repeated multiple times in some form, suffers from the same defects that doomed the FAC.

To start, Plaintiff's theory is marred by a glaring inconsistency. On the one hand, Plaintiff claims that the KYC instruction required QIWI to identify its customers. In another part of the SAC, however, Plaintiff claims the exact opposite: that "[b]ecause Qiwi Bank is not a bank in the classical form, Qiwi *does not have a legal obligation to identify its customers*." (SAC ¶ 80.) These two statements cannot be reconciled, and thus make it impossible for Plaintiff to plead a predicate violation with particularity. *Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, 2022 WL 17587853, at *3 (2d Cir. Dec. 13, 2022) (plaintiff failed to plead underlying unlawful acts with required specificity where complaint alleged "inconsistent and irreconcilable facts regarding the scale of alleged improper sales practices"); *see also In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 423-24 n.1 (S.D.N.Y. 2021).

Even setting aside this contradiction, QIWI informed investors that the AML Law (after which the KYC instruction was modeled) (*see* SAC ¶ 53) does not categorically prohibit anonymity. QIWI's disclosures explained that "certain transactions of physical persons are exempt from the identification requirements under the [AML Law], unless officers of a financial service provider suspect that such operation is carried out to legalize funds received from illegal activities, to finance terrorism or to spread weapons of mass destruction." (Ex. B at 56; Ex. C at 61; *see also*

16

*id.* (explaining, for example, that "[m]oney transfers by individuals not exceeding RUB 15,000 are generally exempt from the identification requirement").) The SAC, however, fails to even acknowledge such an exemption, much less include any allegations that QIWI knowingly permitted anonymous transactions that fell outside of it.

Indeed, the SAC contains no analysis of this exemption at all, a fatal flaw. *See Gray v. Alpha & Omega Semiconductor Ltd.*, 2021 WL 4429499, at \*8-9 (S.D.N.Y. Sept. 27 2021) (rejecting allegations of undisclosed illegal conduct "as conclusory" where complaint failed to address regulations that "contain[ed] exemptions"). The SAC does not specify (i) **which** "Western banks" entered into agreements with QIWI, (ii) **what** if anything these agreements provided (such as whether they permitted anonymous transactions that did not meet the AML Law's exemptions), (iv) **how many** "violative" transactions occurred during the class period pursuant to these agreements, and (v) **the extent to which** these transactions contributed to QIWI's financial revenue and growth. What emerges from the resulting cloud of ambiguity is an allegation that raises more questions than answers and, as such, disregards this Court's directive to "'specify **what** law or standard the defendant violated and **how** the alleged violation occurred.'" (MTD Order at 21.)

Plaintiff's allegations concerning the NPS Law are just as threadbare. First, the SAC does not plead any facts from which to infer that QIWI allowed customers to "deposit cash to their accounts anonymously through payment terminals and offices of mobile operators," once a prohibition against such cash transfers became effective on August 3, 2020. (SAC ¶ 120; *see also id.* ¶ 114.) That is to say, Plaintiff supplies no particulars about QIWI's alleged violations of the NPS Law, such as when the supposed breaches occurred in relation to the class period, how they violated the law, or whether these unidentified transactions "had a meaningful relationship to Qiwi's profits or growth." (MTD Order at 22-23.) Instead, Plaintiff merely accuses QIWI of failing

17

to "*adequately* restrict[] the use of anonymous wallets before the CBR audit began by July 20, 2020." (SAC ¶ 120.) This loose formulation is not only vague and conclusory, but it tacitly concedes that QIWI *did* limit the use of anonymous wallets—just not in a way that meets Plaintiff's own subjective, undefined, and irrelevant standard of "adequa[cy]."[9]

What is more, Plaintiff still does not plausibly allege that the CBR adjudicated—or even charged QIWI with—violations of its KYC instruction, the NPS Law, or any other law, based on conduct that occurred during the class period. In this regard, Plaintiff proffers no new facts about the CBR's December 2020 findings; nor does it make any headway in tying these findings to any of QIWI's alleged legal and regulatory violations during the class period (which themselves are inadequately pled for the reasons above). Instead, Plaintiff offers allegations about regulatory violations identified by the CBR from 2013 to 2015—years before the class period began. (SAC ¶¶ 81, 84, 85.) Crucially, the SAC does not link these violations in any particularized way to QIWI's operations during the class period—let alone to the CBR's findings in December 2020. Without this connection, Plaintiff's "new" allegations are just as irrelevant as those that came before, and thus Plaintiff again has failed to "fill the gap in its pleadings" by pointing to prior actions by the CBR. (MTD Order at 24; *id.* at 28 ("[I]nsofar as plaintiff suggests in its briefing that the CBR audit determined that Qiwi's customers had engaged in illegal transactions, . . . that claim lacks grounding in plaintiff's complaint.").) If anything, QIWI's disclosure that "a 2018 CBR audit identified violations and imposed sanctions" (*id.* at 11) cuts against any notion that its public statements would mislead investors. *Telefonaktiebolaget LM Ericsson Sec. Litig.*, 2023 WL

---

[9] Plaintiff also cites QIWI's purported disregard for the NPS Law as the reason why the Company allegedly was "unable to report information on opened and closed e-wallets to the FTS pursuant to the tax laws." (SAC ¶ 120; *see also id.* ¶¶ 177-78, 180, 183-84, 186, 188-89.) Given this symbiotic relationship, Plaintiff's failure to plead a predicate violation of the NPS Law dooms its allegations under the tax laws. Unsurprisingly, Plaintiff does not plead that the CBR, the FTS, or any other regulator ever accused QIWI of any tax-related reporting breach.

18

3628244, at *11 ("[W]here a company's previous potential wrongdoing is already public knowledge[,] . . . investors are even *less* likely to rely on generic compliance-related statements in making investment decisions.").

Finally, Plaintiff cannot overcome the rule in this Circuit that there is no duty to disclose "'uncharged, unadjudicated wrongdoing.'" (MTD Order at 26.) To do so, Plaintiff needs to plead with particularity that omitting such information rendered a public statement materially false or misleading. (*Id.* at 22.) But the SAC runs headlong into QIWI's disclosures—*i.e.*, the "'steady stream of warnings'" the Company delivered throughout the class period concerning compliance and internal controls. (*Id.* at 38.) As this Court observed, QIWI never guaranteed that it was in full compliance with all laws and regulations, and in fact emphasized that the legal environment in Russia was complex, fluid, and fraught with risk. (*Supra* Facts II; MTD Order at 37-38.)[10] As to its controls environment, QIWI struck an equally cautious tone, "admitt[ing] that it needed 'to implement enhanced processes, procedures and controls in order to provide reasonable assurance that we are operating in compliance with applicable regulatory requirements.'" (MTD Order at 5.)

Viewed holistically, these disclosures addressed the very risks about which Plaintiff now complains. They again represent a separate and independent basis for dismissal. *See, e.g.*, *Telefonaktiebolaget LM Ericsson Sec. Litig.*, 2023 WL 3628244, at *11 (statements were not actionable because the company "expressly warned" investors it "cannot provide any assurances that violations" of the company's policies, directives, and Code of Conduct "will not occur").

---

[10] As the Court explained, QIWI repeated these disclosures in multiple SEC filings during the putative class period. (*See, e.g.*, MTD Order at 10-11.)

### 2.   Purported Violations of the Betting Law by QIWI's Customers

The FAC alleged that Defendants misled investors by failing to disclose how "customers'

illegal gambling transactions contributed to the company's revenue or growth." (MTD Order at

26.) The SAC reasserts this theory, alleging that the "online betting transactions [at issue] . . .

violated the Betting Law." (*See, e.g.*, SAC ¶¶ 134, 136, 152, 158.) But these conclusory

invocations of the Betting Law fall well short of "'stating with particularity the circumstances

constituting fraud,'" (MTD Order at 17), and indeed, are conspicuous for what they do not say.

Notably, Plaintiff does not accuse QIWI of violating the Betting Law. There is, for

instance, no claim that QIWI refused to "block payments to blacklisted [gambling] cites," as

required by Russian authorities (SAC ¶ 99), or that the Company allowed bookmakers to process

transactions for non-sports bets after a Betting Law prohibition against doing so became effective

in July 2020 (*id.* ¶ 107). Instead, Plaintiff alleges QIWI "recklessly did not tighten its controls to

prevent illegal bookmakers from using its system." (SAC ¶ 100; Motion at 9-10 (arguing that

QIWI "did not have processes, procedures and controls to detect . . . illegal transactions").)

But Plaintiff still offers no details about any of these illicit customer activities, such as who

the "betting organizers and illegal offshore bookmakers" were, when the suspect transactions

occurred, how precisely these unidentified activities violated the Betting Law, and the extent to

which they contributed to QIWI's performance. As such, the SAC repeats the FAC's flaws and

should suffer the same fate. (MTD Order at 27-28 ("Plaintiff does not allege which customer

transactions were illegal, when they were illegal, what laws or regulations they violated, how those

legal requirements were transgressed, or to what extent illegal transactions contributed to revenue

or growth.")); *see also Steamfitters Loc. 449 Pension Plan*, 2022 WL 17587853, at *3 (rejecting

claim that company failed to disclose that subscriber growth was "artificially inflated by ghost

accounts," where complaint lacked specifics about "the scale of alleged improper sales practices").

20

Indeed, Plaintiff's new allegations create more ambiguity. Case in point, Plaintiff claims that by supposedly failing to "verify records showing a gambling network was registered and licensed as required under the Betting Law," QIWI "enabl[ed]" a so-called "'grey' gambling industry to function anonymously within the Company's payment system." (Motion at 9 (citing SAC ¶¶ 54, 107, 109-10).) But Plaintiff does not define what it means for a gambling industry to operate in a "grey" zone. Indeed, the word "grey" suggests **_uncertainty_** about what is—and is not—illegal. *See* https://www.merriam-webster.com/dictionary/gray%20area ("gray area" defined as "area or situation in which it is difficult to judge what is right and what is wrong"). Plaintiff also fails to "plausibly allege that the CBR charged or adjudicated unlawful gambling on the part of Qiwi's customers." (MTD Order at 26.) This is fatal since "companies 'do not have a duty to disclose uncharged, unadjudicated wrongdoing.'" (*Id.*)

Finally, even if the SAC had pled legal violations by QIWI's customers with the necessary specificity, it still fails to identify any statement that was rendered materially false or misleading. In this respect, Plaintiff recycles the allegation that certain statements about QIWI's revenue and growth "touted" betting as one element of the Company's success while misleadingly omitting that illegal transactions were a material contributor. (*See* SAC ¶¶ 133-34, 137, 138, 149, 155, 162, 167, 177.) But again, Plaintiff ignores QIWI's actual disclosures, which warned about the risks that unlawful customer activity posed to the Company's growth and revenue.

QIWI cautioned that its services may be used "'for fraudulent, illegal[,] or improper purposes,'" which could include "'illegal online gambling.'" (MTD Order at 38.) It also "warn[ed] that the Russian betting industry was 'subject to extensive and actively developing regulation in Russia,' and that if merchants on the Qiwi platform did not comply with Russian law or ceased operation, Qiwi would lose income from those merchants." (*Id.* at 11; SAC ¶¶ 147, 175, 184.)

21

QIWI even offered examples of "actively developing regulation" and enforcement, advising that "Russia had 'blacklisted' certain betting merchants, that the blacklisting 'trend [wa]s gaining momentum[,] [that] further blacklistings [we]re likely,' and [that] such a development could 'result in the contraction of the betting sector or [Qiwi's] share in the market.'" (MTD Order at 38.) Given these disclosures, QIWI had no duty to "accuse itself of wrongdoing" or engage in self-sabotage by "disclos[ing] that its revenues were derived from 'unsustainable and illegitimate sources.'" *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Tr. v. Citigroup Inc.*, 165 F. App'x 928 (2d Cir. 2006); *see also Marcu v. Cheetah Mobile Inc.*, 2020 WL 4016645, at *5 (S.D.N.Y. July 16, 2020).

## B.     Allegations Regarding the 2020 CBR Audit

Plaintiff fails to rehabilitate its claim that QIWI needed to speculate in its SEC filings about the potential outcome of an ongoing and yet-to-be-completed CBR audit. Plaintiff once again neglects to plead even basic facts about the audit's progress. Quite the contrary, the SAC actually strikes the one—albeit conclusory—allegation from the FAC that had speculated about how the examination was "going." (*See* ECF No. 79-2, at 9 & ¶ 5 (redline version of SAC) (removing claim that 2020 CBR audit was "not going well").) What Plaintiff offers in lieu of this deletion is more conjecture. Plaintiff alleges that the CBR's audit was destined to yield violations because QIWI had not strengthened its "processes, procedures and controls" in time to comply with the NPS Law amendments becoming effective on August 3, 2020. (Motion at 12 (citing SAC ¶¶ 120, 181-84).) But as detailed at Point II(A), *supra*, Plaintiff offers no particularized support for the notion that QIWI was violating Russian laws and regulations at the time of the CBR audit.[11]

---

[11] It is equally off-base for Plaintiff to contend that Protopopov and Kim misled investors during QIWI's November 2020 earnings call by discussing the potentially negative impact of recently-enacted and pending regulations. (Motion at 12.) Plaintiff posits that these forthright disclosures about how certain legislative measures might **harm** the

Regardless, it strains credulity that investors could have been misled by QIWI's CBR-related disclosures, which advised not only that "[t]he CBR may *at any time*" audit the Company's filings and inspect its books and records," but also that that such inspections could "result in discovery of . . . violations" that could lead to material sanctions. (SAC ¶¶ 51, 145, 173, 183.) Such warnings negate any suggestion that QIWI was trying to keep investors in the dark about the CBR's inspection rights. (MTD Order at 38); *see also Telefonaktiebolaget LM Ericsson Sec. Litig.*, 2023 WL 3628244, at *13; *Sandoz v. Waterdrop Inc.*, 2023 WL 1767526, at *2, *10 (S.D.N.Y. Feb. 3, 2023), *aff'd sub nom. Mi v. Waterdrop Inc.*, 2024 WL 159191 (2d Cir. Jan. 16, 2024).

## C.        Allegations Regarding the Impacts of New and Pending Regulations

Finally, Plaintiff still "has not pleaded with particularity that defendants 'created the false impression that Qiwi had . . . positioned itself to benefit, and not suffer, from stricter regulations.'" (MTD Order at 30.) Plaintiff previously "identifie[d] three allegedly actionable statements" in this category. (*Id.*) But Plaintiff has since withdrawn one (Motion at 14 (confirming that it has "remove[d] allegations relating to the proposed Boxing Federation regulation")), and its claims with respect to the other two statements (by Messrs. Solonin and Kim) continue to be defective.

Plaintiff attempts to rehabilitate its allegation that Mr. Solonin misled investors during a May 16, 2019, earnings call by supposedly predicting that any new regulations would "be basically positive" for QIWI. (*Id.* at 15.) Plaintiff neglects to mention that Mr. Solonin's forward-looking opinion was responding to a question about a specific "draft bill"—not all new regulations generally—and thus was far narrower in scope. (SAC ¶ 153.) Moreover, the SAC alleges no facts that conflict with this statement when made. At most, Plaintiff posits in hindsight that the bill

---

Company were nonetheless deceptive because they omitted mention of the CBR audit—which, in Plaintiff's words, was already "having an immediate regulatory impact." (*Id.*) Again, there is no factual foundation for this claim.

ultimately "reduced the number of merchants with whom Qiwi could transact and receive the associated revenue." (Motion at 14.) Notably, this bill was not presented to the Russian legislature until March 2021, *two years after* Mr. Solonin's statement. (*Compare* SAC ¶ 109 *with* ¶ 153.) The SAC is silent as to how the bill identified by Mr. Solonin in May 2019 compared to the 2021 version that supposedly became law. *See In re DraftKings*, 650 F. Supp. 3d at 157 (plaintiffs failed to plead "what, if any, online gambling laws applied between 2014 and 2017").

Plaintiff also takes out of context Mr. Kim's November 2020 optimistic statement of opinion that QIWI "[had] a chance to be the single TSUPIS." (Motion at 16.) Far from misleading, Mr. Kim stressed that the regulatory climate was "uncertain" and that, as a result, it was "difficult to predict whether this draft law will be adopted eventually" or "what will be the final text and who will be the single TSUPIS." (SAC ¶ 195.)[12] Tailored warnings like this compel dismissal. *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 310 (S.D.N.Y. 2021) (dismissing where filings "specifically identified that HEXO's statements could be affected by risks relating to 'changes to government laws, regulations or policies'"); *see also Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 354-55 (2d Cir. 2022) (affirming dismissal where "[a]ll of the statements identified by the [i]nvestors were made on earnings calls or in presentations in which the relevant risk . . . was fully disclosed").

Both challenged statements, as opinions, are also subject to the demanding strictures of *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175

---

[12] (*See also* SAC ¶ 194 (proposed restrictions "could limit such operation [of trans-border payments]" and "could have an impact on our business"); *id.* ¶ 196 ("[A]t the moment, it's a very theoretical discussion. What will be the real hit on our net revenue if and when this legislation will be adopted. . . . But we have to warn you . . . that could be probably an impact on our net revenue in the future."); Ex. D at S-15 (warning that "if this proposal [to create a unified TSUPIS] is implemented, we may experience a decrease in or complete loss of payment volumes and income associated directly or indirectly with the TSUPIS established by Qiwi Bank," and that this "may negatively affect the payment volume, revenue and margins of our Payment Services business, as well as overall usage of Qiwi Wallet").)

(2015). "Such statements of belief are not actionable simply because the 'belief turned out to be wrong.'" (MTD Order at 25.) Instead, when proceeding under an omissions theory (like here), a plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).

Plaintiff still has not pled with particularity facts from which to infer that QIWI misled investors about its regulatory compliance and internal controls. Plaintiff is thus left to argue that Solonin and Kim's remarks were deceptive because the regulatory measures in question supposedly "hurt" QIWI. (*See* Motion at 14.) But this tactic—criticizing Defendants in hindsight for being (in Plaintiff's view) excessively optimistic during prior periods—is precisely what this Court recognized as having been foreclosed by *Omnicare*. (MTD Order at 25.)

Plaintiff's attempted end-run around *Omnicare* is further undercut by QIWI's disclosures, which repeatedly warned about the potential harm posed by new laws and regulations. (*See, e.g.*, MTD Order at 37-38; *supra* Facts II.) This context, which Plaintiff ignores, defeats any inference of falsity. *Mi v. Waterdrop, Inc.*, 2024 WL 159191, at *4 (2d Cir. Jan. 16, 2024) ("[W]hen there is cautionary language in the disclosure, the Court analyzes 'the allegedly fraudulent materials *in their entirety* to determine whether a reasonable investor would have been misled.'").[13]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the SAC in its entirety with prejudice.

---

[13] Because Plaintiff fails to adequately plead a primary violation of the Exchange Act, its claims of control-person liability under Section 20(a) against the Individual Defendants must also fail. (*See* MTD Order at 42.)

25

Dated: February 2, 2024
        New York, New York

/s/ Alexander C. Drylewski

Alexander C. Drylewski
William J. O'Brien
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
alexander.drylewski@skadden.com
william.obrien@skadden.com

*Counsel for Defendants QIWI plc, Andrey Protopopov, Sergey Solonin, Boris Kim, Alexander Karavaev, Varvara Kiseleva, and Vladislav Poshmorga*