# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re QIWI PLC SECURITIES LITIGATION | Master File No.: 1:20-cv-06054-RPK-CLP<br><br>CLASS ACTION |
| This Document Relates To:<br><br> ALL ACTIONS. | JURY TRIAL DEMANDED |

**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT
<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION .................................................................................. 1

II.   JURISDICTION AND VENUE ........................................................................... 9

III.  PARTIES ............................................................................................................. 9

IV.  SUBSTANTIVE ALLEGATIONS ..................................................................... 15

    A.     Relevant Background Regarding Qiwi .................................................... 15

         1.  Qiwi Operated One of Three TSUPIS Centers in Russia ........................ 19

         2.  Online Betting was a Significant Source of Revenue for Qiwi ............... 22

    B.     Russian Authorities Tightened Regulations on E-Wallets and Online Gambling as the Acting Institutions, Including Qiwi, Continued to Fail to Prevent Illicit Activity. ....... 27

         1.  The Anonymity Default for Qiwi E-Wallets Has Invited Actors Funding Illicit Activity, of Which Defendants Were Increasingly Aware as Regulators and Lawmakers Scrutinized and Restricted Anonymous Online Payments................... 28

         2.  Qiwi's Nonexistent Identification Requirements for Money Card Holders and Payment Processing Controls Conflicted with Its Responsibilities as a TSUPIS and Its Support of Regulators' Fight Against Illegal Gambling. .................................... 32

         3.  As Self-Regulation by Qiwi and Other Providers Failed, Russian Regulators Cracked Down on E-Wallets. .................................................................... 41

    C.     While Concealing the Ongoing CBR Audit and Qiwi's Insufficient Processes, Procedures, and Controls to Detect and Prevent the Funding of Illicit Activity, the Individual Defendants Attempted to Off-load Qiwi Securities. .................................... 46

V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........... 49

    Third Quarter 2018 Financial Results ................................................................. 50

    Fourth Quarter and Fiscal Year 2018 Financial Results ...................................... 52

    First Quarter 2019 Financial Results ................................................................... 57

    Second Quarter 2019 Financial Results ............................................................... 59

    Third Quarter 2019 Financial Results .................................................................. 62

    Fourth Quarter and Fiscal Year 2019 Financial Results ...................................... 63

First Quarter 2020 Financial Results ................................................................ 68

Secondary Public Offering Prospectus .............................................................. 69

Second Quarter 2020 Financial Results ............................................................ 72

Third Quarter 2020 Financial Results ............................................................... 73

VI.   THE TRUTH EMERGES ................................................................................. 77

July 20 Partial Disclosure ................................................................................. 77

December 9 Class Period Ending Disclosure .................................................... 78

VII.  LOSS CAUSATION ......................................................................................... 80

VIII. CLASS ALLEGATIONS ................................................................................. 82

IX.   PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET ................... 83

X.    INAPPLICABILITY OF SAFE HARBOR ..................................................... 84

XI.   CLAIMS FOR RELIEF ................................................................................... 85

COUNT I ............................................................................................ 85

COUNT II ........................................................................................... 88

XII.  PRAYER FOR RELIEF ................................................................................. 89

XIII. JURY TRIAL DEMANDED ............................................................................ 90

ii

Lead Plaintiff Moset International Company Limited ("Lead Plaintiff" or "Moset"), by and through its attorneys, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to its own acts and on information and belief as to all other matters. Lead Plaintiff bases this information and belief on, among other things, the investigation conducted by its counsel, which includes a review and analysis of: United States Securities and Exchange Commission ("SEC") filings by Qiwi plc ("Qiwi" or the "Company"); press releases, analyst reports, public statements, news articles and other publications disseminated by or concerning Qiwi; independent factual sources, including individuals formerly employed by Qiwi and the Central Bank of the Russian Federation ("CBR"); and other publicly available information. Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to Defendants or are exclusively within their custody or control. Lead Plaintiff's investigation indicates substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class ("Class") consisting of all persons and entities that purchased or otherwise acquired Qiwi securities between November 14, 2018 and December 9, 2020, both dates inclusive (the "Class Period"), against Qiwi, and corporate insiders Boris Kim ("Kim"), Sergey Solonin ("Solonin"), Andrey Protopopov ("Protopopov"), Alexander Karavaev ("Karavaev"), Varvara Kiseleva ("Kiseleva"), Vladislav Poshmorga ("Poshmorga"), and Pavel Korzh ("Korzh") (collectively, "Individual Defendants") (together with Qiwi, "Defendants"), pursuing remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2.     Qiwi purports to be a leading provider of next generation payment and financial

services in Russia and the Commonwealth of Independent States ("CIS"). It has an integrated proprietary network of electronic wallets ("e-wallets") and cash-collecting terminals and kiosks enabling merchants and consumers to instantly and interchangeably make, accept, and transfer cash and electronic payments ("e-payments") across online, mobile, and physical environments.

3. Throughout the Class Period, online gambling – specifically sports betting – was a significant revenue stream for Qiwi. The Company served as the operator of one of only three interactive bets accounting centers ("TSUPIS") authorized to accept electronic bets on behalf of self-regulated bookmakers, or betting merchants, operating in Russia. Notably, online betting accounted for more than one-third of Qiwi's revenues during the Class Period.

4. In that capacity, Qiwi is subject to Russian regulations aimed at restricting gambling on illegitimate websites and applications by bookmakers who are offshore or unlicensed. In addition, Qiwi owns and controls Qiwi Bank JSC ("Qiwi Bank"), which has a Banking License issued by the CBR.[1] Accordingly, Qiwi must comply with the CBR's reporting and record-keeping requirements and policies and is subject to routine and spontaneous audits by the CBR, which Defendants knew was very strong and had a long-standing policy against illegal proceeds.

5. Going into the Class Period, online gambling had been growing as was Russia's scrutiny and regulation of online gambling sites and businesses (including Qiwi) that facilitated payments to and from those sites. Specifically, the Russian government:

- required full identification for those withdrawing cash from prepaid cards;[2]
- banned money transfers to illegal gambling and bookmaking operations;[3]
- banned the withdrawal of cash from anonymous e-wallets;[4]

---

[1] On September 1, 2013, the CBR became a mega-regulator of **all** financial markets of Russia, where it was previously the main regulator of the Russian banking industry.

[2] *See* CBR's "Know Your Client" instruction; *see also* AML Law; Amendment N 325-FZ to Russia's tax code.

[3] *See* ¶98.

[4] *See* Bill No. 287876-7 (Archived), STATE DUMA OF THE FEDERAL ASSEMBLY OF THE RUSSIAN FEDERATION, https://sozd.duma.gov.ru/bill/287876-7 (last visited Jun. 24, 2021) (Google trans.).

- facilitated the identification of bettors using illegal bookmakers; and

- required anonymous e-wallet owners to use bank accounts to make deposits (instead of cash in payment terminals or at branch offices), such that payors replenishing wallets could be identified and accounts could be blocked if an illegal operation was suspected.[5]

6.      Given its substantial revenues from online gambling, Qiwi's compliance with online betting regulations and the CBR's "Know Your Client" instruction[6] was critical to investors. Any growth derived from illegitimate proceeds, including transactions involving illegal (*i.e.,* unlicensed or offshore) bookmakers, was unsustainable. And any transactions involving unidentifiable sources invited scrutiny and sanctions that would threaten Qiwi's profits from legitimate transactions. Indeed, experts in the Russian bookmaking industry "called the blocking of Qiwi and similar payment services almost the only effective way to [combat] offshore bookmakers." To continue profiting from legitimate transactions to authorized gambling sites, therefore, Qiwi had to ensure its policies, procedures, and controls complied with the record-keeping and reporting regulations and instructions that supported the CBR's policy against illegal proceeds to satisfy audits. The CBR did not need to base its actions on specific regulations; violating its policy by not reporting or checking transactions was enough. Based on pre-Class Period CBR audits of Qiwi, Defendants were aware that the CBR would fine or limit operations based on violations of policy in the absence of specific regulations. Going into the Class Period, Defendants specifically assured investors that they had reviewed and "generally rectified [the] regulatory violations and deficiencies" previously identified by the CBR to prevent payments to illegal bookmakers, and Defendant Solonin further noted that "[w]e constantly interact with law

---

[5] *See* Law No. 166-FZ and Law No. 173-FZ.

[6] The referenced "Know Your Client" instructions are rooted in the know-your-client requirements established by Federal Law of the Russian Federation No. 115-FZ "On Combating the Legalization (Laundering) of Criminally Obtained Income and Funding of Terrorism", dated August 7, 2001, as amended, or the Anti-Money Laundering ("AML") Law (hereinafter referred to in the SAC as CBR's "Know Your Client" instruction).

enforcement agencies and provide them with tools to track transactions and calculate unscrupulous counterparties in the system."

7. During the Class Period, Defendants assured investors that Qiwi had policies, procedures, and controls in place to ensure compliance with those ongoing obligations and that it profited from transactions it could show were legitimate. While regulators had found Qiwi non-compliant with certain CBR requirements before the Class Period, by March 2019, Defendants assured investors that "we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward any violations or deficiencies found by the CBR." Defendant Solonin further noted in May 2019 that, because Qiwi was already figuring out ways to prevent payments to illegal bookmakers and regularly worked with regulators, "any new regulation rules will be basically positive for us."

8. Qiwi's purported policies, procedures, and controls ensuring compliance and combatting illegal bookmakers permitted it to go all-in on the Russian betting industry. It struck "favorable deals with the gambling brands inside the country" and made "money by charging deposit and withdrawal fees from customers." As represented by Defendants, Qiwi's bet paid off, as it "was able to significantly improve its top-line performance and by the end of 2019, revenues from the betting industry accounted for more than [a] third of its total revenues." In other words, Qiwi appeared to have successfully tapped into the legitimate betting industry, while ensuring compliance with the enhanced regulatory scrutiny of that industry. Those material representations appealed to investors, prompting Qiwi's share price to rise to its Class Period high of $24.50.

9. Unbeknownst to investors, however, Qiwi was still not verifying bookmakers were legal before processing payments to them or customers' identities before transferring money from corporate accounts to pre-paid cards. Instead, since July 2018, Qiwi was working with foreign

4

merchants to transfer unidentified funds – meaning funds from unidentified sources, which included gambling and/or gaming monies – and making 0.5-0.7% profit on those transfers, fueling the Company's growth. The CBR discovered those deficiencies when it turned to auditing Qiwi transactions with international firms by July 20, 2020, after inspecting other banks involved with online casinos beginning in 2019 to ensure compliance with the July 26, 2019 amendment to Russia's National Payment System Law. Defendants concealed the ongoing CBR audit and the current and pending impact of new regulations while making a partial disclosure in the form of announcing a secondary public offering ("SPO"). Specifically, after markets closed on July 20, 2020, Defendants announced that major shareholders, including Defendants Kim and Solonin, were registering 6.8 million Class B Shares (represented by ADSs) for sale through the SPO. In other words, insiders who knew material information about Qiwi wanted to sell significant amounts of their holdings. That news indicated to investors that Qiwi faced undisclosed problems. Consequently, Qiwi's ADS price fell $1.90 per share, or 9.9%, to close at $17.29 per share on July 21, 2020, on unusually heavy trading.

10. But, on July 22, 2020, Defendants reversed course and canceled the SPO, claiming that the selling shareholders, including Defendants Kim and Solonin, had backed out "due to market conditions." Defendants, therefore, signaled that there were no undisclosed problems for investors to worry about, and that the Company had the policies, procedures, and controls to keep up with the increasingly strict regulations over online betting. The message worked. Qiwi's share price increased $1.54, or 8.8%, to close at $18.75 per share on July 22, 2020.

11. As the CBR audit progressed that fall, Defendants continued to conceal the audit and maintain the message that Qiwi's policies, procedures and controls were preventing payments to illegal bookmakers. By this time, due to the failing self-regulated system, Russia was

5

considering new regulations to create a single Unified Interactive Bets Accounting Center (ETSUP), replacing the self-regulated TSUPISs (including TSUPIS-2 operated by Qiwi) by the end of 2021. It was vital for Qiwi to earn that role to continue making money in the betting space. Qiwi could earn the role only if it could show alignment with the CBR in combatting illegal bookmakers. Assuaging investor concerns and maintaining their portrayal of the Company's policies, procedures, and controls as ensuring alignment and compliance with the CBR's policies and requirements, Defendants repeatedly touted that Qiwi had "remedied" prior violations and "will not be in breach of such requirements going forward."

12.     Thus, Defendants' consistent message to investors was that Qiwi had remedied past regulatory violations, that it had the processes, procedures, and controls to profitably operate in the legal online betting space, and that regulatory scrutiny provided growth opportunities, including the possibility of becoming the single ETSUP, because it was aligned with regulators in combatting illegal bookmakers. Defendants still did not mention the CBR audit or suggest that regulatory concerns had influenced the attempted SPO or that investor reaction had led to its cancellation.

13.     **That narrative was false**. In reality, Qiwi was violating the most basic reporting and record-keeping requirements by the CBR relating to customer identification. Defendant Korzh – who had joined the Company in August 2020 as Chief Financial Officer ("CFO") of Qiwi Bank (Qiwi's wholly-owned subsidiary) – became CFO on December 1, 2020. One week into his tenure, on December 9, 2020, Defendants stunned investors with the unexpected disclosures that:

- "From July to December 2020, the [CBR], acting in its supervisory capacity, performed a routine scheduled audit of [Qiwi Bank] for the period of July 2018 to September 2020;"

- "[I]n the course of this audit, [CBR] has identified certain violations and deficiencies relating primarily to reporting and record-keeping requirements;"

6

- The CBR fined Qiwi RUB 11 million or approximately USD 150,000;

- "[T]he CBR introduced certain restrictions with respect to Qiwi Bank's operations, including, effective from December 7, 2020, the suspension or limitation of most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts;" and

- "[A]ssuming such CBR restrictions were to be in effect and the corresponding operations were to be discounted for the entire nine-month period ending on September 30, 2020, approximately *33% to 40% of our Payment Services Segment Net Revenue for such period would have been negatively affected* (based on our actual results of operations for such period as previously reported on November 19, 2020), primarily in E-Commerce and Money Remittance market verticals."

14. On December 10, 2020, the truth emerging caused a 20.6% loss on Qiwi's ADS price, leaving investors with tens of millions of dollars in losses. Just three months later, Defendant Korzh—who, in his new role as CFO, had forced Qiwi to reveal the truth to investors—resigned.

15. Worse yet, Qiwi's regulatory violations from July 2018 to September 2020 torpedoed the Company's ability to become Russia's new gambling ETSUP. As Defendant Kim confirmed on March 30, 2021, Qiwi had "made a proposal to serve as the ETSUP, however" if Qiwi "cannot become a part of the new industry landscape, we may experience a decrease in, or complete loss of, payments volume and income related to the TSUPIS."

16. Thus, contrary to Defendants' public statements throughout the Class Period, Qiwi's reporting and record-keeping policies, procedures, and controls relating to records identifying its customers and reporting information on opening or closing personalized e-wallets to Russia's Federal Tax Service ("FTS") were so deficient that it was unable to pass even a routine scheduled CBR audit. Defendants' statements that, *inter alia*, Qiwi had "remedied" past violations, "will not be in breach of such requirements going forward," and "new regulation rules will be basically positive for us" were false. Despite statements related to the possible risk of a CBR audit, Defendants failed to inform investors when a CBR audit had begun. Specifically, from the start of the CBR audit by July 20, 2020 to the Company's disclosure of the audit on December 9, 2020,

7

Defendants conducted 2 quarterly calls with analysts and investors, and issued approximately 13 public filings and/or press releases without ever mentioning the ongoing 2020 CBR audit.

17.     In sum, throughout the Class Period, Defendants made materially false and/or misleading statements and omissions regarding Qiwi's policies, procedures, and internal controls, including that: (1) Qiwi's internal controls related to reporting and record-keeping of foreign merchant transactions and winnings transfers to pre-paid cards failed to verify customer identities and legal bookmakers; (2) Qiwi was thus not meeting the CBR's reporting and record-keeping requirements related to obtaining and verifying customer identification records before transferring winnings to pre-paid cards; (3) Qiwi's nonexistent identification requirements and payment processing controls obfuscated online betting transactions which violated the Betting Law[7] because money card holders were not identified before processing their payments to foreign merchants or winnings to pre-paid cards; (4) as a result, Qiwi would not be able to pass any CBR audit; (5) Qiwi was undergoing a CBR audit by July 20, 2020 that it was unable to pass; (6) as a result, Qiwi was fined by the CBR, had its ability to make all payments to foreign merchants and all money transfers to pre-paid cards restricted by the CBR, and was no longer be in a prime position to process electronic bets in Russia; and (7) thus, Qiwi had put all its legitimate online revenue at risk by not ensuring compliance with Russia's National Payment System Law.

18.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Qiwi's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

---

[7] Introduced on July 21, 2014 by Russian regulators, Interactive Bets (интерактивные ставки) No. 222-FZ, an amendment to Federal Law No. 244-FZ, "[o]n state regulation on the organization and management of gambling operations, and on amending individual legislative acts of the Russian Federation" dated December 2006 (the "Betting Law").

## II. JURISDICTION AND VENUE

19. The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act (15 U.S.C. § 78aa).

21. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

22. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

23. Lead Plaintiff Moset was appointed to serve as Lead Plaintiff in this Action by Order of this Court dated May 20, 2021 (ECF No. 27). As set forth in his shareholder certification (ECF No. 20-1), which is incorporated by reference herein, Moset purchased Qiwi securities at artificially inflated prices during the Class Period and suffered economic losses when true facts about the Company's business operations and future prospects were disclosed and the artificial inflation was removed from the price of Qiwi securities.

24. Defendant Qiwi, together with its subsidiaries, provides online, mobile, and physical payment services to consumers and merchants primarily in Russia, Kazakhstan, Moldova,

Belarus, Romania, the United Arab Emirates, and other overseas markets. Qiwi is incorporated in Cyprus with its principal executive offices located at 12-14 Kennedy Ave., Kennedy Business Centre, 2nd Floor, Office 203, 1087 Nicosia, Cyprus. The Company's American Depository Shares ("ADSs") are traded on the NASDAQ under the ticker symbol "QIWI."

25.      Defendant Kim served as Qiwi's Chief Executive Officer ("CEO") from January 15, 2020 through June 2, 2021[8], a director since May 2013 and as Chairman of its Board from June 2014 to January 2020. Before joining Qiwi, he co-founded the e-port payment system, serving as its CEO from November 2004 until September 2007 and as an advisor to the CEO from September 2007 until February 2010. In addition, he was the head of the payment networks and banking instruments committee at the Russian E-Market Participants National Association from 2007 until 2012 and an executive director at the Association for Development of Financial Technologies from 2017 until 2018. He graduated from Lomonosov Moscow State University in 1985 with a degree in chemistry, Russian Institute of Finance and Economics in 1996 with a degree in finance, Moscow State Law Academy in 2000 with a degree in law, and Lomonosov Moscow State University in 2004 and in 2007 with degrees in psychology and philosophy, respectively.

26.      Defendant Solonin co-founded Qiwi and served as its CEO from October 2012 through January 15, 2020, a director since December 2010, and Chairman of the Board since January 2020. He has held key executive roles within Qiwi and is currently a member of the Boards of Qiwi Bank and FLOCKTORY LTD. He is also a co-director of the FinNet working group within the framework of the National Technology Initiative since September 2016, a General Director and a member of the Supervisory Board of Association for Development of Financial Technologies

---

[8] On March 31, 2021, Qiwi announced that "as a result of a lengthy succession planning process," the Board of Directors ("Board") recommended that Defendant Protopopov replace Defendant Kim as CEO. Defendant Protopopov subsequently was appointed CEO effective June 2, 2021.

10

since January 2017, a member of the Board of AlfaStrakhovanie JSC since June 2017, a member of the Investment Committee of Venture Fund of Skolkovo — IT I since June 2017 and a member of the Expert Committee of Vnesheconombank since October 2017. Mr. Solonin graduated from the Distance-Learning Institute of Finance and Economics (now part of Financial University under the Government of the Russian Federation) in 1996 with a degree in economics.

27.     Defendant Protopopov has served as Qiwi's CEO since June 2, 2021. Prior to that, Protopopov served as its CEO of Payment Services Segment beginning August 2019, Head of IT and Product from June 2015 to August 2019, and Head of Product Management from September 2013 to June 2015. Before Qiwi, Protopopov worked at Procter & Gamble for 12 years, holding numerous positions in market strategy and planning, as well as business development. Protopopov graduated from Novosibirsk State University in 2004 with a master's degree in mathematics.

28.     Defendant Karavaev served as Qiwi's CFO from July 4, 2013 to May 17, 2019, as a director from June 2019 to December 31, 2020, and as Chief Operating Officer from August 2012 to July 2013. Before Qiwi, he had served as CFO of Mail.ru (a leading Internet Company in Russia) from November 2008 to September 2011, as CFO of Akado Group (a subsidiary of Renova Holding) between March 2008 and October 2008, and as deputy CFO at Renova from May 2007 to October 2008. He began his career in the audit department of Arthur Andersen in 1997 and after moving to Ernst & Young LLC in May 2001, worked in the audit and business consulting departments until December 2003. Karavaev graduated from the Siberian Aerospace Academy with a degree in economics, majoring in management and strategic planning. Concurrently, he attended the University of Passau in Germany, studying strategic planning.

29.     Defendant Poshmorga served as Qiwi's CFO from July 1, 2019 to October 8, 2019. Prior to Qiwi, Poshmorga served as a Chief Investment Officer at Social Discovery Ventures (an

11

international group of technology and software engineering companies); CFO at S.P.I. Group (a leading international producer of premium spirits); in various investment banking and investment management roles at Salomon Smith Barney and Morgan Stanley UK and Switzerland; and in different finance positions at London Fortaiting Company in Cyprus and Guta-Bank in Moscow. Poshmorga received a master's degree in economics from Russian Peoples' Friendship University in Moscow and an MBA in finance from Johnson School of Management at Cornell University.

30.     Defendant Kiseleva joined Qiwi in 2013. She served as its Deputy CFO of Capital Markets from April 2015 to May 19, 2019; from July 1, 2019, to October 8, 2019; and again, from December 1, 2020, until departing later that month. She also served as interim CFO from May 17, 2019 to July 1, 2019, and from October 8, 2019 to December 1, 2020. In addition, Kiseleva was Head of Investor Relations from April 2015 until December 2020. Prior to Qiwi, Kiseleva worked at Macquarie Russian Infrastructure Fund and KPMG. She holds a bachelor's and master's degree in banking from National Research University Higher School of Economics.

31.     Defendant Korzh served as Qiwi's CFO from December 1, 2020 to April 2, 2021.[9] Korzh joined in August 2020 as CFO of its wholly owned subsidiary, Qiwi Bank. Korzh has over 20 years of experience in finance. Prior to joining Qiwi, Korzh worked as CFO at Ozon (a leading e-commerce company in Russia that went public on Nasdaq in 2020) and Wikimart (an online marketplace). He also worked as the Director of Treasury and Corporate Finance and Director of Financial Reporting at CTC Media and held various positions at PricewaterhouseCoopers. Korzh graduated from the Moscow State Institute of International Relations (MGIMO University) with a degree in International Economic Relations.

---

[9] On March 3, 2021, Qiwi announced Korzh's resignation as purportedly due to "personal reasons" and revealed Elena Nikonova, Qiwi's then Deputy CFO for Financial Reporting (appointed in 2019), as interim CFO. Prior to her position as Deputy CFO, Nikonova worked as Qiwi's Deputy Head of the International Financial Reporting Standards (IFRS) Department from 2010 to 2019.

32.     The Individual Defendants, because of their positions with Qiwi, had access to non-public information about its business operations and prospects, financial condition, markets, and meetings and communications with the CBR and/or other third parties *via* access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and *via* reports and other information provided to them in connection therewith. Specifically, Defendant Solonin reviewed corporate reporting documents after everything he needed was uploaded in the corporate reporting format. Because of the Individual Defendants' professional achievements, education, and relevant industry expertise, the Individual Defendants were aware of regulatory requirements and policies and had access to industry standards and protocols for record-keeping and reporting of foreign merchant transactions and pre-paid cards.

33.     As such, the Individual Defendants had access to material adverse non-public information concerning the pre-Class Period and Class Period CBR audits of Qiwi Bank and its record-keeping and reporting of foreign merchant transactions and pre-paid cards. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

34.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Each of the Individual Defendants had access to the adverse undisclosed information about Qiwi's

13

record-keeping and reporting of foreign merchant transactions and transfers to pre-paid cards as specified herein, and knew or recklessly disregarded that these adverse facts rendered the positive representations made about Qiwi and its business, which were issued or adopted by it, materially false and/or misleading.

35. In addition, the Individual Defendants, by reason of their positions with Qiwi, were "controlling persons" within the meaning of § 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Qiwi's business.

36. As control persons of a publicly traded company whose securities was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Qiwi's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Qiwi's securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions of material facts during the Class Period violated these specific requirements and obligations.

37. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Qiwi's publicly traded securities by disseminating materially false and misleading statements and concealing material adverse facts. The scheme deceived the investing public concerning the CBR's audit of Qiwi Bank

14

and its record-keeping and reporting of foreign merchant transactions and pre-paid cards, causing Lead Plaintiff and other Class members to purchase Qiwi securities at artificially inflated prices.

38. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

39. The scienter of the Individual Defendants and other employees and agents of Qiwi is similarly imputed to the Company under *respondeat superior* and agency principles.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Relevant Background Regarding Qiwi

40. Qiwi purports to be a leading provider of next-generation payment and financial services in Russia and the CIS, with an integrated proprietary network of e-wallets and cash-collecting terminals and kiosks enabling merchants and consumers to instantly make, accept, and transfer cash and e-payments across online, mobile, and physical environments interchangeably.

41. The Company's payment services business, encompassing its virtual distribution services (Qiwi Wallet), physical distribution (kiosks and terminals), Contact money remittance system, and merchant-focused services, or E-commerce (including, betting companies), has been and continues to be a major focus of its operations. Historically, Qiwi's payment services business has generated most of its revenues.

42. Qiwi operates its payment services primarily through its virtual products, most notably Qiwi Wallet. Qiwi Wallet enables Qiwi's customers to access, make, and receive payments through their computers or mobile devices. To set up a Qiwi Wallet, customers create an online account, or virtual wallet, with Qiwi through a variety of interfaces where the customer can store money deposited from cash or funded from other sources, such as pre-paid cards, bank accounts, mobile phone balances, or money transfers. With a Qiwi Wallet, customers can make online

15

payments and purchases at any time. Further, as discussed in detail below, prior to July 2019, customers were also allowed to make cash payments and withdraws from "anonymous" e-wallets directly through one of Qiwi's physical distribution networks.[10] In addition, Qiwi Wallet accounts can be linked to virtual or physical Visa pre-paid cards that can be used to make purchases at any merchant accepting Visa worldwide.

43.     The default for the Company is an "anonymous" Qiwi Wallet, meaning customers only need to provide a phone number to open an account— as touted by Qiwi, "[m]aking a wallet is easier than tying your shoelaces."[11] Customers who choose to be identified receive advanced features and options, but most wallets remain without personification as that functionality is enough for most everyday transactions.

44.     By the end of 2019, 534.6 million e-wallets had been opened in Russia, of which only 17.1 million were personalized.[12] During that year, Russians used those e-wallets to make 2.8 billion transactions totaling 1.9 trillion rubles. Of those transactions, ***800 billion rubles*** fell on anonymous wallets. The largest share of e-wallets belongs to Yandex.Money (48.5%), followed by WebMoney (38.9%), PayPal (38.6%), and Qiwi (36.2%).

45.     Through a Qiwi Wallet, customers can virtually access Qiwi's merchants who are vendors, including online retailers and service providers, betting companies, banks, microfinance organizations, money remittance companies, mobile network operators, and utilities. Qiwi also provides hyperlink icons placed directly on its kiosk screens for its larger merchants.

46.     As of December 31, 2020, Qiwi had approximately 10,900 merchants active on its

---

[10] *Anonymous replenishment of Yandex.Money and QIWI wallets will be banned in Russia*, ROSBIZNESCONSULTING ("RBC") (Jul. 29, 2019) https://www.rbc.ru/finances/29/07/2019/5d3b00db9a7947f7ddbd3787 (last visited Jun. 14, 2021) (Google trans.).

[11] QIWI, PLC, https://qiwi.com (last visited Jul. 6, 2021) (Google trans.).

[12] *Tax Service got access to data on electronic wallets of Russians*, ROSBIZNESCONSULTING ("RBC") (Apr. 1, 2020) https://www.rbc.ru/finances/01/04/2020/5e834c079a79475db11e1698 (last visited Jun. 14, 2021) (Google trans.).

Case 1:20-cv-06054-RPK-CCP Document 82-7 Filed 12/21/23 Page 21 of 95 PageID #: 3016

system, on a monthly basis. According to the Company, it regularly adds new merchants to its list "with the aim of creating a 'one-stop' experience for [its] customers."

47.     In September 2010, Qiwi acquired Qiwi Bank (which is a licensed credit organization in the Russian Federation) to serve as a platform for Qiwi Wallet. As Qiwi explains it:

> When a consumer deposits cash into his or her Qiwi Wallet account, Qiwi Bank issues a virtual prepaid card to a consumer. Qiwi Bank also issues plastic cards to Qiwi Wallet customers. Funds received by Qiwi Bank from customers loading and reloading their Qiwi Wallet accounts are held on Qiwi Bank's account. Qiwi Bank does not pay interest on Qiwi Wallet accounts.[13]

48.     Thus, Qiwi Bank "is not a credit institution in its classical form" but "is the settlement center of the Qiwi payment system, which has only electronic wallets."[14]

49.     In addition, as of April 2017, Qiwi Bank became the operator of Qiwi's Contact money remittance system, and its operational, payment clearing and settlement center. Qiwi's Contact money transfer system provides, *without opening a bank account*, fund transfer services to individuals and legal entities in Russia, CIS, and abroad, and it allows customers to reload cards of international payment systems such as MasterCard, Visa, and UnionPay.

50.     Notably, payouts of winnings to customers from Qiwi's sports gambling merchants are included in its Money Remittances services.[15]

51.     As a licensed credit organization, Qiwi Bank is subject to regulation by the CBR. As Qiwi explains it:

> All banks and non-banking credit organizations operating in Russia are subject to extensive regulation and supervision. Requirements imposed by regulators, including capital adequacy, liquidity reserves, prudential ratios, loss provisions and

---

[13] QIWI plc, Annual Report (Form 20-F) p. 97 (Apr. 15, 2021).
[14] *Staying Alive: A Loophole for Illegal Online Bookmakers*, BETTING BUSINESS RUSSIA (Aug. 5, 2019), https://bettingbusiness.ru/articles/0014100-ostatsya-v-zhivyh-lazejka-dlya-nelegalnyh-onlajn-bukmekerov (last visited Jun. 14, 2021) (Google trans.).
[15] QIWI plc, Annual Report (Form 20-F) p. 15 (Mar. 28, 2019).

other regulatory requirements are designed to ensure the integrity of the financial markets and to protect consumers and other third parties with whom a bank deals. These regulations may limit our activities, and may increase our costs of doing business, or require us to seek additional capital in order to comply with applicable capital adequacy or liquidity requirements. Existing laws and regulations could be amended, the manner in which laws and regulations are enforced or interpreted could change and new laws or regulations could be adopted. Russian banks also have extensive reporting obligations, including, without limitation, disclosure of financial statements, various operational indicators, and affiliates and persons who exercise (direct or indirect) influence over the decisions taken by the management bodies of the bank. **The CBR may at any time conduct full or selective audits of any bank's filings and may inspect all of its books and records.**[16]

52.     The CBR, the main regulator of the Russian banking industry until September 1, 2013 when it became a mega-regulator of all financial markets of Russia, had a long-standing policy against illegal proceeds. The CBR's goals are "to protect the ruble and ensure its stability; to develop and strengthen the banking system of the Russian Federation, to ensure stability of and develop the national payment system, and to develop the financial market of the Russian Federation to ensure its stability."[17] The CBR's powers are, in effect, the functions of state power, and thus are very strong because they imply state enforcement. The CBR has the power to act where policy has been violated, even in the absence of a specific regulation. The CBR is accountable to the State Duma of the Federal Assembly of the Russian Federation (the "State Duma").

53.     The CBR has "Know Your Client" instructions, which are rooted in the know-your-client requirements established by Federal Law of the Russian Federation No. 115-FZ "On Combating the Legalization (Laundering) of Criminally Obtained Income and Funding of Terrorism", dated August 7, 2001, as amended, or the Anti-Money Laundering ("AML") Law. Based on the AML Law, Qiwi distinguishes three types of customers based on their level of

---

[16] QIWI plc, Annual Report (Form 20-F) p. 12 (Mar. 28, 2018).

[17] Legal Status and Functions, BANK OF RUSSIA, https://www.cbr.ru/eng/about_BR/bankstatus/ (last visited Jun. 14, 2021).

identification: being anonymous, identified through a simplified procedure, and fully identified. Customers face varying monetary and non-monetary restrictions in terms of the transactions they may perform, and electronic money account balances they may hold, with fully identified customers enjoying the most privileges. The key difference between the simplified and full identification procedures is that the simplified identification can be performed remotely. Remote identification requires verification of certain data provided by customers against public databases.

### 1. *Qiwi Operated One of Three TSUPIS Centers in Russia*

54.     Capitalizing on its position as a licensed credit organization, Qiwi established a unique position in the fast-growing market of online betting as the co-operator of one of only three interactive bets accounting centers (TSUPIS).

55.     On July 21, 2014, Russian regulators introduced the interactive bet (интерактивные ставки) No. 222-FZ,[18] an amendment to Federal Law No. 244-FZ, "[o]n state regulation on the organization and management of gambling operations, and on amending individual legislative acts of the Russian Federation" (the "Betting Law"), dated December 2006, changing the industry and establishing a legal basis for online bookmaking.[19] Pursuant to the amended Betting Law, any bookmaker, licensed by the FTS, could undertake interactive bets, and no specific online license was needed. However, the licensed bookmaker must disclose the domain name through which it would operate online (they are limited to one) and must be a member of a self-regulatory organization ("SRO"). In addition, the servers handling the transactions must be physically located within Russia. Moreover, interactive bets are limited to only sports betting and

---

[18] Virve Marionneau, *Gambling in Russia: Policies, Markets, and Research*, INT'L JOURNAL OF RUSSIAN STUDIES, Issue No. 9 (2020/2), http://www.ijors.net/issue9_2_2020/pdf/__www.ijors.net_issue9_2_2020_article_2_marionneau.pdf.

[19] Stephen Carter, *Online betting in Russia: an overview*, iGB (Feb. 18, 2020), https://igamingbusiness.com/online-betting-in-russia-an-overview/ (last visited Jun. 14, 2021).

19

totalizator verticals. Online casinos in any form are explicitly banned.

56.     With the legalization of online bookmaking, Russia saw a spike in licensed gambling operations. Specifically, between 2013 and 2015, the number of gambling operators paying taxes had grown from 39 to 728, an increase of 1,867%.[20] The most significant growth came from a rise in the number of bookmaker betting shops, which increased by a factor of 116.

57.     In 2016, the tax on gambling businesses amounted to 809.4 million RUB, up from 623 million RUB in 2015, mainly due to increases in the numbers of taxable objects. The largest share of this revenue (404.9 million RUB) came from the casino sector, followed by bookmakers (379.9 million RUB) and totalizator betting (24.5 million RUB).

58.     Then in November 2017, Russian President Vladimir Putin ("Putin") signed into law an amendment to Part Two of the Tax Code of the Russian Federation doubling gambling tax rates and clarifying the peculiarities of calculating the income tax in the form of winnings and the procedure for taxation of gambling objects.[21] Under the new law, bettors paid a 13% tax from their net winnings (winnings minus bet amount) to the FTS, which is automatically withheld by the bookmaker when funds are withdrawn.

59.     While the SROs control the bookmaking industry and act as the primary level of regulatory oversight under Russian law, the transactions themselves must be accepted through a centralized financial processing system called TSUPIS (Центр Учёта Переводов Интерактивных Ставок, or Centre for Accounting of Interactive Bet Transactions). A TSUPIS must be set up by a credit organization, like Qiwi, and an SRO.

---

[20] Virve Marionneau, *Gambling in Russia: Policies, Markets, and Research*, INT'L JOURNAL OF RUSSIAN STUDIES, Issue No. 9 (2020/2), p. 128,
http://www.ijors.net/issue9_2_2020/pdf/__www.ijors.net_issue9_2_2020_article_2_marionneau.pdf
[21] *The President of the Russian Federation signed the law on doubling the tax rates on gambling business*, BETTING BUSINESS RUSSIA (Nov. 28, 2017), https://bettingbusiness.ru/news/0011012-prezident-rf-podpisal-zakon-ob-udvoenii-stavok-naloga-na-igornyj-biznes (last visited Jul. 6, 2021) (Google trans.).

60.     Initially opened to ensure safety and prevent fraud, the TSUPIS acted as an intermediary between a bookmaker and a bettor, guaranteeing the security of payments.[22] In addition, the TSUPIS acts as a creditor for the SROs of Russian bookmakers. The TSUPIS does not take bets on its own, but transfers money from a bettor to the bookmaker's account and vice-versa when winnings were withdrawn. Russian government officials stated that they would only favor online bookmakers and gambling operators compliant with a TSUPIS center designed to protect Russian consumers against criminal and fraudulent activities.[23]

61.     At the start of the Class Period, three TSUPIS existed: TSUPIS-1, TSUPIS-2, and TSUPIS-3.[24] The first TSUPIS began operating in February 2016.[25] To legally participate in interactive betting, players must verify their identity twice: for the bookmaker and for the TSUPIS organization. The key requirements included: Russian citizenship, adulthood, and identity verification. To register with TSUPIS-1, the player must visit the first TSUPIS's official website; fill in the fields with a valid phone number and email address and create a password; enter a code received in an SMS message; choose a bookmaker and pass their identification requirements. To verify their identity with most bookmakers associated with TSUPIS-1, a player must physically attend a bookmaker location or local Euroset store with a passport, mobile telephone, and tax number. The first TSUPIS accepted payment through e-wallets, as well as debit and credit cards.

62.     The second TSUPIS, launched in December 2016, was a joint project by the Association of Bookmakers SRO ("Bookmakers SRO") and Qiwi Bank. TSUPIS-2 did not require

---

[22] *What is TSUPIS, and who benefits from it?*, 3SNET LIMITED, (Jan. 23, 2020), https://3snet.co/en/news/chto-takoe-cupis-i-komu-eto-vygodno/ (last visited May 27, 2021).

[23] Leonard Postrado, *Russia censorship targets sports betting portals, affiliates*, CALVINAYRE.COM (Jul. 11, 2016), https://calvinayre.com/2016/07/11/business/russia-censorship-targets-sports-betting-portals-affiliates/ (last visited Jul. 9, 2021).

[24] *What is TSUPIS, and who benefits from it?*, 3SNET LIMITED, (Jan. 23, 2020), https://3snet.co/en/news/chto-takoe-cupis-i-komu-eto-vygodno/ (last visited May 27, 2021).

[25] I Davletsin, P Raciborki, *Russian Technology, Digital battleground*, WOOD & COMPANY, pp. 41-42 (Dec. 2, 2019), www.wood.com

registration or physical attendance at the bookmaker or Euroset store. To register in the TSUPIS-2, players visited www.qiwi.com and created a wallet. Again, to create a Qiwi Wallet, customers only needed to provide a valid phone number. TSUPIS-2 routes all payments through the Qiwi platform, and support service was provided by the Qiwi support team through email and a hotline. Furthermore, bettors had to use Qiwi Wallet as the method of payment.

63. The third TSUPIS offered bettors the option to verify their identity online or to pass full identification by visiting the TSUPIS-3's office to provide notarized documents or verifying identity in one of the Euroset stores or at one of the Contact Payment System service points.[26]

64. Again, the main functions of a TSUPIS are to accept interactive bets in favor of the members of the SROs, pay winnings to players, verify the age of the bettors, and record and provide information on the bettors and accept interactive bets to the members of the SROs.

65. On July 3, 2019, Putin signed a law[27] to simplify the identification of players through the TSUPIS.[28] The law was aimed at eliminating duplicative provisions requiring double identification of a gambling participant. The law allowed bookmakers to accept interactive bets from bettors who have been identified through the TSUPIS.

### 2. Online Betting was a Significant Source of Revenue for Qiwi

66. As the operator of TSUPIS-2, going into 2017, Qiwi was in a prime position to capitalize on the fastest-growing sector of the Russian economy – bookmaking.[29] The estimated turnover of the bookmaking industry, both legal and illegal, was 677 billion RUB (10.1 billion

---

[26] *What is TSUPIS, and who benefits from it?*, 3SNET LIMITED, (Jan. 23, 2020), https://3snet.co/en/news/chto-takoe-cupis-i-komu-eto-vygodno/ (last visited May 27, 2021).

[27] Law No. 166-FZ and Law No. 173-FZ.

[28] *Putin signed a law to simplify the identification of players in the bookmaker*, BETTING BUSINESS RUSSIA (Jul. 4, 2019), https://bettingbusiness.ru/news/0014029-putin-podpisal-zakon-ob-uproshenii-identifikacii-igrokov-v-bk (last visited Jul. 6, 2021) (Google trans.).

[29] Virve Marionneau, *Gambling in Russia: Policies, Markets, and Research*, INT'L JOURNAL OF RUSSIAN STUDIES, Issue No. 9 (2020/2), http://www.ijors.net/issue9_2_2020/pdf/__www.ijors.net_issue9_2_2020_article_2_marionneau.pdf.

22

USD) in 2017 and online betting represented about 62% of that market. The Olympics and FIFA World Cup aided the significant growth of payments from bookmakers' customers in 2017-2018.

67.     Indeed, by 2019, Qiwi reported payment volumes of 1,488.6 billion RUB for its Payment Services segment[30] – specifically, 410.6 billion RUB for its E-commerce and 549.1 billion RUB for its Money remittance verticals.[31] Approximately 21.6% of the Payment Services segment payment volume came from processing payments to betting merchants. *Id*. at 17.

68.     Russia has 21 licensed online bookmakers, many of whom share a brand identity with international sites licensed in jurisdictions such as Cyprus, Malta and Curacao.[32] Many of those sites do a brisk trade with Russian bettors, in part because they can offer online casino and poker products which are not legally permitted in Russia. *Id*. One of Russia's biggest bookmakers is 1xStavka, the local version of 1xBet which is popular with bettors worldwide. *Id*. The Curacao-licensed 1xBet.com prominently features Qiwi's e-wallet in its list of payment options, right under Visa and Mastercard. *Id*.

69.     Because Qiwi was processing bookmaker transfers, it was capturing nearly half of the legal market.[33] As a result, the share of betting for its turnover more than doubled from 6.9% in 2016 to 15.5% in 2018. The Company's development director, Nikolay Volchek ("Volchek"), noted that "[t]his market growth reflects both the low base effect and the fact that the segment itself was growing - bookmakers were allowed to advertise on television. Plus, during this period,

---

[30] Payment Services payment volume – consists of the amount paid by Qiwi's customers to merchants, including betting companies, or other customers included in each market vertical (E-commerce, financial services, money remittances and telecom) less intra-group eliminations.

[31] Qiwi plc, Annual Report (Form 20-F) p. 48 (Mar. 24, 2020).

[32] Steven Stradbrooke, *Russia blocks Qiwi from handling payments for int'l firms after audit*, CALVYNAYRE (Dec. 10, 2020) https://calvinayre.com/2020/12/10/business/russia-central-bank-blocks-qiwi-payments-foreign-firms (last visited Dec. 4, 2023)

[33] *Staying Alive: A Loophole for Illegal Online Bookmakers*, BETTING BUSINESS RUSSIA (Aug. 5, 2019), https://bettingbusiness.ru/articles/0014100-ostatsya-v-zhivyh-lazejka-dlya-nelegalnyh-onlajn-bukmekerov (last visited Jul. 6, 2021) (Google trans.).

there were such sports events as the Europa League, Champions League, and the FIFA World Cup. They became the catalyst for this growth." [34]

70.     Qiwi was able to make money on several bookmaker products. First, it received a commission because its infrastructure was used for settlements between bookmakers and gamblers. According to a Forbes source, Qiwi charged about 3.5% for depositing money and 5% for receiving a prize. Volchek had explained that Qiwi "automatically create[s] a wallet for each user, as required by law. The client does not see this, and it does not matter for him how he transfers money - through other e-wallets or through a bank card." Qiwi wallets are then used for settlements at rates and in MCCIS, for which Qiwi also receives a commission. Lastly, it earned 1.8% to 2.2% directly from the acquiring commission, making payments between bookmakers and banks.

71.     Qiwi's share of income from receiving payments to bookmakers, *i.e.,* payment processing fees, has been estimated to be as high as 35-40% of its revenue for 2018, or 6.9-7.9 billion RUB. Defendant Solonin confirmed in 2018 "that Qiwi's bookmaker transactions account for about 70% of e-commerce traffic."[35]

72.     Throughout the Class Period, "[p]rocessing payments for betting merchants represent[ed] a significant portion of [Qiwi's] revenues and also generally carrie[d] higher margins than processing payments to merchants in most of the other market verticals [the Company] serve[d]. Furthermore, gains received by [the Company's] consumers from betting into their Qiwi Wallet accounts represents one of the significant reload sources for Qiwi Wallet accounts."[36]

---

[34] Yulia Titova and Lyudmila Petukhova, *Qiwi's new source of income: the company earned up to 40% of revenue from bookmakers*, FORBES (Jun. 25, 2019, 00:58), https://www.forbes.ru/finansy-i-investicii/378361-novyy-istochnik-dohoda-qiwi-kompaniya-zarabotala-do-40-vyruchki-na (last visited Jun. 14, 2021) (Google trans.).

[35] *Staying Alive: A Loophole for Illegal Online Bookmakers*, BETTING BUSINESS RUSSIA (Aug. 5, 2019), https://bettingbusiness.ru/articles/0014100-ostatsya-v-zhivyh-lazejka-dlya-nelegalnyh-onlajn-bukmekerov (last visited Jun. 14, 2021) (Google trans.).

[36] QIWI plc, Annual Report (Form 20-F) p. 9 (Mar. 28, 2019); Qiwi plc, Annual Report (Form 20-F) p. 10 (Mar. 24, 2020).

73. Qiwi's revenue from processing payments to betting merchants is part of its E-commerce market vertical, and processing customer winnings (settlements) is part of its Money Remittance market vertical, which is a segment of Payment Services. The chart below illustrates Qiwi's revenue reported for these segments during the Class Period through March 31, 2021:

| Three months Ended | Adjusted Net Revenue (in millions) (USD) | | | |
|---|---|---|---|---|
| | Total Revenue | Payment Services | E-Commerce | Money Remittances |
| Sept. 30, 2018 | 79.7 | 55.9 | 31.1 | 16.5 |
| Dec. 31, 2018 | 83.7 | 59.3 | 34.9 | 16.7 |
| Mar. 31, 2019 | 82.9 | 64.5 | 38.2 | 18.8 |
| June 30, 2019 | 88.2 | 69.9 | 40.0 | 22.1 |
| Sept. 30, 2019 | 93.0 | 72.6 | 41.3 | 22.2 |
| Dec. 31, 2019 | 101.0 | 78.2 | 44.6 | 24.1 |
| Mar. 31, 2020 | 80.5 | 59.1 | 34.9 | 17.4 |
| June 30, 2020 | 97.8 | 65.9 | 38.4 | 18.8 |
| Sept. 30, 2020 | 83.3 | 66.6 | 39.2 | 20.1 |
| Dec. 31, 2020 | 84.5 | 68.3 | 34.6 | 24.5 |
| Mar. 31, 2021 | 68.2 | 53.7 | 23.5 | 25.1 |

74. The Individual Defendants had actual knowledge of Qiwi's revenue streams, and of the significant contribution of online gambling, based on their own statements. During Qiwi's call with investors to discuss its third quarter 2018 financial results ("3Q18 Earnings Call"), Defendant Solonin touted, "***Our results this quarter were mainly driven by the growth in our key vertical, currently our betting related payment services that presented as part of our e-commerce market vertical***[.]"

75. Similarly, during the Company's call with investors to discuss its fourth quarter 2018 financial results ("4Q18 Earnings Call"), Defendant Karavaev responded to analyst Svetlana Sukhanova of Sberbank's question about "betting services, how much was it either of total payments of payment services or can you give us approximately the size, the significant part of the payment business as of now? Betting business, I mean, betting business?" by stating:

25

***It's a substantial part***. It's, I mean, it's involved the payment gateways, ***it's just around half of our business***. … ***Half of payment services business***.

76.     And during Qiwi's call with investors to discuss its first quarter 2019 financial results ("1Q19 Earnings Call"), in response to Ms. Sukhanova asking, "what kind of betting contribution was the e-commerce growth or e-commerce revenues in the first quarter," Defendant Solonin stated that "***for sports betting, it's still one of the key categories. So it has continued to the major part of the segment***." Ms. Sukhanova followed up with: "[b]ut what's a major part? Because for the full year you, I think you said that it's about 60% of your e-commerce revenue. So is the major part is it's like 80%, 90% or what kind of ratios that are going to come?" Defendant Solonin responded: "I'm really disclosing the kind of both the numbers but the composition of net revenue ***within these segments remained on a stable compared to the last quarter***."

77.     Then, Defendant Kiseleva and Ms. Sukhanova had the following exchange during an investor call regarding Qiwi's second quarter 2019 financial results ("2Q19 Earnings Call"):

*Sukhanova*: [S]o my first question in betting could be if you can kindly disclose or give us some kind of hint what percent of betting revenues as of your total payment revenues. Is it more than 30%? How significant – any hint would be much appreciated? And second question in betting would be if I look at 100% of your betting revenues, how would this be separated between e-commerce and Money Remittances segment because when asked about Money Remittances segment, the effect of betting, the answer was it's pretty insignificant for the acceleration, but how significant betting revenues for Money Remittances segment and the split between e-commerce and Money Remittance? Thank you.

*Kiseleva*: Yes, hi. So in terms of the split between categories, digital entertainment category, overall, the majority consist of the major part of the e-commerce category. We do not disclose separately the betting revenues. And ***if we are discussing the contribution of betting in e-commerce and Money Remittance, the major part by far would be booked into e-commerce category***.

*Sukhanova*: That's very clear. Thank you very much. Quick question, a quick follow-up on digital entertainment, what else do you include in digital entertainment? Is it games or it's pretty much all e-commerce or what is it, in fact?

*Kiseleva*: That's online. ***That's online games, social network, some parts of the donations and e-sports, cyber sports, etcetera, everything which you can basically call digital entertainment***.

78.     Likewise, during a call with investors regarding Qiwi's fourth quarter 2019 financial results ("4Q19 Earnings Call"), in response to questions from Andrey Pavlov-Rusinov with Goldman Sachs about "what actually was your betting share in payments and revenues in the fourth quarter and also in the Money Remittances, as far as I remember there is also or kind of a share of volumes that are related to betting payout, so also what is there, what is the share there," Defendant Kiseleva stated:

> So as we've discussed, we don't disclose the exact share of betting revenues in our e-commerce market vertical. But I can say that ***for 2019, we have disclosed the share of betting in volumes. It's roughly around 22%, information is disclosed in our 20-F report – 22% of the entire group volume.***
>
> So you can basically extrapolate to the share in revenues. So ***that's for the betting as part of the quarters. And in terms share of Money Remittance, which is connected with the payout for betting merchants that would be around like mid-teens percentages.***

**B.     Russian Authorities Tightened Regulations on E-Wallets and Online Gambling as the Acting Institutions, Including Qiwi, Continued to Fail to Prevent Illicit Activity.**

79.     To combat illicit activity, Russian authorities have long had a strong interest in regulating online financial transactions. And going into the Class Period, Defendants knew or should have known Qiwi's payment system was being used to commit fraud, illegal trading, and other unlawful activities. And since it provided anonymous e-wallets and operated TSUPIS-2, it needed to stay on top of new regulations targeting anonymous transactions. Qiwi represented to investors that it was doing so, and that it had processes, procedures, and controls in place to detect and prevent illegal activities, so any new regulations limiting anonymous transactions would not impact its business. Unbeknownst to investors, that was not the case.

27

**1. *The Anonymity Default for Qiwi E-Wallets Has Invited Actors Funding Illicit Activity, of Which Defendants Were Increasingly Aware as Regulators and Lawmakers Scrutinized and Restricted Anonymous Online Payments.***

80.     Qiwi is one of many players in the world of internet banks, banking apps, and plastic cards. It has differentiated itself as a leading payment system among payers who prefer cash and anonymity. Because Qiwi Bank is not a bank in the classical form, Qiwi does not have a legal obligation to identify its customers. Thus, for the same reason as security-conscious people, payers of illicit activity are drawn to Qiwi's services—which allow them to transfer money electronically without having to transmit sensitive bank account information or to even have a bank account. Despite ample notice and opportunity to implement robust processes, procedures, and controls to prevent payers from using its services to fund illegal activity, and despite telling investors that it had such processes, procedures, and controls during the Class Period, Qiwi did not even meet the CBR's basic reporting and record-keeping requirements relating to knowing its customers.

81.     As early as July 2013, the CBR inspected Qiwi Bank and discovered deficiencies in its compliance with banking regulations related "to, among other things, the mechanics of its settlements with OSMP [the primary operating subsidiary for Qiwi's Distribution business] as a payment agent (see "Regulation – Regulation of Payment Services – Qiwi Distribution"), *reporting requirements*, credit risk assessment, prudential ratio calculation and reserve requirements and governance. The CBR also noted that Qiwi Bank's "internal controls did not reflect the nature and scope of the bank's activities."[37] Thereafter, Qiwi paid a 150,000 RUB (or 2,593 USD) fine and assured investors the deficiencies, including those relating to reporting requirements, had been rectified.

---

[37] Qiwi plc, Prospectus, October 1, 2013.

82.    Then, following a series of anonymously-funded suicide bombings at the end of 2013, on January 15, 2014, Russian lawmakers introduced amendments to the Country's counter-terrorism laws that would limit electronic financial transactions and increase government surveillance.[38] Specifically, the proposed legislation would restrict anonymous online payments to 1,000 RUB (30 USD) per day or 15,000 RUB per month for one user, down from the then-current limit of 15,000 RUB per transaction or 40,000 RUB per month. Industry analysts estimated that the new measures could cause the volume of Russia's online payment transactions to shrink by 50%-80%. Qiwi investors reacted negatively to this news. After closing at $53.96 on January 14, Qiwi opened at $50.01 on January 15 and fell to $40 within the first half-hour of trading.

83.    The final version of the amended law passed on May 5, 2014[39], and while anonymous payments under 15,000 RUB were retained, the legislation did ban anonymous payments of any size if they were between individuals rather than companies or other organizations.[40] And on January 10, 2021, amendments to the counter-terrorism law came into force, providing even stricter control over cash flow and non-cash transactions exceeding 600,000 rubles.

84.    In September 2014, the CBR inspected Qiwi Bank and again discovered a number of violations of Russia's National Payment System Law, including certain CBR reporting obligations and failing to comply with statutory thresholds for electronic money transfers.[41] As a Goldman Sachs analyst indicated in October 2014, "Qiwi's customer identification process may

---

[38] *Qiwi Shares Plummet as Anti-Terror Bill Targets Electronic Payments*, THE MOSCOW TIMES (Jan. 16, 2014), https://www.themoscowtimes.com/2014/01/16/qiwi-shares-plummet-as-anti-terror-bill-targets-electronic-payments-a31145 (last visited Jun. 14, 2021).

[39] Federal Law No. 110-FZ on amendments to the Law on the National Payment System.

[40] Joanna Paraszczuk, *IS Militants Use Popular Russian Web Payment System To Raise Cash,* TRACKING ISLAMIC STATE, RADIOFREEEUROPE RADIOLIBERTY (May 17, 2015, 16:05 GMT) https://www.rferl.org/a/islamic-state-funding-russian-web-payments-qiwi/27021379.html (last visited Jul. 6, 2021).

[41] Qiwi plc, Annual and Transition Report of Foreign Private Issuers Pursuant to Sections 13 or 15(d) (Form 20-F) (Mar. 14, 2016), https://investor.qiwi.com/results-and-reports/sec-filings/4001181

not be fully in accord with the new regulation for person-to-person transfers."[42] And as former Qiwi employee Denis Dushnov exposed in November 2014, the Company's kiosks were used for advanced money-laundering mechanisms which used existing loopholes in AML legislature. *Id*. Those loopholes included when the Company: (1) used judgment calls to get around financing limits, including processing payments made by its customers from their Visa Qiwi Wallet accounts for amounts exceeding the thresholds imposed by the AML laws without the required client identification; (2) generally did not identify its customers except where there was an express requirement to do so under the AML laws, so anyone could have been using its networks; and (3) did not keep up with the AML laws as they evolved, including verifying data provided by remote customers against public databases, so it was significantly behind the ball in terms of being compliant. *Id*. The CBR issued an order requiring Qiwi to rectify the violations and implement the CBR's recommendations, including the adoption of an internal action plan, which contained step-by-step measures to ensure no such violations would occur in the future.

85.     In March 2015, Qiwi told investors that it had rectified the violations and did not have to pay a fine. Yet, the following month, the Company received an order from the CBR prescribing Qiwi Bank to comply with applicable e-payment threshold requirements in connection with electronic money transfers and the topping up of electronic accounts. As a result of allowing the uncontrolled use of kiosks, the CBR fined Qiwi and shut down many kiosks despite there being no specific regulation about how much cash could be taken out or deposited from a kiosk. The CBR simply declared that Qiwi did not control use of its systems.

86.     Thus, at least since 2014, Qiwi has been aware of the CBR's concern that high

---

[42] The Emperor Has No Clothes, *QIWI's Compliance Issues May Place Its Stock And Business In A World Of Hurt*, SEEKING ALPHA (Jun.15, 2015), https://seekingalpha.com/article/3259825-qiwis-compliance-issues-may-place-its-stock-and-business-in-a-world-of-hurt (last visited Dec. 4, 2023).

transaction limits combined with not requiring identification from customers could be "easily exploited to transfer proceeds from illicit activities, from drug dealing to tax evasion."[43] Indeed, The New York Times ("NY Times") reported on June 12, 2015 that Defendant "Solonin, said in a telephone interview that QIWI blocked some of the accounts identified by The Times last summer because they were engaged in fund-raising activity prohibited by company policy."

87. Likewise, in cooperating with law enforcement officials in an investigation relating to clients of Qiwi Bank, Qiwi was required "to provide certain additional information concerning its users, clients, partners and employees."[44] As noted in its Form 6-K filed on February 20, 2015, such cooperation "is one of the tasks of our company. We closely cooperate with them in matters that relate to uncovering fraud, illegal trading, and other unlawful activities." *Id*. Thus, since at least 2015, Qiwi has been aware of the importance of record-keeping and the need for robust processes, procedures, and controls over verifying customer identities as "Qiwi Group continues to receive and handle inquiries from law enforcement agencies on a regular basis."

88. Despite lawmakers' efforts to quash the use of e-payment systems, like Qiwi, for terrorist financing, in May 2015, Radio Free Europe/Radio Liberty ("RFE/RL"), reported that an Islamic State (IS) militant group was openly using Qiwi services to raise money, despite Russia banning IS and making illegal donating money to it. Specifically, the militant group provided a Qiwi account number on its official page, allowing IS sympathizers to donate either through a Qiwi kiosk or their smartphone, by transferring money from their Qiwi account to the militant group's Qiwi account. Qiwi responded to an inquiry by RFE/RL regarding this illegal use of its services by insisting that it operates in "strict compliance with applicable legislation including

---

[43] Jo Becker and Steven Lee Myers, *Russian Groups Crowdfund the War in Ukraine*, THE NEW YORK TIMES (Jun. 11, 2015) https://www.nytimes.com/2015/06/12/world/europe/russian-groups-crowdfund-the-war-in-ukraine.html?searchResultPosition=1 (last visited Jul. 6, 2021).
[44] QIWI, plc, Current Report (Form 6-K) (Feb. 20, 2015).

legislation to combat money laundering or criminal funds and terror financing" and it "is taking all necessary and applicable legal measures to protect its services from penetration by criminal proceeds and also to minimize the risk of the company being involved in the laundering of proceeds from criminal activities and terrorist financing."[45]

89.     However, without additional client identification requirements, Qiwi's efforts to combat illicit activity were futile. Underscoring how easy it was to use the Company's platform for illicit activities, as noted by the NY Times, actors with accounts blocked by Qiwi would simply update their page to include a new Qiwi account number.[46]

90.     During the Class Period, Russian media reported a criminal trial in February 2019 involving the organized criminal group "Vovse" which been using the Qiwi payment service as well as cryptocurrency in mutual settlements involving the sale of illegal drugs in violation of the CBR's policy against illicit funds.[47] Thus Defendants knew or should have realized that Qiwi's processes, procedures and controls were still not effectively identifying illicit actors at that point in time.

### 2.  *Qiwi's Nonexistent Identification Requirements for Money Card Holders and Payment Processing Controls Conflicted with Its Responsibilities as a TSUPIS and Its Support of Regulators' Fight Against Illegal Gambling.*

91.     Regulators attempted to stifle illicit actors by approving new limitations on the authorized payment amounts between anonymous individuals, but the 2014 amendments to the Betting Laws opened the possibility of transfers to gambling and lottery companies deemed in

---

[45] Joanna Paraszczuk, *IS Militants Use Popular Russian Web Payment System To Raise Cash,* TRACKING ISLAMIC STATE, RADIOFREEEUROPE RADIOLIBERTY (May 17, 2015, 16:05 GMT) https://www.rferl.org/a/islamic-state-funding-russian-web-payments-qiwi/27021379.html (last visited Jul. 6, 2021).

[46] Jo Becker and Steven Lee Myers, *Russian Groups Crowdfund the War in Ukraine*, THE NEW YORK TIMES (Jun. 11, 2015) https://www.nytimes.com/2015/06/12/world/europe/russian-groups-crowdfund-the-war-in-ukraine.html?searchResultPosition=1 (last visited Jun. 14, 2021).

[47] *In Ryazan, members of the organized criminal group "Vovse"*, YA62, (Feb. 25, 2019), https://ya62.ru/news/laworder/v_ryazani_sudyat_chlenov_ong_vovse/ (last visited Jun. 16, 2021) (Google trans.).

violation of Russian regulations. When the interactive bet was first introduced, the law was unclear and some believed it allowed for full online betting, while others construed the law to apply only to financial transactions associated with betting.[48] In practice, the interactive bet developed under the broader understanding and was confirmed with amendments to the Betting Law in July 2019, to clarify that the law constitutes an exclusive exception to the prohibition on remote gambling.

92.    However, as previously discussed, Russia regulators intended online betting to be a local game – meaning the only legal vehicle is to place interactive bets with local bookmakers through a TSUPIS center. International gambling transactions are not allowed unless the offshore merchant partners with a commercial arrangement with a local licensed bookmaker. *Id*.

93.    Indeed, from October 2015 to July 2016, the Russian Federal Service for Supervision of Communications, Information Technology and Mass Media ("Roskomnadzor") regulator shut out over 6,000 gambling and lottery websites – including sports betting portals – and affiliates the Russian government deemed violating their regulations.[49] From June 8 to 21, 2016 alone, the Russian media regulator blocked over 118 online casinos and online bookmakers' websites and 50 applications in Apple's App Store and Google Play, including unregulated Russian sportsbooks and well-known Western brands like PokerStars and William Hill.[50]

94.    As part of its clampdown on unlicensed online gambling, Roskomnadzor sent a cease-and-desist letter to Qiwi in July 2016 to remove from its website links to Internet casinos

---

[48] Stephen Carter, *Online betting in Russia: an overview*, iGB (Feb. 18, 2021), https://igamingbusiness.com/online-betting-in-russia-an-overview/ (last visited Jul. 9, 2021).

[49] Leonard Postrado, *Russia censorship targets sports betting portals, affiliates*, CALVINAYRE.COM (Jul. 11, 2016), https://calvinayre.com/2016/07/11/business/russia-censorship-targets-sports-betting-portals-affiliates/ (last visited Jun. 15, 2021).

[50] Katie Barlowe, *Russia Blacklists Skrill and QIWI in Clampdown on Payment Processors*, CASINO.ORG (Jul. 18, 2016, 06:35 AM, updated Oct. 12, 2016, 08:34 AM), https://www.casino.org/news/russia-blacklists-skrill-qiwi-clampdown-payment-processors/ (last visited Jun. 15, 2021).

and opportunities to transfer money to bookmakers.[51] As a result of the letter and being blacklisted, *i.e.* entered into Russia's unified register of Internet resources containing information banned in the Russian Federation, Qiwi deleted the offending online gambling advertisements from its pages.[52] At the time, the president of the Bookmakers SRO, Konstantin Makarov, stated that "[i]f Roskomnadzor made such a decision, then the company had violations. As far as I know from the media, Qiwi is now actively working to prepare its resources in accordance with applicable law."[53]

95. Regarding why Russian authorities honed in on blocking Qiwi, the Chairman of the Board of Directors of the First TSUPIS, Anton Rozhkovsky, noted in an interview that the Company was "among the most noticeable in terms of the share of processed payments and the coverage of the Russian audience in this segment" and that "the state will soon have other mechanisms to directly block payments … including non-residents."[54] He also believed that Russian authorities would "create a register of illegal gambling companies, with which banks will be prohibited from conducting transactions," and that Russian banks would "carefully comply with the instructions of this register, since the control over them is now very serious."

96. When TSUPIS-2 was being created, experts in the Russian bookmaking industry "called the blocking of Qiwi and similar payment services almost the only effective way to [combat] offshore bookmakers" and argued "that the threat of blocking should force [Qiwi] to

---

[51] Dmitry Churin, *Roskomnadzor sends notices to take down information from payment service sites*, CAPITAL LEGAL SERVICES (Jul. 19, 2016), https://www.cls.ru/press-centr/legal-overviews/roskomnadzor-sends-notices-to-take-down-information-from-payment-service-sites/ (last visited Jun. 15, 2021).

[52] Steven Stradbrooke, *Russia blacklists payment processors Skrill and Qiwi over online gambling links*, CALVINAYRE.COM (Jul. 15, 2016), https://calvinayre.com/2016/07/15/business/russia-blacklists-payment-processors-skrill-qiwi-online-gambling-links/ (last visited Jun. 15, 2021).

[53] *Konstantin Makarov: "The situation with Qiwi will not affect the launch of MCCIS*, BETTING BUSINESS RUSSIA (Jul. 15, 2016), https://bettingbusiness.ru/news/0006744-konstantin-makarov-ya-ne-vizhu-nikakih-osnovanij-somnevatsya-v-tom-chto-blokirovka-qiwi-povliyaet-na-sozdanie-cupis (last visited Jun. 15, 2021) (Google trans.).

[54] Alexey Ageev, *Skrill and Qiwi blocking is just the first step*, CHAMPIONAT (Jul. 15, 2016), https://www.championat.com/bets/article-3288531-anton-rozhkovskij---o-borbe-s-nelegalnymi-bukmekerami-v-rossii.html (last visited Jun. 17, 2021) (Google trans.).

34

tighten control over illegal transactions."[55] However, "unscrupulous bookmakers" continued to look for "loopholes – opportunities for transfers to illegal companies through Qiwi wallets."

97.     Despite knowing that "offshore bookmakers with marketing proposals to new customers" sometimes would even "guarantee, in the event of a replenishment of the account through Qiwi wallet, '100% refund of the first bet on any match if it does not win,'" Qiwi recklessly did not close those loopholes which allowed transfers to illegal companies, because that would mean cutting its own revenue.[56]

98.     Then on November 15, 2017, the State Duma adopted a law banning money transfers to illegal gambling operations.[57] Shortly thereafter, on November 27, 2017, Putin signed into law an amendment to the Betting Law banning money transfers to illegal bookmakers.[58] In particular, this amendment obliged credit institutions like Qiwi to refuse to carry out transactions for the transfer and receipt of funds, including electronic money, for cross-border money transfers to organize and conduct gambling in violation of the legislation of the Russian Federation.

99.     When the Betting Law, as amended in 2017, took force in January 2018, the Roskomnadzor created a blacklist, requiring banks to block payments to blacklisted cites.[59] While few entities were named on the blacklist, Russian banks appeared to be unwilling to handle any international gambling transactions. *Id*. Indeed, on October 19, 2018, in response to the

---

[55] *Staying Alive: A Loophole for Illegal Online Bookmakers*, BETTING BUSINESS RUSSIA (Aug. 5, 2019), https://bettingbusiness.ru/articles/0014100-ostatsya-v-zhivyh-lazejka-dlya-nelegalnyh-onlajn-bukmekerov (last visited Jun. 14, 2021) (Google trans.).

[56] *Id*.

[57] *State Duma adopts law banning money transfers to illegal gambling operators*, BETTING BUSINESS RUSSIA (Nov. 15, 2017) https://bettingbusiness.ru/news/0010947-gosduma-prinyala-zakon-o-zaprete-denezhnyh-perevodov-nelegalnym-operatoram-azartnyh-igr (last visited Jun. 16, 2021) (Google trans.).

[58] *The President of the Russian Federation signed a law banning money transfers to illegal bookmakers*, BETTING BUSINESS RUSSIA (Nov. 28, 2017), https://bettingbusiness.ru/news/0011015-prezident-rf-podpisal-zakon-o-zaprete-perevodov-nelegalnym-bukmekeram (last visited Jun. 16, 2021) (Google trans.).

[59] Stephen Carter, *Online betting in Russia: an overview*, iGB (Feb. 18, 2021), https://igamingbusiness.com/online-betting-in-russia-an-overview/ (last visited Jul. 9, 2021).

35

amendments to the Betting Law, Sberbank, the largest bank in Russia, became the first central bank to block all payments to offshore gambling operations.[60] Likewise, the payment system Yandex.Money also began blocking suspect transfers in mass.[61]

100. Yet Qiwi recklessly did not tighten its controls to prevent illegal bookmakers from using its system to withdraw gambling funds offshore. In fact, when banks began blocking money transfers in accordance with the new law, "some betting organizers who conduct their business with violations, offer[ed] to use the services of e-payment systems, in particular Qiwi, the main owner of which is [Defendant] Solonin, a member of the 2015 Forbes list." *Id*. In addition, illegal offshore bookmakers with similar names and indistinguishable logos to legal bookmakers offered "the same means of crediting money as in the official bookmaker office, including Qiwi wallet." Defendants knew or should have known about these loopholes circumventing the CBR's policy against illicit funds, but failed to investigate and improve Qiwi's processes, procedures, and controls to identify and verify bookmakers in its system.

101. Instead, Qiwi simply reminded investors in its Form 20-F Annual Report for fiscal year ended December 31, 2017 ("2017 20-F"), filed with the SEC on March 28, 2018, that its payment system has "been and may continue to be used for fraudulent, illegal or improper purposes" and that Qiwi Bank has "been the subject of CBR investigations in the past that have uncovered various violations and deficiencies in relation to, among other things, reporting requirements, anti-money laundering, cybersecurity, compliance with applicable e-payments thresholds requirements in connection with electronic money transfers and the topping up of

---

[60] Anuj Arora, *Russia's Largest Bank Implements Ban on Offshore Gambling Transactions*, POKERINDUSTRYPRO.COM (Nov. 2, 2018), https://pokerindustrypro.com/news/article/210158-russias-largest-bank-implements-ban-offshore-gambling (last visited July 9, 2021).

[61] *Staying Alive: A Loophole for Illegal Online Bookmakers*, BETTING BUSINESS RUSSIA (Aug. 5, 2019), https://bettingbusiness.ru/articles/0014100-ostatsya-v-zhivyh-lazejka-dlya-nelegalnyh-onlajn-bukmekerov (last visited June 16, 2021) (Google trans.).

electronic accounts and other issues[.]" [62]

102.     In addition, Qiwi warned investors of "the perceived risk of the use of e-payments to finance fraudulent, illegal or improper activities is causing the regulators to impose restrictions on the payment systems' operations" and "that in 2018 Qiwi Bank will be subject to a CBR inspection as part of the ongoing supervisory process." Qiwi further conceded that "[i]n light of the fact that we are a highly regulated business that processes large volumes of payments, we need to implement enhanced processes, procedures and controls in order to provide reasonable assurance that we are operating in compliance with applicable regulatory requirements."

103.     Then, in the Form 6-K filed with the SEC on August 16, 2018 announcing its second quarter 2018 financial results ("2Q18"), Qiwi assured investors that with regard to the CBR's supervision and regulation of Qiwi Bank:

> In recent years, the CBR has considerably increased the intensity of its supervision and regulation of the Russian banking sector. Qiwi Bank is central to the operation of all of the Group's segments, as it provides issuing, acquiring and deposit settlement functions within the Group, serves as the issuing bank for our payment-by-installment SOVEST cards and is the banking institution behind Tochka's financial services offering. Qiwi Bank, like all banks and non-banking credit organizations operating in Russia, is subject to extensive regulation and reporting obligations, which may limit the Groups activities and increase the Groups costs of doing business. Qiwi Bank has been the subject of CBR investigations in the past that have uncovered various regulatory violations and deficiencies, **which the Group has generally rectified**.

104.     Despite explicitly assuring investors that they had reviewed and rectified regulatory violations and deficiencies just before the Class Period began, Defendants recklessly did little to nothing to strengthen Qiwi's processes, procedures, and controls over record-keeping and reporting transactions involving foreign merchants or prepaid cards to prepare for the next CBR inspection. Defendants knew or should have known that Qiwi's process, procedures and controls

---

[62] QIWI plc, Annual Report (Form 20-F) at 18 (Mar. 28, 2018).

were failing to prevent illicit actors like drug dealers and illegal bookmakers from taking advantage of Qiwi's anonymous payment system to transfer illegal funds, against long-standing CBR policy.

105.    At the same time, Defendants indicated to investors that Qiwi was on the same page as regulators in combatting illicit transactions. As Defendant Solonin noted in an interview on April 4, 2018, "[w]e constantly interact with law enforcement agencies and provide them with tools to track transactions and calculate unscrupulous counterparties in the system."[63]

106.    Artem Kiryanov, Chairman of the Executive Committee of the Russian Union of Taxpayers, head of the working group on improving the level of financial literacy of the Public Chamber of the Russian Federation, suggested:

> Perhaps this is because the mechanism for detecting illegal transfers has not been properly detached. There are problems with compliance with the ban on offshore transfers. In this sense, there are no problems for banks that make payments virtually manually, tracking illegal transactions and checking the register of the Federal Tax Service. The payment system is more automated. However, in my opinion, the difficulties in organizing translation control should not justify the company, as Qiwi ensures payment security in its [TSUPIS].[64]

107.    As Russian Regulators learned about different loopholes permitting payments to illegal bookmakers, they enacted amendments to close them up, thereby also limiting legal transactions. For example, on July 22, 2020, the State Duma adopted amendments to the Betting Law, prohibiting bookmakers from accepting bets on non-sports events, obligating them to issue a bank guarantee of performance of obligations to players in the amount of more than 500 million rubles and pay targeted deductions from betting not only on Russian, but also on foreign sports, as well as prohibiting "dormant" licenses – companies receiving a license must start operating within

---

[63] Anna Eremina, *The Crypto-Clipper should be anonymous*, VEDOMOSTI, (Apr. 4, 2018, 19:43) https://www.vedomosti.ru/finance/characters/2018/04/04/755869-kriptorubl (last visited Jul. 6, 2021) (Google trans.).

[64] *Staying Alive: A Loophole for Illegal Online Bookmakers*, BETTING BUSINESS RUSSIA (Aug. 5, 2019), https://bettingbusiness.ru/articles/0014100-ostatsya-v-zhivyh-lazejka-dlya-nelegalnyh-onlajn-bukmekerov (last visited Jun. 16, 2021) (Google trans.).

six months.[65] Previously, Qiwi was not verifying that bookmakers using its platform were only accepting bets on sports events or that companies using its platform did not have dormant licenses.

108.    Further, in the summer of 2020, the Deoffshorization Law was expanded to bookmakers.[66] The bill for the amendment was registered in March 2020, which stipulated that gambling organizers "cannot be legal entities registered in states or territories that are not providing for the disclosure and provision of information during financial transactions" that are overseen by Russia's Ministry of Finance.[67] Expanding the Deoffshorization Law gave Russian authorities the power to go after local online bookmakers if they established internationally licensed offshoots that cater not only to an international audience, but also accept Russian customers who are seeking forbidden options like an online casino or poker products. *Id*. Initially adopted in January 2015, Federal Law No. 376-FZ 'Concerning the Introduction of Amendments to Parts One and Two of the Tax Code of the Russian Federation (Regarding the Taxation of the Profit of Controlled Foreign Companies and the Income of Foreign Organizations)' (the "Deoffshorization Law"), signed by Putin, declared "offshorization" illegal.[68] In practice, the Deoffshorization Law introduced significant changes to the rules governing the reporting and taxation of interests of Russian tax residents in controlled foreign companies ("CFC"). A CFC is a foreign company or structure which is not a Russian tax resident and is controlled by a Russian tax resident. Following the introduction of this new law the profit of CFCs is imputed as taxable

---

[65] Anna Afanasyeva, *Bookmakers banned unsportsmanlike behavior*, KOMMERSANT (Jul. 23, 2020), https://www.kommersant.ru/doc/4426077 (last visited Jul. 9, 2021) (Google trans.).

[66] Andriey Nabukhotnyi, *Russian Company William Hill LLC Unfreezes It's License*, E-PLAY ONLINE (Oct. 6, 2020), https://e-playonline.com/russian-company-william-hill-llc-unfreezes-its-license/ (last visited Jul. 9, 2021).

[67] Steven Stradbrooke, *Russia legislation targets local bookmakers' international sites*, CALVINAYRE (Mar. 2, 2020), https://calvinayre.com/2020/03/02/business/russia-targets-local-bookmakers-international-sites (last visited Dec. 4, 2020)

[68] Emily Yiolitis, Philip Graham and Simon Hudd, *Russian Federation: Guide To The Russian Deoffshorization Law*, MONDAQ (Dec. 15, 2014), https://www.mondaq.com/russianfederation/corporate-tax/358972/guide-to-the-russian-deoffshorization-law (last visited Jul. 9, 2021).

39

profit of a Russian tax resident at the usual Russian tax rate. Despite the bill and amendment expanding the Deoffshorization Law, Qiwi did not have processes, procedures, and controls in place to ensure that local bookmakers establishing international offshoots providing online casino and poker products were not transacting with Russian customers, and thus, during the Class Period, such customers were illegally gambling and receiving winnings in their Qiwi e-wallet via transfers from corporate money cards.

109. Then, in March 2021, a draft bill was submitted to the Russian legislature that prohibited Russian credit institutions from contracting with any gambling merchants, including offshore merchants, that were not on a list of specifically approved betting merchants maintained by the regulator (the "Whitelist").[69] In addition, the proposed law prohibited Russian credit institutions from contracting with any foreign banks, foreign payment institutions or other payment facilities processing, or facilitating in any way, payments of the "blacklisted" gambling merchants. This bill prevented illegal bookmakers from just rebranding and doing business under new names, which Qiwi previously did not have processes, procedures, and controls to detect and thus had been processing transactions from illegal and legal bookmakers alike. The bill reduced the number of gambling merchants with whom Qiwi could transact, and thereby the associated revenue.

110. Until these laws were enacted, however, Qiwi's inadequate processes, procedures, and controls to detect and identify gambling networks that were unregistered and did not hold required licenses enabled the "grey" gambling industry to hide and function anonymously, and Qiwi to profit off those transactions, as investors found out at the end of the Class Period.[70] Specifically, Western banks entered into an agreement with, and channeled money to, Qiwi via

---

[69] Qiwi plc, Annual Report (Form 20-F) at p.14 (Apr. 15, 2021).

[70] Andrey Luzgin, *QIWI has restricted withdrawals. How will this affect the Russian crypto market?*, ROSBIZNESCONSULTING ("RBC") (Jul. 26, 2023), https://www.rbc.ru/crypto/news/64c0cd379a79475e7dac75b1, (last visited Dec.1, 2023) (Google trans.)

money cards who then transferred the money to e-wallets for Western customers. However, QIWI did not have information on who the money card holders were and thus did not know, and did not check, who the customer was in violation of the CBR's "Know Your Client" instruction. That instruction included obtaining a copy of an ID, an address, and a place of employment as well as regular verifications through governmental agencies. Because Qiwi had no such records for money card holders it was transferring money for, nor records confirming gambling merchants it was processing payments for were legal, it was not complying with the CBR's instruction, the tax law amendments, or the Betting Law amendments which were rolling out throughout the Class Period.

### 3. As Self-Regulation by Qiwi and Other Providers Failed, Russian Regulators Cracked Down on E-Wallets.

111. Since the lack of self-regulation continued, Russian authorities took matters into their own hands during the Class Period, increasing restrictions on e-wallets. For example, on March 18, 2019, Russian authorities banned the withdrawal of cash from anonymous wallets.[71] The measure was "intended to counteract the cashing of proceeds from crime."[72]

112. Defendants were aware of the increasing regulatory restrictions combatting illegal proceeds and the need to improve Qiwi's processes, procedures, and controls accordingly. Indeed, since the CBR began inspecting banks involved with online casinos in 2019, and scheduled the audit with Qiwi in advance, Defendants were aware of the pending audit and should have ensured all Qiwi's processes, procedures, and controls over payments to foreign merchants and money transfers to e-wallets complied with online casino regulations and CBR policies before the CBR got to Qiwi by July 20, 2020, but did not. Qiwi's March 28, 2019 Form 20-F Annual Report for

---

[71] Bill No. 287876-7 (Archived), STATE DUMA OF THE FEDERAL ASSEMBLY OF THE RUSSIAN FEDERATION, https://sozd.duma.gov.ru/bill/287876-7 (last visited Jun. 24, 2021) (Google trans.).
[72] *Anonymous replenishment of Yandex.Money and QIWI wallets will be banned in Russia*, ROSBIZNESCONSULTING ("RBC") (Jul. 29, 2019), https://www.rbc.ru/finances/29/07/2019/5d3b00db9a7947f7ddbd3787 (last visited Jun. 14, 2021) (Google trans.).

fiscal year December 31, 2018 ("2018 20-F") even noted:

- "***Russian lawmakers and enforcement agencies have recently demonstrated increased scrutiny in matters relating to cyberspace and e-payments***, as borne out in the enhanced enforcement activities in the kiosk market, the de-anonymization of e-payments and various other initiatives aimed at increasing state control over online activities;"

- Qiwi's "business has grown and developed rapidly in recent years and we are continuing to realign our compliance function with the size of our business. In light of the fact that we are a highly regulated business that processes large volumes of payments, ***we need to implement enhanced processes, procedures and controls in order to provide reasonable assurance that we are operating in compliance with applicable regulatory requirements***;" and

- "[T]he Russian anti-money laundering laws to which we are subject contain numerous requirements with respect to identification of clients, and documentation and reporting of transactions subject to mandatory control and other suspicious transactions to the relevant authorities."[73]

Qiwi's SEC filings reiterated these observations for the rest of the Class Period. *Id.* at 14, 17.

113.    On July 16, 2019, the State Duma adopted 54-FZ "On the use of cash register equipment, a law "which prohibited bank payment agents from using a remote [cash register] in payment terminals."[74] Even though "[t]he new requirements w[ould] primarily affect QIWI payment terminals," Defendant Solonin assured investors that they would "have an insignificant effect on QIWI's business" because at most, they "may affect small paying agents in remote parts of Russia, where business margins are low."

114.    Then, on July 26, 2019, the Federation Council of the Federal Assembly of the Russian Federation[75] approved changes to the National Payment System Law (Federal Law-161) preventing owners of anonymous e-wallets, including Qiwi Wallet, from replenishing "them in

---

[73] QIWI, plc, Annual Report (Form 20-F) at 14-15 (Mar. 28, 2019).
[74] Evgeniya Chernyshova, Olga Ageeva, *Banks warned of reduction of payment terminals due to new law*, ROSBIZNESCONSULTING ("RBC") (Jul. 23, 2019, 08:00), https://www.rbc.ru/economics/23/07/2019/5d30962a9a79478eb3b69fd6?from=from_main (last visited Jun. 16, 2021) (Google trans.).
[75] FEDERATION COUNCIL OF THE FEDERAL ASSEMBLY OF THE RUSSIAN FEDERATION, http://council.gov.ru/en/structure/council/ (last visited Jun. 24, 2021).

cash through payment terminals and offices of cellular operators - for this they will need a bank account."[76]

115. As a result of the change in the law, "the source of funds would be known," and the requirement of "[r]eplenishing a wallet from a bank account would allow [operators like Qiwi Bank] to accurately identify the identity of the payer and block his account if it is suspected of performing an illegal operation." *Id*. "[T]he purpose of the law [wa]s to strengthen control over the payment services market when making cross-border money transfers."[77]

116. Yandex.Money representatives, the largest e-payment system in Russia, commented that "[t]he changes will negatively affect the income of electronic money operators, which, along with banks, invest a lot in stimulating non-cash payments." *Id*. But Qiwi representatives again assured investors that the changes would not materially impact the Company because "the vast majority of users in the QIWI ecosystem" were identified and in any case, "anonymous wallets [were] strictly limited in amount: their balance cannot exceed 15 thousand rubles, and the total amount of transactions per month – no more than 40 thousand rubles." *Id*. Investors thus understood that Qiwi had policies, procedures, and controls to identify most of the customers, including money card holders, in their system and that anonymous customers minimally impacted the Company – but neither was true during the Class Period because Qiwi did not identify and verify money card holders before processing payments to foreign merchants or transferring winnings to prepaid cards. And such transactions accounted for at least 33% of the Company's Payment Services Net Revenue.

---

[76] *Anonymous replenishment of Yandex.Money and QIWI wallets will be banned in Russia*, RosBiznesConsulting ("RBC") (Jul. 29, 2019) https://www.rbc.ru/finances/29/07/2019/5d3b00db9a7947f7ddbd3787 (last visited Dec. 1, 2023) (Google trans.).

[77] *The requirements for the activities of foreign payment systems are being clarified*, Council of the Federation (Jul. 26, 2019), http://council.gov.ru/events/news/107002/ (last visited July 7, 2021) (Google trans.).

117.     E-wallet owners began to see the impact of the new laws on September 15, 2019, when the ban on the withdrawal of cash from anonymous wallets became law and they were forbidden to withdraw cash from non-personalized e-wallets.[78] At that time, "in Russia[,] 2 billion transactions totaling more than 1.7 trillion rubles" were performed annually through e-wallets and "[m]ore than 10 million people own[ed] anonymous wallets."[79]

118.     In February 2020, for the first time in eight years, the CBR published amendments to AML regulation 374-P, which relates to signs of questionable transactions like cash withdrawals from corporate (i.e., money) cards.[80] The CBR had been developing the list of over 100 signs for a year to "eliminate outdated and add new schemes for performing unusual transactions, taking into account the modern development of the financial market and the general digitalization of technologies for providing banking services." *Id*. Defendants were thus given a robust roadmap of what the CBR considered questionable transactions, which included withdrawals from money cards, as they were assessing and improving Qiwi's processes, procedures, and controls to detect and prevent illegal gambling.

119.     Then, on April 1, 2020, amendment N 325-FZ to Russia's tax code[81] entered into force, requiring banks to provide the FTS with information on opening or closing personalized e-wallets that undergone simplified or full identification.[82] Russian fiscal authorities needed

---

[78] Bill No. 287876-7 (Archived), STATE DUMA OF THE FEDERAL ASSEMBLY OF THE RUSSIAN FEDERATION, (last visited Jun. 24, 2021) (Google trans.).

[79] *Owners of anonymous e-wallets will be prohibited from replenishing via terminals*, VEDOMOSTI (Jul. 29, 2019, 05:26), https://www.vedomosti.ru/technology/news/2019/07/29/807509-obladatelyam-koshelkov-terminali (last visited Jun. 24, 2021) (Google trans.).

[80] Yulia Koshkina, Evgeniya Chernyshova, *For the first time in eight years, the Central Bank will change the grounds for blocking accounts,* ROSBIZNESCONSULTING ("RBC") (Feb. 17, 2020), https://www.rbc.ru/finances/17/02/2020/5e46d18c9a7947711d96cd28 (last visited Dec. 4, 2023) (Google trans.)

[81] Federal Law of 29.09.2019 N 325-FZ (as amended on 26.03.2020), RUSSIAN FEDERATION FEDERAL LAW, https://www.consultant.ru/cons/cgi/online.cgi?req=doc&base=LAW&n=348661&fld=134&dst=1000000001,0&rnd=0.9590006566236924#028385121515434664 (last visited Dec. 4, 2023) (Google trans.).

[82] Evgeniya Chernyshova, *E-wallet services reported the postponement of data transfer to the Federal Tax Service*, ROSBIZNESCONSULTING ("RBC") (Apr. 1, 2020, 18:53), https://www.rbc.ru/finances/01/04/2020/5e8493bb9a7947684dc1ce0b (last visited Jun. 24, 2021).

information about funds in e-wallets to identify income that should be taxed and to combat money laundering and terrorist financing.[83] And by January 6, 2021, the FTS had begun tracking data on e-wallets operating in Russia following the CBR's determination on how data on opened and closed e-wallets would be transferred to the FTS. But Qiwi did not obtain or require the requisite identification information from money card holders before transferring their winnings to e-wallets to start providing it to the FTS on April 1, 2020 in violation of the tax code.

120.    As a result of the amendments to the National Payment System Law adopted in July 2019[84], beginning on August 3, 2020, owners of Qiwi Wallet and other e-wallets in Russia could no longer deposit cash to their accounts anonymously through payment terminals and offices of mobile operators, they had to identify themselves and link a bank account to their wallet to do so.[85] Market participants had been given 12 months to adapt their business processes to the amendments, but had sought a postponement due to the coronavirus pandemic, which the CBR did not grant because "[t]hese changes are aimed at improving control over anonymous electronic money transfers. The law was adopted in August 2019, *was widely discussed with participants in the payment market*, the time for the implementation of these changes, taking into account the entry into force, is one year, which seems to be sufficient, including in the context of the spread of coronavirus infection."[86] As for Qiwi, it continued to assure investors that it was "unlikely to see

---

[83] Evgeniya Chernyshova, *Tax Service got access to data on electronic wallets of Russians*, ROSBIZNESCONSULTING ("RBC") (Apr. 1, 2020), https://www.rbc.ru/finances/01/04/2020/5e834c079a79475db11e1698 (last visited Jun. 24, 2021) (Google trans.).

[84] Law No. 166-FZ and Law No. 173-FZ, formerly known as Bill No. 473002-7 on Amendments to Article 12 of the Federal Law on the National Payment System and Bill No. 603192-7 on Amendments to the Federal Law on the National Payment System and Certain Legislative Acts of the Russian Federation respectively, were signed into law by the President of the Russian Federation, Vladimir Putin, on 3 July 2019.

[85] Yulia Koshkina, *Russia has limited cash deposits to anonymous wallets and travel cards*, ROSBIZNESCONSULTING ("RBC") (Aug. 3, 2020), https://www.rbc.ru/finances/03/08/2020/5f2434599a7947fd59aa1d21 (last visited Jun. 24, 2021) (Google trans.).

[86] Evgeniya Chernyshova, *The Central Bank did not support the transfer of the ban on replenishing anonymous wallets with cash*, ROSBIZNESCONSULTING ("RBC") (Jun. 5, 2020, 06:00), https://www.rbc.ru/finances/05/06/2020/5ed8bca99a79477a7bed3662 (last visited Jun. 24, 2021) (Google trans.).

45

a direct and significant impact on the business in connection with the amendments." Unfortunately for investors, despite having a year to prepare for and implement processes, procedures, and controls to abide by the new regulations, Qiwi still had not adequately expanded the client identification and verification procedure to money card holders to comply with the CBR's "Know Your Client" instruction or adequately restricted the use of anonymous wallets before the CBR audit began by July 20, 2020. Qiwi would thus also be unable to report information on opened and closed e-wallets to the FTS pursuant to the tax laws.

**C.      While Concealing the Ongoing CBR Audit and Qiwi's Insufficient Processes, Procedures, and Controls to Detect and Prevent the Funding of Illicit Activity, the Individual Defendants Attempted to Off-load Qiwi Securities.**

121.    Based on Defendants' own statements, they were aware of the increased regulations relating to online gambling on Qiwi's business, the reasoning behind the increase, and the resulting need for enhanced policies, procedures, and controls. Indeed, Qiwi's SEC filings identified the risks of regulatory non-compliance and a failed audit by the CBR. Yet Defendants concealed from investors that they had not made the requisite enhancements, and thus, those risks had materialized.

122.    Instead of disclosing the truth about the Company's deficient policies, procedures, and controls to detect and prevent the funding of illicit activity and the ongoing CBR audit that Defendants therefore knew would fail,[87] Qiwi launched an SPO after markets closed on July 20, 2020 to sell the Individual Defendants' shares while the Company's share price was still inflated and before the CBR levied any fines or restrictions, registering for sale 6.8 million Class B Shares represented by ADSs. The SPO would dilute Qiwi's approximately 62 million outstanding shares, without providing it any funds.[88] Instead, Defendants Kim and Solonin, and other large shareholders, would be enriched:

---

[87] QIWI plc, Quarterly Report (Form 6-K) (Dec. 9, 2020).
[88] QIWI plc, Prospectus Supplement (Form 424B7) (Jul. 20, 2020).

| | Kim | | Solonin | |
|---|---|---|---|---|
| | Total Class A Shares | Total Class B Shares | Total Class A Shares | Total Class B Shares |
| Shares Owned Prior to Offering | 468,894 | 703,881 | 10,756,822 | 896,501 |
| Shares Owned After Offering (assuming no exercise of options to purchase additional shares) | 468,894 | 91,811 | 9,977,256 | 0 |
| Shares Owned After Offering (assuming option to purchase additional shares exercised in full) | 468,894 | 0 | 9,860,321 | 0 |
| Total Shares Being Offered | 0 | 703,811 | 0 | 896,501 |

123. The market reacted negatively to the news, causing Qiwi's ADS price to fall $1.90 per share to close at $17.29 on July 21, 2020. The next day, on July 22, 2020, Qiwi canceled the SPO – purportedly "due to market conditions."[89] The Russian news agency *Tass* reported that Qiwi shareholders had backed out of the share sale.[90] As a result, Qiwi's ADS price came back up $1.54 per share to close at $18.75 on July 22, 2020.

124. Then on August 20, 2020, Qiwi disclosed that the number of active accounts of Qiwi Wallet had decreased from 21.8 million to 20.9 million, or over 4%.[91] The Company explained, *without* disclosing the ongoing CBR audit, the decrease as "mainly the result of the introduction of new restrictions on the use of anonymous wallets and the subsequent optimization of certain transaction processes, the extension of the inactivity period from six to 12 months (the period after which the service turns off the wallet and debits a commission from it, an increase in the inactive period occurred in October 2019) and expanding the client verification procedure, [such that the] identification and verification [complies] with regulatory requirements." Defendant

---

[89] *QIWI Announces Cancellation of Proposed Secondary Offering*, QIWI (Jul. 22, 2020), https://investor.qiwi.com/node/9591/pdf.

[90] *Qiwi canceled SPO*, TASS (July 22, 2020, 03:35 AM, updated July 22, 2020, 04:21 AM), https://tass.ru/ekonomika/9022993 (last visited Jul. 9, 2021) (Google trans.).

[91] Evgeniya Chernyshova, *QIWI lost 4% of wallets due to restrictions for anonymous*, ROSBIZNESCONSULTING ("RBC") (Aug. 20, 2020), https://www.rbc.ru/finances/20/08/2020/5f3d11f59a79476179615b74 (last visited Jun. 24, 2021) (Google trans.).

47

Protopopov continued to assure investors that "[c]ontrary to popular belief, unidentified wallets have very little effect on turnover and occupy an insignificant part in the structure of our product." What Defendants concealed, however, was that Qiwi was still not obtaining or requiring verification of money card holders' identification before transferring winnings to pre-paid cards in violation of the CBR's "Know Your Client" instruction.

125.   But after markets closed on December 9, 2020, Qiwi was forced to reveal that it had been the subject of a CBR audit, covering July 2018 to September 2020, since July 2020. Qiwi further disclosed that, as a result of that audit, the CBR had fined Qiwi Bank approximately $150,000 for "violations and deficiencies relating primarily to reporting and record-keeping requirements" *and* suspended or limited its ability to conduct "most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts" because casinos likely were hidden behind the foreign merchants and gambling monies likely were hidden behind the money transfers. Qiwi explained that if those restrictions had been in effect for the prior nine months, a whopping "*33% to 40%* of [the Company's] Payment Services Segment Net Revenue for such period would have been negatively affected."

126.   As noted by BFM.ru the next day, Qiwi shares on the NASDAQ fell after the Company disclosed "an inspection by the [CBR], as a result of which Qiwi Bank was fined 11 million rubles, and the regulator also limited some operations."[92] Defendant Protopopov explained that the CBR's claims "related to reporting and drawing up documents." *Id*. These "claims were related to payments to online casinos."[93]

127.   And as a Motley Fool analyst noted the next day, "$150,000 doesn't sound so bad,

[92] *QIWI Shares Fell After News of Restrictions Imposed on Qiwi Bank*, BFM.RU (Dec. 10, 2020), https://www.bfm.ru/news/460222 (last visited Dec. 3, 2023) (Google trans.).

[93] *Individuals Were Restricted from Transferring Money and Withdrawing Cash Through Qiwi*, BFM.RU (July 26, 2023), https://www.bfm.ru/news/460222 (last visited Dec. 3, 2023) (Google trans.).

48

but the [CBR] has also suspended Qiwi's ability to conduct most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts, effective Dec. 7. It's not entire[ly] clear how serious this [suspension] will be for Qiwi -- but it sounds like it could be pretty serious."[94]

128.     As a result of Defendants' revelations of the truth, Qiwi's ADS price fell $2.80 per share, or 20.6%, on unusually high trading to close at $10.79 on December 10, 2020, causing Lead Plaintiff and the putative Class tens of millions of dollars in losses.

129.     Nikita Zuvorev, a senior analyst at the online exchanger's aggregator Bestchange.ru, suggested that "Qiwi's main problem in the eyes of the regulator is the 'obviously leaky' process of identifying users" because "[o]n the black market, there is an 'unimaginably large' segment of selling identities for fake Qiwi accounts, and some businesses almost openly use fake accounts for their laundering operations."[95] The Company's "payment system is often used not only in criminal activities (fraud, drug trafficking), but also in online casinos." Zuvorev further explained that "[t]he very introduction of the restrictions by the [CBR] was a natural step" because Qiwi's "payment system 'has ignored for years the fact that it is used by fraudsters on a disproportionately large[r] scale than any other.'"

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS[96]

130.     Throughout the Class Period, Defendants made materially false and misleading statements regarding Qiwi's policies, procedures, and controls. Specifically, Defendants made false and/or misleading statements and failed to disclose that: (1) Qiwi's internal controls related

---

[94] Rich Smith, *Why Qiwi Stock Just Crashed 20%*, THE MOTLEY FOOL (Dec. 10, 2020), https://www.fool.com/investing/2020/12/10/why-qiwi-stock-just-crashed-20/ (Last visited Dec. 4, 2023)
[95] Andrey Luzgin, QIWI has restricted withdrawals. How will this affect the Russian crypto market?, RosBiznesConsulting ("RBC") (Jul. 26, 2023), https://www.rbc.ru/crypto/news/64c0cd379a79475e7dac75b1 (Last visited Dec. 4, 2023)
[96] The particular portions of the statements alleged to be false or misleading are in bold and italicized herein.

to reporting and record-keeping of foreign merchant transactions and money transfers to pre-paid cards failed to at verify customer identities; (2) Qiwi was thus not meeting the CBR's reporting and record-keeping requirements and policies related to obtaining and verifying customer identification records before transferring winnings to pre-paid cards; (3) Qiwi's nonexistent identification requirements and payment processing controls to identify money card holders before processing payments to foreign merchants and winnings to pre-paid cards were obfuscating online betting transactions that violated the Betting Law; (4) as a result, Qiwi would not be able to pass any CBR audit; (5) Qiwi was undergoing a CBR audit beginning in June 2020 that it was unable to pass; (6) as a result, Qiwi was fined by the CBR, had its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR, was no longer in a prime position to process electronic bets in Russia; and (7) thus, Qiwi had put all its legitimate online revenue at risk by not ensuring compliance with the Russia's National Payment System Law.

Third Quarter 2018 Financial Results

131.    The Class Period begins on November 14, 2018, when Qiwi announced its third quarter 2018 financial results in Exhibit 99.1 ("3Q18 Financial Report") to a Form 6-K, signed by Defendant Karavaev, touting the growth of its Payment Services Segment as "driven by *growth in* E-commerce and Money Remittances market verticals resulting largely from the development of certain payment solutions for merchants including *betting merchants*, new contracts and projects targeting the self-employed market as well as secular growth in some of our key categories."

132.    The 3Q18 Financial Report also quoted Defendant Solonin as stating:

I would like to emphasize the robust performance of our core Payment Services segment, which demonstrated 34% segment net revenue growth and 27% segment net profit growth driven by the development of our payment ecosystem and *growth in our key verticals including primarily betting related payment services* that are presented as part of the e-commerce market vertical.

As we continued to benefit from the strong performance of the Payment Services

50

segment, which remains a core part of our business, generating significant cash flows, *we are well positioned to* pursue our strategy and carry on with investing in new business lines and projects in order to build up our ecosystem, diversify our operations, prolong the life cycle of our clients and *ultimately secure the long term growth prospects of our Company.*

133.    Later that day, the Company held its 3Q18 Earnings Call to discuss its results with analysts and investors. During the call, Defendant Solonin touted:

Our results this quarter were mainly driven by the ***growth in our key vertical, currently our betting related payment services*** that presented as part of our e-commerce market vertical[.]

\* \* \*

As we continue to benefit from the strong performance of Payment Services segment, which remains a core part of our business, generating significant cash flows, ***we are well-positioned to*** pursue our strategy and carry on with investing in new business lines and projects in order to build out our ecosystem, diversify operation, prolong the life cycle of our clients and ultimately ***secure the long-term growth prospects of our company***.

\* \* \*

The ***growth was largely driven by the circle of trends in our core categories including the boom of sports betting markets*** triggered by the football World Cup of 2018.

134.    The statements referenced in ¶¶131-33 *supra* regarding Qiwi's "growth" in "betting related payment services" and being "well-positioned to" "secure the long-term growth prospects" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's policies, procedures and controls which were known to Defendants or recklessly disregarded by them, including that: (1) Qiwi's growth included online betting transactions which violated the Betting Law, but were obfuscated by its nonexistent identification requirements and payment processing controls that failed to identify money card holders before processing payments to foreign merchants and winnings to pre-paid cards; (2) as a result, Qiwi was not "well-positioned" for "long-term growth" because it was unable to sustain its growth without the use of its payment services by unlicensed betting merchants that violated Russia's

51

Betting Law; and (3) Defendants were putting all its legitimate online revenue at risk by not ensuring compliance with Russia's National Payment System Law.

135. In addition, in response to a question from analyst Ulyana Lenvalskaya with UBS regarding whether the "surprisingly strong" e-commerce volumes were the result of "any one-offs," Defendant Solonin stated that:

> [I]t's relatively a new market for us, especially around ***skilled betting*** and self-employed but very strong user dynamic. In September and October, we feel that in Q3 there were no sort of say one off items. So generally speaking, ***the trend is going to continue***. And not only in Q4, but again, a yearly kind of RUB50 million at the top of penetration of rubles in this market is still very low. ***So we would really expect to benefit from cycle of trend, from increasing of the penetration of those markets***.

136. The statements referenced in ¶135 *supra* relating to the "skilled betting" revenues were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's policies, procedures and controls which were known to Defendants or recklessly disregarded by them, including that: (1) the "trend" included online betting transactions which violated the Betting Law but were obfuscated by the nonexistent identification requirements and payment processing controls that failed to identify money card holders before processing payments to foreign merchants and winnings to pre-paid cards; (2) as a result, the "trend" was not "going to continue" because it was unable to sustain its growth without the use of its payment services by unlicensed betting merchants that violated Russia's Betting Law; and (3) Defendants were putting all of Qiwi's legitimate online revenue at risk by not ensuring compliance with Russia's National Payment System Law.

Fourth Quarter and Fiscal Year 2018 Financial Results

137. On March 28, 2019, Qiwi announced its fourth quarter 2018 and full year ended December 31, 2018 financial results in Exhibit 99.1 ("4Q18 and FY18 Financial Report") to a Form 6-K, signed by Defendant Karavaev, touting the growth in the Payment Services Segment

as "driven by *growth in* E-commerce and Money Remittances market verticals resulting largely from the development of certain payment solutions for merchants including *betting merchants*, new contracts and projects targeting the self-employed market as well as secular growth in some of our key categories."

138.    The 4Q18 and FY18 Financial Report also quoted Defendant Solonin as stating:

I would like to highlight that the *reacceleration of our payment services business was driven largely by the development of numerous new use cases* that are well fitted to serve our users, merchants and partners *including betting merchants*, self-employed and sharing economy partners… As we continued to benefit from the strong performance of the Payment Services segment, which remains a core part of our business, generating substantial cash flows, I believe we are well positioned to pursue our strategy and carry on our investments in the new business lines and projects… This year *we have built a strong foundation for future growth, we are well positioned to continue* building up our ecosystem, diversifying our operations, increasing the life cycle of our clients with an ultimate goal of *securing the long-term growth prospects* of our Company.

139.    Also on March 28, 2019, during the Company's 4Q18 Earnings Call, Defendant Solonin stated that:

Our *impressive growth was driven by strong performance in our key areas, payment services for betting related merchants*, digital money remittances and projects we developed, self employed and B2B, B2C customers as well as by a more general expansion of our payments ecosystem.

\* \* \*

Our payment services segment volume increased by 31% to reach RUB329 billion, driven by significant growth in e-commerce and money remittance vertical, which grew 80% and 46% respectively. *The growth was largely driven by* the secular trends and *development of our core categories, including sports based market, headed by our Football World Cup 2018 reinforced by the expansion of product offering for the betting merchant*, to roll out our project we developed for our partners as part of our B2B, B2C strategy, development of self employed use cases and expansion of our B2B ecosystem.

140.    The statements referenced in ¶¶137-39 *supra* regarding Qiwi's "growth" in "payment services," "having "built a strong foundation," and being "well-positioned to" "secur[e] the long-term growth prospects" were materially false and/or misleading because they

53

misrepresented and failed to disclose adverse facts pertaining to Qiwi's policies, procedures and controls which were known to Defendants or recklessly disregarded by them, including that: (1) Qiwi's growth included online betting transactions which violated the Betting Law but were obfuscated by its nonexistent identification requirements and payment processing controls that failed to identify money card holders before processing payments to foreign merchants and winnings to pre-paid cards; (2) as a result, Qiwi was not "well-positioned" for long-term growth because it was unable to sustain its growth without the use of its payment services by unlicensed betting merchants that violated Russia's Betting Law; and (3) Defendants were putting all of Qiwi's legitimate online revenue at risk by not ensuring compliance with Russia's National Payment System Law.

141. In addition, Qiwi filed its 2018 20-F with the SEC on March 28, 2019, providing its 2018 financial statements and position. The 2018 20-F was signed by Defendant Solonin and contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Solonin and Karavaev attesting to the accuracy of financial reporting, the disclosure of any material changes to Qiwi's internal controls over financial reporting, and the disclosure of all fraud.

142. As to internal controls, the 2018 20-F stated that "***management concluded that as of December 31, 2018, our internal control over financial reporting was effective***."

143. The statements referenced in ¶¶141-42 *supra* relating to Qiwi's internal controls were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's policies, procedures and controls which were known to Defendants or recklessly disregarded by them, including that: (1) Qiwi's internal controls related to reporting and record-keeping of foreign merchant transactions and pre-paid cards were

54

ineffective at verifying customer identities; (2) Qiwi was thus not meeting the CBR's reporting and record-keeping requirements related to obtaining and verifying customer identification records before transferring winnings to pre-paid cards; (3) Qiwi's nonexistent identification requirements and payment processing controls obfuscated online betting transactions which violated the Betting Law by failing to identify money card holders before processing payments to foreign merchants and winnings to pre-paid cards; (4) as a result, Qiwi was at high risk of not being able to pass an audit by the CBR, being fined by the CBR, having its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR; and not being in a prime position to process all of the electronic bets in Russia.

144. Furthermore, while the 2018 20-F discussed several "Risk Factors," the Defendants failed to adequately warn investors that the following "Risk Factors" had already materialized at the time of the Annual Report.

145. First, with regard to "extensive government regulation," the 2018 20-F warned that:

Both Qiwi Bank and Rapida LTD have been the subject of CBR investigations in the past that have uncovered various violations and deficiencies in relation to, among other things, reporting requirements, anti-money laundering, cybersecurity, compliance with applicable electronic payments thresholds requirements and other issues which we believe we have generally rectified. In the course of 2018, Qiwi Bank underwent a major scheduled audit by the CBR as part of its ongoing supervisory process, which resulted in CBR identifying a number of violations and imposing certain sanctions on us. The measures that the CBR has so far imposed on us in response have not had a significant impact on our operations and have been mostly lifted. We believe that *we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward*. However, there can be no assurance that additional sanctions will not be imposed on us as a result of such or any other findings and that we will not come under greater CBR scrutiny in connection with any perceived deficiencies in our past conduct, or that any currently planned or future inspections will not result in discovery of any significant or minor additional violations of various banking regulations, and what sanctions the CBR would choose to employ against us if this were to happen. *Any such sanctions could have a material adverse effect on our business, financial condition and results of operations*.

\* \* \*

55

*Any breach of applicable regulations could expose us to potential liability, including fines, prohibition to carry out certain transactions for a period of up to six months (or more in the event of repeated violations)*, the introduction of temporary administration by the CBR and in certain instances the revocation of our banking license.... For these reasons, *any material breach of laws and regulations by Qiwi Bank* or the revocation of its banking licenses *could have a material adverse effect on our business, financial condition and results of operations*.

146. The statements referenced in ¶145 *supra* were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's policies, procedures and controls which were known to Defendants or recklessly disregarded by them, including that: (1) despite remedying violations discovered during the 2018 CBR audit, Qiwi was still not meeting the CBR's reporting and record-keeping requirements related to obtaining and verifying customer identification records before transferring winnings to pre-paid cards; (2) Qiwi's lax reporting and record-keeping to verify customer identities was obfuscating online betting transactions made through its payment system which violated the Betting Law; and (3) as a result, Qiwi was at high risk of not being able to pass an audit by the CBR, being fined by the CBR, having its ability to make payments to foreign merchants and transfer money to pre-paid cards from corporate accounts restricted by the CBR, and no longer being in a prime position to process all the electronic bets being placed in Russia.

147. Second, with regard to the "substantial portion of [Qiwi's] revenues [derived] from merchants in the betting industry," the 2018 20-F warned that:

We provide payment processing services to a number of merchants in the betting industry. Processing payments to such merchants constitutes approximately 7.5% of our payment services segment payment volumes for the year ended December 31, 2017 and also represents a relatively significant portion of our revenues. Moreover, processing such payments generally carries higher margins than processing payments to merchants in most other market verticals that we serve, while the repayment of winnings also functions as one of the wallet reload channels contributing to the sustainability and attractiveness of our ecosystem. The betting industry is subject to extensive and actively developing regulation in Russia, as well as increasing government scrutiny. In particular, under amendments to the Russian betting laws introduced in 2014 (see "Regulation"), in order to engage in the betting

industry, a bookmaker has to become a member of a self-regulated organization of bookmakers and abide by its rules, and any and all interactive bets may be only accepted through an Interactive Bets Accounting Center (TSUPIS) set up by a credit organization together with a self-regulated association of bookmakers. In 2016 QIWI Bank established a TSUPIS together with one of the self-regulated associations of bookmakers in order to be able to accept such payments. ***If any of our merchants engaged in the betting industry is not able or willing to comply with the Russian betting legislation*** or if they decide to cease their operations in Russia for regulatory reasons or otherwise***, we would have to discontinue servicing them and would lose the associated income. Moreover, if we are found to be in non-compliance with any of the requirements of the applicable legislation, we could not only become subject to fines and other sanctions.***

148.    The statements referenced in ¶147 *supra* were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's policies, procedures and controls which were known to Defendants or recklessly disregarded by them, including that: (1) Qiwi's lax reporting and record-keeping of customer identities in foreign merchant transactions and money transfers to pre-paid cards was obfuscating online betting transactions made through its payment system which violated the Betting Law; (2) as a result, Qiwi was at high risk of not being able to pass an audit by the CBR, being fined by the CBR, having its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR, and no longer being in a prime position to process all the electronic bets in Russia; and (3) Defendants were putting all of Qiwi's legitimate online revenue at risk by not ensuring compliance with Russia's National Payment System Law.

First Quarter 2019 Financial Results

149.    On May 16, 2019, Qiwi announced its first quarter 2019 financial results in Exhibit 99.1 ("1Q19 Financial Report") to a Form 6-K, signed by Defendant Karavaev, touting "[t]he ***increase in payment volume []as driven by growth in E-commerce and Money Remittances market verticals resulting largely from the development of certain payment solutions for merchants including betting merchants***, new contracts and projects targeting the self-employed

57

market as well as secular growth in some of our key categories."

150.    The 1Q19 Financial Report also quoted Defendant Solonin as stating:

As we continued to benefit from the strong performance and substantial cash flows generated by the Payment Services segment, which remains a core part of our business, I believe we are well positioned to pursue our strategy and carry on our investments in the new projects. *We are well positioned* to continue building up our ecosystem, diversifying our operations and increasing the life cycle of our clients with an ultimate goal of *securing the long-term growth prospects of our Company*.

151.    That same day, during Qiwi's 1Q19 Earnings Call, Defendant Solonin stated that its "*growth was driven by robust performance of our key areas; payment services for betting-related merchants*, digital money remittances, and projects we developed for self-employed and B2B B2C customers, as well as by a general expansion of our payment ecosystem. Glad to acknowledge that *the continued strong performance of payment service business provides stable foundation for future growth*.

152.    The statements referenced in ¶¶149-51 *supra* relating to Qiwi's "growth" in "payment services for betting-related merchants" and that "continued strong performance… provid[ing] stable foundation for future growth" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's policies, procedures and controls which were known to Defendants or recklessly disregarded by them, including that: (1) Qiwi's growth included online betting transactions which violated the Betting Law but were obfuscated by its nonexistent identification requirements and payment processing controls that failed to identify money card holders before processing payments to foreign merchants and winnings to pre-paid cards; (2) as a result, Qiwi did not have a "strong foundation for future growth" because it was unable to sustain its growth without the use of its payment services by unlicensed betting merchants that violated Russia's Betting Law; and (3) Defendants were putting all of Qiwi's legitimate online revenue at risk by not ensuring compliance with Russia's National

58

Payment System Law.

153.    In addition, Defendant Solonin responded to a question from analyst Maria Sukhanova with BCS Global Markets about "a draft bill approved in the first, about varying market and about putting stricter rules into play," by stating that:

> And on the regulatory part, I mean we – I mean first of all, it's not something that all the kind of rumors and the regulation that we're discussing now. We're aware of that, so we are actually working together with the regulators and are doing additional perspective that given our scale and market partition, ***any new regulation rules will be basically positive for us***, we feel the markets in the way and ***we will be in a position to kind of extend our figures***.

154.    The statement referenced in ¶153 *supra* relating to "any new regulation rules will be basically positive for us" was materially false and/or misleading because it misrepresented and failed to disclose adverse facts pertaining to Qiwi's policies, procedures and controls which were known to Defendants or recklessly disregarded by them, including that: (1) Qiwi was not even meeting the CBR's then-current reporting and record-keeping requirements related to obtaining and verifying customer identification records before transferring winnings to pre-paid cards; and (2) as a result, more regulation would make it harder for Qiwi to pass an audit by the CBR and thus make CBR-imposed fines and/or restrictions in Qiwi's ability to make payments to foreign merchants and transfer money to pre-paid cards more likely.

Second Quarter 2019 Financial Results

155.    On August 19, 2019, Qiwi announced its second quarter 2019 financial results in Exhibit 99.1 ("2Q19 Financial Report") to a Form 6-K, signed by Defendant Poshmorga, touting "[t]he increase in payment volume []as driven by ***growth in E-commerce, Financial Services and Money Remittances market verticals resulting largely from the development of certain payment solutions for merchants including betting merchants***, new contracts and new projects targeting the self-employed market as well as secular growth in some of our key categories."

156.    The 2Q19 Financial Report also quoted Defendant Solonin as stating:

As we continue to benefit from the strong performance and substantial cash flows generated by the Payment Services segment, which remains a core part of our business, we proceed with pursuing our strategy, building up our payment and financial services ecosystem and investing in the development of the new products and projects. We see many opportunities both in the payment space and in the adjacent markets and I believe *we are well positioned* to continue strengthening our ecosystem and increasing the life cycle of our clients with an ultimate goal of *securing the long-term growth prospects of our Company*.

157.    That same day, Qiwi held its second quarter 2019 financial earnings call ("2Q19 Earnings Call") to discuss its results with analysts and investors. During the Call, Analyst Chris Kennedy with William Blair inquired about where Qiwi was in achieving its mid-term guidance. Defendant Kiseleva responded by saying:

*[W]e are on a new track to achieve the guidance* that we have provided during our Investor Day. *We are well on with the Payment Services business over-performing our current expectations.* We reiterate the mid-term guidance no change to that yet, but we believe that we are on a good track with our 3 main streams. And definitely, as we have already said, *the core of the results and the core of the increase in the scale of business and net profit, both net revenue, and net profit guidance lies within the growth of the Payment Services business*.

158.    The statements referenced in ¶¶155-57 *supra* relating to Qiwi's "growth in E-commerce, Financial Services an Money Remittances" and "Payment Services" and being "on track" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's policies, procedures and controls which were known to Defendants or recklessly disregarded by them, including that: (1) Qiwi's growth included online betting transactions which violated the Betting Law but were obfuscated by its nonexistent identification requirements and payment processing controls that failed to identify money card holders before processing payments to foreign merchants and winnings to pre-paid cards; (2) as a result, Qiwi was not "on track" because it was unable to sustain its growth without the use of its payment services by unlicensed betting merchants that violated Russia's Betting Law; and (3)

60

Defendants were putting all of Qiwi's legitimate online revenue at risk by not ensuring compliance with Russia's National Payment System Law.

159.    Also during the 2Q19 Earnings Call, Defendant Protopopov had the following exchange with analyst Sveta Sukhanova with Sberbank:

*Sukhanova*: [H]ow Money Rem are affected by the betting revenues and that kind of acceleration of Money Rem, I would think about payout, about self-employed, etcetera. But yes, is that kind of Money Rem acceleration somehow connected with the betting business and with the payouts to them from the betting business to the wallet that people forward to – using the same peer-to-peer money transfer, etcetera, etcetera? So the question is it somehow connected with betting businesses now?

*Protopopov*: It is partially connected with the betting businesses as well, because part of the payout is going directly to the bank card is going to the Money Rem, while the volume that is going to the payout to the wallet is not reflected in our volumes of the category since its top-up – part of our wallet top-up. So it's partially connected, but ***the main growth of this category is driven by other factors***, as I already mentioned and the [indiscernible] is not big.

*Sukhanova***:** Very clear. Thank you very much. And ***what about e-commerce revenue slowdown***?

*Protopopov***:** Actually, ***the main reason is the high base in the last year because of the World Cup and the high betting volumes on this period last year***.

160.    Later during the 2Q19 Earnings Call, in response to a question from analyst Andrey Pavlov-Rusinov wondering with regard to the "25% year-on-year growth in net revenues there, what is growing faster, the betting, revenues or the rest of the e-commerce," Defendant Protopopov stated that "regarding the e-commerce category, ***betting has more or less the same growth rate as other parts of this business***."

161.    The statements referenced in ¶¶159-60 *supra* relating to "betting volumes" and "betting" revenues were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's policies, procedures and controls which were known to Defendants or recklessly disregarded by them, including that Qiwi's growth included online

61

betting transactions which violated the Betting Law but were obfuscated by its nonexistent identification requirements and payment processing controls that failed to identify money card holders before processing payments to foreign merchants and winnings to pre-paid cards.

Third Quarter 2019 Financial Results

162.    On November 20, 2019, Qiwi announced its third quarter 2019 financial results in Exhibit 99.1 ("3Q19 Financial Report") to a Form 6-K, signed by Defendant Kiseleva, touting: "[t]he increase in payment volume []as driven by ***growth in Ecommerce, Financial Services and Money Remittances market verticals resulting largely from the development of certain payment solutions for merchants including betting merchants***, new contracts and new projects targeting the self-employed market as well as secular growth in some of our key categories.

163.    The 3Q19 Financial Report also quoted Defendant Solonin as saying:

As we continue to benefit from the strong performance and substantial cash flows generated by the Payment Services segment, which remains a core part of our business, we proceed with pursuing our strategy of building up our payment and financial services ecosystem and investing in the development of new products and projects, the majority of which also demonstrate improving operating and financial performance. We see many opportunities both in the payment space and in the adjacent markets and I believe ***we are well positioned*** to continue strengthening our ecosystem with the ultimate goal of ***securing a long-term growth prospects***.

164.    'The statements referenced in ¶¶162-63 *supra* relating to Qiwi's "growth" in "Ecommerce, Financial Services and Money Remittances" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's policies, procedures and controls which were known to Defendants or recklessly disregarded by them. Including that: (1) Qiwi's growth included online betting transactions which violated the Betting Law but were obfuscated by its nonexistent identification requirements and payment processing controls that failed to identify money card holders before processing payments to foreign merchants and winnings to pre-paid cards; (2) as a result, Qiwi was not "well positioned" to secure

62

"long-term growth prospects" without the use of its payment services by unlicensed betting merchants that violated Russia's Betting Law; and (4) Defendants were putting all of Qiwi's legitimate online revenue at risk by not ensuring compliance with Russia's National Payment System Law.

165.    During the earnings call later that same day, Defendant Solonin responded to a question from analyst Svetlana Sukhanova with Sberbank about "the performance of betting-related revenues in Q3" which "are recorded on this kind of E-commerce line," by stating that:

> **On the betting revenues, we are not growing at the same pace of course as the previous year. So now betting revenues are more or less in line with the budget, but not growing as fast anymore as it was previous year.** That's what I can say.

166.    The statements referenced in ¶165 *supra* relating to "betting revenues" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's policies, procedures and controls which were known to Defendants or recklessly disregarded by them, including that Qiwi's growth included online betting transactions which violated the Betting Law but were obfuscated by its nonexistent reporting and record-keeping that failed to identify money card holders before processing payments to foreign merchants or money transfers to pre-paid cards.

Fourth Quarter and Fiscal Year 2019 Financial Results

167.    On March 24, 2020, Qiwi announced its fourth quarter of 2019 and full year ended December 31, 2019 financial results in Exhibit 99.1 ("4Q19 and FY19 Financial Report") to a Form 6-K, signed by Defendant Kiseleva, touting "[t]he increase in payment volume []as *driven by growth in Ecommerce, Money Remittances and Financial Services market verticals resulting largely from the development of certain payment solutions for merchants including betting merchants*, new contracts and new projects targeting the self-employed market and sharing economy partners as well as secular growth in some of our key categories."

63

168. The statement referenced in ¶167 *supra* relating to Qiwi's growth in "Ecommerce, Money Remittances an Financial Services" was materially false and/or misleading because it misrepresented and failed to disclose adverse facts pertaining to Qiwi's policies, procedures, and controls which were known to Defendants or recklessly disregarded by them, including that Qiwi's growth included online betting transactions which violated the Betting Law but were obfuscated by its nonexistent identification requirements and payment processing controls that failed to identify money card holders before processing payments to foreign merchants and winnings to pre-paid cards.

169. That same day, Qiwi filed its 20-F Annual Report for the year ended December 31, 2019 (the "2019 20-F") with the SEC, providing its 2019 financial statements and position. The 2019 20-F was signed by Defendant Kim and contained signed SOX certifications by Defendants Kim and Kiseleva attesting to the accuracy of financial reporting, the disclosure of any material changes to Qiwi's internal controls over financial reporting, and the disclosure of all fraud.

170. As to internal controls, the 2019 20-F stated that "***management concluded that as of December 31, 2019, our internal control over financial reporting was effective***."

171. The statements referenced in ¶¶169-70 *supra* relating to Qiwi's internal controls were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's policies, procedures and controls which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and failed to disclose that: (1) Qiwi's internal controls related to reporting and record-keeping of foreign merchant transactions and pre-paid cards were ineffective at verifying customer identities; (2) Qiwi was thus not meeting the CBR's basic reporting and record-keeping requirements related to obtaining and verifying customer identification records before

64

transferring winnings to pre-paid cards; (3) Qiwi's nonexistent identification requirements and payment processing controls failed to identify money card holders before processing payments to foreign merchants and money transfers to pre-paid cards, thus obfuscating online betting transactions which violated the Betting Law; (4) as a result, Qiwi was at high risk of not being able to pass an audit by the CBR, being fined by the CBR, and having its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR, and not being in a prime position to process all electronic bets in Russia.

172. Furthermore, while the 2019 20-F discussed several "Risk Factors," Defendants failed to adequately warn investors that the following "Risk Factors" had already materialized at the time of the annual report.

173. First, with regard to "Qiwi Bank and other Russian banks and credit organizations operat[ing] in a highly regulated environment and increased regulatory scrutiny," the 2019 20-F warned that:

> Both Qiwi Bank and Rapida LTD have been the subject of CBR investigations in the past that have uncovered various violations and deficiencies in relation to, among other things, reporting requirements, anti-money laundering, cybersecurity, compliance with applicable electronic payments thresholds requirements and other issues which we believe we have generally rectified. In the course of 2018, Qiwi Bank underwent a major scheduled audit by the CBR as part of its ongoing supervisory process, which resulted in CBR identifying a number of violations and imposing certain sanctions on us. The measures that the CBR has so far imposed on us in response have not had a significant impact on our operations and have been mostly lifted. We believe that *we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward*. However, there can be no assurance that additional sanctions will not be imposed on us as a result of such or any other findings and that we will not come under greater CBR scrutiny in connection with any perceived deficiencies in our past conduct, or that any currently planned or future inspections will not result in discovery of any significant or minor additional violations of various banking regulations, and what sanctions the CBR would choose to employ against us if this were to happen. *Any such sanctions could have a material adverse effect on our business, financial condition and results of operations.*

\* \* \*

*Any breach of applicable regulations could expose us to potential liability, including fines, prohibition to carry out certain transactions for a period of up to six months (or more in the event of repeated violations)*, the introduction of temporary administration by the CBR and in certain instances the revocation of our banking license. ... For these reasons, *any material breach of laws and regulations by Qiwi Bank* or the revocation of its banking licenses *could have a material adverse effect on our business, financial condition and results of operations*.

174.    The statements referenced in ¶173 *supra* were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's policies, procedures and controls which were known to Defendants or recklessly disregarded by them, including that: (1) despite remedying violations discovered during the 2018 CBR audit, Qiwi was still not meeting the CBR's basic reporting and record-keeping requirements related to obtaining and verifying customer identification records before transferring winnings to pre-paid cards; (2) Qiwi's lax reporting and record-keeping to verify customer identities was obfuscating online betting transactions made through its payment system which violated the Betting Law; and (3) as a result, Qiwi was at high risk of not being able to pass an audit by the CBR, being fined by the CBR, having its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR, and no longer being in a prime position to process all electronic bets in Russia.

175.    Second, with regard to the substantial portion of [Qiwi's] revenues [derived] from merchants in the betting industry," the 2019 20-F warned that:

> We provide payment processing and acquiring services to a number of merchants in the betting industry. Processing payments to such merchants constituted approximately 9.5%, 15.5% and 21.6% of our payment services segment payment volume for the periods ended December 31, 2017, December 31, 2018 and December 31, 2019 respectively. These volumes are included in our E-commerce market vertical. Processing payments for this category of merchants generally carries higher average margins then processing payments to merchants in most other market verticals that we serve and corresponded to a significant part of our revenues in our payment services segment in 2019. We also provide winning repayment services to such merchants including processing of winnings to banking cards that is included in our Money Remittances market vertical and repayment of

66

winnings to QIWI Wallets that is not included in our payment volume. Moreover, the repayment of winnings by such merchants to the customers' QIWI Wallets serves as an important and economically beneficial reload channel and new customer acquisition tool, contributing to the sustainability and attractiveness of our ecosystem. Our operating results will continue to depend on merchants in the betting industry and their use of our services for the foreseeable future. The betting industry is subject to extensive and actively developing regulation in Russia, as well as increasing government scrutiny. Under amendments to the Russian betting laws introduced in 2014 (see "Regulation"), in order to engage in the betting industry, a bookmaker has to become a member of a self-regulated organization of bookmakers and abide by its rules, and any and all interactive bets may be only accepted through an Interactive Bets Accounting Center (TSUPIS) set up by a credit organization together with a self-regulated association of bookmakers. In 2016 QIWI Bank established a TSUPIS together with one of the self – regulated associations of bookmakers in order to be able to accept such payments. *If any of our merchants engaged in the betting industry is not able or willing to comply with the Russian betting legislation* or if they decide to cease their operations in Russia for regulatory reasons or otherwise or shift to another payment processor (TSUPIS), *we would have to discontinue servicing them and would lose associated volumes and income. Moreover, if we are found to be in non-compliance with any of the requirements of the applicable legislation, we could not only become subject to fines and other sanctions, but could also have to discontinue to process transactions that are deemed to be in breach of the applicable rules and as a result lose associated revenue streams.*

176.    The statements referenced in ¶175 *supra* were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's policies, procedures and controls which were known to Defendants or recklessly disregarded by them, including that: (1) Qiwi's lax reporting and record-keeping to verify customer identities before making payments to foreign merchants or transferring money to pre-paid cards was obfuscating online betting transactions made through its payment system which violated the Betting Law; (2) as a result, Qiwi was at high risk of not being able to pass an audit by the CBR, being fined by the CBR, having its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR, and no longer being in a prime position to process all electronic bets in Russia; and (3) Defendants were putting all of Qiwi's legitimate online revenue at risk by not ensuring compliance with the Russia's National Payment System Law.

67

First Quarter 2020 Financial Results

177.    On May 20, 2020, Qiwi announced its first quarter 2020 financial results in Exhibit 99.1 ("1Q20 Financial Results") to a Form 6-K, signed by Defendant Kiseleva, touting "[t]he increase in payment volume []as ***driven by growth in Money Remittances, E-commerce, and Telecom*** market verticals ***resulting largely from the strong performance of our core products, development of certain payment solutions for merchants including betting merchants,*** and new projects targeting the self-employed market as well as growth in some of our key categories."

178.    In addition, the 1Q20 Financial Results quoted Defendant Kim as stating:

[W]e continue to optimize our operations and implement stricter cost controls. Even in these challenging times, we see many opportunities both in the payment space and in the adjacent markets and I believe ***we are well positioned to continue strengthening our ecosystem with the ultimate goal of securing our long-term growth prospects***.

179.    The statements referenced in ¶¶177-78 *supra* relating to Qiwi's "growth" in "Money Remittances, E-Commerce and Telecom" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's policies, procedures and controls which were known to Defendants or recklessly disregarded by them, including that: (1) Qiwi's growth included online betting transactions which violated the Betting Law but were obfuscated by its nonexistent identification requirements and payment processing controls that failed to identify money card holders before processing payments to foreign merchants and winnings to pre-paid cards; (2) as a result, Qiwi was not "well-positioned" to secure "long-term growth prospects" without the use of its payment services by unlicensed betting merchants that violated Russia's Betting Law; (3) without the customer identification information from money card holders, Qiwi was unable to report to the FTS information on opening or closing e-wallets as required by the tax code as of April 1, 2020; and (4) Defendants were putting all of Qiwi's legitimate online revenue at risk by not ensuring compliance with Russia's National

Payment System Law and tax code.

180.   During the earnings call later that day, in response to a question from Vladimir Bespalov about "how big was the decline of betting volumes" in April and May, Defendant Protopopov stated:

> Yes, we of course observe for the sudden decrease around 25% to 30%. But at the same time, I would say, *it's stabilized in the mid-April, and we are more or less stable trend since then on this volume*. We have, I would say, moderate optimism looking forward as soon as some of the sports events already started, you know, probably the Bundesliga restarted this weekend. We saw some I would say pick up, so we will continue to monitor other sport events and the volumes recovery going forward.

181.   The statement referenced in ¶180 *supra* relating to the stability of "betting volumes" was materially false and/or misleading because it misrepresented and failed to disclose adverse facts pertaining to Qiwi's policies, procedures and controls which were known to Defendants or recklessly disregarded by them, including that: (1) the betting volumes included online betting transactions which violated the Betting Law but were obfuscated by its nonexistent identification requirements and payment processing controls that failed to identify money card holders before processing payments to foreign merchants and winnings to pre-paid cards, (2) without that customer identification information, Qiwi was unable to report to the FTS information on opening or closing e-wallets as required by the tax code as of April 1, 2020; and (3) Defendants were putting all of Qiwi's legitimate online revenue gambling at risk by not ensuring compliance with Russia's National Payment System Law and tax code.

Secondary Public Offering Prospectus

182.   On July 20, 2020, Qiwi filed a Prospectus Supplement ("Prospectus"), on Form 424B7, as part of a registration statement the Company filed with the SEC, on January 16, 2020, under the "shelf" registration process. The Prospectus detailed the various "Risk Factors" and incorporated by reference, the "Risk Factors" contained in Qiwi's FY19 Form 20-F, and "*updates,*

69

*if any*," to those "Risk Factors" disclosed in a Form 6-K. While the Prospectus discussed several "Risk Factors," Defendants failed to adequately warn investors that the following "Risk Factors" had already materialized at the time of the filing of the Prospectus.

183.    First, with regard to "Qiwi Bank and other Russian banks and credit organizations operat[ing] in a highly regulated environment and increased regulatory scrutiny," the Prospectus warned that:

> The ***CBR may at any time conduct full or selective audits*** of any bank's filings and may inspect all of its books and records.
>
> Both ***Qiwi Bank*** and Rapida LTD have been ***the subject of CBR investigations in the past*** that have uncovered various violations and deficiencies in relation to, among other things, reporting requirements, anti-money laundering, cybersecurity, compliance with applicable electronic payments thresholds requirements and other issues which we believe we have generally rectified. In the course of 2018, Qiwi Bank underwent a major scheduled audit by the CBR as part of its ongoing supervisory process, which resulted in CBR identifying a number of violations and imposing certain sanctions on us. The measures that the CBR has so far imposed on us in response have not had a significant impact on our operations and have been mostly lifted. We believe that ***we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward***. However, there can be no assurance that additional sanctions will not be imposed on us as a result of such or any other findings and that we will not come under greater CBR scrutiny in connection with any perceived deficiencies in our past conduct, or that any currently planned or future inspections will not result in discovery of any significant or minor additional violations of various banking regulations, and what sanctions the CBR would choose to employ against us if this were to happen. ***Any such sanctions could have a material adverse effect on our business, financial condition and results of operations.***
>
> * * *
>
> ***Any breach of applicable regulations could expose us to potential liability, including fines, prohibition to carry out certain transactions for a period of up to six months (or more in the event of repeated violations)***, the introduction of temporary administration by the CBR and in certain instances the revocation of our banking license. ... For these reasons, ***any material breach of laws and regulations by Qiwi Bank*** or the revocation of its banking licenses ***could have a material adverse effect on our business, financial condition and results of operations***.

184.    Second, with regard to the substantial portion of [Qiwi's] revenues [derived] from merchants in the betting industry," the Prospectus warned that:

70

We provide payment processing and acquiring services to a number of merchants in the betting industry. Processing payments to such merchants constituted approximately 9.5%, 15.5% and 21.6% of our payment services segment payment volume for the periods ended December 31, 2017, December 31, 2018 and December 31, 2019 respectively. These volumes are included in our E-commerce market vertical. Processing payments for this category of merchants generally carries higher average margins then processing payments to merchants in most other market verticals that we serve and corresponded to a significant part of our revenues in our payment services segment in 2019. We also provide winning repayment services to such merchants including processing of winnings to banking cards that is included in our Money Remittances market vertical and repayment of winnings to QIWI Wallets that is not included in our payment volume. Moreover, the repayment of winnings by such merchants to the customers' QIWI Wallets serves as an important and economically beneficial reload channel and new customer acquisition tool, contributing to the sustainability and attractiveness of our ecosystem. Our operating results will continue to depend on merchants in the betting industry and their use of our services for the foreseeable future. The betting industry is subject to extensive and actively developing regulation in Russia, as well as increasing government scrutiny. Under amendments to the Russian betting laws introduced in 2014 (see "Regulation"), in order to engage in the betting industry, a bookmaker has to become a member of a self-regulated organization of bookmakers and abide by its rules, and any and all interactive bets may be only accepted through an Interactive Bets Accounting Center (TSUPIS) set up by a credit organization together with a self-regulated association of bookmakers. In 2016 QIWI Bank established a TSUPIS together with one of the self - regulated associations of bookmakers in order to be able to accept such payments. If any of our merchants engaged in the betting industry is not able or willing to comply with the Russian betting legislation or if they decide to cease their operations in Russia for regulatory reasons or otherwise or shift to another payment processor (TSUPIS), we would have to discontinue servicing them and would lose associated volumes and income. ***Moreover, if we are found to be in non-compliance with any of the requirements of the applicable legislation, we could not only become subject to fines and other sanctions, but could also have to discontinue to process transactions that are deemed to be in breach of the applicable rules and as a result lose associated revenue streams.***

185. The statements referenced in ¶¶183-84 *supra* relating to Qiwi's compliance with applicable regulations and policies were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's policies, procedures and controls which were known to Defendants or recklessly disregarded by them, including that: (1) Qiwi was *currently* the subject of a CBR audit; (2) despite remedying violations discovered during the 2018 CBR audit, Qiwi was still not meeting the CBR's basic reporting and

71

record-keeping requirements and policies related to obtaining and verifying customer identification records before transferring winnings to pre-paid cards and thus was not reporting that customer information on opening or closing e-wallets relating to the FTS; (3) Qiwi's lax reporting and record-keeping to verify customer identities was obfuscating online betting transactions made through its payment system which violated the Betting Law; (4) without the customer identification information, Qiwi was unable to report to the FTS information on opening or closing e-wallets as required by the tax code as of April 1, 2020; (5) as a result, Qiwi would not be able to pass the then-ongoing CBR audit, would have its ability to pay foreign merchants and transfer money to pre-paid cards restricted by the CBR, and would no longer be in a prime position to process all electronic bets in Russia; and (6) Defendants were putting all of Qiwi's legitimate online revenue at risk by not ensuring compliance with Russia's National Payment System Law and tax code.

<u>Second Quarter 2020 Financial Results</u>

186. On August 19, 2020, Qiwi held its second quarter 2020 financial earnings call ("2Q20 Earnings Call") to discuss its results with analysts and investors. During the call, Andrey Pavlov-Pusinov with Goldman Sachs requested "a little bit more color on how the volumes in this [e-commerce] market still showed very solid and dynamic despite the cancelation in major sports events and what basically helped you to sustain the solid performance?" In response, Defendant Protopopov stated that:

> So, for the volumes, there are two reasons. First one is the decline. While we absorbed the decline in betting volumes, though ***it was not like dramatic and drastic decline*** as we told in our previous calls. So, ***because people were still playing for other types of sports and other type of events.*** Second reason is that ***at the same time, other digital entertainment from other digital entertainment categories, such as, for example, online games, demonstrated solid growth at the same period of time***. So overall, we managed to, let's say, keep them -- the overall volume.

187. The statements referenced in ¶186 *supra* relating to the "current trends" in the "betting market" and the "performance" of the betting "volumes" were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's policies, procedures and controls which were known to Defendants or recklessly disregarded by them., including that (1) Qiwi's lax reporting and record-keeping to verify customer identities before making payments to foreign merchants or transferring money to pre-paid cards was obfuscating online betting transactions made through its payment system which violated the Betting Law; (2) without that customer identification information, Qiwi was unable to report to the FTS information on opening or closing e-wallets as required by the tax code as of April 1, 2020; and (3) Defendants were putting all of Qiwi's legitimate online revenue at risk by not ensuring compliance with Russia's National Payment System Law and tax code.

Third Quarter 2020 Financial Results

188. On November 19, 2020, Qiwi filed its third quarter 2020 financial results in Exhibit 99.1 ("3Q20 Financial Report") to a Form 6-K, quoting Defendant Kim as stating:

> Our ***Payment Services segment*** showed solid dynamics and ***delivered 11% segment net revenue growth supported by several factors including high density of sport events*** as well as growth of our strategic self-employed stream.

189. That same day, Qiwi held its third quarter 2020 financial earnings call ("3Q20 Earnings Call") to discuss its results with analysts. During the call, Defendant Protopopov stated:

> For the third quarter 2020, our ***Payment Services segment volume increased by 11%*** to RUB435 billion, ***driven primarily by growth in E-commerce and money limited market vertical***, offset by a decline in financial services and telecom market vertical. As we've discussed on a number of occasions, ***we started to see volume recovery in June as the current restrictions are eased and the majority of sports events are back on track.***

190. The statements referenced in ¶¶188-89 *supra* relating to Qiwi's "growth" in "Payment Services" were materially false and/or misleading because they misrepresented and

failed to disclose adverse facts pertaining to its policies, procedures and controls which were known to Defendants or recklessly disregarded by them, including that (1) Qiwi's growth included online betting transactions which violated the Betting Law but were obfuscated by its nonexistent identification requirements and payment processing controls that failed to identify money card holders before processing payments to foreign merchants and winnings to pre-paid cards; (2) without that customer identification information, Qiwi was unable to report to the FTS information on opening or closing e-wallets as required by the tax code as of April 1, 2020; and (3) Defendants were putting all of Qiwi's legitimate online revenue at risk by not ensuring compliance with Russia's National Payment System Law and tax code.

191. The 3Q20 Financial Report also stated that "[t]he number of active Qiwi Wallet accounts was 19.7 million as of September 30, 2020, a decrease of 2.6 million, or 12%, as compared with 22.3 million as of September 30, 2019 *primarily resulting from the introduction of new limitations on the anonymous wallets and consequent optimization of certain transaction processes, change of inactivity term from 6 to 12 months and enhancement of certain KYC, identification and compliance procedures*."

192. Likewise, during the 3Q20 Earnings Call, Defendant Protopopov stated that:

This quarter, we continued to see declines in the number of active QIWI Wallet from RUB22.3 million as of September 30, 2019, to RUB19.7 million at September 30, 2020.

We believe that *the key factors that resulted in such decline related primarily to the regulatory and operational reason* rather than any substantial changes in the consumer preferences for economic slowdown. Such decline did not substantially impact our financial operating performance due to increasing diversification of our product proposition and operating models. At the same time, we believe that *certain regulatory initiatives that are being discussed from time to time* as well as continued economic slowdown *have a potential to negatively affect our operating performance in the future*.

193. Defendant Kim also stated that:

*[W]e have noted in the past and **are likely to continue to see in the future, cost of default of our governmental bodies to adopt more robust and stringent regulations in respect of our key products and markets. These may include, without limitations, more elaborate wallet, KYC requirement, establishment of certain limits for the digital wallet transactions, both in respect of the types and maximum amounts, specific rules and regulations in respect of the cross-border transactions and regulation of the sport betting market**.*

194.    In addition, in response to a request from Chris Kennedy with William Blair for "more color on the potential regulatory changes in Russia and how that would impact QIWI's business and how you would navigate potential changes," Defendant Kim stated that:

[W]e have a few initiatives from the government and legislative bodies regarding two key markets. The first one is betting. And I mean the at which the change the legislation is astonishing even for Russia because they just adopted two new laws in July, changing the legislation for bookmakers in terms of in terms of taxation and offshore beneficiary ownership.

And now we prepare two new laws, which now are being discussed and at the level of the government, a bit slower is about further increase in quite different taxation of book makers. And the second law is about changing the whole regulation of bookmaker companies including creating unified TSUPIS.

Now I remind you, we have two TSUPIS, to one of this TSUPIS is here. So, it's very early to predict any material effect on QIWI business, but for sure that's a very important change in the regulation. And the second law is about foreign e-money wallets. At the moment, it's about -- I mean, they try to introduce a special form of reporting of owners of this wallet for federal taxation office and for central bank about the operations.

***It wouldn't directly impact our operation*** but of course, that shows – that's a sign of the level of attention or the regulator to their e-money and to the electronic wallets, especially in trans-border payments. So, it's a sign of this attention and ***potentially they could limit such operation***. ***And that could -- that could have an impact on our business*** in this case.

195.    Maria Sukhanova of BCS then followed up on Defendant Kim's statements "about grading single TSUPIS, could you please tell us, have there been more developments on this front so far? . . . So I wonder the fact that you have stressed now is it because you are really concerned about what's going on the regulatory front or it just like reflects there have been so many initiatives so far, which together might be, if approved, negative?" In response, Defendant Kim stated that:

So talking about single TSUPIS, the situation has changed since September or since

75

August when we had the last earnings call, because in August, it was just a proposal from books in federation, which was discussed at the level of government. And now it's a draft law, which is now in Parliament. And so, they started to consider this draft lots. That's a huge progress in this.

That's why we put this sentence in our press release even because the situation is changing. At the moment, I mean, it's difficult to predict whether this draft law will be adopted eventually. And what will be the final text and who will be the single TSUPIS. *We also have a chance to be the single TSUPIS*. And that's going to be much better for us even because we will serve the whole market instead of half of that, half of it, but the true is here, the situation is changing and is becoming more uncertain.

196. Later during the call, Vladimir Bespalov of VTB Capital "follow[ed]-up on the regulatory issue" and asked Defendants to "assume that the situation develops in to worst-case scenario, you are not the funder of this new single 2% in it. Could you give for a very rough maybe estimate what kind of heat your adjusted net revenues or whatever metric could take in this event?"

Defendant Kim responded:

I will answer to your question regarding betting. At this stage, it's very early to make such stress scenario just because the legislation itself, it's not even on the first reading and statistics of Russian laws show that only 80% of the law, which are just -- which could be into Parliament and to the parliament. Only 20% goes further from the first region. And there are two competitive laws. At the moment, one from the government, but it's still not in the parliament because it's being still discussed at the level of the government.

And the second one about single supers is already in the parent, but not on the first region, even. So I would say that at the moment, it's a very theoretical discussion. *What will be the real hit on our net revenue if and when this legislation will be adopted.* So at the moment, we couldn't just give you any numbers. But we have to warn you, and we have to discuss that, *that could be probably an impact on our net revenue in the future*.

197. The statements referenced in ¶¶191-96 *supra* relating to the impact of pending "legislative" or "regulatory initiatives" in Russia were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Qiwi's policies, procedures, and controls which were known to Defendants or recklessly disregarded by them, including that: (1) Qiwi's lax reporting and record-keeping to verify customer identities before making payments

76

to foreign merchants or transferring money to pre-paid cards was obfuscating online betting transactions made through its payment system which violated the Betting Law; and (2) as a result, Qiwi would not be able to pass the then-ongoing audit by the CBR, would be fined by the CBR, would have its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR, and would no longer be in a prime position to process all electronic bets in Russia after the single ETSUP replaces the two TSUPIS.

## VI. THE TRUTH EMERGES

### July 20 Partial Disclosure

198. After the markets closed on July 20, 2020, Qiwi launched an SPO while the CBR audit was ongoing, registering 6.8 million Class B Shares represented by ADSs for sale by shareholders including Defendants Kim and Solonin.[97] On this news, Qiwi's ADS price fell $1.90 per share, or 9.9%, to close at $17.29 per share on July 21, 2020, on unusually heavy trading.

199. Then, On July 22, 2020, the Russian news agency *Tass* reported that Qiwi shareholders had back out of the share sale.[98] An analyst for Seeking Alpha explained in an article titled "Qiwi +9% after reports of scrapped share sale," that "On Monday, Qiwi said shareholders were planning to sell 6.8M shares in a secondary offering. The ADRs were supposed to trade today." When announcing the cancellation of the SPO, Qiwi informed investors that the selling shareholders had decided not to proceed purportedly "due to market conditions."[99] On this news, Qiwi's share price increased $1.54, or 8.8%, to close at $18.75 per share on July 22, 2020.

200. An analyst for Russian Rocket further noted in an August 3, 2020 article titled

---

[97] Jason Aycock, *Qiwi -4% after holder to offer ADRs*, SEEKING ALPHA (Jul. 20, 2020), https://seekingalpha.com/news/3592903-qiwiminus-4-after-holder-to-offer-adrs.
[98] Brandy Betz, *Qiwi +9% after reports of scrapped share sale*, SEEKING ALPHA (Jul. 22, 2020), https://seekingalpha.com/news/3593564-qiwiplus-9-after-reports-of-scrapped-share-sale.
[99] *Qiwi Announces Cancellation of Proposed Secondary Offering*, GLOBE NEWSWIRE (Jul. 22, 2020), https://investor.qiwi.com/node/9591/pdf.

"Qiwi Plc: Fundamental Risks In The Core Business" that "[a] failed attempt to provide SPO signifies some core problems in the company's business and suggests that institutional investors do not want to buy Qiwi shares."[100] The analyst added that "[w]hile Qiwi stock price returned to the previous level as the SPO was canceled, there are still factors that could have a negative impact on the company. The fact that the company's management attempted to get rid of the stake in the company, but have so far failed to do it, is concerning."

<u>December 9 Class Period Ending Disclosure</u>

201. After the markets closed on December 9, 2020, Qiwi filed a Form 6-K with the SEC, revealing that as the result of an audit by the CBR, from July to December 2020, covering the period of July 2018 to September 2020, the CBR had identified "violations and deficiencies relating primarily to reporting and record-keeping requirements" resulting in a fine on Qiwi Bank of approximately $150,000 in addition to the suspension or limitation of its ability to conduct "most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts." As Qiwi further explained "[f]or illustrative purposes only and in order to assist our investors in understanding the potential impact of these restrictions on our results of operations, assuming such CBR restrictions were to be in effect and the corresponding operations were to be discounted for the entire nine-month period ending on September 30, 2020, approximately *33% to 40%* of our Payment Services Segment Net Revenue for such period would have been negatively affected[.]"

202. On this news, Qiwi's ADS price fell $2.80 per share, or 20.6%, to close at $10.79 per share on December 10, 2020, on unusually heavy trading.

203. As an analyst for the Motley Fool noted in a December 10, 2020 article titled "Why

---

[100] Russian Rocket, *Qiwi plc: Fundamental Risks In The Core Business*, SEEKING ALPHA (Aug. 3, 2020), https://seekingalpha.com/article/4363796-qiwi-plc-fundamental-risks-in-core-business.

Qiwi Stock Just Crashed 20%," "$150,000 doesn't sound so bad, but the [CBR] has also suspended Qiwi's ability to conduct most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts, effective Dec. 7. It's not entirely clear how serious this [suspension] will be for Qiwi -- but it sounds like it could be pretty serious."[101]

204. An analyst for Seeking Alpha further explained on December 23, 2020 that the CBR "prohibited Qiwi from executing transfers to foreign online shops and to the prepaid cards, since prepaid cards are anonymous most of the time, while foreign online shops could act as online casinos that can't be regulated."[102] The analyst also noted that while Qiwi stated that the $150,000 fine was for accounting violations, "numerous Russian sources tell that the fine has to do with Qiwi's involvement in the betting industry and that this might not be the last fine that it receives."

205. Investors' suspicions about the material impact of the CBR's restrictions were proven correct on March 30, 2021. That day, during Qiwi's fourth quarter 2020 ("4Q20") earnings conference call, Defendant Kim confirmed that "the CBR restrictions continue to have a negative impact on our volumes and revenues, primarily in E-Commerce and Money Remittance curve" and that Qiwi had "made a proposal to serve as the ETSUP,[103] however," if it "cannot become a part of the new industry landscape, we may experience a decrease in or complete loss of payments volume and income related to the TSUPIS."[104] He added that under the new law, the single Unified

---

[101] Rich Smith, *Why Qiwi Stock Just Crashed 20%*, THE MOTLEY FOOL (Dec. 10, 2020), https://www.fool.com/investing/2020/12/10/why-qiwi-stock-just-crashed-20/.

[102] Bears of Wall Street, *Qiwi: The Future Is In The Hands Of Russian Regulators*, SEEKING ALPHA (Dec. 23, 2020), https://seekingalpha.com/article/4395948-qiwi-future-is-in-hands-of-russian-regulators.

[103] On December 23, 2020, the State Duma adopted a bill reforming the betting market to create a public-law company "The United Gambling Regulator" and a unified center to record bookmaker rates in the form of a credit institution, which was signed into law on December 30, 2020. *See* Bill No. 1055657-7 (Archived), STATE DUMA OF THE FEDERAL ASSEMBLY OF THE RUSSIAN FEDERATION, https://sozd.duma.gov.ru/bill/1055657-7 (last visited Jun. 24, 2021) (Google trans.).

[104] *Qiwi plc (QIWI) CEO Boris Kim on Q4 2020 Results - Earnings Call Transcript*, SEEKING ALPHA (Mar. 30, 2021), https://seekingalpha.com/article/4416829-qiwi-plc-qiwi-ceo-boris-kim-on-q4-2020-results-earnings-call-transcript.

79

Interactive Bets Accounting Center (ETSUP) replaced the existing TSUPIS by the end of September 2021.[105]

206. And investors' suspicions were confirmed again on September 10, 2021, when Seeking Alpha reported that Qiwi had experienced a "14.7% decline in e-commerce which was more directly impacted by the Central Bank sanctions" and the Company was excluded when "the Russian government took steps to reform the system[,] consolidating all industry financial services into a sole operator."[106]

207. Further confirming Qiwi's lack of proper record-keeping and internal controls, Qiwi reported on one Critical Audit Matter in the Company's 2020 20-F.[107] As reported in a Watchdog Report dated May 26, 2021, when submitting financial reports with the SEC, some companies have begun reporting Critical or Key Audit Matters, including "those matters that, in the auditor's judgment, were of most significance in the audit of the company's financial statements," in accordance with the standards issued by the International Audit and Assurance Standards Board in January 2015.[108] This is the only Critical Audit Matter Qiwi has reported on since 2016. The Watchdog Report provides a description of the Critical Audit Matter as "recognition of revenue for payment processing fees" regarding the topic of "cash and income."

## VII. LOSS CAUSATION

208. The false and misleading misrepresentations and material omissions, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and other Class members.

---

[105] *QIWI Announces Unaudited Fourth Quarter and Full Year 2020 Financial Results*, QIWI PLC (Mar. 30, 2021), https://investor.qiwi.com/news-releases/news-release-details/qiwi-announces-unaudited-fourth-quarter-and-full-year-2020 (last visited Jun. 25, 2021).

[106] Dan Victor, *Is QIWI Plc Stock A Buy Or Sell Now? Russian Payments Leader Faces Challenges,* SEEKING ALPHA (Sep. 10, 2021) https://seekingalpha.com/article/4454517-qiwi-stock-buy-sell-now.

[107] Qiwi plc, Annual Report (Form 20-F) at p. F-2 (Apr. 15, 2021).

[108] Qiwi, WATCHDOG RESEARCH, INC. (May 26, 2021) (the "Watchdog Report").

209. During the Class Period, Lead Plaintiff and other Class members purchased Qiwi securities at artificially inflated prices and were damaged thereby. The price of the securities declined significantly when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were disseminated and publicly revealed.

210. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Qiwi securities, by publicly issuing false and/or misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Qiwi's policies, procedures, and controls, as alleged herein.

211. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and other members of the Class. Defendants made or caused to be made materially false and/or misleading statements about Qiwi's policies, procedures, and controls. These material misstatements and omissions had the cause and effect of creating in the market a false positive assessment of the Company and its business and operational performance and related well-being, thus causing its securities to be overvalued and the price of its securities to be artificially inflated at all relevant times. Defendants' materially false and/or misleading statements, as alleged herein, resulted in Lead Plaintiff and other members of the Class in purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was partially revealed July 20, 2020, and then fully on December 9, 2020, causing the trading price of Qiwi securities to materially decline and removing

81

the previously embedded artificial inflation.

## VIII. CLASS ALLEGATIONS

212. Lead Plaintiff brings this action as a class action, pursuant to Federal Rules of Civil Procedure ("Rules") 23(a) and 23(b)(3), on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, Qiwi securities during the Class Period, and were damaged by the conduct asserted herein. Excluded from the Class are Defendants and their immediate families and legal representatives, heirs, successors or assigns, and any entity in which the Defendants named herein have, or had, a controlling interest.

213. The members of the Class are so numerous that the joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes there are hundreds, if not thousands, of members in the proposed Class. Throughout the Class Period, millions of Qiwi securities were outstanding, owned and/or publicly traded on the NASDAQ by hundreds, if not thousands, of persons.

214. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the Class that predominate over those that may affect individual class members include whether:

- Defendants violated the federal securities laws;
- Defendants omitted and/or misrepresented material facts;
- Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- Defendants knowingly or with deliberate recklessness, disregarded or turned a blind eye toward the fact that their Class Period statements were false and misleading;
- Individual Defendants caused Qiwi to issue false and misleading filings during the Class Period;

- The price of Qiwi securities was artificially inflated because of Defendants' conduct complained of herein; and

- The Class members have sustained damages and, if so, the appropriate measure of damages.

215. Lead Plaintiff's claims are typical of those of Class members because they were similarly damaged by Defendants' wrongful conduct in violation of the federal securities laws.

216. Lead Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced in securities class action litigation. Lead Plaintiff has no interests that conflict with those of the Class.

217. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Lead Plaintiff knows of no difficulties in the management of this action that would preclude its maintenance as a class action.

## IX. PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET

218. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations or failed to disclose material facts; (b) the omissions and misrepresentations were material; (c) the Company's securities traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and (e) Lead Plaintiff and the other members of the Class purchased Qiwi securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

219. At all relevant times, the market for Qiwi securities was efficient for the following reasons, among others: (a) Qiwi securities met the listing requirements for, and were listed and actively traded on the NASDAQ, a highly efficient market; (b) during the Class Period, Qiwi shares were actively traded, supporting a strong presumption of efficiency; (c) as an SEC regulated

issuer, Qiwi issued *via* NASDAQ periodic public reports; (d) Qiwi regularly communicated with public investors, including via regular dissemination of press releases on major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (e) unexpected material news about Qiwi was rapidly reflected in and incorporated into the price of its securities during the Class Period.

220. As a result, the market for Qiwi securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of Qiwi's shares. Under these circumstances, all purchasers or acquirers of Qiwi securities during the Class Period suffered similar injury through their purchase or acquisition of Qiwi securities at artificially inflated prices, and a presumption of reliance applies.

221. In addition, Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

## X.    INAPPLICABILITY OF SAFE HARBOR

222. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements plead in this Complaint. All of the specific statements pleaded herein were not identified as, and/or were not "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Company and the Individual Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker

knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Qiwi named under the Exchange Act who knew that those statements were materially false and misleading when made.

## XI.    CLAIMS FOR RELIEF

### COUNT I
### Violations of § 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

223.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)-5 promulgated thereunder, against all Defendants.

224.    Defendants carried out a plan, scheme, and course of conduct which was intended to, and did, deceive the investing public, including Lead Plaintiff and the other Class members, as alleged herein, and caused Lead Plaintiff and the other Class members to purchase Qiwi securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

225.    During the Class Period, Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew, or deliberately disregarded as, or turned a blind eye to be, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

226.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon

purchasers or acquirers of Qiwi securities in order to maintain them at artificially high market prices in violation of § 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

227. Defendants, individually and together, directly and/or indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Qiwi's policies, procedures, and controls as specified herein.

228. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Qiwi's value and performance and continued substantial growth, which included the preparation of and/or dissemination or approval of untrue statements of material facts and/or omitting to state material facts necessary in order to make statements made about Qiwi and its business operations and further prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and course of business which operated as a fraud and deceit upon the purchasers and acquirers of Qiwi securities during the Class Period.

229. Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of conduct described herein. Defendants acted with scienter in that they knew that the public documents and statements prepared, issued and/or disseminated in the name of Qiwi were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants by virtue of their receipt of information reflecting the true facts of Qiwi, their control over, and/or receipt and/or modification of its allegedly materially misleading

86

statements, and/or their associations with it which made them privy to confidential proprietary information concerning it, participated in the fraudulent scheme alleged herein.

230. The Individual Defendants are the most high-level executives and/or directors at Qiwi and members of its management team or had control thereof. By virtue of their responsibilities and activities as senior officers, the Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material fact set forth herein and intended to deceive Lead Plaintiff and other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed to obtain such knowledge by deliberately refraining from taking steps necessary to discover whether the statements alleged herein, were false and/or misleading, or turned a blind eye toward the true facts available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's true prospects from the investing public and supporting the artificially inflated price of Qiwi securities.

231. As a result of the dissemination of materially false and/or misleading information and omission of material facts, as set forth herein, the market price of Qiwi securities was artificially inflated. In ignorance of the fact that market price of Qiwi securities was artificially inflated during the Class Period, and relying directly or indirectly on Defendants' false and misleading statements, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or recklessly disregarded, by Defendants, but not disclosed in Defendants' public statements, Lead Plaintiff and the other Class members acquired Qiwi securities at artificially high prices and were, or will be, damaged thereby.

232. At the time of said misrepresentation and omissions, Lead Plaintiff and the other Class members were ignorant of their falsity and believed them to be true. Had Lead Plaintiff and

the other members of the Class, and the marketplace, known the truth regarding the Company's business, which was not disclosed by Defendants, Lead Plaintiff and the other member of the Class would not have purchased or acquired Qiwi securities, of if they had purchased or acquired such securities, they would not have done so at the artificially inflated prices that they paid.

233. By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

234. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Qiwi securities during the Class Period.

235. This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiff's purchase of securities giving rise to the cause of action.

## COUNT II
### Violations of § 20(a) of the Exchange Act
### (Against the Individual Defendants)

236. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. As members of Qiwi's executive team and/or the Company's Board, the Individual Defendants acted as controlling persons of Qiwi within the meaning of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

237. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Qiwi's operations and/or intimate knowledge of the false information disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Qiwi, including the content and dissemination of the statements that Lead Plaintiff contends are false and misleading. The Individual Defendants were provided with, or had unlimited access to Qiwi's reports, press releases, public filings and other statements, alleged by Lead Plaintiff to have

88

been misleading, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

238. In particular, each of the Individual Defendants had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control and/or influence the particular transactions giving rise to the securities violations, as alleged herein, and exercised the same.

239. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Qiwi's business operations and prospects, and to promptly correct any public statements issued by the Company which had become materially false or misleading.

240. As set forth above, Qiwi and the Individual Defendants each violated § 10(b) and Rule 10b-5, promulgated thereunder, by their acts and omissions as alleged in this Complaint, and the Class was damaged thereby. By virtue of their positions as "controlling persons," the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.

241. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their purchase or acquisition of Qiwi securities during the Class Period.

242. This action was filed within two years of discovery of the fraud and within five years of Lead Plaintiff's purchase of securities giving rise to the cause of action.

## XII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff on behalf of itself and the Class, prays for relief and judgment, as follows:

a. Declaring this Action is a proper class action and certifying Lead Plaintiff as class

89

representative pursuant to Rules 23(a) and 23(b)(3) on behalf of the Class defined herein and Lead Counsel as Class Counsel;

b. Awarding Lead Plaintiff and the other members of the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' conduct, in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

d. Awarding such other equitable/injunctive or further relief as this Court may deem just and proper.

## XIII. JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury on all triable claims.

DATED: December 21, 2023

Respectfully Submitted,

**FREEDMAN NORMAND FRIEDLAND LLP**

*/s/ Ivy T. Ngo*
Ivy T. Ngo (*pro hac vice*)
Velvel (Devin) Freedman
One SE 3rd Avenue, Suite 1240
Miami, Florida 33131
Telephone: (305) 971-5943
Emails: ingo@fnf.law
       vel@fnf.law

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall (*pro hac vice* forthcoming)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*

90

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on December 21, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

*/s/ Ivy T. Ngo*
Ivy T. Ngo