# Exhibit C

Case 1:20-cv-06054-BMC-CLP   Document 87-3   Filed 05/02/24   Page 2 of 187 PageID #: 3471

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 20-F

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

Or

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2019**

Or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Or

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number: 001-35893**

# QIWI PLC
**(Exact name of Registrant as specified in its charter)**

**N/A**
**(translation of Registrant's name into English)**

**Cyprus**
**(Jurisdiction of incorporation or organization)**

**Kennedy 12, Kennedy Business Centre, 2nd floor**
**P.C. 1087, Nicosia, Cyprus**
**(Address of principal executive offices)**

**Varvara Kiseleva**
**+ 357 2265-3390**
**ir@qiwi.com**
**Kennedy 12, Kennedy Business Centre, 2nd floor**
**P.C. 1087, Nicosia, Cyprus**
**(Name, telephone, e-mail and/or facsimile number and address of company contact person)**

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol | Name of Each Exchange on Which Registered |
|---|---|---|
| American Depositary Shares, each representing one Class B ordinary share, having a nominal value EUR 0.0005 per share | QIWI | The NASDAQ Stock Market LLC |
| Class B ordinary shares, having a nominal value of EUR | N/A | |

0.0005 per share*

*\* Not registered for trading, but exist only in connection with the registration of the American Depositary Shares.*

**Securities registered or to be registered pursuant to Section 12(g) of the Act:**

**None**
**(Title of Class)**

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:**

**None**
**(Title of Class)**

_____

Indicate the number of outstanding shares of each of the Issuer's classes of capital or common stock as of the close of the period covered by the annual report.

**As of December 31, 2019, 12,083,419 Class A ordinary shares, par value EUR 0.0005 per share and 50,629,556 Class B ordinary shares, par value EUR 0.0005 per share were outstanding.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such a shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See definition of "large accelerated filer, "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐          Accelerated filer ☒          Non-accelerated filer ☐          Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13 (a) of the Exchange Act   ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐          International Financial Reporting Standards as issued          Other ☐
                              by the International Accounting Standards Board ☒

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the Registrant has elected to follow:   Item 17 ☐   Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.   Yes ☐   No ☐

Table of Contents

**TABLE OF CONTENTS**

PART I

| | | | |
|---|---|---|---|
| ITEM 1. | Identity of Directors, Senior Management and Advisers | | 3 |
| ITEM 2. | Offer Statistics and Expected Timetable | | 3 |
| ITEM 3. | Key Information | | 3 |
| | A. | Selected Financial Data | 3 |
| | B. | Capitalization and Indebtedness | 8 |
| | C. | Reasons for the Offer and Use of Proceeds | 8 |
| | D. | Risk Factors | 8 |
| ITEM 4. | Information on the Company | | 43 |
| | A. | History and Development of the Company | 43 |
| | B. | Business Overview | 43 |
| | C. | Organizational Structure | 62 |
| | D. | Property, Plants and Equipment | 62 |
| ITEM 4A. | Unresolved Staff Comments | | 62 |
| ITEM 5. | Operating and Financial Review and Prospects | | 62 |
| | A. | Operating Results | 62 |
| | B. | Liquidity and Capital Resources | 82 |
| | C. | Research and Development, Patents and Licenses, etc. | 84 |
| | D. | Trend Information | 84 |
| | E. | Off-balance Sheet Arrangements | 85 |
| | F. | Tabular Disclosure of Contractual Obligations | 85 |
| | G. | Safe Harbor | 85 |
| ITEM 6. | Directors, Senior Management and Employees | | 85 |
| | A. | Directors and Senior Management | 85 |
| | B. | Compensation | 87 |
| | C. | Board Practices | 89 |
| | D. | Employees | 91 |
| | E. | Share Ownership | 91 |
| ITEM 7. | Major Shareholders and Related Party Transactions | | 91 |
| | A. | Major Shareholders | 91 |
| | B. | Related Party Transactions | 92 |

1

Table of Contents

| | | | |
|---|---|---|---|
| | C. | Interests of Experts and Counsel | 93 |
| ITEM 8. | Financial Information | | 94 |
| | A. | Consolidated Financial Statements and Other Financial Information | 94 |
| | B. | Significant Changes | 94 |
| ITEM 9. | The Offer and Listing | | 94 |
| | A. | Offer and Listing Details | 94 |
| | B. | Plan of Distribution | 94 |
| | C. | Markets | 94 |
| | D. | Selling Shareholders | 94 |
| | E. | Dilution | 94 |
| | F. | Expenses of the Issue | 94 |
| ITEM 10. | Additional Information | | 95 |
| | A. | Share Capital | 95 |
| | B. | Memorandum and Articles of Association | 95 |
| | C. | Material Contracts | 99 |
| | D. | Exchange Controls | 99 |
| | E. | Taxation | 99 |
| | F. | Dividends and Paying Agents | 111 |
| | G. | Statements by Experts | 111 |
| | H. | Documents on Display | 111 |
| | I. | Subsidiary Information | 112 |
| ITEM 11. | Quantitative and Qualitative Disclosures About Market Risk | | 112 |
| ITEM 12. | Description of Securities Other Than Equity Securities | | 114 |
| | A. | Debt Securities | 114 |
| | B. | Warrants and Rights | 114 |
| | C. | Other Securities | 115 |
| | D. | American Depositary Shares | 115 |

PART II

| | | |
|---|---|---|
| ITEM 13. | Defaults, Dividend Arrearages and Delinquencies | 115 |
| ITEM 14. | Material Modifications to the Rights of Security Holders and Use of Proceeds | 116 |
| ITEM 15. | Controls and Procedures | 116 |

Case 1:20-cv-06054-BMC-CLP    Document 87-3    Filed 05/02/24    Page 5 of 187 PageID #: 3474

| ITEM 16. | [RESERVED] | 117 |
| ITEM 16A. | Audit Committee Financial Expert | 117 |
| ITEM 16B. | Code of Ethics | 117 |
| ITEM 16C. | Principal Accountant Fees and Services | 117 |
| ITEM 16D. | Exemptions from the Listing Standards for Audit Committees | 118 |
| ITEM 16E. | Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 118 |
| ITEM 16F. | Change in Registrant's Certifying Accountant | 118 |
| ITEM 16G. | Corporate Governance | 118 |
| ITEM 16H. | Mine Safety Disclosure | 119 |

**PART III**

| ITEM 17. | Financial Statements | 119 |
| ITEM 18. | Financial Statements | 119 |
| ITEM 19. | Exhibits | 119 |

2

Table of Contents

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This annual report contains forward-looking statements that reflect our current expectations and views of future events. These forward looking statements are made under the "safe-harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. Some of these forward looking statements can be identified by terms and phrases such as "anticipate", "should", "likely", "foresee", "believe", "estimate", "expect", "intend", "continue", "could", "may", "plan", "project", "predict", "will", and similar expressions. These forward-looking statements include statements relating to:

- our goals and strategies;

- our ability to grow our payment volumes;

- our ability to maintain and grow the size of our physical and virtual distribution network;

- our ability to increase our market share in our key payment market verticals and segments;

- our ability to successfully introduce new products and services, including our consumer lending business SOVEST and through our joint venture JSC Tochka, in respect of its banking platform;

- our ability to successfully execute our business strategy, including in respect of SOVEST and Tochka, and our ability to recoup our investments made in such businesses or other projects that we develop from time to time;

- our ability to maintain our relationships with our merchants, agents and partners;

- the expected growth of Qiwi Wallet and alternative methods of payment;

- our ability to successfully divest or dispose of non-core investments, including Rocketbank;

- our ability to continue to develop new and attractive products and services;

- our future business development, results of operations and financial condition;

- our ability to continue to develop new technologies and upgrade our existing technologies;

- competition in our industry;

- projected revenue, profits, earnings and other estimated financial information; and

- developments in, or changes, to the laws, regulation and governmental policies governing our business and industry.

The preceding list is not intended to be an exhaustive list of all of our forward-looking statements. These forward-looking statements are based on our beliefs, assumptions and expectations of future performance, taking into account the information currently available to us. These statements are only predictions based upon our current expectations and projections about future events. There are important factors that could cause our actual results, level of activity, performance or achievements to differ materially from the results, level of activity, performance or achievements expressed or implied by the forward-looking statements. In particular, you should consider the risks described in Item 3.D "Risk Factors" in this annual report.

These forward-looking statements speak only as of the date of this annual report. Except as required by law, we undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

**PART I**

**ITEM 1.      Identity of Directors, Senior Management and Advisers.**

Not applicable.

ITEM 2.    Offer Statistics and Expected Timetable.

Not applicable.

ITEM 3.    Key Information.

A.    Selected financial data.

The following tables set forth our selected consolidated financial and other data. You should read the following selected consolidated financial and other data together with the information in Item 5 "Operating and Financial Review and Prospects" and Item 3.D "Risk Factors" and our consolidated financial statements and the related notes included elsewhere in this annual report. Our consolidated financial statements have been prepared in accordance with the International Financial Reporting Standards as published by the International Accounting Standards Board.

3

Table of Contents

The following tables also contain translations of ruble amounts into U.S. dollars for amounts presented as of December 31, 2019 and for the year ended December 31, 2019. These translations are solely for convenience of the reader and were calculated at the rate of RUB 61.9057 per U.S. $1.00, which is equal to the official exchange rate quoted by the Central Bank of the Russian Federation, or CBR, on December 31, 2019.

| | Year ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2018 | 2019 | |
| | RUB | RUB | RUB | RUB | RUB | U.S.$ |
| | (in millions, except per share data) | | | | | |
| **Consolidated Statement of Comprehensive Income Data:** | | | | | | |
| **Revenue:** | 17,717 | 17,880 | 20,897 | 30,610 | 39,336 | 635 |
| Payment processing fees | 13,822 | 14,999 | 17,265 | 23,694 | 30,736 | 496 |
| Interest revenue calculated using the effective interest rate | 1,157 | 899 | 1,052 | 1,854 | 3,646 | 59 |
| Fees from inactive accounts and unclaimed payments | 1,113 | 1,290 | 1,310 | 1,419 | 1,806 | 29 |
| Other revenue | 1,625 | 692 | 1,270 | 3,643 | 3,148 | 51 |
| **Operating costs and expenses:** | (12,853) | (13,743) | (16,906) | (26,161) | (32,896) | (531) |
| Cost of revenue (exclusive of depreciation and amortization) | (7,489) | (7,269) | (7,704) | (10,953) | (16,160) | (261) |
| Selling, general and administrative expenses | (1,596) | (1,526) | (3,796) | (6,099) | (6,213) | (100) |
| Personnel expenses (1) | (2,717) | (3,059) | (4,286) | (7,748) | (7,765) | (125) |
| Depreciation and amortization | (689) | (796) | (796) | (864) | (1,324) | (21) |
| Credit loss expense (2) | (362) | (215) | (220) | (474) | (642) | (10) |
| Impairment of intangible assets | — | (878) | (104) | (23) | (792) | (13) |
| **Profit from operations** | **4,864** | **4,137** | **3,991** | **4,449** | **6,440** | **104** |
| Share of gain/(loss) of an associate and joint ventures | — | — | — | (46) | 258 | 4 |
| Other income and expenses, net | (61) | (79) | (41) | (181) | (91) | (1) |
| Foreign exchange gain (3) | 2,801 | 1,040 | 257 | 1,311 | 905 | 15 |
| Foreign exchange loss (3) | (1,360) | (1,963) | (373) | (1,049) | (1,077) | (17) |
| Interest income and expenses, net | (93) | (28) | 6 | 17 | (56) | (1) |
| **Profit before tax** | **6,151** | **3,107** | **3,840** | **4,501** | **6,379** | **103** |
| Income tax expense | (877) | (618) | (698) | (875) | (1,492) | (24) |
| **Net profit** | **5,274** | **2,489** | **3,142** | **3,626** | **4,887** | **79** |
| **Attributable to:** | | | | | | |
| Equity holders of the parent | 5,187 | 2,474 | 3,114 | 3,584 | 4,832 | 78 |
| Non-controlling interests | 87 | 15 | 28 | 42 | 55 | 1 |
| Weighted average number of shares | | | | | | |
| Basic | 58 | 60 | 61 | 61 | 62 | 62 |
| Diluted | 58 | 61 | 61 | 62 | 62 | 62 |
| Earnings per share | | | | | | |
| Basic | 89.72 | 40.91 | 51.25 | 58.56 | 78.20 | 1.26 |
| Diluted | 89.49 | 40.79 | 50.92 | 58.06 | 77.60 | 1.25 |
| Dividends declared per share | | | | | | |
| RUB | 11.56 | 79.92 | 36.22 | — | 54.00 | n/a |
| U.S.$ | 0.25 | 1.16 | 0.62 | — | 0.84 | n/a |

(1)    Historically, personnel expenses directly associated with revenue recognized were disclosed within cost of revenue and personnel expenses associated with all other activities were disclosed within selling, general, and administrative expenses. Starting full year 2019 reporting we present all personnel expenses as a single item in a Personnel expenses line. Personnel expenses for the years ended December 31, 2015 through 2018 were separated from cost of revenue and selling, general and administrative expenses and presented in a separate line for comparative purposes. See *Item 5 Operating and Financial Review and Prospects. Operating Costs and Expenses* for details.

(2)    Credit loss expense for the years ended December 31, 2015 through 2017 was separated from selling, general and administrative expenses for comparative purposes as a result of the adoption of IFRS 9.

(3)    Primarily relates to foreign currency changes resulting from the funds received in connection with our offering of ADSs in June 2014

4

Table of Contents

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2015* | 2016 | 2017 | 2018 | 2019 | |
| | RUB | RUB | RUB | RUB | RUB | U.S.$ |
| | | | (in millions) | | | |
| **Consolidated Balance Sheet Data:** | | | | | | |
| Cash and cash equivalents | 19,363 | 18,997 | 18,406 | 40,966 | 42,101 | 680 |
| Total current assets | 27,015 | 27,205 | 31,094 | 58,371 | 61,994 | 1,001 |
| Total assets | 41,577 | 39,674 | 45,059 | 73,023 | 81,477 | 1,316 |
| Total equity | 22,436 | 19,969 | 21,157 | 25,706 | 27,437 | 443 |
| Total debt | 3 | — | — | — | 1,545 | 25 |
| Total liabilities | 19,141 | 19,705 | 23,902 | 47,317 | 54,040 | 873 |
| Total equity and liabilities | 41,577 | 39,674 | 45,059 | 73,023 | 81,477 | 1,316 |

\*    The amounts shown here may immaterially differ from the amounts shown in the Annual Report on Form 20-F for the year ended December 31, 2015 due to rounding adjustments.

| | Year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | |
| | RUB | RUB | RUB | RUB | RUB | U.S.$ |
| | | | (in millions, except as otherwise indicated) | | | |
| **Other Financial and Operating Data:** | | | | | | |
| Total Adjusted Net Revenue (1) | 10,228 | 10,611 | 13,193 | 19,657 | 23,176 | 374 |
| Payment Services segment net revenue | 10,198 | 10,583 | 12,580 | 16,497 | 20,965 | 339 |
| Adjusted EBITDA (1) | 5,640 | 6,035 | 5,185 | 5,948 | 9,099 | 147 |
| Adjusted Net Profit (1) | 4,142 | 4,714 | 4,054 | 4,137 | 6,679 | 108 |
| Payment Services segment payment volume (in billions) (2) | 860 | 847 | 911 | 1,138 | 1,489 | 24 |
| Active kiosks and terminals (units) (3) | 172,269 | 162,173 | 152,525 | 143,690 | 134,280 | n/a |
| Active Qiwi Wallet accounts (at period end, in millions) (4) | 16.1 | 17.2 | 20.1 | 20.8 | 22.5 | n/a |
| Payment services segment net revenue yield (5) | 1.19% | 1.25% | 1.38% | 1.45% | 1.41% | n/a |
| Consumer Financial Services segment payment volume (in billions) (6) | — | — | 3.3 | 15.9 | 27.8 | 0.4 |

(1)    See "—Non-IFRS Financial Measures" for how we define and calculate Total Adjusted Net Revenue, Adjusted EBITDA, and Adjusted Net Profit as non-IFRS financial measures and reconciliations of these measures to revenue, in the case of Total Adjusted Net Revenue, and net profit, in the case of Adjusted EBITDA and Adjusted Net Profit.

(2)    Payment Services segment payment volume consists of the amounts paid by our customers to merchants or transferred to other customers less intra-group eliminations in our Payment Services segment.

(3)    We measure the numbers of our kiosks and terminals on a daily basis, with only those kiosks and terminals being taken into calculation through which at least one payment has been processed during the day, which we refer to as active kiosks and terminals. The period end numbers of our kiosks and terminals are calculated as an average of the amount of active kiosks and terminals for the last 30 days of the respective reporting period.

(4)    Number of active Qiwi Wallet accounts is defined as the number of wallets through which at least one payment has been made or that have been loaded or reloaded in the 12 months preceding the end of the relevant reporting period.

(5)    Payment Services segment net revenue yield is defined as Payment Services segment net revenue divided by Payment Services payment segment volume.

(6)    Consumer Financial Services segment payment volume consists of the transaction amounts paid by SOVEST card customers to merchants offline and online (including, but not limited to the partner-merchants) or withdrawn through ATMs less the amount returned for corresponding reimbursements.

Table of Contents

**Non-IFRS Financial Measures**

We present Total Adjusted Net Revenue, Adjusted EBITDA and Adjusted Net Profit, each of which are non-IFRS financial measures. You should not consider these non-IFRS financial measures as substitutes for or superior to revenue, in the case of Total Adjusted Net Revenue, or net profit, in the case of Adjusted EBITDA and Adjusted Net Profit, each prepared in accordance with IFRS. Furthermore, because these non-IFRS financial measures are not determined in accordance with IFRS, they are susceptible to varying calculations and may not be comparable to other similarly titled measures presented by other companies. We encourage investors and others to review our financial information in its entirety and not rely on a single financial measure.

*Total Adjusted Net Revenue*

Total Adjusted Net Revenue is calculated by subtracting cost of revenue from revenue. Total Adjusted Net Revenue is a key measure used by management to observe our operational profitability since it reflects our portion of the revenue net of fees that we pass through, primarily to our agents and other reload channels providers. In addition, under IFRS, most types of fees are presented on a gross basis whereas certain types of fees are presented on a net basis. Therefore, in order to analyze our two sources of payment processing fees on a comparative basis, management reviews Total

Adjusted Net Revenue. For the periods presented in this Annual Report, Total Adjusted Net Revenue is equal to Total Segment Net Revenue.

The following table reconciles Adjusted Net Revenue to revenue.

| | Year ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2015 (1) RUB | 2016 RUB | 2017 RUB | 2018 RUB | 2019 RUB | U.S.$ |
| | (in millions) | | | | | |
| **Revenue** | 17,717 | 17,880 | 20,897 | 30,610 | 39,336 | 635 |
| Minus: Cost of revenue (2) | (7,489) | (7,269) | (7,704) | (10,953) | (16,160) | (261) |
| **Total Adjusted Net Revenue** | 10,228 | 10,611 | 13,193 | 19,657 | 23,176 | 374 |

(1)    The amounts shown here may immaterially differ from the amounts shown in the Annual Report on Form 20-F for the year ended December 31, 2015 due to rounding adjustments.

(2)    Historically, we viewed personnel expenses related to main personnel and compensation to employees related to administrative personnel as two separate items. Personnel expenses related to main personnel were disclosed within cost of revenue and personnel expenses related to administrative personnel were disclosed within selling, general, and administrative expenses. Starting full year 2019 reporting we present all personnel expenses as a single item in a Personnel expenses line. Personnel expenses for the years ended December 31, 2015 through 2018 were separated from cost of revenue and selling, general and administrative expenses and presented in a separate line for comparative purposes. See *Item 5 Operating and Financial Review and Prospects. Operating Costs and Expenses for details*.

*Adjusted EBITDA*

Adjusted EBITDA is defined as net profit before income tax expense, interest expense, interest income and depreciation and amortization, as further adjusted for share of loss of associates, impairment of investment in associates, expenses associated with filing the registration statement on Form F-3 for our major shareholders and related transaction expenses, foreign exchange gain and loss, other expenses, other income, loss on formation of associate, share-based payment expenses, impairment of non-current assets and impairment of intangible assets recorded on acquisitions. We present Adjusted EBITDA as a supplemental performance measure because we believe that it facilitates operating performance comparisons from period to period and company to company by backing out potential differences caused by variations in capital structures (affecting interest expenses, net), changes in foreign exchange rates that impact financial asset and liabilities denominated in currencies other than our functional currency (affecting foreign exchange loss and foreign exchange gain), tax positions (such as the impact on periods or companies of changes in effective tax rates), the age and book depreciation of fixed assets (affecting relative depreciation expense), non-cash charges (affecting share-based payments expenses, impairment of non-current assets, and impairment of intangible assets acquired in the business combinations), and certain one-time income and expenses (affecting other income, expenses associated with filing the registration statement on Form F-3 for our major shareholders and related transaction expenses, loss on formation of associate, etc.). Adjusted EBITDA also excludes other expenses, share in losses of associates and impairment of investment in associates because we believe it is helpful to view the performance of our business excluding the impact of entities that we do not control, and because our share of the net income (loss) of the associate and other expenses includes items that have been excluded from Adjusted EBITDA (such as finance expenses, net, tax on income and depreciation and amortization). Because Adjusted EBITDA facilitates internal comparisons of operating performance on a more consistent basis, we also use Adjusted EBITDA in measuring our performance relative to that of our competitors.

6

Table of Contents

Some limitations of Adjusted EBITDA are:

- Adjusted EBITDA does not include expenses associated with filing the registration statement on Form F-3 for our major shareholders and related transaction expenses;

- Adjusted EBITDA does not reflect income tax payments that may represent a reduction in cash available to us;

- Adjusted EBITDA does not include other income, other expense and foreign exchange gains and losses;

- Adjusted EBITDA excludes depreciation and amortization and although these are non-cash charges, the assets being depreciated and amortized may have to be replaced in the future; and

- Adjusted EBITDA does not include share-based payments.

| | Year ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2015 RUB | 2016 RUB | 2017 RUB | 2018 RUB | 2019 RUB | U.S.$ |
| | (in millions) | | | | | |
| **Net Profit** | **5,274** | **2,489** | **3,142** | **3,626** | **4,887** | **79** |
| adjusted for: | | | | | | |
| Depreciation and amortization | 689 | 796 | 796 | 864 | 1,324 | 21 |
| Other income | 61 | 79 | 41 | 181 | 91 | 1 |
| Foreign exchange gain | (2,801)(1) | (1,040)(1) | (257)(1) | (1,311)(1) | (905) | (15) |
| Foreign exchange loss | 1,360(1) | 1,963(1) | 373(1) | 1,049(1) | 1,077 | 17 |
| Loss / (gain) from associates and joint ventures | — | — | — | 46 | (258) | (4) |
| Impairment of non-current assets | — | — | — | — | 792 | 13 |
| Interest income and expenses, net | 93 | 28 | (6) | (17) | 56 | 1 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Income tax expenses | 877 | 618 | 698 | 875 | 1,492 | 24 |
| Form F-3 and related expenses | — | — | — | — | 79 | 1 |
| Share-based payment expenses | 88 | 224 | 398 | 635 | 464 | 7 |
| Impairment of intangible assets recorded on acquisitions | — | 878 | — | — | — | — |
| **Adjusted EBITDA** | **5,640** | **6,035** | **5,185** | **5,948** | **9,099** | **147** |

*Adjusted Net Profit*

Adjusted Net Profit is defined as net profit excluding fair value adjustments recorded on business combinations and their amortization, share-based payments, foreign exchange loss/(gain) from revaluation of cash proceeds, impairment of non-current assets, loss on disposals of subsidiaries, expenses associated with filing the registration statement on Form F-3 for our major shareholders and related transaction expenses, and the effects of taxation on those excluded items. Adjusted Net Profit is a key measure used by management to observe the operational profitability of the company. We believe Adjusted Net Profit is useful to an investor in evaluating our operating performance because it measures a company's operating performance without the effect of non-recurring items or items that are not core to our operations. For example, loss on disposals of subsidiaries and the effects of deferred taxation on excluded items do not represent the core operations of the business, and fair value adjustments recorded on business combinations and their amortization, impairment of non-current assets and share-based payments expenses do not have a substantial cash effect. Nevertheless, such gains and losses can affect our financial performance. For the periods presented in this Annual Report Adjusted Net Profit is equal to Total Segment Net Profit.

7

**Table of Contents**

The following table reconciles Adjusted Net Profit to net profit.

| | Year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | |
| | **RUB** | **RUB** | **RUB** | **RUB** | **RUB** | **U.S.$** |
| | | | (in millions) | | | |
| **Net profit** | **5,274** | **2,489** | **3,142** | **3,626** | **4,887** | **79** |
| Fair value adjustments recorded on business combinations and their amortization | 270 | 396 | 344 | 369 | 479 | 8 |
| Share-based payments | 88 | 224 | 398 | 635 | 464 | 7 |
| Foreign Exchange loss/(gain) from revaluation of cash proceeds (1) | (1,476) | 975 | 236 | (433) | 130 | 2 |
| Impairment of non-current assets | — | 878 | — | — | 792 | 13 |
| Loss on disposals of subsidiaries | 38 | 10 | — | — | — | — |
| Form F-3 and related expenses | — | — | — | — | 79 | 1 |
| Effect of taxation of the above items | (52) | (258) | (66) | (60) | (152) | (2) |
| **Adjusted Net Profit** | **4,142** | **4,714** | **4,054** | **4,137** | **6,679** | **108** |

(1)   Foreign exchange gain on June 2014 offering proceeds, as presented in the reconciliation of net profit to adjusted net profit differs from the foreign exchange loss/(gain) in the reconciliation of net profit to adjusted EBITDA as the latter includes all the foreign exchange losses/(gains) for the period, while the former relates solely to foreign currency changes resulting from the funds received in connection with our offering of ADSs in June 2014.

**B.    Capitalization and Indebtedness.**

Not applicable.

**C.    Reasons for the Offer and Use of Proceeds.**

Not applicable.

**D.    Risk Factors**

*In conducting our business, we face many risks that may interfere with our business objectives. Some of these risks relate to our operational processes, while others relate to our business environment. It is important to understand the nature of these risks. If any of the following risks actually occurs, it may materially harm our business, results of operations or financial condition.*

**Risks Relating to Our Business and Industry**

***The financial services industry is highly competitive, and we have a vast number of competitors that are larger and have greater financial and other resources.***

The financial services industry in which we operate with our payment services and other financial services that we provide is highly competitive, and our ability to compete effectively is therefore of paramount importance. In all countries where we operate, we face competition from a variety of financial and non-financial business groups. These competitors include retail banks, non-traditional payment service providers (such as retailers and mobile network operators, or MNOs), electronic payment system operators, as well as other companies which provide various forms of banking and payment solutions or services, including electronic payments, payment processing services, consumer lending and other services. Competitors in our industry seek to differentiate themselves by features and functionalities such as speed, convenience, network size, accessibility, safety, reliability and

price, among others. A significant number of our competitors have greater financial, technological and marketing resources than we have, operate robust networks and are highly regarded by consumers.

Our key competitors in Russia are retail banks, particularly those with a focus on well-developed electronic payment solutions, including Sberbank, Russia's largest retail bank that is majority-owned by the Russian state, Alfa-Bank, one of the leading privately owned Russian retail banks, both of which have electronic banking solutions and large retail networks, and Tinkoff Bank, which positions itself as a specialized bank specifically focused on innovative online retail financial services. Sberbank, for example, has long adhered to the strategy of innovation in the financial and payments space and has been focusing on the promotion of alternative banking channels, such as kiosks, internet banking and mobile banking. Sberbank is the market leader of the Russian payments market, and has access to significant financial resources and has an extensive nationwide network of branches. It is also the largest processor of utility bill payments, which constitute a significant portion of overall consumer spending in our industry. It actively develops its online payment services capabilities, including through its online and mobile banking platform Sberbank Online and through Yandex.Money, one of the major electronic payment service providers in Russia that it operates in a joint venture with Yandex, a leading Russian diversified technology company. These factors give Sberbank a substantial competitive advantage over us in the payments business as well as any other financial services businesses that we pursue or may pursue. Additionally, Sberbank is pursuing a strategy to transform itself into an e-commerce ecosystem based on open source software. In furtherance of this strategy, in April 2018 Sberbank announced together with Yandex that they have completed the formation of a joint venture based on the Yandex.Market platform where they intend to combine the technological capabilities of Yandex and the infrastructure and technologies of Sberbank to develop a leading B2C (business-to-consumer) e-commerce ecosystem, and later launched new e-commerce projects Beru.Ru and Bringly.ru. It has also been reported that Sberbank is currently working a "super-app" as a single entry point for all of its various consumer services, which would have the potential to make its products even more attractive and more difficult to compete against. However, Sberbank recently applied for trademark SuperApp and develops its own type of versatile service. While the platform created by the Sberbank-Yandex

8

Table of Contents

joint venture is still being rolled out, this combination could result in a substantial shift in the competitive landscape of the Russian physical e-commerce market to the detriment of our position, market share and growth potential in this category of payments. The recently announced joint venture between Mail.ru Group, Alibaba Group, Megafon and RDIF to create a largest social commerce platform in Russia and the Commonwealth of Independent States ("CIS") based on AliExpress Russia and Pandao platforms, could have a similar effect. Our other major competitors in the banking industry include Alfa-Bank, a major retail bank that combines a strong competitive position in the traditional retail banking sector with a focus on developing innovative financial and payments solutions, and Tinkoff Bank, which is a provider of online retail financial services operating in Russia through a high-tech branchless platform. Similarly to Sberbank, Tinkoff Bank announced in December 2019 the launch of a super-app designed to be its own marketplace and an entry point to all of the numerous lifestyle services of Tinkoff and its partners. Numerous other Russian banks are also actively pursuing the electronic payments business and developing various consumer payment solutions.

The competition in the digital money transfer services space is also further intensifying as key market players including retail banks develop and digitalize their products. Recently the Central Bank of Russia in cooperation with other banks established an instant payment system which is designed to enable instantaneous money transfers between accounts at different banks with the only piece of identification needed for a transfer being the person's cell phone number. All banks doing business in Russia can and will likely be obliged to connect to this system (which Qiwi Bank has already done) for doing peer-to-peer money transfers. It may prove difficult for our digital money remittance solutions to compete with such system on the basis of convenience, price, or otherwise. There can also be no assurance that the CBR will not impose an upper fee limit for transfers within such system that will be lower than the currently prevailing fee rates and thereby drive down the entire market for money remittance fees.

Our competitors in the payments business also include non-traditional payment service providers that engage in payment services as a non-core business. In particular, we compete with the Russian Federal State Unitary Enterprise Postal Service, or Russian Post, which offers certain payment services. Russian Post's geographical penetration is at least as dispersed as our physical distribution network (i.e. our kiosks and terminals). It also co-owns, in a joint-venture with the Russian state-controlled VTB Bank, the full-service commercial bank Pochta Bank. As a state-sponsored institution, we believe that it is able to provide payment services at significantly lower prices than we are able to match profitably. We also face competition from other non-traditional payment service providers that have substantial financial resources, such as brick-and-mortar and online retailers (such as Alibaba and its financial services subsidiary Ant Financial which operates the AliPay payment system), and MNOs, in particular the Russian "Big Three" MNOs, MegaFon, VimpelCom and MTS, as well as their closest competitor Rostelekom, all of which have various payment solutions of their own. In addition, non-traditional payment service providers also include social networks such as Mail.ru Group's VK, which is developing its own payment solution VKPay (which Mail.ru is planning to transfer to its financial services joint venture with AliPay and MegaFon, thereby increasing the potential usability, competitiveness and aggressiveness of the development of this service as outlined in Mail.ru's recently announced strategy) and smartphone manufacturers such as Samsung and Apple. New competitors may penetrate the Russian electronic payment market as well, including established international players such as MoneyGram or Google.

Globally and in Russia, there is a steady influx of new fintech businesses looking to challenge and disrupt the payments and financial services industry. These include so-called "challenger banks" such as Starling, Monzo, N26, Revolut, Atom and Tandem, who develop various digital banking and financial services and compete with various aspects of our services offering (none of the aforementioned companies has penetrated the Russian market as of the date hereof. Since the financial services industry is susceptible to disruption, new categories of non-traditional financial service providers may emerge in the future that may be difficult to currently anticipate. See "– *If we cannot keep pace with rapid developments and change in our industry and provide new services to our clients, or if any of the new products we roll out are unsuccessful, the use of our services could decline, and we could experience a decline in revenue and an inability to recoup costs*".

We also compete against some directly comparable businesses, such as electronic payment system operators (primarily Yandex.Money, WebMoney and PayPal) and kiosk and terminal operators, including Cyberplat, Comepay and Elecsnet.

In recent years, we have started expanding our product portfolio beyond our traditional payment services business to include other types of financial services. These new projects include among others our payment-by-installments SOVEST card project that we launched in 2016, and Tochka, a

digital banking service focused on offering a broad range of services to small and medium businesses (SMEs). In connection with each of these projects, we face intense competition from commercial and retail banks. In particular, SOVEST competes with commercial banks that operate unsecured retail consumer lending programs, such as Sovkombank, HomeCredit, Tinkoff and Alfa Bank, all of which have equivalent or similar products including pay-by-installment projects, which are a direct competition, credit card programs or POS loan solutions. The projects that we develop and invest in compete primarily on the basis of enhanced user experience, price and add-on features, and are therefore exposed to competition from any banking institutions, particularly those that are focused on developing convenient online and mobile solutions such as Sberbank, Alfa Bank and Tinkoff. Such banking institutions often have more established businesses in consumer lending and other banking services similar to those offered by us. While we seek to differentiate our products from the competition, there cannot be any assurance that we will be successful in doing so due to the number of the competitors and their level of sophistication. We have also recently placed some focus on the so-called sharing economy/ B2B2C segment, whereby we provide different complex payment and payout solutions to diverse businesses, such as payments to taxi drivers by taxi companies or payments to property holders by companies like Airbnb as well as on the self-employed market, where we provide different payment and acquiring-like solutions to self-employed individuals. These products are similar in nature to a salary program and certain other products at a traditional retail bank, thereby exposing us to competition from all banks that offer such services, particularly if they are similarly focused on convenience of on-boarding and use as well as customizable and user-friendly interfaces.

9

Table of Contents

In 2016, we became one of the two payment services providers that are able to accept electronic bets on behalf of sports betting companies in Russia. Under amendments to the Russian betting laws introduced in 2014, in order to engage in sports betting, a bookmaker has to become a member of a self-regulated organization of bookmakers and abide by its rules, and any and all interactive bets may be only accepted through an Interactive Bets Accounting Center (TSUPIS) set up by a credit organization together with a self-regulated association of bookmakers. Accordingly, in 2016 QIWI Bank established a TSUPIS together with one of the self -regulated associations of bookmakers in order to be able to accept such payments and started acting as a platform for acceptance of interactive bets in favor of the members of the self-regulated organization of bookmakers. Processing payments for betting merchants represents a significant portion of our revenues and also generally carries higher margins than processing payments to merchants in most of the other market verticals we serve. Furthermore, gains received by our consumers from betting into their Qiwi Wallet accounts represents one of the significant reload sources for Qiwi Wallet accounts. If other banks or payment service providers were to enter this market, the payment volume, revenue and margins of our Payment Services business, as well as overall usage of Qiwi Wallet, could be materially adversely affected.

Any increase in competition by other market participants, or any shift of customer preferences in their favor due to any real or perceived advantages of their products, could result in a loss of consumers and harm to our payment volume, revenue and margins. As major commercial and retail banks increase their online and virtual presence and come up with increasingly sophisticated products directly competing with our core competencies, our competitive position could be severely undermined, resulting in reduced demand for our products, both with respect to our payment services business and the other financial services projects that we are pursuing. If we are unable to compete successfully for consumers, agents, merchants or other partners (including new corporate clients such the clients of Tochka or the businesses that use our B2B2C services as described above), our business, financial condition and results of operations could be materially adversely affected.

***Our continued growth depends on our ability to maintain or increase our payment services average net revenue yield.***

One of the key measures we use to assess the performance of our payment services business is payment average adjusted net revenue yield, which we calculate by dividing payment adjusted net revenue by the total payment volume of the transactions we process. Our payment average adjusted net revenue yield may be affected by a number of factors, including increased competition, pressure from merchants and/or agents, changes in regulation and acquisitions. We have experienced declines in our payment average adjusted net revenue yield for certain merchant categories in the past, in particular for our Telecom merchants where the merchant fees were sharply reduced by the Big Three MNOs, who have been seeking to reduce costs, and may continue to do so in the future. We have also experienced, to a lesser extent, the declines of our net revenue yield in the money remittance and certain categories of e-commerce market verticals. For example, in 2015, our average adjusted net revenue yield declined following the acquisition of the Contact money transfer system ("Contact") and the Rapida payment processing system ("Rapida") businesses, both of which had been operating with a significantly lower average net revenue yield than QIWI (excluding Contact and Rapida) during 2015. Furthermore, our payment average adjusted net revenue yield may decline if we introduce new products that are important for expanding the ecosystem and growing the business, but are generally lower-yielding and thus dilute our net revenue yield, which has, as an example, recently happened with respect to certain part of our betting category with the introduction of card acquiring services, which we now offer to our betting merchants together with Wallet acquiring and other services. Our payment average adjusted net revenue yield may be further compressed in connection with the introduction of the instant money transfer system established by the CBR (see "– *The financial services industry is highly competitive, and we have a vast number of competitors that are larger and have greater financial and other resources* "). The introduction and extensive utilization of this service, especially if the maximum commission limits are imposed by the CBR, can lead to a shift of part of our digital money remittance volumes within our ecosystem: from our card-to-card money transfer service to the instant money transfer system. This may lead to a decline in average commission in the money remittance market vertical and thus be dilutive to our payment average adjusted net revenue yield. In order to maintain our competitiveness, we must continue to ensure that our payment processing system provides a more convenient and attractive option for merchants, customers and partners than alternative systems that may not require payment of a processing fee. Retail banks and various payment service providers are constantly developing low to zero-commission payment channels for their consumers. To attract consumers, we also offer certain services on a commission-free basis, such as most peer-to-peer transfers within Qiwi Wallet and certain payments in e-commerce. Despite our efforts, consumers may still choose to use other payment service providers, even if those providers do not offer the convenience that we do, because they charge lower fees. In addition, because merchants, partners and agents are able to switch between different payment service providers, we may face additional pressure to reduce the fees we charge due to increased competition from other payment service providers.

Our payment average adjusted net revenue yield is also impacted by the cost to us of consumers reloading their Qiwi Wallet accounts. We make available to our consumers a large variety of methods to reload the Qiwi Wallet accounts, including, among others, bank cards and accounts, mobile phone balances, kiosks and terminals and ATMs. Customers can also receive different payouts or money transfers to their wallets. The top up methods have different cost implications for us and such cost implications can change for different channels overtime. For example, on payments made through

the kiosks and terminals owned by our agents, we historically have paid lower fees for reloading the Qiwi Wallet than on most payments made from bank cards, as well as certain other channels. However, recently kiosks became a relatively more expensive top up channel for us. Additionally, since we provide payment processing services to merchants in the sports betting industry, betting gains received by our consumers into their Qiwi Wallet accounts also represent an important and cost-efficient source of Qiwi Wallets reloads, which could decline if our presence as a payment provider in the sports betting market diminishes for any reason. Should the relative weight of these reload channels in our total mix decline, this could put a negative pressure on our yields. We currently do not attempt to direct consumer preferences towards any particular reload methods. If reload methods that come at a higher cost to us were to constitute a larger proportion of our overall reload channels mix, our margins could be adversely affected, which could have a material adverse effect on our business, financial condition and results of operations.

10

[Table of Contents](#)

Our payment services segment net revenue yield, which we calculate by dividing payment services segment net revenue by the total payment volume of the transactions we process, is affected by changes in our payment average adjusted net revenue yield and by our ability to generate revenue from payment-related value added services, as well as passive revenue such as interest income on the wallet balances we hold and revenue from fees for inactive accounts and unclaimed payments. If we are not able to generate such additional revenues for any reasons including regulatory restrictions (see "– *We are subject to extensive government regulation*"), intensified competition or other reasons outside of our control, our financial condition and results of operation could be materially negatively affected.

If payment average adjusted net revenue yield or payment services segment net revenue declines as a result of any of these or other factors, we will have to offset the financial impact of such decline by increasing our payment volume, through the development and enhancement of existing and new services and products. We cannot assure you that we will be able to increase our payment volumes or that any new services we introduce or new products we develop will be profitable. If we are unable to offset the decline in our payment average adjusted net revenue yield resulting from this and other factors, our business, financial condition and results of operations could be materially adversely affected.

***If we cannot keep pace with rapid developments and change in our industry and provide new services to our clients, or if any of the new products we roll out are unsuccessful, the use of our services could decline, and we could experience a decline in revenue and an inability to recoup costs.***

The financial services industry in which we operate is characterized by rapid technological change, new product and service introductions, evolving industry standards, changing customer needs and the entrance of more established market players seeking to expand into these businesses. In order to remain competitive, we continually seek to expand the services we offer and to develop new projects. These projects carry risks, such as delays in delivery, performance problems, lack of customer acceptance, failure to adequately assess the potential revenues and budget the expenses of a project and the amount of investment required by it, failure to anticipate potential pitfalls and issues, and misjudgment of a need for a particular product by the intended customer base, among other things. In our industry, these risks are acute. Any delay in the delivery of new services or the failure to differentiate our services or to accurately predict and address market demand could render our services less desirable, or even obsolete, to consumers, merchants or partners, and hurt our future prospects. For example, if alternative payment and credit mechanisms become widely available, thereby substituting our current products and services, and we do not develop and offer similar alternative payment and credit mechanisms successfully and on a timely basis, our business and its prospects could be adversely affected. At the same time, if a new product we roll out or acquire fails to perform as anticipated, this could similarly adversely affect our business, financial position and results of operations. Since we position ourselves as a provider of next generation payment and financial services, many of these new products are based on business models that are unproven and are essentially start-ups launched to test a hypothesis based on various assumptions regarding consumer behavior patterns and demands. These assumptions may ultimately prove wrong and we may not be able to convert these hypotheses into sustainable businesses and recoup our investments made in such businesses. These risks have materialized in particular with respect to Rocketbank, which we acquired from Otkritie in 2017 and which we are currently winding down. These risks are also applicable to the SOVEST project, for which few equivalents exist in Russia or internationally. Its business model currently continues to evolve, while the project is operating at a loss. SOVEST is a cash-intensive project for us, since we have to invest in the development and marketing of a project with a model that is novel to the market as well as use our own funds to provide funding to our customers to make purchases from the merchants with the use of SOVEST cards. Although we expect SOVEST to reach a breakeven point in 2020, there can ultimately be no assurance that it will be able to achieve it and find a right model to scale the project and recover the investments. See also "– *Our business is exposed to counterparty and credit risks*" and "– *Our operations may be constrained if we cannot attract or service future debt financing.*" Since 2018 we have been testing various multi-bank platform models to develop SOVEST primarily in order to share the funding and credit risk with partner banks. We have, however, not been able to ultimately create such platform on a mutually acceptable and economically efficient terms with any partner bank and have discontinued such attempts as of the date of this annual report. We therefore currently bear the majority of the SOVEST credit portfolio, credit risks and funding costs on our own (except for the pilot SOVEST portfolio in AkBars bank), which could cause us to adjust our plans regarding SOVEST. We cannot rule out the possibility that we might have to substantially modify or scale down the SOVEST project, or we may face a substantial increase in the cost of risk that we may not be able to manage and thus may suffer additional losses. Although Tochka is more of an established operation with a business model that has proved itself, it may face challenges with further developing its product offering or expanding the scope of its operations due to constraints imposed by the terms of our equity associate, co-owned by Otkritie, that now holds the Tochka business, or by any regulatory hurdles. For example, AML and KYC requirements and regulations all across the banking industry, and in the small and medium enterprises ("SME") end-market especially, are constantly evolving and may generally lack widely accepted principals, may often be relatively nonadoptive or difficult to observe and may be subject to varying interpretations by different market participants and regulatory bodies. Hence, we may not be able from time to time to onboard new clients at a targeted pace even if such small and medium-sized businesses are entirely legitimate, or we may be subject to fines, penalties or operational restrictions if any of the appropriate regulatory bodies interprets industry practices or regulations differently from us or if such interpretations changes over time. If any such restrictions or fines were imposed or if we are not able to onboard clients with a projected pace for any of the above reasons or otherwise, our business, financial condition and results of operations could be materially adversely affected. Furthermore, the anticipated returns of Tochka may fail to be achieved due to the failure of Otkritie Bank to perform under its obligations to us, which it assumed in connection with our agreements in respect of Tochka, or any conflict between us and Otkritie with respect to the development of Tochka; see "– *We may not be able to complete or integrate successfully any potential future acquisitions, partnerships or joint ventures.*"

We may be unable to recover the costs we have incurred in developing, rolling out, implementing and marketing new products and services. Our

development efforts could result in increased costs and we could also experience a loss in business that could reduce our earnings or could cause a loss of revenue if promised new services are not timely delivered to our clients, are not able to compete effectively with those of our competitors or do not perform as anticipated. As we enter markets that are new for us with our new products and services offerings, we face additional operational, regulatory and other risks that we may not be able to adequately address due to our lack of experience in such markets and the associated risks.

11

Table of Contents

We also actively develop other new products, services and technologies, including in the areas of big data, blockchain and cryptoprocessing. If our efforts in connection with any of such research and development initiatives do not pay off as expected, this will result in the loss of our investment both in terms of money and management time, which could adversely affect our profitability.

Additionally, in order to remain competitive in an innovative industry such as ours, we have to make investments in start-up companies or undertake different research and development initiatives. If our investments in start-up companies or research and development initiatives do not yield the expected results, we may lose money, time and effort invested.

If we are unable to develop, adapt to or access technological changes or evolving industry standards on a timely and cost effective basis, or if our new initiatives do not yield the expected results, our business, financial condition and results of operations could be materially adversely affected.

***We are subject to the economic risk and business cycles of our merchants, partners and agents and the overall level of consumer spending.***

The financial services industry depends heavily on the overall level of consumer spending, which affects each of our operating segments. We are exposed to general economic conditions that affect consumer confidence, consumer spending, consumer discretionary income or changes in consumer purchasing habits. Economic factors such as employment levels, business conditions, energy and fuel costs, interest rates, inflation rate and the strength of the ruble against foreign currencies (in particular the U.S. dollar) could reduce consumer spending or change consumer purchasing habits. A reduction in the amount of consumer spending could result in a decrease in our revenue and profits. If our merchants or partners make fewer sales of their products and services using our services or consumers spend less money per transaction, the volume of payments our Payment services segment processes will decline, resulting in lower revenue. A further weakening in the economy could have a negative impact on our merchants, as well as consumers who purchase products and services using our payment processing systems, which could, in turn, negatively impact our business, financial condition and results of operations, particularly if the recessionary environment disproportionately affects some of the market segments that represent a larger portion of our payment processing volume. In addition, these factors could force some of our merchants and/or agents to liquidate their operations or go bankrupt, or could cause our agents to reduce the number of their locations or hours of operation, resulting in reduced convenience of our service. Similarly, deteriorating economy and reduced consumer spending may translate into a decline in number of transactions with, or average ticket of, our SOVEST cards and may also affect the creditworthiness of customers, which could result in increased credit risk (see "– *Our business is exposed to counterparty and credit risks*"). Tochka is also exposed to the negative repercussions of the economic slowdown since its business depends on the general level of entrepreneurial activity, which tends to be lower during such periods. We also have a certain amount of fixed costs, including salaries and rent, which could limit our ability to adjust costs and respond quickly to changes affecting the economy and our business.

Russia's economy has been facing significant challenges for the past few years due to the combined effect of the ongoing crisis in Eastern Ukraine, the deterioration of Russia's relationships with many Western countries, the economic and financial sanctions imposed in connection with these events on certain Russian companies and individuals, as well as against entire sectors of Russian economy, by the U.S., EU, Canada and other countries, a steep decline in oil prices, a record weakening of the Russian ruble against the U.S. dollar, a lack of access to financing for Russian issuers, capital flight and a general climate of political and economic uncertainty, among other factors. (See "– *Economic instability in Russia could have an adverse effect on our business*" and "– *The situation in Ukraine and the U.S., EU and other sanctions that have been imposed could adversely impact our operations and financial condition*"). The Russian economy contracted in both 2015 and in 2016, although it returned to modest growth in 2017—2019. During 2014-2016, the population's purchasing power decreased due to the weakening of the ruble, basic necessities such as food products and utilities became more expensive, and consumer confidence declined significantly, according to the Russian Consumer Confidence Overall Index reported by Rosstat. According to Rosstat, inflation was 11.4% in 2014 and 12.9% in 2015 (although it relatively stabilized in subsequent years even if the 3% inflation in 2019 fell behind the targets set by the CBR), while real disposable income has been declining for five years in a row as of the end of 2018 with 0.2% decline in 2018 (and only increased by 0.8% for the first time in six years in 2019) according to Ministry of Economic Development data. Against this backdrop, household consumption decreased in 2015 versus 2014, although it subsequently rebound somewhat in absolute terms, according to Rosstat. Nevertheless, consumer spending generally remains cautious and consumer confidence is far from its peaks. The modest recovery of the Russian economy in recent years has, however, again been put at risk by a series of events in February-March 2020. The outbreak of the COVID-19 strain of coronavirus and associated responses from various countries around the world in early 2020 have negatively affected consumer demand across the globe and across industries, and there is the potential for COVID-19 and the responses to it to cause a global recession. One immediate effect of the coronavirus outbreak was a substantial plunge in the price of crude oil due to extended factory shutdowns and a fall in air travel and road transportation. In response, the Organization of the Petroleum Exporting Countries (OPEC) has attempted, and failed, to reach agreement with Russia on a deal to cut oil production, which resulted in crude prices plummeting further. Following the news, oil prices fell 10.1% to end at $41.28 per barrel on the day the proposed OPEC-Russia deal failed to be reached, and have subsequently declined even further to around $30 per barrel of Brent crude oil (from over $65 at the start of the year). As a result, the Russian ruble has significantly and abruptly depreciated against the U.S. dollar and euro (the decline against the US dollar, for instance, constituted 23% compared to the exchange rate as of January 1, 2020, and 17% in the month of March alone, as of March 19). Furthermore, on March 19 it was reported in the media that the administration of President Trump is considering intervening in the OPEC-Russian oil-price conflict with a diplomatic push to get the Saudis to cut oil production and threats of sanctions on Russia aimed at stabilizing prices, although the details of those possible sanctions and what Russian action might trigger them weren't specified. The full scope of the negative impact that COVID-19 and the abrupt decline in oil prices and resulting exchange rate drop may have on the Russian economy remains unclear but has the potential to be very significant. A prolonged economic slowdown in Russia could have a significant negative effect on consumer spending in Russia and, accordingly, on our business. As a result of the challenging operating environment in Russia, we have experienced slower payment volume growth in certain of our payment categories and payment volume decline in certain others, in particular certain types of money remittances and financial services categories. Further adverse changes in economic conditions in Russia could adversely impact our future revenues and profits and cause a material adverse effect on our

business, financial condition and results of operations.

12

Table of Contents

***If customer or merchant confidence in our business deteriorates, our business, financial condition and results of operations could be adversely affected.***

Our business is built on customers' and merchants' confidence in our brands, as well as our ability to provide fast, reliable payment services, including electronic payment and payment processing services, and other financial services. The strength of our brands and reputation are of paramount importance to us. A number of factors could adversely affect customer confidence in our brands, many of which are beyond our control, and could have an adverse impact on our results of operations. These factors include:

- illegal or improper use of our systems and compliance related concerns;

- regulatory action or investigations against us;

- any significant interruption to our systems and operations; and

- any breach of our security system or any compromises of consumer data.

In addition, we are to some extent dependent on our agents, merchants and partners to which we license our products to maintain the reputation of our brands. Despite the measures that we put in place to ensure their compliance with our performance standards, our lack of control over their operations may result in the low quality of service of a particular counterparty being attributed to our brands, negatively affecting our overall reputation. For example, our agents are able to charge consumers fees for the use of the kiosks and terminals operated by them, in addition to the fees charged by us, and we mostly do not cap or otherwise control the level of such fees levied by our agents on consumers. We can provide no assurance that our agents will not raise these fees to a level that will adversely affect the popularity of our products among consumers. We also might determine to cap this type of fee to protect the strength of our brand and thereby lose some of our agents and points of physical presence. Furthermore, negative publicity surrounding any assertion that our agents, merchants and/or partners are implicated in fraudulent transactions, irrespective of the accuracy of such publicity or its connection with our current operations or business, could harm our reputation.

Any event that hurts any of our brands and reputation as a reliable financial services provider could have a material adverse effect on our business, financial condition and results of operations.

***Qiwi Bank and other Russian banks and credit organizations operate in a highly regulated environment and increased regulatory scrutiny could have an adverse effect on our business, financial condition and results of operations.***

Qiwi Bank is central to the operation of all of our key business segments as it provides issuing, acquiring and deposit settlement functions within our group, serves as the issuing bank for our payment-by-installment SOVEST cards and Rocketbank cards, and is the banking institution behind Tochka's banking services offering (along with our partner Otkritie Bank) and our recently launched electronic bank guarantees business (part of the Factoring Plus project). In June 2015, we acquired Rapida LTD, a non-banking credit organization, from Otkritie Investment Cyprus Limited, or Otkritie. Rapida LTD was merged into Qiwi Bank in 2017.

All banks and non-banking credit organizations operating in Russia are subject to extensive regulation and supervision. Requirements imposed by regulators, including capital adequacy, liquidity reserves, prudential ratios, loss provisions and other regulatory requirements are designed to ensure the integrity of the financial markets and to protect consumers and other third parties with whom a bank deals. These regulations may limit our activities, and may increase our costs of doing business, or require us to seek additional capital in order to comply with applicable capital adequacy or liquidity requirements. Existing laws and regulations could be amended, the manner in which laws and regulations are enforced or interpreted could change and new laws or regulations could be adopted. Russian banks also have extensive reporting obligations, including, without limitation, disclosure of financial statements, various operational indicators, and affiliates and persons who exercise (direct or indirect) influence over the decisions taken by the management bodies of the bank. The CBR may at any time conduct full or selective audits of any bank's filings and may inspect all of its books and records.

Both Qiwi Bank and Rapida LTD have been the subject of CBR investigations in the past that have uncovered various violations and deficiencies in relation to, among other things, reporting requirements, anti-money laundering, cybersecurity, compliance with applicable electronic payments thresholds requirements and other issues which we believe we have generally rectified. In the course of 2018, Qiwi Bank underwent a major scheduled audit by the CBR as part of its ongoing supervisory process, which resulted in CBR identifying a number of violations and imposing certain sanctions on us. The measures that the CBR has so far imposed on us in response have not had a significant impact on our operations and have been mostly lifted. We believe that we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward. However, there can be no assurance that additional sanctions will not be imposed on us as a result of such or any other findings and that we will not come under greater CBR scrutiny in connection with any perceived deficiencies in our past conduct, or that any currently planned or future inspections will not result in discovery of any significant or minor additional violations of various banking regulations, and what sanctions the CBR would choose to employ against us if this were to happen. Any such sanctions could have a material adverse effect on our business, financial condition and results of operations.

13

Table of Contents

Moreover, the scrutiny can be expected to increase in connection with our involvement in the SOVEST, Tochka and Rocketbank projects as they have extended the scope of traditional commercial and retail bank services that Qiwi Bank is providing. Additionally, some of our new projects require significant funding and therefore put certain pressure on the ability of Qiwi Bank to comply with applicable capital requirements and other prudential ratios, while through other projects we are engaged in managing substantial amounts of consumer's funds. Any breach of applicable regulations could expose us to potential liability, including fines, prohibition to carry out certain transactions for a period of up to six months (or more in the event of repeated violations), the introduction of temporary administration by the CBR and in certain instances the revocation of our banking license. Revocation of Qiwi Bank's banking license would significantly hinder our ability to process payments, and would result in a decrease of our profitability, damage our reputation and could cause other regulators to increase their scrutiny of our activities. If Qiwi Bank's banking license is revoked, we would effectively be unable to provide most of our services. For these reasons, any material breach of laws and regulations by Qiwi Bank or the revocation of its banking licenses could have a material adverse effect on our business, financial condition and results of operations.

Recent developments in the Russian banking sector (see "–*The banking system in Russia remains underdeveloped* ") have put increasing pressure on Qiwi Bank, and have also impacted, and we expect may continue to impact, our business in a number of other ways, including a decrease in consumer lending from most large and medium sized banks, resulting in less loan repayments through our network and therefore reduced fees as well as a decrease of Contact's network of partner banks through which it operates and corresponding decline in the reach of its network and thus money remittance volumes. All of these factors could materially adversely affect our business, financial condition and results of operations.

### *A decline in the use of cash as a means of payment or a decline in the use of kiosks and terminals may result in a reduced demand for our services.*

A substantial part of the Russian population continues to rely on cash payments, rather than credit and debit card payments or electronic banking. Our business developed as a network of kiosks and terminals allowing consumers to use physical currency for online payments, and our core competitive edge at the time was our ability to offer consumers that primarily used cash as means of payment access to online payments through our kiosks and terminals simultaneously offering merchants access to a large pool of customers that use cash. While we have since largely outgrown that model, our kiosks and terminals network remains a significant part of our infrastructure as a reload and client acquisition channel for Qiwi Wallet. We believe therefore that the usage of Qiwi Wallet and hence our volumes, revenues and the profitability of our payment services segment continues to depend to some extent on the use of cash as a means of payment and the reach of our kiosks and terminals network. Over time, the prevalence of cash payments is declining as a greater percentage of the population in emerging markets is adopting credit and debit card payments and electronic banking, and our kiosks and terminals network is decreasing. Unless we can successfully differentiate ourselves from competition in the payments and financial services market through other features and functionalities beyond providing a pathway to online payments for consumers who continue to rely on cash through our kiosks and terminals network, and the access to this consumer segment for merchants and partners, the shift from cash payments to credit and debit card payments and electronic banking could reduce our market share and payment volumes and may have a material adverse effect on our business, financial condition and results of operations.

Other factors could also contribute to a decline in the use of kiosks and terminals, including regulatory changes, increases in consumer fees imposed by the agents (see "– *If customer and merchant confidence in our business deteriorates, our business, financial condition and results of operations could be adversely affected* "), and development of alternative payment channels. The overall number of and the use of kiosks underwent a substantial decline in 2015 as a result, among other things, of enhanced scrutiny by the CBR over the compliance by the agents with legislation that requires them to remit their proceeds to special accounts (see *"- Regulation – Regulation of Payment Services* "), and has been continuously declining since. Such decline has adversely affected the availability and convenience of our services to consumers, including the convenience of use of Qiwi Wallet, for which historically kiosks and terminals have been the most popular reload channel. There can be no assurance that this negative impact will not continue going forward as increased regulatory pressures put more agents out of business and deter new ones from entering it. Other statutory requirements that could have a similar effect on our business if fully enforced are the amendments to the Federal Law of the Russian Federation No. 54-FZ "On the use of cash registers in cash payments and (or) settlements with the use of payment cards", dated May 22, 2003 (as amended). In particular, the law mandates that all kiosks (subject to certain exceptions) should be equipped with new or modernized cash registers. There can be no assurance that our agents are and will continue to be fully in compliance with these requirements, which could cause a further reduction of our kiosk network. Moreover, failure to comply with such enhanced control measures by us or our agents could result in the CBR imposing fines or restrictions on our activities (see "– *Qiwi Bank and other Russian banks and credit organizations operate in a highly regulated environment, and increased regulator scrutiny could have an adverse effect on our business, financial condition and results of operations* "). All of these factors could have a material adverse effect on our business, financial condition and results of operations.

### *We are subject to extensive government regulation.*

Our business is impacted by laws and regulations that affect our industry, the number of which has increased significantly in recent years. We are subject to a variety of regulations aimed at preventing money laundering and financing criminal activity and terrorism, financial services regulations, payment services regulations, consumer protection laws, currency control regulations, advertising laws, betting laws and privacy and data protection laws and therefore experience periodic investigations by various regulatory authorities in connection with the same, which may sometimes result in monetary or other sanctions being imposed on us. Further, these laws and regulations vary significantly from country to country. Many of these laws and regulations are constantly evolving, and are often unclear and inconsistent with other applicable laws and regulations, including across various jurisdictions, making compliance challenging and increasing our related operating costs and legal risks. If local authorities in Russia or other countries choose to enforce specific interpretations of the applicable legislation that differ from ours, we may be found to be in violation and subject to penalties or other liabilities. This could also limit our ability to provide some of our services going forward and may increase our cost of doing business.

14

**Table of Contents**

Changes in our industry are rapid, and new products that we develop may become subject to government regulation undoing the benefits we expect to derive from such products. In some jurisdictions where we operate, there is currently little or virtually no legislation addressing electronic payments, and no assurance can be made that if such legislation is adopted it will be beneficial to our business. Court interpretations and applicability of

legislation and regulations in certain jurisdictions in relation to our business can be ambiguous or contradictory, and it is possible that authorities in such jurisdictions may determine that we are required to possess additional licenses, permits or registrations to provide our services. Such licensing or compliance processes may be time consuming and expensive and we may not be successful in acquiring any newly required licenses. If we fail to obtain and maintain required licenses, permits or registrations or comply with certain mandatory procedures in any jurisdiction where we operate, we may face fines, penalties, sanctions, experience a loss of revenues or have to discontinue providing certain services or doing business altogether. With respect to countries that do have an established regulatory framework for the types of services that we provide, no assurance can be given that the relevant legislation will not be amended to the detriment of our business, including due to the lobbying efforts undertaken by or on behalf of our competitors. For instance, any restrictions including complete prohibition, ban of specific reload methods or various quantitative caps on the use or reloads of anonymous e-wallets could have a significant negative impact on our business. Generally, Russian lawmakers and enforcement agencies have recently demonstrated increased scrutiny in matters relating to cyberspace and e-payments, as borne out in the enhanced enforcement activities in the kiosk market, the de-anonymization of e-payments and various other initiatives aimed at increasing state control over online activities.

For example, in early 2018 it was reported that the CBR, Rosfinmonitoring and the Ministry of Finance are actively discussing new proposed legislation that would ban the use of anonymous e-wallets completely. In 2019, amendments to the National Payment System Law were introduced that prohibit the reloading of anonymous e-wallets other than from a bank account. This development could have the effect of making our onboarding process more complicated and therefore our service less attractive, which would in turn slow down the influx of new users or the cost of their engagement. Our revenues may also be adversely affected by further regulation of fees charged on inactive accounts for their continued maintenance and unclaimed payments, which represent a significant revenue stream for us. We have voluntarily signed up to the Memorandum adopted by the E-Money Market Participants Association (a non-state association of fintech players in Russia that we are a founding member of) which imposes certain guidelines with respect to the treatment of such inactive account fees and have had to adjust our policies with respect to such fees upon our accession to the Memorandum. The negative financial impact from such adjustment has been limited so far; however, any further regulation in this regard, whether legislation introduced by state authorities or rules voluntarily self-imposed by the industry, imposing more stringent restrictions than those currently in existence, could have a further adverse effect on such revenue stream.

Another recent regulatory measure that could potentially result in a decline in the use of e-wallets and adversely affect our business is the requirement to report all all newly opened e-wallets in the same manner the banks report new bank accounts. Since recently, we are required to report such new wallets to the CBR and in 2020 a set of amendments to the Russian Tax Code will enter into force that will require us to additionally report our identified wallets to tax authorities. These measures could result in a slowdown in the growth of our user base or negatively affect the propensity of our users to identify their e-wallets and consecutively lead to a decline in the use of e-wallets of different levels of identification (see "— *Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes*") and hence negatively affect our results of operations. Our growth plans could be further adversely affected if we are required to undertake any additional reporting or other functions with respect to e-wallets.

In July 2019, another development in the area of e-payments in Russia was signed into law that toughens control over the activities of foreign payment systems, foreign electronic payment services and payment aggregators in Russia. If these amendments are interpreted as prohibiting the use of foreign payment aggregators (which we currently understand not to be the case), we would have to make changes to our established practices of working with international merchants and payment aggregators, which could have a significant negative impact on our business, in particular in the e-commerce space. Additionally, these developments could cause us to lose the business of other international payment services providers for which we serve as the conduit to the Russian market to the extent they do not choose to localize their Russian operations.

Generally, Russian lawmakers and enforcement agencies have recently demonstrated increased scrutiny in matters relating to cyberspace and e-payments, as borne out in the enhanced enforcement activities in the kiosk market, the de-anonymization of e-payments and various other initiatives aimed at increasing state control over online activities.

Furthermore, recently there has been increased public attention and heightened legislation and regulations regarding money laundering and terrorist financing. We sometimes have to make significant judgment calls in applying anti-money laundering legislation and risk being found in non-compliance with it, particularly in relation to its mandatory client identification requirements, if, for example, we process payments made by our consumers from their Qiwi Wallet accounts for amounts in excess of the thresholds imposed by anti-money laundering legislation or for certain types of merchants without the required client identification. Although we use all methods available for client identification in all our projects and believe our practices in this regard are in compliance with legal requirements and in line with market practice (see "— *Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes*"), the Russian regulators may view us as being non-compliant and impose fines and other sanctions on us. There can also be no assurance that the mandatory client identification requirements under the anti-money laundering legislation will not change further in a manner adverse to our business, for example, through making the identification process more burdensome or through lowering the thresholds for transactions which non-identified customers or customers that only underwent the simplified identification process can perform (see "Regulation"), which could result in lower payment volumes for us. For instance, there have already been proposals from certain government

Table of Contents

officials to ban payments by unidentified consumers altogether. On December 31, 2017, a new law came into force prescribing that the CBR may limit the number of bank accounts opened in aggregate in any number of banks to a client that has only been identified remotely, the amount of credit that may be provided to such customer, or the number of transactions such customer may perform within a month. Any further adverse change to these requirements could have a substantial negative effect on our business.

Risks associated with applying anti-money laundering legislation may be further exacerbated for us in connection with financial services projects, particularly Tochka, that is focused on servicing small and medium sized business entities. Tochka is providing services to legal entities, which execute a significant number of transactions that are under scrutinized control of the regulatory authorities. Thus, the complexity of transactions and clients that we serve and consequently the number of suspicious transactions has materially increased exposing us to extensive ongoing control of the regulator. See

also "– *Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes.*"

Certain sanctions relating to the ongoing hostility between Russian and Ukraine, and Russian countersanctions instituted in response, directly target payment services providers such as ourselves. In November 2016, the National Bank of Ukraine banned several Russian payment services providers from the Ukrainian market. In response, in April 2017, a law was enacted in Russia prohibiting certain types of money remittance from Russia to countries that have introduced sanctions against Russian payment systems (which, to our knowledge, so far only include Ukraine). Moreover, in May 2018, Qiwi Bank, one of our key subsidiaries, was added to the list of sanctioned entities by the Ukrainian government. While we have not experienced any substantial operational difficulties in connection with this so far, there can be no assurance as to what effect the imposition of sanctions on us by Ukraine might have in the future, or what further adverse actions the government of Ukraine might take against us. Any determination by a relevant regulator that we have not complied with the spirit or text of any such sanctions or regulations, or even any statements to that effect, may have a material adverse effect on our business, financial condition and results of operations, as well as the price of our ADSs. While Ukraine remains the only country so far to introduce sanctions of this type, there can be no assurance that additional sanctions affecting the payments business will not be imposed by regulators in other countries in which we operate.

Tax legislation regarding electronic payments and other online services keeps evolving. In July 2016, a bill was signed into law in Russia making online services subject to VAT at the location of the customer, which would require any foreign companies selling certain online services in Russia to register as taxpayers in Russia and pay VAT on Russian sales (see—" *VAT on digital services in Russia* "). The new law also requires companies providing settlement services on behalf of the foreign merchants to act as tax agents and withdraw and remit to the tax authorities the applicable VAT. If we are found to have any obligations under this law or not be in compliance with such obligations or if the authorities choose to enforce specific interpretations of the applicable legislation that differ from ours, we could face significant adverse tax consequences. We could also experience a reduction in volumes from our foreign merchants as they cease or downsize their sales to Russia in the light of the new regulation.

The regulatory framework around electronic payments and other financial services that we offer is in a state of development in most of the countries in which we operate. For example, on January 1, 2017, the Regulatory Framework for Stored Values and Electronic Payment Systems came into force in the United Arab Emirates. It introduced a mandatory licensing and related compliance regime for certain electronic payment service providers and established a one-year transitional period for existing digital payment services providers to take appropriate measures to comply with the new rules. In case of failure to do so payment services provider may be mandated to cease provision of such services. Moreover, any individual or entity providing (or representing themselves as capable of providing) digital payment services without the appropriate license or authorization will be subject to administrative penalties. Implementing legislation and clarifications still remain to be adopted, and we are still assessing the applicability and potential impact of the new legislation on our business. If our position on our status under the Regulatory Framework is different from that of the UAE regulator or if we are unable to comply with the mandatory licensing if it is deemed applicable to us, it could have a material adverse effect on our business, financial condition and results of operations. Effective January 1, 2018, the United Arab Emirates introduced a value added tax at a rate of 5% for certain types of services (while other types of services are subject to a zero tax rate or benefit from exemptions). Although currently we do not expect to be affected materially by this new law, there can be no assurance that we will not be materially affected by it in the future. Any material changes in the applicable legislation, its interpretation by the relevant authorities or their enforcement practice could increase our tax burden substantially and thus reduce our margins.

Further, since the end of 2014 our subsidiary in Kazakhstan is subject to local financial monitoring legislation that imposes certain client identification requirements on us. In connection with this legislation, we had to restructure our operations in Kazakhstan to make our Kazakh subsidiary the operator of our payment system in the country in 2015. As the anti-money laundering legislation in Kazakhstan is still relatively nascent and undeveloped, we may face various difficulties when implementing such legislation. If we are not able to comply with the applicable legislation for any reason, we could become subject to regulatory action in Kazakhstan and could face fines or significant restrictions on our operations in the country. Moreover, the Law of the Republic of Kazakhstan No. 11-VI "On Payments and Payment Systems", dated July 26, 2016, that came into force in September 2016 introduced a more comprehensive regulatory regime for the payments market in general and brought the Kazakh legislation more in line with the international standards. Since the position of the local regulator in relation to the enforcement of this legislation is not yet clear and established, we may be found in violation of applicable laws and regulations and be subject to penalties or other liabilities.

Subsequent legislation and regulation and interpretations thereof, litigation, court rulings, or other events could expose us to increased costs, liability and reputational damage that could have a material adverse effect on our business, financial condition and results of operations.

16

Table of Contents

*We derive a substantial portion of our revenues from merchants in the betting industry.*

We provide payment processing and acquiring services to a number of merchants in the betting industry. Processing payments to such merchants constituted approximately 9.5%, 15.5% and 21.6% of our payment services segment payment volume for the periods ended December 31, 2017, December 31, 2018 and December 31, 2019 respectively. These volumes are included in our E-commerce market vertical. Processing payments for this category of merchants generally carries higher average margins then processing payments to merchants in most other market verticals that we serve and corresponded to a significant part of our revenues in our payment services segment in 2019. We also provide winning repayment services to such merchants including processing of winnings to banking cards that is included in our Money Remittances market vertical and repayment of winnings to QIWI Wallets that is not included in our payment volume. Moreover, the repayment of winnings by such merchants to the customers' QIWI Wallets serves as an important and economically beneficial reload channel and new customer acquisition tool, contributing to the sustainability and attractiveness of our ecosystem. Our operating results will continue to depend on merchants in the betting industry and their use of our services for the foreseeable future. The betting industry is subject to extensive and actively developing regulation in Russia, as well as increasing government scrutiny. Under amendments to the Russian betting laws introduced in 2014 (see "Regulation"), in order to engage in the betting industry, a bookmaker has to become a member of a self-regulated organization of bookmakers and abide by its rules, and any and all interactive bets may be only accepted through an Interactive Bets Accounting Center (TSUPIS) set up by a credit organization together with a self-regulated association of bookmakers. In 2016 QIWI Bank established a TSUPIS together with one of the self -regulated associations of bookmakers in order to be able to accept such payments. If any of our

merchants engaged in the betting industry is not able or willing to comply with the Russian betting legislation or if they decide to cease their operations in Russia for regulatory reasons or otherwise or shift to another payment processor (TSUPIS), we would have to discontinue servicing them and would lose associated volumes and income. Moreover, if we are found to be in non-compliance with any of the requirements of the applicable legislation, we could not only become subject to fines and other sanctions, but could also have to discontinue to process transactions that are deemed to be in breach of the applicable rules and as a result lose associated revenue streams. Effective January 1, 2018, relevant legislation has been supplemented with the concept of government blacklisting of betting merchants that have been found to be in violation or allegedly are not in compliance with applicable Russian laws, and the requirement for credit institutions to block any payments to such blacklisted merchants. We have already experienced a number of instances where certain providers have been blacklisted and we observe that this trend is gaining momentum and further blacklistings are likely. Any of these developments may result in the contraction of the betting sector or our share in this market and therefore adversely affect the revenues, margins and payment net revenue yield of our E-commerce market vertical and overall Payment Services segment as well as decrease the attractiveness of our ecosystem to some of our consumers and consequently overall negatively affect consumer engagement with our services. Furthermore, if any of our merchants engaged in the betting industry are blacklisted, our subsidiaries, which process the payments for betting merchants may be found to be in violation of the relevant laws, whether due to misinterpretation of applicable requirements, failure to take timely action, or for any other reason, and could become so blacklisted as well, which could substantially hinder our operations.

We may also be subject to reputational risks associated with being involved in the betting business through offering our payments services to betting merchants. For example, in July 2016, we were served with notices from Roskomnadzor, the Russian state agency responsible, among other things, for overseeing the media and Internet, stating that we had breached Russian laws on public distribution of information about gambling, since our website contained links to services offered by certain betting operators which were allegedly not in compliance with the Russian betting legislation. We have complied with the prescriptions contained in the notices. However, there can be no assurance that further violations will not occur in the future as we service a wide variety of merchants and depend on their compliance with relevant laws in this regard. If we are found to be in breach, Roskomnadzor or other agencies could take further action against us, including by blocking our website or imposing fines or other sanctions. Furthermore, we could face similar difficulties in other jurisdictions since online betting is an area of intense focus by regulators in many of the countries in which we operate. If we have to terminate our relationships with any of our major merchants in the betting industry, whether for regulatory or reputational reasons or otherwise, and are unable to replace this business, if our current terms of doing business with any of these merchants becomes significantly less favorable, or if we face adverse regulatory consequences associated with servicing such merchants, our business, financial condition and results of operations may be materially adversely affected.

*We may not be able to complete or integrate successfully any potential future acquisitions, partnerships or joint ventures.*

From time to time, we have evaluated and expect to continue to evaluate possible acquisition transactions, partnerships or joint ventures on an on-going basis, some of which may be material. At any time, including currently, we may be engaged in discussions or negotiations or diligence evaluations with respect to possible acquisitions, partnerships or joint ventures or may have entered into non-binding documents in relation to such transactions. As part of our strategy, we intend to continue our disciplined approach to identifying, executing and integrating strategic acquisitions, partnerships and joint ventures.

Potential future acquisitions, partnerships and joint ventures may pose significant risks to our existing operations if we acquire businesses that prove not to be a good fit for our organization, fail to perform the necessary due diligence on the relevant targets, overestimate their anticipated contribution to our business, overvalue them or fail to successfully integrate them. These projects would place additional demands on our managerial, operational, financial and other resources, create operational complexity requiring additional personnel and other resources as well as enhanced control procedures. In addition, we may not be able to successfully finance or integrate any businesses, services or technologies that we acquire or with which we form a partnership or joint venture. Furthermore, the integration of any acquisition may divert management's time and resources from our main business and disrupt our operations. Moreover, even if we were successful in integrating newly acquired assets, expected synergies or cost savings may not materialize, resulting in lower than expected benefits to us from such transactions. We may spend time and money on projects that fail to perform in line with our expectations or require financing in excess of what we were budgeting at the time of the acquisition. Additionally, when making acquisitions it may not be possible for us to conduct a detailed investigation of the nature of the assets being acquired due to, for instance, time constraints in making the decision and other factors. We may become responsible for additional liabilities or obligations not foreseen at the time of an acquisition. In addition, in connection with any

17

Table of Contents

acquisitions, we must comply with various antitrust requirements. It is possible that perceived or actual violations of these requirements could give rise to regulatory enforcement action or result in us not receiving all necessary approvals in order to complete a desired acquisition. To the extent we pay the purchase price of any acquisition in cash, it would reduce our cash reserves, and to the extent the purchase price is paid with our stock, it could be dilutive to our stockholders. To the extent we pay the purchase price with proceeds from the incurrence of debt, it would increase our level of indebtedness and could negatively affect our liquidity and restrict our operations. Our competitors may be willing or able to pay more than us for acquisitions, which may cause us to lose certain acquisitions that we would otherwise desire to complete. We may also face counterparty and credit risks in connection with acquisitions, partnerships and joint ventures in the event our counterparties fail to perform their obligations.

Some of these risks have materialized or may materialize in connection with our August 2017 acquisition of Tochka and Rocketbank assets from Otkritie Bank, one of the largest shareholders of our company. The acquisition of Tochka and Rocketbank assets was a complex deal involving a series of transactions to acquire the brands, software and hardware of both businesses, as well as a number of operational agreements with Otkritie Bank. We subsequently reached an agreement with Otkritie Bank and the founders of Tochka to operate Tochka together through a jointly-owned company that we account for as an equity associate. Furthermore, under the terms of the relevant documentation, all key shareholder decisions with respect to Tochka are to be made by a unanimous vote of the JV partners, and Otkritie has the right to buy out our share in Tochka together with the share of the founders of Tochka or separately in the event of a deadlock, while neither we nor the founders of Tochka enjoy a similar right. This potentially exposes us to various risks relating to conflicts with Otkritie or the founders of Tochka as our JV counterparties in JSC Tochka. In the event Otkritie changes its strategy with respect to Tochka, pursues a different development strategy, or experiences financial or other difficulties or if our or Otkrities' relations with the founders

or management of JSC Tochka deteriorates or in case of the inability of founders and management to run the business for any reasons outside of our control, this could have a material adverse effect on the operations of Tochka and consequently the ultimate success or failure of this transaction from our perspective. All of the above has resulted and may result in the future in us not being able to realize the full anticipated benefit of these acquisitions so far.

All of the above risks could have a material adverse effect on our business, results of operations, financial condition, and prospects.

### *We have grown rapidly in recent years and need to implement enhanced compliance processes, procedures and controls with respect to the rules and regulations that apply to our business.*

Our business has grown and developed rapidly in recent years and we are continuing to realign our compliance function with the size and scope of our business. In light of the fact that we are a highly regulated business that processes large volumes of payments, we need to have enhanced processes, procedures and controls in order to provide reasonable assurance that we are operating in compliance with applicable regulatory requirements. Given that we store and/or transmit sensitive data of our customers, we have ultimate liability to our customers for our failure to protect this data. As discussed in more detail below, we have experienced breaches of our cybersecurity in the past, and future breaches resulting in unauthorized disclosure of data are possible (see—*"Our services have been and may continue to be used for fraudulent, illegal or improper purposes, which could expose us to additional liability and harm our business."*). In addition, the Russian anti-money laundering laws to which we are subject contain numerous requirements with respect to identification of clients, and documentation and reporting of transactions subject to mandatory control and other suspicious transactions to the relevant authorities.

Following our acquisition of Rapida LTD in 2015, we have had to devote additional resources to enhance the compliance function within Rapida LTD, which, at the time of our acquisition, was deficient in several areas. As of the date of this annual report, we continue to develop and integrate certain control procedures with respect to our new projects SOVEST, Tochka, Rocketbank, Flocktory and Billing Online in order to maintain a comprehensive system of controls and procedures across our business. There can be no assurance, however, that the measures we undertake will be sufficient to prevent significant deficiencies in the compliance procedures and internal controls of our new projects. Moreover, we develop Tochka as an associate together with Otkritie Bank (see—*"We may not be able to complete or integrate successfully any potential future acquisitions, partnerships or joint ventures."*) and do not have the full control over operations and processes of JSC Tochka, which has an operational independence under respective agreements. Thus, there can be no assurance that we will be able to implement and successfully execute all necessary control procedures in JCS Tochka. Our failure to implement and maintain effective internal control over financial reporting could result in errors in our financial statements that could lead to a restatement of our financial statements, cause us to fail to meet our reporting obligations and cause investors to lose confidence in our reported financial information, which may result in a decline in the market price of our ADSs.

Among others, we are subject to the U.S. Foreign Corrupt Practices Act, or the FCPA, which prohibits U.S. companies and their intermediaries from bribing foreign officials for the purpose of obtaining or keeping business or otherwise obtaining favorable treatment, and other laws concerning our international operations. Similar legislation in other jurisdictions contains similar prohibitions, although varying in both scope and jurisdiction. We have implemented policies and procedures and internal controls designed to provide reasonable assurance that we, our employees, distributors and other intermediaries comply with the anti-corruption laws to which we are subject. However, there are inherent limitations to the effectiveness of any policies, procedures and internal controls, including the possibility of human error and the circumvention or overriding of the policies, procedures and internal controls. There can be no assurance that such policies or procedures or internal controls will work effectively at all times or protect us against liability under these or other laws for actions taken by our employees, distributors and other intermediaries with respect to our business or any businesses that we may acquire.

Our success requires significant public confidence in our ability to handle large and growing payment volumes and amounts of customer funds, as well as comply with applicable regulatory requirements. Any failure to manage consumer funds or to comply with applicable regulatory requirements could result in the imposition of fines, harm our reputation and significantly diminish use of our products. In

Table of Contents

addition, if we are not in compliance with anti-corruption laws and other laws governing the conduct of business with government entities and/or officials (including local laws), we may be subject to criminal and civil penalties and other remedial measures, which could have an adverse impact on our business, financial condition, results of operations and prospects.

### *Our success depends to a large degree on our ability to successfully address the rapidly evolving market for transactions on mobile devices.*

Mobile devices are increasingly used for e-commerce and money remittance transactions. A significant and growing portion of our customers access our payment services through mobile devices. We may lose customers if we are not able to continue to meet our customers' mobile and multi-screen experience expectations. The variety of technical and other configurations across different mobile devices and platforms increases the challenges associated with this environment. In addition, a number of other companies with significant resources and a number of innovative startups have introduced products and services focusing on mobile markets. Our ability to successfully address the challenges posed by the rapidly evolving market for mobile transactions is crucial to our continued success, and any failure to continuously increase the volume of mobile transactions effected through our platform could have a material adverse effect on our business, financial condition and results of operations.

### *Our systems and our third party providers' systems may fail due to factors beyond our control, which could interrupt our service, cause us to lose business and increase our costs.*

We depend on the efficient and uninterrupted operation of numerous systems, including our computer systems, software and telecommunications networks, as well as the data centers that we lease from third parties. Our systems and operations, or those of our third party providers, could be exposed

to damage or interruption from, among other things, fire, flood, natural disaster, power loss, telecommunications failure, vendor failure, unauthorized entry, improper operation and computer viruses. In addition, because all three of our data centers used for processing payments are located in the city of Moscow, a catastrophic event affecting the city of Moscow may result in the loss of both data centers. Substantial property and equipment loss, and disruption in operations as well as any defects in our systems or those of third parties or other difficulties could expose us to liability and materially adversely impact our business, financial condition and results of operations in all of our operating segments. In addition, any outage or disruptive efforts could adversely impact our reputation, brand and future prospects.

***Unauthorized disclosure of data, whether through cybersecurity breaches, computer viruses or otherwise, could expose us to direct loss, liability, protracted and costly litigation and damage our reputation.***

We store and/or transmit sensitive data, such as credit or debit card numbers, mobile phone numbers and other identification data, and we have ultimate liability to our customers for our failure to protect this data. We have experienced breaches of our security by hackers in the past, and breaches could occur in the future. In such circumstances, our encryption of data and other protective measures have not prevented unauthorized access and may not be sufficient to prevent future unauthorized access. For example, in January 2014 we discovered certain unauthorized activity in a number of wallet accounts. Although we do not believe that any confidential customer account data was compromised as a result of the activity, we incurred a loss of RUB 88 million. Rapida LTD (prior to its merger with and into QIWI Bank) also experienced several security breaches prior to our acquisition of the company. Any future breach of our system, including through employee fraud, may subject us to material losses or liability, including fines and claims for unauthorized purchases with misappropriated credit or debit card information, identity theft, impersonation or other similar fraud claims. A misuse of such data or a cybersecurity breach could harm our reputation and deter clients from using electronic payments as well as kiosks and terminals generally and any of our services specifically, increase our operating expenses in order to correct the breaches or failures, expose us to uninsured liability, increase our risk of regulatory scrutiny, subject us to lawsuits, result in the imposition of material penalties and fines by state authorities and otherwise materially adversely affect our business, financial condition and results of operations.

***If we fail to comply with the applicable requirements of our agreements with major payment systems, they could seek to fine us, suspend us or terminate our registrations.***

Under our agreements with major payment systems, including Visa, MasterCard and MIR, both existing and any such agreements we might enter into in the future, we are and will be required to comply with the terms of the relevant agreement and the generally applicable terms and conditions of the respective payment system based on the applicable laws of Russian Federation. If we do not comply with the terms of the agreements or the rules of the relevant payment system, the relevant payment system could seek to fine us, suspend us or terminate the registrations that allow us to process transactions on its network. If we are in breach of the agreements or the relevant payment system otherwise terminates its agreements with us or terminates or suspends our participation, we may be unable to issue cards under its brand or process transactions made with the use of such cards, which could have a material adverse effect on our business. Any of these factors could have a material adverse effect on our reputation, as well as on our business, financial condition and results of operations.

***Customer complaints, actual or perceived failures of our customer service function or negative publicity about our customer service could materially adversely affect the attractiveness of our services.***

Customer complaints, actual or perceived failures of our customer service function or negative publicity about our customer service could diminish consumer confidence in, and the attractiveness of, our services. Breaches of our consumers' privacy and our security systems could have the same effect. We sometimes take measures to combat risks of fraud and breaches of privacy and security, such as freezing consumer funds or rejecting in opening an account, which could damage relations with our consumers. These measures heighten the need for prompt and attentive customer service to resolve irregularities and disputes. In addition, we have previously received negative media coverage

19

**Table of Contents**

regarding customer disputes. Moreover, some of our products compete to a large extent on the basis of enhanced customer service and attention to customers, and are vulnerable to any customer complaints or actual or perceived decline in service levels. Any failure on our part to continue to provide customers with the level of service they have come to expect could harm our reputation significantly. Effective customer service requires significant personnel expense, and this expense, if not managed properly, could impact our profitability significantly. Any inability by us to manage or train our customer service representatives properly could compromise our ability to handle customer complaints effectively. If we fail to provide customer service at the level our clients expect from us or do not handle customer complaints effectively, our reputation may suffer and we may lose our customers' confidence, which could have a material adverse effect on our business, financial condition and results of operations.

***Our agreements with most of our counterparties, including our agents, merchants and other partners, do not include exclusivity clauses and may be terminated unilaterally at any time or at short notice.***

We normally do not include exclusivity clauses in our agreements with our counterparties, including our agents, merchants (apart from a small number of SOVEST partner merchants), and other partners. Accordingly, our counterparties usually do not have any restrictions on dealings with other providers and can switch from our payment processing system to another or disconnect from our system or platform without significant investment. Additionally, due to mandatory provisions of Russian civil law, our agreements with agents may be unilaterally terminated by the agents at any time, and our agreements with merchants and other counterparties may be unilaterally terminated at a short prior notice. The termination of our contracts with existing agents, merchants or other partners, or a significant decline in the amount of business we do with them as a result of our contracts not having exclusivity clauses could have a material adverse effect on our business, financial condition and results of operations.

***Our services have been and may continue to be used for fraudulent, illegal or improper purposes, which could expose us to additional liability and***

Despite measures we have taken and continue to take, our services have been and may continue to be used for fraudulent, illegal or improper purposes. These include use of our payment and other financial services in connection with fraudulent sales of goods or services, illicit sales of prescription medications or controlled substances, illegal online gambling, software and other intellectual property piracy, money laundering, bank fraud, terrorist financing, trafficking, and prohibited sales of restricted products.

Criminals are using increasingly sophisticated methods to engage in illegal activities. It is possible that fraudulent, illegal or improper use of our services could increase in the future. Our risk management policies and procedures may not be fully effective to identify, monitor and manage these risks, and we may from time to time not be able to identify merchants who are engaged in illegal activities, particularly if we work with them indirectly through payment aggregators since we generally do not perform full know-your-customer procedures with respect to each merchant engaged by such aggregators and rely on the aggregators to vet their merchants appropriately. We are also not able to monitor in each case the sources for our counterparties' funds or the ways in which they use them. Increases in chargebacks or other liability could have a material adverse effect on our business, financial condition and results of operations. An increase in fraudulent transactions or publicity regarding chargeback disputes could harm our reputation and reduce consumer confidence in the use of our products and services. In addition, changes in law have increased the penalties for intermediaries providing payment services for certain illegal activities and additional payments-related proposals are under active consideration by government authorities. Moreover, the perceived risk of the use of e-payments or other financial services to finance fraudulent, illegal or improper activities is causing the regulators to impose restrictions on the operations of the providers of such services including payment systems that negatively affect regular compliant transactions and operations as well. See "*– Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes* " and "*– If we cannot keep pace with rapid developments and change in our industry and provide new services to our clients, or if any of the new products we roll out are unsuccessful, the use of our services could decline, and we could experience a decline in revenue and an inability to recoup costs* ". Furthermore, while we already undertake efforts to cut off or refuse to engage merchants who appear to be engaged in illegal activities from our network, the relevant state authorities could further increase their enforcement measures against such merchants, including through the introduction of new legislation, to curtail the operation of various types of merchants by targeting the processing of payments for such merchants. In the event that we are required to cease working with a significant number of merchants or payment aggregators as a result of such actions, our revenue and our profitability could materially decline.

Any resulting claims could damage our reputation and any resulting liabilities (including the revocation of applicable banking licenses or significant fines), the loss of transaction volume, decline in the number of customers or increased costs could have a material adverse effect on our business, financial condition and results of operations.

### Our business is exposed to counterparty and credit risks.

In our Payment Services segment, we seek to sell services on a prepayment basis or to ensure that our counterparties have low credit risk profiles, such as large merchants and agents. Nevertheless, we are exposed to the risk of non-payment or other default under our contracts with our agents and merchants. If we provide trade credit or loans to an agent and we are unable to collect loans or proceeds paid to the agent by its consumers due to the agent's insolvency, fraud or otherwise, we must nonetheless complete the payment to the merchant on behalf of the consumer. As a result, our losses would not be limited to a loss of revenue in the form of fees due to us from the agent, but could amount to the entire amount of consumer payments accepted by such agent for a certain period of time.

Table of Contents

We also have significant receivables due from some of our merchants and agents, and may not recover these receivables in the event of such merchants' bankruptcy or otherwise. As of December 31, 2019, we had credit exposure to our agents of RUB 2,748 million and to our merchants of RUB 2,815 million. Our receivables from merchants are generally unsecured and non-interest bearing, our receivables and loans from agents are generally interest-bearing and unsecured. Although we monitor the creditworthiness of our counterparties on an ongoing basis, there can be no assurance that the models and approaches we use to assess and monitor their creditworthiness will be sufficiently predictive, and we may be unable to detect and take steps to timely mitigate an increased credit risk.

In our Consumer Financial Services segment, which is represented by our SOVEST installment card project, we are subject to risks related to the credit quality of loans to the customers who have outstanding credit on their SOVEST cards, in addition to the risks of credit exposure to the merchants who may owe us commission payments for short periods. As of December 31, 2019, we had credit exposure to the clients of the SOVEST project of RUB 7,985 million. Changes in the creditworthiness of our customers, or in their behavior, or arising from macroeconomic risks in the Russian or global financial systems, could result in losses for us and in us having to make provisions for impairment of related loans and receivables. In recent years, Russia has experienced an increase in non-performing retail loans, and many of the banks that have been particularly active in this sector have faced difficulties (see "*– We are subject to the economic risk and business cycles of our merchants and agents and the overall level of consumer spending* " and "*– The banking system in Russia remains underdeveloped)* ." While we have credit policies in place to manage this risk, the models, techniques and checks used by us to evaluate the creditworthiness of applicants for the SOVEST cards may not always present a complete and accurate picture of each consumer's financial condition or be able to accurately evaluate the impact of various changes, including changes in the Russian macroeconomic situation, which could significantly and quickly alter a consumer's financial condition. We have little experience addressing such risks, as we have not been active in the consumer lending market before the launch of the SOVEST project. We manage such risk by utilizing different predictive models based on consumer transaction behavior and restricting the card limits available to such individuals; however, due to our lack of relevant experience, our projections may prove incorrect. Additionally, we cannot always accurately ascertain what the current indebtedness of any particular current or potential customer may be as the credit bureau databases in Russia are still in a developmental stage. Additionally, we have no way of preventing our customers from taking additional loans from other financial institutions or otherwise taking steps that heighten the risk that a customer may default on their SOVEST installment payments. As a result, we may not always be able to correctly evaluate the current financial condition of each prospective customer and accurately determine the ability of our customers to pay us back the funds they have used. In addition, we do not take any security for payments outstanding under the SOVEST cards. In the event of defaults by a significant number of our consumers, we may be unable to recover all or a significant

proportion of the balance of such outstanding amounts.

In addition to the above sources of credit risk, as of December 31, 2019, we had credit exposure to our counterparties in connection with our Factoring Plus project of RUB 3,365 million and in connection with financial and performance guarantees we provide to non-related parties, mostly our merchants (predominantly in betting space), in the amount of RUB 8,545 million.

Our counterparty risk is particularly significant in Kazakhstan, where we offer our products in partnership with a local bank since we do not possess a Kazakh banking license. Our previous banking partner in Kazakhstan has recently gone into reorganization procedure in a form of merger with another bank, and we had to shift our business to another counterparty and make a reserve for certain amount of funds that we were not able to immediately recover from our previous partner bank. Although our financial losses were fairly limited in this case, this event presented a major operational hurdle for us. Thus, our entire operation in Kazakhstan, and in any other country where we choose or have to work through a similar model, are dependent on the stability of our counterparty, and face significant counterparty risk as a result.

If we experience material defaults by our consumers, agents, merchants, or other partners, our business, financial condition and results of operations could be materially adversely affected.

***We are subject to fluctuations in currency exchange rates.***

We are exposed to currency risks. Our financial statements are expressed in Russian rubles, while our revenues and expenses outside Russia are in local currencies and some of our assets and liabilities are in foreign currencies (see "— *Quantitative and Qualitative Disclosures About Market Risk – Foreign Exchange Risk* "). Accordingly, our results of operations and assets and liabilities are exposed to fluctuations in exchange rates between the ruble and such other currencies. Changes in currency exchange rates also affect the carrying value of assets on our consolidated statement of financial position, which, depending on the statement of financial position classification of the relevant asset, can result in losses on our consolidated statement of financial position. In addition, because our earnings are primarily denominated in Russian rubles whereas our ADSs are quoted in U.S. dollar, currency exchange rate fluctuations between the Russian ruble and the U.S. dollar significantly affect the price of our ADSs.

Over the past ten years, the Russian ruble has fluctuated dramatically against the U.S. dollar and the euro. Due to the economic sanctions imposed on certain Russian companies and individuals by the US, EU, Canada and other countries, as well as the volatility in oil prices, high inflation and a sharp capital outflow from Russia, the Russian ruble has significantly depreciated against the U.S. dollar and euro since the beginning of 2014 (see "– *Economic instability in Russia could have an adverse effect on our business* "). According to the CBR, from December 31, 2014 to December 31, 2015 and from December 31, 2013 to December 31, 2014, the ruble has depreciated by 30% and 72% against the U.S. dollar, respectively, and by 17% and 52% against the euro, respectively. From December 31, 2015 to December 31, 2016, the ruble appreciated somewhat against these currencies and remained relatively stable throughout 2017; however, depreciation of the Ruble resumed in 2018 when its value fell 21% against the U.S. dollar and 15% against the euro, in each case from December 31, 2017 to December 31, 2018. In 2019, the Rouble/U.S. Dollar exchange was relatively stable with intermittent volatility, and was RUB61.9 per U.S.$1.00 on December 31, 2019. However, in the first quarter of 2020 the Ruble again depreciated substantially and abruptly against the U.S. dollar and the euro due to a steep decline in oil prices (see "– *We are subject to the economic risk and business cycles of our merchants, partners and agents and the overall level of consumer spending*"). It is likely that significant fluctuations will continue in the future. Further fluctuations of the ruble could have a material adverse effect on our business, financial condition, results of operations and the price of our ADSs.

21

Table of Contents

***Events outside of our control, including public health crises, may negatively affect consumer spending and our business.***

Our operations are susceptible to public health crises, such as pandemics and epidemics, political instability or other events outside of our control. These types of events could have a negative effect on consumer spending and result in unpredictable declines in business activity in various industries that we serve.

For example, in December 2019, a novel strain of coronavirus surfaced in Wuhan, China, which has resulted in the temporary closure of many corporate offices, retail stores, and manufacturing facilities and factories across China. The virus then quickly spread out across Europe and the Americas, resulting in bans on international travel, cancellation of major events, and supply chain disruptions. One immediate negative effect of the coronavirus on our business is a likely decline in revenues from our betting merchants due to the cancellation of numerous major sporting events. The full potential impact on global economy from the coronavirus is difficult to predict, and the extent to which it may negatively affect our business operations and our operating results or the duration of any potential business disruption is uncertain. Any potential impact to our results will depend to a large extent on future developments and new information that may emerge regarding the duration and severity of the coronavirus and the actions taken by authorities and other entities to contain the coronavirus or treat its impact, all of which are beyond our control. These potential impacts, while uncertain, could harm our business and adversely affect our operating results.

***Regulatory authorities in Russia and Kazakhstan could determine that we hold a dominant position in our markets, and could impose limitations on our operational flexibility, which may adversely affect our business, financial condition and results of operations.***

The Russian anti-monopoly authorities impose various requirements on companies that occupy a dominant position in their markets. One of the important questions is to identify and define the relevant market, in which the entity in question operates. There are numerous aspects to be taken into account, including interchangeability or substitutability of the products and/or services for the consumer, their pricing and intended use. Different approaches may be applied in this respect by anti-monopoly authorities and the participants of the market. Thus, the state authorities may conclude that we hold a dominant position in one or more of the markets in which we operate. If they were to do so, this could result in limitations on our future acquisitions and a requirement that we pre-clear with the authorities any changes to our standard agreements with merchants and agents, as well as any specially negotiated agreements with business partners. In addition, if we were to decline to conclude a contract with a third party this could, in certain circumstances, be regarded as abuse of a dominant market position. Any abuse of a dominant market position could lead to administrative penalties and

the imposition of a fine of up to 15% of our annual revenue for the previous year. These limitations if imposed may reduce our operational and commercial flexibility and responsiveness, which may adversely affect our business, financial condition and results of operations.

***We may not be able to successfully protect our intellectual property and may be subject to infringement claims.***

We rely on a combination of contractual rights, copyright, trademark and trade secret laws to establish and protect our proprietary technology. We also maintain patents for certain of our technologies. We customarily require our employees and independent contractors to execute confidentiality agreements or otherwise to agree to keep our proprietary information confidential when their relationship with us begins. Typically, our employment contracts also include clauses requiring our employees to assign to us all of the inventions and intellectual property rights they develop in the course of their employment and to agree not to disclose our confidential information. Nevertheless, others, including our competitors, may independently develop similar technology, duplicate our services or design around our intellectual property. Further, contractual arrangements may not prevent unauthorized disclosure of our confidential information or ensure an adequate remedy in the event of any unauthorized disclosure of our confidential information. Because of the limited protection and enforcement of intellectual property rights in certain jurisdictions in which we operate, such as Russia and CIS countries, our intellectual property rights may not be as protected as they may be in more developed markets such as the United States. We may have to litigate to enforce or determine the scope or enforceability of our intellectual property rights (including trade secrets and know-how), which could be expensive, could cause a diversion of resources and may not prove successful. The loss of intellectual property protection could harm our business and ability to compete and could result in costly redesign efforts, discontinuance of certain service offerings or other competitive harm. Additionally, we do not hold any patents for our business model or our business processes, in part because our ability to obtain them in Russia is subject to legislative constraints, and we do not currently intend to obtain any such patents in Russia or elsewhere.

We may also be subject to costly litigation in the event our services or technology are claimed to infringe, misappropriate or otherwise violate a third party's intellectual property or proprietary rights. Such claims could include patent infringement, copyright infringement, trademark infringement, trade secret misappropriation or breach of licenses. In addition, while we seek to obtain copyright registration certificates for the critical software we develop, our rights to software obtained as works for hire might be potentially challenged by the employees and former employees or developers of such software. We may not be able to successfully defend against such claims, which may result in a limitation on our ability to use the intellectual property subject to these claims and also might require us to redesign affected services, enter into costly settlement or license agreements, pay costly damage awards, or face a temporary or permanent injunction prohibiting us from marketing or selling certain of our services. In such circumstances, if we cannot or do not license the infringed technology on reasonable terms or substitute similar technology from another source, our revenue and earnings could be adversely impacted. Additionally, non-practicing entities had and may continue in the future to acquire patents, make claims of patent infringement and attempt to extract settlements from companies in our industry. Even if we believe that such claims are without merit and successfully defend these claims, defending against such claims is time consuming and expensive and could result in the diversion of the time and attention of our management and employees.

22

Table of Contents

***We may use open source software in a manner that could be harmful to our business.***

We use open source software in connection with our technology and services. The original developers of the open source code provide no warranties on such code. Moreover, some open source software licenses require users who distribute open source software as part of their software to publicly disclose all or part of the source code to such software and/or make available any derivative works of the open source code on unfavorable terms or at no cost. The use of such open source code may ultimately require us to replace certain code used in our products, pay a royalty to use some open source code or discontinue certain products. Any of the above requirements could be harmful to our business, financial condition and operations.

***We do not have and may be unable to obtain sufficient insurance to protect ourselves from business risks.***

The insurance industry in Russia is not yet fully developed, and many forms of insurance protection common in more developed countries are not yet fully available or are not available on comparable or commercially acceptable terms. Accordingly, while we hold certain mandatory types of insurance policies in Russia, we do not currently maintain insurance coverage for business interruption, property damage or loss of key management personnel as we have been unable to obtain these on commercially acceptable terms. We do not hold insurance policies to cover for any losses resulting from counterparty and credit risks or fraudulent transactions. We also do not generally maintain separate funds or otherwise set aside reserves for most types of business-related risks. Accordingly, our lack of insurance coverage or reserves with respect to business-related risks may expose us to substantial losses, which could materially adversely affect our business, financial condition and results of operations.

***In a dynamic industry like ours, the ability to attract, recruit, retain and develop qualified personnel is critical to our success and growth.***

Our business functions at the intersection of rapidly changing technological, social, economic and regulatory developments that require a wide ranging set of expertise and intellectual capital. In order for us to compete and grow successfully, we must attract, recruit, retain and develop the necessary personnel who can provide the needed expertise across the entire spectrum of our intellectual capital needs. This is particularly true with respect to top management personnel as well as qualified and experienced software engineers and IT staff, who are highly sought after and are not in sufficient supply in Russia and in most other markets in which we operate. The market for such personnel is highly competitive, and we may not succeed in recruiting additional personnel or may fail to replace effectively current personnel who depart with qualified or effective successors. Our efforts to retain and develop personnel may result in significant additional expenses, which could adversely affect our profitability. We currently do not have a market standard long-term incentive plan due to the failure by our shareholders to approve the disapplication of pre-emptive rights (see "– *Our ADS holders may not be able to exercise their pre-emptive rights in relation to future issuances of class B shares*"), which restricts our ability to attract top talent who have come to expect share-based compensation in an industry like ours. Since in Cyprus, where our Company is registered, there is no statutory carve-out from pre-emptive rights for issuances of shares to employees like in some other jurisdictions, any such disapplication has to be specifically approved by shareholders and renewed periodically. Such failure to approve disapplication of pre-emptive rights has rendered us unable to issue shares to our employees under our employee incentive plans, and has caused us to incur additional expenses due to the fact that we have to make

cash payouts to employees in lieu of issuing shares under an employee incentive plan. These developments could undermine our ability to retain and attract competitive talent because we are not able to adequately align employee interests with the long-term interests of our shareholders. For these and other reasons, we cannot assure you that we will be able to attract and retain qualified personnel in the future. Failure to retain or attract key personnel could have a material adverse effect on our business, financial condition and results of operations.

***Our operations may be constrained if we cannot attract or service future debt financing.***

We may incur debt financing to finance the development of the SOVEST installment card project and other new projects, and our operations and growth may be constrained if we cannot do so on favorable terms or at all. Our debt capacity depends upon our ability to maintain our operating performance at a certain level, which is subject to general economic and market conditions and to financial, business and other factors, many of which are outside of our control. If our cash flow from operating activities is insufficient to service our debt, we could be forced to take certain actions, including delaying or reducing capital or other expenditures or other actions, to restructure or refinance our debt; selling or mortgaging our assets or operations; or raising additional equity capital, which we might not be able to do on favorable terms, in a timely manner or at all. Furthermore, such actions might not be sufficient to allow us to service our debt obligations in full and, in any event, could have a material adverse effect on our business, financial condition, and results of operations. Moreover, our inability to service our debt through internally generated cash flow or other sources of liquidity could put us in default of our obligations to creditors, which could trigger various default provisions under our financings and thus have a material adverse effect on the business, financial condition, and results of operations.

***We have recently been experiencing, and may continue to experience, increasing challenges with conducting transactions denominated in U.S. dollars.***

We contract with some of our international merchants in U.S. dollars and other currencies such as Euros. Recently we started to encounter difficulties in conducting such transactions, even with respect to our largest and most well-known international merchants, due to the refusal of an increasing number of our U.S. relationship banks and the correspondent U.S. banks of our non-U.S. relationship banks to service U.S. dollar payments. A direct or correspondent relationship with a U.S. bank is necessary in order for any non-U.S. company to transact in

23

Table of Contents

U.S. dollars. Reasons we have been given to explain these changes in approach by our banks mainly referred to changes in internal know-your-customer procedures, limits on certain types of merchants and certain jurisdictions, and other internal policies, which we believe might be a result of the increasing negative sentiment towards Russia on part of U.S. banks, among other factors (see "*—The situation in Ukraine and the U.S., EU and other sanctions that have been imposed in connection therewith could adversely impact our operations and financial condition*" ), even with respect to transactions and relationships that do not present any potential violation of any applicable sanctions. Even though we still maintain a number of U.S. dollar accounts with various financial institutions, at the same time we are already conducting a portion of U.S. dollar transactions with our international merchants in other currencies, bearing additional currency conversion costs. No assurance can be given that such institutions or their respective correspondent banks in the U.S. will not similarly refuse to process our transactions for similar reasons or otherwise, thereby further increasing the currency conversion costs that we have to bear or that our international merchants will agree to accept payments in any currency, but the U.S. dollar in the future. If we are not able to conduct transactions in U.S. dollars, we may bear significant currency conversion costs or lose some of our merchants who will not be willing to conduct transactions in currencies other than the U.S. dollars, and our business, financial condition and results of operations may be materially adversely affected. We can give no assurance that similar issues would not arise with respect to our transactions in other currencies, such as the Euro, which could have similarly adverse consequences for us.

***We may not be able to expand into new geographical markets, or develop our existing international operations successfully, which could limit our ability to grow and increase our profitability.***

Certain of our services are offered in countries beyond Russia, and we may look to further expand our geographical footprint if the right opportunities appear. Our expansion into new geographical markets and further development of our international operations depend on our ability to apply our existing technology or to develop new applications to meet the particular needs of each local market or country. We may not have adequate financial, technological or personnel and management resources to develop effective and secure services or distribution channels that will satisfy the demands of these markets. We may not be able to establish partnerships with any counterparties that we may need in order to strengthen our international operations. If we fail to enter new markets or countries or to develop our international operations, we may not be able to continue to grow our revenues and earnings. Furthermore, we may expand into new geographical markets in which we may not have any previous operating experience. We operate in an industry that is often subject to significant regulation, and our lack of familiarity with the regulatory landscape in new markets may result in us running into unanticipated problems or delays in obtaining the requisite regulatory approvals and licenses. We may not be able to successfully expand in such markets due to our lack of experience. Moreover, we may not be able to execute our strategy in our existing international operations successfully, which may result in additional losses or limit our growth prospects. In addition, expanding internationally subjects us to a number of risks, including:

- greater difficulty in managing foreign operations;

- expenses associated with localizing our products, including offering consumers the ability to transact in major currencies;

- higher labor costs and problems integrating employees that we hire in different countries into our existing corporate culture;

- laws and business practices that favor local competitors;

- multiple and changing laws, tax regimes and government regulations;

- foreign currency restrictions and exchange rate fluctuations;

- changes in a specific country's or region's political or economic conditions; and

- differing intellectual property laws.

In addition, our international operations may expose us to numerous and sometimes conflicting legal and regulatory requirements, and violations or unfavorable interpretation by authorities of these regulations could harm our business. In particular, we are exposed to the risk of being deemed to have permanent establishment in a specific country and transfer pricing risks which could result in additional tax liability.

If we are not able to manage these and multiple other risks associated with international operations successfully, our business, financial condition and results of operations could be materially adversely affected.

**Risks Relating to Corporate Governance Matters and Organizational Structure**

***The substantial share ownership position of our major shareholder and Chairman of the Board Sergey Solonin may limit your ability to influence corporate matters.***

Our major shareholder and Chairman of the Board Sergey Solonin owns 95.8% of our class A shares, representing approximately 65.7% of the voting power of our issued share capital. As a result of this concentration of share ownership, Mr. Solonin has sole discretion over any matters submitted to our shareholders for approval that require a simple majority vote and has significant voting power on all matters submitted to our shareholders for approval that require a qualified majority vote, including the power to veto them. Our articles of association require the approval of no less than 75% of present and voting shareholders for matters such as amendments to the constitutional documents of our company, dissolution or liquidation of our company, reducing the share capital, buying back shares and approving the total number of

24

Table of Contents

shares and classes of shares to be reserved for issuance under any employee stock option plan or any other equity-based incentive compensation program of our group. Matters requiring a simple majority shareholder vote include, among other matters, increasing our authorized capital, removing a director, approving the annual audited accounts and appointing auditors.

This concentration of ownership could delay, deter or prevent a change of control or other business combination that might otherwise give you the opportunity to realize a premium over then-prevailing market price of our shares. The interests of Mr. Solonin may not always coincide with the interests of our other shareholders. This concentration of ownership may also adversely affect the price of our ADSs.

***The substantial share ownership position of Otkritie could be adverse to the interests of our minority shareholders.***

Otkritie Bank owns 41.6% of our class B shares, representing approximately 13.1% of the voting power of our issued share capital, and has nominated one member to our board of directors, Ms. Nadiya Cherkasova. Were Mr. Solonin to sell down his stake in such a manner that his shares would convert into class B shares pursuant to our Articles of Association, voting power of Otkritie Bank would increase accordingly. Moreover, since late 2017, Otkritie Bank has been owned by the Central Bank of Russian Federation (CBR) as a result of its financial rehabilitation. CBR is the designated regulator for the financial and securities markets in Russia and is the primary regulator of Qiwi's Russian banking and payments businesses. The liquidity of our ADSs has already significantly declined and could potentially further decline due to one large holder accumulating a significant portion of the shares that formerly constituted free float. The interests of Otkritie Bank, particularly as a state-owned institution, may not always coincide with the interests of our other shareholders. In particular, if Otkritie Bank or its controlling shareholder were to decide they are not interested in continuing to hold this stake, whether due to the fact that it represents a non-core business for Otkritie Bank or otherwise, a sale of a stake of the size could put significant downward pressure on the price of our ADSs. Otkritie Bank's decision to dispose its ownership in the Company may be perceived as directly or indirectly influenced by CBR's internal policies which may negatively impact our business or the market value of our ADSs given CBR's role as the Company's primary regulator. We also believe that due to the recent deterioration of relationships between Russia and the U.S. the fact that the CBR owns, albeit indirectly, a significant stake in our company may be perceived as a negative by certain investors. This concentration of ownership may also adversely affect the price of our ADSs.

***Our ADS holders have limited rights in relation to the appointment of our directors, including our independent directors.***

Other than in certain limited cases provided for in our articles of association, our directors are elected by shareholder weighted voting, sometimes referred to as cumulative voting, under which each shareholder has the right to cast as many votes as the voting rights attached to its shares multiplied by a number equal to the number of board seats to be filled by shareholders. As a result, our class A shareholders will have the ability to appoint, through the weighted voting set forth in our articles of association, at least a majority of the board of directors for the foreseeable future. The interests of our directors may therefore not be aligned with or be in the best interests of the holders of our ADSs.

***The rights of our shareholders are governed by Cyprus law and our articles of association, and differ in some important respects from the typical rights of shareholders under U.S. state laws.***

Our corporate affairs are governed by our articles of association and by the laws governing companies incorporated in Cyprus. The rights of our shareholders and the responsibilities of members of our board of directors under Cyprus law and our articles of association are different than under some of the U.S. state laws. For example, by law existing holders of shares in a Cypriot public company are entitled to pre-emptive rights on the issue of new shares in that company (provided such shares are paid in cash and the pre-emption rights have not been disapplied). In addition, our articles of association include other provisions, which differ from provisions typically included in the governing documents of most companies organized in the U.S.:

- our board of directors can only take certain actions by means of a supermajority vote of 75% of its members, including approving our annual budget and business plan, disposing of our interest in a subsidiary if such disposal results in a change of control over such subsidiary, issuing shares for consideration other than cash and other actions

- our shareholders are able to convene an extraordinary general meeting; and

- if our board of directors exercises its right to appoint a director to fill a vacancy on the board created during the term of a director's appointment, shareholders holding 10.01% of the voting rights of the company may terminate the appointment of all of the directors and initiate reelection of the entire board of directors.

As a result of the differences described above, our shareholders may have rights different to those generally available to shareholders of companies organized under U.S. state laws and our board of directors may find it more difficult to approve certain actions.

***Acquisitions of Russian entities are subject to pre-closing approval by multiple government authorities which exercise significant discretion as to whether a consent should be granted or not, and are regulated by a significant body of law which is often ambiguous and open to varying interpretations.***

Due to our ownership of Qiwi Bank, any transactions resulting in the acquisition of more than 50% of our voting power or the right to otherwise direct our business activities would become subject to preliminary approval by the CBR. In addition, any acquisition of more than 50% of our voting power may also be subject to a preliminary approval by the Russian Federal Antimonopoly Service, or the FAS.

25

Table of Contents

Furthermore, Qiwi Bank holds encryption licenses which are necessary to conduct its operations, and by virtue of this may be deemed to be a "strategic enterprise" for the purposes of the Federal Law of the Russian Federation No. 57-FZ "On the Procedure for Foreign Investments in Enterprises which are Strategically Important for the State Defense and National Security", dated April 29, 2008, as amended, or "the Strategic Enterprise Law." In this case, any acquisition of control over our company would require an approval of a specialized government commission, which is a relatively lengthy process that typically takes between three and six months in practice (see " *—Regulation—Regulation of Strategic Investments* "). These regulatory approval requirements may have the effect of making a takeover of our company more difficult or less attractive, and may prevent or delay a change of control, which could have a negative impact on the liquidity of, and investor interest in, our ADSs.

Additionally, under Russian law, the depositary may be treated as the owner of the class B shares underlying the ADSs, and therefore, could be deemed a beneficial shareholder of Qiwi Bank. This is different from the way other jurisdictions treat ADSs. As a result, the depositary may be subject to the approval requirements of the CBR, FAS and the government commission described above in the event an amount of our shares representing over 50% of our voting power is deposited in the ADS program. Accordingly, our ADS program may be subject to an effective limit of 50% of our voting power, unless the depositary obtains FAS, CBR and potentially additional government commission approvals to increase its ownership in excess of 50% of our voting power. This could limit our ability to raise capital in the future and the ability of our existing shareholders to sell their ADSs in the public markets, which in turn may impact the liquidity of share capital.

***The quota imposed on foreign ownership of Russian banks or IT companies may make a takeover of our company by a foreign purchaser impossible.***

Under current Russian law, the Russian government is entitled, upon consultation with the CBR, to propose legislation imposing a quota on foreign ownership in the Russian banking industry, covering both Russian branches of international banks and foreign participation in the charter capital of Russian banks, such as Qiwi Bank. In December 2015, a 50% quota on foreign ownership was introduced, subject to certain exemptions.

Furthermore, in late 2019 a draft legislative bill was submitted to the Russian legislature proposing to restrict ownership by foreign persons of certain key Russian IT companies pursuant to a list to be determined at a later stage to not more than 20% in the aggregate. Such draft law was repealed after significant criticism. However, there can be no assurance that similar measures will not be adopted in the future, as has already happened, for example, to media companies and video content distributors under other laws adopted in Russia in recent years.

If the quota on foreign ownership of Russian banks is exceeded, or if a law restricting foreign ownership of Russian IT companies is adopted, a takeover of our company by a foreign purchaser may become impossible, which could limit, prevent or delay a change of control of our company and in turn could negatively impact the liquidity of our ADSs.

***As a foreign private issuer whose ADSs are listed on Nasdaq, we have elected to follow certain home country corporate governance practices instead of certain Nasdaq requirements.***

As a foreign private issuer whose ADSs are listed on Nasdaq, we are permitted in certain cases to, and do, follow Cyprus corporate governance practices instead of the corresponding requirements of Nasdaq. A foreign private issuer that elects to follow a home country practice instead of Nasdaq requirements must submit to Nasdaq in advance a written statement from an independent counsel in such issuer's home country certifying that the issuer's practices are not prohibited by the home country's laws. In addition, a foreign private issuer must disclose in its annual reports filed with the Securities and Exchange Commission any significant requirement that it does not follow and describe the home country practice followed instead of any such requirement. We follow Cyprus corporate governance practices with regard to the composition of our board of directors which, unlike the applicable Nasdaq rule for U.S. corporations, do not require that a majority of our directors be independent. Currently only three out of our seven directors are independent. We also do not have a compensation committee or a nominating committee comprised entirely of independent directors, and our independent directors do not meet in regular executive sessions. In addition, our board of directors has not made any determination whether it will comply with certain Nasdaq rules concerning shareholder approval prior to our taking certain company actions, including the issuance of 20% or more of our then-outstanding share capital or voting power in connection with an acquisition, and our board of directors, in such circumstances, may instead

determine to follow Cypriot law. Accordingly, our shareholders may not be afforded the same protection as provided under Nasdaq corporate governance rules.

***Our ADS holders may not have the same voting rights as the holders of our class A shares and class B shares and may not receive voting materials in time to be able to exercise their right to vote. Our ADS holders' right to receive certain distributions may be limited in certain respects by the deposit agreement.***

Except as set forth in the deposit agreement, holders of our ADSs are not able to exercise voting rights attaching to the class B shares represented by our ADSs on an individual basis. Holders of our ADSs have to appoint the depositary or its nominee as their representative to exercise the voting rights attaching to the class B shares represented by the ADSs. Upon receipt of voting instructions from an ADS holder, the depositary will vote the underlying class B shares in accordance with these instructions. Pursuant to our articles of association, we may convene an annual shareholders' meeting or a shareholders' meeting called for approval of matters requiring a 75% shareholder vote upon at least 45 days' notice and upon at least 30 days' notice for all other shareholders' meetings. If we give timely notice to the depositary under the terms of the deposit agreement, the depositary will notify you of the upcoming vote and arrange to deliver our voting materials to you. We cannot assure our ADS holders that they will receive the voting materials in time to instruct the depositary to vote the class B shares underlying their ADSs, and it is possible that our ADS holders, or persons who hold their ADSs through brokers, dealers or other third parties, will not have the opportunity to exercise a right to vote. In addition, the depositary and its agents are not responsible for failing to carry out voting instructions or for the manner of carrying out voting instructions. This means that our ADS holders may not be able to exercise their right to

26

Table of Contents

vote and there may be nothing such holders can do if the class B shares underlying your ADSs are not voted as requested. In addition, although our ADS holders may directly exercise their right to vote by withdrawing the class B shares underlying their ADSs, they may not receive sufficient advance notice of an upcoming shareholders' meeting to withdraw the class B shares underlying their ADSs to allow them to vote with respect to any specific matter. Furthermore, under the deposit agreement, the depositary has the right to restrict distributions to holders of the ADSs in the event that it is unlawful or impractical to make such distributions. We have no obligation to take any action to permit distributions to holders of our ADSs. As a result, holders of ADSs may not receive distributions made by us.

**Risks Relating to the Russian Federation and Other Markets in Which We Operate**

***Emerging markets such as Russia are subject to greater risks than more developed markets, including significant legal, economic and political risks.***

Investors in emerging markets such as Russia should be aware that these markets are subject to greater risk than more developed markets, including in some cases significant legal, economic and political risks. Investors should also note that emerging economies are subject to rapid change and that the information set out herein may become outdated relatively quickly. Accordingly, investors should exercise particular care in evaluating the risks involved and must decide for themselves whether, in light of those risks, their investment is appropriate. Generally, investment in emerging markets is only suitable for sophisticated investors who fully appreciate the significance of the risks involved, and investors are urged to consult with their own legal and financial advisors before making an investment in our ADSs.

***The situation in Ukraine and the U.S., EU and other sanctions that have been imposed in connection therewith could adversely impact our operations and financial condition.***

The Ukraine crisis, which started in late 2013 and remains unresolved, has brought Russian relations with the West to a post-Cold War low point. Western countries protested when Crimea (which had been part of Ukraine since 1954) entered into the Russian Federation in March 2014 and have complained that Russia is fomenting civil insurrection in east Ukraine.

In response to the Ukraine crisis, Ukraine, the European Union and the United States (as well as other countries such as Norway, Canada and Australia) have passed a variety of economic sanctions against Russia. One form these sanctions have taken is to identify certain persons as 'designated nationals' with the basic practical consequences that U.S. persons cannot do business with them while EU persons cannot provide funds or other economic resources to them, their assets in the EU and United States are subject to seizure and in the case of individuals they can be subject to travel bans. A number of Russian government officials, businessmen, banks and companies have been so designated. Another form these sanctions have taken, with greater consequence for the Russian economy, is 'sectoral' sanctions with the basic consequence that several of Russia's leading banks – including Gazprombank, Vnesheconombank, Bank of Moscow, Russian Agricultural Bank, VTB Bank, and Sberbank – cannot access Western capital (as EU and U.S. persons are prohibited from extending them debt financing in excess of 30 days or dealing in their new equity issuances and providing related services); similar sectoral sanctions have been applied against several prominent Russian oil and gas and defense companies. Other Western sanctions have been imposed in respect of, among other things, Russian military defense entities, dual use technologies, sophisticated off-shore oil drilling technologies and doing business in Crimea.

Certain sanctions, thus far only imposed by Ukraine, and Russian countersanctions instituted in response to such sanctions, directly target payment services providers such as ourselves (see *"–We are subject to extensive government regulation"* ). There can be no assurance that additional sanctions affecting the payments business will not be imposed by Russia or other countries in which we operate. While other current sanctions do not target us or the payments industry more generally, these sanctions have had and may continue to have the effect of damaging the Russian economy by, among other things, accelerating capital flight from Russia, weakening of the Russian ruble, exacerbating the negative investor sentiment towards Russia and making it harder for Russian companies to access international financial markets for debt and equity financing. In addition, a number of Western businesses have curtailed or suspended activities in Russia or dealings with Russian counterparts for reputational reasons even though currently neither such activities nor dealings with their relevant Russian counterparts were proscribed by the sanctions. An expansion of the existing or introduction of new sanctions, including those mentioned above, or sanctions specifically targeting us or our management or shareholders, or our sector generally, could result in our international customers, suppliers, shareholders and other business partners revising their relationship with us for compliance, political,

reputational or other reasons, which could affect our business.

Some of our agents, merchants or Tochka's SME clients, although mostly not incorporated in Crimea, may have operations there. Further, before the introduction of the corresponding sanctions we have had direct contacts with several Crimea banks that are registered as financial legal entities in Crimea, and currently such banks may continue to operate as our agents or merchants. On December 19, 2014, U.S. President Obama signed an executive order imposing comprehensive sanctions on the Crimea region. The EU has similarly introduced a broad set of sanctions through the Council Regulation (EU) 692/2014 as amended by Regulation (EU) 1351/2014. To date, we do not believe that any of the current sanctions as in force limit our ability to work with entities that may have operations in Crimea or operate in Crimea. Nevertheless, if we are deemed to be in violation of any sanctions currently in place or if any new or expanded sanctions are imposed on Russian businesses operating in Crimea by the U.S., EU, or other countries, our business and results of operations may be materially adversely affected.

In the ordinary course of our business, we may accept payments from consumers to or otherwise indirectly interact with certain entities that are the targets of U.S. sanctions. We operate primarily within the Russian financial system and, accordingly, many of our customers have accounts at banks in Russia. The U.S., EU and other countries have adopted a package of economic restrictive measures imposing certain sanctions on the operations of various Russian banks, including VTB Bank and Gazprombank. Some of our subsidiaries hold

27

Table of Contents

bank accounts at the aforementioned banks as well as have overdrafts and bank guarantees with VTB Bank. A number of Russian banks, including Bank Rossiya, SMP Bank, Investcapitalbank and Sobinbank have been designated by OFAC and are subject to U.S. economic sanctions. In addition, Tempbank was designated due to its dealings with the Syrian government. U.S. sanctions may be extended to any person that U.S. authorities determine has materially assisted, or provided financial, material, or technological support for, or goods or services to or in support of, any sanctioned individuals or entities. For example, we may be associated with U.S.-designated banks due to us accepting payments for them from consumers in the ordinary course of our business, even though we may not have any direct contract relationships with them. There can be no assurance that the U.S. Government would not view such activities as meeting the criteria for U.S. economic sanctions.

In addition, because of the nature of our business, we do not generally identify our customers where there is no express requirement to do so under Russian anti-money laundering legislation. Therefore, we are not always able to screen them against the Specially Designated Nationals and Blocked Persons List published by OFAC and other sanctions lists.

While we believe that our indirect interaction with sanctioned Russian banks and potential interaction with designated individuals, as well as other interactions we may potentially have with entities and persons that may be subject to U.S. or EU economic and financial sanctions does not contravene any law, our business and reputation could be adversely affected if the U.S. government were to designate us as a blocked party and extend such sanctions to us. The executive orders authorizing the U.S. sanctions provide that persons may be designated if, inter alia, they materially assist, or provide financial, material, or technological support for goods or services to or in support of, blocked or designated parties. EU financial sanctions prohibit the direct and indirect making available of funds or economic resources to or for the benefit of sanctioned parties. Investors may also be adversely affected if we are so designated, resulting in their investment in our securities being prohibited or restricted. Furthermore, under those circumstances, some U.S. or EU investors may decide for legal or reputational reasons to divest their holdings in us or not to purchase our securities in the first place. We are aware of initiatives by U.S. governmental entities and U.S. institutional investors, such as pension funds, to adopt or consider adopting laws, regulations, or policies prohibiting transactions with or investment in, or requiring divestment from, entities doing business with certain countries. There can be no assurance that the foregoing will not occur or that such occurrence will not have a material adverse effect on our share price. Even if we are not subjected to U.S. or other economic sanctions, our participation in the Russian financial system and indirect interaction with sanctioned banks and potential interaction with designated individuals may adversely impact our reputation among investors. There is also a risk that other entities with which we engage in business, or individuals or entities associated with them, are, or at any time in the future may become, subject to sanctions.

In August 2017, the United States passed a Countering America's Adversaries Through Sanctions Act ("CAATSA"), which significantly tightened 'sectoral sanctions' discussed above and introduced a host of new sanctions, including 'secondary sanctions' targeting non-U.S. persons if the U.S. President determines that any such person knowingly and materially violates, attempts to violate, conspires to violate or causes a violation of a restriction introduced under any relevant U.S. Russian sanctions legislation or facilitates a significant transaction or transactions for or on behalf of any person subject to U.S. Russian sanctions or his or her relatives. This legislation further restricts access of the sanctioned Russian banks and energy companies to debt financing on international capital markets, and expands the application of sanctions in relation to the Russian energy sector. Furthermore, this legislation puts significant limitations on the U.S. President's authority to ease sanctions and issue licensing actions with respect to Russia.

In October 2017, the U.S. Department of State issued public guidance on implementation of CAATSA and the list of Russian defense and intelligence companies and institutions, 'significant transactions' with which may result in the imposition of sanctions on persons that engage in such transactions with these companies and institutions. The new legislation also widens the differences between the U.S. and EU sanctions against Russia. The EU recently extended its own sectoral sanctions until 31 July 2018 but has not adopted new, broader sanctions like those in the said U.S. legislation. Instead, some EU leaders have discussed possible 'blocking' or retaliatory measures in response to those U.S. secondary sanctions that may adversely affect European companies.

CAATSA also requires the U.S. Department of Treasury to issue reports on Russian senior political figures and oligarchs, Russian parastatal entities and illicit financing in Russia, presumably to determine whether other parties should be sanctioned. The first report was issued on 29 January 2018 and lists 114 senior Russian political figures and 96 wealthy Russian businessmen ("Report"). The Report states, and the OFAC further clarified, that it is not a sanctions list, and the inclusion of individuals or entities in it, its appendices, or its annex does not and in no way should be interpreted to impose sanctions on those individuals or entities, and moreover, the inclusion of individuals or entities in the Report, its appendices, or its classified annexes does not, in and of itself, imply, give rise to, or create any other restrictions, prohibitions, or limitations on dealings with such persons by U.S. or

non-U.S. persons. The inclusion on the unclassified list does not indicate that the U.S. Government has information about the individuals' involvement in malign activities. In April 2018, several major Russian businessmen (each of them a controlling shareholder of a vast number of diverse businesses in Russia) who were mentioned in the Report became "designated nationals", which had a significant adverse impact on the Russian economy in general and in particular the value of the Rouble. Any new sanctions imposed on the basis of the Report, may have a material adverse effect on the Russian economy and lead to retaliatory sanctions from Russia.

To date, no individual or entity within our group has been designated by either the United States or the EU as a specific target of their respective Ukraine related sanctions. No assurance can be given, however, that any such individual or entity will not be so designated in the future, or that broader sanctions against Russia that affect our company, will not be imposed. In addition, no assurance can be given that any of our transactions with third parties that are subject to the sanctions will not constitute 'significant transactions' for purposes of CAATSA. Non-compliance with the U.S., EU and other sanctions programs applicable to us could expose us to significant fines and penalties and to enforcement measures, or result in the loss of clients, any which in turn could adversely impact our business, financial conditions, results of operations and prospects.

28

Table of Contents

The crisis in Ukraine is ongoing and could escalate. Were full-fledged hostilities to break out between Ukraine and Russia, they would likely cause significant economic disruption and further calls from the Western countries for a comprehensive sanction regime that would seek to further isolate Russia from the world economy. Even the current level of ongoing civil insurrection in eastern Ukraine, if no resolution is forthcoming, may well lead to further strengthening and broadening of Ukraine-related sanctions. For example, there have been proposals to cut off Russia from the international SWIFT payment system, which would disrupt ordinary financial services in Russia and any cross-border trade. Other proposed sanctions that have not been enacted so far but could have a devastating effect on the Russian economy in general and our business, financial condition, results of operations and prospects in particular, include more comprehensive sanctions with respect to major Russian state-owned banks (including a prohibitions on U.S. dollar transactions) and other entities, prohibition on transactions involving sovereign debt of Russia, and various other measures. The potential further repercussions surrounding the situation in Crimea and Eastern Ukraine are unknown and no assurance can be given regarding the future of relations between Russia and other countries. Overall, the situation in Ukraine and Crimea remains uncertain and we cannot predict how the Ukrainian crisis will unfold or the impact it will have on our business or results of operations. Additionally, relations between the US and Russia have recently become strained over a variety of other issues, which could result in further sanctions against Russia or specific individuals, entities or economy sectors. *See "– Deterioration of Russia's relations with other countries could negatively affect the Russian economy and those of the nearby regions"*. Any or all of the above factors could have a material adverse effect on our business, financial condition, results of operations and prospects.

### *Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes.*

Our business is currently subject to know-your-client requirements established by Federal Law of the Russian Federation No. 115-FZ "On Combating the Legalization (Laundering) of Criminally Obtained Income and Funding of Terrorism", dated August 7, 2001, as amended, or the Anti-Money Laundering Law. Based on the Anti-Money Laundering Law we distinguish three types of consumers based on their level of identification, being anonymous, identified through a simplified procedure and fully identified. All these types of consumers face varying monetary and non-monetary restrictions in terms of the transactions they may perform and electronic money account balances they may hold, with fully identified consumers enjoying the most privileges. The key difference between the simplified and the full identification procedures is that the simplified identification can be performed remotely. The remote identification requires the verification of certain data provided by consumers against public databases. There can be no assurance that we will always be able to collect all necessary data to perform the identification procedure in full or that the data the users provide us for the purposes of identification will not contain any mistakes or misstatements and will be correctly matched with the information available in the governmental databases. At the end of 2017, a new law was enacted enabling "full" identification performed remotely as well, to the extent the relevant individual has previously undergone identification by an eligible credit institution and has consented for his data to be included in a database; however, as of the date of this annual report such identification method has not been fully developed either. Due to the lack of clarity and gaps existing under the current customer identification legislation, we have to employ a risk-based approach to customer KYC and sometimes make judgment calls in applying anti-money laundering legislation, with the resulting risk of being found in non-compliance with it. Thus, current situation could cause us to be in violation of the identification requirements. In case we are forced not to use the simplified identification procedure until the databases are fully running or in case the identification requirements are further tightened, it could negatively affect the number of our consumers and, consequently, our volumes and revenues. Additionally, Russian anti-money laundering legislation is in a constant state of development and is subject to varying interpretations. If we are found to be in non-compliance with any of its requirements, we could not only become subject to fines and other sanctions, but could also have to discontinue to process operations that are deemed to be in breach of the applicable rules and lose associated revenue streams.

### *Political and governmental instability could adversely affect the value of investments in Russia.*

Political conditions in the Russian Federation were highly volatile in the 1990s, as evidenced by the frequent conflicts amongst executive, legislative and judicial authorities, which negatively impacted the business and investment climate in the Russian Federation. Over the past three decades the course of political and other reforms has in some respects been uneven and the composition of the Russian Government has at times been unstable. The Russian political system continues to be vulnerable to popular dissatisfaction, including dissatisfaction with the results of the privatizations of the 1990s, as well as to demands for autonomy from certain religious, ethnic and regional groups.

On January 15, 2020, Russian Prime Minister Dmitry Medvedev announced that he and the entire Government were resigning after President Vladimir Putin proposed constitutional amendments that would, among other things, strengthen the powers of the Russian parliament regarding appointment of the Prime Minister and members of the Government. Vladimir Putin has subsequently nominated the former head of the Federal Taxation Service, Mikhail Mishustin, to replace Dmitry Medvedev as Prime Minister and appointed the new Government. Future changes in the Russian Government, the State Duma or the presidency, major policy shifts or eventual lack of consensus between the president, the Russian Government, Russia's parliament and powerful economic groups could lead to political instability. Additionally, the potential for political instability resulting from the worsening of the economic situation in Russia and deteriorating standards of living should not be underestimated. Any such instability could negatively affect the economic and political environment in Russia, particularly in the short term. Shifts in governmental policy and regulation in the Russian

Federation are less predictable than in many Western democracies and could disrupt or reverse political, economic and regulatory reforms. Any significant change in the Russian Government's program of reform in Russia could lead to the deterioration of Russia's investment climate that might limit our ability to obtain financing in the international capital markets or otherwise have a material adverse effect on our business, financial condition and results of operations.

29

Table of Contents

***The implementation of government policies in Russia targeted at specific individuals or companies could harm our business as well as investments in Russia more generally.***

The use of governmental power against particular companies or persons, for example, through the tax, environmental or prosecutorial authorities, could adversely affect the Russian economic climate and, if directed against us, our senior management or our major shareholders, could materially adversely affect our business, financial condition and results of operations. Russian authorities have recently challenged some Russian companies and prosecuted their executive officers and shareholders on the grounds of tax evasion and related charges. In some cases, the results of such prosecutions and challenges have been significant claims against companies for unpaid taxes and the imposition of prison sentences on individuals. There has been speculation that in certain cases these challenges and prosecutions were intended to punish, and deter, opposition to the government or the pursuit of disfavored political or economic agendas. There has also been speculation that certain environmental challenges brought recently by Russian authorities in the oil and gas as well as mining sectors have been targeted at specific Russian businesses under non-Russian control, with a view to bringing them under state control. More generally, some observers have noted that takeovers in recent years of major private sector companies in the oil and gas, metals and manufacturing sectors by state-controlled companies following tax, environmental and other challenges may reflect a shift in official policy in favor of state control at the expense of individual or private ownership, at least where large and important enterprises are concerned.

***Deterioration of Russia's relations with other countries could negatively affect the Russian economy and those of the nearby regions.***

Over the past several years, Russia has been involved in conflicts, both economic and military, involving other members of the CIS or other countries. On several occasions, this has resulted in the deterioration of Russia's relations with other members of the international community, including the United States and various countries in Europe. Many of these jurisdictions are home to financial institutions and corporations that are significant investors in Russia and whose investment strategies and decisions may be affected by such conflicts and by worsening relations between Russia and its immediate neighbors.

For example, relations between Ukraine and Russia, as well as Georgia and Russia, have been strained over a variety of issues. On March 21, 2014, President Putin signed legislation to recognize Crimea's accession to, and status as part of, Russia. Since then, there has been continuing tensions between Russia and Ukraine, which were aggravated by the military conflict in Eastern Ukraine. Another recent point of tension between Russia and Western governments has been the Russian role in the Syrian crisis and its military support for the government of Syria. The events in Ukraine, Crimea and Syria have prompted condemnation by members of the international community and have been strongly opposed by the EU and the United States, with a resulting material negative impact on the relationships between the EU, the United States and Russia. See "*– The situation in Ukraine and the U.S., EU and other sanctions that have been imposed could adversely impact our operations and financial condition*". The Ukraine crisis, which started in late 2013 and remains unresolved, has brought additional tensions between Russia and Western countries (such as the U.S., UK and a number of EU countries), and new issues that adversely affect such relations may arise in the future. Other recent points of tension between Russia and Western governments have included: the Russian role in the Syrian crisis and its military support for the government of Syria; the alleged involvement of the Russian government in the cyber-attacks aimed at disrupting the election process in the U.S.; the alleged involvement of the Russian intelligence service in an attempted poisoning of a Russian citizen in the UK; and the incident involving Ukrainian vessels near the Kerch Strait in November 2018. All of the above have led to escalation of geopolitical tensions, and introduction or expansion of international sanctions or other countermeasures by Western countries against Russia, and may continue to do so in the future. In particular, in response to the alleged use by Russian intelligence services of chemical warfare on UK soil, in August 2018 the U.S. State Department imposed new sanctions on Russia under the Chemical and Biological Weapons Control and Warfare Elimination Act of 1991 (the "CBW Act"). The initial round of sanctions under the CBW Act includes, among other things, termination of sales of any defense articles and services and the prohibition on the export to Russia of certain national security-sensitive goods and technology. If within three months after the initial determination made under the CBW Act, the U.S. President determines that certain conditions set out in the CBW Act are not met, further sanctions, including, among other things, a prohibition on U.S. financial institutions to provide financing to the Russian state, additional bans on exports of goods and technologies and a possible suspension or revocation of the authority of Russian state-owned or controlled air carriers to provide transportation to or from the U.S., may be introduced. After a relatively lengthy period during which no new sanctions have been introduced, on March 19 it was reported in the media that the administration of President Trump is considering intervening in the OPEC-Russian oil-price conflict with a diplomatic push to get the Saudis to cut oil production and threats of sanctions on Russia aimed at stabilizing prices, although the details of those possible sanctions and what Russian action might trigger them weren't specified. The emergence of new or escalated tensions between Russia and neighboring states or other states could negatively affect the Russian economy. This, in turn, may result in a general lack of confidence among international investors in the region's economic and political stability and in Russian investments generally. Such lack of confidence may result in reduced liquidity, trading volatility and significant declines in the price of listed securities of companies with significant operations in Russia, including our ADSs, and in our inability to raise debt or equity capital in the international capital markets, which may affect our ability to achieve the level of growth to which we aspire.

***Crime and corruption could create a difficult business climate in Russia.***

The political and economic changes in Russia since the early 1990s have led, amongst other things, to reduced policing of society and increased lawlessness. Organized crime, particularly property crimes in large metropolitan centers, has reportedly increased significantly since the dissolution of the Soviet Union. In addition, the Russian and international media have reported high levels of corruption in Russia. Press reports have also described instances in which government officials have engaged in selective investigations and prosecutions to further the interest of the government and individual officials or business groups. Although we adhere to a business ethics policy and internal compliance procedures to counteract the effects of crime and corruption, instances of illegal activities, demands of corrupt officials, allegations that we or our management have been involved in corruption

or illegal activities or biased articles and negative publicity could materially and adversely affect our business, financial condition and results of operations.

30

Table of Contents

*Economic instability in Russia could have an adverse effect on our business.*

The Russian economy has been adversely affected by the recent global financial and economic crisis. A continuation of the economic crisis could have a negative effect on the scale and profitability of our business. Any of the following risks, which the Russian economy has experienced at various points in the past, may have or have already had a significant adverse effect on the economic climate in Russia and may burden or have already burdened our operations:

- significant declines in gross domestic product, or GDP;

- high levels of inflation;

- sudden price declines in the natural resource sector;

- high and fast-growing interest rates;

- unstable credit conditions;

- international sanctions;

- high state debt/GDP ratio;

- instability in the local currency market;

- a weakly diversified economy which depends significantly on global prices of commodities;

- lack of reform in the banking sector and a weak banking system providing limited liquidity to Russian enterprises;

- pervasive capital flight;

- corruption and the penetration of organized crime into the economy;

- significant increases in unemployment and underemployment;

- the impoverishment of a large portion of the Russian population;

- large number of unprofitable enterprises which continue to operate due to deficiency in the existing bankruptcy procedure;

- prevalent practice of tax evasion; and

- growth of the black-market economy.

As Russia produces and exports large quantities of crude oil, natural gas, petroleum products and other commodities, the Russian economy is particularly vulnerable to fluctuations in oil and gas prices as well as other commodities prices, which historically have been subject to significant volatility over time, as illustrated by the recent decline in crude oil prices. Russian banks, and the Russian economy generally, were adversely affected by the global financial crisis. In 2014 and 2015, Russia experienced an economic downturn characterized by substantial depreciation of its currency, sharp fluctuations of interest rates, a decline in disposable income, a steep decline in the value of shares traded on its stock exchanges, a material increase in the inflation rate, and a decline in the gross domestic product. In 2016-2017 some of those economic trends reversed or moderated, with oil prices increasing somewhat, inflation rates declining significantly and gross domestic product returning to modest growth. Economic instability resumed in 2018, with the Rouble depreciating significantly and inflation exceeding the government's forecasts. In 2019, the Rouble was relatively stable with intermittent volatility and inflation was below government forecast; however, the first quarter of 2020 saw another abrupt drop in oil prices, and, as a result, the value of the Rouble (see "– *We are subject to the economic risk and business cycles of our merchants, partners and agents and the overall level of consumer spending*"). There can be no assurance that any measures adopted by the Russian government to mitigate the effect of any financial and economic crisis will result in a sustainable recovery of the Russian economy. Current macroeconomic challenges, low or negative economic growth in the United States, China, Japan and/or Europe and market volatility due to the outbreak of COVID-19 or other factors may provoke or prolong any economic crisis.

As an emerging economy, Russia remains particularly vulnerable to further external shocks. Events occurring in one geographic or financial market sometimes result in an entire region or class of investments being disfavored by international investors—so-called "contagion effects". Russia has been adversely affected by contagion effects in the past, and it is possible that it will be similarly affected in the future by negative economic or financial developments in other countries. Economic volatility, or a future economic crisis, may undermine the confidence of investors in the Russian markets and the ability of Russian businesses to raise capital in international markets, which in turn could have a material adverse effect on the Russian economy and the Group's results of operations, financial condition and prospects. In addition, any further declines in oil and gas prices or other commodities pricing could disrupt the Russian economy and materially adversely affect our business, financial condition, results of operations and prospects.

31

Table of Contents

*The banking system in Russia remains underdeveloped.*

The banking and other financial systems in Russia are not well-developed or regulated, and Russian legislation relating to banks and bank accounts is subject to varying interpretation and inconsistent application. The 1998 financial crisis resulted in the bankruptcy and liquidation of many Russian banks and almost entirely eliminated the developing market for commercial bank loans at that time. From April to July 2004, the Russian banking sector experienced further serious turmoil. As a result of various market rumors and certain regulatory and liquidity problems, several privately owned Russian banks experienced liquidity problems and were unable to attract funds on the inter-bank market or from their client base. Simultaneously, they faced large withdrawals of deposits by both retail and corporate customers. Several of these privately owned Russian banks collapsed or ceased or severely limited their operations. Russian banks owned or controlled by the government and foreign owned banks generally were not adversely affected by the turmoil.

There are currently a limited number of creditworthy Russian banks (most of which are headquartered in Moscow). Although the CBR has the mandate and authority to suspend banking licenses of insolvent banks, some insolvent banks still operate. Many Russian banks also do not meet international banking standards, and the transparency of the Russian banking sector in some respects still lags behind internationally accepted norms. Banking supervision is also often inadequate, as a result of which many banks do not follow existing CBR regulations with respect to lending criteria, credit quality, loan loss reserves, diversification of exposure or other requirements. The imposition of more stringent regulations or interpretations could lead to weakened capital adequacy and the insolvency of some banks. Prior to the onset of the 2008 global economic crisis, there had been a rapid increase in lending by Russian banks, which many believe had been accompanied by a deterioration in the credit quality of the loan portfolio of those banks. In addition, a robust domestic corporate debt market was leading Russian banks to hold increasingly large amounts of Russian corporate ruble bonds in their portfolios, which further deteriorated the risk profile of the assets of Russian banks. The global financial crisis of 2007-2008 has led to the collapse or bailout of some Russian banks and to significant liquidity constraints for others. Profitability levels of most Russian banks have been adversely affected. Indeed, the global crisis has prompted the government to inject substantial funds into the banking system amid reports of difficulties among Russian banks and other financial institutions.

In recent years, the CBR has considerably increased the intensity of its supervision and regulation of the Russian banking sector. Historically, the revocation of banking licenses by the CBR has been a relatively rare event mostly occurring to local banks with little assets and little or no significance for the banking sector as a whole. Starting October 2013, however, the CBR has launched a campaign aimed at cleansing the Russian banking industry, revoking the licenses from an unusually high number of banks (including significant banks such as Ugra, Master-Bank, Investbank, ProBusinessBank, Svyaznoy Bank, Vneshprombank, Tatfondbank and others) on allegations of money laundering, financial statements manipulation and other illegal activities, as well as inability of certain banks to discharge their financial obligations, which resulted in turmoil in the industry, instigated bank runs on a number of Russian credit institutions, and severely undermined the trust that the Russian population had with private banks. In addition, in the course of 2017 three of Russia's largest private banks, Otkritie Bank, Binbank and Promsvyazbank, were all bailed out and taken over by the CBR through the newly established Banking Industry Consolidation Fund, since all of them were allegedly unable to perform their obligations as they fell due for various reasons. License revocations have continued throughout 2018 and 2019, again with some major banks impacted. The private banking sector in Russia, always relatively minor compared to state players like Sberbank and VTB to begin with, has contracted severely as a result. This can be expected to result in reduced competition in the banking sector (while at the same time putting alternative payment solution providers such as ourselves in the position of having to predominantly compete with the government itself), increased inflation and a general deterioration of the quality of the Russian banking industry. It could be expected that the difficulties currently faced by the Russian economy could result in further collapses of Russian banks. With few exceptions (notably the state-owned banks), the Russian banking system suffers from weak depositor confidence, high concentration of exposure to certain borrowers and their affiliates, poor credit quality of borrowers and related party transactions. Current economic circumstances in Russia are putting stress on the Russian banking system. These circumstances decrease the affordability of consumer credit, putting further pressure on overall consumer purchasing power. In addition, these factors could further tighten liquidity on the Russian market and add pressure onto the ruble.

Our business is significantly affected by development in the Russian banking sector. First, we periodically hold funds in a number of Russian banks and rely on guarantees given by those banks to enhance our liquidity. Increased uncertainty in the Russian banking sector exposes us to additional counterparty risk and affects our liquidity. In addition, a significant portion of our revenue is derived from consumer payments in the banking industry in our Financial Services market vertical. As a result, the bankruptcy or insolvency of one or more of these banks could adversely affect our business, financial condition and results of operations. The continuation or worsening of the banking crisis could decrease our transaction volumes, while the bankruptcy or insolvency of any of the banks which hold our funds could prevent us from accessing our funds for several days. All of these factors could have a material adverse effect on our business, financial condition and results of operations.

***Social instability could lead to labor and social unrest, increased support for renewed centralized authority, nationalism or violence.***

Failures to adequately address social problems have led in the past, and could lead in the future, to labor and social unrest. Labor and social unrest could have political, social and economic consequences, such as increased support for a renewal of centralized authority; increased nationalism, with support for re-nationalization of property, or expropriation of or restrictions on foreign involvement in the economy of Russia; and increased violence. Any of these could have an adverse effect on confidence in Russia's social environment and the value of investments in Russia, could restrict our operations and lead to a loss of revenue, and could otherwise have a material adverse effect on its business, results of operations and financial condition.

Table of Contents

***Russia has experienced high levels of inflation in the past.***

As a substantial portion of our expenses (including operating costs and capital expenditures) are denominated in rubles, the relative movement of inflation and exchange rates significantly affects our results of operations. The effects of inflation could cause some of our costs to rise. Russia has experienced high levels of inflation since the early 1990s. For example, inflation increased dramatically after the 1998 financial crisis, reaching a rate of 84.4% in that year. According to Rosstat, inflation in the Russian Federation was 11.4% in 2014,12.9% in 2015, 5.4% in 2016, 2.5% in 2017,4.2% in 2018 and 3% in 2019. Certain of our costs, such as salaries and rent, are affected by inflation in Russia. To the extent the inflation causes these costs to increase,

such inflation may materially adversely affect our business, financial condition and results of operations.

***The immaturity of legal systems, processes and practices in the Russian Federation may adversely affect our business, financial condition and results of operations.***

Risks associated with the legal systems of the Russian Federation include, to varying degrees, inconsistencies between and among laws, presidential decrees, edicts and governmental and ministerial orders and resolutions; conflicting local, regional, and federal rules and regulations; the lack of judicial or administrative guidance regarding the interpretation of the applicable rules; the untested nature of the independence of the judiciary and its immunity from political, social and commercial influences; the relative inexperience of jurists, judges and courts in interpreting recently enacted legislation and complex commercial arrangements; a high degree of unchecked discretion on the part of governmental authorities; alleged corruption within the judiciary and governmental authorities; substantial gaps in the regulatory structure due to delays in or absence of implementing regulations; bankruptcy procedures that are not well-developed and are subject to abuse; and a lack of binding judicial precedent. All of these weaknesses affect our ability to protect and enforce our legal rights, including rights under contracts, and to defend against claims by others. In addition, the merger of the Supreme Arbitration Court of the Russian Federation, which used to oversee business disputes, into the Supreme Court, which used to only handle criminal cases and civil lawsuits, is viewed by some as having further aggravated these issues.

The Russian judicial system is not immune from economic and political influences. The Russian court system is understaffed and underfunded, and the quality of justice, duration of legal proceedings, and performance of courts and enforcement of judgments remain problematic. Under Russian legislation, judicial precedents generally have no binding effect on subsequent decisions and are not recognized as a source of law. However, in practice, courts usually consider judicial precedents in their decisions. Enforcement of court judgments can in practice be very difficult and time-consuming in Russia. Additionally, court claims are sometimes used in furtherance of political and commercial aims. All of these factors can make judicial decisions in Russia difficult to predict and make effective redress problematic in certain instances.

The relatively recent enactment of many laws, the lack of consensus about the scope, content and pace of political and economic reform and the rapid evolution of legal systems in ways that may not always coincide with market developments have resulted in legal ambiguities, inconsistencies and anomalies and, in certain cases, the enactment of laws without a clear constitutional or legislative basis. Legal and bureaucratic obstacles and corruption exist to varying degrees in each of the regions in which we operate, and these factors are likely to hinder our further development. These characteristics give rise to investment risks that do not exist in countries with more developed legal systems. The developing nature of the legal systems in Russia could materially adversely affect our business, financial condition and results of operations.

***Unlawful, selective or arbitrary government action may have an adverse effect on our business.***

Governmental authorities have a high degree of discretion in Russia and at times appear to act selectively or arbitrarily, without hearing or prior notice, and in a manner that is contrary to law or influenced by political or commercial considerations. Moreover, the Russian Government also has the power in certain circumstances, by regulation or government act, to interfere with the performance of, nullify or terminate contracts. Unlawful, selective or arbitrary governmental actions have reportedly included denial or withdrawal of licenses, sudden and unexpected tax audits, criminal prosecutions and civil actions. Federal and local government entities also appear to have used common defects in matters surrounding share issuances and registration as pretexts for court claims and other demands to invalidate the issuances or registrations or to void transactions, seemingly for political purposes. Moreover, selective, public criticism by Russian Government officials of Russian companies has in the past caused the price of publicly traded securities in such Russian companies to sharply decline, and there is no assurance that any such public criticism by Russian Government officials in the future will not have the same negative affect. Standard & Poor's has expressed concerns that "Russian companies and their investors can be subjected to government pressure through selective implementation of regulations and legislation that is either politically motivated or triggered by competing business groups". In this environment, our competitors could receive preferential treatment from the government, potentially giving them a competitive advantage. Unlawful, selective or arbitrary governmental action, if directed at our operations in Russia, could materially and adversely affect our business, financial condition and results of operations.

***Shareholder liability under Russian corporate law could cause us to become liable for the obligations of our subsidiaries.***

Russian law generally provides that shareholders in a Russian joint-stock company or participants in a limited liability company are not liable for that company's obligations and risk only the loss of their investment. This may not be the case, however, when one company (the "effective parent") is capable of making decisions for another (the "effective subsidiary"). Under certain circumstances, the effective parent bears joint and several responsibility for transactions concluded by the effective subsidiary in carrying out such decisions.

[Table of Contents](#)

In addition, under Russian law, an effective parent is secondarily liable for an effective subsidiary's debts if an effective subsidiary becomes insolvent or bankrupt as a result of the action of an effective parent. In these instances, the other shareholders of the effective subsidiary may claim compensation for the effective subsidiary's losses from the effective parent that causes the effective subsidiary to take action or fail to take action knowing that such action or failure to take action would result in losses. We could be found to be the effective parent of our subsidiaries, in which case we would become liable for their debts, which could have a material adverse effect on our business, financial condition and results of operations.

***Our operations in Kazakhstan have become significant, and many of the risks we face in Kazakhstan are similar to those we face in Russia.***

In addition to Russia, our operations in Kazakhstan are significant. In many respects, the risks we face in operating business in Kazakhstan are similar to those in Russia as set out above in "—Risks Relating to the Russian Federation and Other Markets in Which We Operate". As is typical of an emerging market, Kazakhstan does not possess a well-developed business, legal and regulatory infrastructure and has been subject to substantial political, economic and social change. Our business in Kazakhstan is subject to Kazakhstan specific laws and regulations including with respect to tax,

anti-corruption, and foreign exchange controls. Such laws are often rapidly changing and are unpredictable. In addition, we are exposed to foreign currency fluctuations between the Russian ruble and the Kazakh tenge, which could affect our financial position and our profitability. Our failure to manage the risks associated with doing business in Kazakhstan could have a material adverse effect upon our results of operations.

**Risks Relating to Taxation**

*Global anti-offshore measures may have adverse impact on our business, financial condition and results of operations.*

In 2013 OECD and G20 countries accepted that existing international tax rules create opportunities for base erosion and profit shifting, because these rules have been designed more than a century ago. Pursuing solutions for this problem, OECD and G20 countries adopted a 15-point Action Plan to address base erosion and profit shifting. The BEPS package of measures represents the substantial renovation of the international tax rules. In light of the new measures, it is expected that profits will be reported where the economic activities that generate them are carried out and where value is created.

The Convention on Mutual Administrative Assistance in Tax Matters developed by the Council of Europe and the OECD in 1988 and amended by Protocol in 2010 is now signed by 136 jurisdictions (the Russian Federation, Cyprus, UAE are among the signatories). This Convention, by virtue of its Article 6, requires competent authorities of jurisdictions-signatories hereto to participate in the automatic exchange of Country-by-Country Reports and the automatic exchange of financial account information pursuant to the Common Reporting Standard (CRS). In addition, by virtue of Article 5 the Convention requires competent authorities of jurisdictions-signatories hereto to participate in the exchange of information on request and, by virtue of Article 7, stipulates that such competent authorities should participate in spontaneous exchange of information. The tax authorities (including, Russian, Cypriot and UAE tax authorities) already cooperate in terms of mutual administrative assistance in tax matters.

On June 7, 2017 67 countries signed the Multilateral Convention to Implement Tax Treaty Related Measures to Prevent Base Erosion and Profit Shifting ("MLI") in order to implement treaty related measures. MLI already covers 94 jurisdictions and entered into force on July 1, 2018 for the first five jurisdictions, which deposited their respective ratification instruments. The Russian Federation, Cyprus and the UAE are among the signatories to the document. The Russian Federation has ratified MLI, however it will come into force starting from 2021. The UAE has ratified MLI on 29 May 2019. Cyprus has ratified MLI on 22 January 2020. It is expected that further countries will also join the Convention by signing of MLI.

Generally, new means for global exchange of financial information provide for much more transparency of international transactions. Due to information exchange instruments the tax authorities are becoming much more efficient in combating tax avoidance.

The implementation of global instruments means the application of such instruments by competent authorities on mutually agreed grounds, however, there might be a risk that competent authorities of jurisdictions where our subsidiaries operate would apply newly introduced global transparency instruments inconsistently, which would lead to the imposition of additional taxes on us. For more details on the possible impact of these measures, see sections below.

*Significant change of substance requirements in certain jurisdictions may adversely impact our business.*

Following the global trend on increase of substance requirements in various jurisdictions, starting from 2019 certain jurisdictions (including traditional offshore jurisdictions) implement legislation that requires companies registered in the relevant offshore jurisdiction to maintain actual substance on the territory of such jurisdictions, which may include, amongst others, the qualified personnel, premises located in the particular jurisdiction, reasonable expenses to support daily operation of the company.

We cannot exclude that we might be subject to additional costs and/or tax liabilities resulted from the said requirements, which could have a material adverse effect on our business, financial condition and results of operations.

34

Table of Contents

*Weaknesses and changes in the Russian tax system could materially and adversely affect our business and the value of investments in Russia.*

We are subject to a broad range of taxes and other compulsory payments imposed at federal, regional and local levels, including, but not limited to, profits tax, VAT and social contributions. Tax laws, namely the Russian Tax Code, have been in force for a short period relative to tax laws in more developed market economies, and the implementation of these tax laws is still unclear or inconsistent. Historically, the system of tax collection has been relatively ineffective, resulting in continual changes to the interpretation of existing laws. Although the quality of Russian tax legislation has generally improved with the introduction of the first and second parts of the Russian Tax Code, the possibility exists that Russia may impose arbitrary or onerous taxes and penalties in the future, which could adversely affect our business, financial condition and results of operations. A large number of changes have been made to various chapters of the Russian Tax Code since their introduction. Since Russian federal, regional and local tax laws and regulations are subject to changes and some of the sections of the Russian Tax Code relating to the aforementioned taxes are comparatively new, interpretation of these regulations is still unclear or non-existent. Also, different interpretations of tax regulations exist both among and within government bodies at the federal, regional and local levels, which creates uncertainties and inconsistent enforcement. The current practice is that private clarifications to specific taxpayers' queries with respect to particular situations issued by the Russian Ministry of Finance are not binding on the Russian tax authorities and there can be no assurance that the Russian tax authorities will not take positions contrary to those set out in such clarifications. During the past several years the Russian tax authorities have shown a tendency to take more assertive positions in their interpretation of the tax legislation, which has led to an increased number of material tax assessments issued by them as a result of tax audits. Starting from January 1, 2019 tax authorities are entitled to claim documents (information) used for calculation and payment of taxes (other obligatory payments) from the taxpayers' auditors. In practice, the Russian tax authorities generally interpret the tax laws in ways that do not favor taxpayers, who often have to resort to court proceedings against the Russian tax authorities to defend their position. In some instances, Russian tax authorities have applied new interpretations of tax laws retroactively. There is no established precedent or consistent court practice in respect of these issues. Furthermore, in the absence of binding precedent, court rulings on tax or other related matters by different courts relating to the same or similar circumstances may also be inconsistent or contradictory.

The Russian tax authorities are increasingly taking a "substance over form" approach. In 2017, anti-avoidance rules were introduced by Article 54.1 of the Russian Tax Code. A similar "unjustified tax benefit" concept introduced by the Plenum of the Supreme Arbitrazh Court of the Russian Federation in its Resolution No. 53 has been in existence for more than 10 years in Russian law. The unjustified tax benefit concept has been widely used by the Russian tax authorities to challenge the tax positions of Russian taxpayers (see also *"Our business in Russia may be deemed to receive unjustified tax benefits"*).

Starting from January 1, 2015 a number of amendments have been made to the Russian tax legislation introducing, among others, the concepts of controlled foreign companies, corporate tax residency and beneficial ownership (see also *"Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations"*). Due to the relative lack of court and administrative practice, no assurance can be currently given as to how these amendments will be applied in practice in the event of each particular case, their potential interpretation by the tax authorities and the possible impact on us.

In addition, on November 27, 2017 the Federal Law No. 340-FZ introducing country-by-country reporting ("CbCR") requirements was published. The mandatory filing of CbCR is, in general, in line with the Organization for Economic Co-operation and Development ("OECD") recommendations within the Base Erosion and Profit Shifting ("BEPS") initiative. The law has taken effect on the date of its official publication, and its provisions apply to financial years starting in 2017 (except for the provisions regarding the national documentation). These amendments would require multinational corporate enterprise groups with consolidated revenues of over certain threshold to submit annual CbCR, as well as certain other reporting forms detailing multinational corporate enterprises groups operations (locally and globally, respectively), as well as transfer pricing methodologies applied to intra-group transactions. Thus, if we reach the reporting threshold in Russia (over RUB 50 billion), or alternatively in any other jurisdiction of our presence (e.g. in Cyprus, where the Decree issued by the Cyprus Minister of Finance on December 30, 2016 introduced a mandatory CbCR for multinational enterprise groups generating consolidated annual turnover exceeding EUR 750 million) we may be liable to submit relevant CbCR. It is unclear at the moment how the above measures will be applied in practice by the Russian tax authorities and courts. It is important to note that the above changes and amendments to the Russian Tax Code introduced by the law do not replace already existing transfer pricing documentation requirements.

Certain other changes were introduced to the Russian Tax Code over the recent years, namely changes to types of controlled transactions subject to transfer pricing rules, increase of the VAT rate to 20%, etc.

The possibility exists that the Government may introduce additional tax-raising measures. Although it is unclear how such measures would operate, the introduction of any such measures may affect the Group's overall tax efficiency and may result in significant additional taxes becoming payable.

On November 24, 2016, the OECD published the MLI which introduces new provisions to existing double tax treaties limiting the use of tax benefits provided thereof. For example, the reduced rate on dividends provided under a double tax treaty shall be denied if the conditions for holding equity interest or shares by the time of the dividend payout are met over less than a 365-day period. MLI also proposes taxing income from gains upon alienation of shares (interests) of property-rich companies in the country where such property is situated if the immovable property value threshold is met at any time during the 365 days preceding the transaction and not at the time of the transaction itself. Thus, when determining tax consequences several sources of legislation will now need to be considered, namely the domestic tax law, double tax treaties and MLI provisions, which have been adopted by states-parties to the relevant double tax treaty. On April 17, 2019, the MLI has been ratified by the Russian State Duma. In December 2019 the Russian Ministry of Finance announced that entry into effect of MLI in Russia is postponed until 1 January 2021. In light of these upcoming amendments, it is likely that the application of the double tax treaties concluded by Russia with countries that also have signed and ratified the MLI, i.a. the double tax treaty between Russia and Cyprus, will be limited that potentially may result in higher tax burden for our Group's business.

Table of Contents

There can be no assurance that the Russian Tax Code will not be changed in the future in a manner adverse to the stability and predictability of the tax system. These factors, together with the potential for state budget deficits, raise the risk of the imposition of additional taxes on us. The introduction of new taxes or amendments to current taxation rules may have a substantial impact on the overall amount of our tax liabilities. There is no assurance that we would not be required to make substantially larger tax payments in the future, which may adversely affect our business, financial condition and results of operations.

*Our business in Russia may be deemed to receive unjustified tax benefits.*

In its decision No 138-0 dated July 25, 2001, the Constitutional Court of the Russian Federation, or the Constitutional Court, introduced the concept of "a taxpayer acting in a bad faith" without clearly stipulating the criteria for it. Although this concept is not defined in Russian tax law, it has been used by the tax authorities to deny, for instance, the taxpayer's right to obtain tax deductions and benefits provided by the tax law. The tax authorities and courts often exercise significant discretion in interpreting this concept in a manner that is unfavorable to taxpayers.

The concept of "unjustified tax benefit" was formulated in Resolution No. 53 issued by the Plenum of the Supreme Arbitrazh Court of the Russian Federation in 2006. The concept is defined in the resolution mainly by reference to specific examples of tax benefits obtained as a result of a transaction that has no reasonable business purpose and which may lead to disallowance of their application.

On July 19, 2017 anti-avoidance provisions were introduced into the Russian Tax Code and the Article 54.1 of the Russian Tax Code was adopted. These provisions provide for two specific criteria that should be met simultaneously to entitle a taxpayer to reduce the tax base or the amount of tax: (i) the main purpose of the transaction (operation) is not a non-payment (incomplete payment) and (or) offset (refund) of the amount of tax; and (ii) the obligation under the transaction (operation) is executed by a person who is a party to a contract entered into with the taxpayer and / or a person to whom the obligation to execute a transaction (operation) was transferred under a contract or law. The Russian Tax Code specifically indicates that signing of primary documents by an unidentified or unauthorized person, violation by the counterparty of tax legislation, the possibility to obtain the same result by a taxpayer by entering into other transactions not prohibited by law cannot be considered in itself as a basis for recognizing the reduction of the tax base

or the amount of tax unlawful. However, application of these criteria is still under consideration of the tax authorities, therefore, no assurance can be given that positions of taxpayers will not be challenged by the Russian tax authorities. Anti-avoidance provisions stipulated in the Article 54.1 of the Russian Tax Code are applied starting from August 19, 2017, yet may be applied to prior periods if benefit taxpayers. The Russian Ministry of Finance in its recent letter stated that the concept expressed in Resolution No. 53 and evolved in the relevant court practice should not be applied by the Russian tax authorities in the course of tax audits following enactment of the Article 54.1 of the Russian Tax Code. However, as of the date of this annual report, no assurance can be given that later the Russian tax authorities would not rely on the court-based version of the concept or even both ones, which may result in a higher tax burden of taxpayers. In addition to the usual tax burden imposed on Russian taxpayers, these conditions complicate tax planning and related business decisions. This uncertainty could possibly expose our Group to significant fines and penalties and to enforcement measures, despite our best efforts at compliance, and could result in a greater than expected tax burden.

*Our Russian subsidiaries are subject to tax audits by Russian tax authorities which may result in additional tax liabilities.*

Generally, taxpayers are subject to tax audits for a period of three calendar years immediately preceding the year in which the decision to conduct the audit is taken. Nevertheless, in some cases the fact that a tax period has been reviewed by the tax authorities does not prevent further review of that tax period, or any tax return applicable to that tax period. In addition, based on the court practice and the first part of the Russian Tax Code, the three-year statute of limitations for tax liabilities is extended if the actions of the taxpayer create insurmountable obstacles for the tax audit. Because none of the relevant terms is defined in Russian law, the tax authorities may have broad discretion to argue that a taxpayer has "obstructed" or "hindered" or "created insurmountable obstacles" in respect of an audit, effectively linking any difficulty experienced in the course of their tax audit with obstruction by the taxpayer and use that as a basis to seek tax adjustments and penalties beyond the three-year term. Therefore, the statute of limitations is not entirely effective. Tax audits may result in additional costs to our Group if the relevant tax authorities conclude that our Russian subsidiaries did not satisfy their tax obligations in any given year. Such audits may also impose additional burdens on our Group by diverting the attention of management resources. The outcome of these audits could have a material adverse effect on our business, financial condition and results of operations.

*Russian transfer pricing legislation may require pricing adjustments and impose additional tax liabilities with respect to all controlled transactions.*

The existing Russian transfer pricing rules became effective from January 1, 2012. Under these rules the Russian tax authorities are allowed to make transfer-pricing adjustments and impose additional tax liabilities in respect of certain types of transactions ("controlled" transactions). The list of the "controlled" transactions includes transactions with related parties (with several exceptions such as guarantees between Russian non-banking organizations and interest-free loans between Russian related parties) and certain types of cross border transactions. Starting from 2019 transactions between Russian tax residents will be controlled only if the amount of income from the

36

Table of Contents

transactions between these parties within one year exceeds RUB 1 billion and at the same time one of the conditions stipulated in Article 105.14 of Russian Tax Code (e.g., the parties to the transaction apply different corporate income tax rates) is met. Certain other transactions, such as foreign trade transactions in commodities traded on global exchanges, transactions with parties from blacklisted countries, transactions between related parties under participation of the independent intermediary, as well as transactions between the Russian tax resident and foreign tax resident (related parties) remain under control in case the amount of income from transactions between these parties within one year exceeds RUB 60 million threshold. The new rules apply to transactions, under which income (expenses) from such controlled transactions are recognised after January 1, 2019. As a side effect, the Russian tax authorities who are entitled to perform tax audits of Russian taxpayers with focus on compliance with existing transfer pricing legislation will no longer be involved in tax audit of transactions between Russian parties due to increased limits on transactions between Russian tax residents but they will be able to pay more attention to cross-border transactions.

The burden of proving market prices, as well as keeping specific documentation, lies with the taxpayers. In certain circumstances, the Russian tax authorities may apply the transfer pricing rules and methods in cases where the rules are formally not applicable, claiming additional tax charges calculated using the transfer rules but based on other tax concepts (e.g. unjustified tax benefit, lack of economic justification of expenses, etc.). For more information see "Our business in Russia may be deemed to receive unjustified tax benefits".

It is therefore possible that the Group entities established in Russia may become subject to transfer pricing tax audits by tax authorities in the foreseeable future. Due to the uncertainty and lack of established practice of application of the Russian transfer pricing legislation the Russian tax authorities may challenge the level of prices applied by the Group under the "controlled" transactions (including certain intercompany transactions) or challenge the methods used to prove prices applied by the Group, and as a result accrue additional tax liabilities. If additional taxes are assessed with respect to these matters, they could have a material adverse effect on our business, financial condition and results of operations.

*ADS holders outside of Russia may be subject to Russian tax for income earned upon a sale, exchange or disposal of our ADSs.*

In the event that the proceeds from a sale, exchange or disposal of ADSs are deemed to be received from a source within Russia, a non-resident holder that is an individual may be subject to Russian tax in respect of such proceeds at a rate of 30% of the gain (such gain being computed as the sales price less any available documented cost deduction, including the acquisition price of the ADSs and other documented expenses, such as depositary expenses and brokers' fees). In case of non-resident holders that are legal entities or organizations proceed from sale, exchange or disposal of ADSs would be regarded as Russian source proceeds subject to tax in Russia at the rate of 20% if more than 50% of our assets consist of immovable property in Russia. Relevant tax may be eliminated under any available double tax treaty relief, provided that the necessary requirements to qualify for the treaty relief and the appropriate administrative requirements under the Russian tax legislation have been met. For example, holders of ADSs that are eligible for the benefits of the United States-Russia double tax treaty should generally not be subject to tax in Russia on any gain arising from the disposal of ADSs, provided that the gain is not attributable to a permanent establishment or a fixed base that is or was located in Russia and/or provided that no more than 50% of our assets consist of immovable property situated in Russia (as defined in the treaty). If more than 50% of our assets were to consist of immovable property situated in Russia, the benefits of the United States-Russia double tax treaty may not be available to an ADS holder (whether a legal

entity or an individual). For more details, see "Russian Tax Considerations Relevant to the Purchase, Ownership and Disposal of the ADSs".

*Changes in the double tax treaty between Russia and Cyprus may significantly increase our tax burden.*

A company that is tax resident of Cyprus is subject to Cypriot taxation and qualifies for benefits available under the Cypriot tax treaty network, including the Russia-Cyprus double tax treaty. We can provide no assurance that the double tax treaty will not be renegotiated or revoked. The Protocol of October 7, 2010 introduced a number of amendments to the Russia-Cyprus double tax treaty dated December 5, 1998. Most of these amendments have been in effect since January 1, 2013. Additionally, the Protocol contained a clause on Article 13 of the Russia-Cyprus double tax treaty, under which gains from the alienation of shares or similar rights deriving more than 50% of their value from immovable property, must be taxed in the country where the property is located starting from January 1, 2017.

Moreover, the MLI that has recently been ratified in Russia and has been ratified in Cyprus on 22 January, 2020, may have a significant impact on application of the Russia-Cyprus double tax treaty, if relevant positions would be mutually agreed upon by Russia and Cyprus. The MLI will enter into force on May 1, 2020 in Cyprus and on January 1, 2021 in Russia. The provisions of the MLI, with regard to taxes withheld at source, are expected to be applicable the earliest as from 1 January 2021. For more information see *"Weaknesses and changes in the Russian tax system could materially and adversely affect our business and the value of investments in Russia"*. Adverse changes in, or the cancellation of, the Russia-Cyprus double tax treaty may significantly increase our tax burden and adversely affect our business, financial condition and results of operations.

*We may be deemed to be a tax resident outside of Cyprus.*

According to the provisions of the Cyprus Income Tax Law, a company is considered to be a resident in Cyprus for tax purposes if its management and control are exercised in Cyprus. The concept of "management and control" is not defined in the Cypriot tax legislation. For more details in relation to tax residency in Cyprus see "Item 10.E Taxation—Material Cypriot Tax Considerations—Tax residency of a company". If we are deemed not to be a tax resident in Cyprus, we may not be subject to the Cypriot tax regime other than in respect of Cyprus sourced income and we may be subject to the tax regime of the country in which we are deemed to be a tax resident.

37

Table of Contents

Further, we would not be eligible for benefits under the double tax treaties entered into between Cyprus and other countries.

Under the Russian Tax Code, a foreign legal entity may be recognized as a Russian tax resident if such entity is in fact managed from Russia. For more details in relation to tax residency in Russia see "Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations".

The double tax treaty in force between Cyprus and Russia provides that a company shall be deemed to be a tax resident of the state in which the place of effective management of the company is situated. In case both states claim the tax residency of the company, the process of determining the effective management will be achieved through the two states endeavoring to determine the place of effective management by mutual agreement having regard to all relevant factors.

On June 7, 2017 Cyprus signed the MLI, and the Cyprus Government ratified the MLI on January 22, 2020. The purpose of the MLI is for Cyprus to implement a series of tax treaty measures to update the existing network of double tax treaties. Cyprus has adopted the minimum standards of the MLI and made full reservations on all other provisions of the MLI, including replacement of the "effective management" concept with the mutual agreement procedure between the jurisdictions of which the entity shall be deemed to be a resident.

In effect the double tax treaties of Cyprus will be amended to include these provisions without further bilateral negotiations after the other jurisdiction of the respective tax treaty has deposited its instrument of ratification, acceptance, or approval of the MLI, and a specified time period has passed.

In addition, taking into account that the majority of our board of directors comprises tax residents or citizens of Russia, this may pose a risk that we, even if we are managed and controlled from Cyprus and, therefore, being a tax resident in Cyprus, may be deemed to have a permanent establishment in Russia or elsewhere. Such a permanent establishment could be subject to taxation of the jurisdiction of the permanent establishment on the profits allocable to the permanent establishment. If we are tax resident in a jurisdiction outside of Cyprus or are deemed to have a permanent establishment in Russia or elsewhere, our tax burden may increase significantly, which, in turn, may materially adversely affect our business, financial condition and results of operations.

*Our subsidiaries may be deemed a tax resident outside of countries of their incorporation.*

Each jurisdiction has its own tax residency requirements. We believe that our subsidiaries do comply with tax residency requirements of the jurisdiction, where they are incorporated; however, there might be a risk that they may be deemed a tax resident outside of countries of their incorporations.

Moreover, the MLI provides that if there is a conflict of tax residency for the person (other than an individual) and competent authorities do not come to an agreement on the relevant person, it shall not be entitled to any tax relief or exemption provided by the relevant double tax treaty except to the extent as may be agreed upon by the competent authorities. In the absence of relevant practice we could not exclude the risk that there might be a conflict of tax residency for our subsidiaries resulting in significant increase of our tax burden, which may materially adversely affect our business, financial condition and results of operations.

*Depending upon the value and the nature of our assets and the amount and nature of our income over time, we could be classified as a passive foreign investment company ("PFIC") for U.S. federal income tax purposes.*

We will be classified as a PFIC in any taxable year if either: (a) 50% or more of the fair market value of our gross assets (determined on the basis of a quarterly average) for the taxable year produce passive income or are held for the production of passive income, or (b) 75% or more of our gross income for the taxable year is passive income. As a publicly traded foreign corporation we intend for this purpose to treat the aggregate fair market value of our gross assets as being equal to the aggregate value of our outstanding stock ("market capitalization") plus the total amount of our liabilities and to treat the excess of the fair market value of our assets over their book value as a nonpassive asset to the extent attributable to our nonpassive income. Because we currently hold, and expect to continue to hold, a substantial amount of cash and cash equivalents and other passive assets used in our business, and because the value of our gross assets is likely to be determined in large part by reference to our market capitalization securities, we would likely become a PFIC for a given taxable year if the market price of our ADSs were to decrease significantly. The application of the PFIC rules is subject to uncertainty in several respects, and we must make a separate determination after the close of each taxable year as to whether we were a PFIC for such year. If we are a PFIC for any taxable year during which a U.S. investor held our ADSs or ordinary shares, the U.S. investor might be subject to increased U.S. federal income tax liability and to additional reporting obligations. We do not intend to provide the information necessary for the U.S. investor to make a qualified electing fund election with respect to our ADSs or ordinary shares. See *"Taxation – United States Federal Income Tax Considerations – Passive Foreign Investment Companies."*

38

Table of Contents

***Our companies established outside of Russia may be exposed to taxation in Russia.***

Due to our international structure (see "Item 18. Financial Statements, Note 5. Consolidated subsidiaries*"*), we are subject to permanent establishment rules and transfer pricing risks in various jurisdictions in which we operate. We manage the related risks by looking at management functions and risks in various countries and level of profits allocated to each subsidiary. If additional taxes are assessed in connection with these matters, they may be material. The Russian Tax Code contains the concept of a permanent establishment in Russia as means for taxing foreign legal entities, which carry on regular operational activities in Russia beyond preparatory and auxiliary activities.

The Russian double tax treaties with other countries also contain a similar concept. If a foreign company is treated as having a permanent establishment in Russia, it would be subject to Russian taxation in a manner broadly similar to the taxation of a Russian legal entity, but only to the extent of the amount of the foreign company's income that is attributable to the permanent establishment in Russia. However, the practical application of the concept of a permanent establishment under Russian domestic law is not well developed and so foreign companies having even limited operations in Russia, which would not normally satisfy the conditions for creating a permanent establishment under international rules, may be at risk of being treated as having a permanent establishment in Russia and hence being exposed to Russian taxation. Furthermore, the Russian Tax Code contains attribution rules, which are not sufficiently developed, and there is a risk that the tax authorities might seek to assess Russian tax on the global income of a foreign company. Having a permanent establishment in Russia may also lead to other adverse tax implications, including challenging a reduced withholding tax rate on dividends under an applicable double tax treaty, potential effect on VAT and property tax obligations. There is also a risk that penalties could be imposed by the tax authorities for failure to register a permanent establishment with the Russian tax authorities. Recent events in Russia suggest that the tax authorities may be seeking more actively to investigate and assert whether foreign entities of our Group operate through a permanent establishment in Russia. Any such taxes or penalties could have a material adverse effect on our business, financial condition and results of operations.

***We may encounter difficulties in obtaining lower rates of Russian withholding income tax envisaged by the Russia-Cyprus double tax treaty for dividends distributed from Russia.***

Dividends paid by a Russian legal entity to a foreign legal entity are generally subject to Russian withholding income tax at a rate of 15%, although this tax rate may be reduced under an applicable double tax treaty. We intend to rely on the Russia-Cyprus double tax treaty. The tax treaty allows reduction of withholding income tax on dividends paid by a Russian company to a Cypriot company to 10% provided that the following conditions are met: (i) the Cypriot company is a tax resident of Cyprus within the meaning of the tax treaty; (ii) the Cypriot company is the beneficial owner of the dividends; (iii) the dividends are not attributable to a permanent establishment of the Cypriot company in Russia; and (iv) the treaty clearance procedures are duly performed. This rate may be further reduced to 5% if the direct investment of the Cypriot company in a Russian subsidiary paying the dividends is at least EUR100,000. Although we will seek to claim treaty protection, there is a risk that the applicability of the reduced rate of 5% or 10% may be challenged by Russian tax authorities. As a result, there can be no assurance that we would be able to avail ourselves of the reduced withholding income tax rate in practice.

Specifically, our Cypriot holding company may incur a 15% withholding income tax at source on dividend payments from Russian subsidiaries if the treaty clearance procedures are not duly performed at the date when the dividend payment is made. In this case, we may seek to claim as a refund the difference between the 15% tax withheld and the reduced rate of 10% or 5% as appropriate. However, there can be no assurance that such taxes would be refunded in practice. Similar approach is applied to dividends received from Russian subsidiaries by the Company's non-Russian subsidiaries. Moreover, MLI coming into force may have an effect on application of a double tax treaty between Russia and Cyprus, in respect to the applicability of the minimum standards. MLI has been already ratified in Russia and will come into effect starting from January 1, 2021. Cyprus has ratified MLI and it will come into force starting May 1, 2020.

Furthermore, starting from January 1, 2015 a number of amendments had been made to the Russian tax legislation introducing, amongst others, the concept of beneficial ownership. Under this concept, double tax treaty benefits are only available to the recipient of income from Russian sources, if such recipient is the beneficial owner of the relevant income. Foreign entities that do not qualify as beneficial owners may not claim double tax treaty relief even if they are residents in a double tax treaty country. For these purposes, the beneficial owner is defined as a person holding directly, through its direct and/or indirect participation in other organizations or otherwise, the right to own, use or dispose of income, or the person on whose behalf another person is authorized to use and/or dispose of such income. In order to determine whether a foreign entity is a beneficial owner of income, it is necessary to take into account the functions performed by such foreign entity, as well as the risks borne by it. Entities are not recognized as beneficial owners of

income if they have limited authorities to use or dispose income received from Russian sources, perform agency or other similar functions in favour of third parties, not taking any risks or transfer such income (either partially or in full) to third parties that are not eligible to double tax treaty benefits.

Introduction of the concept of beneficial ownership may result in the inability of the foreign companies within our Group to claim benefits under a double taxation treaty through structures which historically have benefited from double taxation treaty protection in Russia. It should be noted that simplified approach to confirmation of a beneficial ownership status has recently been adopted for public companies which shares are traded on qualifying stock exchange. At the same time, the Russian Tax Code does not provide for the list of criteria satisfying which would be sufficient for the confirmation of the beneficial ownership rights. Due to lack of any unified set of requirements, decision of the Russian tax authorities and courts with respect to beneficial ownership status may vary in each particular case. Application of such approach by Russian tax authorities and courts may result in additional tax liabilities for the Group. Recent court cases demonstrate that the Russian tax authorities actively challenge application of double tax treaty benefits retroactively (i.e. for the periods prior to 2015, when the concept of beneficial ownership was introduced in the Russian Tax Code) on the grounds that double tax treaties already include beneficial ownership requirement to allow application of reduced tax rates or exemptions. In these cases, the Russian tax authorities obtained relevant

39

Table of Contents

information by means of information exchange with the foreign tax authorities. The imposition of additional tax liabilities as a result of the application of this rule to transactions carried out by us may have a material adverse effect on our business, financial condition and results of operations (see "- Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations").

***Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations.***

The Russian Federation, like a number of other countries in the world, is actively involved in introduction of measures against tax evasion through the use of low tax jurisdictions as well as aggressive tax planning structures. Starting from January 1, 2015, the Federal Law No. 376-FZ, introducing the concept of "controlled foreign companies" (the "CFC Rules"), the concept of "corporate tax residency" and the concept of "beneficial ownership" into Russian tax legislation, came into force (with further amendments within 2016-2018). Moreover, Russia has entered into several multilateral agreements for the exchange of information between the tax authorities of different countries.

Under the Russian CFC Rules, in certain circumstances, undistributed profits of foreign companies and non-corporate structures (e.g., trusts, funds or partnerships) domiciled in foreign jurisdictions, which are ultimately owned and/ or controlled by Russian tax residents (legal entities and individuals) will be subject to taxation in Russia. The Russian CFC Rules are being constantly developed. A number of amendments to the Russian CFC Rules were made within 2015-2019 years. In the meantime, certain provisions of the Russian CFC Rules are still ambiguous and may be subject to arbitrary interpretation by the Russian tax authorities.

Under the concept of "corporate tax residency" a foreign legal entity may be recognized as a Russian tax resident if: (i) its executive body(ies) operates in respect of such company in Russia on regular basis (however, the activity of executive body will not be viewed as regular if it is insignificant compared to the one in the other jurisdiction), or (ii) senior executive personnel of the company who are authorized to plan and control activities of the company and take responsibility over it basically carry out management of the company from Russia (i.e. make decisions or take any other measures in respect of operational activities of the company that are within the competence of the company's executive body). Provided that one of the above conditions is met both in Russia and in other jurisdiction to the same extent, the place of management and control is defined as Russia, provided that one or more of the following is carried out in Russia: (i) bookkeeping and maintaining of management accounts (other than preparation and reporting of consolidated financial or management accounts, as well as analysis of operations of the foreign company), or (ii) company's record keeping, or (iii) daily management of the company's staff. When an entity is recognized as Russian tax resident it is obligated to register with the Russian tax authorities, calculate and pay Russian tax on its worldwide income and comply with other tax-related rules established for Russian entities. There is still an uncertainty as to how these criteria will be applied by the Russian tax authorities in practice.

Under the Russian Tax Code, a beneficial owner is defined as a person holding directly, through its direct and/or indirect participation in other organizations or otherwise, the right to own, use or dispose of income, or the person on whose behalf another person is authorized to use and/or dispose of such income. When determining the beneficial owner, the functions of a foreign person that is claiming the application of reduced tax rates under an applicable double tax treaty and the risks that such person takes should be analyzed. In accordance with the provisions of the Russian Tax Code, the benefits of a double tax treaty will not apply if a foreign person claiming such benefits has limited powers to dispose of the relevant income, fulfills intermediary functions without performing any other duties or taking any risks and paying such income (partially or in full) directly or indirectly to another person who would not be entitled to the same benefits should it received the income in question directly from Russia. Starting from January 1, 2017, the Russian Tax Code requires a tax agent (i.e. the payer of income) (in addition to a certificate of tax residency) to obtain a confirmation from the recipient of the income that it is the beneficial owner of the income. To date, there is still no approved or recommended format of such confirmation letter. However, the court practice proves that in each case the tax authorities follow "the substance over form" approach when considering the beneficial owner confirmations.

The Russian Tax Code allows for a "look through" approach to withholding tax, i.e. double tax treaty benefits shall be still available to the actual beneficial owner of income coming from Russian sources in case the first recipient of such income does not satisfy beneficial ownership criteria and, therefore, is not subject to double tax treaty relief. In this case the actual beneficial owner of such income may be entitled to double tax treaty relief, subject to certain conditions stipulated in articles 7 and 312 of the Russian Tax Code, provided it is a tax resident of the jurisdiction, which has a double tax treaty with Russia. If the actual beneficial owner is a Russian tax resident or is a resident of the jurisdiction with no double tax treaty with Russia in place, provisions of the Russian Tax Code shall apply. Before 2019 there was uncertainty, whether the "look through" approach could be applied in relation to any type of income other than dividends. Since 2019 it is specifically allowed by the Russian Tax Code. Furthermore, based on the recent court practice, in case the tax authorities successfully challenge the beneficiary status of the income recipient that was initially claimed by the taxpayer as a beneficial owner, the application of a look-through approach to another person in the chain will likely be rejected by the tax authorities and domestic Russian withholding tax rate would be applied.

On November 4, 2014 the Russian President signed Federal Law No. 325-FZ ratifying the Multilateral Convention on Mutual Administrative Assistance in Tax Matters developed by the Council of Europe and the OECD, which the Russian Federation signed in 2011. Ratification of this Convention enables the Russian Federation starting from July 1, 2015 to receive tax information from all participating countries which include, among others, a number of offshore jurisdictions (mutual disclosures to the participating countries are required). In particular, this Convention provides for three types of tax information exchange between countries: exchange upon request, automated exchange and voluntary (ad-hoc) exchange. Moreover, the Convention offers such instruments as simultaneous tax audits (tax authorities can carry out an audit in their respective territories and then exchange data on the audited group of companies or persons connected with joint interests), as well as foreign tax audits (when a tax audit includes the work of foreign tax authorities). The Convention also foresees mutual assistance of states to collect taxes within their respective territories.

40

Table of Contents

It is currently unclear how the Russian tax authorities will interpret and apply the abovementioned tax concepts and what will be the possible impact on us and our subsidiaries. In practice, over the last few years the tax authorities have actively applied and used all information exchange instruments available to them. As to the beneficial ownership concept, in a number of recent court cases, the tax authorities successfully applied this concept retroactively in respect to payments made before 2015 (i.e. prior to the date when the Russian beneficial ownership concept have come into force). Herewith, the tax authorities were unable to refer to the new rules enacted by the Federal Law No. 376-FZ for the period prior to 2015, so they referred to an applicable double tax treaty and the Commentaries to the OECD Model Tax Convention. Starting from 2015 the tax authorities may refer to specific provision of the Russian Tax Code when they challenge the beneficial ownership of the recipient and charge additional tax. Moreover, as mentioned above, starting from 2017, obtaining a confirmation that the income recipient is its beneficial owner became an obligatory procedure (rather than a right of a tax agent) for applying a reduced withholding tax rate.

Therefore, it cannot be excluded that we might be subject to additional tax liabilities because of these changes being introduced and applied to transactions carried out by us, which could have a material adverse effect on our business, financial condition and results of operations (see also *"We may encounter difficulties in obtaining lower rates of Russian withholding income tax envisaged by the Russia-Cyprus double tax treaty for dividends distributed from Russia", "Changes in the double tax treaty between Russia and Cyprus may significantly increase our tax burden"*).

*VAT on digital services in Russia.*

Starting from January 1, 2017, the new provisions of the Russian Tax Code introducing an obligation to pay Russian VAT on digital (electronically supplied) services in case such digital services are supplied (deemed to be supplied) to the individuals in Russia ("VAT law") entered into force. Starting from January 1, 2019, the law also extends the obligation to register and pay VAT to foreign companies that provide electronic services to legal entities and individual entrepreneurs in Russia. At the same time, buyers of such services are provided with the right to deduct VAT from foreign sellers.

Based on the new VAT law digital services shall be regarded as supplied at the place of the buyer's location. The new rules establish special criteria to determine whether the buyers are located in Russia.

Obligations to pay VAT on digital services supplied in Russia would depend on the way such services are provided. In particular, the VAT law contains the following provisions:

- If services are provided by foreign suppliers to Russian customers via Russian sales agents under agency (or other similar) agreements and such agents participate in settlements directly with customers, then such Russian agents would be obliged to act as tax agents, withhold and pay the respective amounts of VAT to the Russian budget. No VAT registration will be required for the foreign suppliers. If services are provided via chain of sales agents the last sales agent in the chain collecting money from customers should withhold and pay the respective amounts of VAT;

- If services are provided by foreign suppliers to Russian customers via foreign sales agents and such agents participate in settlements directly with customers, then such foreign agents are obliged to register in Russia for VAT purposes and fulfil VAT obligations related to digital services. If services are provided via several foreign agents, then a foreign agent which performs settlements directly with customers is regarded as a tax agent which should be registered in Russia for VAT purposes and fulfil VAT obligations.

These rules do not contain exact list of companies which should be regarded as tax agents for payment of VAT on digital services, but rather mention a broad list of intermediaries. However, based on the amendments introduced by the Federal Law No. 335-FZ dated November 27, 2017, starting from January 1, 2018 the national payment system operators specified in Federal Law No. 161-FZ "On the National Payment System" dated June 27, 2017 and mobile operators are excluded from the list of tax agents in respect of activities involving cash settlements for digital services.

Many provisions of VAT law are still ambiguous. It is currently unclear whether the foreign service provider registered in Russia for VAT purposes should pay VAT from other (non-digital) services VATable in Russia.

In case we are considered to be a foreign sales agent participating in settlements directly with customers, we may be forced to comply with VAT law as a tax agent for payment of VAT on digital services. Such event together with further developments of VAT law could have a material adverse effect on our business, financial condition and results of operations.

**Risks Relating to our ADSs**

*The class B shares underlying the ADSs are not listed and may be illiquid.*

The class B shares underlying the ADSs are neither listed nor traded on any stock exchange, and we do not intend to apply for the listing or

admission to trading of the class B shares on any stock exchange. As a result, a withdrawal of class B shares by a holder of ADSs, whether by election or due to certain other events will result in that holder obtaining securities that are significantly less liquid than the ADSs and the price of those class B shares may be discounted as a result of such withdrawal.

41

Table of Contents

***Our ADSs trade on more than one market and this may result in increased volatility and price variations between such markets.***

Our ADSs trade on both Nasdaq and MOEX. Trading in our ADSs on these markets occurs in different currencies (U.S. dollars on Nasdaq and Russian rubles on MOEX) and at different times (due to different time zones, trading days and public holidays in the United States and Russia). The trading prices of our ADSs on these two markets may differ due to these and other factors. The liquidity of trading in our ADSs on MOEX is limited. This may impair your ability to sell your ADSs on MOEX at the time you wish to sell them or at a price that you consider reasonable. In addition, trading of a small number of ADSs on that market could adversely impact the price of our ADSs significantly and could, in turn, impact the price in the United States. ADSs are completely fungible between both markets. Any decrease in the trading price of our ADSs on one of these markets could cause a decrease in the trading price of our ADSs on the other market. Additionally, as there is no direct trading or settlement between the two stock markets, the time required to move the ADSs from one market to another may vary and there is no certainty of when ADSs that are moved will be available for trading or settlement.

***Future sales of ADSs or ordinary shares by significant shareholders could cause the price of our ADSs to decline.***

If any of our significant shareholders sell, or indicate an intent to sell, substantial amounts of our ADSs or ordinary shares, including both class A shares and class B shares, in the market, the trading price of our ADSs could decline significantly. We cannot predict the effect, if any, that future sales of these ADSs or ordinary shares or the availability of these ADSs or ordinary shares for sale will have on the market price of our ADSs. As of the date of this annual report, we have outstanding 62,712,975 ordinary shares, including those represented by ADSs. Our shares that are not currently represented by ADSs could generally be added into our ADS program in relatively short order, subject to applicable securities laws restrictions. Our significant shareholders currently include Mr. Sergey Solonin (see *"–The substantial share ownership position of our chief executive officer Sergey Solonin may limit your ability to influence corporate matters "*) and Otkritie Bank (see "*– The substantial share ownership position of Otkritie could be adverse to the interests of our minority shareholders "*), both of whom have certain registration rights and are able to cause us to conduct registered offerings. A significant sale of our securities by any of these holders or any other future owner of a substantial stake in our company could have a detrimental effect on the trading price of our ADSs. We cannot predict what effect, if any, market sales of securities held by our significant shareholders or any other shareholder or the availability of these securities for future sale will have on the market price of the ADSs.

***Investors in our ADSs may have limited recourse against us, our directors and executive officers because we conduct our operations outside the United States and most of our current directors and executive officers reside outside the United States.***

Our presence outside the United States may limit investors' legal recourse against us. We are incorporated under the laws of the Republic of Cyprus. All of our current directors and senior officers reside outside the United States, principally in the Russian Federation. Substantially all of our assets and the assets of our current directors and executive officers are located outside the United States, principally in the Russian Federation. As a result, investors may not be able to effect service of process within the United States upon our company or its directors and executive officers or to enforce U.S. court judgments obtained against our company or its directors and executive officers in Russia, Cyprus or other jurisdictions outside the United States, including actions under the civil liability provisions of U.S. securities laws. In addition, it may be difficult for investors to enforce, in original actions brought in courts in jurisdictions outside the United States, liabilities predicated upon US securities laws. There is no treaty between the United States and the Russian Federation providing for reciprocal recognition and enforcement of foreign court judgments in civil and commercial matters. These limitations may deprive investors of effective legal recourse for claims related to their investment in our ADSs.

***Our ADS holders may not be able to exercise their pre-emptive rights in relation to future issuances of class B shares.***

In order to raise funding in the future, we may issue additional class B shares, including in the form of ADSs. Generally, existing holders of shares in Cypriot public companies are entitled by law to pre-emptive rights on the issue of new shares in that company (provided that such shares are paid in cash and the pre-emption rights have not been disapplied). Our ADS holders may not be able to exercise pre-emptive rights for class B shares represented by ADSs unless applicable securities law requirements are adhered to or an exemption from such requirements is available. In the United States, we may be required to file a registration statement under the Securities Act to implement pre-emptive rights. We can give no assurance that an exemption from the registration requirements of the Securities Act would be available to enable U.S. holders of ADSs to exercise such pre-emptive rights and, if such exemption is available, we may not take the steps necessary to enable U.S. holders of ADSs to rely on it. Accordingly, our ADS holders may not be able to exercise their pre-emptive rights on future issuances of shares, and, as a result, their percentage ownership interest in us would be reduced.

In April 2013, our shareholders authorized the disapplication of pre-emptive rights for a period of five years from May 8, 2013, the date of the closing of our initial public offering, in connection with the issue of up to an additional 52,000,000 class B shares, including in the form of ADSs. Such disapplication has expired on May 8, 2018, and while we have solicited further disapplication by our shareholders, such disapplication has not been supported by our public shareholders so far. If no further disapplication of pre-emptive rights is approved by our shareholders, any of our share issuances would be subject to the pre-emptive rights of our shareholders which some of our ADS holders may not be able to exercise due to the factors described above. At the same time, to the extent we attempt an offering of ADSs in the United States pursuant to the pre-emptive rights of our shareholders, we may not be able to do so due to the fact that rights offerings are difficult to implement effectively under the current U.S. securities laws, and our ability to raise capital in the future may be compromised if we need to do so via a rights offering in the United States.

42

*ADS holders have no legal interest in the underlying class B shares.*

ADS holders acquire the beneficial, and not the legal, interest in the underlying class B shares, which the depositary holds on trust for them, under the terms of the deposit agreement. The intended effect of the trust is to ring-fence the class B shares in the hands of the depositary by conferring a property interest on ADS holders as beneficiaries. The interest of the ADS holders as beneficiaries in trust assets, which are the class B shares, is indirect, in the sense that in the normal course they do not have any direct recourse to the class B shares nor do they have any direct right of action against us.

*ADS holders may be subject to limitations on transfer of their ADSs.*

ADSs are transferable on the books of the depositary. However, the depositary may close its transfer books at any time or from time to time when it deems expedient in connection with the performance of its duties. In addition, the depositary may refuse to deliver, transfer or register transfers of ADSs generally when our books or the books of the depositary are closed, or at any time if we or the depositary deems it advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason in accordance with the terms of the deposit agreement.

**ITEM 4.    Information on the Company**

**A.    History and Development of the Company**

We were incorporated in Cyprus under the name of OE Investments Limited on February 26, 2007 as a new holding company for JSC QIWI (previously known as OSMP CJSC and QIWI CJSC). The company operates under the Companies Law, related legislation, and common law of Cyprus. In 2007, we acquired, among other entities, CJSC E-port and LLC Qiwi Wallet, which were reorganized in the form of accession to JSC QIWI. In April 2008, we launched the Qiwi brand, which gradually became the marketing name for our businesses. We changed our legal name to Qiwi Limited on September 13, 2010, and subsequently to QIWI plc upon going public on February 25, 2013.

Our primary subsidiaries are QIWI Bank (JSC), or Qiwi Bank, JSC QIWI and Sette FZ-LLC. JSC QIWI was incorporated in Russia in January 2004, and QIWI Payments Services Provider Limited was incorporated in the United Arab Emirates in February 2011, and until December 31, 2019 was one of our primary subsidiaries. In 2019 in order to optimize our business operations we have incorporated Sette FZ-LLC in the United Arab Emirates. All rights and obligations of QIWI Payments Services Provider Limited under the contracts with most of merchants and partners have been transferred to Sette FZ-LLC. We plan to launch the liquidation process of QIWI Payments Services Provider Limited shortly.

In September 2010, we acquired Qiwi Bank from a group of our then-current shareholders. In June 2015, we acquired the Rapida payment processing system and the Contact money transfer system from Otkritie Investment Cyprus Limited. In April 2017 Rapida LTD was merged into Qiwi Bank.

In June 2018, QIWI, Bank Otkritie and Tochka management signed a partnership agreement to establish a new entity JCS Tochka to collectively develop this business Tochka, a digital banking service focused on offering a broad range of services to small and medium businesses. JCS Tochka commenced its business operations in February 2019.

In July 2018, we acquired 100% of Rocketbank, a digital banking service offering debit cards and deposits to retail customers, from Bank Otkritie. Rocketbank currently operates as a branch of Qiwi Bank JSC and Rocket Universe LLC. In 2019 the Board of Directors requested management to investigate the potential for a partial or complete sale of Rocketbank. Given that we were not able to find a suitable buyer for Rocketbank, the Board of Directors has determined to wind-down Rocketbank operations. We anticipate that this process will be completed by the end of 2020.

Our principal executive office is located at Kennedy 12, Kennedy Business Centre, 2nd floor, P.C. 1087, Nicosia, Cyprus. Our telephone number at this address is: +357-22-653390. Our registered office is at the same address.

The SEC maintains an internet website that contains reports and other information about issuers, like us, that file electronically with the SEC. The address of that website is www.sec.gov. Our website address is www.qiwi.com. The information contained on, or that can be accessed through, our website is not part of, and is not incorporated into, this Annual Report. References herein to the company's websites shall not be deemed to cause such incorporation.

For a description of our principal capital expenditures and divestitures for the three years ended December 31, 2019 and for those currently in progress, see Item 5 "Operating and Financial Review and Prospects."

For a description of the rules and regulations under which we are governed, see Item 4 "Regulation."

**B.    Business Overview**

We are a leading provider of next generation payment and financial services in Russia and the CIS. We have an integrated proprietary network that enables payment services across online, mobile and physical channels as well as provides access to certain financial services that we offer to our customer and B2B partners. We have deployed over 22.5 million virtual wallets, over 134,000 kiosks and terminals, and enabled merchants, customers and partners to accept and transfer over RUB 124 billion cash and electronic payments monthly connecting over 42 million consumers using our network at least once a month (aggregating consumers across QIWI and Contact networks, without eliminating potential duplication). Our consumers and partners can use cash, stored value and other electronic payment methods in order to pay

43

**Table of Contents**

for goods and services or transfer money across virtual or physical environments interchangeably, as well as employ our open API infrastructure and use our highly customizable, sophisticated payment solutions to serve their business or personal needs. We believe the complementary combination of our physical and virtual payment and financial services as well as our open infrastructure provides differentiated convenience to our consumers and creates a strong network effect that drives payment volume and scale across the business. Recently, we have started to offer certain financial services, which we believe can complement our well-developed digital payment infrastructure. With the launch of our payment-by-installment card, SOVEST, we entered a new consumer lending market. Through Tochka and Factoring Plus projects we expanded our offering for SME customers and individual entrepreneurs, while our data related projects contribute to our value proposition enforcing our ecosystem. We continue working on further broadening the scope of services, products and use cases that we offer our customers and partners and aim to develop new niches we have yet not penetrated. We believe that our leading market position, proprietary network and complementary services provide us with competitive advantages that have enabled us to generate strong growth and profitability.

We operate in and target markets and segments that lack convenient digital solutions for customers and partners to pay or accept payments for goods and services, transfer money or use other financial tools in online, mobile and physical environments or that are largely cash-based. We help consumers, merchants and partners connect more efficiently in these markets by providing an integrated network of virtual wallets, applications, open APIs and physical distribution points as well as payment channels and methods that enable consumers to use differentiated funding sources to pay for any merchant or to other user in or outside of our network or use other services quickly and securely through a variety of interfaces.

Our platform and products provide simple and intuitive user interfaces, convenient access, quick on-boarding and high quality services combined with the reputation and trust associated with the QIWI group brands. In Russia and Kazakhstan, the QIWI brand is well known and our digital solutions as well as our kiosks and terminals provide differentiated access to an alternative payment infrastructure for our customers in those countries. Further, we believe that the popularity and usage of our financial services in Russia is increasing and that such services are well regarded by our customers. We distribute our payment services primarily through our virtual products, most notably QIWI Wallet, which enables consumers to access, make and receive payments through their computers or mobile devices. Our customers can seamlessly create an online account, or virtual wallet, with QIWI through a variety of interfaces where they can store money, deposited from cash or funded from other sources, such as cards, bank accounts, mobile phone balances or money transfers to make payments and purchases at any time or they can make cash payments directly through our physical distribution network. Our services also allow merchants in Russia and other markets, including leading MNOs, online service providers and retailers, financial institutions and utilities, to accept payments via our network, enabling them to attract more consumers, generate more sales and get paid faster and more easily. Our partners can use our infrastructure to create sophisticated payment and payout solutions and use a variety of payment and financial services we provide to services their operations. Our payment infrastructure offers diversity and flexibility that helps us deliver convenient solutions and satisfy the needs of a broad range of customers.

Moreover, our payment solutions target a variety of use cases creating an ecosystem that can be used to meet the diverse needs of our customers. Such use cases include secure peer-to-peer and card-to-card money transfers for friends splitting lunch or self-employed people collecting money for their services; a light banking solution with a variety of upload channels; payment tools for the younger and underbanked population with easy on-boarding, wide acceptance and intuitive interfaces; unique payment tools for gamers and other specialized categories of users; and convenient solutions for payment collection for large, small and very small merchants including customizable open API capabilities.

We run our network and process our transactions using a proprietary, advanced technology platform that leverages the latest virtualization, analytics and security technologies to create a fast, highly reliable, secure and redundant system. We believe that the breadth and reach of our network and product offering, along with the proprietary nature of our technology platform, differentiates us from our competitors and allows us to effectively manage and update our services and realize significant operating leverage with growth in volumes and diversification of our product offering.

Our payment services business historically has been and continues to be a major part of our operations and currently generates most of our revenues. We are constantly striving to diversify our product offering and range of services with certain new projects contributing to our payment services business and others aimed at penetrating new areas of the financial services market. In order to best reflect our current operational and management structure, we are distinguishing four key operating segments in addition to a Corporate and Other category, as set out below:

- *Payment Services segment*, which encompasses our virtual distribution services, including QIWI Wallet and other QIWI applications, payment channels and methods; physical distribution, including our kiosks, terminals and other retail points of service, Contact Money Remittance System; and our merchant focused services, such as QIWI Cashier or acquiring services;

- *Consumer Financial Services segment*, which encompasses our consumer lending business SOVEST;

- *Small and Medium Businesses segment,* which encompasses operations of the Tochka platform;

- *Rocketbank segment,* which encompasses Rocketbank, a digital banking service offering debit cards and deposits to retail customers, and

- *Corporate and Other category*, which encompasses expenses associated with the corporate operations of QIWI Group as well as our R&D, projects and emerging business models that we are testing, including Factoring Plus and Flocktory.

**Table of Contents**

**Payment Services**

Payment services historically have been and continue to be our key business and core area of expertise. We are offering our customers a unique payment processing infrastructure with easy on-boarding and diverse functionality that works seamlessly across virtual and physical channels and a

wide range of accessible, intuitive digital services. We are aiming to develop a secure and convenient multi-use case platform that would allow our customers and partners to satisfy a full range of their transactional and financial needs.

### *Our Payment Network*

Consumers and partners access our payment network through two primary channels: 1) virtual distribution, represented by our online products and APIs that we operate primarily under the Qiwi Wallet brand, and 2) our physical distribution, represented by our kiosks and terminals. These two channels are highly synergetic, creating a self-reinforcing network that we believe has been key for the continuing success of our business.

In 2017, 2018 and 2019, we processed RUB 911 billion, RUB 1,138 billion, and RUB 1,489 billion in payments, respectively.

### *Virtual Distribution*

*Overview*

We have a variety of virtual distribution channels that we operate primarily under the Qiwi Wallet brand. Qiwi Wallet is an online and mobile payment processing and money transfer system that we offer in Russia and Kazakhstan that allows customers to pay for the products and services of our merchants, and to perform peer-to-peer money transfers using a virtual wallet, which effectively replaces a physical wallet in an online and mobile environment. A virtual wallet enables its holder to make online purchases and payments through a convenient, secure and intuitive online or mobile interface with multiple payment methods. Qiwi Wallet accounts can be linked to virtual or physical Visa prepaid cards that can be used to make purchases at any merchant that accepts Visa worldwide. It also allows our customers and partners to create and use highly customizable payment and payout solutions built on our infrastructure that cover a wide variety of business and personal needs. We believe Qiwi Wallet is one of the leading virtual wallets in Russia.

Prior to November 2017, Qiwi Wallet was branded as Visa Qiwi Wallet pursuant to our 5-year Framework Agreement with Visa. Following the termination of our Framework agreement, we re-branded Visa QIWI Wallet to QIWI Wallet. We continue to work with Visa under Qiwi Bank's other agreements (which are consistent with those Visa has entered into with other banks in Russia), issue Visa prepaid cards and provide our customers with access to Visa Direct card-to-card transfer services.

We also operate the Qiwi Wallet brand in certain jurisdictions outside of Russia, predominantly in Kazakhstan.

In 2017, 2018 and 2019, we had 20.1 million, 20.8 million, and 22.5 million active virtual wallets registered with our system as of year-end, respectively.

Apart from the broad functionality of our core Qiwi Wallet product, we offer our consumers certain additional products and applications that complement or enhance our main value proposition. Such products include for example Qiwi Bonus, which offers discounts, cash-backs and loyalty programs from our merchants; Qiwi Donate, which enables streamers to collect donations during broadcasts; Qiwi Travel, which provides customers with services for search, booking and purchase of airline tickets; Qiwi Teamplay, a cybersport platform for non-professional gamers and others. We are also developing digital money remittance services as part of CONTACT money remittance system proposition.

We also offer our merchants and partners a number of solutions that can complement and improve our basic payment acceptance capabilities. Such products include Qiwi Cashier, which allows merchants to connect Qiwi Wallet directly to their checkout page and manage their account with us online; acquiring services that enable merchants to get a one stop payment acceptance solution with the majority of means of payments, payment of delivery services and certain other infrastructural solutions like Interactive Bets Accounting Center (TSUPIS) for betting merchants; or driver payout solutions for taxi companies that allow our partners to access high quality digital payment services without extra costs or technical difficulties. Moreover, we offer our customers an open API (Application Programming Interface) for customizing the interface of Qiwi Wallet so they can use it more conveniently for collecting and accepting payments.

We believe that our ability to leverage our technological platform and create convenient infrastructural solutions demanded by our partners and customers is a defining feature of our network, which has allowed us to expand our business and penetrate new niches that will continue to fuel our growth going forward.

*Our Virtual Wallet*

With Qiwi Wallet, consumers can create an online account, referred to as a virtual wallet, in which they can store money, whether deposited in cash or funded from a variety of sources such as mobile phone balances, bank accounts, credit or debit cards, or money transfers (including winning repayments and other merchant reloads and peer-to-peer transfers), that can be used to make payments, purchases, peer-to-peer transfers or to remit money. To register a virtual wallet, a consumer only needs to have a mobile phone number to which the account is linked. See *Item 3D Risk Factors – "Know-your-client requirements established by Russian anti-money laundering legislation may adversely impact our transaction volumes."*

Table of Contents

The account loading process is simple and intuitive regardless of the interface that the consumer uses to access Qiwi Wallet, whether it is our own website, through a mobile application, the screen of a kiosk, or the virtual banking service of the consumer's bank. Normally, a consumer just needs to enter the unique identification number of his or her virtual wallet and indicate the amount and source of money he or she wishes to load to the account. Likewise, while the process of making a payment through Qiwi Wallet may vary slightly depending on the interface, we believe it is intuitive.

We believe that a key part of our service offering is consumer convenience and ease of use. Qiwi Wallet is available through a variety of interfaces,

including mobile applications, its own website, touch-screens of our kiosks, merchant websites, and SMS/USSD (whereby a payment is made by sending an SMS message to a specified phone number). An increasing percentage of consumers are accessing Qiwi Wallet through our mobile applications rather than through our own website (which was historically the most popular Qiwi Wallet interface), or our kiosk network. Nevertheless, kiosks remain one of the important channels by which consumers load and reload their Qiwi Wallet accounts, which we believe highlights the synergies between our physical and virtual distribution networks and will continue to support the sustainability of our business.

We offer downloadable Qiwi Wallet applications for the most popular mobile and digital platforms and devices and support major mobile operating systems: iOS and Android. We believe that these efforts are a vital part of our overall strategy and serve to increase our consumer base.

*How Our Virtual Wallet Works*

Payments made through Qiwi Wallet can be categorized into push payments and pull payments. A push payment is a payment initiated by the consumer from a Qiwi Wallet interface. Typical push payments include money remittance transactions, utility payments or mobile top-ups. After entering Qiwi Wallet through one of its secure interfaces, a consumer is required to select the name of the merchant from hyperlink icon menu or using the search function, and then to type in the payment amount. Consumers are not subject to a fee when making most payments through Qiwi Wallet. Additionally, consumers are able to link their bank cards to their Qiwi Wallet accounts to make online payments without divulging their bank card details on merchant websites, decreasing the perceived risk of fraud associated with online payments. Payouts to Qiwi Wallets made by the partners and merchants we serve are also mostly push payments. A pull payment is a payment initiated by the consumer from a merchant interface, typically a merchant website through which the consumer makes a purchase. Typical pull payment include for example payments to e-commerce merchants. During the check-out process at a merchant website, the consumer chooses Qiwi Wallet as a payment method and is re-directed to a Qiwi Wallet web page. Next, if the consumer is already registered with Qiwi Wallet, he or she is prompted to enter his or her mobile phone number to which his or her Qiwi Wallet account is linked and his or her Qiwi Wallet password. If the consumer is not yet registered with Qiwi Wallet, our system automatically generates a virtual wallet for him or her once the mobile phone number is entered. A registered Qiwi Wallet user is then required to select a source of funds to be used, including the prepaid balance of the Qiwi Wallet account, a bank card previously linked to the Qiwi Wallet account, or his or her mobile phone account. The consumer may also select a deferred payment option, whereby our system generates an electronic invoice from the merchant to the consumer, which is stored in the consumer's virtual wallet and can be paid at a later stage. After a payment option is chosen, the consumer is required to confirm the transaction, following which funds are withdrawn from the source the consumer has selected and transmitted to the merchant. The only option available to consumers who did not have a Qiwi Wallet account previously is the deferred payment option. Once the consumer loads his or her newly registered virtual wallet or links a bank card to it, the invoice can be confirmed and paid, after which the transaction is completed.

*Our Reload Channels*

Qiwi Wallet accounts can be reloaded through virtually any payment method available on the market, including making cash deposits at any of our kiosks or terminals or third-party kiosks and terminals, via bank cards and accounts, mobile phone balances, online banking and retail or through peer-to-peer wallet transfers. Qiwi Wallet benefits in particular from access to our own network of kiosks and terminals, which is one of the largest cash reload networks in Russia. In certain cases, Qiwi Wallet accounts can be uploaded by our merchants or partners, for example when the betting merchants are paying out winnings to our users, taxi companies are making payouts to taxi drivers or when micro-financial organizations are issuing loans to the wallet accounts. These latter reload channels are becoming consistently more important for us as we develop different infrastructural solutions based on our services, creating an ecosystem that is able to satisfy a wider range of payment and financial service needs of our customers. We believe that by offering the convenience of reloading through a variety of sources, we increase the likelihood of consumers using Qiwi Wallet and other services that we offer as well as the adoption of such services.

Qiwi branded kiosks and terminals historically have been the primary means by which consumers reload their Qiwi Wallet accounts. In 2015 the percentage of reloads made through bank cards, mobile phone balances and directly from bank accounts was less than 15% of total reloads, increasing to more than 25% in 2016. In 2017 and 2018 we have seen a further increase in the proportion of non-cash reload channels as well as the growing share of top ups through different payout mechanisms. As of the end of 2019, the share of such top up surpassed 65% of the total reloads following the decline in the number of our kiosks and third party kiosks on the market (see *"Item 3.D Risk Factors—Risks Relating to Our Business and Industry—a decline in the use of cash as a means of payment or a decline in the use of kiosks and terminals may result in a reduced demand for our services"*) and diversification of our payment infrastructure and product offering and an overall market trend towards the digitalization of payments.

*Our International Virtual Wallets*

As of December 31, 2019, the vast majority of active Qiwi Wallet accounts were based in Russia. We also have a limited number of electronic wallets in Kazakhstan.

46

**Table of Contents**

**QIWI Prepaid Cards**

At the end of 2009, we launched a prepaid card program in partnership with Visa Inc. Qiwi Visa prepaid cardholders enjoy all the benefits of a Visa card without having to open a bank account or credit line, eliminating the perceived risk of fraud associated with traditional credit and debit cards. Our QIWI Visa Plastic Card is a physical card that can be used to make purchases online or in a physical retail environment through a POS terminal from any merchant that accepts Visa branded cards. Qiwi Visa Plastic Cards are linked to the balance of a consumer's Qiwi Wallet and can serve as another extension of QIWI Wallet in to the physical environment, such cards can be ordered through a Qiwi Wallet. We believe that the Visa Qiwi Plastic Card notably complements our online capabilities and offers customers a significantly wider range of use cases such as a full scope light banking services including cash and electronic reloads, intuitive online interfaces, all types of payments and remittances and cash withdrawals from participating ATMs.

Qiwi Visa co-branded cards are issued by Qiwi Bank pursuant to an agreement with Visa International Service Association. Under the agreement,

Qiwi Bank is authorized to issue Visa-branded prepaid cards within Russia, and to offer and perform Visa Direct transactions in and between Russia, Kazakhstan, Uzbekistan, Georgia, Tajikistan and other CIS countries, using Visa's electronic payments processing network to deliver transferred funds.

In 2015, we also launched a Visa payWave contactless payment capability in Qiwi Wallet based on host card emulation technology. This feature, available for users of Android smartphones (4.4 or higher), broadens the scope of use of the wallet and allows customers to do a contactless payment in any equipped offline location with the balance of his or her Qiwi Wallet, without issuing a plastic card.

We also support such capabilities as Android Pay, ApplePay and GooglePay, which are popular among our customers. We believe that offering our customers the latest technological solutions is pivotal for the development and continues growth of our business.

### *Physical distribution*

*Overview*

Our physical distribution comprises approximately 111,000 kiosks and approximately 23,000 terminals (including various interfaces at physical points of service) that are assembled and sold by third party manufacturers. These kiosks and terminals run our proprietary software, which provides the customized interfaces that display our broad range of payment services and provides the connectivity to our processing platform. These capabilities help connect consumers and merchants and enable them to conduct commercial transactions, such as bill payments and purchases, or upload our virtual distribution services or SOVEST cards at thousands of convenient locations.

In 2017, 2018 and 2019 we had approximately 109, 110, and 111 thousand kiosks and 43, 34, and 23 thousand terminals in our network as of year-end, respectively.

We have deployed our network of kiosks and terminals using a proprietary agent model. Under this model, our kiosks are assembled by third party manufacturers using our proprietary specifications and are then purchased by over 4,100 agents who are responsible for placing, operating and servicing the kiosks in high-traffic and convenient retail locations (the number of active agents includes only those who own kiosks and terminal. For reference, number of active agents in physical distribution in 2017 and 2018 were 4,995 and 4,623 respectively). In addition, an agent-owned point of sale terminal, computer, laptop or mobile phone can serve as a QIWI terminal once our proprietary software is installed on it, which allows the agent to process consumer payments to merchants through our system.

In 2015, we acquired the Contact money remittance system. Contact is one of the major classic money transfer systems in Russia that partners with over than 500 financial institutions and agents to form an extensive network of bank branches and retail offices in over 180 countries worldwide to provide highly convenient and easily accessible money transfer services across to a wide variety of users digitalizing the offline market as well as strengthening and enlarging our ecosystem

*Our Kiosks and Terminals*

A kiosk is a stand-alone computer terminal with a touch screen and specialized hardware and software, which enables consumers to make cash payments to merchants or upload Qiwi Wallet. Each kiosk is connected to our network using a dedicated SIM card or via internet and is equipped with a cash acceptor, a printing device and a transaction recording device as well as certain other capabilities in some cases. Kiosks are relatively easy and inexpensive to install and are equipped with specialized software that monitors the condition of the kiosk and its components. A kiosk is also relatively simple to assemble, and we generally have not encountered any significant issues in relation to underproduction or shortage of kiosks. There are 13 base models of kiosk available on the Russian market.

In addition to kiosks, our network includes approximately 23,000 terminals at various retail locations, including a number of major Russian retail chains such as Svyaznoy and Euroset. We provide these businesses with access to our network through our proprietary software and process the payments made by their customers.

Our kiosks and terminals are typically owned by our agents, except in limited circumstances when we enter new markets or develop new solutions where we may own a number of kiosks or terminals. We believe this ownership structure has allowed us to build a large network in a relatively short period of time. The agents purchase, install, operate and service the kiosks and terminals themselves; we provide them with our platform and technical solutions, help them comply with reporting requirements and provide them with various forms of support and incentives. Historically, we have signed rental agreements with large retail networks including Magnit, X5 Retail Group, Dixy, and Fix Price to further sublease those locations to our agents. We believe it is important to provide our agents with comprehensive support in order to ensure quality of service and a unique competitive environment.

47

Table of Contents

*How Our Kiosks and Terminals Work*

To make a payment through a kiosk, a consumer selects the hyperlink icon of a particular merchant on the kiosk screen and enters the data necessary for the merchant to identify the consumer. For instance, this may be the consumer's mobile phone number or details on the consumer's utility bill. The consumer inserts money into a cash acceptor, which automatically recognizes the value of the banknotes. Once the necessary amount of money has been inserted, the consumer presses a button to confirm that he or she wishes to complete the transaction, and the software installed on the kiosk sends an instruction to our processing system to transmit a corresponding amount to the merchant and to withdraw it from the agent's or consumer's account. The kiosk then prints a receipt confirming that payment has been made. The interface of a kiosk is highly intuitive to facilitate a convenient user experience with the entire transaction process normally taking no more than a few minutes. A transaction is mostly automated and usually performed in three or four easy steps, so that the user is only required to input a minimum of information. When making a payment through a terminal, a consumer gives the same information (merchant name, amount of transaction and account identifying data) to a cashier, who processes it on a computer or a mobile

phone using specialized software.

*Our Agents*

Our agent base includes more than 4,100 agents who own kiosks and terminals and are responsible for placing, operating and servicing them in high-traffic, convenient retail locations. Apart from the larger agents such as consumer electronics retailers (for example Svyaznoy) or banks, many of our agents are small to mid-sized businesses, which we believe provides them with insight into local market dynamics. For many of our agents, the business of kiosk and terminal ownership is a full-time occupation, while some view it as an ancillary service that increases consumer traffic in their outlets or provides additional convenience to consumers. We do not consider ourselves to be materially dependent on any of our agents.

Our agents determine the consumer fee for a number of services, mainly in the Telecom market vertical, while we may limit it and set, if applicable, consumer commissions for services of other categories of merchants. Moreover, we are in a position to cap these fees depending on our marketing actions or merchant's request. When the fee payable by the consumers is absent or capped, we normally award the agents with an increased portion of merchant fees.

*Our International Kiosks and Terminals*

Almost our entire physical distribution network is currently located in Russia and Kazakhstan. There is also a limited number of kiosks in Moldova, Romania and Belarus.

### Merchants

As of December 31, 2019, we had approximately 12,500 merchants active on a monthly basis in our system. Our merchants are vendors, including online retailers and service providers, betting companies, banks, money remittance companies, mobile network operators and utilities. Consumers can easily access our merchants through Qiwi Wallet, moreover our larger merchants can be accessed through hyperlink icons placed directly on kiosk screens and, since any of our kiosks can be used as an interface to register a Qiwi Wallet account or to access an existing one, the merchant offering is effectively the same for all our payment services interfaces. In addition, Qiwi Wallet accounts can be linked to virtual or physical Visa prepaid cards that can be used to make purchases at any merchant that accept Visa worldwide. We regularly add new merchants to our already extensive merchant list with the aim of creating a "one-stop" experience for our consumers.

Our merchants fall into five broad verticals, according to the nature of the products and services they provide to the consumers: E-commerce, Money Remittance, Financial Services, Telecom and Other. The following table shows the payment volume, payment adjusted net revenue and the payment average net revenue yield for each of these payment verticals.

|  | For the year ended 31 December, | | | |
|---|---|---|---|---|
|  | 2017 RUB | 2018 RUB | 2019 RUB | 2019 USD |
| **Payment Services segment key operating metrics** | | | | |
| Payment volume (in billions) | 911.1 | 1,138.1 | 1,488.6 | 24.0 |
| E-commerce | 167.9 | 263.4 | 410.6 | 6.6 |
| Financial services | 238.7 | 250.6 | 325.6 | 5.3 |
| Money remittances | 277.2 | 405.9 | 549.1 | 8.9 |
| Telecom | 170.7 | 172.1 | 165.0 | 2.7 |
| Other | 56.6 | 46.2 | 38.3 | 0.6 |
| Payment Adjusted Net Revenue (in millions) | 10,509 | 14,370 | 18,103 | 292.4 |
| E-commerce | 5,347 | 8,243 | 10,415 | 168.2 |
| Financial services | 1,227 | 1,126 | 1,207 | 19.5 |
| Money remittances | 2,902 | 3,961 | 5,534 | 89.4 |
| Telecom | 757 | 775 | 722 | 11.7 |
| Other | 276 | 265 | 225 | 3.6 |
| Payment average Adjusted Net Revenue yield (in %) | 1.15% | 1.26% | 1.22% | 1.22% |
| E-commerce | 3.18 % | 3.13 % | 2.54 % | 2.54 % |
| Financial services | 0.51% | 0.45% | 0.37% | 0.37% |
| Money remittances | 1.05% | 0.98% | 1.01% | 1.01% |
| Telecom | 0.44% | 0.45% | 0.44% | 0.44% |
| Other | 0.49% | 0.57% | 0.59% | 0.59% |

48

Table of Contents

*E-commerce.* E-commerce is one of our major merchant categories and mostly comprises of merchants that sell their products and services online, including betting (mostly sports betting) merchants such as F.O.N., BK Olimp and Leon (*see – Item 3.D Risk Factors,—"We derive a substantial portion of our revenues from merchants in the betting industry"*), online game developers such as Wargaming and Mail.ru, social networks such as Vkontakte and Odnoklassniki; digital-entertainment providers, such as BIGO a large international service for broadcast and life-streaming; large international e-commerce merchants such as AliExpress and Joom and local e-commerce merchants. We also accept payments on behalf of tickets and travel companies, software producers, coupon websites, and numerous other merchants. . Our payment solutions provide e-commerce merchants with an opportunity to accept payments in a fast and reliable manner, increasing their consumer base and attractiveness of their services. Our Qiwi Wallet provides the customers of such businesses with a convenient, fast and secure payment option to make online purchases and top up their personal

accounts, while our kiosk and terminal network offers an attractive offline interface to the online services of our e-commerce merchants.

*Financial Services.* Financial Services includes primarily banks, micro-finance organizations and insurance companies. As of December 31, 2019 we accepted payments on behalf of over 185 banks, including most major Russian retail banks such as Sberbank, VTB, Alfa-Bank, Tinkoff Credit Systems, Russian Standard Bank, Home Credit Bank, Raiffeisen Bank and others. Based on information available from public sources, we believe our kiosk and terminal network is larger than the ATM network of any major bank, and, as a result, we are able to provide banks with the ability to reach a larger market through our network by enabling their customers to make deposits, replenish their cards and repay loans.

*Money Remittance.* Money Remittance segment includes various money transfer capabilities such as classic money remittance, card-to-card money transfers, peer-to-peer transactions, repayment of winning, etc. From August 2010, we offer our consumers Visa Direct and MasterCard Money Send services, which allow a Qiwi Wallet accountholder to reload the account of a Visa or MasterCard bank card with a few clicks on our website, in a mobile application, or a kiosk touch-screen, with the only information required being the number of the recipient card. Since 2015, we started offering our users similar services for China Union Pay bank cards, recently we have launched the same service for MIR cards. Such services constitute a significant proportion of our Money Remittances category and represent our focus use-cases. In June 2015, we acquired the Contact money transfer system, one of the largest operators on the Russian money transfer market, which offers classical money remittance services. Starting from the end of 2016, we also include certain types of peer-to-peer transactions, for which we charge commission on our consumers, in our Money Remittance market vertical. Such peer-to-peer transactions mostly represent use-cases connected to payment, light banking and collection of proceeds (alike acquiring) services we provide to self-employed customers. Money Remittance category also includes some of the major Russian and international money transfer merchants, for example Post of Russia.

*Telecom.* Telecom merchants include various telecommunication service providers, such as MNOs, internet services providers, pay television channels and public utilities. MNOs, in particular the three largest operators in Russia, have historically represented a large portion of our merchant base, though in terms of net revenues their relative importance have decreased significantly following the diversification of our business. For the years ended December 31, 2017, 2018 and 2019, the Big Three MNOs accounted for 12%, 8% and 6% of our payment volume, respectively. Their share in our transaction volume has fallen over the last three years due to the expansion of our merchant base and the increased use of our payment systems by the consumers for purposes other than mobile phone account reloading, as well as the decrease of our kiosk network that affected the Telecom category the most.

*Other.* Our Other category includes all other merchants to which we offer our payment processing services. These includes a broad range of merchants in utilities and other government payments as well as charity organizations.

While we already have considerable penetration in certain markets that we service, there are numerous additional markets and niches where we see opportunities to add new merchants, develop our relationships with existing merchants, increase product penetration and grow our business. Our primary focus areas in this respect are the self-employed market, which is rapidly developing, has significant potential towards digitalization and lacks convenient, easy to use technological solutions and market for servicing evolving sharing economy businesses,

49

Table of Contents

where customization, broad suite of compatible services, convenience and speed are key. Moreover, we see increasing potential in developing and growing our secure peer-to-peer payment and our open API infrastructures, which we believe offer customers and partners convenient, intuitive and reliable tool to transfer and collect money as well as serve as a valuable consumer acquisition channel for us. We are also exploring opportunities to extend and improve the set of services we offer in the housing and utilities payments market, we intend to offer our partners and customers in this space comprehensive digital solutions for organizing settlements for housing and utilities services payments, generating payment documents, accounting of payments, etc.

**Retail Financial Services (SOVEST and Rocketbank)**

Our Consumer Financial Services (CFS) segment currently includes our payment by installment card SOVEST that we launched at the end of 2016. Our Rocketbank (RB) segment includes Rocketbank, a digital banking service offering debit cards and deposits to retail customers that we have acquired form Bank Otkritie. Both SOVEST and Rocketbank are offering digital financial products and services to retail consumers. We are currently in the process of winding-down Rocketbank operations. We believe however, it is important to further develop our suite of services and offer our consumers especially in our key niches a broader range of new generation digital financial services in order to improve consumer value proposition and enforce our ecosystem.

**Payment-by-installment card SOVEST**

In late 2016, we launched a payment-by-installments card program under the SOVEST brand. SOVEST is the first large-scale payment-by-installments card system in Russia developed to help consumers to get easy and transparent access to funds to purchase a wide range of goods and services. SOVEST is a technological IT-driven service that can be accessed by customers through a web site or a mobile application with convenient and intuitive interfaces. Consumers can order and use SOVEST cards to make payments within or outside our partner merchants network both offline and online within the card's limit and then top up the balance of the card to repay the funds they used in equal installments or at once. If the balance is topped up in a timely manner and there are no delays of repayments during the installment period, no interest or fee is charged on the consumer. By default SOVEST cards can only be used with merchants that have enrolled in the program, however users have an opportunity to purchase certain additional features to extend the usability of their cards including, for example, extended installment period, opportunity to purchase goods and services from merchants outside of the partner network and limited cash withdrawals.

We target a wide and diversified client base across Russia including banked customers with established credit history as well as those who have never used credit services before. While we receive a significant number of applications, our advanced technological platform and proprietary scoring models allow us to efficiently screen such applications and we believe we will be able to maintain certain projected levels of credit risk. A significant part

of our scoring procedures is done automatically within second after the customer submits his or her application. We aim to make the onboarding process as easy and convenient as possible while maintaining a high level of risk assessment practices. We offer our customers a credit limit as small as RUB 1,000 and up to RUB 300,000 depending on his or her scoring and increase, decrease or freeze the outstanding limits based on the patterns that the user exhibits. Since 2018 we were testing SOVEST multi-bank model. Initially we aimed to onboard clients and issue SOVEST cards on behalf of partner-banks that would originate corresponding loans, while we would focus on client acquisition, IT infrastructure, merchant relations and marketing. We have started testing such arrangement with AkBars Bank in October 2018 and have onboarded over 75,000 clients to AkBars Bank. We have also tested alternative multi-bank arrangements including such as transfer of loan portfolio to partner banks, however none of the arrangements have yet proven to be economically efficient and mutually beneficial for us and our partners. As of the date of this annual report SOVEST cards are issued solely by Qiwi Bank, thus Qiwi Bank serves as a main lender and bears the majority of the credit risk on outstanding loans. We also have limited outstanding portfolio with AkBars bank as part of the current SOVEST multi-bank model.

We distribute SOVEST cards throughout Russia through all major channels typically used for distribution of digital financial services including the internet, telesales, direct sales agents (DSA) and financial brokers including companies specializing on the distribution of third party financial services and large retailers. We are constantly reviewing and improving our distribution strategies to enlarge our distribution network and optimize our client acquisition costs. We are currently receiving about 500,000 SOVEST card applications per months and as of the date of this annual report have issued over 1,400,000 SOVEST cards.

We generate our revenues through three main sources: in the form of a fixed fees payable to us by customers for purchasing additional value added options such as, for example, extended installment period; in the form of commissions payable to us by merchants that accept SOVEST cards in return for enabling consumers to receive better access to their products, additional sales volumes and higher average checks; and in the form of an acquiring commission (interchange fee). As of the date of this annual report, we have more than 85,000 offline and online partner-merchant locations in the major consumer categories including consumer electronics, tickets, travelling and entertainment, fashion, jewelry and apparel, furniture, food retail and restaurants. The length of the installment that we grant for each purchase depends mostly on the type of merchant and the level of commission he pays us, and the installment period can be between 1 and 12 months. We also offer our clients from time to time certain benefits such as cash-backs or extended installment periods. In 2019 we have also launched a loyalty program, which aims to stimulate users to increase their activity and purchase additional value added options by offering discounts for regular card usage.

For the year ended December 31, 2019 Consumer Financial Services segment payment volume reached RUB 27.8 billion. The carrying amount of loans issued under SOVEST project was equal to RUB 8.0 billion and the outstanding credit limits including credit limits not yet activated amounted to RUB 26.8 billion as of December 31, 2019.

50

Table of Contents

We believe that installment card products have become an important part of the financial services market. Starting from the launch of the SOVEST project we have gained significant expertise and have built unique capacities in a novel consumer financial services market through constantly optimizing our IT, distribution and scoring capabilities and focusing on developing new generation intuitive digital tools within the product and adding new features. Having reached a substantial scale and positive business unite economics of the product we are currently evaluating different strategies for the development of SOVEST projects including shifting our key focus to offering customized products and services to customers in specific niches that we primarily target in our payment business segment and generally building more targeted product and service offering for specific groups of customers such as self-employed.

**Rocketbank**

Rocketbank is one of the first Russian fully remote digital banking services focused on young and tech-savvy audience, digitized spenders and travelers sensitive to service level, product friendliness and end-to-end engagement. Rocketbank offers its clients the following suite of services through convenient mobile and web channels: debit cards, payments and transfers, loyalty program, saving accounts etc.

We have acquired 100% of Rocketbank business form Bank Otkritie in July 2018 and by the end 2018 have mostly finalized the process of transferring Rocketbank clients and processes to Qiwi Bank, where Rocketbank operates as a branch.

As of December 31, 2019 Rocketbank had over 370,000 active users (defined as doing at least two transactions per months or holding a balance of not less than RUB 5,000) and close to RUB 13.6 billion consumer balances on current accounts and deposits.

Throughout the first half of 2019, QIWI reviewed a number of strategic opportunities for the development of the Rocketbank business as either a part of the broader QIWI ecosystem or as a standalone project. A final strategic plan for Rocketbank was presented to and reviewed by the Board of Directors in August 2019. Having duly considered the proposed strategy and required financing, our Board of the Directors concluded that Rocketbank's business plan had an investment profile and financing requirements that are not compatible with QIWI's risk appetite and that the business had limited potential synergies with the core business of the Company. The Board of Directors requested management to investigate the potential for a partial or, complete sale of Rocketbank. Given that we were not able to find a suitable buyer for Rocketbank, the Board of Directors has determined to wind-down Rocketbank operations. We have commenced this process and are currently reviewing the most efficient way to reuse or dispose of the Rocketbank assets. We anticipate that this process will be completed by the end of 2020.

**Small and Medium Enterprises**

We develop our small and medium enterprises segment through JSC Tochka, which is our equity associate that we established together with Bank Otkritie and Tochka management team in June 2018. JSC Tochka started its operations on February 1, 2019. See Item 3D Risk Factors – *"We may not be able to complete or integrate successfully any potential future acquisitions, partnerships or joint ventures."* QIWI and Bank Otkritie split the economic

interest proportionally with 45% each, while 10% will be attributed to Tochka management. JSC Tochka functions as a technological partner and service provider for banks – members of the platform. Currently Tochka serves Bank Otkritie and Qiwi Bank. Before JCS Tochka was launched, QIWI Bank was servicing all respective clients in Bank Otkritie and Qiwi Bank. We do not bear any material credit risk as a part of our participation in JCS Tochka.

Tochka offers its clients, who are primarily digital-ready small and medium entrepreneurs and sole traders, a broad range of services including round-the-clock cash and settlement services, account management, cross-border transactions and currency conversion, merchant acquiring and value-added services such as payroll payment processing, simplified accounting and tax services and certain others. Tochka is a well-known for its level of services as well as for creating value for its customers and has been recognized as the best mobile and internet bank for entrepreneurs by Markswebb for the last five consecutive years, Tochka also has an NPS of 70% according to Ipsos research. (The survey was conducted on Tochka customer database of Medium and Small Business, in the period from November 19 to December 6, 2019. The survey sample included 1,435 interviews representing the following regions: Moscow and the Moscow region, St. Petersburg and the Leningrad region, Ekaterinburg, cities with a population of millions, small towns).

Tochka has a highly efficient and robust business model with attractive unit economics, it generates most of its revenues from three different and equally important streams: service subscription fees, interest income and sales of value-added services to its clients. We believe that Tochka is uniquely positioned on the market through its diversified digital product offering, multi-bank proposition, unique consumer service and recognized brand and has potential to significantly increase its market share in the targeted segments.

As of December 31, 2019, Tochka had approximately RUB 49 billion in customer balances and had over 420,000 clients (the majority of Tochka clients currently have accounts and hold their respective balances in Otkritie bank).

**Corporate and Other**

The Corporate and Other category includes expenses associated with the corporate operations of QIWI Group as well as some of our research and development initiatives, projects and emerging businesses that we are currently testing (*see Item 3D Risk Factors – " If we cannot keep pace with rapid developments and change in our industry and provide new services to our clients, or if any of the new products we roll out are unsuccessful, the use of our services could decline, and we could experience a decline in revenue and an inability to recoup costs."*)

Apart from corporate expenses as of December 31, 2019 this category includes primarily:

- QIWI Blockchain Technologies, our subsidiary focused on the development of certain blockchain solutions for internal and external purposes;

51

Table of Contents

- Factoring Plus, a service that offers digital factoring solutions primarily to small and medium enterprises as well as issues bank guarantees for entities participating in the government procurement procedures. Both projects focus on digitalizing respective areas that currently lack convenient digital solutions and providing clients fast and easy access to necessary financial services and instruments;

- QIWI Data is our R&D project that aims to use our knowledge about customer's behavior to create analytical products in the areas of credit risk management, customer relationships management and fraud detection processes;

- Flocktory, a SaaS platform for customer lifecycle management and personalization focused primarily on the development of automated marketing solutions for the e-commerce, financial, media and travel industries, based on data collection and analysis. Floctory is currently focused on developing second party data exchange solutions based on BigData;

- QIWI Box, a self-pick-up parcel lockers project that allows agents to buy, install and connect compact self-pick-up delivery boxes to their kiosks and further use our network to offer customers additional logistics services. By the end of 2019 following the respective decision of our Board of Directors we have reached an agreement to transfer all parcel lockers to our key partner PickPoint, while software support is temporarily run by QIWI; and

- Other projects, including venture projects, which are individually insignificant.

We believe that our long-term growth depends on our ability to innovate our existing solutions as well as develop and roll out new business models and technological products, thus testing such models and ideas, although inheritably risky, is important for the growth of our business.

**Qiwi Bank**

In September 2010, we acquired Qiwi Bank (which is licensed as a bank in the Russian Federation) to serve as a platform for our Qiwi Wallet business. When a consumer deposits cash into his or her Qiwi Wallet account, Qiwi Bank issues a virtual prepaid card to a consumer. Qiwi Bank also issues plastic cards to Qiwi Wallet customers. Funds received by Qiwi Bank from customers loading and reloading their Qiwi Wallet accounts are held on Qiwi Bank's account. Qiwi Bank does not pay interest on Qiwi Wallet accounts.

In June 2015, we acquired Rapida LTD, a licensed non-banking credit organization and Contact Money Transfer System. In April 2017, Rapida LTD was merged into Qiwi Bank and it became the operator of the Contact Money Remittance System.

In November 2016, following the changes in legislation governing the betting business in Russia, Qiwi Bank, together with one of the self-regulated association of bookmakers, established an Interactive Bets Accounting Center (TSUPIS) and began acting as a platform for acceptance of interactive bets in favor of the members of the self-regulated organization of bookmakers (see "*—Risk Factors – We are subject to extensive government regulation; We*

*derive a substantial portion of our revenues from merchants in the betting industry").*

Further, at the end of 2016, Qiwi Bank started to serve as an issuing and lending bank for our pay-by-installment card project SOVEST. In 2017, Qiwi Bank started to serve as a settlement bank for Tochka (*for the description of Tochka activities see Item 4. B Small and Medium Enterprises*) maintaining and servicing accounts of Tochka clients opened with Qiwi Bank. We have also started to develop certain projects relating to electronic bank guarantees services, which we currently develop as part of the Factoring Plus project.

By the end of 2018, the majority of operations and processes of Rocketbank (*for the description of Rocketbank activities see Item 4. B Rocketbank*), including maintenance of consumer accounts and issuance of Rocketbank debit cards were transitioned to Qiwi Bank following our acquisition of Rocketbank business form Bank Otkritie. As of the date of this annual report Qiwi Bank continues to serve as a backbone for all Rocketbank operations.

Qiwi Bank also maintains a small number of accounts for our employees, officers and directors, agents and certain related parties and issues bank guarantees to some of our merchants.

See also *"—Regulation"* for a brief description of the regulatory regime applicable to Qiwi Bank.

**Our Technology Platform**

Our services are based an advanced, microservice, proprietary high-performing technology platform. All of our key technology has been developed in-house. Qiwi Core Processing System is the main platform, which provides the functionality of both microprocessing and more classical card payments and transfers. Due utilization of our own unified application building system, QIWI Platform, most of the company's products (such as Qiwi Wallet, SOVEST, QIWI Distribution Processing etc) use the common platform Qiwi Core Processing System. This processing system has a connection to VisaNet and MasterCard Direct as principal members of both payment systems, allowing us to perform independent acquiring and issue corresponding cards.

We obtained VisaNet Processor status in July 2014, as a part of our relationship with Visa, this effectively allows us to process Visa transactions on behalf of other Visa member banks. Our processing system also implements the functionality of accepting payments using push and pull methods, internal currency conversion, cross-border remittances and a full set of API solutions for both customers and merchants.

Our main products are Qiwi Wallet and several other applications that enables customers to pay online easily and quickly to thousands of merchants and services, using either mobile, web, kiosk or other interfaces. We also operate a network of kiosks, the principal software under which is our proprietary application called Maratl, which enables payment acceptance, billing and processing connectivity.

Table of Contents

Hardware supporting our solutions and products is located in three leased data centers in different parts of Moscow, all of them are Payment Card Industry Data Security Standard (PCI DSS) certified. We use the Qiwi Private Cloud technology for the unification of our development process.

*Technology platform*

QIWI Private Cloud solution is a combination of hardware and core infrastructure platform for all company services that employs multiple geo distributed datacenter sites. Each of sites is a separate platform capable of maintaining the performance of all systems independently. To ensure stable communication between the sites, a multi-triangle dedicated communication system comprised of duplicated fiber-optic communication lines has been implemented. Such architecture conforms to the principle of double fault tolerance, which means that up to two communication channels can be damaged without affecting the stability of the whole system. All of our data centers are functioning in an active-active mode and are linked to Qiwi Private Cloud, each of them capable of handling twice the usual traffic. This allows us to employ a distributed storage network and maintain protection against attacks like Distributed Denial of Service attack (DDOS).

QIWI also has a telecom operator license in Russia (#135744) for data transmission and has a flexibility to partner directly with the leading telecom operators to obtain more favorable tariffs, manage connections and traffic routing. We have inbound and outbound connection points at each of our Data Center. Our office has the same connections as any other data center and together they form a multi core network so we are able to route incoming and outgoing traffic inside between four points. This secures significant flexibility and durability of our system.

*Architecture*

QIWI is using cutting edge microservices architecture based on the containers, proprietary management system and software defined network and infrastructure. It includes more than 300 microservices out of which more than 100 have their own databases. This ecosystem has a potential to handle more than 20 independent teams continuously making changes to their respective products.

Using this kind of architecture allows us to achieve short time-to-market in IT development. We are able to handle over 50 releases every day, and this is almost an unattainable number for many banks at the moment.

In addition to server-side technologies, we also deploy payment client-side technologies, including kiosk software such as Maratl—a cutting edge software that employs, among others, such technological features as code-obfuscation and strong 3-layer proprietary cryptographic network protocols. This security features enable kiosks and terminals to connect with any open communication network as the data flow is strongly protected. The kiosks are not connected to each other, thus reducing any network risks. Kiosk infrastructure including hardware, software and the network as a whole are certified with Payment Application Data Security Standard (PA DSS).

*Information security*

We have a robust transaction intelligence system designed to trace and prevent suspicious transactions inside our payment network. In the vast majority of cases, fraud through Qiwi Wallet is attributable to scams rather than to a security system failure. We also employ a certified 3-D secure system similar to those adopted by other major payment networks and banks. We have established a sophisticated system of security monitoring utilizing the Security Information and Event Management system (SIEM) and Security Operations Center (SOC), each of which are operating and supported continuously. Our critical internal resources are protected with an advanced intrusion prevention system (IPS); all applications are protected with a web application firewall (WAF) set up in a blocking mode, ensuring that all unauthorized or ambiguous activities are prohibited. Moreover, we have an in-house forensic lab that assesses any potentially harmful events.

Our relationships with major payment systems, such as Visa and MasterCard, impose stringent security requirements on us to protect the data of our consumers. Under the terms of such agreements, we are under an obligation to be compliant with appropriate security standards and to undergo periodic assessments to certify such compliance.

*Development approach*

Our development approach is based on the following values: productivity, predictability, quality and responsiveness. We organize ourselves as a cluster of independent cross-functional teams capable of full lifecycle value delivery. Self-organization principles that we apply provide us with the ability of quickly relocate development forces in accordance with the business needs. Technical excellence and engineering practices we use result in high quality built in our products.

*Data analysis, AI/ML*

In 2018, QIWI completed the development of the Big Data cluster based on Hadoop that meets the requirements of PCI DSS. The company has launched a new business department, QIWI Data, which goal is to build a unified corporate platform for working with data and analytics, machine learning technologies and data monetization. We plan to use such technologies in projects related to predictive analytics, cross-sales and marketing communications. A platform for machine learning was also deployed using the latest approaches, including Natural language processing and graphics processing unit (GPU) computing.

53

Table of Contents

## Sales and Marketing

We run separate marketing and advertising strategies for our key projects including QIWI Wallet and related services, SOVEST and Rocketbank. We have a dedicated team of sales and marketing personnel for each of our key projects who seek to expand our network of merchants and agents, attract and maintain consumers, build our brands and promote our products. Our marketing programs includes advertising campaigns as well as other promotional activities, such as joint loyalty programs with our merchants and partners.

As a part of our marketing and advertising strategy we have started conducting targeted marketing and client segment research. For example, in the fall of 2019 we conducted a large-scale survey of streamers and their audience, which gave us a deeper understanding of this customer segment as well as served as an effective way to position our products and services among younger users who stream or watch gaming or other content.

*Brand Awareness*

We currently operate a number of widely known brands including primarily QIWI, SOVEST and Rocketbank.

We believe that the QIWI brand is a household name in Russia. According to Ipsos Comcom, "QIWI" is the most recognized Russian electronic payments brand with prompted brand awareness of 85% among people paying online in Russia.

In addition, we believe that in our sector, maintaining a social media presence is important to sustain brand awareness. As a result, we have a dedicated team of people who regularly interact with customers and wider audience through our Facebook, Vkontakte, Odnoklassniki, Instagram, YouTube and Twitter accounts. We also use social networks to seek feedback from our consumers in order to improve our business. As part of maintaining our brand image, we have employees available to respond to agent and merchant concerns and to handle consumer issues as well as a dedicated consumer support center.

As part of our branding strategy and in order to attract younger generations, we run a QIWI Finteen program – an educational program for school children aimed at promoting financial literacy. We actively advertise to gamers and cybersports fans by running a QIWI Team Play cybersport platform. We believe that such activities while benefitting and educating participants, help us promote our brand among younger users and attract new customers. Further, one of the key focuses of our brand development is building a strong brand positioning in B2B and self-employed segments to support our B2B2C and self-employed strategy. In order to achieve this we regularly launch different campaigns and initiatives, for example we launched our YouTube show, where we discuss current market trends and new-day professions, in addition we launched QIWI Donate, a new product for streamers made to improve the quality of their content and assist them in collection of donations.

We position ourselves as provider of sophisticated innovative payment and financial solutions and services in fintech space for both B2C and B2B customers. We believe that such positioning will encourage our existing and prospective partners and customers to use our services as a preferred payment and financial solutions to satisfy a broad range of their financial needs and will support the development and launch of highly customizable projects together with diversified range of businesses.

We launched our new installment card project SOVEST in November 2016. During years 2016 through 2018 we focused mainly on building a new market category, rather than only on creating a brand of a product as no installment card products existed on the Russian market before, therefore we concentrated on educating our customers, explaining how the product worked and what its main advantages were.

In respect of SOVEST project promotion, at the start of sale in 2017 we mainly concentrated on educating our customers, explaining how the product worked and what were its main advantages. It took us over a year and four TV campaigns to reach a maximum 66% prompted (24% unprompted) brand recognition level in Moscow (according to Brand Tracking (Tiburon Research)).

In 2018 we continued building brand recognition campaign and increased our unprompted annual average brand recognition level to 24% (67% unprompted) with a maximum of 32% (80% prompted) during TV campaign in March. In December 2018 we tested an OLV (online video) campaign for both existing and prospective customers, which resulted in a 15.6% brand awareness increase (best in class) and 131% brand interest increase. In the year 2019 we concentrated both on promoting the core product and selling client value added options. Our TV campaign of 2019 resulted in 29% unprompted brand awareness as well as the increase in client value-added services sales. We will continue to rely on the mix of both TV and online campaigns with the aim to further increase our annual average unprompted brand awareness.

Rocketbank, which we acquired in 2018, has historically been and continues to be a brand focused on generation "Z" and "Y" customers (generation "Y" or millennials include people born between 1980 and 1994, generation "Z" includes people born between 1995 and 2012), who are young and tech savvy. Rocketbank has developed and currently employs a proprietary content-based approach to marketing that is focused on creating an entertaining content that will stimulate existing and prospective users to increase their engagement with Rocketbank products such as through gamified promo-campaigns.

Tochka, which we develop through our associate JSC Tochka together with Bank Otkritie, is an established and highly acclaimed brand, well known for the quality of the services it provides to the small and medium entrepreneurs.

54

Table of Contents

In 2020, we continue to optimize and develop our brand strategy, collecting and analyzing available data as well as adopting a more targeted approach, focusing mostly on the technically advanced B2B partners in key niches and well as population in big cities including self-employed customers.

### *Advertising and Promotional Activities*

Because we maintain a widespread and visible kiosk network, third-party advertising has not historically been as important to maintain brand awareness. We maintain a relatively low advertising profile for our key payment services, mostly employing Internet advertising to promote Qiwi Wallet.

In addition, we engage in promotional campaigns together with our merchants, in which merchants offer discounts to their customers who make payments through our network.

This year we also improved direct communications with existing customers of our SOVEST project, explaining them both the core value of product and the additional (paid) benefits of the card – extended instalment period etc. In 2019, we pursue two key strategies – for those who do not have SOVEST card ("Get the card") or prospective customers and for our current customers ("You have the card, use it in a better way, turn on the additional options"). On top of this, we launched a new SOVEST loyalty program, which is similar to an online game where a customer is rewarded for actions he takes: cash-back programs, free or discounted paid value-added services and special offers from our main partners. This new loyalty program serves as a hub that will link all activities and promotions for SOVEST.

### Competition

The most significant competitive factors in our business are speed, convenience, network size, accessibility, loyalty programs, reliability and price. Our competitors include retail banks, non-traditional payment services providers (such as retailers, social networks and MNOs), traditional kiosk and terminal operators and, electronic payment system operators and other companies that provide various forms of financial and payment services, including electronic payments and payment processing services. Competitors in our industry seek to differentiate themselves by features and functionalities such as speed, convenience, network size, accessibility, safety, reliability and price, among others. A significant number of our competitors have greater financial, technological and marketing resources than we have, operate robust networks and are highly regarded by consumers.

Our key competitors in Russia are retail banks, particularly those with a focus on well-developed electronic payment solutions, including Sberbank, Russia's largest retail bank that is majority-owned by the Russian state, Alfa-Bank, one of the leading privately owned Russian retail banks, both of which have electronic banking solutions and large retail networks, and Tinkoff Bank, which positions itself as a specialized bank specifically focused on innovative online retail financial services. Sberbank, for example, has long adhered to the strategy of innovation in the financial and payments space and has been focusing on the promotion of alternative banking channels, such as kiosks, internet banking and mobile banking. Sberbank is the market leader of the Russian payments market, and has access to significant financial resources and has an extensive nationwide network of branches. It is also the largest processor of utility bill payments, which constitute a significant portion of overall consumer spending in our industry. It actively develops its online payment services capabilities, including through its online and mobile banking platform Sberbank Online and through Yandex.Money, one of the major electronic payment service providers in Russia that it operates in a joint venture with Yandex, a leading Russian diversified technology company. These factors give Sberbank a substantial competitive advantage over us in the payments business as well as any other financial services businesses that we pursue or may pursue. Additionally, Sberbank is pursuing a strategy to transform itself into an e-commerce ecosystem based on open source software. In furtherance of this strategy, in April 2018 Sberbank announced together with Yandex that they have completed the formation of a joint venture based on the Yandex.Market platform where they intend to combine the technological capabilities of Yandex and the infrastructure and

technologies of Sberbank to develop a leading B2C (business-to-consumer) e-commerce ecosystem, and later launched new e-commerce projects Beru.Ru and Bringly.ru. It has also been reported that Sberbank is currently working a "super-app" as a single entry point for all of its various consumer services, which would have the potential to make its products even more attractive and more difficult to compete against. However, Sberbank recently applied for trademark SuperApp and develops its own type of versatile service. While the platform created by the Sberbank-Yandex joint venture is still being rolled out, this combination could result in a substantial shift in the competitive landscape of the Russian physical e-commerce market to the detriment of our position, market share and growth potential in this category of payments. The recently announced joint venture between Mail.ru Group, Alibaba Group, Megafon and RDIF to create a largest social commerce platform in Russia and the Commonwealth of Independent States ("CIS") based on AliExpress Russia and Pandao platforms, could have a similar effect. Our other major competitors in the banking industry include Alfa-Bank, a major retail bank that combines a strong competitive position in the traditional retail banking sector with a focus on developing innovative financial and payments solutions, and Tinkoff Bank, which is a provider of online retail financial services operating in Russia through a high-tech branchless platform. Similarly to Sberbank, Tinkoff Bank announced in December 2019 the launch of a super-app designed to be its own marketplace and an entry point to all of the numerous lifestyle services of Tinkoff and its partners. Numerous other Russian banks are also actively pursuing the electronic payments business and developing various consumer payment solutions.

The competition in the digital money transfer services space is also further intensifying as key market players including retail banks develop and digitalize their products. Recently the Central Bank of Russia in cooperation with other banks established an instant payment system which is designed to enable instantaneous money transfers between accounts at different banks with the only piece of identification needed for a transfer being the person's cell phone number. All banks doing business in Russia can and will likely be obliged to connect to this system (which Qiwi Bank has already done) for doing peer-to-peer money transfers. It may prove difficult for our digital money remittance solutions to compete with such system on the basis of convenience, price, or otherwise. There can also be no assurance that the CBR will not impose an upper fee limit for transfers within such system that will be lower than the currently prevailing fee rates and thereby drive down the entire market for money remittance fees.

55

---

Table of Contents

Our competitors in the payments business also include non-traditional payment service providers that engage in payment services as a non-core business. In particular, we compete with the Russian Federal State Unitary Enterprise Postal Service, or Russian Post, which offers certain payment services. Russian Post's geographical penetration is at least as dispersed as our physical distribution network (i.e. our kiosks and terminals). It also co-owns, in a joint-venture with the Russian state-controlled VTB Bank, the full-service commercial bank Pochta Bank. As a state-sponsored institution, we believe that it is able to provide payment services at significantly lower prices than we are able to match profitably. We also face competition from other non-traditional payment service providers that have substantial financial resources, such as brick-and-mortar and online retailers (such as Alibaba and its financial services subsidiary Ant Financial which operates the AliPay payment system), and MNOs, in particular the Russian "Big Three" MNOs, MegaFon, VimpelCom and MTS, as well as their closest competitor Rostelekom, all of which have various payment solutions of their own. In addition, non-traditional payment service providers also include social networks such as Mail.ru Group's VK, which is developing its own payment solution VKPay (which Mail.ru is planning to transfer to its financial services joint venture with AliPay and MegaFon, thereby increasing the potential usability, competitiveness and aggressiveness of the development of this service as outlined in Mail.ru's recently announced strategy) and smartphone manufacturers such as Samsung and Apple. New competitors may penetrate the Russian electronic payment market as well, including established international players such as MoneyGram or Google.

Globally and in Russia, there is a steady influx of new fintech businesses looking to challenge and disrupt the payments and financial services industry. These include so-called "challenger banks" such as Starling, Monzo, N26, Revolut, Atom and Tandem, who develop various digital banking and financial services and compete with various aspects of our services offering (none of the aforementioned companies has penetrated the Russian market as of the date hereof). Since the financial services industry is susceptible to disruption, new categories of non-traditional financial service providers may emerge in the future that may be difficult to currently anticipate. See "– *If we cannot keep pace with rapid developments and change in our industry and provide new services to our clients, or if any of the new products we roll out are unsuccessful, the use of our services could decline, and we could experience a decline in revenue and an inability to recoup costs* ".

We also compete against some directly comparable businesses, such as electronic payment system operators (primarily Yandex.Money, WebMoney and PayPal) and kiosk and terminal operators, including Cyberplat, Comepay and Elecsnet.

In recent years, we have started expanding our product portfolio beyond our traditional payment services business to include other types of financial services. These new projects include among others our payment-by-installments SOVEST card project that we launched in 2016, and Tochka, a digital banking service focused on offering a broad range of services to small and medium businesses (SMEs). In connection with each of these projects, we face intense competition from commercial and retail banks. In particular, SOVEST competes with commercial banks that operate unsecured retail consumer lending programs, such as Sovkombank, HomeCredit, Tinkoff and Alfa Bank, all of which have equivalent or similar products including pay-by-installment projects, which are a direct competition, credit card programs or POS loan solutions. The projects that we develop and invest in compete primarily on the basis of enhanced user experience, price and add-on features, and are therefore exposed to competition from any banking institutions, particularly those that are focused on developing convenient online and mobile solutions such as Sberbank, Alfa Bank and Tinkoff. Such banking institutions often have more established businesses in consumer lending and other banking services similar to those offered by us. While we seek to differentiate our products from the competition, there cannot be any assurance that we will be successful in doing so due to the number of the competitors and their level of sophistication.

We have also recently placed some focus on the so-called sharing economy/ B2B2C segment, whereby we provide different complex payment and payout solutions to diverse businesses, such as payments to taxi drivers by taxi companies or payments to property holders by companies like Airbnb as well as on the self-employed market, where we provide different payment and acquiring-like solutions to self-employed individuals. These products are similar in nature to a salary program and certain other products at a traditional retail bank, thereby exposing us to competition from all banks that offer such services, particularly if they are similarly focused on convenience of on-boarding and use as well as customizable and user-friendly interfaces.

**Intellectual Property**

Our intellectual property rights are important to our business. We rely primarily on a combination of contract provisions, copyrights, trademarks, patents and trade secrets to protect our proprietary technology and other intellectual property.

Our in-house know-how is an important element of our intellectual property. Our key software has been either developed in-house by our employees or acquired from the third parties. Accordingly, we seek to enter into confidentiality agreements and incorporate copyright assignment clause into employment contracts with our employees and to enter into confidentiality and copyright assignment agreements with the third parties, inter alia with the external developers, and we rigorously control access to our proprietary technology. We hold copyrights for our key software applications. We have also obtained copyright registrations for some of our software in Russia, Brazil and in the United States.

QIWI and Contact money transfer system's logotypes are registered trademarks in Russia and several other countries, including CIS countries. Rapida, SOVEST and Rocketbank logotypes are also registered trademarks in Russia. However, a number of applications for registration of our brand and logotypes are still pending.

56

Table of Contents

**Employees**

The following table sets out the average number of employees for the years ended December 31, 2017, 2018 and 2019 by function.

| | For the year ended 31 December, | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2019 |
| Qiwi Group | | | |
| Front Office | 855 | 2,177 | 1,541 |
| Back Office | 751 | 1,267 | 1,392 |
| IT Personnel | 396 | 750 | 697 |
| **Total** | **2,002** | **4,194** | **3,630** |

Our management structure is currently a mix among business functions and business units. Function managers are focused on centralized functions such as finance, strategy, legal, compliance and certain other functions, while business unit managers oversee the operations of the respective business units for which they are responsible. As of December 31 2019, we had four distinct key business units in accordance with the structure of our reporting segments: Payment Services, Consumer Financial Services, Small and Medium Enterprises and Rocketbank. The vast majority of our employees are located in Russia including Moscow, Voronezh (prime location of the SOVEST project call-center), and Ekaterinburg, where Tochka headquarters are located.

Significant headcount growth in 2018 was driven by three main factors: (i) continued hiring of personnel engaged in the SOVEST project, including front (mostly direct sales agents) and back office personnel with the total number of employees increasing from 443 in 2017 to 1,035 in 2018; (ii) launch and development of the Tochka project whereas a number of employees joined QIWI to work on establishing a multi-bank platform and running Tochka business with the total number of employees increasing from 396 in 2017 to 1,438 in 2018; and (iii) acquisition of Rocketbank with the following transfer of over 400 of its employees to Qiwi Bank during the year ended December 31, 2018.

The dynamics for the year ended December 31, 2019 were driven by counteractive trends: (i) the total number of employees engaged in Tochka project decreased from 1,438 in 2018 to 144 in 2019 as a result of the transfer of Tochka project to JSC Tochka starting February 1, 2019; as well as (ii) by the continued transfer of employees in connection with the development of Rocketbank project whereas the number of employees has increased by almost 500 people during 2019. Additionally, in 2019 we have hired a number of employees in connection with the development of certain projects in our Payment Services segment.

We place a high value on technological innovation and compete aggressively for talent. We strive to hire the best software engineers, as well as talented sales, marketing and financial and administrative staff. We seek to create a dynamic, fulfilling work environment, encouraging participation, creativity, the exchange of ideas and teamwork. We believe that our relations with our employees are good.

**Regulation**

We are subject to a number of laws and regulations in Russia and other jurisdictions that regulate payment and financial services, anti-money laundering, data protection and information security. Qiwi Bank is also subject to numerous laws and regulations governing banking activities, consumer lending and money remittances in Russia.

*Regulation of Payment Services*

A legislative framework for the payment services industry is not yet fully developed in Russia, and, moreover, is not universal, and various business models that payment services providers pursue are regulated differently.

Virtual wallet operations are legally considered cashless transfers with the use of bank cards. For regulatory purposes, when a Qiwi Wallet account is reloaded, the accountholder is issued one or several virtual prepaid cards, depending on the amount of the reload. While the accountholder agrees to the issuance of the cards through accepting a public offer, he or she is not explicitly provided with details of each card. From a consumer's perspective,

the amount of the reload is simply transferred to an account of a digital wallet, whereas legally it becomes stored value of a virtual prepaid card. Prepaid cards are regulated as "electronic means of payment" under the Federal Law of the Russian Federation No. 161-FZ "On the National Payment System", dated June 27, 2011, as amended, or the "Payment System Law". The major amendments to the Payment System Law were adopted in 2019, introducing inter alia new participants subject to regulation, namely: provider of payment applications, payment aggregator, information exchange operator, foreign provider of payment services and so on. These changes are likely to reshape the contractual and technical framework of electronic payment services' provision in Russia.

The Payment System Law classifies electronic means of payment into personalized and non-personalized, depending on whether they allow for identification of the payer for the purposes of the Federal Law of the Russian Federation No. 115-FZ "On Combating the Legalization (Laundering) of Criminally Obtained Income and Funding of Terrorism", dated August 7, 2001, as amended, or the "Anti-Money Laundering Law". Any electronic money transfers are subject to thresholds on remaining electronic money balances, which amount to RUB 600,000 for personalized means of payment and RUB 15,000 for non-personalized means of payment (or RUB 60,000 if the holder underwent a simplified identification procedure). The total monthly turnover for each non-personalized means of payment cannot exceed RUB 40,000 (or RUB 200,000 if the holder underwent a simplified identification procedure). There are no limitations on the total monthly turnover for fully identified consumers (see—"The Anti-Money Laundering Law"). There are currently no restrictions on ways of reloading prepaid cards, either

57

Table of Contents

personalized or non-personalized. However, since August 2020 non-personalized electronic means of payment (including those which underwent a simplified identification procedure) cannot be replenished by cash unlike the personalized electronic means of payment. Furthermore, since September 2019 consumers are not able to withdraw cash from their non-personalized prepaid cards (excluding those which underwent a simplified identification procedure).

Pursuant to the recent amendments to the Tax Code of the Russian Federation, starting from April 2020 Russian banks should inform the Federal Tax Service on opening, closing or changing details of the electronic means of payment. The implemented procedure is similar to one in regard of the bank accounts.

The CBR is the agency commissioned with supervision of compliance with the provisions of the Payment System Law. As such, it is entitled to suspend the activities of market participants regulated by the Payment System Law in the event of violations and impose administrative liability on the offenders.

As part of operating our agent model, Qiwi Bank has contracts with the bank payment agents, whose principal function is to accept cash for the purpose of Qiwi Wallet uploads through kiosks, terminals and other physical points of service. In accordance with the Payment System Law, Qiwi Bank is responsible for the supervision of compliance of such bank payment agents and sub-agents with the provisions of the corresponding Russian legislation, in particular their compliance with the regulation of payment services, anti-money laundering, data protection, and use of cash registers legislation. The credit institutions shall also file with the CBR various statistical data and information about the bank payment agents on a quarterly basis. The submitted information should be publicly available.

JSC QIWI, as operator of our kiosk network, is deemed to be a payment agent in accordance with the Federal Law of the Russian Federation No. 103-FZ "On Collection of Payments from Individuals by the Payment Agents", dated June 3, 2009, as amended, or the Payment Agents Law. The "Payment Agents Law" is inapplicable to electronic payments and thus does not regulate our Qiwi Wallet business.

The Payment Agents Law requires payment agents to comply with the Anti-Money Laundering Law.

The payment agent's obligation to transmit the funds to the merchant is required to be either insured or secured by means of a pledge, guarantee, or otherwise. The amount of such insurance or security is not statutorily fixed, and there are no other guidelines regarding this requirement.

The Payment Agents Law provides that payment agents are entitled to levy fees from the merchants' customers for each transaction processed by them. These fees are not statutorily capped, although proposals to cap them are from time to time considered by the Russian legislature.

This law also re quires both the payment agent and the merchant serviced by them to maintain segregated bank accounts for the purpose of depositing funds received from the customers and from the payment agent, respectively. All funds received by a payment agent need to be deposited into such specialized accounts.

Although currently, in respect of monitoring the activities of the payment agents, the CBR authority is limited to collection, systematization and analysis of industry data, the CBR activities may have indirect impact on payment agents. For instance, in April 2015 the CBR issued recommendations to credit institutions to enhance their scrutiny over compliance by the payment agents with legislation that requires them to remit their proceeds to special accounts, which resulted in a decline in the number of kiosks in the market as well as our active kiosks.

### *Payment Systems Regulation*

In 2015, we acquired the Contact money transfer system. Contact was established in 1999 and for legal purposes is set up and regulated as a payment system. It provides funds transfer services without opening a bank account to individuals and legal entities in Russia, CIS and European countries, the USA, Canada, Israel, Vietnam, Turkey, UAE, RSA, India, Thailand, New Zealand and Singapore. It also allows its clients to reload cards of international payment systems such as MasterCard, Visa and UnionPay. In accordance with the decision of the CBR, the Contact money transfer system has the status of a nationally significant payment system.

Pursuant to the Payment System Law, a payment system is a group of organizations, including the payment system operator, payment infrastructure service providers (including operational, payment clearing and settlement centers) and payment system participants (which in most cases are credit institutions), which cooperate in order to transfer funds under the payment system regulations.

The payment system operator has a key role in a payment system. Since April 27, 2017, Qiwi Bank has been the operator of Contact money transfer system and its operational, payment clearing and settlement center.

The payment system operator determines the payment system regulations which the payment system participants adhere to. The Contact money transfer system regulations are in full compliance with the current Russian legislation. The CBR is the agency that supervises and oversees payment systems.

58

Table of Contents

### TSUPIS Regulation

As part of our business, we service merchants that provide betting services. The regulatory framework with respect to betting in the Russian Federation is set by the Federal Law of the Russian Federation No. 244-FZ "On State Regulation of Organization and Conducting Games of Chance and on Introducing Changes to Some Legislative Acts of the Russian Federation", dated December 29, 2006, as amended, or the "Betting Law".

In order to engage in the betting business, a bookmaker has to become a member of a self-regulated organization of bookmakers and abide by its rules, and any and all interactive bets may be only accepted through an Interactive Bets Accounting Center (TSUPIS) set up by a credit organization together with a self-regulated association of bookmakers. The core functions of a TSUPIS are as follows: (i) to accept interactive bets in favor of the members of the self-regulated organization; (ii) to pay winnings to the bettors; (iii) to identify bettors in a manner allowing to ascertain their age; (iv) to record and provide to the members the information on the bettors and accepted interactive bets.

Qiwi Bank serves as an interactive bets accounting center. It has entered into a contract with the self-regulated organization "Association of Bookmakers" in 2016.

### Consumer Lending Regulation

In November 2016 QIWI launched a new payment-by-installments card project called SOVEST. The consumer lending activities in Russia are mainly regulated by the Federal Law of the Russian Federation No. 353-FZ "On Consumer Credits (Loans)" dated December 21, 2013, as amended, or the "Consumer Credit Law". The law imposes a range of restrictions on the lender, including interest rate limitations, prohibition to increase the interest rate and prohibition of artificial extra charges.

The terms and conditions of our consumer loan agreements in connection with the SOVEST project comply with applicable legislation.

Before granting a loan Qiwi Bank performs a credit scoring procedure of the potential borrower, for the purposes of which we employ various facilities and methods in full compliance with the Russian legislation.

### Banking Regulation

Qiwi Bank is a "credit institution" and is accordingly subject to the following financial services-related laws and regulations:

The Federal Law of the Russian Federation No. 395-1 "On Banks and Banking Activity", dated December 2, 1990, as amended, or the "Banking Law", is the main law regulating the Russian banking sector. Among other things, it defines credit institutions, sets forth the list of banking operations and other transactions that credit institutions may engage in, and establishes the framework for the registration and licensing of credit institutions as well as the regulation of banking activity by the CBR.

The Banking Law provides for a list of the so-called "banking operations" that cannot be conducted without an appropriate license from the CBR, including, among others, accepting deposits, opening and maintaining bank accounts, performing money transfers from and to bank accounts of clients, and performing money (including electronic money) transfers without opening a bank account (other than postal transfers), etc. The latter type of banking operations is the only one that Qiwi Bank pursues as a main line of our payment services business, although Qiwi Bank is also entitled to accept deposits from individuals and legal entities, invest the funds received in the form of deposits, maintain accounts for individuals and legal entities and perform settlements through their bank accounts, perform teller and cash collection services, sell and purchase currency and issue bank guarantees.

In accordance with the Banking Law, Russian banks are divided into two categories: banks with a basic license and banks with a universal license. The key differences are the range of permitted banking operations, the requirements to net worth (capital), prudential ratios the banks should comply with, the information to be disclosed and the ability to have subsidiaries abroad. Pursuant to this classification, Qiwi Bank holds a universal license.

#### Capital and Reserve Requirements

The Banking Law and legislative acts promulgated thereunder establish minimum charter capital, capital base and various reserve requirements for credit institutions, which Qiwi Bank is in compliance with. The reserve requirements of the CBR negatively impact Qiwi Bank's ability to distribute its profit to the shareholders in the form of dividends.

#### Loss Provisions

Credit institutions are required to adopt procedures for calculating and posting provisions for loan losses and for possible losses other than loan losses, which may include losses from investments in securities, funds held in correspondent accounts at other banks, contingent liabilities and other transactions.

Qiwi Bank maintains certain provisions for losses from loans, default by counterparties, impairment of assets and liability increases, and is in compliance with applicable legislation.

59

Table of Contents

*Prudential Ratios*

CBR establishes and periodically amends mandatory prudential ratios for banks. Key mandatory economic ratios that banks must observe on a daily basis and periodically report to the CBR include capital adequacy ratio, instant liquidity ratio, current liquidity ratio, long-term liquidity ratio, maximum exposure to a single borrower or a group of affiliated borrowers, maximum exposure to major credit risks, maximum amount of loans, bank guarantees and sureties extended by the bank to its participants (shareholders), aggregate amount of exposure to the bank's insiders, and ratio for the use of the bank's capital base to acquire shares (participation interests) in other legal entities. Failure to comply with the prudential ratios may lead to negative consequences for the bank, including revocation of its banking license.

As of December 31, 2019, prudential ratios of Qiwi Bank were in excess of the minimum thresholds imposed by the CBR.

*Reporting Requirements*

A substantial amount of routine reporting has to be performed by credit institutions on a regular and non-regular basis, including disclosure of financial statements, various operational indicators, affiliates and persons who exercise (directly or indirectly) influence over the decisions taken by the management bodies of the credit institution. The CBR may at any time conduct full or selective audits of any credit institution's filings and may inspect all of its books and records.

Additionally, banking holdings such as ourselves (i.e., groups of legal entities in which one legal entity that is not a credit institution, directly or indirectly, controls decisions of the management bodies of a credit institution within such groups, such as Qiwi Bank) must regularly disclose their consolidated financial statements and provide to CBR certain additional information regarding the business operations and financial condition of the group in order for the CBR to assess their risks.

**Factoring Regulation**

In June 2018, Factoring PLUS (previously known as Qiwi Processing) started providing factoring services in Russia. The regulatory framework with respect to factoring is mainly set by the Civil Code of the Russian Federation.

Pursuant to the civil code of the Russian Federation factoring is a series of related financial transactions under which one party (a client) undertakes to assign monetary claims against a third party (a debtor) to another party (a financial agent/factor) and pay for the services of the latter, and the financial agent undertakes to perform at least two of the following functions in relation to the assigned claims: (i) to finance the client (including loans or advance payment) on account of receivables assigned to the factor; (ii) to maintain accounts relating to the client's receivables; (iii) to exercise rights relating to the receivables (in particular, collect payments from the debtors, settle the obligations etc.); (iv) to exercise rights under agreements securing performance of obligations by the debtors. Factoring PLUS as a financial agent/factor performs all the aforementioned functions as may be required from time to time.

Factoring PLUS as a financial agent/factor is deemed to be a financial service provider. Thus, it is subject to the Anti-Money Laundering Law (*see—"The Anti-Money Laundering Law"*).

**Bank Guarantee Transactions Regulation**

In 2018 Qiwi Bank started actively issuing guarantees for SMEs in accordance with the Federal Law of the Russian Federation No. 223-FZ "On Purchasing Goods, Work, and Services by Certain Types of Legal Entities", dated July 18, 2011, as amended, and the Federal Law of Russian Federation No. 44-FZ "On the Contract System for State and Municipal Procurement of Goods, Work, and Services", dated April 5, 2013, as amended.

Pursuant to the Civil Code of the Russian Federation a bank guarantee is an irrevocable commitment by a bank to pay a specified sum in the event that the party requesting the guarantee fails to perform the liability secured by the document. A guarantee is a commitment independent of the liability under the principal debt or the agreement between the creditor and the primary debtor. By issuing a guarantee, a bank commits to pay upon first demand, provided all the conditions stipulated in this guarantee are met. For issuing a guarantee the bank charges a commission from the party requesting it.

Qiwi Bank is included in the list of banks that meet established requirements for an acceptance of bank guarantees for tax purposes, maintained by the Ministry of Finance of the Russian Federation.

**The Anti-Money Laundering Law**

In Russia, the companies performing transactions with funds and other assets (so called financial services providers) shall comply with national anti-money laundering and counter-terrorist financing legislation, as well as requirements of the Foreign Account Tax Compliance Act (FATCA) and the Common Reporting Standard (CRS). Usually, financial services providers in Russia also follow the best international practices in this sphere, such as

recommendations of the Financial Action Task Force, or the FATF. The Federal Financial Monitoring Service, or Rosfinmonitoring, is the agency commissioned with supervision of compliance with the provisions of the Anti-Money Laundering Law.

Under the Anti-Money Laundering Law, the main obligations of a financial services provider are as follows:

1) to elaborate internal control rules and programs for anti-money laundering and counter-terrorism financing purposes and control their implementation, and to designate an officer responsible for compliance of these rules and programs with the Russian legislation;

60

Table of Contents

2) to conduct internal and external trainings of the staff in the anti-money laundering and counter-terrorism financing sphere;

3) to detect, document and report to the Rosfinmonitoring on clients' transactions subject to mandatory control;

4) to detect, document and report to the Rosfinmonitoring on clients' suspicious (unusual) transactions;

5) to keep a close eye on certain transactions where one of the counterparties is a resident in a country included in the FATF "black lists" or uses a bank account maintained in such country, to take reasonable measures for identifying clients that are politically exposed persons (domestic or foreign) and clients that pose high money laundering or financing terrorism risks, and to apply enhanced due diligence measures to such clients;

6) to detect and to freeze (block) funds or other assets of natural or legal persons that are known to participate in extremist or terrorist activities or to spread weapons of mass destruction and report to the Rosfinmonitoring on such taken actions, and not less than once every three months to inspect whether there are clients whose funds or other assets were or shall be frozen/blocked and provide the Rosfinmonitoring with the results of such inspections;

7) to suspend or to restrict the performance of certain operations on the ground set forth by the anti-money laundering and counter-terrorism financing legislation;

8) to provide the Rosfinmonitoring and the CBR on request with information on clients, their operations and beneficial owners;

9) to identify such clients, their representatives and/or beneficial owners, to take reasonable measures for detecting and identifying beneficial owners, to update the information on such clients on a regular basis, and to determine a procedure for cooperating with the persons assigned to perform identification.

Financial services providers are generally required to identify their clients, whether legal entities and individuals. However, certain transactions of physical persons are exempt from the identification requirements under the Anti-Money Laundering Law, unless officers of a financial service provider suspect that such operation is carried out to legalize funds received from illegal activities, to finance terrorism or to spread weapons of mass destruction. Money transfers by individuals not exceeding RUB 15,000 are generally exempt from the identification requirement, but peer-to-peer transfer and transfers to foreign entities and certain kinds of non-profits require at least a simplified identification of the customer regardless of the amount. The key difference between the simplified procedure and the procedure that must be followed in all other circumstances is that simplified identification can be performed remotely. The CBR may limit to a client that has only been identified remotely the number of bank accounts held in Russian banks in aggregated, the total credit balance that may be provided to such client, or the aggregate amount of transactions such client may perform within a month. The identification requirements of the Anti-Money Laundering Law pertain to all clients and their transactions subject to certain exclusions and limitations.

Since mid-2018, in order to block potentially fraudulent transactions, credit institutions have to use anti-fraud criteria, elaborated both by CBR and in-house. Credit institutions are also prescribed to follow certain protocol for combatting the unauthorised transactions and to report all such cases to the CBR which maintains a national fraud database.

***Privacy and Personal Data Protection Regulation***

We are subject to laws and regulations regarding privacy and protection of the user data, including the Federal Law of the Russian Federation No. 152-FZ "On Personal Data", dated July 27, 2006, as amended, or the Personal Data Law. The Personal Data Law, among other things, requires that an individual must consent to the processing (i.e. any action or combination of actions performed with or without the use of technology on personal data, including the collection, recording, systematization, accumulation, storage, alteration (updating or changing), retrieval, use, transfer (distributing, providing or authorizing access to), depersonalization, blocking, deleting and destroying) of his/her personal data and must provide this consent before such data is processed. Generally, the Personal Data Law does not require the consent to be in writing but requires it to be in any form that, from an evidential perspective, sufficiently attests to the fact that it has been obtained.

However, the consent must be in writing in certain cases, including: (i) where the processing relates to special categories of personal data (regarding the individual's race, nationality, political views, religion, philosophical beliefs, health conditions or intimate information); (ii) where the processing of personal data relates to any physiological and biological characteristics of the individual which can help to establish his or her identity (such as, for example, biometric personal data); (iii) cross-border transfers to a state that does not provide adequate protection of rights of individuals; and (iv) the reporting or transferring of an employees' personal data to a third party, etc. The written consent of individuals must meet a number of formal requirements and must be signed by holographic or electronic signature.

Subject to certain limited exemptions, the recording, systematization, accumulation, storage, adjustment (update, alteration), retrieval of personal data of citizens of the Russian Federation is required to be performed through a database located in the territory of the Russian Federation. All our data

centers used to store such personal data are located in the Russian Federation.

61

Case 1:20-cv-06054-BMC-CLP    Document 87-3    Filed 05/02/24    Page 60 of 187 PageID #: 3529

Table of Contents

In May 2018, the General Data Protection Regulation (EU), a set of data protection rules for all companies operating in the European Union, wherever they are based, came into force. It has fundamentally changed the way businesses handle personal data, strengthening the protection of personal data and the rights of the individual.

*Regulation of Strategic Investments*

The Strategic Enterprise Law provides that an acquisition by a foreign investor (or a group of persons including a foreign investor) of direct or indirect control over a company holding an encryption license requires prior approval of a specialized governmental commission. The approval process usually takes between three and six months. Qiwi Bank holds encryption licenses, which are necessary to conduct its operations, and by virtue of this may be deemed to be a "strategic enterprise".

Under the Strategic Enterprise Law, a person is deemed to have control over a strategic enterprise if, among other things, such person controls, directly or indirectly, more than 50% of the total number of votes attributable to the voting shares comprising the share capital of such strategic enterprise. Where the purchaser is a foreign state, foreign governmental organization, international organization or entity controlled by a foreign government, or international organization, the threshold for obtaining a preliminary approval is more than 25% of the voting power. In addition, investors that are controlled by a foreign state or a foreign government or international organization are prohibited from owning more than 50% of the voting power of a strategic enterprise. Failure to obtain the required governmental approval prior to an acquisition would render the acquisition null and void.

The Strategic Enterprise Law is not clear on how to interpret "indirect" control over a strategic enterprise and in what circumstances an acquisition of shares in the holding company of a strategic enterprise would represent an "indirect" acquisition of shares in the latter and, consequently, require approval of the specialized governmental commission. Although the view can be taken that an "indirect" acquisition takes place if a foreign investor acquires over 50% of the shares in the holding company of a strategic enterprise or otherwise obtains control over the holding company, there is no assurance that Russian state authorities would not interpret it differently and apply a lower threshold to the acquisition of such holding company.

**C.    Organizational Structure**

QIWI plc is a holding company that operates through its subsidiaries. Our major operating subsidiaries, each of which is a wholly owned subsidiary, are QIWI Bank (JSC) (which is 99.9% owned by the Group), QIWI JSC, QIWI Payments Services Provider Ltd. As of March 24, 2020, Sette FZ-LLZ is our major operating subsidiary substituting QIWI Payments Services Provider Ltd.

See Exhibit 8.1 for a list of our subsidiaries.

**D.    Property, Plants and Equipment.**

We currently lease a total of over 20,000 square meters in Moscow and other regions across Russia as well as in Kazakhstan, Cyprus and other jurisdictions where we operate, primarily for the purpose of office space (including approximately 7,400 square meters of Rocketbank office space).

**ITEM 4A.        Unresolved Staff Comments**

None.

**ITEM 5.        Operating and Financial Review and Prospects**

You should read the following operating and financial review together with our consolidated financial statements and related notes included elsewhere in this annual report. Certain statements in this section are "forward-looking statements" and are subject to risks and uncertainties, which may cause actual results to differ materially from those expressed or implied by such forward-looking statements. Please see "Special Note Regarding Forward-Looking Statements" and "Risk Factors" for more information.

**A.    Operating Results**

**Overview**

We are a leading provider of next generation payment and financial services in Russia and the CIS. We have an integrated proprietary network that enables payment services across online, mobile and physical channels and provides access to certain financial services that we offer to our customers, merchants and partners. We operate in and target markets and segments that lack convenient digital solutions for customers and partners to pay or accept payments for goods and services, transfer money or use other financial tools in online, mobile and physical environments or that are largely cash-based.

We distribute our payment services online through our virtual Qiwi Wallet and other Qiwi Wallet infrastructure-based solutions, which enable consumers to make payments, transfer and receive funds through their computers or mobile devices, while funding their accounts through a variety of sources. We have also built a physical network of over 134,000 kiosks and terminals using a proprietary agent model. We further develop a number of digital financial services targeting retail customers, like SOVEST installment card or sole traders and small businesses, like Tochka or Factoring Plus.

Table of Contents

Our primary source of revenue are fees we receive from processing payments made by consumers to merchants or other customers or by merchants or partners to users, which we refer to as payment processing fees, typically based on a percentage of the size of the transactions processed, which we refer to as payment volume. We refer to payment processing fees that are paid to us by merchants for collecting payments on their behalf or for processing payouts as "merchant fees" and to payment processing fees that are paid by our consumers directly to us or transmitted to us by our agents as "consumer fees". If the transactions are made in cash through our kiosks and terminals, we typically pass on a portion of the merchant fees to our agents.

We also generate merchant fees based on a percentage of the size of the transactions that we process through operations of our SOVEST project, where we provide our consumers with the opportunity to buy goods and services from partner merchants on credit and repay their debt in equal installment payments. We generate consumer fees when customers pay us for buying value added options to increase the functionality of their SOVEST cards such as prolonged installment period. Further, throughout 2018 we generated revenue from servicing Tochka clients with accounts in Bank Otkritie under the information and technology services agreement between Qiwi Bank and Bank Otkritie. We also generate revenue from commissions we charge for servicing the clients of Tochka, who have accounts with QIWI Bank.

We are constantly seeking new business opportunities, hence in 2019 we have launched a new project focused on providing factoring services and digital guarantees where we generate revenues based on a percentage of the size of debt purchased and guarantee issued, respectively. We also provide digital marketing services through our subsidiary Flocktory where we charge subscription fees to our clients operating in e-commerce, financial, media and travel industries.

**Key Measures of Financial and Operational Performance**

Our management monitors our financial and operational performance on the basis of the following measures.

**Financial Measures**

The following table presents our key financial measures for the year ended December 31, 2017, 2018 and 2019.

| | Year ended December 31, | | |
|---|---|---|---|
| | 2017 | 2018 | 2019 |
| | (in RUB millions) | | |
| Total Adjusted Net Revenue (1) | 13,193 | 19,657 | 23,176 |
| Payment Services Segment Net Revenue(1) | 12,580 | 16,497 | 20,965 |
| Adjusted EBITDA (1) | 5,185 | 5,948 | 9,099 |
| Adjusted Net Profit (1) | 4,054 | 4,137 | 6,679 |

(1) See "Selected Consolidated Financial and Other Data — Non-IFRS Financial Measures" for how we define and calculate Adjusted Net Revenue, adjusted EBITDA, and Adjusted Net Profit as non-IFRS financial measures and reconciliations of these measures to revenue, in the case of Adjusted Net Revenue, and net profit, in the case of adjusted EBITDA and Adjusted Net Profit.

**Operating Measures**

The following table presents our key operative measures for the year ended December 31, 2017, 2018 and 2019.

| | Year ended December 31, | | |
|---|---|---|---|
| | 2017 | 2018 | 2019 |
| | (in RUB millions, unless otherwise indicated) | | |
| Payment Services Segment Payment Volume | 911,095 | 1,138,149 | 1,488,587 |
| Active Qiwi Wallet accounts (at period end, in millions) (1) | 20.1 | 20.8 | 22.5 |
| Active kiosks and terminals (units) (2) | 152,525 | 143,690 | 134,280 |
| Payment Services Segment Net Revenue Yield (3) | 1.38% | 1.45% | 1.41% |
| Consumer Financial Services Segment Payment Volume (4) | 3,304 | 15,945 | 27,794 |

(1) Number of active Qiwi Wallet accounts is defined as the number of wallets through which at least one payment has been made or that have been loaded or reloaded in the 12 months preceding the end of the relevant reporting period.

(2) We measure the numbers of our kiosks and terminals on a daily basis, with only those kiosks and terminals being taken into calculation through which at least one payment has been processed during the day, which we refer to as active kiosks and terminals. The period end numbers of our kiosks and terminals are calculated as an average of the amount of active kiosks and terminals for the last 30 days of the respective reporting period.

(3) Payment Services segment net revenue yield is defined as Payment Services segment net revenue divided by Payment Services segment payment volume.

Table of Contents

(4)    Consumer Financial Services segment payment volume consists of the transaction amounts made by SOVEST card customers to merchants offline and online (including, but not limited to the partner-merchants) or withdrawn through ATMs less the amount of corresponding reimbursements.

*Payment volume.* Payment Services segment payment volume as well as Consumer Financial Services segment payment volume provides a measure of the overall size and growth of the corresponding businesses, and increasing our payment volumes is essential to growing our profitability. Payment Services segment payment volumes have increased by 30.8% in 2019 as compared to 2018, reaching RUB 1,489 billion for the year ended December 31, 2019 mainly as a result of the growth in E-commerce and Money Remittance market verticals where we are best suited to leverage our payment infrastructure by providing our customers with convenient solutions. Payment Services segment payment volumes have increased by 24.9% in 2018 as compared to 2017, reaching RUB 1,138 billion for the year ended December 31, 2018 mainly driven by positive trends in the same key verticals of our business – the E-commerce market vertical fueled by growth of digital entertainment services and the Money Remittances market vertical. Consumer Financial Services segment payment volume increased by almost 74% in 2019 as compared to 2018 reaching RUB 27.8 billion as of December 2019 mainly driven by the scaling of the SOVEST project. The following factors may have a significant impact on the payment volumes and therefore our revenue:

- *Russian economy.* We carry out our operations primarily in Russia. Macroeconomic conditions in Russia significantly impact the volume of payments made by our consumers. During periods of economic growth, overall consumer spending tends to increase along with rises in wealth, and during economic downturns, consumer spending tends to correspondingly decline, although some of the market we service tend to show counter cyclical trends.

- *Increase in the volume of online transactions and the use of alternative payment methods.* The volume of online transactions has grown considerably in the recent years and continues to grow. Similarly, we expect the use of both banking cards and alternative payment methods in Russia, such as smartphones to grow considerably. We believe that growth in online transactions and alternative payment methods will be an important driver in increasing the demand for technological payment solutions, the number of potential merchants and partners for which we can offer payment services and the potential number of our users. However, the rapid development of bank card transactions in online as well as development of online banking services could hinder the growth in alternative payment methods.

- *Consumer adoption.* We have actively sought new merchants to offer consumers more payment choices when using our products and developed certain solutions and technological capabilities to widen the scope of services that we offer for merchants, partners and customers. We believe that growth of our infrastructure and suite of services we offer as well as merchant and partner network will lead to more consumers using our payment and financial services more frequently. In addition, we actively encourage consumers to use multiple products, distribution channels and interfaces, for example, for users of our physical distribution network to create a Qiwi Wallet or other online account and use it for wider range of purposes such as, for example, recurring and non-recurring payments, money transfers or as a payment collection tool. We also encourage our merchants and partners to use variety of our complimentary solutions and promote users of our payment services to adopt the financial services products that we offer, such as SOVEST or Tochka. We believe that the synergies offered within our ecosystem and between our payment and financial services will help enhance consumer adoption of our services in the future and create a more attractive and complete range of use cases and consumer journeys.

- *Use of cash as a means of payment.* Changes in the aggregate use of cash as a means of payment is an important variable affecting our revenues. Cash payments are one of the principal forms of payment in Russia, and, as a result, a significant share of our payment volumes continues to be cash-based. Over time, the prevalence of cash payments is declining as a greater percentage of the population in emerging markets is adopting credit and debit card payments and electronic banking, and our kiosks and terminals network is decreasing. We expect cash payments to continue to be an important means of payment in Russia and to sustain demand for use of our kiosks and terminals in the near future. If the use of cash as a mean of payment declines in Russia, it may negatively impact our financial results, hence we increasingly focus on offering our clients primarily digital solutions.

*Number of active Qiwi Wallet accounts.* Number of active wallets represents the number of wallets through which at least one payment has been made or which has been loaded in the 12 months preceding the end of the relevant reporting period. Number of active wallets is one of the measures of our success in penetrating the market and expanding our customer base. Our strategy is primarily focused on quality of Qiwi Wallet usage and we believe we are able to leverage our large, active base of over 42 million consumers who use our network at least once a month, our technological expertise and our brand recognition to drive the adoption and usage of the Qiwi Wallet.

*Number of active kiosks and terminals.* We measure the numbers of our kiosks and terminals on a daily basis, with only those kiosks and terminals being taken into calculation through which at least one payment has been processed during the day, which we refer to as active kiosks and terminals. The period end numbers of our kiosks and terminals are calculated as an average of the amount of active kiosks and terminals for the last 30 days of the respective reporting period. From December 31, 2018 to December 31, 2019, our number of kiosks increased from 110,000 to 111,000 and the number of terminals decreased from 34,000 to 23,000. Our kiosks and terminals can be found next to convenience stores, in train stations, post offices, retail stores and airport terminals in all major urban cities as well as many small and rural towns that lack large bank branches and other financial infrastructure. While the number of our kiosks and terminals is generally decreasing as market evolves towards higher share of digital payments, we believe that our physical distribution network remains an important part of our infrastructure, and we maintain or even slightly increase our market share.

64

Table of Contents

*Payment Services segment net revenue yield.* We calculate Payment Services segment net revenue yield by dividing Payment Services segment net revenue by Payment Services segment payment volume. Payment Services segment net revenue yield provides a measure of our ability to generate net revenue per unit of volume we process. Payment Services segment net revenue yield was 1.38%, 1.45% and 1.41% in 2017, 2018, and 2019, respectively. In 2019, Payment Services segment net revenue yield decreased by 4 bps in comparison to 2018 primarily as a result of launching of new products with lower yield and decrease in yield in most key market verticals. The following factors have influenced Payment Services segment net revenue yield:

- We have experienced a changing business mix towards higher yielding transactions which are primarily e-commerce and money

remittances, whereas lower yielding transaction, such as telecoms and financial services, have declined as a percentage of total Payment Services segment payment volume. At the same time throughout 2019 the yields in our key market verticals were decreasing primarily as a result of changing product mix within verticals (for example the launch of card acquiring for betting and other merchants, which has lower commissions compared to most other products that we offer).

- In the past, we have experienced a decline in average net revenue yields derived from large merchants such as for example MNOs since they have a substantial bargaining power over the payment channels they use including our infrastructure. We expect that the average net revenue yields will be declining in certain verticals such as E-Commerce and Money Remittances if merchants in these verticals continue to gain scale and accordingly bargaining power or if lower yielding products offered as part our infrastructure gain larger share.

- Our Payment Services segment net revenue yield depends on the level and mix of merchant commissions as well as the level of the reload costs we have. Such costs depend on the commissions charged to us by our partners and agents for the wallet reload as well as on the mix of such channels. If the consumer preferences shift between different reload methods or if any channel becomes more expensive to us (as we have experienced in 2015 in relation to our kiosk network) or less expensive to us, our Payment Services segment net revenue yield may decrease or increase respectively.

**Sources of Revenue**

Our primary source of revenue is payment processing fees. In addition, we receive interest revenue, fees for inactive accounts and unclaimed payments and other revenue, which includes cash and settlement service fees as well as installment cards related fees.

*Payment processing fees.* Payment processing fees constitute the substantial majority of our revenue and comprise of fees charged for processing payments typically based on a percentage of the total volume of each payment. A majority of our payment processing fees are merchant fees and consumer fees. If the payment is made through our physical distribution network, we typically pass on a portion of the merchants fees to our agents. In certain situations, we may not receive any merchant fees, for example, when a merchant is a government body. We generally recognize merchant fees gross at the point when merchants accept or sends payments from or to the consumer. Consumer fees fall into two categories – those collected by us directly and those collected by our agents. We recognize revenue from consumer fees charged through Qiwi Wallet as well as most revenue from consumer fees charged through our kiosks and terminals gross at the point when the consumer makes a payment. Additionally we generate foreign currency conversion revenue when the transactions are made in currencies that different from the currency of the balance used, mainly Russian Rubles. We recognize related revenues at the time of the conversion in the amount of conversion commission representing the difference between the current Russian or relevant country Central Bank foreign currency exchange rate and the foreign currency exchange rate charged by the our processing system.

*Interest revenue calculated using the effective interest rate.* In addition to payment processing fees, we generate revenue from various other sources, including SOVEST merchant commission fees charged for payments made using the SOVEST payment-by-installment card with the merchants (classified as interest revenue calculated using the effective interest rate) as well as income from factoring operations that we have launched in 2019.

*Fees from inactive accounts and unclaimed payments.* We also earn revenues from inactive accounts and unclaimed payments, writing down leftover balances or unclaimed payments when our customers do not use their wallets or do not claim their payments respectively for prolonged periods of time so that their wallets are deemed to be inactive.

*Other sources of revenue.* Additionally, we charge a fee for managing of current accounts that we provide to individuals and legal entities including our agents and SME clients (cash and settlement services fee), related revenue is recorded as services are rendered or as transactions are processed; SOVEST consumer fees charged for purchasing value added services (classified mostly as Installment card related fees); and other revenue (such as interest income and revenue primarily generated from operations such as software licensing for our processing system to third parties and providing bank guarantees to non-related parties in relation to factoring project).

**Operating Costs and Expenses**

*Costs of revenue*

*Transaction costs.* When payments are made through our physical distribution network, we incur transaction costs to our agents, which represent the amount of fees we pass through to agents for use of their kiosks and terminals. Additionally, we incur reload and transaction costs when Qiwi Wallet consumers reload their wallets or make certain types of payments through their wallets for goods and services offered by our merchants including acquiring costs payable to international payment systems, agents, bank-participants, mobile operators and other parties.

**Table of Contents**

*Cost of cash and settlement service fees.* We incur costs in the form of fees for using the services of third-party payment infrastructure for transactions made by our clients, individuals and legal entities, using current bank accounts and deposits, including guarantee deposits from agents placed with the bank to cover consumer payments they accept.

*Interest expense.* Interest expense represents cost related to attraction of money funds from SME and retail customers agents.

*Other expenses.* We incur other expenses in addition to transaction costs, including SMS and voice message expenses (SMS notification), call center expenses (payment to call center provider for the number of the calls serviced), expenses on bank guarantees provided and other expenses (including SOVEST expenses consisting primarily of cards production costs).

*Selling, general and administrative expenses*

Selling, general and administrative expenses consists primarily of advertising, client acquisition and related expenses, advisory and audit services, tax expenses (except of income and payroll relates taxes), advisory and audit services, rent of premises and related utility expenses, expenses related to Tochka platform services, IT related services, net loss / (gain) from initial recognition of loans issued above/below market rates (predominantly related to SOVEST project), securities transactions expenses (including the filing of our registration statement on Form F-3) and other operating expenses.

### Personnel expenses

Personnel expenses represents salaries and benefits paid to our IT, operating services employees, senior management, finance, legal and other administrative staff as well as related taxes and other personnel expenses. Historically, personnel expenses directly associated with revenue recognized were disclosed within cost of revenue and personnel expenses associated with all other activities were disclosed within selling, general, and administrative expenses. Starting full year 2019 reporting we present all personnel expenses as a single item in a Personnel expenses line.

### Depreciation and amortization

Depreciation is calculated on property and equipment on a straight-line basis from the time the assets are available for use, over their estimated useful lives. Intangible assets are amortized on a straight-line basis over their useful economic lives, unless the useful life is indefinite. We do not amortize intangible assets with indefinite useful lives, but we test these assets for impairment annually, either individually or at the cash-generating unit level.

### Credit loss expense

Credit loss expense represent impairment losses for financial assets accounted for using a forward-looking expected credit loss (ECL) approach in accordance with requirements of the IFRS 9 adopted by the Group starting from January 1, 2018 (prior accounted under IAS 39). ECLs are calculated as a difference between the contractual cash flows due in accordance with the contract and all the cash flows that the Group expects to receive. The adoption of the ECL approach resulted in increases in impairment allowances on the Group's financial assets.

### Impairment of non-current assets

We assess at each reporting date whether there is an indication that an asset, other than goodwill, should be impaired. If any such indication exists, or when annual impairment testing of an asset is required, we estimate the asset's recoverable amount. Where the carrying amount of an asset exceeds its recoverable amount, the asset is considered impaired and is written down to its recoverable amount.

Goodwill is tested for impairment annually and when circumstances indicate that the carrying value may be impaired. Impairment is determined for goodwill by assessing the recoverable amount of the cash-generating units, to which the goodwill relates. Where the recoverable amount of the cash-generating units is less than their carrying amount an impairment loss is recognized.

For the purpose of the impairment testing of other non-current assets we estimate the recoverable amounts as the higher of the value in use or the fair value less costs to sell of an individual asset or Cash Generated Unit (CGU) such asset relates to. For the year ended December 31, 2019 impairment of intangible and fixed assets was RUB 441 million and RUB 351 million respectively, mainly relating to the impairment of Rocketbank and QIWI Box CGUs. For the years ended December 31, 2018 and 2017 impairment of intangible assets was RUB 23 million and RUB 104 million respectively, mainly relating to the impairment of New Terminal CGU (New Terminal is a project focus on developing of a new generation of kiosks).

66

Table of Contents

## Other Income and Expense Items

### Share of gain/(loss) of an associate and a joint venture

We recognize our share of gain/loss of an associate/joint venture which is shown on the face of the statement of comprehensive income or in the notes. This is the profit/loss attributable to equity holders of the associate/joint venture and, therefore, is profit after tax and non-controlling interests in the subsidiaries of the associate/joint venture.

### Other income and expenses net

Other income and expenses primarily include loss on formation of associate and compensation of expenses from an associate, change in fair value of financial instruments, revaluation of JV company before acquisition and some other income and expenses that are minor by their nature.

### Foreign exchange gain and loss

Foreign exchange gain and loss arise as a result of re-measurement of monetary assets and liabilities denominated in foreign currencies at the functional currency rate of exchange at the reporting date. The amount of foreign exchange gain and loss for the reporting period is directly related to currency rates fluctuations.

### Interest income and expenses net

Interest income represents primarily interest on non-banking loans issued. Interest expense primarily represents interest expense accrued on lease liabilities and bank guarantees obtained by the Company.

*Income tax expense*

Income tax expense represents current and deferred income taxes with respect to our earnings in the countries in which we operate. Deferred tax also includes taxes on earnings of our foreign subsidiaries that have not been remitted to us to the extent applicable and will be taxed in Cyprus once remitted.

## Critical accounting policies and significant estimates

The preparation of consolidated financial statements in conformity with IFRS requires management to make judgments, estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the reporting dates and the reported amounts of revenues and expenses during the reporting periods. However, uncertainty about these assumptions and estimates could result in outcomes that require a material adjustment to the carrying amount of the asset or liability affected in future periods. The most significant judgments relate to the recognition of revenue, functional currency, recognition of control, joint control or significant influence over entities, acquisition of business in the form of separate assets. The most significant estimates and assumptions relate to determination of the fair values of assets acquired and liabilities assumed in business combinations, fair value of assets transferred in non-monetary transactions, impairment of intangible assets and goodwill, impairment of investments in associates and joint ventures, recoverability of deferred tax assets, fair value of loans issued, impairment of loans and receivables, measurement of costs associated with share based payments and uncertain position over risk assessment. We have based our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may materially differ from these estimates under different assumptions or conditions.

An accounting policy is considered to be critical if it requires an accounting estimate to be made based on assumptions about matters that are highly uncertain at the time the estimate is made, and if different estimates that reasonably could have been used, or changes in the accounting estimates that are reasonably likely to occur periodically, could materially impact the consolidated financial statements. We believe that the following critical accounting policies are the most sensitive and require more significant estimates and assumptions used in the preparation of our consolidated financial statements. You should read the following descriptions of critical accounting policies, judgments and estimates in conjunction with our consolidated financial statements and other disclosures included in this annual report.

*Revenue recognition*

We recognize revenue from contracts with customers when control of the services is transferred to the customer at an amount that reflects the consideration to which the Group expects to be entitled in exchange for those services. We have generally concluded that it is the principal in our revenue arrangements because we typically control the services before transferring them to the customer. Revenues and related cost of revenue from services are recognized in the period when services are rendered, regardless of when payment is made.

All performance obligations are either satisfied at a point of time or over time. In the former case they represent a separate instantaneous service, in the latter – a series of distinct services that are substantially the same and that have the same pattern of transfer to the customers. Such performance obligations are invoiced at least monthly. Progress of performance obligations satisfied over time is measured by the output method. We recognize the majority of our revenue at a point of time.

Contract price is allocated separately to each performance obligation. There are generally no variable amounts affecting consideration at the moment such consideration is recognized as revenue. In the unusual situation when the variability exists, we make estimates of the amount to be recognized based on the appropriate budgets and models. Consideration from customers does not have any non-cash component. Consideration payable to a customer is accounted as a reduction of the transaction price and, therefore, s reduction of revenue. Consideration from customers is normally received within a few months and never in more than a year. Consequently, we believe that it contains no significant financing component.

Table of Contents

Within some components of our business, we pay remuneration to our employees and third parties for attracting customers. The costs which are incremental to acquisition of new customers are further analyzed for recoverability. Generally, this expenditure is not expected to be reimbursed by future incomes and is not capitalized as costs to obtain a contract.

*Payment processing fee revenues and related transaction costs*

Payment processing fee revenues include the following types:

- fees for processing of consumer payment (consumer fee and merchant fee); and

- conversion fees.

We earn a fee for processing payments initiated by the individuals ("consumers") to pay to merchants and service providers ("merchants") or transfer money to other individuals. Payment processing fees are earned from consumers or merchants, or both. Consumers can make payments to various merchants through kiosks or a network of agents and bank-participants of payment system or through our website or applications using a unique user login and password. Kiosks are usually owned by third parties-cash collection agents ("agents"). When a consumer payment is processed, we may incur transaction costs to acquire payments payable to agents, bank-participants, mobile operators, international payment systems and other parties. The payment processing fee revenue and related receivable, as well as the transaction cost and the related payable, are recognized at the point when merchants or individuals accept payments from consumers in the gross amount, including fees payable for payment acquisition. Payment processing fees

and transaction costs are reported gross. Any fees from agents and other service providers are recorded as reduction of transactions costs unless the fee relates to distinct service rendered by us.

We generate revenue from the foreign currency conversion when payments are made in currencies different from the country of the consumer, mainly Russia. We recognize the related revenues at the time of conversion in the amount of conversion commission representing the difference between the current Russian or relevant country Central Bank foreign currency exchange rate and the foreign currency exchange rate charged by the Group's processing system.

*Cash and settlement services*

We charge a fee for managing current bank accounts and deposits of individuals and legal entities, including guarantee deposits from agents placed with the bank to cover consumer payments they accept. Related revenue is recorded as services are rendered or as transactions are processed.

*Installment cards related fees*

Installment cards related fees include revenues from commissions charged for consumer financial services.

*Other revenues*

Other revenues include revenues from commissions charged for consumer financial services, advertising activities, guarantee commissions and some other minor activities.

*Loyalty program*

Our Rocketbank project has a loyalty program, which allows customers to accumulate loyalty points that are accrued as percentage of purchases made using bank cards and can be used to reimburse future purchases. Revenue is therefore decreased by the nominal value of points awarded to customers during the period multiplied by the probability of their subsequent realization.

*Recognition of interest income and interest expense*

For all financial instruments measured at amortized cost, interest bearing financial assets classified as available for sale and financial instruments designated at fair value through profit or loss, interest income or expense is recorded using the EIR method. The EIR (and therefore, the amortised cost of the asset) is calculated by taking into account any discount or premium on acquisition, fees and costs that are an integral part of the EIR of the financial instrument.

We calculate interest income by applying the EIR to the gross carrying amount of financial assets other than credit-impaired assets. When a financial asset becomes credit-impaired and is, therefore, regarded as 'Stage 3', the Bank calculates interest income by applying the effective interest rate to the net amortised cost of the financial asset. If the financial assets restore and is no longer credit-impaired, the Bank reverts to calculating interest income on a gross basis.

Interest income from bank loans and short-term and long-term investments performed as part of our treasury function is classified as part of revenues, interest income derived from loans issued to various third and related parties as part of other arrangements is classified as interest income. Cash receipts of both types of interest are included into interest received in the statement of cash flows.

Interest expense from bank borrowings intended to attract funds for reinvestment is classified as part of cost of revenue. Interest expense derived from borrowings attracted from various third parties as part of other arrangements and interest expense from bank guaranties is classified as interest expense not as part of cost of revenue. Cash disbursements of both types of interest are included into interest paid in the statement of cash flows.

68

**Table of Contents**

*Revenue recognition requiring significant judgment*

We also exercise significant judgment in reaching a conclusion about our accounting policy the following matters concerning revenue:

- Standard applicable to revenue from the SOVEST project; and

- Recognition of revenue from inactive accounts and unclaimed payments.

SOVEST project implies offering interest free loans to individuals for the purchases made with installment cards plus various options connected to the use of these cards. It brings revenues in the form of commissions from merchants and card-holders as well as interchange fee from the payment system. We exercise significant judgment in determining which of these commissions fall within the scope of IFRS 9 or IFRS 15. The resulting conclusion depends mainly on whether a commission can be linked to a specific lending arrangement or not.

Further, we stipulate in our public offers the term during which a customer who failed to identify correctly the recipient of his transfer can return to correct the identification details or claim money back. If the customer does not return, the whole amount of transfer is appropriated by us in the period of specified time in public offer. Similarly, we charge a daily commission on the balance of wallets that remained inactive during the period indicated in the public offer. We believe that including these rules into its public offers gives us appropriate legal rights to recognize the extinguishment of customer liabilities and, therefore, record the related gain as revenue.

*Functional currency*

Each entity in the Group determines its own functional currency, depending on the economic environment it operates in, and items included in the financial statements of each entity are measured using that functional currency.

*Recognition of control, joint control, or significant influence over entities*

In assessing business combination, we analyze all relevant terms and conditions of management of the acquired or newly established entities and exercise judgment in deciding whether we have control, joint control, or significant influence over them. As a result, certain acquisitions where our share is over 50% may not be recognized as consolidated subsidiaries and vice versa.

*Acquisition of business in the form of separate assets*

In 2018 we completed the acquisition of the Rocketbank business that does not represent a separate legal entity. The acquisition was made through a combination of contracts to purchase of the major non-current assets, transfer of employees and so forth. Since the assets and other resources have been acquired in order to operate them as a business, these transactions were accounted for using the acquisition method as a single transaction. The acquisition date was the date when we obtained control over the last key element of the business. All the cash amounts paid by us under any of the contracts related to the acquisition were treated as consideration.

*Fair values of assets and liabilities acquired in business combinations*

We recognize separately, at the acquisition date, the identifiable assets, liabilities and contingent liabilities acquired or assumed in the business combination at their fair values, which involves estimates. Such estimates are based on valuation techniques, which require considerable judgment in forecasting future cash flows and developing other assumptions.

*Fair value of assets transferred in non-monetary transactions*

During the year 2018, we were engaged in a transaction related to the establishment of JSC Tochka. In this process, we invested a number of assets into the newly established entity (fixed assets, intangible assets, promissory notes). The fair value of promissory notes is deemed equal to their nominal value because they can be instantly exchanged for cash. The fair value of fixed assets and intangible assets is deemed equal to their carrying amount because these assets had been purchased recently from an unrelated party.

*Impairment of goodwill and intangible assets*

We determine that we have the following material CGUs: SOVEST, Payment services, Postomatnye Tekhnologii, Tochka, Rocketbank and Flocktory. For the purpose of the goodwill impairment test, we estimate the recoverable amounts of Payment services CGU as fair value less costs of disposal on the basis of quoted prices of the Company's ordinary shares. For the purpose testing for impairment the Group's of intangible assets with indefinite useful lives, we estimate the recoverable amounts of each asset as fair value less costs of disposal on the basis of comparative method and cost approach. For the purpose of intangible assets with definite useful life impairment, when indicators of impairment are noted, we estimate the recoverable amounts as the higher of value in use or fair value less costs to sell of an individual asset or the CGU to which this asset relates.

*Impairment of investments in associates and joint ventures*

Our investments in associate and joint venture are generally designated as separate CGUs. The recoverable amount of these CGUs is determined based on a value in use calculation using appropriate financial models.

Table of Contents

*Recoverability of deferred tax assets*

The utilization of deferred tax assets will depend on whether it is possible to generate sufficient taxable income against which the deductible temporary differences can be utilized. Various factors are used to assess the probability of the future utilization of deferred tax assets, including past operating results, operational plans, expiration of tax losses carried forward, and tax planning strategies.

Certain portion of deferred tax assets were not recorded because we do not expect to realize certain of our tax loss carry forwards in the foreseeable future due to the history of losses.

*Fair value of loans issued*

We measure loans issued at amortized cost using the effective interest rate (EIR) method. EIR is assumed to be equal to loan market rates which are defined on market participants statistic available to us.

*Impairment of financial assets*

For impairment of loans and receivables, we use a forward-looking expected credit loss (ECL) approach.

We record an allowance for ECLs for all loans and other debt financial assets not held at FVPL. The ECL allowance is based on the credit losses expected to arise over the life of the asset (the lifetime expected credit loss of LTECL), unless there has been no significant increase in credit risk since origination, in which case, the allowance is based on the 12 months' expected credit loss (12mECL). The 12mECL is the portion of LTECL that represents the ECLs that result from default events on a financial instrument that are possible within the 12 months after the reporting date. Both LTECL and 12mECL are calculated on either an individual basis or a collective basis, depending on the nature of the underlying portfolio of financial instruments.

ECLs are based on the difference between the contractual cash flows due in accordance with the contract and all the cash flows that the Group expects to receive. The shortfall is then discounted at an approximation to the asset's original effective interest rate. The mechanics of the ECL calculations are outlined below and the key elements are as follows:

PD    The Probability of Default is an estimate of the likelihood of default over a given time horizon. A default may only happen at a certain time over the assessed period, if the facility has not been previously derecognised and is still in the portfolio.

EAD    The Exposure at Default is an estimate of the exposure at a future default date, taking into account expected changes in the exposure after the reporting date, including repayments of principal and interest, whether scheduled by contract or otherwise, expected drawdowns on committed facilities, and accrued interest from missed payments.

LGD    The Loss Given Default is an estimate of the loss arising in the case where a default occurs at a given time. It is based on the difference between the contractual cash flows due and those that the lender would expect to receive, including from the realisation of any collateral. It is usually expressed as a percentage of the EAD.

For other financial assets (i.e., cash in banks, loans and debt instruments) and financial liabilities (i.e., financial guaranties and credit related commitments) we have established a policy to perform an assessment, at the end of each reporting period, of whether a financial instrument's credit risk has increased significantly since initial recognition, by considering the change in the risk of default occurring over the remaining life of the financial instrument.

In all cases, we consider that there has been a significant increase in credit risk when contractual payments are more than 30 days past due. We consider a financial asset in default when contractual payment are 90 days past due (except for particular sort of Trade and other receivables of 60 days). However, in certain cases, we may also consider a financial asset to be in default when internal or external information indicates that we are unlikely to receive the outstanding contractual amounts in full before taking into account any credit enhancements held by us.

For Trade and other receivables, we have applied the standard's simplified approach and have calculated ECLs based on lifetime expected credit losses. We have established a provision matrix that is based on our historical credit loss experience, adjusted for forward-looking factors specific to the debtors and the economic environment.

For instalment card loans and its undrawn credit commitments ELC calculation we use internal historical instalment card loans loss rates statistics for assessment of probabilities of default. The loss given default is an estimate of the loss arising in the case where a default occurs at a given time and is based on internal statistics.

70

Table of Contents

*Uncertain position over risk assessment*

We disclosed possible and accrued probable risks in respect on currency, customs, tax and other regulatory positions. Our management estimates the amount of risk based on its interpretation of the relevant legislation, in accordance with the current industry practice and in conformity with its estimation of probability, which require considerable judgment.

*Measurement of costs associated with share-based payments*

As of December 31, 2019 we had three outstanding equity-based compensation programs: 2012 Employee Stock Option Plan (2012 ESOP), 2015 Restricted Stock Units Plan (RSU Plan) and 2019 Employee Stock Option Plan (2019 ESOP). We estimate fair value of ESOP that are expected to vest using the Black-Scholes-Merton option pricing model and RSUs that are expected to vest using the binominal pricing model and recognize the share-based payment expense by rate over the requisite service period applicable to each option-vesting tranche. We used the following assumptions:

| | 2012 Employee Stock Option Plan (2012 ESOP) | 2015 Restricted Stock Unit Plan (RSU Plan) | 2019 Employee Stock Option Plan (2019 ESOP) |
|---|---|---|---|
| Adoption date | October, 2012 | July, 2015 | June, 2019 |
| Type of shares | Class B shares | Class B shares | Class B shares |
| Number of options or RSUs reserved | Up to 7 % of total amount of shares | Up to 2,100,000 shares | Up to 3,100,000 shares |
| Exercise price | Granted during: | Granted during: | Granted during: |
| | Year 2012: U.S. $ 13.65 | Year 2016: n/a | Year 2019: U.S. $ 16.75 |
| | Year 2013: U.S. $ 41.24 - 46.57 | Year 2017: n/a | |
| | Year 2014: U.S. $ 34.09 - 37.89 | Year 2018: n/a | |
| | Year 2017: U.S. $ 23.94 | Year 2019: n/a | |
| Exercise basis | Shares | Shares | Shares |
| Expiration date | December 2020 | December 2022 | December 2026 |
| Vesting period | Up to 4 years | Three vesting during up to 2 years | Two vesting during up to 4 years |
| Expected volatility (%) | 28 – 49.85 | 40.65 – 64.02 | 41.12 |

| Risk free interest rate (%) | 0.29 – 3.85 | 2.89 – 4.34 | 1.91 - 1.94 |
|---|---|---|---|
| Dividend yield (%) | 0 – 5.03 | 0 – 5.70 | 5.70 |
| Other major terms | The options are not transferrable | The units are not transferrable All other terms of the units under 2015 RSU Plan are to be determined by the Company's Board or the CEO, if so resolved by the Board, acting as administrator of the Plan | The units are not transferrable The Compensation Committee of the Board, acting as Administrator of the Plan, shall have the authority to adopt, amend and repeal such administrative rules, guidelines and practices relating to the Plan as it deems advisable. |

The expected life of the option represents the period during which our option awards are expected to be outstanding. The expected life of each option tranche was based on the simplified method outlined in Staff Accounting Bulletin No. 107, *Share-Based Compensation*. This method is also in line with the requirements of IFRS 2 Share-Based Payment.

With respect to price volatility, for 2012 ESOP (as it was adopted prior to our initial public offering and we did not have an active trading market for our shares) we estimated the volatility of our shares based on the historical volatility of peer group companies over a period which approximates our expected life of option awards, and for the RSU we used the historical three year volatility of our publicly reports share price. For 2019 ESOP we used the historical one-year volatility of peer group companies.

We calculate the risk-free interest rate that we use in the 2012 ESOP and in the 2019 ESOP model based on the implied yield currently available on the US treasury bonds, adjusted for a country risk premium, with a remaining term approximating the expected life of the option award being valued; for the RSU model we based the risk-free interest rate on Russian Eurobonds yield curve with a maturity of five years.

Any determination regarding the amount of future dividends will depend on a range of factors, including the availability of distributable profits, our liquidity and financial position, our strategic plans and growth initiatives, restrictions imposed by our financing arrangements, tax considerations, planned acquisitions, and other relevant factors. At the time of the grant date on December 21, 2012, we expected that we would not pay cash dividends after the closing of the initial public offering. In light of that expectation, we used an expected dividend yield of zero in our option pricing model for option awards granted in the year ended December 31, 2012. In April 2013, our board of directors subsequently reconsidered this determination, and we currently expect that we will pay dividends from time to time in the future. Up until September 2017, we have used dividend yield of 5.03% based on the dividends paid previously. There was no dividend distribution during the year ended December 2018, hence we have been using a dividend yield of zero. Since the fourth quarter 2018 we have started to use dividend yield of 5.70% and we are planning to use this yield further until one is specified. Details are further described in *"Item 8. Financial information — Dividend Policy."*

71

Table of Contents

We determined the amount of share-based compensation expense based on awards that we ultimately expect to vest, taking into account estimated forfeitures. IFRS requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. To properly attribute compensation expense, we are required to estimate pre-vesting forfeitures at the time of grant and revise those estimates in subsequent periods if actual forfeitures differ from those estimates. The forfeiture rate used in valuation models granted during the year 2019, 2018 and 2017 are from nil to 10%, from 11.35% to 16% and 9% respectively. It is based on historical data and current expectations and is not necessarily indicative of forfeiture patterns that may occur.

Because there had been no public market for our shares prior to our initial public offering, with the assistance of an independent valuation firm, we determined the fair value of our shares on the basis of valuations of our company using the "income approach" and the "market approach" valuation methodologies described further below. Since May 2013, QIWI plc is a public company and the fair value of its shares is defined by closing market price of its traded shares.

*Changes in accounting policies – IFRS 16 "Leases"*

IFRS 16 was issued in January 2016 and it replaces IAS 17 *Leases*, IFRIC 4 *Determining whether an Arrangement contains a Lease*, SIC-15 *Operating Leases-Incentives* and SIC-27 *Evaluating the Substance of Transactions Involving the Legal Form of a Lease*. IFRS 16 sets out the principles for the recognition, measurement, presentation and disclosure of leases and requires lessees to account for all leases under a single on-balance sheet model.

We adopted IFRS 16 using the modified retrospective method of adoption with the date of initial application of January 1, 2019. Under this method, the standard is applied retrospectively with the cumulative effect of initially applying the standard recognized at the date of initial application. We elected to use the transition practical expedient allowing the standard to be applied only to contracts that were previously identified as leases applying IAS 17 and IFRIC 4 at the date of initial application. We also elected to use the recognition exemptions for lease contracts that, at the commencement date, have a lease term of 12 months or less and do not contain a purchase option ('short-term leases'), and lease contracts for which the underlying asset is of low value ('low-value assets').

Set out below are our new accounting policies upon adoption of IFRS 16, which have been applied from the date of initial application. Lease liabilities are recognized at the date of initial application at the present value of the remaining lease payments discounted using our incremental borrowing rate at the date of initial application. Right-of-use assets are recognized at an amount equal to the lease liability adjusted by the amount of any prepaid or accrued lease payments relating to that lease recognized in the statement of financial position immediately before the date of initial application.

Right-of-use assets are measured at cost, less any accumulated depreciation and impairment losses, and adjusted for any remeasurement of lease liabilities. Right-of-use assets are depreciated on a straight-line basis over the lease term. No impairment is accrued on right-of-use assets as at the date of initial application.

We apply short-term lease recognition exemption to our short-term leases of office premises (i.e., those leases that have a lease term of 12 months or less from the commencement date and do not contain a purchase option). Lease payments on short-term leases are recognized as expense on a straight-line basis over the lease term.

We determine lease term as the non-cancellable term of the lease, together with any periods covered by an option to extend the lease if it is reasonably certain to be exercised, or any periods covered by an option to terminate the lease, if it is reasonably certain not to be exercised. We have the option, under some of our leases to lease the assets for additional term. We apply judgement in evaluating whether it is reasonably certain to exercise the option to renew. We consider all relevant factors that create an economic incentive for us to exercise the renewal. After the commencement date, we reassess the lease term if there is a significant event or change in circumstances that is within our control and affects our ability to exercise (or not to exercise) the option to renew (e.g., a change in business strategy).

Table of Contents

## Results of Operations

Set out below are our consolidated statements of operations data for the years ended December 31, 2017, 2018 and 2019:

| | Years ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2019 |
| | (in RUB millions) | | |
| **Revenue, including** | **20,897** | **30,610** | **39,336** |
| Payment processing fees | 17,265 | 23,694 | 30,736 |
| Interest revenue calculated using the effective interest rate | 1,052 | 1,854 | 3,646 |
| Fees from inactive accounts and unclaimed payments | 1,310 | 1,419 | 1,806 |
| Other revenue | 1,270 | 3,643 | 3,148 |
| **Operating costs and expenses, including** | **(16,906)** | **(26,161)** | **(32,896)** |
| Cost of revenue (exclusive of items shown separately below) | (7,704) | (10,953) | (16,160) |
| Selling, general and administrative expenses | (3,796) | (6,099) | (6,213) |
| Personnel expenses | (4,286) | (7,748) | (7,765) |
| Depreciation and amortization | (796) | (864) | (1,324) |
| Credit loss expense | (220) | (474) | (642) |
| Impairment of non-current assets | (104) | (23) | (792) |
| **Profit from operations** | **3,991** | **4,449** | **6,440** |
| Share of gain/(loss) of an associate and a joint venture | — | (46) | 258 |
| Other income and expenses, net | (41) | (181) | (91) |
| Foreign exchange gain | 257 | 1,311 | 905 |
| Foreign exchange loss | (373) | (1,049) | (1,077) |
| Interest income and expenses, net | 6 | 17 | (56) |
| **Profit before tax** | **3,840** | **4,501** | **6,379** |
| Income tax expense | (698) | (875) | (1,492) |
| **Net profit** | **3,142** | **3,626** | **4,887** |
| Attributable to: | | | |
| Equity holders of the parent | 3,114 | 3,584 | 4,832 |
| Non-controlling interests | 28 | 42 | 55 |

Set out below are our consolidated statements of operations data for the years ended December 31, 2017, 2018 and 2019 as a percentage of total revenue:

| | Years ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2019 |
| | (as a percentage of revenue) | | |
| **Revenue, including** | **100.0** | **100.0** | **100.0** |
| Payment processing fees | 82.6 | 77.4 | 78.1 |
| Interest revenue calculated using the effective interest rate | 5.0 | 6.1 | 9.3 |
| Fees from inactive accounts and unclaimed payments | 6.3 | 4.6 | 4.6 |
| Other revenue | 6.1 | 11.9 | 8.0 |
| **Operating costs and expenses, including** | **(80.9)** | **(85.5)** | **(83.6)** |
| Cost of revenue (exclusive of items shown separately below) | (36.8) | (35.9) | (41.1) |
| Selling, general and administrative expenses | (18.2) | (19.9) | (15.8) |
| Personnel expenses | (20.5) | (25.3) | (19.7) |
| Depreciation and amortization | (3.8) | (2.8) | (3.4) |
| Credit loss expense | (1.1) | (1.5) | (1.6) |

| | | | |
|---|---|---|---|
| Impairment of non-current assets | (0.5) | (0.1) | (2.0) |
| **Profit from operations** | **19.1** | **14.5** | **16.4** |
| Share of gain/(loss) of an associate and a joint venture | – | (0.2) | 0.7 |
| Other income and expenses, net | (0.2) | (0.6) | (0.2) |
| Foreign exchange gain | 1.2 | 4.3 | 2.2 |
| Foreign exchange loss | (1.7) | (3.4) | (2.8) |
| Interest income and expenses, net | 0.0 | 0.1 | (0.1) |
| **Profit before tax** | **18.4** | **14.7** | **16.2** |
| Income tax expense | (3.4) | (2.9) | (3.8) |
| **Net profit** | **15.0** | **11.8** | **12.4** |
| Attributable to: | | | |
|     Equity holders of the parent | 14.9 | 11.7 | 12.3 |
|     Non-controlling interests | 0.1 | 0.1 | 0.1 |

73

Table of Contents

**Year ended December 31, 2019 compared to year ended December 31, 2018**

*Revenue*

Set out below are our revenues, by source, for the year December 31, 2019 and 2018, and as a percentage of total revenue:

| | Year ended December 31, | | | |
|---|---|---|---|---|
| | 2018 (in RUB millions) | 2018 (% of revenue) | 2019 (in RUB millions) | 2019 (% of revenue) |
| Revenue | 30,610 | 100.0 | 39,336 | 100.0 |
| Commission and other revenue, including | | | | |
|     Payment processing fees | 23,694 | 77.4 | 30,736 | 78.1 |
|     Cash and settlement services fees | 3,017 | 9.9 | 1,403 | 3.6 |
|     Installment cards related fees | 358 | 1.1 | 1,139 | 2.9 |
|     Other revenue | 268 | 0.9 | 606 | 1.5 |
| Interest revenue and related charges, including: | | | | |
|     Interest revenue calculated using the effective interest rate | 1,854 | 6.1 | 3,646 | 9.3 |
|     Fees from inactive accounts and unclaimed payments | 1,419 | 4.6 | 1,806 | 4.6 |

Revenue for the year ended December 31, 2019 was RUB 39,336 million, an increase of 29%, or RUB 8,726 million, compared to the same period in 2018. This increase was primarily driven by an increase in commission and other revenue as well as interest revenue calculated using the effective interest rate. Payment processing fees for the year ended December 31, 2019 were RUB 30,736 million, an increase of 30%, or RUB 7,042 million, compared to the same period in 2018. The increase in payment processing fees resulted primarily from volume growth in such categories as E-commerce (mainly as a result of an increase in volumes of digital entertainment, primarily betting merchants) and Money Remittance (as a result of the implementation of our B2B2C and self-employed strategy) and partially offset by the slight decline in average payment net revenue yield, particularly in E-commerce category, mainly driven by the focus on increasing the scale of our business through offering new services to merchants and partners, which may have lower commission than our core e-Wallet solutions.

The number of active Qiwi Wallet consumers increased to 22.5 million as of December 31, 2019 from 20.8 million as of December 31, 2018. The increase resulted mainly from the implementation of our B2B2C strategy and merchant driven adoption of our services. The number of our kiosks and terminals decreased, with 134,280 active kiosks and terminals as of December 31, 2019 compared to 143,690 as of December 31, 2018, primarily as a result of the underlying market dynamics further described in *"Item 3.D. Risk Factors—Risks Related to Our Business and Industry—a decline in the use of cash as a means of payment or a decline in the use of kiosks and terminals may result in a reduced demand for our services."*

Cash and settlement services fees for the year ended December 31, 2019 was RUB 1,403 million, a decrease of 54%, or RUB 1,614 million, compared to the same period in 2018. This decrease primarily resulted from the termination of information and technology service agreements with Otkritie Bank for providing services to Tochka clients that have their accounts with Otkritie Bank starting from February 1, 2019 following the transfer of the Tochka operations to JSC Tochka.

Installment cards related fees for the year ended December 31, 2019 was RUB 1,139 million, an increase of 218%, or RUB 781 million, compared to the same period in 2018. This increase primarily resulted from the scaling of the SOVEST project as well as higher income from sale of certain value-added options to the existing SOVEST clients as such services were introduced throughout 2019.

Other revenue for the year ended December 31, 2019 was RUB 606 million, an increase of 126%, or RUB 338 million, compared to the same period in 2018. The increase was mainly driven by launch of digital guarantees project as well as income from advertising related to Flocktory Group that is consolidated starting December 2, 2019, and some other individually insignificant items.

Interest revenue calculated using the effective interest rate for the year ended December 31, 2019 was RUB 3,646 million, an increase of 97%, or RUB 1,792 million, compared to the same period in 2018. The growth was primarily related to the increase in the SOVEST project revenues (mostly increase in merchant commission as a result of portfolio growth as well as certain types of consumer value added options fees), increase in interest revenues relating to a Factoring Plus operations, and increase in interest income earned on funds deposited by Qiwi Bank (including Rocketbank branch)

with CBR, other banks and debt securities (due to larger amount of funds deposited in 2019).

Fees for inactive accounts and unclaimed payments increased by 27%, or RUB 387 million, from RUB 1,419 million in 2018 to RUB 1,806 million in 2019. The increase was driven primarily by growth of payment volume and a number of users.

74

Table of Contents

*Operating expenses*

Set out below are the primary components of our operating expenses for the year ended December 31, 2018 and 2019, and as a percentage of total revenue:

| | Year ended December 31, | | | |
|---|---|---|---|---|
| | 2018 | 2018 | 2019 | 2019 |
| | (in RUB millions) | (% of revenue) | (in RUB millions) | (% of revenue) |
| Cost of revenue | (10,953) | (35.8) | (16,160) | (41.1) |
| Transaction costs | (9,324) | (30.5) | (12,633) | (32.1) |
| Cost of cash and settlement service fees | (352) | (1.1) | (1,246) | (3.2) |
| Interest expense | (169) | (0.6) | (689) | (1.8) |
| Other expenses | (1,108) | (3.6) | (1,592) | (4.0) |
| Selling, general and administrative expenses | (6,099) | (19.9) | (6,213) | (15.8) |
| Personnel expenses | (7,748) | (25.3) | (7,765) | (19.7) |
| Depreciation and amortization | (864) | (2.8) | (1,324) | (3.4) |

*Cost of revenue*

Cost of revenue for the year ended December 31, 2019 was RUB 16,160 million, an increase of 48%, or RUB 5,207 million, compared to the same period in 2018. Transaction costs increased by 35% or RUB 3,309 million from RUB 9,324 million to RUB 12,633 million for the year ended December 31, 2019 as compared to the same period in 2018. This increase is in line with the volume growth; such costs primarily include different types of payment processing commissions that are charged by third party providers, including banks and payment systems, and driven primarily by higher volumes.

*Cost of cash and settlement service fees*

Cost of cash and settlement service fees for the year ended December 31, 2019 were RUB 1,246 million, an increase of 254%, or RUB 894 million, compared to the same period in 2018 is primarily related to Rocketbank and originated from the growth of its client's portfolio.

*Interest expense*

Interest expenses for the year ended December 31, 2019 were RUB 689 million, an increase of 308%, or RUB 520 million, compared to the same period in 2018, primarily, related to Rocketbank and of the transfer of its client's accounts and deposits to Qiwi Bank.

*Other expenses*

Other expenses for the year ended December 31, 2019 were RUB 1,592 million, an increase of 44%, or RUB 484 million, compared to the same period in 2018. The increase in other expenses was mainly due to (i) an increase in SMS and voice messages expenses due to an increase in corresponding tariffs by RUB 64 million in 2019 compared to 2018 ; (ii) increase in cost of rent of space for kiosks by RUB 129 million in 2019 compared to 2018 resulted from increase in number of kiosk spaces rented under new agreements signed; and (iii) increase of other items by RUB 209 million, primarily due to an increase in expenses related to digital guarantees project.

*Segment Net Revenue*

The following table presents net revenue by reportable segment (*see "Item 4.B. Business Overview" for more information about our reportable segments*) for the periods indicated:

| | Year ended December 31, | |
|---|---|---|
| | 2018 | 2019 |
| | (in RUB millions) | (in RUB millions) |
| Payment Services | 16,497 | 20,965 |
| Consumer Financial Services | 385 | 1,339 |
| Small and Medium Enterprises | 2,916 | 990 |
| Rocketbank | (263) | (490) |
| Corporate and Other | 122 | 372 |
| Total Segment Net Revenue(1) | 19,657 | 23,176 |

(1)    For the periods indicated above Total Segment Net Revenue is equal to Total Adjusted Net Revenue. See "Selected Consolidated Financial and

Other Data — "Non-IFRS Financial Measures" for how we define and calculate Adjusted Net Revenue, adjusted EBITDA, and Adjusted Net Profit as non-IFRS financial measures and reconciliations of these measures to revenue, in the case of Adjusted Net Revenue, and net profit, in the case of adjusted EBITDA and Adjusted Net Profit.

Segment net revenue attributable to the Payment Services segment increased by RUB 4,468 million, or 27%, in 2019 compared to the same period in 2018. The growth in this segment's net revenue was mainly due to an increase in payment processing fees and interest revenue calculated using the effective interest rate (primarily related to interest income earned on funds deposited by Qiwi Bank). Payment processing fees increased by 30% or by RUB 7,042 million compared to the same period of 2018 in line with volume growth, which was primarily driven by E-commerce and Money Remittances market verticals partially offset by decrease in yields of these verticals. Transaction costs increased by 35% or by RUB 3,309 million, in line with the increase in payment processing fees. Interest revenue increased by 42% or by RUB 557 million compared to 2018. The increase in interest revenue resulted primarily from larger deposits which Qiwi Bank placed with CBR and other banks in 2019. Fees from inactive accounts and unclaimed payments increased by 27%, or RUB 387 million compared to 2018. Other revenue net increased by 72% or by RUB 95 million compared to 2018. Payment Services segment net revenue accounted for 90% of Total Adjusted Net Revenue in 2018.

75

Table of Contents

Segment net revenue attributable to the Consumer Financial Services segment increased by RUB 954 million in 2019 compared to the same period in 2018. The increase in Consumer Financial Services segment net revenue primarily resulted from the introduction of the consumer paid value added options starting from the mid-2018 as well as from scaling of the SOVEST project and corresponding volume growth. Consumer Financial Services segment net revenues accounted for approximately 6% of Total Adjusted Net Revenue in 2019.

Segment net revenue attributable to the Small and Medium Enterprise segment decreased by RUB 1,926 million in 2019 compared to the same period in 2018. The decrease in net revenue was driven by the transfer of the Tochka bank project to the new entity – JSC Tochka, which has commenced its business operations on February 2019. As a result of this transition we stopped to recognize a certain portion of Tochka project revenues associated with the information and technology service agreements with Otkritie Bank. Small and Medium Enterprise Services segment net revenue accounted for approximately 4% of Total Adjusted Net Revenue in 2019.

Segment net revenue attributable to the Rocketbank segment decreased by RUB 227 million in 2019 compared to the same period in 2018. Net revenue was negative due to costs incurred in connection with the operations of Rocketbank after the completion of the transfer of Rocketbanks' customers and loyalty program to Qiwi Bank following Rocketbank acquisition. Rocketbank segment net revenues contributed approximately negative 2% to Total Adjusted Net Revenue in 2019.

Net revenues attributable to the Corporate and Other category increased by RUB 250 million in 2019 compared to the same period in 2018. The growth in net revenue was preliminary driven by the growth in interest revenue due to launch of Factoring Plus project. Corporate and Other category net revenue accounted for approximately 2% of Total Adjusted Net Revenue in 2019.

*Selling, general and administrative expenses*

Selling, general and administrative expenses for the year ended December 31, 2019 were RUB 6,213 million, an increase of 2%, or RUB 114 million, as compared to the same period in 2018 and were driven by offsetting trends. Two items primarily contributed to SG&A growth: (i) introduction of new expense line related to Tochka platform services arising after the transfer of the Tochka's operations to an associate starting from February 2019, in the amount of RUB 538 million; (ii) increase in loss from initial recognition by 92% or by RUB 131 million, from RUB 143 million in 2018 to RUB 274 million in 2019 mainly related to the growth of SOVEST project loan portfolio. This increase was partially offset by: (i) decline in advertising, client acquisition and related expenses, which decreased by 17% or by RUB 402 million from RUB 2,369 million in 2018 to RUB 1,967 million in 2019, mostly as a result of fewer costs related to SOVEST promotion campaigns as compared to 2018; (ii) transfer of Tochka project expenses to JSC Tochka starting from February, 2019; (iii) decrease in rent of premises and related utility expenses by 60% or by RUB 389 million from RUB 643 million in 2018 to RUB 254 million in 2019 resulting primarily from the adoption of IFRS 16; (iv) other changes in selling, general and administrative expenses resulted from change in IT related services which increased by RUB 57 million or 16%, and other expenses increase by RUB 53 million or 4% mainly driven by one-off projects that were individually insignificant.

*Personnel expenses*

Personnel expenses for the year ended December 31, 2019 were RUB 7,765 million, an increase of 0.2%, or RUB 17 million, as compared to the same period in 2018. Flat personnel expenses year over year were driven predominantly by several offsetting factors: (i) hiring of employees in connection with the launch and development of the new projects including the scaling of the SOVEST and Rocketbank projects as well as increase in corresponding social insurance contributions; (ii) increase in salaries and bonus payments for existing employees aimed to matching market level; and (iii) transfer of Tochka personnel QIWI to Tochka JSC in February 2019.

*Depreciation and amortization*

Depreciation for the year ended December 31, 2019 amounted to RUB 1,324 million, an increase of 53% or RUB 460 million compared to the same period in 2018. Depreciation of fixed assets increased as a result of adoption of IFRS 16 in 2019 and purchase of hardware for processing and data centers in order to improve the fault resistance and efficiency of our IT systems.

*Credit loss expense*

Credit loss expense for the year ended December 31, 2019 was RUB 642 million, an increase of 35%, or RUB 168 million, compared to the same

period in 2018. The increase was predominantly related to the growth of the SOVEST loans portfolio.

76

**Table of Contents**

*Impairment of non-current assets*

Impairment of non-current assets for the year ended December 31, 2019 was RUB 792 million, an increase of RUB 769 million, compared to the same period in 2018. The increase was mostly related to a write-down of QIWI Box's and Rocketbank's fixed and intangible assets due to the plan to discontinue their operations.

*Share of gain/losses of an associate and a joint venture*

Share of gain/losses of an associate and a joint venture for the year ended December 31, 2019 was RUB 258 million, an increase of RUB 304 million, compared to the same period in 2018. The increase was mainly driven by our share in net profit of an associate, JSC Tochka, which operations started on February 1, 2019.

*Other income and expenses*

Other expenses, net for the year ended December 31, 2019 were RUB 91 million, a decrease of 50%, or RUB 90 million, compared to RUB 181 million 2018. The decrease was mainly driven by (i) decrease of expenses related to the associate and joint venture transactions of RUB 148 million, which included loss on the formation of associate and compensation of expenses from associate (both relating to the incorporation of JSC Tochka), (ii) decrease in expenses from change in fair value of financial instruments amounting to RUB 41 million, that was partially offset by (iii) recognition of income in the amount of RUB 87 million from revaluation of Flocktory and related put option as at the acquisition date, in 2019. Other income and expenses were individually insignificant.

*Foreign exchange gain*

Foreign exchange gain for the year ended December 31, 2019 was RUB 905 million, a decrease of RUB 406 million, compared to the same period in 2018. The decrease of foreign exchange gain primarily resulted from a revaluation of cash balances, loans issued and guarantee payments denominated in US dollars following the depreciation of the US dollar against the Russian ruble as compared to 2018.

*Foreign exchange loss*

Foreign exchange loss for the year ended December 31, 2019 was RUB 1,077 million, an increase of RUB 28 million, compared to the same period in 2018 mainly as result of the appreciation of US dollar against the Russian ruble in 2019.

*Interest income and expenses, net*

Interest income and expenses, net for the year ended December 31, 2019 was expense of RUB 56 million, an increase of RUB 73 million, compared to the same period in 2018. The increase in expenses in the amounts of RUB 93 million primarily resulted from lease in interest expenses following the adoption of IFRS 16 in 2019.

*Income tax*

Income tax for the year ended December 31, 2019 amounted to RUB 1,492 million, an increase of 71%, or RUB 617 million as compared to the same period in 2018, resulting from the increase in profit before tax as well as higher effective tax rate. Our effective tax rate in 2019 was 23%, an increase of 400 bps compared to the same period in 2018, as a result of a higher share of profits coming from a higher tax jurisdictions.

*Segment Net Profit*

The following table presents our net profit by reportable segment for the periods indicated:

| | Year ended December 31, | |
| --- | --- | --- |
| | **2018** | **2019** |
| | (in RUB millions) | (in RUB millions) |
| Payment Services | 9,529 | 12,105 |
| Consumer Financial Services | (2,618) | (1,981) |
| Small and Medium Enterprises | (776) | 354 |
| Rocketbank | (1,061) | (2,317) |
| Corporate and Other | (937) | (1,482) |
| Total Segment Net Profit(1) | 4,137 | 6,679 |

(1) For the periods indicated above Total Segment Net Profit is equal to Total Adjusted Net Profit. See "Selected Consolidated Financial and Other Data — Non-IFRS Financial Measures" for how we define and calculate Adjusted Net Revenue, adjusted EBITDA, and Adjusted Net Profit as non-IFRS financial measures and reconciliations of these measures to revenue, in the case of Adjusted Net Revenue, and net profit, in the case of adjusted EBITDA and Adjusted Net Profit.

Table of Contents

Segment net profit attributable to the Payment Services segment increased by RUB 2,576 million, or 27%, in 2019 compared to the same period in 2018. The increase was primarily driven by net revenue growth of the respective segment.

Segment net loss attributable to the Consumer Financial Services segment decreased by RUB 637 million, or 24%, in 2019 compared to the same period in 2018. The decrease in segment net loss was mainly driven by the respective segment net revenue growth.

Segment net profit attributable to the Small and Medium Enterprise segment increased by RUB 1,130 million, or 146%, in 2019 compared to the segment net loss in 2018. These increase in net profit was mostly driven by the development and scaling of Tochka business.

Segment net loss attributable to the Rocketbank segment increased by RUB 1,256 million, or 118%, in 2019 compared to the same period in 2018. The main contributing factors were personnel expenses and other selling, general and administrative expenses resulting from the acquisition of Rocketbank in July 2018 and consecutive transfer of its operations to Qiwi Bank.

Net loss attributable to the Corporate and Other category increased by RUB 545 million, or 58%, in 2019 compared to the same period in 2018. The increase mostly related to selling, general and administrative expenses as well as corporate personnel expenses.

**Year ended December 31, 2018 compared to year ended December 31, 2017**

*Revenue*

Set out below are our revenues, by source, for the year December 31, 2017 and 2018, and as a percentage of total revenue:

| | Year ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2017 (1) (in RUB millions) | 2017 (% of revenue) | 2018 (1) (in RUB millions) | 2018 (% of revenue) |
| Revenue | 20,897 | 100.0 | 30,610 | 100.0 |
| Commission and other revenue, including | | | | |
| Payment processing fees | 17,265 | 82.6 | 23,694 | 77.4 |
| Cash and settlement services fees | 670 | 3.2 | 3,017 | 9.9 |
| Installment cards related fees | 140 | 0.7 | 358 | 1.1 |
| Other revenue | 460 | 2.2 | 268 | 0.9 |
| Interest revenue and related charges, including: | | | | |
| Interest revenue calculated using the effective interest rate | 1,052 | 5.0 | 1,854 | 6.1 |
| Fees from inactive accounts and unclaimed payments | 1,310 | 6.3 | 1,419 | 4.6 |

(1)    The presentation for the years ended December 31, 2017 and December 31, 2018 was adjusted to reflect current reportable revenue structure for convenience purposes.

Revenue for the year ended December 31, 2018 was RUB 30,610 million, an increase of 46%, or RUB 9,713 million, compared to the same period in 2017. This increase was primarily driven by an increase in commission and other revenue. Payment processing fees for the year ended December 31, 2018 were RUB 23,694 million, an increase of 37%, or RUB 6,429 million, compared to the same period in 2017. The increase in payment processing fees resulted primarily from volume growth in such categories as E-commerce (mainly as a result of an increase in volumes of digital entertainment, primarily betting, merchants) and Money Remittance (as a result of the implementation of our B2B2C and self-employed strategy underpinned by secular trends towards the digitalization of payments as well as expansion of our classical Money Remittances business through new distribution contacts) and an increase in average payment net revenue yield due to shift in payment volume mix towards higher yielding payment categories, such as E-commerce (primarily digital entertainment) and Money Remittance as opposed to lower yielding payment categories such as Telecom and Financial Services.

The number of active Qiwi Wallet consumers increased to 20.8 million as of December 31, 2018 from 20.1 million as of December 31, 2017. The increase resulted mainly from the implementation of our B2B2C strategy and merchant driven adoption of our services. The number of our kiosks and terminals decreased, with 143,690 active kiosks and terminals as of December 31, 2018 compared to 152,525 as of December 31, 2017, primarily as a result of the underlying market dynamics further described in *"Item 3.D. Risk Factors—Risks Related to Our Business and Industry—a decline in the use of cash as a means of payment or a decline in the use of kiosks and terminals may result in a reduced demand for our services."*

Revenue from cash and settlement services fees for the year ended December 31, 2018 was RUB 3,017 million, an increase of 350%, or RUB 2,347 million, compared to the same period in 2017. This increase was primarily driven by the revenue receiver on information technology service agreement with Bank Otkritie pursuant to the launch of Tochka project in 2017.

Installment cards related fees for the year ended December 31, 2018 was RUB 358 million, an increase of 156%, or RUB 218 million, compared to the same period in 2017. This increase was primarily driven by performing of massive advertising campaigns that involved different media channels and, as a result, increased the distribution of instalment cards.

Other revenue for the year ended December 31, 2018 was RUB 268 million, a decrease of 42%, or RUB 192 million, compared with the same period in 2017. The main reasons of this change are (i) decrease in revenue from rent of space for kiosks by RUB 155 million, resulted from termination of a number of agreements of lease of points; and (ii) decrease in revenue from advertising by RUB 65 million, due to general trend of decrease of demand on such

78

Table of Contents

Interest revenue calculated using the effective interest rate was RUB 1,854 million, an increase of 76%, or RUB 802 million, compared to the same period in 2017. The growth was primarily related to the increase in the SOVEST project revenues (interest income recognized on SOVEST loans) as well as by the increase in interest income earned on funds deposited by Qiwi Bank with CBR and other banks (due to larger amount of funds deposited in 2018).

Fees for inactive accounts and unclaimed payments increased by 8%, or RUB 109 million, from RUB 1,310 million in 2017 to RUB 1,419 million in 2018.

*Operating expenses*

Set out below are the primary components of our operating expenses for the year ended December 31, 2017 and 2018, and as a percentage of total revenue:

| | Year ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2017 (1) (in RUB millions) | 2017 (% of revenue) | 2018 (1) (in RUB millions) | 2018 (% of revenue) |
| Cost of revenue (exclusive of depreciation and amortization) | (7,704) | (36.9) | (10,953) | (35.8) |
| Transaction costs | (6,756) | (32.3) | (9,324) | (30.5) |
| Cost of cash and settlement service fees | (37) | (0.2) | (352) | (1.1) |
| Interest expense | (2) | (0) | (169) | (0.6) |
| Other expenses | (909) | (4.4) | (1,108) | (3.6) |
| Selling, general and administrative expenses | (3,796) | (18.2) | (6,099) | (19.9) |
| Personnel expenses | (4,286) | (20.5) | (7,748) | (25.3) |
| Depreciation and amortization | (796) | (3.8) | (864) | (2.8) |

(1)    The presentation for the years ended December 31, 2017 and December 31, 2018 was adjusted to reflect current reportable expenses structure for convenience purposes.

*Cost of revenue*

Cost of revenue for the year ended December 31, 2018 was RUB 10,953 million, an increase of 42%, or RUB 3,249 million, compared to the same period in 2017. Transaction costs increased by 38% or RUB 2,568 million from RUB 6,756 million to RUB 9,324 million for the year ended December 31, 2018 as compared to the same period in 2017. The increase primarily resulted from growth of transaction costs such as different types of payment processing commissions charged by third party providers including banks and payment systems driven primarily by higher volumes as well as increase in certain tariffs.

Cost of cash and settlement service fees for the year ended December 31, 2018 were RUB 352 million, an increase of 851%, or RUB 315 million, compared to the same period in 2017 that is primarily related to Tochka project and originated from the growth of its client's portfolio.

Interest expenses for the year ended December 31, 2018 were RUB 169 million, an increase of 8,350%, or RUB 167 million, compared to the same period in 2017. The increase is primarily related to the operations of Rocketbank.

Other expenses for the year ended December 31, 2018 were RUB 1,108 million, an increase of 22%, or RUB 199 million, compared to the same period in 2017. The increase in other expenses was mainly due to an increase in expenses related to customers support by RUB 171 million in 2018 compared to 2017 mostly related to the SOVEST project and an increase in tariffs, that was partially offset by a decrease in the cost of rent of space for kiosks, call center and other expenses, which are shown net for 2018.

79

Table of Contents

*Segment Net Revenue*

The following table presents net revenue by reportable segment (*see "Item 4.B. Business Overview" for more information about our reportable segments*) for the periods indicated:

| | Year ended December 31, | |
| --- | --- | --- |
| | 2017(1) (in RUB millions) | 2018 (in RUB millions) |
| Payment Services | 12,580 | 16,497 |
| Consumer Financial Services | 9 | 385 |

| | | |
|---|---:|---:|
| Small and Medium Enterprises | 578 | 2,916 |
| Rocketbank | (5) | (263) |
| Corporate and Other | 31 | 122 |
| Total Segment Net Revenue(1) | 13,193 | 19,657 |

(1) The presentation for the year ended December 31, 2017 was adjusted to reflect current reportable segment structure for convenience purposes

(2) For the periods indicated above Total Segment Net Revenue is equal to Total Adjusted Net Revenue. See "Selected Consolidated Financial and Other Data — Non-IFRS Financial Measures" for how we define and calculate Adjusted Net Revenue, adjusted EBITDA, and Adjusted Net Profit as non-IFRS financial measures and reconciliations of these measures to revenue, in the case of Adjusted Net Revenue, and net profit, in the case of adjusted EBITDA and Adjusted Net Profit.

Segment net revenue attributable to the Payment Services segment increased by RUB 3,917 million, or 31%, in 2018 compared to the same period in 2017. The growth in this segment's net revenue was mainly due to an increase in payment processing fees and interest revenue calculated using the effective interest rate partially offset by a decrease in other revenue and an increase in transaction costs. Payment processing fees increased by 37% or by RUB 6,429 million compared to the same period of 2017 in line with volume growth, which was primarily driven by E-commerce and Money Remittances market verticals underpinned also by a shift of the volume mix towards higher yielding market verticals, such as E-commerce. Transaction costs increased by 38% or by RUB 2,568 million, in line with the increase in payment processing fees. Interest revenue increased by 26% or by RUB 272 million compared to 2017. The increase in interest revenue resulted primarily from larger deposits Qiwi Bank placed with CBR and other banks in 2018. Fees for inactive accounts and unclaimed payments increased by 8%, or RUB 109 million, from RUB 1,310 million in 2017 to RUB 1,419 million in 2018. Other revenue net decreased by 93% or by RUB 330 million compared to 2017 due to an increase in SME costs as well as decrease in revenue from overdrafts provided to agents and advertising revenue net. Payment Services segment net revenue accounted for 84% of Total Adjusted Net Revenue in 2018.

Segment net revenue attributable to the Consumer Financial Services segment increased by RUB 376 million in 2018 compared to the same period in 2017. The increase in Consumer Financial Services segment net revenue resulted mostly from the introduction of the consumer paid value added options starting from the mid-2018 as well as from scaling of the SOVEST project and its volume growth. Consumer Financial Services segment net revenues accounted for approximately 2% of Total Adjusted Net Revenue in 2018.

Segment net revenue attributable to the Small and Medium Enterprise segment increased by RUB 2,338 million in 2018 compared to the same period in 2017. The growth in net revenue was preliminary driven by the growth in revenue from informational and technology services and other agreements with Bank Otkritie, which were operated throughout twelve months for the year ended 31 December 2018 as compared to approximately four months for the year ended December 31, 2017. The growth in revenue from informational and technology services and other agreements with Bank Otkritie was driven largely by the increase in the number of Tochka customers and corresponding expansion of the Tochka business. Small and Medium Enterprise Services segment net revenue accounted for approximately 14.8% of Total Adjusted Net Revenue in 2018.

Segment net revenue attributable to the Rocketbank segment decreased by RUB 258 million in 2018 compared to the same period in 2017. Net revenue was negative due to costs incurred in connection with the operations of Rocketbank after the completion of the transfer of Rocketbanks' customers and loyalty program to Qiwi Bank following Rocketbank acquisition. Rocketbank segment net revenues contributed approximately negative 1.3% to Total Adjusted Net Revenue in 2018.

Net revenues attributable to the Corporate and Other category increased by RUB 91 million in 2018 compared to same period in 2017. The growth in net revenue was preliminary driven by the growth in interest revenue and was driven by the growth of Qiwi Factoring business. Corporate and Other category net revenue accounted for approximately 0.6% of Total Adjusted Net Revenue in 2018.

*Selling, general and administrative expenses*

Selling, general and administrative expenses for the year ended December 31, 2018 were RUB 6,099 million, an increase of 61%, or RUB 2,303 million, as compared to the same period in 2017. The significant expense items in 2018 was advertising, client acquisition and related expenses, which increased by 83%, or RUB 1,075 million, from RUB 1,294 million in 2017 to RUB 2,369 million in 2018, mostly due to client acquisition and advertising campaigns related to the new projects, SOVEST and Tochka. The main drivers of the expense growth (i.e. development of the SOVEST and Tochka projects and transfer of Rocketbank project to QIWI) also effected most of other selling, general and administrative expenses items including rent of premises and related utility expenses, which increased by RUB 252 million or 64%, tax expenses (excluding income and payroll relates taxes), which increased by RUB 283 million or 70%, advisory and audit services, which increased by RUB 228 million or 53% and other expenses, which increased by and RUB 194 million or 19%.

*Personnel expenses*

Personnel expenses for the year ended December 31, 2018 were RUB 7,748 million, an increase of 81%, or RUB 3,462 million, as compared to the same period in 2017. This increase resulted primarily from the growth in compensation to employees, related taxes and other personnel expenses due to (i) hiring of new employees in connection with launch and development of the new projects including the development of the Tochka banking platform, Rocketbank project and the scaling of the SOVEST as well as increase in corresponding social insurance contributions; and (ii) increase in salaries and bonus payments for existing employees aimed matching the average market level and increase in share-based payment expenses (resulting from new grants under the 2015 RSU Plan).

Table of Contents

*Depreciation and amortization*

Depreciation and amortization for the year ended December 31, 2018 was RUB 864 million, an increase of 9%, or RUB 68 million, compared to the

same period in 2017. The amortization of intangible assets decreased as a result of the termination of depreciation of the license allocated to Payments Services CGU, which became fully amortized in 2017. The depreciation of fixed assets increased due to the acquisition of the IT infrastructure equipment for payment processing services and depreciation of processing servers and office equipment purchased in connection with Tochka and Rocketbank deal in the end of 2017.

*Credit loss expense*

Credit loss expense for the year ended December 31, 2018 was RUB 474 million, an increase of 115%, or RUB 254 million, compared to the same period in 2017. The increase was mostly related to the growth of the SOVEST loans portfolio and adoption of IFRS 9 that has fundamentally changed the Group's assessment of credit risk of financial assets by replacing IAS 39's incurred loss approach with a forward-looking expected credit loss (ECL) approach. The overall increase in credit loss expense related to SOVEST project was RUB 250 million driven by the combination of factors described above.

*Impairment of non-current assets*

Impairment of non-current assets for the year ended December 31, 2018 was RUB 23 million, a decrease of 78%, or RUB 81 million, compared to the same period in 2017. Impairment in 2018 and 2017 is mainly related to impairment of expenditures for New terminal project. The project was stopped by decision of the Board of Directors in the mid of March, 2018 when some investments related to 1Q 2018 has already been made.

*Other non-operating gains and losses*

*Share of loss of an associate and a joint venture*

Share of loss of an associate and a joint venture for the year ended December 31, 2018 was RUB 46 million, an increase of 100%, or RUB 46 million, compared to nil in 2017. Share in loss of an associate and a joint venture represents Group's share in financial results of its associates – JSC Tochka and Flocktory Group.

*Other income and expenses, net*

Other expenses, net for the year ended December 31, 2018 was RUB 181 million, an increase of 341%, or RUB 140 million, compared to the same period in 2017. The increase was mainly driven by (i) other expenses of RUB 86 million, which primarily included loss on the formation of associate, compensation of expenses from associate; and (ii) change in fair value of financial instruments amounting to RUB 86 million loss.

*Foreign exchange gain*

Foreign exchange gain for the year ended December 31, 2018 was RUB 1,311 million, an increase of RUB 1,054 million, compared to the same period in 2017. The increase of foreign exchange gain primarily resulted from a revaluation of cash balances and guarantee payments denominated in US dollars following the appreciation of the US dollar against the Russian ruble and higher volatility as compared to 2017.

*Foreign exchange loss*

Foreign exchange loss for the year ended December 31, 2018 was RUB 1,049 million, an increase of RUB 676 million, compared to the same period in 2017 mainly due to significant volatility of U.S. dollar against the Russian ruble in 2018.

*Interest income and expenses, net*

Interest income and expenses, net for the year ended December 31, 2018 amounted to RUB 17 million, an increase of 183%, or RUB 11 million as compared to the same period in 2017.

*Income tax*

Income tax for the year ended December 31, 2018 amounted to RUB 875 million, an increase of 25%, or RUB 177 million as compared to the same period in 2017, resulting from the increase in profit before tax. Our effective tax rate in 2018 was 19.4%, an increase of 126 bps compared to the same period in 2017, as a result of higher share of profits coming from a higher tax jurisdictions.

**Table of Contents**

*Segment Net Profit*

The following table presents our net profit by reportable segment for the periods indicated:

| | Year ended December 31, | |
| --- | --- | --- |
| | 2017(1) | 2018 |
| | (in RUB millions) | (in RUB millions) |
| Payment Services | 7,543 | 9,529 |
| Consumer Financial Services | (2,164) | (2,618) |
| Small and Medium Enterprises | (171) | (776) |

| | | |
|---|---:|---:|
| Rocketbank | (391) | (1,061) |
| Corporate and Other | (843) | (937) |
| Total Segment Net Profit(2) | 4,054 | 4,137 |

(1)   The presentation for the year ended December 31, 2017 was adjusted to reflect current reportable segment structure for convenience purposes.

(2)   For the periods indicated above Total Segment Net Profit is equal to Total Adjusted Net Profit. See "Selected Consolidated Financial and Other Data — Non-IFRS Financial Measures" for how we define and calculate Adjusted Net Revenue, adjusted EBITDA, and Adjusted Net Profit as non-IFRS financial measures and reconciliations of these measures to revenue, in the case of Adjusted Net Revenue, and net profit, in the case of adjusted EBITDA and Adjusted Net Profit.

Segment net profit attributable to the Payment Services segment increased by RUB 1,986 million, or 26%, in 2018 compared to the same period in 2017. The increase was primarily driven by the growth of the respective segment net revenue offset slightly by a growth in compensation to employees and related taxes and income tax expenses.

Segment net loss attributable to the Consumer Financial Services segment increased by RUB 454 million, or 21%, in 2018 compared to the same period in 2017. The increase in segment net loss was mainly driven by the growth of compensation to employees, related taxes and other personnel expenses (both in cost of revenue and in selling, general and administrative expenses) and increase of credit loss expenses due to scaling of the SOVEST project.

Segment net loss attributable to the Small and Medium Enterprise segment increased by RUB 605 million in 2018 compared to the same period in 2017. These increase in net loss was mostly driven by the growth of compensation to employees, related taxes and other personnel expenses (both in cost of revenue and in selling, general and administrative expenses), advertising and related expenses (due to an advertising campaign held in 2018), rent of premises and related utility expenses, office maintenance expenses, tax expenses, loss on set up of the associate and share of loss of associate attributable to the development of the Tochka project that was partially offset by net revenue growth of the segment.

Segment net loss attributable to the Rocketbank segment increased by RUB 750 million in 2018 compared to the same period in 2017. The main contributing factors were compensation to employees, related taxes and other personnel expenses (both in cost of revenue and in selling, general and administrative expenses) and other selling, general and administrative expenses resulting from the acquisition of Rocketbank in July 2018 and consecutive transfer of its operations to Qiwi Bank.

Net loss attributable to the Corporate and Other category increased by RUB 94 million, or 11%, in 2018 compared to the same period in 2017. The increase mostly related to selling, general and administrative expenses, compensation to employees, related taxes and other personnel expenses.

**B.   Liquidity and capital resources**

Our principal sources of liquidity are cash and cash equivalents (including deposits and current accounts of Tochka and Rocketbank customers as well as Qiwi Wallet balances), cash receivable from our SOVEST pay-by-installment card customers, cash receivable from agents, deposits issued to merchants and revenues generated from our operations. Rocketbank customer balances and deposits constitute a significant part of our cash and cash equivalents and as of December 31, 2019 amounted to RUB 11,735 million. In 2019, the Board of Directors requested management to investigate the potential for a partial or complete sale of Rocketbank. Given that we were not able to find a suitable buyer for Rocketbank, the Board of Directors has determined to wind-down Rocketbank operations. We anticipate that this process will be completed by the end of 2020. As a consequence of this winding-down, we anticipate that Rocketbank customer balances will significantly decrease throughout the year.

Our balance of cash and cash equivalents as of December 31, 2019 was 42,101 million compared to RUB 40,966 million as of December 31, 2018 and RUB 18,406 million as of December 31, 2017. Cash and cash equivalents comprise predominantly of cash at banks and short-term deposits with an original maturity of three months or less. There was no significant changes in cash and cash equivalents throughout 2019.

In 2017 the Company received a guarantee and secured it by a cash deposit of USD 2.5 million until July 31, 2020.

Our principal needs for liquidity have been, and will likely continue to be, customer accounts and amounts due to banks, payables to merchants, money remittances and e-wallets accounts payable, deposits received from agents and other working capital items, capital expenditures and acquisitions. We believe that our liquidity is sufficient to meet our current obligation as well as for financing our short- and midterm needs. Such needs may include, but are not limited to funding the credit portfolio of the SOVEST as well as funding the expansion of our Factoring Plus project and corresponding factoring portfolio. We expect to fund the outstanding credit portfolio primarily by our accumulated cash and partly by the account balances and deposits of Tochka and Rocketbank clients as well as deposits of our agents. We expect to fund the outstanding factoring portfolio primarily by our accumulated cash, through credit lines that we get from other banks and potentially through debt markets. Shall our view in respect of our sources of liquidity change or shall our ability to attract customers' or agents' funds deteriorate we may seek to raise additional liquidity (through the capital or debt markets or through bank financing) in order to fund the abovementioned projects as well as fund or finance other potential projects that we may seek to develop in the future.

**Table of Contents**

As of December 31, 2019, customer accounts and amounts due to banks, payables to merchants, money remittances and e-wallets accounts payable, deposits received from agents, were RUB 46,840 million, compared to RUB 43,457 million as of December 31, 2018 and RUB 21,310 million as of December 31, 2017. The increase mostly related to growth of customer accounts and amounts due to banks that was primarily driven by the growth of Rocketbank clients' balances. The total change in other items is insignificant.

An important part of our credit risk management and payment settlement strategy relies on cash we receive from agents in advance for payments made through the kiosks. When a payment is made through a kiosk, we offset these deposits against the payments we make to the merchant. For certain agents with whom we have long and reliable relationships, we provide limited credit support in the form of overdrafts for payment processing. Similarly, some of our merchants (primarily the Big Three MNOs and payment systems including Visa and MasterCard) request that we make deposits with them in relation to payments processed through our system. Whenever a customer makes a payment to a merchant with whom we have made a deposit, that payment gets offset against the deposit held with the respective merchant.

As of December 31, 2019 cash receivable from agents and deposits issued to merchants were RUB 5,426 million, compared to RUB 6,896 million as of December 31, 2018 and RUB 8,146 million as of December 31, 2017. The decrease in cash receivable from agents as of December 31, 2019 as compared to year ended December 31, 2018 is mostly related to whether the last days of the year are banking holiday or business days. The decline in deposits issued to merchants as of December 31, 2018 as compared to year ended December 31, 2017 predominantly resulted from partial substitution of deposits with bank guarantees in 2018. This decline was underpinned by the decline in cash receivable from agents for the year ended December 31, 2018 as compared to year ended December 31, 2017 that was driven by the decrease of payment volumes processed by our agents due to general trend towards the decreasing share of cash payments in the economy.

**Capital Expenditures**

Our capital expenditures primarily relate to acquisition of IT equipment for our processing systems and purchase of software that we use in operations. Capital expenditures for the year ended December 31, 2019 were RUB 1,298 million and consisted of: (i) RUB 457 million related to the acquisition of the hardware for processing and data centers which was primarily related to the construction of the reserve data center; (ii) RUB 399 million related to the purchase of computer software; (iii) RUB 161 million related to workplace improvement and other office equipment; (iv) RUB 233 million related to additions of leasehold improvements and (v) RUB 48 million related to the purchase of other hard- and software.

For the year ended December 31, 2018 our capital expenditures were RUB 995 million and included: (i) RUB 463 million related to the acquisition of the processing servers and engineering equipment; (ii) RUB 279 million related to the acquisition of computer software; (iii) RUB 146 million related to additions of computers, office and other equipment, (iv) RUB 81 million related to construction in progress and (v) RUB 26 million related to other intangible asset.

For the year ended December 31, 2017 our capital expenditures were RUB 794 million (including mainly assets acquired for the purpose of launch of the Tochka project and development of the Rocketbank project amounting to RUB 358 million) and primarily consisted of: (i) RUB 293 million related to construction in progress; (ii) RUB 244 million related to the acquisition of computer software; (iii) RUB 196 million related to the acquisition of processing servers and engineering equipment; and (iv) RUB 61 million related to additions of computers, office and other equipment.

As of December 31, 2019 we had no material capital expenditure commitments.

**Cash Flow**

The following table summarizes our cash flows for the years ended December 31, 2017, 2018 and 2019:

|  | December 31, | | |
|---|---|---|---|
|  | **2017** | **2018** | **2019** |
|  | (in RUB millions) | | |
| Net cash flow generated from operating activities | 3,560 | 22,645 | 9,239 |
| Net cash flow used in investing activities | (1,653) | (1,325) | (4,883) |
| Net cash flow used in financing activities | (2,160) | (29) | (2,277) |
| Effect of exchange rates on cash and cash equivalents | (333) | 1,240 | (944) |
| Net increase/(decrease) in cash and cash equivalents | (586) | 22,531 | 1,135 |
| Cash and cash equivalents at the beginning of the period | 19,021 | 18,435 | 40,966 |
| Cash and cash equivalents at the end of the period | 18,435 | 40,966 | 42,101 |

*Cash flows from operating activities*

Net cash generated from operating activities for the year ended December 31, 2019 was 9,239 million, compared to RUB 22,645 million for the same period in 2018. This decline in net cash flow from operating activities is a result of changes in working capital, primarily a decrease in customer accounts and amounts due to banks, and trade and other payable. The decrease in both these lines is related to Rocketbank client accounts and indebtedness transition to Qiwi Bank that took place throughout 2018 and is described below. There were no such significant changes or operations during the year ended December 31, 2019.

Table of Contents

Net cash generated from operating activities for the year ended December 31, 2018 was RUB 22,645 million, compared to RUB 3,560 million for the same period in 2017. This sharp increase in net cash flow was a result of changes in working capital, primarily an increase in customer accounts and amounts due to banks, change in trade and other payables and decrease in trade and other receivables; that was partially offset by the increase of the amount of loans issued from banking operations (as a result of scaling of the SOVEST project). The increase in customer accounts and amounts due to banks was related mostly to the transfer of Rocketbank clients and corresponding balances in the amount of RUB 12 billion to Qiwi Bank that took place throughout second half of 2018, as well as increase in the number of Tochka users in Qiwi Bank during the year ended December 31, 2018 as compared to the year ended December 31, 2017. The increase in trade and other payables and decrease in trade and other receivables resulted from multiple factors,

including an increase in volumes of the payment services business and transfer of Rocketbank project to Qiwi Bank in 2018.

*Cash flows from investing activities*

Net cash flow used in investing activities for the year ended December 31, 2019 was RUB 4,883 million, compared to RUB 1,325 million for the same period in 2018. This increase in net cash outflow was primarily driven by the launch of Rocketbank treasury activity on debt capital markets that resulted in net purchase of debt securities in the amount of RUB 3 billion.

Net cash flow used in investing activities for the year ended December 31, 2018 was RUB 1,325 million, compared to RUB 1,653 million for the same period in 2017. This reduction in net cash outflow was primarily driven by net cash used in acquisition of a joint venture (Flocktory Ltd) amounting to RUB 813 million in 2017 compared to RUB 21 million in 2018. There were no comparable payouts during 2018. The absence of significant outflow on business combination in 2017 was partially offset by increase of investment in government bonds and loans issued that took place in 2017 and amounted to nil in 2018.

*Cash flows used in financing activities*

Net cash used in financing activities for the year ended December 31, 2019 was RUB 2,277 million, compared to RUB 29 million for the same period in 2018. Starting from the first quarter of 2019 the Board of Directors of the Company decided to restart dividend payments and committed to the annual payout ratio from 65% to 85% of Adjusted Net Profit for 2019. The dividend paid amounted to RUB 3,392 million during 2019. These payouts were partially offset by proceeds from borrowings in net amount of RUB 1,158 million as Factoring PLUS has entered into the credit facility for the purpose of working capital replenishment necessary to increase its loan portfolio and scale the business.

Net cash used in financing activities for the year ended December 31, 2018 was RUB 29 million, compared to RUB 2,160 million for the same period in 2017. The decrease in net cash used in financing activities was primarily due to suspension of the dividend payments throughout the year.

**Borrowings**

During the year ended December 31, 2019 we had available RUB denominated credit facilities with an overall credit limit of RUB 3,460 million (RUB 2,000 million of which is secured), with a maturity of up to December 2021, and with interest rates of up to 30% per annum. The balance payable under these credit lines as of December 31, 2019 was RUB 1,545 and matures in 2021. Certain of these agreements stipulated the right of a lender to increase the interest rate in case the covenants are violated.

**C.     Research and development, patents and licenses, etc.**

See Item 4.B, "Business Overview — Intellectual Property."

**D.     Trend information**

In December 2019, we experienced a slowdown in the growth rates of our Payment Services segment due to a number of factors, including:

- reaching market saturation in the betting market vertical and as a result experiencing reduced growth rates corresponding to general growth of that market vertical;

- the implementation of additional know-your-client and anti-money laundering measures; and

- the closure of one of our largest Kazak merchants that significantly affected our business in that region.

The recent outbreak of COVID-19 has compounded the abovementioned slowdown. In particular, in our betting market vertical, the cancellation of sporting events is likely to significantly reduce payment volume during the remainder of 2020. In addition, it is currently unclear how much consumer demand will be negatively affected from the outbreak of COVID-19 and what effect the outbreak COVID-19 will have on the macroeconomic environment, as a whole. As a result of these factors, we anticipate that we will experience significantly reduced growth rates generally during 2020. Please see also "*3.D Risk Factors*."

84

Table of Contents

**E.     Off-balance sheet arrangements**

**Guarantees issued**

As part of our operations we issue financial guaranties to non-related parties for a term of up to five years at market rate. The total amount of guarantees issued as of December 31, 2019 was RUB 8,545 million, up from RUB 1,260 million as of December 31, 2018. The growth of the amount of bank guarantees outstanding resulted from the development of our project focused on providing bank guarantees to different legal entities primarily small and medium enterprises.

**F.     Tabular disclosure of contractual obligations**

The following table sets forth our contractual obligations as of December 31, 2019:

| | Total | less than one year | one to three years | three to five years | than five years |
|---|---|---|---|---|---|
| | | | (in RUB millions) | | |
| Operating lease obligations | 32 | 32 | — | — | — |
| Unused limits on instalment card loans including credit limits not yet activated* | 26,771 | 26,771 | — | — | — |
| Total contractual obligations | 26,803 | 26,803 | — | — | — |

\* The primary purpose of these instruments is to ensure that funds are available to customers as required. Commitments to extend credit represent unused portions of instalment card loans both activated and not activated by the customers. Commitments to extend credit are contingent upon customers firstly activating their credit limits and further satisfying certain credit standards.

**G.   Safe harbor**

See "Special Note Regarding—Forward Looking Statements" on page 1 of this annual report.

**ITEM 6.       Directors, Senior Management and Employees**

**A.   Directors and Senior Management.**

**Directors and Executive Officers**

The following table sets forth information regarding our directors and executive officers as of the date of this annual report.

| Name | Age | Position |
|---|---|---|
| Sergey Solonin | 46 | Director, Chairman of the Board |
| Boris Kim | 56 | Director, Chief Executive Officer |
| Marcus Rhodes | 58 | Independent Director |
| Elena Titova | 52 | Independent Director |
| Alexey Marey | 42 | Independent Director |
| Nadiya Cherkasova | 48 | Director |
| Alexander Karavaev | 44 | Director |
| Varvara Kiseleva | 30 | Interim Chief Financial Officer |
| Maria Shevchenko | 43 | Chief Operating Officer |
| Andrey Protopopov | 38 | Chief Executive Officer of Payment Services |

**Biographies**

*Sergey Solonin.* Mr. Sergey Solonin has served as our director since December 2010 and as chairman of our Board of Directors since January 2020. He has also been our chief executive officer from October 2012 to January 2020. Mr. Solonin is an entrepreneur and has over 15 years of experience in the payment services and banking industries. He is one of the co-founders of QIWI and held key executive roles within QIWI Group. Mr. Solonin is currently a member of the board of directors of Qiwi Bank and FLOCKTORY LTD. He is also a co-director of the FinNet working group within the framework of the National Technology Initiative since September 2016, a member of the Supervisory Board of Association for Development of Financial Technologies since January 2017, a member of the board of directors of "AlfaStrakhovanie" PLC since June 2017, a member of the Investment Committee of Venture Fund of Skolkovo — IT I since June 2017 and a member of the Expert Committee of Vnesheconombank since October 2017. Mr. Solonin graduated from All-Russian Distance-Learning Institute of Finance and Economics (now part of Financial University under the Government of the Russian Federation) in 1996 with a degree in economics.

85

Table of Contents

*Boris Kim.* Mr. Boris Kim has served as our director since May 2013 and as our chief executive officer since January 2020. He has also been a chairman of our board of directors from June 2014 until January 2020. Mr. Kim is an entrepreneur with over 20 years of experience in the payment services industry. During his career, he held top roles in Russian banks. Mr. Kim is one of the co-founders of the e-port payment system and served as its chief executive officer from November 2004 until September 2007 and from September 2007 until February 2010 was an advisor to the chief executive officer of e-port. From 2007 until 2012 Mr. Kim was the head of the payment networks and banking instruments committee at the Russian E-Market Participants National Association. From 2017 until 2018 Mr. Kim was an executive director at Association for Development of Financial Technologies. Mr. Kim graduated from Lomonosov Moscow State University in 1985 with a degree in chemistry, Russian Institute of Finance and Economics in 1996 with a degree in finance, Moscow State Law Academy in 2000 with a degree in law and Lomonosov Moscow State University in 2004 and in 2007 with a degree in psychology and a degree in philosophy respectively. He holds a Candidate of Sciences Degree in Chemistry (Lomonosov Moscow State University, 1989).

*Marcus Rhodes.* Mr. Marcus Rhodes has served as our director since May 2013. He is also an independent director and chairman of the audit committee for PhosAgro (since May 2011). From May 2014 to May 2017 Mr. Rhodes was an independent director and chairman of the audit committee for Zoltav Resources, from February 2009 to May 2016 an independent director and chairman of the audit committee for Cherkizovo Group, from September 2009 to June 2015 for Tethys Petroleum, from July 2008 to June 2011 for Wimm-Bill-Dann Foods, from November 2009 to June 2011 for Rusagro Group and from September 2018 to June 2019 for Rustranscom PLC. Mr. Rhodes was an audit partner for Ernst & Young from 2002 until 2008. Prior to that, he was an

audit partner for Arthur Andersen from 1998 until 2002. He qualified as a chartered accountant in 1986 and is a member of the Institute of Accountants in England & Wales (ICAEW). Mr. Rhodes graduated with a BA (Hons) from Loughborough University in 1982 with a degree in economics and social history.

*Elena Titova*. Ms. Elena Titova has served as our director since June 2019. Ms. Elena Titova has over 24 years of experience in investment banking. She is currently an independent member of the Supervisory Board of the "Bank Otkritie Financial Corporation" (Public Joint-Stock Company), a member of the Supervisory Board of Bank Trust and also a partner and chairperson of the Board Directors of ICONIC, a block-chain integrator. In 1990-1993 Ms. Elena Titova worked as an international markets specialist at W.R. Grace & Co. (USA). Between 1994 and 1998, Ms. Elena Titova held a number of positions in New York and London offices of Goldman Sachs. In 1998-2006 she headed Moscow office of Goldman Sachs. In 2006 Ms. Elena Titova joined Morgan Stanley in Moscow as Head of Investment Banking Division and then became a President and General Director of Morgan Stanley Bank in Russia and later a member of its Board of Directors. In 2012-2013 Ms. Elena Titova was a President and Chairperson of the Management Board of the Russian Regional Development Bank. In 2014-2018 Ms. Elena Titova served as a President and Chief Executive Officer of UBS Bank, Moscow, Russia, as well as a member of its Board of Directors. Ms. Titova graduated in 1989 from Lomonosov Moscow State University with a degree in economics. In 1994, she received an MBA from Kellogg Business School, Northwestern University, IL (USA).

*Alexey Marey*. Mr. Alexey Marey has served as our director since June 2019. Mr. Alexey Marey holds several key positions in Alfa Group. He is currently a member of the Board of Directors of Alfa-Bank JSC and Rissa Investments Limited (IDS Borjomi International Group). From 1998 to 2004 Mr. Alexey Marey successively worked at DANONE, Gillette International (Moscow) and Duracell Batteries N.V. Further Mr. Alexey Marey joined Alfa-Bank JSC where he headed Retail Business, and then held a position of Chief Executive Officer of Alfa-Bank JSC from May 2012 to November 2017. Mr. Alexey Marey graduated from Moscow Aviation Institute, Economics Department in 1999.

*Nadiya Cherkasova*. Ms. Nadiya Cherkasova has served as our director since June 2018. During her career Ms. Nadiya Cherkasova held top positions at Inkombank, KMB Bank, Trust Bank and VTB 24. Ms. Nadiya Cherkasova is currently a member of the Management Board and a Deputy President—Chairman of the Management Board of "Bank Otkritie Financial Corporation" (Public Joint-Stock Company). Ms. Cherkasova earned a degree in economics from Nizhny Novgorod State University, followed by a degree from the International Moscow Finance and Banking School, as well as she held internships with South Shore Bank (USA), the EBRD (Austria) and the IIMD (Germany).

*Alexander Karavaev.* Mr. Alexander Karavaev has served as our director since June 2019. He has also been our chief financial officer from July 2013 to May 2019. After leaving QIWI he served as Deputy General Director for Finance and Investment at Samolet Group of Companies from May 2019 through December 2019. Mr. Karavaev has 20 years of experience in finance and accounting. Before becoming our Chief Financial Officer Mr. Karavaev served as the Chief Operating Officer of QIWI from August 2012 to July 2013 and led our IPO . From November 2008 until September 2011 Mr. Karavaev was a chief financial officer of Mail.ru. He also served as a nominee director for Mail.ru on our board of directors. Previously, Mr. Karavaev was a chief financial officer of Akado Group (a subsidiary of Renova Holding) between March 2008 and October 2008 and a deputy chief financial officer at Renova between May 2007 and October 2008. He was also vice president of development of financial systems at SUAL Holding from December 2003 until May 2007. Mr. Karavaev started his career at the audit department of Arthur Andersen in July 1997 and after moving to Ernst & Young in May 2001 worked at the audit and business consulting departments until December 2003. Mr. Karavaev graduated with honors from Siberian Aerospace Academy in 1998 with a degree in economics, majoring in management and strategic planning. Concurrently, between September 1996 and October 1997, he attended the University Passau in Germany, studying strategic planning.

*Varvara Kiseleva.* Ms. Varvara Kiseleva has served as our Interim Chief Financial Officer since October 2019. Previously, she served as a Deputy Chief Financial Officer for Capital Markets and Head of Investor Relations since April 2015. Ms. Kiseleva has joined QIWI in September 2013. Before joining QIWI, Ms. Kiseleva worked at Macquarie Russian Infrastructure Fund and KPMG. Ms. Kiseleva graduated from National Research University Higher School of Economics in 2012 with a masters degree in banking.

*Maria Shevchenko.* Ms. Maria Shevchenko has served as our Chief Operating Officer since January 2020. She is also currently a member of the board of directors of Qiwi Bank. Ms. Shevchenko joined us as a Government Relations Counsel in January 2019. Prior to that, she worked at Alfa-Bank JSC holding top positions in business strategy and operations. Ms. Shevchenko graduated from All-Russian Distance-Learning Institute of Finance and Economics (now part of Financial University under the Government of the Russian Federation) in 1998 with a degree in banking and finance. In 2005, she received an MBA-Finance from Moscow International Higher Business School MIRBIS (Institute) – London Metropolitan University.

86

[Table of Contents](#)

*Andrey Protopopov.* Mr. Andrey Protopopov has served as Chief Executive Officer of Payment Services since August 2019. Previously, he served as Head of IT and Product from June 2015 to August 2019 and a Head of Product Management from September 2013 to June 2015. Mr. Protopopov has over 12 years of commercial and product managing experience. Before joining QIWI, Mr. Protopopov worked at Procter & Gamble for 12 years, holding numerous positions in market strategy and planning as well as business development. Mr. Protopopov graduated from Novosibisrsk State University in 2004 with a masters degree in mathematics.

**B.    Compensation.**

**Compensation of Directors and Executive Officers**

Under our articles of association, our shareholders determine the compensation of our directors from time to time at a general meeting of our shareholders, our board of directors determines the compensation of our chief executive officer. The compensation of our other executive officers is determined by our chief executive officer while our board of directors (which power may be delegated to the compensation committee) approves short-term cash incentive in the form of annual bonus based on financial results of the Company.

For the year ended December 31, 2019, the aggregate remuneration paid (comprising salary, discretionary bonuses, share-based payments and

other short-term benefits) to our directors and executive officers was RUB 236 million. No amounts in respect of pensions, retirement or similar benefits have been accrued in any of the periods presented in this annual report. None of our non-executive directors and independent director appointees has a service contract with us that provides for benefits upon termination of office.

Our executive officers participate in a bonus program of the Company that is subject to performance of corporate key performance indicators ("cKPIs") that are approved by the board of directors (which power may be delegated to the compensation committee). The cKPIs for 2019 vary depending on the reporting segment and may include for each manager of the respective segment: payment volume, net revenue, selling, general and administrative expenses / net revenue, achievement of target business unit economics parameters (for Consumer Financial Services segment only) for the relevant reporting segment or the Group level. Each manager has at least three KPIs with an equal split of weigh between cKPIs. Bonus shall be allocated on an annual basis subject to performance of the cKPIs according to the formula approved by the Board of Directors. Bonus allocation shall take place upon approval of the annual consolidated financial statements of the Company by the Board of Directors.

**2012 Employee Stock Option Plan**

*General.* In October 2012, our board of directors adopted and our shareholders approved an Employee Stock Option Plan, or the 2012 Plan, an equity-based incentive compensation plan intended to help align the interests of our management and others with those of our shareholders. Certain amendments were introduced to the 2012 Plan in 2013, 2015 and 2017. Under the 2012 Plan, we may grant options to purchase our class B shares to employees and service providers in connection with their provision of services to us or our subsidiaries. A maximum of 3,640,000 of our class B shares, or 7% of our entire issued and outstanding share capital as of the date immediately preceding our initial public offering, are reserved for issuance under the 2012 Plan, subject to equitable adjustment in the event of certain corporate transactions, such as a stock split or recapitalization. The 2012 Plan is scheduled to expire on the tenth anniversary of its adoption, although previously granted awards will remain outstanding after such date in accordance with their terms.

*Administration.* Our board of directors administers the 2012 Plan, including determining the vesting schedule, exercise price, term of the award, transfer restrictions applicable to shares acquired pursuant to an option exercise and other terms and conditions of option awards under the 2012 Plan. Our board of directors also has the authority to make all necessary or appropriate interpretations of 2012 Plan terms. The participants of the 2012 Plan are also selected by our Board.

*Option Terms Generally.* Options granted under the 2012 Plan permit the holder of the option to purchase our class B shares once such options are vested and exercisable, at a purchase price per share determined by our board of directors and specified in the option grant. Grants of options under the 2012 Plan following the initial public offering have a purchase price per share not less than the average closing price of our class B shares on the principal exchange, on which such shares are then traded for the ten business days immediately preceding the date of grant. Options granted under the 2012 Plan cannot be sold, pledged or disposed of in any manner without our prior written consent.

*Other Information.* Shares subject to options which are cancelled or forfeited without being exercised will be returned to the 2012 Plan and will be available for subsequent option grants under the 2012 Plan. Any material amendment to the 2012 Plan (such as the addition of more class B shares to the pool of shares available under the 2012 Plan) or the adoption of a new equity compensation plan is subject to approval in compliance with applicable Cypriot law.

**Employee Restricted Stock Units Plan**

*General.* In July 2015, our shareholders approved an Employee Restricted Stock Units Plan, or the 2015 Plan, an equity-based incentive compensation plan intended to help align the interests of our management and others with those of our shareholders. Under the 2015 Plan, we may grant the restricted stock units ("RSUs") to employees, officers and contractors with their provision of services to us or our subsidiaries. In June 2019, our shareholders approved a decrease in the total number of shares and classes of shares to be reserved for issuance under the 2015 Plan up to 2,100,000 class B shares, subject to equitable adjustment in the event of certain corporate transactions, such as a stock split or recapitalization. The 2015 Plan is scheduled to expire on December 31, 2022.

87

Table of Contents

*Administration.* Our board of directors administers the 2015 Plan, including determining the vesting schedule, term of the award and making all necessary or appropriate interpretations of the terms of the 2015 Plan. The participants of the 2015 Plan are selected by our chief executive officer and the list of top-30 participants of each grant shall be approved by our board. Our chief executive officer and members of the board are eligible to receive the RSUs subject to the approval by the relevant corporate body of the Company.

*Terms and Conditions Generally.* The recipients of the RSUs have no dividend, voting, or any other rights as a stockholder of the Company. Upon vesting of the RSUs, the participants will receive class B shares free of all restrictions. RSUs that have not become vested as of the date of termination of the participant's employment or service shall be forfeited upon such termination. Except for transfers resulting from the laws of descent and distribution, no RSUs granted under the 2015 Plan can be sold, pledged or disposed of in any manner without our prior written consent.

*Other Information.* The number of shares underlying expired, terminated or cancelled RSUs, shall continue to be available for the purpose of further awards under the 2015 Plan. Any material amendment to the 2015 Plan (such as the addition of more class B shares to the pool of shares available under the 2015 Plan) or the adoption of a new equity compensation plan is subject to approval in compliance with applicable Cypriot law.

**2019 Employee Stock Option Plan**

*General.* In June 2019, our shareholders approved an Employee Stock Option Plan, or the 2019 Plan, an equity-based incentive compensation plan

intended to help align the interests of our management and others with those of our shareholders. Under the 2019 Plan, we may grant options to purchase our class B shares to executive managers and key services providers of the Group who are in a position to make a significant contribution to the success of the Group. Each executive director of the board is also eligible to receive grants of options under the 2019 Plan in connection with such individual's service as an employee of the Company. Non-employee directors of the board of directors of the Company is not eligible to participate in the 2019 Plan. A maximum of 3,100,000 of our class B shares are reserved for issuance under the 2019 Plan, subject to equitable adjustment in the event of certain corporate transactions, such as a stock split or recapitalization. The 2019 Plan is scheduled to expire on the tenth anniversary of its adoption (unless terminated earlier by the Administrator), although previously granted options will remain outstanding after such date in accordance with their terms.

*Administration.* Our compensation committee administers the 2019 Plan, including determining the terms of all options (including terms and conditions with respect to the achievement of established performance metrics), subject to the certain limitations. The Administrator also has the authority to adopt, amend and repeal such administrative rules, guidelines and practices relating to the 2019 Plan as it deems advisable. Our compensation committee interprets the terms of the 2019 Plan and any option granted thereunder. The participants of the 2019 Plan are also selected by our compensation committee.

*Option Terms Generally.* Options granted under the 2019 Plan permit the holder of the option to acquire our class B shares upon satisfaction of the vesting conditions and payment of the exercise price. 40% of the options is eligible to vest and become exercisable on the third anniversary of the grant date, with the remaining 60% of the options eligible to vest and become exercisable on the fourth anniversary of the grant date subject to the achievement of one or several corporate targets set forth in the award agreement. The exercise price shall not be less than the average closing price per share of the shares being traded in the form of American depositary shares on the NASDAQ Global Select Market for the 90 business days immediately preceding the grant date or the par value of the shares, whichever is higher. Options granted under the 2019 Plan cannot be sold, pledged or disposed of in any manner without our prior written consent.

*Other Information.* Shares subject to options which are cancelled or forfeited without being exercised will be returned to the 2019 Plan and will be available for subsequent option grants under the 2019 Plan. Any material amendment to the 2019 Plan (such as the addition of more class B shares to the pool of shares available under the 2019 Plan) or the adoption of a new equity compensation plan is subject to approval in compliance with applicable Cypriot law.

**QIWI Employees Trust**

In April 2018, QIWI plc established QIWI Employees Trust. Our class B shares reserved for the existing long-term incentive plans were issued and allotted to that trust. QIWI Employees Trust holds those shares in favor of the participants of the long-term incentive plans and is eligible to transfer them to such participants at their request subject to the vesting schedule.

**Long-Term Cash Incentive Program**

*General.* In August 2019, in lieu of aligning employee compensation practices and plans with the best market practices and applicable guidelines, our board of directors approved a Long-Term Cash Incentive Program, or the LTCIP. Under the LTCIP, we may grant rights to bonus to executive managers and key employees of the Group who are in a position to make a significant contribution to the success of the Group. Each executive director of the board is also eligible to receive grants to bonus under the LTCIP in connection with such individual's service as an employee of the Company. Non-employee directors of the board of directors of the Company is not eligible to participate in the LTCIP. A maximum amount of cash equal to RUB 500,000,000 is reserved for grants of the rights to bonus under the LTCIP. The LTCIP is scheduled to expire on the tenth anniversary of its effectiveness (unless terminated earlier by the Administrator), although the rights to bonus granted prior to such expiration (if any) will remain outstanding after such date in accordance with their terms.

88

Table of Contents

*Administration.* Our chief executive officer administers the LTCIP, including determining the terms of all rights to bonus (including terms and conditions with respect to the achievement of established performance metrics), subject to the certain limitations. The Administrator also has the authority to adopt, amend and repeal such administrative rules, guidelines and practices relating to the LTCIP as it deems advisable. Our chief executive officer construes and interprets the terms of the LTCIP and any bonuses granted thereunder. The participants of the LTCIP are also selected by our chief executive officer.

*Terms and Conditions Generally.* The bonuses payout is subject to the achievement of one or several corporate targets set forth in the award agreement. 100% of the bonuses is eligible to payout on the third anniversary of the grant date. Bonuses that have not become eligible to payout as of the date of termination of a participant's employment or service with a member of the Group is forfeited upon such termination. No right to bonus granted under the LTCIP may be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner (other than pursuant to the laws of descent and distribution), provided that the bonus payout is not considered to be any type of disposal.

*Other Information.* The LTCIP includes clawback provisions. The Administrator, in its sole and absolute discretion, may amend or alter the LTCIP and may at any time terminate or discontinue the LTCIP as to any future grants of bonuses. Any amendments to the LTCIP shall be conditioned upon stockholder approval only to the extent, if any such approval is required by applicable law, as determined by the Administrator.

**Outstanding Equity Awards to Certain Executive Officers**

The following table sets forth certain information with respect to outstanding equity awards held by the following executive officers at March 19, 2020:

| | Option plan | Grant Date | Number of Class B Shares Underlying Vested Options (#) Exercisable | Number of Class B Shares Underlying Unvested Options (#) Unexercisable | Option Exercise Price ($) | Option Expiration Date |
|---|---|---|---|---|---|---|
| Andrey Protopopov | 2012 ESOP | November 15, 2013 | 51,000 | — | 41.2380 | December 31, 2020 |
| | RSU Plan | August 14, 2018 | — | 6,534 | n/a | December 31, 2022 |
| | 2019 ESOP | July 17, 2019 | — | 350,000 | 16.7500 | December 31, 2026 |
| Varvara Kiseleva | RSU Plan | August 10, 2018 | | 1,400 | n/a | December 31, 2022 |

## C.    Board Practices.

### Board of Directors

Our company has a single-tier board structure, with a board of directors comprised of up to seven directors nominated and elected by the shareholders (subject to certain exemptions), including not less than three directors who shall be independent directors (see also "Description of Share Capital—Board of Directors"). The primary responsibility of our board of directors is to oversee the operations of our company, and to supervise the policies of senior management and the affairs of our company. The term for the directors serving on our board of directors at the time of the annual report will expire at the annual general meeting of shareholders to be held in 2020. Our directors shall be elected at each subsequent annual general meeting of shareholders. Our articles of association provide that we may have up to seven directors, including not less than three independent directors. Non-independent directors shall not be more than four.

Under the Nasdaq Listing Rules, a director employed by us or that has, or had, certain relationships with us during the three years prior to this annual report, cannot be deemed to be an independent director, and each other director will qualify as independent only if our board of directors affirmatively determines that the director has no material relationship with us, either directly or as a partner, shareholder or officer of an organization that has a relationship with us. Ownership of a significant amount of our shares, by itself, does not constitute a material relationship. Our articles of association provide that any non-independent director may be qualified as an independent director if such director meets certain criteria under the Nasdaq Listing Rules. Accordingly, our board of directors has affirmatively determined that Mr. Marcus Rhodes, Mr. Alexey Marey and Ms. Elena Titova are each an independent director in accordance with the Nasdaq Listing Rules.

### Committees of our Board of Directors

We have established three committees under the board of directors: the audit committee, the compensation committee and the strategy committee. We have adopted a charter for each of these committees. Each committee's members and functions are as follows.

89

Table of Contents

*Audit Committee*. Our audit committee consists of Messrs. Marey, Rhodes and Titova, Mr. Rhodes is the chairman of the audit committee and our board of directors has determined that Mr. Rhodes qualifies as an "audit committee financial expert," as defined under Nasdaq Listing Rules and the rules and regulations of the Exchange Act. Messrs. Marey, Rhodes and Titova are each an independent director in accordance with the Nasdaq Listing Rules.

The purpose of the audit committee is to assist our board of directors with its oversight responsibilities regarding: (a) the integrity of our financial statements, (b) our compliance with legal and regulatory requirements, (c) the independent auditor's qualifications, independence and performance and (d) the performance of our internal audit function and independent auditor.

Our audit committee's duties include, but are not limited to:

- selecting the independent registered public accounting firm and pre-approving all auditing and non-auditing services permitted to be performed by the independent registered public accounting firm;

- reviewing with our independent registered public accounting firm any audit problems or difficulties and management's response;

- reviewing all proposed related party transactions, as defined in Item 404 of Regulation S-K under the Securities Act;

- discussing the annual audited financial statements with management and the independent registered public accounting firm;

- reviewing major issues as to the adequacy of our internal control and any special audit steps adopted in light of material control deficiencies; and

- meeting separately and periodically with management and our independent registered public accounting firm.

*Compensation Committee*. Our compensation committee consists of Messrs. Cherkasova, Rhodes and Titova, Ms. Titova is the chairman of the compensation committee. Messrs. Rhodes and Titova are independent directors in accordance with the Nasdaq Listing Rules, whereas Ms. Nadiya Cherkasova is a non-independent director. We follow Cyprus law which does not require companies to have a compensation committee made up entirely of independent directors. None of the members of our compensation committee is an officer or employee of our company.

Our compensation committee's duties include, but are not limited to:

- approving the compensation package of the chief executive officer;

- administering our equity incentive plan;

- overseeing, and advising the board of directors on, overall compensation plans and benefit programs; and

- authorizing the repurchase of shares from terminated employees.

*Strategy Committee.* Our strategy committee consists of Messrs. Karavaev, Titova and Marey. Mr. Marey is the chairman of the strategy committee. Our strategy committee has a key role in defining our strategic goals and objectives, advises our board of directors on the implementation of our strategic goals and objectives and oversees their implementation.

**Code of Ethics and Business Conduct**

We have adopted a Code of Ethics and Business Conduct that applies to all of our directors, officers and employees. The Code of Ethics and Business Conduct is intended to promote honest and ethical conduct, full and accurate reporting, and compliance with laws as well as other matters. The first version of the Code was introduced in 2013, we have adopted an amended version in 2019 in order to reflect the development of the business environment and our Company. We believe these amendments incorporate best practices and reflect most current regulatory environment, as well as make the Code more transparent and well-structured. A copy of the Code of Ethics and Business Conduct is available on our website: https://investor.qiwi.com/corporate-governance/documents.

**Directors' Duties**

Under Cyprus law, our directors owe fiduciary duties both under common law and statute, including a statutory duty and common law duty to act honestly, in good faith and in what the director believes are the best interests of the company. When exercising powers or performing duties as a director, the director is required to exercise the care, diligence and skill that a responsible director would exercise in the same circumstances taking into account, without limitation, the nature of the company, the nature of the decision and the position of the director and the nature of the responsibilities undertaken by him. The directors are required to exercise their powers for a proper purpose and must not act or agree to the company acting in a manner that contravenes our articles of association or Cyprus law.

**Employment Agreements**

We have entered into employment agreements with each of our executive officers. Each of these contains standard terms and conditions in compliance with Russian labor law. The terms of these employment agreements include, among other things, duration, remuneration, the treatment of confidential information, social insurance and employment benefits.

90

Table of Contents

We may terminate the employment agreements with our executive officers in accordance with the general provisions envisaged by Russian labor law if, among other things, one of our executive officers commits serious breach of duties, is guilty of any gross misconduct in connection with the handling of money or valuables, or takes an erroneous decision that leads to the improper use of, or causes damage to, our property. In addition, Russian labor law and employment agreements of some of our executive officers contain certain additional provisions whereby we may terminate their employment agreements if such officers are dismissed from office in accordance with Russian bankruptcy legislation.

Each executive officer has agreed to hold in strict confidence any confidential information or trade secrets of our company. Each executive officer also agrees to comply with all material applicable laws and regulations related to his or her responsibilities at our company as well as all material corporate and business policies and procedures of our company.

**Limitation on Liability and Indemnification of Directors and Officers**

Our memorandum and articles of association provide that, subject to certain limitations, we will indemnify our directors and officers against any losses or liabilities which they may sustain or incur in or about the execution of their duties including liability incurred in defending any proceedings, whether civil or criminal, in which judgment is given in their favor or in which they are acquitted.

Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers or persons controlling us pursuant to the foregoing provisions, in the opinion of the U.S. Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act of 1933 and may therefore be unenforceable.

**Interests of our Directors and our Employees**

Certain of our directors and our executive officers have beneficial ownership interests in our shares or hold options to purchase shares. The economic interests through these holdings may give rise to a conflict of interest between their duties owed to us and their private interests. For example, it could cause them to pursue short-term gains in respect of those private interests instead of acting in our best interest. Other than the potential conflicts of interest described in the footnotes to the table in "Principal and Selling Shareholders", we are not aware of any other potential conflicts of interest between any duties owed by members of our board of directors or our executive officers to us and their private interests and/or other duties.

Under our articles of association and Cyprus Law, a director who is in any way, directly or indirectly, interested in a contract or proposed contract with us must declare the nature of his or her interest at a meeting of our board of directors. In addition, a director has no right to vote in respect of any contract or arrangement in which he or she is interested, and if the director does vote, his or her vote will not be counted nor will he or she be counted for purposes of determining whether quorum at the meeting has been established.

Our directors are generally not prohibited from owning or acquiring interests in companies that could compete with us in the future for investments or business, and each of them has a range of business relationships outside the context of their relationship with us that could influence their decisions in the future.

**D.    Employees.**

See Item 4.B "Business overview—Employees."

**E.    Share Ownership.**

See Item 7.A "Major Shareholders" for information on the shareholdings of our directors and executive officers.

See Item 6.B "Compensation—Outstanding Equity Awards to Certain Executive Officers" for information on options granted to our executive officers.

See Item 6.B "Compensation—Employee Stock Option Plan" for a description of our employee stock option plan.

**ITEM 7.    Major Shareholders and Related Party Transactions**

**A.    Major Shareholders.**

The following table sets forth information with respect to the beneficial ownership of our ordinary shares, as of March 23, 2020, by:

- each of our directors and executive officers; and

- each person known to us to own beneficially more than 5% of our ordinary shares.

91

Table of Contents

Beneficial ownership is determined in accordance with the rules and regulations of the SEC. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, we have included shares that the person has the right to acquire within 60 days, including through the exercise of any option, warrant or other right or the conversion of any other security. These shares, however, are not included in the computation of the percentage ownership of any other person.

The calculations in the table below are based on 11,225,718 class A shares and 51,487,257 class B shares outstanding as of March 24, 2020, which comprise our entire issued and outstanding share capital as of that date. Class A ordinary shares have ten votes per share, and Class B shares have one vote per share.

Currently, none of our ordinary shares are held by U.S. holders.

| | Total Class A Shares | Total Class B Shares | Total % of Issued Class A Shares | Total % of Issued Class B Shares | Total % of Votes at a General Meeting |
|---|---|---|---|---|---|
| **Directors and Executive Officers:** | | | | | |
| Sergey Solonin (5) | 10,756,822 | — | 95.8 | — | 65.7 |
| Boris Kim | 468,894 | 703,881 | 4.2 | 1.4 | 3.3 |
| Marcus Rhodes | — | 1,250 | — | * | * |
| Elena Titova | — | 3,500 | — | * | * |
| Alexey Marey | — | — | — | — | — |
| Nadiya Cherkasova | — | — | — | — | — |
| Alexander Karavaev | — | 34,066 | — | * | * |
| Andrey Protopopov (1)(3) | — | 69,333 | — | * | * |
| Varvara Kiseleva (2) | — | 1,400 | — | * | * |
| Maria Shevchenko | — | — | — | — | — |
| **All directors and executive officers as a group** | | | | | |
| **Principal Shareholders:** | | | | | |
| Sergey Solonin (5) | 10,756,822 | — | 95.8 | — | 65.7 |
| Boris Kim | 468,894 | 703,881 | 4.2 | * | 3.3 |
| Public Joint-Stock Company «Bank Otkritie Financial Corporation» (4) | — | 21,426,733 | — | 41.6 | 13.1 |

\*      Represents less than 1%.

(1)      Reflects options to purchase 51,000 class B shares that have already vested and the right to receive 18,333 class B shares that are currently unvested.

(2)      Including the right to receive 1,400 class B shares that are currently unvested.

(3)      Calculated as percentage of the issued share capital assuming the exercise of all vested options and restricted stock units held by the participants.

(4)      Based solely on the Schedule 13-D filed by Public Joint-Stock Company «Bank Otkritie Financial Corporation» with the Securities and Exchange Commission on June 7, 2018.

(5)      Based solely on the Schedule 13-D filed by Sergey Solonin with the Securities and Exchange Commission on January 14, 2020.

## B.    Related Party Transactions.

### Bank Accounts and Deposits

Qiwi Bank maintains accounts and deposits of various affiliates of our directors, executive officers and shareholders in the ordinary course of its business amounting to RUB 322 million as of December 31, 2019 (including accounts of Bank Otkritie of RUB 272 million). We believe that all of the agreements pertaining to such accounts and deposits are entered into on arm's length terms and do not deviate in any material aspect from the terms that we would use in similar contracts with non-related parties.

### Agreements with Bank Otkritie

Pursuant to our diversified business relations with one of our significant shareholders Bank Otkritie we have entered into a number of agreements with Bank Otkritie including, but not limited to:

92

Table of Contents

*Information Technology Services Agreements*

On August 22, 2017, QIWI entered into an information technology services agreement with Bank Otkritie providing for information and technology services rendered by QIWI Bank to Bank Otkritie in connection with the cash and settlement services provided by Bank Otkritie to Tochka clients holding their accounts therein. The agreement was terminated with effect on February 1, 2019. Total amount of consideration received by QIWI Bank for the services rendered under that information technology services agreement was RUB 1,859 million.

On February 1, 2019 QIWI Bank entered into the new information technology services agreement with JSC Tochka providing for information and technology services rendered by JSC Tochka to QIWI Bank in connection with cash and settlement services provided by QIWI Bank to Tochka holding their accounts therein. The consideration to be received by JSC Tochka for the services rendered to QIWI Bank will be calculated monthly based on operational performance of the Tochka branch of QIWI Bank. Bank Otkritie has entered into a similar contract with JSC Tochka.

*Cooperation Agreement*

On June 7, 2018, the Company, QIWI Bank, Bank Otkritie and Catalytic People Ltd., representing the management team of Tochka, entered into a cooperation agreement providing for the establishment of JSC Tochka and the transfer of assets attributable to the operations of the Tochka business to JSC Tochka, in order to develop the Tochka banking platform and operate Tochka business. Pursuant to the cooperation agreement, QIWI holds 40% in the share capital of JSC Tochka, Bank Otkritie holds 50%+1 share in the share capital of the JSC Tochka and Catalytic People Ltd. holds 10%-1 share in the share capital of JSC Tochka. At the same time, QIWI and Bank Otkritie received 45% of economic interest (both in dividend and in capital gain) and 50% in investment to be made into JSC Tochka. The parties agreed to contribute and/or transfer all of the assets held by each of them, including Tochka software, trademark, website, certain specified indebtedness and cash investments required to develop the banking platform to JSC Tochka. The Parties have also agreed to enter into shareholders agreement on the terms and conditions as were attached to the cooperation agreement.

*Shareholders Agreement*

On August 3, 2018 QIWI, Bank Otkritie and Catalytic People Ltd. entered into a shareholders agreement in respect of JSC Tochka providing for rules on supervisory board composition, shareholders' and supervisory board reserved matters list, deadlock resolution procedure as well as terms and conditions of a call option provided to Bank Otkritie and a put option provided to QIWI and Catalytic People Ltd. Pursuant to the shareholders agreement, Bank Otkritie has three seats in the supervisory board of JSC Tochka and each of QIWI and Catalytic People Ltd. have one seat in the supervisory board of JSC Tochka. The majority of the key matters, such as decisions on strategy, business plan, budget, dividend distributions, and appointment of the general director of JSC Tochka require a unanimous vote of either all members of the supervisory board or the shareholders. In the instance of deadlock (i) Bank Otkritie may exercise a call option to acquire the respective JSC Tochka shares of QIWI and/or Catalytic People Ltd. and (ii) QIWI and/or Catalytic People Ltd. may exercise a put option to sell their respective JSC Tochka shares to Bank Otkritie. The price of the call option or a put option shall be determined by the independent appraisal by one of the "Big4" accounting firms. The agreement also includes lock up provision for shareholders of JSC Tochka valid until August 8, 2021. Customary right of first refusal, drag along right and tag along right are also provided under the shareholders agreement. In addition, the agreement includes a customary change of control clause in the event of a change of control of QIWI and Catalytic People Ltd.

*Deed of non-competition and non-solicitation*

On June 21, 2019 Catalytic People Ltd., Mr. Eduard Panteleev and Mr. Boris Dyakonov, being the founders of Tochka project, Bank Otkritie and QIWI entered into a deed of non-competition and non-solicitation providing for non-competition and non-solicitation of Catalytic People Ltd. and each of the founders in relation to the business of JSC Tochka for a period of five years from the date of the Deed. The liability of the Founders and Catalytic

People Ltd. is limited by a total amount of EUR 10 million being split equally between Bank Otkritie and QIWI.

*Deed of Warranty*

On June 21, 2019 Catalytic People Ltd., Mr. Eduard Panteleev and Mr. Boris Dyakonov, Bank Otkritie, Rozala Limited, QIWI and JSC Tochka entered into a deed of warranty providing for certain warranties from Catalytic People Ltd, Mr. Eduard Panteleev and Mr. Boris Dyakonov in favor of Bank Otkritie, Rozala Limited, QIWI and JSC Tochka in respect of the computer programs used by JSC Tochka in its operations. The total amount of aggregate liability of Catalytic People Ltd., Mr. Eduard Panteleev and Mr. Boris Dyakonov is equal to EUR 10 million.

**Employment Agreements and Share Options**

See "Management – Employment Agreements" and "Management – Employee Stock Option Plan."

**C.    Interests of Experts and Counsel.**

Not applicable.

93

Table of Contents

**ITEM 8.        Financial Information**

**A.    Consolidated Financial Statements and Other Financial Information**

See Item 18 "Financial Statements."

**Legal Proceedings**

From time to time, we are involved in various litigation matters arising in the ordinary course of our business. We are not currently, and have not been in the recent past, subject to any legal, arbitration or government proceedings (including proceedings pending or threatened) that we believe will have a material impact on our business, financial condition and results of operations.

**Dividend Policy**

In the medium to long term, we aim to distribute all excess cash to our shareholders in the form of dividends.

Management has determined to provide increased transparency and visibility of our dividend distribution practices for the benefit of its shareholders. As a result, we aim to provide dividend guidance specifying a target dividend payout ratio range for the next financial year, which will be reviewed and adjusted on an annual basis. We aim to announce this dividend payout ratio range each year together with the annual guidance for the period covering next four quarters.

For the year ending December 31, 2020, we aim to distribute at least 50% of our annual Adjusted Net Profit. The board of directors reserves the right to distribute dividends on a quarterly basis, and individual quarterly payouts may fall outside of the above-mentioned dividend payout ratio.

This statement is a general declaration of intention and the actual declaration of dividends will require corporate action at the relevant time by the board of directors or by the general meeting of the Company's shareholders, as the case may be, and will depend on the precise circumstances prevailing at that time, including the present or future business needs of the Company. Shareholders and potential investors should not treat this statement as an obligation or similar undertaking by us that dividends will be declared as set out herein. Under Cyprus law, we are not allowed to make distributions if the distribution would reduce our shareholders' equity below the sum of the issued share capital, including any share premium, and the reserves.

As a holding company, the level of our income and our ability to pay dividends depends primarily upon the receipt of dividends and other distributions from our subsidiaries. The payment of dividends by our subsidiaries is contingent upon the sufficiency of their earnings, cash flows, regulatory capital requirements, and distributable profits.

**B.    Significant Changes**

Except as disclosed elsewhere in this annual report, we have not experienced any significant changes since the date of our audited consolidated financial statements included in this annual report.

**ITEM 9.        The Offer and Listing**

**A.    Offer and Listing Details.**

See Item 9.C "—Markets."

**B.    Plan of Distribution.**

Not applicable.

**C.      Markets.**

Our ADSs, each representing one class B share, have been listed on the Nasdaq since May 3, 2013 and have been admitted to trading on MOEX since May 20, 2013, under the symbol "QIWI."

**D.      Selling Shareholders.**

Not applicable.

**E.      Dilution.**

Not applicable.

**F.      Expenses of the Issue.**

Not applicable.

94

Table of Contents

**ITEM 10.          Additional Information**

**A.      Share Capital.**

Not applicable.

**B.      Memorandum and Articles of Association.**

Our memorandum and articles of association contain, among others, the following provisions:

**Objects**

Our objects are set forth in full in Regulation 3 of our memorandum of association. The objects for which we are established are to assist in carrying on the business of a variety of entities, both public and private, with no restriction as to type, industry, legal form, or services provided. We aim to engage and train professional, technical, and other staff, retain such staff internally for the benefit of our Company, or allocate the aforesaid personnel or their services to those requiring such services and assistance. We are empowered to purchase or otherwise acquire all or any part or interest in the business and liabilities of other entities that we determine will be of benefit to us and our shareholders. We are additionally authorized to borrow, raise money or secure obligations in on such terms as we see fit, to issue any type of securities, both secured or unsecured (and upon such terms as priority or otherwise), and to invest moneys not immediately required, other than towards our shares. We may enter into any arrangement for working jointly with any other company, partnership or person, provided the joint work is in furtherance of our business or our interests and generally do all such other things as may appear to be incidental or conductive to the attainment of our objects.

**Shareholders' General Meetings**

Share Capital

Our share capital is divided into two classes of shares: class A shares, each of which carries ten votes at shareholders' general meetings, and class B shares, each of which carries one vote at shareholders' general meetings.

Convening Shareholders' Meetings

An annual general meeting must be held not more than 15 months after the prior annual general meeting, and at least one annual general meeting must be held in each calendar year.

Our board of directors, at its discretion, may convene an extraordinary general meeting. Extraordinary general meetings must also be convened by the board of directors at the request of shareholders holding in aggregate at the date of the deposit of the requisition either (a) not less than 10% of our outstanding share capital or (b) not less than 10% of the voting rights attached to our issued shares, or, in case the board of directors fails to do so within 21 days from the date of the deposit of the requisition notice, such requisitioning shareholders, or any of them representing more than one half of the total voting rights of all of them, may themselves convene an extraordinary general meeting, but any meeting so convened may not be held after the expiration of 3 months from the date that is 21 days from the date of the deposit of the requisition notice.

The annual general meeting and a shareholders' general meeting called for the election of directors or for a matter for which Cypriot law requires a special resolution, which means a resolution passed by a majority of not less than 75% of the voting rights attached to our issued shares present and voting at a duly convened and quorate general meeting, must be called with no less than 45 days' written notice or such longer notice as is required by the Companies Law (not counting the day in which it was served or deemed to be served and the date for which it is given). Other shareholders' general meetings must be called with no less than 30 days' written notice.

A notice convening a shareholders' general meeting shall be served within 5 days after the record date for determining the shareholders entitled to

receive notice of attend and vote at such General Meeting, which is fixed by the Board and is not more than 60 days and not less than 45 days prior to an Annual General Meeting, or a General Meeting called for the passing of a Special Resolution, or for the election of Directors, and not more than 45 days and not less than 30 days prior to any other General Meeting. A notice convening a shareholders' general meeting must be sent to each of the shareholders, provided that the accidental failure to give notice of a meeting to, or the non-receipt of notice of a meeting by, any person entitled to receive notice will invalidate the proceedings at that meeting to which such notice refers in the event that a shareholder holding not less than 5% of our outstanding share capital is not in attendance as a result of the accidental failure to give notice or non-receipt thereof.

All shareholders are entitled to attend the shareholders' general meeting or be represented by a proxy authorized in writing. The quorum for a shareholders' general meeting will consist of shareholders representing 50.01% of the voting rights attached to our issued shares, whether present in person or by proxy.

The agenda of the shareholders' general meeting is determined by our board of directors or by whoever else is calling the meeting.

95

Table of Contents

## Voting

Matters determined at shareholders' general meetings require an ordinary resolution, which requires a simple majority of the votes cast at any particular general meeting duly convened and quorate, unless our articles of association and the Companies Law specify differently. It is within the powers of the shareholders to have a resolution executed in writing by all shareholders and in such event no meeting needs to take place or notice to be given.

## Reserved Matters

Our articles of association provide for special majorities for resolutions concerning, among other things, the following matters (for so long as class A shares are in issue and outstanding): (i) any variance to the rights attached to any class of shares requires approval of the holders of 75% of the shares of the affected class, passed at a separate meeting of the holders of the shares of the relevant class, as well as a special resolution of the general meeting; and (ii) approval of the total number of shares and classes of shares to be reserved for issuance under any of our or our subsidiaries' employee stock option plan or any other equity-based incentive compensation program requires approval of a majority of not less than 75% of the voting rights attached to all issued shares present and voting at a duly convened and quorate general meeting.

## Board of Directors

### Appointment of Directors

Our articles of association provide that we shall have up to seven directors, including not less than three independent directors. As a foreign private issuer, we have elected to follow Cyprus corporate governance practices, which, unlike the applicable Nasdaq requirements for domestic issuers, do not require the majority of directors to be independent.

It is understood that, if at a proposed general meeting there shall be elections of both non-independent directors and independent directors, (i) there shall be two separate sets of voting procedures, one with respect to the non-independent directors and one with respect to the independent directors; (ii) at each such procedure the shareholders shall have the number of votes provided by the articles of association for the election of non-independent directors and independent directors respectively and (iii) the voting procedure in respect of the minimum number of independent directors, being three directors, shall take place first.

Each of the board and any shareholder or group of shareholders is entitled to nominate one or more individuals for election (or re-election) to our board of directors not less than 30 days prior to any general meeting at which the non-independent directors are scheduled to be appointed. The board shall screen all submitted nominations for compliance with the provisions of our articles of association following which it shall compile and circulate a final slate of nominees to be voted on at the general meeting to all the shareholders entitled to attend and vote at the relevant general meeting at least 15 days prior to the scheduled date thereof.

Except as set out below, the non-independent directors are appointed by shareholder weighted voting, under which each shareholder has the right to cast among one or more nominees as many votes as the voting rights attached to its shares multiplied by a number equal to the number of non-independent directors to be appointed. Non-independent directors are appointed as follows: (1) the term of office of the non-independent directors shall be for a period from the date of the annual general meeting at which they were elected until the following annual general meeting; (2) all the non-independent directors shall retire from office at each annual general meeting; (3) all retiring non-independent directors shall be eligible for re-election; and (4) the vacated position may be filled at the meeting at which the non-independent directors retire by electing another individual nominated to the office of non-independent director by any of the board, any shareholder or group of shareholders by serving a notice at least 30 days prior to such general meeting, and in default the retiring non-independent director shall, if offering himself for re-election and if he has been so nominated by the board, be deemed to have been re-elected, unless at such meeting it is expressly resolved not to fill such vacated position or unless a resolution for the re-election of such non-independent director shall have been put to the meeting and not adopted.

The independent directors are nominated by the board, a shareholder or group of shareholders. All independent directors are appointed by shareholder weighted voting in the same manner as voting for non-independent directors. The independent directors will be appointed as follows: (1) the term of office of each independent director shall be for a period from the date of the annual meeting at which such independent director has been duly elected and qualified until the following annual general meeting; (2) all the independent directors shall retire from office at each annual general meeting; (3) all retiring independent directors shall be eligible for re-election; and (4) the vacated position may be filled at the meeting at which the independent directors retire by electing another individual nominated by any of the board, a shareholder or a group of shareholders by serving a notice at least 30

days prior to such general meeting, and in default the retiring independent director shall, if offering himself for re-election and if he has been so nominated by the board, be deemed to have been re-elected, unless at such meeting it is expressly resolved not to fill such vacated position or unless a resolution for the re-election of such independent director shall have been put to the meeting and not adopted.

At any moment of time after the appointment of the non-independent directors any director may request the board to screen the non-independent directors for compliance with independence criteria within the meaning of the Nasdaq Listing Rules. In case the board determines that any non-independent director meets the criteria, such non-independent director shall be re-classified as the independent director.

In the event that the entire board of directors is terminated by a shareholder or a group of shareholders representing at least 10.01% of the voting rights attached to our issued shares in relation to exercise by the board of directors of its right to appoint a director to fill a vacancy on the board, the board will remain in office only to summon a general meeting for purposes of (1) terminating the entire board pursuant to a

96

Table of Contents

request of the requesting shareholders and (2) appointing new non-independent directors, and new independent directors. If, for any reason, the number of directors falls below the number fixed by the articles of association as the necessary quorum for board meetings and the vacant positions are not filled as per the above procedure within 21 days, the remaining directors may remain in office only to convene a general meeting, at which all directors must retire and new directors will be appointed as provided above.

Our board of directors can elect a chairman by an absolute majority of votes of all the directors, provided that an affirmative vote of at least one independent director is received (for so long as class A shares are in issue and are outstanding).

### Removal of Directors

Under Cyprus law, notwithstanding any provision in our articles of association, a director may be removed by an ordinary resolution of the general shareholders' meeting. Such general shareholders' meeting must be convened with at least 30 days' notice. The office of any of the directors shall be vacated if, among other things, the director (a) becomes bankrupt or makes any arrangement or composition with his or her creditors generally; or (b) becomes permanently incapable of performing his or her duties due to mental or physical illness or due to his or her death. If our board of directors exercises its right to appoint a director to fill in a vacancy on the board created during the term of a director's appointment as provided in our articles of association, a shareholder or a group of shareholders holding at least 10.01% of the voting rights attached to our issued shares may terminate the appointment of the entire board of directors. *See also "—Appointment of Directors."*

### Powers of the Board of Directors

Our board of directors has been granted authority to manage our business affairs and has the authority to decide, among other things, on the following:

(a)   approval of strategy and annual budget and for the group;

(b)   approval of certain transactions, including material transactions (as defined in our articles of association), borrowings as well as transactions involving sale or disposition of any interest in any group company (other than QIWI plc) or all or substantially all of the assets of any group company;

(c)   any group company's exit from or closing of a business or business segment, or a down-sizing, reduction in force or streamlining of any operation over certain thresholds as set out in our articles of association;

(d)   any merger, consolidation, amalgamation, conversion, reorganization, scheme of arrangement, dissolution or liquidation involving any group company (other than QIWI plc);

(e)   entry into (whether by renewal or otherwise) any agreement or transaction with a related party except for: (1) transactions in the ordinary course of business (as defined in our articles of association) on an arm's length basis, (2) intra-group transactions, (3) transactions at a price less than U.S.$50,000 (if the price can be determined at the time the transaction is entered into);

(f)   issuance and allotment of shares by us for consideration other than cash; and

(g)   adoption of any employee stock option plan or any other equity-based incentive compensation program for our group (subject to a general meeting approving the total number of shares and classes of shares to be reserved for issuance under any such program).

Our board of directors may exercise all the powers of the Company to borrow or raise money.

### Proceedings of the Board of Directors

Our board of directors meets at such times and in such manner as the directors determine to be necessary or desirable. For as long as any class A shares are issued and outstanding, the quorum necessary for a meeting of our board of directors to be validly convened is a simple majority of the total number of the non-independent directors and the then-existing independent directors.

A resolution at a duly constituted meeting of our board of directors is approved by an absolute majority of votes of all the directors unless a higher majority and/or affirmative vote of any independent directors is required on a particular matter. The chairman does not have a second or casting vote in case of a tie. A resolution consented to in writing, signed or approved by all directors will be as valid as if it had been passed at a meeting of our board of directors or a committee when signed by all the directors.

Where a director has, directly or indirectly, an interest in a contract or proposed contract, that director must disclose the nature of his or her interest at the meeting of the board of directors and shall not vote on such contract or arrangement, nor shall he be counted in the quorum present at the meeting.

**Chief Executive Officer**

Our board of directors may by an absolute majority of votes of all the directors appoint a director to be our chief executive officer to be in charge and responsible for all day-to-day affairs of our group. Our chief executive officer is to be appointed for such period and on such terms as our board of directors thinks fit, and, subject to the terms of any agreement entered into in any particular case, his appointment may be terminated by our board of directors at any time as provided in our articles of association. The term of appointment for our chief executive officer shall be for a period from the date of his appointment until the first meeting of the board on the second year after the date of his appointment.

97

[Table of Contents](#)

**Rights Attaching to Shares**

*Voting rights.* For so long as class A shares are in issue and are outstanding, each class A share has the right to ten votes at a meeting of our shareholders; and each class B share has the right to one vote at a meeting of our shareholders.

*Issue of shares and pre-emptive rights.* Subject to the Cypriot law and our articles of association, already authorized but not yet issued shares are at the disposal of our board of directors, which may allot or otherwise dispose of any unissued shares as it may decide. All new shares and/or other securities giving right to the purchase of our shares or which are convertible into our shares must be offered before their issue to our shareholders on a pro rata basis. If the new securities are of the same class as existing shares, the offer must first be made on a pro rata basis to the shareholders of the relevant class and, if any such new securities are not taken up by those shareholders, an offer to purchase the excess will be made to all other shareholders on a pro rata basis (provided that such pre-emption rights have not been removed). On May 8, 2018 the disapplication of pre-emptive rights in connection with the issues of up to an additional 52,000,000 class B shares, including in the form of ADSs, previously authorized by our shareholders, has expired and since then any issuance and allotment of class B shares by the Company for cash consideration is subject to pre-emptive rights.

*Conversion.* At the irrevocable request of any class A shareholder, all or part of the class A shares held by such shareholder will convert into class B shares, on the basis that each class A share shall convert into one class B share, and the class B shares resulting from such conversion shall rank pari passu in all respects with the existing class B shares in issue.

In addition, class A shares will be automatically converted into class B shares, on a one-to-one basis, in the following circumstances: (1) all class A shares which are transferred by a holder, except in circumstances permitted under our articles of association, shall, immediately upon such transfer, be automatically converted into class B shares; (2) all class A shares held by a shareholder will be automatically converted into class B shares on the occurrence of a change of control (as defined in our articles of association) of that class A shareholder; and (3) all class A shares will be automatically converted into class B shares in the event that the aggregate number of class A shares constitute less than 10% of the aggregate number of class A and class B shares outstanding.

For so long as class A shares are in issue and are outstanding, class A shares will not convert into class B shares where: (1) the transfer is to one or more of the transferor's directly or indirectly controlled affiliates (as defined in our articles of association); (2) 10% or more of the total number of class A shares in issue are transferred as a single transaction or a series of related transactions by a shareholder or a group of shareholders; (3) the transfer is to one or more of the existing class A shareholders; and (4) the transfer is to the person(s) that was (were) the ultimate beneficial owner(s) of class A shareholder at the time of Listing. In the case of (2) above the transfer of A shares is permitted if: (a) it is approved in writing by the shareholders holding in aggregate at least 75% of the total number of class A shares in issue; or (b) the shareholder (or a group of shareholders) transferring class A shares has (or have) offered such shares to the other then existing shareholders holding class A shares in accordance with the procedure set out in the articles of association.

*Dividend.* For so long as class A shares are in issue and are outstanding, our board may declare dividend, including final dividend, but no dividend will be paid except out of our profits. Our board of directors may set aside out of our profits such sums as it thinks proper as a reserve. The board of directors may also, without establishing a reserve, carry forward to the next year any profits it may think prudent not to distribute as a dividend. The class A shares and the class B shares have the right to an equal share in any dividend or other distribution we pay. Please see "Dividend Policy" for more details.

*Winding Up.* If our company is wound up, the liquidator may, upon a special resolution and any other procedure prescribed by the Cypriot law, (i) divide in specie or kind all or part of our assets among the shareholders; and (ii) vest the whole or any part of such assets in trustees for the benefit of the contributories as the liquidator shall think fit, but so that no shareholder is compelled to accept any shares or other securities with any attached liability.

*Form and transfer of shares.* The instrument of transfer of any share must be executed by or on behalf of the transferor and the transferee, and the transferor will be deemed to be the holder of the share until the name of the transferee is entered into the register of shareholders. Except as set out above and in our articles of association, shareholders are entitled to transfer all or any of their shares by instrument of transfer in writing in any usual or common form or in any other form, including electronic form, which the directors may approve.

There is no limitation under Cypriot law or our articles of association on the right of non-Cypriot residents or nationals to own or vote our shares.

**Relevant Provisions of Cypriot law**

The liability of our shareholders is limited. Under the Cypriot law, a shareholder of a company is not personally liable for the acts of the company, except that a shareholder may become personally liable by reason of his or her own acts.

As of the date of this annual report, Cypriot law does not contain any requirement for a mandatory offer to be made by a person acquiring shares or depositary receipts of a Cypriot company even if such an acquisition confers on such person control over us if neither the shares nor depositary receipts are listed on a regulated market in the European Economic Area (EEA). Neither our shares nor depositary receipts are listed on a regulated market in the EEA.

98

Table of Contents

Cypriot Companies Law contains provisions in respect of squeeze-out rights. The effect of these provisions is that, where a company makes a takeover bid for all the shares or for the whole of any class of shares of another company, and the offer is accepted by the holders of 90% in value of the shares concerned, the offeror can upon the same terms acquire the shares of shareholders who have not accepted the offer, unless such persons can persuade the Cypriot courts not to permit the acquisition. If the offeror company already holds more than 10%, in value of the shares concerned, additional requirements need to be met before the minority can be squeezed out. If the company making the takeover bid acquires sufficient shares to aggregate, together with those which it already holds, more than 90%, then, within one month of the date the bidder holds more than 90%, it must give notice of the fact to the remaining shareholders and such shareholders may, within three months of receiving such notice, require the offeror company to acquire their shares and the offeror company shall be bound to do so upon the same terms on which the shares were acquired or on such other terms as may be agreed between them or upon such terms as the court may order.

C.    **Material Contracts.**

None.

D.    **Exchange Controls.**

Cyprus currently has no exchange control restrictions.

E.    **Taxation.**

The following summary of the Cypriot tax, Russian tax and United States federal income tax consequences of ownership of the ADSs is based upon laws, regulations, decrees, rulings, income tax conventions (treaties), administrative practice and judicial decisions in effect at the date of this annual report. Legislative, judicial or administrative changes or interpretations may, however, be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may be retroactive and could affect the tax consequences to holders of the ADSs. This summary does not purport to be a legal opinion or to address all tax aspects that may be relevant to a holder of the ADSs. Each prospective holder is urged to consult its own tax advisor as to the particular tax consequences to such holder of the ownership and disposition of the ADSs, including the applicability and effect of any other tax laws or tax treaties, of pending or proposed changes in applicable tax laws as of the date of this annual report, and of any actual changes in applicable tax laws after such date.

**Material Cypriot Tax Considerations**

**Cyprus Tax residency of a company**

In accordance with the Cyprus Income Tax Law, a company is tax resident in Cyprus if its management and control are exercised in Cyprus. There is no definition in the Cyprus Income Tax Law as to what constitutes management and control however it is understood that the concept of "central management and control" followed by the Cyprus tax authorities is in line with such concepts applied in other common law countries and as it has developed through case law. The concept refers to the highest level at which the business of the company is controlled and the policy decisions of the directors are taken. This place is usually where the shareholders and/or the board of directors meet and take key management and commercial decisions.

In 2016 the Cyprus tax authorities have issued a questionnaire for tax residency certificate indicating information that needs to be provided by a company when obtaining Cyprus tax residency certificate, including the following questions: (i) whether the company is incorporated in Cyprus and is a tax resident only in Cyprus; (ii) whether the majority of the Board of Directors meetings take place in Cyprus; (iii) whether the Board of Directors exercise control management and make key management and commercial decisions necessary for a company's operations and general policies; (iv) whether Board of Directors' minutes are prepared and kept in Cyprus; (v) whether the majority of the Board of Directors are Cyprus tax residents; (vi) whether shareholders' meetings take place in Cyprus; (vii) whether the terms and conditions of the general powers of attorney issued by the company do not prevent the company and its board of directors to exercise control and make decisions; etc. Depending on the answers to the above questionnaire the Cyprus tax authorities may or may not issue a tax residency certificate to a company.

We consider the company to be a resident of Cyprus for tax purposes. However, taking into consideration that the majority of our board of directors is comprised of non-Cyprus tax residents and a number of other factors which may be treated as not fully in line with the abovementioned requirements, our tax residency in Cyprus may be challenged.

Moreover, we may be deemed to be a tax resident outside of Cyprus, for further details see risk factor *"Risk Factors – Risks Related to Taxation – We may be deemed to be a tax resident outside of Cyprus."*

Case 1:20-cv-06054-BMC-CLP   Document 87-3   Filed 05/02/24   Page 96 of 187 PageID #: 3565

With respect to the individual holders of our ADSs, such holder may be considered to be a tax resident in Cyprus in any one calendar year (which corresponds to a period from January 1 to December 31) if such holder is physically present in Cyprus for a period exceeding in aggregate more than 183 days in that one calendar year.

99

Table of Contents

Furthermore, on January 1, 2017 an amendment to the Income Tax Law entered into force introducing a second tax resident test – the "60 day rule" – for the purposes of determining Cyprus tax residency for individuals. An individual is considered as a tax resident in Cyprus, if he/she satisfies either the current "183 day rule" or the "60 day rule" for the relevant tax year (coinciding with calendar year). The "60 day rule" applies to an individual who in the relevant tax year:

- does not reside in any other single state for a period exceeding 183 days in aggregate in the same tax year, and

- resides in Cyprus for at least 60 days within the tax year, and

- is not a tax resident in any other country for the same tax year, and

- carries on any business in Cyprus and/or is employed in Cyprus and/or holds an office at a person tax resident in Cyprus at any time during the tax year, and

- maintains a permanent residence in Cyprus either owned or rented by the individual.

An individual is considered to be domiciled in Cyprus for the purposes of Special Contribution for the Defence if he/she has a domicile of origin in Cyprus per the Wills and Succession Law (with certain exceptions) or if he/she has been a tax resident in Cyprus for at least 17 out of the 20 tax years immediately prior to the tax year of assessment.

Holders of ADSs must consult their own tax advisors on their tax residency status and their tax liabilities arising from holding and/or disposal of the ADSs in their tax residency jurisdictions.

**Taxation of Cyprus Resident Company**

A company which is considered as a resident of Cyprus for tax purposes is subject to corporate income tax in Cyprus on its income accrued and derived from all chargeable sources in Cyprus and abroad, worldwide income, taking into account certain exemptions. The rate of corporate income tax in Cyprus is 12.5% as of January 1, 2013.

Non-tax resident Cyprus companies (i.e. not managed and controlled from Cyprus) are liable to income tax in Cyprus only in respect of the following types of income arising from sources in Cyprus: trading profits of a permanent establishment situated in Cyprus (i.e. fixed base from which a business is carried on), profit from the sale of trade goodwill in Cyprus and rental income from property situated in Cyprus.

Tax resident Cyprus companies are subject to Special Contribution for the Defence which may be imposed on its dividend income, "passive" interest income and rental income according to the provisions of the Special Contribution for the Defence of the Republic Law N.117(I)/2002, as amended (See provisions of sections "Material Cypriot Tax Considerations – "Taxation of Dividend Income", "Deemed Dividends Distribution" and "Taxation of Interest Income").

**Taxation of Dividend Income**

Dividend income (whether received from Cyprus tax resident or non-tax resident Cyprus companies) is exempt from Corporate Income Tax in Cyprus.

Dividend income received from Cyprus resident companies is exempt from the Cypriot Special Contribution for the Defence in Cyprus. The rate of Special Contribution for the Defence in Cyprus is 17% as from January 1, 2014 onwards.

Dividend income received from non-Cyprus resident companies is exempt from the Cypriot Special Contribution for the Defence in Cyprus provided that either (i) not more than 50% of the foreign paying company and/or permanent establishment's activities result directly or indirectly in investment ("passive") income, or (ii) the foreign tax burden suffered on income of the foreign company and/or permanent establishment paying the dividends is not significantly lower than the tax burden payable in Cyprus (currently interpreted to mean an effective tax burden of at least 6.25% on the profit distributed).

Dividends declared by a Cyprus tax resident company to another Cyprus tax resident company after the lapse of four years from the end of the year in which the profits were generated are subject to Special Contribution for the Defence at applicable rate. Dividend income which emanates directly or indirectly out of such dividends on which Special Contribution for the Defence was previously suffered is exempt.

If the participation exemption for the Cypriot Special Contribution for the Defence does not apply, dividends receivable from non-Cyprus resident companies are taxed at a rate of 17%. Foreign tax paid or withheld on dividend income received by the Cyprus tax resident company can be credited against Cypriot tax payable on the same income provided proof of payment can be furnished.

New provisions were incorporated effectively from January 1, 2016 in the Cyprus tax legislation in order to be harmonized with the European Directive 2011/96/EU and related amending directives. These provisions involve the introduction of anti-hybrid and general anti-avoidance measures in

relation to the distribution of profits from a subsidiary to a parent company within the European Union. These new provisions apply only between EU companies.

The anti-hybrid provision introduced provides that to the extent where the profits which are distributed from a subsidiary company to its Cyprus parent company are deductible from the taxable income of the subsidiary company, Cyprus is required to tax such profits. The respective profits are subject to taxation at the rate of 12.5% in accordance with the provisions of the Income Tax Law and are not considered as dividends for Special Contribution for Defence purposes.

100

**Table of Contents**

The general anti-avoidance measures introduced provides that where dividend is received from a company which is a tax resident of another EU member state (level of holding is not relevant) and where it is considered that there is abuse (i.e. arrangement or series of arrangements that do not reflect economic reality), a credit will not be granted against the Cypriot tax liability for the foreign tax withheld on the profits of the company paying the dividend and of each sub-subsidiary from which the dividend originates.

Under Cyprus legislation no withholding tax on dividends shall be paid to non-residents of Cyprus. The dividend will be paid free of any tax to the shareholder who will be taxed according to the laws of his country of residence or domicile. Holders of ADSs must consult their own tax advisors on the consequences of their residence or domicile in relation to the taxes applied to the payment of dividends.

**Deemed Dividend Distribution**

Cyprus tax resident companies which do not distribute 70% of their profits after tax, as defined by the Special Contribution for the Defence of the Republic Law, by the end of the two years after the end of the year of assessment to which the profits refer, will be deemed to have distributed this amount as dividend. Special Contribution for the Defence will be payable on such deemed dividend to the extent that the shareholders for deemed dividend distribution purposes are Cyprus tax residents and domiciled in Cyprus. In respect of profits of years of assessment after 2012 onwards the Special Contribution for the Defence rate is 17%. The amount of this deemed dividend distribution is reduced by any actual dividend paid out of the profits of the relevant year by the end of the period of two years from the end of the year of assessment to which the profits refer. This Special Contribution for the Defence is paid by the Company for the account of the shareholders. Special Contribution for the Defence may also be payable on deemed dividends in case of liquidation or capital reduction of the company.

In September 2011, the Commissioner of the Inland Revenue Department of Cyprus issued Circular 2011/10, which exempted from the Special Contribution for the Defence any profits of a company that is tax resident in Cyprus imputed indirectly to shareholders that are themselves tax resident in Cyprus to the extent that these profits are indirectly apportioned to shareholders who are ultimately not Cyprus tax residents.

Further to the above and in view of the provisions of Tax Technical Circular 2016/8, any profits of a Cyprus tax resident company imputed directly or indirectly to shareholders who are Cyprus tax resident but not domiciled in Cyprus should be exempt from Special Contribution for the Defence.

In case of our individual ultimate shareholder(s) is/are considered to be a Cyprus tax resident and domiciled in Cyprus and no actual dividend is ever paid out of the relevant profits, we may be subject to the Special Contribution of the Defence. Imposition of this tax could have a material adverse effect on our business, financial condition and results of operations.

**National Health System (NHS)**

A national health system was introduced in Cyprus aiming to provide to the population equal access to a holistic health care system. Contributions relating to the implementation of the NHS started on 1 March 2019 and increased from 1 March 2020.

NHS contributions apply to various types of income received by an individual in Cyprus irrespective of whether they are domiciled in Cyprus or not. Indicatively, we note that NHS contribution rates for dividend and interest income sourced in Cyprus received by Cyprus tax resident individuals should be 1.70% as from 1 March 2019 and 2.65% as from 1 March 2020.

**Taxation of Capital Gains**

Cyprus Capital Gains Tax is imposed (when the disposal is not subject to income tax) at the rate of 20% on gains from the disposal of immovable property situated in Cyprus including gains from the disposal of shares in companies which own immovable property in Cyprus (either directly or indirectly), and such shares are not listed in any recognized stock exchange, but only if the value of the immovable property is more than 50% of the value of the assets of the company the shares of which are sold.

It is unclear whether this exception also applies to disposal of the ADSs.

**Inheritance Tax**

There is no Cyprus inheritance tax.

**Tax Position of Holders of ADSs with Respect to Distributions**

There is no express provision in the Special Contribution for the Defence law on the treatment of holders of ADSs with respect to Special Contribution for the Defence on dividends nor is there any specific guidance issued by the Cypriot tax authorities on the point. We are of the view that

holders of ADSs will be subject to the same treatment as holders of shares with respect to the liability of Special Contribution for the Defence and income tax on dividends and, therefore, the provision of sections "Taxation of Dividend Income", "Deemed Dividend Distributions" and "National Health System (NHS)" above would apply equally to the holders of ADSs.

Non-Cyprus tax resident holders of ADSs must also consult with their own tax advisors on the tax liabilities arising from ADSs distributions.

101

Table of Contents

**Taxation of income and gains**

**Gains from the disposal of ADSs**

In accordance with Article 2 of the Income Tax Law L118(I)/2002 (as amended) the term "securities" is explicitly defined to include shares, bonds, debentures, founders' shares and other securities of companies or other legal persons, incorporated under a law in the Republic of Cyprus or abroad and rights. Circulars have been issued by the Cyprus Tax Authorities clarifying that the term also includes among others, options on securities, short positions on securities, futures/forwards on securities, swaps on securities, depositary receipts on securities (American Depositary Receipts ("ADRs"), GDRs), rights of claim on bonds and debentures (rights on interest of these instruments are not included), index participations only if they result on securities, repurchase agreements or Repos on securities, units in open-end or close-end collective investment schemes.

Any gain from disposal by a Cyprus tax resident company/individual of securities shall be exempt from corporate income tax irrespective of the trading nature of the gain, the number of shares held or the holding period and shall not be subject to the Cypriot Special Contribution for the Defence. Such gains are also outside of the scope of capital gains tax provided that the company whose shares are disposed of does not own any immovable property situated in Cyprus or such shares are listed in any recognized stock exchange.

If the ADSs are considered by the Cyprus tax authorities not qualifying as "securities", any gain on disposal of ADSs by a Cyprus tax resident company will be subject to corporate income tax at the rate of 12,5% and personal income tax at the progressive rates of 0—35% in cases of a gain on disposal by a Cyprus tax resident individual.

**Gains from Intellectual Property ("IP")**

Under Cyprus IP box regime (came into force in 2012) an 80% deduction is allowed from the net profit received from the use or disposal of IP rights. In case a loss is resulting from the said activities, only 20% of the resulting loss can be offset against income from other sources or carried forward to be offset against income of subsequent tax years. That provision has a retroactive effect in respect to IP acquired or developed before January 2012 (i.e. IPs acquired or developed before January 2012 qualify for the IP Box regime).

Since July 1, 2016 a new IP Box regime is available in Cyprus, fully aligned with the OECD/G20 Base Erosion and Profit Shifting ("BEPS") Action 5 report. Under the new Cyprus IP Box, Cyprus IP companies can achieve an effective tax rate of 2.5% (or less) on qualifying profits earned from exploiting qualifying IP. Non-qualifying incomes are taxable at an effective tax rate of 12.5% (or less).

**Tax treatment of the Foreign exchange differences**

As of January 1, 2015 Cyprus tax laws provide for all foreign exchange differences to be tax neutral from a Cyprus income tax perspective (i.e. gains are not taxable/losses are not tax deductible) with the exception of forex gains/losses arising from trading in forex which remain taxable/deductible. Regarding trading in forex, which remains subject to tax, the tax payers may irrevocably elect whether to be taxed only upon realization of forex rather than on an accruals/accounting basis.

**Taxation of Interest income**

The tax treatment of interest income of any company which is a tax resident of Cyprus will depend on whether such interest income is treated as "active" (subject to corporate income tax) or "passive" (subject to Special Contribution for the Defence Fund). Interest income which consists of interest which has been derived by a company which is a tax resident of Cyprus in the ordinary course of its business and/or interest income closely connected with the ordinary course of its business may be treated as active and hence will be subject to corporate income tax at the rate of 12.5%, after the deduction of any allowable business expenses. The Special Contribution for the Defence shall not apply to such income. Any other interest income (i.e. of "passive" nature), to the contrary, will be subject to the Special Contribution for the Defence at the rate of 30% on the gross amount of interest, corporate income tax shall not apply.

Specifically, interest income arising from provision of loans to related or associated parties should be generally considered as income arising from activities closely connected with the ordinary course of business and should, as such, be exempt from Special Contribution for the Defence and only be subject to corporate income tax, see provisions of section "Arm's length principle".

**Withholding taxes on interest**

No withholding taxes shall apply in Cyprus on interest paid by the company, which is a tax resident in Cyprus, to a non-Cyprus tax resident lenders (both corporations and individuals).

Moreover, no withholding tax shall apply in Cyprus on interest paid by the company, which is a tax resident in Cyprus, to Cyprus tax resident lenders when the interest is considered as interest accruing from their ordinary course of business or interest income closely connected with the ordinary course of their business.

Any payment of interest which is not considered as interest accruing from the ordinary course of business or interest income closely connected with the ordinary course of business by the company, which is a tax resident in Cyprus, to Cyprus tax resident lenders (both corporations and individuals) shall be subject to Special Contribution for the Defence at the rate of 30%, whereby the company may be required to withhold such tax from the interest. Depending on the facts and circumstances of the case, the company may not need to act as the withholding agent.

102

Table of Contents

**Tax deductibility of expenses, including interest expense**

The general principle of the Cyprus income tax law is that an expense may be deducted in case it is incurred wholly and exclusively for the production of taxable income.

The Tax Circular 2008/14 issued by the Cypriot tax authorities provides guidance as to the tax deductibility of expenses incurred in relation to the production of income which is exempt from corporate income tax such as dividend income and profits/ gains on sale of securities. According to that tax circular (i) any expenditure that can be directly or indirectly attributed to income, that is exempt from tax, is not deductible for corporate income tax purposes and cannot be set-off against other (taxable) sources of income; and (ii) any expenditure that is attributable to both taxable and exempt income (i.e. general overheads) should be apportioned based on a gross revenue ratio or based on an asset ratio. The taxpayer should select the most appropriate method and should use this method on a consistent basis.

Interest incurred in connection with acquisition (directly or indirectly) of shares in a 100% owned subsidiary company as of January 1, 2012 (irrespective of the tax residency status of the subsidiary) shall be deductible for Cypriot tax purposes. This would apply provided that the assets of the subsidiary do not include assets not used in the business. However, in case the subsidiary possesses such assets, the deductibility of interest at the level of the holding company is limited only to the amount relevant to assets, used in the business.

Furthermore, notional interest deduction is available starting from January 1, 2015 (See provisions of section "Material Cypriot Tax Considerations – Notional Interest Deduction").

According to the provisions of EU Anti-Tax Avoidance Directive ("ATAD") which was approved by the EU Commission in 2016 and transposed into Cyprus domestic legislation, new provisions in respect of the Interest Limitations Rules have been introduced in Cyprus in the Article 11(16) of the Income Tax Law L.118(1)/2002 as amended, with effect as from January 1, 2019 (See provisions of section "*Material Cypriot Tax Considerations – EU Anti-Tax Avoidance Directive ("ATAD")*").

**Notional Interest Deduction**

Effectively from January 1, 2015, Cyprus tax legislation provides for Notional Interest Deduction (NID) under which the Cyprus companies that have issued additional share capital starting from January 1, 2015 and afterwards will have the benefit of a notional interest that will be deducted from their taxable income for each tax year. As per the legislation, the NID is calculated on "new equity" introduced in the company as from January 1, 2015. The NID is calculated as follows: New Equity x NID rate.

"New equity" is considered to consist of paid-up share capital of any class (ordinary, preference, redeemable, convertible shares), paid in cash or in kind, and share premium which have been issued and settled as from January 1, 2015 and that is available for the period during which the new equity is in issue.

As per the Cyprus legislation the NID interest rate is the yield on 10-year government bonds (as at December 31 of the prior tax year) of the country where the funds are employed plus a 3.0% premium, subject to a minimum amount which is the yield on the 10-year Cyprus government bond plus the 3.0% premium. The NID deduction cannot exceed 80% of the taxable profit as calculated before NID. A scheduling approach is expected to be followed – it is applied by reference to the taxable profits that are generated from assets/activities that are financed by the "new equity" on which the NID is calculated as per the Tax Technical Circular issued by the Cyprus tax authorities.

**Arm's length principle**

The arm's length principle in the Cyprus income tax law requires that all transactions between related parties should be carried out on the at an arm's length basis, being at fair values and on normal commercial terms.

More specifically, under the arm's length principle, where conditions are made or imposed upon the commercial or financial relations of two related parties which differ from those which would have been made between independent parties, any profits which would have accrued to one of the party had the two parties been independent, but have not so accrued, may be included in the profits of that party and taxed accordingly. The amendment to the income tax law, effective as of January 1, 2015, extends the arm's length principle by introducing the possibility of, in cases where two related Cyprus residents transact and the Cyprus tax authorities make an upward arm's length adjustment to one of them, effecting a corresponding downwards adjustment to the other one.

On June 30, 2017 the Cyprus tax authorities issued a tax technical circular (Circular) providing guidance for the tax treatment of intra-group financing transactions (IGFTs). The Circular effective as from July 1, 2017 closely follows the application of the arm's length principle of the OECD Transfer Pricing Guidelines and it applies for all relevant existing and future IGFTs. In this respect, the remuneration on all IGFTs should be supported by a transfer pricing study in order to be accepted by the Cyprus tax authorities.

IGFTs for the purposes of the Circular are defined as (i) any activity relating to granting of loans or cash advances to related companies that is or

should be remunerated by interest; and (ii) such activity is financed by financial means and instruments, such as debentures, private loans, cash advances and bank loans.

The Circular requires that the transfer pricing study should be prepared by independent experts and will have to be based on the relevant OECD standards for the purposes of (i) describing (delineating) the IGFT by performing a comparability analysis based on the functional and risk profile of the company; and (ii) determining the applicable arm's length remuneration by performing an economic analysis.

103

Table of Contents

Under certain conditions and assuming minimum substance requirements, taxpayers carrying out a purely intermediary intra-group financing activity may opt for the application of a Simplification Measure (resulting in a minimum 2% after-tax return on assets, meaning circa minimum 2.285% pre-tax return on assets).

There are no specific transfer pricing rules or any transfer pricing documentation requirements in the Cyprus tax laws in respect to any other related party transactions. However, Cyprus is in the late stages of adopting transfer pricing rules, covering all types of transactions, that is applicable to Cyprus tax resident companies or Cyprus permanent establishments with the view to comply with the standards set in the OECD BEPS Action 13: Transfer Pricing Documentation and Country-by-Country Reporting. The Cyprus transfer pricing legislation is currently drafted and is expected to be enacted with retrospective effect from January 1, 2020.

We cannot exclude that the Cyprus Tax Authorities may challenge the arm's length principle applied to transactions with our related parties and therefore additional tax liabilities may accrue. If additional taxes are assessed with this respect, they could have a material adverse effect on our business, financial conditions and results of operations.

**Stamp duty**

Cyprus levies a stamp duty on contracts that relate to any property situated in Cyprus or any matter or thing which is performed or done in Cyprus.

Documents are subject to stamp duty in Cyprus at a fixed fee or based on the value of such document with a maximum amount of stamp duty of EUR 20,000 per instrument. The above obligation arises irrespective of whether the instrument is executed in Cyprus or abroad. In case the document has a nominal value, there is a risk stamp duty to apply on the fair market value of the underlying asset.

A liability to stamp duty may arise on acquisition of Cyprus shares and such stamp duty would be payable where the shares acquisition documents are executed in Cyprus or later brought into Cyprus as the company's shares may be considered as Cypriot property.

**Minimum Flat Registration Fee**

Capital duty has been abolished by the Council of Ministers with effective date as from December 18, 2018. As a result no capital duty is payable to the Registrar of Companies in respect of the registered authorized share capital of a Cypriot company upon its incorporation and upon its subsequent increases thereon, other than minimal flat registration fees payable to the Registrar of Companies.

**Base Erosion and Profit Shifting ("BEPS") Action Plan**

The recommendations of the BEPS Action Plan led by the Organization for Economic Cooperation and Development ("OECD") contains action points aimed to tackle concerns over base erosion and profit shifting by addressing perceived flaws in international tax rules such as tax avoidance, improve the coherence of international tax rules and ensure a more transparent tax environment.

Cyprus is not a member of the OECD but follows the OECD and EU relevant initiatives. As an EU member state Cyprus adopts and applies the relevant EU Directives.

In short, the EU Anti-Tax Avoidance Directive (the provisions of which are outlined below) will be adopted and tackles measures of Actions 2, 3 and 4 of the BEPS Action Plan.

**EU Anti-Tax Avoidance Directive ("ATAD")**

On April 25, 2019, further to the publication of Law 63(I)/2019, the provisions of the EU Anti-Tax Avoidance Directive (ATAD EU 2016/1164) of July 2016 were transposed into the Cyprus domestic law. The Law transposes three ATAD measures in the Cypriot law; interest limitation, a general anti-abuse rule (GAAR) and rules concerning controlled foreign companies (CFC). An overview of these three provisions, which will apply retroactively as from January 1, 2019, is set out below.

The remaining measures of the EU Anti-Tax Avoidance Directive (ATAD1 and ATAD2) include the rules on exit taxation and hybrid mismatches, are expected to be implemented in 2020 with an effective date of January 1, 2020, except for the rules on reverse hybrid mismatches, which are to apply from January 1, 2022.

*Interest limitation rule*

The interest limitation rule requires that the Exceeding Borrowing Cost (EBC) (which refers to the amount by which deductible interest expense exceeds the taxable interest income) shall be deductible only up to 30% of the taxpayer's adjusted taxable profit before interest, tax, depreciation and

amortisation (i.e. taxable EBITDA). Case 1:20-cv-06054-BMC-CLP    Document 87-3    Filed 05/02/24    Page 101 of 187
PageID #: 3570

104

Table of Contents

There are certain exemptions to the rule including a de minimis threshold of three million euro (EUR 3,000,000) per fiscal year. In addition, standalone entities are excluded from the limitation rule. Moreover, grandfathering has been provided for loans concluded before June 17, 2016. Finally, a group equity 'escape' clause is provided, allowing a Cyprus resident company that is part of a consolidated group for financial reporting purposes, to opt to fully deduct its EBCs, provided that the ratio of its equity over its total assets is equal to (or even up to 2% lower) or higher than the equivalent ratio of the group.

In addition, should a Cyprus company belong to a Cyprus group as defined in the Cyprus tax legislation, the main rule and the de minimis rule apply to the Cyprus group as one taxpayer.

*Controlled Foreign Company (CFC) rule:*

A non-Cyprus tax resident company, or a foreign permanent establishment of a Cyprus tax resident company whose profits are not subject to or are exempt from (Corporate) Income Tax in Cyprus (PE), is considered a CFC when the following conditions are satisfied:

(a) the Cyprus tax resident company, either by itself or together with its associated enterprises, holds a direct or indirect participation of more than 50% of the voting rights, or owns directly or indirectly more than 50% of the capital or is entitled to receive more than 50% of the profits of that non-Cypriot tax resident company; and

(b) the actual corporate tax paid by non-Cypriot tax resident company or PE on its profits is lower than 50% of the corporate tax that would have been charged on such non-Cypriot tax resident company or PE under the applicable corporate tax system in Cyprus, had it been Cyprus tax resident.

In cases where a non-Cyprus tax resident company or PE is considered a CFC of a Cyprus company, the tax base of the Cyprus tax resident controlling shareholder shall include any non-distributed income of the CFC arising from non-genuine arrangements which have been put in place for the essential purpose of obtaining a tax advantage.

An arrangement or series of arrangements shall be regarded as non-genuine to the extent that the CFC would not own the assets or would not have undertaken the risks which generate all or part of its income, if it were not controlled by the Cyprus tax resident parent, where the significant people functions which are relevant to those assets and risks are carried out and are instrumental in generating the CFC's income.

The Cyprus CFC rules provide the following exemptions:

(a) Realising accounting profits of no more than €750,000 and non-trading income of no more than €75,000; or(b) the accounting profits amount to no more than 10% of its operating costs for the tax period.

There is no definition of what constitutes non-trading income for CFC purposes in the Cyprus tax legislation. The Cyprus CFC rules apply to the undistributed income of a CFC which should be included in the tax base of the Cyprus tax resident parent company to the extent that such income arises from non-genuine arrangements which have been put in place for the essential purpose of obtaining a tax advantage.

The Cyprus tax authorities are in the process of issuing a detailed Tax Technical Circular which will cover various technical issues, including potentially the relevant filing obligations. The expectation is that the information on CFCs and the inclusion of any non-distributed income of the CFC may be disclosed in the income tax return of the Cyprus tax resident company for the specific tax year.

*General Anti-Abuse Rule (GAAR):*

The GAAR allows the Cyprus tax authorities to ignore non-genuine arrangements where (one of) the main purpose(s) is to obtain a tax advantage that defeats the object or purpose of the relevant provision. Arrangements are regarded as non-genuine to the extent they are not put in place for valid commercial reasons which reflect economic reality.

**EU Directive on Administrative Cooperation 6 ("DAC 6")**

On May 25, 2018 the Economic and Financial Affairs Council (ECOFIN) formally adopted the Council Directive amending Directive 2011/16/EU on administrative cooperation in the field of taxation as regards mandatory automatic exchange of information in the field of taxation in relation to reportable cross-border arrangements in order to disclose potentially aggressive tax planning arrangements.

The Directive applies to cross-border arrangements concerning either more than one Member State or a Member State and a third country and sets a two-step disclosure obligation for such arrangements. First by disclosure of the arrangement to the national authorities by those obliged to report and second by automatic exchange of reported information between the national tax authorities of the Member States.

Member States should have transposed the Directive into their national laws and regulations by December 31, 2019 and the first automatic exchange of information should be communicated among Member States by October 31, 2020.

DAC6 is expected to be implemented in Cyprus as part of the Administrative Cooperation in the Field of Taxation (Amendment) Law 2019 (AC19 Law). The Cypriot Tax Department launched a public consultation on the AC19 Law on October 22, 2019, and the bill is expected to be enacted into law in Cyprus in early 2020 with an effective date as from July 1, 2020. The draft bill follows DAC6 very closely without any clear deviations, however the legislative process in Cyprus may result in changes.

The rules of the Directive are already effective as from June 25, 2018 and any legally reportable cross-border arrangements starting from the effective date must be disclosed by August 31, 2020.

The cross-border arrangements are reportable if:

(1) one of the "hallmarks" of the Directive is met, and

(2) avoiding tax is one of the main benefits of the scheme ("main benefit" test).

Some of the "hallmarks" can make a transaction reportable without meeting the main benefit test.

The reporting obligation of the arrangements falls on the service providers and other intermediaries, however, in certain cases the obligation to report applies to the taxpayers taking part in the cross-border arrangements themselves.

The penalties for non-compliance with the provisions on DAC6 set by Cyprus in the draft bill depend on the nature of the violation and are up to €20,000 per transaction/arrangement.

### Country by Country reporting

On May 26, 2017 a Decree was issued by the Cyprus Ministry of Finance, which outlines the Country by Country (CbC) reporting requirements for multinational enterprise groups generating consolidated annual turnover exceeding 750 million euros (MNE Group).

As per the Decree, a CbC report filing obligation arises in Cyprus for a Cyprus tax resident entity that is the ultimate parent entity (UPE) of an MNE Group or has been designated by the MNE Group as the sole substitute of the UPE (under the "surrogate parent" mechanism).

MNE Groups need to disclose on their CbC report the following data for each tax jurisdiction in which they operate: (i) the amount of revenue, profit before tax, and corporate taxes paid and accrued; (ii) capital, retained earnings and tangible assets, together with the number of employees; (iii) identification of each entity within the group doing business in a particular tax jurisdiction, with a broad indication of its economic activity.

The format of the CbC report is consistent with the template published by the OECD.

Furthermore, each Cyprus tax resident constituent entity of an MNE Group should notify, on an annual basis, the Cyprus tax authorities if it is the reporting entity of the MNE Group (i.e. the UPE or surrogate parent). In the case where the entity is not the reporting entity, then it should also notify the Cyprus tax authorities of the details and tax residency of the reporting entity of the Group.

With reference to the above section "Material Cypriot Tax Considerations" we cannot exclude the possibility that we might be subject to additional tax liabilities in case certain taxes become applicable to us or the respective Cyprus tax authorities apply different rulings to the transactions carried out by us or in our respect, which could have a material adverse effect on our business, financial condition and results of operations.

### United States Federal Income Tax Considerations

The following discussion is a summary of the U.S. federal income tax consequences to U.S. Holders (as defined below) of the ownership and disposition of our ADSs or ordinary shares. The discussion is not a complete analysis or listing of all of the possible tax consequences and does not address all tax considerations that may be relevant to investors in light of their particular circumstances. Special rules that are not discussed in the general descriptions below may also apply. In particular, the description of U.S. federal income tax consequences deals only with U.S. Holders that own our ADSs or ordinary shares as capital assets. In addition, the description of U.S. federal income tax consequences does not address the tax treatment of special classes of U.S. Holders, such as banks and other financial institutions, insurance companies, persons holding our ADSs or shares as part of a "straddle," "hedge," "appreciated financial position," "conversion transaction" or other risk reduction strategy, U.S. expatriates, persons liable for alternative minimum tax, Medicare tax, brokers or dealers in securities or currencies, holders whose "functional currency" is not the U.S. dollar, regulated investment companies, real estate investment trusts, partnerships (or any entity treated as a partnership for U.S. federal income tax purposes) and other pass-through entities, traders in securities who have elected the mark-to-market method of accounting for their securities, individual retirement accounts or other tax-deferred accounts, holders who acquired shares pursuant to the exercise of an employee stock option or right or otherwise as compensation, tax-exempt entities, and investors who own directly, indirectly through certain non-U.S. entities, or constructively 10% or more of the voting power or value of our aggregate shares outstanding. The following discussion does not address any tax consequences arising under the laws of any U.S. state or local or foreign jurisdiction, or under any U.S. federal laws other than those pertaining to income tax.

The discussion is based on the laws of the United States, including the Internal Revenue Code of 1986, as amended, or the Code, its legislative history, Treasury regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the U.S. Internal Revenue Service, or the IRS, all as in effect at the date of this annual report, and any of which may change, possibly with retroactive effect. Further, there can be no assurance that the IRS will not disagree with or will not challenge any of the conclusions reached and described herein. The discussion is also based, in part, on representations by the depositary and assumes that each obligation under the depositary agreement and any related agreement will be performed in accordance with its terms.

**Table of Contents**

**In General**

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of our ADSs or ordinary shares that is, for U.S. federal income tax purposes:

- a citizen or individual resident of the United States;

- a corporation, or other entity treated as a corporation that is created in or organized under the laws of the United States, any state thereof or the District of Columbia;

- an estate whose income is subject to U.S. federal income tax regardless of its source; or

- a trust if either (1) a United States court is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (2) the trust has a valid election in effect to be treated as a U.S. person under applicable Treasury regulations.

If an entity treated as a partnership for U.S. federal income tax purposes holds our ADSs or ordinary shares, the U.S. federal income tax treatment of such partnership and each partner will generally depend on the status and the activities of the partnership and the partner. Partnerships that hold our ADSs or ordinary shares, and partners in such partnerships, should consult their tax advisors regarding the U.S. federal, state and local and non-U.S. tax consequences applicable to them of the ownership and disposition of our ADSs or ordinary shares.

For U.S. federal income tax purposes, U.S. Holders of ADSs generally will be treated as the owners of the ordinary shares represented by the ADSs. Accordingly, except as otherwise noted, the U.S. federal income tax consequences discussed below apply equally to U.S. Holders of ADSs or the underlying ordinary shares.

**Holders should consult their tax advisors regarding the particular tax consequences to them of the ownership and disposition of our ADSs or ordinary shares under the laws of the United States (federal, state and local) or any other relevant taxation jurisdiction.**

**Taxation of Distributions**

Subject to the discussion under "— Passive Foreign Investment Companies" below, the gross amount of a distribution made by us with respect to the ordinary shares underlying our ADSs, including the full amount of any Cypriot withholding tax thereon, will be a dividend for U.S. federal income tax purposes includible in the gross income of a U.S. Holder to the extent paid out of our current or accumulated earnings and profits (as determined for U.S. federal income tax purposes). Such dividends will not be eligible for the dividends received deduction allowed to corporations, unless, pursuant to newly-enacted legislation, such corporations hold at least 10% of the equity of our company (by vote or value) and certain other requirements are met. Because we do not intend to maintain calculations of our earnings and profits on the basis of U.S. federal income tax principles, U.S. Holders should expect that any distribution paid will generally be reported to them as a "dividend" for U.S. federal income tax purposes. Dividends received by individuals and other non-corporate U.S. Holders of our ADSs that are traded on Nasdaq will be eligible for beneficial rates of taxation provided we are not a PFIC (as defined below) during the year in which the dividend is paid or the prior taxable year and certain other requirements, including stock holding period requirements, are satisfied by the recipient. U.S. Holders should consult their tax advisors regarding the application of the relevant rules to their particular circumstances.

Dividends will be included in a U.S. Holder's income on the date of the U.S. Holder's (or in the case of ADSs, the Depository's) receipt of the dividend. The amount of any dividend income paid in a foreign currency will be the U.S. dollar amount calculated by reference to the exchange rate in effect on the date of receipt, regardless of whether the payment is in fact converted into U.S. dollars. If the dividend is converted into U.S. dollars on the date of receipt, U.S. holders should not be required to recognize foreign currency gain or loss in respect of dividend income. A U.S. Holder may have foreign currency gain or loss if the dividend is converted into U.S. dollars after the date of receipt.

**Sale or Other Disposition of ADSs or Ordinary Shares**

Subject to the discussion under "— Passive Foreign Investment Companies" below, a U.S. Holder generally will recognize capital gain or loss for U.S. federal income tax purposes upon a sale or other disposition of its ADSs or ordinary shares in an amount equal to the difference between the amount realized from such sale or disposition and the U.S. Holder's adjusted tax basis in such ADSs or ordinary shares, in each case, as determined in U.S. dollars. Such capital gain or loss will be long-term capital gain (taxable at a reduced rate for non-corporate U.S. Holders, such as individuals) or loss if, on the date of sale or disposition, such ADSs or ordinary shares were held by such U.S. Holder for more than one year. The deductibility of capital losses is subject to significant limitations.

If a Russian tax is imposed on the sale or other disposition of our ADSs or ordinary shares, a U.S. Holder's amount realized will include the gross amount of the proceeds before deduction of the Russian tax. See "—Russian Tax Considerations Relevant to the Purchase, Ownership and Disposition of the ADSs" for a description of when a disposition may be subject to taxation by Russia. Because a U.S. Holder's gain from the sale or other disposition of ADSs or ordinary shares will generally be U.S. source gain, a U.S. Holder may be unable to claim a credit against its U.S. federal tax liability for any Russian tax on gains. In lieu of claiming a foreign tax credit, a U.S. Holder may elect to deduct foreign taxes, including the Russian tax, in computing taxable income, subject to generally applicable limitations under U.S. law. U.S. Holders should consult their tax advisors as to whether any Russian tax on gains may be creditable against U.S. federal income tax on foreign source income from other sources.

**Table of Contents**

The surrender of ADSs in exchange for ordinary shares (or vice versa) will not result in the realization of gain or loss for U.S. federal income tax purposes, and U.S. Holders will not recognize any gain or loss upon such a surrender. A U.S. Holder's tax basis in withdrawn shares will be the same as such holder's tax basis in the ADSs surrendered, and the holding period of the shares will include the holder's holding period for the ADSs.

**Passive Foreign Investment Companies**

In general, a publicly traded non-U.S. corporation will be classified as a passive foreign investment company, or PFIC, for U.S. federal income tax purposes, if either (i) 75% or more of its gross income consists of certain types of "passive" income or (ii) 50% or more of the fair market value of its assets (determined on the basis of a quarterly average) produce or are held for the production of passive income. For this purpose, cash is categorized as a passive asset and our unbooked intangibles will be taken into account and generally treated as non-passive assets. We will be treated as owning our proportionate share of the assets and earning our proportionate share of the income of any other corporation in which we own, directly or indirectly, 25% or more (by value) of the shares.

We do not believe that we were a PFIC for the taxable year ended December 31, 2019. We do not anticipate being a PFIC for our current taxable year, although we can make no assurances in this regard. Our status as a PFIC in any year depends on our assets and activities in that year. Because PFIC status is factual in nature, may depend in part on fluctuations in the market price of our ADSs, is determined annually, and generally cannot be determined until the close of the taxable year, there can be no assurance that we will not be considered a PFIC for any taxable year. We could be a PFIC, for example, based on changes to our business and assets and the potential application of technical regulations in the PFIC rules regarding certain banking activities. Furthermore, it is possible that the IRS may challenge our valuation of our goodwill and other unbooked intangibles, which may result in our company being classified as a PFIC.

If we are classified as a PFIC for any taxable year during which a U.S. Holder holds our ADSs or ordinary shares, the U.S. Holder will generally be subject to an increased amount of taxes and an interest charge, characterization of any gain from the sale or exchange of our ADSs or ordinary shares as ordinary income, and other disadvantageous tax treatment with respect to our ADSs or ordinary shares unless the U.S. Holder may make a mark-to-market election (as described below). Further, if we are classified as a PFIC for any taxable year during which a U.S. Holder holds our ADSs or ordinary shares and any of our non-U.S. subsidiaries is also a PFIC, such U.S. Holder would be treated as owning a proportionate amount (by value) of the shares of each such non-U.S. subsidiary classified as a PFIC (each such subsidiary, a lower tier PFIC) for purposes of the application of these rules. U.S. Holders should consult their tax advisors regarding the application of the PFIC rules to any of our subsidiaries.

As an alternative to the foregoing rules, a U.S. holder of "marketable stock" in a PFIC may make a mark-to-market election. A mark-to-market election may be made with respect to our ADSs, provided they are actively traded, defined for this purpose as being traded on a "qualified exchange," other than in de minimis quantities, on at least 15 days during each calendar quarter, but may not be made with respect to our ordinary shares as they are not marketable stock. We anticipate that our ADSs should qualify as being actively traded, but no assurances may be given in this regard. If a U.S. Holder of our ADSs makes this election, the U.S. Holder will generally (i) include as income for each taxable year the excess, if any, of the fair market value of our ADSs held at the end of the taxable year over the adjusted tax basis of such ADSs and (ii) deduct as a loss the excess, if any, of the adjusted tax basis of our ADSs over the fair market value of such ADSs held at the end of the taxable year, but only to the extent of the net amount previously included in income as a result of the mark-to-market election. The U.S. Holder's adjusted tax basis in our ADSs would be adjusted to reflect any income or loss resulting from the mark-to-market election. In addition, any gain such U.S. Holder recognizes upon the sale or other disposition of our ADSs will be treated as ordinary income and any loss will be treated as ordinary loss, but only to the extent of the net amount previously included in income as a result of the mark-to-market election. If a U.S. Holder makes a mark-to-market election in respect of a corporation classified as a PFIC and such corporation ceases to be classified as a PFIC, the U.S. Holder will not be required to take into account the gain or loss described above during any period that such corporation is not classified as a PFIC. In the case of a U.S. Holder who has held our ADSs during any taxable year in respect of which we were classified as a PFIC and continues to hold such ADSs (or any portion thereof) and has not previously made a mark-to-market election, and who is considering making a mark-to-market election, special tax rules may apply relating to purging the PFIC taint of such ADSs. Because a mark-to-market election cannot be made for any lower tier PFICs that we may own, a U.S. Holder may continue to be subject to the PFIC rules with respect to such U.S. Holder's indirect interest in any investments held by us that are treated as an equity interest in a PFIC for U.S. federal income tax purposes.

We do not intend to provide the information necessary for U.S. Holders of our ADSs or ordinary shares to make qualified electing fund elections, which, if available, would result in tax treatment different from the general tax treatment for PFICs described above.

If a U.S. Holder owns our ADSs or ordinary shares during any taxable year that we are a PFIC, such U.S. Holder may be subject to certain reporting obligations with respect to our ADSs or ordinary shares, including reporting on IRS Form 8621.

Each U.S. Holder should consult its tax advisor concerning the U.S. federal income tax consequences of holding and disposing of our ADSs or ordinary shares if we are or become classified as a PFIC, including the possibility of making a mark-to-market election.

108

Table of Contents

An individual U.S. Holder and certain entities may be required to submit to the IRS certain information with respect to his or her beneficial ownership of the ADSs or ordinary shares, if such ADSs or ordinary shares are not held on his or her behalf by a financial institution. This law also imposes penalties if an individual U.S. Holder is required to submit such information to the IRS and fails to do so. U.S. Holders should consult their tax advisors regarding application of the information reporting rules.

**Russian Tax Considerations Relevant to the Purchase, Ownership and Disposal of the ADSs**

The following is a summary of material Russian tax consequences relevant to the purchase, ownership and disposal of the ADSs. The summary is based on the laws of the Russian Federation in effect on the date of this annual report. All of the foregoing is subject to change (possibly on a retroactive

basis) and varying interpretations which may be inconsistent or contradictory.

The summary does not seek to address the applicability of, and procedures in relation to, Russian regional and local taxes. Nor does the summary seek to address the availability of double tax treaty relief, and it should be noted that there may be practical difficulties involved in claiming relief under an applicable double tax treaty. Prospective holders should consult their own tax advisors regarding the tax consequences of investing in the ADSs and no representations with respect to the Russian tax consequences of purchasing, owning or disposal of the ADSs to any particular holder is made hereby.

**General**

For the purposes of this section, a "resident holder" means a holder of ADSs who is:

An ADSs holder that is a legal entity or an organization which is:

- a Russian legal entity;

- a foreign legal entity or organization, in each case organised under a foreign law, that is recognized as a Russian tax resident based on Russian domestic law (see "Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations");

- a foreign legal entity or organization in each case organised under a foreign law, that is, in the case of conflicting tax residency statuses under the relevant foreign law and Russian law, recognized as a Russian tax resident based on the provisions of an applicable double tax treaty (for the purposes of application of such double tax treaty);

- a foreign legal entity or organization which holds and/ or disposes ADSs through its permanent establishment in Russia;

- an individual actually present in Russia for an aggregate period of 183 calendar days (including days of arrival to the Russian Federation and including days of departure from the Russian Federation) or more in any period comprised of 12 consecutive months (days of medical treatment and education outside the Russian Federation are also counted as days spent in the Russian Federation if the individual departed from the Russian Federation for these purposes for less than six months). The interpretation of this definition by the Russian Ministry of Finance states that, for tax withholding purposes, an individual's tax residence status should be determined on the date of the actual income payment (based on the number of days in Russia in the 12-month period preceding the date of the payment). Given that the tax residency status of an individual may change, an individual's final tax liability in the Russian Federation for any reporting calendar year should be determined based on the number of days spent in Russia in such calendar year, and may require a reassessment.

For the purposes of this section, a "non-resident holder" is a holder of ADSs who does not fall under the definition of a resident holder.

ADSs holders should consult their own tax advisors on their tax status in Russia.

**Non-resident holders**

Generally, a non-resident holder of ADSs should not be subject to any Russian taxes in respect of distributions made by us with respect to class B shares underlying the ADSs.

Legal entities or organizations

A non-resident holder that is a legal entity or organization generally should not be subject to any Russian taxes in respect of any gain or other income realized on the sale, exchange or other disposal of the ADSs unless more than 50% of our assets consist of immovable property situated in Russia. Otherwise, it is possible that any proceeds from sale, exchange or other disposal of ADSs may be regarded as Russian source income received by non-resident holders that are legal entities or organizations, subject to Russian income tax at a rate of 20%. The above tax may be reduced or eliminated under an applicable double tax treaty, provided that the recipient of the income is its beneficial owner, such income is not attributable to a permanent establishment in Russia, the necessary requirements to qualify for the treaty relief and the appropriate administrative requirements under the Russian tax legislation have been met.

109

Table of Contents

Capital gains that are received by a non-resident legal entity or an organisation from sale or other disposal of shares that are recognised as quoted securities under the requirements of the Russian Tax Code generally should not be subject to profits tax in Russia. However, there is an uncertainty whether the above exemption may be applied to depository receipts which are representing shares of a company which assets more than for 50% consist of immovable property situated in Russia.

Non-resident holders that are legal entities or organizations should consult their own tax advisors with respect to the tax consequences of the sale, exchange or other disposal of the ADSs.

Individuals

A non-resident holder who is an individual should not generally be subject to Russian taxes in respect of any gains realized on the sale, exchange or other disposal of ADSs, provided that the proceeds of such sale, exchange or disposal are not received from a source within Russia.

ADS holders outside of Russia may be subject to Russian tax for income earned upon a sale, exchange or disposal of our ADSs. However, in the

event that the proceeds from a sale, exchange or other disposal of ADSs are deemed to be received from a source within Russia, a non-resident holder that is an individual may be subject to Russian tax in respect of such proceeds at a rate of 30% of the gain (such gain being computed as the sales price less any available documented cost deduction, including the acquisition price of the ADSs and other documented expenses, such as depositary expenses and brokers' fees), subject to any available double tax treaty relief, provided that the necessary requirements to qualify for the treaty relief and the appropriate administrative requirements under the Russian tax legislation have been met. For example, holders of ADSs that are eligible for the benefits of the United States-Russia double tax treaty should generally not be subject to tax in Russia on any gain arising from the disposal of ADSs, provided that the gain is not attributable to disposal of shares in a Russian "property-rich companies" (company with more than 50% of its assets consisting of immovable property situated in Russia, as defined in the treaty). If more than 50% of our assets were to consist of immovable property situated in Russia, there is no assurance that the benefits of the United States-Russia double tax treaty may not be available to an ADS holder.

According to Russian tax legislation, income received from a sale, exchange or other disposal of the ADSs should be treated as having been received from a Russian source if such sale, exchange or other disposal occurs in Russia. Russian tax law gives no clear indication as to how to identify the source of income received from a sale, exchange or other disposal of securities except that income received from the sale of securities "in Russia" will be treated as having been received from a Russian source. In the absence of any guidance as to what should be considered as sale, exchange or other disposal of securities "in Russia", the Russian tax authorities may apply various criteria in order to determine the source of the sale or other disposal, including looking at the place of conclusion of the transaction, the location of the issuer or other similar criteria. There is no assurance, therefore, that the proceeds received by non-resident holders – individuals from a sale, exchange or other disposal of the ADSs will not become subject to tax in Russia.

The tax may be withheld at the source of payment only if the individual acts via a professional intermediary that is registered for the tax purposes in Russia (such as asset manager, dealer, licensed broker or other intermediary that carries out operations under a brokerage service agreement, agency agreement, asset management agreement, commission agreement or commercial mandate agreement), otherwise the non-resident holder – individual shall be liable to file a tax return and pay the tax due to the Russian budget.

Starting from January 1, 2020, in absence of the licensed broker or an asset manager mentioned above, Russian tax agent responsibilities should also be fulfilled by a Russian legal entities or organisations acquiring the ADSs from the non-resident holders – individuals under sale or barter agreement.

Additionally, acquisition of the ADSs by a non-resident holder who is an individual may constitute a taxable event pursuant to provisions of the Russian Tax Code relating to the material benefit (deemed income) received by individuals as a result of acquisition of securities. If the acquisition price of the ADSs is below the lower margin of fair market value calculated under a specific procedure for the determination of market prices of securities for tax purposes, the difference may be subject to the Russian personal income tax at a rate of 30% (arguably, this would be subject to reduction or elimination under the applicable double tax treaty).

As noted above with respect to the disposal of the ADSs under Russian tax legislation, taxation of the income of non-resident holders who are individuals will depend on whether this income would be assessed as received from Russian or non-Russian sources. Although Russian tax legislation does not contain any provisions on how the related material benefit should be sourced, the tax authorities may infer that such income should be considered as Russian source income if the ADSs are purchased "in Russia". In the absence of any additional guidance as to what should be considered as a purchase of securities "in Russia", the Russian tax authorities may apply various criteria in order to determine the source of the related material benefit, including looking at the place of conclusion of the acquisition transaction, the location of the issuer or other similar criteria. There is no assurance, therefore, that proceeds received by non-resident holders – individuals from a sale, exchange, redemption or other disposal of the ADSs will not become subject to tax in Russia.

Non-resident holders who are individuals should consult their own tax advisors with respect to the tax consequences arising from acquisition, sale, exchange or other disposal of the ADSs and the receipt of the proceeds from source within Russia in their respect.

110

Table of Contents

Double Tax Treaty Procedures

Where a non-resident holder of ADSs receives income from a Russian source, the Russian tax (if applicable under Russian domestic tax law) may be reduced or eliminated in accordance with the provisions of a double tax treaty. Advance treaty relief should be available for those eligible, subject to the requirements of the laws of Russia. In order for a non-resident holder to benefit from the applicable double tax treaty, documentary evidence is required to confirm the applicability of the double tax treaty for which benefits are claimed. Currently, a non-resident holder is required to provide a tax residence confirmation issued by the competent tax authority of the relevant treaty country (duly apostilled or legalized, translated into Russian and notarized). The tax residency confirmation needs to be renewed on an annual basis, and provided before the first payment of income in each calendar year. For a non-resident holder that is a legal entity or organization this should be a tax residency certificate for the relevant year.

In order to benefit from the applicable double tax treaty, the person claiming such benefits must be the beneficial owner of the relevant income. Starting from January 1, 2017, under the Russian Tax Code, in addition to a certificate of tax residency, the tax agent is obliged to require a confirmation from the non-resident holder or legal entity that it is the beneficial owner of the relevant income. As of the date of this annual report, the form of such confirmation is not set by the Russian Tax Code. Current clarifications of the Russian Ministry of Finance and Federal Tax Service guidance generally describe the information that is necessary to confirm the beneficial ownership of income, yet they do not set the precise form for the above confirmation. The Russian tax authorities try to extend this requirement retrospectively (for details see "Russian anti-offshore measures may have adverse impact on our business, financial condition and results of operations").

A non-resident holder who is an individual willing to obtain the advance double tax treaty relief at source should confirm to a tax agent that he or she is tax resident in a relevant foreign jurisdiction having a double tax treaty with Russia by providing the tax agent with a personal identity document and document confirming the tax residency of an individual in a relevant jurisdiction. To date, the Russian tax authorities do not generally make additional

claims for confirmation of tax residency. However, due to the lack of available practice there is some uncertainty as to how they will be applied by the Russian tax authorities.

Non-resident holders should consult their own tax advisors regarding possible tax treaty relief and procedures for obtaining such relief with respect to any Russian taxes imposed on any payments received with respect to the ADSs.

Refund of Tax Withheld

If Russian withholding tax on income derived from Russian sources by a non-resident holder has been withheld at the source of payment and such non-resident holder is entitled to benefits of an applicable double tax treaty allowing such non-resident holder not to pay the tax in Russia or pay the tax at a reduced rate in relation to such income, an application for the refund of the tax withheld may be made within three years from the end of the tax period in which the tax was withheld for non-resident holders.

In order to obtain a refund, the non-resident holder that is a legal entity or an individual is required to file with the Russian tax authorities, among other documents, along with the tax refund claim a pack of documents a list of which is stipulated by the Russian Tax Code.

The Russian tax authorities may, in practice, require a wide variety of documentation confirming the right to benefits under a double tax treaty. Such documentation, in practice, may not be explicitly required by the Russian Tax Code. Obtaining a refund of Russian tax withheld may be a time consuming process and can involve considerable practicable difficulties, depending to a large extent on the position of the local tax inspectorates. No assurance can be given that a refund of Russian tax withheld will be granted in practice.

Non-resident holders should consult their own tax advisors should they need to obtain a refund of Russian taxes withheld on any payments received with respect to the ADSs.

**Resident holders**

A resident holder will generally be subject to all applicable Russian taxes in respect of the purchase of the ADSs and income received on the ADSs, including any distributions on ADSs, gains from their sale, exchange or other disposal.

Resident holders should consult their own tax advisors with respect to their tax position regarding the ADSs.

F.     **Dividend and Paying Agents.**

Not applicable.

G.     **Statements by Experts.**

Not applicable.

H.     **Documents on Display.**

We are subject to the periodic reporting and other informational requirements of the Exchange Act. Under the Exchange Act, we are required to file reports and other information with the SEC. Specifically, we are required to file annually a Form 20-F within four months after the end of each fiscal year, which is December 31. The SEC also maintains a website at www.sec.gov that contains reports, proxy and information statements, and other information regarding registrants that make electronic filings with the SEC using its EDGAR system. As a foreign private issuer, we are exempt from the rules under the Exchange Act prescribing the furnishing and content of quarterly reports and proxy statements, and officers, directors and principal shareholders are exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act.

Table of Contents

I.     **Subsidiary Information.**

Not applicable.

**ITEM 11.**     **Quantitative and Qualitative Disclosures About Market Risk**

The main risks that could adversely affect our financial assets, liabilities or future cash flows are foreign exchange risk, liquidity and credit risk. Our management reviews and approves policies for managing each of the risks which are summarized below.

**Foreign exchange risk**

Foreign exchange risk is the risk that fluctuations in exchange rates will adversely affect items in our statement of comprehensive income, statement of financial position and/or cash flows. Foreign currency denominated assets and liabilities give rise to foreign exchange exposure.

As a result of our June 2014 secondary public offering, we increased our issued share capital by 2,292,330 class B shares and received U.S. $ 88,942,404, which then were used for mergers and acquisitions (M&A) and certain operational needs that relate to the ordinary course of business. The major part of these proceeds was accounted for as other short-term bank deposits in cash and cash equivalents as of December 31, 2018 and 2017. The

outstanding balance was immaterial as of December 31, 2019. Due to the depreciation of the U.S. dollar against the ruble in 2019 and 2017, and appreciation of U.S. dollar rate against the ruble during 2018, we recorded foreign exchange loss in the amount of RUB 130 and RUB 236 million and foreign exchange gain in the amount of RUB 433 million for these periods respectively.

*Foreign currency sensitivity*

The following tables demonstrate the sensitivity to a reasonably possible change in U.S. dollar and euro exchange rates against Russian ruble, with all other variables held constant. The impact on profit before tax is due to changes in the carrying amount of monetary assets and liabilities denominated in U.S. dollar and euro when these currencies are not functional currencies of the respective Group subsidiary. Our exposure to foreign currency changes for all other currencies is not material.

| | change in US Dollar | Effect on profit before tax Gain/(loss) (in RUB millions) |
|---|---|---|
| 2019 | +13% | 147 |
| | -11% | (124) |
| 2018 | +14% | 329 |
| | -14% | (329) |

| | change in Euro | Effect on profit before tax Gain/(loss) (in RUB millions) |
|---|---|---|
| 2019 | +13% | 192 |
| | -11% | (162) |
| 2018 | +14% | 196 |
| | -14% | (196) |

*Liquidity risk and capital management*

Liquidity risk is the risk that an entity will encounter difficulty in meeting obligations associated with financial liabilities. We seek to maintain a stable funding base primarily consisting of agent's deposits, current accounts and due to banks, retail deposits from customers and debt. The deposits received from our consumers and agents are also primarily due on demand, but are usually offset against future payments processed through agents. We expect that agent's deposits will continue to be offset against future payments and not be called by the agents. Customer accounts and amounts due to banks, trade and other payables are due in demand. We have sufficient cash balances and keeps it in diversified portfolios of liquid instruments such as government bonds, correspondent account with CBR and overnight placements in high-rated commercial banks, in order to be able to respond timely and steady to unforeseen liquidity requirements.

Since 2014, the Russian economy has been going through a period of macroeconomic slowdown and liquidity shortage in a number of markets (including those in which we operate), caused among other things by falling oil prices, ruble devaluation and the economic sanctions regime. Banks and other entities in Russia decreased credit limits in their everyday operations and we have noted that our merchants and

112

Table of Contents

partners also started and in certain cases continued to request from us larger collaterals to hedge their risks. In the first quarter of 2020 the Ruble again depreciated substantially and abruptly against the U.S. dollar and the euro due to a steep decline in oil prices. The full scope of the negative impact that COVID-19 and the abrupt decline in oil prices and resulting exchange rate drop may have on the Russian economy and available liquidity remains unclear but has the potential to be very significant. We were able to manage these conditions and requirements to date, though the liquidity shortage in the market if exacerbated may have negative effects on our operations, which cannot be now reliably estimated.

According to CBR requirements, bank's capital calculated based on CBR instructions should be not less than certain portion of its risk-adjusted assets. As of December 31, 2019, Qiwi Bank JSC's capital ratio is above the minimal level required of 8%. We monitor the fulfillment of requirements on a daily basis and send the reports to CBR on a monthly basis. During the years ended December 31, 2019 and 2018 Qiwi Bank JSC met the capital adequacy requirements.

We manage our capital structure and adjust it, in light of changes in economic conditions. Our capital includes share capital, share premium, additional paid-in capital, other reserves and translation reserve. To maintain or adjust the capital structure, we may make dividend payments to shareholders or issue new shares. Currently, we require capital to finance our growth, but we generate sufficient cash from our operations. The table below summarizes the maturity profile of our financial liabilities based on contractual undiscounted payments.

| | Total | Due: On demand | Within a year | More than a year |
|---|---|---|---|---|

| | Total | On demand | Within a year | More than a year |
|---|---|---|---|---|
| | | | | (in RUB millions) |
| Debt | 1,545 | — | — | 1,545 |
| Lease liabilities | 1,357 | — | 340 | 1,017 |
| Trade and other payables | 27,295 | 27,295 | — | — |
| Customer accounts and amounts due to banks | 21,963 | 18,712 | 2,807 | 444 |
| **Total as of December 31, 2019** | **52,160** | **46,007** | **3,147** | **3,006** |

| | | Due: | Within | More than |
|---|---|---|---|---|
| | Total | On demand | a year | a year |
| | | (in RUB millions) | | |
| Trade and other payables | 27,499 | 27,499 | — | — |
| Customer accounts and amounts due to banks | 18,105 | 16,002 | 1,866 | 237 |
| **Total as of December 31, 2018** | **45,604** | **43,501** | **1,866** | **237** |

*Credit risk*

Our financial assets, which potentially subject us and our subsidiaries, joint ventures and associates to credit risk, consist principally of trade receivables, loans issued, cash and short-term investments. We sell services on a prepayment basis or ensure that our receivables are from customers with an appropriate credit history – large merchants and agents with sufficient and appropriate credit history. Our receivables from merchants and others, except for agents, are generally non-interest-bearing and do not require collateral. Receivables from agents are interest-bearing and unsecured. We hold cash primarily with reputable Russian and international banks, including the Central Bank of Russia, which management considers having minimal risk of default, although credit ratings of Russian and Kazakh banks are generally lower than those banks in more developed markets. Short-term investments include fixed-rate debt instruments issued by the Russian Government.

An impairment analysis is performed at each reporting date using a provision matrix to measure expected credit losses. The provision rates are based on days past due for groupings of various customer segments with similar loss patterns. The carrying amount of accounts receivable, net of allowance for impairment of receivables, represents the maximum amount exposed to the credit risk for this type of receivables.

Set out below is the information about the credit risk exposure on our trade and other receivables (except for advances issued) using a provision matrix:

**December 31, 2019**

| | | Days past due | | | |
|---|---|---|---|---|---|
| | Current and <30 days | 30-60 days | 61-90 days | >91 days | Total |
| Expected credit loss rate | 0.10% | 1% | 57% | 94% | |
| Exposure at default | 5,143 | 490 | 362 | 76 | **6,071** |
| Expected credit loss | (6) | (3) | (208) | (71) | **(288)** |

**December 31, 2018**

| | | Days past due | | | |
|---|---|---|---|---|---|
| | Current and <30 days | 30-60 days | 61-90 days | >91 days | Total |
| Expected credit loss rate | 0.26% | 3% | 36% | 98% | |
| Exposure at default | 7,672 | 96 | 22 | 331 | **8,121** |
| Expected credit loss | (20) | (3) | (8) | (323) | **(354)** |

113

Table of Contents

We evaluate the concentration of risk with respect to trade and other receivables as low, as its customers are located in several jurisdictions and industries and operate in largely independent markets. The table below demonstrates the largest counterparties' balances as a percentage of respective totals:

| | Trade and other receivables | | |
|---|---|---|---|
| | As of | As of | As of |
| Concentration of credit risks by main counterparties, | December 31, | December 31, | December 31, |
| % from total amount | 2017 | 2018 | 2019 |
| Top 5 counterparties | 47% | 40% | 43% |
| Others | 53% | 60% | 57% |

We are also exposed to substantial credit risk through our payment-by-installment card project SOVEST, where Qiwi Bank JSC serves as a lender and bears substantially all credit risk on outstanding loans. When granting loans on SOVEST cards, we use automated scoring solvency models and evaluate individually each application for the probability of fraud and social default. We use the information from the major credit bureaus as well as certain other data including the evaluation of the potential effects of changes in macroeconomic conditions and regional affiliation of the applicant in order to approve or reject the application. We can then use manual verification for determining the credit limit for the approved applicants. We run

advanced forward-looking models that are based on the analysis of the transactional behavior of individual customers in order to predict and stimulate usage as well as prevent fraud, and we use a migration matrix approach for calculation of the loan expected credit loss provisions.

As of December 31, 2019 the amount of total loans issued (net of expected credit loss allowance) was equal to RUB 7,985 million up from RUB 5,274 as of December 31, 2018, the corresponding amount of provisions for loan impairment was RUB 810 million as compared with RUB 822 million as compared to the same period in the prior year (*see " – Item 5. A. Operating results" for more details on the dynamics*). The amount of credit loss expense for the year ended December 31, 2019 is RUB 642 million. A loan is considered overdue when the borrower fails to make any payment due under the loan at the reporting date and an overdue amount is recognized as the aggregate amount of all amounts due from the borrower under the respective loan agreement including accrued interest and commissions in any. For the purposes of our internal credit risk assessment, we consider all loans with a principal and/or interest payment that is more than 90 days overdue as "non-performing".

We distribute our installment cards to customers on a federal scale, across all regions of Russia. Our target audience includes Russian citizens with permanent registration and aged 18 to 70 years. We also use a variety of distribution channels and strategies to obtain clients and therefore believe that our credit risk is broadly diversified.

As of December 31, 2019, we had credit exposure to our counterparties in connection with our Factoring PLUS business of RUB 3,365 million up from RUB 1,559 as of December 31, 2018, and in connection with financial and performance guarantees we provide mostly to non-related parties as part of our Factoring Plus business and certain of our merchants (predominantly in betting space) in the amount of RUB 8,545 million up from RUB 1,260 as of December 31, 2018.

As part of the credit risk assessment of the factoring transactions, we evaluate the credit risk of an individual client as well as of the debtor. We believe that debtor risk assessment is an important source of additional security and credit quality guarantee. Procedures and responsibilities for assessing and managing credits risks of clients and debtors are clearly stipulated in the internal risk policy. To assess clients' accounts receivable as a form of collateral, we analyze each debtor individually and collectively at the portfolio level (risk concentration, turnover ratios and other parameters). We also make allowances for the dual structure of collateral for the assets placed under factoring operations. According to such structure, the debtor whose receivables are assigned to us must fulfill its obligations and in case the debtor fails to fulfill its contractual liabilities, the liabilities are transferred to the client under recourse. Compared with traditional lending, therefore, the assets are better collateralized and the credit risk is lower.

The management established a credit committee that develops and approves general principles for lending and takes special measures to mitigate credit risk such as reduction of the credit limits for unreliable clients, diversification of methods of work with overdue borrowers and more advanced scoring models for the new borrowers.

**ITEM 12.**     **Description of Securities Other Than Equity Securities**

**A.**    **Debt Securities.**

Not applicable.

**B.**    **Warrants and Rights.**

Not applicable.

114

**Table of Contents**

**C.**    **Other Securities.**

Not applicable.

**D.**    **American Depositary Shares.**

**Fees and Expenses**

| Persons depositing or withdrawing class B shares or ADS holders must pay: | For: |
|---|---|
| U.S.$5.00 (or less) per 100 ADSs (or portion of 100 ADSs) | • Issuance of ADSs, including issuances resulting from a distribution of class B shares or rights or other property |
| | • Cancellation of ADSs for the purpose of withdrawal, including if the deposit agreement terminates |
| U.S.$0.05 (or less) per ADS | • Any cash distribution to ADS holders |
| A fee equivalent to the fee that would be payable if securities distributed to you had been class B shares and the class B shares had been deposited for issuance of ADSs | • Distribution of securities distributed to holders of deposited securities which are distributed by the depositary to ADS holders |
| U.S.$0.05 (or less) per ADSs per calendar year | • Depositary services |
| Registration or transfer fees | • Transfer and registration of class B shares on our share register to or from the name of the depositary or its agent when you deposit or withdraw class B shares |

| | |
|---|---|
| Expenses of the depositary | Cable, telex and facsimile transmissions (when expressly provided in the deposit agreement) |
| | • Converting foreign currency to U.S. dollars |
| Taxes and other governmental charges the depositary or the custodian have to pay on any ADS or share underlying an ADS, for example, stock transfer taxes, stamp duty or withholding taxes | • As necessary |
| Any charges incurred by the depositary or its agents for servicing the deposited securities | • As necessary |

The depositary collects its fees for delivery and surrender of ADSs directly from investors depositing class B shares or surrendering ADSs for the purpose of withdrawal or from intermediaries acting for them. The depositary collects fees for making distributions to investors by deducting those fees from the amounts distributed or by selling a portion of distributable property to pay the fees. The depositary may collect its annual fee for depositary services by deduction from cash distributions or by directly billing investors or by charging the book-entry system accounts of participants acting for them. The depositary may generally refuse to provide fee-based services until its fees for these services are paid.

From time to time, the depositary may make payments to us to reimburse and/or class B share revenue from the fees collected from ADS holders, or waive fees and expenses for services provided, generally relating to costs and expenses arising out of establishment and maintenance of the ADS program. In performing its duties under the deposit agreement, the depositary may use brokers, dealers or other service providers that are affiliates of the depositary and that may earn or share fees or commissions.

**Payment of Taxes**

You will be responsible for any taxes or other governmental charges payable on your ADSs or on the deposited securities represented by any of your ADSs. The depositary may refuse to register any transfer of your ADSs or allow you to withdraw the deposited securities represented by your ADSs until such taxes or other charges are paid. It may apply payments owed to you or sell deposited securities represented by your ADSs to pay any taxes owed and you will remain liable for any deficiency. If the depositary sells deposited securities, it will, if appropriate, reduce the number of ADSs to reflect the sale and pay to ADS holders any proceeds, or send to ADS holders any property, remaining after it has paid the taxes.

**PART II**

ITEM 13.       **Defaults, Dividend Arrearages and Delinquencies**

None.

115

Table of Contents

ITEM 14.       **Material Modifications to the Rights of Security Holders and Use of Proceeds**

None.

ITEM 15.       **Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

The company's management, with the participation of the company's chief executive officer and chief financial officer, evaluated the effectiveness of the company's disclosure controls and procedures as of December 31, 2019. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on the evaluation of the company's disclosure controls and procedures as of December 31, 2019, the company's chief executive officer and chief financial officer concluded that, as of such date, the company's disclosure controls and procedures were effective to allow timely decisions regarding required disclosure.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate "internal control over financial reporting," as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. This rule defines internal control over financial reporting as a process designed by, or under the supervision of, a company's chief executive officer and chief financial officer and effected by our board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and

expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods is subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with policies and procedures may deteriorate.

Management assessed the design and operating effectiveness of our internal control over financial reporting as of December 31, 2019. This assessment was performed under the direction and supervision of our chief executive officer and chief financial officer, and used the criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on that evaluation, management concluded that as of December 31, 2019, our internal control over financial reporting was effective.

The effectiveness of our internal control over financial reporting as of December 31, 2019 has been audited by Ernst & Young LLC, our independent registered public accounting firm. Their report may be found below:

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of QIWI plc

Opinion on Internal Control Over Financial Reporting

We have audited QIWI plc's internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). In our opinion, QIWI plc (the "Company") maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated statement of financial position of the Company as of December 31, 2019 and 2018, the related consolidated statements of comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2019 and the related notes and our report dated March 24, 2020 expressed an unqualified opinion thereon.

116

Table of Contents

*Basis for Opinion*

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

*Definition and Limitations of Internal Control Over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLC

Moscow, Russia

**ITEM 16.**　　　**[RESERVED]**

**ITEM 16A.**　　**Audit Committee Financial Expert**

Our board of directors has determined that Mr. Marcus Rhodes is an "audit committee financial expert" as defined in Item 16A of Form 20-F under the Exchange Act. Our board of directors has also determined that Mr. Rhodes satisfies the "independence" requirements set forth in Rule 10A-3 under the Exchange Act.

**ITEM 16B.**　　**Code of Ethics**

We have adopted a Code of Ethics and Business Conduct that applies to all our directors, officers and employees. The Code of Ethics and Business Conduct is intended to promote honest and ethical conduct, full and accurate reporting, and compliance with laws as well as other matters. The first version of the Code was introduced in 2013, we have adopted an amended version in 2019 in order to reflect the development of the business environment and our Company. We believe these amendments incorporate best practices and reflect most current regulatory environment, as well as make the Code more transparent and well-structured. A copy of the Code of Ethics and Business Conduct is available on our website: https://investor.qiwi.com/corporate-governance/documents.

**ITEM 16C.**　　**Principal Accountant Fees and Services**

The following table sets forth the aggregate fees by categories specified below in connection with certain professional services rendered by Ernst & Young, our principal external auditors, for the periods indicated.

| | For the year ended December 31, | |
| | 2018 | 2019 |
| --- | --- | --- |
| | (in RUB millions) | |
| Audit Fees | 46 | 51 |
| Audit-Related Fees | — | 16 |
| Tax Fees | 4 | 4 |
| **All Other Fees** | **4** | **7** |
| **Total** | **54** | **78** |

117

Table of Contents

**Audit Fees**

Audit fees for 2018 and 2019 are the aggregate fees billed for the audit of our consolidated financial statements and other audit or interim review services provided in connection with statutory and regulatory filings or engagements.

**Audit-Related Fees**

There were no audit-related fees incurred in 2018. Audit-related fees in 2019 comprise securities transaction expenses including related to the filing of the Form F-3.

**Tax Fees**

Tax fees in 2018 and 2019 were related to tax compliance and tax planning services.

**All Other Fees**

All other fees in 2018 and 2019 relate to services in connection with corporate compliance matters, staff training and development costs.

**Pre-Approval Policies and Procedures**

All audit and non-audit services provided by our independent auditors must be pre-approved by our audit committee.

**ITEM 16D.**　　**Exemptions from the Listing Standards for Audit Committees**

None.

**ITEM 16E.**　　**Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

None.

**ITEM 16F.**　　**Change in Registrant's Certifying Accountant**

None.

**ITEM 16G.    Corporate Governance**

Our corporate affairs are governed by our memorandum and articles of association and the provisions of applicable Cyprus law, including the Companies Law and common law. The Companies Law differs from laws applicable to U.S. corporations and their shareholders.

**Exemptions From Nasdaq Corporate Governance Requirements**

The Nasdaq Marketplace Rules, or the Nasdaq Rules, provide that foreign private issuers may follow home country practice in lieu of the corporate governance requirements of the Nasdaq Stock Market LLC, subject to certain exceptions and requirements and except to the extent that such exemptions would be contrary to U.S. federal securities laws and regulations. The significant differences between our corporate governance practices and those followed by U.S. companies under the Nasdaq Listing Rules are summarized as follows:

- We follow home country practice that permits our board of directors to consist of less than a majority of independent directors, in lieu of complying with Rule 5605(b)(1) of the Nasdaq Rules that requires that the board of directors consist of a majority of independent directors. Currently, three members of our board of directors out of the total seven members are independent with the meaning of the Nasdaq Listing Rules.

- We follow home country practice that permits our board of directors not to implement a nominations committee or for directors to be nominated by a majority of our independent directors, in lieu of complying with Rule 5605(e) of the Nasdaq Rules that requires the implementation of a nominations committee or the nomination of directors by a majority of the independent directors. Subject to the rights of shareholders under Cyprus law to nominate directors to our board, the methodology by which directors are nominated to our board is as set forth in "Board of Directors Appointment of Directors."

- We follow home country practice that permits us not to hold regular executive sessions where only independent directors are present, in lieu of complying with Rule 5605(b)(2) of the Nasdaq Rules that requires that regular executive sessions are held where only independent directors are present. We do not hold regular executive sessions.

- We follow home country practice that permits our compensation committee to not consist entirely of independent directors, in lieu of complying with Rule 5605(d) (1) of the Nasdaq Rules that requires that the board of directors have a compensation committee consisting of entirely independent directors. In addition, although our compensation committee charter provides that the compensation committee may, in its sole discretion, retain a compensation consultant, our compensation committee charter does not include all enumerated matters concerning retention of compensation consultants as set forth in Rule 5605(d)(3) of the Nasdaq Rules.

118

**Table of Contents**

- We follow home country practice that permits the board of directors, without shareholder approval, to establish or materially amend any equity compensation arrangements, in lieu of complying with Rule 5635(b) of the Nasdaq Rules that requires that our shareholders approve the establishment or any material amendments to any equity compensation arrangements.

- Our board of directors has not made any determination with respect to the Company's intention to follow Rule 5635(a), (b), and (d) of the Nasdaq Rules, relating to matters requiring shareholder approval. Cypriot law and our articles of association permit us, with approval of our board of directors and without shareholder approval, to take the following actions:

  - Acquire the stock or assets of another company, where such acquisition results in the issuance of 20% or more of our outstanding share capital or voting power, in contrast to Rule 5635(a) of the Nasdaq Rules, which would require shareholder approval in order to enter into such an acquisition.

  - Enter into any transaction that may result in a person, or group of persons acting together, holding more than 20% of our outstanding share capital or voting power. Such transaction may be considered a change of control under Rule 5635(b) of the Nasdaq Rules, requiring shareholder approval. Notwithstanding the above, Cypriot law would not permit us to enter into any reorganization, merger or consolidation without shareholder approval.

  - Enter into any transaction other than a public offering involving the sale, issuance or potential issuance by the company of shares (or securities convertible into or exercisable for shares) equal to 20% or more of the outstanding share capital of the Company or 20% or more of the voting power outstanding before the issuance for less than the greater of book or market value of the stock, in contrast to Rule 5635(d), which would require shareholder approval for such issuance of shares (or securities convertible into or exercisable for shares).

Please see also "—Rights Attaching to Shares—Issue of Shares and Pre-emptive Rights" for restrictions on the issuance of shares.

We are not permitted to opt out of the requirement that we maintain an audit committee that consists entirely of independent directors and we currently comply with Rule 5605(c) of the Nasdaq Rules with respect to audit committee composition and practices.

**ITEM 16H.    Mine Safety Disclosure**

Not applicable.

PART III

**ITEM 17.**     **Financial Statements**

We have responded to Item 18 in lieu of responding to this item.

**ITEM 18.**     **Financial Statements**

Please refer to the financial statements beginning on page F-1.

**ITEM 19.**     **Exhibits**

**Index to Exhibits**

| Exhibit Number | Description of Document |
|---|---|
| 1.1 | Articles of Association of QIWI plc (incorporated by reference to Exhibit 1.1 to QIWI plc's Annual Report on Form 20-F, filed on March 28, 2018) |
| 2.1 | Form of Registrant's American Depositary Receipt (included in Exhibit 2.3) |
| 2.2 | Specimen Certificate for Class B Shares of the Registrant (incorporated by reference to Exhibit 4.2 to QIWI plc's Registration Statement on Form F-1/A, File No. 333-187579, filed on April 19, 2013) |
| 2.3 | Form of Deposit Agreement among the Registrant, the Depositary and Owners and Beneficial Owners of the American Depositary Shares issued thereunder (incorporated by reference to Exhibit 4.3 to QIWI plc's Registration Statement on Form F-1/A, File No. 333-187579, filed on April 19, 2013) |
| 2.4 | Description of Securities |
| 4.1 | Form of Amended and Restated Registration Rights Agreement among Saldivar Investments Limited, Sergey A. Solonin, Palmway Holdings Limited, Antana International Corporation, Andrey N. Romanenko, Dargle International Limited, Igor N. Mikhailov, Bralvo Limited, E1 Limited, Mail.ru Group Limited and Mitsui & Co., Ltd., and QIWI plc. (incorporated by reference to Exhibit 4.5 to QIWI plc's Registration Statement on Form F-1, File No. 333-191221, filed on September 30, 2013) |

119

Table of Contents

| | |
|---|---|
| 4.2 | Form of Amended and Restated Registration Rights Agreement among QIWI plc andPublic Joint-Stock Company «Bank Otkritie Financial Corporation» and (incorporated by reference to Exhibit 4. to QIWI plc's Registration Statement on Form F-3, File No. 333-235239, filed on November 25, 2019) |
| 8.1 | Subsidiaries of the Registrant |
| 12.1 | Certification of Boris Kim, Chief Executive Officer of QIWI plc, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 12.2 | Certification of Varvara Kiseleva, Interim Chief Financial Officer of QIWI plc, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 13.1 | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 15.1 | Consent of Ernst & Young LLC |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

120

Table of Contents

INDEX TO THE CONSOLIDATED FINANCIAL STATEMENTS

QIWI plc

Consolidated financial statements

for the year ended December 31, 2019

Report of independent registered public accounting firm | F-2
Consolidated financial statements
Consolidated statement of financial position as of December 31, 2018 and 2019 | F-3
Consolidated statement of comprehensive income for the years ended December 31, 2017, 2018 and 2019 | F-4
Consolidated statement of cash flows for the years ended December 31, 2016, 2017 and 2019 | F-5
Consolidated statement of changes in equity for the years ended December 31, 2017, 2018 and 2019 | F-6
Notes to consolidated financial statements | F-9

F-1

---

**Table of Contents**

QIWI plc

Consolidated financial statements

for the year ended December 31, 2019

**Report of independent registered public accounting firm**

To the Shareholders and the Board of Directors of QIWI plc

**Opinion on the Financial Statements**

We have audited the accompanying consolidated statement of financial position of QIWI plc (the Company) as of December 31, 2019 and 2018, the related consolidated statements of comprehensive income, changes in equity and cash flows for each of the three years in the period ended December 31, 2019, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019, in conformity with International Financial Reporting Standards as issued by the International Accounting Standards Board.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated March 24, 2020 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Ernst & Young LLC

We have served as the Company's auditor since 2008

Moscow, Russia

March 24, 2020

F-2

---

**Table of Contents**

QIWI plc

Consolidated statement of financial position

As of December 31, 2019

*(in millions of Rubles)*

| | Notes | As of December 31, 2018 | As of December 31, 2019 |
|---|---|---|---|
| **Assets** | | | |
| **Non-current assets** | | | |
| Property and equipment | 10 | 1,074 | 2,346 |
| Goodwill and other intangible assets | 11, 12 | 10,846 | 11,316 |
| Investments in associates | 21 | 812 | 1,118 |
| Investments in joint ventures | 22 | 836 | — |
| Long-term debt securities and deposits | 33 | 497 | 4,015 |
| Long-term loans | 13, 33 | 230 | 265 |
| Other non-current assets | | 110 | 83 |
| Deferred tax assets | 29 | 157 | 217 |
| **Total non-current assets** | | **14,562** | **19,360** |
| **Current assets** | | | |
| Trade and other receivables | 14 | 8,042 | 6,162 |
| Short-term loans | 13 | 6,890 | 11,419 |
| Short-term debt securities and deposits | 33 | 1,432 | 1,136 |
| Prepaid income tax | | 112 | 259 |
| Other current assets | 16 | 929 | 917 |
| Cash and cash equivalents | 15 | 40,966 | 42,101 |
| **Total current assets** | | **58,371** | **61,994** |
| Assets held for sale | 7 | 90 | 123 |
| **Total assets** | | **73,023** | **81,477** |
| **Equity and liabilities** | | | |
| **Equity attributable to equity holders of the parent** | | | |
| Share capital | 17 | 1 | 1 |
| Additional paid-in capital | | 1,876 | 1,876 |
| Share premium | 17 | 12,068 | 12,068 |
| Other reserve | | 2,097 | 2,576 |
| Retained earnings | | 9,091 | 10,557 |
| Translation reserve | | 513 | 289 |
| **Total equity attributable to equity holders of the parent** | | **25,646** | **27,367** |
| Non-controlling interests | | 60 | 70 |
| **Total equity** | | **25,706** | **27,437** |
| **Non-current liabilities** | | | |
| Long-term debt | 18 | — | 1,545 |
| Long-term lease liabilities | 23 | — | 1,017 |
| Long-term customer accounts | 20 | 237 | 444 |
| Other non-current liabilities | | 1 | 45 |
| Deferred tax liabilities | 29 | 743 | 749 |
| **Total non-current liabilities** | | **981** | **3,800** |
| **Current liabilities** | | | |
| Trade and other payables | 19 | 27,499 | 27,295 |
| Customer accounts and amounts due to banks | 20 | 17,868 | 21,519 |
| Short-term lease liabilities | 23 | — | 340 |
| VAT and other taxes payable | | 428 | 184 |
| Other current liabilities | 16 | 541 | 902 |
| **Total current liabilities** | | **46,336** | **50,240** |
| **Total equity and liabilities** | | **73,023** | **81,477** |

*The accompanying notes form an integral part of these consolidated financial statements.*

F-3

Table of Contents

QIWI plc

Consolidated statement of comprehensive income

for the year ended December 31, 2019

*(in millions of Rubles, except per share data)*

| | Notes | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| | | **Year ended December 31** | | |
| **Revenue:** | | **20,897** | **30,610** | **39,336** |
| Payment processing fees | | 17,265 | 23,694 | 30,736 |
| Interest revenue calculated using the effective interest rate | 24 | 1,052 | 1,854 | 3,646 |
| Fees from inactive accounts and unclaimed payments | | 1,310 | 1,419 | 1,806 |
| Other revenue | 24 | 1,270 | 3,643 | 3,148 |
| **Operating costs and expenses:** | | **(16,906)** | **(26,161)** | **(32,896)** |
| Cost of revenue (exclusive of items shown separately below) | 25 | (7,704) | (10,953) | (16,160) |
| Selling, general and administrative expenses | 26 | (3,796) | (6,099) | (6,213) |
| Personnel expenses | 3.19 | (4,286) | (7,748) | (7,765) |
| Depreciation and amortization | 10, 11 | (796) | (864) | (1,324) |
| Credit loss expense | 13,14,15,30 | (220) | (474) | (642) |
| Impairment of non-current assets | 11, 12 | (104) | (23) | (792) |
| **Profit from operations** | | **3,991** | **4,449** | **6,440** |
| Share of gain/(loss) of an associate and a joint venture | 21, 22 | — | (46) | 258 |
| Other income and expenses, net | 27 | (41) | (181) | (91) |
| Foreign exchange gain | | 257 | 1,311 | 905 |
| Foreign exchange loss | | (373) | (1,049) | (1,077) |
| Interest income and expenses, net | | 6 | 17 | (56) |
| **Profit before tax** | | **3,840** | **4,501** | **6,379** |
| Income tax expense | 29 | (698) | (875) | (1,492) |
| **Net profit** | | **3,142** | **3,626** | **4,887** |
| **Attributable to:** | | | | |
| Equity holders of the parent | | 3,114 | 3,584 | 4,832 |
| Non-controlling interests | | 28 | 42 | 55 |
| **Other comprehensive income** | | | | |
| *Other comprehensive income that may be reclassified to profit or loss in subsequent periods:* | | | | |
| <u>Foreign currency translation:</u> | | | | |
| Exchange differences on translation of foreign operations | | (133) | 525 | (229) |
| <u>Debt securities at fair value through other comprehensive income:</u> | | | | |
| Net change in fair value | | — | — | 33 |
| Net gains recycled to profit or loss upon disposal | | — | — | (26) |
| Changes in allowance for expected credit losses | | — | — | 8 |
| **Total other comprehensive income, net of tax** | | **(133)** | **525** | **(214)** |
| **Total comprehensive income, net of tax effect of nil** | | **3,009** | **4,151** | **4,673** |
| **Attributable to:** | | | | |
| Equity holders of the parent | | 2,981 | 4,099 | 4,623 |
| Non-controlling interests | | 28 | 52 | 50 |
| **Earnings per share:** | | | | |
| Basic, profit attributable to ordinary equity holders of the parent | 9 | 51.25 | 58.56 | 78.20 |
| Diluted, profit attributable to ordinary equity holders of the parent | 9 | 50.92 | 58.06 | 77.60 |

*The accompanying notes form an integral part of these consolidated financial statements.*

F-4

Table of Contents

QIWI plc

Consolidated statement of cash flows

for the year ended December 31, 2019

*(in millions of Rubles)*

| | Notes | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| | | **Year ended December 31** | | |
| **Cash flows from operating activities** | | | | |
| **Profit before tax** | | **3,840** | **4,501** | **6,379** |
| *Adjustments to reconcile profit before tax to net cash flows generated from operating activities* | | | | |
| Depreciation and amortization | 10, 11 | 796 | 864 | 1,324 |
| Foreign exchange loss/(gain), net | | 116 | (262) | 172 |
| Interest income, net | 24 | (1,016) | (1,782) | (2,901) |
| Credit loss expense | | 220 | 474 | 642 |

| | Notes | | | |
|---|---|---|---|---|
| Share of (gain)/loss of an associate and a joint venture | | — | 46 | (258) |
| Share-based payments | 34 | 398 | 635 | 464 |
| Impairment of non-current assets | 11, 12 | 104 | 23 | 792 |
| Loss from initial recognition | 25 | — | 143 | 273 |
| Other | | 46 | 371 | 122 |
| **Operating profit before changes in working capital** | | **4,504** | **5,013** | **7,009** |
| (Increase)/decrease in trade and other receivables | | (3,683) | 1,127 | 1,256 |
| (Increase)/decrease in other assets | | 150 | (529) | 39 |
| Increase in customer accounts and amounts due to banks | | 898 | 14,601 | 3,528 |
| Increase in accounts payable and accruals | | 3,414 | 7,347 | 976 |
| Increase in loans issued from banking operations | | (1,888) | (5,827) | (5,159) |
| **Cash flows generated from operations** | | **3,395** | **21,732** | **7,649** |
| Interest received | | 1,048 | 1,795 | 3,694 |
| Interest paid | | (70) | (113) | (333) |
| Income tax paid | | (813) | (769) | (1,771) |
| **Net cash flow generated from operating activities** | | **3,560** | **22,645** | **9,239** |
| **Cash flows used in investing activities** | | | | |
| Acquisition of associate and joint control company | 6 | (813) | (21) | (200) |
| Cash received upon /(used in) business combination | 6 | (321) | 138 | (354) |
| Purchase of property and equipment | | (292) | (736) | (858) |
| Purchase of intangible assets | | (566) | (385) | (443) |
| Proceeds from sale of fixed and intangible assets | | — | — | 196 |
| Loans issued | | (376) | (187) | (444) |
| Repayment of loans issued | | 316 | 4 | 412 |
| Purchase of debt instruments and funds depositing | | (1,376) | (810) | (5,405) |
| Proceeds from sale and redemption of debt instruments | | 1,775 | 672 | 2,213 |
| **Net cash used in investing activities** | | **(1,653)** | **(1,325)** | **(4,883)** |
| **Cash flows (used in)/generated from financing activities** | | | | |
| Proceeds from borrowings | | — | — | 1,545 |
| Payment of principal portion of lease liabilities | | — | — | (387) |
| Dividends paid to owners of the Group | 28 | (2,148) | — | (3,392) |
| Dividends paid to non-controlling shareholders | | (12) | (29) | (43) |
| **Net cash used in financing activities** | | **(2,160)** | **(29)** | **(2,277)** |
| Effect of exchange rate changes on cash and cash equivalents | | (333) | 1,240 | (944) |
| **Net increase/(decrease) in cash and cash equivalents** | | **(586)** | **22,531** | **1,135** |
| Cash and cash equivalents at the beginning of year | 15 | 19,021 | 18,435 | 40,966 |
| Cash and cash equivalents at the end of year | 15 | 18,435 | 40,966 | 42,101 |

*The accompanying notes form an integral part of these consolidated financial statements.*

F-5

Table of Contents

QIWI plc

Consolidated statement of changes in equity

for the year ended December 31, 2019

*(in millions of Rubles, except per share data)*

| | | Attributable to equity holders of the parent | | | | | | | Non- | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Share capital | | Additional | | | | | | |
| | | Number | | | | | | | | |
| | | of shares | | paid-in | Share | Other | Retained | Translation | | controlling | Total |
| | Notes | outstanding | Amount | capital | premium | reserves | earnings | reserve | Total | interests | equity |
| **Balance as of December 31, 2018** | | **61,451,513** | **1** | **1,876** | **12,068** | **2,097** | **9,091** | **513** | **25,646** | **60** | **25,706** |
| Profit for the year | | — | — | — | — | — | 4,832 | — | 4,832 | 55 | 4,887 |
| Other comprehensive income: | | | | | | | | | | | |
| Foreign currency translation | | — | — | — | — | — | — | (224) | (224) | (5) | (229) |
| Debt instruments at FVOCI | | — | — | — | — | 15 | — | — | 15 | — | 15 |
| **Total comprehensive income** | | **—** | **—** | **—** | **—** | **15** | **4,832** | **(224)** | **4,623** | **50** | **4,673** |
| Share-based payments | 34 | — | — | — | — | 464 | — | — | 464 | — | 464 |
| Exercise of options | 17 | 641,322 | — | — | — | — | — | — | — | — | — |
| Dividends (54 RUR per share) | 28 | — | — | — | — | — | (3,366) | — | (3,366) | — | (3,366) |

| | Number of shares outstanding | Amount | Additional paid-in capital | Share premium | Other reserves | Retained earnings | Translation reserve | Total | Non-controlling interests | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|
| Dividends to non-controlling interests | — | — | — | — | — | — | — | — | (43) | **(43)** |
| Other | — | — | — | — | — | — | — | — | 3 | **3** |
| **Balance as of December 31, 2019** | **62,092,835** | **1** | **1,876** | **12,068** | **2,576** | **10,557** | **289** | **27,367** | **70** | **27,437** |

*The accompanying notes form an integral part of these consolidated financial statements.*

F-6

Table of Contents

QIWI plc

Consolidated statement of changes in equity

for the year ended December 31, 2019

*(in millions of Rubles, except per share data)*

| | Notes | Number of shares outstanding | Amount | Additional paid-in capital | Share premium | Other reserves | Retained earnings | Translation reserve | Total | Non-controlling interests | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance as of December 31, 2017** | | **60,932,654** | **1** | **1,876** | **12,068** | **1,462** | **5,715** | **(2)** | **21,120** | **37** | **21,157** |
| Impact of adopting IFRS 9 | | — | — | — | — | — | (208) | — | (208) | — | (208) |
| **Restated opening balance as of December 31, 2017** | | **60,932,654** | **1** | **1,876** | **12,068** | **1,462** | **5,507** | **(2)** | **20,912** | **37** | **20,949** |
| Profit for the year | | — | — | — | — | — | 3,584 | — | **3,584** | 42 | **3,626** |
| Other comprehensive income: | | | | | | | | | | | |
| Foreign currency translation | | — | — | — | — | — | — | 515 | **515** | 10 | **525** |
| **Total comprehensive income** | | **—** | **—** | **—** | **—** | **—** | **3,584** | **515** | **4,099** | **52** | **4,151** |
| Share-based payments | 34 | — | — | — | — | 635 | — | — | **635** | — | **635** |
| Exercise of options | 17 | 518,859 | — | — | — | — | — | — | **—** | — | **—** |
| Dividends to non-controlling interests | | — | — | — | — | — | — | — | **—** | (29) | **(29)** |
| **Balance as of December 31, 2018** | | **61,451,513** | **1** | **1,876** | **12,068** | **2,097** | **9,091** | **513** | **25,646** | **60** | **25,706** |

*The accompanying notes form an integral part of these consolidated financial statements.*

F-7

Table of Contents

QIWI plc

Consolidated statement of changes in equity

for the year ended December 31, 2019

*(in millions of Rubles, except per share data)*

| | Notes | Number of shares outstanding | Amount | Additional paid-in capital | Share premium | Other reserves | Retained earnings | Translation reserve | Total | Non-controlling interests | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance as of December 31, 2016** | | **60,597,034** | **1** | **1,876** | **12,068** | **1,064** | **4,808** | **131** | **19,948** | **21** | **19,969** |
| Profit for the year | | — | — | — | — | — | 3,114 | — | **3,114** | 28 | **3,142** |
| Other comprehensive income: | | | | | | | | | | | |
| Foreign currency translation | | — | — | — | — | — | — | (133) | (133) | — | (133) |
| **Total comprehensive income** | | **—** | **—** | **—** | **—** | **—** | **3,114** | **(133)** | **2,981** | **28** | **3,009** |
| Share-based payments | 34 | — | — | — | — | 398 | — | — | **398** | — | **398** |
| Exercise of options | 17 | 335,620 | — | — | — | — | — | — | **—** | — | **—** |
| Dividends (36 RUR per share) | 28 | — | — | — | — | — | (2,207) | — | **(2,207)** | — | **(2,207)** |
| Dividends to non-controlling | | | | | | | | | | | |

| interests | | | | | | | | (12) | | (12) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance as of December 31, 2017** | **60,932,654** | **1** | **1,876** | **12,068** | **1,462** | **5,715** | **(2)** | **21,120** | **37** | **21,157** |

*The accompanying notes form an integral part of these consolidated financial statements.*

F-8

**Table of Contents**

QIWI plc

Notes to consolidated financial statements

## 1.  Corporate information and description of business

QIWI plc (hereinafter "the Company") was registered on February 26, 2007 as a limited liability Company OE Investment in Cyprus under the Cyprus Companies Law, Cap. 113. The registered office of the Company is Kennedy 12, Kennedy Business Centre, 2nd Floor, P.C.1087, Nicosia, Cyprus. On September 13, 2010 the directors of the Company resolved to change the name of the Company from OE Investments Limited to QIWI Limited. On February 25, 2013 the directors of the Company resolved to change the legal form of the Company from QIWI Limited to QIWI plc. The consolidated financial statements of QIWI plc and its subsidiaries for the year ended December 31, 2019 were authorized for issue by Board of Directors (BoD) on March 13, 2020.

QIWI plc and its subsidiaries (collectively the "Group") operate electronic online payment systems primarily in Russia, Kazakhstan, Moldova, Belarus, Romania, United Arab Emirates (UAE) and other countries and provide consumer and small and medium enterprises (SME) financial services.

The Company was founded as a holding company as a part of the business combination transaction in which ZAO Ob'edinennya Sistema Momentalnykh Platezhey and ZAO e-port Group of entities were brought together by way of contribution to the Company. The transaction was accounted for as a business combination in which ZAO Ob'edinennya Sistema Momentalnykh Platezhey was identified as the acquirer.

The Company's American Depositary Securities (ADS) have been listed on Nasdaq since May 3, 2013 and have been admitted to trading on MOEX since May 20, 2013. Prior to that time, there was no public market for the Company' ADSs or ordinary shares. Subsequently, the Company closed two follow-on offerings of its ADSs on October 3, 2013 and on June 20, 2014.

Sergey Solonin is the ultimate controlling shareholder of the Group as of December 31, 2019.

Information on the Company's principal subsidiaries is disclosed in Note 5.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-9

**Table of Contents**

QIWI plc

Notes to consolidated financial statements (continued)

## 2.  Principles underlying preparation of consolidated financial statements

### 2.1  Basis of preparation

The consolidated financial statements are prepared on a historical cost basis. The consolidated financial statements are presented in Russian rubles ("RUB") and all values are rounded to the nearest million (RUB (000,000)) except when otherwise indicated.

The Group's subsidiaries maintain and prepare their accounting records and prepare their statutory accounting reports in accordance with domestic accounting legislation. Standalone financial statements of subsidiaries are prepared in their respective functional currencies (see Note 3.3 below).

The Group accounts are prepared in accordance with the International Financial Reporting standards (IFRS) as issued by the International Accounting Standards Board (IASB). These consolidated financial statements are based on the underlying accounting records appropriately adjusted and reclassified for a fair presentation in accordance with IFRS. IFRS adjustments to local statutory accounting records include and affect but not limited to such major areas as consolidation, revenue recognition, accruals, deferred taxation, fair value adjustments, business combinations and impairment.

### 2.2  Basis of consolidation

The consolidated financial statements comprise the financial statements of QIWI plc and its subsidiaries as of December 31 each year.

Control is achieved when the Group is exposed, or has rights, to variable returns from its involvement with the investee and has the ability to affect

those returns through its power over the investee.

Specifically, the Group controls an investee if and only if the Group has:

- Power over the investee (i.e. existing rights that give it the current ability to direct the relevant activities of the investee),

- Exposure, or rights, to variable returns from its involvement with the investee, and

- The ability to use its power over the investee to affect its returns.

When the Group has less than a majority of the voting or similar rights of an investee, the Group considers all relevant facts and circumstances in assessing whether it has power over an investee, including:

- The contractual arrangement with the other vote holders of the investee,

- Rights arising from other contractual arrangements,

- The Group's voting rights and potential voting rights.

The Group re-assesses whether or not it controls an investee if facts and circumstances indicate that there are changes to one or more of the three elements of control. Consolidation of a subsidiary begins when the Group obtains control over the subsidiary and ceases when the Group losses control of the subsidiary. Assets, liabilities, income and expenses of a subsidiary acquired or disposed of during the year are included in the statement of comprehensive income from the date the Group gains control until the date the Group ceases to control the subsidiary. The financial statements of the subsidiaries are prepared for the same reporting period as the parent company, using consistent accounting policies.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-10

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**2.    Principles underlying preparation of consolidated financial statements (continued)**

**2.2    Basis of consolidation (continued)**

All intra-group balances, income, expenses and unrealized gains and losses resulting from intra-group transactions are eliminated in full, except for the foreign exchange gains and losses arising on intra-group loans.

Profit or loss and each component of other comprehensive income (OCI) are attributed to the equity holders of the parent of the Group and to the non-controlling interests, even if this results in the non-controlling interests having a deficit balance. When necessary, adjustments are made to the financial statements of subsidiaries to bring their accounting policies into line with the Group's accounting policies.

A change in the ownership interest of a subsidiary, without a loss of control, is accounted for as an equity transaction. If the Group loses control over a subsidiary, it:

- Derecognises the assets (including goodwill) and liabilities of the subsidiary.

- Derecognises the carrying amount of any non-controlling interests, including any components of other comprehensive income attributable to them.

- Recognises the fair value of the consideration received.

- Recognises the fair value of any investment retained.

- Recognises any surplus or deficit in profit or loss.

- Reclassifies to profit or loss or retained earnings, as appropriate, the amounts previously recognized in OCI as would be required if the Group had directly disposed of the related assets or liabilities.

**2.3    Changes in accounting policies**

The accounting policies adopted in the preparation of the consolidated financial statements are consistent with those followed in the preparation of the Group's annual financial statements for the year ended December 31, 2018, except for the adoption of the new and amended IFRS and IFRIC interpretations as of January 1, 2019. The Group has not early adopted any other standard, interpretation or amendment that has been issued but is not yet effective.

The Group applies *IFRS 16 Leases* for the first time in 2019. The nature and effect of changes to the Group's financial statements as a result of adopting this standard are disclosed below.

Several other amendments and interpretations are applied for the first time in 2019, but do not have an impact on the consolidated financial

statements of the Group:

*The accompanying notes form an integral part of these consolidated financial statements.*

F-11

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**2.      Principles underlying preparation of consolidated financial statements (continued)**

**2.3      Changes in accounting policies (continued)**

*IFRS 16 - Leases*

IFRS 16 was issued in January 2016 and it replaces IAS 17 *Leases*, IFRIC 4 *Determining whether an Arrangement contains a Lease*, SIC-15 *Operating Leases-Incentives* and SIC-27 *Evaluating the Substance of Transactions Involving the Legal Form of a Lease*. IFRS 16 sets out the principles for the recognition, measurement, presentation and disclosure of leases and requires lessees to account for all leases under a single on-balance sheet model.

Lessor accounting under IFRS 16 is substantially unchanged from IAS 17. Lessors will continue to classify leases as either operating or finance leases using similar principles as in IAS 17. Therefore, IFRS 16 did not have an impact for leases where the Group is the lessor.

The Group adopted IFRS 16 using the modified retrospective method of adoption with the date of initial application of January 1, 2019. Under this method, the standard is applied retrospectively with the cumulative effect of initially applying the standard recognized at the date of initial application. The Group elected to use the transition practical expedient allowing the standard to be applied only to contracts that were previously identified as leases applying IAS 17 and IFRIC 4 at the date of initial application. The Group also elected to use the recognition exemptions for lease contracts that, at the commencement date, have a lease term of 12 months or less and do not contain a purchase option ('short-term leases'), and lease contracts for which the underlying asset is of low value ('low-value assets').

The impact of adopting IFRS 16 on the statement of financial position (increase/ (decrease)) as at January 1, 2019:

|  | Amount |
|---|---|
| **Assets** | |
| Property and equipment (right-of-use assets) | 936 |
| **Liabilities** | |
| Long-term portion of lease liabilities | 704 |
| Short-term portion of lease liabilities | 364 |
| Trade and other payables | (132) |

*The accompanying notes form an integral part of these consolidated financial statements.*

F-12

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**2.      Principles underlying preparation of consolidated financial statements (continued)**

**2.3      Changes in accounting policies (continued)**

**a) Nature of the effect of adoption of IFRS 16**

The standard includes two recognition exemptions for lessees – leases of 'low-value' assets (e.g., personal computers) and short-term leases (i.e., leases with a lease term of 12 months or less). At the commencement date of a lease, a lessee will recognize a liability to make lease payments (i.e., the lease liability) and an asset representing the right to use the underlying asset during the lease term (i.e., the right-of-use assets). Lessees will be required to separately recognize the interest expense on the lease liability and the depreciation expense on the right-of-use assets.

Lessees are also required to remeasure the lease liability upon the occurrence of certain events (e.g., a change in the lease term, a change in future lease payments resulting from a change in an index or rate used to determine those payments). The lessee generally recognizes the amount of the remeasurement of the lease liability as an adjustment to the right-of-use assets.

Most contracts where the Group acts as a lessee (except for long-term contract for office premises lease), fall under the recognition exemption for being short-term leases. The Group did not recognize either assets or liabilities for them and will continue to recognize expenditure arising from them as

expenses on rent of premises and related utility expenses (within selling, general, and administrative expenses) as they are incurred.

Accounting for several long-term contracts of lease of office premises where the Group acts as a lessee, had a material effect on the consolidated financial statements of the Group. This effect resulted from recognition of lease liabilities and right-of-use assets and from derecognition of accounts payable related to these contracts.

The lease liabilities as at January 1, 2019 can be reconciled to the operating lease commitments as of December 31, 2018 as follows:

|  | Amount |
|---|---|
| **Operating lease commitments as at December 31, 2018** | **1,242** |
| Weighted average incremental borrowing rate as at January 1, 2019 | 9% |
| **Discounted operating lease commitments at January 1, 2019** | **1,202** |
| *Less:* |  |
| Commitments relating to short-term lease | (134) |
| **Lease liabilities as at January 1, 2019** | **1,068** |

*The accompanying notes form an integral part of these consolidated financial statements.*

F-13

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**2.      Principles underlying preparation of consolidated financial statements (continued)**

**2.3      Changes in accounting policies (continued)**

**b) Summary of new accounting policies**

Set out below are the new accounting policies of the Group upon adoption of IFRS 16, which have been applied from the date of initial application.

*Lease liabilities*

Lease liabilities are recognized at the date of initial application at the present value of the remaining lease payments discounted using the Group's incremental borrowing rate at the date of initial application.

*Right-of-use assets*

Right-of-use assets are recognized at an amount equal to the lease liability adjusted by the amount of any prepaid or accrued lease payments relating to that lease recognized in the statement of financial position immediately before the date of initial application. Right-of-use assets are measured at cost, less any accumulated depreciation and impairment losses, and adjusted for any remeasurement of lease liabilities. Right-of-use assets are depreciated on a straight-line basis over the lease term. No impairment is accrued on right-of-use assets as at the date of initial application.

*Short-term leases and leases of low-value assets*

The Group applies the short-term lease recognition exemption to its short-term leases of office premises (i.e., those leases that have a lease term of 12 months or less from the commencement date and do not contain a purchase option). Lease payments on short-term leases are recognized as expense on a straight-line basis over the lease term.

*Significant judgement in determining the lease term of contracts with renewal options*

The Group determines the lease term as the non-cancellable term of the lease, together with any periods covered by an option to extend the lease if it is reasonably certain to be exercised, or any periods covered by an option to terminate the lease, if it is reasonably certain not to be exercised.

The Group has the option, under some of its leases to lease the assets for additional term. The Group applies judgement in evaluating whether it is reasonably certain to exercise the option to renew. That is, it considers all relevant factors that create an economic incentive for it to exercise the renewal. After the commencement date, the Group reassesses the lease term if there is a significant event or change in circumstances that is within its control and affects its ability to exercise (or not to exercise) the option to renew (e.g., a change in business strategy).

The carrying amounts of the Group's right-of-use assets and lease liabilities and the movements during the year are disclosed in note 23.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-14

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**2.      Principles underlying preparation of consolidated financial statements (continued)**

**2.3     Changes in accounting policies (continued)**

The following amended standards and interpretations became effective for the Group from January 1, 2019, but did not have any material impact on the Group:

- *IFRIC 23 Uncertainty over Income Tax Treatments* (issued on June 7, 2017).

- *Prepayment Features with Negative Compensation – Amendments to IFRS 9* (issued on October 12, 2017).

- *Amendments to IAS 28 Long-term Interests in Associates and Joint Ventures* (issued on October 12, 2017).

- *Amendments to IAS 19 Plan Amendment, Curtailment or Settlement* (issued on February 7, 2018).

- *Annual Improvements to IFRSs 2015-2017 cycle – amendments to IFRS 3, IFRS 11, IAS 12 and IAS 23* (issued on December 12, 2017).

**2.4     Standards issued but not yet effective**

The following other new pronouncements are not expected to have any material impact on the Group when adopted:

- *Amendments to References to the Conceptual Framework in IFRS Standards* (issued on March 29, 2018 and effective for annual periods beginning on or after January 1, 2020).

- *Amendments to IAS 1 and IAS 8: Definition of Material* (issued on October 31, 2018 and effective for annual periods beginning on or after January 1, 2020).

- *Amendment to IFRS 3 Business Combinations* (issued on October 22, 2018 and effective for annual periods beginning on or after January 1, 2020).

- *IFRS 17 Insurance Contracts* (issued in May 2018 and effective for annual periods beginning on or after January 1, 2021)

- *Amendments to IFRS 9, IAS 39 and IFRS 7: Interest Rate Benchmark Reform* (issued in September, 2019 and effective for annual periods beginning on or after January 1, 2020).

- *Amendments to IAS 1: Classification of liabilities as current or non-current* (issued on January 23, 2020 and effective for annual periods beginning on or after January 1, 2022).

*The accompanying notes form an integral part of these consolidated financial statements.*

F-15

**Table of Contents**

QIWI plc

Notes to consolidated financial statements (continued)

**3.      Summary of significant accounting policies**

Set out below are the principal accounting policies used to prepare these consolidated financial statements:

**3.1     Business combinations and goodwill**

Business combinations are accounted for using the acquisition method.

Consideration transferred includes the fair values of the assets transferred, liabilities incurred by the Group to the previous owners of the acquiree, and equity interests issued by the Group. Consideration transferred also includes the fair value of any contingent consideration and share-based payment awards of the acquiree that are replaced mandatorily in the business combination.

If a business combination results in the termination of pre-existing relationships between the Group and the acquiree, then the Group identifies any amounts that are not part of what the Group and the acquiree exchanged in the business combination. The Group recognizes as part of applying the acquisition method, only the consideration transferred for the acquiree and the assets acquired and liabilities assumed in the exchange for the acquiree.

If the business combination is achieved in stages, any previously held equity interest is re-measured at its acquisition date fair value and any resulting gain or loss is recognized in profit or loss. It is then considered in the determination of goodwill.

Any contingent consideration to be transferred by the acquirer will be recognized at fair value at the acquisition date. Subsequently, contingent consideration classified as an asset or liability, is measured at fair value with changes in fair value recognized in profit or loss. Contingent consideration

that is classified as equity is not re-measured and subsequent settlement is accounted for within equity.

The Group measures any non-controlling interest at its proportionate interest in the identifiable net assets of the acquiree.

Goodwill is initially measured at cost, being the excess of the aggregate of the consideration transferred and the amount recognized for non-controlling interests, and any previous interest held, over the net identifiable assets acquired and liabilities assumed. If the fair value of the net assets acquired is in excess of the aggregate consideration transferred, the Group re-assesses whether it has correctly identified all of the assets acquired and all of the liabilities assumed and reviews the procedures used to measure the amounts to be recognized at the acquisition date. If the re-assessment still results in an excess of the fair value of net assets acquired over the aggregate consideration transferred, then the gain is recognized in profit or loss.

After initial recognition, goodwill is measured at cost less any accumulated impairment losses. For the purpose of impairment testing, goodwill acquired in a business combination is, from the acquisition date, allocated of the Group's cash generating units that are expected to benefit from the synergies of the combination, irrespective of whether other assets or liabilities of the acquired entity are assigned to those units.

Where goodwill has been allocated to a cash-generating unit and certain operation within that unit is disposed of, the goodwill associated with the operation disposed of is included in the carrying amount of the operation when determining the gain or loss on disposal of the operation. Goodwill disposed in this circumstance is measured based on the relative values of the operation disposed and the portion of the cash-generating unit retained.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-16

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**3.      Summary of significant accounting policies (continued)**

**3.2      Investments in associates and joint ventures**

The Group's investment in its associate and joint ventures are accounted for using the equity method. An associate is an entity in which the Group has significant influence. A joint venture is a joint arrangement whereby the parties that have joint control of the arrangement (i.e. unanimous consent of the parties) have rights to the net assets of the arrangement.

Under the equity method, the investment in the associate or joint venture is carried on the statement of financial position at cost plus post acquisition changes in the Group's share of net assets of the associate/joint venture. Goodwill relating to the associate/joint venture is included in the carrying amount of the investment and is neither amortized nor individually tested for impairment.

The statement of comprehensive income reflects the Group's share of the results of operations of the associate/joint venture. When there has been a change recognized directly in the equity of the investment, the Group recognizes its share of any changes and discloses this, when applicable, in the statement of changes in equity. Unrealized gains and losses resulting from transactions between the Group and the associate/joint venture are eliminated to the extent of the interest in it.

The Group's share of profit of an associate/joint venture is shown on the face of the statement of comprehensive income or in the notes. This is the profit attributable to equity holders of the associate/joint venture and, therefore, is profit after tax and non-controlling interests in the subsidiaries of the associate/joint venture.

The financial statements of the associates/joint ventures are prepared for the same reporting period as the Group. When necessary, adjustments are made to bring the accounting policies in line with those of the Group.

After application of the equity method, the Group determines whether it is necessary to recognize an additional impairment loss on its investment in its associates/joint ventures. The Group determines at each reporting date whether there is any objective evidence that the investment in the associate/joint venture is impaired. If this is the case, the Group calculates the amount of impairment as the difference between the recoverable amount of an investment in associate/joint venture and its carrying value and recognizes any respective loss in the statement of comprehensive income.

Upon loss of significant influence over the associate/joint venture, the Group measures and recognizes any retaining investment at its fair value. Any difference between the carrying amount of the associate/joint venture upon loss of significant influence and the fair value of the retained investment and proceeds from disposal is recognized in profit or loss.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-17

Table of Contents

QIWI plc

Case 1:20-cv-06054-BMC-CLP    Document 87-3    Filed 05/02/24    Page 127 of 187
Notes to consolidated financial statements (continued)
PageID #: 3596

**3.    Summary of significant accounting policies (continued)**

**3.3    Foreign currency translation**

The consolidated financial statements are presented in Russian rubles (RUB), which is the Company's functional and the Group's presentation currency. Each entity in the Group determines its own functional currency, depending on what the underlying economic environment is, and items included in the financial statements of each entity are measured using that functional currency. Transactions in foreign currencies are initially recorded in the functional currency at the functional currency rate at the date of the transaction. Monetary assets and liabilities denominated in foreign currencies are re-measured in to the functional currency at the functional currency rate of exchange at the reporting date. All differences are taken to profit or loss. They are shown separately for each Group company but netted by major types of monetary assets and liabilities. Non-monetary items that are measured in terms of historical cost in a foreign currency are translated using the exchange rates as of the dates of the initial transactions.

Non-monetary items measured at fair value in a foreign currency are translated using the exchange rates at the date when the fair value is determined. The gain or loss arising on retranslation of non-monetary items is treated in line with the recognition of gain or loss on change in fair value of the item (i.e., translation differences on items whose fair value gain or loss is recognized in other comprehensive income or profit or loss is also recognized in other comprehensive income or profit or loss, respectively).

The functional currency of the foreign operations is generally the respective local currency – US Dollar (U.S.$), Euro (€), Kazakhstan tenge (KZT), Belarussian ruble (BYR), Moldovan leu (MDL) and New Romanian leu (RON). As of the reporting date, the assets and liabilities of these operations are translated into the presentation currency of the Group (the Russian Ruble) at the rate of exchange at the reporting date and their statements of comprehensive income are translated at the average exchange rates for the year or exchange rates prevailing on the date of specific transactions. The exchange differences arising on the translation are recognized in other comprehensive income. On disposal of a foreign entity, the deferred cumulative amount recognized in equity relating to that particular foreign operation is reclassified to the profit or loss.

The exchange rates of the Russian ruble to each respective currency as of December 31, 2019 and 2018 were as follows:

|  | Average exchange rates for the year ended December 31, | | Exchange rates at December 31, | |
|---|---|---|---|---|
|  | 2018 | 2019 | 2018 | 2019 |
| US Dollar | 62.7078 | 64.7362 | 69.4706 | 61.9057 |
| Euro | 73.9384 | 72.5021 | 79.4605 | 69.3406 |
| Kazakhstan Tenge (100) | 18.1717 | 16.8972 | 18.0570 | 16.2174 |
| Belarussian Ruble | 30.7630 | 30.9653 | 32.0732 | 29.4257 |
| Moldovan Leu (10) | 37.3239 | 36.8844 | 40.9084 | 35.9917 |
| New Romanian Leu | 15.8887 | 15.2820 | 17.0501 | 14.4948 |

The currencies listed above are not a fully convertible outside the territories of countries of their operations. Related official exchange rates are determined daily by the Central Bank of the Russian Federation (further CBR). Market rates may differ from the official rates but the differences are, generally, within narrow parameters monitored by the respective Central Banks. The translation of assets and liabilities denominated in the currencies listed above into RUB for the purposes of these financial statements does not indicate that the Group could realize or settle, in RUB, the reported values of these assets and liabilities. Likewise, it does not indicate that the Group could return or distribute the reported RUB value of capital and retained earnings to its shareholders.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-18

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**3.    Summary of significant accounting policies (continued)**

**3.4    Property and equipment**

*3.4.1    Cost of property and equipment*

Property and equipment are stated at cost less accumulated depreciation and any accumulated impairment loss. Expenditures for continuing repairs and maintenance are charged to the profit or loss as incurred.

*3.4.2    Depreciation and useful lives*

Depreciation is calculated on property and equipment on a straight-line basis from the time the assets are available for use, over their estimated useful lives as follows:

| Processing servers and engineering equipment | 3-10 years |
|---|---|
| Computers and office equipment | 3-5 years |

| Other equipment | 2-20 years |

Useful lives of leasehold improvements of leased office premises are determined at the lower between the useful live of the asset or the lease term. The asset's residual values, useful lives and depreciation methods are reviewed, and adjusted as appropriate, at each financial year-end.

### 3.5    Intangible assets

#### 3.5.1    *Software and other intangible assets*

Software and other intangible assets acquired separately are measured on initial recognition at cost. The cost of intangible assets acquired in a business combination is their fair value as of the date of acquisition. Following initial recognition, intangible assets are carried at cost less any accumulated amortization and accumulated impairment losses.

Following initial recognition of the development expenditure as an asset, the cost model is applied requiring the asset to be carried at cost less any accumulated amortization and accumulated impairment losses. Amortization of the asset begins when development is complete and the asset is available for use. It is amortized over the period of expected generation of future benefits, generally 3-5 years. During the period of development, the asset is tested for impairment annually.

#### 3.5.2    *Software development costs*

Development expenditure on an individual project is recognized as an intangible asset when the Group can demonstrate the technical feasibility of completing the intangible asset so that it will be available for use or sale, its intention to complete and its ability to use or sell the asset, how the asset will generate future economic benefits, the availability of resources to complete the asset and the ability to measure reliably the expenditure during development.

#### 3.5.3    *Useful life and amortization of intangible assets*

The Group assesses whether the useful life of an intangible asset is finite or indefinite and, if finite, the length of that useful life. An intangible asset is regarded by the entity as having an indefinite useful life when, based on an analysis of all of the relevant factors, there is no foreseeable limit to the period over which the asset is expected to generate net cash inflows for the entity.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-19

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

### 3.    Summary of significant accounting policies (continued)

### 3.5    Intangible assets (continued)

Intangible assets with finite lives are amortized on a straight-line basis over the useful economic lives and assessed for impairment whenever there is an indication that the intangible asset may be impaired. Below is the summary of useful lives of intangible assets:

| | |
|---|---|
| Customer relationships and contract rights | 4-15 years |
| Computer Software | 3-10 years |
| Bank license | indefinite |
| Trademarks and other intangible assets | 3-11 years |

Amortization periods and methods for intangible assets with finite useful lives are reviewed at least at each financial year-end. Changes in the expected useful life or the expected pattern of consumption of future economic benefits embodied in the asset are accounted for by changing the amortization period or method, as appropriate, and treated as changes in accounting estimates.

Intangible assets with indefinite useful lives are not amortized, but are tested for impairment annually, either individually or at the cash-generating unit level. The assessment of indefinite life is reviewed annually to determine whether the indefinite life continues to be supportable. Indefinite-lived intangible assets include the acquired licenses for banking operations. It is considered indefinite-lived as the related license is expected to be renewed indefinitely.

Gains or losses arising from derecognition of an intangible asset are measured as the difference between the net disposal proceeds and the carrying amount of the asset and are recognized in the statement of comprehensive income when the asset is derecognized.

### 3.6    Impairment of non-financial assets

The Group assesses at each reporting date whether there is an indication that an asset, other than goodwill and intangible assets with indefinite useful life, may be impaired. If any such indication exists, or when annual impairment testing for an asset is required, the Group estimates the asset's

recoverable amount. An asset's recoverable amount is the higher of an asset's or cash-generating unit's fair value less costs to sell and its value in use and is determined for an individual asset, unless the asset does not generate cash inflows that are largely independent of those from other assets or groups of assets. Where the carrying amount of an asset exceeds its recoverable amount, the asset is considered impaired and is written down to its recoverable amount. In assessing value in use, the estimated future cash flows are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset. In determining fair value less costs to sell, an appropriate valuation model is used.

These calculations are corroborated by valuation multiples, quoted share prices for publicly traded analogues, if applicable, or other available fair value indicators.

The Group bases its impairment calculation on detailed budgets and forecast calculations, which are prepared separately for each of the Group's cash generating units (CGU), to which the individual assets are allocated.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-20

---

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**3.    Summary of significant accounting policies (continued)**

**3.6    Impairment of non-financial assets (continued)**

These budgets and forecast calculations generally cover a period of five years or longer, when management considers appropriate. For longer periods, a long-term growth rate is calculated and applied to project future cash flows after the last year.

Impairment losses of continuing operations are recognized in profit or loss in those expense categories consistent with the function of the impaired asset.

For assets excluding goodwill, an assessment is made at each reporting date as to whether there is any indication that previously recognized impairment losses may no longer exist or may have decreased. If such indication exists, the Group makes an estimate of recoverable amount. A previously recognized impairment loss is reversed only if there has been a change in the estimates used to determine the asset's recoverable amount since the last impairment loss was recognized. If that is the case, the carrying amount of the asset is increased to its recoverable amount.

That increased amount cannot exceed the carrying amount that would have been determined, net of depreciation, had no impairment loss been recognized for the asset in prior years. Such reversal is recognized in profit or loss. The following criteria are also applied in assessing impairment of specific assets:

*Goodwill*

Goodwill is tested for impairment annually and when circumstances indicate that the carrying value may be impaired. Impairment is determined for goodwill by assessing the recoverable amount of the cash-generating units, to which the goodwill relates. Where the recoverable amount of the cash-generating units is less than their carrying amount an impairment loss is recognized. Impairment losses relating to goodwill cannot be reversed in future periods. The Group performs its annual impairment test of goodwill as of December 31 and whenever certain events and circumstances indicate that its carrying value may be impaired.

*Intangible assets with indefinite useful life*

Intangible assets with indefinite useful life are tested for impairment annually as of December 31, either individually or at the cash generating unit level, as appropriate and whenever events and circumstances indicate that an asset may be impaired.

**3.7    Financial assets**

*3.7.1    Initial recognition and measurement*

Financial assets are classified, at initial recognition, as subsequently measured at amortised cost, fair value through other comprehensive income (OCI), and fair value through profit or loss.

The classification of financial assets at initial recognition depends on the financial asset's contractual cash flow characteristics and the Group's business model for managing them. With the exception of trade receivables that do not contain a significant financing component or for which the Group has applied the practical expedient, the Group initially measures a financial asset at its fair value plus, in the case of a financial asset not at fair value through profit or loss, transaction costs. Trade receivables that do not contain a significant financing component or for which the Group has applied the practical expedient are measured at the transaction price determined under IFRS 15.

*The accompanying notes form an integral part of these consolidated financial statements.*

**Table of Contents**

QIWI plc

Notes to consolidated financial statements (continued)

**3.    Summary of significant accounting policies (continued)**

**3.7    Financial assets (continued)**

In order for a financial asset to be classified and measured at amortised cost or fair value through OCI, it needs to give rise to cash flows that are 'solely payments of principal and interest (SPPI)' on the principal amount outstanding. This assessment is referred to as the SPPI test and is performed at an instrument level.

The Group's business model for managing financial assets refers to how it manages its financial assets in order to generate cash flows. The business model determines whether cash flows will result from collecting contractual cash flows, selling the financial assets, or both.

*3.7.2    Subsequent measurement*

For purposes of subsequent measurement, financial assets are classified in four categories:

- Financial assets at amortised cost
- Financial assets at fair value through OCI with recycling of cumulative gains and losses
- Financial assets designated at fair value through OCI with no recycling of cumulative gains and losses upon derecognition
- Financial assets at fair value through profit or loss

*Financial assets at amortised cost*

This category is the most relevant to the Group. The Group measures financial assets at amortised cost if both of the following conditions are met:

- The financial asset is held within a business model with the objective to hold financial assets in order to collect contractual cash flows, And
- The contractual terms of the financial asset give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.

Financial assets at amortised cost are subsequently measured using the effective interest (EIR) method and are subject to impairment. Gains and losses are recognised in profit or loss when the asset is derecognised, modified or impaired.

The Group's financial assets at amortised cost includes debt instruments, trade and other receivables and loans issued.

*Financial assets at fair value through profit or loss*

Financial assets at fair value through profit or loss include financial assets held for trading, financial assets designated upon initial recognition at fair value through profit or loss, or financial assets mandatorily required to be measured at fair value. Financial assets are classified as held for trading if they are acquired for the purpose of selling or repurchasing in the near term. Derivatives, including separated embedded derivatives, are also classified as held for trading unless they are designated as effective hedging instruments. Financial assets with cash flows that are not solely payments of principal and interest are classified and measured at fair value through profit or loss, irrespective of the business model.

Financial assets at fair value through profit or loss are carried in the statement of financial position at fair value with net changes in fair value recognised in the profit or loss section of statement of comprehensive income.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-22

**Table of Contents**

QIWI plc

Notes to consolidated financial statements (continued)

**3.    Summary of significant accounting policies (continued)**

**3.7    Financial assets (continued)**

The Group's financial assets at fair value through profit or loss includes several loans that did not pass SPPI test.

*Financial assets at fair value through OCI*

For debt securities at fair value through OCI, interest income, foreign exchange revaluation and impairment losses or reversals are recognised in the statement of profit or loss and computed in the same manner as for financial assets measured at amortised cost. The remaining fair value changes are recognised in OCI. Upon derecognition, the cumulative fair value change recognised in OCI is recycled to profit or loss.

The Group's debt securities at fair value through OCI represent investments in quoted debt securities included under long-term and short-term debt securities and deposits.

### 3.7.3   Impairment—credit loss allowance for ECL

The Group assesses and recognises an allowance for expected credit losses (ECLs) for all debt instruments not held at fair value through profit or loss.

The measurement of ECL reflects:

- an unbiased and probability weighted amount that is determined by evaluating a range of possible outcomes;

- the time value of money; and

- all reasonable and supportable information that is available without undue cost and effort at the end of each reporting period about past events, current conditions and forecasts of future economic conditions.

Debt instruments measured at AC are presented in the consolidated statement of financial position net of the allowance for ECL.

For loan commitments (where those components can be separated from the loan), a separate provision for ECL is recognised as other financial liabilities as part of accounts payable in the consolidated statement of financial position. For debt instruments at FVOCI, an allowance for ECL is recognised in profit or loss and it affects fair value gains or losses recognised in OCI rather than the carrying amount of those instruments.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-23

**Table of Contents**

QIWI plc

Notes to consolidated financial statements (continued)

**3.      Summary of significant accounting policies (continued)**

**3.7      Financial assets (continued)**

The Group applies a "three stage" model for impairment in accordance with IFRS 9, based on changes in credit quality since initial recognition:

1.      A financial instrument that is not credit-impaired on initial recognition is classified in Stage 1. Financial assets in Stage 1 have their ECL measured at an amount equal to the portion of lifetime ECL that results from default events possible within the next 12 months (12 month ECL).

2.      If the Group identifies a significant increase in credit risk ("SICR") since initial recognition, the asset is transferred to Stage 2 and its ECL is measured based on ECL on a lifetime basis (lifetime ECL).

3.      If the Group determines that a financial asset is credit-impaired, the asset is transferred to Stage 3 and its ECL is measured as a lifetime ECL.

For financial assets that are credit-impaired on purchase or at origination, the ECL is always measured at a lifetime ECL. Note 33 provides information about inputs, assumptions and estimation techniques used in measuring ECL, including an explanation of how the Group incorporates forward-looking information in the ECL models.

### 3.7.4   Derecognition

A financial asset (or, where applicable a part of a financial asset or part of a group of similar financial assets) is derecognized when:

- The rights to receive cash flows from the asset have expired

- The Group has transferred its rights to receive cash flows from the asset or has assumed an obligation to pay the received cash flows in full without material delay to a third party under a 'pass-through' arrangement; and either (a) the Group has transferred substantially all the risks and rewards of the asset, or (b) the Group has neither transferred nor retained substantially all the risks and rewards of the asset, but has transferred control of the asset.

When the Group has transferred its rights to receive cash flows from an asset or has entered into a pass-through arrangement, and has neither transferred nor retained substantially all of the risks and rewards of the asset nor transferred control of the asset, the asset is recognized to the extent of the Group's continuing involvement in the asset.

In that case, the Group also recognizes an associated liability. The transferred asset and the associated liability are measured on a basis that reflects the rights and obligations that the Group has retained.

Continuing involvement that takes the form of a guarantee over the transferred asset is measured at the lower of the original carrying amount of the asset and the maximum amount of consideration that the Group could be required to repay.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-24

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**3.    Summary of significant accounting policies (continued)**

**3.8    Financial liabilities**

*3.8.1    Initial recognition and measurement*

Financial liabilities are classified, at initial recognition, as financial liabilities at fair value through profit or loss, loans and borrowings, payables, or as derivatives designated as hedging instruments in an effective hedge, as appropriate.

All financial liabilities are recognised initially at fair value and, in the case of loans and borrowings and payables, net of directly attributable transaction costs.

The Group's financial liabilities include trade and other payables, bank overdraft, financial guarantees, undrawn loan commitments, customer accounts and amounts due to banks.

*3.8.2    Subsequent measurement*

The measurement of financial liabilities depends on their classification, as described below:

*Financial liabilities at fair value through profit or loss*

Financial liabilities at fair value through profit or loss include financial liabilities held for trading and financial liabilities designated upon initial recognition as at fair value through profit or loss. The Group has no such instruments.

*Loans and deposits*

This is the category most relevant to the Group. After initial recognition, interest-bearing loans and borrowings are subsequently measured at amortised cost using the EIR method. Gains and losses are recognised in profit or loss when the liabilities are derecognised as well as through the EIR amortisation process.

Amortised cost is calculated by taking into account any discount or premium on acquisition and fees or costs that are an integral part of the EIR. The EIR amortisation is included as finance costs in the profit or loss section of statement of comprehensive income.

*Financial guarantees*

Subsequent to initial recognition, the Group's liability under each guarantee is measured at the higher of the amount initially recognised less cumulative amortisation recognised in the income statement, and an ECL allowance. The premium received is recognised in the income statement in Commissions and other revenue on a straight line basis over the life of the guarantee.

*Undrawn loan commitments*

Undrawn loan commitments are commitments under which, over the duration of the commitment, the Group is required to provide a loan with pre-specified terms to the customer. Similar to financial guarantee contracts, under IAS 39, a provision was made if they were an onerous contract but, from January 1, 2018, these contracts are in the scope of the ECL requirements.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-25

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**3.      Summary of significant accounting policies (continued)**

**3.8      Financial liabilities (continued)**

*3.8.3    Derecognition*

A financial liability is derecognized when the obligation under the liability is discharged or cancelled or expires. Where an existing financial liability is replaced by another from the same lender on substantially different terms, or the terms of an existing liability are substantially modified, such an exchange or modification is treated as a derecognition of the original liability and the recognition of a new liability, and the difference in the respective carrying amounts is recognized in profit or loss.

In accordance with terms and conditions of use of e-wallet accounts and system rules, the Group charges a fee on its consumers on the balance of unused accounts after certain period of inactivity and unclaimed payments. Such fees are recorded as revenues in the period a fee is charged.

*3.8.4    Offsetting financial assets and liabilities*

Financial assets and financial liabilities are offset and the net amount reported in the consolidated statement of financial position if, and only if:

- There is a currently enforceable legal right to offset the recognized amounts; and

- There is an intention to settle on a net basis, or to realize the assets and settle the liabilities simultaneously.

The right of set-off:

- Must not be contingent on a future event; and

Must be legally enforceable in all of the following circumstances:

(i) the normal course of business;

(ii) the event of default; and

(iii) the event of insolvency or bankruptcy of the entity and all of the counterparties

**3.9      Cash and cash equivalents**

Cash comprises cash at banks and in hand and short-term deposits with an original maturity of three months or less and are included as a component of cash and cash equivalents for the purpose of the statement of financial position and statement of cash flows.

**3.10      Employee benefits**

*3.10.1    Short-term employee benefits*

Wages and salaries paid to employees are recognized as expenses in the current year. The Group also accrues expenses for future vacation payments and short-term or long-term employee bonuses.

*3.10.2    Social contributions and defined contributions to pension fund*

Under provisions of the Russian legislation, social contributions include defined contributions to pension and other social funds of Russia and are calculated by the Group by the application of a regressive rate (from 30% to 15% in 2019, 2018 and 2017) to the annual gross remuneration of each employee. For the year ended December 31, 2019 defined contributions to pension funds of Russia of the Group amounted to 875 (2018 – 886; 2017 – 473).

*The accompanying notes form an integral part of these consolidated financial statements.*

F-26

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**3.      Summary of significant accounting policies (continued)**

**3.11      Provisions**

Provisions are recognized when the Group has a present legal or constructive obligation as a result of past events, it is probable that an outflow of resources will be required to settle the obligation, and a reliable estimate of the amount can be made. Where the Group expects a provision to be reimbursed, for example under an insurance contract, the reimbursement is recognized as a separate asset but only when the reimbursement is virtually certain.

If the effect of discounting is material, provisions are determined by discounting the expected value of future cash flows at a pre-tax rate that reflects current market assessments of the time value of money and, where appropriate, the risks specific to the liability. Where discounting is used, the increase in the provision due to the passage of time is recognized as an interest expense.

*Performance guarantees*

Performance guarantees are contracts that provide compensation if another party fails to perform a contractual obligation. Performance guarantees are initially recognized at their fair value, which is usually equal to the amount of fees received. This amount is amortised on a straight line basis over the life of the contract. Performance guarantees do not transfer credit risk. The risk under performance guarantee contracts is the possibility that the failure to perform the contractual obligation by another party occurs.

### 3.12    Special contribution for defence of the Republic of Cyprus

*Dividend Distribution*

Cyprus entities that do not distribute 70% of their profits after tax, as defined by the relevant tax law, within two years after the end of the relevant tax year, are deemed to have distributed as dividends 70% of these profits. A special contribution for the defence fund of the Republic of Cyprus is levied at the 17% rate for 2017, 2018, 2019 and thereafter will be payable on such deemed dividends distribution. Profits that are attributable to shareholders who are not tax resident of Cyprus and own shares in the Company either directly and/or indirectly at the end of two years from the end of the tax year to which the profits relate, are exempted. The amount of deemed distribution is reduced by any actual dividends paid out of the profits of the relevant year at any time. This special contribution for defence is payable by the Company for the account of the shareholders.

The Company's ultimate shareholder as of December 31, 2019 is non-Cypriot tax resident and as such the Cypriot deemed dividend distribution rules are not applicable.

*Dividend income*

Dividends received from a non-resident (foreign) company are exempt from the levy of defence contribution if either the dividend paying company derives at least 50% of its income directly or indirectly from activities which do not lead to investment income ("active versus passive investment income test" is met) or the foreign tax burden on the profit to be distributed as dividend has not been substantially lower than the Cypriot corporate income tax rate (i.e. lower than 6.25%) at the level of the dividend paying company ("effective minimum foreign tax test" is met).

The Company has not been subject to defence tax on dividends received from abroad as the dividend paying entities are engaged in other than investing activities.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-27

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

### 3.    Summary of significant accounting policies (continued)

### 3.13    Income taxes

*Current income tax*

Current income tax assets and liabilities for the current and prior periods are measured at the amount expected to be recovered from or paid to the taxation authorities. The tax rates and tax laws used to compute the amount are those that are enacted or substantively enacted by the reporting date.

Current income tax relating to items recognized in other comprehensive income is recognized in other comprehensive income.

*Deferred income tax*

Deferred tax is recognized in respect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for taxation purposes. Deferred tax is not recognized for the following temporary differences: the initial recognition of assets or liabilities in a transaction that is not a business combination and that affects neither accounting nor taxable profit or loss, and differences relating to investments in subsidiaries to the extent that it is probable that they will not reverse in the foreseeable future. In addition, deferred tax is not recognized for taxable temporary differences arising on the initial recognition of goodwill. Deferred tax is measured at the tax rates that are expected to be applied to temporary differences when they reverse, based on the laws that have been enacted or substantively enacted by the reporting date.

Deferred tax assets and liabilities are offset if there is a legally enforceable right to offset current tax liabilities and assets, and they relate to income taxes levied by the same tax authority on the same taxable entity, or on different tax entities, but they intend to settle current tax liabilities and assets on a net basis or their tax assets and liabilities will be realized simultaneously.

A deferred tax asset is recognized for unused tax losses, tax credits and deductible temporary differences, to the extent that it is probable that future taxable profits will be available against which they can be utilized. Deferred tax assets are reviewed at each reporting date and are reduced to the extent

that it is no longer probable that the related tax benefit will be realized.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-28

**Table of Contents**

QIWI plc

Notes to consolidated financial statements (continued)

**3.      Summary of significant accounting policies (continued)**

**3.14    Revenue from contracts with customers and transaction cost recognition**

Revenue from contracts with customers is recognized when control of the services are transferred to the customer at an amount that reflects the consideration to which the Group expects to be entitled in exchange for those services. The Group has generally concluded that it is the principal in its revenue arrangements because it typically controls the services before transferring them to the customer. Revenues and related cost of revenue from services are recognized in the period when services are rendered, regardless of when payment is made.

All performance obligations are either satisfied at a point of time or over time. In the former case they represent a separate instantaneous service, in the latter – a series of distinct services that are substantially the same and that have the same pattern of transfer to the customers. Such performance obligations are invoiced at least monthly. Progress of performance obligations satisfied over time is measured by the output method. The Group recognizes the majority of its revenue at a point of time.

Contract price is allocated separately to each performance obligation. There are generally no variable amounts affecting consideration at the moment such consideration is recognized as revenue. In the rare cases when the variability exists, the Group makes estimate of the amount to be recognized basing on appropriate budgets and models. Consideration from customers does not have any non-cash component. Consideration payable to a customer is accounted for as a reduction of the transaction price and, therefore, a reduction of revenue. Consideration from customers is normally received within a few months and never in more than a year. Consequently, the Group believes it contains no significant financing component.

Within some components of its business, the Group pays remuneration to its employees and third parties for attracting customers. The costs which are incremental to acquisition of new customers are further analysed for recoverability. Generally, this expenditure is not expected to be reimbursed by future income and is not capitalized as costs to obtain a contract.

*Payment processing fee revenues and related transaction costs*

Payment processing fee revenues include the following types:

•      fees for processing of consumer payment (consumer fee and merchant fee),

•      conversion fees.

The Group earns a fee for processing payments initiated by the individuals ("consumers") to pay to merchants and service providers ("merchants") or transfer money to other individuals. Payment processing fees are earned from consumers or merchants, or both. Consumers can make payments to various merchants through kiosks or a network of agents and bank-participants of payment system or through the Group's website or applications using a unique user login and password (e-payments). Payment kiosks are owned by third parties – cash collection agents ("agents"). When a consumer payment is processed, the Group may incur transaction costs to acquire payments payable to agents, bank-participants, mobile operators, international payment systems and other parties. The payment processing fee revenue and related receivable, as well as the transaction cost and the related payable, are recognized at the point when merchants or individuals accept payments from consumers in the gross amount, including fees payable for payment acquisition. Payment processing fees and transaction costs are reported gross. Any fees from agents and other service providers are recorded as reduction of transactions costs unless the fee relates to distinct service rendered by the Group.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-29

**Table of Contents**

QIWI plc

Notes to consolidated financial statements (continued)

**3.      Summary of significant accounting policies (continued)**

**3.14    Revenue from contracts with customers and transaction cost recognition (continued)**

The Group generates revenue from the foreign currency conversion when payments are made in currencies different from the country of the consumer, mainly Russia. The Group recognizes the related revenues at the time of conversion in the amount of conversion commission representing the

difference between the current Russian or relevant country Central Bank foreign currency exchange rate and the foreign currency exchange rate charged by the Group's processing system.

*Cash and settlement services*

The Group charges a fee for managing current bank accounts and deposits of individuals and legal entities, including guarantee deposits from agents placed with the bank to cover consumer payments they accept. Related revenue is recorded as services are rendered or as transactions are processed.

*Installment cards related fees*

Installment cards related fees include revenues from commissions charged for consumer financial services.

*Other revenues*

Other revenues include revenues from commissions charged advertising activities, guarantee commissions and some other minor activities.

*Loyalty program*

The Group's component engaged in banking services to retail customers has a loyalty program, which allows customers to accumulate loyalty points that are accrued as a percentage of purchases made using bank cards and can be used to reimburse future purchases. Revenue is therefore decreased by the nominal value of points awarded to customers during the period multiplied by the probability of their subsequent realization.

**3.15.  Recognition of interest income and interest expense**

For all financial instruments measured at amortized cost, interest bearing financial assets classified as available for sale and financial instruments designated at fair value through profit or loss, interest income or expense is recorded using the EIR method. The EIR (and therefore, the amortised cost of the asset) is calculated by taking into account any discount or premium on acquisition, fees and costs that are an integral part of the EIR of the financial instrument.

The Group calculates interest income by applying the EIR to the gross carrying amount of financial assets other than credit-impaired assets. When a financial asset becomes credit-impaired and is, therefore, regarded as 'Stage 3', the Bank calculates interest income by applying the effective interest rate to the net amortised cost of the financial asset. If the financial assets restore and is no longer credit-impaired, the Bank reverts to calculating interest income on a gross basis.

Interest income from bank loans and short-term and long-term investments performed as part of the Group's treasury function is classified as part of revenues, Interest income derived from loans issued to various third and related parties as part of other arrangements is classified as interest income. Cash receipts of both types of interest are included into interest received in the statement of cash flows.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-30

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**3.     Summary of significant accounting policies (continued)**

**3.15    Recognition of interest income and interest expense (continued)**

Interest expense from bank borrowings intended to attract funds for reinvestment is classified as part of cost of revenue. Interest expense derived from borrowings attracted from various third parties as part of other arrangements and interest expense from bank guaranties is classified as interest expense not as part of cost of revenue. Cash disbursements of both types of interest are included into interest paid in the statement of cash flows.

**3.16    Share-based payments**

Employees of the Group receive remuneration in the form of share-based payments, whereby employees render services as consideration for equity instruments (equity-settled transactions).

The cost of equity-settled transactions is recognized, together with a corresponding increase in other reserves in equity, over the period in which the performance and/or service conditions are fulfilled. The cumulative expense recognized for equity-settled transactions at each reporting date until the vesting date reflects the extent to which the vesting period has expired and the Group's best estimate of the number of equity instruments that will ultimately vest. The statement of comprehensive income expense or credit for a period represents the movement in cumulative expense recognized as of the beginning and end of that period and is recognized in compensation to employees and other personnel expenses.

No expense is recognized for awards that do not ultimately vest, except for equity-settled transactions for which vesting is conditional upon a

market or non-vesting condition. These are treated as vested irrespective of whether or not the market or non-vesting condition is satisfied, provided that all other performance and/or service conditions are satisfied.

When the terms of an equity-settled award are modified, the minimum expense recognized is the expense that would have been incurred had the terms not been modified, if the original terms of the award are met. An additional expense is recognized for any modification that increases the total fair value of the share-based payment transaction, or is otherwise beneficial to the employee as measured at the date of modification.

When an equity-settled award is cancelled, it is treated as if it vested on the date of cancellation, and any expense not yet recognized for the award is recognized immediately. This includes any award where non-vesting conditions within the control of either the entity or the employee are not met. However, if a new award is substituted for the cancelled award, and designated as a replacement award on the date that it is granted, the cancelled and new awards are treated as if they were a modification of the original award, as described in previous paragraph.

The dilutive effect of outstanding options is reflected as additional share dilution in the computation of diluted earnings per share.

Option awards outstanding for all periods presented are of the equity settled type.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-31

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**3.    Summary of significant accounting policies (continued)**

**3.17    Leases prior to adoption of IFRS 16**

Before the Group's adoption of IFRS 16 on January 1, 2019 all leases in which the Group does not obtain substantially all the risks and benefits of ownership of an asset are classified as operating leases. Initial direct costs incurred in negotiating an operating lease are added to the carrying amount of the leased asset and recognized over the lease term on the same basis as rental income. Contingent rents are recognized as revenue in the period in which they are earned.

**3.18    Non-current assets held for sale and discontinued operations**

Non-current assets and disposal groups classified as held for sale are measured at the lower of their carrying amount and fair value less costs to sell. Non-current assets and disposal groups are classified as held for sale if their carrying amounts will be recovered principally through a sale transaction rather than through continuing use. This condition is regarded as met only when the sale is highly probable and the asset or disposal group is available for immediate sale in its present condition. Management must be committed to the sale, which should be expected to qualify for recognition as a completed sale within one year from the date of classification.

In the statement of comprehensive income, income and expenses from discontinued operations are reported separately from income and expenses from continuing operations, down to the level of profit after taxes, even when the Group retains a non-controlling interest in the subsidiary after the sale. The resulting profit or loss (after taxes) is reported separately in the statement of comprehensive income.

Property and equipment and intangible assets once classified as held for sale are not depreciated or amortized.

**3.19 Changes in presentation**

In 2019 the Group changed the presentation of its personnel and related costs by segregating it from cost of revenue and selling, general and administrative expenses in a separate line on the face of the financial statements. The reclassification was made to better reflect the nature and amount of these costs in the current business environment and in order to make the financial statements more comparable with industry peers.

| | As originally presented | Reclassification | As reclassified |
|---|---|---|---|
| **For the year ended December 31, 2018** | | | |
| Personnel expenses | — | (7,748) | **(7,748)** |
| Cost of revenue | (15,129) | 4,176 | **(10,953)** |
| Selling, general and administrative expenses | (9,671) | 3,572 | **(6,099)** |
| **For the year ended December 31, 2017** | | | |
| Personnel expenses | — | (4,286) | **(4,286)** |
| Cost of revenue | (9,763) | 2,059 | **(7,704)** |
| Selling, general and administrative expenses | (6,023) | 2,227 | **(3,796)** |

*The accompanying notes form an integral part of these consolidated financial statements.*

F-32

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**4.     Significant accounting judgments, estimates and assumptions**

The preparation of consolidated financial statements in conformity with IFRS requires management to make judgments, estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the reporting dates and the reported amounts of revenues and expenses during the reporting periods. However, uncertainty about these assumptions and estimates could result in outcomes that require a material adjustment to the carrying amount of the asset or liability affected in future periods.

**Significant judgments**

*Revenue recognition*

*Revenue from SOVEST project – applicable standards*

SOVEST project implies offering interest free loans to individuals for the purchases made with installment cards plus various options connected to the use of these cards. It brings revenues in the form of commissions from merchants and card-holders as well as interchange fees from the payment system. The Group exercises significant judgment in determining which of these commissions fall within the scope of IFRS 9 or IFRS 15. The resulting conclusion depends mainly on whether a commission can be linked to a specific lending arrangement or not.

*Revenue from inactive accounts and unclaimed payments*

The Group stipulates in its public offers the term during which a customer who failed to identify correctly the recipient of his transfer can return to correct the identification details or claim money back. If the customer does not return, the whole amount of transfer is appropriated by the Group in the period of specified time in the public offer. Similarly, the Group charges a daily commission on the balance of wallets that remained inactive during the period indicated in the public offer. The Group believes that including these rules into its public offers gives it appropriate legal rights to recognize the extinguishment of customer liabilities and, therefore, record the related gain as revenue.

*Functional currency*

Each entity in the Group determines its own functional currency, depending on the economic environment it operates in, and items included in the financial statements of each entity are measured using that functional currency.

*Recognition of control, joint control, or significant influence over entities*

In assessing business combinations, we analyse all relevant terms and conditions of management of the acquired or newly established entities and exercise judgment in deciding whether the Group has control, joint control, or significant influence over them. As a result, certain acquisitions where the Group's share is over 50% may not be recognized as consolidated subsidiaries and vice versa. See Note 6 for details.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-33

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**4.     Significant accounting judgments, estimates and assumptions (continued)**

*Acquisition of business in the form of separate assets*

In 2018 the Group completed the acquisition of the Rocketbank business that does not represent a separate legal entity. The acquisition was made through a combination of contracts to purchase the major non-current assets, transfer of employees and so forth. Since the assets and other resources have been acquired in order to operate them as a business, these transactions were accounted for using the acquisition method as a single transaction. The acquisition date was the date when the Group obtained control over the last key element of the business. All the cash amounts paid by the Group under any of the contracts related to the acquisition were treated as consideration. See Note 6 for details.

**Significant estimates and assumptions**

Significant estimates reflected in the Company's financial statements include, but are not limited to:

- Fair values of assets and liabilities acquired in business combinations;

- Fair value of assets transferred in non-monetary transactions;

- Useful life of property, equipment and Intangible assets

- Impairment of intangible assets, goodwill, investments in associates and joint ventures;

- Recoverability of deferred tax assets;

- Fair value of loans issued;

- Impairment of loans and receivables;

- Measurement of cost associated with share-based payments;

- Uncertain position over risk assessment;

Actual results could materially differ from those estimates. The key assumptions concerning the future events and other key sources of estimation uncertainty at the reporting date that have a significant risk of a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below:

### Fair values of assets and liabilities acquired in business combinations

The Group recognizes separately, at the acquisition date, the identifiable assets, liabilities and contingent liabilities acquired or assumed in the business combination at their fair values, which involves estimates. Such estimates are based on valuation techniques, which require considerable judgment in forecasting future cash flows and developing other assumptions.

### Fair value of assets transferred in non-monetary transactions

The Group was engaged in a transaction related to the establishment of JSC Tochka during the year 2018. In this process, the Group invested a number of assets into the newly established entity (fixed assets, intangible assets, promissory notes). The fair value of promissory notes is deemed equal to their nominal value because they can be instantly exchanged for cash. The fair value of fixed assets and intangible assets is deemed equal to their carrying amount because these assets had been purchased recently from an unrelated party.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-34

---

**Table of Contents**

QIWI plc

Notes to consolidated financial statements (continued)

### 4.    Significant accounting judgments, estimates and assumptions (continued)

### Impairment of goodwill and intangible assets

The Group determines it has the following material CGUs: SOVEST, Payment services, Postomatnye Tekhnologii, Tochka, Rocketbank and Flocktory. For the purpose of the goodwill impairment test, the Group estimates the recoverable amounts of Payment services CGU as fair value less costs of disposal on the basis of quoted prices of the Company's ordinary shares. See also Note 12 below for details. For the purpose of testing for impairment the Group's intangible assets with indefinite useful lifes estimates the recoverable amounts of each asset as fair value less costs of disposal on the basis of comparative method and cost approach. For the purpose of intangible assets with definite useful life impairment, when indicators of impairment are noted, the Group estimates the recoverable amounts as the higher of value in use or fair value less costs to sell of an individual asset or the CGU to which this asset relates.

### Impairment of investments in associates and joint ventures

The Group's investments in significant associates and joint ventures are generally designated as separate CGUs. The recoverable amount of these CGUs is determined based on a value in use calculation using appropriate financial models.

### Recoverability of deferred tax assets

The utilization of deferred tax assets will depend on whether it is possible to generate sufficient taxable income against which the deductible temporary differences can be utilized. Various factors are used to assess the probability of the future utilization of deferred tax assets, including past operating results, operational plans, expiration of tax losses carried forward, and tax planning strategies.

Certain deferred tax assets were not recorded because the Group does not expect to realize certain of its tax loss carry forwards in the foreseeable future due to the history of losses. Further details on deferred taxes are disclosed in Note 29.

### Fair value of loans issued

The Group measures loans issued at amortized cost using the effective interest rate (EIR) method. EIR is assumed to be equal to loan market rates which are defined on market participants statistic available to the Group.

*ECL measurement*

The Group records an allowance for ECLs for all loans and other debt financial assets not held at FVPL. The ECL allowance is based on the credit losses expected to arise over the life of the asset (the lifetime expected credit loss or LTECL), unless there has been no significant increase in credit risk since origination, in which case, the allowance is based on the 12 months' expected credit loss (12mECL). The 12mECL is the portion of LTECL that represent the ECLs that result from default events on a financial instrument that are possible within the 12 months after the reporting date. Both LTECL and 12mECL are calculated on either an individual basis or a collective basis, depending on the nature of the underlying portfolio of financial instruments.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-35

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**4.      Significant accounting judgments, estimates and assumptions (continued)**

ECLs are based on the difference between the contractual cash flows due in accordance with the contract and all the cash flows that the Group expects to receive. The shortfall is then discounted at an approximation to the asset's original effective interest rate. The mechanics of the ECL calculations are outlined below and the key elements are as follows:

- PD      The *Probability of Default* is an estimate of the likelihood of default over a given time horizon. A default may only happen at a certain time over the assessed period, if the facility has not been previously derecognised and is still in the portfolio.

- EAD     The *Exposure at Default* is an estimate of the exposure at a future default date, taking into account expected changes in the exposure after the reporting date, including repayments of principal and interest, whether scheduled by contract or otherwise, expected drawdowns on committed facilities, and accrued interest from missed payments.

- LGD     The *Loss Given Default* is an estimate of the loss arising in the case where a default occurs at a given time. It is based on the difference between the contractual cash flows due and those that the lender would expect to receive, including from the realisation of any collateral. It is usually expressed as a percentage of the EAD.

For other financial assets (i.e., cash in banks, loans and debt instruments) and financial liabilities (i.e., financial guaranties and credit related commitments) the Group has established a policy to perform an assessment, at the end of each reporting period, of whether a financial instrument's credit risk has increased significantly since initial recognition, by considering the change in the risk of default occurring over the remaining life of the financial instrument.

In all cases, the Group considers that there has been a significant increase in credit risk when contractual payments are more than 30 days past due. The Group considers a financial asset in default when contractual payment are 90 days past due (except for particular sort of Trade and other receivables of 60 days). However, in certain cases, the Group may also consider a financial asset to be in default when internal or external information indicates that the Group is unlikely to receive the outstanding contractual amounts in full before taking into account any credit enhancements held by the Group.

For Trade and other receivables, the Group has applied the standard's simplified approach and has calculated ECLs based on lifetime expected credit losses. The Group has established a provision matrix that is based on the Group's historical credit loss experience, adjusted for forward-looking factors specific to the debtors and the economic environment.

For instalment card loans and its undrawn credit commitments ELC calculation the Group uses internal historical instalment card loans loss rates statistics for assessment of probabilities of default. The loss given default is an estimate of the loss arising in the case where a default occurs at a given time and is based on internal statistics.

Further details on provision for impairment of loans and receivables are disclosed in Notes 13, 14.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-36

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**4.      Significant accounting judgments, estimates and assumptions (continued)**

*Measurement of cost associated with share-based payments*

Share-based payments included expenses incurred under employee stock option plans (ESOP) and restricted stock unit plan (RSU). See also Note

Management estimates the fair value of stock options at the date of grant using the Black-Scholes-Merton pricing model and its restricted stock units using the Binominal model. The option pricing models were originally developed for use in estimating the fair value of traded options, which have different characteristics than the stock options granted by the Company and its subsidiaries, associates and joint ventures. The models are also sensitive to changes in the subjective assumptions, which can materially affect the fair value estimate. These subjective assumptions include the expected life of the options, expected volatility, risk-free interest rates, expected dividend yield, the fair value of the underlying shares. The amount of expense is also sensitive to the number of awards, which are expected to vest, taking into account estimated forfeitures. Below is the discussion of each of these estimates:

*Assumptions used for ESOP valuation*

*Expected life*

The Company did not have any option grants in the past, and does not have sufficient history to determine the time the option holders will hold the shares. Therefore, the Company used the expected term as the average between the vesting and contractual term of each option tranche for stock option plan.

*Expected volatility*

Due to a relatively short period of historical market data, QIWI's share price volatility for options valuation was defined based on the historical volatility of peer group companies over a period, which approximates the expected life of option tranches.

*Risk-free interest rates*

Risk-free interest rates are based on the implied yield currently available in the US treasury bonds, adjusted for a country risk premium, with a remaining term approximating the expected life of the option award being valued.

*Expected dividend yield*

The Group set a dividend yield based on historical payout and best management's expectation for dividends distribution.

*Fair value of the underlying shares*

Prior to May 2013 the Company's ordinary shares were not publicly traded. Therefore, it estimated the fair value of the underlying shares on the basis of valuations arrived at by employing the "income approach" valuation methodology. Since May 2013 QIWI plc is a public company and the fair value of its shares defined by reference to closing market price of its traded shares.

*Estimated forfeitures*

As of the dates of stock options grants had no data of attrition rate among key personnel and management resulted in an estimated forfeiture rate of zero. Subsequently, the actual forfeiture rate is higher, the actual amount of related expense will become lower.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-37

**Table of Contents**

QIWI plc

Notes to consolidated financial statements (continued)

**4.    Significant accounting judgments, estimates and assumptions (continued)**

*Assumptions used for RSU valuation*

*Expected life*

The Company used the expected term as the vesting term for RSU plan.

*Expected volatility*

The expected volatility reflects the assumption that the historical QIWI's share price volatility over a period similar to the life of the RSUs is indicative of future trends, which may not necessarily be the actual outcome.

*Risk-free interest rates*

Risk-free interest rates are based on the implied yield currently available in the US treasury bonds, adjusted for a country risk premium, with a remaining term approximating the expected life of the option award being valued.

*Expected dividend yield*

The Group set a dividend yield based on historical payout and best management's expectation for dividends distribution.

*Fair value of the underlying shares*

The fair value of shares defined by reference to closing market price of the Group's traded shares.

*Estimated forfeitures*

The forfeiture rate for RSUs granted during the period is 6-10%. It is based on historical data and current expectations and is not necessarily indicative of forfeiture patterns that may occur.

*Uncertain position over risk assessment*

The Group disclosed possible and accrued probable risks in respect on currency, customs, tax and other regulatory positions. Management estimates the amount of risk based on its interpretation of the relevant legislation, in accordance with the current industry practice and in conformity with its estimation of probability, which require considerable judgment. See Note 30 for details.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-38

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

5.    **Consolidated subsidiaries**

The consolidated IFRS financial statements include the assets, liabilities and financial results of the Company and its subsidiaries. The subsidiaries are listed below:

| | | Ownership interest | |
| | | As of December 31, 2018 | As of December 31, 2019 |
| Subsidiary | Main activity | | |
| --- | --- | --- | --- |
| JSC QIWI (Russia) | Operation of electronic payment kiosks | 100% | 100% |
| QIWI Bank JSC (Russia) | Maintenance of electronic payment systems and Bank operations, inc.: money transfer, consumer and SME financial services | 100% | 100% |
| QIWI Payments Services Provider Ltd (UAE) | Operation of on-line payments | 100% | 100% |
| QIWI International Payment System LLC (USA) | Operation of electronic payment kiosks | 100% | 100% |
| Qiwi Kazakhstan LP (Kazakhstan) | Operation of electronic payment kiosks | 100% | 100% |
| JLLC OSMP BEL (Belarus) | Operation of electronic payment kiosks | 51% | 51% |
| QIWI—M S.R.L. (Moldova) | Operation of electronic payment kiosks | 51% | 51% |
| QIWI ROMANIA SRL (Romania) | Operation of electronic payment kiosks | 100% | 100% |
| QIWI WALLET EUROPE SIA (Latvia)[1] | Operation of on-line payments | 100% | — |
| QIWI Management Services FZ-LLC (UAE) | Management services | 100% | 100% |
| Attenium LLC (Russia) | Management services | 100% | 100% |
| Postomatnye Tekhnologii LLC (Russia) | Logistic | 100% | 100% |
| Future Pay LLC (Russia) | Operation of on-line payments | 100% | 100% |
| Qiwi Blockchain Technologies LLC (Russia) | Software development | 100% | 100% |
| QIWI Shtrikh LLC (Russia) | On-line cashbox production | 51% | 51% |
| QIWI Platform LLC (Russia) | Software development | 100% | 100% |
| Factoring PLUS LLC (ex. QIWI Processing LLC (Russia) | Software development | 100% | 100% |
| ContactPay Solution (United Kingdom)[2] | Operation of on-line payments | — | 100% |
| Rocket Universe LLC (Russia)[2] | Software development | — | 100% |
| Billing Online Solutions LLC (Russia)[2] | Software development | — | 100% |
| Flocktory Ltd (Cyprus) [3] | Holding company | 82% | 99% |
| Flocktory Spain S.L. (Spain) [3] | SaaS platform for customer lifecycle management and personalization | 82% | 99% |
| FreeAtLast LLC (Russia) [3] | SaaS platform for customer lifecycle | | |

| | | | |
|---|---|---|---|
| | Management and personalization | 82% | 99% |
| SETTE FZ-LLC (UAE) [2] | Payment Services Provider | — | 100% |
| LALIRA DMCC (UAE) [2] | Payment Services Provider | — | 100% |
| **Associate** | | | |
| JSC Tochka (Russia) | Digital services for banks | 40% | 40% |

[1]   The Entity was liquidated during 2019
[2]   The Entities were established during 2019
[3]   Flocktory Ltd and its subsidiaries were joint ventures as of December 31, 2018 (Note 6, Note 22)

*The accompanying notes form an integral part of these consolidated financial statements.*

F-39

**Table of Contents**

QIWI plc

Notes to consolidated financial statements (continued)

**6.      Acquisitions and business combinations**

*2019*

***Flocktory***

On March 22, 2017, the Group acquired an 82% stake in Flocktory Ltd, a private company, operating in Russia and Spain. Flocktory Ltd operates through its subsidiaries Flocktory Spain S.L. and FreeAtLast LLC (Russia). Flocktory's business is primarily focused on the development of automated marketing solutions for the e-commerce, financial, media and travel industries, which are based on data collection and analysis and substantively represents SAAS platform for customer lifecycle management and personalization. The Group also entered into call and put option agreements with respect to the remaining 17% stake in Flocktory Ltd. On December 2, 2019 put options were exercised and the Group gained sole control over Flocktory. The acquisition has been accounted for using the acquisition method. Pre-existing relationships between the Group and Flocktory were accounted through share of gain/(loss) of a joint venture and disclosed in the Note 22.

As at date of acquisition the Group revalued its prior holding of its 82% stake in Flocktory and put option at fair value and recognized a 180 gain and a 267 loss from those revaluations respectively (Note 27).

The consideration was made by the following:

| | |
|---|---|
| Fair value of prior holding of 82% stake | 984 |
| Cash consideration for 17% | 214 |
| **Total consideration** | **1,198** |

The provisional fair value of the identifiable assets and liabilities as of the date of acquisition was:

| | **Fair value** |
|---|---|
| **Net assets acquired:** | |
| Property, equipment (including right-of-use of leased assets) | 45 |
| Intangible assets | 394 |
| Trade and other receivables | 66 |
| Cash and cash equivalents | 178 |
| Trade and other payables | (80) |
| Lease liabilities | (46) |
| Deferred tax liabilities | (74) |
| Other liabilities | (8) |
| **Total identifiable net assets at fair value** | **475** |
| **Group's share of net assets (99%)** | 472 |
| **Goodwill arising on acquisition** | **726** |

Provisional goodwill in the amount of 726 relates to qualified workforce and potential synergy with the existing business and is equal to the difference between the fair value of net assets acquired in the business combination and the consideration paid. Goodwill was allocated to the CGU Flocktory. The Group determined the fair value of Flocktory software, trademarks, client base and recognized these as intangible assets with a value of 394. None of the goodwill recognised is expected to be deductible for income tax purposes.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-40

QIWI plc

Notes to consolidated financial statements (continued)

**6.     Acquisitions and business combinations (continued)**

Revenue of Flocktory business from the acquisition date to the reporting date amounted to 49 and the net profit was nil. If Flocktory business had been part of the Group from the beginning of the year, the Group's revenue through to the reporting date would have amounted to 39,730 and net profit 4,876.

| *Analysis of cash flows on acquisition:* | Amount |
|---|---|
| Cash paid (Including cash paid for put option (267)) | (482) |
| Net cash acquired with the subsidiary | 178 |
| **Total cash paid upon business combination** | **(304)** |

### Billing online

During the fourth quarter of 2019, the Group completed a series of transactions related to the acquisition of assets of the Billing Online business combined with the hiring of its employees into newly established entity Billing Online Solutions LLC. By December 31, 2019, the Group obtained control over Billing online business. The entity offers software services to housing and utility companies and, in the future, will provide on interface to households for utility payments using QIWI payment systems. The acquisition has been accounted for using the acquisition method. Pre-existing relationships between the Group and Billing online were not significant.

Consideration for Billing online business comprises cash in the amount of 129 (50 was paid during the year 2019 and 79 is payable as at December 31, 2019). The fair value of identified intangible assets amounted to 78 and consisted primarily of software and trademarks (refer to Note 11). Provisional goodwill resulted as the difference between fair value of net assets acquired in the business combination and the consideration paid amounted to 51 and related to potential synergy with the Payment services segment of the Group. Goodwill was allocated to CGU Payment services. None of the goodwill recognised is expected to be deductible for income tax purposes.

Revenue and net profit of Billing online business from the acquisition date to the reporting date was insignificant. If Billing online business had been part of the Group from the beginning of the year, the Group's revenue and net profit would have changed insignificantly.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-41

QIWI plc

Notes to consolidated financial statements (continued)

**6.     Acquisitions and business combinations (continued)**

*2018*

### Rocketbank

In July 2018, the Group obtained control over Rocketbank business, which does not represent a separate legal entity and will operate under the banking license of QIWI bank. Rocketbank is primarily focused on consumer financial services. The transaction was structured as an acquisition of assets combined with hiring of Rocketbank employees by the Group. The acquisition has been accounted for using the acquisition method. Pre-existing relationships between the Group and Rocketbank were not significant.

Consideration paid for Rocketbank business comprises only of cash in the amount of 183.

The fair value of the identifiable assets and liabilities as of the date of acquisition was:

| | Fair value |
|---|---|
| **Net assets acquired:** | |
| Property and equipment | 113 |
| Intangible assets | 393 |
| Deferred tax asset | 3 |
| Other liabilities | (419) |
| **Total identifiable net assets at fair value** | **90** |
| **Consideration paid** | **183** |
| **Goodwill arising on acquisition** | **93** |

Goodwill in the amount of 93 relates to qualified workforce and is equal to the difference between fair value of net assets acquired in the business acquisition and the consideration paid. Goodwill was allocated to CGU Rocketbank. The Group determined the fair value of Rocketbank software, trademarks, client base and recognized as intangible assets as 393. The Group also obtained a liability regarding loyalty program of the acquired client base in the amount of 419. The Group received a compensation in the amount of 321 from seller for loyalty program liability transferred which was included as decrease of consideration paid. None of the goodwill recognised is expected to be deductible for income tax purposes.

Revenue of Rocketbank business from the acquisition date to the reporting date amounted to 180 and the net loss was 818. If Rocketbank business had been part of the Group from the beginning of the year, the Group's revenue through to the reporting date would have amounted to 31,016 and net profit to 2,266.

| Analysis of cash flows on acquisition for 2018: | Amount |
|---|---|
| Cash paid to the seller for non-current assets | (83) |
| Cash paid to the top-management of Rocketbank | (100) |
| Cash received from the seller | 321 |
| **Total cash received upon business combination in the year 2018** | **138** |

Cash paid to the seller for purchases of non-current assets of Rocketbank in the year 2017 was 321.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-42

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

6.      Acquisitions and business combinations (continued)

**JSC Tochka**

In June 2018, the Group, Bank Financial Corporation Otkritie and Tochka management signed a cooperation agreement to establish a new entity to develop the Tochka project together as a multi-banking platform. In July 2018 new entity JSC Tochka was created. Tochka is a digital banking service focused on offering a broad range of services to small and medium businesses. The capital structure of the new entity is as follows: Otkritie Bank has 50% + 1 share, QIWI—40% and Tochka management has 10%—1 share, while dividends and potential capital gains are distributed as follows: QIWI and Otkritie Bank to receive 45% each and 10% will be attributed to Tochka management. QIWI Group assesses its share in the new entity at 45% (according to its share in dividends and potential capital gains). Otkritie can impose its decisions by forcefully acquiring the shares of other partners in case of deadlocks, so the Group believes it only has significant influence over JSC Tochka. The Group recognizes this investment as an associate and has been accounted for it under the equity method. As part of the transaction Bank Financial Corporation Otkritie, Tochka management and the Group agreed to each contribute their assets to the new entity, including software, hardware and cash financing.

The structure of the Group contribution was the following:

| | |
|---|---|
| Non-monetary assets | 125 |
| Monetary assets* | 992 |
| **Total contribution** | **1,117** |

*   No cash was paid during 2018.

No significant additional contributions are expected to be made in the next periods.

The fair value of assets contributed to JSC Tochka was:

| | Fair value |
|---|---|
| Property and equipment | 47 |
| Intangible assets | 88 |
| Cash, accounts receivable and promissory notes | 1,753 |
| **Total contributions** | **1,888** |
| **Group's share (45%)** | **850** |
| Contribution of the Group | 1,117 |
| **Loss on set up of associate** | **(267)** |

The loss in the amount of 267 relates to disproportional contribution of assets by the Group as compared to other shareholders and is equal to the difference between the fair value of the obtained share in the JSC Tochka's assets and Group contribution made.

*The accompanying notes form an integral part of these consolidated financial statements.*

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**7.     Assets held for sale and discontinued operations**

*QIWI Box*

During the fourth quarter of 2019, due to underperformance on key metrics, the BoD of the Company decided to discontinue the operations of the QIWI Box project. Immediately before the classification of QIWI Box assets as held for sale, the recoverable amount was estimated for certain items of property, plant and equipment and an impairment loss was identified (pls refer to Note 12), the remaining part of property, plant and equipment which was classified as assets held for sale, amounted to 123. As at December 31, 2019, there was no further impairment as the carrying amount of the disposal group did not fall below its fair value less costs to sell.

**8.     Operating segments**

In reviewing the operational performance of the Group and allocating resources, the chief operating decision maker of the Group (CODM), who is the Croup's CEO and its ultimate controlling shareholder, reviews selected items of each segment's statement of comprehensive income.

In determining that the CODM was the CEO, the Group considered the CEO responsibilities as well as the following factors:

- The CEO determines compensation of other executive officers while the Group's board of directors approves corporate key performance indicators (KPIs) and total bonus pool for those executive officers. In case of underperformance of corporate KPIs a right to make a final decision on bonus pool distribution is left with the BOD;

- The CEO is actively involved in the operations of the Group and regularly chairs meetings on key projects of the Group; and

- The CEO regularly reviews the financial and operational reports of the Group. These reports primarily include segment net revenue, segment profit before tax and segment net profit for the Group as well as certain operational data.

The financial data is presented on a combined basis for all key subsidiaries, joint ventures and associates representing the segment net revenue, segment profit before tax and segment net profit. The Group measures the performance of its operating segments by monitoring: segment net revenue, segment profit before tax and segment net profit. Segment net revenue is a measure of profitability defined as the segment revenues less segment direct costs. The Group does not monitor balances of assets and liabilities by segments as the CODM considers they have no impact on decision-making.

The Group has identified its operating segments based on the types of products and services the Group offers. Before January 1, 2018, the Group reported two segments: Payment Services (PS) and Consumer Financial Services (CFS). Since 2018, the Group additionally discloses: Small and Medium Enterprises (SME) segment and the Rocketbank segment. In 2018, the Group completed the transaction related to the acquisition of Rocketbank and started to invest in the new business activities which resulted in Rocketbank segment becoming significant. As a result, starting from 2018, CODM reviews segment net revenue, segment profit before tax and segment net profit separately for each of the following reportable segments: Payment Services, Consumer Financial Services, Small and Medium Enterprises and Rocketbank:

*The accompanying notes form an integral part of these consolidated financial statements.*

F-44

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**8.     Operating segments (continued)**

- Payment Services (PS), operating segment that generates revenue through operations of the payment processing system offered to the Group's customers through a diverse range of channels and interfaces;

- Consumer Financial Services (CFS), operating segment that generates revenue through financial services rendered to individuals, currently presented by SOVEST installment card project;

- Small and Medium Enterprises (SME), operating segment that generates revenue through operations of the Tochka business, which is focused on offering a broad range of services for small and medium enterprises;

- Rocketbank (RB), operating segment that generates revenue through offering digital banking service including debit cards and deposits to retail customers.

For the purpose of management reporting, expenses related to corporate back-office operations were not allocated to any operating segment and are presented separately to the CODM. Results of other operating segments and corporate expenses are included in Corporate and Other (CO) category

for the purpose of segment reporting.

Management reporting is different from IFRS, because it does not include certain IFRS adjustments, which are not analyzed by the CODM in assessing the operating performance of the business. The adjustments affect such major areas as share-based payments, expenses associated with filing the registration statement on Form F-3 for our major shareholders and related transaction expenses, foreign exchange gain/(loss) from revaluation of cash proceeds received from secondary public offering, the effect of disposal of subsidiaries and fair value adjustments, such as amortization and impairment, as well as irregular non-recurring items that occur from time to time and are evaluated for adjustment as and when they occur. The tax effect of these adjustments is also excluded from management reporting.

The segments' statement of comprehensive income for the year ended December 31, 2019, as presented to the CODM are presented below:

|  | 2019 | | | | | |
|  | PS | CFS | SME | RB | CO | Total |
|---|---|---|---|---|---|---|
| Revenue | 34,700 | 1,575 | 1,170 | 1,339 | 552 | 39,336 |
| **Segment net revenue** | **20,965** | **1,339** | **990** | **(490)** | **372** | **23,176** |
| Segment profit/(loss) before tax | 14,716 | (2,484) | 372 | (2,858) | (1,423) | 8,323 |
| **Segment net profit/(loss)** | **12,105** | **(1,981)** | **354** | **(2,317)** | **(1,482)** | **6,679** |

The segments' statement of comprehensive income for the year ended December 31, 2018, as presented to the CODM are presented below:

|  | 2018 | | | | | |
|  | PS | CFS | SME | RB | CO | Total |
|---|---|---|---|---|---|---|
| Revenue | 26,649 | 558 | 3,045 | 180 | 178 | 30,610 |
| **Segment net revenue** | **16,497** | **385** | **2,916** | **(263)** | **122** | **19,657** |
| Segment profit/(loss) before tax | 11,552 | (3,281) | (898) | (1,327) | (974) | 5,072 |
| **Segment net profit/(loss)** | **9,529** | **(2,618)** | **(776)** | **(1,061)** | **(937)** | **4,137** |

*The accompanying notes form an integral part of these consolidated financial statements.*

F-45

[Table of Contents]

QIWI plc

Notes to consolidated financial statements (continued)

**8.    Operating segments (continued)**

The segments' statement of comprehensive income for the year ended December 31, 2017, as presented to the CODM are presented below:

|  | 2017 | | | | | |
|  | PS | CFS | SME | RB | CO | Total |
|---|---|---|---|---|---|---|
| Revenue | 20,133 | 105 | 611 | — | 48 | 20,897 |
| **Segment net revenue** | **12,580** | **9** | **578** | **(5)** | **31** | **13,193** |
| Segment profit/(loss) before tax | 8,795 | (2,704) | (190) | (323) | (760) | 4,818 |
| **Segment net profit/(loss)** | **7,543** | **(2,164)** | **(171)** | **(311)** | **(843)** | **4,054** |

Segment net revenue, as presented to the CODM, for the years ended December 31, 2017, 2018 and 2019 is calculated by subtracting cost of revenue from revenue as presented in the table below:

|  | 2017 | 2018 | 2019 |
|---|---|---|---|
| **Revenue under IFRS** | **20,897** | **30,610** | **39,336** |
| Cost of revenue | (7,704) | (10,953) | (16,160) |
| **Total segment net revenue, as presented to CODM** | **13,193** | **19,657** | **23,176** |

A reconciliation of segment profit before tax as presented to the CODM to IFRS consolidated profit before tax of the Group, for the years ended December 31, 2017, 2018 and 2019 is presented below:

|  | 2017 | 2018 | 2019 |
|---|---|---|---|
| **Consolidated profit before tax under IFRS** | **3,840** | **4,501** | **6,379** |
| Fair value adjustments recorded on business combinations and their amortization | 344 | 369 | 479 |
| Impairment of non-current assets | — | — | 792 |
| Share-based payments | 398 | 635 | 464 |
| Form F-3 and related expenses | — | — | 79 |
| Foreign exchange loss/(gain) from revaluation of cash proceeds received from secondary public offering | 236 | (433) | 130 |
| **Total segment profit before tax, as presented to CODM** | **4,818** | **5,072** | **8,323** |

A reconciliation of segment net profit as presented to the CODM to IFRS consolidated net profit of the Group, for the years ended December 31, 2017, 2018 and 2019 is presented below:

| | 2017 | 2018 | 2019 |
|---|---|---|---|
| **Consolidated net profit under IFRS** | **3,142** | **3,626** | **4,887** |
| Fair value adjustments recorded on business combinations and their amortization | 344 | 369 | 479 |
| Impairment of non-current assets | — | — | 792 |
| Share-based payments | 398 | 635 | 464 |
| Form F-3 and related expenses | — | — | 79 |
| Foreign exchange loss/(gain) from revaluation of cash proceeds received from secondary public offering | 236 | (433) | 130 |
| Effect from taxation of the above items | (66) | (60) | (152) |
| **Total segment net profit, as presented to CODM** | **4,054** | **4,137** | **6,679** |

*The accompanying notes form an integral part of these consolidated financial statements.*

F-46

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

## 8.    Operating segments (continued)

**Geographic information**

Revenues from external customers are presented below:

| | 2017 | 2018 | 2019 |
|---|---|---|---|
| Russia | 15,556 | 22,693 | 29,485 |
| Other CIS | 1,098 | 1,393 | 1,592 |
| EU | 989 | 2,353 | 3,291 |
| Other | 3,254 | 4,171 | 4,968 |
| **Total revenue** | **20,897** | **30,610** | **39,336** |

Revenue is recognized according to merchants' or consumers' geographic place. The majority of the Group's non-current assets are located in Russia.

The Group has the only one external customer where revenue exceeded 10% of the Group's total revenue for the year ended December 31, 2019 and amounted to 10.3%. This revenue was generated within the PS segment. The Group had no single external customer amounting to 10% or greater of the Group's revenue for the years ended December 31, 2018 and 2017.

## 9.    Earnings per share

Basic earnings per share amounts are calculated by dividing net profit for the year attributable to ordinary equity holders of the parent by the weighted average number of ordinary shares outstanding during the year.

Diluted earnings per share amounts are calculated by dividing the net profit attributable to ordinary equity holders of the parent adjusted for the effect of any potential share exercise by the weighted average number of ordinary shares outstanding during the year plus the weighted average number of ordinary shares that would be issued on conversion of all the dilutive potential ordinary shares into ordinary shares.

The following reflects the income and share data used in basic and diluted earnings per share computations for the years ended December 31:

| | 2017 | 2018 | 2019 |
|---|---|---|---|
| **Net profit attributable to ordinary equity holders of the parent for basic earnings** | **3,114** | **3,584** | **4,832** |
| **Weighted average number of ordinary shares for basic earnings per share** | **60,755,706** | **61,202,710** | **61,788,024** |
| Effect of share-based payments | 404,357 | 522,116 | 476,420 |
| **Weighted average number of ordinary shares for diluted earnings per share** | **61,160,063** | **61,724,826** | **62,264,444** |
| **Earnings per share:** | | | |
| Basic, profit attributable to ordinary equity holders of the parent | 51.25 | 58.56 | 78.20 |
| Diluted, profit attributable to ordinary equity holders of the parent | 50.92 | 58.06 | 77.60 |

There have been no other transactions involving ordinary shares or potential ordinary shares between the reporting date and the date of completion of these financial statements.

*The accompanying notes form an integral part of these consolidated financial statements.*

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**10.    Property and equipment**

| | Processing servers and engineering equipment | Computers and office equipment | Other equipment | Construction in progress (CIP) and Advances for equipment | Leasehold improvements | Right of use of leased assets | Total |
|---|---|---|---|---|---|---|---|
| **Cost** | | | | | | | |
| **Balance as of December 31, 2017** | 822 | 130 | 174 | 111 | — | — | 1,237 |
| Transfer between groups | 22 | 5 | 12 | (39) | — | — | — |
| Additions | 478 | 134 | 109 | 15 | — | — | 736 |
| Additions from business combinations (Note 6) | 82 | 22 | 9 | (68) | — | — | 45 |
| Disposals | (65) | (13) | (109) | — | — | — | (187) |
| **Balance as of December 31, 2018** | 1,339 | 278 | 195 | 19 | — | — | 1,831 |
| **Impact of adopting IFRS 16 (Note 2)** | — | — | — | — | — | 936 | 936 |
| **Restated opening balance as of December 31, 2018** | 1,339 | 278 | 195 | 19 | — | 936 | 2,767 |
| Transfer between groups | (110) | 3 | (152) | (9) | 268 | — | — |
| Additions | 356 | 147 | 14 | 104 | 230 | 848 | 1,699 |
| Additions from business combinations (Note 6) | — | — | 3 | — | — | 42 | 45 |
| Disposals | (75) | (98) | (7) | (6) | — | (209) | (395) |
| Assets held for sale | (341) | — | — | — | — | — | (341) |
| **Balance as of December 31, 2019** | 1,169 | 330 | 53 | 108 | 498 | 1,617 | 3,775 |
| **Accumulated depreciation and impairment:** | | | | | | | |
| **Balance as of December 31, 2017** | (356) | (76) | (81) | — | — | — | (513) |
| Depreciation charge | (192) | (40) | (52) | — | — | — | (284) |
| Disposals | 16 | 10 | 14 | — | — | — | 40 |
| **Balance as of December 31, 2018** | (532) | (106) | (119) | — | — | — | (757) |
| Transfer between groups | 96 | — | 128 | — | (224) | — | — |
| Depreciation charge | (246) | (68) | (34) | — | — | (304) | (652) |
| Disposals | 37 | 35 | 2 | — | — | 39 | 113 |
| Assets held for sale | 218 | — | — | — | — | — | 218 |
| Impairment | (132) | — | — | — | (219) | — | (351) |
| **Balance as of December 31, 2019** | (559) | (139) | (23) | — | (443) | (265) | (1,429) |
| **Net book value** | | | | | | | |
| **As of December 31, 2017** | 466 | 54 | 93 | 111 | — | — | 724 |
| **As of December 31, 2018** | 807 | 172 | 76 | 19 | — | — | 1,074 |
| **As of December 31, 2019** | 610 | 191 | 30 | 108 | 55 | 1,352 | 2,346 |

As of December 31, 2019, the gross book value of fully depreciated assets is equal to 321 (2018 — 249).

*The accompanying notes form an integral part of these consolidated financial statements.*

F-48

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**11.    Intangible assets**

| Cost: | Goodwill | Licenses | Computer Software | Customer relationships | Trade marks | Advances for intangibles, CIP and others | Total |
|---|---|---|---|---|---|---|---|
| **Balance as of December 31, 2017** | **6,285** | **183** | **1,083** | **5,326** | **216** | **199** | **13,292** |
| Additions | — | — | 279 | — | — | 106 | **385** |
| Additions from business combinations (Note 6) | 93 | — | 166 | 88 | 139 | (149) | **337** |
| Transfer between groups | — | — | 31 | — | — | (31) | — |
| Disposals | — | — | (205) | — | — | (19) | **(224)** |
| **Balance as of December 31, 2018** | **6,378** | **183** | **1,354** | **5,414** | **355** | **106** | **13,790** |
| Additions | — | — | 236 | — | — | 211 | **447** |
| Additions from business combinations (Note 6) | 777 | — | 280 | 159 | 32 | — | **1,248** |
| Transfer between groups | — | — | 36 | — | — | (36) | — |
| Disposals | — | — | (156) | — | — | (39) | **(195)** |
| **Balance as of December 31, 2019** | **7,155** | **183** | **1,750** | **5,573** | **387** | **242** | **15,290** |
| **Accumulated Amortization:** | | | | | | | |
| **Balance as of December 31, 2017** | **—** | **—** | **(536)** | **(1,818)** | **(124)** | **(7)** | **(2,485)** |
| Amortization charge | — | — | (245) | (289) | (43) | (3) | **(580)** |
| Impairment | — | — | (4) | — | — | (19) | **(23)** |
| Disposals | — | — | 125 | — | — | 19 | **144** |
| **Balance as of December 31, 2018** | **—** | **—** | **(660)** | **(2,107)** | **(167)** | **(10)** | **(2,944)** |
| Amortization charge | — | — | (317) | (301) | (44) | (10) | **(672)** |
| Impairment | (93) | — | (148) | (67) | (115) | (18) | **(441)** |
| Disposals | — | — | 82 | — | — | 1 | **83** |
| **Balance as of December 31, 2019** | **(93)** | **—** | **(1,043)** | **(2,475)** | **(326)** | **(37)** | **(3,974)** |
| **Net book value** | | | | | | | |
| **As of December 31, 2017** | **6,285** | **183** | **547** | **3,508** | **92** | **192** | **10,807** |
| **As of December 31, 2018** | **6,378** | **183** | **694** | **3,307** | **188** | **96** | **10,846** |
| **As of December 31, 2019** | **7,062** | **183** | **707** | **3,098** | **61** | **205** | **11,316** |

As of December 31, 2019, the gross book value of fully amortized intangible assets is equal to 450 (2018 – 190).

*The accompanying notes form an integral part of these consolidated financial statements.*

F-49

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**12.    Impairment testing of goodwill and intangible assets**

The Group identified the following significant CGU's: Payment Services, SOVEST, Tochka, Rocketbank, QIWI Box and Flocktory. As of December 31, 2019 the Goodwill is allocated to two of the CGUs: Payment Services and Flocktory and intangible assets with indefinite useful life relates to four CGUs: Payment Services, SOVEST, Tochka and Rocketbank.

An analysis and movement of the net book value of goodwill and indefinite life licenses acquired through business combinations, as included in the intangible assets (Note 11), is as follows:

| | Goodwill | | | Indefinite life license | Total |
|---|---|---|---|---|---|
| | Payment services | Rocketbank | Flocktory | | |
| **As of December 31, 2017** | 6,285 | — | — | 183 | **6,468** |
| Addition (Note 6) | — | 93 | — | — | 93 |
| **As of December 31, 2018** | **6,285** | **93** | **—** | **183** | **6,561** |
| Addition (Note 6) | 51 | — | 726 | — | 777 |
| Impairment | — | (93) | — | — | (93) |
| **As of December 31, 2019** | **6,336** | **—** | **726** | **183** | **7,245** |

The Group tests its goodwill and the intangible assets with an indefinite useful life annually.

*Goodwill*

For the purpose of goodwill impairment test of the Payment services CGU the Company estimated the recoverable amount as fair value less costs of disposal on the basis of quoted prices of the Company's ordinary shares (Level 1). As a result of the annual impairment test the Group did not identify impairment of Goodwill allocated to Payment services CGU as of December 31, 2018 and 2019.

Management believes that goodwill allocated to Flocktory CGU is not impaired since the acquisition and related purchase accounting was completed close to year end 2019.

During the year 2019, goodwill allocated to Rocketbank CGU was impaired. Please refer to section «*Intangible assets with definite useful life*» below.

*Intangible assets with indefinite useful life*

As of December 31, 2019, the carrying amount of intangible assets with an indefinite useful life (licenses for banking operations, which are expected to be renewed indefinitely) is recognized with a value of 183 (2018—183). Intangible assets with an indefinite useful life were recorded by the Group at the date of acquisition of QIWI Bank JSC.

For the purpose of the impairment test of the intangible assets with indefinite useful life, the Company estimated the recoverable amounts of the asset as fair value less costs of disposal on the basis of comparative method and cost approach (Level 2). Under the valuation using the comparative method the Group considered identical third-party's transactions for acquisition of banks or bank organization that holds licenses identical to the Group's ones. Under the valuation using the cost approach the Group considered outflows required to meet the requirements for a minimum amount of equity to be held by the bank or bank organization with licenses similar to the Group's according to current legislation.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-50

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**12.     Impairment testing of goodwill and intangible assets (continued)**

The key assumption used in fair value less cost of disposal calculations is expected outflows to acquire a license on the open market.

All the assumptions are determined using observable market data and publicly available information of the cash transactions of the third-parties.

The Group performed an annual impairment test of Qiwi Bank's license as of December 31, 2019 and as of December 31, 2018, no impairment was identified. Reasonably possible changes in any valuation parameters would not result in impairment of intangible assets with indefinite useful life.

*Intangible assets with definite useful life*

For the purpose of the impairment test on other intangible assets the Company estimated the recoverable amounts as the higher of value in use or fair value less costs to sell of an individual asset or CGU the asset relates.

During the year 2019, the Group identified impairment indicators of non-current assets allocated to Rocketbank CGU and QIWI Box CGU due to underperformance on key metrics and the management plans to discontinue the operations to which the assets belong. The Group performed an impairment test of these CGUs, which indicated that there is impairment as of the reporting date in the amount of 201 for QIWI Box CGU and 591 for Rocketbank CGU. The recoverable amount of QIWI Box CGU has been determined by the Company based on a fair value less costs to sell. The recoverable amount of Rocketbank CGU has been also determined by the Company based on a fair value less cost to sell, using cash flow projections based on the business plans approved by Management and an appropriate discount rate reflecting the time value of money and risks associated. The period of forecast was five years. The discount rate applied was 21%. As a result, the Company partially impaired the non-current assets, relating to both CGUs.

| As of December 31, 2019 | Rocketbank CGU | QIWI Box CGU | Total |
|---|---|---|---|
| Carrying amount | 743 | 342 | 1,085 |
| Recoverable amount | 152 | 141 | 293 |
| **Impairment** | **(591)** | **(201)** | **(792)** |
| *Allocated to:* | | | |
| *Goodwill* | *(93)* | *—* | *(93)* |
| *Intangible assets* | *(279)* | *(69)* | *(348)* |
| *Property and equipment* | *(219)* | *(132)* | *(351)* |

With regard to the assessment of recoverable amounts of cash-generating units, management believes that no reasonably possible change in any of key assumptions would cause the recoverable amounts of the units to materially exceed their carrying values.

As of December 31, 2018 the Group did not recognize any significant impairment of intangible assets.

Case 1:20-cv-06054-BMC-CLP    Document 87-3    Filed 05/02/24    Page 152 of 187
PageID #: 3621

*The accompanying notes form an integral part of these consolidated financial statements.*

F-51

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**13.    Long-term and short-term loans issued**

As of December 31, 2019, long-term and short-term loans issued consisted of the following:

| | Total as of December 31, 2019 | Expected credit loss allowance | Net as of December 31, 2019 |
|---|---:|---:|---:|
| **Long-term loans** | | | |
| Loans to legal entities | 265 | — | 265 |
| **Total long-term loans** | **265** | **—** | **265** |
| **Short-term loans** | | | |
| Loans to legal entities | 3,467 | (33) | 3,434 |
| Instalment Card Loans | 8,795 | (810) | 7,985 |
| **Total short-term loans** | **12,262** | **(843)** | **11,419** |

The Group's loans mainly issued in Russian rubles.

As of December 31, 2018, long-term and short-term loans consisted of the following:

| | Total as of December 31, 2018 | Expected credit loss allowance | Net as of December 31, 2018 |
|---|---:|---:|---:|
| **Long-term loans** | | | |
| Loans to legal entities | 235 | (5) | 230 |
| **Total long-term loans** | **235** | **(5)** | **230** |
| **Short-term loans** | | | |
| Loans to individuals | 30 | — | 30 |
| Loans to legal entities | 1,612 | (26) | 1,586 |
| Instalment Card Loans | 6,096 | (822) | 5,274 |
| **Total short-term loans** | **7,738** | **(848)** | **6,890** |

The amounts in the tables show the maximum exposure to credit risk regarding loans issued. The Group has no internal grading system of loans issued for credit risk rating grades analysis. Loans issued are not collateralized.

An analysis of the changes in the ECL allowances due to changes in corresponding gross carrying amounts for the year ended December 31, 2019, was the following:

| | Stage 1 Collective | Stage 2 Collective | Stage 3 | Total |
|---|---:|---:|---:|---:|
| **ECL allowance as of January 1, 2019** | **(216)** | **(120)** | **(517)** | **(853)** |
| Changes because of financial instruments (originated or acquired)/derecognized during the reporting period | (127) | 7 | (496) | **(616)** |
| Transfers between stages | 114 | (7) | (107) | — |
| Amounts sold and written off | — | — | 626 | **626** |
| **ECL allowance as of December 31, 2019** | **(229)** | **(120)** | **(494)** | **(843)** |

During the year ended December 31, 2019, the Group sold defaulted balances of Installment Card Loans with the gross carrying amount of 655 to an unrelated party.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-52

**Table of Contents**

QIWI plc

Notes to consolidated financial statements (continued)

**13.    Long-term and short-term loans issued (continued)**

An analysis of the changes in the ECL allowances due to changes in corresponding gross carrying amounts for the year ended December 31, 2018, was the following:

|  | Stage 1 | Stage 2 |  |  |
|---|---|---|---|---|
|  | Collective | Collective | Stage 3 | Total |
| ECL allowance as of January 1, 2018 | (175) | (60) | (194) | (429) |
| Changes because of financial instruments (originated or acquired)/derecognized during the reporting period | (146) | (44) | (309) | (499) |
| Transfers between stages | 105 | (16) | (89) | — |
| Amounts written off | — | — | 75 | 75 |
| ECL allowance as of December 31, 2018 | (216) | (120) | (517) | (853) |

The movement of provision for impairment of loans for 2017 was the following:

|  | Provision for impairment of loans as of December 31, 2016 | (Charge)/ reversal for the year | Utilisation | Provision for impairment of loans as of December 31, 2017 |
|---|---|---|---|---|
| Instalment Card Loans | — | (222) | — | (222) |
| Loans to legal entities | (113) | 3 | 14 | (96) |
| Loans to financial institutions | (3) | — | — | (3) |
| Total | (116) | (219) | 14 | (321) |

**14.    Trade and other receivables**

As of December 31, 2019, trade and other receivables consisted of the following:

|  | Total as of December 31, 2019 | Expected credit loss allowance/Provision for impairment | Net as of December 31, 2019 |
|---|---|---|---|
| Cash receivable from agents | 2,947 | (199) | 2,748 |
| Deposits issued to merchants | 2,690 | (12) | 2,678 |
| Commissions receivable | 158 | (21) | 137 |
| Advances issued | 380 | (1) | 379 |
| Other receivables | 276 | (56) | 220 |
| Total trade and other receivables | 6,451 | (289) | 6,162 |

As of December 31, 2018, trade and other receivables consisted of the following:

|  | Total as of December 31, 2018 | Expected credit loss allowance/Provision for impairment | Net as of December 31, 2018 |
|---|---|---|---|
| Cash receivable from agents | 4,207 | (270) | 3,937 |
| Deposits issued to merchants | 2,975 | (16) | 2,959 |
| Commissions receivable | 559 | (21) | 538 |
| Advances issued | 287 | (12) | 275 |
| Other receivables | 380 | (47) | 333 |
| Total trade and other receivables | 8,408 | (366) | 8,042 |

*The accompanying notes form an integral part of these consolidated financial statements.*

F-53

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**14.    Trade and other receivables (continued)**

The amounts in the tables show the maximum exposure to credit risk regarding Trade and other receivables. The Group has no internal grading system of Trade and other receivables for credit risk rating grades analysis.

An analysis of the changes in the ECL allowances due to changes in the corresponding gross carrying amounts for the year ended December 31, 2019, was the following:

| | Total |
|---|---|
| **ECL allowance as of January 1, 2019** | **(366)** |
| Changes because of financial instruments (originated or acquired)/ derecognized during the reporting period | (9) |
| Amounts written off | 86 |
| **ECL allowance as of December 31, 2019** | **(289)** |

An analysis of the changes in the ECL allowances due to changes in the corresponding gross carrying amounts for the year ended December 31, 2018, was the following:

| | Total |
|---|---|
| **ECL allowance as of January 1, 2018** | **(578)** |
| Changes because of financial instruments (originated or acquired)/ derecognized during the reporting period | 5 |
| Amounts written off | 207 |
| **ECL allowance as of December 31, 2018** | **(366)** |

For the year ended December 31, 2017, the provision for impairment of receivables movement was the following:

| | Provision for impairment of receivables as of December 31, 2016 | (Charge)/ reversal for the year | Utilisation | Provision for impairment of receivables as of December 31, 2017 |
|---|---|---|---|---|
| Cash receivable from agents | (659) | 16 | 217 | (426) |
| Deposits issued to merchants | (3) | (11) | 1 | (13) |
| Commissions receivable | (7) | (11) | — | (18) |
| Advances issued | (1) | — | — | (1) |
| Other receivables | (109) | 5 | 17 | (87) |
| **Total trade and other receivables** | **(779)** | **(1)** | **235** | **(545)** |

Receivables are non-interest bearing, except for agent receivables bearing, generally, interest rate of 20%-36% per annum and credit terms generally do not exceed 30 days. There is no requirement for collateral for customers to receive credit.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-54

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**15.    Cash and cash equivalents**

As of December 31, 2019 and 2018, cash and cash equivalents consisted of the following:

| | As of December 31, 2018 | As of December 31, 2019 |
|---|---|---|
| Correspondent accounts with Central Bank of Russia (CBR) | 5,587 | 3,261 |
| Cash with banks and on hand | 13,119 | 7,317 |
| Short-term CBR deposits | 21,000 | 30,500 |
| Other short-term bank deposits | 1,267 | 1,025 |
| Less: Allowance for ECL | (7) | (2) |
| **Total cash and cash equivalents** | **40,966** | **42,101** |

The Group held cash and cash equivalents in different currencies mainly in Russian rubles and U.S. dollars.

The amounts in the table show the maximum exposure to credit risk regarding cash and cash equivalents. The Group has no internal grading system of cash and cash equivalents for credit risk rating grades analysis.

Since 2017 the Company has a bank guarantee and secured it by a cash deposit of U.S.$ 2.5 mln until July 31, 2020.

**16.    Other current assets and other current liabilities**

**16.1    Other current assets**

As of December 31, 2019 and 2018, other current assets consisted of the following:

| | As of December 31, 2018 | As of December 31, 2019 |
|---|---|---|
| Reserves at CBR* | 684 | 611 |
| Prepaid expenses | 156 | 230 |
| Other | 89 | 76 |
| **Total other current assets** | **929** | **917** |

\*  Banks are currently required to post mandatory reserves with the CBR to be held in non-interest bearing accounts. Starting from July 1, 2019, such mandatory reserves established by the CBR constitute 4.75% for liabilities in RUR and 8% for liabilities in foreign currency. The amount is excluded from cash and cash equivalents for the purposes of cash flow statement and does not have a repayment date.

The Group has no internal grading system of other current assets for credit risk rating grades analysis.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-55

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**16.2    Other current liabilities**

As of December 31, 2019 and 2018, other current liabilities consisted of the following:

| | As of December 31, 2018 | As of December 31, 2019 |
|---|---|---|
| Contract liability related to loyalty program | 473 | 607 |
| Contract liability related to guarantees issued | — | 199 |
| Other | 68 | 96 |
| **Total other current liabilities** | **541** | **902** |

**17.    Share capital, additional paid-in capital, share premium and other reserves**

The Capital of the Company is divided by two classes. Each class A share has the right to ten votes at a meeting of shareholders and each class B share has the right to one vote at a meeting of shareholders. The class A shares and the class B shares have the right to an equal share in any dividend or other distribution the Company pays and have nominal of EUR 0.0005 each.

| Authorised shares | As of December 31, 2017 Thousands | As of December 31, 2018 Thousands | As of December 31, 2019 Thousands |
|---|---|---|---|
| Ordinary Class A shares | 131,778 | 131,333 | 129,583 |
| Ordinary Class B shares | 99,072 | 99,517 | 101,267 |
| **Total authorised shares** | **230,850** | **230,850** | **230,850** |

| Issued and fully paid shares | As of December 31, 2017 Thousands | As of December 31, 2018 Thousands | As of December 31, 2019 Thousands |
|---|---|---|---|
| Ordinary Class A shares | 14,278 | 13,833 | 12,083 |
| Ordinary Class B shares | 46,655 | 48,880 | 50,630 |
| **Total issued and fully paid shares** | **60,933** | **62,713** | **62,713** |

As of December 31, 2019 the Company owned 620 thousand treasury class B shares (December 31, 2018—1,261) that were issued and fully paid in 2018 and retained by QIWI Employee trust in order to settle future obligations on share-based payments.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-56

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

## 17.   Share capital, additional paid-in capital, share premium and other reserves (continued)

For the year ended December 31, 2019 and 2018 the movement of outstanding shares' number was the following:

| | Ordinary Class A shares Thousands | Ordinary Class B shares Thousands | Number of outstanding shares Thousands |
|---|---|---|---|
| **As of December 31, 2017** | **14,278** | **46,655** | **60,933** |
| Transfer between classes | (445) | 445 | — |
| Increase of share capital due to exercise of options by employees during the year | — | 519 | 519 |
| **As of December 31, 2018** | **13,833** | **47,619** | **61,452** |
| Transfer between classes | (1,750) | 1,750 | — |
| Increase of share capital due to exercise of options by employees during the year | — | 641 | 641 |
| **As of December 31, 2019** | **12,083** | **50,010** | **62,093** |

In case of liquidation, the Company's assets remaining after settlement with creditors, payment of dividends and redemption of the par value of shares is distributed among the ordinary shareholders proportionately to the number of shares owned.

The other reserves of the Group's equity represent the financial effects from changes in equity settled share-based payments to employees, acquisitions and disposals, as well as other operations with non-controlling interests in the subsidiaries without loss of control.

## 18.   Debt

During the year ended December 31, 2019 the Group had available RUR denominated credit facilities with an overall credit limit of 3,460 (2,000 of which is secured, see note 30), with maturity up to December 2021, and with interest rate of up to 30% per annum. The balance payable under these credit lines as of December 31, 2019 is 1,545 and matures in 2021. Certain of these agreements stipulated the right of a lender to increase the interest rate in case the covenants are violated.

**19.    Trade and other payables**

As of December 31, 2019 and 2018, the Group's trade and other payables consisted of the following:

| | As of December 31, 2018 | As of December 31, 2019 |
|---|---|---|
| Payables to merchants | 13,942 | 12,116 |
| Money remittances and e-wallets accounts payable | 6,571 | 6,515 |
| Deposits received from agents | 4,839 | 6,246 |
| Commissions payable | 601 | 503 |
| Accrued personnel expenses and related taxes | 562 | 883 |
| Provision for undrawn credit commitments (Note 30) | 84 | 98 |
| Other payables | 900 | 934 |
| **Total trade and other payables** | **27,499** | **27,295** |

*The accompanying notes form an integral part of these consolidated financial statements.*

F-57

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**20.    Customer accounts and amounts due to banks**

As of December 31, 2019 and 2018, customer accounts and amounts due to banks consisted of the following:

| | As of December 31, 2018 | As of December 31, 2019 |
|---|---|---|
| Individuals' current/demand accounts | 10,844 | 11,553 |
| Legal entities' current/demand accounts | 3,767 | 4,599 |
| Term deposits | 2,103 | 3,251 |
| Due to banks | 1,391 | 2,560 |
| **Total customer accounts and amounts due to banks** | **18,105** | **21,963** |
| *Including long-term deposits* | 237 | 444 |

Customer accounts and amounts due to banks bear interest of up to 6% (2018—6%).

**21.    Investment in associates**

The Group has a single associate: JSC Tochka.

QIWI Group assesses its share in the entity at 45% according to its share in dividends and potential capital gains. The Group's interest in JSC Tochka is accounted for using the equity method in the consolidated financial statements.

The following table illustrates summarized financial information of the Group's investment in JSC Tochka associate:

| | As of December 31, 2018 | As of December 31, 2019 |
|---|---|---|
| **Associates' statement of financial position:** | | |
| Non-current assets | 149 | 1,199 |
| Current assets | 1,836 | 2,019 |
| *including cash and cash equivalents* | 1,326 | 995 |
| Non-current financial liabilities | — | (337) |
| Current liabilities | (183) | (397) |
| *including financial liabilities* | (183) | (314) |
| **Net assets** | **1,802** | **2,484** |
| **Carrying amount of investment in associates (45%) of net assets** | **812** | **1,118** |

Associate' revenue and net income for the years ended December 31 was as follows:

|  | 2018 | 2019 |
|---|---|---|
| Revenue | 4 | 5,534 |
| Cost of revenues | (3) | (289) |
| Other income and expenses, net | (85) | (4,565) |
| *including personnel expenses* | *(1)* | *(2,147)* |
| *including depreciation and amortization* | *(1)* | *(129)* |
| **Total net profit/(loss)** | **(84)** | **680** |
| **Group's share (45%) of total net profit/(loss)** | **(38)** | **306** |

*The accompanying notes form an integral part of these consolidated financial statements.*

F-58

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

## 22.   Investment in joint venture

The Group had a single joint venture: Flocktory Ltd with subsidiaries. Three parties exercised joint control over this entity via unanimous consent over major issues, including the distribution and payment of dividends.

The Group's interest in Flocktory joint venture was accounted for using the equity method in the consolidated financial statements until December 2, 2019 at which the Group gained control and consolidated FLocktory (see Note 6).

The following table illustrates summarized financial information of the Group's investment in Flocktory joint venture:

|  | As of December 31, 2018 |
|---|---|
| **Joint venture companies' statement of financial position:** |  |
| Non-current assets | 598 |
| Current assets | 191 |
| *including cash and cash equivalents* | 144 |
| Current liabilities | (20) |
| *including financial liabilities* | (18) |
| **Net assets** | 769 |
| **Group's share (82%) of net assets** | 631 |
| Goodwill | 205 |
| **Carrying amount of investment in joint venture company** | **836** |

Joint venture' revenue and net income for the years ended December 31 was as follows:

|  | 2017 | 2018 | 2019 |
|---|---|---|---|
| Revenue | 187 | 332 | 394 |
| Cost of revenues | (13) | (26) | (86) |
| Other income and expenses, net | (173) | (316) | (367) |
| *including personnel expenses* | *(27)* | *(183)* | *(227)* |
| *including depreciation and amortization* | *(59)* | *(79)* | *(84)* |
| **Total net loss** | **1** | **(10)** | **(59)** |
| **Group's share (82%) of total net loss** | **1** | **(8)** | **(48)** |

The Group did not identify any impairment indicators regarding its investment in Flocktory joint venture as at December 31, 2018 and December 31, 2017.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-59

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

### 23.  Leases

The Group has commercial lease agreements of office buildings. The leases have an average life up to six years. The contracts for a term of less than a year fall under the recognition exemption for being short-term leases. Total lease expense for the year ended December 31, 2019 recognized under such contracts is 198. Future minimum lease rentals under non-cancellable operating lease commitments for office equipment premises for a term less than 1 year as of December 31, 2019 are 32.

For long-term contracts, right-of-use assets and lease liabilities were recognized. Right-of-use assets are included into property and equipment. There change from the date of initial recognition was as follows:

| | Right-of-use assets | Lease |
| --- | --- | --- |
| | Office buildings | liabilities |
| **As at January 1, 2019 (Note 2.3)** | **936** | **1,068** |
| Additions | 891 | 851 |
| Disposals | (171) | (175) |
| Depreciation | (305) | — |
| Interest expense | — | 95 |
| Payments | — | (482) |
| **As at December 31, 2019** | **1,351** | **1,357** |
| *Including short-term portion* | | *340* |

For the amount of rent expense recognized from short-term leases for year ended December 31, 2019 and December 31, 2018 see note 26.

### 24.  Revenue

Other revenue for the years ended December 31 was as follows:

| | 2017 | 2018 | 2019 |
| --- | --- | --- | --- |
| Cash and settlement service fees | 670 | 3,017 | 1,403 |
| Installment cards related fees | 140 | 358 | 1,139 |
| Other revenue | 460 | 268 | 606 |
| **Total other revenue** | **1,270** | **3,643** | **3,148** |

For the purposes of consolidated cash flow statement, "Interest income, net" consists of the following:

| | 2017 | 2018 | 2019 |
| --- | --- | --- | --- |
| Interest revenue calculated using the effective interest rate | (1,052) | (1,854) | (3,646) |
| Interest expense classified as part of cost of revenue | 42 | 89 | 689 |
| Interest income and expenses, net, classified separately in the consolidated statement of comprehensive income | (6) | (17) | 56 |
| **Interest income, net, for the purposes of consolidated cash flow statement** | **(1,016)** | **(1,782)** | **(2,901)** |

*The accompanying notes form an integral part of these consolidated financial statements.*

F-60

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

### 25.  Cost of revenue

Cost of revenue for the years ended December 31 was as follows:

| | 2017 | 2018 | 2019 |
| --- | --- | --- | --- |
| Transaction costs | 6,756 | 9,324 | 12,633 |
| Cost of cash and settlement service fees | 37 | 352 | 1,246 |
| Interest expense | 2 | 169 | 689 |
| Other expenses | 909 | 1,108 | 1,592 |
| **Total cost of revenue** | **7,704** | **10,953** | **16,160** |

**26.    Selling, general and administrative expenses**

Selling, general and administrative expenses for the years ended December 31 were as follows:

| | 2017 | 2018 | 2019 |
|---|---|---|---|
| Advertising, client acquisition and related expenses | 1,294 | 2,369 | 1,967 |
| Tax expenses, except income and payroll related taxes | 407 | 690 | 687 |
| Advisory and audit services | 433 | 661 | 711 |
| Rent of premises and related utility expenses | 391 | 643 | 254 |
| Expenses related to Tochka multi-bank platform services | — | — | 538 |
| IT related services | 236 | 364 | 421 |
| Loss/(gain) from initial recognition, net | — | 143 | 274 |
| Offering expenses | — | — | 79 |
| Other expenses | 1,035 | 1,229 | 1,282 |
| **Total selling, general and administrative expenses** | **3,796** | **6,099** | **6,213** |

**27.    Other income and expenses**

Other income and expenses for the years ended December 31 was as follows:

| | 2017 | 2018 | 2019 |
|---|---|---|---|
| Loss on formation of associate (Note 6) | — | (267) | — |
| Compensation of expenses from an associate | — | 181 | 62 |
| Change in fair value of financial instruments | — | (86) | (45) |
| Gain/(loss) from revaluation to fair value of JV company and related put option, net | — | — | (87) |
| Other expenses | (71) | (27) | (57) |
| Other Income | 30 | 18 | 36 |
| **Total other income and expenses, net** | **(41)** | **(181)** | **(91)** |

*The accompanying notes form an integral part of these consolidated financial statements.*

F-61

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**28.    Dividends paid and proposed**

Dividends paid and proposed by the Group to the shareholders of the parent are presented below:

| | 2017 | 2018 | 2019 |
|---|---|---|---|
| **Proposed, declared and approved during the year:** | | | |
| 2019: Interim dividend for 2019: U.S.$ 51,969,316 or U.S.$ 0.28 per share | | | 3,366 |
| 2018: nil | | — | |
| 2017: Final dividend for 2016: U.S.$ 11,520,798, Interim dividend for 2017: U.S.$ 26,113,788 | 2,207 | | |
| **Paid during the period*:** | | | |
| 2019: Interim dividend for 2019: U.S.$ 51,969,316 or U.S.$ 0.28 per share | | | 3,392 |
| 2018: nil | | — | |
| 2017: Final dividend for 2016: U.S.$ 11,520,798, Interim dividend for 2017: U.S.$ 26,113,788 | 2,148 | | |
| **Proposed for approval (not recognized as a liability as of December 31):** | | | |
| 2019: Final dividend for 2019: U.S.$ 13,660,424 or U.S.$ 0.22 per share | | | 1,011 |
| 2018: nil | | — | |
| 2017: nil | — | | |
| **Dividends payable as of December 31** | **—** | **—** | **—** |

*    The difference between paid and declared dividends represents foreign exchange movement

*The accompanying notes form an integral part of these consolidated financial statements.*

F-62

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**29.     Income tax**

The Company is incorporated in Cyprus under the Cyprus Companies Law, but the business activity of the Group and joint ventures is subject to taxation in multiple jurisdictions, the most significant of which include:

*Cyprus*

The Company is subject to 12.5% corporate income tax applied to its worldwide income.

Gains from the sale of securities/titles (including shares of companies) either in Cyprus or abroad are exempt from corporate income tax in Cyprus. Capital gains tax is levied at a rate of 20% on profits from disposal of immovable property situated in Cyprus or of shares in companies which own immovable property situated in Cyprus (unless the shares are listed on a recognized stock exchange).

Dividends received from a non-resident (foreign) company are exempt from the levy of defence contribution if either the dividend paying company derives at least 50% of its income directly or indirectly from activities which do not lead to investment income ("active versus passive investment income test" is met) or the foreign tax burden on the profit to be distributed as dividend has not been substantially lower than the Cypriot corporate income tax rate (i.e. lower than 6.25%) at the level of the dividend paying company ("effective minimum foreign tax test" is met). The Company has not been subject to defence tax on dividends received from abroad as the dividend paying entities are engaged in operating activities.

*The Russian Federation*

The Company's subsidiaries incorporated in the Russian Federation are subject to corporate income tax at the standard rate of 15% applied to income received from Russia government bonds and 20% applied to their other taxable income. Withholding tax of 15% is applied to any dividends paid out of Russia, reduced to as low as 5% for some countries (including Cyprus), with which Russia has double-taxation treaties.

*Kazakhstan*

The Company's subsidiary incorporated in Kazakhstan is subject to corporate income tax at the standard rate of 20% applied to their taxable income.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-63

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**29.     Income tax (continued)**

Deferred income tax assets and liabilities as of December 31, 2019 and 2018, relate to the following:

| | Consolidated statement of financial position as of December 31 | | Consolidated statement of comprehensive income for the year ended | |
| --- | --- | --- | --- | --- |
| | **2019** | **2018** | **2019** | **2018** |
| Intangible assets | (638) | (678) | 90 | 59 |
| Trade and other payables | 272 | 181 | 91 | (7) |
| Trade and other receivables | 58 | 31 | 27 | (74) |
| Loans issued | 56 | 69 | (13) | (2) |
| Lease obligations | 287 | — | 287 | — |
| Property and equipment | (261) | (24) | (238) | (9) |
| Taxes on unremitted earnings | (480) | (253) | (202) | (69) |
| Other | 174 | 88 | 86 | 45 |
| **Net deferred income tax asset/(liability)** | **(532)** | **(586)** | **128** | **(57)** |
| including: | | | | |
| Deferred tax asset | 217 | 157 | | |
| Deferred tax liability | (749) | (743) | | |

Deferred tax assets and liabilities are not offset because they do not relate to income taxes levied by the same tax authority on the same taxable entity.

Reconciliation of deferred income tax asset/(liability), net:

| | 2017 | 2018 | 2019 |
|---|---|---|---|
| **Deferred income tax asset/(liability), net as of January 1** | (581) | (581) | (586) |
| Impact of adopting new accounting policies | — | 49 | — |
| Effect of acquisitions of subsidiaries | — | 3 | (74) |
| Deferred tax benefit/(expense) | — | (57) | 128 |
| **Deferred income tax asset/(liability), net as of December 31** | (581) | (586) | (532) |

As of December 31, 2019 the Group does not intend to distribute a portion of its accumulated unremitted earnings in the amount of 4,367 (2018 – 3,212). The amount of tax that the Group would pay to distribute them would be 218 (2018 – 161). Unremitted earnings include all earning that were recognized by the Group's subsidiaries and that are expected to be distributed to the holding company.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-64

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**29.    Income tax (continued)**

For the year ended December 31 income tax expense included:

| | 2017 | 2018 | 2019 |
|---|---|---|---|
| **Total tax expense** | | | |
| Current income tax expense | (698) | (818) | (1,620) |
| Deferred tax benefit/(expense) | — | (57) | 128 |
| **Income tax expense for the year** | (698) | (875) | (1,492) |

Theoretical and actual income tax expense is reconciled as follows:

| | 2017 | 2018 | 2019 |
|---|---|---|---|
| **Profit before tax** | **3,840** | **4,501** | **6,379** |
| Theoretical income tax expense at the domestic rate in each individual jurisdiction | (370) | (479) | (824) |
| **(Increase)/decrease resulting from the tax effect of:** | | | |
| Non-taxable income | 12 | 70 | 23 |
| Non-deductible expenses | (222) | (388) | (387) |
| Income tax associated with earnings of foreign subsidiaries | (109) | (70) | (202) |
| Unrecognized deferred tax assets | (9) | (8) | (102) |
| **Total income tax expense** | (698) | (875) | (1,492) |

During the year ended December 31, 2019 the Group did not recognize deferred tax assets related to the tax loss carry forward in the amount of 102 (2018 – 8, 2017 - 9) because the Group did not believe that the realization of the related deferred tax assets is probable.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-65

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**30.    Commitments, contingencies and operating risks**

**Operating environment**

Russia's economy has been facing significant challenges for the past few years due to the combined effect of various geopolitical, macroeconomic and other factors. The Russian economy has demonstrated modest growth rates while the population's purchasing power has decreased. Currently, consumer spending generally remains cautious and consumer confidence is far from its peaks. The modest recovery of the Russian economy in recent years has, however, again been put at risk by a series of events in February-March 2020. The outbreak of coronavirus and associated responses from various countries around the world in early 2020 have negatively affected consumer demand across the globe and across industries, and there is the potential for coronavirus and the responses to it to cause a global recession. One immediate effect of the coronavirus outbreak was a substantial plunge in the price of crude oil due to extended factory shutdowns and a fall in air travel and road transportation. As a result, the Russian ruble has significantly and abruptly depreciated against the U.S. dollar and euro. The full scope of the negative impact that coronavirus and the abrupt decline in oil prices and

resulting exchange rate drop may have on the Russian economy remains unclear but has the potential to be very significant. As a result of the challenging operating environment in Russia, the Group has experienced slower payment volume growth. Further adverse changes in economic conditions in Russia could adversely impact the Group's future revenues and profits and cause a material adverse effect on its business, financial condition and results of operations.

Some of the Group's agents, merchants or Tochka's SME clients, although mostly not incorporated in Crimea, may have operations there. To date, management does not believe that any of the current sanctions as in force limit the Group's ability to work with entities that may have operations in Crimea or operate in Crimea. Nevertheless, if the Group is deemed to be in violation of any sanctions currently in place or if any new or expanded sanctions are imposed on Russian businesses operating in Crimea the Group's business and results of operations may be materially adversely affected.

Further, in the ordinary course of the Group's business, it may accept payments from consumers to or otherwise indirectly interact with certain entities that are the targets of U.S. and/or EU sanctions. For example, the U.S., EU and other countries have adopted a package of economic restrictive measures imposing certain sanctions on the operations of various Russian banks, including VTB Bank and Gazprombank. Some of the Group's subsidiaries hold bank accounts at the aforementioned banks as well as have overdrafts and bank guarantees with VTB Bank. Moreover, the Group may be associated with U.S.- designated banks due to accepting payments for them from consumers in the ordinary course of business, even though the Group may not have any direct contract relationships with them.

In addition, because of the nature of the Group's business, management does not generally identify the Group's customers where there is no express requirement to do so under Russian anti-money laundering legislation. Therefore, management is not always able to screen them against the Specially Designated Nationals and Blocked Persons List published by OFAC and other sanctions lists.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-66

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**30.     Commitments, contingencies and operating risks (continued)**

**Operating environment (continued)**

Even if the Group is not subjected to U.S. or other economic sanctions, its participation in the Russian financial system and indirect interaction with sanctioned banks and potential interaction with designated individuals may adversely impact the Group's reputation among investors.

The Group contracts with some of international merchants in U.S. dollars and other currencies such as Euros. Recently it started to encounter difficulties in conducting such transactions, even with respect to largest and most well-known international merchants, due to the refusal of an increasing number of the Group's U.S. relationship banks and the correspondent U.S. banks of the Group's non-U.S. relationship banks to service U.S. dollar payments. Even though the Group still maintains a number of U.S. dollar accounts with various financial institutions, at the same time the Group is already conducting a portion of U.S. dollar transactions with international merchants in other currencies, bearing additional currency conversion costs. No assurance can be given that such institutions or their respective correspondent banks in the U.S. will not similarly refuse to process the Group's transactions, thereby further increasing the currency conversion costs that the Group has to bear or that international merchants will agree to accept payments in any currency, but the U.S. dollar in the future. If the Group is not able to conduct transactions in U.S. dollars, it may bear significant currency conversion costs or lose some merchants who will not be willing to conduct transactions in currencies other than the U.S. dollars, and the Group's business, financial condition and results of operations may be materially adversely affected. Management can give no assurance that similar issues would not arise with respect to the Group's transactions in other currencies, such as the Euro, which could have similarly adverse consequences.

In recent years, the CBR has considerably increased the intensity of its supervision and regulation of the Russian banking sector. Starting October 2013, the CBR has launched a campaign aimed at cleansing the Russian banking industry, revoking the licenses from an unusually high number of banks, which resulted in turmoil in the industry, instigated bank runs on a number of Russian credit institutions, and severely undermined the trust that the Russian population had with private banks. In addition, in the course of 2017 three of Russia's largest private banks, Otkritie Bank, Binbank and Promsvyazbank, were all bailed out and taken over by the CBR. License revocations have continued throughout 2018 and early 2019, again with some major players impacted. This can be expected to result in reduced competition in the banking sector (while at the same time putting alternative payment solution providers such as itself in the position of having to predominantly compete with the government itself), increased inflation and a general deterioration of the quality of the Russian banking industry. With few exceptions (notably the state-owned banks), the Russian banking system suffers from weak depositor confidence, high concentration of exposure to certain borrowers and their affiliates, poor credit quality of borrowers and related party transactions.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-67

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**30.    Commitments, contingencies and operating risks (continued)**

**Operating environment (continued)**

As part of its business operations, the Group provides payment processing services to a number of merchants in the betting industry. Processing payments to such merchants represents a significant portion of the Group's revenues. Processing such payments generally carries higher margins than processing payments to merchants in most other categories. Moreover, the repayment of winnings by such merchants to customers also serves as an important and economically beneficial Qiwi Wallet reload channel and new customer acquisition tool. The Group's operating results will continue to depend on merchants in the betting industry and their use of the Group's services for the foreseeable future. The betting industry is subject to extensive and actively developing regulation in Russia, as well as increasing government scrutiny. In 2016 QIWI Bank established a TSUPIS together with one of the self-regulated associations of bookmakers in order to be able to accept such payments. If any merchants engaged in the betting industry are not able or willing to comply with the Russian betting legislation or if they decide to cease their operations in Russia for regulatory reasons or otherwise or shift to another payment processor (TSUPIS), the Group would have to discontinue servicing them and would lose associated volumes and income. Moreover, if the Group is found to be in non-compliance with any of the requirements of the applicable legislation, it could not only become subject to fines and other sanctions, but could also have to discontinue to process transactions that are deemed to be in breach of the applicable rules and as a result lose associated revenue streams. Effective January 1, 2018, relevant legislation has been supplemented with the concept of government blacklisting of betting merchants that have been found to be in violation or allegedly are not in compliance with applicable Russian laws, and the requirement for credit institutions to block any payments to such blacklisted merchants.

A substantial part of the Russian population continues to rely on cash payments, rather than credit and debit card payments or electronic banking. The Group's business has developed as a network of kiosks and terminals allowing consumers to use physical currency for online payments While the Group has since largely outgrown that model, kiosks and terminals network remains a significant part of the Group's infrastructure as a reload and client acquisition channel for Qiwi Wallet.

Certain factors may further contribute to a decline in the use of kiosks and terminals, including regulatory changes, increases in consumer fees imposed by the agents and development of alternative payment channels. Based on available data, management believes that the overall number of and the use of kiosks declined substantially in 2015 versus prior years and continues to decline slightly since then. The decline in 2015 was a result, among other things, of enhanced scrutiny by the CBR over the compliance by the agents with legislation that requires them to remit their proceeds to special accounts. Other statutory requirements that could have a similar effect on the Group's business if fully enforced are the amendments to the Federal Law of the Russian Federation No. 54-FZ "On the use of cash registers in cash payments and (or) settlements with the use of payment cards", dated May 22, 2003 (as amended). In particular, the law mandates that all kiosks (subject to certain exceptions) should be equipped with new or modernized cash registers. There can be no assurance that the Group's agents are and will continue to be fully in compliance with these requirements, which could cause a further reduction of the Group kiosk network. Moreover, failure to comply with such enhanced control measures by the Group or the Group's agents could result in the CBR imposing fines or restrictions on the Group's activities.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-68

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**30.    Commitments, contingencies and operating risks (continued)**

**Taxation**

Russian and the CIS's tax, currency and customs legislation is subject to varying interpretations, and changes, which can occur frequently. Management's interpretation of such legislation as applied to the transactions and activity of the Group may be challenged by the relevant regional and federal authorities. Recent events within Russia and the CIS which are discussed below suggest that the tax authorities are taking a more assertive position in their interpretation of the legislation and assessments and as a result, it is possible that transactions and activities that have not been challenged in the past may be challenged in the future.

The Company may encounter difficulties in obtaining lower rates of Russian withholding income tax envisaged by the Russia-Cyprus double tax treaty for dividends distributed from Russia. Dividends paid by a Russian legal entity to a foreign legal entity are generally subject to Russian withholding income tax at a rate of 15%, although this tax rate may be reduced under an applicable double tax treaty. The Company intends to rely on the Russia-Cyprus double tax treaty. The tax treaty allows reduction of withholding income tax on dividends paid by a Russian company to a Cypriot company to 10% provided that the following conditions are met: (i) the Cypriot company is a tax resident of Cyprus within the meaning of the tax treaty; (ii) the Cypriot company is the beneficial owner of the dividends; (iii) the dividends are not attributable to a permanent establishment of the Cypriot company in Russia; and (iv) the treaty clearance procedures are duly performed. This rate may be further reduced to 5% if the direct investment of the Cypriot company in a Russian subsidiary paying the dividends is at least EUR 100,000. Although the Group will seek to claim treaty protection, there is a risk that the applicability of the reduced rate of 5% or 10% may be challenged by Russian tax authorities. As a result, there can be no assurance that the Company would be able to avail itself of the reduced withholding income tax rate in practice.

Specifically, Cypriot holding company may incur a 15% withholding income tax at source on dividend payments from Russian subsidiaries if the treaty clearance procedures are not duly performed at the date when the dividend payment is made. In this case the Company may seek to claim as a refund the difference between the 15% tax withheld and the reduced rate of 10% or 5% as appropriate. However, there can be no assurance that such

taxes would be refunded in practice. Similar approach is applied to dividends received from Russian subsidiaries by the Company's non-Russian subsidiaries.

Furthermore, a number of amendments had been made to the Russian tax legislation introducing, amongst others, the concept of beneficial ownership. Under this concept, double tax treaty benefits are only available to the recipient of income from Russian sources, if such recipient is the beneficial owner of the relevant income. Foreign entities that do not qualify as beneficial owners may not claim double tax treaty relief even if they are residents in a double tax treaty country. For these purposes, the beneficial owner is defined as a person holding directly, through its direct and/or indirect participation in other organizations or otherwise, the right to own, use or dispose of income, or the person on whose behalf another person is authorized to use and/or dispose of such income. In order to determine whether a foreign entity is a beneficial owner of income, it is necessary to take into account the functions performed by such foreign entity, as well as the risks borne by it. Entities are not recognized as beneficial owners of income if they have limited authorities to use or dispose income received from Russian sources, perform agency or other similar functions in favor of third parties, not taking any risks or transfer such income (either partially or in full) to third parties that are not eligible to double tax treaty benefits.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-69

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**30.    Commitments, contingencies and operating risks (continued)**

**Taxation (continued)**

Introduction of the concept of beneficial ownership may result in the inability of the foreign companies within the Group to claim benefits under a double taxation treaty through structures which historically have benefited from double taxation treaty protection in Russia. This may be the case if the recipient of the income is not recognized as its beneficial owner, look-through approach cannot be applied or is challenged by the tax authorities. Recent court cases demonstrate that the Russian tax authorities actively challenge application of double tax treaty benefits retroactively (i.e. prior to concept of beneficial ownership was introduced in the Russian Tax Code) on the grounds that double tax treaties already include beneficial ownership requirement to allow application of reduced tax rates or exemptions. In these cases the Russian tax authorities obtained relevant information by means of information exchange with the foreign tax authorities. The imposition of additional tax liabilities as a result of the application of this rule to transactions carried out by the Group may have a material adverse effect on its business, financial condition and results of operations.

In addition, on November 27, 2017 the Federal Law No. 340-FZ introducing country-by-country reporting ("CbCR") requirements was published. The mandatory filing of CbCR is, in general, in line with the Organization for Economic Co-operation and Development ("OECD") recommendations within the Base Erosion and Profit Shifting ("BEPS") initiative. The law has taken effect on the date of its official publication, and its provisions apply to financial years starting in 2017 (except for the provisions regarding the national documentation). These amendments would require multinational corporate enterprise groups with consolidated revenues of over certain threshold to submit annual CbCR, as well as certain other reporting forms detailing multinational corporate enterprises groups operations (locally and globally, respectively), as well as transfer pricing methodologies applied to intra-group transactions. Thus, if the Group reaches the reporting threshold in Russia (over RUB 50 billion), or alternatively in any other jurisdiction of presence (e.g. in Cyprus, where the Decree issued by the Cyprus Minister of Finance on December 30, 2016 introduced a mandatory CbCR for multinational enterprise groups generating consolidated annual turnover exceeding EUR 750 million) the Group may be liable to submit relevant CbCR. It is unclear at the moment how the above measures will be applied in practice by the Russian tax authorities and courts. Management does not consider the Company to be subject to CbCR requirements. However, taking into consideration the possibility of further developments in Russia as well as international legislation, the Group may become subject to the above requirements. It is important to note that the above changes and amendments to the Russian Tax Code introduced by the law do not replace already existing transfer pricing documentation requirements.

Certain other changes were introduced to the Russian Tax Code over the recent years, namely changes to types of controlled transactions subject to transfer pricing rules, increase of the VAT rate to 20%, etc.

The possibility exists that the Government may introduce additional tax-raising measures. Although it is unclear how such measures would operate, the introduction of any such measures may affect the Group's overall tax efficiency and may result in significant additional taxes becoming payable.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-70

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**30.    Commitments, contingencies and operating risks (continued)**

**Taxation (continued)**

On November 24, 2016, the OECD published the multilateral instrument ("MLI") which introduces new provisions to existing double tax treaties limiting the use of tax benefits provided thereof. For example, the reduced rate on dividends provided under a double tax treaty shall be denied if the conditions for holding equity interest or shares by the time of the dividend payout are met over less than a 365-day period. Thus, when determining tax consequences several sources of legislation will now need to be considered, namely the domestic tax law, double tax treaties and MLI provisions, which have been adopted by states-parties to the relevant double tax treaty. To date the MLI has not been ratified by Russia. The draft law on ratification of the MLI has been submitted to the Russian State Duma (the low chamber of the parliament). However, it is likely that the application of the double tax treaties, which Russia is a party to, i.e. the double tax treaty between Russia and Cyprus, will be significantly limited by the MLI.

There can be no assurance that the Russian Tax Code will not be changed in the future in a manner adverse to the stability and predictability of the tax system. These factors, together with the potential for state budget deficits, raise the risk of the imposition of additional taxes on the Group. The introduction of new taxes or amendments to current taxation rules may have a substantial impact on the overall amount of the Group's tax liabilities. There is no assurance that it would not be required to make substantially larger tax payments in the future, which may adversely affect the Group's business, financial condition and results of operations.

In its decision No 138-0 dated July 25, 2001, the Constitutional Court of the Russian Federation, or the Constitutional Court, introduced the concept of "a taxpayer acting in a bad faith" without clearly stipulating the criteria for it. Although this concept is not defined in Russian tax law, it has been used by the tax authorities to deny, for instance, the taxpayer's right to obtain tax deductions and benefits provided by the tax law. The tax authorities and courts often exercise significant discretion in interpreting this concept in a manner that is unfavorable to taxpayers.

The concept of "unjustified tax benefit" was formulated in Resolution No. 53 issued by the Plenum of the Supreme Arbitrazh Court of the Russian Federation in 2006. The concept is defined in the resolution mainly by reference to specific examples of tax benefits obtained as a result of a transaction that has no reasonable business purpose and which may lead to disallowance of their application.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-71

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**30.    Commitments, contingencies and operating risks (continued)**

**Taxation (continued)**

On July 19, 2017 anti-avoidance provisions were introduced into the Russian Tax Code and the Article 54.1 of the Russian Tax Code was adopted. These provisions provide for two specific criteria that should be met simultaneously to entitle a taxpayer to reduce the tax base or the amount of tax: (i) the main purpose of the transaction (operation) is not a non-payment (incomplete payment) and (or) offset (refund) of the amount of tax; and (ii) the obligation under the transaction (operation) is executed by a person who is a party to a contract entered into with the taxpayer and / or a person to whom the obligation to execute a transaction (operation) was transferred under a contract or law. The Russian Tax Code specifically indicates that signing of primary documents by an unidentified or unauthorized person, violation by the counterparty of tax legislation, the possibility to obtain the same result by a taxpayer by entering into other transactions not prohibited by law cannot be considered in itself as a basis for recognizing the reduction of the tax base or the amount of tax unlawful. However, application of these criteria is still under consideration of the tax authorities, therefore, no assurance can be given that positions of taxpayers will not be challenged by the Russian tax authorities. Anti-avoidance provisions stipulated in the Article 54.1 of the Russian Tax Code are applied starting from August 19, 2017, yet may be applied to prior periods if benefit taxpayers. The Russian Ministry of Finance in its recent letter stated that the concept expressed in Resolution No. 53 and evolved in the relevant court practice should not be applied by the Russian tax authorities in the course of tax audits following enactment of the Article 54.1 of the Russian Tax Code. However, as of the date of this annual report, no assurance can be given that later the Russian tax authorities would not rely on the court-based version of the concept or even both ones, which may result in a higher tax burden of taxpayers. In addition to the usual tax burden imposed on Russian taxpayers, these conditions complicate tax planning and related business decisions. This uncertainty could possibly expose the Group to significant fines and penalties and to enforcement measures, despite the best efforts at compliance, and could result in a greater than expected tax burden.

The existing Russian transfer pricing rules became effective from January 1, 2012. Under these rules the Russian tax authorities are allowed to make transfer-pricing adjustments and impose additional tax liabilities in respect of certain types of transactions ("controlled" transactions). The list of the "controlled" transactions includes transactions with related parties (with several exceptions such as guarantees between Russian non-banking organizations and interest-free loans between Russian related parties) and certain types of cross border transactions. Starting from 2019 transactions between Russian tax residents will be controlled only if the amount of income from the transactions between these parties within one year exceeds RUB 1 billion and at the same time one of the conditions stipulated in Article 105.14 of Russian Tax Code (e.g., the parties to the transaction apply different corporate income tax rates) is met. Certain other transactions, such as foreign trade transactions in commodities traded on global exchanges, transactions with parties from blacklisted countries, transactions between related parties under participation of the independent intermediary, as well as transactions between the Russian tax resident and foreign tax resident (related parties) remain under control in case the amount of income from transactions between these parties within one year exceeds RUB 60 million threshold. The new rules apply to transactions, under which income (expenses) from such controlled transactions are recognised after January 1, 2019. As a side effect, the Russian tax authorities who are entitled to perform tax audits of Russian taxpayers with focus on compliance with existing transfer pricing legislation will no longer be involved in tax audit of transactions between Russian parties due to increased limits on transactions between Russian tax residents but they will be able to pay more attention to cross-border transactions.

*The accompanying notes form an integral part of these consolidated financial statements.*

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**30.    Commitments, contingencies and operating risks (continued)**

**Taxation (continued)**

The burden of proving market prices, as well as keeping specific documentation, lies with the taxpayers. In certain circumstances, the Russian tax authorities may apply the transfer pricing rules and methods in cases where the rules are formally not applicable, claiming additional tax charges calculated using the transfer rules but based on other tax concepts (e.g. unjustified tax benefit, lack of economic justification of expenses, etc.).

It is therefore possible that the Group entities established in Russia may become subject to transfer pricing tax audits by tax authorities in the foreseeable future. Due to the uncertainty and lack of established practice of application of the Russian transfer pricing legislation the Russian tax authorities may challenge the level of prices applied by the Group under the "controlled" transactions (including certain intercompany transactions) or challenge the methods used to prove prices applied by the Group, and as a result accrue additional tax liabilities. If additional taxes are assessed with respect to these matters, they could have a material adverse effect on the Group's business, financial condition and results of operations.

Following the global trend on increase of substance requirements in various jurisdictions, starting from 2019 certain jurisdictions (including traditional offshore jurisdictions) implement legislation that requires companies registered in the relevant offshore jurisdiction to maintain actual substance on the territory of such jurisdictions, which may include, amongst others, the qualified personnel, premises located in the particular jurisdiction, reasonable expenses to support daily operation of the company.

It cannot be excluded that the Group might be subject to additional costs and/or tax liabilities resulted from the said requirements, which could have a material adverse effect on the Group's business, financial condition and results of operations.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-73

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**30.    Commitments, contingencies and operating risks (continued)**

**Risk of cybersecurity breach**

The Group stores and/or transmits sensitive data, such as credit or debit card numbers, mobile phone numbers and other identification data, and the Company has ultimate liability to its customers for the failure to protect this data. The Company has experienced breaches of its security by hackers in the past, and breaches could occur in the future. In such circumstances, the encryption of data and other protective measures have not prevented unauthorized access and may not be sufficient to prevent future unauthorized access. For example, in January 2014 the Group has discovered certain unauthorized activity in a number of wallet accounts. Although management does not believe that any confidential customer account data was compromised as a result of the activity, the Company incurred a loss of RUB 88 million. Rapida LTD (prior to its merger with and into QIWI Bank) also experienced several security breaches prior to acquisition of the company. Any future breach of the system, including through employee fraud, may subject the Company to material losses or liability, including fines and claims for unauthorized purchases with misappropriated credit or debit card information, identity theft, impersonation or other similar fraud claims. A misuse of such sensitive data or a cybersecurity breach could harm the Group's reputation and deter clients from using electronic payments as well as kiosks and terminals generally and any of the Group's services specifically, increase operating expenses in order to correct the breaches or failures, expose the Group to uninsured liability, increase risk of regulatory scrutiny, subject the Group to lawsuits, result in the imposition of material penalties and fines by state authorities and otherwise materially adversely affect the Group's business, financial condition and results of operations.

**Risk assessment**

The Group's management believes that its interpretation of the relevant legislation is appropriate and is in accordance with the current industry practice and that the Group's currency, customs, tax and other regulatory positions will be sustained. However, the interpretations of the relevant authorities could differ and the maximum effect of additional losses, if the authorities were successful in enforcing their different interpretations, could be significant, and amount up to RUB 3 billion that was assessed by the Group as of December 31, 2019 (RUB 2.7 billion as of December 31, 2018).

**Insurance policies**

The Group holds no insurance policies in relation to its assets, operations, or in respect of public liability or other insurable risks. There are no significant physical assets to insure. Management has considered the possibility of insurance of business interruption in Russia, but the cost of it outweighs the benefits in management's view.

**Legal proceedings**

In the ordinary course of business, the Group is subject to legal actions and complaints. Management believes that the ultimate liability, if any, arising from such actions or complaints will not have a material adverse effect on the financial condition or the results of future operations of the Group.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-74

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**30.     Commitments, contingencies and operating risks (continued)**

**Know-your-client requirements in Russia**

The Group's business is currently subject to know-your-client requirements established by Federal Law of the Russian Federation No. 115-FZ "On Combating the Legalization (Laundering) of Criminally Obtained Income and Funding of Terrorism", dated August 7, 2001, as amended, or the Anti-Money Laundering Law. Based on the Anti-Money Laundering Law management distinguishes three types of consumers based on their level of identification, being anonymous, identified through a simplified procedure and fully identified. All these types of consumers face varying monetary and non-monetary restrictions in terms of the transactions they may perform and electronic money account balances they may hold, with fully identified consumers enjoying the most privileges. The restrictions on usage of anonymous e-wallets have been increasing lately including limitations on cash withdrawal and cash top up of anonymous e-wallets. The key difference between the simplified and the full identification procedures is that the simplified identification can be performed remotely. The remote identification requires the verification of certain data provided by consumers against public databases. Albeit the Group performs all necessary steps to collect data and performs the relevant identification procedures either personally or through such or additional public databases, the Group cannot guarantee that it will be able to collect all necessary data to perform the identification procedure in full or that the data the users provide it for the purposes of identification will not contain any mistakes or misstatements and will be correctly matched with the information available in the governmental databases. At the end of 2017, a new law was enacted enabling "full" identification performed remotely as well, to the extent the relevant individual has previously undergone identification by an eligible credit institution and has consented for his data to be included in a database; however, as of the date of this report such identification method has not been fully developed either. Thus, the current situation could cause the Group to be in violation of the identification requirements. In case management is forced not to use the simplified identification procedure until the databases are fully running or in case the identification requirements are further tightened, it could negatively affect the number of consumers and, consequently, volumes and revenues. Additionally, Russian anti-money laundering legislation is in a constant state of development and is subject to varying interpretations. If the Group is found to be in non-compliance with any of its requirements, it could not only become subject to fines and other sanctions, but could also have to discontinue to process operations that are deemed to be in breach of the applicable rules and lose associated revenue streams.

**Pledge of assets**

As of December 31, 2019, the Group pledged debt securities (government bonds) with the carrying amount of 3,628 and cash deposit with the carrying amount of 33 (December 31, 2018 – 1,445 and nil correspondingly) as collateral for bank guarantees issued on Group's behalf to its major partners and also pledged debt securities with the carrying amount of 203 (December 31, 2018 – 484) to CBR.

**Guarantees issued**

The Group issues financial and performance guaranties to non-related parties for the term up to five years at market rate. The amount of guaranties issued as of December 31, 2019 is 8,545 (as of December 31, 2018 – 1,260).

*The accompanying notes form an integral part of these consolidated financial statements.*

F-75

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**30.     Commitments, contingencies and operating risks (continued)**

**Credit related commitments**

The primary purpose of these instruments is to ensure that funds are available to a customer as required. Commitments to extend credit represent unused portions of credit limits of instalment card loans of both activated and not activated customers. Commitments to extend credit are contingent upon customers firstly activating their credit limits and further maintaining specific credit standards. Since the year 2019 the Group started to cancel the credit offer and cut the limits if customer didn't use the card within 120 days. Outstanding credit limits are possible to be used including credit limits not

yet activated by the customers and related commitments as at December 31, 2019 comprised RUB 26.8 billion (RUB 30.1 billion rubles as of December 31, 2018).

The amounts of credit limits comprise the maximum exposure to credit risk regarding credit related commitments. An analysis of changes in the ECL allowances due to change in corresponding gross carrying amounts for the years ended December 31 was the following:

| | 2018 | 2019 |
|---|---|---|
| **ECL allowance as of January 1,** | (111) | (84) |
| Changes because of financial instruments (originated or acquired)/derecognized during the reporting period | 27 | (14) |
| Amounts written off | — | — |
| **ECL allowance as of December 31,** | (84) | (98) |

The total outstanding contractual amount of unused limits on contingencies and commitments liability does not necessarily represent future cash requirements, as these financial instruments may expire or terminate without being funded. In accordance with instalment card service conditions the Group has a right to refuse the issuance, activation, reissuing or unblocking of an instalment card, and is providing an instalment card limit at its own discretion and without explaining its reasons. The Group also has a right to increase or decrease a credit card limit at any time without prior notice.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-76

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**31.    Balances and transactions with related parties**

The following table provides the total amount of transactions that have been entered into with related parties during the year ended December 31, 2019 and 2018, as well as balances with related parties as at December 31, 2019 and December 31, 2018:

| | For the year ended December 31, 2019 | | As at December 31, 2019 | |
|---|---|---|---|---|
| | Sales to/ income from related parties | Purchases/ expenses from related parties | Amounts owed by related parties | Amounts owed to related parties |
| Associates | 121 | (568) | — | (74) |
| Key management personnel | 1 | (288) | — | (83) |
| Other related parties | 4 | (27) | 5 | (1) |

| | For the year ended December 31, 2018 | | As at December 31, 2018 | |
|---|---|---|---|---|
| | Sales to/ income from related parties | Purchases/ expenses from related parties | Amounts owed by related parties | Amounts owed to related parties |
| Associates | — | — | 180 | (185) |
| Key management personnel | 12 | (168) | — | (70) |
| Other related parties | 4 | (24) | 6 | (3) |

Benefits of key management and Board of Directors generally comprise of short-term benefits amounted to 253 during the year ended December 31, 2019 (120—for the year 2018, 115- for the year 2017) and share-based payments amounted to 34 during the year ended December 31, 2019 (36—for the year 2018, 22—for the year 2017).

**32.    Risk management**

The main risks that could adversely affect the Group's financial assets, liabilities or future cash flows are foreign exchange risk, liquidity and credit risk. Management reviews and approves policies for managing each of the risks which are summarized below.

**Foreign exchange risk**

Foreign exchange risk is the risk that fluctuations in exchange rates will adversely affect items in the Group's statement of comprehensive income, statement of financial position and/or cash flows. Foreign currency denominated assets and liabilities give rise to foreign exchange exposure.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-77

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**32.    Risk management (continued)**

*Foreign currency sensitivity*

The following tables demonstrate the sensitivity to a reasonably possible change in US Dollar and Euro exchange rates against Ruble, with all other variables held constant. The impact on the Group's profit before tax is due to changes in the carrying amount of monetary assets and liabilities denominated in US Dollar and Euro when these currencies are not functional currencies of the respective Group subsidiary. The Group's exposure to foreign currency changes for all other currencies is not material.

| | change in US Dollar | Effect on profit before tax Gain/(loss) |
|---|---|---|
| 2019 | +13% | 147 |
| | -11% | (124) |
| 2018 | +14% | 329 |
| | -14% | (329) |

| | change in Euro | Effect on profit before tax Gain/(loss) |
|---|---|---|
| 2019 | +13% | 192 |
| | -11% | (162) |
| 2018 | +14% | 196 |
| | -14% | (196) |

**Liquidity risk and capital management**

Liquidity risk is the risk that an entity will encounter difficulty in meeting obligations associated with financial liabilities. The Group seeks to maintain a stable funding base primarily consisting of agent's deposits, current accounts and due to banks, retail deposits from customers and debt. The Deposits received from agents are due on demand, but are usually offset against future payments processed through agents. The Group expects that agent's deposits will continue to be offset against future payments and not be called by the agents. Customer accounts and amounts due to banks, trade and other payables are due on demand. The Group has sufficient cash balances and keeps it in diversified portfolios of liquid instruments such as government bonds, correspondent account with CBR and overnight placements in high-rated commercial banks, in order to be able to respond timely and steady to unforeseen liquidity requirements.

Since 2014, the Russian economy has been going through a period of macroeconomic slowdown and liquidity shortage in a number of markets (including those in which the Group operates), caused among other things by falling oil prices, ruble devaluation and the economic sanctions regime. Banks and other entities in Russia decreased credit limits in their everyday operations and it was noted that the Group's merchants and partners also started and in certain cases continued to request from the Group larger collaterals to hedge their risks. The Group was able to manage these conditions and requirements to date, though the liquidity shortage in the market if exacerbated may have further negative effects on the Group's operations, which cannot be now reliably estimated.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-78

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**32.    Risk management (continued)**

According to CBR requirements, a bank's capital calculated based on CBR instruction should be not less than certain portion of its risk-adjusted assets. As of December 31, 2019, QIWI Bank JSC's capital ratio is above the minimal level required of 8%. The Group monitor the fulfillment of requirements on a daily basis and send the reports to CBR on a monthly basis. During the years ended December 31, 2019 and 2018 QIWI Bank JSC met the capital adequacy requirements.

The Group manages its capital structure and makes adjustments to it, in light of changes in economic conditions. Capital includes share capital, share premium, additional paid-in capital, other reserves and translation reserve. To maintain or adjust the capital structure, the Group may make dividend payments to shareholders, return capital to shareholders or issue new shares. Currently, the Group requires capital to finance its growth, but it generates sufficient cash from its operations. The table below summarizes the maturity profile of the Company's financial liabilities based on contractual undiscounted payments.

| | | Due: | | |
| | | | | More than a |
| | **Total** | **On demand** | **Within a year** | **year** |
| Debt (Note 18) | 1,545 | — | — | 1,545 |
| Lease liabilities (Note 23) | 1,357 | — | 340 | 1,017 |
| Trade and other payables (Note 19) | 27,295 | 27,295 | — | — |
| Customer accounts and amounts due to banks (Note 20) | 21,963 | 18,712 | 2,807 | 444 |
| **Total as of December 31, 2019** | **52,160** | **46,007** | **3,147** | **3,006** |

| | | Due: | | |
| | | | | More than a |
| | **Total** | **On demand** | **Within a year** | **year** |
| Trade and other payables (Note 19) | 27,499 | 27,499 | — | — |
| Customer accounts and amounts due to banks (Note 20) | 18,105 | 16,002 | 1,866 | 237 |
| **Total as of December 31, 2018** | **45,604** | **43,501** | **1,866** | **237** |

**Credit risk**

Financial assets of the Group, which potentially subject the Company and its subsidiaries, joint ventures and associates to credit risk, consist principally of trade receivables, loans issued, cash and short-term investments. The Group sells services on a prepayment basis or ensures that its receivables are from customers with an appropriate credit history – large merchants and agents with sufficient and appropriate credit history. The Group's receivables from merchants and others, except for agents, are generally non-interest-bearing and do not require collateral. Receivables from agents are interest-bearing and unsecured. The Group holds cash primarily with reputable Russian and international banks, including CBR, which management considers having minimal risk of default, although credit ratings of Russian and Kazakh banks are generally lower than those banks in more developed markets. Short-term investments include fixed-rate debt instruments issued by Russian Government.

An impairment analysis is performed at each reporting date using a provision matrix to measure expected credit losses. The provision rates are based on days past due for groupings of various customer segments with similar loss patterns. The carrying amount of accounts receivable, net of allowance for impairment of receivables, represents the maximum amount exposed to the credit risk for this type of receivables (Note 14).

*The accompanying notes form an integral part of these consolidated financial statements.*

F-79

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**32.    Risk management (continued)**

Set out below is the information about the credit risk exposure on the Group's trade and other receivables (except for advances issued) using a provision matrix:

**December 31, 2019**

| | | | Days past due | | |
| | Current and | | | | |
| | **<30 days** | **30-60 days** | **61-90 days** | **>91 days** | **Total** |
| Expected credit loss rate | 0.10% | 1% | 57% | 94% | |
| Exposure at default | 5,143 | 490 | 362 | 76 | **6,071** |
| Expected credit loss | (6) | (3) | (208) | (71) | **(288)** |

**December 31, 2018**

| | | | Days past due | |
| | Current and | | | |

| | <30 days | 30-60 days | 61-90 days | >91 days | Total |
|---|---|---|---|---|---|
| Expected credit loss rate | 0.26% | 3% | 36% | 98% | |
| Exposure at default | 7,672 | 96 | 22 | 331 | **8,121** |
| Expected credit loss | (20) | (3) | (8) | (323) | **(354)** |

The Group evaluates the concentration of risk with respect to trade and other receivables as low, as its customers are located in several jurisdictions and industries and operate in largely independent markets. The table below demonstrates the largest counterparties' balances, as a percentage of respective totals:

| | Trade and other receivables | |
|---|---|---|
| Concentration of credit risks by main counterparties, % from total amount | As of December 31, 2018 | As of December 31, 2019 |
| Top 5 counterparties | 40% | 43% |
| Others | 60% | 57% |

The Group is also exposed to substantial credit risk through the payment-by-installment card project SOVEST, where Qiwi Bank JSC serves as a lender and bears all credit risk on outstanding loans. When granting loans on SOVEST cards, the Group uses automated scoring solvency models and evaluates individually each application for the probability of fraud and social default. It uses the information from the major credit bureaus as well as certain other data including the evaluation of the potential effects of changes in macroeconomic conditions and regional affiliation of the applicant in order to approve or reject the application. Qiwi Bank can then use manual verification for determining the credit limit for the approved applicants. Qiwi Bank runs advanced forward-looking models that are based on the analysis of the transactional behavior of individual customers in order to predict and stimulate usage as well as prevent fraud, and Qiwi Bank uses a migration matrix approach for calculation of the loan expected credit loss provisions.

Qiwi Bank distributes its installment cards to customers on a federal scale, across all regions of Russia. The target audience includes Russian citizens with the permanent registration and aged 18 to 70 years. Qiwi Bank also uses a variety of distribution channels and strategies to obtain clients and therefore believe that its credit risk is broadly diversified.

The management established a credit committee that develops and approves general principles for lending and takes special measures to mitigate credit risk such as a reduction of the credit limits for unreliable clients and more advanced scoring models for the new borrowers. See Note 13 for the carrying amount of loans issued and the maximum amount exposed to the credit risk for these type of assets.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-80

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

### 33.    Financial instruments

The Group's principal financial instruments consisted of loans receivable, trade and other receivables, customer accounts and amounts due to banks, trade and other payables, cash and cash equivalents, long and short-term debt instruments and reserves at CBR. The Group has various financial assets and liabilities which arise directly from its operations. During the year, the Group did not undertake trading in financial instruments.

The fair value of the Group's financial instruments as of December 31, 2019 and 2018 is presented by type of the financial instrument in the table below:

| | | As of December 31, 2018 | | As of December 31, 2019 | |
|---|---|---|---|---|---|
| | | Carrying amount | Fair value | Carrying amount | Fair value |
| **Financial assets** | | | | | |
| Debt securities* | AC | 1,929 | 1,931 | 3,825 | 3,913 |
| Debt securities* | FVOCI | — | — | 1,294 | 1,294 |
| Long-term loans | AC | 159 | 159 | 249 | 249 |
| Long-term loans | FVPL | 71 | 71 | 16 | 16 |
| **Total financial assets** | | **2,159** | **2,161** | **5,384** | **5,472** |

\*  Starting mid year 2019 the Group has two portfolios of debt securities with different business model whose objectives is to hold securities in order to collect contractual cash flows and both collecting contractual cash flows and selling.

Financial instruments used by the Group are included in one of the following categories:

- AC – accounted at amortized cost;

- FVOCI – accounted at fair value through other comprehensive income;

- FVPL – accounted at fair value through profit or loss.

Carrying amounts of cash and cash equivalents, short-term loans issued, short-term deposits placed, debt, accounts receivable and payable, reserves at CBR, lease liabilities, customer accounts and amounts due to banks approximate their fair values largely due to short-term maturities of these instruments.

Debt securities of the Group mostly consist of RUB nominated government and high-quality corporate bonds with interest rate 6.4%—10.75% and maturity up to May 2033. Some of debt securities are pledged (Note 30).

Long-term loans generally represent RUB nominated loans to Russian legal entities and have a maturity up to seven years. For the purpose of fair value measurement of these loans the Group uses comparable marketable interest rate which is in range of 9-35%.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-81

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

**33.    Financial instruments (continued)**

The following table provides the fair value measurement hierarchy of the Group's financial instruments to be accounted or disclosed at fair value:

| | Date of valuation | Total | Fair value measurement using | | |
| --- | --- | --- | --- | --- | --- |
| | | | Quoted prices in active markets (Level 1) | Significant observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
| **Assets accounted at fair value through profit or loss** | | | | | |
| Long-term loans | December 31, 2019 | 16 | — | — | 16 |
| **Assets accounted at fair value through other comprehensive income** | | | | | |
| Debt securities | December 31, 2019 | 1,294 | 1,294 | — | — |
| **Assets for which fair values are disclosed** | | | | | |
| Debt securities | December 31, 2019 | 3,913 | 3,913 | — | — |
| Long-term loans | December 31, 2019 | 249 | — | — | 249 |
| **Assets accounted at fair value through profit or loss** | | | | | |
| Long-term loans | December 31, 2018 | 71 | — | — | 71 |
| **Assets for which fair values are disclosed** | | | | | |
| Debt securities | December 31, 2018 | 1,931 | 1,931 | — | — |
| Long-term loans | December 31, 2018 | 159 | — | — | 159 |

There were no transfers between Level 1 and Level 2 fair value measurements and no transfers into or out of Level 3 fair value measurements during the year ended December 31, 2019.

The Group uses the following IFRS hierarchy for determining and disclosing the fair value of financial instruments by valuation technique:

- Level 1: Quoted (unadjusted) prices in active markets for identical assets or liabilities;

- Level 2: Other techniques for which all inputs that have a significant effect on the recorded fair value are observable, either directly or indirectly;

- Level 3: Techniques that use inputs that have a significant effect on the recorded fair value that are not based on observable market data.

With regard to the level 3 assessment of fair value, management believes that no reasonably possible change in any of the unobservable inputs would be sensitive for financial assets accounted at fair value

*Valuation methods and assumptions*

The fair value of the financial assets and liabilities are evaluated at the amount the instrument could be exchanged in a current transaction between willing parties, other than in a forced or liquidation sale.

Long-term fixed-rate loans issued are evaluated by the Group based on parameters such as interest rates, terms of maturity, specific country and industry risk factors and individual creditworthiness of the customer.

*The accompanying notes form an integral part of these consolidated financial statements.*

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

## 34.    Share-based payments

### 34.1. Option plans

As of December 31, 2019, the Group has the following outstanding option plans:

| | 2012 Employee Stock Option Plan | 2015 Restricted Stock Unit Plan | 2019 Employee Stock Option Plan |
|---|---|---|---|
| | (2012 ESOP) | (RSU Plan) | (2019 ESOP) |
| **Adoption date** | October, 2012 | July, 2015 | June, 2019 |
| **Type of shares** | class B shares | class B shares | class B shares |
| **Number of options or RSUs reserved** | Up to 7 % of total amount of shares | Up to 2,100,000 shares | Up to 3,100,000 shares |
| **Exercise price** | Granted during:<br>Year 2012: U.S.$ 13.65<br>Year 2013: U.S.$ 41.24 - 46.57<br>Year 2014: U.S.$ 34.09 - 37.89<br>Year 2017: U.S.$ 23.94 | Granted during:<br>Year 2016: n/a<br>Year 2017: n/a<br>Year 2018: n/a<br>Year 2019: n/a | Granted during:<br>Year 2019: U.S. $ 16.75 |
| **Exercise basis** | Shares | Shares | Shares |
| **Expiration date** | December 2020 | December 2022 | December 2026 |
| **Vesting period** | Up to 4 years | Three vesting during up to 2 years | Two vesting during up to 4 years |
| **Other major terms** | The options are not transferrable | • The units are not transferrable<br>• All other terms of the units under 2015 RSU Plan are to be determined by the Company's BOD or the CEO, if so resolved by the BOD, acting as administrator of the Plan | • The units are not transferrable<br>• The Compensation Committee of the Board, acting as Administrator of the Plan, shall have the authority to adopt, amend and repeal such administrative rules, guidelines and practices relating to the Plan as it deems advisable. |

In April 2018, QIWI plc established QIWI Employees Trust, which owns shares reserved for ESOP and RSU plans and transfers them to employees who exercise their options. The Trust is not a legal entity and major decisions relating to its activities are determined by QIWI plc. In these financial statements it is regarded as an extension of QIWI plc.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-83

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

## 34.    Share based payments (continued)

### 34.2. Changes in outstanding options

The following table illustrates the movements in share options during the year ended December 31, 2019:

| | As of December 31, 2018 | Granted during the period | Forfeited during the period | Exercised during the period | As of December 31, 2019 |
|---|---|---|---|---|---|
| 2012 ESOP | 1,516,981 | — | (60,000) | (303,206) | 1,153,775 |
| 2015 RSU Plan | 813,019 | 132,800 | (14,899) | (565,197) | 365,723 |
| 2019 ESOP | — | 1,280,000 | (350,000) | — | 930,000 |
| **Total** | **2,330,000** | **1,412,800** | **(424,899)** | **(868,403)** | **2,449,498** |

As of December 31, 2019 the Company has 2,083,775 options outstanding, of which 1,153,775 are vested and 930,000 are unvested, and 365,723

RSUs outstanding, of which 33,466 are vested and 332,257 are unvested.

The weighted average price for share options exercised under ESOP during the year was U.S. $13.65 and exercised under RSU plan was nil.

### 34.3. Valuations of share-based payments

The valuation of all equity-settled options granted are summarized in the table below:

| Option plan/ Grant date | Number of options/ RSUs | Dividend yield, % | Volatility, % | Risk-free interest rate, % | Expec-ted term, years | Weighted average share price (U.S. $) | Weighted average fair value per option/ RSU (U.S. $) | Valuation method |
|---|---|---|---|---|---|---|---|---|
| 2012 ESOP | 4,128,521 | 0-5.03% | 28%-49.85% | 0.29%-3.85% | 2-4 | 28.10 | 7.14 | Black-Scholes-Merton |
| 2015 RSU Plan | 2,035,808 | 0-5.7% | 40.65%-64.02% | 2.89%-4.34% | 0-2 | 15.26 | 14.56 | Binominal |
| 2019 ESOP | 1,280,000 | 5.7% | 41.12% | 1.91%-1.94% | 0-4 | 19.81 | 5.23 | Black-Scholes-Merton |

The forfeiture rate used in valuation models granted during the year is from nil to 10%. It is based on historical data and current expectations and is not necessarily indicative of forfeiture patterns that may occur. The expected volatility reflects the assumption that the historical volatility over a period similar to the life of the options is indicative of future trends, which may not necessarily be the actual outcome.

### 34.4. Share-based payment expense

The amount of expense arising from equity-settled share-based payment transactions for the year ended December 31, 2019 was 464 (2018 – 635, 2017 – 398).

*The accompanying notes form an integral part of these consolidated financial statements.*

F-84

Table of Contents

QIWI plc

Notes to consolidated financial statements (continued)

### 35. Events after the reporting date

**Dividends distribution**

On March 13, 2020 the Board of Directors of the Company approved a dividend of U.S.$ 13,660,424 (equivalent of 1,011).

**Rocketbank**

In March 2020, the Board of Directors has decided to wind down the Rocketbank project and the Group is currently investigating the most efficient way to reuse or dispose of the Rocketbank assets.

*The accompanying notes form an integral part of these consolidated financial statements.*

F-85

Table of Contents

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the

undersigned to sign this registration statement on its behalf.

QIWI PLC

By: /s/ Boris Kim
Name: Boris Kim
Title: Chief Executive Officer

Date: March 24, 2020

## DESCRIPTION OF SECURITIES

The following description of the capital stock of QIWI Plc ("us," "our," "we" or the "Company") is a summary of the rights of our ordinary shares and certain provisions of our articles of association in effect as of March 24, 2020. This summary does not purport to be complete and is qualified in its entirety by the provisions of our articles of association filed with the Securities and Exchange Commission as an exhibit to our Annual Report on Form 20-F for the year ended December 31, 2019, as well as to the applicable provisions of Cypriot legislation on stock corporations. We encourage you to read our articles of association and applicable Cypriot legislation on stock corporations carefully.

**Share Capital**

As of March 24, 2020, our registered share capital consists of 11,225,718 class A shares and 51,487,257 class B shares outstanding, each with a par value of €0.0005 per share.

American depositary shares, or ADSs, each representing one class B share, have been listed on the Nasdaq Stock Market LLC since May 3, 2013 and have been admitted to trading on the Moscow Stock Exchange since May 20, 2013, under the symbol "QIWI."

*Rights Attaching to Shares*

*Voting rights*. For so long as class A shares are in issue and are outstanding, each class A share has the right to ten votes at a meeting of our shareholders; and each class B share has the right to one vote at a meeting of our shareholders.

*Issue of shares and pre-emptive rights*. Subject to the Cypriot law and our articles of association, already authorized but not yet issued shares are at the disposal of our board of directors, which may allot or otherwise dispose of any unissued shares as it may decide. All new shares and/or other securities giving right to the purchase of our shares or which are convertible into our shares must be offered before their issue to our shareholders on a pro rata basis. If the new securities are of the same class as existing shares, the offer must first be made on a pro rata basis to the shareholders of the relevant class and, if any such new securities are not taken up by those shareholders, an offer to purchase the excess will be made to all other shareholders on a pro rata basis (provided that such pre-emption rights have not been removed). On May 8, 2018 the disapplication of pre-emptive rights in connection with the issues of up to an additional 52,000,000 class B shares, including in the form of ADSs, previously authorized by our shareholders, has expired and since then any issuance and allotment of class B shares by the Company for cash consideration is subject to pre-emptive rights.

*Conversion*. At the irrevocable request of any class A shareholder, all or part of the class A shares held by such shareholder will convert into class B shares, on the basis that each class A share shall convert into one class B share, and the class B shares resulting from such conversion shall rank pari passu in all respects with the existing class B shares in issue.

In addition, class A shares will be automatically converted into class B shares, on a one-to-one basis, in the following circumstances: (1) all class A shares which are transferred by a holder, except in circumstances permitted under our articles of association, shall, immediately upon such transfer, be automatically converted into class B shares; (2) all class A shares held by a shareholder will be automatically converted into class B shares on the occurrence of a change of control (as defined in our articles of association) of that class A shareholder; and (3) all class A shares will be automatically converted into class B shares in the event that the aggregate number of class A shares constitute less than 10% of the aggregate number of class A and class B shares outstanding.

For so long as class A shares are in issue and are outstanding, class A shares will not convert into class B shares where: (1) the transfer is to one or more of the transferor's directly or indirectly controlled affiliates (as defined in our articles of association); (2) 10% or more of the total number of class A shares in issue are transferred as a single transaction or a series of related transactions by a shareholder or a group of shareholders; (3) the transfer is to one or more of the existing class A shareholders; and (4) the transfer is to the person(s) that was (were) the ultimate beneficial owner(s) of class A shareholder at the time of Listing. In the case of (2) above the transfer of A shares is permitted if: (a) it is approved in writing by the shareholders holding in aggregate at least 75% of the total number of class A shares in issue; or (b) the shareholder (or a group of shareholders) transferring class A shares has (or have) offered such shares to the other then existing shareholders holding class A shares in accordance with the procedure set out in the articles of association.

*Dividend*. For so long as class A shares are in issue and are outstanding, our board may declare dividend, including final dividend, but no dividend will be paid except out of our profits. Our board of directors may set aside out of our profits such sums as it thinks proper as a reserve. The board of directors may also, without establishing a reserve, carry forward to the next year any profits it may think prudent not to distribute as a dividend. The class A shares and the class B shares have the right to an equal share in any dividend or other distribution we pay.

*Winding Up*. If our company is wound up, the liquidator may, upon a special resolution and any other procedure prescribed by the Cypriot law, (i) divide in specie or kind all or part of our assets among the shareholders; and (ii) vest the whole or any part of such assets in trustees for the benefit of the contributories as the liquidator shall think fit, but so that no shareholder is compelled to accept any shares or other securities with any attached liability.

*Form and transfer of shares*. The instrument of transfer of any share must be executed by or on behalf of the transferor and the transferee, and the transferor will be deemed to be the holder of the share until the name of the transferee is entered into the register of shareholders. Except as set out above and in our articles of association, shareholders are entitled to transfer all or any of their shares by instrument of transfer in writing in any usual or common form or in any other form, including electronic form, which the directors may approve.

There is no limitation under Cypriot law or our articles of association on the right of non-Cypriot residents or nationals to own or vote our shares.

*Convening Shareholders' Meetings*

An annual general meeting must be held not more than 15 months after the prior annual general meeting, and at least one annual general meeting

must be held in each calendar year.

Our board of directors, at its discretion, may convene an extraordinary general meeting. Extraordinary general meetings must also be convened by the board of directors at the request of shareholders holding in aggregate at the date of the deposit of the requisition either (a) not less than 10% of our outstanding share capital or (b) not less than 10% of the voting rights attached to our issued shares, or, in case the board of directors fails to do so within 21 days from the date of the deposit of the requisition notice, such requisitioning shareholders, or any of them representing more than one half of the total voting rights of all of them, may themselves convene an extraordinary general meeting, but any meeting so convened may not be held after the expiration of 3 months from the date that is 21 days from the date of the deposit of the requisition notice.

The annual general meeting and a shareholders' general meeting called for the election of directors or for a matter for which Cypriot law requires a special resolution, which means a resolution passed by a majority of not less than 75% of the voting rights attached to our issued shares present and voting at a duly convened and quorate general meeting, must be called with no less than 45 days' written notice or such longer notice as is required by the Companies Law (not counting the day in which it was served or deemed to be served and the date for which it is given). Other shareholders' general meetings must be called with no less than 30 days' written notice.

A notice convening a shareholders' general meeting shall be served within 5 days after the record date for determining the shareholders entitled to receive notice of attend and vote at such General Meeting, which is fixed by the Board and is not more than 60 days and not less than 45 days prior to an Annual General Meeting, or a General Meeting called for the passing of a Special Resolution, or for the election of Directors, and not more than 45 days and not less than 30 days prior to any other General Meeting. A notice convening a shareholders' general meeting must be sent to each of the shareholders, provided that the accidental failure to give notice of a meeting to, or the non-receipt of notice of a meeting by, any person entitled to receive notice will invalidate the proceedings at that meeting to which such notice refers in the event that a shareholder holding not less than 5% of our outstanding share capital is not in attendance as a result of the accidental failure to give notice or non-receipt thereof.

All shareholders are entitled to attend the shareholders' general meeting or be represented by a proxy authorized in writing. The quorum for a shareholders' general meeting will consist of shareholders representing 50.01% of the voting rights attached to our issued shares, whether present in person or by proxy.

The agenda of the shareholders' general meeting is determined by our board of directors or by whoever else is calling the meeting.

*Voting*

Matters determined at shareholders' general meetings require an ordinary resolution, which requires a simple majority of the votes cast at any particular general meeting duly convened and quorate, unless our articles of association and the Companies Law specify differently. It is within the powers of the shareholders to have a resolution executed in writing by all shareholders and in such event no meeting needs to take place or notice to be given.

*Reserved Matters*

Our articles of association provide for special majorities for resolutions concerning, among other things, the following matters (for so long as class A shares are in issue and outstanding): (i) any variance to the rights attached to any class of shares requires

2

approval of the holders of 75% of the shares of the affected class, passed at a separate meeting of the holders of the shares of the relevant class, as well as a special resolution of the general meeting; and (ii) approval of the total number of shares and classes of shares to be reserved for issuance under any of our or our subsidiaries' employee stock option plan or any other equity-based incentive compensation program requires approval of a majority of not less than 75% of the voting rights attached to all issued shares present and voting at a duly convened and quorate general meeting.

*Relevant Provisions of Cypriot law*

The liability of our shareholders is limited. Under the Cypriot law, a shareholder of a company is not personally liable for the acts of the company, except that a shareholder may become personally liable by reason of his or her own acts.

Cypriot law does not contain any requirement for a mandatory offer to be made by a person acquiring shares or depositary receipts of a Cypriot company even if such an acquisition confers on such person control over us if neither the shares nor depositary receipts are listed on a regulated market in the European Economic Area (EEA). Neither our shares nor depositary receipts are listed on a regulated market in the EEA.

Cypriot Companies Law contains provisions in respect of squeeze-out rights. The effect of these provisions is that, where a company makes a takeover bid for all the shares or for the whole of any class of shares of another company, and the offer is accepted by the holders of 90% in value of the shares concerned, the offeror can upon the same terms acquire the shares of shareholders who have not accepted the offer, unless such persons can persuade the Cypriot courts not to permit the acquisition. If the offeror company already holds more than 10%, in value of the shares concerned, additional requirements need to be met before the minority can be squeezed out. If the company making the takeover bid acquires sufficient shares to aggregate, together with those which it already holds, more than 90%, then, within one month of the date the bidder holds more than 90%, it must give notice of the fact to the remaining shareholders and such shareholders may, within three months of receiving such notice, require the offeror company to acquire their shares and the offeror company shall be bound to do so upon the same terms on which the shares were acquired or on such other terms as may be agreed between them or upon such terms as the court may order.

**American Depositary Shares**

The Bank of New York Mellon, as depositary, registers and delivers our ADSs. Each ADS will represent one class B share (or a right to receive one

class B share) deposited with the principal London office of The Bank of New York Mellon, as custodian for the depositary. Each ADS will also represent any other securities, cash or other property which may be held by the depositary. The depositary's corporate trust office at which the ADSs will be administered is located at 101 Barclay Street, New York, New York 10286. The depository's principal executive office is located at One Wall Street, New York, New York 10286.

You may hold ADSs either (A) directly (i) by having an American Depositary Receipt, or ADR, which is a certificate evidencing a specific number of ADSs, registered in your name, or (ii) by having ADSs registered in your name in the Direct Registration System, or (B) indirectly by holding a security entitlement in ADSs through your broker or other financial institution. If you hold ADSs directly, you are a registered ADS holder, also referred to as an ADS holder. This description assumes you are an ADS holder. If you hold the ADSs indirectly, you must rely on the procedures of your broker or other financial institution to assert the rights of ADS holders described in this section. You should consult with your broker or financial institution to find out what those procedures are.

The Direct Registration System, or DRS, is a system administered by The Depository Trust Company, or DTC, pursuant to which the depositary may register the ownership of uncertificated ADSs, which ownership is confirmed by periodic statements sent by the depositary to the registered holders of uncertificated ADSs.

As an ADS holder, we will not treat you as one of our shareholders and you will not have shareholder rights. Cyprus law governs shareholder rights. The depositary will be the holder of class B shares underlying your ADSs. As a registered holder of ADSs, you will have ADS holder rights. A deposit agreement among us, the depositary and you, as an ADS holder, and all other persons indirectly holding ADSs sets out ADS holder rights as well as the rights and obligations of the depositary. New York law governs the deposit agreement and the ADSs.

### Dividends and Other Distributions

The depositary has agreed to pay to ADS holders the cash dividends or other distributions it or the custodian receives on class B shares or other deposited securities, after deducting its fees and expenses. You will receive these distributions in proportion to the number of class B shares your ADSs represent.

- <u>Cash</u>. The depositary will convert any cash dividend or other cash distribution we pay on the class B shares underlying the ADSs into U.S. dollars, if it can do so on a reasonable basis and can transfer the U.S. dollars to the United States. If

3

that is not possible or if any government approval is needed and cannot be obtained, the deposit agreement allows the depositary to distribute the foreign currency only to those ADS holders to whom it is possible to do so. It will hold the foreign currency it cannot convert for the account of the ADS holders who have not been paid. It will not invest the foreign currency and it will not be liable for any interest.

Before making a distribution, any withholding taxes, or other governmental charges that must be paid will be deducted. It will distribute only whole U.S. dollars and cents and will round fractional cents to the nearest whole cent. If the exchange rates fluctuate during a time when the depositary cannot convert the foreign currency, you may lose some or all of the value of the distribution.

- <u>Distribution of Class B Shares</u>. The depositary may distribute additional ADSs representing any class B shares we distribute as a dividend or free distribution. The depositary will only distribute whole ADSs. It will try to sell class B shares which would require it to deliver a fractional ADS and distribute the net proceeds in the same way as it does with cash. If the depositary does not distribute additional ADSs, the outstanding ADSs will also represent the new class B shares. The depositary may sell a portion of the distributed class B shares sufficient to pay its fees and expenses in connection with that distribution.

- <u>Rights to Purchase Additional Class B Shares</u>. If we offer holders of our securities any rights to subscribe for additional shares or any other rights, the depositary may make these rights available to ADS holders. If the depositary decides it is not legal and practical to make the rights available but that it is practical to sell the rights, the depositary will use reasonable efforts to sell the rights and distribute the proceeds in the same way as it does with cash. The depositary will allow rights that are not distributed or sold to lapse. *In that case, you will receive no value for them.*

If the depositary makes rights available to ADS holders, it will exercise the rights and purchase the shares on your behalf. The depositary will then deposit the class B shares and deliver ADSs to the persons entitled to them. It will only exercise rights if you pay it the exercise price and any other charges the rights require you to pay.

U.S. securities laws may restrict transfers and cancellation of the ADSs represented by class B shares purchased upon exercise of rights. For example, you may not be able to trade these ADSs freely in the United States. In this case, the depositary may deliver restricted depositary shares that have the same terms as the ADSs described in this section except for changes needed to put the necessary restrictions in place.

- <u>Other Distributions</u>. The depositary will send to ADS holders anything else we distribute on deposited securities by any means it thinks is legal, fair and practical. If it cannot make the distribution in that way, the depositary has a choice. It may decide to sell what we distributed and distribute the net proceeds, in the same way as it does with cash. Or, it may decide to hold what we distributed, in which case ADSs will also represent the newly distributed property. However, the depositary is not required to distribute any securities (other than ADSs) to ADS holders unless it receives satisfactory evidence from us that it is legal to make that distribution. The depositary may sell a portion of the distributed securities or property sufficient to pay its fees and expenses in connection with that distribution.

The depositary is not responsible if it decides that it is unlawful or impractical to make a distribution available to any ADS holders. We have no obligation to register ADSs, shares, rights or other securities under the Securities Act. We also have no obligation to take any other action to permit the distribution of ADSs, class B shares, rights or anything else to ADS holders. This means that you may not receive the distributions we make on our class B shares or any value for them if it is illegal or impractical for us to make them available to you.

The depositary will deliver ADSs if you or your broker deposit class B shares or evidence of rights to receive class B shares with the custodian. Upon payment of its fees and expenses and of any taxes or charges, such as stamp taxes or stock transfer taxes or fees, the depositary will register the appropriate number of ADSs in the names you request and will deliver the ADSs to or upon the order of the person or persons that made the deposit.

You may surrender your ADSs at the depositary's corporate trust office. Upon payment of its fees and expenses and of any taxes or charges, such as stamp taxes or stock transfer taxes or fees, the depositary will deliver the class B shares and any other deposited securities underlying the ADSs to the ADS holder or a person the ADS holder designates at the office of the custodian. Or, at your request, risk and expense, the depositary will deliver the deposited securities at its corporate trust office, if feasible.

You may surrender your ADR to the depositary for the purpose of exchanging your ADR for uncertificated ADSs. The depositary will cancel that ADR and will send to the ADS holder a statement confirming that the ADS holder is the registered holder of uncertificated ADSs. Alternatively, upon receipt by the depositary of a proper instruction from a registered holder of uncertificated ADSs requesting the exchange of uncertificated ADSs for certificated ADSs, the depositary will execute and deliver to the ADS holder an ADR evidencing those ADSs.

4

## Voting Rights

ADS holders may instruct the depositary to vote the number of deposited class B shares their ADSs represent. The depositary will notify ADS holders of shareholders' meetings and arrange to deliver our voting materials to them if we ask it to. Those materials will describe the matters to be voted on and explain how ADS holders must instruct the depositary how to vote. For instructions to be valid, they must reach the depositary by a date set by the depositary.

The depositary will try, as far as practical, subject to the laws of Cyprus and of our articles of association or similar documents, to vote or to have its agents vote class B shares or other deposited securities as instructed by ADS holders. The depositary will only vote or attempt to vote as instructed.

We cannot assure you that you will receive the voting materials in time to ensure that you can instruct the depositary to vote your class B shares. In addition, the depositary and its agents are not responsible for failing to carry out voting instructions or for the manner of carrying out voting instructions. This means that you may not be able to exercise your right to vote and there may be nothing you can do if your shares are not voted as you requested.

In order to give you a reasonable opportunity to instruct the Depositary as to the exercise of voting rights relating to Deposited Securities, if we request the Depositary to act, we agree to give the Depositary notice of any such meeting and details concerning the matters to be voted upon at least 30 days in advance of the meeting date.

## Payment of Taxes

You will be responsible for any taxes or other governmental charges payable on your ADSs or on the deposited securities represented by any of your ADSs. The depositary may refuse to register any transfer of your ADSs or allow you to withdraw the deposited securities represented by your ADSs until such taxes or other charges are paid. It may apply payments owed to you or sell deposited securities represented by your ADSs to pay any taxes owed and you will remain liable for any deficiency. If the depositary sells deposited securities, it will, if appropriate, reduce the number of ADSs to reflect the sale and pay to ADS holders any proceeds, or send to ADS holders any property, remaining after it has paid the taxes.

## Reclassifications, Recapitalizations and Mergers

| If we: | Then: |
|---|---|
| • Change the nominal or par value of our class B shares | The cash, class B shares or other securities received by the depositary will become deposited securities. Each ADS will automatically represent its equal share of the new deposited securities. |
| • Reclassify, split up or consolidate any of the deposited securities | The depositary may distribute some or all of the cash, class B shares or |
| • Distribute securities on class B shares that are not distributed to you | other securities it received. It may also deliver new ADRs or ask you to |
| • Recapitalize, reorganize, merge, liquidate, sell all or substantially all of our assets, or take any similar action | surrender your outstanding ADRs in exchange for new ADRs identifying the new deposited securities. |

## Amendment of the Deposit Agreement

We may agree with the depositary to amend the deposit agreement and the ADRs without your consent for any reason. If an amendment adds or increases fees or charges, except for taxes and other governmental charges or expenses of the depositary for registration fees, facsimile costs, delivery charges or similar items, or prejudices a substantial right of ADS holders, it will not become effective for outstanding ADSs until 30 days after the depositary notifies ADS holders of the amendment. At the time an amendment becomes effective, you are considered, by continuing to hold your ADSs, to agree to the amendment and to be bound by the ADRs and the deposit agreement as amended.

## Termination of the Deposit Agreement

The depositary will terminate the deposit agreement at our direction by mailing notice of termination to the ADS holders then outstanding at least 90 days prior to the written notice of such removal. The depositary may also terminate the deposit agreement by mailing notice of termination to us and the ADS holders if 60 days have passed since the depositary told us it wants to resign but a successor depositary has not been appointed and accepted its appointment.

After termination, the depositary and its agents will do the following under the deposit agreement but nothing else: collect distributions on the

deposited securities, sell rights and other property, and deliver class B shares and other deposited securities upon cancellation of ADSs. Four months after termination, the depositary may sell any remaining deposited securities by public or private sale. After that, the depositary will hold the money it received on the sale, as well as any other cash it is holding under the deposit

5

agreement for the pro rata benefit of the ADS holders that have not surrendered their ADSs. It will not invest the money and has no liability for interest. The depositary shall be discharged from all obligations under the deposit agreement, except to account for the net proceeds of such sale and other cash (after deducting fees and expenses and applicable taxes and governmental charges). The depositary's only obligations will be to account for the money and other cash. After termination our only obligations will be to indemnify the depositary and to pay fees and expenses of the depositary that we agreed to pay.

### *Limitations on Obligations and Liability*

The deposit agreement expressly limits our obligations, as well as those of our directors, officers, employees, agents and affiliates, and the obligations of the depositary. It also limits our liability and the liability of the depositary. We and the depositary:

- are only obligated to take the actions specifically set forth in the deposit agreement without negligence or bad faith;

- are not liable if we are or it is prevented or delayed by law or circumstances beyond our control from performing our or its obligations under the deposit agreement;

- are not liable if we or it exercises discretion permitted under the deposit agreement;

- are not liable for the inability of any holder of ADSs to benefit from any distribution on deposited securities that is not made available to holders of ADSs under the terms of the deposit agreement, or for any special, consequential or punitive damages for any breach of the terms of the deposit agreement;

- have no obligation to become involved in a lawsuit or other proceeding related to the ADSs or the deposit agreement on your behalf or on behalf of any other person;

- may rely upon any documents we believe or it believes in good faith to be genuine and to have been signed or presented by the proper person.

In the deposit agreement, we and the depositary agree to indemnify each other under certain circumstances.

### *Requirements for Depositary Actions*

Before the depositary will deliver or register a transfer of an ADS, make a distribution on an ADS, or permit withdrawal of class B shares, the depositary may require:

- payment of stock transfer or other taxes or other governmental charges and transfer or registration fees charged by third parties for the transfer of any class B shares or other deposited securities;

- satisfactory proof of the identity and genuineness of any signature or other information it deems necessary; and

- compliance with regulations it may establish, from time to time, consistent with the deposit agreement, including presentation of transfer documents.

The depositary may refuse to deliver ADSs or register transfers of ADSs generally when the transfer books of the depositary or our transfer books are closed or at any time if the depositary or we think it advisable to do so.

### *Your Right to Receive Class B Shares Underlying your ADSs*

ADS holders have the right to cancel their ADSs and withdraw the underlying class B shares at any time except:

- When temporary delays arise because: (i) the depositary has closed its transfer books or we have closed our transfer books; (ii) the transfer of class B shares is blocked to permit voting at a shareholders' meeting; or (iii) we are paying a dividend on our class B shares.

- When you owe money to pay fees, taxes and similar charges.

- When it is necessary to prohibit withdrawals in order to comply with any laws or governmental regulations that apply to ADSs or to the withdrawal of class B shares or other deposited securities.

This right of withdrawal may not be limited by any other provision of the deposit agreement.

### *Pre-release of ADSs*

The deposit agreement permits the depositary to deliver ADSs before deposit of the underlying class B shares. This is called a pre-release of the ADSs. The depositary may also deliver class B shares upon cancellation of pre-released ADSs (even if the ADSs are canceled before the pre-release transaction has been closed out). A pre-release is closed out as soon as the underlying class B shares

6

are delivered to the depositary. The depositary may receive ADSs instead of class B shares to close out a pre-release. The depositary may pre-release ADSs only under the following conditions: (1) before or at the time of the pre-release, the person to whom the pre-release is being made represents to the

depositary in writing that it or its customer owns class B shares or ADSs to be deposited; (2) the pre-release is fully collateralized with cash or other collateral that the depositary considers appropriate; (3) the depositary must be able to close out the pre-release on not more than five business days' notice and (4) the pre-release is subject to such further indemnities and credit regulations as the depositary deems appropriate. In addition, the depositary will limit the number of ADSs that may be outstanding at any time as a result of pre-release, although the depositary may disregard the limit from time to time, if it thinks it is appropriate to do so.

### *Direct Registration System*

In the deposit agreement, all parties to the deposit agreement acknowledge that the DRS and Profile Modification System, or Profile, will apply to uncertificated ADSs upon acceptance thereof to DRS by DTC. DRS is the system administered by DTC pursuant to which the depositary may register the ownership of uncertificated ADSs, which ownership will be evidenced by periodic statements sent by the depositary to the registered holders of uncertificated ADSs. Profile is a required feature of DRS that allows a DTC participant, claiming to act on behalf of a registered holder of ADSs, to direct the depositary to register a transfer of those ADSs to DTC or its nominee and to deliver those ADSs to the DTC account of that DTC participant without receipt by the depositary of prior authorization from the ADS holder to register that transfer.

In connection with and in accordance with the arrangements and procedures relating to DRS/Profile, the parties to the deposit agreement understand that the depositary will not verify, determine or otherwise ascertain that the DTC participant that is claiming to be acting on behalf of an ADS holder in requesting registration of transfer and delivery described in the paragraph above has the actual authority to act on behalf of the ADS holder (notwithstanding any requirements under the Uniform Commercial Code). In the deposit agreement, the parties agree that the depositary's reliance on and compliance with instructions received by the depositary through the DRS/Profile System and in accordance with the deposit agreement shall not constitute negligence or bad faith on the part of the depositary.

### *Shareholder communications; inspection of register of holders of ADSs*

The depositary will make available for your inspection at its office any reports, notices and other communications, including any proxy soliciting material that it receives from us as a holder of deposited securities that we make generally available to holders of deposited securities. The depositary will send you copies of those communications if we ask it to. You have a right to inspect the register of holders of ADSs, but not for the purpose of contacting those holders about a matter unrelated to our business or the ADSs.

7

**Exhibit 8.1**

| Subsidiary | Main activity | Jurisdiction of incorporation | Ownership interest as of December 31, 2019 |
|---|---|---|---|
| JSC QIWI | Operation of electronic payment kiosks | Russia | 100% |
| QIWI Bank JSC | Maintenance of electronic payment systems, money transfer, consumer and SME financial services | Russia | 99.9% |
| QIWI Payments Services Provider Ltd | Operation of on-line payments | UAE | 100% |
| QIWI International Payment System LLC | Operation of electronic payment kiosks | USA | 100% |
| Qiwi Kazakhstan LP | Operation of electronic payment kiosks | Kazakhstan | 100% |
| JLLC OSMP BEL | Operation of electronic payment kiosks | Belarus | 51% |
| QIWI- M S.R.L. | Operation of electronic payment kiosks | Moldova | 51% |
| QIWI ROMANIA SRL | Operation of electronic payment kiosks | Romania | 100% |
| QIWI WALLET EUROPE SIA[1] | Operation of on-line payments | Latvia | — |
| QIWI Management Services FZ-LLC | Management services | UAE | 100% |
| Attenium LLC | Management services | Russia | 100% |
| Postomatnye Tekhnologii LLC | Logistic | Russia | 100% |
| Future Pay LLC | Operation of on-line payments | Russia | 100% |
| Qiwi Blockchain Technologies LLC | Software development | Russia | 100% |
| QIWI Shtrikh LLC | On-line cashbox production | Russia | 51% |
| QIWI Platform LLC | Software development | Russia | 100% |
| Factoring PLUS LLC (previously known as QIWI Processing LLC) | Factoring | Russia | 100% |
| Flocktory Ltd | Holding company | Cyprus | 98.6% |
| Flocktory Spain S.L. | SaaS platform for customer lifecycle management and personalization | Spain | 98.6% |
| FreeAtLast LLC | SaaS platform for customer lifecycle management and personalization | Russia | 98.6% |
| ContactPay Solution Ltd [2] | Operation of on-line payments | UK | 100% |
| Rocket Universe LLC [2] | Software development | Russia | 100% |
| Billing Online Solution LLC [2] | Software development | Russia | 100% |
| SETTE FZ-LLC [2] | Operation of on-line payments | UAE | 100% |
| LALIRA DMCC [2] [3] | Operation of on-line payments | UAE | 100% |
| **Associate** | | | |
| JSC Tochka | Digital services for banks | Russia | 40% |

[1]  The entity was liquidated during the year 2019.

[2]  The entities were incorporated during the year 2019.

[3]  The title to shares is in the process of transfer.

**Exhibit 12.1**

**Certification of the Chief Executive Officer**

I, Boris Kim, certify that:

1. I have reviewed this annual report on Form 20-F of QIWI plc;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date:   March 24, 2020

By:     /s/ Boris Kim

Name:    Boris Kim
Title:    Chief Executive Officer

2

**Exhibit 12.2**

**Certification of the Chief Financial Officer**

I, Varvara Kiseleva, certify that:

1. I have reviewed this annual report on Form 20-F of QIWI plc;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date:   March 24, 2020

By:   /s/ Varvara Kiseleva
Name:      Varvara Kiseleva
Title:      Interim Chief Financial Officer

2

**Exhibit 13.1**

**Certification of CEO and CFO Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report on Form 20-F (the "Report") of QIWI plc (the Company") for the fiscal year ended December 31, 2019 as filed with the U.S. Securities and Exchange Commission on the date hereof, Boris Kim, as Chief Executive Officer of the Company, and Varvara Kiseleva, as Interim Chief Financial Officer of the Company, each hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of his knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the issuer.

/s/ Boris Kim
Name:    Boris Kim
Title:    Chief Executive Officer
Date:    March 24, 2020

/s/ Varvara Kiseleva
Name:    Varvara Kiseleva
Title:    Interim Chief Financial Officer
Date:    March 24, 2020

A signed original of this written statement required by Section 906 of the Sarbanes-Oxley Act of 2002 has been provided to the Company and will be retained by the Company and furnished to the SEC or its staff upon request.

This certification accompanies the Report pursuant to section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by the Sarbanes-Oxley Act of 2002, be deemed filed by the Company for purposes of section 18 of the Securities Exchange Act of 1934.

**Exhibit 15.1**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the Registration Statement on Form F-3 (File No. 333-235239) and the Registration Statements on Form S-8 No. 333-190918; and No. 333-212441, pertaining to the Amended and Restated Employee Stock Option Plan and the 2015 Employee Restricted Stock Units Plan, respectively, of Qiwi plc of our reports dated March 24, 2020, with respect to the consolidated financial statements of QIWI plc and the effectiveness of internal control over financial reporting of QIWI plc, included in this Annual Report (Form 20-F) for the year ended December 31, 2019.

/s/ Ernst & Young LLC
Moscow, Russia

March 24, 2020