**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re QIWI PLC SECURITIES LITIGATION | Master File No.: 1:20-cv-06054-RPK-CLP |
| | <u>CLASS ACTION</u> |
| This Document Relates To:<br><br> ALL ACTIONS. | JURY TRIAL DEMANDED |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

RELEVANT BACKGROUND ........................................................................................... 4

ARGUMENT ....................................................................................................................... 8

I.   Defendants Fraudulently Concealed Qiwi's Unlawful Acts and Record-keeping Deficiencies. ........................................................................................................... 8

    A.   *Defendants' Concealment of Qiwi's Unlawful Acts and Record-keeping Deficiencies Rendered Their Statements About Its Profits and Growth Materially Misleading.* ....... 8

    B.   *Defendants' Access to, or Failure to Check, Give Rise to a Strong Inference of Scienter.* ..................................................................................................... 12

II.   Defendants Fraudulently Misled Investors Re: the Strength of Qiwi's Internal Controls and Specific, Then-Existing Regulatory Risks. ...................................................... 14

    A.   *Defendants Falsely Affirmed that Qiwi Maintained Adequate Disclosure Controls and Procedures and Internal Controls Over Its Financial Reporting.* ........................ 14

    B.   *Defendants' Concealment of the 2020 CBR Audit Rendered Their Statements About Specific, Then-Existing Regulatory Risks Materially Misleading.* ............................... 15

    C.   *Defendants Knew or Should Have Known that Qiwi Had Shoddy Internal Controls, Which the CBR Would Uncover in Its 2020 Audit and Issue Additional and More Severe Sanctions.* ....................................................................................... 18

III.   Defendants Fraudulently Misled Investors Re: the Impact of New  and Pending Regulations. ........................................................................................................... 21

    A.   *The New and Pending Regulation Statements Are Materially Misleading.* ................... 21

    B.   *The New and Pending Regulation Statements Were Made With Scienter.* ................... 23

**TABLE OF AUTHORITIES**

**Page(s)**

Cases

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)..................................................................................... 15

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021)....................................................................... 23

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. 2012)....................................................................... 11

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)...................................................................................... 11

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat., PLC*,
423 F. Supp. 2d 348 (S.D.N.Y. 2006)....................................................................... 24

*Cornwell v. Credit Suisse Grp.*,
689 F. Supp. 2d 629 (S.D.N.Y. 2010)....................................................................... 25

*Cosmas v. Hassett*,
886 F.2d 8 (2d Cir. 1989)........................................................................................... 24

*Credit & Fin. Corp. v. Warner & Swasey Co.*,
638 F.2d 563 (2d Cir. 1981)....................................................................................... 9

*Dolphin & Bradbury, Inc. v. SEC*,
512 F.3d 634 (D.C. Cir. 2008) ................................................................................. 19

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018)....................................................................... 12

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015)....................................................................................... 12

*Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)....................................................................... 19

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................... 11

*Gagnon v. Alkermes PLC*,
368 F. Supp. 3d 750 (S.D.N.Y. 2019)....................................................................... 11

*In re Aphria, Inc. Sec. Litig.*,
    2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020).................................................................... 13

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004)...................................................................... 25

*In re Banco Bradesco S.A. Sec. Litig.*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017)............................................................................. 20

*In re Barclays PLC Sec. Litig.*,
    2024 WL 757385 (S.D.N.Y. Feb. 23, 2024)........................................................ 2, 14, 19, 24

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015)............................................................................... 17

*In re Braskem S.A. Sec. Litig.*,
    246 F. Supp. 3d 731 (S.D.N.Y. 2017)............................................................................. 10

*In re Didi Global Inc. Sec. Lit.*,
    2024 WL 1119483 (S.D.N.Y. Mar. 14, 2024) ................................................................. 22

*In re Enzymotec Sec. Litig.*,
    2015 WL 8784065 (D.N.J. Dec. 15, 2015) ..................................................................... 15

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006)............................................................................... 20

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012).............................................................................. 13

*In re Grupo Televisa Sec. Litig.*,
    368 F. Supp. 3d 711 (S.D.N.Y. 2019).............................................................................. 15

*In re Henry Schein, Inc. Sec. Litig.*,
    2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) ................................................................ 12

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
    251 F. Supp. 3d 596 (S.D.N.Y. 2017).............................................................................. 12

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014)............................................................................... 19

*In re Mylan N.V. Sec. Litig.*,
    2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ................................................................. 17

*In re Oxford Health Plans, Inc.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) .................................................................................... 20

iii

*In re Par Pharm., Inc. Sec. Litig.*,
   733 F. Supp. 668 (S.D.N.Y. 1990) ................................................................................ 12

*In re Pareteum Sec. Litig.*,
   2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ............................................................... 19

*In re Pfizer Inc. Sec. Litig.*,
   2012 WL 983548 (S.D.N.Y. Mar. 22, 2012) ................................................................. 11

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
   930 F. Supp. 68 (S.D.N.Y. 1996) ................................................................................. 19

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ............................................................................................. 8

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005) ........................................................................... 11

*In re Veeco Instruments, Inc. Sec. Litig.*,
   *235 F.R.D. 220 (S.D.N.Y. 2006)* .................................................................................. 20

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   195 F. Supp. 3d 528 (S.D.N.Y. 2016) ........................................................................... 12

*In re Y-mAbs Therapeutics, Inc. Sec. Litig.*,
   2024 WL 451691 (S.D.N.Y. Feb. 5, 2024) ................................................................... 16

*Institutional Invs. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) .......................................................................................... 12

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) ...................................................................................................... 11

*Karimi v. Deutsche Bank Aktiengesellschaft*,
   607 F. Supp. 3d 381 (S.D.N.Y. 2022) ...................................................................... 17, 22

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ........................................................................................................ 10

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014) ...................................................................... 17, 19, 22, 25

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) .......................................................................................... 12

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
   2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ............................................................... 14

*Rosi v. Aclaris Therapeutics, Inc.*,
2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) .............................................................. 9

*S.E.C. v. DeFrancesco*,
2023 WL 4631449 (S.D.N.Y. July 20, 2023) ............................................................. 19

*S.E.C. v. Farnsworth*,
2023 WL 5977240 (S.D.N.Y. Sept. 14, 2023)................................................... 13, 24

*Schlick v. Penn-Dixie Cement Corp.*,
507 F.2d 374 (2d Cir. 1974)...................................................................................... 8

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)........................................... 19, 20, 24, 25

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007).................................................................................................. 19

*U.S. ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*,
865 F.3d 71 (2d Cir. 2017)......................................................................................... 8

*U.S. ex rel. Hart v. McKesson Corp.*,
2024 WL 1056936 (2d Cir. Mar. 12, 2024).............................................................. 20

*U.S. ex rel. McSherry v. SLSCO, L.P.*,
2023 WL 6050202 (E.D.N.Y. Sept. 15, 2023) ......................................................... 20

*U.S. ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 739 (2023).................................................................................................. 20

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
672 F. Supp. 2d 596 (S.D.N.Y. 2009)...................................................................... 20

*Washington State Inv. Bd. v. Odebrecht S.A.*,
461 F. Supp. 3d 46 (S.D.N.Y. 2020)........................................................................ 11

v

Lead Plaintiff Moset International Company Limited ("Plaintiff") respectfully submits this Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Second Amended Class Action Complaint (ECF No. 83) ("Motion") and supporting Memorandum ("Mem.").[1] Previously, on November 3, 2023, the Court granted Defendants' motion to dismiss the Consolidated Amended Class Action Complaint ("CAC") on the basis of falsity and scienter, but permitted Plaintiff to "seek[] leave to file a second amended complaint … and explain why leave to amend should be granted." *See* ECF No. 78 ("Order") at 42. After Plaintiff sought leave to amend, the parties stipulated to the proposed SAC and to briefing motion to dismiss instead of leave to amend, which the Court entered on December 14, 2023.

## PRELIMINARY STATEMENT

To address the Court's concerns for more particularity, the SAC pleads new, detailed, and contemporaneous facts based on Lead Counsel's renewed investigation plausibly establishing falsity and scienter – including what laws, regulations, and CBR policies Qiwi was violating and how (*see* ¶¶9, 90, 107, 110, 119-20, 124), and what processes, procedures, and controls were deficient and how (*see* ¶¶9, 16, 104, 112, 120). Thus, the SAC pleads with more specificity how Defendants fraudulently (1) concealed Qiwi's unlawful acts and record-keeping deficiencies; (2) misled investors with regard to the strength of Qiwi's internal controls and then-existing regulatory risks; and (3) misled investors with regard to the impact of new and pending regulations.

Ignoring these changes, Defendants rely on their vague risk language and "warnings" that there could be no assurance that such internal controls would work effectively and that increased regulatory scrutiny could have an adverse effect on their business to insulate them from liability.

---

[1] Citations to "¶" refer to the Consolidated Second Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 82) ("SAC"). Unless otherwise noted, capitalized terms not defined herein have the meaning ascribed in the SAC, all emphasis added, and all internal citations omitted.

Defendants cannot argue with a straight face that they adequately warned investors of specific potential non-compliance risks that they knew had *already* materialized during the Class Period. The SAC's allegations compel a strong inference of scienter because that Defendants could have been ignorant of Qiwi's lack of internal controls, processes, and procedures, as well as of the zero chance that it would become the ETSUP, is utterly implausible, particularly when they were making statements on these topics and had conceded that they operated in a "highly regulated environment," MTD at 8, and "need[ed] to implement enhanced process, procedures and controls." ¶112; *see In re Barclays PLC Sec. Litig.*, 2024 WL 757385, at *19 (S.D.N.Y. Feb. 23, 2024) ("[I]t is impossible to believe that the Executive Defendants were ignorant of the change in the Company's WKSI status[,]" when that status was critical to its operations, and it had been sanctioned by the regulatory agency a couple years prior). All Defendants' arguments fall short.

*First*, the SAC alleges that Defendants misled investors into believing that Qiwi had established effective processes, procedures, and controls to ensure betting transactions in its payment system involved licensed and local bookmakers in accordance with Russia's Betting Law and non-anonymous customers in accordance with the National Payment System ("NPS") Law, and therefore its touted betting revenue growth was sound. *See* ¶¶6-8, 10-12, 131-33, 135, 137-39, 141-42, 145, 149-51, 153, 155-57, 159-60, 162-63, 165, 167, 169-70, 173, 177-78, 180, 183, 186, 188-89. In truth, since July 2018, Qiwi had had agreements with Western banks pursuant to which they channeled money to Qiwi via money cards, and Qiwi then transferred that money to anonymous e-wallets. *See* ¶110. But Qiwi did not have, or require, records identifying who the money card holders were and thus did not know, or check, who the customers were in violation of the CBR's "Know Your Client" instruction and the related July 26, 2019 amendment to the NPS Law preventing anonymous cash deposits into e-wallets. *See* ¶¶110, 120, 124. Nor did Qiwi verify

2

that a gambling network was registered and licensed as required under the Betting Law, enabling the "grey" gambling industry to hide and function anonymously within Qiwi's payment system. *See* ¶¶107, 109-10. Defendants had known they had to review and improve Qiwi's processes, procedures, and controls over anonymous e-wallets since the July 2019 NPS Law amendment and overpayments to offshore bookmakers since the Betting Law had taken force in January 2018 – which Qiwi's competitors were complying with by the fall of 2018. *See* ¶¶99, 120.

*Second*, the SAC alleges that Defendants concealed from investors that Qiwi had not improved those processes, procedures, and internal controls before the scheduled, routine CBR audit, which had begun by July 20, 2020 and continued until December 2020 – despite knowing that the July 26, 2019 amendment to the NPS Law would be in force on August 3, 2020, and that to ensure compliance, the CBR had been inspecting banks involved with online casinos since 2019. *See* ¶¶9, 13, 112, 114, 120. Furthermore, in 2018, Qiwi had underwent a major scheduled CBR audit which had resulted in sanctions related to, *inter alia*, reporting requirements. *See* ¶¶145, 173, 183. Since Qiwi had still not ensured adequate reporting and record-keeping of money card holders who transferred funds to anonymous e-wallets when the 2020 CBR audit had begun, Defendants knew or should have known that more, and worse, sanctions would result. *See* ¶¶6, 110, 116, 120.

*Third*, the SAC alleges that Defendants misleadingly assured investors that the new regulations rolling out during the Class Period would have a minimal and perhaps positive impact on Qiwi's business, implying that it was already above board with identifying illegal bookmakers and knowing its customers. *See* ¶¶7, 11, 145, 153, 173, 183, 193-95. Because it was not, Qiwi's revenue growth declined as new regulations increasingly restricted its ability to process transactions in the grey betting space (which Defendants downplayed) and then plummeted when the CBR publicly took Qiwi to task by preventing it from processing payments to foreign

3

merchants and money transfers to pre-paid cards from corporate accounts–even if the transactions had nothing to do with betting–and not having it continue as the new single ETSUP. *See* ¶¶13, 15, 107, 108-09, 124-25, 205-06. Defendants' own statements indicate that they tracked pending and new regulations and analyzed their impact on Qiwi's business. *See* ¶¶7, 112, 145, 153, 173, 183.

Accordingly, because the SAC readily cures the defects previously identified, and fully satisfies Rule 9(b) and the PSLRA's pleading standards, Defendants' Motion should be denied.

## RELEVANT BACKGROUND

From before the Class Period, Qiwi was under intense regulatory scrutiny as it owned and controlled Qiwi Bank (licensed by the CBR) and operated one of only three TSUPIS authorized to accept electronic bets on behalf of bookmakers in Russia. ¶¶3-4. As a result, Qiwi was subject to routine and spontaneous CBR audits and had to comply with the CBR's reporting and record-keeping requirements and policies, including its long-standing policy against illegal proceeds. ¶4. As online betting grew before and during the Class Period, so did Russian laws and regulations aimed at restricting gambling on illegitimate websites and by offshore or unlicensed bookmakers:

- 8/7/11: AML Law codified know-your-client requirements which varied for different transactions (¶¶5, 53);
- 11/15/17: Betting Law adopted, banning money transfers to illegal gambling operations (¶98);
- 11/27/17: Betting Law amended, banning money transfers to illegal bookmakers (*id.*);
- 1/2018: Betting Law took force, requiring credit institutions like Qiwi to block payments to blacklisted entities (¶99);
- 7/26/19: NPS Law amended to prevent owners of anonymous e-wallets, including Qiwi Wallets, from replenishing them in cash via mobile operator offices or payment terminals, and thus requiring them to do so with a bank account (¶114);
- 2/2020: AML Law amended (regulation 374-P) to list signs of questionable transactions like cash withdrawals from corporate (*i.e.*, money) cards (¶118);
- 4/1/20: N 325-FZ took force, requiring banks to provide information on opening or closing personalized e-wallets to the Federal Tax Service ("FTS") (¶119);
- 8/3/20: July 26, 2019 NPS Law amendment took force (¶120).

4

Qiwi's compliance with online betting regulations was key to investors because growth derived from illegitimate proceeds–including transactions involving unlicensed or offshore bookmakers–was unsustainable and transactions involving unidentifiable sources invited scrutiny and sanctions that threatened profits from legitimate transactions. ¶6. Notably, before the Class Period, Qiwi Bank had undergone a major scheduled CBR audit in 2018. ¶145. After identifying numerous violations, the CBR imposed sanctions. *Id*. But by the Class Period, Defendants assured investors that Qiwi's "internal control over financial reporting was effective" and they "ha[d] remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward." ¶¶142, 145. Solonin further assured investors in May 2019 that since Qiwi was already figuring out how to prevent payments to illegal bookmakers and regularly worked with regulators, "any new regulation rules will be basically positive for us." ¶¶7, 153.

Investors thus believed that Qiwi's regulatory issues were behind it as Defendants touted its success as driven by "growth in [its] key verticals including primarily betting related payment services[,]" which was "relatively a new market for [it], especially around skilled betting[,]" and that that "trend is going to continue." ¶¶132, 135; *see also* ¶¶131, 133, 137-39. These and other similar statements by Defendants pushed Qiwi's share price to a Class Period high of $24.50. ¶8.

Unbeknownst to investors, however, Qiwi was not verifying the legality of bookmakers before processing payments to them or the identities of customers before transferring money from corporate accounts to pre-paid cards. ¶9. Rather, since July 2018, Qiwi was working with foreign merchants to transfer unidentified funds – *i.e.,* funds from unidentified sources, which included gambling and/or gaming monies – and making 0.5-0.7% profit on those transfers. *Id*. The CBR did not discover these deficiencies until it turned to auditing Qiwi Bank's transactions with international firms by July 20, 2020 – after inspecting other banks working with online casinos

5

beginning in 2019 to ensure compliance with the July 26, 2019 NPS Law amendment. *Id*.

Instead of disclosing the ongoing audit and negative impact of new regulations, Defendants announced after markets closed on July 20, 2020 that major shareholders–including Solonin and Kim–would sell 6.8M of their shares in an SPO. *Id*. That news indicated hidden problems to investors, causing Qiwi's share price to fall 9.9% a share. *Id*. Faced with those "market conditions[,]" Defendants reversed course and canceled the SPO to signal that they were not hiding anything. ¶10. In response, Qiwi's share price went back up 8.8%. *Id*. Still, as an analyst noted, "[w]hile Qiwi stock price returned to the previous level as the SPO was canceled, there are still factors that could have a negative impact on [it]. The fact that [Qiwi's] management attempted to get rid of the stake in the company but have so far failed to do it, is concerning." ¶200.

Just a month later, during the August 20, 2020 2Q20 earnings call, while still concealing the CBR audit, Qiwi downplayed that the number of active Qiwi Wallet accounts had fallen by 900,000 as "mainly the result of the introduction of new restrictions on the use of anonymous wallets…and expanding the client verification procedure, [such that the] identification and verification [complies] with regulatory requirements." ¶124. Defendants continued to conceal the CBR audit through the 3Q20 earnings call on November 19, 2020, while touting that Qiwi had "a chance to be the single TSUPIS." ¶195. Even when analysts asked about the revenue impact if Qiwi was not selected to be the sole TSUPIS, Defendant Kim implied that near-term revenues were stable: "[A]t the moment, it's a very theoretical discussion. What will be the real hit on our net revenue if and when this legislation will be adopted." ¶196. Indeed, Defendants conducted two earnings calls with analysts and investors, and issued approximately 13 public filings and/or press releases, without ever mentioning the ongoing CBR audit and pending sanctions despite Qiwi still not obtaining or requiring verification of money card holders' identification before transferring

6

winnings to pre-paid cards in violation of the CBR's "Know Your Client" instructions. ¶¶16, 124.

Not until after markets closed on December 9, 2020 did Qiwi finally reveal to investors that Qiwi Bank had been subject to a CBR audit covering July 2018 to September 2020 since before July 20, 2020. ¶¶13, 125. As a result of the "violations and deficiencies relating primarily to reporting and record-keeping requirements" again, the CBR fined Qiwi Bank approximately $150,000 and suspended or limited its ability to conduct "most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts" because casinos likely were hiding behind foreign merchants and gambling monies likely were hiding behind the money transfers. *Id*. Qiwi further explained that if those restrictions had been in place for the prior nine months, a whopping "***33% to 40%*** of [its] Payment Services Segment Net Revenue for such period would have been negatively affected." *Id*. The next day, Defendant Protopov confirmed that the CBR's claims were "related to reporting and drawing documents" and "to payments to online casinos." ¶126. As a result of these revelations, Qiwi's ADS price fell 20.6% a share. ¶128.

Worse yet, the regulatory violations and deficiencies the CBR identified at Qiwi solidified regulators' move away from self-regulated TSUPIs and to a single ETSUP. ¶¶11, 15. Since Qiwi had not been aligned with regulators to combat illegal bookmakers during the Class Period, it had no chance of becoming the ETSUP as Defendants had indicated and inevitably would "experience a decrease in, or complete loss of, payments volume and income related to the TSUPIS." ¶¶12, 15.

As an analyst pointed out, "Qiwi's main problem in the eyes of the regulator is the 'obviously leaky' process of identifying users" as its "payment system is often used not only in criminal activities (fraud, drug trafficking) but also in online casinos." ¶129. Thus, "the restrictions by the [CBR] was a natural step" because Qiwi's "payment system 'has ignored for years the fact that it is used by fraudsters on a disproportionately large[r] scale than any other.'" *Id*.

**ARGUMENT**

I.  <u>Defendants Fraudulently Concealed Qiwi's Unlawful Acts and Record-keeping Deficiencies.</u>

A.  *Defendants' Concealment of Qiwi's Unlawful Acts and Record-keeping Deficiencies Rendered Their Statements About Its Profits and Growth Materially Misleading.*

To address the Court's concerns about the challenged profits and growth statements (*see* Order at 21, 23), the SAC alleges underlying conduct, including agreements with Western banks dating back to July 2018, pursuant to which Qiwi received money via money cards and then transferred the money to anonymous e-wallets. *See* ¶110. The SAC also adds that in violation of the CBR's "Know Your Client" instruction and related July 2019 NPS Law amendment preventing anonymous cash deposits into e-wallets, Qiwi did not have processes, procedures, or controls to obtain or require records identifying money card holders, and thus did not know or check who customers were before transferring money to e-wallets. *See* ¶¶110, 120. As a result, Qiwi did not have the requisite customer information to start providing it to the FTS on April 1, 2020, in violation of the tax code. *See* ¶119. In addition, the SAC alleges that Qiwi did not verify records showing a gambling network was registered and licensed as required under the Betting Law, enabling the "grey" gambling industry to function anonymously within its payment system through dormant licenses or new corporate names that were not on the "blacklist." *See* ¶¶54, 107, 109-10. Defendants claim that those detailed allegations still do not suffice. Mem at 16-21. They are wrong.

Despite the heightened pleading standards of Rule 9(b) and the PSLRA, complaints do not need to plead "detailed evidentiary matter." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). In addition, a plaintiff may allege facts on "information and belief" as to "matters peculiarly within the opposing party's knowledge." *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir. 1974); *see U.S. ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 83 (2d Cir. 2017) (Rule 9(b) satisfied based on plausible "information and belief"

8

allegations regarding facts within defendant's "knowledge and control"); *Credit & Fin. Corp. v. Warner & Swasey Co.*, 638 F.2d 563, 566 (2d Cir. 1981) ("evidence need not be pleaded").

Here, Plaintiff specifically alleges what laws, regulations, and CBR policies Qiwi was violating and how (*see* ¶¶9, 90, 107, 110, 119-20, 124) and what processes, procedures, and controls were deficient and how (*see* ¶¶9, 16, 104, 112, 120). Plaintiff further alleges that because Qiwi did not have processes, procedures, and controls to detect illegal bookmakers or to identify and verify money card holders, it was processing payments and profiting from legal and illegal transactions alike. *See* ¶¶109-10. Yet while repeatedly identifying online betting as being a key driver of Qiwi's profits and growth during the Class Period, and that it was a continuing trend, Defendants failed to disclose that a material number of unidentifiable or unverified parties were involved in those online betting transactions, thereby obscuring illegal transactions. *See* ¶¶131-40, 149-52, 155-68, 177-79, 186-90. This detailed omission is actionable because liability arises where, as here, "a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices." *Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *15 (S.D.N.Y. Mar. 29, 2021).

Defendants' concealment of unidentifiable or unverified parties was material to their statements about betting driving Qiwi's profits and growth. Throughout the Class Period, they consistently confirmed that betting-related revenue was critical to Qiwi's profits and growth:

- 11/14/18: Solonin emphasized Qiwi's "***core*** Payment Services segment…driven by the …growth in our ***key*** verticals including ***primarily betting*** related payment services that are presented as part of the e-commerce market vertical." ¶132.

- 3/28/19: When asked about how much payment services consisted of betting services, Karavaev declared: "It's a ***substantial*** part…it's just around half of our business…***Half*** of payment services business." ¶75.

- 5/16/19: When asked about the betting contribution to e-commerce growth or revenues, Solonin stated that "sports betting, it's still one of the ***key*** categories. So it has continued to [be] the ***major*** part of the [e-commerce] segment." ¶76.

9

- 3/24/20: When asked about betting share in payments and Money Remittances, Kiseleva detailed that for 2019, "the share of betting in volumes. It's roughly around **22%**...in terms [of] share of Money Remittance, which is connected with the payout for betting merchants that would be around like **mid-teens percentages**." ¶78.

Since analysts asked how much of Qiwi's profits and revenues were related to betting **every** quarter, investors needed to know that unverified and unidentified parties added significant risk to those revenues continuing as Russian regulators increasingly restricted gambling on illegitimate websites and by offshore or unlicensed bookmakers. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011) (Where company stated "revenues were going to rise 50 and then 80 [% but] had information indicating a significant risk to its leading revenue-generating product" being able to continue generating revenue, those "were material facts 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'")

That significant risk materialized at the end of the Class Period with the CBR suspending or limiting Qiwi's ability to conduct "most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts" – restrictions which, if in effect for the prior nine months, would have negatively affected "**33% to 40%** of [its] Payment Services Segment Net Revenue." ¶¶13, 125, 201. The market immediately recognized the impact on Qiwi's profits and revenues, as its ADS price fell 20.6% the next day in response. ¶¶14, 202. Defendant Kim further confirmed on March 30, 2021, that "the CBR restrictions continue to have a negative impact on our volumes and revenues, primarily in E-Commerce and Money Remittance curve." ¶205.

Thus, as in *Rosi*, Defendants' statements about betting revenue driving Qiwi's profits and growth were materially misleading, actionable half-truths. *Accord*, *e.g.*, *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 759–60 (S.D.N.Y. 2017) (finding a "classic half-truth" where defendant gave investors a "selective portrait," crediting low supplier prices on "benign factors" while omitting that the low prices were due to bribery). If a company "puts the topic of the cause

10

of its financial success at issue, then it is obligated to disclose information concerning the source of its success since, reasonable investors would find that such information would significantly alter the mix of available information." *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 768 (S.D.N.Y. 2019) (actionable omission where defendants provided benign reasons for success while omitting that "intense lobbying and marketing efforts played [a role] in Vivitrol's financial success").

And since each Defendant is responsible for his or her own statements as a Qiwi executive and/or director, whether orally or in writing, they are each liable for securities fraud.[2] Each Defendant is also responsible for Qiwi SEC filings and press releases issued while an executive and/or director based on the "presumption that ***written*** statements that are 'group-published,' *e.g.*, SEC filings and press releases, are statements made by all individuals 'with direct involvement in the everyday business of the company.'" *Lockheed,* 875 F. Supp. 2d at 373 (emphasis in original).

Although "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing," *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014), numerous New York district courts have uniformly found an exception where, as here, the defendant put "the reasons for its success at issue" without disclosing that illegal or improper conduct materially contributed to that success. In addition to *Rosi*, *Braskem*, and *Gagnon*, *supra*, this exception was applied in *Washington State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 74 (S.D.N.Y. 2020) ("investor[s] would be misled by the company's failure to disclose that an additional reason for its success was its illegal bribery scheme"); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (statements concerning the sources and

---

[2] *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43 (2011); *In re Pfizer Inc. Sec. Litig.*, 2012 WL 983548, at *4 (S.D.N.Y. Mar. 22, 2012). All conference call participants are liable for statements made on the call, as the speaker or as a participant who failed to correct the misstatement. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 195 (S.D.N.Y. 2010) ("[C]ompany official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements."). *Janus* did not change the basic principle that officers can be liable for other insiders' statements. *See Pfizer*, 2012 WL 983548 at *4; *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012).

11

significance of the company's revenue actionable due to omission of illegal trading practices). Many similar cases exist,[3] and no court has rejected or questioned this well-reasoned principle.

*B. Defendants' Access to, or Failure to Check, Give Rise to a Strong Inference of Scienter.*

Scienter may be inferred when defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000); *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015); *see also In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 621 (S.D.N.Y. 2017) (knowledge or access to information showing public statements were inaccurate "alone" is enough to satisfy scienter). The Court's analysis should rest "on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is **at least** as likely as not that defendants acted with scienter." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 268–69 (3d Cir. 2009). "Each case will present a different configuration of factual allegations, and it is the composite picture, not the isolated components, that judges must evaluate in the last instance. In assessing the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *Id*. at 272-73.

Here, the SAC describes how Defendants knew or should have known illegal transactions were taking place within Qiwi's payment system based on, at a minimum, the public reporting on November 2, 2018 of competitor banks like Sberbank blocking all payments to offshore gambling

---

[3] *E.g., In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *15 (E.D.N.Y. Sept. 27, 2019) (actionable omission where company claimed success based on value-added services while omitting that it was also due to alleged price-fixing agreement); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016) (statement that investors' decisions to purchase of fund shares were "driven largely by the portfolio managers' investment performance" plausibly misleading due to omitted backdated performance history); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 444 (S.D.N.Y. 2018) (where company attributed success to factors such as "its engineering capabilities and experience," an "ordinary investor would be misled by [its] failure to disclose that an additional reason for its success was its illegal bribery scheme"); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 677-78 (S.D.N.Y. 1990) (projections false and misleading where "they were based on illegal activities which could not be sustained once the illegal scheme was uncovered").

operations and on August 5, 2019 of e-payment providers like Yandex.Money blocking suspect transfers in mass in response to the Betting Law which had taken force in January 2018, because those actions were pushing illegal bookmakers to Qiwi. *See* ¶¶99-100. The SAC also alleges illicit activity like that uncovered in the February 2019 trial of the organized criminal group Vovse which used Qiwi's payment service to sell illegal drugs – which Defendants knew or should have known about as they "constantly interact[ed] with law enforcement agencies and provide[d] them with tools to track transactions and calculate unscrupulous counterparties in the system." *See* ¶¶90, 105.

While Defendants frame Plaintiff's argument as these reports and this "conduct of parties *other than Qiwi*" constituting scienter alone, MTD at 12, Plaintiff is arguing that the reports and conduct, taken with the SAC's other allegations—including Defendants' admission that they "constantly interact with law enforcement agencies" (¶¶99-100) and "work[] together with the regulators" (¶153), and the fact that the activity in the reports was directly related to Qiwi's core operations, was of the type that was under strict regulatory scrutiny, and was of the same type for which Qiwi had previously faced sanctions—shows that Defendants knew or should have known of the illegal activity and conduct discussed in the reports. *See In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012) ("an inference of knowledge may be appropriate, even if not determinative," where, "employing a holistic analysis ... it would be absurd to suggest that management was without knowledge"); *In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020) (focusing on "critical" nature of information in assessing scienter); *S.E.C. v. Farnsworth*, 2023 WL 5977240, at *16 (S.D.N.Y. Sept. 14, 2023) (An "executive of a publicly traded company" "ha[s] a duty to 'familiarize himself with the ... core operations.'").

And despite knowledge of those illegal transactions—which all violated the CBR's long-standing policy against illicit funds (*see* ¶¶52, 90, 99-100) and were part of the impetus for the

13

July 2019 amendment to the NPS Law preventing anonymous e-wallet holders from replenishing them in cash and requiring a bank account to do so in order for "the source of funds [to] be known" (*see* ¶¶114-15)—Defendants did not establish processes, procedures and controls to detect illegal bookmakers or identify and verify money card holders (*see* ¶120). At the same time, they assured investors that Qiwi was "unlikely to see a direct and significant impact on the business in connection with the amendments," implying that it was already compliant. *Id*. Indeed, while competitor Yandex.Money warned, "[t]he changes will negatively affect the income of electronic money operators, which, along with banks, invest a lot in stimulating non-cash payments," Qiwi told investors the changes were immaterial to it because "the vast majority of users in the QIWI ecosystem" were identified. *See* ¶116. However, it is illogical that the illegal transactions on Qiwi's platform just stopped, unless Defendants put processes, procedures, and controls in place to identify and restrict them. Since Defendants did not adequately do so, they knew they were profiting off legal and illegal transactions alike when each and every quarter, they were touting betting revenues as the key driver for Qiwi's profits and growth. *See Barclays*, 2024 WL 757385 at \*20 ("Taken together, these facts clearly suggest that [defendants] made the [disclosures] recklessly, in total disregard of their failure to implement a system for tracking the issuance of securities from the Shelves following the Company's loss of WKSI status in March 2017.").

II.    Defendants Fraudulently Misled Investors Re: the Strength of Qiwi's Internal Controls and Specific, Then-Existing Regulatory Risks.

   A. *Defendants Falsely Affirmed that Qiwi Maintained Adequate Disclosure Controls and Procedures and Internal Controls Over Its Financial Reporting.*

Misrepresentations regarding the adequacy of a company's internal controls, including in SOX certifications, are actionable under the Exchange Act. *See, e.g.*, *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at \*12 (S.D.N.Y. Apr. 14, 2020) ("The Fund has also plausibly alleged that some of Defendants statements about its internal controls were false or

14

misleading."); *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 720 (S.D.N.Y. 2019) (misstatements "concerning the design and efficacy of internal controls are actionable"); *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015) (sustaining claims based SOX certifications where "Defendants had no reasonable basis" for certifying the adequacy of the company's internal controls and finding sufficient that, "in contrast to the certifications, Lead Plaintiffs specifically allege that the internal controls were deficient, such that Defendants were allowed to engage in the allegedly fraudulent behavior during the Class Period").

After undergoing the 2018 CBR audit, Defendants assured investors on March 28, 2019, and March 24, 2020 that "our internal controls over financial reporting was effective" and "we have remedied the violations [identified by the CBR] and taken appropriate measures to ensure that we will not be in breach of such requirements going forward." ¶¶142, 145, 170, 173. These statements lulled investors into believing that Defendants had reviewed Qiwi's processes, procedures and internal controls and ensured that they met the reporting requirements for money transfers and they took into account the full scope of the Company's activities, including online betting, when that was false. *See* ¶¶100-02, 143, 146, 171, 174. Qiwi's inadequate record-keeping and reporting over money transfers and deficient internal controls over online betting in 2020 led to CBR sanctions, the resulting drop in revenue from payment processing fees, and the Company's auditor flagging its "recognition of revenue for payment processing fees" as a critical or key audit matter. ¶207. Thus, while Defendants' statements about Qiwi's "internal controls are statements of opinion" (Order at 25), they are misleading and actionable because they "omitted contrary facts [which] substantially undermine the conclusion a reasonable investor would reach" from the statements. *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020).

   B. *Defendants' Concealment of the 2020 CBR Audit Rendered Their Statements About Specific, Then-Existing Regulatory Risks Materially Misleading.*

15

Addressing what triggered Defendants' duty to disclose the July 2020 CBR audit and the associated regulatory violations (Order at 29), the SAC pleads with specificity that Defendants made statements warning of audit and regulatory risks in the July 20, 2020 Prospectus and that those risks had already materialized—and Defendants knew they had materialized—due to (1) Qiwi not having the processes, procedures, and controls to identify customers who were transferring money into anonymous e-wallets pursuant to the July 26, 2019 amendment to the NPS Law in force on August 3, 2020 and (2) the CBR audit of Qiwi beginning by July 20, 2020 in which the CBR discovered the Company's continued lack of reporting and record-keeping as to money card holders and foreign bookmakers. *See* ¶¶120, 182-84. Additionally, the SAC points to specific statements, and adds one by Protopopov and Kim regarding the potential impact of new and pending regulations on Qiwi–including having one TSUPIS. *See* ¶¶191-96. Those statements continued to conceal the ongoing CBR audit—which was having an immediate regulatory impact and undercutting the strength of Qiwi's application to be the sole TSUPIS. ¶¶185, 197.

Facing these new specific allegations, Defendants reframe Plaintiff's argument as there simply being an "ongoing and yet-to-be-completed CBR audit" and imply that they had no reason to know of the "NPS Law amendments" until they became "effective on August 3, 2020." MTD at 22. Russian regulators gave companies over a year to assess and comply with the amendments, but they had become law on July 29, 2019. ¶120. So by the time of the CBR audit, Defendants knew that audit and regulatory risks had *already* materialized because Qiwi was not compliant with the amendments *at the time* of the challenged statements. Defendants' knowledge of these facts, combined with their admissions that "'the CBR may *at any time*' audit the Company's filings" and that "such inspections could 'result in discovery of … violations,'" MTD at 23, makes these statements materially misleading. *See In re Y-mAbs Therapeutics, Inc. Sec. Litig.*, 2024 WL

16

451691, at *11–12 (S.D.N.Y. Feb. 5, 2024) (statements that defendant had "resolved all the issues" requested by the regulatory agency and that there was a clear, successful path forward with the agency were materially misleading when viewed in full context as they were not compliant); *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *10 (S.D.N.Y. Mar. 28, 2018) ("[I]nvestor[s] could have concluded from [Mylan]'s statement that although the government 'may' disagree with [it], and 'could' open an investigation, such unfavorable events had not yet occurred. In this context, 'to warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.'").

Further, in response to whether "an audit was ongoing at the time of the statements," Order at 30, the SAC pleads that Defendants were aware of the routine, scheduled CBR audit of Qiwi transactions with international firms that began by July 20, 2020, and the CBR audits of competitor banks since 2019 to ensure their compliance with the July 2019 NPS Law amendment in force on August 3, 2020. *See* ¶¶9, 18, 112, 120 (While it got to Qiwi by July 20, 2020, the CBR had begun inspecting banks involved with online casinos in 2019 and scheduled Qiwi's audit in advance). No more is required. *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (vacating dismissal and finding falsity where statements "gave comfort to investors that reasonably effective steps were being taken to comply with applicable [Chinese] environmental regulations," but omitted that such measures "were then failing to prevent substantial violations of the Chinese regulations"); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 729 (S.D.N.Y. 2015) (denying motion to dismiss where there was an ongoing government investigation, active investigations into other companies in defendants' business, and conduct that was "remarkably similar to the conduct [defendant] had been engaged in for … years"); *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 393 (S.D.N.Y. 2022) (finding regulatory compliance statements actionable where

17

company processes were routinely "failing to prevent substantial violations").

    *C. Defendants Knew or Should Have Known that Qiwi Had Shoddy Internal Controls, Which the CBR Would Uncover in Its 2020 Audit and Issue Additional and More Severe Sanctions.*

Attempting to piggy-back on the Court's Order, Defendants argue that "Plaintiff again has failed to 'fill the gap in its pleadings' by pointing to prior actions by the CBR" and that the "SAC does not link these [prior] violations in any particularized way to QIWI's operations during the class period—let alone to the CBR's findings in December 2020[,]" and thus the allegations are irrelevant. *See* MTD at 18 (citing Order at 23, 28). Not so.

The SAC details how the 2013 regulatory deficiencies support scienter because they related to "reporting requirements" and internal controls which "did not reflect the nature and scope of the bank's activities[,]" and how the 2014 NPS Law violations support scienter because they related to reporting requirements, specifically customer identification for person-to-person transfers. *See* ¶¶81, 84. The SAC also alleges new scienter facts about the CBR previously fining Qiwi in March 2015, and shutting down its kiosks because it was allowing uncontrolled kiosk use – despite no then-existing regulation dictating how much could be taken out or deposited into a kiosk. *See* ¶85.

These facts, combined with the 2018 CBR audit, the concession that Defendants "need[ed] to implement enhanced processes, procedures and controls in order to provide reasonable assurance that we are operating in compliance with applicable regulatory requirements" (¶102), and the publicly reported illegal transactions occurring on Qiwi's platform (¶¶90, 99-100) demonstrate that Defendants knew or should have known that the Company did not have adequate processes, procedures, and controls from the start of the Class Period. And because Defendants did not ensure that Qiwi kept up with applicable reporting requirements or strengthened its internal controls to curb its platform from being used for illegal transactions, they acted with scienter when reviewing and signing off on its internal controls every year (¶¶81, 84, 141-43, 169-71). *See*

*Barclays*, 2024 WL 757385 at \*19 (finding scienter where defendants stated they had internal controls when they did not, and previously had been sanctioned for failing to follow regulations).[4]

Defendants also knew or should have known that the CBR had the power to, and did, fine and sanction companies for not following its "Know Your Client instruction" and violating its long-standing policy against illegal proceeds by not reporting or checking transactions – without citing a specific regulation. *See* ¶¶6, 52-53. Lastly, the CBR suspending or limiting "most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts" is a remedial measure that augments Defendants' scienter. *See* ¶¶13, 125, 201; *Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 542 (S.D.N.Y. 2017) ("remedial measures to improve accounting and internal controls" supports scienter); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 583 (S.D.N.Y. 2014) (remediation of quality control processes supports scienter).

Taken together, construed in the light most favorable to Plaintiff, and "accept[ing] all factual allegations … as true," *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007), these allegations of circumstantial evidence give rise to the requisite inference of scienter.[5] *See In re Pareteum Sec. Litig.*, 2021 WL 3540779, at \*16 (S.D.N.Y. Aug. 11, 2021) (finding

---

[4] Thus, that Defendants disclosed that "a 2018 CBR audit identified violations and imposed sanctions" and made other disclosures regarding compliance and internal controls during the Class Period, MTD at 18-19, is of no moment because they knew that Qiwi's processes, procedures, and controls were inadequate to begin with. *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at \*2 (S.D.N.Y. Feb. 5, 2024) ("[I]f a company is warning investors about future risks and the company's efforts to deal with them, a reasonable investor would infer that those risks have not yet happened. If the 'risk' has already happened or is then happening, the company has a duty to say so. Omitting that information makes the statements misleading."); *see also Dolphin & Bradbury, Inc. v. SEC,* 512 F.3d 634, 640 (D.C. Cir. 2008) (highlighting "the critical distinction between disclosing the risk a future event *might* occur and disclosing actual knowledge the event *will* occur"); *In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("[B]espeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

[5] Defendants argue the more compelling inference is they were "trying to provide investors timely, accurate, and complete information about a complex, rapidly shifting regulatory landscape fraught with uncertainty[,]" MTD at 15, but their omissions about, *inter alia*, the CBA audit, lack of compliance with existing and pending regulations, and specific, known risks undermine this recharacterization of the facts. *See S.E.C. v. DeFrancesco*, 2023 WL 4631449, at \*4 (S.D.N.Y. July 20, 2023) ("But the risks here are couched as if they are future possibilities, when in fact they were already realized facts. 'A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability.'") (quoting *Meyer*, 761 F.3d at 251).

19

scienter where defendants "were the ranking officers of Parateum responsible for [its] optimistic estimates of backlog and revenue reported in the…10-K" while being told that "their internal controls over financial reporting were 'inadequate and ineffective'"); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009) (finding scienter based on "the repeated disclosures of CSP's weak internal controls…and that these flaws were likely influencing financial results"). While Qiwi disclosed its "recognition of revenue for payment processing fees" as a critical or key audit matter after the Class Period, the fact that Defendants "fail[ed] to maintain sufficient internal controls to avoid fraud [during the Class Period] is…indicative of scienter." *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006).

Specifically regarding the 2020 CBR audit, that Defendants were at least reckless in not disclosing it when announcing the SPO or making statements about the strength of Qiwi's internal controls and warning of potential regulatory risks "is at least as compelling as any plausible opposing inferences" of innocence and any "tie goes to the plaintiff." *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 667 (S.D.N.Y. 2017).[6] As executives or directors of Qiwi at the time of the 2020 CBR audit, Defendants Kim (CEO), Kiseleva (Interim CFO), Solonin (Board Chair), Karavaev (Director) had to have been aware of the audit as well of the regulatory risks that were no longer speculative. *See* ¶¶183-84; *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F.

---

[6] Defendants' argument—and the Court's concerns (Order at 34)—that by withdrawing their offer of sale of QIWI shares, they took a loss which undermines a motive inference (*see* MTD at 10), does not negate the suspicious timing of the offer, nor their intent at the time they made the offer. *See U.S. ex rel. Hart v. McKesson Corp.*, 2024 WL 1056936, at *9 (2d Cir. Mar. 12, 2024) ("whether … a defendant acted 'knowingly' … turns on 'what the defendant thought when [committing the act] – not what the defendant may have thought *after* [committing] it'") (quoting *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 752 (2023)); *U.S. ex rel. McSherry v. SLSCO, L.P.*, 2023 WL 6050202, at *2 (E.D.N.Y. Sept. 15, 2023) (same); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) ("[S]ales of stock may be evidence of scienter if the trades are unusual or *suspicious in timing* or amount."). Moreover, taken in totality with the SAC's other facts, this fact supports scienter because the SPO was offered shortly after the CBA audit began and analysts were still concerned that Qiwi's "management attempted to get rid of their stake in the company, but have so far failed to do it." ¶200; *see* ¶¶9, 12, 122-23, 198-99; *see also Stadium*, 2024 WL 456745 at *6 (finding scienter "[e]ven if a defendant could refute a recklessness claim by showing that he hurt himself too, that is not th[e] case" where "their supposed evidence of good faith is just as likely to show bad faith or not to be especially probative at all").

Supp. 2d 88, 99 (S.D.N.Y. 2006) (finding scienter because CFO "had to have been aware of the SED investigation, the TAP audit and the U.S. Department of Education inquiry, since all of these impacted, or had the potential to impact, EVCI's bottom line."). While not an executive of Qiwi, Defendant Protopopov had been CEO of its Payment Services Segment and speaking on its behalf at investor conferences since August 2019, including making alleged misstatements, as part of a lengthy succession planning process. *See* ¶¶25 n. 8, 27, 159-60, 180, 186, 189, 192.

III.     Defendants Fraudulently Misled Investors Re: the Impact of New and Pending Regulations.

     *A. The New and Pending Regulation Statements Are Materially Misleading.*

To address the Court's questions about how certain regulations hurt Qiwi or how CBR restrictions qualified as regulations (*see* Order at 31), the SAC removes the Boxing Federation regulation allegations and adds new factual allegations. Specifically, the SAC explains how the draft bill referenced by Solonin reduced the number of merchants with whom Qiwi could transact and receive related revenue, and how excluding it from the ETSUP program would cut all its betting revenues, and thus its Class Period non-compliance with the Betting Laws, NPS Law, and the CBR's instructions pursuant to the AML Law was hurting it. *See* ¶¶109-10, 205-06. Likewise, the SAC alleges that the CBR restrictions on payments to foreign merchants and pre-paid cards resulted from the NPS Law amendments adopted in July 2019, which hurt Qiwi because Defendants still had not adequately expanded its client identification and verification procedure to money card holders to comply with the CBR's "Know Your Client" instruction or adequately restricted the use of anonymous e-wallets before the CBR audit began. *See* ¶¶6, 110, 120. The SAC also explains how the CBR's long-standing policy against illegal proceeds and associated "Know Your Client" instruction qualified as regulations in that Qiwi needed to comply with them to avoid more, and worse, CBR sanctions. *See* ¶¶52-53, 110. And the SAC details how expanding the Deoffshorization Law to bookmakers hurt Qiwi because local bookmakers establishing

21

international offshoots could no longer provide online casino and poker products to Russian customers without running into regulatory scrutiny. *See* ¶108. Lastly, the SAC describes how Qiwi was hurt by repeatedly not staying on top of the increasingly restrictive Betting Laws and NPS Law in that the CBR then severely sanctioned and precluded it from being the ETSUP after being TSUPIS-2 since December 2016, causing a 14.7% drop in its e-commerce. *See* ¶¶205-06.

These alleged facts, accepted as true, rendered the challenged statements about the negative impact of regulations on Qiwi materially misleading. ¶¶153-54, 191-97. Defendants' arguments to the contrary fail, particularly "that Mr. Solonin's forward-looking opinion was responding to a question about a specific 'draft bill'—not all new regulations generally…" Mot. at 23. While Plaintiff recognizes the question was about a specific "draft bill", Solonin did not limit his response to the "draft bill" and he meant what he said: "***any new regulation rules will be basically positive for us***." *See* ¶153. His statement, as well as Kim's statement that Qiwi "[had] a chance to be the single TSUPIS," ¶195, was made to be misleading. Analyzing similar statements, the Second Circuit held that a company misled investors even if it "did not guarantee 100% of the time" by portraying its business practices as "reasonably effective" when they were "then failing" to meet minimum regulatory standards. *Meyer*, 761 F.3d at 251–52; *see also Karimi*, 607 F. Supp. 3d at 396 (statements about know-your-client processes and compliance adequately alleged to be false).

That Defendants "repeatedly warned about the potential harm posed by new laws and regulations" does not "compel dismissal" (MTD at 24-25) because they failed to warn of specific, known risks. *See, e.g., In re Didi Global Inc. Sec. Lit.*, 2024 WL 1119483, at *8 (S.D.N.Y. Mar. 14, 2024) (Defendants "warned only of the general risk that its failure to comply with applicable laws and regulations jeopardized its future operations. They made no mention of the far more specific risk, known to [defendant], that the company, in proceeding with the IPO, was defying

22

the Chinese government's directives and thus inviting its wrath.").

### B. The New and Pending Regulation Statements Were Made With Scienter.

Based on their own statements, Defendants closely analyzed new betting regulations and laws as they rolled out. *See* ¶153 (Solonin: "[O]n the regulatory part … all the kind of rumors and the regulation that we're discussing now. ***We're aware of that***, so ***we are actually working together with the regulators and are doing additional perspective*** that given our scale and market partition, any new regulation rules will be basically positive for us"); ¶195 (Kim: "[T]alking about single TSUPIS, the situation has changed since … we had the last earnings call, because in August, it was just a proposal from books in federation, which was discussed at the level of government. And now it's a draft law, which is now in Parliament. So, they started to consider this draft a lot. That's a huge progress in this. ***That's why we put this sentence in our press release*** ..."); ¶192 (Protopopov: "***[T]he key factors that resulted in such decline related primarily to the regulatory and operational reason*** rather than any substantial changes in the consumer preferences for economic slowdown .... [W]e believe that ***certain regulatory initiatives that are being discussed from time to time*** as well as continued economic slowdown ***have a potential to negatively affect our operating performance in the future***."); *see also* ¶¶105, 113, 124, 126, 193-94, 196, 205.

Defendants' argument that their "unremarkable" statements on the topics at issue "does not permit the inference that any Defendant acted with scienter" fails, as does that not pleading "any Individual Defendant's knowledge of, or access to, specific contradictory information" is a fatal flaw. Each Defendant spoke about the importance and impact of amendments and new regulations on Qiwi, and that ability to speak knowledgeably supports an inference that they had educated themselves about its violative operations and the ongoing CBR audit. *See Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 133–134 (D. Conn. 2021) ("Actively communicating with the public about this issue demonstrates defendants' sensitivity to it," and is "strong circumstantial

23

evidence that [they] were receiving some form of specific information about [it.]"); *Farnsworth*, 2023 WL 5977240 at *16 ("Making statements about core aspects of [subsidiary]'s business and its current or future profitability — while either knowing that the statements were baseless or recklessly failing to investigate those aspects before speaking on them — is not 'inconsistent with a state of mind going toward deliberate illegal behavior or conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care.'"). Combined with the CBR sanctioning Qiwi for reporting requirements and other deficiencies after the 2018 audit, Defendants acted with scienter. *See Barclays*, 2024 WL 757385 at *19 (scienter sufficiently alleged because "[i]f the Executive Defendants knew that (i) Barclays had lost its WKSI status and (ii) [it] needed to implement a system for tracking issuances from the Shelves, then they knew that (iii) they, as the persons responsible for [its] compliance with the securities laws, had a duty to monitor whether such controls were implemented"); *Stadium*, 2024 WL 456745 at *5 (rejecting argument that plaintiffs failed to identify specific sales reports or documents where defendant's statements acknowledged he and other executives had access, and could review, the sales data).

Moreover, the betting laws and regulations related to Qiwi's core operations because going into the Class Period, its "bookmaker transactions account[ed] for about 70% of e-commerce" and throughout the Class Period, betting transactions "represent[ed] a significant portion of [its] revenues and also generally carrie[d] higher margins than" other merchant transactions and "gains received by [Qiwi's] consumers from betting into their Qiwi Wallet accounts represent[ed] one of the significant reload sources." *See* ¶¶71-72. As such, Defendants had a duty to stay on top of amendments and new regulations, and if they spoke about them, to speak truthfully and fully. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (inferring knowledge of new regulations relating to a significant part of business); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat.*,

24

*PLC*, 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) (that a troubled division contributed nearly a third of a company's total profit supported scienter, of which key officers should have been informed); *Stadium*, 2024 WL 456745, at *6 (Core-operations doctrine "simply reflects the commonsense assumption that executives are likely to know more about things central to their business.").

For instance, after discussing the proposed legislation on consolidating into one ETSUP during the 3Q20 Earnings Call, Defendant Kim added: "***We also have a chance to be the single TSUPIS***. And that's going to be much better for us even because we will serve the whole market instead of … half of it, but the truth is here, the situation is changing and is becoming more uncertain." *See* ¶195. While technically true, this statement was misleading as it failed to disclose that Qiwi would not be able to pass the then-ongoing CBR audit and thus, was not in the running to be the ETSUP, and was made with scienter because both the CBR audit and being a TSUPIS were core to Qiwi's profitability and growth. *See* ¶¶6, 11-12, 15, 145, 175, 183, 197, 205; *Meyer*, 761 F.3d at 251 (warning of risk from "environmental violations" materially misleading where it did not "disclose then-ongoing and serious pollution violations" which caused investors to be "overly optimistic" about the risk); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010) ("facts showing that the [d]efendants had direct knowledge of information contradicting their public statements or access to similar information ***they should have monitored***" sufficed to allege scienter and pre-class period knowledge "remained pertinent" to class period statements); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("When a plaintiff has adequately alleged that the defendant made false or misleading statements, … that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false.").

Defendants' Motion should be denied in full. If it is not, Plaintiff requests leave to amend.

25

DATED: April 2, 2024

Respectfully Submitted,

**FREEDMAN NORMAND FRIEDLAND LLP**

*/s/ Ivy T. Ngo*

Ivy T. Ngo (*pro hac vice*)
Velvel (Devin) Freedman
1 SE 3rd Avenue, Suite 1240
Miami, Florida 33131
Telephone: (786) 924-2900
Emails: ingo@fnf.law
        vel@fnf.law

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

**THE SCHALL LAW FIRM**

Brian Schall (*pro hac vice* forthcoming)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*

26