UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------x

IN RE QIWI PLC SECURITIES
LITIGATION

----------------------------------------------------x

MEMORANDUM DECISION
AND ORDER

20-cv-6054 (BMC) (CLP)

COGAN, United States District Judge:

Plaintiff Moset International Company ("Moset") brings this putative securities class action against Qiwi plc ("Qiwi"), and a number of Qiwi's officers.  Moset alleges that defendants are civilly liable under Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for making false and misleading statements related to Qiwi's compliance with Russian regulations.  The Court earlier granted defendants' motion to dismiss the first amended complaint, In re Kiwi PLC Securities Litigation, No. 20-cv-6054, 2023 WL 7283619 (E.D.N.Y. Sept. 3, 2003) ("Kiwi I"), finding that plaintiff had failed to plead the existence of any material misstatements or omissions and had failed to plead scienter on the part of any defendant.[1]

Following the Court's order, plaintiff filed a second amended complaint, and defendants again have moved to dismiss.  Because the operative complaint does not materially improve upon the former, defendants' motion is granted.

---

[1] That decision was authored by Judge Rachel Kovner, to whom this case was previously assigned.

# BACKGROUND

## I.    Qiwi's Platform

Qiwi operates a "network of electronic wallets" and physical "terminals and kiosks" that let merchants and consumers make instant payments in Russia, Kazakhstan, Moldova, Belarus, and other countries.  Qiwi's American Depository Shares are traded on the NASDAQ.

Qiwi's customers use a product called Qiwi Wallet to make and receive online payments. Almost 11,000 merchants are accessible to customers through the Qiwi Wallet system.  To open an "anonymous" Qiwi Wallet, customers only need a phone number.  Prior to July 2019, Qiwi's customers could make cash payments and withdrawals from "anonymous" e-wallets through Qiwi's physical distribution networks.

Qiwi also owns and controls Qiwi Bank JSC ("Qiwi Bank"), which is the platform for Qiwi Wallet.  When a customer puts cash into a Qiwi Wallet account, Qiwi Bank issues virtual and physical cards to the customer.  Qiwi Bank also operates a money remittance system that provides transfer services to individuals and entities.  A bank account is not required to participate in that system.  Qiwi's money remittances services include payouts of winnings to customers from sports gambling merchants.

The Central Bank of the Russian Federation ("CBR"), which regulates all financial markets in Russia, has issued a banking license for Qiwi Bank.  Qiwi is required to comply with the CBR's reporting and recordkeeping rules and is subject to routine and spontaneous CBR audits.

In Russia, any bookmaker licensed by the Russian tax service can engage in interactive betting.  Among other requirements, online bookmakers must be a member of a self-regulatory organization ("SRO").

The SROs control the Russian bookmaking industry and engage in regulatory oversight. But gambling transactions must be accepted through a centralized financial processing system called a TSUPIS. The basic function of a TSUPIS is to transfer money between bettor and bookmaker accounts.

The TSUPIS system also allegedly protects consumers against criminal and fraudulent gambling activities. For example, to place legal bets, bettors must verify their identity, including their Russian citizenship and age, for the bookmaker and the TSUPIS. As of July 3, 2019, Russian law permitted bookmakers to accept interactive bets from bettors identified through a TSUPIS. A TSUPIS records and transmits information about bettors and their bets to SROs.

There are three TSUPIS in Russia, and Qiwi Bank operates one of them, TSUPIS-2, as a joint project with the Association of Bookmakers SRO ("Bookmakers SRO"). To register with the TSUPIS-2 system, bettors go to the Qiwi website and create a wallet. Qiwi Wallet is the only available payment method for TSUPIS-2.

During the class period, online betting generated significant revenue for Qiwi. Plaintiff alleges that Qiwi captured nearly half of the legal bookmaking market. Qiwi generated revenue from that market by charging percentage fees for deposits and prize winnings and by making commissions on payments between bookmakers and banks. Qiwi's income on payment processing fees was allegedly thirty-five to forty percent of its revenue in 2018. At the end of 2019, revenue derived from the betting industry amounted to more than a third of Qiwi's total revenue.

Plaintiff alleges that the individual defendants knew about Qiwi's revenue streams and the significant amount that online gambling contributed to Qiwi's business. For example, during an earnings call for the fourth quarter of 2018, defendant Karavaev, who at the time was Qiwi's

Chief Financial Officer ("CFO"), said that the betting business was "[h]alf of [the] payment services business."  Plaintiff alleges that other defendants made comments on later earnings calls suggesting that online gambling was a significant part of Qiwi's business.

## II.    Russia's Regulation and Enforcement Actions Between 2013 and 2020

Plaintiff alleges that beginning as early as 2013, Russia started cracking down on Qiwi and other online gambling businesses like it that facilitate payments – especially anonymous ones – to betting sites.

In September 2014, for example, the CBR inspected Qiwi Bank and discovered a number of violations of Russia's National Payment System ("NPS") Law, "including certain CBR reporting obligations and failing to comply with statutory thresholds for electronic money transfers."  The CBR issued an order requiring Qiwi to rectify these violations.  At the time, a Goldman Sachs analyst opined that "Qiwi's customer identification process may not be fully in accord with the new regulation for person-to-person transfers, which could raise compliance risks."  Also around this time, a former employee of Qiwi publicly alleged that Qiwi's kiosks were used for advanced money-laundering mechanisms which exploited loopholes in existing anti-money laundering legislation.

In March 2015, despite Qiwi telling investors that it had rectified the earlier identified violations and did not have to pay a fine, Qiwi "received an order from the CBR prescribing Qiwi Bank to comply with applicable e-payment threshold requirements in connection with electronic money transfers and the topping up of electronic accounts."  Although there was no specific regulation for how much cash could be transacted at a kiosk, the CBR fined Qiwi for failing to control its users' use of the kiosks.

Between October 2015 and July 2016, the Russian Federal Service for Supervision of Communications, Information Technology and Mass Media began cracking down on unlicensed gambling and lottery websites, including sports betting portals, shutting down over 6,000 such websites. In July 2016, a Russian government agency sent Qiwi a cease-and-desist letter ordering Qiwi to stop linking to these unlicensed sites and permitting money transfers to bookmakers. Qiwi complied. The president of the Bookmakers SRO allegedly said in response that if the government agency "made such a decision, then [Qiwi] had violations." Even though Russian bookmaking experts thought that the threat of further sanctions would force Qiwi to exert greater control over illegitimate transactions, plaintiff alleges that some bookmakers looked for loopholes in the Qiwi system that would allow for transfers to illegal companies. Plaintiff alleges that Qiwi did not close those loopholes because doing so would have resulted in losses to Qiwi's revenue.

In November 2017, the Russian Duma passed a law banning money transfers to illegal bookmakers. That law required credit institutions to decline cross-border money transfers to illegal bookmakers for gambling. Faced with that new regulatory scheme, Russian banks were allegedly unwilling to handle any international gambling transactions for any offshore gambling sites, whether blacklisted or not. But plaintiff alleges that Qiwi did not take action to stop bookmakers from withdrawing offshore funds. And illegal offshore bookmakers allegedly found ways to continue using Qiwi Wallet.

Plaintiff alleges that instead of stopping illegitimate gambling operators from accessing Qiwi Wallet, Qiwi simply advised investors in its Form 20-F Annual Report filed on March 28, 2018 ("2017 20-F") that its system has "been and may continue to be used for fraudulent, illegal or improper purposes" and that Qiwi Bank has "been the subject of CBR investigations in the

past that have uncovered various violations and deficiencies in relation to, among other things, reporting requirements, anti-money laundering, cybersecurity, compliance with applicable e-payments thresholds requirements in connection with electronic money transfers and the topping up of electronic accounts and other issues."  Qiwi also warned that the perceived risk of illegal activity on the Qiwi platform was "causing . . . regulators to impose restrictions on . . . operations" and that Qiwi was "recently notified that in 2018 Qiwi Bank will be subject to a CBR inspection as part of the ongoing supervisory process."  Qiwi admitted that it needed "to implement enhanced processes, procedures and controls in order to provide reasonable assurance that we are operating in compliance with applicable regulatory requirements."

In Qiwi's August 2018 Form 6-K announcing its second quarter 2018 financial results, Qiwi made a similar disclosure that Qiwi Bank "is subject to extensive regulation and reporting obligations, which may . . . increase the . . . costs of doing business."  Qiwi also noted that "Qiwi Bank has been the subject of CBR investigations in the past that have uncovered various regulatory violations and deficiencies, which the Group has generally rectified."  For example, in an interview on April 4, 2018, defendant Solonin, who co-founded Qiwi and served as its CEO from October 2012 through January 15, 2020, said that Qiwi "constantly interact[s] with law enforcement agencies and provide[s] them with tools to track transactions and calculate unscrupulous counterparties in the system."

On March 18, 2019, Russian authorities banned cash withdrawals from anonymous wallets.  Ten days later, Qiwi noted in its Form 20-F Annual Report for 2018 that "Russian lawmakers and enforcement agencies . . . recently demonstrated increased scrutiny [of] . . . e-payments."  Qiwi admitted that it "need[ed] to implement enhanced processes . . . to provide

reasonable assurance that [Qiwi] [was] operating in compliance with . . . regulatory requirements."

In July 2019, the Russian Duma adopted a law prohibiting "bank payment agents from using a remote [cash register] in payment terminals."  Solonin said that the requirements would "have an insignificant effect on Qiwi's business" because they "may affect small paying agents in remote parts of Russia, where business margins are low."  That month, the upper body of the Russian assembly also approved changes to the NPS law that would prevent anonymous e-wallets, including anonymous Qiwi Wallets, from being replenished in cash through payment terminals and without bank accounts.  Qiwi's representatives stated that the effect on its business would be small because "the vast majority of [Qiwi] users" were identified and Qiwi had limited the maximum balance and transactional volume for anonymous wallets.  However, representatives from the largest e-payment system in Russia, Yandex.Money, asserted that the relevant changes in the law would "negatively affect the income of electronic money operators" like Qiwi.

The ban on cash withdrawals from anonymous e-wallets became law on September 15, 2019.  Starting on August 3, 2020, holders of Russian e-wallets could not anonymously deposit cash to their accounts through certain physical terminals and offices without identifying themselves and linking a bank account to the wallet.  Qiwi responded that the change in the law was "unlikely to [have] a direct and significant impact on the business."

In AML regulation 374-P, the CBR listed "signs of questionable transactions," including "withdrawals from money cards."  In February 2020, the CBR updated this regulation for the first time in eight years.  Plaintiff alleges that this regulation put Qiwi on notice of the types of transactions the CBR considered questionable.

On April 1, 2020, amendment N 325-FZ to Russia's tax code took force, requiring banks to provide the Federal Tax Service "with information on opening or closing personalized e-wallets that had undergone simplified or full identification."  Plaintiff alleges that Qiwi did not obtain the requisite identification information from money card holders before they transferred their winnings to e-wallets on its platform, in violation of the tax code.

Additionally, plaintiff alleges that the CBR had, throughout the entire period at issue, "Know Your Client" instructions rooted in Russian anti-money laundering legislation. Plaintiff alleges generally that Qiwi failed to comply with these instructions by not adequately identifying its customers, thereby permitting "Western banks" to channel money to e-wallets for "Western customers" on Qiwi's platform.

Plaintiff alleges that defendants tracked Qiwi's financial metrics and were therefore aware of the negative impacts that increased regulations would have on Qiwi's business. Although Qiwi's SEC filings noted the risks of regulatory non-compliance and of a potential CBR audit, defendants allegedly failed to disclose that those risks and negative impacts on business from regulations had materialized.

Indeed, the CBR began auditing Qiwi in July 2020, though plaintiff alleges that defendants were aware of this audit even earlier since it had been "scheduled . . . with Qiwi in advance."  Qiwi did not disclose that the CBR was conducting an audit.

On July 20, 2020, after the markets closed, defendants announced a secondary public offering through which major shareholders of Qiwi would sell millions of shares.  Qiwi's share price fell 9.9% on July 21, the next trading day, following the announcement.  Plaintiff alleges that this was because the prospect of insiders selling significant stakes in the company indicated

"undisclosed problems."  Due to this negative reaction, Qiwi canceled the secondary public

offering on July 22, blaming "market conditions."  Qiwi's share price then rose 8.8%.

On August 20, 2020, Qiwi disclosed that active Qiwi Wallet accounts had declined from

21.8 million to 20.9 million.  Qiwi explained that the decrease in accounts "was mainly the result

of the introduction of new restrictions on the use of anonymous wallets," "expanding the client

verification procedure" to comply "with regulatory requirements," and an extension of the period

after which Qiwi turns off an inactive wallet.  Defendant Protopopov also assured investors that

"unidentified wallets have very little effect on turnover and occupy an insignificant part in the

structure of [Qiwi's] product."

Plaintiff alleges that by fall 2020, Russia was considering new regulations that would

create a single "Unified Interactive Bets Accounting Center" ("ETSUP") that would replace

TSUPISs.  Plaintiff further alleges that for Qiwi to become the ETSUP, Qiwi had to "fully

comply[] with the CBR's regulations."

Plaintiff asserts that while the CBR audit – which Qiwi had not disclosed – was ongoing,

defendants continued to represent to investors that "Qiwi had remedied past regulatory

violations, that it had the processes, procedures, and controls to profitably operate in the legal

online betting space, and that regulatory scrutiny provided growth opportunities, including the

possibility of becoming the single ETSUP, because it was aligned with regulators in combatting

illegal bookmakers."

Defendant Korzh joined Qiwi as CFO of Qiwi Bank in August 2020.  On December 1,

2020, Korzh became CFO of Qiwi.  Eight days later, Qiwi disclosed for the first time that the

CBR had "performed a routine scheduled audit" of Qiwi Bank "for the period of July 2018 to

September 2020."  Defendants disclosed that the CBR "identified certain violations and

deficiencies relating primarily to reporting and record-keeping requirements," and the CBR fined Qiwi approximately $150,000.  In addition, defendants disclosed that "CBR introduced certain restrictions with respect to Qiwi Bank's operations, including, effective from December 7, 2020, the suspension or limitation of most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts."  Qiwi explained that had those restrictions been in effect for the nine-month period ending on September 30, 2020, about thirty-three to forty percent of net revenue from the payment services segment would have been negatively affected.

Following these disclosures, Qiwi's stock price declined 20.6%.  Korzh resigned three months later.  Plaintiff also alleges that Qiwi's regulatory violations jeopardized Qiwi's bid to become the ETSUP.

Because Qiwi failed to pass the CBR's routine audit, plaintiff alleges that Qiwi's regulatory compliance was deficient and defendants' statements that Qiwi had "remedied" earlier violations and would not "be in breach of [regulatory] requirements going forward" and that new regulations would "be basically positive for [Qiwi]" were false.  Plaintiff also alleges that defendants made statements about the possible risk of a CBR audit while failing to tell investors that that risk had materialized.  From the start of the audit in July 2020 to the disclosure of the audit on December 9, 2020, defendants had two quarterly calls and issued thirteen public filings or press releases without mentioning the audit.

## III.    Procedural Background

Dale Ochakoff filed the original complaint in this case on December 11, 2020.  In 2021, Magistrate Judge Pollak granted a motion to consolidate this case with a related action and appointed Moset as the lead plaintiff.

On July 9, 2021, Moset filed an amended complaint bringing two causes of action against defendants.  *First*, plaintiff alleged that all defendants violated Section 10(b) of the Exchange Act and Rule 10(b)-5 by preparing, disseminating, or approving misleading statements that caused Moset and other class members to buy Qiwi securities at artificially high prices.  *Second*, plaintiff alleged that the individual defendants violated Section 20(a) of the Exchange Act because they were "controlling persons" at Qiwi who had the power to and did influence and control Qiwi's decision to disseminate misleading statements.  Plaintiff sought compensatory damages on behalf of itself and the other class members.

Defendants Qiwi and Protopopov moved to dismiss the complaint.  On November 3, 2023, the Court granted defendants' motion and dismissed the first amended complaint against all defendants.  On consent, plaintiff filed a second amended complaint on December 21, 2023, bringing the same claims but with additional factual allegations.  Defendants (all defendants but Korzh) filed the present renewed motion to dismiss.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Rule 12(b)(6), a court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." Lotes Co., Ltd. v. Hon Hai Precision Indus. Co., 753 F.3d 395, 403 (2d Cir. 2014) (quoting Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010), abrogated on other grounds, Lexmark Intern., Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014)).  To avoid dismissal, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the allegations in the complaint are true."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted).  The complaint, in other words, must plead "enough facts to state a claim to relief that is plausible on its face."

Id. at 570.  Although the plausibility standard "is not akin to a 'probability requirement,'" it requires "more than a sheer possibility that a defendant has acted unlawfully."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 556).

A complaint alleging securities fraud must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") by "stating with particularity the circumstances constituting fraud." ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009) (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)).  To satisfy these requirements, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 94 (2d Cir. 2018) (quoting Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 305 (2d Cir. 2015)).  The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u-4(b)(2)).

At the motion-to-dismiss stage, a court may consider only (i) the complaint itself, (ii) documents either attached to the complaint or incorporated in it by reference, (iii) documents the plaintiff relied on and knew of when bringing suit, and (iv) matters in the public record that are subject to judicial notice.  See, e.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007); Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004); Leonard F. v. Israel Disc. Bank of New York, 199 F.3d 99, 107 (2d Cir. 1999).

**DISCUSSION**

I.    **Section 10(b) Claims**

Plaintiff's second amended complaint still does not adequately plead a claim under Section 10(b) of the Exchange Act or under Rule 10b-5.

Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  In turn, Rule 10b-5 implements this section by making it unlawful "for any person, directly or indirectly . . . [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.

To state a claim under these provisions, "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."  Setzer v. Omega Healthcare Inv'rs, Inc., 968 F.3d 204, 212 (2d Cir. 2020) (quoting ATSI Commc'ns, Inc., 493 F.3d at 105).  Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  Tellabs, 551 U.S. at 319 (citation omitted); see Setzer, 968 F.3d at 212.

As explained below, plaintiff's claims are deficient because the second amended complaint does not adequately plead that defendants made misstatements or omissions of material fact or that they acted with scienter.

A.    **Plaintiff has not adequately pleaded materially false statements or omissions.**

The second amended complaint does not adequately plead any actionable misstatements or omissions.

13

Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). A statement is misleading when "a reasonable investor would have received a false impression from the statement." In re Inv. Tech. Grp., Inc. Sec. Litig., 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017) (quoting Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010)). Statements are actionable under Rule 10b-5 only if they were "false when made" and do not qualify as mere "optimistic statements or puffery." Stratte-McClure v. Morgan Stanley, 784 F. Supp. 2d 373, 383 (S.D.N.Y. 2011) (citing Rombach, 355 F.3d at 174). In addition, to be actionable, a misstatement must be "material," meaning that there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231–32 (1988)).

Omissions are actionable under Section 10(b) and Rule 10b-5 only when a defendant is subject to an underlying duty to disclose the omitted information. Levitt v. J.P. Morgan Sec., Inc., 710 F.3d 454, 465 (2d Cir. 2013) (citing Basic, 485 U.S. at 239 n.17). In other words, Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 239 (2d Cir. 2016) (citation and quotation marks omitted). Rather, a duty to disclose arises when new information "renders prior public statements materially misleading," In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993), or when an actor "chooses, even without obligation, to speak" on a given issue or topic, In re Vivendi, 838 F.3d at 258 (emphasis omitted). If a company chooses to speak on a particular matter, the company has "'a duty to tell the whole truth,' 'even when there is no

existing independent duty to disclose information' on the issue or topic." Id. at 258 (quoting

Meyer v. Jinkosolar Holdings Co., Ltd., 761 F.3d 245, 250 (2d Cir. 2014)) (alterations omitted).

Plaintiff groups the second amended complaint's alleged misstatements and omissions

into three categories: (1) those "fraudulently conceal[ing] Qiwi's unlawful acts and record-

keeping deficiencies," (2) those "fraudulently misle[ading] investors [regarding] the strength of

Qiwi's internal controls and specific, then-existing regulatory risks, and (3) those "fraudulently

misle[ading] investors regarding] the impact of new and pending regulations."   None of these

sets of allegations provides a basis for liability in this case.

### 1. Plaintiff fails to plead with particularity that defendants made actionable statements based on alleged unlawful acts or recordkeeping deficiencies.

With respect to the first amended complaint, the Court ruled that plaintiff had failed to

identify any actionable statements regarding alleged unlawful acts by Qiwi or its customers

because "plaintiff has not identified any specific legal violations, the substance of those

violations, or the underlying conduct that led to the violations." Qiwi I, 2023 WL 7283619, at

*11. Similarly, the Court ruled that the FAC had not "plead[ed] any reporting or recordkeeping

violations with specificity because plaintiff does not allege what reporting or recordkeeping

requirements were violated, when, and in what ways." Id. at *12.

Plaintiff's second amended complaint adds only vague and conclusory allegations to

supplement this theory.  Plaintiff alleges that "[t]he CBR has 'Know Your Client' instructions,

which are rooted in the know-your-client requirements established by" Russian anti-money

laundering law.  This Know Your Client instruction allegedly "included obtaining a copy of an

ID, an address, and a place of employment as well as regular verifications through governmental

agencies."  Plaintiff alleges that "Western banks entered into an agreement with, and channeled

money to, Qiwi via money cards who then transferred the money to e-wallets for Western

15

customers," and that, because Qiwi "did not have information on who the money card holders were and thus did not know, and did not check," it violated the Know Your Client instruction. Plaintiff alleges that this failure to comply with the Know Your Client instruction led to derivative violations of amendments to Russian tax law, effective April 1, 2020, that required banks to provide the Federal Tax Service "with information on opening or closing personalized e-wallets that had undergone simplified or full identification."

Plaintiff fails to plead with particularity any violations of the CBR's "Know Your Client" instruction. The most glaring deficiency is that the second amended complaint also alleges that "[b]ecause Qiwi Bank is not a bank in the classical form, Qiwi does not have legal obligation to identify its customers." This statement is facially inconsistent with the allegation that the Know Your Client instruction imposed a legal requirement on Qiwi to identify its customers, which it had breached because it "did not know, and did not check, who [its] customer[s]" were. "Where a plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss." In re Columbia Tuition Refund Action, 523 F. Supp. 3d 414, 424 n.1 (S.D.N.Y. 2021); see, e.g., Steamfitters Loc. 449 Pension Plan v. AT&T Inc., No. 21-2698, 2022 WL 17587853, at *3 (2d Cir. Dec. 13, 2022) (complaint that contained "inconsistent and irreconcilable facts regarding the scale of alleged improper sales practices" failed to allege falsity with particularity). Though defendants identify the contradiction in their motion to dismiss, plaintiff's briefing fails to address this flaw in their pleadings at all.

Even setting aside this inconsistency, plaintiff's allegations about violations of the Know Your Client instruction remain insufficiently specific to satisfy the requirement that, "[w]hen a securities fraud claim is premised on the defendant's predicate violations of law, . . . the facts of

that underlying violation must be pled with particularity." Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 99 (2d Cir. 2021). Plaintiff has not alleged the contents of the Know Your Customer instruction, when those legal requirements took effect and how they may have evolved over the class period, which and how many "Western banks" Qiwi allegedly entered into agreements with, what those agreements constituted, and when and how many violative transactions occurred. Simply naming a law and generically averring that defendants breached it will not satisfy plaintiff's obligation to plead, with specificity, "*how* the alleged violation occurred." Danske Bank, 11 F.4th at 99.

Plaintiff also relies on two amendments to the Betting Law – one that took effect on July 22, 2020 and one merely "proposed" in March 2021. The first "prohibit[ed] bookmakers from accepting bets on non-sports events" and "prohibit[ed] 'dormant' licenses" by requiring "companies receiving a license [to] start operating within six months." The second proposed to restrict the ability of Russian credit institutions to contract with or facilitate processing payments for a blacklisted list of illegal, offshore gambling merchants. But plaintiff does not allege that Qiwi violated these amendments to the Betting Law; instead, plaintiff alleges that, *prior* to these amendments' passage or proposal, Qiwi lacked the internal processes in place to comply with them. To the extent plaintiff seeks to hold defendants liable for fraudulently concealing the extent to which Qiwi's violations of Russian law contributed to its profitability, plaintiff must plead that Qiwi actually violated the law as it existed at the time – not as it would evolve in the future. Cf. Diabat v. Credit Suisse Grp. AG, No. 23-cv-5874, 2024 WL 4252502, at *12 (S.D.N.Y. Sept. 19, 2024) ("Future developments cannot, as a purely logical matter, render statements misleading when made, and 'allegations that defendants should have anticipated

future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.'" (quoting Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000))).

Plaintiff's theory of liability relying on undisclosed violations of Russian law and regulatory requirements fails for an additional reason. Plaintiff still cannot surmount the principle that "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." City of Pontiac Policemen's & Firemen's Retirement Sys. v. UBS AG, 752 F.3d 173, 184 (2d Cir. 2014) (quotation marks and citation omitted).

Plaintiff again invokes the principle that liability can arise where "a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices." Plaintiff identifies repeated statements by defendants touting the importance of betting-related revenue to Qiwi's bottom-line. But plaintiff still "has not plausibly alleged with particularity that 'a material source of [Qiwi's] success is the use of improper or illegal business practices.'" Kiwi I, 2023 WL 7283619, at *14. Plaintiff points to the fact that, as a result of the CBR's audit identifying "violations and deficiencies relating primarily to reporting and record-keeping requirements," the CBR imposed restrictions on Qiwi's ability to conduct "most types of payments to foreign merchants and money transfers to pre-paid cards from corporate accounts" which Qiwi self-identified would have "negatively affected" "approximately 33% to 40%" of [its] Payment Services Segment Net Revenue." But the second amended complaint does not allege what the "violations and deficiencies relating primarily to reporting and record-keeping requirements" – notably, plaintiff does not allege "that the CBR audit determined that Qiwi's customers had engaged in illegal transactions." The estimated impact of the sanction CBR chose to impose going forward for violations of unspecified recordkeeping deficiencies is not a substitute for a detailed allegation regarding the

size of any supposed illegal activity engaged in by Qiwi or its customers and its relative importance to Qiwi's profitability.

       **2.**    **Plaintiff fails to plead with particularity that defendants fraudulently misled investors regarding the strength of Qiwi's internal controls and specific, then-existing regulatory risks.**

       **a.**    **Statements Regarding Qiwi's Internal Controls**

Plaintiff fails to plead that defendants' statements about the strength of Qiwi's internal controls were false.

Plaintiff takes issue with the statements in Qiwi's 2018 and 2019 20-F reports that "management concluded that . . . our internal control over financial reporting was effective." As the Court previously explained, Qiwi's management's views on the strength of the company's internal controls are statements of opinion.  Kiwi I, 2023 WL 7283619, at *13. These statements, therefore, are only actionable if the speaker does not "actually hold[] the stated belief," Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 184 (2015); or if the statement "contain[s] embedded statements of fact" that are not true, id. at 185; or if the opinion statement "omitted to state facts necessary to make its opinion . . . not misleading," id. at 186 (internal quotation marks omitted).

Plaintiff argues that these statements were misleading because they omitted crucial facts, thereby "lull[ing] investors into believing that Defendants had reviewed Qiwi's processes, procedures and internal controls and ensured that they met the reporting requirements for money transfers and they took into account the full scope of the Company's activities, including online betting, when that was false."  Specifically, plaintiff alleges that "despite remedying violations discovered during the 2018 CBR audit, Qiwi was still not meeting the CBR's basic reporting and record-keeping requirements related to obtaining and verifying customer identification records before transferring winnings to pre-paid cards"; that "Qiwi's lax reporting and record-keeping to

19

verify customer identities was obfuscating online betting transactions made through its payment system which violated the Betting Law"; and that, "as a result, Qiwi was at high risk of not being able to pass an audit by the CBR, being fined by the CBR, having its ability to make payments to foreign merchants and transfer money to pre-paid cards restricted by the CBR, and no longer being in a prime position to process all electronic bets in Russia."

As before, plaintiff's reliance on managements' statements regarding the strength of Qiwi's internal controls fails because "plaintiff does not plead with particularity what reporting or recordkeeping controls were allegedly ineffective, when, or in what way." Kiwi I, 2023 WL 7283619, at *12. Plaintiff does not plead what these CBR requirements related to obtaining and verifying customer identification records were.  And it can only speculate that Qiwi would already have known it was out of compliance as of the dates of the 2018 and 2019 20-F reports, and that those requirements were even the reason it failed the CBR's July 2020 audit.  At bottom, plaintiff still attempts to reason backwards from the fact of the failed audit that management's prior belief in the strength of their internal controls was fraudulent, as opposed to merely wrong. Because plaintiff cannot point to contemporaneous facts, omitted by management, that would have showed at the time that Qiwi's optimistic view was likely misplaced, management's statements of opinion about the strength of Qiwi's internal controls are not actionable.

### b.      Failure to Disclose the 2020 CBR Audit

Plaintiff fails to plead with particularity that defendants' failure to disclose the existence of the 2020 CBR audit prior to December 9, 2020 rendered any of defendants' statements materially misleading.

As the Court previously explained, "[b]ecause Qiwi was not obligated to disclose 'uncharged, unadjudicated wrongdoing,' defendants were not required to inform investors that the CBR was performing a routine audit that had not yet charged Qiwi with misconduct."  Id. at

*14.  Instead, disclosure of the audit would have been required "only . . . to make statements made, in the light of the circumstances under which they were made, not misleading."  Id.

Plaintiff argues that the existence of the audit rendered misleading two groups of statements.  *First*, plaintiff identifies Qiwi's statement in the July 20, 2020 prospectus announcing its SPO that in 2018, "Qiwi Bank underwent a major scheduled audit by the CBR as part of its ongoing supervisory process, which resulted in CBR identifying a number of violations and imposing certain sanctions" but that Qiwi "believe[s] that we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward."  This statement was also contained in Qiwi's 2018 and 2019 20-F filings, filed on March 28, 2019 and March 24, 2020 respectively.[2]  Plaintiff argues that this statement was misleading because "Qiwi was *currently* the subject of a CBR audit," and Qiwi knew that the CBR audit would uncover the fact that Qiwi lacked "the processes, procedures, and controls to identify customers who were transferring money into anonymous e-wallets pursuant to the July 26, 2019 amendment to the NPS Law in force on August 3, 2020."  *Second*, plaintiff identifies statements made by defendants Protopopov and Kim during Qiwi's Q3 and Q4 2020 earnings calls "relating to the impact of pending 'legislative' or 'regulatory initiatives' in Russia."  Plaintiff argues that these statements were misleading because they "continued to conceal the ongoing CBR audit – which was having an immediate regulatory impact and undercutting the strength of Qiwi's application to be the sole TSUPIS."

---

[2] The Court previously determined that the statements in the July 20 prospectus and the 2018 and 2019 20-F filings were not actionable because plaintiff had not alleged the audit was ongoing at the time of those statements. Plaintiffs second amended complaint rehabilitates the July 20 prospectus by alleging that the audit had begun "by July 20", but offers only speculation that defendants must have known about the audit in advance as of the 2018 and 2019 20-F filings.  This is an independent reason those later statements are not actionable.

Plaintiff has not pleaded with particularity that either of these sets of statements were misleading by virtue of the ongoing CBR audit.  Namely, as already explained, plaintiff has not pleaded the existence of any *specific* reporting or recordkeeping deficiencies at Qiwi existing during the audit at all, and certainly none that defendants knew of in advance.  Once again, plaintiff never alleges that the CBR audit determined Qiwi customers were engaged in any illegal activity, whether in violation of the July 26, 2019 amendment to the NPS Law or otherwise.  And because of that, there is no basis from which to infer that defendants Protopopov and Kim knew of such violations when discussing the Q3 and Q4 2020 earnings results such that the audit represented an "immediate regulatory impact" or posed any risk to Qiwi's bid to become the sole TSUPIS.

What's more, the July 20 prospectus (and 2018 and 2019 20-F reports) contained explicit language warning that "[t]he CBR may at any time conduct full or selective audits of any bank's filings and may inspect all of its books and records," and that

> there can be no assurance that additional sanctions will not be imposed on us as a result of such or any other findings and that we will not come under greater CBR scrutiny in connection with any perceived deficiencies in our past conduct, or that *any currently planned* or future inspections will not result in discovery of any significant or minor additional violations of various banking regulations, and what sanctions the CBR would choose to employ against us if this were to happen.

In other words, Qiwi disclosed, concurrently with the statements that plaintiff challenges, that (1) Qiwi Bank could at any time be subject to audit, (2) both "currently planned" as well as "future" audits could result in discovery of recordkeeping and reporting violations, and (3) the CBR's resulting sanctions were unpredictable.  In light of these specific warnings about the constant risk of CBR audit, no reasonable investor would have understood the statement that Qiwi "believe[s] that we have remedied the violations and taken appropriate measures to ensure that we will not be in breach of such requirements going forward" as a guarantee that CBR

audits, both "currently planned" and "future," would not uncover any further noncompliance. See In re Telefonaktiebolaget LM Ericsson Sec. Litig., 675 F. Supp. 3d 273, 292–94 (E.D.N.Y. 2023) (concluding that "ubiquitous warnings to investors regarding the possibility of future compliance failures and investigations" rendered "statements regarding the resolution of [governmental] investigations and improvements to [defendant's] compliance program" inactionable), aff'd sub nom., Boston Ret. Sys. v. Telefonaktiebolaget LM Ericsson, No. 23-940, 2024 WL 4023842 (2d Cir. Sept. 3, 2024); Sandoz v. Waterdrop Inc., No. 21-cv-7683, 2023 WL 1767526 (S.D.N.Y. Feb. 3, 2023) (concluding that a registration statement's failure to disclose an ongoing investigation was not a material omission where the same statement "explicitly warned investors that [defendant] had been under investigation by [industry regulators] and likely would be again"), aff'd sub nom., Mi v. Waterdrop Inc., No. 23-301, 2024 WL 159191 (2d Cir. Jan. 16, 2024).

### 3.    Plaintiff fails to plead with particularity that defendants fraudulently misled investors regarding the impact of new and pending regulations.

Plaintiff has not pleaded that opinions expressed by defendants Solonin and Kim regarding the anticipated impact of new or pending regulations were false.  Plaintiff challenges two of the same statements identified by the first amended complaint: (1) defendant Solonin's response to a question about a draft bill on an earnings call that "any new regulation rules will be basically positive for us," and (2) in a comment about the proposal to create an ETSUP, defendant Kim's statement that Qiwi had "a chance to be the single TSUPIS."

Plaintiff argues that Solonin's statement was misleading because the specific draft bill referenced by Solonin hurt Qiwi by "reduc[ing] the number of merchants with whom Qiwi could transact and receive related revenue."  However, plaintiff's second amended complaint does not allege the contents of, or anticipated impact of, the specific draft bill contemplated in May 2019;

instead, plaintiff points to the impacts of a draft bill introduced nearly two years later by the Russian legislature, in March 2021. The second amended complaint is silent about how this later bill compared to the bill contemplated in 2019 and referenced by Solonin and thus fails to allege any facts, known contemporaneously to Solonin, that would have rendered his opinion meaningfully misleading when made. Plaintiff also argues that Solonin's statement represented an opinion that *all* regulation that would or could be introduced by any Russian regulator at any point in the future would be a positive for Qiwi. No reasonable investor could have reasonably understood Solonin to be expressing such a sweeping opinion, nor would any such reliance have been reasonable considering the constant warnings from Qiwi throughout the class period expressing uncertainty about the ever-changing regulatory environment. And, as discussed above, plaintiff still has not pleaded with particularity the substance of any supposed legal violations or defective procedures and processes at Qiwi known to defendants.

Similarly, defendant Kim's statement about Qiwi having "a chance to become the single TSUPIS" is not actionable because, in context, that statement is a non-actionable expression of optimism and because plaintiff has not pleaded knowledge by Kim of any contrary facts that would render it misleading. In the very same earnings call – indeed, in the same answer – that the supposedly misleading statement was made, Kim also repeatedly expressed caution as to Qiwi's chances at becoming the single TSUPIS, stating, among other things, that it was "very early to predict any material effect [from the change to a single TSUPIS] on QIWI business," that "the situation is changing and becoming more uncertain," and that it was "difficult to predict" whether the anticipated change would occur. See Omnicare, Inc., 575 U.S. at 190 (statements must be considered "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information").

**B.      Plaintiff has not adequately pleaded scienter for any defendant.**

To state a claim under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), which in the context of Section 10(b) and Rule 10b-5 is "an intent to deceive, manipulate or defraud," Ganino v. Citizens Utilities Co., 228 F.3d 154, 168 (2d Cir. 2000) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)).  That *mens rea* can be established through proof of either intent or recklessness.  See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc., 531 F.3d 190, 194 (2d Cir. 2008).

Since plaintiff must allege facts supporting a "strong inference" of scienter, it is not enough to "allege facts from which an inference of scienter rationally could be drawn." Tellabs, 551 U.S. at 323 (emphasis omitted).  Rather, the inference of intent to defraud "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 314. Because "[t]he strength of an inference cannot be decided in a vacuum," id. at 323, a court must consider "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged," id. at 314.  The critical question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets th[e] standard."  In re Magnum Hunter Res. Corp. Sec. Litig., 26 F. Supp. 3d 278, 291–92 (S.D.N.Y. 2014) (citing Tellabs, 551 U.S. at 322–23).

Scienter can be established by "alleging facts to show that defendants had both motive and opportunity to commit fraud, or . . . by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  Ganino, 228 F.3d at 168–69 (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).  Plaintiff has not done either.

25

The second amended complaint does not add any new allegations that bear on the defendants' motive and opportunity to commit fraud.  Instead, to show motive, plaintiff relies on the allegations, repeated from the first amended complaint, that defendants Kim and Solonin registered shares for sale in an SPO announced on July 20, 2020 that they then withdrew after two days following a drop in the market price.  In the prior order ruling on defendants' first motion to dismiss, the Court explained why this listing of shares did not suggest a motive to profit from fraud that was "at least as compelling as any opposing inference of nonfraudulent intent," Tellabs, 551 U.S. at 314, when considered in light of the complaint's other allegations. The Court adheres to and incorporates that analysis here.

Similarly, plaintiff's allegations regarding defendants' conscious behavior or recklessness are largely recycled from the first amended complaint.  Conscious misbehavior or recklessness can be established through allegations of "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted).  A plaintiff must, as a general matter, "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements."  Id. (citation omitted).  Scienter may then be inferred because "defendants knew or . . . should have known that they were misrepresenting material facts related to the corporation."  Id. (citation omitted).

Plaintiff fails to plead scienter because plaintiff has not alleged that any individual defendant had knowledge of facts or access to information that contradicted their public statements.  Once again, plaintiff has failed to specifically identify "any reports or statements that contained contrary information to which defendants allegedly had access."  Instead, plaintiff

argues that various pieces of publicly available information about Qiwi's operations known to defendants, in combination with the eventual revelation of the purported fraud following the 2020 CBR audit, are enough circumstantial evidence to permit the Court to draw an inference of defendants' knowledge.  But none of these allegations renders an inference of scienter "at least as compelling as any opposing inference of nonfraudulent intent."  Tellabs, 551 U.S. at 314.

With respect to the prospect of illegal transactions occurring via Qiwi's payment systems platform, plaintiff argues that defendants "knew or should have known illegal transactions were taking place . . . based on" public reporting about enforcement actions its competitors Skerbank and Yandex.Money were taking to crack down on suspect transfers on their respective systems. Allegations that defendants knew (from public reporting) about illegal transfers that may have been taking place on *other* companies' platforms do not substitute for allegations that defendants knew about illegal transactions taking place at Qiwi.  Cf. Ret. Bd. of Policemen's Annuity & Benefit Fund of Chi. v. FXCM Inc., 767 F. App'x 139, 142 (2d Cir. 2019) (fact that competitors judged the risks posed by a potential government action differently than defendant "cannot itself raise a strong inference of scienter").

With respect to Qiwi's internal controls, plaintiff argues that pre-class period investigations by CBR and resulting sanctions in 2013, 2014, and 2015 "demonstrate that Defendants knew or should have known that" Qiwi had inadequate internal controls at the start of the class period.  Plaintiff's allegations regarding these prior investigations and the violations they uncovered are threadbare.  Plaintiff provides no detail about the violations discovered in 2013, and only gestures towards the 2014 and 2015 violations being related to Qiwi's customers' use of kiosks – plaintiff does not allege that the CBR's 2020 audit charged Qiwi with violations of any rules or regulations that were also at issue in any of these prior investigations.  Nor does

plaintiff point to anything beyond the mere fact of the violations themselves to suggest that the individual defendants knew such violations had not been remedied from the time of the previous investigations.

Finally, with respect to defendants' statements regarding the impact of new and pending regulations, plaintiff argues that defendants' "ability to speak knowledgeably" on the issue supports an inference that they possessed knowledge that what they were saying was false.  For much the same reasons plaintiff failed to plead falsity, plaintiff likewise fails to plead scienter. See In re Sanofi Sec. Litig., 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015) ("[W]here plaintiffs allege a false statement of opinion, the falsity and scienter requirements are essentially identical because a material misstatement of *opinion* is by its nature a false statement, not about the objective world, but about the defendant's own belief." (quotation marks and citation omitted)). Defendants' statements of optimism regarding the anticipated impact of new regulations and the chances of Qiwi becoming the single TSUPIS do not raise an inference of scienter because plaintiff has not alleged any facts known to defendants that would have rendered those statements false or misleading when made.

Three final points bear on scienter, for which the Court adopts the reasoning set forth in the prior opinion.  *First*, "the numerous warnings about regulatory compliance, audits, and online gambling that defendants included in Qiwi's filings undercut any inference of fraudulent intent pertaining to the statements that plaintiff highlights." Kiwi I, 2023 WL 7283619, at *18.  *Second*, plaintiff has not sufficiently alleged that the core operations doctrine – which "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business," Das v. Rio Tinto PLC, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018) (citation omitted) – applies to the betting transactions targeted by CBR.  And even if

plaintiff had made sufficient allegations to that effect, "the totality of circumstantial evidence still does not give rise to an inference of fraudulent intent that is at least as compelling as an opposing inference of negligence." And *third*, because plaintiff has failed to identify any fraudulent statements at all, let alone any "dramatic" ones, plaintiff has also failed to allege corporate scienter on the part of Qiwi.

## II.    Section 20(a) Claims

Because plaintiff fails to adequately plead a primary violation of the Exchange Act, its claims of control-person liability under Section 20(a) are dismissed. See ATSI Commc'ns, Inc., 493 F.3d at 108.

## III.    Leave to Amend

Plaintiff's request for leave to amend a third time is denied. "District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)." ATSI Commc'ns, Inc., 493 F.3d at 108. Because the deficiencies in plaintiff's second amended complaint largely mirror those that the Court identified in the first amended complaint, the Court finds that "granting [further] leave to amend is unlikely to be productive." Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993).

**CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss plaintiff's second amended complaint is granted.[3]  Further leave to amend is denied.  The Clerk of Court is respectfully directed to enter judgment and to close the case.

SO ORDERED.

_/s/  Brian M. Cogan_
BRIAN M. COGAN
United States District Judge

Dated:  November 16, 2025
        Brooklyn, New York

---

[3] Although defendant Pavel Korzh has not yet appeared in this action, because plaintiff's claims against Korzh are substantially the same as their claims against the other individual defendants that have moved to dismiss, plaintiff's claims are dismissed against Korzh as well.